IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Chicago Police officer SHANNON SPALDING; <br> Chicago Police Officer DANIEL ECHEVERRIA | ) <br> ) <br> ) | |
| Plaintiffs, | ) <br> ) | |
| v. | ) <br> ) | Case No. |
| CITY OF CHICAGO, an Illinois Municipality <br> Chicago Police Chief JUAN RIVERA; Chicago <br> Deputy Chief of Police DEBRA KIRBY; Chicago <br> Police Sergeant JAMES PADAR; Chicago Police <br> Commander JAMES O'GRADY, Chicago Police <br> Commander NICHOLAS ROTI; Chicago Police <br> Deputy Superintendent JAMES JACKSON; <br> Chicago Police Lieutenant KEVIN SADOWSKI; <br> Chicago Police Lieutenant DEBRA PASCUA; <br> Chicago Police Commander ADRIAN STANLEY; <br> Chicago Police Sergeant MAURICE BARNES; <br> Chicago Police Lieutenant ROBERT CESARIO, <br> Chicago Police Commander JOE SALEME, | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Judge <br><br> Magistrate Judge |
| Defendants. | ) <br> ) | |

## ***COMPLAINT AT LAW***

NOW COME the plaintiffs, SHANNON SPALDING and DANIEL ECHEVERRIA, by and through their attorneys, Patrick J. Walsh and Daniel Q. Herbert, and present their Complaint at Law and in support thereof complain as follows:

## ***PARTIES TO THE ACTION***

1. Plaintiff City of Chicago Police Officer Shannon Spalding ("SPALDING") is, and at all times complained of herein was, a duly qualified peace officer employed by defendant CITY OF CHICAGO, an Illinois municipal corporation.

1

2. Plaintiff City of Chicago Police Officer Daniel Echeverria ("ECHEVERRIA") is, and at all times complained of herein was, a duly qualified peace officer employed by defendant CITY OF CHICAGO, a municipal corporation.

3. Defendant CITY OF CHICAGO is, and at all times complained of herein was, a municipality incorporated in the State of Illinois and a municipality within the State of Illinois.

4. Defendant City of Chicago Police Chief of Internal Affairs Juan Rivera ("CHIEF RIVERA") is, and at all times complained of was, a duly qualified peace officer employed by defendant CITY OF CHICAGO. CHIEF RIVERA assisted in creating and instituting the discriminatory and retaliatory policies complained of herein. CHIEF RIVERA is sued individually in his capacity as a Chicago Police Officer.

5. Defendant City of Chicago Police Chief Debra Kirby ("CHIEF KIRBY") is, and at all times complained of was, a duly qualified peace officer employed by defendant CITY OF CHICAGO. CHIEF KIRBY assisted in creating and instituting the discriminatory and retaliatory policies complained of herein. CHIEF KIRBY is sued individually in her capacity as a Chicago Police Officer.

6. Defendant City of Chicago Police Sergeant James Padar ("SERGEANT PADAR") is, and at all times complained of was, a duly qualified peace officer employed by defendant CITY OF CHICAGO. SERGEANT PADAR assisted in creating and instituting the discriminatory and retaliatory policies complained of herein. SERGEANT PADAR is sued individually in his capacity as a Chicago Police Officer.

7. Defendant City of Chicago Police Commander James O'Grady ("COMMANDER O'GRADY") is, and at all times complained of was, a duly qualified peace officer employed by defendant CITY OF CHICAGO. COMMANDER O'GRADY assisted in creating and instituting

the discriminatory and retaliatory policies complained of herein. COMMANDER O'GRADY is sued individually in his capacity as a Chicago Police Officer.

8. Defendant City of Chicago Police Commander Nicholas Roti ("COMMANDER ROTI") is, and at all times complained of was, a duly qualified peace officer employed by defendant CITY OF CHICAGO. COMMANDER ROTI assisted in creating and instituting the discriminatory and retaliatory policies complained of herein. COMMANDER ROTI is sued individually in his capacity as a Chicago Police Officer.

9. Defendant City of Chicago Deputy Superintendent James "Jimmy" Jackson ("DEPUTY SUPERINTENDENT JACKSON") is, and at all times complained of was, a duly qualified peace officer employed by defendant CITY OF CHICAGO. DEPUTY SUPERINTENDENT JACKSON assisted in creating and instituting the discriminatory and retaliatory policies complained of herein. DEPUTY SUPERINTENDENT JACKSON is sued individually in his capacity as a Chicago Police Officer.

10. Defendant City of Chicago Police Lieutenant Debra Pascua ("LIEUTENANT PASCUA") is, and at all times complained of was, a duly qualified peace officer employed by defendant CITY OF CHICAGO. LIEUTENANT PASCUA assisted in creating and instituting the discriminatory and retaliatory policies complained of herein. LIEUTENANT PASCUA is sued individually in her capacity as a Chicago Police Officer.

11. Defendant City of Chicago Police Commander Adrian Stanley ("COMMANDER STANLEY") is, and at all times complained of was, a duly qualified peace officer employed by defendant CITY OF CHICAGO. COMMANDER STANLEY assisted in creating and instituting the discriminatory and retaliatory policies complained of herein. COMMANDER STANLEY is sued individually in his capacity as a Chicago Police Officer.

12. Defendant City of Chicago Police Sergeant Maurice Barnes ("SERGEANT BARNES") is, and at all times complained of was, a duly qualified peace officer employed by defendant CITY OF CHICAGO. SERGEANT BARNES assisted in creating and instituting the discriminatory and retaliatory policies complained of herein. SERGEANT BARNES is sued individually in his capacity as a Chicago Police Officer.

13. Defendant ROBERT CESARIO ("CESARIO") is, and at all times complained of was, a duly qualified peace officer employed by defendant CITY OF CHICAGO. CESARIO assisted in creating and instituting the discriminatory and retaliatory policies complained of herein. CESARIO is sued individually in his capacity as a Chicago Police Officer.

14. Defendant City of Chicago Police Commander JOE SALEME ("SALEME") is, and at all times complained of was, a duly qualified peace officer employed by defendant CITY OF CHICAGO. SALEME assisted in creating and instituting the discriminatory and retaliatory policies complained of herein. SALEME is sued individually in his capacity as a Chicago Police Officer.

15. This is a civil action for damages to redress deprivations under the color of law of the rights, privileges, and immunities secured under the First and Fourteenth Amendments to the United States Constitution as well as the laws of the State of Illinois.

### *JURISDICTION AND VENUE*

16. This Court has original jurisdiction in this matter pursuant to Federal Question Jurisdiction, 28 U.S.C. § 1331, in that this is a civil action arising under the Constitution, laws or treaties of the United States.

17. This Court has supplemental jurisdiction over plaintiffs' state law claim pursuant to 28 U.S.C. § 1367(a).

18. Venue is proper in this district pursuant to 28 U.S.C. § 1391 (b)(1)(2) and (3), in that the defendants reside and may be found in this district and all of the events occurred in this district.

### *STATEMENT OF FACTS*

19. In 1996, SPALDING was appointed as a police officer with the CITY OF CHICAGO. She has an exemplary record and is a highly decorated officer.

20. In 1999, ECHEVERRIA, was appointed as a police officer with the CITY OF CHICAGO. He also has an exemplary record and has received numerous commendations between 1999 and 2010.

21. In 2000, F.B.I. Special Agent "K.S." called SPALDING and asked whether she had any knowledge of Watts engaging in illegal activity such as stealing money drug dealers or failing to inventory evidence.

22. Prior to 2006, CHIEF RIVERA had worked as a sergeant in the "Confidential" section of Internal Affairs Division. Upon information and belief, during that time CHIEF RIVERA knew that Watts had been the subject of allegations of misconduct.

23. In May 2006, PLAINTIFFS were transferred to the "Narcotics Division," Unit 189 based upon their exemplary work histories.

24. In 2006, while working an undercover narcotics investigation, PLAINITFFS uncovered evidence of illegal activity being committed by various Chicago Police Officers.

25. One of those officers was Sergeant Ronald Watts ("Sergeant Watts"), who they had witnessed robbing drug couriers and manufacturing a case against at least one confidential informant.

26. SPALDING recognized Sergeant Watts as the same person Special Agent K.S. had interviewed her about in 2002 when she was assigned in the public housing unit.

27. When SPALDING was interviewed in 2002, she was then unaware of any illegal activities perpetrated by Sergeant Watts or any other Chicago Police Officers.

28. In 2006, when ECHEVERRIA and Sergeant Watts worked in tact team at 002 District, Watts' office was located less than 30 feet from ECHEVERRIA'S office. Sergeant Watts regularly entered PLAINTIFFS' office and asked what they were working on.

29. PLAINTIFFS notified their superior Sergeant Roderick Watson of the criminal conduct in accordance with their duty to do so as found in their General Orders. Sergeant Watson told PLAINTIFFS that "we're not going to go there."

30. No one at the Chicago Police Department opened an investigation of Sergeant Watts or others pursuant to PLAINTIFFS' notification.

31. In or near April 2007, knowing that the Chicago Police Department had failed to open an investigation against Sergeant Watts, PLAINTIFFS contacted the Federal Bureau of Investigation and met with F.B.I. Special Agent "P.S." to discuss intelligence on Watts.

32. PLAINTIFFS continued to meet with Special Agent "P.S.," who was assigned to the bureau's public corruption unit, intermittently between April 2007 and August 2008 to discuss intelligence on Watts.

33. In August 2008, PLAINTIFFS met with F.B.I. special agents and then-Chicago Police Chief of Internal Affairs Tina Skahill ("Chief Skahill") to discuss intelligence on Watts. PLAINTIFFS were assured that their identities would remain confidential and not be compromised.

6

34. At that time, PLAINTIFFS were recruited jointly to work on Operation "Brass Tax" related to Watts and other Chicago Police Officers. They were immediately detailed to "Detached Services," Unit 543, and began reporting to F.B.I. headquarters.

35. PLAINTIFFS were told at the August 2008 meeting that they could expect to be promoted to sergeant at the conclusion of their involvement in the investigation.

36. CHIEF KIRBY knew of PLAINTIFFS' involvement in Operation Brass Tax and the assurances made to them by August 2008.

37. In August 2010, PLAINTIFFS submitted paperwork to COMMANDER O'GRADY, seeking approval of a confidential informant, or "C/I." After learning the application was submitted by PLAINTIFFS, he refused to approve it.

38. In August 2010, COMMANDER O'GRADY and COMMANDER ROTI attended a meeting of exempt personnel where PLAINTIFFS' identities and possible reassignment to Unit 189 were discussed. It was at that meeting where COMMANDER O'GRADY and COMMANDER ROTI first voiced that they would not allow PLAINTIFFS to work in any unit under them.

39. In August 2010, SERGEANT PADAR informed PLAINTIFFS in the presence of another witness that O'GRADY stated to him "you are not to work with those IAD rats, you are not to assist them and they are not to get any overtime."

40. Upon information and belief and prior to December 2010, CHIEF RIVERA was aware that Sergeant Watts was a friend and/or acquaintance of Deputy Chief Ernie Brown.

41. In or near December 2010, CHIEF RIVERA disclosed PLAINTIFFS' identities and roles in the Watts investigation to Deputy Chief Ernie Brown.

42. CHIEF RIVERA then told PLAINTIFFS that "Brown told everyone," including O'GRADY and they should expect to be on the "receiving end" of severe retaliation.

43. In or near late April 2011, Deputy Superintendent Beatrice Cuello ("Deputy Superintendent Cuello") called CHIEF KIRBY to confirm whether PLAINTIFFS were working on an undercover investigation and whether the paperwork was in place. CHIEF KIRBY denied even knowing PLAINTIFFS or knowing that PLAINTIFFS were involved with any investigation to create space between herself and the controversial investigation.

44. Based upon CHIEF KIRBY'S denials, Deputy Superintendent Cuello believed PLAINTIFFS had lied about their roles in the Watts investigation. It was then decided PLAINTIFFS should be kicked out of Unit 543.

45. On May 4, 2011, PLAINTIFFS were removed from Unit 543 by Deputy Superintendent James Jackson and detailed to the Educational and Training Division ("Police Academy"), Unit 044, in retaliation for having investigated fellow officers.

46. On May 21, 2011, PLAINTIFFS were "officially" detailed to the Inspection Division, Unit 126, under Chief Tina Skahill. However, PLAINTIFFS were immediately "borrowed" back to the police academy to be "in-car camera instructors" despite never having used an "in-car camera" throughout their careers. PLAINTIFFS were returned to the police academy in retaliation for having investigated fellow police officers.

47. Between May 5, 2011 and the end of July 2011, PLAINITIFFS were required to report daily to the police academy and spent much of the time in a small room without phones or radios and were effectively on "house arrest." This again was in retaliation for having investigated fellow officers.

8

48. PLAINTIFFS were then reassigned to an office shared with LIEUTENANT PASCUA in Unit 126. On August 16, 2011, LIEUTENANT PASCUA yelled "you should be back in IAD," to PLAINTIFFS in front of other officers thereby further compromising their identities.

49. LIEUTENANT SADOWSKI heard LIEUTENANT PASCUA yell at PLAINTIFFS, but rather than filing a complaint against LIEUTENANT PASCUA as required by General Orders, suggested to PLAINTIFFS that instead they file a complaint with the Commander and initiate a "CR Investigation."

50. On September 13, 2011, PLAINTIFFS attempted to file a complaint of retaliation with COMMANDER STANLEY during a meeting at Police Headquarters at 3510 South Michigan. After being told of the retaliation, STANLEY said, "I don't want to hear this, I don't want to know." PLAINTIFFS reminded COMMANDER STANLEY that General Order 93.3 required them to report retaliation and him to initiate a CR Investigation. He still refused.

51. On September 14, 2011, LIEUTENANT SADOWSKI told PLAINTIFFS he met with COMMANDER STANLEY about their concerns and that COMMANDER STANLEY refused to initiate a CR Investigation and said "just leave it alone."

52. By September 17, 2011 Chief Skahill had grown increasingly worried for PLAINTIFFS and ordered them to discuss the retaliation with CHIEF RIVERA.

53. On September 20, 2011, PLAINTIFFS again complained of the ongoing retaliation to CHIEF RIVERA and implored him to initiate a CR Investigation to protect them. ECHEVERRIA told RIVERA "since no one at CPD will do anything, we need to take this to an outside agency." RIVERA responded, "look, everyone is against you, so you don't want to piss me off."

54. On October 4, 2011, LIEUTENANT PASCUA was overheard saying "fuck them from narcotics…I'm a lawyer and know how to put a case together…I'm gonna work on getting them fucking launched."

55. Between October 2011 and February 2012, PLAINTIFFS were reassigned to Operation Brass Tax to brief different special agents on various issues related to the operation.

56. In November 2011, as another manifestation of the CITY OF CHICAGO'S policy against investigating fellow officers, two Sergeants of the Internal Affairs Division told PLAINTIFFS "sometimes you have to turn a blind eye" to misconduct.

57. In December 2011, Sergeant Tom Chester of the Internal Affairs Division Confidential Investigations Section warned SPALDING not to attend the department Christmas party because he believed O'GRADY might confront her.

58. In February 12, 2012, the United States Attorney indicted Sergeant Watts and Officer Kallat Mohammed pursuant to PLAINTIFFS' work on Operation Brass Tax.

59. On February 13, 2012, following the arrests of Watts and Mohammed, PLAINTIFFS involvement in Operation Brass Tax ended and they were reassigned to Unit 126.

60. CHIEF RIVERA then told PLAINTIFFS that ROTI ordered that they were not allowed to return to the narcotics unit "or any other division of Organized Crime" due to their investigation of corruption at the Chicago Police Department.

61. SPALDING then again asked CHIEF RIVERA to initiate a CR Investigation for hostile work environment after she began to suffer severe anxiety attacks. CHIEF RIVERA refused to acknowledge the request.

62. PLAINTIFFS were not given any assignments with Unit 126 and were again made to sit idly for eight hours per day until March 16, 2012.

10

63. On March 20, 2012, PLAINTIFFS were detailed to "Fugitive Apprehension," Unit 606, Unite States Marshalls Task Force Team. Unit 606 acts under the supervision of the United States Marshalls.

64. PLAINTIFFS operated under the supervision of SERGEANT BARNES while detailed to Unit 606.

65. PLAINTIFFS were taken off major cases and reassigned to low level, dead-end assignments at Unit 606, such as locating unknown turnstile jumpers or individuals that had been intoxicated on the public way.

66. On June 20, 2012, PLAINTIFFS are ordered to meet with COMMANDER SALEME, LIEUTENANT CESARIO and SERGEANT BARNES at Unit 606 headquarters. LIEUTENANT CESARIO told them they are being removed from the task force due to lack of arrests and lack of priority cases.

67. LIEUTENANT CESARIO then asks whether PLAINTIFFS are "working for IAD." He then says, "you brought this baggage on yourselves.

68. SERGEANT BARNES then tells PLAINTIFFS that "it's a safety issue" and "I don't want to tell your daughter you're coming home in a box because the team won't help you on the street."

69. LIEUTENANT CESARIO then tells PLAINTIFFS they were being moved "up north, will not go to the U.S. Marshall's Task Force, will not get a take home car, Marshall's pay, overtime or be deputized. That will never happen for you."

70. On June 20, 2012, PLAINTIFFS were removed from the U.S. Marshalls Task Force Team without ever being deputized and without just cause.

11

71. Shortly thereafter, two other officers on the U.S. Marshall's Task Force of less seniority but who, upon information and belief, had not worked in IAD or investigated other police officers, were deputized.

72. On June 23, 2012, PLAINTIFFS contacted CHIEF RIVERA and Sergeant Chester from IAD to lodge another complaint. Again, their complaint was ignored.

73. On June 25, 2012, PLAINTIFFS were reassigned to a nighttime fugitive apprehension team and relocated to the North side of Chicago. Their new hours were 4:00 p.m. – 12:30 a.m. The nighttime fugitive apprehension team is not part of the U.S. Marshalls Task Force Team.

74. On August 17, 2012, COMMANDER O'GRADY "barred" SPALDING from entering Chicago Police Headquarters at Homan Square, where she was assigned a locker. LIEUTENANT CESARIO stressed that SPALDING should "heed the warning that O'GRADY doesn't want you there."

### *COUNT I – VIOLATION OF FIRST AMENDMENT VIA 42 U.S.C § 1983 AGAINST THE CITY OF CHICAGO, CHIEF RIVERA, DEPUTY SUPERINTENDENT KIRBY, SERGEANT PADAR, COMMANDER O'GRADY, COMMANDER ROTI, DEPUTY SUPERINTENDENT JACKSON, LIEUTENANT PASCUA, COMMANDER STANLEY, SERGEANT BARNES, LIEUTENANT SADOWSKI, LIEUTENANT CESARIO and COMMANDER SELEMI*

75. That PLAINTIFFS repeat, re-allege and incorporate by reference the factual allegations of paragraphs one through seventy-four as if fully set forth herein.

76. That the First Amendment to the United States Constitution guarantees PLAINTIFFS' rights to speak out on matters of public concern without fear of unjust retaliation.

77. That PLAINTIFFS engaged in extensive protected speech on matters of public concern by implicating Watts, Mohammed and others in violations of state and federal laws with regard to their duties as Chicago Police Officers.

78. That in direct retaliation for their exercise of protected speech, Defendants retaliated against PLAINTIFFS in the manner described in the preceding paragraphs.

79. That the retaliation and misconduct described in this Count was devised and carried out individuals with final policymaking authority to establish municipal policy with respect to the actions ordered or delegated.

80. That the retaliation and misconduct described in this Count constituted the municipal policy and widespread practice of the City of Chicago to retaliate against officers that investigate or complain of misconduct by fellow officers regardless of the truth of the complaints.

81. That as a result of the aforementioned deprivation of federal rights, PLAINTIFFS suffered and will likely continue to suffer grievous harm including, without limitation, substantial loss of income and benefits, loss of earnings potential, loss of enjoyment of life, and severe emotional distress.

WHEREFORE, PLAINTIFFS demand individually compensation from all defendants in an amount in excess of $500,000 in compensatory damages, attorney's fees, costs of suit, and exemplary damages as warranted.

### *COUNT II – VIOLATION OF EQUAL PROTECTION VIA 42 U.S.C. § 1983*

82. That PLAINTIFFS repeat, re-allege and incorporate by reference the factual allegations of paragraphs one through seventy-four as if fully set forth herein.

83. That PLAINTIFFS were retaliated against based upon their membership in a certain class of individuals, i.e., whistleblowers who complained about and investigated fellow Chicago Police Officers.

84. Members of PLAINTIFFS' class were treated differently than other similarly-situated individuals that were not whistleblowers or did not complain or investigate fellow Chicago Police Officers.

85. That the differential treatment of PLAINTIFFS, described in the preceding paragraphs was intentional and arbitrary, motivated by nefarious and discriminatory purpose, and not rationally related to any governmental interest.

86. That the misconduct described in this Count was undertaken by municipal policymakers with final authority to establish municipal policy with respect to the actions ordered or delegated.

87. That the misconduct described in this Count constituted the municipal policy and widespread practice of the CITY OF CHICAGO.

88. That the Defendants each acted under color of law in depriving PLAINTIFFS of their Fourteenth Amendment right to Equal Protection as secured by the Constitution of the United States.

89. That as a result of the aforementioned deprivation of federal rights, PLAINTIFFS suffered and will likely continue to suffer grievous harm including, without limitation, substantial loss of income and benefits, loss of earnings potential, loss of enjoyment of life, and severe emotional distress.

WHEREFORE, PLAINTIFFS each individually demand compensation from all defendants in an amount in excess of $500,000 in compensatory damages, attorney's fees, costs of suit, and exemplary damages as warranted.

### *COUNT III – CONSPIRACY VIA 42 U.S.C. § 1983*

90. That PLAINTIFFS repeat, re-allege and incorporate by reference the factual allegations of paragraphs one through seventy-four as if fully set forth herein.

91. That as described in the preceding paragraphs, Defendants, acting in concert with other known and unknown conspirators, reached an understanding to deprive PLAINTIFFS of their Constitutional rights.

92. That PLAINTIFFS were deprived of their Constitutional rights in the manner described in the preceding paragraphs.

93. That in furtherance of the conspiracy, Defendants committed overt acts and were otherwise willful participants in joint activity with state actors under color of law.

94. That the misconduct describe in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

95. That as a result of the aforementioned deprivation of federal rights, PLAINTIFFS suffered and will likely continue to suffer grievous harm including, without limitation, substantial loss of income and benefits, loss of earnings potential, loss of enjoyment of life, and severe emotional distress.

WHEREFORE, PLAINTIFFS each individually demand compensation from all defendants in an amount in excess of $500,000 in compensatory damages, attorney's fees, costs of suit, and exemplary damages as warranted.

### *COUNT IV – MONELL CLAIM*

96. That PLAINTIFFS repeat, re-allege and incorporate by reference the factual allegations of paragraphs one through seventy-four as if fully set forth herein.

97. That the retaliation against PLAINTIFFS was part of a custom, policy and practice espoused by the CITY OF CHICAGO and its policymakers in the Police Department to punish officers that investigated or complained of misconduct by other officers.

98. That as a result of employing a custom, policy and practice espoused by the CITY OF CHICAGO to retaliate against those officers that complained about or investigated fellow officers accused of misconduct or criminal acts, PLAINTIFFS suffered and will likely continue to suffer grievous harm including, without limitation, substantial loss of income and benefits, loss of earnings potential, loss of enjoyment of life, and severe emotional distress.

WHEREFORE, PLAINTIFFS individually demand compensation from all defendants in an amount in excess of $500,000 in compensatory damages, attorney's fees, costs of suit, and exemplary damages as warranted.

### *COUNT V – VIOLATION OF THE ILLINOIS WHISTLEBLOWER PROTECTION ACT AGAINST CITY OF CHICAGO*

99. That PLAINTIFFS repeat, re-allege and incorporate by reference the factual allegations of paragraphs one through seventy-four as if fully set forth herein.

100. That the CITY OF CHICAGO was at all times complained of PLAINTIFFS' employer as defined in 740 ILCS § 174/5.

101. That PLAINTIFFS were at all times complained of employees of the CITY OF CHICAGO as defined in 740 ILCS § 174/5.

102. That the CITY OF CHICAGO and its employees and agents were prohibited according to 740 ILCS § 174/15 from retaliating against PLAINTIFFS for disclosing to the F.B.I. what they reasonably believed and in fact knew were multiple violations state and federal laws by Watts, Mohammed and other Chicago Police Officers.

103. That the CITY OF CHICAGO retaliated against PLAINTIFFS by denying them promotions, overtime, preferential assignments, making them sit in a small room for hours and months at a time and foreclosing all possibilities of advancement.

104. That as a result of the aforesaid retaliation, PLAINTIFFS suffered loss of wages, loss of future wages, loss of opportunity and severe emotional distress that required them to seek the care of medical professionals.

WHEREFORE, PLAINTIFFS demand each individually compensation from the CITY OF CHICAGO in an amount in excess of $500,000 in compensatory damages, attorney's fees, costs of suit, and exemplary damages as warranted.

## *RULE 38 JURY DEMAND*

PLAINTIFFS demand trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

ELLIOT R. ZINGER & ASSOCIATES

By: ____/s/ Patrick J. Walsh_____
Patrick J. Walsh, Esq.
One of Plaintiffs' Attorneys

Patrick J. Walsh, Esq.
ELLIOT R. ZINGER & ASSOCIATES
10 South LaSalle Street, Suite 1420
Chicago, Illinois 60603
(312) 782-9464
ARDC No. 6287629

Daniel Q. Herbert, Esq.
LAW OFFICES OF DANIEL Q. HERBERT & ASSOCIATES
206 South Jefferson
Chicago, Illinois 60601
(312) 655-7660
ARDC No. 6273940