**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Chicago Police Officers SHANNON SPALDING and DANIEL ECHEVERRIA, | |
| Plaintiffs, | No. 12 C 8777 |
| v. | Judge Gary Feinerman |
| CITY OF CHICAGO, *et al.*, | Magistrate Judge Sheila M. Finnegan |
| Defendants. | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS**

NOW COME Plaintiffs, SHANNON SPALDING and DANIEL ECHEVERRIA, by and through their attorneys, Smith, Johnson & Antholt, LLC, responding in opposition to Defendants' motions to dismiss, as follows:

**INTRODUCTION**

Unlike other cases about select incidents of misconduct and the code of silence within a particular unit or team, Plaintiffs' case demonstrates that the code of silence starts at the top; that it reaches throughout bureaus, units and teams; and that it is directed and enforced, not by the rank-and-file, but by the very same persons who control the Department. When Plaintiffs stepped outside of their roles as police officers, and went outside of the chain of command, to report the corruption within the Department to the FBI, *they did so as citizens*. After years of retaliation for doing that, Plaintiffs again spoke out publicly about the corruption within the Department, this time about the code of silence. In both instances their speech is protected by the First Amendment and Defendants should be held accountable. As set forth below, Plaintiffs' claims are adequately pled and Defendants' motions to dismiss should be denied.

## I.     THE PLEADING STANDARD

A complaint need only provide a "short and plain statement of the claim showing that the pleader is entitled to relief," that is sufficient to provide the defendant with "fair notice" of the claim and its basis. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007), *quoting* Fed. R. Civ. Pro. 8(a)(2). A complaint does not need to "'allege all, or *any,* of the facts logically entailed by the claim,' and it certainly need not include evidence." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (quoting *Bennett v. Schmidt,* 153 F.3d 516, 518 (7th Cir. 1998)).

In order to survive a motion to dismiss under Rule 12(b)(6), the Supreme Court has established two "easy-to-clear hurdles." *E.E.O.C. v. Concentra Health Servs, Inc.*, 496 F.3d 773, 776-77 (7th Cir. 2007). First, a complaint must provide fair notice. *Id.* (citing *Twombly*, 550 U.S. at 545). A plaintiff alleging a civil rights violation may do so quite generally as long as fair notice of the claim and its basis is provided. *Tamayo*, 526 F.3d at 1081. Second, the allegations must suggest that the plaintiff has a "plausible" right to relief; a right that goes beyond mere speculation. *Twombly*, 550 U.S. at 574; *Concerta Health*, 496 F.3d at 776. Plausibility in this context does not mean the district court must decide which version of events to believe or which version is more likely, but rather the court must decide whether the events in question *could* have occurred. *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010).

## II.     PLAINTIFFS HAVE ADEQUATELY PLED THEIR FIRST AMENDMENT CLAIMS FOR RETALIATION

Public employees do not surrender their First Amendment rights as a result of their employment. The Supreme Court has emphasized that, "public employees retain the prospect of constitutional protection for their contributions to the civic discourse." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). In *Garcetti,* however, the Court did restrict First Amendment protections

to exclude circumstances where the speech at issue was made pursuant to the employee's official duties. *Id.* at 421 ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."). Because the parties agreed that the speech at issue in *Garcetti* was pursuant to official duties, the Court "had no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." *Id.* at 424. Instead the Court only gave general guidance that "the inquiry is a practical one" and should focus on "the duties an employee actually is expected to perform." *Id.* at 424-25.

### A. Plaintiff's Initial Speech Outside of the Department Regarding Corruption Within The Department Was Made Publicly As Private Citizens

Plaintiffs did not just go outside of their own chain-of-command, they took time off of work and went outside of the Police Department to speak out about corruption within the Department. *See* Amended Complaint (henceforth, "AC"), ¶¶23-25. They did so as private citizens exposing police corruption. *See Kristofek v. Village of Orland Hills*, 712 F.3d 979, 984-85 (7th Cir. 2013) (finding that plaintiff's speech in reporting police corruption to the FBI to be a matter of public concern protected by the First Amendment). Plaintiffs' speech at issue is therefore not reporting misconduct to their employer, as they are required by CPD policy to do. Going outside the agency to the FBI was not a part of their official duties as Chicago police officers. *See Novick v. Staggers*, No. 08 C 3733, 2012 WL 2325661, at *4 (N.D. Ill. June 19, 2012) ("Here, nothing in Novick's job duties required him to report hiring misconduct to outside, federal investigators. It was not part of his official duties.") *citing Trant v. Okla.*, 426 Fed. Appx. 653, 660 (10th Cir. 2011) (finding a Chief Medical Officer's report of misconduct to a

supervisory board was in the course of his duties, but comments about reporting misconduct to the FBI was protected speech.); *Casey v. W. Las Vegas Indep. Sch. Dist*., 473 F.3d 1323, 1331-32 (10th Cir. 2007) (ruling a local Head Start official's report of misconduct to the regional Head Start office was within job duties, but reporting the same misconduct to the Attorney General was protected speech).

A similar example is provided in the case of *Freitag v. Ayers,* 468 F.3d 528, 545 (9th Cir. 2006) cited and discussed favorably in *Morales v. Jones*, 494 F.3d 590, 596-97 (7th Cir. 2007). In that case, a correctional officer complained of multiple incidents of sexual harassment by several prisoners. *Frietag,* 468 F.3d at 533. After the incidents continued, she complained to her supervisor's superiors about the supervisor's handling of the harassment and that her documentation of the harassment was being denied and/or thrown away. *Id.* at 533-34. She next took her complaints outside the prison, to her state senator and the State Office of the Inspector General (and, was subsequently fired). The Seventh Circuit examined this case in the context of the official duties inquiry under *Garcetti,* noting that the Ninth Circuit found that the plaintiff's "right to complain both to an elected public official and to an independent state agency is guaranteed to any citizen in a democratic society regardless of his status as a public employee … it was certainly not part of her official tasks to complain to the [s]enator or the IG about the state's failure to perform its duties properly. . . . Rather, it was [the plaintiff's] responsibility as a citizen to expose such official malfeasance to broader scrutiny." *Freitag*, 468 F.3d at 545; *Morales*, 494 F.3d at 596-97.

Defendants' motion argues that Plaintiffs had a general duty to report misconduct, but that is an unsupported factual claim (not in the pleadings). In fact, discovery will show that Departmental policy requires officers to report misconduct *to the Department*. Plaintiffs did not

4

do that. They went to an independent agency just like the *Freitag* plaintiff did. Moreover, as the Seventh Circuit has explained, a generalized argument of the duty to report does not alone invoke the *Garcetti* official duties restriction.

> That ISP employees may have this general duty does not by itself mean that all speech made by Chaklos and Wist regarding anticompetitive practices was necessarily made pursuant to their job duties. Indeed, plaintiffs did not submit their concerns to the Attorney General or the chief procurement officer as directed by the code. Furthermore, in *Garcetti*, the Supreme Court rejected the idea "that employers can restrict employees' rights by creating excessively broad job descriptions." 547 U.S. at 424, 126 S.Ct. 1951. "Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Id*.

*Chaklos v. Stephens,* 560 F.3d 705, 711 (7th Cir. 2009).

In contrast to this case, in each of the cases cited by Defendants, the speech at issue fell under *Garcetti* because the speech at issue was made to the plaintiff's employer or, in the case of *Tamayo,* pursuant to a specific duty. In *Tamayo v. Blagojevich,* 526 F.3d 1074 (7th Cir. 2008), the plaintiff served as Administrator of the Illinois Gaming Board and the speech at issue was testimony before the Illinois House's Gaming Committee. The Court found that her job responsibilities included "a duty to bring alleged wrongdoing within her agency to the attention of the relevant public authorities—here, the House Gaming Committee." *Id.* at 1091.[1] In

---

[1] The Court explained further:

> An employee with significant and comprehensive responsibility for policy formation and implementation certainly has greater responsibility to speak to a wider audience on behalf of the governmental unit. When, as here, a complaint states that the senior administrator of an agency testified before a committee of the legislature charged with oversight of the agency about allegedly improper political influence over that agency, the natural reading of such an allegation is that the official, in so informing the legislators, was discharging the responsibilities of her office, not appearing as "Jane Q. Public." Reporting alleged misconduct against an agency over which one has general supervisory responsibility is part of the duties of such an office.

*Sigsworth v. City of Aurora*, 487 F.3d 506 (7th Cir. 2007), the plaintiff was a supervisor on a taskforce who reported misconduct by officers working on the taskforce to his superiors. He was "merely doing what was expected of him" as a supervisor reporting to his superiors. *Id.* at 511. Likewise, in *Vose v. Kliment*, 506 F.3d 565 (7th Cir. 2007), a police sergeant reported misconduct by subordinates to his superiors, his supervisor and the mayor). The Court explained, "[b]ecause Vose was responsible for the operations of the narcotics unit, his speech regarding alleged misconduct that may affect his unit was made pursuant to his official responsibilities, and not as a private citizen, despite not having explicit responsibility for the detectives involved or the search warrants at issue." *Id.* at 570-71.

In this case, *if* Plaintiffs reported corruption within the Department, *that* speech would relate to the "official duties" as Chicago police officers and the cases cited by Defendants would be on point. But, because Plaintiffs were speaking while off-duty to the FBI, they were speaking as citizens for the purpose of exposing corruption. *Kristofek v. Village of Orland Hills*, 712 F.3d 979, 984-85 (7th Cir. 2013) (plaintiff's speech reporting police corruption to the FBI to be a matter of public concern protected by the First Amendment).

### B.  Plaintiffs Have Adequately Pled Causation

Plaintiffs have more than adequately established that Plaintiffs' public speech (reporting to the FBI) was "a motivating factor" in the retaliation. AC ¶¶ 31, 33, 35, 38, 40-42, 44, 50, 75-78, 82, 90-91. *See Surita v. Hyde*, 665 F.3d 860, 874 (7th Cir. 2011) ("a motivating factor, i.e., a 'sufficient factor,' meaning when something present makes something else bound to happen.") *quoting Green v. Doruff,* 660 F.3d 975, 978-79 (7th Cir. 2010). The pleading sets forth that the campaign of harassment started and continued because Plaintiffs were labeled as "rats" for going

---

*Tamayo*, 526 F.3d at 1092.

outside the Department in order to bring down a CPD sergeant with a federal investigation. *Id.*
Defendants can—after discovery and with supporting evidence—attempt to rebut causation by
that "the harm would have occurred anyway." *Surita,* 665 F.3d at 874.

Furthermore, the fact that there is a temporal gap between the speech and the retaliation
does not defeat the claim in the face of other evidence of causation. *Davidson v. Midelfort Clinic,
Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998). That is especially true in a case such as this where during
the time between the speech and the onset of the retaliation Plaintiffs were not working out of the
Department. AC ¶29. The retaliation began thereafter when the information was leaked to
Defendant O'Grady. AC ¶31-33. Furthermore, under the pleadings, there is no evidence that
Defendants knew of Plaintiffs' protected speech prior to the onset of the retaliation. *Id.*

Defendants want to conflate Plaintiffs' protected speech with their subsequent work on
the investigation. While Plaintiffs' subsequent work on the investigation could possibly lead to a
question of fact for Defendants to dispute causation, it cannot defeat the pleadings as a matter of
law. *Green,* 660 F.3d at 977 (defendants bear the burden of demonstrating an alternative cause of
the harm). The retaliation that Plaintiffs suffered resulted from the fact that they went outside of
the Department. Discovery will show that it was different in nature and substance then, for
example, their treatment would have been if they had simply reported the misconduct to their
superiors or even gone to work for IAD. At this stage, Defendants' arguments claiming
alternative causes are not relevant to the inquiry at hand. *See Tamayo,* 526 F.3d at 1081
("[L]itigants are entitled to discovery before being put to their proof, and treating the allegations
of the complaint as a statement of the party's proof leads to windy complaints and defeats the
function of Federal Rule of Civil Procedure Rule 8.") *quoting Bennett v. Schmidt*, 153 F.3d 516,

7

519 (7th Cir. 1998).[2]

### C.  Plaintiff's Recent Public Speech About the Lawsuit and the Code of Silence

On November 1, 2012, Plaintiffs filed the original civil action in this case complaining of years of retaliation, led and encouraged by top-ranking Department leaders. *See* AC at ¶92. Following the filing, Chicago-area media publicized Plaintiffs' reporting of the Watts criminal misconduct and the Department-wide effort to punish Plaintiffs for reporting police corruption. *Id.* at ¶93. While accounts of the prevalence of the code of silence among Chicago Police Department rank-and-file have been widely reported for years, Plaintiffs' case shed new light on Department's top ranking members explicit enforcement of the code of silence. *Id.* at ¶94. Plaintiffs appeared in the media, including local television and newspapers telling of the years of retaliation that they endured at the hands of their superiors. *Id.* at ¶95.[3]

Plaintiffs' pleading establishes a second First Amendment claim arising out of their speech following the initial filing of the lawsuit. This speech (appearing in the media, while off-duty, about their lawsuit against the City) is not even arguably an official duty. In fact, *Garcetti*, lists "writing a letter to a local newspaper" as a form of public speech that would be protected by the First Amendment. 547 U.S. at 423.

---

[2] In *Tamayo,* for example, the defendants argued that the plaintiff pled herself out court by including factual allegations in her complaint that tended to show an alternative case of her constructive discharge (allegations demonstrating a political motivation). *Id.* at 1086. The Seventh Circuit rejected that argument finding that although the allegations did support a non-discriminatory motivation they did not defeat the other allegations demonstrating a discriminatory purpose. *Id.* ("Ms. Tamayo does not allege any facts that establish an 'impenetrable defense' to her sex discrimination claim; she merely alleges facts that ultimately make her success on the merits less likely. Recovery is still plausible under her complaint.").

[3] This publicity came at the heels of a widely publicized "code of silence" verdict against the City of Chicago in *Obrycka v. City of Chicago*. For a few examples out of the dozens of reported articles and news stories, *see* "Chicago 'Code of Silence' Trial Verdict: Court Rules Against City," by Don Babwin and Michael Tarm, Huffington Post (11/13/12), available at http://www.huffingtonpost.com/2012/11/13/code-of-silence-trial-ver_n_2125663.html, and "Federal Judge Preserves 'Code of Silence' Verdict" CBS News (12/20/12) available at: http://chicago.cbslocal.com/tag/karolina-obrycka/.

Moreover, this speech very much related to matters of public concern. To determine whether a statement rises to the level of public concern, courts examine the "content, form and context" of the speech. *Connick v. Myers*, 461 U.S. 138, 147-48, 148 n.7 (1983). Public corruption by high ranking CPD officials, the prevalence of the code of silence in the Department, and retaliation against officers who attempt to stop the criminal activity of corrupt officers—the subject matters of Plaintiffs' speech—are all matters of public concern.

"Whether public officials are operating the government ethically and legally is a quintessential issue of public concern." *Greer v. Amesqua*, 212 F.3d 358, 371 (7th Cir. 2000) (finding news release about issues of favoritism within the Department and the lenient disciplinary action taken against a particular employee to be matters of public concern under the First Amendment). The protections of the First Amendment are not limited, as Defendants would have it, to reporting criminal misconduct. In *Freitag v. Ayers,* 468 F.3d 528, 545 (9th Cir. 2006), for example, the Ninth Circuit held that a prison's mishandling of female correctional officers' sexual harassment complaints was a matter of public concern reasoning that the failure of the prison administration to "to take appropriate corrective measures is relevan[t] to the public's evaluation of the performance of governmental agencies." *Id.* (internal citation omitted). *See also McDonough v. City of Chicago*, 743 F. Supp. 2d 961, 973 (N.D. Ill. 2010) ("[W]hile general complaints about promotions, job assignments, and overtime are not necessarily matters of public concern by themselves, they may rise to the level of public concern … if they describe events that supposedly occurred in retaliation for reporting alleged political corruption.").

Defendants want to recast Plaintiffs' speech as "merely personal" grievances in an effort to "bolster" their personal lawsuit. This unsupported argument is a nonstarter. It blindly ignores the content of the speech, which courts have consistently found to be matters of public concern.

9

Furthermore, the fact that Plaintiffs have a personal stake in the issues does not transform their speech from matters of public concern. *See Kristofek v. Village of Orland Hills*, 712 F.3d 979, 985 (7th Cir. 2013) ("But even if Kristofek were motivated exclusively by his own self-interest, his First Amendment claim would not necessarily be dismissed."). The cases that Defendants rely upon relate to "wholly personal grievances" (*Bendoraitis*) and speech made solely for the purpose of "reach[ing] a resolution of her own problem." (*Januszewski*). Defs. Mot. at 8-9. Those cases are not applicable here where the speech at issue was the public reporting of corruption reaching the highest levels of the Chicago Police Department.

## III.     PLAINTIFFS HAVE ADEQUATELY PLED MUNICIPAL LIABILITY

The Amended Complaint contains allegations supporting two theories of municipal liability. First, that the high ranking officials who have been delegated policymaking authority directly caused the retaliation against Plaintiffs. Second, that the widespread practices relating to the "code of silence" so entrenched within the Department caused the retaliation.

### A.  The Allegations in the Amended Complaint More Than Sufficiently Set Forth the Two Theories of Municipal Liability

Both theories are adequately pled, meeting the "easy-to-clear" hurdles required to survive a Rule 12(b)(6) motion to dismiss. *E.E.O.C. v. Concentra Health Servs, Inc.*, 496 F.3d 773, 776 (7th Cir. 2007). First, the Amended Complaint provides more than "fair notice" to the Defendants. Count I specifically sets forth the *Monell* claim against the City. The delegations of authority are all properly set forth. AC at¶¶112(a)-(d). The allegations further include that the City maintains a policy and practice that facilitated and caused the constitutional violations at issue in this case. *Id.* at ¶113. The specific widespread practice at issue is set forth as the enforcement of the 'code of silence' through retaliation against officers who speak out about

10

misconduct; *Id.* Within the factual background section, Plaintiffs provide further specific factual allegations describing these practices by including specific admissions by high ranking authorities as to their own enforcement of the code of silence (*id.* at ¶¶38, 40, 57, 68, 83) as well admissions relating to the existence of the code of silence and the consequences when it is broken (*id.* at ¶¶61, 65, 82, 91).[4]

The second hurdle is cleared because the facts alleged raise the possibility of Plaintiffs' recovering beyond a purely speculative level. *Concerta Health*, 496 F.3d at 776. In order to meet *Twombly*'s plausibility requirement, a complaint must provide "a minimal level of factual detail, although that level is indeed very minimal." *Id.* at 777 (citing *Twombly*, 550 U.S. at 554-55). Since the complaint alleges facts that go well beyond this "minimal" requirement, Defendants' motions to dismiss must be denied.

Courts in this district have often denied Rule 12(b)(6) motions to dismiss *Monell* claims even where plaintiffs have provided far less detail than in the case at bar. In *Young v. Village of Romeoville*, No. 10 C 1737, 2011 WL 1575512 (N.D. Ill. Apr. 27, 2011), the court denied a motion to dismiss for failure to state a claim where the plaintiff's complaint alleged that the defendant officers had committed similar excessive force violations in the past, but the municipality at issue took no action. *Id.* at *3. Though no factual evidence was provided in the

---

[4] *See Wilson v. City of Chicago*, No. 09 C 2477, 2009 WL 3242300, at *3 (N.D. Ill. Oct. 7, 2009) (internal citations omitted) ("Finally, the City argues that the Court should dismiss claims against it because Wilson has not adequately pleaded municipal liability. The City argues that cursory allegations of *Monell* liability are insufficient to plead a claim against the City. Specifically, the City argues that Wilson has not provided any other examples of the alleged 'widespread practices' about which he complains. *Monell* claims, however, are not subject to a heightened pleading standard. And notice pleading does not require Wilson to plead all of the facts logically entailed by the claim. It is not reasonable to expect a plaintiff to have information about other incidents at the pleading stage; instead, a plaintiff should be given the opportunity to develop an evidentiary record to determine whether he can provide support for his claims.").

complaint to support this allegation, the court held that such production was necessary at the summary judgment, rather than the pleading, stage. *Id.*

Similarly, in *Johnson v. City of Chicago*, No. 10 C 2850, 2010 WL 4790905 (N.D. Ill. Nov. 18, 2010), the court denied a motion to dismiss where the plaintiff alleged that the City knew about constitutional violations its subordinates were committing, and chose to cover them up instead of correcting them. *Id.* at *2. Although not a detailed accounting of the theory of liability, the allegations were sufficient to give "fair notice" of the claim. "These allegations are more than bare recitations of the elements of a section 1983 cause of action; they identify specific wrongs by the defendants." *Id.* Likewise, in *Marcinczyk v. Plewa*, No. 09 C 1997, 2011 WL 2672350 (N.D. Ill. July 8, 2011), the court held that an allegation that the City maintained a policy and practice of allowing arrests without probable cause and failed to properly train its officers was sufficiently well-pled—in spite of its lack of any specific support for the very broad assertion—to survive a motion to dismiss. *Id*. at *3.

Defendants are in effect seeking to establish a heightened pleading standard for section 1983 claims. "[T]he Supreme Court has expressly rejected a heightened pleading standard for § 1983 claims against a municipality." *Riley v. County of Cook*, 682 F. Supp. 2d 856, 861 (N.D. Ill. 2010) (citing *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 165-66 (1993)). Even if the allegations were "conclusory" as the Defendants' motion argues, this would not be a reason to dismiss the *Monell* count. *Riley*, 682 F. Supp. 2d at 861 ("[A]n official capacity claim can survive even with conclusory allegations that a policy or practice existed, so long as facts are pled that put the defendants on proper notice of the alleged wrongdoing"); *Johnson*, 2010 WL 4790905, at *1 ("If a *Monell* claim provides fair notice of the

nature of the wrongdoing alleged, it can survive a motion to dismiss even if its allegations of the existence of a municipal policy are conclusory").

### B. The City Is Not Entitled to Dismissal on the Basis of a Factual Argument That a Superintendent Cannot be a Policymaker

Through the Chicago Municipal Code, the City Council has delegated certain policymaking authority to the Superintendent of Police. *See* Chi. Municipal Code 2-84-040, 2-84-050. Plaintiffs have pled allegations based on the delegation of authority. *See* AC ¶¶112(a)-(d), pages 16-17. Pursuant to *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694 (1978), a municipality may be held liable where the actions and decisions of its policymakers result in constitutional violations. *Id.*

Defendants make the bold, yet incorrect, assertion that "it is well-settled that even the Superintendent of the Chicago Police Department is not a final policymaker capable of creating municipal liability for the City." Defs. Mot. at 4. Defendants rely on *Auriemma v. Rice*, 957 F.2d 397 (7th Cir. 1992) for the proposition that "City Council, rather than the Superintendent of Police, has final policymaking authority for the Police Department." Defs. Mot. at 4. However, that reliance is misguided and a far overreach on the law.

In *Auriemma*, the superintendent of the CPD promoted thirteen black and nine white officers while demoting no black but twenty-five white officers. 957 F.2d at 398. Eighteen of the demoted officers filed suit alleging that the superintendent and the City of Chicago used their race and politics against them. *Id.* The Seventh Circuit began by acknowledging that "[s]tate and local governments need not follow the pattern of separated powers in the national Constitution" and that "[e]xecutive officials sometimes exercise legislative powers." *Id.* at 399. The Court went on to say "[e]ven executive action in the teeth of municipal law could be called policy." *Id.*

13

Nonetheless, because the relevant ordinances "unequivocally ban racial and political discrimination," the court decided not to address the possible policymaking functions of a municipal executive, like the superintendent. *Id.* The court reasoned that where the actions countermand the applicable ordinance, the "[l]iability for unauthorized acts is personal" and cannot hold a municipality liable. *Id.* at 400. Defendants point to no such argument here.

> In a more recent case, the Seventh Circuit distinguished *Auriemma* and explained:

> The qualification "for the action in question" is vital. We don't know the full scope of the police superintendent's authority. But one can be an official policymaker in one domain but not in another. . . . All that matters in this case is that Chicago's police superintendent has sole responsibility to make policy regarding control of demonstrations. He was in his headquarters throughout the March 20, 2003, demonstration, not only monitoring it but also approving the decisions of his subordinates, specifically their decisions to shield Michigan Avenue from the marchers and to make the mass arrests of the people trapped on Chicago Avenue. The superintendent *was* the City, so far as the demonstration and arrests were concerned.

*Vodak v. City of Chicago*, 639 F.3d 738, 748 (7th Cir. 2011) (internal citations omitted). Similar to *Vodak*, here the necessary question is not whether the Defendant Superintendent was the official policymaker over *all* matters concerning actions of the CPD. Rather, the question is whether the superintendent had the sole responsibility to make policy decisions regarding the general management and control of the police department—including making appointments, promotions, transfers and disciplinary actions against Department employees. Therefore, like in *Vodak*, here the Defendant "superintendent *was* the City," so far as the retaliatory acts against Plaintiffs were concerned. *Id.* at 747-48 (emphasis in original).

Furthermore, it is well established that an institutional actor can delegate his policymaking authority. *See McMillian v. Monroe County*, 520 U.S. 781, 802 (1997). ("[T]his Court has never reasoned that all policymaking authority must be vested in a single body that

14

either exercises that power or formally delegates it to another.") In *Kujawski v. Board of Commissioners of Bartholomew County*, 183 F.3d 734 (7th Cir. 1999), the Seventh Circuit held:

> Our colleagues in the Eighth Circuit stated the appropriate inquiry succinctly: "[T]he key question . . . is whether the County delegated . . . its power to establish final employment policy with respect to the discipline of officers. If so, then [the official's] decisions would represent county policy and could give rise to municipal liability."

*Id.* at 739-40 (quoting *Ware v. Jackson County*, 150 F.3d 873, 886 (8th Cir. 1998)); *see also Sweeney v. Bausman*, No. 88 C 20370, 1992 WL 390773, at *7 (N.D. Ill. Dec. 14, 1992) ("If a county board delegates its power to establish final employment policy to the sheriff, the sheriff's decisions become the policy of the county, rendering the county liable.").

Similarly, because the Defendant Superintendent may be considered a person with final policymaking authority, he may also be liable for the actions of lower ranking officers and supervisors within the Chicago Police Department. Under supervisor liability, "[t]he supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988). *See Leary v. Daeschner*, 349 F.3d 888, 903 (6th Cir. 2003) (quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.), *cert. denied*, 469 U.S. 845 (1984)) ("[S]upervisor liability under § 1983 is appropriate when 'the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it,' or 'at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.'").

15

## IV.     PLAINTIFFS STATE A CLAIM FOR CONSPIRACY UNDER § 1983

### A. Plaintiffs' Conspiracy Claim Is Not Barred by the Intra-Corporate Conspiracy Doctrine.

Defendants are mistaken that Plaintiffs' conspiracy claim is barred as a matter of law by the "intra-corporate conspiracy" doctrine. First, "[m]any district courts in this circuit do not apply the intra-corporate conspiracy doctrine to § 1983 claims." *Johnson v. Village of Maywood*, No. 12 C 3014, 2012 WL 5862756, at *2 (N.D. Ill. Nov. 19, 2012); *see Newsome v. James*, No. 96 C 7680, 2000 WL 528475, at *15 (N.D. Ill. Apr.26, 2000) (Plunkett, J.) (reviewing history of doctrine and cases); *Salto v. Mercado*, No. 96 C 7168, 1997 WL 222874, at *1 (N.D. Ill. Apr.24, 1997) (Zagel, J.) (finding the doctrine does not apply to "classic conspiracy situation" where a number of officers took concerted action to harm an individual).

Second, while Defendants are correct that the Seventh Circuit has not yet addressed whether the doctrine extends to § 1983 cases, the Seventh Circuit's recent decision in *Geinosky v. City of Chicago*, 675 F.3d 743 (7th Cir. 2012), reinforces the view that the doctrine does not apply here. In *Geinosky*, the plaintiff alleged a civil conspiracy claim against eight Chicago police officers after he received more than twenty illegitimate parking tickets. *Id.* at 745. The Seventh Circuit reversed the district court's dismissal of the conspiracy claim, finding that the plaintiff had pled a conspiracy and discrete actions that furthered the conspiracy against all defendants, including the City of Chicago. *Id.* at 750. And though the Court did not mention the doctrine itself, it also did not "suggest that there was any general bar to a claim that a group of police officers formed a conspiracy to violate a person's constitutional rights." *Johnson*, 2012 WL 5862756 at *3 (citing *Geinosky*, 675 F.3d at 749-50); *see also Jones v. City of Chicago*, 856

F.2d 985, 992-93 (7th Cir.1988) (affirming § 1983 conspiracy verdict against various police officers without any discussion of intra-corporate conspiracy doctrine).

**B.  Plaintiffs Have Sufficiently Alleged an Agreement.**

Plaintiffs are not required to make direct allegations of a conspiracy, but can allege circumstances that add up to a "plausible account of a conspiracy." *Geinosky*, 675 F.3d at 749. Furthermore, at the pleading stage, Plaintiffs are only required to "indicate the parties, the general purpose, and approximate date of the agreement to form a conspiracy so that the defendant has notice of the charges against him." *Estate of Sims ex rel. Sims v. County of Bureau*, 506 F.3d 509, 517 (7th Cir. 2007).

Plaintiffs have met this standard. Based on the extensive facts contained in the Amended Complaint, the parties, purpose, and approximate date of the agreement to form a conspiracy are sufficiently clear to put the Defendants on notice. The parties are the Defendants who have either participated directly or indirectly in the retaliatory acts against Plaintiffs. The purpose was to retaliate against Plaintiffs for becoming "rats" by going outside the Department to bring down a (corrupt) sergeant. *See* AC at ¶¶35, 38, 50, 57-58, 75-76 82. As for the approximate date of the agreement to form a conspiracy, Plaintiffs have included an approximation of the timeframe through the sequence of events beginning in August 2010 (¶33). Plaintiffs have included specific details of meetings among Defendants.

At the earliest meeting known to Plaintiffs, which included Defendants O'Grady and Roti, among others, Plaintiffs have specifically pled the agreement reached at this meeting to explicit terms of retaliation:

> [M]ultiple Defendants discussed with one another the handling or treatment of Plaintiffs. At one such meeting, Plaintiffs' possible reassignment within the Department was discussed. In response, Defendant O'Grady referred to Plaintiffs as "rats" and stated that

17

he did not want Plaintiffs working in his unit.

During the meeting, on information and belief, Defendant O'Grady stated words to the effect of, "God help them if they ever need help on the street, it ain't coming."

Instead of putting a stop to his subordinate's retaliation against Plaintiffs, Defendant Chief Nicholas Roti, who was also present at the meeting, concurred with Defendant O'Grady.

AC ¶¶38-41. When Plaintiffs were finally allowed into another Bureau in the Department, on or about March 20, 2012, Defendant O'Grady went out of his way to meet with Defendants Salemme and Cesario in furtherance of the conspiracy. ¶¶73-74. He made sure that Plaintiffs' new bosses knew "that they were 'rats' and should be treated accordingly." *Id.* Plaintiffs describe further communications showing an agreement between Defendants. AC ¶44 ("Plaintiffs were informed that none of the 'bosses' wanted them in their units and that their 'careers are over'"), ¶¶80-83 (describing a meeting on or about June 20, 2012, involving Defendants Commander Salemme, Lt.Cesario and Sgt. Barnes).

While Plaintiffs have gone above and beyond the pleading standards for conspiracy claims, Plaintiffs are not able to detail the explicit agreement of some of the Defendants in the conspiracy. However, the actions of these Defendants in joining in the conspiracy are well pled and sufficient at this stage. *See Geinosky*, 675 F.3d at 749 ("While the complaint makes only rather conclusory, direct allegations of conspiracy, the complaint also alleges a pattern of harassment by several officers over a period of months. It is a challenge to imagine a scenario in which that harassment would not have been the product of a conspiracy."). As the Seventh Circuit has held, "if several members of the same police unit allegedly acted in the same inexplicable way against a plaintiff on many different occasions, we will not dismiss a complaint

for failure to recite language explicitly linking these factual details to their obvious suggestion of collusion." *Id.*

## V.  Plaintiffs Have Sufficiently Alleged Their Claims Against Defendants Rivera and Kirby

Defendants Rivera and Kirby have filed separate motions to dismiss, arguing that Plaintiffs have not sufficiently alleged their involvement in the constitutional violations. Plaintiffs have made allegations of their involvement sufficient to proceed on the claim of conspiracy against both and First Amendment retaliation against Defendant Rivera.

Among the CPD-exempt personnel who knew of Plaintiffs' reporting of the Watts corruption to the FBI and subsequent assignment to the investigation were Defendants Kirby and Rivera. AC ¶28. At that time, Defendant Kirby was a Deputy Superintendent and Defendant Rivera was the head of the Internal Affairs Division. *Id*. Both became involved in the retaliation when Plaintiffs were returned to the Department from the FBI in 2011. *Id.* at ¶¶45-55. At this point in the events, Defendant Kirby purposely interfered with Plaintiffs' detail by expressly lying to another Deputy Superintendent about their assignment. *Id.* at ¶¶46-47. She did so knowing that she could thereby force Plaintiffs back into a very inhospitable department. *Id.* at ¶47. Plaintiffs were then shuffled around and essentially put on "house arrest" as Defendants O'Grady and Roti banned them from their Bureaus. Defendant Rivera was on notice of these events throughout and during the retaliation that followed. *Id.* at ¶¶54, 63, 70-71, 87. Despite that it was his job—above and beyond any other person in the Department, excepting the Superintendent, to protect Plaintiffs and put a stop to the retaliation—Defendant Rivera knowingly allowed it to continue unabated. *Id.*

19

"[A]ll that is required to state a claim of conspiracy is a simple pleading of facts from which a conspiracy may be inferred." *Windsor v. Village of Lynwood.* No. 90 C 0417, 1992 WL 80455, at *4 (N.D. Ill. Apr. 9, 1995). A plaintiff "is not required to plead with exact specificity a conspiracy to deprive him of his constitutional rights, but rather just enough circumstantial evidence [that] may provide adequate proof of a conspiracy." *Moreno v. Town of Cicero*, No. 01 C 1726, 2002 WL 31017932, at *3 (N.D. Ill., Sept.5, 2002). Plaintiffs have pled the fact that there was an agreement among the Defendants (¶116); the timing of each Defendants' involvement (below); the purpose of the agreement (as set forth above, to retaliate against them reaching outside the Department to publicly report corruption and bring about a federal investigation); and that each Defendant took overt action in furtherance of the conspiracy (¶118). The above allegations demonstrate the involvement of both Defendants Rivera and Kirby in furthering the conspiracy. Plaintiffs identify them as involved in the conspiracy. Plaintiffs give an approximate timing of one incident of Kirby's direct involvement as May 2011 (¶45) and the timing of ongoing involvement by Rivera on specific dates in the summer and fall of 2011 (¶¶54, 63), in February-March, 2012 (¶71) and on June 23, 2012 (¶87). That is sufficient for Rule 12(b)(6) purposes. *Gonzalez v. Town of Cicero*, No. 06 C 3961, 2008 WL 506143, at *2 (N.D. Ill. Feb. 21, 2008) ("Any remaining details about the particular involvement of the individuals in the conspiracy or deprivations can be filled in through subsequent discovery or at trial.").

Specifically, with respect to Defendants Rivera and Kirby, direct participation is not required. *See Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003). All that is required is that Defendants Rivera and Kirby either "[knew] about the conduct and facilitate[d] it, approve[d] it, condone[d] it, or turn[ed] a blind eye." *Hildebrandt v. Illinois Dept. of Natural Resources*, 347 F.3d 1014, 1039 (7th Cir. 2003) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561

20

(7th Cir.1995) (emphasis added). As discussed in greater detail above, Plaintiffs have sufficiently

met this requirement. *See Santiago v. Walls*, 599 F.3d 749, 759 (7th Cir. 2010) ("We think that

this allegation is sufficient, at the pleading stage, to state a claim that Warden Walls actually

knew or consciously turned a blind eye toward an obvious risk. [Plaintiff] cannot know for

certain what Warden Walls knew without discovery. Consequently, the district court should not

have dismissed this count of the complaint.").

**CONCLUSION**

For all the foregoing reasons, Plaintiffs' claims are sufficiently pled and Defendants'

motions to dismiss should be denied in their entirety.

RESPECTFULLY SUBMITTED,

_____/s/Amanda Antholt_____
Attorney for Plaintiff

Amanda Antholt
Christopher R. Smith
Emily J. Stine
Smith, Johnson & Antholt, LLC
1 N. LaSalle Street, Suite 3040
Chicago, IL 60602
312.432.0400

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that the foregoing Response to Defendants'
Motions to Dismiss was served on counsel for all Defendants by electronic means July 19, 2013.

_____/s/ Amanda Antholt_____

21