UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SHANNON SPALDING and DANIEL ECHEVERRIA, | ) | |
| | ) | |
| Plaintiffs, | ) | 12 C 8777 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| CITY OF CHICAGO, JUAN RIVERA, DEBRA KIRBY, | ) | |
| JAMES O'GRADY, NICHOLAS ROTI, KEVIN | ) | |
| SADOWSKI, DEBORAH PASCUA, ADRIENNE | ) | |
| STANLEY, MAURICE BARNES, ROBERT CESARIO, | ) | |
| JOSEPH SALEMME, and THOMAS MILLS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Shannon Spalding and Daniel Echeverria, both officers with the Chicago Police
Department ("CPD"), brought this suit under 42 U.S.C. § 1983 and Illinois law against the City
of Chicago and eleven other CPD officers. The amended complaint alleges that Defendants
violated the First Amendment and the Illinois Whistleblower Protection Act, 740 ILCS 174/15,
by conspiring to retaliate and actually retaliating against Plaintiffs for reporting criminal
misconduct by other CPD officers to the FBI and for speaking to the media about this lawsuit.
Doc. 44. The City and nine of the officers (collectively, "Chicago Defendants") have moved to
dismiss the suit under Federal Rule of Civil Procedure 12(b)(6), and the two other officers, Juan
Rivera and Debra Kirby, have adopted that motion and filed separate Rule 12(b)(6) motions.
Docs. 57, 59-60. The motions to dismiss are denied.

### Background

In considering the motions to dismiss, the court assumes the truth of the amended
complaint's factual allegations, though not its legal conclusions. *See Munson v. Gaetz*, 673 F.3d

630, 632 (7th Cir. 2012). The court must consider "documents attached to the [amended] complaint, documents that are critical to the [amended] complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Plaintiffs' briefs opposing dismissal, so long as those facts "are consistent with the pleadings." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). The following facts are set forth as favorably to Plaintiffs as these materials allow. *See Gomez v. Randle*, 680 F.3d 859, 864 (7th Cir. 2012). The court's recitation of these facts should not be taken as indicating the court's belief that Plaintiffs' allegations of misconduct are true and, by the same token, that disclaimer should not be taken as indicating the court's belief that the allegations are false. The court does not know at this point whether Plaintiffs' allegations of misconduct are entirely true, partly true and partly false, or entirely false.

Spalding and Echeverria began their careers as CPD officers in 1996 and 1999, respectively. Doc. 44 at ¶¶ 17-18. In May 2006, they were assigned to the Narcotics Division, Unit 189, where they combatted drug crimes by developing confidential informants, obtaining search warrants, and conducting conspiracy investigations. *Id*. at ¶ 19. While working on an undercover narcotics investigation in 2007, Plaintiffs discovered that Sergeant Ronald Watts and other CPD officers were extorting drug dealers by demanding payments in exchange for protecting them from arrest and prosecution. *Id*. at ¶¶ 20-22. In 2007, while off-duty, Plaintiffs reported this illegal activity to Special Agent "P.S." of the FBI's public corruption unit. *Id*. at ¶¶ 23-24. Plaintiffs met with P.S. intermittently in 2008 while off-duty to discuss new information they had learned about Sergeant Watts. *Id*. at ¶ 24. When the FBI asked Plaintiffs to spend more time assisting with the case, Plaintiffs responded that they would if the investigation was conducted through the CPD, so as not to encroach upon their professional time. *Id*. at ¶ 25.

In August 2008, FBI special agents met with the chief of the CPD's Internal Affairs Division ("IAD") regarding the Watts case and then informed Plaintiffs that they would be joining the federal investigation—known as Operation Brass Tax—in their official capacity as police officers. *Id*. at ¶¶ 26-28. Although Operation Brass Tax and Plaintiffs' involvement therein were confidential, certain CPD command staff were informed, including the Superintendent of Police; Defendant Debra Kirby, who then was Deputy Superintendent; and the IAD Chief, a post later assumed by Defendant Juan Rivera. *Id*. at ¶¶ 27-28. Although they remained assigned to the Narcotics Division, Plaintiffs were detailed to Detached Services, Unit 543, and reported directly to FBI headquarters. *Id*. at ¶ 29. During the time Plaintiffs worked on Operation Brass Tax, they were encouraged by the CPD command staff to develop narcotics cases, which overlapped with their work on Operation Brass Tax. *Id*. at ¶ 30.

Some time later, information regarding Plaintiffs' reporting misconduct by another CPD officer and their involvement in the FBI investigation was leaked within the CPD and became known to Defendant James O'Grady, Commander of the Narcotics Division. *Id*. at ¶¶ 31-32. On or about August 17, 2010, in the course of developing a narcotics case, Plaintiffs submitted paperwork seeking O'Grady's approval of a confidential informant. *Id*. at ¶ 34. Although O'Grady initially approved the application, he rescinded his approval after learning that the application had been submitted by Plaintiffs. *Ibid*. O'Grady then informed supervising personnel in the Narcotics Division that Plaintiffs were "rats" and ordered them to no longer work with or assist Plaintiffs. *Id*. at ¶ 35. By interfering with Plaintiffs' ability to develop narcotics cases, O'Grady intentionally prohibited Plaintiffs from earning overtime pay. *Id*. at ¶ 36. Other officers in the Narcotics Division were able to use evidence gathered by Plaintiffs to develop cases and earn overtime pay. *Id*. at ¶ 37.

On one or more occasions, several of the individual defendants met to discuss how they would "handl[e] or treat[]" Plaintiffs.  *Id*. at ¶ 38.  During one meeting, O'Grady referred to Plaintiffs as "rats," stated that he did not want them in his unit, and added words to the effect of, "God help them if they ever need help on the street, it ain't coming."  *Id*. at ¶¶ 38-39.  Defendant Nicholas Roti, the head of the Bureau of Organized Crime, which includes the Narcotics Division, was present at this meeting, concurred with O'Grady, encouraged retaliation against Plaintiffs, and would not allow Plaintiffs to work in any unit in his bureau.  *Id*. at ¶¶ 40-43.  Plaintiffs were informed that none of the "bosses" wanted them in their units and that their "careers are over."  *Id*. at ¶ 44.

Around late May 2011, Kirby received a call from Beatrice Cuello, the Deputy Superintendent of Detached Services, seeking confirmation that Plaintiffs were working on an undercover investigation and that the necessary paperwork was in place.  *Id*. at ¶ 46.  Despite her knowledge of Plaintiffs' detail to work on Operation Brass Tax, Kirby told Cuello that she did not know Plaintiffs or of their involvement with any investigation.  *Id*. at ¶ 47.  Cuello was thus led to believe that Plaintiffs had lied about their involvement in the FBI investigation, and she removed Plaintiffs from Detached Services.  *Id*. at ¶ 48.

O'Grady and Roti forbade Plaintiffs from returning to the Narcotics Division or any other division in the Bureau of Organized Crime.  *Id*. at ¶¶ 43, 49.  Having been labeled "rats," Plaintiffs lost their specialized assignments, take-home vehicles, weekends and holidays off, and ability to work overtime.  *Id*. at ¶ 50.  Plaintiffs were then detailed to the Police Academy for three weeks, during which they did little more than sit idly at their desks.  *Id*. at ¶¶ 51-53.  Plaintiffs complained to Rivera, who by that time had become IAD Chief, about the retaliatory reassignment to the Police Academy, but Rivera did not take any action.  *Id*. at ¶ 54.

From July 2011 through March 2012, Plaintiffs were assigned to the Inspection Division, Unit 126, under the immediate supervision of Defendant Deborah Pascua. *Id*. at ¶¶ 55-56. Pascua called Plaintiffs "rat motherf---ers," told them she did not want them in her unit, and told others in the unit not to talk to Plaintiffs because they were "rats." *Id*. at ¶¶ 57-58. Pascua also threatened to put a false case on Plaintiffs, saying: "[F]--- them from narcotics … I'm a lawyer and know how to put a case together … I'm gonna work on getting them f---ing launched." *Id*. at ¶ 60. Pascua rarely gave Plaintiffs legitimate assignments and often forced them to chauffeur her on personal errands. *Id*. at ¶ 59.

On September 13, 2011, Plaintiffs informed their commanding officer, Defendant Adrienne Stanley, of the ongoing retaliation and hostile work environment, to which Stanley replied, "I don't want to hear this, I don't want to know." *Id*. at ¶ 61. Stanley failed to initiate a Complaint Register investigation into the retaliation, as required by CPD policy. *Id*. at ¶ 62. Defendant Kevin Sadowski joined Pascua's "campaign" by repeatedly attempting to lodge false allegations of wrongdoing against Plaintiffs. *Id*. at ¶ 64. Rivera knew of this ongoing retaliation and refused to initiate an IAD investigation into the matter. *Id*. at ¶ 63.

In October 2011, Plaintiffs resumed their involvement with Operation Brass Tax and continued to work with the FBI until Sergeant Watts and Officer Kallat Mohammed were indicted in February 2012. *Id*. at ¶¶ 66-67. After the investigation concluded, Roti prohibited Plaintiffs from returning to the Narcotics Division or any other division in Organized Crime, which resulted in Plaintiffs being forced to return to the Inspection Division, where they were subjected to harassment, not given assignments, and made to sit idly for up to eight hours a day. *Id*. at ¶¶ 68-69, 72. Spalding began suffering anxiety attacks and was again unsuccessful in

urging Rivera to initiate an investigation. *Id*. at ¶ 70. In November 2011, two IAD sergeants told Plaintiffs, "sometimes you have to turn a blind eye" to misconduct. *Id*. at ¶ 65.

On March 20, 2012, Plaintiffs were detailed to the Fugitive Apprehension Division and assigned to the United States Marshal's Task Force team. *Id*. at ¶ 73. Defendant Joseph Salemme was the Commander of the division, Defendant Robert Cesario was Plaintiffs' Lieutenant, and Defendant Maurice Barnes was Plaintiffs' immediate supervisor. *Id*. at ¶ 74. As soon as Plaintiffs began work in the division, O'Grady personally informed their supervisors that Plaintiffs were "rats" and should be treated accordingly. *Id*. at ¶ 75. Barnes then told members of the Marshal's Task Force Team that Plaintiffs were "rats" and should not be trusted or backed up, and he removed Plaintiffs from a high profile case. *Id*. at ¶¶ 76-77.

When Spalding approached Barnes about the retaliation, Barnes responded that Plaintiffs had brought down Watts, that the team hated Plaintiffs and would not provide back up support if needed, and stated words to the effect of, "I don't want to tell your daughter you're coming home in a box because the team won't help you on the street." *Id*. at ¶¶ 78-79. Around June 20, 2012, at a meeting at the Unit 606 headquarters, Salemme, Cesario, and Barnes told Plaintiffs that they would be relocated from the Marshal's Task Force team, which was on the far South Side of Chicago and where they worked the 7:00 a.m. to 3:00 p.m. shift, to a team on the North Side, where they would work the third watch from 4:00 p.m. to midnight. *Id*. at ¶¶ 80-81. During the meeting, Salemme said words to the effect of, "[Y]ou brought this baggage on yourselves … if you go against sworn personnel you know this will happen." *Id*. at ¶ 82. Cesario stated that Plaintiffs would not be deputized by the Marshals Service, despite Plaintiffs' understanding to the contrary, and that they would not get a take-home car, Marshal's pay, or overtime. *Id*. at

¶¶ 83-84.  Since then, Plaintiffs were repeatedly passed over for being deputized by the Marshals Service.  *Id*. at ¶¶ 85-86.

On June 23, 2012, Plaintiffs contacted Rivera to lodge another complaint, and again Rivera ignored their request.  *Id*. at ¶ 87.  Two days later, Plaintiffs began work on the North Side.  *Id*. at ¶ 88.  On August 17, 2012, Mohammed pled guilty to extorting drug dealers; during his plea, he described criminal misconduct going as far back as 2007.  *Id*. at ¶ 89.  Around this time, O'Grady "banned" Spalding from entering CPD headquarters at Homan Square, where she had been assigned a locker, and Cesario cautioned Spalding to "heed the warning that O'Grady doesn't want you there."  *Id*. at ¶¶ 90-91.

On November 1, 2012, Plaintiffs filed this suit, which complained of the retaliatory actions described above.  *Id*. at ¶ 92; *see* Doc. 1.  The Chicago media publicized Plaintiffs' account of Watts's criminal misconduct and the ensuing CPD-wide retaliation, including by high-ranking officers.  Doc. 44 at ¶¶ 93-94.  Plaintiffs also appeared in the media to speak about the retaliation they experienced.  *Id*. at ¶ 95.

Prior to the lawsuit, Plaintiffs' supervisor on the North Side team, Defendant Thomas Mills, appeared to defend Plaintiffs from retaliation from outside the team.  *Id*. at ¶ 97.  After the lawsuit was filed and the media reports appeared, Mills made Plaintiffs' daily tasks more difficult and hindered their ability to work overtime, develop cases, and participate in team arrests, and at the same time threatened to remove Plaintiffs from the team for failing to produce arrests.  *Id*. at ¶¶ 98-103.  Once, when Plaintiffs were assigned to pursue a dangerous felon, they were falsely told that the team would provide necessary back-up and support; however, when Plaintiffs arrived at the scene, the team was not present and Mills sent them a text message stating, "[B]e careful."  *Id*. at ¶¶ 104-05.

**Discussion**

Plaintiffs allege First Amendment retaliation based on their pre-suit speech (reporting criminal misconduct by other CPD officers and assisting with the FBI investigation) and post-suit speech (speaking with the media about this suit). The First Amendment conspiracy claim appears to pertain solely to the pre-suit speech. Doc. 64 at 17 (where Plaintiffs argue that "[t]he purpose [of the conspiracy] was to retaliate against Plaintiffs for becoming 'rats' by going outside the Department to bring down a (corrupt) sergeant," citing only portions of the complaint describing events prior to the filing of this suit). Defendants' challenges to the First Amendment claims are addressed below. No substantive challenge is made to the state law claim; Defendants argue only that the state law claim should be dismissed without prejudice under 28 U.S.C. § 1367(c) if the federal claims are dismissed.

**I.      Chicago Defendants' Motion to Dismiss**

Chicago Defendants advance the following arguments: (1) Plaintiffs do not allege a basis for municipal liability against the City under *Monell v. Department of Social Services*, 436 U.S. 658, 690-91 (1978); (2) Plaintiffs fail to state a First Amendment retaliation claim because their speech is not constitutionally protected; and (3) Plaintiffs fail to state a § 1983 conspiracy claim. Doc. 58; Doc. 59 at 1; Doc. 60 at 1.

**A.      *Monell* Claim Against the City**

To state a municipal liability claim under *Monell*, a plaintiff must allege "that an official policy or custom not only caused the constitutional violation, but was the moving force behind it." *Estate of Sims ex rel. Sims v. Cnty. of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007) (internal quotation marks omitted). "An official policy or custom may be established by means of [1] an express policy, [2] a widespread practice which, although unwritten, is so entrenched and well-

8

known as to carry the force of policy, or [3] through the actions of an individual who possesses the authority to make final policy decisions on behalf of the municipality or corporation." *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012); *see also Milestone v. City of Monroe*, 665 F.3d 774, 780 (7th Cir. 2011). Plaintiffs proceed under the second and third vehicles, alleging that "the widespread practices relating to the 'code of silence' so entrenched within the Department caused the retaliation," and that "the high ranking officials who have been delegated policymaking authority directly caused the retaliation." Doc. 64 at 10. The well-pleaded facts support the third basis for *Monell* liability.

In an effort to establish that predicate for a *Monell* claim, the amended complaint alleges that the Chicago City Council delegated "general management [responsibility] and control of the police department, … including to make appointments, promotions, transfers and to take disciplinary action against [CPD] employees [and] to … suspend or transfer employees," to the CPD Superintendent, who in turn "delegated certain policymaking authority to his Chiefs, including Defendants Kirby, Rivera and Roti." Doc. 44 at ¶ 112(a)-(c). Defendants respond by citing *Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir. 1992), for the proposition that "even the Superintendent of the Chicago Police Department is not a final policymaker capable of creating municipal liability for the City," which if true means that subordinates like Kirby, Rivera, and Roti are not policymakers either. Doc. 58 at 4. *Auriemma* held that the City was not liable under *Monell* for the CPD Superintendent's promotion of African-American officers and demotion of white officers—decisions that were alleged to have been based on race and politics. 957 F.2d at 398. To support its holding, the Seventh Circuit pointed to Chicago ordinances "unequivocally ban[ning] racial and political discrimination," and noted that the plaintiffs "do not contend that the City Council condoned departures from these rules." *Id.* at 399. The court explained that "to

hold the municipality liable [under] *Monell* …, the agent's action must implement rather than frustrate the government's policy," and that the *Auriemma* plaintiffs had alleged that the defendants had frustrated, rather than advanced, the City's policy as expressed in the ordinances prohibiting racial discrimination. *Id*. at 400.

Unlike the situation in *Auriemma*, Plaintiffs do not allege that Kirby, Rivera, and Roti frustrated any particular City policy. Rather, citing *Vodak v. City of Chicago*, 639 F.3d 738 (7th Cir. 2011), Plaintiffs submit that, "so far as the retaliatory acts against Plaintiffs were concerned," Kirby, Rivera, and Roti were the City's policymakers. Doc. 64 at 14. In *Vodak*, the Seventh Circuit explained that the relevant question under *Monell* turns not on a general inquiry into the governmental hierarchy, but rather on an examination of whether an individual municipal officer "was at the apex of authority for the *action in question*." 639 F.3d at 748 (quoting *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 468 (7th Cir. 2001)) (emphasis added). The Seventh Circuit noted that the CPD Superintendent "can be an official policymaker in one domain but not in another," and that where, as in *Vodak*, the challenged action pertained to dealing with demonstrations and mass arrests, "[a]ll that matters … is that Chicago's police superintendent has sole responsibility to make policy regarding control of demonstrations." *Ibid*. Because the Superintendent was "monitoring" and "approving the decisions of his subordinates, specifically their decisions [regarding demonstrations and mass arrests]," the Seventh Circuit held that "[t]he superintendent *was* the City, so far as the demonstration and arrests were concerned." *Ibid*. *Vodak* distinguished *Auriemma* on the ground that no ordinance constrained the Superintendent's authority to make policy regarding demonstrations and mass arrests, while in *Auriemma* there was an ordinance that constrained and

in fact eliminated the Superintendent's ability to take the action in question (making employment decisions based on race and politics). *Id*. at 748-49.

As in *Vodak*, the actions challenged here are not submitted by either side to have been restricted or prohibited by City ordinance. Defendants retort that this does not matter because *Auriemma* holds that the City Council is the sole policymaker with respect to *all* employment decisions. Doc. 66 at 13. That greatly overreads *Auriemma*, which holds only that the City Council is the sole policymaker with respect to the particular employment decisions challenged in that case—those based on considerations (race and politics) made unlawful by ordinance. *See DeLoughery v. City of Chicago*, 2002 WL 31654942, at *3 (N.D. Ill. Nov. 25, 2002) (denying a motion to dismiss a *Monell* claim alleging that the plaintiff CPD officers were denied promotions and transferred in retaliation for protected speech, reasoning that the plaintiffs "have sufficiently alleged what the plaintiff in *Auriemma* did not: that via custom and practice, the City had delegated to [the Superintendent] final authority to make policy regarding personnel matters, and not just authority to hire and fire"). Accordingly, the *Monell* claim survives dismissal.

**B.** **First Amendment Retaliation Claim**

To plead a First Amendment retaliation claim, Plaintiffs must allege that: "(1) [their] speech was constitutionally protected; (2) [they have] suffered a deprivation likely to deter free speech; and (3) [their] speech was at least a motivating factor in [Defendants'] actions." *Peele v. Burch*, 722 F.3d 956, 959 (7th Cir. 2013) (quoting *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012)). Defendants challenge the first and the third elements. Doc. 58 at 6-10.

**1.** **Nature of Plaintiffs' Speech**

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417

(2006). "For a public employee's speech to be protected under the First Amendment, the employee must show that (1) he made the speech as a private citizen, (2) the speech addressed a matter of public concern, and (3) his interest in expressing that speech was not outweighed by the state's interests as an employer in promoting effective and efficient public service." *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013) (internal quotation marks omitted).

With respect to Plaintiffs' pre-suit speech, Defendants argue only that Plaintiffs did not speak as private citizens. The Supreme Court has held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. Accordingly, the analysis turns on whether Plaintiffs were acting "pursuant to their official duties" when reporting to the FBI criminal misconduct by other CPD officers.

The cases draw the following line regarding a public employee's reporting of official misconduct. If the employee reports misconduct in the manner directed by official policy, to a supervisor, or to an external body with formal oversight responsibility, then the employee speaks pursuant to her official duties and her speech is unprotected. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1091 (7th Cir. 2008) (where an Illinois Gaming Board employee reported agency misconduct to the Gaming Committee of the Illinois House of Representatives, "a legislative committee responsible for overseeing the activities of" the Gaming Board); *Vose v. Kliment*, 506 F.3d 565, 570-71 (7th Cir. 2007) (where a police sergeant in the Springfield Police Department reported misconduct to his supervisors); *Sigsworth v. City of Aurora*, 487 F.3d 506, 511 (7th Cir. 2007) (where an Aurora Police Department detective reported his colleagues' alleged misconduct to his supervisor, as required by established policy); *Spiegla v. Hull*, 481 F.3d 961,

963 (7th Cir. 2007) (where a correctional officer reported other officers' breach of prison security rules to a supervisor, consistent with official policy). By contrast, if the employee testifies regarding misconduct to a jury or grand jury or reports misconduct outside established channels or in violation of official policy, she speaks as a private citizen and her speech is constitutionally protected. *See Chrzanowski v. Bianchi*, 725 F.3d 734, 739-40 (7th Cir. 2013) (where a county prosecutor testified under a subpoena before a grand jury and at trial regarding alleged wrongdoing by his supervisors); *Chaklos v. Stevens*, 560 F.3d 705, 711-12 (7th Cir. 2009) (where an Illinois State Police employee protested an agency decision to somebody other than the individuals identified by the applicable regulation).

The point is well illustrated by *Chaklos v. Stevens*, *supra*. The plaintiffs in *Chaklos* were employed by the Illinois State Police to train forensic scientists, and they also owned a forensic training company on the side. 560 F.3d at 709. After the Illinois State Police awarded a no-bid contract to a different training company on terms allegedly unfavorable to the government, the plaintiffs submitted a protest letter to an Illinois State Police procurement officer. *Ibid*. At the time, the Illinois Procurement Code provided that where a "State employee suspects … anticompetitive practice among any bidders [or] offerors …, a notice of the relevant facts shall be transmitted to the Attorney General and the chief procurement officer." *Id*. at 712 (quoting 30 ILCS 500/50-40). Although the statute imposed a "general duty" on the plaintiffs to report contracting fraud, the Seventh Circuit held that the plaintiffs were speaking as citizens, and not pursuant to their official duties, because they reported the alleged misconduct not to the individuals identified by the statute (the Attorney General or the agency's chief procurement officer) but rather to somebody else (a regular procurement officer). *See ibid.* ("Indeed,

plaintiffs did not submit their concerns to the Attorney General or the chief procurement officer as directed by the code.").

Plaintiffs' pre-suit speech, at least on the record at the pleading stage, is governed by *Chaklos*. Plaintiffs assert in their opposition brief that CPD policy requires officers to report misconduct by other officers internally to the CPD and that there is no duty to report such misconduct to a different law enforcement agency, such as the FBI. Doc. 64 at 3-4. This assertion, made by the non-movant in an opposition brief, must be credited on a Rule 12(b)(6) motion. *See Geinosky*, 675 F.3d at 745 n.1. In any event, Defendants appear to agree with Plaintiffs on this point, charging that Plaintiffs "violated Department policy by initially reporting the alleged misconduct to the FBI." Doc. 66 at 3. Under these circumstances, Plaintiffs spoke as private citizens, not pursuant to their official duties. *See Novick v. Staggers*, 2012 WL 2325661, at *4 (N.D. Ill. June 19, 2012) (holding that the plaintiff spoke as a citizen where "nothing in [his] job duties required him to report hiring misconduct to outside, federal investigators"). It follows that Plaintiffs' pre-suit speech was protected.

The same is true of Plaintiffs' post-suit speech, which occurred when they "appeared in the media, including local television and newspapers[,] telling of the years of retaliation that they endured at the hands of their superiors." Doc. 44 at ¶ 95. Defendants first assert, without explanation, that "Plaintiffs were not speaking to the media as private citizens." Doc. 58 at 9. That assertion is meritless. As *Garcetti* explains: "Employees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government. The same goes for writing a letter to a local newspaper … or discussing politics with a co-worker …." 547 U.S. at 423. Nowhere do Plaintiffs allege, and nor is it reasonable to

infer, that CPD policy required or expected CPD employees to speak to the media about internal misconduct. Accordingly, Plaintiffs spoke to the media as citizens, not as part of their official duties. *See Alaska v. EEOC*, 564 F.3d 1062, 1070 (9th Cir. 2009) (holding that an employee of the Alaska governor spoke as a citizen when she held a press conference publicly supporting a colleague's allegations of sexual harassment in the Governor's Office); *Payne v. D.C.*, 741 F. Supp. 2d 196, 217 (D.D.C. 2010) (same, where an elevator inspector "went outside his chain of command and made statements to the media … about his perceived problems with [the Department of Consumer and Regulatory Affairs's] elevator inspection regime"); *Wright v. City of Salisbury*, 656 F. Supp. 2d 1013, 1026 (E.D. Mo. 2009) (same, where a city police officer wrote to local media outlets about his concerns with the mayor's alleged directive to refrain from arresting suspected drunk drivers, noting that "[t]he record leaves little doubt that Plaintiff's duties did not include sharing his views on the matters discussed in his letters with the media").

Defendants next argue that Plaintiffs' post-suit speech did not address "a matter of public concern" because they merely aired their personal grievances. Doc. 58 at 9. To determine whether speech addresses a matter of public concern, the court must examine the statement's "content, form, and context." *Kristofek v. Vill. of Orland Hills*, 712 F.3d 979, 984 (7th Cir. 2013) (internal quotation marks omitted). "The motive of the speaker is relevant as part of the 'context' in which the speech was made … but content remains the most important factor in determining whether speech addresses a matter of public concern." *Ibid.* (internal quotation marks omitted). "[A] public employee's speech may still be protected if the speaker's motives were mixed and also included a desire to help the public." *Ibid.* Indeed, speech may be protected even if the employee's speech was "motivated *exclusively* by his own self-interest." *Id.* at 985. Consequently, while "[a] whistleblower's exclusive motive may be a desire for fame

and a book deal, … it is also accurate to say that the main objective of his *speech*—given its content, context, and the manner in which it is delivered—is to reform the system." *Id*. at 986. "In sum, if the objective of the speech—as determined by content, form, and context—is simply to further a purely personalized grievance, then the speech does not involve a matter of public concern. But if an objective of the speech was also to bring about change with public ramifications extending beyond the personal, then the speech does involve a matter of public concern." *Ibid*. (citations omitted).

These principles are exemplified by the *Kristofek* case itself. The plaintiff, a Village of Orland Hills police officer, released from police custody the son of a former mayor on orders from the police department's deputy chief. *Id*. at 982. Suspecting that he had acted illegally and seeking to absolve himself of potential criminal liability, the plaintiff reported to the FBI that incident as well as "possible political corruption in the Orland Hills Police Department and/or Village of Orland Hills." *Id*. at 983. In holding that the plaintiff's speech was a matter of public concern, the Seventh Circuit reasoned that "[t]he mere fact that [the plaintiff] was motivated by his self-interest does not make it implausible that he was *also* motivated to help the public," as "[a]ny reasonable person would understand that a report to the FBI could potentially result in widespread changes to police practices in Orland Hills." *Id*. at 984.

Accordingly, even if Plaintiffs spoke to the media about this suit to advance their own interests—perhaps to extract a favorable settlement as a result of the public pressure and scrutiny—it is plausible that they were also motivated to help the public by prompting "widespread changes to police practices" in Chicago. *See Greer v. Amesqua*, 212 F.3d 358, 371 (7th Cir. 2000) (holding that the plaintiff's "central motivation was exposing what he considered wrongdoing by declaring [in a news release] that the [Fire] Department's handling of [a certain]

incident reflected illegitimate favoritism," even though the "news release was replete with personal jibes"). On the pleadings, then, Plaintiffs' post-suit speech addressed a matter of public concern. *See ibid.* ("Whether public officials are operating the government ethically and legally is a quintessential issue of public concern."); *Glass v. Dachel*, 2 F.3d 733, 741 (7th Cir. 1993) ("Obviously, speech that focuses on police departments (and ultimately police protection and public safety) involve matters of great public concern."); *Auriemma v. Rice*, 910 F.2d 1449, 1460-61 (7th Cir. 1990) (en banc) (holding that "[i]t must … be a matter of public concern if a group of public employees is allegedly harassed and penalized by supervisors for seeking redress in our federal court system because of their public objection to the alleged racial basis of the [CPD] reorganization," and noting that there was "clearly public interest" because "[t]he reorganization was front page news in the *Chicago Tribune*"); *cf. Houskins v. Sheahan*, 549 F.3d 480, 492 (7th Cir. 2008) (holding that the plaintiff's police report did not address a matter of public concern because the "statements in the report were tied to a personal employment dispute; there is nothing in the record to indicate that [the plaintiff's] purpose in filing the police report was to bring to light any wrongdoing by the Sheriff, *e.g.*, to raise public awareness about the safety of the employees within the [department] or to uncover a policy of selective discipline or clout within the [department]").

### 2. Causation

Defendants also argue that Plaintiffs' pre-suit speech does not satisfy the causation requirement because the amended complaint "does not plausibly allege that the report made *to the FBI* some three years earlier [in 2007] was the but-for cause of the 'campaign of harassment' that allegedly started in August 2010." Doc. 66 at 9. In their opposition brief, Plaintiffs assert that they were retaliated against "for going outside the Department in order to bring down a CPD

sergeant with a federal investigation." Doc. 64 at 6-7. Defendants maintain that because "Plaintiffs do not cite to the Amended Complaint for this assertion," the court should disregard it. Doc. 66 at 8. On a motion to dismiss, however, the court may consider additional facts set forth in Plaintiffs' opposition brief if those facts "are consistent with the pleadings." *Geinosky*, 675 F.3d at 745 n.1. Plaintiffs' allegation of causation in their opposition brief is wholly consistent with the amended complaint, which alleges that the retaliation began as soon as O'Grady, among others, found out that "Plaintiffs had reported criminal misconduct by a sworn officer and were working with an *outside investigation*." Doc. 44 at ¶ 31 (emphasis added). It follows that the First Amendment retaliation claim adequately alleges causation.

## C.     Section 1983 Conspiracy Claim

Defendants contend that Plaintiffs' § 1983 conspiracy claim is barred by the intra-corporate conspiracy doctrine. Doc. 58 at 11. The doctrine provides that "managers of a corporation jointly pursuing its lawful business do not become 'conspirators' when acts within the scope of their employment are said to be discriminatory or retaliatory." *Wright v. Ill. Dept. of Children & Family Servs.*, 40 F.3d 1492, 1508 (7th Cir. 1994) (quoting *Travis v. Gary Cmty. Mental Health Ctr., Inc.*, 921 F.2d 108, 110 (7th Cir. 1990)). The doctrine applies with full force to municipal corporations. *See ibid.* Although the doctrine most often is applied in cases brought under 42 U.S.C. § 1985, *see Hartman v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 4 F.3d 465, 470-71 (7th Cir. 1993); *Travis*, 921 F.2d at 109-11; *Volk v. Coler*, 845 F.2d 1422, 1435 (7th Cir. 1988); *Dombrowski v. Dowling*, 459 F.2d 190, 196 (7th Cir. 1972), the court will assume for present purposes that it also applies to § 1983 conspiracy claims. *See Grider v. City of Auburn*, 618 F.3d 1240, 1261 (11th Cir. 2010).

There are two recognized exceptions to the intra-corporate conspiracy doctrine: (1) "where corporate employees are shown to have been motivated solely by personal bias"; and (2) where "the conspiracy was part of some broader discriminatory pattern …, or … permeated the ranks of the organization's employees." *Hartman*, 4 F.3d at 470-71. The second exception applies here, at least on the pleadings, as the amended complaint alleges a widespread pattern of retaliation by multiple defendants throughout CPD's ranks. *See Volk*, 845 F.2d at 1435 (holding that the intra-corporate conspiracy doctrine did not bar a conspiracy claim where the plaintiff "alleged numerous acts undertaken by several defendants").

Defendants alternatively argue that "Plaintiffs have not pled facts that plausibly show that the Defendants entered into an *agreement* to retaliate." Doc. 66 at 11. Defendants' argument cannot be reconciled with *Geinosky v. City of Chicago*, *supra*, where the plaintiff alleged a conspiracy among police officers to harass him by issuing 24 bogus parking tickets over a fourteen-month period. 675 F.3d at 745. In rejecting an argument that the plaintiff had not adequately pleaded a conspiracy claim, the Seventh Circuit reasoned:

> While the complaint makes only rather conclusory direct allegations of conspiracy, the complaint also alleges a pattern of harassment by several officers over a period of months. It is a challenge to imagine a scenario in which that harassment would not have been the product of a conspiracy. Under *Twombly*, all plaintiff needed to allege was a plausible account of a conspiracy. This complaint goes well beyond that. … *Iqbal* calls on us to apply our "judicial experience and common sense." If several members of the same police unit allegedly acted in the same inexplicable way against a plaintiff on many different occasions, we will not dismiss a complaint for failure to recite language explicitly linking these factual details to their obvious suggestion of collusion.

675 F.3d at 749 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)) (one citation omitted). The same result obtains here, as it would be a challenge to imagine a scenario in which the numerous alleged retaliatory acts against Plaintiffs over a two-year period would not have been

the product of a conspiracy.  In any event, the complaint does not rest on conclusory allegations, as it details meetings in which "multiple Defendants discussed with one another the handling or treatment of Plaintiffs" and referred to them as "rats."  Doc. 44 at ¶¶ 35, 38, 50, 57-58, 75-76, 82. These allegations, if true, support the reasonable inference that Defendants agreed to act together to violate Plaintiffs' constitutional rights.

## II.     Kirby's Motion to Dismiss

Kirby presses three other grounds for dismissing the claims against her.  Doc. 59 at 4-8. Her arguments are considered in turn.

### A.     First Amendment Retaliation Claim

Kirby contends that "Plaintiffs fail to allege they suffered a deprivation by Chief Kirby likely to deter free speech" or that "any protected speech was at least a motivating factor in Chief Kirby's actions."  *Id.* at 6.  This argument fails.  The amended complaint alleges that Plaintiffs were "kicked out" of Detached Services and transferred to a less desirable unit as a result of Kirby falsely telling Cuello that she did not know of Plaintiffs' involvement in the FBI investigation.  Doc. 44 at ¶¶ 45-48.  Additionally, the amended complaint alleges that Plaintiffs' pre-lawsuit speech caused Kirby's retaliatory conduct.  *Id.* at ¶ 111.  Kirby maintains that her "supposed denial of knowing what Plaintiff[]s were working on to Cuello in May 2011 is entirely consistent with maintaining Plaintiffs' confidentiality."  Doc. 65 at 3.  While that might be turn out to be true, the court at the Rule 12(b)(6) stage must draw all reasonable inferences in Plaintiffs' favor, and that inference is that Kirby lied to Cuello in an effort to undermine Plaintiffs' standing with Cuello and prompt their transfer out of Detached Services.

**B.      Section 1983 Conspiracy Claim**

Kirby next argues that the conspiracy claim against her should be dismissed because it is "so conclusory that it is not entitled the assumption of truth" and because it "fails to allege that Chief Kirby reached an agreement with anyone to violate Plaintiffs' free speech rights." Doc. 59 at 7. For the reasons discussed in Section I.C, *supra*, this argument fails. *Iqbal* does not require that the amended complaint explicitly allege that Kirby entered into an agreement to violate Plaintiffs' constitutional rights. Because the amended complaint's factual allegations make it plausible that Kirby and the other defendant officers reached an agreement to retaliate against Plaintiffs, the conspiracy claim against Kirby survives. *See Geinosky*, 675 F.3d at 749.

**C.      Qualified Immunity**

Kirby also argues that she is entitled to qualified immunity. Doc. 59 at 7. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Seventh Circuit asks two questions in determining whether a defendant is entitled to qualified immunity: "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right[,] and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Hernandez v. Sheahan*, 711 F.3d 816, 817 (7th Cir. 2013).

Kirby focuses on the second inquiry, arguing that Plaintiffs fail to allege that she violated a clearly established right. Doc. 59 at 7. For a right to be clearly established, it "must be specific to the relevant factual context of a cited case and not generalized with respect to the amendment that is the basis of the claim." *Surita v. Hyde*, 665 F.3d 860, 868 (7th Cir. 2011). Here, it was

clearly established at the time of Kirby's conversation with Cuello that the First Amendment prohibited facilitating the transfer of public employees to less desirable positions because of their involvement in uncovering government misconduct. *See Spiegla*, 371 F.3d at 936 (holding that the plaintiff's First Amendment rights were violated where the defendants facilitated her transfer to an undesirable post in retaliation for reporting other correctional officers' misconduct); *see also Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 648 (7th Cir. 2013) (holding that the defendants were not entitled to qualified immunity because "it was clearly established at the time of the [defendants'] actions that the First Amendment prohibited investigating and then suspending and terminating a public employee because he had helped another employee pursue a lawsuit aimed at uncovering and proving public corruption"). Kirby therefore is alleged to have violated a clearly established constitutional right.

## III.     Rivera's Motion to Dismiss

Like Kirby, Rivera raises three other grounds for dismissing the claims against him. Doc. 60 at 1-2. And as with Kirby, his arguments are without merit.

### A.     First Amendment Retaliation Claim

Rivera contends that his mere refusal to initiate an investigation into the alleged retaliation against Plaintiffs does "not support a protected constitutional right that was violated." Doc. 60 at 2. This contention misunderstands the nature of Plaintiffs' claim. Plaintiffs do not assert that Rivera was constitutionally required to initiate an investigation; rather, they claim that Rivera retaliated against them—by allowing the ongoing retaliation by others—for their involvement in the FBI investigation. Doc. 44 at ¶ 71 (alleging that "[i]n repeatedly refusing to initiate a[n] … investigation into the hostile work environment, Defendant Chief Rivera

condoned, encouraged, agreed to and allowed the retaliation to continue unabated"). This is sufficient to state a First Amendment retaliation claim against Rivera.

**B.**     **Section 1983 Conspiracy Claim**

Rivera next contends that Plaintiffs do not state a viable conspiracy claim against him because "[n]othing is alleged [in the amended complaint] other than the simple conclusion that he conspired." Doc. 67 at 3. This argument is materially identical to Kirby's argument for dismissing the conspiracy claim against her, and it fails for the same reason.

**C.**     **Qualified Immunity**

Rivera argues that he is entitled to qualified immunity because "[t]here was no constitutional right to have an internal investigation initiated upon a complaint by Plaintiffs to investigate their belief that they were experiencing retaliation by certain Chicago police officers." Doc. 60 at 2. Again, Rivera misunderstands Plaintiffs' claim. Nowhere do Plaintiffs claim a constitutional right to have an investigation into their complaints of retaliation. Instead, they allege that Rivera violated the First Amendment by retaliating against them for engaging in protected speech. Moreover, Rivera offers no authority or analysis in the one paragraph of his motion he devotes to qualified immunity, which forfeits the point in any event. *See Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 386 (7th Cir. 2012); *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011).

**Conclusion**

For the foregoing reasons, Defendants' motions to dismiss are denied. Defendants shall answer the amended complaint by April 3, 2014.

March 10, 2014

_____
United States District Judge