**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

Chicago Police Officers SHANNON
SPALDING and DANIEL ECHEVERRIA,

      Plaintiffs,

      v.

CITY OF CHICAGO, Chicago Police Chief
JUAN RIVERA, Chicago Police Chief
DEBRA KIRBY, Chicago Police Commander
JAMES O'GRADY, Chicago Police Chief
NICHOLAS ROTI, Chicago Police Lt.
DEBORAH PASCUA, Chicago Police
Sergeant MAURICE BARNES, Chicago
Police Lt. ROBERT CESARIO, Chicago
Police Commander JOSEPH SALEMME,
Chicago Police Sergeant THOMAS MILLS,

      Defendants.

No. 12 C 8777

Judge Gary Feinerman

Magistrate Judge Sheila M. Finnegan

**SECOND AMENDED**
**COMPLAINT**

      NOW COME Plaintiffs, SHANNON SPALDING and DANIEL ECHEVERRIA, by and

through their attorneys, complaining of Defendants and alleging as follows:

**Jurisdiction and Venue**

      1.      This Court has jurisdiction of the action pursuant to the Civil Rights Act, 42

U.S.C. § 1983, 28 U.S.C. § 1331 and 1343(a), and the Constitution of the United States; it also

has supplemental jurisdiction under 28 U.S.C. § 1367.

2.      Venue is proper under 28 U.S.C. § 1391(b). On information and belief, all defendants reside in this judicial district, and the events giving rise to the claims asserted herein occurred within the district.

**The Parties**

3.      Plaintiff Shannon Spalding is now and was at all times complained of a resident of Chicago, Illinois and a duly qualified peace officer employed by Defendant City of Chicago.

4.      Plaintiff Officer Daniel Echeverria is now and was at all times complained of a resident of Chicago, Illinois and a duly qualified peace officer employed by Defendant City of Chicago.

5.      Defendant City of Chicago is now and was at all times complained of a municipality incorporated in the State of Illinois and the employer of the individually named Defendants.

6.      Defendant Chief Juan Rivera is now and was at all times complained of an officer employed by Defendant City of Chicago. He engaged in the conduct complained of while acting under the color of law and within the scope of his employment. He is sued in his individual capacity.

7.      Defendant Chief Debra Kirby is now and was at all times complained of an officer employed by Defendant City of Chicago. She engaged in the conduct complained of while acting under the color of law and within the scope of her employment. She is sued in her individual capacity.

8.      Defendant Commander James O'Grady is now and was at all times complained of an officer employed by Defendant City of Chicago. He engaged in the conduct complained of while acting under the color of law and within the scope of his employment. He is sued in his

individual capacity.

9.      Defendant Chief Nicholas Roti is now and was at all times complained of an officer employed by Defendant City of Chicago. He engaged in the conduct complained of while  acting under the color of law and within the scope of his employment. He is sued in his individual capacity.

10.      Defendant Lieutenant Deborah Pascua is now and was at all times complained of  an officer employed by Defendant City of Chicago. She engaged in the conduct complained of  while acting under the color of law and within the scope of her employment. She is sued in her  individual capacity.

11.      Defendant Sergeant Maurice Barnes is now and was at all times complained of an  officer employed by Defendant City of Chicago. He engaged in the conduct complained of while  acting under the color of law and within the scope of his employment. He is sued in his individual capacity.

12.      Defendant Lieutenant Robert Cesario is now and was at all times complained of  an officer employed by Defendant City of Chicago. He engaged in the conduct complained of while acting under the color of law and within the scope of his employment. He is sued in his  individual capacity.

13.      Defendant Commander Joseph Salemme is now and was at all times complained of an officer employed by Defendant City of Chicago. He engaged in the conduct complained of  while acting under the color of law and within the scope of his employment. He is sued in his  individual capacity.

14.      Defendant Sergeant Thomas Mills is now and was at all times complained of an officer employed by Defendant City of Chicago. He engaged in the conduct complained of

2

while acting under the color of law and within the scope of his employment. He is sued in his

individual capacity.

## STATEMENT OF FACTS

15.     In 1996, Plaintiff Shannon Spalding was appointed as a police officer with

the City of Chicago. She has an exemplary record and is a highly decorated officer.

16.     In 1999, Plaintiff Daniel Echeverria was appointed as a police officer with the

City of Chicago. He has an exemplary record and received numerous commendations

between 1999 and 2010.

17.     In May 2006, Plaintiffs were assigned to the "Narcotics Division," Unit 189,

where their work involved pro-active police efforts to combat drug crimes. They worked to

develop confidential informants, obtain and conduct search warrants and conducted

conspiracy investigations.

18.     In 2007, while working an undercover narcotics investigation, Plaintiffs

uncovered evidence of illegal activity being committed by various Chicago Police

Officers.

19.     One of those officers was Sergeant Ronald Watts, who Plaintiffs had learned

was involved in the narcotics trade and was using his police powers to extort drug dealers.

20.     Over time, Plaintiffs learned more and more credible information that Sgt.

Watts and his cohort were extorting drug dealers by demanding payments to keep them free of

arrest and/or prosecution.

21.     In 2007, while off-duty, Plaintiffs reported to the Federal Bureau of

Investigation, Special Agent "P.S." the illegal activity by Sgt. Watts and others who worked

with him.

22.     Plaintiffs continued to meet with Special Agent "P.S.," who was assigned to the bureau's public corruption unit, intermittently through 2008 to discuss the information on Sgt. Watts that they continued to learn. Plaintiffs always did so while off-duty and in their personal capacities.

23.     After approximately a year of speaking to the F.B.I. in their personal capacities, the F.B.I. agents began to request that Plaintiffs spend more time assisting on the case. Because additional involvement with the investigation would encroach on their professional time, Plaintiffs responded that it would have to be conducted through the Chicago Police Department.

24.     In August 2008, F.B.I. special agents met with the then-Chief of the Internal Affairs Division ("IAD") for the Chicago Police Department to discuss the Watts investigation.

25.     At a meeting with the F.B.I. and the Chief of IAD, Plaintiffs were informed that they would be joining the investigation in their official capacity as police officers. The federal investigation was highly confidential and Plaintiffs' identities and involvement in the case were to remain confidential.

26.     Certain CPD command staff knew of Plaintiffs' involvement in the federal Watts investigation (known as "Operation Brass Tax"), including the Superintendent of Police, former-Deputy Superintendent (now Chief) Kirby, and the Chief of IAD (subsequently, Defendant Juan Rivera).

27.     Thereafter, although Plaintiffs remained assigned to the Narcotics Unit, they were detailed to "Detached Services," Unit 543, and reported directly to F.B.I. headquarters to work on Operation Brass Tax.

28.     Over the next several years Plaintiffs continued to work on Operation Brass Tax. During that time, they were also encouraged by CPD command staff to develop other

narcotics related cases, which overlapped with their work on Operation Brass Tax.

29.     On an unknown date, information that Plaintiffs had reported criminal misconduct by a sworn officer and were working with an outside investigation was leaked within the Department and became known to Defendant Commander O'Grady.

30.     Defendant O'Grady was the Commander of Unit 189, Plaintiffs' unit of assignment.

31.     In August 2010, Defendant O'Grady began a campaign of harassment and retaliation that persists to this day.

32.     On approximately August 17, 2010, Plaintiffs were developing a narcotics case, as they were previously approved to do. Plaintiffs submitted paperwork to Defendant O'Grady, seeking approval of a confidential informant. Although he initially approved the application, upon learning that it had been submitted by Plaintiffs, he rescinded the approval.

33.     Defendant O'Grady then informed supervising personnel in the unit that Plaintiffs were "rats," meaning that they had reported other police officers' misconduct. Defendant O'Grady ordered that the unit was not to work with Plaintiffs and personnel in the unit should not assist Plaintiffs.

34.     By interfering with their ability to develop narcotics cases in their unit of assignment, Defendant O'Grady intentionally prohibited Plaintiffs from earning overtime.

35.     Although Plaintiffs were thereafter prevented from working overtime in Unit 189, other officers in the unit were able to use the intelligence provided by Plaintiffs to develop one or more successful narcotics cases and to earn overtime.

36.     On one or more dates, multiple Defendants discussed with one another the handling or treatment of Plaintiffs. At one such meeting, Plaintiffs' possible reassignment

2

within the Department was discussed. In response, Defendant O'Grady referred to Plaintiffs as "rats" and stated that he did not want Plaintiffs working in his unit.

37.    During the meeting, on information and belief, Defendant O'Grady stated words to the effect of, "God help them if they ever need help on the street, it ain't coming."

38.    Instead of putting a stop to his subordinate's retaliation against Plaintiffs, Defendant Chief Nicholas Roti, who was also was present at the meeting, concurred with Defendant O'Grady.

39.    Defendant Chief Roti is the head of the Bureau of Organized Crime, which includes the Narcotics Division, the Gang Enforcement Division, and the Gang Investigation Division (which includes most of the Department's Task Forces, as well as the Vice and Intelligence Sections).

40.    Defendant Chief Roti fostered, allowed, agreed to and encouraged the retaliation against Plaintiffs at this meeting and in the years that followed.

41.    Although Plaintiffs' years of exemplary police work made them a perfect fit for the Bureau of Organized Crime, Defendant Chief Roti would not allow Plaintiffs to work in any unit in the Bureau.

42.    Plaintiffs were informed that none of the "bosses" wanted them in their units and that their "careers are over."

43.    In or near late May 2011, then-Deputy Superintendent (now, Chief) Defendant Debra Kirby caused Plaintiffs to be removed from their detail to Unit 543, Detached Services.

44.    At that time, the Deputy Superintendent of Detached Services, Beatrice Cuello, called Defendant Kirby to confirm that Plaintiffs were working on an undercover investigation and that the paperwork was in place.

2

45.     Despite her knowledge of Plaintiffs' detail to the federal investigation, Defendant  Kirby falsely denied even knowing Plaintiffs or knowing that Plaintiffs were involved with any  investigation. She did so knowing that this denial would jeopardize Plaintiffs' detail.

46.     Based upon Defendant Kirby's denials, Deputy Superintendent Cuello believed Plaintiffs had lied about their roles in the Watts investigation. As a result, Plaintiffs were kicked  out of Unit 543.

47.     Despite having years of experience conducting undercover operations, eavesdropping operations, developing informants and other valuable police work, Defendants  O'Grady and Roti would not allow Plaintiffs to return to any unit within Organized Crime  including their own unit of assignment.

48.     Because Plaintiffs had been labeled "rats" in the Department, they lost their specialized assignments, weekends and holidays off, take-home vehicles, and the ability to work  unlimited overtime.

49.     Plaintiffs were therefore detailed to the Police Academy for the next three weeks.

50.     During their time at the Police Academy, Plaintiffs often did nothing more than sit at desks. Other times they sat in on recruit or other courses, sometimes the same course repeatedly for no reason other than that no one knew why Plaintiffs were there.

51.     Plaintiffs were effectively on "house arrest" in retaliation for having investigated  fellow officers.

52.     Although Plaintiffs complained to Defendant Chief Rivera about the retaliatory  re-assignment to the Police Academy, he failed to take any action.

53.     Around the end of July 2011, Plaintiffs were moved to the Inspections Division,  Unit 126.

54.      They remained detailed to Unit 126, Inspections until March 2012. Throughout that time Plaintiffs were subjected to harassment and hostility, which was directed by their immediate supervisor, Defendant Lt. Pascua.

55.      Defendant Lt. Pascua called Plaintiffs, "rat motherf---ers" and told them that she did not want them in the unit.

56.      Defendant Lt. Pascua spread the word among their co-workers that Plaintiffs were "rats" and no one should talk to them.

57.      Throughout their time in Unit 126, Defendant Lt. Pascau gave Plaintiffs few legitimate work assignments. Most of their time was spent sitting at desks idle or being forced to chauffeur Defendant Lt. Pascua, often on personal errands.

58.      Defendant Lt. Pascua threatened to put a false case on Plaintiffs, saying "f---them from narcotics…I'm a lawyer and know how to put a case together…I'm gonna work on getting them f---ing launched."

59.      On September 13, 2011, Plaintiffs met with their commanding officer, Commander Stanley and informed her of ongoing retaliation and hostile work environment in the unit. After being told of the retaliation, Stanley said, "I don't want to hear this, I don't want to know."

60.      Commander Stanley did nothing to stop the retaliation or Lt. Pascua's inappropriate conduct including that she did not initiate a Complaint Register ("C.R.") about the retaliation as she was required to do by Department policy. By allowing the retaliation against Plaintiffs to continue unabated in her unit Commander Stanley condoned, encouraged, and agreed to the retaliation.

61.      Likewise, Defendant Chief Rivera knew of the constant retaliation against Plaintiffs but allowed it to continue unabated including that he refused to initiate an I.A.D. investigation into the harassment and retaliation.

2

62.     In November 2011, as another manifestation of the City of Chicago's policy against investigating fellow officers, two Sergeants of the Internal Affairs Division told Plaintiffs "sometimes you have to turn a blind eye" to misconduct.

63.     In October 2011, Plaintiffs were called back to assist the F.B.I. with the completion of Operation Brass Tax.

64.     Plaintiffs continued to work on the case with the F.B.I. until the successful arrests and indictments of Sgt. Ronald Watts and Officer Kallat Mohammed in February 2012.

65.     Because Plaintiffs had already been established to be "rats," Defendant Chief Roti ordered that they were not allowed to return to the narcotics unit "or any other division of Organized Crime."

66.     As a result, Plaintiffs were forced to return to Unit 126, which was an undesirable position as well as a hostile work environment due to the continued retaliation and harassment.

67.     When Plaintiff Spalding again asked Defendant Chief Rivera to initiate a C.R. investigation for a hostile work environment after she began to suffer anxiety attacks, Rivera refused to acknowledge the request.

68.     In repeatedly refusing to initiate a C.R. investigation into the hostile work environment, Defendant Chief Rivera condoned, encouraged, agreed to and allowed the retaliation to continue unabated.

69.     Plaintiffs were not given assignments with Unit 126 and were again made to sit idly, sometimes for up to eight hours a day.

70.     On March 20, 2012, Plaintiffs were detailed to the Bureau of Detectives, Fugitive Apprehension, Unit 606. Within that Unit, Plaintiffs were assigned to the United States Marshal's Task Force.

2

71.     Defendant Joseph Salemme was the Commander of Fugitive Apprehension; Defendant Robert Cesario was Plaintiffs' Lieutenant in the unit; and Defendant Sgt. Maurice  Barnes was Plaintiffs' immediate supervisor on the U.S. Marshal's Task Force Team.

72.     Upon information and belief, on or around the day of their initial detail to the U.S.  Marshal's Task Force Team, Defendant O'Grady went out of his way to personally inform  Plaintiffs' new supervisors that they were "rats" and should be treated accordingly.

73.     Defendant Sgt. Barnes thereafter informed Plaintiffs' new team that they were  "rats," that Plaintiffs should not be trusted or backed up by the team.

74.     At one point, Defendant Sgt. Barnes removed Plaintiffs from a high profile case to which they had been assigned; because they were "rats," Plaintiffs would not be allowed to work the case.

75.     When Plaintiff Spalding tried to talk to Sgt. Barnes in an effort to prevent further  retaliation, Sgt. Barnes repeatedly referenced that Plaintiffs had brought down a sergeant  (referring to Watts).

76.     Sgt. Barnes told Plaintiff Spalding that the team hated them and would not back them up if they were in need. He stated words to the effect of, "I don't want to tell your daughter  you're coming home in a box because the team won't help you on the street."

77.     On or about June 20, 2012, Plaintiffs were ordered to meet with Defendants  Commander Salemme, Lt.Cesario and Sgt. Barnes at Unit 606 headquarters.

78.     Defendants Commander Salemme, Lt.Cesario and Sgt. Barnes removed Plaintiffs from the Marshal's Taskforce Team, located on the far Southside, where they worked days (7 a.m. to 3 p.m. Defendants had Plaintiffs placed on a team located on the Northside, working the third watch (4 p.m. to 12 p.m.).

2

79.     During the meeting, Defendant Commander Salemme told Plaintiffs words to the effect of, "you brought this baggage on yourselves … if you go against sworn personnel you know this will happen."

80.     Defendant Lt. Cesario said words to the effect of, Plaintiffs were being sent "up north" and would not get a take-home car, Marshal's pay, overtime or be deputized. He made clear, "that will never happen for you."

81.     When Plaintiffs were initially assigned to the Task Force, they had been informed that when positions opened up for deputization by the U.S. Marshals, they—like other members of the Task Force—would be deputized.

82.     Shortly after Plaintiffs were removed from the Task Force Team, dozens of positions for officers to be deputized as U.S. Marshals opened up. After Plaintiffs' removal from the team, other officers with less seniority than Plaintiffs were brought into Unit 606 and deputized while Plaintiffs were passed up.

83.     In fact, since then, dozens of other officers in the Fugitives Apprehension Unit have been deputized by the U.S. Marshals including other officers from Plaintiffs' current team. As Lt. Cesario promised, however, Plaintiffs have been continually passed up for deputization.

84.     On June 23, 2012, Plaintiffs contacted Defendant Chief Rivera from I.A.D. to lodge another complaint. Again, their complaint was ignored.

85.     On June 25, 2012, Plaintiffs were reassigned to a nighttime fugitive apprehension team and relocated to the Northside of Chicago. This reassignment was a step backwards for Plaintiff professionally, as well as an inconvenience.

86.     On August 17, 2012, Sgt. Watts' co-conspirator, Officer Mohammed pled guilty to extorting drug dealers. In his plea, he described the criminal misconduct going back to at least 2007.

2

87.     Around the same time, Defendant Commander O'Grady "banned" Plaintiff Spalding from entering Chicago Police Headquarters at Homan Square, where she was assigned a locker.

88.     Plaintiffs' own supervisor, Defendant Lt. Cesario, stressed that Plaintiff should "heed the warning that O'Grady doesn't want you there."

## Retaliation Resulting from the Lawsuit and Speech in the Media

89.     On November 1, 2012, Plaintiffs filed the original civil action in this case complaining of the above-described retaliation.

90.     Following the filing, Chicago area media publicized Plaintiffs' reporting of the  Watts' criminal misconduct and the Department-wide effort to punish Plaintiffs for reporting  police corruption.

91.     While accounts of the prevalence of the code of silence among Chicago Police Department rank-and-file have been widely reported for years, Plaintiffs' case shed new light on  Department's top ranking members explicit enforcement of the code of silence.

92.     Plaintiffs appeared in the media, including local television and newspapers telling  of the years of retaliation that they endured at the hands of their superiors.

93.     As a result, Plaintiffs experienced new and additional retaliation.

94.     Prior to the lawsuit, Plaintiffs' current supervisor, Defendant Sgt. Mills seemed to  defend Plaintiffs in the face of the retaliation coming from outside the team.

95.     After the filing of the lawsuit and Plaintiffs' related media appearances, Plaintiffs  faced retaliation within the team, including being ostracized and no longer included in team activities.

96.     Defendant Sgt. Mills regularly brought up the fact that Plaintiffs have a lawsuit and  made allegations against the "bosses."

2

97.     Defendant Sgt. Mills badgered Plaintiffs, making their day to day  work more difficult. For example, Sgt. Mills insisted that even when the team wass working on the Southside, Plaintiffs must return to the Northside office to check-off while the rest of the team is  allowed to leave directly from the Southside.

98.     Defendant Sgt. Mills has ordered Plaintiffs to only return to the team's office for check-off at the end of the day. Other officers freely come and go from the office while Plaintiffs risk ridicule and harassment if they do so.

99.     Defendant Sgt. Mills repeatedly made it difficult for Plaintiffs to work overtime hours while the rest of the team did so without hindrance.

100.     Defendant Sgt. Mills prevented Plaintiffs from  working up cases, as well as excluded them from team arrests, while simultaneously threating to remove Plaintiffs from the team for "not producing" (arrests).

101.     On one occasion when Plaintiffs were allowed to pursue the arrest of a felon who  was known to be violent and dangerous, Plaintiffs were assured by their team that the team  would be present for the necessary back-up and support.

102.     However, when Plaintiffs arrived as scheduled, their team was nowhere in sight.  Instead, they received a text from Defendant Sgt. Mills stating, "be careful."

103.     In light of the danger presented by the suspect, Plaintiffs took this to be a threat to  their safety and well-being.

104.     On March 29, 2013, Detective Thomas Becker told Defendant Sgt. Thomas Mills that Police Officer Coleen Dougan had approached him in a parking lot and told him that she had observed plaintiff Spalding in the hallway of the 11th District, and she appeared to be listening on speaker mode to an unknown electronic device that was possibly a cell phone. Dougan had told Becker that she heard what she thought was the voice of Thomas Mills

2

coming from the device and she "thought" if was a recording.

105.    Dougan told investigators Barz and Muscolino, however, that she did not know if Spalding was having a conversation with Mills on a cell phone or if what she heard was a voice message.  Dougan further told investigators that she did not know for certain what the electronic device was Spalding was listening to, if the voice was indeed Sgt. Thomas Mills or if Spalding and Mills were having a telephone conversation.  Dougan informed Barz that she had only informed Det. Becker for the purpose of being careful around Officer Spalding and not to begin a criminal investigation.

106.    On March 31, 2013, without speaking to Dougan or Spalding, Defendant Thomas Mills initiated a criminal investigation of plaintiff Spalding, accusing her of illegally recording a conversation with him.  Mills took this action despite the fact that he was aware of no evidence of illegal conduct on the part of Spalding. These actions were in furtherance of the conspiracy to retaliate against Spalding for her protected activities as set forth herein.

107.    On April 11, 2013, Barz and Muscolino confronted plaintiff Spalding on the job. Barz informed Spalding that she was under arrest.  Barz and Muscolino then escorted plaintiff Spalding into a room, shut the door and unlawfully detained Spalding, preventing her from leaving.

108.    Barz and Muscolino read Spalding her constitutional rights and informed Spalding that she was being detained on federal charges of illegally recording Thomas Mills. When Spalding asked if she was free to leave the room she was told "no."

109.    During the arrest and detention, Barz told plaintiff Spalding that he knew the allegations were false. He further suggested to Spalding that the charges could "go away" if she dropped her federal lawsuit.

110.    Plaintiff Spalding was not released from custody until she was able to contact her attorney and assert her constitutional right to refuse further interrogation.

2

## COUNT I –FIRST AMENDMENT RETALIATION

111.    Plaintiffs repeat, re-allege and incorporate by reference the factual allegations   above as fully set forth herein.

112.    The First Amendment to the United States Constitution guarantees Plaintiffs'   rights to speak out on matters of public concern without fear of unjust retaliation.

113.    As described more fully above, Plaintiffs engaged in extensive protected speech  on matters of public concern by reporting on the criminal misconduct and corruption of Sgt.  Watts, Officer Mohammed and others to the F.B.I.

114.    As described more fully above, Plaintiffs engaged in extensive protected speech on matters of public concern by filing this civil action and speaking out in the media about the retaliation that they have faced and the prevalence of the code of silence within the Chicago Police Department.

115.    As a result of their exercise of protected speech, Defendants City of Chicago, Chief Rivera, Chief Kirby, Commander O'Grady, Chief Roti, Lieutenant Pascua, Commander Stanley, Sergeant Barnes, Lieutenant Cesario, Commander Salemmi, and  Sergeant Mills, retaliated against Plaintiffs in the manner described in the preceding paragraphs.

116.    Retaliation against Plaintiffs was devised, approved and carried out by individuals  with final policymaking authority with respect to the actions taken, including as follows:

a.    By authority delegated to him by the Chicago City Council, the Superintendent of Police is responsible for the general management and control of the police department, and has full and complete authority to administer the department. The Superintendent has the power and the duty to administer the affairs of the department as its

2

chief administrative officer, including to make appointments, promotions, transfers and to take disciplinary action against department employees; to appoint, discharge, suspend or transfer employees; and to issue instructions to department employees in the line of their duties.

      b.     Within the Department, the Superintendent has delegated certain policymaking authority to his Chiefs, including Defendants Kirby, Rivera and Roti.

      c.     The Superintendent, as well as Defendant Chiefs Kirby, Rivera and Roti, were responsible for the retaliatory re-assignments and effective demotions to Plaintiffs.

      d.     The Superintendent, as well as Defendant Chiefs Kirby, Rivera and Roti, were aware of the retaliation against Plaintiffs, described above, and knowingly allowed it to continue unabated thereby encouraging, fostering and causing the retaliation.

117.    The misconduct described in this Count was the result of Defendant City of Chicago's deliberate indifference to the policies and widespread practices described more fully above and in that:

      a.  Municipal policymakers are aware of, condone and facilitate by their inaction, a "code of silence" in the Chicago Police Department, by which officers understand that they should cover for each other unconditionally and that failure to do so amounts to a betrayal.

      b.  Municipal policymakers are aware of, condone and facilitate by their inaction, the enforcement of the "code of silence" within the Department through the retaliation against officers who do report the misconduct of other officers.

      c.  The City Council's Committee on Police and Fire has recognized the existence of the code of silence within the Chicago Police Department but has failed to take the necessary steps to protect officers who break the Code of Silence and suffer retaliation as

a result.

d. As a matter of both policy and practice, the City of Chicago directly encouraged, and was thereby the moving force behind the very type of misconduct at issue here by failing to adequately supervise, discipline, and control its officers, such that its failure to do so manifests deliberate indifference.

e. As a matter of both policy and practice, the City of Chicago facilitated the very type of misconduct at issue here by allowing it to continue as a matter of practice within the Department, thereby leading Chicago police officers to believe that the code of silence will be enforced throughout the Department and, in that way, directly encouraging future abuses.

f. As a matter of widespread practice so prevalent as to comprise municipal policy, officers of the Chicago Police Department who have dared to speak out about the misconduct of others have experienced retaliation a manner similar to that alleged by Plaintiffs.

118. As a result of the aforementioned deprivation of federal rights, Plaintiffs have suffered and will likely continue to suffer injuries including but not limited to emotional distress.

## COUNT II – CONSPIRACY VIA 42 U.S.C. § 1983

119. Plaintiffs repeat, re-allege and incorporate by reference the factual allegations above as fully set forth herein.

120. As described in the preceding paragraphs, Defendants, acting in concert with other known and unknown conspirators, reached an understanding to deprive Plaintiffs of their Constitutional rights.

121. Plaintiffs were deprived of their Constitutional rights in the manner described

in  the preceding paragraphs.

122.    That in furtherance of the conspiracy, Defendants committed overt acts and were  otherwise willful participants in joint activity with state actors under color of law.

123.    That the misconduct described in this Count was undertaken with malice,  willfulness, and reckless indifference to the rights of others.

124.    As a result of the aforementioned deprivation of federal rights, Plaintiffs have suffered and will likely continue to suffer injuries including but not limited to emotional distress.

## COUNT III – VIOLATION OF THE ILLINOIS
## WHISTLEBLOWER PROTECTION ACT

125.    Plaintiffs repeat, re-allege and incorporate by reference the factual allegations   above as fully set forth herein.

126.    The City of Chicago was at all times complained of Plaintiffs' employer as  defined in 740 ILCS § 174/5.

127.    The individual Defendants were at all times "employers" within the meaning of 740 ILCS §174/5.

128.    Plaintiffs were at all times complained of employees of the City of Chicago as defined in 740 ILCS § 174/5.

129.    The City of Chicago and  the individual Defendants  were prohibited according to  740 ILCS § 174/15 from retaliating against Plaintiffs for disclosing to the F.B.I. what they reasonably believed and in fact knew were multiple violations state and federal laws by Watts, Mohammed and other Chicago Police Officers.

130.    The City of Chicago and the individual Defendants were prohibited according to 740 ILCS 174/15 from retaliating against Plaintiffs for disclosing to the City's Internal

2

Affairs Department what they reasonably believed and in fact knew were multiple violations of

state and federal laws by Watts Mohammed and other Chicago Police Officers.

131.    The City of Chicago and the individual Defendants continuously and

repeatedly retaliated against Plaintiffs in the manner described in the  preceding paragraphs

as a result of their reporting of the criminal misconduct.

132.    As a result of the aforesaid retaliation, Plaintiffs have suffered and will likely

continue to suffer injuries including but not limited to emotional distress.

WHEREFORE, pursuant to 42 U.S.C. Section 1983 and applicable state law, Plaintiffs

demand judgment against the Defendants, jointly and severally, for compensatory damages and,

because the individual Defendants acted maliciously, wantonly, or oppressively, Plaintiffs seek

punitive damages against them in their individual capacity, in addition to the costs of this action

and attorneys' fees, and such other and additional relief as this court deems equitable and just.

PLAINTIFFS DEMAND TRIAL BY JURY.

RESPECTFULLY SUBMITTED,

_/s/Christopher R. Smith_____
Attorney for Plaintiff

Christopher R. Smith
Christopher Smith Trial Group, LLC
1 N. LaSalle Street, Suite 3040
Chicago, IL 60602
312.432.0400
Email: chris@crstrialgroup.com

Jeffrey L. Taren
Miriam N. Geraghty
Kinoy, Taren & Geraghty P.C.
224 S. Michigan Ave.
Suite 490
Chicago, IL 60604
Tel: 312- 663-5210
Fax: 312-663-6663
Email:  jtaren@ktglawyer.com
            mgeraghty@ktglawyer.com

2

## **CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that the foregoing Second Amended Complaint was served on counsel for all Defendants by electronic means.


                                        /s/ Christopher Smith
                                   _____