**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Chicago Police Officer SHANNON SPALDING, | ) | |
| Chicago Police Officer DANIEL ECHEVERRIA, | ) | Case No. 12-cv-8777 |
| | ) | |
| Plaintiffs, | ) | Judge Gary Feinerman |
| | ) | Magistrate Judge Shelia Finnegan |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR**
**MOTION FOR SUMMARY JUDGMENT**

Defendants, City of Chicago (the "City"), Juan Rivera ("Rivera"), James O'Grady ("O'Grady"), Nicholas Roti ("Roti"), Maurice Barnes ("Barnes"), Robert Cesario ("Cesario"), Joseph Salemme ("Salemme") and Thomas Mills ("Mills") (referred to herein as the "City Individual Defendants") (collectively "Defendants"), by their undersigned attorneys, submit this Memorandum in Support of their Motion for Summary Judgment on the Complaint of Shannon Spalding ("Spalding") and Daniel Echeverria ("Echeverria") (collectively "Plaintiffs").

**INTRODUCTION**

Plaintiffs, who are Chicago Police Officers, have filed a three-count Second Amended Complaint against the City and the remaining individual Defendants alleging claims under 42 U.S.C. § 1983 for First Amendment Retaliation (Counts I) and Conspiracy (Count II), and a state law claim of retaliation under the Illinois Whistleblower Act ("IWA"), 740 ILCS 174/15 (Count III). Plaintiffs' claims arise from their alleged protected activity of reporting illegal activity of other police officers, which they did first internally within the Chicago Police Department ("CPD") and then to another law enforcement agency, the FBI. Plaintiffs allege that Defendants retaliated against them, and entered into a conspiracy to retaliate against them, for engaging in the allegedly protected reporting to the FBI. Defendants submit that there are no genuine issues

of material fact as to any of Plaintiffs' claims, and that for the numerous reasons explained below Defendants are entitled to judgment as a matter of law on the Second Amended Complaint.

## STATEMENT OF FACTS[1]

In approximately 1997, while Spalding was working as a Chicago Police Officer assigned to Public Housing South, FBI Special Agent Ken Samuels ("Agent Samuels") contacted Spalding and asked her if she had any knowledge of illegal activity by multiple officers, including Sergeant Ronald Watts ("Watts"), who was also then working in Public Housing South.  (D. St. ¶ 8.)  Spalding told Agent Samuels that she was not aware of any illegal activity by Watts or the other officers.  *Id.*  Based on that contact to her by Agent Samuels, Spalding knew then that the FBI was looking into allegations of illegal activity by Watts and other officers.  (D. St. ¶ 9.)  In fact, the FBI and CPD had been investigating Watts and an Officer Mohammed ("Mohammed") for nearly a decade before 2008.  (D. St. ¶ 24.)

Plaintiffs allege that approximately ten years later, when they were assigned to the Narcotics Division of Unit 189, Bureau of Organized Crime, during an intelligence debriefing of one suspect in 2007 by CPD officers including Echeverria, the suspect informed Echeverria of certain alleged illegal activity by Watts.  Plaintiffs allege that Echeverria reported the alleged illegal activity conveyed by the suspect to his supervisor, CPD Sergeant Roderick Watson ("Watson").  (D. St. ¶¶ 7, 10-11.)  In 2007, shortly after Echeverria reported the alleged illegal activity of Watts to Watson, Spalding reported the same information Echeverria had learned concerning Watts' alleged criminal activity to Agent Patrick Smith ("Agent Smith") with the FBI.  (D. St. ¶ 12.)  When Spalding contacted Agent Smith she asked him to put her in contact with Agent Samuels because Spalding knew that Agent Samuels had previously been investigating Watts.  (D. St. ¶ 13.)

---

[1] Defendants' complete statement of facts is set forth in Defendants' Rule 56.1(a)(3) Statement of Material Facts, filed together herewith.  Those facts are summarized here.  References to Defendants' Rule 56.1(a) Statement will be made herein as follows:  "D. St. ¶ __."

According to Plaintiffs, prior to August 2008, Plaintiffs assisted the FBI on the Watts investigation during their non-work time at CPD. (D. St. ¶ 14.) However, certain personnel within CPD's Internal Affairs Division ("IAD") knew for at least some time prior to March 2008 that Plaintiffs were working on the Watts investigation with the FBI on an as-needed basis, and in or about June 2008 Defendant Roti, then Commander of Narcotics, approved Plaintiffs doing so. (D. St. ¶¶ 15-16.) In an August 2008 meeting that included personnel from the FBI and CPD's Internal Affairs Division (but did not include any of the individual Defendants), Plaintiffs were informed that they would be detailed to CPD's Detached Services unit to continue to work on the Watts investigation (also known as "Operation Brass Tax") as part of their official CPD duties. (D. St. ¶ 20.) Plaintiffs are not claiming that their detail to Detached Services was retaliatory. (D. St. ¶ 23.)

Plaintiffs admit that they worked on Operation Brass Tax as their CPD-approved work assignment for approximately two years, until August 17, 2010, before they suffered any alleged retaliation. (D. St. ¶ 28.) Plaintiffs allege that this first incident of alleged retaliation involved Defendant O'Grady and was the result of an alleged "leak" to O'Grady that Plaintiffs were working on Operation Brass Tax. However, the undisputed admissible evidence is that there was no such leak to O'Grady, and O'Grady had no knowledge of Plaintiffs' participation in the Watts investigation or that Plaintiffs had reported any alleged illegal activity of another officer either to the FBI or internally within CPD. (D. St. ¶¶ 37-39; 85-86.)[2]

In May 2011, Defendant Roti (then Chief of the Bureau of Organized Crime that included Narcotics) was asked by Defendant Rivera (then Chief of IAD) if he wanted Plaintiffs to return to Narcotics, and Roti consulted with O'Grady (then Commander of Narcotics) about the matter. (D. St. ¶ 43.) O'Grady and Roti were in agreement that they did not want Plaintiffs to return to Narcotics based on what they knew of Plaintiffs' performance during their prior stint in the unit,

---

[2]  Additionally, as argued herein, this first incident of alleged retaliation on August 17, 2010 is time-barred by the statutes of limitations governing Plaintiffs' claims under § 1983 and the IWA.

including in Roti's case because of a discrepancy at one point in terms of whether Plaintiffs were showing up for work on days when they weren't working with the FBI on Operation Brass Tax. (D. St. ¶¶ 43-48.)[3]  Plaintiffs never asked Roti or O'Grady if they could return to Narcotics.  (D. St. ¶ 41.)  O'Grady has never met either of the Plaintiffs and has never supervised them.  (D. St. ¶ 27.) Defendant Rivera, who became Chief of CPD's Internal Affairs Division in March 2009, never told O'Grady about Plaintiffs being involved in Operation Brass Tax or any type of investigation of police officers.  (D. St. ¶ 37.)  Rivera was never in a meeting with O'Grady and Roti in which Plaintiffs came up.  (D. St. ¶ 39.)  Rivera never had a conversation with an individual named Ernie Brown about Plaintiffs.  (D. St. ¶ 38.)

After the conclusion of Operation Brass Tax, Plaintiffs applied for positions in the Fugitive Apprehension Unit ("FAU"), Unit 606, and Rivera and his predecessor, former IAD Chief Tina Skahill, wrote letters of recommendation in support of Plaintiffs' applications. Plaintiffs were reassigned to the FAU on or about March 18, 2012.  (D. St. ¶ 49.)  Plaintiffs are not claiming that there was anything retaliatory about their move to the FAU.  (D. St. ¶ 50.)[4]

Plaintiffs' first assignment in the FAU was on Defendant Barnes' team.  Prior to their arrival on his team, Barnes had not heard anything negative about Plaintiffs.  (D. St. ¶ 53.) Barnes has never spoken to O'Grady, Roti or Rivera about Plaintiffs or their lawsuit.  (D. St. ¶ 54.)  On one occasion when Plaintiffs were on Barnes' team, Spalding's boyfriend Officer Tony Hernandez ("Hernandez") approached Barnes in what Barnes perceived to be an angry, pissed-off manner accusing Barnes of trying to dump Spalding from the FAU.  Barnes reported the

---

[3]  As argued herein, this alleged incident of retaliation, not allowing Plaintiffs to return to Narcotics in May 2011, is barred by the one-year statute of limitations governing claims under the IWA.

[4]  For a period of time between the time Plaintiffs were detailed to Detached Services and joining the Fugitive Apprehension Unit, Plaintiffs were assigned to the Inspection Division.  However, Plaintiffs have voluntarily dismissed all of the individual defendants from the Inspection Division who were previously named in this suit, Adrienne Stanley, Deborah Pascua and Kevin Sadowski.  Additionally, Plaintiffs have voluntarily dismissed former individual defendant Debra Kirby, whom Plaintiffs had previously alleged caused Plaintiffs to be removed from Detached Services and temporarily assigned to the police academy before Plaintiffs were assigned to the Inspection Division.  Thus, Plaintiffs are presumably no longer bringing any claims in this action relating to their time in the Inspection Division or the previously alleged incidents of retaliation between Plaintiffs' assignments to Detached Services and Inspections.

incident with Spalding's boyfriend to his lieutenant Defendant Cesario the next day. (D. St. ¶ 61.)

In June 2012, Cesario made the decision to remove Plaintiffs from Barnes' team due to the confrontation between Hernandez and Barnes and Plaintiffs' low arrest activity since joining the unit. (D. St. ¶¶ 63-64.) Plaintiffs were then moved from Barnes' team on the Second Watch to Defendant Mills' team on the Third Watch. (D. St. ¶ 69.) Plaintiffs do not allege that Mills engaged in any retaliation against them until after they filed their lawsuit on November 1, 2012. (D. St. ¶ 75.)

On one occasion when Plaintiffs were on Mills' team, Detective Steve Becker told Mills that he believed Spalding had illegally recorded a conversation Mills was having with Plaintiffs using Spalding's cellphone. (D. St. ¶ 77.) Mills initiated a CR against Spalding based on what Becker reported to Mills. When Mills was interviewed by Officers Barz and Musculino who were investigating the matter, Mills told them that during the subject conversation Mills did not see anything that appeared to be evidence of Plaintiffs recording the conversation. (D. St. ¶ 78.)

At some point, Plaintiffs requested to be moved back to days in FAU. That request was granted, and Plaintiffs were reassigned to Sergeant Stack's ("Stack") team on days. (D. St. ¶ 81.) Spalding never reported for duty on days with Stack due to her taking medical leave. Echeverria is not claiming that he has suffered any retaliation since he's been on Stack's team. (D. St. ¶ 82.)

While Plaintiffs contend that some of the individual Defendants knew generally that Plaintiffs were engaged in some activity with IAD and, in some cases, allegedly even made negative references to it, with the exception of Defendant Rivera who learned this in his capacity as Chief of IAD, the undisputed facts based on admissible evidence shows that none of the individual Defendants had any knowledge that Plaintiffs had reported alleged illegal conduct by Watts or other officers either to the FBI or internally within CPD until after Plaintiffs' lawsuit was filed on November 1, 2012 and media reports that followed. (D. St. ¶¶ 83-94.) The only

5

retaliation by Rivera that Plaintiffs allege is not opening an internal "CR" investigation when Plaintiffs allegedly complained to him about alleged retaliation by others. (D. St. ¶ 99.) Rivera denies that Plaintiffs made any such complaints of retaliation. (D. St. ¶¶ 96-97.) Plaintiffs admit that they never made any written complaints to anyone about any alleged retaliation against them. (D. St. ¶ 95.) Plaintiffs also admit that they never made any complaint to the Independent Police Review Authority ("IPRA") about any alleged retaliation against them. *Id.*

Plaintiffs have not been terminated and currently remain CPD officers in the FAU. During the time they were allegedly retaliated against, their salaries and benefits were never cut, and they do not know whether they have lost any overtime pay. (D. St. ¶¶ 101-104.)

## ARGUMENT[5]

### I.  Defendants are Entitled to Summary Judgment on Plaintiffs' First Amendment Retaliation Claim

#### A.  The Legal Standards Applicable to Plaintiffs' First Amendment Retaliation Claim.

In *Garcetti v. Ceballos*, 547 U.S. 410 (2006), the Supreme Court explained that a public employee's speech is only protected if it is speech as a citizen. "The first [inquiry] requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based upon his or her employer's reaction to the speech." *Id.* at 418 (internal citation omitted). "We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. "The proper inquiry is a practical one.

---

[5] Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Ezell v. Potter*, 400 F.3d 1041, 1046 (7th Cir. 2005). To avoid summary judgment, the non-moving party must go beyond the pleadings and "present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000). Neither "the mere existence of *some* alleged factual dispute between the parties," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original), nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), is sufficient to defeat a motion for summary judgment.

Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform[.]" *Id.* at 424-25. In the context of police officers, the Seventh Circuit has very recently explained that this "practical inquiry" into what duties a police officer is "expected" to perform is made by determining if the speech at issue was intimately connected with the officer's job to protect the public from harm. *Kubiak v. City of Chicago*, 2016 WL 106868, at *4 (7th Cir. Jan. 11, 2016). ("[I]n the context of a police department, it makes even more sense to expect officers to report that a fellow officer acted violently. Kubiak is a police officer, and as a part of that job, she is responsible for protecting the public from harm[.]").[6]

A plaintiff also must prove by a preponderance of the evidence (which may be direct or circumstantial) that any protected citizen speech was the 'but-for' cause of the alleged retaliation. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009); *Fairley v. Andrews*, 578 F.3d 518, 525-26 (7th Cir. 2009). At this stage, Plaintiffs must show admissible evidence from which a reasonable jury could find that Defendants' actions alleged to constitute retaliation would not have occurred "but-for" the protected speech. Plaintiffs must also come forward with evidence of damages resulting from the protected speech. *Fairley*, 578 F.3d at 525-26.

## B. Plaintiffs' FBI Speech Involving Illegal Activity by Sergeant Watts Was Unprotected Employee Speech.

Plaintiffs' speech regarding alleged illegal activity by fellow police officer Watts, first internally to their supervisor and then to the FBI, was unprotected employee speech because it was what they were expected to do as Chicago police officers to protect the public from harm. Contrary to the Complaint allegations before the Court on Defendants' Motion to Dismiss, Plaintiffs first learned about possible illegal activity by Watts from the FBI in approximately

---

[6] This critical first inquiry is appropriate for resolution on a motion for summary judgment. "The inquiry into the protected status of speech is one of law, not fact." *Spiegla v. Hull*, 481 F.3d 961, 965 (7th Cir. 2007) quoting *Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983). Nor may the court accept the plaintiff's characterization of the status of her speech at issue. "A plaintiff cannot rely on 'labels and conclusions' (citation omitted). Nor are we 'bound to accept as true a legal conclusion couched as a factual allegation' (citation omitted)." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1092 (7th Cir. 2008) (rejecting plaintiff's reliance upon her own legal statement that she spoke as a citizen.).

1997, when FBI Agent Samuels contacted Spalding and asked her if she had any knowledge of illegal activity by Watts. (D. St. ¶ 8.) This FBI inquiry to Spalding was made in the course of her job as a police officer, as at that time both Spalding and Watts were assigned to Public Housing South. *Id.* As a Chicago police officer, Spalding was expected to respond to this inquiry by the FBI by reporting any illegal activity by Watts of which she had knowledge. According to Spalding, she had no such knowledge at that time. *Id.*

Based on the contact to her by Agent Samuels, Spalding knew then that the FBI was looking into allegations of illegal activity by Watts and other officers. (D. St. ¶ 9.). Subsequently, in 2007, Plaintiffs learned of alleged illegal activity by Watts when Plaintiff Echeverria was debriefing a suspect in the course of performing his professional duties and the suspect informed Echeverria of alleged illegal activity by Watts. (D. St. ¶ 10.) Echeverria first reported the alleged illegal activity by Watts to his supervisor, Watson, as a part of his job. (D. St. ¶ 11.) Spalding then reported the same allegations of illegal activity by Watts to the FBI. (D. St. ¶ 12.) As a police officer aware of the ongoing FBI investigation about Watts' illegal activity who had been contacted by the FBI to find out what she knew in the course of her job as a Chicago Police Officer, Spalding was "expected" to convey this information to the FBI. Expected employee speech intimately connected with their professional duties, like the Plaintiffs' report about Watts' illegal activity to the FBI in this case, is unprotected employee speech. *Kubiak,* 2016 WL 106868, at *4.

In Kubiak, the Seventh Circuit rejected an "overly narrow" concept of a police officer's official duties. *Id.* at *9. The Seventh Circuit explained that as a police officer Kubiak was "expected" to report her coworker's violent conduct to protect the public from harm and accordingly, her speech was employee speech. *Id.* ("Kubiak is a police officer, and as part of that job, she is responsible for protecting the public from harm [.]") Likewise here, Plaintiffs were expected to report illegal activity by Watts to their supervisor and to the FBI as part of their

jobs as police officers to protect the public from harm. In fact, although *Kubiak* involved only internal reporting within the police department, Plaintiffs' report to the FBI was even more intimately connected with their professional duties than was the police officer's report of her coworker's misconduct in *Kubiak*. Kubiak was never asked to report on her coworker's violent actions as Plaintiffs in this case were. Furthermore, Kubiak merely involved a verbal assault by a coworker in the context of a media office of a police department. The criminal activity by Watts in this case was more likely to harm the public. Also unlike *Kubiak*, Plaintiffs here were assigned to work on the FBI investigation of Watts' illegal activity as their core job duty as CPD officers for at least two years before any incident of alleged retaliation occurred. (D. St. ¶ 28.) Moreover, both the FBI *and CPD* had been investigating Watts and Mohammed for nearly a decade before 2008. (D. St. ¶¶ 8; 24.)

Like Kubiak, Plaintiffs apply an "overly narrow" concept to their public duties as police officers when they claim that their speech to the FBI of misconduct by Sergeant Watts was protected citizen speech. *Kubiak's* broad concept of a police officer's professional duties is in keeping with the Seventh Circuit's interpretation of *Garcetti*. *See Fairley*, 578 F.3d at 523-24 ("We disapprove *Alaska v. EEOC* [564 F.3d 1062 (9th Cir. 2009)] to the extent that decision rests on a belief that *Garcetti* applies only to speech expressly commanded by an employer."). Thus, the determinative factor is not simply whether the speech was internal or external, but rather whether under a practical inquiry the speech was intimately connected with an employee's job duties and is what the employee would be expected to do. Further, *Kubiak* is only the most recent post-*Garcetti* decision by the Seventh Circuit that a police officer's report of misconduct by fellow officers is unprotected employee speech. *See also Sigsworth v. City of Aurora*, 487 F.3d 506, 510-11 (7th Cir. 2007) (holding an Aurora police officer's report to his supervisors that other task force members gave improper notice to targets of arrests was unprotected employee speech); *Spiegla v. Hull*, 485 F.3d 961, 965-66 (7th Cir. 2007) (correctional officer spoke

pursuant to her official duties – not as a citizen – when she reported breach of security by fellow officers); *Vose v. Kliment*, 506 F.3d 565, 570-71 (7th Cir. 2007) ("Vose may have gone above and beyond his routine duties by investigating and reporting suspected misconduct in another police unit, but that does not mean that he spoke as a citizen and not as a public employee"); *Houskins v. Sheahan*, 549 F.3d 480, 491 (7th Cir. 2008) (Correctional officer's report of misconduct by another correctional officer was a part of her job as an employee of the Sheriff, and not as a citizen); *Fairley*, 578 F.3d at 522 ("So here, plaintiffs [prison guards] reported what they deemed illegal conduct by co-workers, and that speech is not protected.").

Accordingly, Plaintiffs' reporting of Watts' alleged criminal activity to the FBI was employee speech that does not implicate the First Amendment. After Plaintiffs filed their complaint in this action on November 1, 2012, they publicized their earlier speech to the FBI regarding their role assisting the Watts investigation in their media interviews. Defendants submit that such media reporting does not convert Plaintiffs' earlier employee speech into citizen speech, it merely publicized it. In any event, as explained below, Plaintiffs cannot establish that their post-lawsuit media speech was the but-for cause of any alleged retaliation. Thus, Defendants are entitled to summary judgment on Plaintiffs' First Amendment claim.

### C.     The Individual Defendants Are Entitled to Qualified Immunity.

Even if this Court determines that Plaintiffs' speech to the FBI was citizen speech, the individual Defendants are entitled to qualified immunity from Plaintiffs' First Amendment retaliation claims because it was not "clearly established" at the time of the alleged retaliatory actions by Defendants that a police officer's report to the FBI of criminal activity by a fellow police officer under investigation by the FBI was constitutionally protected citizen speech.[7]

---

[7] With respect to the First Amendment claims against the individual Defendants, this Court need not even resolve the constitutional question whether Plaintiffs' speech was employee speech or citizen speech, as it has discretion to resolve this case as to the individual Defendants solely on the basis of qualified immunity. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). *See Chaklos v. Stevens*, 560 F.3d 705, 711 (7th Cir. 2009) ("It is far from obvious whether the speech in this case is constitutionally protected and we do not think resolving the First Amendment

"Under [qualified immunity], courts may not award damages against a government official in his personal capacity unless 'the official violated a statutory or constitutional right,' and 'the right was 'clearly established' at the time of the challenged conduct.'" *Lane v. Franks*, __ U.S. __, 134 S. Ct. 2369, 2381 (2014), quoting *Ashcroft v. al-Kidd*, 563 U.S. 73, 131 S. Ct. 2074, 2085 (2011). In *Lane*, the Supreme Court held that truthful trial testimony under oath pursuant to a subpoena was citizen speech entitled to protection against retaliation under the First Amendment. *Id*. at 2383. It was undisputed in *Lane* that Lane's ordinary job responsibilities did not include testifying in court proceedings. *Id.* at 2378 n.4. In contrast, Defendants here dispute that Plaintiffs' speech to the FBI regarding Watts' illegal activity in this case was outside their job duties. In any event, *Lane* held that the defendant was entitled to qualified immunity because it was not clearly established at the time of the alleged retaliation that Lane's compelled truthful testimony at trial was protected citizen speech. *Id.* at 2383.[8]

To qualify as "clearly established" the right must be "particularized" in the sense that "[t]he contours of the right [were] sufficiently clear that a reasonable official would understand that what he [was] doing violate[d] that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Accordingly, to determine whether the individual Defendants are entitled to qualified immunity, this Court should determine whether Seventh Circuit precedent provided clear notice that a police officer's speech to the FBI regarding information acquired in the course of their professional responsibilities related to an ongoing FBI criminal investigation is speech of a citizen entitled to First Amendment protection. Defendants submit that there was no such clear authority and as argued above, Defendants believe Seventh Circuit precedent strongly suggests

_____

issue serves any jurisprudential purpose. Because defendant did not violate clearly established law we do not decide whether the facts established a constitutional violation.").

[8] *Lane* further supports Defendants' argument here that Plaintiffs' reporting to the FBI was unprotected employee speech. In *Lane*, the Court found that regardless of their employment situation every person has an independent obligation as a citizen to testify truthfully under oath. *Lane*, 134 S. Ct. at 2379. By contrast, Plaintiffs could be expected to report criminal conduct to aid the FBI's investigation not because that is an obligation all citizens have, but rather specifically because of their jobs as police officers and because they were expressly asked by the FBI to report such information.

that such speech was not and is not constitutionally protected speech.

The case of *Kristofek v. Village of Orland Hills*, 712 F.3d 979 (7th Cir. 2013), relied upon by Plaintiffs at the Motion to Dismiss stage, actually demonstrates that it was an open question in the Seventh Circuit as late as 2013 whether a police officer's external speech regarding possible illegal activity in his own department could be speech of a citizen entitled to First Amendment protection. *Id.* at 984 n.1. In *Kristofek*, the plaintiff police officer arrested the son of the mayor of a nearby village for driving violations and while processing the driver at the police station, he was told to hand over the paperwork to the deputy chief and release the driver. *Id*. at 982. Based upon subsequent on-line police training, Kristofek became concerned that the favoritism shown to the driver might constitute official misconduct, and discussed this with fellow police officers. *Id.* at 983. On the advice of counsel to protect himself, Kristofek also reported it to the FBI. *Id.* Subsequently, Kristofek had a conversation with the Orland Hills police chief in which he disclosed that he reported the incident to an outside law enforcement agency. *Id.* In the course of that conversation, the police chief fired Kristofek. *Id.* The district court granted defendant's motion to dismiss because Kristofek's report to the FBI did not involve matters of public concern as it was motivated by the purely private concern to protect himself. *Id.* On appeal, the Seventh Circuit held that Kristofek had sufficiently pled that his speech to the FBI involved matters of public concern because it was plausible that his motives were mixed. *Id*. at 985.

Notably, the issue of whether Kristofek's speech to the FBI was employee speech or citizen speech was not raised by Orland Hills in that case. On its own initiative, the Seventh Circuit called out the fact that Kristofek also needed to show that he was speaking in his capacity as a private citizen rather than an employee when he reported the matter to the FBI, and expressly stated that it was not considering the citizen versus employee speech issue: "The plaintiff must also show that he was speaking in his capacity as a private citizen rather than as an employee. (*Garcetti*, cite omitted). Orland Hills does not argue on appeal that Kristofek did not

speak in a private citizen capacity. . . so we do not address any of these considerations." *Id*. at 984 n.1.

Thus, as of March 11, 2013 when *Kristofek* was decided, which post-dates the filing of the Complaint in this case, the Seventh Circuit expressly left open the question of whether a police officer's speech to the FBI involving possible criminal conduct by a fellow officer was employee speech or citizen speech. Accordingly, *Kristofek* demonstrates that it was not "clearly established" at the time of Defendants' actions alleged to be retaliation in this case that speech by a police officer to the FBI involving criminal conduct by a fellow officer who was the subject of an ongoing FBI and CPD investigation was constitutionally protected citizen speech. Thus, the individual Defendants are entitled to qualified immunity.

### D. Plaintiffs Lack Proof That Their Allegedly Protected FBI Speech Caused the Alleged Retaliation

To survive summary judgment, Plaintiffs must show that their reporting of alleged criminal activity to the FBI—not their speech while working on Operation Brass Tax as part of their official CPD job duties—was the but-for cause the alleged retaliatory actions by Defendants. *Gross*, 557 U.S. at 177-78; *Fairley*, 578 F.3d at 525-26. Plaintiffs have not met this burden.

In fact, both Plaintiffs assert that CPD has an alleged "code of silence" that means you do not report police misconduct either internally or externally to another law enforcement agency like the FBI. (D. St. ¶ 106.) Echeverria testified that Plaintiffs suffered retaliation because they broke the "code of silence," not because they went to the FBI. (D. St. ¶ 107.) This admission stands to reason because from at least August 2008 until August 2010 when they claim they first experienced any form of alleged retaliation, Plaintiffs were assigned by CPD to work on Operation Brass Tax as part of their official CPD duties, which was clearly unprotected

employee speech. *See Kubiak*.[9]  Plaintiffs have no evidence demonstrating that it was their allegedly protected speech to the FBI that was the but-for cause of the alleged retaliation.  Thus, Defendants are entitled to summary judgment.  *See Fairley*, 578 F.3d at 523-26 ("Plaintiffs must show that their potential testimony [citizen speech], not their internal complaints [employee speech], caused the assaults and threats.  This means but-for causation.")[10]

### 1.     Defendants Lacked Knowledge of Plaintiffs' FBI Speech.

Plaintiffs do not have admissible evidence that any of the individual Defendants other than Rivera even knew about their allegedly protected report of alleged criminal activity to the FBI.  In fact, they did not.  (D. St. ¶¶ 83, 85, 87, 89, 91, 93.)  Thus, even based on Plaintiffs' evidence, the other individual Defendants only knew, at most, that Plaintiffs were working with IAD on a police officer corruption case—not that Plaintiffs had reported alleged criminal conduct to the FBI.  Absent such knowledge of the alleged protected activity, Plaintiffs cannot establish but-for causation.  *See Trigillo v. Snyder*, 547 F.3d 826, 830 (7th Cir. 2008) ("Trigillo presented no competent evidence that the decision maker (the department's director) who elected not to renew her for another term knew (or even thought) that she was the person who called the FBI."); *Gunville v. Walker*, 583 F.3d 979, 987 (7th Cir. 2009) ("Oakley concedes that he is unable to prove that any of the defendants knew of his political affiliation.").

### 2.     Plaintiffs Have Insufficient Evidence of Any Retaliation Caused by Their Allegedly Protected FBI Speech

#### a.     Rivera.

Plaintiffs have no evidence that Rivera took any adverse action with respect to them because of their speech to the FBI.  The evidence shows that Rivera wrote a letter of recommendation in support of Plaintiffs' request for reassignment to the FAU on March 18,

---

[9]  Again, Plaintiffs had actually been authorized by CPD to work on Operation Brass Tax prior to August 2008.  (D. St. ¶¶ 15-16.)

[10]   For purposes of this causation argument, we assume this Court finds that Plaintiffs' speech to the FBI was citizen speech as there is no need for the Court to consider whether Plaintiffs have evidence of causation if the Court agrees with Defendants that even Plaintiffs' speech to the FBI about Watts' illegal activities was employee speech.

2012.  (D. St. ¶ 49.)  Plaintiffs are not claiming that there was anything retaliatory about their move to the FAU.  (D. St. ¶ 50.)  Although Plaintiffs complain that Rivera failed to open a CR investigation against the other Defendants for their alleged retaliation against Plaintiffs, there is no evidence that this is somehow retaliation for Plaintiffs' alleged protected speech.  Moreover, Rivera denies that Plaintiffs made any such requests, and Plaintiffs admit that they never made any written complaints to Rivera about alleged retaliation against them.  (D. St. ¶ 95.)  Rivera recalled one occasion where Spalding told him that her boyfriend, Hernandez, who worked in Narcotics, told her that there were rumors that O'Grady and Roti were referring to Plaintiffs as "snitch" and "rat."  Spalding told Rivera that Hernandez did not witness any of this and that according to Hernandez it was just rumors.  (D. St. ¶ 98.)  This hearsay report of rumors circulating in the Narcotics Unit was not a sufficient basis for Rivera to have initiated disciplinary action against Roti and O'Grady, in any event.  Furthermore, even if these rumors were true, they are not specific to Plaintiffs' speech to the FBI.  The rumored reference to Plaintiffs as "snitch" and "rat" apply to Plaintiffs' employment when they were assigned to work with IAD on Operation Brass Tax as a core job duty.  Thus, Plaintiffs have no evidence that Rivera ever retaliated against them because of their speech to the FBI. *See Gunville*, 583 F.3d at 987 (Despite evidence that the defendants knew of the plaintiff's political affiliation, "plaintiffs have failed to create a genuine issue of fact regarding whether the defendants used political affiliation in determining who would be laid off.").

### b.    Roti

As Commander of Narcotics in or about June 2008, Roti approved then IAD Chief's Skahill's request for Plaintiffs to work on the FBI corruption case.  (D. St. ¶ 16.)  Additionally, Roti's reasons for not taking Plaintiffs back into Narcotics was that he found a discrepancy at one point in terms of whether Plaintiffs were showing up for work on days when they were not working with the FBI on Operations Brass Tax (D. St. ¶ 47), Spalding's extremely poor

performance evaluation when she was previously in Narcotics, and his agreement with O'Grady's recommendation that was based upon Spalding's problematic reputation in the unit and a "dog incident" that resulted in a CR against Plaintiffs. (D. St. ¶ 47-48.) Plaintiffs cannot show that but-for their allegedly protected speech to the FBI, Roti would have approved their return to Narcotics or otherwise acted differently with regard to Plaintiffs.

### c.   O'Grady

O'Grady's decision not to approve Plaintiffs' August 17, 2010 request for a confidential informant is the first incident of alleged retaliation claimed by Plaintiffs. O'Grady did not approve Plaintiffs' request because he was not supervising them at that time as they had been detailed elsewhere and he believed Plaintiffs' supervisor should be the one to approve the confidential informant for Plaintiffs. (D. St. ¶ 29.) Additionally, O'Grady explained that he opposed Plaintiffs' return to Narcotics because of Spalding's reputation in Narcotics from her previous stint was bad in terms of not getting along with her team members and being difficult to supervise and because of the "dog incident" that resulted in a CR against Plaintiffs. (D. St. ¶ 44.) O'Grady recommended to Roti that he not take Plaintiff back into Narcotics for these reasons. (D. St. ¶ 47.) Plaintiffs have no admissible evidence that O'Grady refused to approve Plaintiffs' request for a confidential informant or did not want Plaintiffs to return to Narcotics Unit, or engaged in any other alleged retaliatory conduct towards Plaintiff, because of Plaintiffs' allegedly protected speech to the FBI.

### d.   Barnes.

After the conclusion of Operation Brass Tax, Plaintiffs applied for and were assigned to the FAU, and were first assigned to Barnes' team. (D. St. ¶ 53.) On one occasion when Plaintiffs were on Barnes' team, Spalding's boyfriend, Hernandez, approached Barnes in what Barnes perceived to be an angry, pissed-off manner accusing Barnes of trying to dump Spalding from the FAU. (D. St. ¶ 61.) Barnes reported the incident with Spalding's boyfriend to Cesario

the next day. *Id.* Cesario, not Barnes, made the decision to remove Plaintiffs from Barnes' team. (D. St. ¶ 63.) Plaintiffs have no evidence of any actionable retaliation by Barnes based on their report to the FBI.

### e. Cesario

At the time Cesario transferred Plaintiffs from Barnes' team to Mills' team, the FAU was starting a new third watch that had to be staffed by officers. At that time Plaintiffs had only been in the FAU for a few months. (D. St. ¶ 71.) Plaintiffs agree that at the June 2012 meeting where they were informed of their transfer from Barnes' team to Mills' team on third watch, Cesario had arrest activity reports with him in the meeting and cited their low arrest activity from March to June 2012, and that the incident between Hernandez and Barnes was also discussed. (D. St. ¶ 67.) On this record, Plaintiffs lack sufficient evidence for a jury to infer that Cesario's actions in moving Plaintiffs from Barnes' to Mills' team, or any alleged retaliation by Cesario, was because Plaintiffs had engaged in allegedly protected speech with the FBI.

### f. Salemme.

The evidence shows that Salemme was present at the June 2012 meeting when Lieutenant Cesario made the decision to transfer Plaintiffs from Barnes' team to Mills' team. Salemme agreed with Cesario's decision based upon the confrontation between Henandez and Barnes. (D. St. ¶ 67.) Plaintiffs have no evidence that Salemme's concurrence with Cesario's decision to transfer them from Barnes' team to Mills' team, or any other alleged retaliatory action by Salemme, was based upon their allegedly protected speech to the FBI.

### g. Mills.

Finally, Plaintiffs do not allege that Mills engaged in any retaliation against them before they filed this lawsuit on November 1, 2012. (D. St. ¶ 75.) On one occasion Detective Steve Becker told Mills that he believed Spalding had illegally recorded a conversation Mills was having with Plaintiffs using Spalding's cellphone. Mills initiated an internal complaint (CR)

17

against Spalding based upon Becker's report of the illegal recording. (D. St. ¶¶ 77-78.)  Plaintiffs cannot carry their burden of showing that any alleged retaliation against them by Mills was caused by their allegedly protected FBI speech or the media reports of such speech.

### E. Part of Plaintiffs' First Amendment Retaliation Claim is Time-Barred

In Illinois, the statute of limitations for § 1983 claims is two years.  *Dominguez v. Hendley*, 545 F.3d 585, 588 (7th Cir. 2008).  First Amendment claims under § 1983 accrue when the plaintiff knows or should know that his constitutional rights have been violated.  *Wilson v. Geisen*, 956 F.3d 738, 740 (7th Cir. 1992).  Here, Plaintiffs filed their lawsuit on November 1, 2012.  Thus, all incidents of alleged retaliation occurring prior to November 1, 2010 are time-barred and must be dismissed from this action.  This includes what Plaintiffs contend was the first incident of alleged retaliation on August 17, 2010, when O'Grady allegedly retaliated against Plaintiffs by refusing to approve their request for a confidential informant.

## II. Defendants are Entitled to Summary Judgment on Plaintiffs' Conspiracy Claim

To establish a § 1983 conspiracy claim, Plaintiffs must show that "(1) the individuals reached an agreement to deprive [them] of [their] constitutional rights, and (2) overt acts in furtherance actually deprived [them] of those rights."  *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015).  Plaintiffs' conspiracy claim fails as a matter of law because Plaintiffs cannot establish that the individual Defendants violated Plaintiffs' rights and have insufficient evidence to establish that the individual Defendants "*reached an agreement*" to deprive them of their constitutional rights.

### A. Plaintiffs Were Not Deprived of Constitutional Rights

As an initial matter, Plaintiffs' conspiracy claim fails because Plaintiffs base their claim on the alleged violation of their First Amendment rights in Count I, and as explained above, Defendants are entitled to summary judgment on that claim.  If a plaintiff fails to establish an underlying constitutional violation, any corresponding conspiracy claim also necessarily fails.

*Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008) ("[C]onspiracy is not an independent basis of liability in § 1983 actions."); *Cefalu v. Village of Elk Grove*, 211 F.3d 416, 423 (7th Cir. 2000) ("there is no constitutional violation in conspiring to cover-up an action which does not itself violate the Constitution.") (citation omitted). Accordingly, since Defendants are entitled to summary judgment on Count I, Count II must be dismissed.

### B. Plaintiffs Cannot Establish That the Individual Defendants Reached An Agreement to Deprive Them of Their Constitutional Rights

Further, even if Plaintiffs could otherwise survive summary judgment on their § 1983 First Amendment retaliation claim, the conspiracy claim still fails because they cannot show that the individual Defendants "reached an agreement" to deprive them of their constitutional rights. "Although a conspiracy certainly may be established by circumstantial evidence … such evidence cannot be speculative," *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003), and "a conspiracy claim cannot survive summary judgment based on vague conclusory allegations that include no overt acts reasonably related to promoting the conspiracy." *Doe v. V. of T.*, No. 02-C-7680, 2008 WL 4450317, at *10 (N.D. Ill. Sept. 30, 2008).

In *Williams*, the plaintiff alleged that the defendants conspired to fire him from his job as a county police officer based on a public statement he made about the validity of a murder conviction. 342 F.3d at 778-79. The plaintiff's primary evidence of an agreement to retaliate included alleged expressions of dissatisfaction by various public officials with plaintiff's public statement and plaintiff's "unsupported conjecture that this statement created a conspiracy to fire him for exercising his right to free speech." *Id.* at 785-86. In affirming summary judgment for the defendants, the Seventh Circuit held that the fact that various individuals knew about and expressed displeasure with plaintiff's public statement did "not provide evidence of an *agreement* on the part of those who expressed the displeasure to deprive [plaintiff] of his rights." *Id.* at 786 (emphasis in original). The court further held that evidence that one of the alleged conspirators (who did not make the termination decision) was involved in the events surrounding

the plaintiff's termination was insufficient "evidence from which a conspiracy may be inferred." *Id*.

Just as in *Williams*, Plaintiffs here have insufficient evidence of any agreement among the individual Defendants to deprive them of their constitutional rights. Plaintiffs' allegations to contrary in their Second Amended Complaint are not supported by the record evidence. For example, alleged "meetings" in which Plaintiffs contend they were allegedly discussed did not take place at all; did not involve Plaintiffs; and/or were not attended by the individuals that Plaintiffs claim attended. (D. St. ¶¶ 37-40, 54-56, 76, 79.) Plaintiffs' allegation of an agreement is based solely on their conjecture that certain individual Defendants allegedly knew about the alleged retaliation of other Defendants and failed to stop it, report it or engaged in it themselves. (D. St. ¶ 100). This is insufficient evidence of an agreement to deprive Plaintiffs of their constitutional rights. *See, e.g., Goetzke v. Ferro Corp.*, 280 F.3d 766 (7th Cir. 2002) (holding that the existence of numerous phone calls between alleged conspirators, "standing alone, merely proves that [the individuals] remained in contact … To assert that the calls are evidence of a conspiracy is simply speculation."); *Doe*, 2008 WL 4450317 at *11 (holding that the fact that one defendant failed to bring something to the attention of another defendant was insufficient to prove a conspiracy); *Mendoza v. City of Chicago*, 2013 WL 6234692, at *4 (N.D. Ill. Dec. 2, 2013) (granting summary judgment on plaintiff's conspiracy claims as there was "no evidence in the record in which a reasonably jury could infer that during" three meetings the defendants "had a 'meeting of the minds' or an agreement regarding [plaintiff]").

Finally, even if some general agreement to retaliate against Plaintiffs could be inferred from the evidence, Plaintiffs must demonstrate not merely that Defendants reached an agreement to retaliate against them (which Defendants did not), but rather that they conspired to retaliate specifically *because of* Plaintiffs' reporting to the FBI, which Plaintiffs contend was their protected activity under the First Amendment. As explained above, there is no evidence in the

record that anyone retaliated against Plaintiffs because they complained to the FBI, let alone any evidence of an agreement among the individual Defendants to do so. Accordingly, the Court should grant summary judgment on Plaintiffs' conspiracy claim.

### III. There is No Basis for Municipal Liability Against the City

As an initial matter, Plaintiffs' *Monell* claim against the City automatically fails because Defendants are entitled to summary judgment on Counts I and II. It is well-settled that "if no constitutional violation occurred in the first place, a *Monell* claim cannot be supported." *Petty v. City of Chicago*, 754 F.3d 416, 424 (7th Cir. 2014); *see also Aguilera v. Baca*, 510 F.3d 1161, 1167, 1174 (9th Cir. 2007) (noting that if no constitutional violation occurred, the court need not consider qualified immunity or a claim brought pursuant to *Monell*).

Further, a municipality may not be held liable under § 1983 on a *respondeat superior* theory. *Monell v. Dep't of Social Serv.*, 436 U.S. 658, 690 (1978). Rather, to establish municipal liability for a § 1983 violation, Plaintiffs must demonstrate that their alleged injury "was caused either by (1) the enforcement of an express policy of the City, (2) a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) a person with final policymaking authority." *Latuszkin v. City of Chicago*, 250 F.3d 502, 504 (7th Cir. 2001). "A municipality may only be held liable where it is the moving force behind the injury because some policymaker made a deliberate choice to act or not act in a certain way." *Id.* at 505; *see also Gayton v. McCoy*, 593 F.3d 610, 622 (7th Cir. 2010) (municipal policy must be the "moving force" behind the harm done).

Here, Plaintiffs will presumably assert that their alleged injuries were caused by a person or persons with final policymaking authority and/or that their alleged injuries were caused by an alleged "code of silence" within CPD that allegedly constitutes a widespread custom and practice of the City. As explained below, Plaintiffs have insufficient evidence to establish *Monell* liability under either of these theories.

### A.    Plaintiffs' Alleged Harm Was Not Caused by Any Person With Final Policymaking Authority.

The constitutional claim asserted here is that Defendants violated and conspired to violate the Constitution by allegedly retaliating against Plaintiffs for engaging in alleged protected First Amendment speech by reporting criminal activity of other officers outside of CPD.  As explained below, however, the City's municipal ordinances and police board rules expressly prohibit such retaliatory behavior.  Thus, none of the individual Defendants in this case (or even up to the City's Superintendent of Police) has the authority to set policy in this area, and if they engaged in retaliatory behavior as alleged by Plaintiffs they would have done so directly contrary to and in frustration of City policy, not pursuant to it.

"[O]nly those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability."  *City of St. Louis v.  Praprotnik,* 485 U.S. 112, 123 (1988) (internal citation omitted). The determination as to who is a municipal policymaker is a question of state or local law. *See, e.g., Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989); *Radic v. Chicago Transit Auth.*, 73 F.3d 159, 161 (7th Cir. 1996); *Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir. 1992).  The Court "must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." *Jett*, 491 U.S. at 737.

As the Seventh Circuit has explained, a policymaker must have the "authority to adopt rules for the conduct of government." *Auriemma*, 957 F.2d at 401.  Mere "[a]uthority to make a final decision" is not sufficient if the official does not also have authority to adopt rules. *Id.*; *accord, Radic*, 73 F.3d at 161.  Thus, a final decision by the person at "the apex of a bureaucracy" is not sufficient because it does not "forge a link between 'finality' and 'policy.'" *Auriemma*, 957 F.2d at 400.

The Seventh Circuit has already determined that CPD's Superintendent is not a municipal

policymaker where he lacks the final authority to make rules.  *See id.* at 401.  Lower-ranking CPD officials also are not municipal policymakers as they certainly have no more authority to make rules than the Superintendent does.  *See Latuszkin*, 250 F.3d at 505 (subordinates not municipal policymakers); *see also Lewis v. City of Chicago,* 496 F.3d 645, 656 (7th Cir. 2007) (Chief Maurer not municipal policymaker).  These conclusions stem directly from municipal law, which provides that the Superintendent:

> shall be responsible for the general management and control of the police department and shall have full and complete authority to administer the department *in a manner consistent with the ordinances of the city, the laws of the state, and the rules and regulations of the police board.*

Municipal Code of Chicago, Ill. § 2-84-040 (2013) (emphasis added).  (D. St. ¶ 105.)  In turn, Rule 1 of the Chicago Police Board's Rules of Conduct prohibits "[v]iolation of any law or ordinance."  *Id.*

Thus, the Superintendent is responsible for "general management and control" of CPD and has the "authority to administer the department."  *Id.* However, the City Council has constrained the Superintendent "to administer the department in a manner consistent with the ordinances of the city, the laws of the state, and the rules and regulations of the police board." Municipal Code of Chicago, Ill. § 2-84-040 (2013).  One such state law would be the IWA (the subject of Count III here), which prohibits retaliation against whistleblowers as defined in that Act.  Additionally, Rule 1 of the Police Board expressly prohibits "[v]iolation of any law or ordinance," which would include violating the First Amendment's prohibition against retaliation for protected speech as well as violations of the IWA.  Thus, any individual Defendant in this case who allegedly engaged in retaliation for protected speech would have done so directly contrary to and in frustration of City policy, not pursuant to it.[11]

---

[11]  At the motion to dismiss stage, this Court concluded that based on the Complaint "the well-pleaded facts support the [final policymaker] basis for *Monell* liability."  (Dkt. 81 at 9.)  In so holding, however, the Court noted that "Plaintiffs do not allege that Kirby, Rivera, and Roti frustrated any particular City Policy."  (*Id.* at 10.)  As shown above, however, any of the individual Defendants who allegedly engaged

In denying the Motion to Dismiss on the final policymaker prong, this Court relied upon *Vodak v. City of Chicago*, 639 F.3d 738 (7th Cir. 2011), where the challenged action related to dealing with demonstrations and mass arrests rather than a matter involving employment policy. There, the Seventh Circuit noted that "[a]ll that matters . . .is that Chicago's police superintendent has sole responsibility to make policy regarding control of demonstrations." (Dkt. 81 at 10, citing *Vodak*, 639 F.3d at 748.)  Unlike in *Vodak*, however, where there "only rule governing policies and procedures regarding mass arrests" was a rule issued by the superintendent, 639 F.3d at 747, the challenged action here is retaliation against employees for allegedly engaging in protected speech.  As noted above, the City Council has made clear policy in this area by constraining the superintendent to follow the laws that prohibit illegal retaliatory conduct, and the superintendent has been given no authority to make policy in this area.  Indeed it is well-settled that only the City Council and the City's Commissioner of Human Resources have final policymaking authority regarding employment policy in Chicago.  *Waters v. City of Chicago*, 580 F.3d 575, 581 (7th Cir. 2009); *Chaparro v. City of Chicago*, 47 F. Supp. 3d 767, 780 (N.D. Ill. 2014).

As the Supreme Court has made clear, "[w]hen an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality." *Praprotnik*, 485 U.S. at 127.  Thus, Plaintiffs cannot establish *Monell* liability under the final policymaker theory.

### B.  Plaintiffs Have Insufficient Evidence of a Widespread Custom and Practice

A custom or practice for purposes of § 1983 must be "so widespread as to have the force of law." *Board of County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).  This requires showing "a habitual practice or a course of action that characteristically is repeated under like circumstances." *Sims v. Mulcahy*, 902 F.2d 524, 542 (7th Cir. 1990) (quotation marks omitted).

---

in retaliation in violation of the First Amendment or the IWA would have done so in direct opposition to and frustration of municipal law as set forth in the City ordinance and police board rules.

As the Seventh Circuit has explained, while there is no "bright-line rule[] defining a 'widespread custom or practice' . . . [and] there is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability . . . 'it must be more than one instance' . . . or even three." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 292, 303 (7th Cir. 2010) (internal citations omitted). When a plaintiff is attempting to prove an unconstitutional policy "by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned" the misconduct, "proof of a single act of misconduct will not suffice; for it is the series that lays the premise of the system of inference." *Davis v. Carter*, 452 F.3d 686, 695 (7th Cir. 2006) (citing *Jackson v. Marion Cnty.*, 66 F.3d 151, 152 (7th Cir. 1995)). Moreover, even where instances are sufficiently numerous, there must be evidence that the policymaking level knew about them and "has acquiesced in the outcome." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005).

In the present case, the challenged action is alleged retaliation by CPD against police officers who, in some legally protected manner, report misconduct of other officers. Thus, Plaintiffs have the burden of demonstrating that the City has a widespread custom and practice of engaging in retaliation against such officers. Plaintiffs have insufficient evidence to meet this burden. First, other than their own allegations of retaliation, Plaintiffs themselves have identified only three other cases of alleged retaliation by CPD against officers who reported misconduct by other officers—the cases of Michael Spaargaren, Anthony Hernandez (Spalding's boyfriend), and vague allegations of an Officer Finnigan in a so-called "SOS scandal." (D. St. ¶¶ 108-109.) Additionally, Plaintiffs' expert on the so-called "code of silence," Lou Reiter, testified that other than the alleged retaliation against Plaintiffs in this case, he is aware of only one instance of alleged retaliation against a Chicago police officer who reported misconduct in violation of the alleged code of silence: the same Spaargaren example cited by Plaintiffs. (D. St. ¶ 111.) Mr.

Reiter further testified that he does not know the percentage of police officers who report misconduct on behalf of other police officers who suffer some level of retaliation.  (D. St. ¶ 112.) Thus, while Mr. Reiter purports to demonstrate that there is some general code of silence against reporting other officers' misconduct (which Defendants deny), he offers no evidence of a widespread municipal policy or custom to *retaliate* against officers who do so.  Accordingly, in addition to the other reasons set forth above, the City is entitled to summary judgment on Counts I and II because there is no basis for *Monell* liability against the City.

## IV. <u>Plaintiffs' Illinois Whistleblower Act Claim Fails as a Matter of Law</u>

Under the IWA "an employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule or regulation."  740 ILCS 174/15(b).

### A. <u>Plaintiffs Have Insufficient Evidence of Causation Under the IWA</u>

Apart from, at most, knowing generally that Plaintiffs were working on a police corruption case with IAD, with the exception of Rivera the individual Defendants had no knowledge prior to the media reports on their lawsuit that Plaintiffs had disclosed information to IAD or the FBI about illegal activity of Watts, Mohammed or other officers.  (D. St. ¶¶ 83-94.) For this reason, as well as the evidence explained above as to the legitimate reasons why the individual Defendants took the actions that Plaintiffs may allege are retaliatory, Plaintiffs cannot prove causation, and the individual Defendants are entitled to summary judgment on the IWA claim.  *See Pignato v. Givaudan Flavors Corp.*, 2013 WL 995157 (N.D. Ill. March 13, 2013) (granting summary judgment on IWA claim because plaintiff failed to prove that that the defendant had knowledge that he had contacted the FDA); and *Noe v. R.R. Donnelly & Sons*, 2011 WL 5078770 (N.D. Ill. Oct. 25, 2011) (granting summary judgment on IWA claim because plaintiff did not inform the employer about his OSHA complaint and the Department of Labor

never revealed his identity to the employer).

### B.     The Conduct Plaintiffs Rely Upon Is Not a Materially Adverse Action

Under the IWA, an action short of termination can be retaliatory "if the act or omission would be materially adverse to a reasonable employee." 740 ILCS 174/20.1. In a recent case considering the "materially adverse" standard under the IWA, the Illinois Appellate Court in *LaRiviere v. Board of Tr. of S. Ill. Univ.*, 2015 IL App (5th) 140443-U, ¶ 23 (2015), relied upon the materially adverse employment action standard in the context of employment discrimination as "one that significantly alters the terms and conditions of the employee's job." *Id.* (quoting *Owens v. Department of Human Rights*, 403 Ill. App. 3d 899, 919, 936 N.E.2d 623 (1st Dist. 2010)). "Adverse actions include such things such as hiring, denial of promotion, reassignment to a position with significantly different job responsibilities or an action that causes substantial change in benefits." *Id.*

Plaintiffs have not offered evidence of an alleged retaliatory action that could be considered a materially adverse action under the IWA. The closest Plaintiffs can come are with respect to their job reassignments, including not being allowed to return to Narcotics, but "a plaintiff must show more than an inconvenience or alteration of job responsibilities" in order to demonstrate an adverse employment action. *See Banks of Chicago Bd. of Educ.*, 2013 WL 951111, at * (N.D. Ill. March 12, 2013) quoting *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). In order to prove that a reassignment to a different position is an adverse action, plaintiffs must suffer "a cut in pay, benefits, or privileges of employment." *Id.* quoting *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 729-30 (7th Cir. 2009). Here, Plaintiffs' reassignments were not adverse actions because their salary and benefits remained the same. (D. St.¶¶ 101-104.) As such, their reassignments and not being allowed to return to Narcotics do not qualify as adverse actions under the IWA. *See Place v. Abbott Lab., Inc.*, 215

F.3d 803, 810 (7th Cir. 2000) ("[B]eing shifted to an essentially equivalent job that [the plaintiff] did not happen to like as much does not a Title VII claim create.").[12]

## C.   Plaintiffs' IWA Claim Is Barred Under the Tort Immunity Act

Even if Plaintiffs could otherwise make out a claim under the IWA, any such claim is barred under § 2-201 and § 2-109 of the Tort Immunity Act ("TIA"). Under the TIA, a "public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission." 745 ILCS 10/2-201. In order for immunity to attach, the employee's act or omission must be "both a determination of policy and an exercise of discretion." *Harinek v. 161 North Clark St. Ltd. P'ship*, 181 Ill. 2d 335, 341, 692 N.E.2d 1177 (1998). A policy determination for purposes of the TIA has been defined as "those acts that require the balancing of competing interests to make a judgment as to what solution will best serve those interest[s]." *Id.*

Employment-related decisions of supervisory personnel like the individual Defendants here, such as which individuals to assign to which unit or team, to whom to give which assignments, whether to approve a confidential informant and whether to initiate a CR investigation, are inherently acts of discretion. *See Thompson v. Board of Educ. of City of Chicago*, 2014 WL 1322958, at *7 (N.D. Ill. April 2, 2014) (granting summary judgment on plaintiff's IWA claim as the decisions by plaintiff's supervisor to not approve time sheets, change plaintiff's teaching assignment, and disciplinary actions were all discretionary decisions); *Johnson v. Mers*, 279 Ill. App. 3d 372, 380, 664 N.E.2d 668 (2d Dist. 1996) (hiring decisions are inherently discretionary); *Anderson v. Grayslake Sch. Dist*. No. 46, 1997 WL 639032, at *1 (N.D. Ill. Oct. 3, 1997) (applying Illinois law and holding that school board members' discretionary act of firing plaintiff is absolutely immune from liability). Further, even if the

---

[12]   As explained above, the alleged conduct of Rivera (not opening a CR investigation) and of Mills' post-lawsuit certainly does not rise to the level of actionable adverse actions under the IWA. Thus, whether or not Plaintiffs can prove knowledge and causation with respect to Rivera and Mills, these individual Defendants are still entitled to summary judgment on Plaintiffs' IWA claims because they engaged in no actionable retaliation.

individual Defendants here had abused their discretion in carrying out any of the alleged retaliatory actions—indeed even if their actions had been "corrupt or malicious"—the individual Defendants would still be immunized from liability based on § 2-201 of the TIA. *See Village of Bloomingdale v. CDG Enter., Inc.*, 196 Ill. 2d 484, 486, 752 N.E.2d 1090 (2001) (TIA does not contain an exception for "corrupt or malicious motives.").

Further, under the TIA, "[a] local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." 745 ILCS 10/2-109. Thus, since the individual Defendants are immune from suit under the IWA, the City is also immune from liability pursuant to 745 ILCS 10/2-109. *See Thompson*, 2014 WL 1322958, *7; *Anderson*, 1997 WL 639032, *1.

### D. Part of Plaintiffs' IWA Retaliation Claim is Time-Barred

Under Illinois law, "tort claims against a government entity or its employees have a one-year statute of limitations under the Tort Immunity Act, 745 ILCS 10/8-101." *Cunliffe v. Wright*, 51 F. Supp. 3d 721, 731 (N.D. Ill. 2014). "The one-year statute of limitations period for civil actions against Illinois local government entities . . . applies to Illinois Whistleblower Act claims." *Crumpley v. Rich Township High Sch.*, 2009 WL 2986374, *6 (N.D. Ill. Sept. 15, 2009). The Seventh Circuit has instructed that a "plaintiff's action accrues when he discovers that he has been injured, not when he determines that that the injury was unlawful." *Thelen v. Marc's Big Boy Corp.*, 64 F.3d 264, 267 (7th Cir. 1995).

Here, Plaintiffs filed their lawsuit on November 1, 2012. Accordingly, even if Plaintiffs could otherwise maintain their IWA claim, all incidents of alleged retaliation under the IWA occurring prior to November 1, 2011 are time-barred and must be dismissed from this action. This includes what Plaintiffs contend was the first incident of alleged retaliation on August 17, 2010, when O'Grady refused to approve their request for a confidential informant (D. St. ¶ 28), as well as the decision not to accept Plaintiffs back into the Narcotics Division in May of 2011.

(D. St. ¶ 43.)

## CONCLUSION

For all the foregoing reasons, Defendants respectfully submit that they are entitled to summary judgment on all of Plaintiffs' claims, and this action should be dismissed.

Dated: February 2, 2016

Respectfully submitted,

**CITY OF CHICAGO, JUAN RIVERA, JAMES O'GRADY, NICHOLAS ROTI, MAURICE BARNES, ROBERT CESARIO, JOSEPH SALEMME, and THOMAS MILLS**

By:   /s/ Alan S. King
Alan S. King, Esq. (ARDC #: 06198223)
Noreen H. Cull, Esq. (ARDC #: 06229417)
Leslie D. Davis, Esq. (ARDC #: 06229110)
Alejandra Lara, Esq. (ARDC # 6309517)
Drinker Biddle & Reath LLP
191 N. Wacker Drive, Suite 3700
Chicago, IL  60606-1698
Phone: (312) 569-1000/Fax: (312) 569-3334
E-mail:   alan.king@dbr.com
E-mail:   noreen.cull@dbr.com
E-mail:  alejandra.lara@dbr.com

84378188.7