**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Chicago Police Officer SHANNON SPALDING, | ) | |
| Chicago Police Officer DANIEL ECHEVERRIA, | ) | Case No. 12-cv-8777 |
| | ) | |
| Plaintiffs, | ) | Judge Gary Feinerman |
| | ) | Magistrate Judge Shelia Finnegan |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**EXHIBIT LIST FOR DEFENDANTS' LOCAL**
**RULE 56.1(a) STATEMENT OF UNDISPUTED MATERIAL FACTS**

**Exhibit A.**     Plaintiffs' First Amended Complaint ("FAC")

**Exhibit B.**     Defendants' Answer to First Amended Complaint ("Answer to FAC")

**Exhibit C.**     The Deposition of Shannon Spalding("Spalding Dep."), along with cited deposition exhibits

**Exhibit D.**     The Deposition of Daniel Echeverria ("Echeverria Dep."), along with cited deposition exhibits

**Exhibit E.**     The Deposition of Tina Skahill ("Skahill Dep.")

**Exhibit F.**     The Deposition of Nicholas Roti ("Roti Dep.")

**Exhibit G**      The Declaration of Nicholas Roti ("Roti Decl.")

**Exhibit H**      The Deposition of James O'Grady ("O'Grady Dep.")

**Exhibit I**       The Deposition of James Padar ("Padar Dep.")

**Exhibit J**       The Deposition of Juan Rivera ("Rivera Dep.")

**Exhibit K**      The Declaration of James O'Grady ("O'Grady Decl.")

**Exhibit L**      The Deposition of Maurice Barnes ("Barnes Dep.")

**Exhibit M**      The Deposition of Robert Cesario ("Cesario Dep.")

| | |
|---|---|
| **Exhibit N** | The Declaration of Robert Cesario ("Cesario Decl.") |
| **Exhibit O** | The Deposition of Joseph Salemme ("Salemme Dep.") |
| **Exhibit P** | The Deposition of Thomas Mills ("Mills Dep.") |
| **Exhibit Q** | The Declaration of Joseph Salemme ("Salemme Decl.") |
| **Exhibit R** | The Declaration of Maurice Barnes ("Barnes Decl.") |
| **Exhibit S** | The Declaration of Thomas Mills ("Mills Decl.") |
| **Exhibit T** | Rules of Conduct |
| **Exhibit U** | The Deposition of Lou Reiter ("Reiter Dep.") |

# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| Chicago Police Officers SHANNON SPALDING and DANIEL ECHEVERRIA, | |
| Plaintiffs, | No. 12 C 8777 |
| v. | Judge Gary Feinerman |
| CITY OF CHICAGO, Chicago Police Chief JUAN RIVERA, Chicago Police Chief DEBRA KIRBY, Chicago Police Commander JAMES O'GRADY, Chicago Police Chief NICHOLAS ROTI, Chicago Police Lt. KEVIN SADOWSKI, Chicago Police Lt. DEBORAH PASCUA, Chicago Police Commander ADRIENNE STANLEY, Chicago Police Sergeant MAURICE BARNES, Chicago Police Lt. ROBERT CESARIO, Chicago Police Commander JOSEPH SALEMME, Chicago Police Sergeant THOMAS MILLS, | Magistrate Judge Sheila M. Finnegan |
| Defendants. | |

### <u>AMENDED COMPLAINT</u>

NOW COME Plaintiffs, SHANNON SPALDING and DANIEL ECHEVERRIA, by and through their attorneys, Smith, Johnson & Antholt, LLC, complaining of Defendants and alleging as follows:

### Jurisdiction and Venue

1. This Court has jurisdiction of the action pursuant to the Civil Rights Act, 42 U.S.C. § 1983, 28 U.S.C. § 1331 and 1343(a), and the Constitution of the United States; it also has supplemental jurisdiction under 28 U.S.C. § 1367.

2.    Venue is proper under 28 U.S.C. § 1391(b). On information and belief, all defendants reside in this judicial district, and the events giving rise to the claims asserted herein occurred within the district.

**The Parties**

3.    Plaintiff Shannon Spalding is now and was at all times complained of a resident of Chicago, Illinois and a duly qualified peace officer employed by Defendant City Of Chicago.

4.    Plaintiff Officer Daniel Echeverria is now and was at all times complained of a resident of Chicago, Illinois and a duly qualified peace officer employed by Defendant City Of Chicago.

5.    Defendant City of Chicago is now and was at all times complained of a municipality incorporated in the State of Illinois and the employer of the individually named Defendants.

6.    Defendant Chief Juan Rivera is now and was at all times complained of an officer employed by Defendant City of Chicago. He engaged in the conduct complained of while acting under the color of law and within the scope of his employment. He is sued in his individual capacity.

7.    Defendant Chief Debra Kirby is now and was at all times complained of an officer employed by Defendant City of Chicago. She engaged in the conduct complained of while acting under the color of law and within the scope of her employment. She is sued in her individual capacity.

8.    Defendant Commander James O'Grady is now and was at all times complained of an officer employed by Defendant City of Chicago. He engaged in the conduct complained of while acting under the color of law and within the scope of his employment. He is sued in his

2

individual capacity.

9.      Defendant Chief Nicholas Roti is now and was at all times complained of an officer employed by Defendant City of Chicago. He engaged in the conduct complained of while acting under the color of law and within the scope of his employment. He is sued in his individual capacity.

10.     Defendant Lieutenant Kevin Sadowski is now and was at all times complained of an officer employed by Defendant City of Chicago. He engaged in the conduct complained of while acting under the color of law and within the scope of his employment. He is sued in his individual capacity.

11.     Defendant Lieutenant Deborah Pascua is now and was at all times complained of an officer employed by Defendant City of Chicago. She engaged in the conduct complained of while acting under the color of law and within the scope of her employment. She is sued in her individual capacity.

12.     Defendant Commander Adrienne Stanley is now and was at all times complained of an officer employed by Defendant City of Chicago. She engaged in the conduct complained of while acting under the color of law and within the scope of her employment. She is sued in her individual capacity.

13.     Defendant Sergeant Maurice Barnes is now and was at all times complained of an officer employed by Defendant City of Chicago. He engaged in the conduct complained of while acting under the color of law and within the scope of his employment. He is sued in his individual capacity.

14.     Defendant Lieutenant Robert Cesario is now and was at all times complained of an officer employed by Defendant City of Chicago. He engaged in the conduct complained of

while acting under the color of law and within the scope of his employment. He is sued in his individual capacity.

15.     Defendant Commander Joseph Salemme is now and was at all times complained of an officer employed by Defendant City of Chicago. He engaged in the conduct complained of while acting under the color of law and within the scope of his employment. He is sued in his individual capacity.

16.     Defendant Sergeant Thomas Mills is now and was at all times complained of an officer employed by Defendant City of Chicago. He engaged in the conduct complained of while acting under the color of law and within the scope of his employment. He is sued in his individual capacity.

## <u>STATEMENT OF FACTS</u>

17.     In 1996, Plaintiff Shannon Spalding was appointed as a police officer with the City of Chicago. She has an exemplary record and is a highly decorated officer.

18.     In 1999, Plaintiff Daniel Echeverria was appointed as a police officer with the City of Chicago. He has an exemplary record and received numerous commendations between 1999 and 2010.

19.     In May 2006, Plaintiffs were assigned to the "Narcotics Division," Unit 189, where their work involved pro-active police efforts to combat drug crimes. They worked to develop confidential informants, obtain and conduct search warrants and conducted conspiracy investigations.

20.     In 2007, while working an undercover narcotics investigation, Plaintiffs uncovered evidence of illegal activity being committed by various Chicago Police Officers.

4

21.     One of those officers was Sergeant Ronald Watts, who Plaintiffs had learned was involved in the narcotics trade and was using his police powers to extort drug dealers.

22.     Over time, Plaintiffs learned more and more credible information that Sgt. Watts and his cohort were extorting drug dealers by demanding payments to keep them free of arrest and/or prosecution.

23.     In 2007, while off-duty, Plaintiffs reported to the Federal Bureau of Investigation, Special Agent "P.S." the illegal activity by Sgt. Watts and others who worked with him.

24.     Plaintiffs continued to meet with Special Agent "P.S.," who was assigned to the bureau's public corruption unit, intermittently through 2008 to discuss the information on Sgt. Watts that they continued to learn. Plaintiffs always did so while off-duty and in their personal capacities.

25.     After approximately a year of speaking to the F.B.I. in their personal capacities, the F.B.I. agents began to request that Plaintiffs spend more time assisting on the case. Because additional involvement with the investigation would encroach on their professional time, Plaintiffs responded that it would have to be conducted through the Chicago Police Department.

26.     In August 2008, F.B.I. special agents met with the then-Chief of the Internal Affairs Division ("IAD") for the Chicago Police Department to discuss the Watts investigation.

27.     At a meeting with the F.B.I. and the Chief of IAD, Plaintiffs were informed that they would be joining the investigation in their official capacity as police officers. The federal investigation was highly confidential and Plaintiffs' identities and involvement in the case were to remain confidential.

28.     Certain CPD command staff knew of Plaintiffs' involvement in the federal Watts

5

investigation (known as "Operation Brass Tax"), including the Superintendent of Police, former-Deputy Superintendent (now Chief) Kirby, and the Chief of IAD (subsequently, Defendant Juan Rivera).

29.     Thereafter, although Plaintiffs remained assigned to the Narcotics Unit, they were detailed to "Detached Services," Unit 543, and reported directly to F.B.I. headquarters to work on Operation Brass Tax.

30.     Over the next several years Plaintiffs continued to work on Operation Brass Tax. During that time, they were also encouraged by CPD command staff to develop other narcotics related cases, which overlapped with their work on Operation Brass Tax.

31.     On an unknown date, information that Plaintiffs had reported criminal misconduct by a sworn officer and were working with an outside investigation was leaked within the Department and became known to Defendant Commander O'Grady.

32.     Defendant O'Grady was the Commander of Unit 189, Plaintiffs' unit of assignment.

33.     In August 2010, Defendant O'Grady began a campaign of harassment and retaliation that persists to this day.

34.     On approximately August 17, 2010, Plaintiffs were developing a narcotics case, as they were previously approved to do. Plaintiffs submitted paperwork to Defendant O'Grady, seeking approval of a confidential informant. Although he initially approved the application, upon learning that it had been submitted by Plaintiffs, he rescinded the approval.

35.     Defendant O'Grady then informed supervising personnel in the unit that Plaintiffs were "rats," meaning that they had reported other police officers' misconduct. Defendant O'Grady ordered that the unit was not to work with Plaintiffs and personnel in the unit should

not assist Plaintiffs.

36.     By interfering with their ability to develop narcotics cases in their unit of assignment, Defendant O'Grady intentionally prohibited Plaintiffs from earning overtime.

37.     Although Plaintiffs were thereafter prevented from working overtime in Unit 189, other officers in the unit were able to use the intelligence provided by Plaintiffs to develop one or more successful narcotics cases and to earn overtime.

38.     On one or more dates, multiple Defendants discussed with one another the handling or treatment of Plaintiffs. At one such meeting, Plaintiffs' possible reassignment within the Department was discussed. In response, Defendant O'Grady referred to Plaintiffs as "rats" and stated that he did not want Plaintiffs working in his unit.

39.     During the meeting, on information and belief, Defendant O'Grady stated words to the effect of, "God help them if they ever need help on the street, it ain't coming."

40.     Instead of putting a stop to his subordinate's retaliation against Plaintiffs, Defendant Chief Nicholas Roti, who was also was present at the meeting, concurred with Defendant O'Grady.

41.     Defendant Chief Roti is the head of the Bureau of Organized Crime, which includes the Narcotics Division, the Gang Enforcement Division, and the Gang Investigation Division (which includes most of the Department's Task Forces, as well as the Vice and Intelligence Sections).

42.     Defendant Chief Roti fostered, allowed, agreed to and encouraged the retaliation against Plaintiffs at this meeting and in the years that followed.

43.     Although Plaintiffs' years of exemplary police work made them a perfect fit for the Bureau of Organized Crime, Defendant Chief Roti would not allow Plaintiffs to work in any

7

unit in the Bureau.

44.     Plaintiffs were informed that none of the "bosses" wanted them in their units and that their "careers are over."

45.     In or near late May 2011, then-Deputy Superintendent (now, Chief) Defendant Debra Kirby caused Plaintiffs to be removed from their detail to Unit 543, Detached Services.

46.     At that time, the Deputy Superintendent of Detached Services, Beatrice Cuello, called Defendant Kirby to confirm that Plaintiffs were working on an undercover investigation and that the paperwork was in place.

47.     Despite her knowledge of Plaintiffs' detail to the federal investigation, Defendant Kirby falsely denied even knowing Plaintiffs or knowing that Plaintiffs were involved with any investigation. She did so knowing that this denial would jeopardize Plaintiffs' detail.

48.     Based upon Defendant Kirby's denials, Deputy Superintendent Cuello believed Plaintiffs had lied about their roles in the Watts investigation. As a result, Plaintiffs were kicked out of Unit 543.

49.     Despite having years of experience conducting undercover operations, eavesdropping operations, developing informants and other valuable police work, Defendants O'Grady and Roti would not allow Plaintiffs to return to any unit within Organized Crime including their own unit of assignment.

50.     Because Plaintiffs had been labeled "rats" in the Department, they lost their specialized assignments, weekends and holidays off, take-home vehicles, and the ability to work unlimited overtime.

51.     Plaintiffs were therefore detailed to the Police Academy for the next three weeks.

52.     During their time at the Police Academy, Plaintiffs often did nothing more than sit

at desks. Other times they sat in on recruit or other courses, sometimes the same course repeatedly for no reason other than that no one knew why Plaintiffs were there.

53.  Plaintiffs were effectively on "house arrest" in retaliation for having investigated fellow officers.

54.  Although Plaintiffs complained to Defendant Chief Rivera about the retaliatory re-assignment to the Police Academy, he failed to take any action.

55.  Around the end of July 2011, Plaintiffs were moved to the Inspections Division, Unit 126.

56.  They remained detailed to Unit 126, Inspections until March 2012. Throughout that time Plaintiffs were subjected to harassment and hostility, which was directed by their immediate supervisor, Defendant Lt. Pascua.

57.  Defendant Lt. Pascua called Plaintiffs, "rat motherf---ers" and told them that she did not want them in the unit.

58.  Defendant Lt. Pascua spread the word among their co-workers that Plaintiffs were "rats" and no one should talk to them.

59.  Throughout their time in Unit 126, Defendant Lt. Pascau gave Plaintiffs few legitimate work assignments. Most of their time was spent sitting at desks idle or being forced to chauffeur Defendant Lt. Pascua, often on personal errands.

60.  Defendant Lt. Pascua threatened to put a false case on Plaintiffs, saying "f--- them from narcotics...I'm a lawyer and know how to put a case together...I'm gonna work on getting them f---ing launched."

61.  On September 13, 2011, Plaintiffs met with their commanding officer, Defendant

Commander Stanley and informed her of ongoing retaliation and hostile work environment in the unit. After being told of the retaliation, Defendant Stanley said, "I don't want to hear this, I don't want to know."

62.     Defendant Commander Stanley did nothing to stop the retaliation or Lt. Pascua's inappropriate conduct including that she did not initiate a Complaint Register ("C.R.") about the retaliation as she was required to do by Department policy. By allowing the retaliation against Plaintiffs to continue unabated in her unit Defendant Commander Stanley condoned, encouraged, and agreed to the retaliation.

63.     Likewise, Defendant Chief Rivera knew of the constant retaliation against Plaintiffs but allowed it to continue unabated including that he refused to initiate an I.A.D. investigation into the harassment and retaliation.

64.     After Commander Stanley failed to address the retaliation, Defendant Lt. Sadowski joined in Lt. Pascua's campaign by repeatedly attempting to lodge false allegations of wrongdoing against Plaintiffs.

65.     In November 2011, as another manifestation of the City of Chicago's policy against investigating fellow officers, two Sergeants of the Internal Affairs Division told Plaintiffs "sometimes you have to turn a blind eye" to misconduct.

66.     In October 2011, Plaintiffs were called back to assist the F.B.I. with the completion of Operation Brass Tax.

67.     Plaintiffs continued to work on the case with the F.B.I. until the successful arrests and indictments of Sgt. Ronald Watts and Officer Kallat Mohammed in February 2012.

68.     Because Plaintiffs had already been established to be "rats," Defendant Chief Roti ordered that they were not allowed to return to the narcotics unit "or any other division of

Organized Crime."

69.     As a result, Plaintiffs were forced to return to Unit 126, which was an undesirable

position as well as a hostile work environment due to the continued retaliation and harassment.

70.     When Plaintiff Spalding again asked Defendant Chief Rivera to initiate a C.R.

investigation for a hostile work environment after she began to suffer anxiety attacks, Rivera

refused to acknowledge the request.

71.     In repeatedly refusing to initiate a C.R. investigation into the hostile work

environment, Defendant Chief Rivera condoned, encouraged, agreed to and allowed the

retaliation to continue unabated.

72.     Plaintiffs were not given assignments with Unit 126 and were again made to sit

idly, sometimes for up to eight hours a day.

73.     On March 20, 2012, Plaintiffs were detailed to the Bureau of Detectives, Fugitive

Apprehension, Unit 606. Within that Unit, Plaintiffs were assigned to the United States

Marshal's Task Force.

74.     Defendant Joseph Salemme was the Commander of Fugitive Apprehension;

Defendant Robert Cesario was Plaintiffs' Lieutenant in the unit; and Defendant Sgt. Maurice

Barnes was Plaintiffs' immediate supervisor on the U.S. Marshal's Task Force Team.

75.     Upon information and belief, on or around the day of their initial detail to the U.S.

Marshal's Task Force Team, Defendant O'Grady went out of his way to personally inform

Plaintiffs' new supervisors that they were "rats" and should be treated accordingly.

76.     Defendant Sgt. Barnes thereafter informed Plaintiffs' new team that they were

"rats," that Plaintiffs should not be trusted or backed up by the team.

77.     At one point, Defendant Sgt. Barnes removed Plaintiffs from a high profile case

Case: 1:12-cv-08777 Document #: 44 Filed: 03/29/13 Page 12 of 20 PageID #:130

to which they had been assigned; because they were "rats," Plaintiffs would not be allowed to work the case.

78.     When Plaintiff Spalding tried to talk to Sgt. Barnes in an effort to prevent further retaliation, Sgt. Barnes repeatedly referenced that Plaintiffs had brought down a sergeant (referring to Watts).

79.     Sgt. Barnes told Plaintiff Spalding that the team hated them and would not back them up if they were in need. He stated words to the effect of, "I don't want to tell your daughter you're coming home in a box because the team won't help you on the street."

80.     On or about June 20, 2012, Plaintiffs were ordered to meet with Defendants Commander Salemme, Lt.Cesario and Sgt. Barnes at Unit 606 headquarters.

81.     Defendants Commander Salemme, Lt.Cesario and Sgt. Barnes removed Plaintiffs from the Marshal's Taskforce Team, located on the far Southside, where they worked days (7 a.m. to 3 p.m. Defendants had Plaintiffs placed on a team located on the Northside, working the third watch (4 p.m. to 12 p.m.).

82.     During the meeting, Defendant Commander Salemme told Plaintiffs words to the effect of, "you brought this baggage on yourselves … if you go against sworn personnel you know this will happen."

83.     Defendant Lt. Cesario said words to the effect of, Plaintiffs were being sent "up north" and would not get a take-home car, Marshal's pay, overtime or be deputized. He made clear, "that will never happen for you."

84.     When Plaintiffs were initially assigned to the Task Force, they had been informed that when positions opened up for deputization by the U.S. Marshals, they—like other members

of the Task Force—would be deputized.

85.     Shortly after Plaintiffs were removed from the Task Force Team, dozens of positions for officers to be deputized as U.S. Marshals opened up. After Plaintiffs' removal from the team, other officers with less seniority than Plaintiffs were brought into Unit 606 and deputized while Plaintiffs were passed up.

86.     In fact, since then, dozens of other officers in the Fugitives Apprehension Unit have been deputized by the U.S. Marshals including other officers from Plaintiffs' current team. As Lt. Cesario promised, however, Plaintiffs have been continually passed up for deputization.

87.     On June 23, 2012, Plaintiffs contacted Defendant Chief Rivera from I.A.D. to lodge another complaint. Again, their complaint was ignored.

88.     On June 25, 2012, Plaintiffs were reassigned to a nighttime fugitive apprehension team and relocated to the Northside of Chicago. This reassignment was a step backwards for Plaintiff professionally, as well as an inconvenience.

89.     On August 17, 2012, Sgt. Watts' co-conspirator, Officer Mohammed pled guilty to extorting drug dealers. In his plea, he described the criminal misconduct going back to at least 2007.

90.     Around the same time, Defendant Commander O'Grady "banned" Plaintiff Spalding from entering Chicago Police Headquarters at Homan Square, where she was assigned a locker.

91.     Plaintiffs' own supervisor, Defendant Lt. Cesario, stressed that Plaintiff should "heed the warning that O'Grady doesn't want you there."

**Retaliation Resulting from the Lawsuit and Speech in the Media**

92.     On November 1, 2012, Plaintiffs filed the original civil action in this case

13

complaining of the above-described retaliation.

93.     Following the filing, Chicago area media publicized Plaintiffs' reporting of the Watts' criminal misconduct and the Department-wide effort to punish Plaintiffs for reporting police corruption.

94.     While accounts of the prevalence of the code of silence among Chicago Police Department rank-and-file have been widely reported for years, Plaintiffs' case shed new light on Department's top ranking members explicit enforcement of the code of silence.

95.     Plaintiffs appeared in the media, including local television and newspapers telling of the years of retaliation that they endured at the hands of their superiors.

96.     As a result, Plaintiffs experienced new and additional retaliation.

97.     Prior to the lawsuit, Plaintiffs' current supervisor, Defendant Sgt. Mills seemed to defend Plaintiffs in the face of the retaliation coming from outside the team.

98.     Since the filing of the lawsuit, and Plaintiffs' related media appearances, Plaintiffs have faced retaliation within the team, including that they are now ostracized and are no longer included in team activities.

99.     Defendant Sgt. Mills regularly brings up the fact that Plaintiffs have a lawsuit and are making allegations against the "bosses."

100.     Defendant Sgt. Mills constantly is badgering Plaintiffs making their day to day work more difficult. For example, Sgt. Mills insists that even when the team is working on the Southside, Plaintiffs must return to the Northside office to check-off while the rest of the team is allowed to leave directly from the Southside.

101.     Defendant Sgt. Mills has ordered Plaintiffs to only return to the team's office for check-off at the end of the day. Other officers freely come and go from the office while Plaintiffs

risk ridicule and harassment if they do so.

102.     Defendant Sgt. Mills has repeatedly made it difficult for Plaintiffs to work overtime hours while the rest of the team does so without hindrance.

103.     Defendant Sgt. Mills has prevented Plaintiffs from working up cases, as well as excluded them from team arrests, while simultaneously threating to remove Plaintiffs from the team for "not producing" (arrests).

104.     On one occasion when Plaintiffs were allowed to pursue the arrest of a felon who was known to be violent and dangerous, Plaintiffs were assured by their team that the team would be present for the necessary back-up and support.

105.     However, when Plaintiffs arrived as scheduled, their team was nowhere in sight. Instead, they received a text from Defendant Sgt. Mills stating, "be careful."

106.     In light of the danger presented by the suspect, Plaintiffs took this to be a threat to their safety and well-being.

## COUNT I –FIRST AMENDMENT RETALIATION

107.     Plaintiffs repeat, re-allege and incorporate by reference the factual allegations above as fully set forth herein.

108.     The First Amendment to the United States Constitution guarantees Plaintiffs' rights to speak out on matters of public concern without fear of unjust retaliation.

109.     As described more fully above, Plaintiffs engaged in extensive protected speech on matters of public concern by reporting on the criminal misconduct and corruption of Sgt. Watts, Officer Mohammed and others to the F.B.I.

110.     As described more fully above, Plaintiffs engaged in extensive protected speech on matters of public concern by filing this civil action and speaking out in the media about the

retaliation that they have faced and the prevalence of the code of silence within the Chicago Police Department.

111.     As a result of their exercise of protected speech, Defendants City of Chicago, Chief Rivera, Chief Kirby, Commander O'Grady, Chief Roti, Lieutenant Pascua, Commander Stanley, Sergeant Barnes, Lieutenant Sadowski, Lieutenant Cesario, Commander Salemmi, and Sergeant Mills retaliated against Plaintiffs in the manner described in the preceding paragraphs.

112.     Retaliation against Plaintiffs was devised, approved and carried out by individuals with final policymaking authority with respect to the actions taken, including as follows:

a.     By authority delegated to him by the Chicago City Council, the Superintendent of Police is responsible for the general management and control of the police department, and has full and complete authority to administer the department. The Superintendent has the power and the duty to administer the affairs of the department as its chief administrative officer, including to make appointments, promotions, transfers and to take disciplinary action against department employees; to appoint, discharge, suspend or transfer employees; and to issue instructions to department employees in the line of their duties.

b.     Within the Department, the Superintendent has delegated certain policymaking authority to his Chiefs, including Defendants Kirby, Rivera and Roti.

c.     The Superintendent, as well as Defendant Chiefs Kirby, Rivera and Roti, were responsible for the retaliatory re-assignments and effective demotions to Plaintiffs.

d.     The Superintendent, as well as Defendant Chiefs Kirby, Rivera and Roti, were aware of the retaliation against Plaintiffs, described above, and knowingly allowed it to continue unabated thereby encouraging, fostering and causing the retaliation.

16

113.    The misconduct described in this Count was the result of Defendant City of Chicago's deliberate indifference to the policies and widespread practices described more fully above and in that:

a.   Municipal policymakers are aware of, condone and facilitate by their inaction, a "code of silence" in the Chicago Police Department, by which officers understand that they should cover for each other unconditionally and that failure to do so amounts to a betrayal.

b.   Municipal policymakers are aware of, condone and facilitate by their inaction, the enforcement of the "code of silence" within the Department through the retaliation against officers who do report the misconduct of other officers.

c.   The City Council's Committee on Police and Fire has recognized the existence of the code of silence within the Chicago Police Department but has failed to take the necessary steps to protect officers who break the Code of Silence and suffer retaliation as a result.

d.   As a matter of both policy and practice, the City of Chciago directly encouraged, and was thereby the moving force behind the very type of misconduct at issue here by failing to adequately supervise, discipline, and control its officers, such that its failure to do so manifests deliberate indifference.

e.   As a matter of both policy and practice, the City of Chicago facilitated the very type of misconduct at issue here by allowing it to continue as a matter of practice within the Department, thereby leading Chicago police officers to believe that the code of silence will be enforced throughout the Department and, in that way, directly encouraging future abuses.

f.   As a matter of widespread practice so prevalent as to comprise municipal policy, officers of the Chicago Police Department who have dared to speak out about the

17

misconduct of others have experienced retaliation a manner similar to that alleged by Plaintiffs.

114.    As a result of the aforementioned deprivation of federal rights, Plaintiffs have suffered and will likely continue to suffer injuries including but not limited to emotional distress.

## COUNT II – CONSPIRACY VIA 42 U.S.C. § 1983

115.    Plaintiffs repeat, re-allege and incorporate by reference the factual allegations above as fully set forth herein.

116.    As described in the preceding paragraphs, Defendants, acting in concert with other known and unknown conspirators, reached an understanding to deprive Plaintiffs of their Constitutional rights.

117.    Plaintiffs were deprived of their Constitutional rights in the manner described in the preceding paragraphs.

118.    That in furtherance of the conspiracy, Defendants committed overt acts and were otherwise willful participants in joint activity with state actors under color of law.

119.    That the misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

120.    As a result of the aforementioned deprivation of federal rights, Plaintiffs have suffered and will likely continue to suffer injuries including but not limited to emotional distress.

## COUNT III – VIOLATION OF THE ILLINOIS
## WHISTLEBLOWER PROTECTION ACT

121.    Plaintiffs repeat, re-allege and incorporate by reference the factual allegations above as fully set forth herein.

122.    The City of Chicago was at all times complained of Plaintiffs' employer as defined in 740 ILCS § 174/5.

18

123.     Plaintiffs were at all times complained of employees of the City of Chicago as defined in 740 ILCS § 174/5.

124.     The City of Chicago and its employees and agents were prohibited according to 740 ILCS § 174/15 from retaliating against Plaintiffs for disclosing to the F.B.I. what they reasonably believed and in fact knew were multiple violations state and federal laws by Watts, Mohammed and other Chicago Police Officers.

125.     The City of Chicago retaliated against Plaintiffs in the manner described in the preceding paragraphs as a result of their reporting of the criminal misconduct.

126.     As a result of the aforesaid retaliation, Plaintiffs have suffered and will likely continue to suffer injuries including but not limited to emotional distress.

WHEREFORE, pursuant to 42 U.S.C. Section 1983 and applicable state law, Plaintiffs demand judgment against the Defendants, jointly and severally, for compensatory damages and, because the individual Defendants acted maliciously, wantonly, or oppressively, Plaintiffs seek punitive damages against them in their individual capacity, in addition to the costs of this action and attorneys' fees, and such other and additional relief as this court deems equitable and just.

PLAINTIFFS DEMAND TRIAL BY JURY.

RESPECTFULLY SUBMITTED,


_____/s/Amanda Antholt_____
Attorney for Plaintiff


Amanda Antholt
Christopher R. Smith
Robert W. Johnson

19

James Baranyk
Emily J. Stine
Smith, Johnson & Antholt, LLC
112 S. Sangamon Street, Third Floor
Chicago, IL 60607
312.432.0400

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that the foregoing *Corrected* Amended
Complaint was served on counsel for all Defendants by electronic means May 29, 2013.


/s/ Amanda Antholt

# Exhibit B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| Chicago Police Officer SHANNON SPALDING and Chicago Police Officer DANIEL ECHEVERRIA, | ) ) ) | |
| | ) | No. 12 C 8777 |
| Plaintiffs, | ) ) | |
| v. | ) ) | Judge Gary Feinerman |
| | ) | Magistrate Judge Sheila M. Finnegan |
| CITY OF CHICAGO,  Chicago Police Chief JUAN RIVERA, Chicago Police Chief DEBRA KIRBY, Chicago Police Commander JAMES O'GRADY, Chicago Police Chief NICHOLAS ROTI, Chicago Police Lt. KEVIN SADOWSKI, Chicago Police Lt. DEBORAH PASCUA, Chicago Police Commander ADRIENNE STANLEY, Chicago Police Sergeant MAURICE BARNES, Chicago Police Lt. ROBERT CESARIO, Chicago Police Commander JOSEPH SALEMME, Chicago Police Sergeant THOMAS MILLS, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## CERTAIN DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' AMENDED COMPLAINT

Defendants, City of Chicago (the "City"), James O'Grady ("O'Grady"), Nicholas Roti ("Roti"), Kevin Sadowski ("Sadowski"), Debra Pascua ("Pascua"), Adrienne Stanley ("Stanley"), Maurice Barnes ("Barnes"), Robert Cesario ("Cesario"), Joseph Salemme ("Salemme") and Thomas Mills ("Mills") (collectively referred to herein as the "Individual Defendants" and the City and the Individual Defendants are collectively referred to herein as the "Defendants"), by their attorneys, Drinker Biddle & Reath LLP, for their answer and affirmative defenses to the Amended Complaint of Plaintiffs Shannon Spalding ("Spalding") and Daniel Echeverria ("Echeverria") (collectively, "Plaintiffs"), state as follows:

## Jurisdiction and Venue

1.    This Court has jurisdiction of the action pursuant to the Civil Rights Act, 42 U.S.C. § 1983, 28 U.S.C. § 1331 and 1343(a), and the Constitution of the United States; it also has supplemental jurisdiction under 28 U.S.C. § 1367.

**ANSWER:** Defendants state that the allegations of Paragraph 1 constitute legal conclusions for

which no answer is required.  Further answering, Defendants admit that this Court has subject

matter jurisdiction over this action.

2.    Venue is proper under 28 U.S.C. § 1391(b). On information and belief, all defendants reside in this judicial district, and the events giving rise to the claims asserted herein occurred within the district.

**ANSWER:** Defendants state that the allegations of Paragraph 2 constitute legal conclusions for

which no answer is required.  Further answering, Defendants admit that venue is proper in this

judicial district.

## The Parties

3.    Plaintiff Shannon Spalding is now and was at all times complained of a resident of Chicago, Illinois and a duly qualified peace officer employed by Defendant City Of Chicago.

**ANSWER:** Defendants admit that Spalding is and has been since 1996 a police officer

employed by the City.  Defendants lack knowledge or information sufficient to admit or deny

that Plaintiff is or was a resident of Chicago, Illinois.  Defendants deny the remaining allegations

of Paragraph 3.

4.    Plaintiff Officer Daniel Echeverria is now and was at all times complained of a resident of Chicago, Illinois and a duly qualified peace officer employed by Defendant City Of Chicago.

**ANSWER:** Defendants admit that Echeverria is and has been since 1999 a police officer

employed by the City.  Defendants lack knowledge or information sufficient to admit or deny

that Plaintiff is or was a resident of Chicago, Illinois.  Defendants deny the remaining allegations

of Paragraph 4.

     5.     Defendant City of Chicago is now and was at all times complained of a municipality incorporated in the State of Illinois and the employer of the individually named Defendants.

**ANSWER:** Defendants admits that the City of Chicago is now and was at all times complained of a municipality incorporated in the State of Illinois and admits that the City of Chicago was the employer of the individually named defendants for certain periods of time. Defendants deny the remaining allegations of Paragraph 5.

     6.     Defendant Chief Juan Rivera is now and was at all times complained of an officer employed by Defendant City of Chicago. He engaged in the conduct complained of while acting under the color of law and within the scope of his employment. He is sued in his individual capacity.

**ANSWER:** Defendants admit that Rivera is and has been employed as an officer by the City for a period of time, admit that during all times alleged as it relates to Rivera, he was acting under color of law and within the scope of his employment, and admit that Plaintiffs purport to bring this action against Rivera in his individual capacity. Defendants deny that Rivera engaged in any unlawful conduct and deny the remaining allegations of Paragraph 6.

     7.     Defendant Chief Debra Kirby is now and was at all times complained of an officer employed by Defendant City of Chicago. She engaged in the conduct complained of while acting under the color of law and within the scope of her employment. She is sued in her individual capacity.

**ANSWER:** Defendants admit that Kirby was employed as an officer by the City for a period of time, admit that during all times alleged as it relates to Kirby, she was acting under color of law and within the scope of her employment, and admit that Plaintiffs purport to bring this action against Kirby in her individual capacity. Defendants deny that Kirby engaged in any unlawful conduct and deny the remaining allegations of Paragraph 7.

     8.     Defendant Commander James O'Grady is now and was at all times complained of an officer employed by Defendant City of Chicago. He engaged in the conduct complained of while acting under the color of law and within the scope of his employment. He is sued in his individual capacity.

**ANSWER:** Defendants admit that O'Grady was employed as an officer by the City for a period

of time, admit that during all times alleged as it relates to O'Grady, he was acting under color of

law and within the scope of his employment, and admit that Plaintiffs purport to bring this action

against O'Grady in his individual capacity. Defendants deny that O'Grady engaged in any

unlawful conduct and deny the remaining allegations of Paragraph 8.

9. Defendant Chief Nicholas Roti is now and was at all times complained of an
officer employed by Defendant City of Chicago. He engaged in the conduct complained of while
acting under the color of law and within the scope of his employment. He is sued in his
individual capacity

**ANSWER:** Defendants admit that Roti is and has been employed as an officer by the City for a

period of time, admit that during all times alleged as it relates to Roti, he was acting under color

of law and within the scope of his employment and admit that Plaintiffs purport to bring this

action against Roti in his individual capacity. Further answering, Defendants deny that Roti

engaged in any unlawful conduct and deny the remaining allegations of Paragraph 9.

10. Defendant Lieutenant Kevin Sadowski is now and was at all times complained of
an officer employed by Defendant City of Chicago. He engaged in the conduct complained of
while acting under the color of law and within the scope of his employment. He is sued in his
individual capacity.

**ANSWER:** Defendants admit that Sadowski is and has been employed as an officer by the City

for a period of time, admit that during all times alleged as it relates to Sadowski, he was acting

under color of law and within the scope of his employment and admit that Plaintiffs purport to

bring this action against Sadowski in his individual capacity. Defendants deny that Sadowski

engaged in any unlawful conduct and deny the remaining allegations of Paragraph 10.

11. Defendant Lieutenant Deborah Pascua is now and was at all times complained of
an officer employed by Defendant City of Chicago. She engaged in the conduct complained of
while acting under the color of law and within the scope of her employment. She is sued in her
individual capacity.

**ANSWER:** Defendants admit that Pascua is and has been employed as an officer by the City for a period of time, admit that during all times alleged as it relates to Pascua, she was acting under color of law and within the scope of her employment, and admit that Plaintiffs purport to bring this action against Pascua in her individual capacity. Defendants deny that Pascua engaged in any unlawful conduct and deny the remaining allegations of Paragraph 11.

12. Defendant Commander Adrienne Stanley is now and was at all times complained of an officer employed by Defendant City of Chicago. She engaged in the conduct complained of while acting under the color of law and within the scope of her employment. She is sued in her individual capacity.

**ANSWER:** Defendants admit that Stanley is and has been employed as an officer by the City for a period of time, admit that during all times alleged as it relates to Stanley, she was acting under color of law and within the scope of her employment, and admit that Plaintiffs purport to bring this action against Stanley in her individual capacity. Defendants deny that Stanley engaged in any unlawful conduct and deny the remaining allegations of Paragraph 12.

13. Defendant Sergeant Maurice Barnes is now and was at all times complained of an officer employed by Defendant City of Chicago. He engaged in the conduct complained of while acting under the color of law and within the scope of his employment. He is sued in his individual capacity.

**ANSWER:** Defendants admit that Barnes is and has been employed as an officer by the City for a period of time, admit that during all times alleged as it relates to Barnes, he was acting under color of law and within the scope of his employment, and admit that Plaintiffs purport to bring this action against Barnes in his individual capacity. Further answering, Defendants deny that Barnes engaged in any unlawful conduct and deny the remaining allegations of Paragraph 13.

14. Defendant Lieutenant Robert Cesario is now and was at all times complained of an officer employed by Defendant City of Chicago. He engaged in the conduct complained of while acting under the color of law and within the scope of his employment. He is sued in his individual capacity.

**ANSWER:** Defendants admit that Cesario is and has been employed as an officer by the City for a period of time, admit that during all times alleged as it relates to Cerario, he was acting under color of law and within the scope of his employment, and admit that Plaintiffs purport to bring this action against Cesario in his individual capacity. Defendants deny that Cesario engaged in any unlawful conduct and deny the remaining allegations of Paragraph 14.

15. Defendant Commander Joseph Salemme is now and was at all times complained of an officer employed by Defendant City of Chicago. He engaged in the conduct complained of while acting under the color of law and within the scope of his employment. He is sued in his individual capacity.

**ANSWER:** Defendants admit that Salemme is and has been employed as an officer by the City for a period of time, admit that during all times alleged as it relates to Salemme, he was acting under color of law and within the scope of his employment, and admit that Plaintiffs purport to bring this action against Salemme in his individual capacity. Defendants deny that Salemme engaged in any unlawful conduct and deny the remaining allegations of Paragraph 15.

16. Defendant Sergeant Thomas Mills is now and was at all times complained of an officer employed by Defendant City of Chicago. He engaged in the conduct complained of while acting under the color of law and within the scope of his employment. He is sued in his individual capacity.

**ANSWER:** Defendants admit that Mills is and has been employed as an officer by the City for a period of time, admit that during all times alleged as it relates to Mills, he was acting under color of law and within the scope of his employment and admit that Plaintiffs purport to bring this action against Mills in his individual capacity. Further answering, Defendants deny that Mills engaged in any unlawful conduct and deny the remaining allegations of Paragraph 16.

## STATEMENT OF FACTS

17. In 1996, Plaintiff Shannon Spalding was appointed as a police officer with the City of Chicago. She has an exemplary record and is a highly decorated officer.

**ANSWER:** Defendant City admits that Spalding was appointed as a police officer with the City

in 1996, and denies the remaining allegations of Paragraph 17. The Individual Defendants state

they are without knowledge or information sufficient to admit or deny the allegations of

Paragraph 17.

18.    In 1999, Plaintiff Daniel Echeverria was appointed as a police officer with the City of Chicago. He has an exemplary record and received numerous commendations between 1999 and 2010.

**ANSWER:** Defendant City admits that Echeverria was appointed as a police officer with the

City in 1999, admits that Echeverria received certain commendations during his employment

with the City, and denies the remaining allegations of Paragraph 18. The Individual Defendants

state they are without knowledge or information sufficient to admit or deny the allegations of

Paragraph 18.

19.    In May 2006, Plaintiffs were assigned to the "Narcotics Division," Unit 189, where their work involved pro-active police efforts to combat drug crimes. They worked to develop confidential informants, obtain and conduct search warrants and conducted conspiracy investigations.

**ANSWER:** Defendants City, O'Grady and Roti admit that in or about May 2006, Plaintiffs

were assigned to Unit 189, Narcotics Division, admit that their work included police efforts to

combat drug crimes, admit that, among other things, Plaintiffs at certain times worked to develop

confidential informants, obtain and conduct search warrants and conduct conspiracy

investigations, and deny the remaining allegations of Paragraph 19. Answering further, the

remaining Individual Defendants state they are without knowledge or information sufficient to

admit or deny the allegations of Paragraph 19.

20.    In 2007, while working an undercover narcotics investigation, Plaintiffs uncovered evidence of illegal activity being committed by various Chicago Police Officers.

**ANSWER:** Defendants state they are without knowledge or information sufficient to admit or

deny the allegations of Paragraph 20.

21.     One of those officers was Sergeant Ronald Watts, who Plaintiffs had learned was involved in the narcotics trade and was using his police powers to extort drug dealers.

**ANSWER:** Defendants state they are without knowledge or information sufficient to admit or

deny the allegations of Paragraph 21.

22.     Over time, Plaintiffs learned more and more credible information that Sgt. Watts and his cohort were extorting drug dealers by demanding payments to keep them free of arrest and/or prosecution.

**ANSWER:** Defendants state they are without knowledge or information sufficient to admit or

deny the allegations of Paragraph 22.

23.     In 2007, while off-duty, Plaintiffs reported to the Federal Bureau of Investigation, Special Agent "P.S." the illegal activity by Sgt. Watts and others who worked with him.

**ANSWER:** Defendants state they are without knowledge or information sufficient to admit or

deny the allegations of Paragraph 23.

24.     Plaintiffs continued to meet with Special Agent "P.S.," who was assigned to the bureau's public corruption unit, intermittently through 2008 to discuss the information on Sgt. Watts that they continued to learn. Plaintiffs always did so while off-duty and in their personal capacities.

**ANSWER:** On information and belief, Defendants deny that Plaintiffs met with and discussed

information regarding Sgt. Watts with Special Agent P.S. in their "personal capacities."

Answering further, Defendants state they are without knowledge or information sufficient to

admit or deny the remaining allegations of Paragraph 24.

25.     After approximately a year of speaking to the F.B.I. in their personal capacities, the F.B.I. agents began to request that Plaintiffs spend more time assisting on the case. Because additional involvement with the investigation would encroach on their professional time, Plaintiffs responded that it would have to be conducted through the Chicago Police Department.

**ANSWER:** Defendants deny that Plaintiffs spoke to the F.B.I. in their "personal capacities."

Defendant City admits that Plaintiffs spent time working on the Watts investigation as police

officers through the Chicago Police Department.  Answering further, Defendants state they are

without knowledge or information sufficient to admit or deny the remaining allegations of

Paragraph 25.

26.     In August 2008, F.B.I. special agents met with the then-Chief of the Internal Affairs Division ("IAD") for the Chicago Police Department to discuss the Watts investigation.

**ANSWER**: Defendant City admit that in or about August 2008, one or more F.B.I. agents met

with the then-Chief of the IAD for the Chicago Police Department and discussed the Watts

investigation, and denies the remaining allegations of Paragraph 26.  Answering further, the

Individual Defendants state they are without knowledge or information sufficient to admit or

deny the allegations of Paragraph 26.

27.     At a meeting with the F.B.I. and the Chief of IAD, Plaintiffs were informed that they would be joining the investigation in their official capacity as police officers. The federal investigation was highly confidential and Plaintiffs' identities and involvement in the case were to remain confidential.

**ANSWER**: Defendant City admits that Plaintiffs spent time working on the Watts investigation

as police officers through the Chicago Police Department, admits that the federal investigation

was confidential and that information concerning the investigation and Plaintiffs' identities and

involvement was shared on a need to know basis, and denies the remaining allegations of

Paragraph 27.  Answering further, the Individual Defendants state they are without knowledge or

information sufficient to admit or deny the allegations of Paragraph 27.

28.     Certain CPD command staff knew of Plaintiffs' involvement in the federal Watts investigation (known as "Operation Brass Tax"), including the Superintendent of Police, former-Deputy Superintendent (now Chief) Kirby, and the Chief of IAD (subsequently, Defendant Juan Rivera).

**ANSWER**: Defendant City admits, on information and belief, that at some point Kirby and

Rivera had knowledge of Plaintiffs' involvement in the Watts investigation.  Answering further,

Defendants state they are without knowledge or information sufficient to admit or deny the

remaining allegations of Paragraph 28.

29.     Thereafter, although Plaintiffs remained assigned to the Narcotics Unit, they were detailed to "Detached Services," Unit 543, and reported directly to F.B.I. headquarters to work on Operation Brass Tax.

**ANSWER:**  Defendant City admits that for a period of time, Plaintiffs remained assigned to the

Narcotics Unit but were detailed to "Detached Services," Unit 543.  Further answering,

Defendants state they are without knowledge or information sufficient to admit or deny the

remaining allegations of Paragraph 29.

30.     Over the next several years Plaintiffs continued to work on Operation Brass Tax. During that time, they were also encouraged by CPD command staff to develop other narcotics related cases, which overlapped with their work on Operation Brass Tax.

**ANSWER:**  Defendant City admits that Plaintiffs worked on Operation Brass Tax as Chicago

police officers for a certain period of time, denies that Plaintiffs were encouraged by CPD

command staff to develop narcotics related cases which overlapped with Operation Brass Tax,

and denies the remaining allegations of Paragraph 30.  Answering further, the Individual

Defendants state they are without knowledge or information sufficient to admit or deny the

allegations of Paragraph 30.

31.     On an unknown date, information that Plaintiffs had reported criminal misconduct by a sworn officer and were working with an outside investigation was leaked within the Department and became known to Defendant Commander O'Grady.

**ANSWER:**  Defendants City and O'Grady admit that at some point O'Grady became aware that

Plaintiffs were working on a federal investigation, and deny the remaining allegations of

Paragraph 31.  Answering further, the remaining Individual Defendants state they are without

knowledge or information sufficient to admit or deny the allegations of Paragraph 31.

32.     Defendant O'Grady was the Commander of Unit 189, Plaintiffs' unit of assignment.

**ANSWER:**  Defendants City and O'Grady admit that O'Grady was the Commander of Unit 189

when Plaintiffs were assigned to Unit 189, and deny the remaining allegations of Paragraph 32.

Answering further, the remaining Individual Defendants state they are without knowledge or information sufficient to admit or deny the allegations of Paragraph 32.

33.     In August 2010, Defendant O'Grady began a campaign of harassment and retaliation that persists to this day.

**ANSWER:** Defendants City and O'Grady deny the allegations of Paragraph 33. Answering further, the remaining Individual Defendants state they are without knowledge or information sufficient to admit or deny the allegations of Paragraph 33.

34.     On approximately August 17, 2010, Plaintiffs were developing a narcotics case, as they were previously approved to do. Plaintiffs submitted paperwork to Defendant O'Grady, seeking approval of a confidential informant. Although he initially approved the application, upon learning that it had been submitted by Plaintiffs, he rescinded the approval.

**ANSWER:** Defendants City and O'Grady admit that in or about August 2010, Plaintiffs submitted paperwork seeking approval of a confidential informant, admit that O'Grady did not approve the application because Plaintiffs at the time were detailed to another unit and were not officers working for the Bureau of Organized Crime, and deny the remaining allegations of Paragraph 34. Answering further, the remaining Individual Defendants state they are without knowledge or information sufficient to admit or deny the allegations of Paragraph 34.

35.     Defendant O'Grady then informed supervising personnel in the unit that Plaintiffs were "rats," meaning that they had reported other police officers' misconduct. Defendant O'Grady ordered that the unit was not to work with Plaintiffs and personnel in the unit should not assist Plaintiffs.

**ANSWER:** Defendants City and O'Grady deny the allegations of Paragraph 35. Answering further, the remaining Individual Defendants state they are without knowledge or information sufficient to admit or deny the allegations of Paragraph 35.

36.     By interfering with their ability to develop narcotics cases in their unit of assignment, Defendant O'Grady intentionally prohibited Plaintiffs from earning overtime.

**ANSWER:** Defendants City and O'Grady deny the allegations of Paragraph 36. Answering further, the remaining Individual Defendants state they are without knowledge or information sufficient to admit or deny the allegations of Paragraph 36.

37. Although Plaintiffs were thereafter prevented from working overtime in Unit 189, other officers in the unit were able to use the intelligence provided by Plaintiffs to develop one or more successful narcotics cases and to earn overtime.

**ANSWER:** Defendants City and O'Grady deny the allegations of Paragraph 37. Answering further, the remaining Individual Defendants state they are without knowledge or information sufficient to admit or deny the allegations of Paragraph 37.

38. On one or more dates, multiple Defendants discussed with one another the handling or treatment of Plaintiffs. At one such meeting, Plaintiffs' possible reassignment within the Department was discussed. In response, Defendant O'Grady referred to Plaintiffs as "rats" and stated that he did not want Plaintiffs working in his unit.

**ANSWER:** Defendants City, O'Grady and Roti admit that on one or more dates, Roti discussed with O'Grady Plaintiffs' possible reassignment within the Narcotics Department, and that on one or more dates, Roti and/or O'Grady discussed Plaintiffs' possible reassignment within the Narcotics Department with Rivera. Defendants City, O'Grady and Roti deny the remaining allegations of Paragraph 38. Answering further, the remaining Individual Defendants deny that they had discussions with other Defendants concerning Plaintiffs' possible reassignment within the Narcotics Department, and state they are without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 38.

39. During the meeting, on information and belief, Defendant O'Grady stated words to the effect of, "God help them if they ever need help on the street, it ain't coming."

**ANSWER:** Defendants City and O'Grady deny the allegations of Paragraph 39. Answering further, the remaining Individual Defendants state they are without knowledge or information sufficient to admit or deny the allegations of Paragraph 39.

40.     Instead of putting a stop to his subordinate's retaliation against Plaintiffs, Defendant Chief Nicholas Roti, who was also was present at the meeting, concurred with Defendant O'Grady.

**ANSWER:**  Defendants City, Roti and O'Grady deny the allegations of Paragraph 40.

Answering further, the remaining Individual Defendants state they are without knowledge or

information sufficient to admit or deny the allegations of Paragraph 40.

41.     Defendant Chief Roti is the head of the Bureau of Organized Crime, which includes the Narcotics Division, the Gang Enforcement Division, and the Gang Investigation Division (which includes most of the Department's Task Forces, as well as the Vice and Intelligence Sections).

**ANSWER:**  Defendants admit the allegations of Paragraph 41.

42.     Defendant Chief Roti fostered, allowed, agreed to and encouraged the retaliation against Plaintiffs at this meeting and in the years that followed.

**ANSWER:**  Defendants City and Roti deny the allegations of Paragraph 42.  Answering further,

the remaining Individual Defendants state they are without knowledge or information sufficient

to admit or deny the allegations of Paragraph 42.

43.     Although Plaintiffs' years of exemplary police work made them a perfect fit for the Bureau of Organized Crime, Defendant Chief Roti would not allow Plaintiffs to work in any unit in the Bureau.

**ANSWER:**  Defendants City and Roti admit that Plaintiffs were not returned to the Narcotics

Division, and deny the remaining allegations of Paragraph 43.  Answering further, the remaining

Individual Defendants state they are without knowledge or information sufficient to admit or

deny the allegations of Paragraph 43.

44.     Plaintiffs were informed that none of the "bosses" wanted them in their units and that their "careers are over."

**ANSWER:**  Defendants state they are without knowledge or information sufficient to admit or

deny the allegations of Paragraph 44.

45.     In or near late May 2011, then-Deputy Superintendent (now, Chief) Defendant Debra Kirby caused Plaintiffs to be removed from their detail to Unit 543, Detached Services.

**ANSWER:** On information and belief, Defendant City denies the allegations of Paragraph 45.

Answering further, the Individual Defendants state they are without knowledge or information

sufficient to admit or deny the allegations of Paragraph 45.

46. At that time, the Deputy Superintendent of Detached Services, Beatrice Cuello, called Defendant Kirby to confirm that Plaintiffs were working on an undercover investigation and that the paperwork was in place.

**ANSWER:** On information and belief, Defendant City admits that at one point Beatrice Cuello

contacted Kirby asking her about Plaintiffs' status. Defendants state they are without knowledge

or information sufficient to admit or deny the remaining allegations of Paragraph 46.

47. Despite her knowledge of Plaintiffs' detail to the federal investigation, Defendant Kirby falsely denied even knowing Plaintiffs or knowing that Plaintiffs were involved with any investigation. She did so knowing that this denial would jeopardize Plaintiffs' detail.

**ANSWER:** On information and belief, Defendant City denies the allegations of Paragraph 47.

Answering further, the Individual Defendants state they are without knowledge or information

sufficient to admit or deny the allegations of Paragraph 47.

48. Based upon Defendant Kirby's denials, Deputy Superintendent Cuello believed Plaintiffs had lied about their roles in the Watts investigation. As a result, Plaintiffs were kicked out of Unit 543.

**ANSWER:** On information and belief, Defendant City denies the allegations of Paragraph 48.

Answering further, the Individual Defendants state they are without knowledge or information

sufficient to admit or deny the allegations of Paragraph 48.

49. Despite having years of experience conducting undercover operations, eavesdropping operations, developing informants and other valuable police work, Defendants O'Grady and Roti would not allow Plaintiffs to return to any unit within Organized Crime including their own unit of assignment.

**ANSWER:** Defendants City, O'Grady and Roti admit that Plaintiffs had experience in uncover

operations, eavesdropping operations, developing informants and other police work, admit that

Plaintiffs were not returned to the Bureau of Organized Crime, and deny the remaining

allegations of Paragraph 49.  Answering further, the remaining Individual Defendants state they

are without knowledge or information sufficient to admit or deny the allegations of Paragraph

49.

50.     Because Plaintiffs had been labeled "rats" in the Department, they lost their specialized assignments, weekends and holidays off, take-home vehicles, and the ability to work unlimited overtime.

**ANSWER:**  Defendant City denies that Plaintiffs were labeled "rats" and denies the remaining

allegations of Paragraph 50.  Answering further, the Individual Defendants deny labeling

Plaintiffs as "rats" or retaliating against them, and state they are without knowledge or

information sufficient to admit or deny the remaining allegations of Paragraph 50.

51.     Plaintiffs were therefore detailed to the Police Academy for the next three weeks.

**ANSWER:**  Defendant City admits that at one point Plaintiffs were detailed to the Police

Academy for a short period of time, and denies the remaining allegations of Paragraph 51.

Answering further, the Individual Defendants state they are without knowledge or information

sufficient to admit or deny the allegations of Paragraph 51.

52.     During their time at the Police Academy, Plaintiffs often did nothing more than sit at desks.  Other times they sat in on recruit or other courses, sometimes the same course repeatedly for no reason other than that no one knew why Plaintiffs were there.

**ANSWER:**  Defendant City denies the allegations of Paragraph 52.  Answering further, the

Individual Defendants state they are without knowledge or information sufficient to admit or

deny the allegations of Paragraph 52.

53.     Plaintiffs were effectively on "house arrest" in retaliation for having investigated fellow officers.

**ANSWER:**  Defendant City denies the allegations of Paragraph 53.  Answering further, the

Individual Defendants deny that they placed Plaintiffs on "house arrest" or retaliated against

them, and state they are without knowledge or information sufficient to admit or deny the

remaining allegations of Paragraph 53.

54.     Although Plaintiffs complained to Defendant Chief Rivera about the retaliatory
re-assignment to the Police Academy, he failed to take any action.

**ANSWER:**  On information and belief, Defendant City denies the allegations of Paragraph 54.

Answering further, the Individual Defendants state they are without knowledge or information

sufficient to admit or deny the allegations of Paragraph 54.

55.     Around the end of July 2011, Plaintiffs were moved to the Inspections Division,
Unit 126.

**ANSWER:**  Defendants City, Stanley and Pascua admit that in or about July 2011, Plaintiffs

were detailed to the Inspection Division, Unit 126.  Answering further, the Individual Defendants

state they are without knowledge or information sufficient to admit or deny the allegations of

Paragraph 55.

56.     They remained detailed to Unit 126, Inspections until March 2012. Throughout
that time Plaintiffs were subjected to harassment and hostility, which was directed by their
immediate supervisor, Defendant Lt. Pascua.

**ANSWER:**  Defendants City, Pascua, Stanley and Sadowski admit that Plaintiffs were detailed

to Unit 126, Inspections for some period of time until in or about March 2012, admit that during

some of that time Pascua was Plaintiffs' immediate supervisor, and deny the remaining

allegations of Paragraph 56.  Answering further, the remaining Individual Defendants state they

are without knowledge or information sufficient to admit or deny the allegations of Paragraph

56.

57.     Defendant Lt. Pascua called Plaintiffs, "rat motherf---ers" and told them that she
did not want them in the unit.

**ANSWER:** Defendants City and Pascua deny the allegations of Paragraph 57. Answering further, the remaining Individual Defendants state they are without knowledge or information sufficient to admit or deny the allegations of Paragraph 57.

58. Defendant Lt. Pascua spread the word among their co-workers that Plaintiffs were "rats" and no one should talk to them.

**ANSWER:** Defendants City and Pascua deny the allegations of Paragraph 58. Answering further, the remaining Individual Defendants state they are without knowledge or information sufficient to admit or deny the allegations of Paragraph 58.

59. Throughout their time in Unit 126, Defendant Lt. Pascua gave Plaintiffs few legitimate work assignments. Most of their time was spent sitting at desks idle or being forced to chauffeur Defendant Lt. Pascua, often on personal errands.

**ANSWER:** Defendants City and Pascua deny the allegations of Paragraph 59. Answering further, the remaining Individual Defendants state they are without knowledge or information sufficient to admit or deny the allegations of Paragraph 59.

60. Defendant Lt. Pascua threatened to put a false case on Plaintiffs, saying "f--- them from narcotics…I'm a lawyer and know how to put a case together…I'm gonna work on getting them f---ing launched."

**ANSWER:** Defendants City and Pascua deny the allegations of Paragraph 60. Answering further, the remaining Individual Defendants state they are without knowledge or information sufficient to admit or deny the allegations of Paragraph 60.

61. On September 13, 2011, Plaintiffs met with their commanding officer, Defendant Commander Stanley and informed her of ongoing retaliation and hostile work environment in the unit. After being told of the retaliation, Defendant Stanley said, "I don't want to hear this, I don't want to know."

**ANSWER:** Defendants City and Stanley deny that Plaintiffs informed Stanley of "ongoing retaliation and hostile work environment in the unit," and deny the remaining allegations of Paragraph 61. Answering further, the remaining Individual Defendants state that they are without knowledge or information sufficient to admit or deny the allegations of Paragraph 61.

62.     Defendant Commander Stanley did nothing to stop the retaliation or Lt. Pascua's inappropriate conduct including that she did not initiate a Complaint Register ("C.R.") about the retaliation as she was required to do by Department policy. By allowing the retaliation against Plaintiffs to continue unabated in her unit Defendant Commander Stanley condoned, encouraged, and agreed to the retaliation.

**ANSWER:**  Defendants City and Stanley admit that Stanley did not initiate a Complaint Register concerning Pascua, and deny the remaining allegations of Paragraph 62.  Answering further, the remaining Individual Defendants state they are without knowledge or information sufficient to admit or deny the allegations of Paragraph 62.

63.     Likewise, Defendant Chief Rivera knew of the constant retaliation against Plaintiffs but allowed it to continue unabated including that he refused to initiate an I.A.D. investigation into the harassment and retaliation.

**ANSWER:**  Defendant City admits, on information and belief, that Rivera did not initiate an investigation regarding Plaintiffs, and denies the remaining allegations of Paragraph 63. Answering further, the Individual Defendants state they are without knowledge or information sufficient to admit or deny the allegations of Paragraph 63.

64.     After Commander Stanley failed to address the retaliation, Defendant Lt. Sadowski joined in Lt. Pascua's campaign by repeatedly attempting to lodge false allegations of wrongdoing against Plaintiffs.

**ANSWER:**  Defendants City, Stanley, Sadowski and Pascua deny the allegations of Paragraph 64.  Answering further, the remaining Individual Defendants state they are without knowledge or information sufficient to admit or deny the allegations of Paragraph 64.

65.     In November 2011, as another manifestation of the City of Chicago's policy against investigating fellow officers, two Sergeants of the Internal Affairs Division told Plaintiffs "sometimes you have to turn a blind eye" to misconduct.

**ANSWER:**  Defendants deny that the City has a policy against investigating fellow officers, and state they are without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 65.

66.     In October 2011, Plaintiffs were called back to assist the F.B.I. with the completion of Operation Brass Tax.

**ANSWER:** Defendants state they are without knowledge or information sufficient to admit or

deny the allegations of Paragraph 66.

67.     Plaintiffs continued to work on the case with the F.B.I. until the successful arrests and indictments of Sgt. Ronald Watts and Officer Kallat Mohammed in February 2012.

**ANSWER:** Defendant City admits that Sgt. Ronald Watts and Officer Kallat Mohammed were

arrested and indicted in or about February 2012, and that during certain periods Plaintiffs worked

on the case in their capacities as Chicago police officers.  Defendants state they are without

knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 67.

68.     Because Plaintiffs had already been established to be "rats," Defendant Chief Roti ordered that they were not allowed to return to the narcotics unit "or any other division of Organized Crime."

**ANSWER:** Defendants City and Roti admit that Plaintiffs were not returned to the Bureau of

Organized Crime, including the Narcotics Division, and deny the remaining allegations of

Paragraph 68.  Answering further, the remaining Individual Defendants state they are without

knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 68.

69.     As a result, Plaintiffs were forced to return to Unit 126, which was an undesirable position as well as a hostile work environment due to the continued retaliation and harassment.

**ANSWER:** Defendant City admits that at some point following the indictment of Watts and

Mohammed, Plaintiffs reported to Unit 126, and deny the remaining allegations of Paragraph 69.

Answering further, the Individual Defendants state they are without knowledge or information

sufficient to admit or deny the allegations of Paragraph 69.

70.     When Plaintiff Spalding again asked Defendant Chief Rivera to initiate a C.R. investigation for a hostile work environment after she began to suffer anxiety attacks, Rivera refused to acknowledge the request.

**ANSWER:** Defendant City admits, on information and belief, that Rivera did not initiate a C.R.

regarding Plaintiffs, states it is without knowledge or information sufficient to admit or deny the

allegation that Spalding suffered anxiety attacks, and denies the remaining allegations of

Paragraph 70. Answering further, the Individual Defendants state they are without knowledge or

information sufficient to admit or deny the allegations of Paragraph 70.

71. In repeatedly refusing to initiate a C.R. investigation into the hostile work
environment, Defendant Chief Rivera condoned, encouraged, agreed to and allowed the
retaliation to continue unabated.

**ANSWER:** Defendant City admits, on information and belief, that Rivera did not initiate a C.R.

regarding Plaintiffs, and denies the remaining allegations of Paragraph 71. Answering further,

the Individual Defendants state they are without knowledge or information sufficient to admit or

deny the allegations of Paragraph 71.

72. Plaintiffs were not given assignments with Unit 126 and were again made to sit
idly, sometimes for up to eight hours a day.

**ANSWER:** Defendant City denies the allegations of Paragraph 72. Answering further, the

Individual Defendants state they are without knowledge or information sufficient to admit or

deny the allegations of Paragraph 72.

73. On March 20, 2012, Plaintiffs were detailed to the Bureau of Detectives, Fugitive
Apprehension, Unit 606. Within that Unit, Plaintiffs were assigned to the United States
Marshal's Task Force.

**ANSWER:** Defendants City, Salemme, Cesario and Barnes admit that in or about March 2012,

Plaintiffs were detailed to Bureau of Detectives, Fugitive Apprehension, Unit 606, deny that

Plaintiffs were assigned to the U.S. Marshal's Task Force, and deny the remaining allegations of

Paragraph 73. Answering further, the remaining Individual Defendants state they are without

knowledge or information sufficient to admit or deny the allegations of Paragraph 73.

74.     Defendant Joseph Salemme was the Commander of Fugitive Apprehension; Defendant Robert Cesario was Plaintiffs' Lieutenant in the unit; and Defendant Sgt. Maurice Barnes was Plaintiffs' immediate supervisor on the U.S. Marshal's Task Force Team.

**ANSWER:**  Defendants City, Salemme, Cesario and Barnes admit that at the time Plaintiffs were detailed to Unit 606 in or about March 2012, Barnes was Plaintiffs' immediate supervisor, Cesario was the Commanding Officer of Fugitive Apprehension, and Salemme was the Commander of Unit 606, Central Investigations, deny that Plaintiffs were on the U.S. Marchal's Task Force Team, and deny the remaining allegations of Paragraph 74.  Answering further, the remaining Individual Defendants state they are without knowledge or information sufficient to admit or deny the allegations of Paragraph 74.

75.     Upon information and belief, on or around the day of their initial detail to the U.S. Marshal's Task Force Team, Defendant O'Grady went out of his way to personally inform Plaintiffs' new supervisors that they were "rats" and should be treated accordingly.

**ANSWER:**  Defendants City, Salemme, Cesario and Barnes deny that Plaintiffs were detailed to the U.S. Marshal's Task Force Team, and deny the remaining allegations of Paragraph 75. Defendant O'Grady denies that he informed Plaintiffs' new supervisors that they were rats and should be treated accordingly, and states he is without knowledge or information to admit or deny the remaining allegations of Paragraph 75.  Answering further, the remaining Individual Defendants state they are without knowledge or information sufficient to admit or deny the allegations of Paragraph 75.

76.     Defendant Sgt. Barnes thereafter informed Plaintiffs' new team that they were "rats," that Plaintiffs should not be trusted or backed up by the team.

**ANSWER:**  Defendants City and Barnes deny the allegations of Paragraph 76.  Answering further, the remaining Individual Defendants state they are without knowledge or information sufficient to admit or deny the allegations of Paragraph 76.

77.     At one point, Defendant Sgt. Barnes removed Plaintiffs from a high profile case to which they had been assigned; because they were "rats," Plaintiffs would not be allowed to work the case.

**ANSWER:** Defendants City and Barnes deny the allegations of Paragraph 77. Answering further, the remaining Individual Defendants state they are without knowledge or information sufficient to admit or deny the allegations of Paragraph 77.

78.     When Plaintiff Spalding tried to talk to Sgt. Barnes in an effort to prevent further retaliation, Sgt. Barnes repeatedly referenced that Plaintiffs had brought down a sergeant (referring to Watts).

**ANSWER:** Defendants City and Barnes deny the allegations of Paragraph 78. Answering further, the remaining Individual Defendants state they are without knowledge or information sufficient to admit or deny the allegations of Paragraph 78.

79.     Sgt. Barnes told Plaintiff Spalding that the team hated them and would not back them up if they were in need. He stated words to the effect of, "I don't want to tell your daughter you're coming home in a box because the team won't help you on the street."

**ANSWER:** Defendants City and Barnes deny the allegations of Paragraph 79. Answering further, the remaining Individual Defendants state they are without knowledge or information sufficient to admit or deny the allegations of Paragraph 79.

80.     On or about June 20, 2012, Plaintiffs were ordered to meet with Defendants Commander Salemme, Lt. Cesario and Sgt. Barnes at Unit 606 headquarters.

**ANSWER:** Defendants City, Salemme, Cesario and Barnes admit that in or about June 2012, Plaintiffs met with Salemme, Cesario and Barnes at Unit 606 headquarters, and deny the remaining allegations of Paragraph 80. Answering further, the remaining Individual Defendants state they are without knowledge or information sufficient to admit or deny the allegations of Paragraph 80.

81.     Defendants Commander Salemme, Lt. Cesario and Sgt. Barnes removed Plaintiffs from the Marshal's Taskforce Team, located on the far Southside, where they worked days (7 a.m. to 3 p.m. Defendants had Plaintiffs placed on a team located on the Northside, working the third watch (4 p.m. to 12 p.m.).

**ANSWER:** Defendants City, Salemme, Cesario and Barnes admit that in or about June 2012,

Plaintiffs were transferred from the 2nd Watch South fugitive apprehension team, which works 7

am to 3pm, to the 3rd Watch North fugitive apprehension team, which works 4 pm to 12 pm.,

deny that Plaintiffs had been on the Marshal's Task Force Team or were removed from the

Marshal's Task Force Team, and deny the remaining allegations of Paragraph 81.  Answering

further, the remaining Individual Defendants state they are without knowledge or information

sufficient to admit or deny the allegations of Paragraph 81.

82.     During the meeting, Defendant Commander Salemme told Plaintiffs words to the
effect of, "you brought this baggage on yourselves … if you go against sworn personnel you know
this will happen."

**ANSWER:** Defendants City and Salemme deny the allegations of Paragraph 82.  Answering

further, the remaining Individual Defendants state they are without knowledge or information

sufficient to admit or deny the allegations of Paragraph 82.

83.     Defendant Lt. Cesario said words to the effect of, Plaintiffs were being sent "up
north" and would not get a take-home car, Marshal's pay, overtime or be deputized. He made clear,
"that will never happen for you."

**ANSWER:** Defendants City and Cesario admit that Plaintiffs were advised that they were being

transferred to the 3rd Watch North fugitive apprehension team, admit that non-Task Force

Officers, including Plaintiffs, were not assigned a take home car, and deny the remaining

allegations of Paragraph 83.  Answering further, the remaining Individual Defendants state they

are without knowledge or information sufficient to admit or deny the allegations of Paragraph

83.

84.     When Plaintiffs were initially assigned to the Task Force, they had been informed
that when positions opened up for deputization by the U.S. Marshals, they—like other members of
the Task Force – would be deputized.

**ANSWER:** Defendants City, Salemme, Cesario and Barnes deny that Plaintiffs were assigned

to the Marshals Task Force, and deny the remaining allegations of Paragraph 84.  Answering

Case: 1:12-cv-08777 Document #: 166-1 Filed: 02/03/16 Page 48 of 239 PageID #:717
Case: 1:12-cv-08777 Document #: 83 Filed: 04/03/14 Page 24 of 35 PageID #:367

further, the remaining Individual Defendants state they are without knowledge or information

sufficient to admit or deny the allegations of Paragraph 84.

85.     Shortly after Plaintiffs were removed from the Task Force Team, dozens of positions for officers to be deputized as U.S. Marshals opened up. After Plaintiffs' removal from the team, other officers with less seniority than Plaintiffs were brought into Unit 606 and deputized while Plaintiffs were passed up.

**ANSWER:** Defendant City admits that certain positions in which officers were deputized by the

U.S. Marshals became available in 2012, admits that Plaintiffs were not selected for such

positions, deny that Plaintiffs had been on the Task Force Team or were removed from the Task

Force Team, deny that seniority is determinative for the selection of Task Force Officers to be

deputized by the U.S. Marshals, and deny the remaining allegations of Paragraph 85. Defendants

Salemme, Cesario and Barnes deny that Plaintiffs had been on the Task Force Team or were

removed from the Task Force Team. Answering further, the remaining Individual Defendants

state they are without knowledge or information sufficient to admit or deny the allegations of

Paragraph 85.

86.     In fact, since then, dozens of other officers in the Fugitives Apprehension Unit have been deputized by the U.S. Marshals including other officers from Plaintiffs' current team. As Lt. Cesario promised, however, Plaintiffs have been continually passed up for deputization.

**ANSWER:** Defendant Cesario denies that he promised that Plaintiffs would not be deputized.

Defendants City, Salemme, Cesario, Barnes and Mills admit that certain officers in the Fugitive

Apprehension Unit have been selected for a Task Force Officer position and deputized by the

U.S Marshals, including officers from Plaintiffs' teams, admit that Plaintiffs have not been

selected for a Task Force Officer position or deputized by the U.S. Marshals, and deny the

remaining allegations of Paragraph 86. Answering further, the remaining Individual Defendants

state they are without knowledge or information sufficient to admit or deny the allegations of

Paragraph 86.

87.     On June 23, 2012, Plaintiffs contacted Defendant Chief Rivera from I.A.D. to lodge another complaint. Again, their complaint was ignored.

**ANSWER:**  On information and belief**,** Defendant City denies that Rivera ignored any complaint

that may have been lodged by Plaintiffs, and states that it is without knowledge or information

sufficient to admit or deny the allegation that on June 23, 2012, Plaintiffs lodged a Complaint

with Rivera.  Answering further, the Individual Defendants state they are without knowledge or

information sufficient to admit or deny the allegations of Paragraph 87.

88.     On June 25, 2012, Plaintiffs were reassigned to a nighttime fugitive apprehension team and relocated to the Northside of Chicago. This reassignment was a step backwards for Plaintiff professionally, as well as an inconvenience.

**ANSWER:**  Defendants City, Salemme, Cesario, Barnes and Mills admit that on or about June

25, 2012, Plaintiffs were assigned to the 3rd Watch North fugitive apprehension team, state they

are without knowledge or information sufficient to admit or deny whether this was an

"inconvenience" to Plaintiffs, and deny the remaining allegations of Paragraph 88.  Answering

further, the Individual Defendants state they are without knowledge or information sufficient to

admit or deny the allegations of Paragraph 88.

89.     On August 17, 2012, Sgt. Watts' co-conspirator, Officer Mohammed pled guilty to extorting drug dealers. In his plea, he described the criminal misconduct going back to at least 2007.

**ANSWER:**  Defendant City admits that on or about August 17, 2012, Mohammed pled guilty.

Defendants state they are without knowledge or information sufficient to admit or deny the

remaining allegations of Paragraph 89.

90.     Around the same time, Defendant Commander O'Grady "banned" Plaintiff Spalding from entering Chicago Police Headquarters at Homan Square, where she was assigned a locker.

**ANSWER:**  Defendants City and O'Grady deny that O'Grady "banned" Spalding from entering

Homan Square.  Defendants state they are without knowledge or information sufficient to admit

or deny the remaining allegations of Paragraph 90, including whether Spalding was assigned a

locker at Homan Square.

91.     Plaintiffs' own supervisor, Defendant Lt. Cesario, stressed that Plaintiff should "heed the warning that O'Grady doesn't want you there."

**ANSWER:**  Defendants City and Cesario admit that Cesario advised Spalding that O'Grady

requested that she not come to Homan Square unless she is on police business, and deny the

remaining allegations of Paragraph 91.  Answering further, the remaining Individual Defendants

state they are without knowledge or information sufficient to admit or deny the allegations of

Paragraph 91.

## Retaliation Resulting from the Lawsuit and Speech in the Media

92.     On November 1, 2012, Plaintiffs filed the original civil action in this case complaining of the above-described retaliation.

**ANSWER:**  Defendants admit the allegations of Paragraph 92.

93.     Following the filing, Chicago area media publicized Plaintiffs' reporting of the Watts' criminal misconduct and the Department-wide effort to punish Plaintiffs for reporting police corruption.

**ANSWER:**  Defendants admit that following Plaintiffs' filing of this lawsuit, some Chicago area

media publicized the allegations in the lawsuit.  Defendants deny that there was or is any

Department-wide effort to punish Plaintiffs for reporting police corruption, and deny the

remaining allegations of Paragraph 93.

94.     While accounts of the prevalence of the code of silence among Chicago Police Department rank-and-file have been widely reported for years, Plaintiffs' case shed new light on Department's top ranking members explicit enforcement of the code of silence.

**ANSWER:**  Defendants deny that there is a code of silence within the Chicago Police

Department and deny the remaining allegations of Paragraph 94.

95.     Plaintiffs appeared in the media, including local television and newspapers telling of the years of retaliation that they endured at the hands of their superiors.

**ANSWER:** Defendants admit that Plaintiffs appeared in the media, including local television and newspapers, discussing the allegations of their lawsuit. Defendants deny the remaining allegations of Paragraph 95.

96.     As a result, Plaintiffs experienced new and additional retaliation.

**ANSWER:** Defendants deny the allegations of Paragraph 96.

97.     Prior to the lawsuit, Plaintiffs' current supervisor, Defendant Sgt. Mills seemed to defend Plaintiffs in the face of the retaliation coming from outside the team.

**ANSWER:** Defendants City and Mills admit that when he became their supervisor, Mills told Plaintiffs words to the effect that they would get a "fresh start" or "new beginning" with him, deny that Plaintiffs faced retaliation coming from outside the team, and deny the remaining allegations of Paragraph 97. Answering further, the remaining Individual Defendants state they are without knowledge or information sufficient to admit or deny the allegations of Paragraph 97.

98.     Since the filing of the lawsuit, and Plaintiffs' related media appearances, Plaintiffs have faced retaliation within the team, including that they are now ostracized and are no longer included in team activities.

**ANSWER:** Defendants deny the allegations of Paragraph 98.

99.     Defendant Sgt. Mills regularly brings up the fact that Plaintiffs have a lawsuit and are making allegations against the "bosses."

**ANSWER:** Defendants City and Mills deny the allegations of Paragraph 99. Answering further, the remaining Individual Defendants state they are without knowledge or information sufficient to admit or deny the allegations of Paragraph 99.

100.     Defendant Sgt. Mills constantly is badgering Plaintiffs making their day to day work more difficult. For example, Sgt. Mills insists that even when the team is working on the Southside, Plaintiffs must return to the Northside office to check-off while the rest of the team is allowed to leave directly from the Southside.

**ANSWER:** Defendants City and Mills admit that the officers on Mills' team, including

Plaintiffs, are generally required to return to the team's office at the end of each shift, and deny

the remaining allegations of Paragraph 100. Answering further, the remaining Individual

Defendants state they are without knowledge or information sufficient to admit or deny the

allegations of Paragraph 100.

101. Defendant Sgt. Mills has ordered Plaintiffs to only return to the team's office for check-off at the end of the day. Other officers freely come and go from the office while Plaintiffs risk ridicule and harassment if they do so.

**ANSWER:** Defendants City and Mills admit that Mills generally requires the members on his

team, including Plaintiffs, to return to the team's office at the end of each shift, and deny the

remaining allegations of Paragraph 101. Answering further, the remaining Individual

Defendants state they are without knowledge or information sufficient to admit or deny the

allegations of Paragraph 101.

102. Defendant Sgt. Mills has repeatedly made it difficult for Plaintiffs to work overtime hours while the rest of the team does so without hindrance.

**ANSWER:** Defendants City and Mills deny the allegations of Paragraph 102. Answering

further, the remaining Individual Defendants state they are without knowledge or information

sufficient to admit or deny the allegations of Paragraph 102.

103. Defendant Sgt. Mills has prevented Plaintiffs from working up cases, as well as excluded them from team arrests, while simultaneously threating to remove Plaintiffs from the team for "not producing" (arrests).

**ANSWER:** Defendants City and Mills deny the allegations of Paragraph 103. Answering

further, the remaining Individual Defendants state they are without knowledge or information

sufficient to admit or deny the allegations of Paragraph 103.

104. On one occasion when Plaintiffs were allowed to pursue the arrest of a felon who was known to be violent and dangerous, Plaintiffs were assured by their team that the team would be present for the necessary back-up and support.

**ANSWER:** Defendants City and Mills admit that Plaintiffs' team would provide necessary

back-up and support to the team members, including Plaintiffs. Defendants state they are

without knowledge or information sufficient to admit or deny the remaining allegations of

Paragraph 104.

105.    However, when Plaintiffs arrived as scheduled, their team was nowhere in sight. Instead, they received a text from Defendant Sgt. Mills stating, "be careful."

**ANSWER:** Defendants City and Mills admit that Mills has often advised his team members to

"be careful" if they are involved in a dangerous arrest. Defendants state they are without

knowledge or information sufficient to admit or deny the remaining allegations of Paragraph

105.

106.    In light of the danger presented by the suspect, Plaintiffs took this to be a threat to their safety and well-being.

**ANSWER:** Defendants City and Mills deny that Mills ever threatened Plaintiffs' safety or well-

being. Defendants state they are without knowledge or information sufficient to admit or deny

the remaining allegations of Paragraph 106.

## COUNT I – FIRST AMENDMENT RETALIATION

107.    Plaintiffs repeat, re-allege and incorporate by reference the factual allegations above as fully set forth herein.

**ANSWER:** Defendants reallege and incorporate by reference their answers to the factual

allegations above as if fully set forth herein.

108.    The First Amendment to the United States Constitution guarantees Plaintiffs' rights to speak out on matters of public concern without fear of unjust retaliation.

**ANSWER:** Defendants state that the allegations of Paragraph 108 constitute legal conclusions

for which no answer is required. To the extent an answer is required, Defendants deny the

allegations of Paragraph 108.

109.  As described more fully above, Plaintiffs engaged in extensive protected speech on matters of public concern by reporting on the criminal misconduct and corruption of Sgt. Watts, Officer Mohammed and others to the F.B.I.

**ANSWER:**  Defendants state that the allegations that Plaintiffs engaged in "protected speech on matters of public concern" constitute legal conclusions for which no answer is required.  To the extent an answer is required, Defendants deny the allegations of Paragraph 109.

110.  As described more fully above, Plaintiffs engaged in extensive protected speech on matters of public concern by filing this civil action and speaking out in the media about the retaliation that they have faced and the prevalence of the code of silence within the Chicago Police Department.

**ANSWER:**  Defendants state that the allegations that Plaintiffs engaged in "protected speech on matters of public concern" constitute legal conclusions for which no answer is required.  To the extent an answer is required, Defendants deny the allegation of Paragraph 110.

111.  As a result of their exercise of protected speech, Defendants City of Chicago, Chief Rivera, Chief Kirby, Commander O'Grady, Chief Roti, Lieutenant Pascua, Commander Stanley, Sergeant Barnes, Lieutenant Sadowski, Lieutenant Cesario, Commander Salemme, and Sergeant Mills retaliated against Plaintiffs in the manner described in the preceding paragraphs.

**ANSWER:**  Defendants state that the allegations that Plaintiffs engaged in "protected speech" constitute legal conclusions for which no answer is required.  To the extent an answer is required, Defendants deny that allegation and deny the remaining allegations of Paragraph 111.

112.  Retaliation against Plaintiffs was devised, approved and carried out by individuals with final policymaking authority with respect to the actions taken, including as follows:

a.  By authority delegated to him by the Chicago City Council, the Superintendent of Police is responsible for the general management and control of the police department, and has full and complete authority to administer the department. The Superintendent has the power and the duty to administer the affairs of the department as its chief administrative officer, including to make appointments, promotions, transfers and to take disciplinary action against department employees; to appoint, discharge, suspend or transfer employees; and to issue instructions to department employees in the line of their duties.

b.  Within the Department, the Superintendent has delegated certain policymaking authority to his Chiefs, including Defendants Kirby, Rivera and Roti.

c.     The Superintendent, as well as Defendant Chiefs Kirby, Rivera and Roti, were responsible for the retaliatory re-assignments and effective demotions to Plaintiffs.

d.     The Superintendent, as well as Defendant Chiefs Kirby, Rivera and Roti, were aware of the retaliation against Plaintiffs, described above, and knowingly allowed it to continue unabated thereby encouraging, fostering and causing the retaliation.

**ANSWER**: Defendants deny the allegations of Paragraph 112 and each of its subparts.

113.   The misconduct described in this Count was the result of Defendant City of Chicago's deliberate indifference to the policies and widespread practices described more fully above and in that:

a.     Municipal policymakers are aware of, condone and facilitate by their inaction, a "code of silence" in the Chicago Police Department, by which officers understand that they should cover for each other unconditionally and that failure to do so amounts to a betrayal.

b.     Municipal policymakers are aware of, condone and facilitate by their inaction, the enforcement of the "code of silence" within the Department through the retaliation against officers who do report the misconduct of other officers.

c.     The City Council's Committee on Police and Fire has recognized the existence of the code of silence within the Chicago Police Department but has failed to take the necessary steps to protect officers who break the Code of Silence and suffer retaliation as a result.

d.     As a matter of both policy and practice, the City of Chicago directly encouraged, and was thereby the moving force behind the very type of misconduct at issue here by failing to adequately supervise, discipline, and control its officers, such that its failure to do so manifests deliberate indifference.

e.     As a matter of both policy and practice, the City of Chicago facilitated the very type of misconduct at issue here by allowing it to continue as a matter of practice within the Department, thereby leading Chicago police officers to believe that the code of silence will be enforced throughout the Department and, in that way, directly encouraging future abuses.

f.     As a matter of widespread practice so prevalent as to comprise municipal policy, officers of the Chicago Police Department who have dared to speak out about the misconduct of others have experienced retaliation a manner similar to that alleged by Plaintiffs.

**ANSWER**: Defendants deny the allegations of Paragraph 113 and each of its subparts.

114.   As a result of the aforementioned deprivation of federal rights, Plaintiffs have suffered and will likely continue to suffer injuries including but not limited to emotional distress.

**ANSWER**: Defendants deny the allegations of Paragraph 114.

## COUNT II – CONSPIRACY VIA 42 U.S.C. § 1983

115.    Plaintiffs repeat, re-allege and incorporate by reference the factual allegations above as fully set forth herein.

**ANSWER:**  Defendants reallege and incorporate by reference their answers to the factual

allegations above as if fully set forth herein.

116.    As described in the preceding paragraphs, Defendants, acting in concert with other known and unknown conspirators, reached an understanding to deprive Plaintiffs of their Constitutional rights.

**ANSWER:**  Defendants deny the allegations of Paragraph 116.

117.    Plaintiffs were deprived of their Constitutional rights in the manner described in the preceding paragraphs.

**ANSWER:**  Defendants deny the allegations of Paragraph 117.

118.    That in furtherance of the conspiracy, Defendants committed overt acts and were otherwise willful participants in joint activity with state actors under color of law.

**ANSWER:**  Defendants deny the allegations of Paragraph 118.

119.    That the misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

**ANSWER:**  Defendants deny the allegations of Paragraph 119.

120.    As a result of the aforementioned deprivation of federal rights, Plaintiffs have suffered and will likely continue to suffer injuries including but not limited to emotional distress.

**ANSWER:**  Defendants deny the allegations of Paragraph 120.

## COUNT III – VIOLATION OF THE ILLINOIS WHISTLEBLOWER PROTECTION ACT

121.    Plaintiffs repeat, re-allege and incorporate by reference the factual allegations above as fully set forth herein.

**ANSWER:**  Defendant City realleges and incorporates by reference its answers to the factual

allegations above as if fully set forth herein.  As this Count III is directed to Defendant City only,

no answer is required by the Individual Defendants.  To the extent an answer is required by the

Individual Defendants, the Individual Defendants deny any and all allegations of wrongful

conduct, including any alleged violation of the Illinois Whistleblower Protection Act.

122.    The City of Chicago was at all times complained of Plaintiffs' employer as defined in 740 ILCS § 174/5.

**ANSWER:**  Defendant City denies that it violated the Illinois Whistleblower Protection Act (the

"Act"), but admits the allegations of Paragraph 122.

123.    Plaintiffs were at all times complained of employees of the City of Chicago as defined in 740 ILCS § 174/5.

**ANSWER:**  Defendant City denies that it violated the Act, but admits the allegations of

Paragraph 123.

124.    The City of Chicago and its employees and agents were prohibited according to 740 ILCS § 174/15 from retaliating against Plaintiffs for disclosing to the F.B.I. what they reasonably believed and in fact knew were multiple violations state and federal laws by Watts, Mohammed and other Chicago Police Officers.

**ANSWER:**  Defendant City states that the allegations of Paragraph 124 constitute legal

conclusions for which no answer is requested.  Further answering, Defendant City denies that the

City or its employees or agents retaliated against Plaintiffs, denies that Plaintiffs made a

protected disclosure under the Act, denies that the City violated the Act, and denies the

remaining allegations of Paragraph 124.

125.    The City of Chicago retaliated against Plaintiffs in the manner described in the preceding paragraphs as a result of their reporting of the criminal misconduct.

**ANSWER:**  Defendant City denies the allegations of Paragraph 125.

126.    As a result of the aforesaid retaliation, Plaintiffs have suffered and will likely continue to suffer injuries including but not limited to emotional distress.

**ANSWER:**  Defendant City denies the allegations of Paragraph 126.

## AFFIRMATIVE DEFENSES TO AMENDED COMPLAINT

1.      Plaintiffs' claims and their right to recovery are barred, in whole or in part, by the applicable statute(s) of limitations.

2.      Plaintiffs' claims are barred, in whole or in part, by Defendants' immunity or qualified immunity.

3.      Plaintiffs' state law claims are barred, in whole or part, by the Illinois Tort Immunity Act.

4.      Plaintiffs' state law claims are barred, in whole or in part, by the one-year statute of limitations period in the Illinois Tort Immunity Act.

5.      Plaintiffs' conspiracy claim is barred by the intra-corporate conspiracy doctrine.

6.      Plaintiffs have failed to reasonably mitigate their damages, if any.

7.      Plaintiffs' claims fail because the Individual Defendants' statements alleged in this action were protected by the common law doctrine of absolute privilege.

8.      Under the common law doctrine of public officials' immunity, the Individual Defendants are immune from liability for any decisions any of them made that were based on his or her discretionary actions.

9.      Plaintiffs' recovery in this action, if any, must be decreased by the amount of any earnings, compensation and benefits received by Plaintiffs during the relevant period.

10.     Defendant City is not liable on Plaintiffs' First Amendment or conspiracy claims under Section 1983 because the City is a public entity and no official policy or custom of discrimination or other basis for municipal liability exists.

11.     Plaintiffs may not recover punitive damages in this action because Defendants engaged in good faith efforts to comply with the law.

12.     Plaintiffs are not entitled to punitive damages against Defendant City because Defendant City is a public employer and a municipality.

13.     Plaintiffs' claims, in whole or in part, must be dismissed because even if Plaintiffs could demonstrate that any employment decisions concerning them were made by Defendants based on an illegal motive, Defendants would have made the same decisions absent the illegal motive.

14.     Plaintiffs' claims, in whole or in part, fail to state a claim upon which relief can be granted.

WHEREFORE, Defendants respectfully pray that Plaintiffs take nothing by the Amended Complaint and request that the Court:

(a)     Enter judgment in favor of Defendants and against Plaintiffs;
(b)     Order Plaintiffs to pay Defendants' costs and reasonable attorneys' fees incurred in defending against this action; and
(c)     Grant such other and further relief to Defendants as the Court deems just and equitable under the circumstances.

Dated:  April 3, 2014                    Respectfully submitted,
                                         **CITY OF CHICAGO**

                                         By:    /s/ Alan S. King
                                         Alan S. King, Esq. (ARDC #06198223)
                                         Noreen H. Cull, Esq. (ARDC # 06229417)
                                         Alejandra Lara (ARDC # 6309517)
                                         DRINKER BIDDLE & REATH LLP
                                         191 North Wacker Drive, Suite 3700
                                         Chicago, Illinois 60606
                                         Telephone:  (312) 569-1000/Fax:  (312) 569-3334
                                         Alan.king@dbr.com
                                         Noreen.cull@dbr.com
                                         Alejandra.lara@dbr.com
                                         FIRM ID NO. 41748

CH01/ 26335640.9

# Exhibit C

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014

1–4

Page 1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE NORTHERN DISTRICT OF ILLINOIS
3        EASTERN DIVISION
4  CHICAGO POLICE OFFICERS  )
   SHANNON SPALDING and      )
5  DANIEL ECHEVERRIA,        )
                             )
6     Plaintiffs,            )
   vs.              )  No. 12 C 8777
7                            )
   CITY OF CHICAGO, Chicago  )
8  Police Chief JUAN         )
   RIVERA, Chicago Police    )
9  Chief DEBRA KIRBY,        )
   Chicago Police Commander  )
10 JAMES O'GRADY, Chicago    )
   Police Chief NICHOLAS     )
11 ROTI, Chicago Police Lt.  )
   KEVIN SADOWSKI, Chicago   )
12 Police Lt. DEBORAH        )
   PASCUA, Chicago Police    )
13 Commander ADRIENNE        )
   STANLEY, Chicago Police   )
14 Sergeant MAURICE BARNES,  )
   Chicago Police Lt.        )
15 ROBERT CESARIO, Chicago   )
   Police Commander JOSEPH   )
16 SALEMME, Chicago Police   )
   Sergeant THOMAS MILLS,    )
17                           )
      Defendants.            )
18
       The deposition of SHANNON MARIE SPALDING,
19  called for examination, taken pursuant to the
    provisions of the Code of Civil Procedure and
20  the Rules of the Supreme Court of the State of
    Illinois pertaining to the taking of depositions
21  for the purpose of discovery taken before
    SUSAN HASELKAMP, CSR No. 084-004022, Certified
22  Shorthand Reporter of said state, on
    November 18, 2014, at the hour of 9:26 a.m. at
23  191 North Wacker Drive, Suite 3700, Chicago,
    Illinois, pursuant to notice.
24

Page 2

1    APPEARANCES:

2

3        CHRISTOPHER SMITH TRIAL GROUP,

4        MR. CHRISTOPHER R. SMITH,

5        One North LaSalle Street

6        Suite 3040

7        Chicago, Illinois 60602

8        (312) 432-0400

9        office@crstrialgroup.com

10           Representing the Plaintiffs;

11

12       DRINKER, BIDDLE & REATH LLP, by

13       MR. ALAN S. KING,

14       191 North Wacker Drive

15       Suite 3700

16       Chicago, Illinois  60606-1698

17       (312) 569-1334

18       alan.king@dbr.com

19           Representing the Defendants.

20

21   ALSO PRESENT:  MR. DANIEL ECHEVERRIA

22

23

24

Page 3

1        (Whereupon, the witness was duly
2    sworn.)
3        SHANNON MARIE SPALDING,
4    having been first duly sworn, was examined and
5    testified as follows:
6        EXAMINATION
7    BY MR. KING:
8    Q.  Let the record reflect that is this the
9    deposition of one of the Plaintiffs
10   Shannon Spalding being taken pursuant to notice
11   and agreement of the parties and pursuant to
12   applicable rules of the Federal Rules of Civil
13   Procedure and Federal Rules of Evidence.
14       Ms. Spalding, can you state your full
15   name and spell your last name again for the
16   record.
17   A.  Shannon Marie Spalding,
18   S-P-A-L-D-I-N-G.
19   Q.  And have you ever given a deposition
20   before?
21   A.  Once.
22   Q.  Once.  What kind of case was that?
23   A.  It was an accident case.
24   Q.  Okay.  Were you the plaintiff?

Page 4

1    A.  No.
2    Q.  Okay.  Well, I'm sure you're pretty
3    familiar with what's going to go on here today
4    but I'll go over --
5    A.  Please.
6    Q.  -- a few ground rules.  Obviously
7    you've been -- I'll be asking you questions,
8    you've been sworn to tell the truth in response
9    to my questions.  If you don't understand any of
10   my questions or if I'm speaking too fast, feel
11   free to let me know.  I can try to rephrase the
12   question, I'll be happy to slow down.  I see you
13   nodding the head.  And another rule that we need
14   to make sure --
15   A.  I understand.
16   Q.  -- that your answers are verbal so the
17   court reporter will be able to take them down.
18       Another issue with the court reporter
19   is that it's difficult for her to take down
20   anything if we're both talking at the same time.
21   So I'll do my best to allow you to answer the
22   questions if you'll allow me to get the
23   questions out, this will go a little bit
24   smoother.  Okay?

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014

5–8

Page 5

1     A.   Okay.  Thank you.
2     Q.   Thank you.  And if you need to take a
3  break at any point, that should be fine.  The
4  only thing that I would ask is that you not take
5  a break while there's a question pending.  Okay?
6     A.   Okay.
7     Q.   Okay.  What's your current home
8  address?
9     A.   11016 South Central Park Avenue,
10  Chicago, 60655.
11     Q.   And how long have you lived at that
12  address?
13     A.   Approximately under two months.
14     Q.   Okay.  And where were you living prior
15  to that?
16     A.   3421 West 115th Place, Chicago, 60655.
17     Q.   And how long were you at that
18  address?
19     A.   Almost eight years.
20     Q.   And at your current address, is there
21  anyone living there with you?
22     A.   Yes.
23     Q.   Who would that be?
24     A.   My daughter.

Page 6

1     Q.   Okay.  I'm sorry.
2     A.   It's my -- my daughter is renting the
3  house.  Her boyfriend.
4     Q.   Okay.
5     A.   And my boyfriend.
6     Q.   Okay.  And your boyfriend is?
7     A.   Anthony Hernandez.
8     Q.   Thank you.  And you're currently still
9  employed with the Chicago Police Department?
10     A.   I am currently still employed, yes.
11     Q.   Okay.
12     A.   But not actively at work.
13     Q.   Okay.  You're on medical leave?
14     A.   I am on disability leave.
15     Q.   Okay.  It's my understanding you had
16  made an application for injured on duty status;
17  is that correct?
18     A.   That is correct.
19     Q.   To your knowledge has there been any
20  determination on that application?
21     A.   Yes.  It was denied as an IOD, injured
22  on duty --
23     Q.   Okay.
24     A.   -- by the committee on finance.

Page 7

1     Q.   And are you seeking some kind of review
2  of that?
3     A.   Yes.  A grievance was filed by the FOP.
4     Q.   Okay.  So am I correct that at some
5  point, you were on medical leave that was paid
6  and then you reached a point where it became
7  unpaid, correct?
8     A.   Yes, correct.
9     Q.   And do you recall when the paid medical
10  leave ended?
11     A.   Yes.  It was in June of this year.
12     Q.   Okay.  And since June of this year when
13  your pay was stopped, have you had any other
14  sources of income?
15     A.   I was approved for a partial disability
16  by the pension board until my case can be
17  reviewed for full duty disability benefits.  And
18  that partial, I believe it is called ordinary
19  disability, kicked in I'm not sure if it was the
20  end of July or August.
21     Q.   Okay.  And does that pay you a portion
22  of your regular compensation with the
23  department?
24     A.   Yes, it does.

Page 8

1     Q.   And do you know what portion you
2  received under the ordinary disability?
3     A.   Don't quote me the exact amount, but
4  it's roughly $3,200 or $3,400 a month.
5     Q.   And what was your regular rate of pay
6  before?
7     A.   I don't even know what we got paid
8  hourly, but I do know that it is double.  That
9  is what I believe it is.  But that's -- and then
10  taxes.  Probably 5 or more, 5,000 or more.
11     Q.   Your regular rate of pay --
12     A.   Yeah.
13     Q.   -- before your pay was stopped --
14     A.   Yeah.
15     Q.   -- is what you believe was
16  approximately --
17     A.   Yeah.
18     Q.   -- $5,000 a month?
19     A.   Yeah.
20     Q.   And the -- did I hear you correctly
21  that the amount you're getting for ordinary
22  disability --
23     A.   Correct.
24     Q.   -- is half, 50 percent of your pay?

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
9–12

Page 9

1    A.  I believe it's something like that.
2   It's -- the checks I've received are somewhere
3   between, I'm guessing the amount, the proximity
4   of 3,200 to 3,400 once a month.
5    Q.  Okay.  You don't remember them telling
6   you a percentage, like you'll get 50 percent of
7   your pay?
8    A.  I'm not -- I can't be exactly sure.  I
9   can't recall exactly, and I don't want to guess.
10   Q.  That's fine, okay.
11       And since your pay was initially
12  stopped in June, 2014, have you had any other
13  employment?
14   A.  No.
15   Q.  Okay.  Have you had any other sources
16  of income other than the ordinary disability
17  payments?
18   A.  Not income but I -- no.
19   Q.  Okay.  You started with the police
20  department in 1996; is that correct?
21   A.  That's correct.
22   Q.  Okay.  Can you, as best as you can,
23  just explain sort of your history from when you
24  were -- when you started, where you were

Page 10

1   assigned, to the extent you can remember, your
2   supervisors.  Actually, just go up until the
3   point that you were detailed to Detached
4   Services.  We don't need to get into that now.
5    A.  Okay.
6    Q.  But starting when you joined the force,
7   as best as you can recall, can you kind of trace
8   your history?
9    A.  Yes.  After completing the academy, I
10  was assigned to the 5th District.  I remember
11  supervisor -- the sergeant was Elizabeth Glatz.
12  When you are put on the watch, your supervisors
13  rotate, and so you don't have a specific
14  supervisor that you report to every day.  And I
15  don't recall who they were.  It was a long time
16  ago.
17   Q.  Sure.
18   A.  And you are a PPO, probationary police
19  officer, so you work with different people all
20  the time for training purposes.  I was not in
21  the 5th District very long.  I don't recall how
22  long it was.  From there, I was assigned to the
23  2nd District at 51st and Wentworth.  And from
24  the 2nd District, I went to work in Public

Page 11

1   Housing South.
2    Q.  Do you remember any of your supervisors
3   in the 2nd District?
4    A.  In the 2nd District, I -- honestly, I
5   remember it was the Watch Commander Michael
6   Byrne.  No, I don't remember the sergeants.
7    Q.  Okay.
8    A.  And then I went to work for Commander
9   Toliver in Public Housing South.  There were
10  multiple supervisors there that worked there.
11  Glenn Evans was my supervisor at the time.  And
12  I know there was a supervisor Sergeant Mark
13  Moore worked there.
14   Q.  Okay.
15   A.  Billy Patterson, William Patterson and
16  Anthony Ceja.
17   Q.  Do you know how to spell Ceja?
18   A.  Yes, I do.  C-E-J-A.
19   Q.  Thank you.
20   A.  You're welcome.  I don't recall.
21   Q.  Okay.
22   A.  I'm missing people.
23   Q.  Okay.  Before we move on, do you know
24  approximately how long you were in the 2nd

Page 12

1   District before you went to the Public Housing?
2    A.  It had to be roughly a year and a half
3   to two years.
4    Q.  Okay.
5    A.  Roughly.  I'm guessing.  I don't
6   recall.
7    Q.  Sure.  And how long were you in Public
8   Housing South?
9    A.  Until they disbanded, which was
10  November of I think 2005.  I don't recall the
11  year to be exactly.
12   Q.  Okay.
13   A.  But the unit disbanded.
14   Q.  Okay.
15   A.  Then I went to work on the gang team in
16  the 1st District, tactical/gang team in the
17  1st District.
18   Q.  Okay.
19   A.  I was not there very long, and then I
20  went to Organized Crime Narcotic Division.  And
21  from there, assigned to 543.
22   Q.  Okay.  Do you remember when you started
23  in Organized Crime Division?
24   A.  It was approximately May of -- it was

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
13–16

Page 13

1  when the fentanyl operation was going on, and it
2  was in approximately May of 2006 or '07.
3      Q.  Okay.
4      A.  And then we were -- my partner,
5  Danny Echeverria, and I were borrowed for the
6  fentanyl mission in May of two thousand -- or
7  whatever the year --
8      Q.  Sure.
9      A.  And we were the intelligence behind the
10 fentanyl mission.  So we were borrowed, we were
11 not assigned to that unit.  The mission for
12 Operation Fallout, the fentanyl mission, was
13 completed in October and then we were
14 requested -- we were assigned there.
15     Q.  Okay.  So when you worked on Operation
16 Fallout, you had essentially between borrowed by
17 the Organized Crime unit --
18     A.  Correct.
19     Q.  -- you weren't officially detailed
20 there yet?
21     A.  No.  And we worked for Sergeant
22 DiCristofano, Anthony DiCristofano and then we
23 went to 543.
24     Q.  You mentioned Officer Echeverria being

Page 14

1  your partner.  When did the two of you become
2  partners?
3      A.  We had -- when I went to the
4  1st District, we became partners at that time.
5  But we had crossed paths and worked together
6  within the Public Housing sector prior to that.
7      Q.  Okay.  And since you and Officer
8  Echeverria first became partners, have you been
9  partners consistently ever since then?
10     A.  Except for a period of time in
11 Organized Crime, yes.
12     Q.  Do you recall what period of time or
13 why you weren't partners?
14     A.  When you first come to Organized Crime,
15 the Narcotic Division, it was explained to us
16 that since I had been from the South Side my
17 entire time, I couldn't go as an undercover
18 officer buying on the South Side where I would
19 be recognized.  So I needed to go somewhere
20 different, on the West Side or the North Side.
21 And Officer Echeverria needed to go in a
22 different area and for training purposes for
23 that, they -- that is my understanding of it.
24     Q.  So you were -- is it your understanding

Page 15

1  you were separated just for training purposes?
2      A.  That's what we were told.
3      Q.  Okay.  Do you recall about how long you
4  were separated?
5      A.  Up until the time -- I'm not sure of
6  exactly when it was.  It was maybe February
7  of 2008 I was an undercover officer who was a
8  victim of a battery and a robbery.
9          And after that incident, I received a
10 phone call from Chief Limon who stated, have you
11 been placed back with your partner yet.  And I
12 specifically remember stating, if I had been
13 working with my partner, this incident would not
14 have occurred.  And he said, well, I'm going to
15 get you back with your partner immediately.
16     Q.  Okay.
17     A.  And then he put us both on the same
18 team.
19     Q.  Okay.
20     A.  That was Chief Limon's decision, and he
21 contacted me.
22     Q.  Okay.  What were the circumstances of
23 the battery and the robbery or do you know who
24 committed it?

Page 16

1      A.  At this time, absolutely not.  I don't
2  know their names.
3      Q.  Sure.
4      A.  No, I did not know them.
5      Q.  Okay.
6      A.  The incident was that we were going to
7  a particular location on the West Side to
8  purchase a controlled narcotics purchase.  The
9  regular sergeant, I'm not even sure at the time
10 who it was, I believe it was Kevin Johnson
11 maybe, wasn't there.  I know that a Sergeant Ty
12 Bates I was working for on that particular day.
13 And when he gave the location, I specifically
14 told him prior to going out that I cannot
15 purchase narcotics there because my last
16 controlled buy, I was called out as an
17 undercover officer and it would jeopardize my
18 safety.
19     Q.  Okay.
20     A.  He said, okay, that's fine.  I set up
21 as surveillance.  And then he came over the
22 radio and said, you are going to go through and
23 make this purchase.
24     Q.  Okay.

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
17—20

Page 17

1    A.  Which I explained I was extremely
2  uncomfortable with the situation, because I'm
3  going back to a spot I had already been
4  identified at.
5    Q.  Sure.
6    A.  But he gave me a direct order to go
7  through and buy, so I did.  At which point I was
8  immediately identified and was pulled out of the
9  car and they tried to take the car and I began
10  fighting.  My surveillance, I should have had
11  two surveillance officers, one was a
12  Robin McGhee, who was supposed to be directly
13  behind me, and another one was Officer Masud,
14  Saud.  Saud was his first name, S-A-U-D.
15    Q.  That's fine.
16    A.  He was my main eyeball and was calling
17  out the actions, so he should have been the
18  first to respond; however, that did not occur.
19        What happen was the enforcement vehicle
20  was the first one on the scene.  And enforcement
21  is usually parked multiple blocks away and
22  they're the farthest distance away.  So it is
23  very questionable as to where was my backup and
24  where was my surveillance.  They were not the

Page 18

1  first on the scene.
2    Q.  Okay.
3    A.  Okay.  And so it felt like forever that
4  I was fighting this.  But Officer Joseph Mirus
5  and Officer Abner Rodriguez were the enforcement
6  car, and they began to pursue the offenders on
7  foot and in vehicle, at which point, you know,
8  multiple offenders, I believe four or five were
9  apprehended.
10    Q.  Okay.
11    A.  And what happened next was that --
12    Q.  I'm going to cut you off now.  I
13  think --
14    A.  Okay.
15    Q.  -- you've answered my question.
16    A.  Okay.
17    Q.  You indicated that that incident where
18  you were subject to the battery and the robbery
19  you thought was February, 2008.  Are you pretty
20  sure it was that month or approximately?
21    A.  Approximately.
22    Q.  Okay.
23    A.  I'm just trying to --
24    Q.  Sure.

Page 19

1    A.  It's a long time to remember the exact
2  dates.  I don't have the documents to review.
3    Q.  Okay.
4        (Whereupon, Spalding Deposition
5          Exhibit No. 1 was marked for
6          identification.)
7  BY MR. KING:
8    Q.  Ms. Spalding, I'm showing you what's
9  been marked Spalding Deposition Exhibit No. 1,
10  which is a copy of your Amended Complaint in the
11  lawsuit.
12        Can you tell me if you've seen this
13  document before?
14    A.  Yes, I believe I have seen this
15  document.
16    Q.  Okay.  And if I could direct your
17  attention to Paragraph 20 of the Complaint,
18  which is on Page 4.  And Paragraph 20 begins, in
19  2007 while working an undercover narcotics
20  investigation, Plaintiffs uncovered evidence of
21  illegal activity being committed by various
22  Chicago Police Officers.
23    A.  I'm missing a page.
24        MR. SMITH:  Here, we can switch.  Oh,

Page 20

1  wait, no.
2        THE WITNESS:  You're missing it, too.
3  Because it only goes to Chicago Police Officers
4  and then it goes to 21.  He's reading
5  Paragraph 20.
6        MR. SMITH:  Right.
7        THE WITNESS:  There's only two
8  sentences, and then it goes to 21.
9        MR. SMITH:  That's fine.
10        THE WITNESS:  Am I confused?  I'm
11  sorry.
12  BY MR. KING:
13    Q.  That's correct.  That's okay.
14  Paragraph 20 is just one sentence.
15    A.  I'm sorry.
16    Q.  Okay.  And, again, it indicates that,
17  in 2007 while working an undercover narcotics
18  investigation, Plaintiffs uncovered evidence of
19  illegal activity being committed by various
20  Chicago Police Officers.  And then the next
21  Paragraph it says, one of those officers was
22  Sergeant Ronald Watts.  Do you see that?
23    A.  Yes, I do.
24    Q.  Okay.  Prior to 2007, as alleged in

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014

21–24

Page 21

1  Paragraph 20, you had been asked at some point
2  if you had any knowledge of any illegal activity
3  by Sergeant Watts, correct?
4      A.  Correct.
5      Q.  And when were you first approached
6  about illegal activity involving Sergeant Watts?
7      A.  It was while I was assigned to Public
8  Housing South.  I was --
9      Q.  So approximately what year?
10     A.  It had to be at least ten years prior.
11     Q.  Okay.
12     A.  About ten years, at least, you know.
13     Q.  Okay.
14     A.  Maybe it was 9, maybe it was 11.
15     Q.  Sure.  And did someone discuss
16  Sergeant Watts with you at that time?
17     A.  Yes.
18     Q.  Who was -- who discussed Sergeant Watts
19  with you?
20     A.  FBI Special Agent Ken Samuels.
21     Q.  And what did Mr. Samuels say to you?
22     A.  He originally contacted me -- let me
23  rephrase that.  He contacted me and first asked
24  me about several -- he asked me about multiple

Page 22

1  people, which included Sergeant Watts.  He asked
2  me if I had any knowledge to the best of my
3  recollection.
4      Q.  Sure.
5      A.  The scope of the conversation was my
6  direct firsthand knowledge of any illegal
7  activity that I may have seen or witnessed from
8  these multiple officers, including Sergeant
9  Watts.
10     Q.  And was this an in-person meeting with
11  Mr. Samuels or telephone?
12     A.  No, it was not.  It was telephone.
13     Q.  Okay.  Do you have any knowledge of how
14  or why Mr. Samuels came to reach out to you
15  about this subject?
16     A.  Yes, I do.
17     Q.  And why did he reach out to you?
18     A.  It was because another officer that I
19  worked with in Public Housing had gone to the
20  FBI regarding the corruption within the Public
21  Housing South units and on multiple officers.
22     Q.  Okay.  Was Sergeant Watts one of those
23  officers?
24     A.  I can't be sure of the conversation

Page 23

1  between the officer that went to him and
2  Ken Samuels.
3      Q.  Okay.  Was Sergeant Watts working in
4  the same Public Housing South unit at the time?
5      A.  As me?
6      Q.  As you.
7      A.  Correct.
8      Q.  Yes, okay.  Who was the other officer
9  who had complained about -- or gone to the FBI?
10     A.  Michael Spaargaren,
11  S-P-A-A-R-G-A-R-E-N.
12     Q.  And do you know if it was Ken Samuels
13  that Mr. Spaargaren --
14     A.  I do.
15     Q.  It was?
16     A.  Yes, sir.
17     Q.  And you know that based on what
18  Mr. Spaargaren told you?
19     A.  Spaargaren, yes.
20     Q.  Spaargaren.  Sorry.
21     But you weren't present for the
22  conversation between Mr. Spaargaren and
23  Mr. Samuels?
24     A.  I had no knowledge of him going to the

Page 24

1  FBI until after the fact.
2      Q.  Okay.  And do you know what
3  Mr. Spaargaren's conversation with Mr. Samuels
4  or anyone else at the FBI before you talked to
5  Mr. Samuels had to do with Ronald Watts?
6      A.  I don't know that.
7      Q.  Okay.  It may have, it may not have?
8      A.  I don't know.  I wasn't present for
9  their conversations.
10     Q.  Okay.  So going back to your telephone
11  call with Ken Samuels approximately between 9 or
12  11 years approximately before 2007, tell me
13  again to the best of your recollection what
14  was said by Mr. Samuels and what was said by
15  you.
16     A.  Well, he just basically asked me if I
17  had witnessed any illegal activity from
18  several -- he asked me about several different
19  people.
20     Q.  Sure.
21     A.  At which point I told him that I had
22  not witnessed anything and I was not aware of
23  anything.  Because at the time, I had absolutely
24  no knowledge of that.

SHANNON MARIE SPALDING                                        November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                              25—28

Page 25

1    Q.  Okay.  So you didn't tell him that you
2  were aware of any --
3    A.  I didn't --
4    Q.  -- illegal activity by Ron Watts?
5    A.  No.
6    Q.  Okay.
7    A.  I did not know that there was illegal
8  activity happening.
9    Q.  Okay.  But he asked you about several
10  people including Watts, correct?
11    A.  I believe so, yes.
12    Q.  Okay.
13    A.  I don't know if it was during one
14  conversation or another conversation.  At some
15  point in time, I was asked.
16    Q.  Right.  And given that you were
17  contacted by the FBI and asked if you were aware
18  of any illegal activity by officers including
19  Watts, it would be fair to say that you knew at
20  that point that the FBI was investigating Watts,
21  correct?
22    A.  Well, I assumed that there would be
23  some type -- I knew that there were allegations
24  that had been made against multiple people.

Page 26

1  Now, as I said before, the main person -- that I
2  don't believe Ron Watts was the main person I
3  was asked about initially.
4    Q.  Okay.
5    A.  There was another officer that I recall
6  specifically.
7    Q.  Who was that officer?
8    A.  His name was Joe Seinitz,
9  S-E-I-N-I-T-Z.  And at the time, I just believed
10  by what these officers were bringing in, that
11  they were just really good officers, including
12  Ronald Watts.
13    Q.  Okay.  But my question is, would it be
14  fair to say that because you were contacted by
15  the FBI --
16    A.  I'm sorry.
17    Q.  -- to ask you questions about certain
18  officers and their illegal activity, including
19  Ron Watts, you understood that the FBI was
20  investigating those officers, including Watts at
21  the time, correct?
22    A.  That they were looking into
23  allegations, is what I thought.
24    Q.  Okay.  And did you have more than one

Page 27

1  conversation with Ken Samuels on that subject?
2    A.  I did.
3    Q.  Okay.
4    A.  So I don't know if it was the first
5  conversation or at some point later on.
6    Q.  Sure.
7    A.  I can't tell you at what point Ronald
8  Watts came up, but at some point, he did come
9  up.
10    Q.  Okay.  Do you recall approximately how
11  many conversations you had with Ken Samuels?
12    A.  I don't.
13    Q.  Did it ever get to a point where you
14  reported to Ken Samuels yes, I do have
15  information about illegal activity by Officer
16  Watts or anyone else?
17    A.  No.
18    Q.  Okay.  So between your last
19  conversation -- well, let's strike that.
20       And I'm going to butcher his name
21  again.  Michael --
22    A.  Spaargaren.
23    Q.  -- Spaargaren, okay.
24       Do you know if Mr. Spaargaren is still

Page 28

1  with the police department?
2    A.  Yes, he is.
3    Q.  Do you know what his current position
4  is?
5    A.  I know that he just transferred from
6  the 9th District to a North Side district.  I
7  can't be sure.
8    Q.  Sure.  Do you know what his rank is?
9    A.  PO, police officer.
10    Q.  Okay.  Going back to Paragraph 20 of
11  the Amended Complaint.  You indicate that you
12  and your partner uncovered evidence of illegal
13  activity being committed by various Chicago
14  Police Officers.  Can you tell me what you
15  uncovered?
16    A.  When you are in Narcotics, there is an
17  intelligence debriefing that goes on by the
18  enforcement officers, which was the position of
19  my partner, Danny Echeverria.
20       At the time, you interview the person
21  who sold the narcotics to the undercover officer
22  to gather further intelligence to go up the
23  chain for conspiracy.  During his assignment on
24  the South Side, he was unfamiliar with Ronald

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
29–32

Page 29

1   Watts and not working with him or these
2   individuals before.
3       Q.   Sure.
4       A.   During debriefings, these detained
5   individuals, the arrestees, began to always talk
6   about being under arrest but yet you don't
7   prosecute your own, Sergeant Watts.  You know,
8   he's out there running a dope line.  And they
9   made multiple, multiple allegations.
10          At first it was inconsistent and vague
11  and unbelievable because they couldn't give any
12  hard facts or anything.
13      Q.   Sure.
14      A.   And a lot of times people will say
15  anything to try to get out of an arrest.  There
16  came a point, though, that Danny had -- Officer
17  Echeverria had interviewed a subject that was
18  able to give enough information that he could
19  further investigate and it concerned him that
20  there may be some truth to these allegations
21  that continuously surfaced on the same sworn
22  personnel.  It never deviated from the
23  personnel.
24      Q.   Sure.

Page 30

1       A.   It was consistently the same ones.
2       Q.   Do you recall, in addition to Watts,
3   what other personnel these arrestees were giving
4   information on that suggested that they were
5   engaging in illegal activity?
6       A.   Yes, I do.
7       Q.   Who would that be?
8       A.   Most of the time they would say his
9   crew, which was referring to his tact team.
10  I -- you would have to ask Officer Echeverria
11  exactly who they did name.
12      Q.   Okay.  But your understanding, they
13  named at least Watts and his tact team, was your
14  impression?
15      A.   During -- yes.
16      Q.   Okay.
17      A.   During his interrogations -- I was
18  not -- I shouldn't say interrogations.
19  Interviews.  I'm sorry.  Let me stand corrected.
20  As being an undercover, I would never be in the
21  room with that -- for the conversation.
22      Q.   Okay.
23      A.   And I don't recall specifically during
24  that.  But I know later on down the line,

Page 31

1   individuals that were identified --
2       Q.   Sure.
3       A.   -- that I had firsthand knowledge of.
4       Q.   Okay.  So in Paragraph 20 where it
5   indicates that Plaintiffs uncovered evidence of
6   illegal activity, is it actually more accurate
7   to say that Plaintiff Echeverria uncovered
8   that --
9       A.   Yes.
10      Q.   -- and then informed you about it?
11      A.   That is correct.
12      Q.   Okay.  Now, these intelligence
13  briefings where you indicate Officer Echeverria
14  would have learned of the allegations of illegal
15  activity, do you know who attends those
16  intelligence briefings?
17      A.   Usually it would be the enforcement
18  officers.  And it could be one, two, three, I
19  mean, how many subjects are in the room.
20      Q.   Okay.  And would sergeants be part of
21  those meetings?
22      A.   It was my understanding not usually,
23  unless they would be requested for some reason.
24      Q.   Okay.  And how about lieutenants?

Page 32

1       A.   I don't believe I've ever known a
2   lieutenant to be in there.
3       Q.   Okay.  Have you, yourself ever been in
4   a position where you participate in these
5   intelligence briefings that you testified to?
6       A.   While working in Narcotics --
7       Q.   Correct.
8       A.   -- as an undercover?  Not while I was
9   working in an undercover.
10      Q.   Okay.  So to the best of your
11  knowledge, Officer Echeverria was not the only
12  one in these intelligence briefings who was
13  receiving knowledge about the illegal activity
14  of Watts and others; is that correct?
15      A.   That's absolutely correct.  I do know
16  of two other officers that were present --
17      Q.   What --
18      A.   -- at some point.
19      Q.   Who else was present?
20      A.   Trevor Stotts, S-T-O-T-T-S and
21  Ken Herrera.
22      Q.   And Trevor Stotts, do you know what his
23  position was at the time?
24      A.   He was an officer in Narcotics.

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
33–36

Page 33

1    Q.   And the same for Ken Herrera?
2    A.   Correct.
3    Q.   Okay.  Did you ever have any, you
4  personally have any conversations with
5  Mr. Stotts or Mr. Herrera about this alleged
6  illegal activity?
7    A.   No, I did not.
8    Q.   Okay.  Other than your partner,
9  Officer Echeverria, did you ever have any
10  discussions prior to going to the FBI with
11  anyone within the Chicago Police Department
12  about alleged illegal activity by Watts and
13  others?
14    A.   I'm sorry, could you -- I'm not
15  understanding.
16    Q.   Sure.  You allege in your Complaint
17  later on, and we'll get to this, that in roughly
18  August of 2008, you -- well, let's strike that.
19  Let's strike that.
20        When you learned of the alleged illegal
21  activity from your partner, Officer Echeverria,
22  did you personally have any conversations with
23  anyone else within Chicago Police Department
24  about the alleged illegal activity?

Page 34

1    A.   No, I did not because I was not present
2  for the information.  But I did instruct Danny
3  to go to his -- go to the supervisor on the
4  scene and inform them of this immediately so
5  that they could take the appropriate action
6  necessary and make a determination how they
7  wanted to proceed with this.
8    Q.   Okay.  And to your knowledge, did
9  Officer Echeverria do that?
10    A.   Yes, he did.
11    Q.   Okay.  Do you know who that person he
12  went to was?
13    A.   I do.
14    Q.   Who was that?
15    A.   Sergeant Roderick Watson.
16    Q.   And do you recall -- what was it, the
17  first time that Officer Echeverria told you
18  about this alleged illegal activity that you
19  recommended that he go to the supervising
20  officer or was it some point down the line?
21    A.   It was the first time that he received
22  credible information, that it was reported
23  immediately.
24    Q.   Okay.  Did you, yourself ever speak

Page 35

1  with Sergeant Roderick Watson about alleged
2  illegal activity by Watts or others?
3    A.   No.  I wasn't even on duty the day that
4  that occurred.
5    Q.   Okay.  And am I correct that at some
6  point after Officer Echeverria contacted
7  Roderick Watson, you or Officer Echeverria
8  contacted the FBI about this subject?
9    A.   Yes.  The day that Officer Echeverria
10  reported this to Roderick Watson, it is Officer
11  Echeverria's responsibility to complete the
12  intelligence report, the debriefing and he has
13  to sign off on that information.  So he directly
14  asked the sergeant, how do you want me to handle
15  this, how do you want me to document this, what
16  do I need to do.  Because he had not come across
17  these circumstances prior.
18        And he was given a direct order by
19  Sergeant Watson to disregard all that
20  information and make the report a negative,
21  meaning no intelligence was gathered.
22    Q.   And what you just testified to about
23  this alleged direct order, the basis for your
24  information on that is what Officer Echeverria

Page 36

1  told you, correct?
2    A.   That is correct, because he contacted
3  me again --
4    Q.   Okay.
5    A.   -- informing me of that.
6    Q.   Okay.  And after that contact that you
7  were just speaking of, did you or Officer
8  Echeverria contact the FBI at any point?
9    A.   Well, after that.  Because at first, I
10  thought that maybe the reasoning for the
11  negative debriefing was that maybe Sergeant
12  Watson was going to initiate a confidential
13  investigation or something.  You know, he's a
14  supervisor, I was pretty confident that he was
15  going to handle it according to department rules
16  and regulations.
17        But through the, you know, chain of
18  events that followed and, you know, the
19  information kept flowing in, it became evident
20  that the department was not -- I didn't -- I did
21  not have the confidence that an investigation, a
22  fair investigation would happen within the
23  department --
24    Q.   Okay.

SHANNON MARIE SPALDING
November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO
37–40

Page 37

1    A.  -- looking into the allegations.
2    Q.  Okay.  I just move to strike as not
3  being responsive to my question, which was
4  simply at some point did you contact the FBI
5  about --
6    A.  Yes.
7    Q.  -- the alleged illegal activity of
8  Watts and others.
9    A.  Yes.
10    Q.  Okay.  And if we look at Paragraph 23
11  of your Complaint, your Amended Complaint, it
12  indicates that in 2007, Plaintiffs reported to
13  FBI Special Agent PS the illegal activity by
14  Sergeant Watts and others who worked with him.
15  The PS is Patrick Smith, correct?
16    A.  Yes.
17    Q.  Okay.  And in terms of this reporting
18  to Patrick Smith initially, did you make that
19  report or did Officer Echeverria make that
20  report?
21    A.  I did.
22    Q.  Okay.
23    A.  I contacted Agent -- Special Agent
24  Patrick Smith initially and informed him that I

Page 38

1  had information on what I believed was at one
2  time an investigation by Special Agent Ken
3  Samuels into corrupt activity by Sergeant Ronald
4  Watts, and if he could put me in contact with
5  Ken Samuels again.
6    Q.  How did you -- was it random that you
7  contacted Patrick Smith or was there a reason
8  that you went to him?
9    A.  Because I had worked with Patrick Smith
10  prior to that.
11    Q.  Okay.
12    A.  So I just happened to have his number.
13    Q.  Sure.
14    A.  And so I contacted him asking him if he
15  personally could give me Ken Samuels' number --
16    Q.  Sure.
17    A.  -- or if he knew him.  And he said that
18  he was well aware of the Watts investigation and
19  had been involved on a certain level with Ken
20  Samuels on it.
21    Q.  Okay.  Now, this initial contact, you
22  had a phone conversation with Mr. Smith?
23    A.  Yes, I did.  I called him and was
24  requesting to meet with Ken Samuels or how I

Page 39

1  could contact him.
2    Q.  Sure.
3    A.  Because I knew that at some point so
4  long ago, there was an investigation into it;
5  however, I did not know if it was closed, if it
6  was still open and active, if it was closed with
7  negative results.
8    Q.  And Mr. Smith told you that he was well
9  aware of the Watts investigation?
10    A.  Correct.  And --
11    Q.  And in this initial phone conversation,
12  do you recall Mr. Smith saying anything else?
13    A.  I know we had spoke, I don't know if it
14  was the same day or again.  But we -- at one
15  point he did say, when you said you had some
16  information, I never thought it would be as big
17  as the Watts case.  And --
18    Q.  Okay.  Let's just talk about that first
19  conversation.  And you just said, you're not
20  sure if that was in the first conversation.
21      You testified that in the first
22  conversation he did indicate that he was well
23  aware of the Watts investigation.  Do you recall
24  him saying anything else in that first

Page 40

1  conversation?
2    A.  I recall him saying that he knew
3  Ken Samuels and knew that Ken Samuels had that
4  investigation.
5    Q.  Okay.  Did he say, I'll get you to
6  Ken Samuels or you can deal with me on this?
7    A.  He said he was going to talk to
8  Ken Samuels.
9    Q.  Okay.  Was it your understanding that
10  Ken Samuels was still in the FBI at that point?
11    A.  Yes.
12    Q.  Okay.  And other than what you've
13  already testified to, do you recall anything
14  else that you said or that Patrick Smith said in
15  that first conversation?
16    A.  I know that we were going to provide
17  the information.  I don't know if that was the
18  first conversation or the next conversation
19  or -- but I know that he was going to have a
20  conversation with Ken Samuels.
21      I can't be sure if it was the exact
22  conversation of -- at some point I was asked.
23  Like how I knew Ken Samuels had it and I had
24  said I had spoken to him so many years prior --

SHANNON MARIE SPALDING                                November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                    41–44

Page 41

1     Q.  Sure.
2     A.  -- and I didn't even know if it was an
3  active case or what had happened.
4     Q.  Sure.
5     A.  But I can't be 100 percent that that
6  was the very initial conversation.
7     Q.  Sure, sure.
8     A.  It was just that we were going to come
9  in at some point and provide the information.
10    Q.  Okay.  And at some point, did you go
11 in --
12    A.  Yes.
13    Q.  -- and meet with Patrick Smith?
14    A.  I'm sorry.  Yes, we did.
15    Q.  Was Ken Samuels part of that meeting,
16 also?
17    A.  No, not in the first meeting.  He was
18 not.
19    Q.  Okay.  And between the first
20 conversation you had with Patrick Smith and the
21 time you went in to meet, do you recall if you
22 had any other conversations with Patrick Smith
23 or was there the one phone call and then you had
24 a meeting?

Page 42

1     A.  I don't recall.
2     Q.  Okay.  And at the time that you --
3  strike that.
4        So at some point you and Officer
5  Echeverria, I assume, have a meeting with
6  Patrick Smith?
7     A.  Correct.
8     Q.  And was anyone else present for that
9  initial meeting?
10    A.  Yes.
11    Q.  Who else was present?
12    A.  Special Agent Julie Anderson.
13    Q.  And Ms. Anderson was with the FBI?
14    A.  Correct.
15    Q.  Anyone else?
16    A.  No.
17    Q.  Okay.  So it was Patrick Smith, you and
18 Officer Echeverria and Special Agent Julie
19 Anderson?
20    A.  Correct.
21    Q.  Okay.  What's your best recollection
22 chronologically if you can who said what in the
23 course of that meeting?
24    A.  Oh, gosh.

Page 43

1     Q.  I know it's been a long time.
2     A.  It has been.
3     Q.  What's your best recollection of
4  what --
5     A.  I know that they introduced themselves.
6  We went into a small conference room in the FBI
7  building, at which point we presented the facts
8  that we had, the information that we had to them
9  so that an outside investigation -- an
10 investigation by an outside agency could be
11 conducted.  We would provide the information and
12 that would be it.
13    Q.  Okay.  Well, what do you recall the
14 facts and the information being that you related
15 to them in this meeting?
16    A.  Just what I told you earlier, that
17 continuously the same names continuously popped
18 up by people from different areas, whether it
19 was Englewood or Idabeballs (phonetic) or the
20 South Side, all consistently naming Ronald Watts
21 and members of his team committing the same
22 crimes of robbing the drug dealers, false
23 arrests, stealing the money, extortion.
24    Q.  Sure.

Page 44

1     A.  Just a whole laundry list.
2     Q.  Okay.
3     A.  And we provided that information.  They
4  asked some questions and --
5     Q.  Do you recall what questions they
6  asked?
7     A.  Well, you know, our names, where we
8  worked, where we were assigned, how Danny came
9  across the information, asked me previously how
10 I knew about -- how I previously knew Ken
11 Samuels --
12    Q.  Sure.
13    A.  -- had the case.  And I told him that I
14 had spoke with him so long ago.
15    Q.  Sure.
16    A.  And they were just vague, you know,
17 conversations.  You know, the FBI doesn't give
18 you a lot of information when they call you.
19 They want information.
20    Q.  Sure.
21    A.  And I know we concluded the meeting
22 with he was going to pass this information along
23 to Ken Samuels and they may be working on the
24 investigation with him.

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
45–48

Page 45

1    Q.   Okay.
2    A.   And we left the building knowing that
3  we had provided the information and --
4    Q.   Sure.
5    A.   -- we thought we were out of it.
6    Q.   Okay.
7    A.   Because with Ken Samuels, I never heard
8  back from him again so.
9    Q.   Okay.  So you never heard from Ken
10  Samuels on the investigation?
11    A.   After he talked to me about it?
12    Q.   Right.
13    A.   No, I never did.
14    Q.   Okay.
15    A.   And so --
16    Q.   You've answered my question.
17    A.   Thank you.
18    Q.   Okay.  But you did have further contact
19  with Patrick Smith about the Watts matter?
20    A.   After that meeting?
21    Q.   After the initial meeting.
22    A.   Correct.
23    Q.   Okay.  And did you have any more
24  in-person meetings with Patrick Smith or just

Page 46

1  telephone calls?
2    A.   I believe we did meet in person.
3  Again, always when we were off duty, on our own
4  time.
5    Q.   Okay.  And how many times do you think
6  you met in person with him after that initial
7  meeting?
8    A.   Are you talking through the whole
9  investigation?
10    Q.   Yes.
11    A.   Well, we went to work directly with
12  him, so it would be -- we would see him every --
13  I mean, I can't even begin to guess.
14    Q.   Okay, that's fine.
15        Well, let's say prior to August
16  of 2008, how many in-person meetings do you
17  think you had with Patrick Smith after the first
18  one, if any?
19    A.   I can just tell you multiple, but I
20  can't be sure how many.
21    Q.   Okay.  And did you also have any
22  telephone calls during that -- with him during
23  that period after the first meeting and prior to
24  August of 2008?

Page 47

1    A.   Yes.
2    Q.   Do you recall how many telephone calls
3  you may have had?
4    A.   I can tell you initially they were
5  sporadic and then as time passed, it became more
6  frequent.
7    Q.   Okay.
8    A.   And more demanding on our part to the
9  point that I was a little uncomfortable with
10  it.
11    Q.   You mean it was more demanding in the
12  sense that it was encroaching on your work time
13  as a Chicago Police Officer?
14    A.   No.  He was requesting us to come in
15  during hours that we couldn't or anything like
16  that.  So we told him, we cannot meet with you
17  or talk to you.  At one point he called me and
18  wanted to know if I could meet him, you know, at
19  a certain time and I said, I can't, I'm working
20  and -- tomorrow.  And he said, well, can't you
21  break away.  And I said, you know, it doesn't
22  work that way.  We can't do that.
23    Q.   Okay.
24    A.   And that's the point where I became

Page 48

1  uncomfortable.  Because if you're going to call
2  me on my day off and ask me if I know if Watts
3  is on vacation or not or something, I can say
4  yes or no; but to meet with you, no.  I -- no.
5    Q.   Do you recall when -- that conversation
6  where he wanted you to meet with him during work
7  hours, do you recall when that was?
8    A.   I recall that it made me so
9  uncomfortable that Danny and I decided that we
10  needed to go contact the chief of our own IAD.
11  And it was -- so it was shortly before we met
12  with Chief Tina Skahill of IAD in August
13  of 2008.
14    Q.   And before that meeting with Tina
15  Skahill, which we'll talk about in August
16  of 2008, is it your testimony that you never met
17  with Patrick Smith or talked to Patrick Smith on
18  the phone or otherwise provided any information
19  to the FBI during your work hours?
20    A.   I may have taken a phone call and said
21  I'll have to call you back or something like
22  that.  Everybody answers, you know, their phone.
23    Q.   Okay.
24    A.   But no.  We would always meet with

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
49–52

Page 49

1  Patrick Smith or provide information or
2  something like that on our own time.
3     Q.  Okay.  If you take a look at
4  Paragraph 26 of the Amended Complaint.  This
5  August, 2008 meeting, is that the meeting you
6  just testified to where Tina Skahill was
7  present?
8     A.  Correct.
9     Q.  Okay.  Who else was present at that
10  meeting?
11     A.  Unbeknownst to us -- Officer Echeverria
12  and I had a scheduled meeting.  Unbeknownst to
13  us when we walk in, Special Agent Patrick Smith
14  was there along with Sergeant Tom Chester and
15  commanding officer of IAD at the time Barbara
16  West.
17     Q.  Okay.
18     A.  Along with Chief Skahill, of course.
19     Q.  And was Tom Chester with Internal
20  Affairs Division, also?
21     A.  Yes.
22     Q.  Okay.
23     A.  He's the FBI liaison of the
24  confidential investigation section for Chicago

Page 50

1  Police.
2     Q.  And had you been under the impression
3  that you were only going to meet with Tina
4  Skahill?
5     A.  Yes.
6     Q.  Okay.  How did you set up the meeting
7  with Tina Skahill?
8     A.  Officer Echeverria called and made an
9  appointment.
10     Q.  Okay.  What do you recall being said by
11  you and everyone else in this August, 2008
12  meeting?
13     A.  The short version?
14     Q.  I'm afraid to say I think I need the
15  long version.
16     A.  Oh, no.
17     Q.  I need your best recollection of
18  everything that was said in that meeting --
19     A.  Okay.
20     Q.  -- from the beginning until the end, as
21  best you can recall.
22     A.  I can recall.
23     Q.  Okay.
24     A.  We walked in the door -- and let me

Page 51

1  just back up.  Prior to the meeting with Chief
2  Skahill, I had -- I believe it was Officer
3  Echeverria notified Patrick Smith that we
4  intended on going to the chief of IAD because he
5  was requesting our involvement and it made us
6  uncomfortable.  So when we walked in and saw
7  Patrick Smith there, we were floored.
8     Q.  Okay.
9     A.  And we had no idea who any of these
10  individuals were.  Tina Skahill was very
11  welcoming, very professional, made you feel like
12  you were coming to the right place.  She
13  introduced everybody in the room, she told us to
14  have a seat.
15     She said that they had had a meeting
16  prior to us coming in.  They, meaning the other
17  people present, Barb West, Tom Chester, Patrick
18  Smith.  At which point they had determined that
19  the Watts investigation, that we had enough
20  intelligence, that we had enough credible
21  information, that they could revive the current
22  investigation that was stalled.
23     Q.  Who said this?
24     A.  Tina Skahill.

Page 52

1     Q.  Okay.
2     A.  With our involvement in the
3  investigation.
4     Q.  Okay.
5     A.  We were told that the investigation
6  under Ken Samuels was not closed out, but -- I
7  forgot the FBI term that they use.
8     Q.  Okay.
9     A.  But just dormant, like stalled.
10     Q.  Okay.
11     A.  Because they were unable to gather any
12  current information on activity to --
13     Q.  Okay.  I just want to make sure you're
14  telling me what was said in this meeting.
15     A.  Yes.
16     Q.  Okay.
17     A.  And so then we were told that what we
18  were going to do is be detailed to 543.
19     Q.  Let me stop you for a second.  Did
20  anyone other than Tina Skahill say anything in
21  the meeting?
22     A.  I know that Patrick Smith -- everyone
23  was talking at some point.
24     Q.  Okay.

SHANNON MARIE SPALDING                                    November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                        53–56

Page 53

1     A.   It was an interactive conversation.
2     Q.   Okay.  I'm sorry, continue.  What else
3  do you recall being said and by whom in the
4  meeting?
5     A.   Okay.  Well, then Tina Skahill wanted
6  to hear our story, like what had happened.  And
7  I believe Officer Echeverria, since he's the one
8  that made the appointment, laid the facts on the
9  table and told them, this is the information I
10  got, this is how I got it, this is who I
11  reported it to, this is additional information I
12  learned.
13     I -- you know, we learned that there's
14  been so many open CR numbers against these same
15  individuals and, you know, all this time has
16  gone by from the first time I was contacted and
17  we decided to go on our own to FBI and, you
18  know.
19     Q.   Was the conversation just about Officer
20  Watts or other individuals, as well?
21     A.   No.  The member of his tact team, as
22  well.
23     Q.   Okay.  Were the specific names --
24     A.   Yes.

Page 54

1     Q.   -- discussed in that meeting?
2     A.   Yes.
3     Q.   Okay.  And Officer Mohammed was one of
4  them?
5     A.   Yes.
6     Q.   Okay.  What else do you recall, if
7  anything, you or anyone else saying in the
8  meeting?
9     A.   I remember that we were being told that
10  we were going -- we're not asking you to go to
11  this investigation.  I remember that I voiced
12  extreme concern because I worked with these
13  individuals from the start of my career, one of
14  the named targets I actually graduated the
15  academy with and I also knew the allegations
16  that were made against Sergeant Watts --
17     Q.   Sure.
18     A.   -- and they're serious allegations.
19  And not only is he working with -- allegedly
20  working with these gang members and committing
21  these crimes, he also has the ability to look
22  into who's investigating him and he has the
23  ability to use the police systems and it made me
24  extremely nervous.

Page 55

1     Q.   Okay.  Was it your point of going to
2  the FBI to get approval to work on this with --
3  during your regular work hours?
4     A.   Going to the FBI?
5     Q.   Going to the department.  I'm sorry.
6     A.   No.  It was to inform Tina Skahill that
7  we had gone to the FBI and that this agent was
8  now contacting us and wanting us to break away
9  and -- or meet with him and we informed him that
10  we couldn't.
11     Q.   Okay.  So were you trying to get
12  Officer Skahill to protect you from having to
13  work on this investigation or get authorization
14  to work on it during work hours?
15     A.   No.  It was to inform her of the action
16  that we had taken and we didn't know -- you
17  know, we work for Chicago Police Department --
18     Q.   Yes.
19     A.   -- we're unfamiliar with the rules and
20  regulations on what exactly you can and cannot
21  do with these agents.
22     Q.   Okay.
23     A.   And in order for this to remain
24  confidential -- because I do recall now that

Page 56

1  Patrick Smith and Julie Anderson said, we must
2  keep this confidential, the investigation must
3  remain confidential.  We cannot talk about this
4  to anyone or we would be interfering with the
5  investigation and could jeopardize it.  So we
6  couldn't just go ask our own sergeant.
7     Q.   Sure.
8     A.   So we know that IAD does confidential
9  investigations.
10     Q.   Sure.
11     A.   So we went to get clarification from
12  her and make sure that we weren't coloring
13  outside the lines in any capacity before, you
14  know, Patrick Smith was requesting what I felt
15  was too much.  And so we just wanted to -- and
16  you can't -- with confidential information, you
17  don't know who's friends with who --
18     Q.   Sure.
19     A.   -- so we went to the chief.
20     Q.   Sure, sure.  And you said you were told
21  in that meeting that you needed to keep this
22  confidential?
23     A.   Yes, yes, yes.
24     Q.   Okay.  Other than what you've already

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
57—60

Page 57

1 testified to, what do you recall else, if
2 anything, being said in this August, 2008
3 meeting?
4    A.  I recall Tina Skahill saying that this
5 is going to be a very good move for you, it is
6 necessary.  This is a very important
7 investigation to the department, you have the
8 resources, you have the ability to close this
9 out with positive results, your concerns are
10 unwarranted, we would never just throw you back
11 into patrol, you will be protected, your
12 identity will never be revealed.
13       In fact, you know, you can be made
14 meritorious sergeant from this because --
15 meritorious means when you go above and beyond.
16 You know it's not -- that's what it's supposed
17 to be for.  You can remain on the task force so
18 you don't go right back into patrol and some --
19 you know, that's I think a three or five-year
20 detail.
21       She said, we protect our people at all
22 costs, it will never come back to you.  You have
23 nothing to worry about as long as you don't ever
24 talk about this.  Chief Skahill, Tom Chester --

Page 58

1    Q.  Go ahead.  I'm sorry.
2    A.  They then said, this is how we're going
3 to proceed.
4    Q.  Let me stop you for a second.  When
5 Sergeant -- I'm sorry.  When Tina Skahill was
6 saying, this will be a good move for you, you
7 could be made meritorious sergeant, you could
8 remain on the task force, you understood that as
9 she was giving you possible outcomes following
10 this investigation, she wasn't promising you
11 those things, correct?
12    A.  She was promising us that we would be
13 one, protected --
14    Q.  Yes.
15    A.  -- two, our identity would never be
16 revealed; and three, we would be able to go
17 within a specialized unit of like the FBI Task
18 Force or something so we would not transition
19 right back into the Chicago Police Officers
20 directly or promoted so that you're not back in
21 the rank and files until it's safe to do so.
22    Q.  Okay.  Is it your understanding that in
23 that meeting, Tina Skahill was promising you a
24 promotion?

Page 59

1    A.  I did not perceive it as that
2 personally.
3    Q.  Okay.  Is it your understanding that in
4 that meeting, Tina Skahill was promising you
5 that at the end of this investigation, you would
6 be on some task force?
7    A.  I did not perceive it as a promise of
8 exactly where or something, but a promise of you
9 would not be returned here and we will take care
10 of you.
11    Q.  Okay.  I'm sorry.  Other than what
12 you've already testified to, what else do you
13 recall being said in that August, 2008 meeting?
14    A.  I recall that it was explained to us
15 why we were going to be detailed to 543 and the
16 structure of how that worked.  Because my
17 partner and I were unfamiliar of 543, which is
18 miscellaneous details.  She explained that --
19    Q.  I'm sorry.  Is Tina Skahill explaining
20 this to you?
21    A.  Yes.
22    Q.  Okay.
23    A.  She explained that there are many
24 different divisions that come out of there, like

Page 60

1 the Mayor's detail, serving I think summons, the
2 DEA Task Force, FBI Task Force.  So you would
3 report to 543.  That way if anybody, like
4 Sergeant Watts or someone else, we don't know
5 where the investigation is going --
6    Q.  Sure.
7    A.  -- or how far up the chain it's going
8 to lead, we're to look at where -- whoever would
9 question us, it would say 543 miscellaneous
10 detail.  And from there --
11    Q.  And 543 was Detached Services, correct?
12    A.  I'm sorry, Detached Services.  With
13 many miscellaneous details in there, that's
14 correct.
15    Q.  Okay.
16    A.  And then that would show that we were
17 there and then nobody would be exactly sure what
18 we were doing.  We could never be connected
19 specifically to what was then dubbed as
20 Operation Brass Tax, the Ronald Watts case.
21       And we were told that we were under no
22 circumstances no one is allowed to question us
23 about this.  We do not talk about it.  The only
24 people that would have knowledge were the people

SHANNON MARIE SPALDING                                    November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                      61–64

Page 61

1  that were in the room.  And I believe the people
2  above her at the time was Debra Kirby, Brust and
3  Jodie Wies.  And other than that, we were given
4  a story to stick to.
5     Q.  Okay.
6     A.  No matter who asked us.
7     Q.  Okay.  And this is Tina Skahill giving
8  you this information?
9     A.  Yes.
10    Q.  Okay.
11    A.  At points Barb West may have been
12 talking and Tom Chester was definitely talking.
13    Q.  Okay.
14    A.  And they were just breaking it down and
15 explaining, but the majority of the information
16 came from Chief Skahill.
17    Q.  Okay.  And while I understand they were
18 indicating it would be a confidential
19 investigation, did anyone say that the folks,
20 the people that would know about it would be on
21 a need to know basis?
22    A.  Yes.
23    Q.  Okay, all right.
24    A.  Oh, no.

Page 62

1     Q.  Other than what you've already
2  testified to, is there anything else you recall
3  being said in that meeting?
4     A.  I have a question.  When you say on a
5  need to know basis, are you talking -- I
6  perceive that question to mean that we were not
7  to discuss it with other people.
8     Q.  Okay.
9     A.  Am I correct?
10       Okay.  So my answer to yes is meaning
11 that I am not to discuss it with other people
12 because there's only certain people that need to
13 know about the investigation.
14    Q.  Correct.
15    A.  Okay.  And we do our reports and give
16 them to Tom Chester and Tom Chester briefs,
17 whether it's Tina Skahill --
18    Q.  Sure.
19    A.  -- or the superintendent or whoever.
20 But we don't go outside that square.
21    Q.  Sure, right.  But the certain people
22 who would need to know about the investigation,
23 was not determined by you --
24    A.  No.

Page 63

1     Q.  -- or Officer Echeverria, correct?
2     A.  No.
3     Q.  Correct?
4     A.  Correct.
5     Q.  Okay.  Do you recall anything else
6  being said --
7     A.  Yes, I remember Tina --
8     Q.  -- in the August, 2008 meeting?
9     A.  So sorry.
10    Q.  That's okay.
11    A.  Tina Skahill and Patrick Smith
12 discussed that the FBI was to give us vehicles
13 and we would be using FBI vehicles and that we
14 would complete packets for our credentials so
15 that we would report to 2111 West Roosevelt on a
16 regular basis and we would report our -- the
17 liaison, our direct contact for CPD was Tom
18 Chester.  We could go into 543.
19       The only person that would -- in 543
20 that knew what we would be doing was then
21 Lieutenant and Commanding Officer Liz Glatz,
22 G-L-A-T-Z.  And if anyone, including a
23 lieutenant or someone, asked us anything, just
24 say you work for Tom Chester and they should

Page 64

1  know immediately not to ask you anything
2  further.
3     Q.  Okay.
4     A.  And then she said that it was going to
5  happen quick, that we were going to be moved
6  right away.  She -- they stressed the importance
7  of keeping our identity confidential --
8     Q.  Okay.
9     A.  -- is not to discuss this.
10    Q.  Right.
11    A.  Gave us the story that we were going to
12 be -- once again, we were detailed to 543 and
13 the story was that we were being borrowed as
14 intelligence to the FBI Narcotics Task Force.
15 So we were to also, you know, along the way have
16 stories ready for -- you know, you're going to
17 run into police personnel.
18    Q.  Sure.
19    A.  They're going to ask you where are you
20 working, what are you doing.
21    Q.  Sure.
22    A.  So make sure you're prepared for that.
23    Q.  Did they tell you what to say to those
24 people who may ask you what you're doing?

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014

65–68

Page 65

1    A.   Yeah.  You're borrowed to the FBI
2  Narcotics Task Force and, you know, discuss what
3  you want about that but be vague.  But questions
4  will come up, you know, who are you working for.
5    Q.   Sure.
6    A.   Many officers -- when we got to
7  2111 West Roosevelt, we realized there was a
8  whole lot of CPD personnel in there.
9    Q.   And that address is the FBI
10  headquarters, correct?
11    A.   Yes.
12    Q.   Okay.  Do you recall anything else
13  being said at the August, 2008 meeting?
14    A.   You know, we were given the BlackBerry
15  numbers of Barb West, Tom Chester, Tina Skahill
16  for direct contact.
17    Q.   Okay.
18    A.   We were told that, you know, we weren't
19  going to discuss this with anyone from
20  Narcotics, that it would be handled at the chief
21  level.
22    Q.   Okay.
23    A.   We would at some point be told -- how
24  it was going to happen is somebody from

Page 66

1  Narcotics would just tell us that we're on an
2  order to go and we just say, okay.
3    Q.   Okay.
4    A.   But we don't -- you don't go to work
5  and ask or anything, it was just going to be
6  handled.
7    Q.   Okay.
8    A.   Run silent.
9    Q.   Okay.  Other than what you've already
10  testified to, do you recall anything else said
11  in the August, 2008 meeting?
12    A.   I know that we were reassured that we
13  were doing the right thing and we were thanked
14  for coming forward and that, you know, it's no
15  secret in the Chicago Police Department that
16  when you go against officers --
17        MR. KING:  I move to strike the
18  response.
19  BY MR. KING:
20    Q.   My question is do you recall anything
21  else being said --
22    A.   Yes.
23    Q.   -- in the August, 2008 meeting?
24    A.   Yes.

Page 67

1    Q.   Okay.  And I don't want to hear about
2  secrets or no secrets.  What else was said in
3  the August, 2008 meeting?
4    A.   I was just about to tell you.  I said
5  in the meeting, it's no secret that when you go
6  against other officers in the department, the
7  things that can happen to you.
8    Q.   Someone said that in the meeting?
9    A.   I said it.
10    Q.   Okay.  You said it?
11    A.   Yes.
12    Q.   Okay.
13    A.   And I was extremely concerned.
14    Q.   Okay.
15    A.   And we were reassured that we were
16  doing the right thing and that, you know, we
17  would be protected.
18    Q.   Okay.
19    A.   And that people come forward and you
20  never know about it, we should have no fears.
21    Q.   Okay.  They were basically telling you
22  they do things like this all the time, you
23  shouldn't worry?
24    A.   Correct.

Page 68

1    Q.   Okay.  Anything else you can recall
2  being said in that meeting?
3    A.   I think the major points are covered.
4    Q.   Okay.
5    A.   I believe so.
6    Q.   Okay.  Was it your understanding
7  that -- well, strike that.
8        Just so I'm clear, would you say that
9  you and Officer Echeverria agreed to participate
10  under these terms, you weren't -- this wasn't
11  something you were coerced to do against your
12  will, was it?
13    A.   Well, I can tell you we were told in
14  this meeting, we're not asking, we're informing
15  you that you will be part of this
16  investigation.
17    Q.   Okay.  Did you agree to be part of the
18  investigation?
19    A.   When a chief tells you you're going to
20  be part of the investigation, you agree to it.
21    Q.   Okay.
22    A.   Yes.
23    Q.   Okay.  My question is did you not want
24  to be part of this investigation but you were

SHANNON MARIE SPALDING                                November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                      69–72

Page 69

1  ordered to, is that what your testimony is?
2     A.  I was concerned about being part of
3  this investigation and I was reassured that --
4  from the chief that it would be fine.  And so
5  yes, we agreed to be part of the
6  investigation --
7     Q.  Okay.
8     A.  -- under those conditions.
9     Q.  Fair enough, okay.
10       Was it your understanding that
11  immediately after that meeting, you were going
12  to Detached Services or would it be some time
13  later that you would be told that you were going
14  to Detached Services?
15    A.  She just said that it would happen
16  soon.
17    Q.  Okay.  If you'll look at Paragraph 28
18  of the Amended Complaint.  You say that certain
19  CPD command staff knew of your involvement with
20  the Watts investigation, including the
21  superintendent and former deputy superintendent
22  Kirby and the chief of IAD at the time was Tina
23  Skahill and later Juan Rivera, correct?
24    A.  Correct.  And also to that list I

Page 70

1  believe was Brust, who worked under Jodie Wies,
2  and I cannot tell you --
3     Q.  Sure.
4     A.  -- his position or his first name or
5  anything.  I never met the man.
6     Q.  That's fine.  What's your basis for
7  saying Superintendent Wies was aware of your
8  participation in the investigation?
9     A.  Because during that meeting with Chief
10  Skahill, Tom Chester, Barb West and Patrick
11  Smith, we were told the only people that will
12  know about it are the people in the room and
13  that list was given to us, these people.  And
14  nobody else outside this circle, other than
15  Liz Glatz.
16       MR. KING:  I move to strike the answer
17  as nonresponsive.
18  BY MR. KING:
19    Q.  What's your basis for saying that the
20  superintendent of police Jodie Wies had
21  knowledge of your involvement in the Watts
22  investigation?
23    A.  Because the superintendent was briefed
24  about Operation Brass Tax by somebody from the

Page 71

1  IAD office, I believe it would be the chief.
2  And whether Barb West was present or not, I was
3  not at the meetings or the briefings.
4     Q.  Okay.  During the August, 2008 meeting,
5  are you -- is it your testimony that you were
6  told that the superintendent would be made aware
7  of your involvement in Operation Brass Tax?
8     A.  Yes.
9     Q.  Okay.  During that August, 2008
10  meeting, is it your testimony that you were made
11  aware that Deputy Superintendent Kirby would be
12  made aware of your involvement in the
13  investigation?
14    A.  Yes.
15    Q.  Okay.  And obviously Chief Skahill was
16  in the meeting, so she knew about your
17  involvement of the investigation, correct?
18    A.  Yes.
19    Q.  And you think that Mr. Brust, that he
20  may or may not have told you that he would also
21  be made aware of your involvement in the
22  investigation, is that your best recollection?
23    A.  My recollection is his name came up as
24  being a person that had knowledge of it, but I

Page 72

1  don't know if it was in this meeting or later on
2  in the investigation.
3     Q.  Okay.  So these individuals,
4  Superintendent Kirby and Brust possibly, you
5  were being told in the meeting that they already
6  had knowledge of this?
7     A.  That they --
8     Q.  Correct?
9     A.  That they -- I was being told that they
10  would be the only ones who would have knowledge.
11  Whether they already had knowledge or they had
12  knowledge after the meeting, I can't say because
13  I'm not privilege to those meetings.
14    Q.  Right, right.  So you have no personal
15  knowledge of what the superintendent had
16  knowledge of with respect to your involvement in
17  the investigation, correct?
18       MR. SMITH:  Objection, are you asking
19  at the time of the meeting or subsequent?
20  BY MR. KING:
21    Q.  I'm asking at the time of the meeting.
22    A.  I have no idea.
23    Q.  Okay.  So after that August, 2008
24  meeting, there was a period of time where you

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
73–76

Page 73

1 continued to work in Narcotics before you were
2 told that you were being detailed to Detached
3 Services, correct?
4    A.  Yeah, about two days.
5    Q.  About two days, okay.
6       So on Paragraph 29 of the Amended
7 Complaint, you indicated that you were detailed
8 to Detached Services at a certain point and you
9 then reported directly to FBI headquarters; is
10 that correct?
11    A.  Yes.
12    Q.  And our records indicate you were
13 detailed to Detached Services early August,
14 2008.  Does that sound correct?
15    A.  That's what your records reflect?
16    Q.  Yes.
17    A.  That's --
18    Q.  I'm just asking if that sounds correct
19 to you.
20    A.  Yes, because it was immediately after
21 the meeting with Chief Skahill.
22    Q.  Okay.
23    A.  When I say immediately, days.  That
24 fast.

Page 74

1    Q.  Okay.  And when you were then detailed
2 to Detached Services and reporting to the FBI,
3 was it your understanding at that point that
4 that was all you were going to do, was work on
5 the Watts case with the FBI or would you work on
6 the Watts case as needed and then you performed
7 other responsibilities in the Detached Services
8 unit?
9    A.  Our purpose for being detailed to the
10 FBI was to work on Operation Brass Tax.
11    Q.  At the time you were detailed to
12 Detached Services, was it your understanding
13 that you were going to spend all of your work
14 time working on Operation Brass Tax or that you
15 would work on it periodically as needed and also
16 have some responsibilities within Detached
17 Services?
18    A.  Work on Operation Brass Tax full time
19 with no responsibility -- other responsibilities
20 within 543.
21    Q.  Okay.  And what was the basis for that
22 understanding?
23    A.  Because that's what we were told we
24 were going to do in that meeting by the chief --

Page 75

1    Q.  Okay.
2    A.  -- Tom Chester, Liz Glatz.  We reported
3 to her periodically.  We would go into 543, but
4 2111 West Roosevelt is where we reported.
5    Q.  Okay.  Paragraph 30 of the Complaint
6 you say, over the next several years, Plaintiff
7 continued to work on Operation Brass Tax.
8 During that time, you were also encouraged by
9 CPD command staff to develop other Narcotics
10 related cases, which overlapped with their work
11 on Operation Brass Tax.
12       Who encouraged you to develop other
13 Narcotics cases as alleged in Paragraph 30?
14    A.  Juan Rivera.
15    Q.  Okay.  And at the time Juan Rivera was
16 chief of the Internal Affairs Division, correct?
17    A.  Correct.
18    Q.  And do you know why Chief Rivera asked
19 you to also work on other Narcotics cases?
20    A.  Yes.
21    Q.  Why?
22    A.  Because I told him that during the
23 course of the investigation, we were coming
24 across very credible Narcotics information that

Page 76

1 did not pertain directly to Operation Brass Tax
2 but that Chicago Police Narcotics Division could
3 use and develop conspiracies or search warrants.
4 And he said, as long as it doesn't compromise
5 Brass Tax or overlap it, by all means, any
6 intelligence that you gather regarding
7 Narcotics, you have my blessing to go back to
8 Narcotics and forward that information to the
9 officers and supervisors there and I will sign
10 off on any overtime that you work with them on
11 cases that you develop.  Because if you can
12 kill basically two birds with one stone --
13    Q.  Sure.
14    A.  -- by all means, do it, as long as it
15 does not interfere, compromise the integrity of
16 Operation Brass Tax.
17    Q.  Okay.
18    A.  You can't cross that line.
19    Q.  Do you recall how long you were working
20 out of FBI headquarters before you had that
21 conversation with Chief Rivera?
22    A.  I don't.
23    Q.  Okay.  Any sense of whether it was in
24 2008, 2009, 2010?

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
77–80

Page 77

1    A.   It might have been about 2010.
2    Q.   Okay.  And when you were reporting to
3  the FBI to work at that headquarters but were
4  also in the Detached Services unit, did you have
5  an understanding of there was someone in
6  Detached Services that you were supposed to
7  report to also?
8    A.   No.
9    Q.   During that time when you were in
10  Detached Services and reporting to the FBI
11  headquarters, do you know if your time, the A&A
12  sheets for you were being kept in Detached
13  Services?
14    A.   I believe they would be.
15    Q.   Okay.
16    A.   But I never questioned that.  I never
17  asked that question.
18    Q.   Okay.  And you believe they would be
19  because --
20    A.   Why would the FBI have them.
21    Q.   Okay.  And you were detailed to
22  Detached Services Unit 543, right?
23    A.   Yes.
24    Q.   Okay.

Page 78

1    A.   To the best of my knowledge, we were.
2  That's what we were told.
3    Q.   Okay.
4    A.   I can't be sure how they recorded it
5  because I'm not privilege to the records.
6    Q.   Are you familiar with Lieutenant
7  Cervanka?
8    A.   I know who he is, yes.
9    Q.   Was he ever a lieutenant in your chain
10  of command at any point?
11    A.   He was.
12    Q.   At what period of time was -- were you
13  working ultimately under Lieutenant Cervanka?
14    A.   When Chief Limon called me after I was
15  the victim of the robbery and battery and asked
16  me if I had been working with my partner Danny
17  Echeverria, set back up with him.  And I told
18  him, no.  And he said, well, I'll adjust that
19  and take care of it.  He then moved me to work
20  on Sergeant Roderick Watson's team with Danny
21  Echeverria, which fell under Cervanka's command.
22    Q.   Okay.
23    A.   And that was for a brief time prior to
24  going to 543.

Page 79

1    Q.   Was there any time while you were
2  working in Detached Services and working on the
3  Watts investigation that you were told to report
4  to Lieutenant Cervanka?
5    A.   No.
6    Q.   Do you have any knowledge of whether
7  Lieutenant Cervanka was aware of your work on
8  Operation Brass Tax while you were in Detached
9  Services?
10    A.   No.  He was not in that list of who
11  would have knowledge of it.
12    Q.   Okay.
13    A.   So I don't believe he should have had
14  knowledge of it.
15    Q.   Okay.  You don't recall any
16  circumstances where you were instructed by
17  anyone that on days that you were going to be
18  working at the FBI, that you would let
19  Lieutenant Cervanka know that you'd be over at
20  the FBI and not working at Detached Services?
21    A.   At no time did anybody tell myself,
22  tell me that I was ever to report to anybody
23  from Narcotics.
24    Q.   Okay.  You testified earlier that

Page 80

1  Chief Rivera told you essentially if you came
2  across credible Narcotics information that might
3  help an investigation, you should report that.
4  Did he tell you who you should take that
5  information to?
6    A.   He told me, feel free to pass it on to
7  someone that we may have known or worked with in
8  Narcotics.
9    Q.   Okay.
10    A.   To pass the intelligence on.
11    Q.   Okay.  And were there any situations
12  while you were in Detached Services, that you
13  did pass intelligence on to anyone in Narcotics?
14    A.   Yes.
15    Q.   And whom did you pass that information
16  onto?
17    A.   Sergeant Jay Padar and at the time
18  Anthony Hernandez worked on his team.
19    Q.   And those would be the only two
20  individuals?
21    A.   Other members of the Narcotics team
22  would work on the cases, but those were the
23  individuals we contacted or we discussed with.
24    Q.   Okay.  How many times do you think you

SHANNON MARIE SPALDING                      November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO            81—84

Page 81

1  provided information to Sergeant Padar while you
2  were in Detached Services and working on the
3  Watts investigation about other Narcotics
4  cases?
5      A.  Multiple times.  I can't be sure of the
6  exact amount.
7      Q.  And would that be the same for Officer
8  Hernandez?
9      A.  Correct.
10     Q.  Okay.  But other than you communicating
11 information to them, you didn't talk to anybody
12 else in Narcotics about the information or
13 evidence that you'd come up with?
14     A.  Okay.  That's -- we would initially
15 speak to one of those individuals being Padar or
16 Hernandez.
17     Q.  Sure.
18     A.  Once the information was provided and
19 the supervising sergeant Jay Padar decided that
20 they were going to work it, we would then talk
21 to other team members if we were going to go do
22 a search warrant or something.
23     Q.  Sure.
24     A.  But the initial intelligence was --

Page 82

1      Q.  Right.
2      A.  -- given to them and then that was how
3  it flowed to the team.
4      Q.  Right.  So you mentioned, for example,
5  if you were going to do a search warrant -- so
6  at times while you were in Detached Services and
7  you were working on the Watts investigation with
8  the FBI, at times you were also working on
9  Narcotics cases; is that your testimony?
10     A.  Yes.
11     Q.  Okay.
12     A.  It happened multiple times.
13     Q.  Okay.  And when you were working on
14 Narcotics cases, did you have an understanding
15 of who you reported to in connection with that
16 work of Narcotics cases?
17         MR. SMITH:  I'm just going to object to
18 the form of the question, vague as to reported
19 to.
20 BY MR. KING:
21     Q.  Did you understand my question?
22     A.  Could you say it again, please?
23     Q.  During the period when you were in
24 Detached Services and you were working on the

Page 83

1  Watts investigation, you testified that you were
2  also from time to time working on Narcotics
3  cases.
4      Did you have an understanding of who
5  your direct report was, if anyone, while you
6  were working on those Narcotics cases?
7      A.  Yeah.  We reported directly to Tom
8  Chester and we would inform Tom Chester and also
9  Juan Rivera directly.
10     Q.  Okay.  During that same period of time,
11 were you ever told that you needed to let
12 someone know on the days that you'd be working
13 on the Watts case, someone within the police
14 department?
15     A.  No.  We would report to work at the FBI
16 building.  What do you -- what do you mean
17 someone?  Tom Chester was within the police
18 department, but he was at the FBI building.
19     Q.  Okay.  So if there were days where you
20 didn't go to the FBI building because you were
21 working on a Narcotics case, were you supposed
22 to report what you were doing for that day, hey,
23 we're not going to be at FBI, we're going to be
24 in Narcotics?  Were you supposed to tell someone

Page 84

1  that?
2      A.  We weren't, per se, in Narcotics.
3      Q.  Right.
4      A.  But rather just forwarding the
5  information.
6      Q.  Sure.
7      A.  And then the search warrants that
8  Officer Echeverria and I participated on were
9  always overtime and we would report directly to
10 Sergeant Padar, who was conducting the search
11 warrants then.
12     Q.  Okay.
13     A.  And that was with Juan Rivera's
14 consent.
15     Q.  Okay.  So is it correct that when you
16 were in Detached Services and you provided
17 information to Sergeant Padar or Officer
18 Hernandez and that led to further work, as you
19 just said, was that work always under Sergeant
20 Padar?
21     A.  Yes.
22     Q.  Okay.  I assume the decision to move
23 you to Detached Services so that you could work
24 on the Watts case, you're not claiming that that

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
85—88

Page 85

1  decision was part of any retaliation against you
2  in this case, are you?
3     A.  When Tina Skahill moved us?
4     Q.  Yes.
5     A.  No.
6     Q.  And, in fact, you're not alleging, the
7  Plaintiffs are not alleging that Tina Skahill
8  retaliated against you or harassed you in any
9  manner in this case?
10     A.  Not in any manner whatsoever.
11     Q.  Okay.  If I could direct your attention
12  to Paragraph 31 in the Amended Complaint, which
13  indicates, on an unknown date, information that
14  Plaintiffs had reported criminal misconduct by a
15  sworn officer and were working with an outside
16  investigation was leaked within the department
17  and became known to Defendant Commander O'Grady.
18        What's the basis for your allegation
19  that information was leaked to Commander
20  O'Grady?
21     A.  Okay.  If I may, I need to back you up
22  just a little bit because that's really a
23  two-part question.  How we found out the
24  information and then who we addressed it to.

Page 86

1     Q.  My question for now is what's the basis
2  for the allegation that information was leaked
3  to Commander O'Grady?
4     A.  Okay.
5     Q.  How do you know that?
6     A.  Because on one of the search warrants
7  that we were conducting with Sergeant Jay Padar
8  and his team, we were in the 7th District
9  parking lot after the search warrant.  And
10  Sergeant Jay Padar handed me back a file that I
11  had submitted, along with Officer Echeverria, to
12  register our -- register our informants who were
13  already registered as FBI informants with the
14  Chicago Police Department so they could be
15  compensated --
16     Q.  Okay.
17     A.  -- for the work that they were now
18  doing on these other Narcotic cases that they
19  were --
20     Q.  You were trying to get approval for a
21  confidential informant to get paid?
22     A.  Correct, under these.
23     Q.  Okay.
24     A.  The approval you have to be assigned --

Page 87

1  or an undercover or assigned to 189, which we
2  were, and it has to come from Commander
3  James O'Grady, who I never worked under.  I was
4  gone before he came, okay.
5     Q.  Right.
6     A.  It was submitted.  Commander --
7     Q.  Let me stop you for a second.  You said
8  you were assigned to 189 and, in fact, at the
9  time were detailed to Detached Services,
10  correct?
11     A.  Correct.  But the way that works, we're
12  assigned and then detailed.
13     Q.  I understand.
14     A.  So that is correct.
15     Q.  Okay.  So Padar, Sergeant Padar hands
16  you a form, I think you said?
17     A.  No.
18     Q.  I'm sorry.
19     A.  Okay.  He hands me back --
20     Q.  Right.
21     A.  I completed a file, submitted it, gave
22  it to Padar, who submitted it to Commander
23  O'Grady.  Commander O'Grady then signed off on
24  it.

Page 88

1     Q.  Okay.  Just to stop you.  The
2  information you're testifying to is based on
3  what Sergeant Padar told you in the parking lot,
4  correct?
5     A.  Correct.
6     Q.  Okay.  So did he tell you that
7  Commander O'Grady had signed off on it?
8     A.  He handed me back the file and I looked
9  at it and saw that it was signed off.
10     Q.  Okay.
11     A.  And then he said that there was a
12  yellow Post-it on it for him to go see Commander
13  O'Grady.
14     Q.  Okay.  So when you saw the form, it had
15  been signed by Commander O'Grady?
16     A.  Yes.
17     Q.  And there was a yellow Post-it on it
18  telling Sergeant Padar to see Commander O'Grady
19  about this?
20     A.  Yes.
21     Q.  Okay.
22     A.  It was -- the Post-it was on the
23  outside envelope of the packet.  It was multiple
24  forms.

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
89–92

Page 89

1    Q.  Okay.  Did Sergeant Padar say anything
2   else to you in that conversation --
3    A.  Yes.
4    Q.  -- in the parking lot?
5    A.  Yes.
6    Q.  What else did he tell you?
7    A.  He said -- when I went in there,
8   Commander O'Grady said to me, he said, I will
9   not approve this with these two IAD rats
10  Spalding and Echeverria on here.  If you want to
11  remove their names, I will approve the informant
12  for Hernandez only.  Furthermore, you are no
13  longer to ever work with them.  I don't want
14  them in this building, you never cross their
15  paths.  And if you are out there and they call a
16  10-1, which is a police emergency, you or any
17  member of this division is not to respond.
18       And I looked at him and I said, why in
19  the hell would a commander who never met me say
20  something like that.  He said, don't kill the
21  messenger, I have no idea.  So do you want to
22  remove your names.  And I said, no, and I took
23  the file back, which is now in possession of my
24  attorney.

Page 90

1    Q.  Okay.
2    A.  Okay.  And then I'm --
3    Q.  Are we still talking about with
4   Sergeant Padar, the conversation with you and
5   him in the parking lot?
6    A.  Yes.
7    Q.  Is your partner, Officer Echeverria,
8   there at this time also?
9    A.  Yes.  Along with another witness.
10   Q.  Okay.  Who else was there?
11   A.  Anthony Hernandez.
12   Q.  Okay.
13   A.  Because it was his search warrant.
14   Q.  Okay.  Was there anything else said in
15  that conversation by either Sergeant Padar or
16  you or Officer Hernandez or Officer Echeverria?
17   A.  Yes.
18   Q.  What else was said?
19   A.  I said, you mean to tell me if Danny
20  and I leave this parking lot and someone has
21  opened fire on us and shooting on us, you will
22  not respond?  Sergeant Padar said, I can't and I
23  won't.  I have my orders, I can't mess up my
24  job.  But someone on the zone will come, it just

Page 91

1   won't be anyone from Narcotics.
2       We took our file -- and he said, we
3   have the search warrant for 7:00 tomorrow
4   morning.  After that, I have my direct orders,
5   we are to part ways and our paths are never to
6   cross again per Commander O'Grady.
7    Q.  Okay.
8    A.  With that information --
9    Q.  Let me just stop you.
10       Other than what you've already
11  testified to, was there anything else said in
12  that conversation in the parking lot?
13   A.  I remember asking him, you know, why
14  Commander O'Grady would do this and why he
15  thought we were working with IAD.  And he said,
16  I'm not sure where his information came from,
17  I'm not privilege to that.  I just know that
18  that's what he said.
19   Q.  Okay.  So you don't know -- if
20  Commander O'Grady had learned that you were
21  working with IAD, you don't know how he learned
22  that or what the source of that information is,
23  correct?
24   A.  I do know.

Page 92

1    Q.  You know now?
2    A.  I do know now.
3    Q.  Okay.  What's your understanding of the
4   source of that information to Commander O'Grady?
5    A.  Once that incident occurred, my partner
6   Echeverria and I went to Juan Rivera and I was
7   absolutely mortified that my -- that somebody
8   may have knowledge of the investigation.  It was
9   clear Commander O'Grady had insider information
10  as to what we were doing, because he knew that
11  there was a confidential investigation into
12  other officers, okay.
13   Q.  Okay.
14   A.  So with that information, I asked Juan
15  Rivera, how in the hell would Commander O'Grady
16  have known this.  And he said, that may be my
17  fault.
18   Q.  Okay.
19   A.  And I asked Juan Rivera, what do you
20  mean, that may be your fault?  He said, I might
21  have fucked up.
22   Q.  Okay.
23   A.  He said, I went to Ernie Brown, the
24  then chief of Organized Crime, and told him you

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
93–96

Page 93

1 two were working on Operation Brass Tax and the
2 nature of the investigation.
3        And I asked Juan Rivera, why in the
4 hell would you do something like that when you
5 know there are connected relationships with him
6 and the targets of the investigation that is
7 jeopardizing our safety. He said, I did it with
8 the hopes that Ernie Brown would then put you in
9 place for the FBI Task Force. But instead, he
10 held a meeting and told everybody with his
11 commanding officers over there when he wasn't
12 supposed to do that.
13    Q. Okay. We'll come back to that, that
14 conversation with Rivera. But when you were
15 executing search warrants and doing work for
16 Sergeant Padar --
17    A. With Sergeant Padar.
18    Q. -- with Sergeant Padar, that was work
19 in the Narcotics unit, correct?
20    A. No.
21    Q. It was Narcotics work?
22    A. It was -- it was us providing, once
23 again, intelligence of narcotics activity --
24    Q. Okay.

Page 94

1    A. -- so that the Narcotics officers could
2 then go and --
3    Q. Sure.
4    A. -- execute the search warrants and
5 build up conspiracies, which we did not work
6 on.
7    Q. Okay.
8    A. We only worked on the information we
9 provided where our informant would be the
10 witness for the search warrant or something --
11    Q. Right.
12    A. -- and we were necessary to be involved
13 in.
14    Q. My point is you were spending some of
15 your time not on the Watts case but you were
16 spending it on things related to Narcotics
17 investigation, correct?
18       MR. SMITH: Objection to the form of
19 the question, vague and Narcotics is the work.
20 BY MR. KING:
21    Q. You're in the parking lot talking to
22 Padar and you're providing information, you
23 testified, about other Narcotics matters.
24       So I'm just asking you when you're

Page 95

1 doing that, you are assisting with Narcotics
2 cases other than the Watts case, correct?
3    A. On overtime, yes.
4    Q. Okay. And at the time, James O'Grady
5 was the commander of the Narcotics Division,
6 correct?
7    A. Yes.
8    Q. And at the time, Ernie Brown was the
9 chief over Organized Crime that included the
10 Narcotics Division, correct?
11    A. Correct.
12    Q. You testified that when Sergeant Padar
13 told you this information that Commander O'Grady
14 had allegedly said, you had never worked for
15 O'Grady previously, correct?
16    A. Correct.
17    Q. Did you know Commander O'Grady at all?
18    A. No.
19    Q. Okay. And I apologize for interrupting
20 you. Let's go back to the conversation that you
21 had with Juan Rivera once you learned that
22 Commander O'Grady was aware of your work, as you
23 allege, on Operation Brass Tax.
24       Sergeant -- or Chief Rivera indicates

Page 96

1 that he told Ernie Brown and you testified that
2 he had done it for a certain reason and instead
3 that Ernie Brown held a meeting. What did
4 Rivera tell you about the meeting that Ernie
5 Brown held?
6    A. He said that instead of keeping the
7 information confidential, it's apparent that he
8 opened his mouth to everyone of his -- you know,
9 at least the command staff, which then obviously
10 trickles down, because now Sergeant James Padar
11 knows about it, too.
12    Q. I just want to know what specifically
13 Rivera told you out of his mouth in this
14 meeting. What -- tell me about that
15 conversation, everything that you can recall.
16    A. Everything I just said.
17    Q. And was Officer Echeverria part of this
18 meeting, as well?
19    A. Yes. And it was in the -- it was not a
20 meeting in a room where we were sitting down.
21    Q. Sure.
22    A. It was a conversation in the hallway
23 outside of his office.
24    Q. Okay.

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
97—100

Page 97

1    A.   And yes, Officer Echeverria was there.
2  I was very upset.  I even -- I said, I wanted to
3  be removed from the investigation, that I didn't
4  feel safe, my identity had been compromised.
5  And these people all have access to where I
6  live, my daughter.  And the crimes alleged
7  against these members that we're investigating,
8  are very serious allegations.  And I did not
9  feel safe at all.  And he -- he violated
10  every -- everything that I was told would never
11  happen.
12    Q.   All right.  I'm going to move to strike
13  the answer.  My question -- and I do apologize
14  for interrupting you when you started talking
15  about the conversation.
16        But I'm going to ask you to start from
17  the beginning.  You and Officer Echeverria are
18  in the hallway and you have a conversation with
19  Juan Rivera where he tells you about the fact
20  that he had disclosed it to Ernie Brown.
21    A.   Correct.
22    Q.   Tell me everything you recall you
23  saying --
24    A.   Okay.

Page 98

1    Q.   -- Officer Echeverria saying --
2    A.   Okay.
3    Q.   -- or Juan Rivera saying in that
4  hallway conversation.
5    A.   I said -- I informed Chief Juan
6  Rivera -- I wanted to know --
7    Q.   Take your time.
8    A.   -- how the hell Commander O'Grady knew
9  to the point that a sergeant would tell me that
10  he would go the other way if I was being shot at
11  and that they would not respond.
12        And this is a man I have never met.
13  How the hell did O'Grady find out to the point
14  that you put my life and my partner's life in
15  jeopardy.  And Chief Rivera said -- and Chief
16  Rivera said --
17    Q.   Take your time.
18    A.   -- that may be my fault, I might have
19  fucked up.
20    Q.   Okay.
21    A.   And I'm quoting, so I apologize.
22    Q.   Sure.
23    A.   I went to Ernie Brown and I told him
24  that the two of you were working on Operation

Page 99

1  Brass Tax and the nature of the investigation,
2  but I did it in hopes that he would then put you
3  on an FBI Task Force.  And I told Juan Rivera,
4  why would you tell someone that has
5  relationships with the targets of the
6  investigation?  It could compromise the
7  investigation.  It definitely compromised our
8  safety.  It's supposed to be a confidential
9  investigation.  It doesn't make any sense is
10  what I'm telling him.
11    Q.   Okay.
12    A.   That you're the chief and you would
13  tell this person.  I don't feel safe anymore.  I
14  want to be removed from the investigation.  He
15  said, you can't.  This is an important
16  investigation.  You have to stay on it.  Hang in
17  there.  Hang in there.  Hang in there when I
18  have people telling me that I could be shot and
19  they're not going to help me in the street.
20        And he said that Ernie Brown was
21  supposed to keep that information confidential,
22  but instead he had a meeting with then Deputy
23  Chief Nick Roti and Commander O'Grady and
24  obviously his command staff.  I don't know

Page 100

1  everybody.
2    Q.   Did he tell -- who did he tell you, who
3  did Rivera tell you that the meeting Brown
4  allegedly had with?  Did he --
5    A.   He only named who was then deputy chief
6  was Nick Roti, Nick Roti.  I'm sorry.  Nicholas
7  Roti, if I'm saying that name correct, and then
8  Commander O'Grady.
9    Q.   Okay.
10    A.   And then he told me that I had to stay
11  on this investigation.
12    Q.   Other than him telling you that Ernie
13  Brown had had a meeting with Nick Roti and
14  O'Grady, did he tell you anything else about it?
15    A.   That he was supposed to keep his F-ing
16  mouth shut.
17    Q.   Okay.
18    A.   He wasn't supposed to do that.
19    Q.   And it was your understanding that Juan
20  Rivera was not in this meeting that Ernie Brown
21  allegedly had with Roti and O'Grady, correct?
22    A.   I didn't perceive that he was in the
23  meeting.
24    Q.   Okay.

SHANNON MARIE SPALDING                    November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO          101–104

Page 101

1    A.  But I was not there and I don't know
2  who was there.
3    Q.  Right, right.
4      So other than what you've already
5  testified to, do you recall anything else that
6  you, Officer Echeverria or Juan Rivera said in
7  this hallway conversation?
8    A.  That we were just to continue working
9  on Operation Brass Tax, lay low, stay off the
10  radar, do not go around, you know, Narcotics and
11  all that.  He said -- we obviously can't work
12  with them anymore.  But just don't -- steer
13  clear of Narcotics, stay away from them for your
14  own safety.  You know, fly under the radar, lay
15  low.  You report directly to me, you tell me,
16  you know, what you guys are doing and fly under
17  the radar, unseen, unheard for your own safety.
18    Q.  Okay.  Do you recall anything else
19  being said?
20    A.  I really -- you know, other than me
21  saying several times that I wanted off of this
22  and being told to hang in there.
23    Q.  Do you recall if Officer Echeverria
24  said he wanted off of this?

Page 102

1    A.  I know he did.
2    Q.  Do you recall if he said that in the
3  meeting?
4    A.  I don't know.
5    Q.  Okay.
6    A.  I'm not sure at this point.
7    Q.  Okay.  And after that conversation with
8  Juan Rivera, did you, in fact, stop working on
9  any Narcotics cases?
10    A.  Yes.  We had no choice.
11    Q.  My question is --
12    A.  We stopped.
13    Q.  -- after the conversation, did you stop
14  working on any Narcotics cases?
15    A.  With --
16    Q.  Other than the Watts investigation.
17    A.  Watts investigation is a Narcotics.
18  Other than the -- other than the Watts
19  investigation.  Do you mean FBI-wise or do you
20  mean CPD-wise?
21    Q.  I mean CPD-wise.
22    A.  Yes, we stopped.
23    Q.  Okay.
24      MR. SMITH:  Is this an okay time to

Page 103

1  take a break?
2      MR. KING:  Absolutely.
3      (Whereupon, a discussion was had
4      off the record.)
5      (Whereupon, Spalding Deposition
6      Exhibit No. 2 was marked for
7      identification.)
8  BY MR. KING:
9    Q.  Officer Spalding, I'm showing you
10  another document that's been marked as Spalding
11  Deposition Exhibit No. 2.  And I would ask you
12  to take a look at this document and let me know
13  if you've ever seen this before.
14    A.  This is part of -- yes.  The answer is
15  yes.
16    Q.  Okay.
17    A.  This is part of the informant packet
18  that I and my partner Officer Echeverria
19  submitted to have our informant approved --
20    Q.  All right.
21    A.  -- registered with the Chicago Police
22  Department to Sergeant Jay Padar who in turn
23  turned it into Commander O'Grady.
24    Q.  Okay.  And you say this is part of the

Page 104

1  packet, correct?
2    A.  No, I don't know if -- yes, it is part
3  of the packet.
4    Q.  Okay.  And if you look on Page 1 of
5  this document, does it appear to be signed by
6  Commander O'Grady?
7    A.  Yes.
8    Q.  Okay.  Where do you see Commander
9  O'Grady's signature?
10    A.  Isn't that the second one?  Am I
11  mistaken?
12    Q.  On the right side of the page under
13  Jay Padar, you believe that's Commander
14  O'Grady's signature; is that correct?
15    A.  I thought it was.
16    Q.  Okay.
17    A.  It's not?
18    Q.  Other than --
19    A.  I can't read it.
20    Q.  Okay.  That's fine.
21    A.  I thought it was Commander O'Grady's.
22    Q.  Other than not having the yellow
23  Post-it note on Exhibit 2 that you testified to
24  before, does this look like -- is this the

SHANNON MARIE SPALDING                    November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO          105–108

Page 105

1  document that you were testifying about
2  previously?
3      A.  This is part of it, yes.
4      Q.  Turning your attention back to
5  Exhibit 1 of the Amendment Complaint.
6      A.  I'm sorry, where are we?
7      Q.  The Amended Complaint.  And we'll look
8  at Paragraphs 34 and 35 deal with -- well, take
9  a look at 34 and 35.  And my question is the
10  basis for the information alleged in -- let me
11  strike that.  Let's just direct your attention
12  to Paragraph 35.
13      And my question is the basis for what's
14  alleged in Paragraph 35 is what Jay Padar told
15  you in the parking lot what you've already
16  testified to, correct?
17      A.  Correct.
18      Q.  Okay.
19      MR. SMITH:  I object --
20  BY MR. KING:
21      Q.  And directing your attention to
22  Paragraph 36, you allege that by interfering
23  with your ability to develop Narcotics cases in
24  the unit, Defendant O'Grady intentionally

Page 106

1  prohibited Plaintiffs from earning overtime.
2  And that's based on your prior testimony that
3  Jay Padar was allowing you to work overtime on
4  some Narcotics cases, correct?
5      A.  Correct.
6      Q.  Okay.  And do you happen to know how
7  much you made in overtime in 2008?
8      A.  Not much.  It was stopped.
9      Q.  Okay.
10      A.  I have no idea the amount to be honest
11  with you.
12      Q.  Okay.  How about let's say 2007, 2006,
13  any of those years, do you know the amount of
14  overtime you earned?
15      A.  I have no idea.
16      Q.  Okay.  How about 2009 or 2010, do you
17  know the amount of overtime you earned?
18      A.  No, I don't even know the amount.  But
19  2010 was much more than the rest of them, I
20  believe.
21      Q.  You believe?
22      A.  Or maybe it was 2011.  The VRI program.
23  I don't know.
24      Q.  Okay.

Page 107

1      A.  I have no idea.
2      Q.  Okay.  As you sit here, you don't have
3  any idea how much you earned in overtime in any
4  of the years between 2006 and 2014; is that fair
5  to say?
6      A.  That's fair to say.
7      Q.  Okay.  Now, directing your attention to
8  Paragraph 38 of the Amended Complaint.  What's
9  the basis of your allegation in Paragraph 38
10  that, on one or more dates, multiple Defendants
11  discussed the handling or treatment of
12  Plaintiffs.  At one such meeting, Plaintiffs'
13  possible reassignment was discussed.  In
14  response, Defendant O'Grady referred to
15  Plaintiffs as rats and stated he did not want
16  Plaintiffs working in his unit.
17      Is that also based on what Jay Padar
18  told you in that conversation in the parking
19  lot?
20      A.  No.
21      Q.  Okay.  What's the basis for that
22  allegation in Paragraph 38?
23      A.  The basis is -- you're going to ask me
24  for the date and I can't tell you the date.

Page 108

1      Q.  So you're about to tell me about a
2  meeting that you believe occurred?
3      A.  That I know occurred.
4      Q.  Okay.  Were you in the meeting?
5      A.  No, I was not.
6      Q.  So you're going to tell me about a
7  meeting you believe occurred, correct?
8      A.  I'm going to tell you about a meeting
9  Juan Rivera informed me of that occurred.
10      Q.  Okay.  Do you know what year that
11  meeting was?
12      A.  It was right at the time -- the day
13  before we were reassigned from 543 to the
14  academy.  Is that Unit 041?  The police academy.
15      Q.  Okay.
16      A.  So the day before that.
17      Q.  Okay.  Juan Rivera told you about a
18  meeting the day before that or he told you the
19  meeting happened the day before?
20      A.  The meeting occurred the day before.
21      Q.  Okay.  So when did Juan Rivera tell
22  you about the meeting, the same day or was it
23  later?
24      A.  It was -- it was the next day, I

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
109–112

Page 109

1  believe.  It was within a couple of days of the
2  meeting.
3      Q.  Okay.
4      A.  The day of, the day after.
5      Q.  Okay.
6      A.  Shortly after the meeting occurred.
7      Q.  Okay.  And what did Ron -- Juan Rivera
8  tell you about this meeting?
9      A.  Juan Rivera stated that in the meeting
10  when we were being reassigned from 543, removed
11  from the Brass Tax investigation, that a meeting
12  was called and present in the meeting was
13  Beatrice Cuello, James Jackson, Nick Roti or
14  Roti.  I'm sorry, Nick Roti, James O'Grady,
15  Juan Rivera, and I don't recall if he mentioned
16  anyone else or not.
17      Q.  I thought you previously testified that
18  Juan Rivera was not in this meeting.
19      MR. SMITH:  Objection, it assumes it's
20  the same meeting.
21      THE WITNESS:  That's not the same
22  meeting.  This is the meeting on -- are you
23  talk -- this is not the Ernie Brown meeting.
24  BY MR. KING:

Page 110

1      Q.  Right.  I'm talking about the -- at one
2  such meeting, as you allege in Paragraph 38,
3  that's the meeting we're talking about now,
4  correct?
5      A.  Yeah.
6      Q.  Okay.
7      A.  It's -- I believe -- I believe 38 is
8  referencing a meeting that happened in regards
9  to us being removed from Operation Brass Tax, at
10  which point Beatrice Cuello wanted us returned
11  to Unit 189.
12      Q.  And you found out about the content of
13  this meeting from Juan Rivera, correct?
14      A.  That is correct.
15      Q.  Tell me everything you recall -- strike
16  that.
17      Did Juan Rivera tell you about this
18  meeting in person or in a telephone call?
19      A.  In person.
20      Q.  And was Officer Echeverria also there?
21      A.  Yes.
22      Q.  Was anyone else present?
23      A.  No.
24      Q.  Okay.  And tell me what Juan Rivera

Page 111

1  said, what you said, what Officer Echeverria
2  said in that conversation.
3      A.  I believe that 38 is referring to the
4  meeting that occurred the day before we were
5  removed from Operation Brass Tax.  So if, in
6  fact, that is the one that we're referencing, he
7  stated shortly after, within the next day or so,
8  that in that meeting -- the individuals that I
9  named -- do you want me to repeat them?  No,
10  you're good?  Beatrice Cuello, okay.
11      Beatrice Cuello wanted us removed from
12  543.  And usually you return to your unit of
13  assignment and she was requesting that we go
14  back to work for O'Grady and Nick Roti.  At
15  which point Juan Rivera stated that O'Grady said
16  in the meeting that I'm not taking those F-ing
17  IAD rats back; and furthermore, God help them if
18  they need help on the street, he's not -- it's
19  not going to come.  She's going to -- I'll
20  bounce her to the 3rd District on midnights and
21  him, I don't remember if it was the 14th or 13th
22  District on midnights.  We're not taking --
23  under no circumstances are they coming back
24  here.  And then --

Page 112

1      Q.  You mentioned in your description of
2  the meeting, you made a comment that normally
3  you'd go back to your unit, that -- that's your
4  understanding.  You weren't relating what Chief
5  Rivera told you about the meeting, correct?
6      A.  No, no.  He said, normally you would
7  just go back, but they don't want you back.
8      Q.  Okay.
9      A.  They're not going to take you back
10  because --
11      Q.  I understand.  Chief Rivera told you
12  that?
13      A.  Yes.
14      Q.  So Paragraphs 38 and 39 are both what
15  was -- Paragraph 39 is part of what was said in
16  the meeting, correct?
17      A.  I didn't even read that far.  But yes.
18      Q.  What else -- other than what you've
19  testified to, what else did Juan Rivera tell you
20  was said in the meeting?
21      A.  He said that not only did -- not only
22  did they not want to take us back because we
23  assisted on a confidential investigation against
24  other officers, but he'd like to see us fired,

SHANNON MARIE SPALDING                          November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO              113–116

Page 113

1    that our careers were over.
2        Q.   Rivera said -- who said that they'd
3    like to see you fired?
4        A.   O'Grady.
5        Q.   Okay.
6        A.   And then --
7        Q.   Do you recall anything else that Rivera
8    said in the meeting?
9        A.   Yes.  At this time, Nick Roti is now
10   the chief and Ernie Brown is no longer the
11   chief.
12       Q.   Chief of Organized Crime?
13       A.   Of Organized Crime, correct.  And that
14   we would never, ever work in Organized Crime
15   again or any task force or anything.  It will
16   never happen.
17       Q.   Did Rivera tell you that or did Rivera
18   say that someone said that in the meeting?
19       A.   Rivera said that Nick -- Chief Nick
20   Roti said that.  And he said, that's a big
21   problem because if you are to go to any task
22   force after this, Nick Roti is the one who has
23   to sign off on it.  But because you assisted --
24       Q.   I understand.  I'm just asking you

Page 114

1    about what Rivera said to you.
2        A.   Rivera is telling me this.  But because
3    you guys assisted with this, they don't want you
4    in their unit.
5        Q.   Okay.
6        A.   Juan Rivera also said that it's
7    really -- your careers are over.
8        Q.   Rivera said that, he didn't -- someone
9    said that in the meeting?
10       A.   No.  Rivera was -- it was Rivera's
11   opinion that our careers were over.
12       Q.   Okay.  Do you recall anything else that
13   was said in the meeting with you, Officer
14   Echeverria and Juan Rivera?
15       A.   Yes.  I recall that he said that his
16   hands were tied because Nick Roti is in bed with
17   the superintendent, that's his drinking buddy.
18   And whatever he says, Gary McCarthy -- no, that
19   was a different time.  I'm sorry.  That was a
20   later time.  Please disregard that, because this
21   is later.  It wasn't that time.  This time was
22   just about the meeting from 543.
23       Q.   Right.
24       A.   No, he said that he was limited in how

Page 115

1    he could help us and that our careers were over.
2        Q.   Okay.
3        A.   That was it, basically.
4        Q.   Okay.  And you don't recall anything
5    else being said?
6        A.   Not.
7        Q.   You don't have to.
8        A.   Not at this time.
9        Q.   Okay.
10       A.   I don't -- I don't know if I will
11   later, but I don't now right at this moment.
12       Q.   Did Rivera tell you at that point that
13   the two of you were going to be sent back to
14   patrol, meaning you and Officer Echeverria?
15       A.   Earlier that day, that same day on
16   the -- we heard when we reported to the
17   academy -- no.  To answer your question, at that
18   moment in time in that same conversation, no.
19       Q.   Okay.  Let's -- I think this is going
20   to get to what you are going to testify about.
21   If you look at Paragraph 45 of the Amended
22   Complaint, you allege that Chief Kirby caused
23   the two of you to be removed from your detail in
24   543 Detached Services.

Page 116

1        Can you explain the basis of that
2    allegation, why you believe Defendant Kirby
3    caused you to be removed?
4        A.   Yes.  On that date in question, which
5    was late May of 2011, the person that we were to
6    report to in 543 was Lieutenant Liz Glatz.  She
7    went on furlough and was in Ireland.  She was
8    the only person within the unit that knew what
9    our true assignment was.
10       Q.   Okay.
11       A.   Okay.  I don't know --
12       Q.   To the best of your knowledge, she was
13   the only person in the Detached Services who
14   knew what your true assignment was?
15       A.   To the best of my knowledge.
16       Q.   Okay.
17       A.   Okay.  So on the date in question, the
18   acting commanding officer in her place while she
19   is gone is a Sergeant Jill Stevens.
20       Q.   Okay.
21       A.   She calls my partner Echeverria and
22   states that --
23       Q.   And just to stop you for a moment.
24   This was a conversation between Jill Stevens --

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014

117–120

Page 117

1    A.   And Echeverria.
2    Q.   -- and Echeverria?  You were not part
3  of the conversation?
4    A.   I was not part of it.  She called him
5  on the phone.
6    Q.   And what's your understanding of what
7  was said in that conversation?
8    A.   What my understanding was is that Jill
9  Stevens related to Officer Echeverria that she
10  needed a specific form and she gave the name of
11  the form, I don't recall what the name was,
12  completed -- completed listing what our exact
13  assignment was, the nature of our investigation,
14  who we reported directly to.  And Danny related
15  back -- Officer Echeverria related back to
16  Sergeant Jill Stevens that he would call her
17  back.
18    Q.   Go ahead.
19    A.   Do you know the form I'm talking about?
20    Q.   Go ahead.  I do.
21    A.   That she --
22    Q.   Okay.  So is it your testimony that
23  your understanding is that after Jill Stevens
24  requested whatever she requested, did --

Page 118

1  Echeverria was -- the only thing he said is that
2  he'd called her back or did he say something
3  else?
4    A.   He said, can I call you back with that
5  information.  I don't know if she was asking if
6  the form had been completed or informing him it
7  needed to be completed or asking him to get the
8  form completed by the supervisor.  I do know
9  that she was told that he would call her back
10  and she was okay with that.
11    Q.   Okay.
12    A.   Is my understanding.
13    Q.   It's based on what Officer Echeverria
14  has told you?
15    A.   Yes.
16    Q.   Okay.  Based on that understanding, you
17  would agree that Sergeant Stevens asked for
18  certain information in that phone call and
19  Officer Echeverria did not provide that
20  information in that phone call?
21    A.   He told her he did not have that
22  information but he would get that information
23  for her and call her back.
24        MR. KING:  Okay.  Could you read my

Page 119

1  question back?
2        (Whereupon, the record was read
3              as requested.)
4  BY MR. KING:
5    Q.   Is that correct?
6    A.   He was unable to provide the
7  information she requested.  So no, he did not
8  provide it.
9    Q.   Okay.  Well, he knew information about
10  what he was working on and who he was working
11  with, he certainly knew information about the
12  assignment.  Your understanding is that he did
13  not provide that to Sergeant Stevens, correct?
14    A.   She did not request that.  She
15  requested that form be completed with the
16  information.
17    Q.   Okay.  And what happened next that
18  leads to your allegation in Paragraph 45 that
19  Debra Kirby caused you to be removed from
20  Detached Services?
21    A.   What happens next is Danny immediately
22  calls Chief Juan Rivera and states, Jill Stevens
23  is requesting this information on a form that I
24  am unfamiliar with.  How do you want us to

Page 120

1  proceed with this?
2    Q.   Yes.
3    A.   Chief Juan Rivera instructed, gave
4  Officer Echeverria a direct order and said,
5  under no circumstances are you to tell Jill
6  Stevens that you received this information from
7  me because you will jeopardize, which was
8  ironic, the confidentiality of the
9  investigation, which --
10    Q.   Now, let me just stop you and ask you.
11  You said Officer Echeverria calls Juan Rivera --
12    A.   That is correct.
13    Q.   -- and Rivera tells him some things.
14  Are you part of that conversation or no?
15    A.   I am relating what Officer Echeverria
16  stated to me.
17    Q.   Okay.
18    A.   I was not part of the conversation.
19    Q.   Okay.  So what else did Officer
20  Echeverria tell you about that conversation with
21  Juan Rivera?
22    A.   He stated that Juan Rivera said, I want
23  you to tell her the forms are already taken care
24  of on your behalf and that under no

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
121–124

Page 121

1  circumstances are you to tell her that you spoke
2  with me. Because then she will know that you
3  are working with IAD and it will be confirmed.
4  You are to tell her the forms are completed.
5  And should she have any questions, she -- she
6  would need to contact Debra Kirby, who will
7  provide any answers to questions she has.
8      Q.  Okay.
9      A.  Officer Echeverria said okay, and
10  followed his instructions.
11      Q.  Okay. So it's your understanding that
12  Officer Echeverria then calls Jill Stevens back,
13  is that correct?
14      A.  That is correct.
15      Q.  And you're also not part of that
16  conversation?
17      A.  No, sir, I am not.
18      Q.  And you learned from Officer Echeverria
19  what's said in that conversation between himself
20  and Jill Stevens?
21      A.  That's correct.
22      Q.  And what does Officer Echeverria tell
23  you about what was said in that conversation
24  with Jill Stevens?

Page 122

1      A.  He states that when he called Officer
2  Stevens back, he said words to the effect of,
3  please don't take this as any disrespect, but I
4  was told to tell you that -- by my chief that
5  those forms are completed on our behalf and that
6  should you have any further questions, you would
7  need to contact -- or need further information,
8  that your source of information should come
9  directly from Debra Kirby and that you should
10  contact her and she should be able to answer any
11  questions that you have.
12          Jill Stevens then said, what chief was
13  that. And Danny again said, I apologize, you
14  know, but I cannot give you that information, I
15  am not at liberty to say. And she said, so
16  you're telling me you are refusing to answer my
17  question. Officer Echeverria said, it's not
18  that I'm refusing, I've been given a direct
19  order not to disclose that information. Words
20  to that effect.
21      Q.  Okay.
22      A.  At which time Jill Stevens says, well,
23  then I will let her, referring to Beatrice
24  Cuello, know. She said I will let her --

Page 123

1      Q.  Did she say her or did she say Beatrice
2  Cuello?
3      A.  She said, I will let her -- I believe
4  she said, I will let her. Because in the
5  initial conversation, she had stated that per
6  Beatrice Cuello, these forms needed to be
7  completed.
8      Q.  Okay. So to the best of your
9  knowledge, it was Echeverria's understanding
10  that Beatrice Cuello had asked Jill Stevens to
11  call him and request this information; is that
12  correct?
13      A.  Yes, yes.
14      Q.  Okay.
15      A.  So when --
16      Q.  And do you know -- do you have any
17  knowledge of the circumstances as to why
18  Beatrice Cuello would have called and asked
19  Jill Stevens to contact Officer Echeverria and
20  get information about his assignment?
21      A.  We have information -- I have
22  information as to why and then further
23  information later as to why.
24          But the information immediately stated

Page 124

1  by Jill Stevens is that the interim
2  superintendent would be leaving and the new
3  superintendent would be coming in and they
4  needed to have these forms completed.
5      Q.  Okay. And to your understanding, was
6  that said in the first conversation --
7      A.  Yes.
8      Q.  -- between Officer Echeverria and Jill
9  Stevens?
10      A.  Yes.
11      Q.  Okay. So he understood that she was
12  calling at the direction of Beatrice Cuello to
13  get some information that the new superintendent
14  needed, correct?
15      A.  To the best of my knowledge, that is
16  correct.
17      Q.  Okay. And now going back to the last
18  conversation you testified about, that Officer
19  Echeverria had with Jill Stevens or the second
20  conversation. Other than what you've already
21  testified to, are you aware of anything else
22  that was said in that conversation?
23      A.  She said, well, then I will let her
24  know that you are refusing to provide the

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
125–128

Page 125

1  information and hung up on him.
2      Q.  Okay.  And what, if anything, happened
3  next that leads you to allege that Debra Kirby
4  caused you to be removed from Detached
5  Services?
6      A.  Multiple things happened that led me to
7  believe that.  One, I received a call, I
8  personally received a call from Sergeant Tom
9  Chester shortly after this saying, what the hell
10  is going on, what happened with Jill Stevens.  I
11  relayed the same information to him that we just
12  discussed.
13      Q.  Yes.
14      A.  Do I need to repeat it?
15      Q.  No.
16      A.  Okay.  At which point he said, Juan
17  Rivera had absolutely no right to put Officer
18  Echeverria in that position.  He should have
19  made that call to Debra Kirby himself and had
20  Kirby call.  He said, they're in an uproar,
21  they're trying to throw you out of 543 over
22  this.  He said, and I've got to get ahold of
23  Juan Rivera, Juan to straighten this out.
24      Q.  Okay.

Page 126

1      A.  He said, you should have never been put
2  in that position, never.
3      Q.  Okay.
4      A.  Okay.
5      Q.  Do you recall anything else being said
6  in that conversation with you and Tom Chester?
7      A.  I don't know if it was that first
8  conversation, because I talked to him twice that
9  day or the next conversation.
10      Q.  Let's stick with the first one.  Other
11  than what you just testified to, can you recall
12  anything else said in the first conversation?
13      A.  I know that he said he was going to
14  call Chief Rivera to try to straighten this out,
15  that this was a big mess, that Beatrice Cuello
16  was very upset.
17          And, again, I don't -- I don't know if
18  in this first conversation he stated that
19  Beatrice Cuello did call Debra Kirby and she
20  denied having any knowledge of this
21  investigation or that was a conversation --
22  because I was just hit with a ton of bricks.
23      Q.  I understand.
24      A.  And so I'm not -- you know, everything

Page 127

1  is unravelling at a fast face.
2      Q.  Right.
3      A.  So I -- you know, a lot of calls are
4  going on, so I don't know if it's this one or
5  the next one.
6      Q.  Do you believe you had two
7  conversations that -- with Tom Chester about
8  this subject?
9      A.  I don't know if they were on the same
10  day or the next day.
11      Q.  Okay.
12      A.  But I had multiple conversation with
13  him about this.
14      Q.  And it's your testimony that in one of
15  those conversations, Tom Chester told you what
16  about Debra Kirby?
17      A.  Tom -- in one of the conversations with
18  Tom Chester, he told me that Debra Kirby had
19  called and -- I mean, that Debra Kirby had been
20  contacted and denied having knowledge, I was
21  also informed by Juan Rivera of the same
22  information.
23      Q.  Juan Rivera told you that Debbie -- Deb
24  Kirby had been contacted and denied

Page 128

1  knowledge of your involvement in Operation Brass
2  Tax, is that your testimony?
3      A.  That's a polite way to put what he
4  said.
5      Q.  Tell me what he said.
6      A.  Are you sure you want me to quote him?
7      Q.  Yeah.  Well, before you do that.  In
8  the multiple conversations you had with
9  Tom Chester on this subject, other than what
10  you've already testified, can you recall
11  anything else that was said between you and Tom
12  Chester?
13      A.  In the immediately -- following the
14  events of Jill Stevens, not immediately
15  afterward, no.
16      Q.  Okay.  Did you, around the same time
17  you were having these conversations with
18  Tom Chester, have a conversation with Juan
19  Rivera about this subject?
20      A.  We had -- at the same time I had
21  immediately tried to call Juan Rivera, and he
22  was not picking the phone up.
23      Q.  Okay.  Did you eventually speak with
24  him?

SHANNON MARIE SPALDING                                    November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                       129–132

Page 129

1    A.  Yes.  The next -- early the next
2   morning.
3    Q.  Okay.  And was that a telephone
4   conversation?
5    A.  The first time, yes; the next time in
6   person.
7    Q.  Was the telephone conversation just
8   between you and Juan Rivera?
9    A.  It was between -- one conversation was
10  between Danny, but we passed the phone back and
11  forth.
12   Q.  Okay.
13   A.  So it was the same conversation --
14   Q.  Okay.
15   A.  -- with me and I don't know if it was
16  from -- Danny called him or I called him, but we
17  both spoke on the phone.
18   Q.  Sure.  There was one telephone
19  conversation, you both spoke at times on the
20  phone and then you had a meeting with Rivera
21  about it; is that correct?
22   A.  The same day.  We were at the academy
23  that day in the morning and we -- yes.
24   Q.  Tell me about the telephone

Page 130

1   conversation that day you had with Juan Rivera.
2   What do you recall you saying to him or him
3   saying to you in the phone conversation.
4    A.  Well, when I -- are you talking about
5   the day I tried to call him -- okay.
6    Q.  You told me that the day you were
7   talking to Tom Chester --
8    A.  Yeah, he didn't pick up.  So then --
9    Q.  -- he didn't pick up, you spoke to him
10  on the phone the following morning.
11   A.  Okay, the next morning.
12   Q.  I'm asking you about that telephone
13  conversation that morning.
14   A.  That morning -- okay.  So I informed
15  him that we were at the academy, the night
16  before we had received a call, I received a
17  message that's from James Jackson that said,
18  this is Deputy Superintendent Jimmy Jackson.
19   Q.  You received a voicemail message?
20   A.  A voicemail message.
21   Q.  Okay.  Tell me about what was left on
22  the voicemail.
23   A.  Okay.  I received a voicemail message
24  from Deputy Superintendent, I believe was his

Page 131

1   title, Jimmy Jackson.  He said, Officer
2   Spalding, this is Deputy Superintendent Jimmy
3   Jackson with the Chicago Police Department,
4   effective immediately today, you are no longer
5   assigned to the FBI and you are being reassigned
6   to Chicago Police Department.  You are to report
7   at 0700 to Beatrice Cuello at Unit 543 in
8   uniform effective tomorrow morning.
9    Q.  Okay.
10   A.  The next morning --
11   Q.  Did the message say you were no longer
12  assigned to the FBI --
13   A.  Correct.
14   Q.  -- or no longer assigned to Detached
15  Services?
16   A.  You are no longer assigned to the FBI.
17   Q.  Do you still have that voicemail
18  message?
19   A.  I may.
20   Q.  Okay.
21   A.  I may.
22   Q.  I ask you and your counsel not to
23  delete it to the extent it can be transcribed, I
24  think that's called for in the request for

Page 132

1   produce in the case.  But you can go back and
2   check if you have any.
3    A.  I certainly will.
4    Q.  Okay.  So then the following morning,
5   do you have the phone conversation with Rivera
6   before you report to the police academy?
7    A.  While I guess upon arrival of the
8   police academy.  Because on the way there, we
9   then received a call from the secretary of
10  Beatrice Cuello that said, do not report here at
11  0700, you and your partner are going to go to a
12  one-day retraining to transition back in or
13  whatever she said.  A one-day training at the
14  academy, so report to the academy at 0800 and
15  then -- for a one-day training.
16   Q.  Do you know that secretary's name?
17   A.  I can't think of it right now, but I do
18  know her name.
19   Q.  Did you speak with her or did she also
20  leave you a voicemail message?
21   A.  I spoke with her.
22   Q.  And to the best of your recollection,
23  she said a one-day training?
24   A.  She said, per Deputy Chief Cuello --

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
133–136

Page 133

1    Q.   Okay.
2    A.   -- you are not to report here today at
3  0700, but rather you will be going to a one-day
4  training session at the academy starting 0800,
5  so just go straight there.
6    Q.   Okay.  And at that point, you had not
7  yet talked to Juan Rivera?
8    A.   No.
9    Q.   Okay.  And do you talk to Juan Rivera
10  before you get to the academy?
11    A.   I talked to him -- I briefly walked
12  into the academy and there was no training
13  schedule for the day, at which point we walked
14  outside and called Juan Rivera.
15    Q.   Okay.
16    A.   I was talking to him and --
17    Q.   Okay.  Tell me your best recollection
18  of everything that was said in that conversation
19  with Juan Rivera.
20    A.   I know I said that -- or we were down
21  at the academy, that we had received a message
22  from Jimmy Jackson to report down there and that
23  we were no longer assigned to 543.  And he
24  didn't seem to know what I was speaking about.

Page 134

1  I know that Danny had a much lengthier
2  conversation with him --
3    Q.   Okay.
4    A.   -- in my presence.  I was there.  I was
5  not the one on the phone.
6    Q.   But initially you were the one on the
7  phone with him?
8    A.   Yeah, initially I was.  I had talked --
9    Q.   When you reported those circumstances,
10  Juan Rivera did not seem to be aware of them,
11  correct?
12    A.   No, no.
13    Q.   That's correct?
14    A.   That's correct.
15    Q.   Okay.
16    A.   To the best of my recollection.
17    Q.   Sure.
18    A.   But then I believe his name was
19  Lieutenant Pigott was coming out of the academy.
20  And aggressively like and he was saying -- Danny
21  was then on the phone with Juan.
22    Q.   Right.
23    A.   And he was saying, are you Spalding and
24  Echeverria, and I said, yeah.  He said, you know

Page 135

1  you're not fucking here for a one-day training.
2  You know what the fuck you did, you fucked up.
3  And that's when I'm no longer on the phone.
4  He's screaming at us.  And Danny is still
5  continuing on the phone.
6    Q.   And what's this individual's name,
7  Tom --
8    A.   Lieutenant Pigott, Pigott or something
9  like --
10    Q.   Okay.
11    A.   I don't -- my interaction with him was
12  very brief.
13    Q.   Okay.  Before we get to Lieutenant
14  Pigott, while you have the receiver and you're
15  on the phone with Juan Rivera, do you recall
16  anything else discussed?
17    A.   No.
18    Q.   Okay.
19    A.   I was briefed and then the lieutenant
20  came out and Danny was --
21    Q.   And what are you alleging that
22  Lieutenant Pigott said to you?
23    A.   He stated, are you Spalding and
24  Echeverria, and I said, yes.  And he said, you

Page 136

1  know damn -- you know damn well you're not here
2  for a one-day training, you know what you did
3  and you fucked up.  And he said, you're not --
4  you, and he points at me, you're going to 3 on
5  midnights and Echeverria is going to, I don't
6  remember, I think it was 13 on midnights or
7  something like that.
8    Q.   Sure, sure.
9    A.   And he said and -- he said and you knew
10  that, you were informed of this.  And I said, we
11  did not know that and neither did our chief.
12  And he said, I'll take your cell phones, I'll
13  write -- and if you think you're going to make a
14  fucking phone call to get out of this, I'll give
15  a CR number on you.  He said, you knew and your
16  chief knows.
17    I said, no, he doesn't.  He said, oh,
18  he doesn't or your chief doesn't know?  I said,
19  no, he's on the phone right now.  Do you want to
20  talk to him?  He's like, sure he's on the phone.
21  And Danny goes, here you go, and handed him the
22  cell phone.  And then all you hear was yes, sir,
23  yes, sir.  I received an e-mail from Jimmy
24  Jackson.  I was unaware that you didn't know,

SHANNON MARIE SPALDING                              November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                  137–140

Page 137

1  sir.  That's all we heard on that end of it.
2  Then the phone was hung up and we were ordered
3  to go in.  And that was the end of the
4  conversation with Juan.
5      Q.  Okay.  So the conversation ends and you
6  go back in the police academy.  Is it your
7  understanding at that point that you're going
8  back to patrol in these two districts that
9  Lieutenant Pigott mentioned?
10     A.  I had no understanding of anything that
11  was happening.
12     Q.  Okay.
13     A.  So I understood nothing that was
14  happening.  We were let into the academy, we
15  were put into an empty room why -- obviously now
16  the lieutenant is now confused as to what is
17  going on, Chief Rivera is confused as to what is
18  going on.
19     Q.  Okay.
20     A.  It's nothing but mass confusion.  I
21  have no understanding of anything at that point.
22     Q.  Okay.  Did you have another
23  conversation or a meeting with Juan Rivera that
24  day?

Page 138

1      A.  Yeah.  We left as soon as we had a
2  lunch break and we were right over to his
3  office.
4      Q.  Okay.
5      A.  And that's the conversation I told you
6  about earlier when he told us about the meeting
7  that took place the day before where we couldn't
8  go back to 189 like we normally would.
9      Q.  Okay.
10     A.  And all of that.  And that day the --
11     Q.  That's the meeting you testified to
12  previously?
13     A.  Yes.
14     Q.  Okay.
15     A.  And while that meeting --
16     Q.  You and Officer Echeverria were never,
17  in fact, sent back to patrol, correct?
18     A.  No.
19     Q.  Is that correct?
20     A.  Yes.
21     Q.  Thank you.
22         So you spent some time in the -- at the
23  police academy.  How long did you -- do you
24  recall how long you reported to the police

Page 139

1  academy?
2      A.  Well, yes.
3      Q.  How long was that?
4      A.  Several months.
5      Q.  Okay.
6      A.  To the best of my recollection.
7      Q.  Ultimately, do you have any personal
8  knowledge of whose decision it was to have you
9  go report to the police academy?
10     A.  Well, the voicemail that was left came
11  from Jimmy Jackson.
12     Q.  Okay.
13     A.  So that's the person who informed me.
14     Q.  Okay.  And are you aware that it's
15  police policy when an officer hasn't been in
16  patrol for a certain extended period of time,
17  that they're typically sent back to police
18  academy for some retraining before they go to
19  patrol?
20     A.  It's my understanding in our
21  circumstances that that's not typical.
22         MR. KING:  Could you read back my
23  question?
24

Page 140

1         (Whereupon, the record was read
2             as requested.)
3  BY MR. KING:
4      Q.  Are you aware of that?
5      A.  No.
6      Q.  Okay.  Ever heard of that, going back
7  to the academy for some retraining before you go
8  back to patrol, you never heard of that?
9      A.  I've heard of it if you've been out
10  injured or away out of service for a long period
11  of time and haven't been actively working, like
12  desk duty or on the street, but I have not heard
13  of it where you were actively working on the
14  street, and then sent for retraining.  No, I
15  never have heard of that.
16     Q.  When you say you've heard of it, have
17  you seen a policy on that or --
18     A.  No.
19     Q.  -- just kind of --
20     A.  Just from personal knowledge --
21     Q.  Yeah.
22     A.  -- of people.
23     Q.  Okay.  And you testified that you, in
24  fact, weren't sent back to patrol.  In fact,

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
141–144

Page 141

1 after the police academy, you were moved to the
2 Inspections Division, correct?
3     A.   While we were -- that's not actually --
4 we were under the Inspection Division A&As but
5 reported to the police academy for part of the
6 time we were at the police academy, to answer
7 that question.
8     Q.   Okay.  And the A&As is the attendance
9 and assignments sheet, is that --
10    A.   I think it's attendance and absence or
11 maybe it's attendance and assignments.
12    Q.   Okay.  And do you recall who told you
13 that you were going on the Inspections Division
14 A&As?
15    A.   Chief Skahill.
16    Q.   Chief Skahill?
17    A.   Yes.
18    Q.   Okay.  And was that in a meeting or a
19 telephone conversation?
20    A.   I think that it was in person.
21    Q.   Okay.
22    A.   Because we met with Chief Skahill
23 multiple times when all this was going on.  In
24 fact, when that meeting was taking place with

Page 142

1 Jimmy Jackson and I couldn't get ahold of Juan
2 Rivera, I went down to Chief Skahill's office
3 with Officer Echeverria to inform her of what
4 was going on immediately.
5     Q.   Okay.
6     A.   And so then the next day when we left
7 Rivera's office, we went back to Chief Skahill's
8 office, because she's the one who initially
9 placed us on the assignment.
10    Q.   Right.  At that point, Chief Skahill
11 was no longer in Internal Affairs, correct?
12    A.   No.  But Chief --
13    Q.   Is that correct?
14    A.   No.  I mean, correct, she was not in
15 Internal Affairs.
16    Q.   Okay.  So that day you said the two of
17 you went to her office when you couldn't get
18 ahold of Juan Rivera?
19    A.   Correct.
20    Q.   What do you recall being said in that
21 meeting by you or by Officer Echeverria or Tina
22 Skahill?
23    A.   I walked in and I told her the events
24 that had occurred.

Page 143

1     Q.   Tell me what you recall telling her.
2     A.   I told her that -- first, I said, you
3 know, there's a big uproar and there's supposed
4 to be a meeting going on right now.  They're
5 trying to kick us off of 543 and off of
6 Operation Brass Tax.  And she said, that can't
7 happen, this is a very important investigation.
8 The superintendent is directly involved with
9 this as well as his command staff.  This cannot
10 happen.  She said, what happened?  And Danny
11 explained the conversation with Jill Stevens
12 briefly.
13    Q.   Yes.
14    A.   And she said, where is this meeting?  I
15 said, down there.  Because we had just left 543
16 so we could speak with Beatrice Cuello.  She
17 said, wait here, I'm going down there right now.
18 This cannot be allowed.  We were about to break
19 the case the next day and sign on a big witness,
20 and she was aware of that.
21    Q.   Okay.
22    A.   She went down to the meeting, but she
23 shortly returned.  And she said, I went down
24 there, I couldn't get into the meeting.

Page 144

1     Q.   Okay.
2     A.   She said, I am going to talk to Juan
3 Rivera the second that meeting is over, go home.
4 We're going to have to straighten this out.
5     Q.   Okay.
6     A.   These guys are going to have to
7 straighten this out.  This can't happen.
8     Q.   Okay.
9     A.   I will call you.
10    Q.   Okay.  Did Tina Skahill ever call you
11 after that about this subject?
12    A.   She met with us the next day.
13    Q.   Okay.  And it was just you and she and
14 Officer Echeverria?
15    A.   Yes.
16    Q.   And in her office?
17    A.   Correct.
18    Q.   And what was said in that conversation?
19    A.   She said that she had spoke to Juan
20 Rivera and that -- she had mentioned -- she had
21 mentioned Debra Kirby, but I don't remember
22 exactly what it was about.  I do remember she
23 said that Juan was pissed off --
24    Q.   Okay.

SHANNON MARIE SPALDING                    November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO        145–148

Page 145

1      A.  -- about Debra Kirby denying everything
2  and starting this whole issue.
3      Q.  You recall Tina Skahill saying that in
4  the meeting?
5      A.  Yes.  Our meeting.
6      Q.  In your meeting?
7      A.  Not the --
8      Q.  I understand.  In your meeting with
9  Tina Skahill, you remember her saying something
10  to the effect that Juan was pissed off?
11      A.  That Juan had related to her that he
12  was pissed.
13      Q.  Okay.
14      A.  Something to those --
15      Q.  Sure.
16      A.  It meant the same.  Those are not her
17  exact words, but that is the point she was
18  getting across.
19      Q.  Sure.
20      A.  And that she was going to -- she said,
21  I don't know why Juan doesn't just assign you to
22  Confidentials.  That is what he should be doing.
23  He needs to just assign you to Confidentials.
24      He doesn't need anyone's permission, he

Page 146

1  doesn't even need the superintendent's.  You
2  know, he should assign you to Confidentials.  If
3  I were in IAD, that's exactly what I would do.
4  None of this -- if I were still there, none of
5  this would have happened.
6      Q.  Sure.
7      A.  And then she said, I need to have a
8  talk with him and he needs to start doing what
9  he's supposed to be doing.  Go back to the
10  academy and we'll see what we can do to -- I'll
11  see what I can do to figure this out for you
12  guys.
13      Q.  So at that point, it's your
14  understanding Skahill is directing you to go
15  back to the academy while she tries to figure
16  the situation out; is that fair to say?
17      A.  That's fair.
18      Q.  Okay.  And do you have a subsequent
19  conversation with Tina Skahill where she has
20  figured it out or has any resolution for you?
21      A.  There are -- as all of this is going on
22  for the next months, we have conversations with
23  Juan and Tina Skahill.  Was it the next day, the
24  same day, two hours later, five hours later, I

Page 147

1  can't tell you.
2      Q.  Sure.
3      A.  But I do have subsequent conversations
4  with her.
5      Q.  Okay.
6      A.  She did tell us -- I'm sorry.  In that
7  first meeting, she said -- we told her that we
8  were going back to patrol.  She said, they can't
9  do that.
10      Q.  Right.
11      A.  You'll get killed.  That's officer
12  safety.  We have to address that immediately.
13  You cannot take officers from this, have their
14  identities compromised and then throw them back
15  to the wolves.  That was in the very first
16  meeting.
17      Q.  Sure.
18      A.  She said we need to get this --
19      Q.  Okay.
20      A.  You need to go back to the academy.  I
21  do recall now that was said in the first
22  meeting.
23      Q.  Sure.
24      A.  Later on she reiterated that in another

Page 148

1  conversation, we don't do our police officers
2  like that.
3      Q.  Sure.
4      A.  You know, when you do something like
5  this and you come forward, we want to encourage
6  that, not discourage it.  We can't let that
7  happen.  What does that say going forward to
8  other officers.  We can't compromise that.
9      Q.  Okay.  Let me try to shortcut this.
10  You testified that at some point you're at the
11  academy and you don't physically move to
12  Inspections Division but you're put on
13  Inspections A&A sheets, correct?
14      A.  For part of the time.
15      Q.  Okay.  I'm trying to find out, how did
16  you learn that you were going put -- going to be
17  put on Inspections Division A&A sheets and that
18  you were then going to be reassigned to the
19  Inspections Division?
20      A.  From Chief Tina Skahill.
21      Q.  Okay.
22      A.  We were told at one point when we
23  reported to the academy one morning, we were
24  told by a Sergeant Steve, I don't -- something

SHANNON MARIE SPALDING                    November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO            149–152

Page 149

1   with a W, Wosniak (phonetic) or something along
2   those lines.
3       Q.  Okay.
4       A.  That we were not going to be reassigned
5   to the patrol for officer safety.
6       Q.  Okay.
7       A.  That Tina Skahill had called Howard
8   something Loading (phonetic) maybe --
9       Q.  Okay.
10      A.  -- of the academy and said that it was
11  an officer safety concern and that he is not to
12  put us on the street because it would be
13  detrimental to us.
14      Q.  Okay.
15      A.  And she then -- the academy then,
16  because she was no longer with IAD, fell under
17  her rank.
18      Q.  Yes.
19      A.  So then she said that she would put us
20  in Inspection Division on -- we were being moved
21  to the Inspection Division on A&As, but they
22  needed -- but we would report to the academy
23  until we went on furlough for some -- to sit in
24  on in-car camera training.  Not that -- that we

Page 150

1   would be doing the training, not that we were
2   receiving the training.
3       Q.  You were told by Tina Skahill that you
4   were first going to be put on Inspections --
5       A.  Yeah.
6       Q.  -- A&A sheets.  And then before you
7   actually physically moved to Inspections, you
8   were to stay at the academy for a certain period
9   of time to do some in-car camera training; is
10  that fair?
11      A.  No.  Let me clarify just a little bit.
12      Q.  Okay.
13      A.  We were at the academy.  At some point
14  while we were there, we went to Inspections for
15  a couple of days.
16      Q.  Okay.
17      A.  Okay.  Maybe a week, two weeks, days.
18  At which point the academy then needed -- they
19  were short people to teach this class.
20      Q.  Sure.
21      A.  So I guess it would be fair to say we
22  were then on the A&As at 126 and borrowed to the
23  academy.
24      Q.  Okay.

Page 151

1       A.  We were borrowed again.
2       Q.  And you actually had physically been at
3   126 and then -- for a few days, at least?
4       A.  I believe so.
5       Q.  And then Tina Skahill asked you to go
6   back to the academy to do this work?
7       A.  That is --
8       Q.  Correct?
9       A.  That is correct.
10      Q.  And is it your understanding that Tina
11  Skahill was the one who made the decision to
12  move you to the Inspections Division?
13      A.  Yes.  Because she said we should be put
14  in Confidentials but Juan wasn't doing that, so
15  this is what --
16      Q.  Okay.
17      A.  -- she could do.
18      Q.  Okay.  Are you okay for a little while
19  longer?
20      A.  I'm okay.  That's what matters.
21          (Whereupon, a discussion was had
22           off the record.)
23  BY MR. KING:
24      Q.  When you were told I guess by Tina

Page 152

1   Skahill that you were going to be moved over to
2   Inspections, did she tell you what you were
3   going to be doing at Inspections or why you were
4   being moved there?
5       A.  For officer safety.
6       Q.  Okay.
7       A.  As we couldn't be just thrown back out
8   there like that.
9       Q.  Okay.  Did you have an understanding
10  that -- were you still working on the Watts
11  investigation at that point?
12      A.  No.
13      Q.  It had kind of ended?
14      A.  It -- yes.  But it had ended at the
15  time for reasons unbeknownst to us beyond the
16  misunderstanding, we later found out there was a
17  bigger situation with it.
18      Q.  We'll probably come back to that.
19      A.  You ain't going to want to.
20      Q.  No, I will.
21          So you went to Inspections ultimately
22  and you were working for Lieutenant Pascua,
23  correct?
24      A.  Yes, that's correct.

SHANNON MARIE SPALDING                                November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                   153–156

Page 153

1    Q.  Okay.  When you were there for a few
2  days and then went back to the academy those few
3  days, were you interacting with Lieutenant
4  Pascua?
5    A.  Minimum.
6    Q.  Okay.  Let's go to Paragraph 56 of the
7  Amended Complaint of Deposition Exhibit No. 1.
8        You indicate that you and your partner
9  were detailed to 126 Inspections until March,
10  2012.  Do you know when you were first referred
11  to or detailed to Inspections?
12        I'll tell you, our records indicate it
13  was in May of 2011.  So you would have been in
14  Inspections from some point in May, 2011 until
15  March, 2012.  Does that sound correct?
16    A.  I was going to guess the end of May or
17  beginning of June.  I thought it was right
18  around Memorial Day.
19    Q.  Okay.
20    A.  Was that about right when you guys have
21  it?
22    Q.  I think that's right.
23    A.  That was going to be my guess.
24    Q.  Okay.  So you allege -- well, strike

Page 154

1  that.
2        For part of the time you were in
3  Inspections you were, for lack of a better term,
4  reporting to Lieutenant Pascua and then that
5  changed at some point and you were reporting to
6  Lieutenant Sadowski, correct?
7    A.  Yes.
8    Q.  Do you recall how long you were
9  reporting to Lieutenant Sadowski?
10    A.  We were there until March.  I would say
11  the greater portion of it or at least half of
12  the time.
13    Q.  At least half of the time you think you
14  were reporting to Lieutenant Sadowski?
15    A.  I think -- I think.
16    Q.  Okay.
17    A.  Reporting is a vague term.
18    Q.  Sure, okay.  But at some point you were
19  told either your reporting or your working
20  relationship was moving from Pascua to Sadowski,
21  correct?
22    A.  Correct.
23    Q.  Okay.  And you think that was
24  approximately half way through your time in the

Page 155

1  Inspections Division, correct?
2    A.  That's a guestimation.
3    Q.  Okay.  Obviously you allege that in
4  Paragraph 56 that you were subjected to
5  harassment and hostility from Lieutenant Pascua.
6  In Paragraph 37 you alleged that she called you,
7  rat, I guess, motherfuckers, didn't want you in
8  the unit.
9        That allegation in Paragraph 57, was
10  that her allegedly referring to you as that, was
11  that the first thing that happened that you
12  consider harassment or retaliation by Lieutenant
13  Pascua?
14    A.  No.
15    Q.  Okay.  What was the first thing that
16  you consider retaliation by Lieutenant Pascua?
17    A.  I think -- I think that the first
18  retaliation, I wasn't even there for.
19    Q.  Okay.
20    A.  It was witnessed by my partner, which
21  was indirectly Lieutenant -- it was Lieutenant
22  Pascua but -- and a Sergeant Jan Barney.
23    Q.  What was that incident?
24    A.  It was where they -- Jan Barney was the

Page 156

1  one talking but stated that they knew that the
2  only way -- the reason I was in Narcotics is
3  blonde hair blue eyed female, I fucked my way in
4  there.
5    Q.  And Officer Echeverria told you that he
6  had heard that being said?
7    A.  Yeah.  They said it to him.  That Jan
8  Barney was doing the talking.
9    Q.  Okay.
10    A.  And he responded.
11    Q.  And what did he say?
12    A.  You don't got to be jealous, they sell
13  blond wigs.  Because he tried to make light of
14  the subject.
15    Q.  Okay.  Sure.  Was there anything more
16  to that incident that you consider either
17  harassment or retaliation by Lieutenant Pascua?
18    A.  Not to that incident.
19    Q.  Okay.  What was the next incident that
20  you would consider retaliation by Lieutenant
21  Pascua?
22    A.  We were put in desks and not given any
23  assignments.  Just empty cubicles.  Just like an
24  empty wall cubical with no computer, no

SHANNON MARIE SPALDING                                      November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                        157–160

Page 157

1  anything, to sit there and do nothing.  And I
2  mean absolutely just sit there, okay.
3      Q.  Okay.
4      A.  And I was --
5      Q.  Lieutenant Pascua would tell you to sit
6  there?
7      A.  Well, she was our person we reported to
8  so yeah.
9      Q.  She wasn't giving you any assignments
10  to do?
11      A.  None, nothing, zero.
12      Q.  Okay.
13      A.  And then --
14      Q.  Let me just stop you now.  Did you have
15  an understanding when you started in Inspections
16  of what your job duties or responsibilities
17  would be working in Inspections?
18      A.  Well, I figured work.  I would do some
19  type of work.
20      Q.  My question is did you have an
21  understanding of what kind of work that would be
22  that you'd be doing in Inspections?
23      A.  I understood that Inspection did
24  investigations into -- like audits into

Page 158

1  overtime.  Not criminal stuff but like
2  infractions or --
3      Q.  Sure.
4      A.  You don't have plates or something,
5  officers don't.
6      Q.  You do a lot of -- you do auditing,
7  right?
8      A.  I do?
9      Q.  In Inspections.
10      A.  In Inspections, they do, yes.
11      Q.  Okay.
12      A.  Like into investigations that needed
13  auditing.  Like there may be some overtime fraud
14  here, so they have to look for that.
15      Q.  Sure.
16      A.  But they also do the field work where
17  they go out and look for infractions.  And I
18  just understood that that was the work that they
19  did.
20      Q.  Okay.
21      A.  And, again, no understanding through
22  any of this time what was going on and what I
23  would be doing.
24      Q.  Nobody told you at any point what kind

Page 159

1  of work you would be doing in Inspections?
2      A.  No.
3      Q.  Okay.  Did you or Officer Echeverria at
4  some point when you were detailed to
5  Inspections, do any auditing work, sitting in
6  the office, going through records, that sort of
7  auditing work?  Did you do that?
8      A.  One time.
9      Q.  One time?
10      A.  We were given one assignment.
11      Q.  Okay.  And were you given that
12  assignment by Lieutenant Pascua?
13      A.  I remember working with a Sergeant John
14  Stahl on it.  And he's the one that gave it to
15  me, so I don't know where ultimately it came
16  from, whether it was Sadowski or Pascua.  It was
17  all lieutenants and then Sergeant John Stahl.
18  So I recall working with him, I don't recall who
19  it was for.
20      Q.  Okay.  And did you do any of the what
21  you believed that Inspections also did field
22  work.  Were you asked to do any field work while
23  you were in Inspections?
24      A.  One time I went with for -- both Danny

Page 160

1  and I went with to a fire drill at one district.
2  I don't recall.
3      Q.  Okay.
4      A.  That was about an hour in the morning.
5  And another occasion I went to -- they had me go
6  to the Organized Crime building --
7      Q.  Okay.
8      A.  -- to -- to -- for some -- for some equipment
9  inventory from a TRU Unit -- the TRU Unit that
10  had disbanded.  And there were something -- it
11  was something involved with the TRU Unit.  I
12  know that it was another location.  It might
13  have been the old 7th District, I don't know.
14      Q.  Okay.
15      A.  Again, in almost a year, that was it.
16      Q.  Okay.
17      A.  That I can recall.
18      Q.  Okay.  And during that time when you
19  were detailed to Inspections, you started
20  working on the Watts investigation again,
21  correct?
22      A.  In October.
23      Q.  In October of what?
24      A.  Of twenty -- we were there until March

SHANNON MARIE SPALDING                                    November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                      161–164

Page 161

1   of 2012. Is that what we said?
2       Q. Yes.
3       A. Then it was October, 2011.
4       Q. Okay. And once you started working on
5   the Watts investigation again in October, 2011,
6   would you say for the remainder of the time that
7   you were detailed to Inspections, at least on
8   paper, you were spending most of your time
9   working on the Watts investigation?
10      A. No.
11      Q. Okay.
12      A. That's not accurate.
13      Q. Okay. How much of your time was spent
14  on Watts and how much of your time was being
15  over at Inspections?
16      A. From October until maybe the beginning
17  of December, it was divided.
18      Q. Okay.
19      A. Then we were the -- I believe -- or
20  maybe until -- yeah, somewhere around December
21  maybe. And then the Operation Brass Tax
22  concluded I think in the beginning of February
23  and then we were back to sitting at the desk.
24      Q. Okay. During the period when you were

Page 162

1   at -- when you started working on the Watts
2   investigation again when you were in
3   Inspections, do you think you were still under
4   Lieutenant Pascua when that started up again or
5   were you under Lieutenant Sadowski?
6       A. I believe it was Sadowski at that
7   point.
8       Q. Okay.
9       A. Somewhere in that -- during that time
10  it shifted, right around that time maybe.
11      Q. Okay. And on days that you were going
12  to spend not at Inspections but working on the
13  Watts investigation, were you supposed to tell
14  anyone in Inspections where you were going, what
15  you were going to be working on?
16      A. No. We had -- again, we were under
17  Juan Rivera because he is -- they shifted
18  everything and now Inspection fell under Juan
19  Rivera. They shifted it.
20      Q. Okay.
21      A. And he instructed us that we only
22  report directly to him.
23      Q. Okay. So if you were still reporting
24  to Lieutenant Pascua and on a particular day you

Page 163

1   were going to work on the Watts investigation,
2   you just go work on the Watts investigation, you
3   wouldn't tell Lieutenant Pascua, hey, we're not
4   coming in today, we're going to be working on
5   Watts; is that correct?
6       A. That was confusing in the beginning.
7   Because Juan Rivera, on the day that he had
8   contacted -- I'm going to tell you. On the day
9   that the investigation was reinitiated --
10      Q. Yes.
11      A. -- he directly called me and said,
12  effective tomorrow, I want you to report at 0900
13  to the FBI building. You are going to brief the
14  FBI agents about the case for the last several
15  years and bring them up to speed.
16      Q. Okay.
17      A. And then I specifically asked Juan
18  Rivera, will you be notifying the personnel over
19  here? Because by this time --
20      Q. Okay.
21      A. -- they were gone for the day. So who
22  was going to notify them? Do I go directly
23  there? And he said, I am the chief. If I tell
24  you and give you a direct order, that is not for

Page 164

1   you to worry about.
2       Q. Okay. I'm not talking specifically
3   about the first day you go to the FBI and brief
4   them. My question is while you were working in
5   Inspections under Lieutenant Pascua and the
6   Watts investigation had started up again, you
7   testified you spent some of your time on Watts,
8   some of your time in Inspections.
9           My question is on the days that you
10  were going to work on Watts, did you tell
11  Lieutenant Pascua what you were doing or did you
12  just go work on Watts?
13      A. No. I did not just go work on Watts.
14  Whoever I was working under, was notified that
15  we would be working on Watts, whether that was
16  Pascua or Sadowski, and I don't recall which one
17  it was at the time.
18      Q. Okay.
19      A. And the communication was usually done
20  through Officer Echeverria.
21      Q. Are you aware of either yourself
22  or Officer Echeverria ever telling Lieutenant
23  Pascua personally, we are not coming into
24  Inspections, we're working on Watts? Are you

SHANNON MARIE SPALDING                                    November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                    165–168

Page 165

1  aware of that ever happening?
2      A.  No.
3      Q.  Okay.  Similarly, are you aware of
4  either yourself or Officer Echeverria ever
5  telling Lieutenant Sadowski in those situations
6  that you were not coming in to Inspections, you
7  were going to be off working on Watts?
8      A.  I recall that when we were told that we
9  would be needed to work on Operation Brass Tax,
10  that we would inform them that that was going to
11  happen.  Like on these days, we are going to be
12  working on those -- like this week, we'll be
13  working on this day, this day and this day prior
14  to it happening.
15      MR. KING:  Okay.  Can you read back my
16  question?
17      (Whereupon, the record was read
18      as requested.)
19      THE WITNESS:  Yes, they were told when
20  we would be working on the Watts case.
21  BY MR. KING:
22      Q.  I'm asking about Lieutenant Sadowski.
23  You or Officer Echeverria would tell him?
24      A.  Yes.

Page 166

1      Q.  Okay.  He had started talking about
2  some incidents you felt was retaliation from
3  Lieutenant Pascua.  Other than what you've
4  testified to already, what was the next
5  incident, if any?
6      A.  In the empty cubical that I was sitting
7  in, she came up to the corner of it.  You know
8  how the cubical comes to the corner, and she
9  stood over it and she told me, if you want to
10  work with Juan Rivera and the rest of those
11  fucking rats, you should be sitting across the
12  hall.  I don't want you over here in this
13  fucking unit.  Words to that effect.
14      Q.  Was anyone else present?
15      A.  No.
16      Q.  Okay.  Do you recall anything else she
17  said or you said in that incident?
18      A.  Not in that incident I didn't -- no.
19      Q.  Okay.  So she said that and you just
20  didn't respond?
21      A.  No.
22      Q.  Okay.  What was the next incident, if
23  any, where you felt that Lieutenant Pascua was
24  retaliating or harassing you?

Page 167

1      A.  Well, I was escorted to the bathroom
2  either by her or Jan Barney every time I would
3  get up to use the bathroom.  There are cubicles
4  in close proximity also and I had to sit right
5  there in earshot of her saying comments about me
6  as if I'm not there to the other command staff.
7  Like I'm an attorney, I know how to put a case
8  on a motherfucker and things like that, you
9  know.  And -- Narcotics officers.
10      So we're the only Narcotics officers up
11  there, obviously it's referring to myself and my
12  partner.
13      Q.  Let me back up just to maybe move this
14  along.  Paragraph 57, you allege that Lieutenant
15  Pascua called the Plaintiffs rat motherfuckers
16  and told them that she did not want them in the
17  unit.
18      Is that what you just testified to at
19  the cubical or when did this occur?
20      A.  That incident occurred after a meeting,
21  a meeting within the unit that was prompted by
22  Danny and I going to Commander Adrienne Stanley
23  to report the harassment of retaliation of
24  Pascua against us.

Page 168

1      Q.  Okay.  So before -- well, let me ask
2  you this.  Strike that.
3      With respect to the allegation in
4  Paragraph 57 of her calling you rat
5  motherfuckers, did you hear that directly or how
6  did you learn about that?
7      A.  I was sitting in the cubical and she
8  said it as she walked by going to her desk.
9      Q.  Tell me exactly what you recall her
10  saying.
11      A.  Are you talking -- you're talking
12  about --
13      Q.  Paragraph 57.
14      A.  57.
15      Q.  Is it your testimony that you heard her
16  saying that as she was walking by?
17      A.  Yes, she did say that when she was
18  walking by.
19      Q.  Okay.  What exactly did you hear her
20  say?
21      A.  That -- just that, that we were rat
22  motherfuckers and she didn't want us in the
23  unit.
24      Q.  Okay.  Did she say --

SHANNON MARIE SPALDING                    November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO              169–172

Page 169

1    A. Are you talking --
2    Q. Did she say Spalding and Echeverria,
3 did she --
4    A. Narcotics officers.
5    Q. -- just say rat motherfuckers?  What
6 did she say?
7    A. She said, I don't want those rat
8 motherfuckers in the unit.  And then she further
9 stated, I'm an attorney, I know how to put a
10 case on those Narcotics officers.  I know how to
11 build a case, not put a case on.  I know how to
12 build a case on those Narcotics officers.
13    Q. Okay.
14    A. And that comment was made on several
15 occasions.
16    Q. Okay.  But on the one occasion we're
17 talking about, you're saying she made both the
18 rat motherfuckers reference and said something
19 about building a case; is that correct?
20    A. Yes.  But that building a case was said
21 a couple times.
22    Q. Okay.  On this same time when she
23 walked passed -- strike that.
24       On this occasion where she walked

Page 170

1 passed and you heard her make reference to the,
2 I'm a lawyer, I know how to put on a case, was
3 that the first time that she said something
4 along those lines and then there were subsequent
5 times where she said something about being a
6 lawyer and knowing how to put on a case?
7    A. Yes.  And the correct word was build a
8 case.  She didn't say put on a case.
9    Q. I'm sorry.
10    A. I don't want to confuse that, because
11 that's a pretty different meaning.
12    Q. My question is was that the first
13 time --
14    A. That I --
15    Q. -- when she walked by your cubical that
16 you ever heard her make reference to building a
17 case?
18    A. Yes.
19    Q. Okay.  You indicated that -- well,
20 strike that.
21       Directing your attention to
22 Paragraph 60 of the Amended Complaint.  Is that
23 a reference to that same incident where she
24 walked by your cubical?

Page 171

1    A. No.  This one is the -- this one is
2 when we came out of the meeting with the team
3 after we went to the commander.
4    Q. Okay.  Let's talk about when you went
5 to the commander.  That was you and --
6    A. Officer Echeverria.
7    Q. -- and Commander Stanley?
8    A. Yes.
9    Q. And before we get to that, when you
10 first moved over to Inspections, Commander
11 Stanley was out on medical leave, correct?
12    A. Yes, that's correct.  She was gone.
13    Q. Do you recall approximately how long
14 you were in Inspections before she returned from
15 medical leave?
16    A. No.  But I do know that it was -- she
17 was back before October --
18    Q. Okay.
19    A. -- of 2011, because she was there for
20 when we started that FBI case again.  And I
21 think she had been back for a little while
22 before that.  So maybe a month or so maybe.
23    Q. Okay.  When do you recall going to
24 Commander Stanley to complain about anything?

Page 172

1    A. Well, it would have to be in August or
2 September of 2011, if she was back at that time.
3 And that was prompted by Lieutenant Sadowski
4 stating that we should address the issue of the
5 harassment and retaliation from Lieutenant
6 Pascua with Adrienne Stanley.  He approached us
7 and said, I've witnessed it and it's going to
8 continue.  I see what she does.  And I said,
9 well, why don't you talk to Adrienne Stanley?
10 He said, you need to go and address that issue
11 with her.
12    Q. Okay.  Let's talk now about that
13 conversation with Lieutenant Sadowski.  Is that
14 a conversation that you and he had or is it the
15 three of you, you and Echeverria?
16    A. The three of us.
17    Q. Okay.  And where does this conversation
18 take place?
19    A. In front of his desk in Unit 126.
20    Q. And what's your best recollection of
21 everything Lieutenant Sadowski says and
22 everything that the two of you say in that
23 conversation?
24    A. In that morning, we would come in

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
173–176

Page 173

1  earlier than everyone else and of course we
2  would, you know, say good morning to him and he
3  would be at his desk.  And he said that he, you
4  know, was aware of, you know, what's going on
5  and that he witnesses it.  He knows I was very
6  distraught going there and I was -- it was very
7  difficult and it was very apparent.  It was a
8  very hostile work environment and these are open
9  cubicles.  So he's aware of it.  He told me
10 that.
11    Q.  Okay.
12    A.  He said, so the only way it will stop
13 is you need to go report that to the commander.
14    Q.  Okay.
15    A.  And he said, I've witnessed it but it
16 won't stop.
17    Q.  Okay.  Do you recall you or Officer
18 Echeverria saying anything else or Lieutenant
19 Sadowski saying anything else?
20    A.  I recall I asked him since he's a
21 lieutenant, why couldn't he initiate a CR number
22 or talk to the commander about it.
23    Q.  Okay.
24    A.  And he said, no, no, it's got to come

Page 174

1  from you guys.  Which I don't understand, but we
2  followed his advice.
3    Q.  Okay.  So you then go -- I'm sorry.  Is
4  there anything else you recall being discussed
5  in that conversation?
6    A.  No, just that we would go see the
7  commander then.
8    Q.  Okay.  And the two of you then did go
9  see the commander?
10    A.  Yes, we did.
11    Q.  Okay.  And was that a meeting in the
12 commander's office?
13    A.  Yes.
14    Q.  And the commander and you and Officer
15 Echeverria were present, correct?
16    A.  Yes.
17    Q.  Okay.  And was it that same day as the
18 conversation with Sadowski or shortly after?
19    A.  Shortly after.
20    Q.  Okay.  What do you recall being said in
21 that meeting?
22    A.  I know that we walked in and we told
23 her that we wanted to talk to her and address
24 some issues.  And Danny had started saying that,

Page 175

1  you know, that we are being harassed by
2  Deborah Pascua and that it's a hostile work
3  environment and this is, you know, negatively
4  affecting us and we want -- and we were
5  requesting her to initiate a CR number.  And
6  Adrienne Stanley stated -- you know, and to
7  investigate what we were saying.  She said, I'm
8  not trying to hear that, I don't want to hear
9  any of this.  I don't want to know.
10        And Danny said, whether you want to
11 know or not, you're our commander and we are
12 requesting you to take action on this.  And she
13 said, I refuse.  You will never get a CR number
14 from me on one of my own.  If you want that, and
15 she points over to the IAD side, because it's
16 one side and the other side, you go over there
17 with Juan and those people and maybe they'll
18 give you a fucking CR -- I'm sorry, she didn't
19 swear.
20    Q.  Okay.
21    A.  They'll give you a CR number.
22    Q.  Okay.  Do you recall anything else
23 being said in that meeting?
24    A.  She said, we're done, I don't want to

Page 176

1  hear any more.  And we left.
2    Q.  Okay.  And at some point after that
3  meeting, your assignment was essentially changed
4  from Lieutenant Pascua to Lieutenant Sadowski,
5  correct?
6    A.  Yeah.
7    Q.  Okay.  And to the best of your
8  knowledge, a commander would have made that
9  decision, Commander Stanley, correct?
10    A.  Yeah, I --
11    Q.  If you know.
12    A.  I don't know who made it.
13    Q.  Okay.  Other than what you've already
14 testified to, was there anything else that
15 happened that you believe was retaliation or
16 harassment by Lieutenant Pascua?
17    A.  Yes.  Things got so bad in Unit 126.
18 The commander's office is in the middle and
19 there's cubicles here and cubicles on the other
20 side, just a couple.  But Deborah Pascua sits
21 here and my cubical is right here.
22    Q.  Right.
23    A.  So I'm in earshot of hearing this all
24 the time.  So I move to the other side in the

SHANNON MARIE SPALDING                        November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO              177–180

Page 177

1  back of a vacant desk. There's two desks here,
2  two desks here, two desks here.
3      Q. Sure.
4      A. These people -- it was a Sandra, I
5  don't remember her last -- Espinoza, Aileen
6  Robinson, they worked for a different
7  department, and then a vacant desk. So I just
8  became -- I was so distraught, I would just come
9  in and sit there. After a few days of that, you
10  know, I began talking to Aileen Robinson and,
11  you know, like good morning, how are you. And,
12  you know, just average small talk that should
13  happen in an office environment.
14      Q. Sure.
15      A. Well, that didn't last too long because
16  a brief time later, a week, two weeks, something
17  like that, when I came in in the morning because
18  we come in before most everyone, Aileen
19  approached me, Robinson, A-I-L-E-E-N, Robinson.
20  And she said, I just want you to know that when
21  you left yesterday, officer George Flores
22  approached me and the women over here are my
23  coworkers and told us that we should not be
24  talking to you, that you are IAD rats, you are

Page 178

1  here to fuck us over, you're here to put it --
2  develop cases against us, don't talk to us,
3  ignore, ignore us, you know. And he said, I
4  know this to be a fact because Lieutenant Pascua
5  told me herself.
6      Q. So Aileen Robinson is telling you about
7  something that George Flores told her and George
8  Flores allegedly told her that Lieutenant
9  Pascua --
10      A. It's coming from Lieutenant Pascua.
11      Q. Okay.
12      A. And Lieutenant Pascua and George Flores
13  are very close friends.
14      Q. Okay.
15      A. And she just said, I'm just telling you
16  this because I think you should know what's
17  going on behind your back.
18      Q. Okay. Other than that incident, is
19  there anything else that happened that you
20  believe was harassment or retaliation by
21  Lieutenant Pascua, other than what you've
22  already testified to?
23      A. There was one time that a secretary who
24  retired from there, her name was Jo, J-O, I

Page 179

1  don't know her last name. She was Commander
2  Stanley's secretary. She had mentioned in front
3  of Danny and I she had said that she knows that
4  I have a hard time up there and the treatment
5  that I'm getting and how bad it is for me and
6  that she sees it, as well.
7      And it was a conversation that I left
8  crying from because I was hearing all the --
9  again, you know, I sit at a desk and I don't
10  even talk to anyone and this is just continuing.
11  And you go and you're subjected to that all day
12  long, it's just very difficult.
13      Q. Okay.
14      A. And it doesn't take much. But if you
15  say -- and in Unit 126, there's under 20 people.
16  So if you say a few negative things, we're
17  not -- we're --
18      Q. Do you recall that secretary Jo saying
19  anything else to you in that incident?
20      A. It wasn't a real short conversation, it
21  just went into how bad things were for me there
22  and that, you know, she felt really bad for me
23  and then she retired.
24      Q. Okay. Other than what you've testified

Page 180

1  to, was there anything else that -- any other
2  incidents where you believe were evidence of
3  Lieutenant Pascua retaliating against you or
4  harassing you?
5      A. Yes, there is one more incident that is
6  pretty important.
7      Q. Okay.
8      A. The first day that I had to go brief at
9  the FBI under the direct order of Juan Rivera,
10  and he told me it's directly under my command,
11  you are to go there. I was harassed so bad and
12  they would follow me to the bathroom, they were
13  just doing everything. I remember the Jill
14  Stevens incident, and I just didn't trust the
15  communication gap. So even though I didn't have
16  to go into Unit 126, I went in before.
17      There was a sign-in sheet and I signed
18  in. Lieutenant Pascua was there. I walked up
19  to her and said, I don't know if you have been
20  informed by Chief Rivera. I want to make sure
21  everyone here is aware, there's no
22  miscommunication. I've been given a direct
23  order by Chief Rivera to go and report to the
24  FBI building today and that is where I'm going

SHANNON MARIE SPALDING                            November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO              181–184

Page 181

1  to be working.  Nobody was in yet.  She was the
2  only -- she's the lieutenant.
3      Q.  Okay.
4      A.  Please make sure that if any further
5  notification is -- or the commander has been
6  notified, if she has any questions, to call Juan
7  Rivera.
8          Well, when I'm in that meeting, and I
9  went with Sergeant Tom Chester --
10     Q.  Okay, all right.  I'm confused.  You
11  signed in at Inspections and saw Lieutenant
12  Pascua before you went --
13     A.  And I didn't have to do that.
14     Q.  -- before you went to the meeting at
15  the FBI?
16     A.  Yes.
17     Q.  And when you told her what you were
18  doing and that this was per Chief Rivera, did
19  Lieutenant Pascua say anything to you at that
20  point in time?
21     A.  Fine.
22     Q.  Fine, okay.
23     A.  And I said, please make sure that the
24  commander is informed when she comes in in case

Page 182

1  Juan Rivera did not -- it was a precaution on my
2  end I did not need to take.  I did not have to
3  do that.  In case Chief Rivera --
4      Q.  Okay.
5      A.  -- did not get ahold of her, I knew
6  that they would be like where the hell is she,
7  who gave you permission or whatever.  I came in
8  early --
9      Q.  Sure, I understand.
10     A.  -- and went there first and then went
11  to the FBI building.  While I was there, I was
12  with -- I was sitting here, Tom Chester was
13  sitting here.  We both reported as we were
14  directed to.
15     Q.  Yes.
16     A.  My phone keeps buzzing, buzzing,
17  buzzing.  I finally look at it and it's the
18  commander.  And I pick it up and she is
19  absolutely livid and screaming at me.
20     Q.  This is Commander Stanley?
21     A.  Yes.
22     Q.  And what did Commander Stanley say to
23  you on the phone?
24     A.  She said, Officer Spalding, you are to

Page 183

1  report back here to Unit 126.  This is not how
2  we do things.  It's not the wild west, a rogue
3  police officer, you just do whatever the hell
4  you want.  I've already talked to Eddie Walsh
5  about getting you thrown out of here, getting
6  you dumped out of this unit.  Who gave you
7  permission to go over there?  And I explained to
8  her that it was a direct order from the chief, I
9  even came in.  And she said, that's not how we
10  do things here.  I don't know what I'm supposed
11  to do.
12     Q.  Sure.
13     A.  It's before anyone else is in.  She's
14  screaming at me so bad that I hand my phone to
15  Tom Chester and I said, you're a white shirt,
16  I'm following your direct orders, I want you to
17  handle this.
18     Q.  Okay.
19     A.  He walked out of the conference room,
20  had a conversation with her.  And then
21  afterwards, I said, you're going to go back up
22  there with me and we're going to straighten this
23  out.  And she said that Deborah Pascua while on
24  the phone -- I said, I notified Lieutenant

Page 184

1  Pascua.  And she said, Lieutenant Pascua said
2  you just came in here for a brief minute and you
3  told her you were just going out.  Like she
4  didn't accurately repeat that I had a direct
5  order.  She made it -- from that phone call, it
6  was not correctly relayed.  It was relayed in a
7  negative manner to the point --
8      Q.  It's your impression from the phone
9  call with Commander Stanley that she did not
10  know that you had received an order from Chief
11  Rivera to report to the FBI, is that fair?
12     A.  Well, that -- maybe that she did not
13  receive the order for it or that even if I did,
14  that I was supposed to clear it with someone in
15  126, which I did.  I took extra precautions to
16  do that.
17     Q.  I understand.
18     A.  So I don't know what else I could have
19  done.
20     Q.  Okay.
21     A.  So whether she was informed or not, I
22  cannot say.
23     Q.  Okay.
24     A.  But I know that she was angry that I

SHANNON MARIE SPALDING                          November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO            185–188

Page 185

1  didn't receive permission.  And I did notify --
2      Q.  Lieutenant Pascua?
3      A.  -- Lieutenant Pascua.
4      Q.  Okay.  I know you said there was one
5  more incident.  Was that the only -- other than
6  what you've already testified to, was there any
7  other incident where you believe Lieutenant
8  Pascua retaliated or harassed you?
9      A.  Not that I can recall at this time.
10     Q.  Okay.  Are you also claiming that
11 Commander Stanley engaged in some retaliation
12 against you?
13     A.  Yes.
14     Q.  What's the basis of that allegation?
15     A.  Well, the first time would be to fail
16 to initiate a CR investigation when I tell you
17 that I'm being harassed and retaliated against.
18     Q.  Okay.
19     A.  Failing to take action and telling me
20 you don't want to hear about that, allowing it
21 to continue, basically.  To a certain extent,
22 I'm entitled to a CR number.
23     Q.  Okay.  Other than Commander Stanley not
24 acting on a CR number, is there anything else

Page 186

1  that you're alleging was a retaliation by
2  Commander Stanley?
3      A.  Well, hostile I would say is that phone
4  call.  Even if you thought that I failed to
5  report to someone, you don't call screaming and
6  swearing at an officer like that that's -- you
7  know, like that.  Even after the circumstances
8  were explained, she was very hostile towards me
9  and I'm put in a catch-22.
10     Q.  You say after the circumstances were
11 explained.  Are you saying she was hostile to
12 you on the telephone after the circumstances
13 were explained to her?
14     A.  Yes.  And after I returned to the unit,
15 as well.
16     Q.  Okay.  What -- you said you passed the
17 phone to Tom Chester, correct?
18     A.  Yes.
19     Q.  Okay.  After Tom -- it's your testimony
20 Tom Chester gives you the phone back and
21 Commander Stanley is hostile to you, is that
22 your testimony?
23     A.  She told me I needed to leave the FBI
24 building and come in, period, disregarding what

Page 187

1  Juan Rivera said.  That is what she said in a
2  hostile manner.
3      Q.  Okay.  Commander Stanley said that
4  after or before you passed the phone to Tom
5  Chester, if you can recall?
6      A.  See, I don't recall if it was after or
7  before.
8      Q.  Okay.
9      A.  But I thought it was after.
10     Q.  All right.  You also testified when you
11 returned to Inspection, she was hostile.  Can
12 you explain that?
13     A.  She was very angry and -- yes.  She was
14 very angry.  The way you talk to someone.  I
15 mean, Tom Chester said to me, I do not want to
16 go up there and deal with this, I don't want to
17 get involved.  I said, that's too bad.  Because
18 as, you know -- he did.  He said, oh, but I
19 don't want to because of how irate she was.
20     Q.  So Tom Chester went with you back to
21 the unit, right?
22     A.  He said, first we're going to stop --
23 first, we're going to go over to Juan Rivera's
24 office and let him know about what is going on.

Page 188

1  And we stopped there first.
2      Q.  Okay.  And what did you tell Juan
3  Rivera?
4      A.  Exactly the events that I just related
5  to you about the meeting.
6      Q.  Okay.
7      A.  And he said, that's fucking ridiculous.
8  He said, Adrienne Stanley doesn't want you in
9  the unit, they don't want you there and she's
10 looking for any reason to throw you out.
11     Q.  Okay.
12     A.  Absolutely any reason.  They're not
13 comfortable with you being over there because
14 you worked with IAD on these confidential cases.
15     Q.  Juan Rivera said --
16     A.  Yes.
17     Q.  -- that because you worked at IAD on
18 these confidential cases, is that your
19 testimony?
20     A.  Because you worked with IAD on these
21 confidential, with.  Because we never worked for
22 IAD.
23     Q.  I understand.
24     A.  There's a difference.  Yes, he did.

SHANNON MARIE SPALDING                                        November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                        189–192

Page 189

1    Q.  Okay.
2    A.  And he says -- again, dismissed it and
3  said, just go back over there it will be fine.
4  But I knew from the phone conversation --
5    Q.  Okay.
6    A.  -- it's not going to be fine because --
7    Q.  Did you go back to the commander with
8  Tom Chester?
9    A.  I don't recall if we walked in there
10  together.  I think he did walk across the hall,
11  but when I -- because they're just like right by
12  each other, the offices.  We went to Rivera's
13  and then I do think he walked across the hall.
14  And when we approached her office --
15    Q.  Yes.
16    A.  -- she didn't want anything to do with
17  me.  She didn't want to talk to me at all.  She
18  was so mad, she just walked out of her office
19  and said she was going across the hall to deal
20  with it, referring to Juan Rivera's office.
21    Q.  You thought --
22    A.  And then I think Tom Chester went back
23  across the hall, too, I just went back to the
24  cubical.

Page 190

1    Q.  Okay.
2    A.  It was very stressful.
3    Q.  Okay.  Other than what you've already
4  testified to, is there any other incidents of
5  alleged retaliation by Commander Stanley against
6  you or Officer Echeverria?
7    A.  No, not at this time.
8    Q.  When you talked about the meeting with
9  Rivera and you and Tom Chester, was Officer
10  Echeverria also in that meeting?
11    A.  He was off that day.
12    Q.  Okay.  So when you were presenting on
13  the Operation Brass Tax case that day at the
14  FBI, Officer Echeverria was not with you?
15    A.  No.
16    Q.  Okay.  If I could direct your attention
17  to Paragraph 68 of the Complaint.  You allege,
18  among other things, that Chief Roti had ordered
19  that you not be allowed back in the Narcotics
20  unit or any other bureau of Organized Crime.
21  You've already testified to that conversation,
22  correct?
23    A.  Correct.
24    Q.  Okay.  Did you or Officer Echeverria

Page 191

1  ever personally ask Chief Roti if you could come
2  back to Narcotics?
3    A.  I attempted to, yes.
4    Q.  What do you mean you attempted to?
5    A.  Officer Echeverria called his office to
6  make an appointment with him to talk about it,
7  because we are getting all of this information
8  from Juan Rivera directly but we're starting to
9  question Juan Rivera because he's not doing what
10  he's supposed to.
11        So we want to hear from our chief
12  himself that we can't come back.  I want to hear
13  him tell me that.
14    Q.  And did you ever have a meeting with
15  Chief Roti?
16    A.  No.
17    Q.  Okay.  But as you testified, you were
18  starting to question whether things that Rivera
19  was telling you about not being able to go back
20  to Narcotics, were true?
21    A.  I was questioning everything.  Because
22  absolutely everybody -- my head was spinning.
23  Everybody was all over the map and nobody was
24  doing what they were supposed to do.

Page 192

1    Q.  Okay.
2    A.  So that -- yes.  Because Juan Rivera
3  was not putting us in confidential, forcing us
4  to stay in 126, which was still under his
5  command and allowing us -- refusing to get a CR
6  number.
7    Q.  Okay.
8    A.  I don't know what's up and what's down.
9    Q.  I understand.
10        When Officer Echeverria made an attempt
11  to meet with Chief Roti, was there just no
12  response or --
13    A.  No, there was a response.  Officer
14  Echeverria called his office.  The phone was
15  answered by Sue Blauer (phonetic), his
16  secretary.  At which point she stated, you need
17  to be a member of Organized Crime to get a
18  meeting with Chief Nick Roti.  And he said, I
19  am.  She said, no, you need to be assigned to
20  the unit.  He said, I am.  And she said, what's
21  your name.  And he said, Officer Daniel
22  Echeverria, I'd like to schedule a meeting.
23        And she said, well, what is it about.
24  He said, it's of a confidential matter that I

SHANNON MARIE SPALDING                    November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO        193—195

Page 193

1  need to discuss directly with the chief.  And
2  she said, you need to tell me what that's about.
3  And then she basically said, you know what, that
4  is never going to happen, and hung up on Danny.
5      Q.  Okay.
6      A.  Now, we know that Chief Roti got the
7  message.
8         MR. KING:  I move to strike.  It's not
9  responsive to any question.
10 BY MR. KING:
11     Q.  Well, let's go there.  You testified
12 that Chief Roti got the message that you and
13 Echeverria were trying to have a meeting with
14 him.  Is that your testimony?
15     A.  Yes.
16     Q.  How do you know he got that message?
17     A.  Juan Rivera.
18     Q.  Okay.  What did Juan tell you about
19 that?
20     A.  Juan Rivera saw us in the hallway and
21 he said, what the -- we were both walking
22 together.  What -- he starts telling me, what
23 the fuck is wrong with you, why the fuck did you
24 call Nick Roti.  I said, I didn't call anyone.

Page 194

1  Danny said, that was me, boss, I did that.  He
2  said, why in the fuck did you call Nick Roti.
3         He said, he called over here and told
4  me, don't you fucking ever have either one of
5  those motherfuckers call my office again.  You
6  tell those motherfucking Spalding and Echeverria
7  I've got nothing to say to them, they will never
8  work here, that's it.
9         Now, Juan Rivera knew this shortly
10 after the phone call happened.  There is no way
11 possible he could have quoted what happened --
12     Q.  Okay.
13     A.  -- if Nick Roti did not relay that
14 information.
15     Q.  Okay.  Did you or Officer Echeverria
16 ever attempt to speak directly with Commander
17 O'Grady about returning to Narcotics?
18     A.  After the higher ranking official told
19 us never to contact that unit and we couldn't
20 come back, we would be going down.  Absolutely
21 not.
22         MR. KING:  Okay.  Do you guys want to
23 take a short lunch or do you want to --
24         THE WITNESS:  I'm good.

Page 195

1  BY MR. KING:
2      Q.  You're good?
3      A.  I'd rather get this over with.  It's up
4  to you guys.  Let's push through it.
5         MR. KING:  How do you feel?
6         MS. COURT REPORTER:  I'm fine.
7  Whatever you want to do.
8         MR. KING:  We'll push through all the
9  way to the end.  Well, let's keep going for a
10 while.
11        MR. SMITH:  Well, let's just go for a
12 little while and we can revisit this in a half
13 hour or so?
14        MR. KING:  Yeah, that's fine.
15 BY MR. KING:
16     Q.  If I can direct your attention to
17 Paragraph 64 of the Amended Complaint.
18        You indicate that Lieutenant
19 Sadowski --
20     A.  64, 6-4?
21     Q.  64.  You indicate that Lieutenant
22 Sadowski joined what you refer to as the
23 campaign by repeatedly attempting to lodge false
24 allegations of wrongdoing against Plaintiffs.

Page 196

1  Do you see that?
2      A.  Yes, I do.
3      Q.  Okay.  So that was after you were
4  reassigned to be under Lieutenant Sadowski,
5  correct?
6      A.  Correct.
7      Q.  Okay.  And what are you referring to
8  when you say, he attempted to lodge false
9  allegations against you?
10     A.  Well, there are a couple of incidents.
11 One of the incidents being that when we would be
12 working later than our regular time, we would
13 call him and tell him that we were working
14 overtime with Operation Brass Tax and then we
15 would call him and tell him when we had
16 completed that.
17        So we were about to leave, be done for
18 the day at headquarters with Operation Brass Tax
19 and Officer Echeverria called Lieutenant
20 Sadowski to tell him that we were leaving.  When
21 we went to get on the elevators to go, the doors
22 open up and Juan Rivera and Commander Klimess
23 (phonetic) were there.
24     Q.  Okay.

SHANNON MARIE SPALDING                                    November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                      197–200

Page 197

1    A.  We were on, you know, the fifth floor
2    where we all, you know, worked out of.  And he
3    said, oh, just the two I'm looking for.  Come
4    into my -- Chief Rivera said, just the two I'm
5    looking for, come into my office.  I need you to
6    bring me up to speed, brief me on where we are
7    with Operation Brass Tax because we, referring
8    to himself and Klimess, Commander Klimess, have
9    to go in to McCarthy's office and brief him.
10   Q.  Okay.
11   A.  That delayed us an extra hour and a
12   half, approximately.  So then we said, okay,
13   boss, well, here's our overtime sheets.  Who's
14   going to sign those now?  Because we --
15   Q.  Right --
16   A.  -- we signed them out when we were
17   leaving at -- we signed it for like 6:00 and now
18   we're there until 7:30.
19   Q.  Sure, sure.
20   A.  He said, give them to me, I'll sign
21   them and he signed them.  We said, do we need to
22   call Lieutenant Sadowski back.  And he said, I'm
23   the fucking chief.
24   Q.  Okay.

Page 198

1    A.  I signed it, it's done.
2         Well, fast forward, now Lieutenant
3    Sadowski says he wants to file a complaint
4    against us for falsifying our overtime because
5    Danny had called him and said we were leaving
6    and then we didn't.
7    Q.  Okay.
8    A.  So we explained the situation to him,
9    Danny explained the situation to him over the
10   phone while I was in the car.  I heard Danny
11   explain exactly the incident that I just
12   explained to you.
13   Q.  Okay.  So Danny has a conversation with
14   him when you all are driving back to
15   Inspections?
16   A.  This is on another day.  This is fast
17   forward.
18   Q.  Okay.
19   A.  Because it takes about a few weeks or
20   longer for the slips to go through however long.
21   Q.  Okay.
22   A.  So this is another day he contacts
23   Danny.  So we thought the explanation would
24   satisfy the situation --

Page 199

1    Q.  Okay.
2    A.  -- at which point it doesn't.
3    Q.  Okay.  Let me --
4         (Whereupon, Spalding Deposition
5          Exhibit No. 3 was marked for
6          identification.)
7    BY MR. KING:
8    Q.  Ms. Spalding, I'm showing you another
9    document that's marked Deposition Exhibit No. 3,
10   I believe.  And it appears to be a counseling
11   session report.  The first page is Officer
12   Echeverria's name, the second page is your name
13   and it's a counseling by Lieutenant Sadowski.
14   Have you seen this document before?
15   A.  No.  I have not seen this at all.
16   Q.  Okay.  This indicates anyway under the
17   section statement of performance concern and he
18   writes, above is being counseled for two
19   separate incidents.  The second incident states,
20   failed to notify a supervisor assigned to 126
21   when above worked overtime on 21, November,
22   2011.  Is that the overtime incident that you
23   were just testifying about?
24        MR. SMITH:  I object to the

Page 200

1    characterization as second incident.  I'm sorry,
2    I see the first sentence above this.  I withdraw
3    the objection.
4         THE WITNESS:  Yes.
5    BY MR. KING:
6    Q.  Yes?
7    A.  Yes.
8    Q.  Okay.  So Lieutenant Sadowski had a
9    meeting with you and Officer Echeverria about
10   this overtime incident, correct?
11   A.  No, incorrect.
12   Q.  Okay.  Never had a meeting?
13   A.  No.  He told us we were going to have a
14   meeting for this counseling report.  And the
15   reason I never saw it is when I -- he told us we
16   needed to come --
17   Q.  Right.
18   A.  -- we needed to come and you'll see
19   that this -- there is no signature on here.  We
20   would have to sign this.
21   Q.  I understand.  My only question is --
22   A.  Okay.
23   Q.  -- did you have a meeting --
24   A.  No.

SHANNON MARIE SPALDING                          November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO              201–204

Page 201

1    Q.  -- with Lieutenant Sadowski about this
2  overtime issue?
3    A.  No.  No, I did not.  I was not --
4  never met with him.
5    Q.  Okay.  And -- okay.
6       And do you know what the first incident
7  is referencing, failed to notify a supervisor
8  assigned to Unit 126 about the status of
9  eligibility for OPY, Operation Project Youth?
10   A.  I have no idea what that even is.
11   Q.  Okay.  Do you have any recollection of
12  OPY, Operation Project Youth?
13   A.  I don't know what that even is.
14   Q.  Okay.  Do you have any recollection of
15  being asked to participate in OPY, Operation
16  Project Youth?
17   A.  I was never asked to participate in it.
18  I don't even know what it is.
19   Q.  Okay.  Do you ever recall being asked
20  to participate in a police initiative where you
21  would go to one of the schools?
22   A.  No.
23   Q.  Okay.  And Lieutenant Sadowski, to the
24  best of your recollection, never had a

Page 202

1  conversation with you about failing to notify a
2  supervisor about the status of your eligibility
3  for OPY?
4    A.  With me?
5    Q.  Yes.
6    A.  Lieutenant Sadowski had this
7  conversation with me?
8    Q.  Yes.  I'm asking you, yes.
9    A.  No, not that I recall at all.  No.
10   Q.  Okay.  And if you look at the third
11  page of this exhibit.  Are these the overtime
12  slips that you were testifying about that were
13  signed by Juan Rivera?
14   A.  These would not be the ones because --
15  they can't be because of -- to 1830, yes, they
16  would be the ones because it says Juan Rivera
17  down there, doesn't it, at the bottom?
18   Q.  It appears to.
19   A.  If that's his signature.  I can't see.
20  I can't read it, either, any of this.
21   Q.  Okay.
22   A.  And it's signed seven days later, isn't
23  it, by Juan -- is that Juan Rivera?
24   Q.  Let me just -- have you seen this

Page 203

1  document before?
2    A.  No.
3    Q.  Okay.
4    A.  I'm -- no, I haven't.  But --
5    Q.  That's fine.
6    A.  But it is signed by Juan Rivera.
7    Q.  Correct.
8    A.  So it would have to be the incident
9  date.
10   Q.  Okay.  You don't have any reason to
11  doubt that --
12   A.  No.
13   Q.  -- this relates to the incident that
14  you were testifying about where Rivera signed
15  the overtimes?
16   A.  I have no reason to doubt it.
17   Q.  Okay.  And Lieutenant Sadowski never
18  sat down and had what you understood to be a
19  counseling with you?
20   A.  No.
21   Q.  Okay.
22   A.  Never.
23   Q.  And then I assume you --
24      MR. SMITH:  I'm just going to object to

Page 204

1  the vagueness of counseling with you.
2      THE WITNESS:  I could tell you why.
3  BY MR. KING:
4    Q.  I was asking you if you felt that there
5  was any retaliation by Lieutenant Sadowski, you
6  mentioned this overtime incident.
7    A.  Uh-huh.
8    Q.  Other than that, are you alleging that
9  there are any other incidents where Lieutenant
10  Sadowski retaliated against you or harassed you?
11   A.  The overtime incident where he was
12  calling us in for the meeting, to go into -- for
13  our counseling meeting that never happened
14  between him and I.
15   Q.  Okay.
16   A.  Okay.  And then there was another
17  incident --
18   Q.  Let me just stop you for a second.  So
19  you understood you were going to be called in
20  for a counseling meeting with Lieutenant
21  Sadowski but that, in fact, never happened?
22   A.  He talked to me on the phone and yes,
23  he said you're going to come in and you're going
24  to come in at this time in the morning.  And we,

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
205–208

Page 205

1  you know -- but no, the meeting with me and
2  Sadowski never happened.
3      Q.  Okay.  Do you know if there was a
4  meeting between Echeverria and Sadowski --
5      A.  Yes.
6      Q.  -- about the overtime?
7      A.  Yes.
8      Q.  Okay.  And you weren't present for
9  that?
10     A.  I was on my way up when Juan Rivera
11 stopped me and said, what the hell are you doing
12 here.
13     Q.  I see.
14     A.  You're supposed to be on the street.
15     Q.  Okay, that's fine.
16         And I'm sorry, you were testifying to
17 any other incidents of alleged retaliation by
18 Lieutenant Sadowski.
19     A.  There was another time on a day we were
20 not working Operation Brass Tax, you can ask me
21 when, I don't recall when exactly it was.  It
22 was in the middle of sometime when he became our
23 lieutenant --
24     Q.  Sure.

Page 206

1      A.  -- and before we left the unit.  That
2  he was talking about an incident that happened
3  and he was going over it with Danny and I.  And
4  I said, wait a minute, on what date?  And I
5  don't recall the incident.  But I said,
6  lieutenant, I don't even know what you're
7  talking about and I wasn't even at work that
8  day.  And he said, it doesn't matter, partners
9  go down in pairs.  You're getting written up for
10 it, too.
11     Q.  Okay.  Do you recall what the incident
12 was that you were getting written up for?
13     A.  No, because I had no idea.  And then I
14 couldn't recall.  I'm like, what is he talking
15 about.  And so then I asked him the date.  And
16 said, I wasn't here that day, that's why I have
17 no knowledge of what you're talking about.
18     Q.  But did Lieutenant Sadowski tell you
19 what the incident was?
20     A.  At the time he did, I don't recall what
21 it is now.
22     Q.  You don't recall what it was?
23     A.  Yes.  He did state it at the time.
24     Q.  Okay.

Page 207

1      A.  I don't recall because I wasn't even
2  there.
3      Q.  Sure.  So you were upset that --
4      A.  How am I going to --
5      Q.  -- he was faulting you for some
6  incident on a day when you weren't even at work?
7      A.  Correct.
8      Q.  Okay.  Other than what you already
9  testified to, is there anything else that
10 happened that you believe is retaliation or
11 harassment by Lieutenant Sadowski?
12     A.  Not that I recall at this time.
13     Q.  Okay.  And would I be correct that
14 everything that you're alleging was retaliation
15 by Lieutenant Pascua, Lieutenant Sadowski or
16 Commander Stanley occurred during the time that
17 you were assigned to the Inspection Division?
18     A.  Correct.
19     Q.  Okay.  Did you ever complain to Tina
20 Skahill about anything that you believed was --
21 that you were being retaliated against or
22 harassed?
23     A.  I did -- we did tell her like when we
24 were being thrown out of 543, as we discussed --

Page 208

1      Q.  Okay.
2      A.  -- and, you know, how we were being
3  thrown out and that we were going to go back to
4  the district.
5      Q.  Other than what you've already
6  testified to, did you ever complain to Tina
7  Skahill about any alleged retaliation or
8  harassment?
9      A.  During the course of Operation Brass
10 Tax, of course with the permission of Juan
11 Rivera, he was well informed of it, we would
12 continue to keep her up on date when we would
13 see her -- up to date on Operation Brass Tax.
14     Q.  Okay.
15     A.  And during the course of those
16 conversations, I would say, you know, this --
17 you know, like I would mention things that had
18 happened.  And she said she would talk to Juan
19 because Juan needed to just assign us to
20 Confidentials and then everybody in IAD
21 Confidentials does the same work as us and the
22 harassment would stop.
23         And she said she didn't understand why
24 Juan wasn't doing that, but she would talk to

SHANNON MARIE SPALDING                          November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                209–212

Page 209

1    him.  She offered to talk to Juan multiple times
2    on our behalf --
3        Q.  Okay.
4        A.  -- about that.
5        Q.  Okay.  And all of these occasions where
6    you were just testifying about were when Juan
7    Rivera was the chief and Tina Skahill was no
8    longer the chief, correct?
9        A.  Correct.
10       Q.  Okay.  You never specifically asked
11   Tina Skahill to pull a CR number for you, did
12   you?
13       A.  No, because she wasn't -- no.  We
14   weren't reporting directly to her anymore, so we
15   would ask Juan.
16       Q.  Okay.  Do you have any recollection of
17   ever discussing with Tina Skahill any alleged
18   retaliation that you believe was happening in
19   Inspections at the hands of Lieutenant Pascua or
20   Sadowski or Commander Stanley?
21       A.  You mean while it was under her
22   authority?
23       Q.  At any time.
24       A.  No.

Page 210

1        Q.  Okay.  And after the Inspections
2    Division, your next detail was Fugitive
3    Apprehension, correct?
4        A.  Correct.
5        Q.  Okay.  And are you alleging that there
6    was anything retaliatory about your move to
7    Fugitive Apprehension?
8        A.  No.
9        Q.  Okay.  In fact, you applied to get into
10   that unit, correct?
11       A.  In fact, Danny and I went and had a
12   conversation with Chief Tom Byrne.  He was our
13   former boss when we were in the 1st District and
14   he had -- he knew that we were really good
15   officers and he had, in fact, asked us to come
16   to Fugitives while we were in Operation Brass
17   Tax and I had told Juan Rivera I wanted off and
18   I wanted to go, but we were denied.
19       Q.  Okay.
20       A.  And during the course of the
21   conversations with Juan when all of this was
22   happening, he said, my hands are tied, I can't
23   help you, maybe you can go back and talk to Tom
24   Byrne, maybe he can help you.

Page 211

1        Q.  Okay.
2        A.  So we did.
3        Q.  So let me stop you.
4           So when you testified that you were, at
5    certain points, trying to get out -- or at a
6    certain point trying to get out of Operation
7    Brass Tax and you told that to Juan Rivera, you
8    were trying to move to Fugitive Apprehension; is
9    that correct?
10       A.  Well, at -- no, not at all times.  At
11   one point, I didn't care where he put me, I just
12   wanted off.  And at one point he said, I could
13   put you in Confidentials -- I'll move you, I'll
14   move you to Confidentials or I'll move you back
15   to the academy.  And I said, I'll gladly go to
16   Confidentials and it never happened.  So we
17   didn't know where it would be.
18       Q.  Okay.  So prior -- is it your testimony
19   that prior to you and Officer Echeverria putting
20   in applications to go to Fugitive Apprehension,
21   you had a conversation with Chief Tom Byrne
22   about Fugitive Apprehension?
23       A.  It was a conversation in passing.
24       Q.  Okay.

Page 212

1        A.  Where he said, you know, you guys being
2    inside is a really big waste of talent and you
3    guys should go work with me.  We knew that
4    wasn't going to happen because we weren't --
5        Q.  When he's saying, you guys should come
6    work for me, is he referring to Fugitive
7    Apprehension?
8        A.  That's how I took it.
9        Q.  Okay.  And when did this conversation
10   take place in relation to when you submitted an
11   application to go to Fugitive Apprehension?
12       A.  It had to be at least a year or so
13   before.
14       Q.  Okay.  Thank you.
15           (Whereupon, Spalding Deposition
16            Exhibit No. 4 was marked for
17            identification.)
18   BY MR. KING:
19       Q.  Ms. Spalding, I'm showing you another
20   document that's been marked Deposition Exhibit
21   No. 4, which is an e-mail -- or a couple of
22   e-mails.  At the top, an e-mail from Officer
23   Echeverria to Juan Rivera.  Have you ever seen
24   this e-mail before?

SHANNON MARIE SPALDING                                    November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                      213–216

Page 213

1     A.  No.
2     Q.  Okay.  Were you aware that Juan Rivera
3  was providing you information and suggesting
4  that you apply to the Fugitive Apprehension
5  unit?
6     A.  What -- again, I will state that what
7  he said was it would be our best bet to go and
8  see if Tom Byrne could help us get into there.
9  Because Nick Roti was the one that would have to
10 sign off on any of the other units and it was
11 impossible.
12    Q.  Okay.  There are three different
13 e-mails reprinted on Exhibit 4.  Is it your
14 testimony you've never seen any of them?
15    A.  I did not see the actual e-mail.
16    Q.  Okay.
17    A.  But I do know that -- hold on, there's
18 more down here.  Hold on a second.  This was --
19 no, I never saw these documents before.
20    Q.  Okay, that's fine.
21       You were aware, obviously, that you and
22 Officer Echeverria decided to submit
23 applications for the Fugitive Apprehension unit,
24 correct?

Page 214

1     A.  Okay.  This is referring to a night
2  task force that is going to start that was not
3  up and running at the time.  But yes, for
4  Fugitive Apprehension unit, the task force, yes.
5     Q.  Okay.  You're saying what this is
6  referring to but you've never seen the e-mail?
7     A.  No, I haven't seen the actual e-mails.
8  No, I have not.
9     Q.  Okay.
10    A.  I have not seen these e-mails.  It's
11 the first time I'm seeing them.
12    Q.  Okay.  At some point, you and Officer
13 Echeverria --
14    A.  I must be failing to understand.
15    Q.  -- decided to apply for a reassignment
16 to Unit 606 Fugitive Apprehension, correct?
17    A.  Correct.
18    Q.  Okay.  And in connection with that
19 application, you asked both Chief Rivera and
20 Tina Skahill to provide letters of
21 recommendation for the two of you, correct?
22    A.  Correct.
23    Q.  And both of them did, correct?
24    A.  Correct.

Page 215

1     Q.  Okay.  And you were reassigned to
2  Fugitive Apprehension, by my records, effective
3  on or about March 18, 2012.  Does that sound
4  correct?
5     A.  Yes.
6     Q.  Okay.  If I could now direct your
7  attention back to Exhibit 1, the Amended
8  Complaint, Paragraph 73.
9        You allege that on March 20th, you are
10 detailed to Fugitive Apprehension Unit 606.  And
11 you allege, within that unit, Plaintiffs were
12 assigned to the United States Marshal's Task
13 Force.  Do you see that?
14    A.  I see that.
15    Q.  Is that your understanding that when
16 you first joined Fugitive Apprehension, that you
17 were a part of the United States Marshal's Task
18 Force, yes or no?
19    A.  United States Marshal's Task Force,
20 no.
21    Q.  Okay.  Is it your understanding at any
22 time since you've been detailed to Fugitive
23 Apprehension, that you've been a member of the
24 United States Marshal's Task Force?

Page 216

1     A.  Since we were in Fugitives?
2     Q.  Yes.
3     A.  No.
4     Q.  And in order to do that, you'd need to
5  be deputized --
6     A.  Correct.
7     Q.  -- by the U.S. Marshals, correct?
8     A.  Correct.
9     Q.  Okay.  And when you first went to
10 Fugitive Apprehension, your first immediate
11 supervisor was Sergeant Barnes, correct?
12    A.  Correct.
13    Q.  Looking at Paragraph 75 of the Amended
14 Complaint.  You allege upon information and
15 belief on or around the day of your initial
16 detail, it says to the U.S. Marshal's Task
17 Force, Defendant O'Grady went out of his way to
18 personally inform Plaintiffs' new supervisors
19 that they were rats and should be treated
20 accordingly.
21       Do you have any personal knowledge of
22 Defendant O'Grady telling anyone in Fugitive
23 Apprehension that you were rats and should be
24 treated accordingly?

SHANNON MARIE SPALDING                              November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                    217–220

Page 217

1    A.  Yes.
2    Q.  And what's the basis of that knowledge?
3    A.  On the first day that Officer
4  Echeverria and I reported to the unit, we met
5  with Salemme and Cesario, at which point, you
6  know, they asked us if we had come -- you know,
7  where our background, if we worked -- you know,
8  worked with IAD before, things like that.
9    Q.  Okay.
10   A.  And were we assigned.  And I said, at
11  no time were we assigned to IAD.  And then when
12  we left the office after the brief meeting, he
13  walked us over to the two secretaries, Jan
14  Hannah and Colleen Dugan, and he said, you'll
15  talk to them about getting, you know, your
16  radios, your equipment, whatever.
17   Q.  Sure.
18   A.  And they walked away.  At which point,
19  they stated, oh --
20   Q.  Who is they?
21   A.  Jan Hannah and Colleen Dugan.
22   Q.  Are both of them talking or one of
23  them?
24   A.  At one point, each one of them talked.

Page 218

1    Q.  Okay.  What did you hear Jan Hannah and
2  Colleen Dugan, the secretaries, say?
3    A.  Jan Hannah said, oh, so you guys are
4  the IAD rats that we heard about and Colleen
5  said -- echoed the same thing.
6    Q.  Okay.
7    A.  Within ten minutes of being in the
8  unit.
9    Q.  Okay.  And that's the basis for your
10  allegation in Paragraph 75 of the Amended
11  Complaint?
12   A.  That was my second heads-up that
13  something was going on.  The first time, there
14  was --
15   Q.  Okay.  My question is you allege on the
16  information and belief that O'Grady personally
17  informed your new supervisors that you were rats
18  and should be treated accordingly.  One basis
19  for that is what you testified to that Jan
20  Hannah and Colleen Dugan said.  Is there any
21  other basis for your allegation in Paragraph 75?
22   A.  Yes.
23   Q.  And what is that?
24   A.  Prior to -- on the day that we were

Page 219

1  notified that we were going to Fugitive
2  Apprehension, we had to contact them to find out
3  when do we start and general information, where
4  do we report.  And the secretary Maureen,
5  something with an S, answered the phone.  She
6  used to be -- work down in Narcotics at the
7  24-hour desk, so I was familiar with who she
8  was.  And she said, okay, Officer Spalding, so
9  you and your partner -- and she said, so you're
10  coming from Unit -- so you're assigned to 126.
11       And I said, no, actually we're assigned
12  to Unit 189 Narcotics.  She said, oh, that
13  explains why Commander O'Grady is up here for
14  the last couple of hours so upset.  He's
15  probably mad that we're taking two of his
16  officers away.  That was my first heads-up that
17  things weren't going to go so well.
18   Q.  Okay.
19   A.  That's probably why he's upset.
20   Q.  Did Maureen S. say anything else in
21  that conversation?
22   A.  After that, I can't recall what she
23  said because I was just so shaken to the core.
24   Q.  Okay.  You don't have any personal

Page 220

1  knowledge, do you, of Defendant O'Grady saying
2  anything about you to anyone in the Fugitive
3  Apprehension unit, do you?
4    A.  Yes.
5    Q.  Is that based on what you already
6  testified to?
7    A.  No.
8    Q.  Okay.  What is that based on?
9    A.  That's based on July of 2011 when I was
10  called in to Lieutenant Cesario's office in the
11  presence of Sergeant Mills and was told that --
12   Q.  Okay.  Before we -- I don't mean to
13  interrupt you.  But before we get to the July,
14  2011 meeting.
15   A.  Okay.
16   Q.  Prior to that, did you have any
17  personal knowledge that Commander O'Grady spoke
18  negatively about you or Officer Echeverria to
19  anyone in the Fugitive Apprehension unit?
20       MR. SMITH:  Objection, vague as to
21  meaning of personal knowledge.
22       Go ahead.
23       THE WITNESS:  I'm confused now.
24

SHANNON MARIE SPALDING                    November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO          221–224

Page 221

1  BY MR. KING:
2     Q.  Do you have any knowledge based on
3  anything other than what you've already
4  testified to --
5     A.  Prior to.
6     Q.  -- that prior to this July, 2011
7  meeting, Commander O'Grady spoke to anyone in
8  the Fugitive Apprehension unit negatively about
9  you or Officer Echeverria?
10    A.  Not that I can recall at this time.
11    Q.  Okay.  And you have no personal
12 knowledge that -- prior to you starting in
13 Fugitive Apprehension, you have no personal
14 knowledge of Commander O'Grady speaking to
15 Sergeant Barnes about anything, correct?
16    A.  Prior to me starting?
17    Q.  Yes.
18    A.  No.
19    Q.  And likewise, you have no personal
20 knowledge of Defendant O'Grady speaking to
21 Commander Salemme or Lieutenant Cesario in a
22 negative manner about you or Officer Echeverria,
23 do you?
24    A.  Other than the indication from Maureen

Page 222

1  saying that O'Grady was up there very upset with
2  the commanders over us coming there, no.
3     Q.  Okay.  You were testifying about
4  Paragraph 75, what you base your belief on that
5  O'Grady had informed new supervisors that you
6  were rats and should be treated accordingly.
7        Have you testified about everything
8  that allegation in Paragraph 75 was based on?
9     A.  I believe so.
10    Q.  Okay.  In the next paragraph, you
11 indicate that your first sergeant in Fugitive
12 Apprehension, Sergeant Barnes thereafter
13 informed your new team that you were rats, that
14 you were not to be trusted or backed up by the
15 team; is that correct?
16    A.  Correct.
17    Q.  And what's the basis for that
18 allegation?
19    A.  Team members informing us of that.
20    Q.  Okay.  And when did they inform you of
21 that?
22    A.  Shortly after our assignment to work
23 with them.
24    Q.  And what team members informed you of

Page 223

1  that?
2     A.  Robert Walker and Loren, L-O-R-E-N,
3  Guishnere, G-U-I-S-H-N-E-R-E, I believe.
4     Q.  And was Guishnere and Walker on your
5  team under Sergeant Barnes?
6     A.  Yes.
7     Q.  Okay.  And were both you -- strike
8  that.
9        Was this in a single conversation with
10 both Walker and Guishnere or were these separate
11 conversations?
12    A.  Separate.
13    Q.  And were you present for both of those
14 conversations?
15    A.  Yes.
16    Q.  Was Officer Echeverria present for both
17 of those conversations?
18    A.  Yes.
19    Q.  Who told you this first?
20    A.  Walker.
21    Q.  In person or on the phone?
22    A.  In person.
23    Q.  What did Walker say to you and what did
24 you or Officer Echeverria say to Walker?

Page 224

1     A.  He said, after working with you guys
2  for a while, I just think it's fair that you
3  know what's going on.  He said, you know, we
4  heard about you prior to you getting here.  The
5  sergeant told us that, you know, you're coming
6  from IAD and that we shouldn't be working with
7  you or back you up, you know, that I just think
8  you should know.  I base my judgment on the
9  individuals and you guys are good cops and maybe
10 you should address this issue with the sergeant
11 and see if, you know, you can resolve the
12 issues.
13    Q.  Do you recall Robert Walker saying
14 anything else in that conversation?
15    A.  I mean, the conversation wasn't just
16 that simple.  I mean, of course we were floored.
17 And I think he said that he had mentioned, and I
18 don't recall his exact wording, that Sergeant
19 Barnes was very good friends with Jim O'Grady.
20 I believe he mentioned that he was good friends
21 with the boss.  I don't know who told us that it
22 was -- actually, that he was friends with, you
23 know, O'Grady and that it had come from the
24 Narcotic Division is what he said.

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
225–228

Page 225

1    Q.   Okay.  Do you recall Walker saying
2  anything else?
3    A.   No.
4    Q.   Okay.  And was the conversation with
5  Loren Guishnere in person?
6    A.   Yes.
7    Q.   And is that a male or female?
8    A.   It's a male.
9    Q.   Okay.  What do you recall Mr. Guishnere
10  saying to you and you and Officer Echeverria
11  saying in the conversation that you say supports
12  your allegation in Paragraph 76?
13    A.   Guishnere stated that they were
14  instructed not to work with us and the same --
15  basically the same information that Walker --
16  you know, that we're from IAD, not to work with
17  us and -- or back us up.  And Guishnere said,
18  you know, that he personally cannot treat an
19  officer in a negative manner, unless he has his
20  own specific personal reasons to do so.
21    Q.   Okay.  Other than that, do you remember
22  Officer Guishnere saying anything else?
23    A.   Since then, Guishnere has had multiple
24  conversations with my partner directly regarding

Page 226

1  the same situation.
2    Q.   Okay.  Have you personally had any
3  other conversations with Guishnere about this
4  situation?
5    A.   You know, it may have come up in
6  passing, but not a direct, you know,
7  conversation like that.
8    Q.   Okay.  If I could direct your attention
9  to Paragraph 77 in the Complaint.  You allege
10  that at one point Sergeant Barnes removed the
11  Plaintiffs from a high profile case to which
12  they had been assigned because they were rats.
13  Plaintiff would not be allowed to work on the
14  case.  Can you explain what that incident was
15  about?
16    A.   Yes.  I had been given a high profile
17  homicide case that was all over the media.  And
18  I was working with my partner Echeverria, Kevin
19  Williams and Larry Odem, O-D-E-M, and we had
20  been working together on cases.  And on this
21  particular day, it was Officer Echeverria,
22  myself, and I believe Larry Odem was there.  I
23  don't believe Kevin Williams was present for
24  this.

Page 227

1      We -- I got the assignment, we hurried
2  up, we pulled out all the information, made
3  contact with a possible witness and we're en
4  route to handle this when Sergeant Barnes had
5  called and said that he was taking the case away
6  from me.
7      Every one of the cases that I had prior
8  to that had been like turnstile jumpers for CTA
9  or something like that in --
10    Q.   So you were en route to working on the
11  case --
12    A.   Yes.
13    Q.   -- and Sergeant Barnes calls you and
14  says he's taking the case away from you?
15    A.   Correct.
16    Q.   Okay.  Did he say anything else other
17  than he's taking the case away from you?
18    A.   No.  I know I told him that we were
19  already en route and we had already worked it
20  up.  And, you know, he said, it's being
21  reassigned to somebody else, and then I received
22  turnstile jumpers and things like that.
23    Q.   Do you recall him saying anything else
24  in that conversation?

Page 228

1    A.   Not in that conversation.
2    Q.   Okay.  So you're en route to work on
3  the case that you worked up.  Do you continue on
4  to do that?
5    A.   No.
6    Q.   Do you stop and get out of the car or
7  what happens?
8    A.   We pick up the next file and start
9  working on that one.
10    Q.   So you stopped working on the case that
11  you --
12    A.   I was ordered to.
13    Q.   Okay.  And was that just you and
14  Officer Echeverria in the car?  I'm sorry.
15    A.   It was Larry Odem, as well.
16    Q.   Right.  Was Kevin Williams also in the
17  car?
18    A.   I don't believe Kevin Williams was in
19  the car at the time this happened.
20    Q.   Okay.  If I can direct your attention
21  to Paragraph 78 of the Complaint.  You allege
22  that when you tried to talk to Sergeant Barnes,
23  he repeatedly referenced that you had brought
24  down a sergeant, referring to Watts; is that

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
229–232

Page 229

1    correct?
2        A.   Correct.
3        Q.   How many times did Sergeant Barnes
4    reference to you that you had brought down a
5    sergeant?
6        A.   Multiple times.
7        Q.   Okay.  Any recollection of when the
8    first time was?
9        A.   This is during one conversation, I
10   believe.  You're saying -- you are referring to
11   the time that I tried to talk to --
12       Q.   I'm referring to whatever you're
13   referring to in Paragraph 78.
14       A.   Okay.  This was after I was informed,
15   we, my partner and I, were informed by Robert
16   Walker of the situation.  He had said, why don't
17   you try to talk to Sergeant Barnes.
18       Q.   Okay.
19       A.   So I was working with Kevin Williams
20   that day and Sergeant Barnes had come in.  And
21   he was being -- he was -- he just -- he was
22   really being -- I don't even know the right
23   word, other than very aggressively hostile
24   towards me.

Page 230

1            First when he came in, they had just
2    come in from apprehending someone for I believe
3    homicide.  And Guishnere had -- it was actually
4    his case and everybody was out on it but not
5    myself, Danny or Kevin.  And he told me, well,
6    we just got this guy, you're going to get on the
7    computer and you're going to write up, start the
8    arrest report.  I can't start the arrest report,
9    I wasn't even on scene.  I'm not the arresting
10   officer.  So he said, you're going to start it.
11           So I called Guishnere and I said,
12   Guish, how do you want me to do your report.
13   And he said, absolutely not, you can't.  Don't
14   do it, you'll ruin the whole case.  I said,
15   yeah, I'm confused.  Can I start something else
16   for you.  So Barnes became very upset that I
17   wouldn't go ahead and start this arrest report.
18   I'm not even on the scene, I don't even know
19   where you guys were.
20       Q.   Sure.
21       A.   That's not even -- I can't.  It's
22   illegal.
23       Q.   Sure.
24       A.   So he sits down next to me right here,

Page 231

1    he leans all the way over in my ear and puts the
2    radio down and turns it up.  He says, you
3    fucking hear that?  Do you hear that?  That's
4    the 3rd fucking District.  Do you now how fast I
5    could fucking have you back there?  Do you want
6    to go back to that fucking district?  Do you
7    want to go back to the district?  He was being
8    so aggressive that a female detective turned
9    around and said, Sergeant Barnes, I don't like
10   the way you're talking to her.  This is
11   inappropriate and this is hostile.  You need to
12   stop immediately.
13       Q.   And who was the female detective?
14       A.   I don't know who she was.
15       Q.   Okay.
16       A.   But I would know her if I saw her
17   again.
18       Q.   Okay.
19       A.   It was upstairs in Area South on 111th
20   and Ellis.
21       Q.   Okay.
22       A.   711 East 111th Street.
23       Q.   Other than what you've already
24   testified to, did Sergeant Barnes do or say

Page 232

1    anything else to you in that incident?
2        A.   Yes.
3        Q.   What did he do or say?
4        A.   After that incident, he walked away and
5    he sat down at this desk.  And I figured, this
6    is escalating, maybe I should try to talk to him
7    and see if we could quash this.  I mean, we're
8    in Fugitives, we're working with really good
9    officers on this team.  I'm so tired of this,
10   I'm desperate to make it work.  We did what I
11   think is the right thing with Watts.  So I
12   approached --
13       Q.   What did Sergeant Barnes say or do?
14       A.   I approached Sergeant Watts and
15   asked -- Sergeant Barnes and asked him if I
16   could speak to him and he said, okay.  We
17   started talking and I said, you know, it's my
18   understanding that, you know, you have some
19   preconceived ideas about my partner and I and
20   that maybe you're concerned about our reasons
21   for being here.  And these are issues that I
22   would -- if you have concerns about, I would
23   like to attempt to address and rectify so that
24   we don't have any future problems.

SHANNON MARIE SPALDING                 November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO     233–236

Page 233

1   Q.  Okay.
2   A.  And so Sergeant Barnes said, we're
3  going to go, you know, talk and he led me to
4  this back like storage room area, I don't know
5  what it was, up in the Detective Division.
6       And I basically, without naming who, I
7  told him what information I had heard.  And, you
8  know, he said, you know, I know that, you know,
9  you worked for IAD, you brought a sergeant down.
10  And I said -- he said, you're going to deny you
11  worked for IAD?
12       I said, well, there's a difference
13  between working for IAD or working on, you know,
14  a case that IAD is involved in, a Narcotics
15  case, you know, with wrongful stuff.  I said
16  does -- yes, does IAD become involved, you know,
17  once you learn of some kind of allegations and
18  stuff, absolutely.  What are you supposed to do,
19  you know, but it happens.
20      And he's like, so you like to bring
21  sergeants down, huh?  You like to have sergeants
22  arrested?  And he's like, you like to do that
23  stuff?  And I'm like nobody, you know --
24   Q.  Just tell me what he said and what you

Page 234

1  said.
2   A.  -- likes to do that.  And he's like,
3  well, you know what the problem is, the team
4  doesn't -- the team doesn't like you.  They're
5  not going to back you up, they don't trust you.
6  I said, they don't?  They don't trust us?  And
7  why is that?  Because my understanding is
8  they're being ordered by you.  They don't have a
9  problem with us.  He said, yes, they do.
10      I said, well, do you think it's
11  possible we could have a team meeting to
12  clarify?  Let's put all the cards on the table,
13  we'll answer any questions.  I don't want any
14  problems.  And he said -- again, he would
15  continue to bring up, you like to bring
16  sergeants down, you like to put sergeants in
17  prison, over and over again.
18   Q.  Okay.
19   A.  And then he said, well, you know what,
20  you're not -- you're not social, you don't
21  even -- you don't socialize with the guys.  I
22  said, I didn't know socializing with the guys
23  was part of my job requirement.
24      And he's like, well, you know, and

Page 235

1  they're not going to back you up.  You're not
2  safe out here.  He said, to be honest with you,
3  I'd hate to one of these days have to be the one
4  to knock on your door and tell your daughter
5  you're coming home in a box.  That's how serious
6  it is.
7      He said, if you want to address the
8  issue, I'll tell you what, the next time we have
9  a -- I call a team meeting, feel free to stand
10  up and address the issues, but I'm not going to
11  do it.
12   Q.  Okay.
13   A.  So I said, okay.  On that particular
14  day, I said, okay.
15   Q.  Okay.
16   A.  During the course of that meeting,
17  Officer Echeverria and Williams walked in.
18   Q.  Okay.  During the course of the meeting
19  you were just testifying to that you were having
20  with Barnes, Officer Echeverria and Kevin
21  Williams walk in?
22   A.  Yes.
23   Q.  Are they part of the conversation?
24   A.  They come in and they say, what's going

Page 236

1  on, you know.  And I said, well, Danny, maybe
2  you should have a seat because Sergeant Barnes
3  says this is an issue with both of us, it
4  concerns both of us.
5   Q.  Does Officer Echeverria sit down?
6   A.  He walks in to sit down and Sergeant
7  Barnes says, no, Danny, you get to play with her
8  all day.  I'll send her back when I'm finished.
9   Q.  Okay.
10   A.  And tells Danny to leave the room.
11   Q.  Okay.
12   A.  And Kevin Williams walked out, as well.
13   Q.  Okay.  Other than what you just
14  testified to you saying and then Barnes saying,
15  Officer Echeverria was not present for the rest
16  of the conversation with Barnes, correct?
17   A.  Correct.
18   Q.  Okay.  Am I correct that the
19  conversation that you just testified to with
20  Sergeant Barnes is what you're referring to in
21  Paragraphs 78 and 79 of the Complaint?
22   A.  Correct.
23   Q.  Okay.  Other than what you've already
24  testified to, is there any other alleged

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
237—240

Page 237

1  retaliation or harassment by Sergeant Barnes
2  that you're alleging?
3      A.  From these paragraphs, no.
4      Q.  Other than anything you've already
5  testified to, is there anything else that you're
6  alleging is retaliation or harassment by
7  Sergeant Barnes?
8      A.  Yes.
9      Q.  What else?
10     A.  After that -- after that meeting with
11  Sergeant Barnes, a few days later, he calls a
12  team meeting.  During that meeting, Officer
13  Echeverria stood up and said, I'd like to
14  address an issue.  You know, does anybody here
15  seem to have a problem with my partner and I?
16  There's -- we're seeming to receive information
17  that people are questioning our intentions here
18  and whether we could be trusted.  And it seems
19  to be we've been -- you know, my partner has
20  been informed that, you know, it's a problem,
21  the team has a problem working with us.  Does
22  anyone have a problem working with either my
23  partner or I?  And everyone said, no, we don't
24  have a problem.

Page 238

1          And Sergeant Barnes said, you know, no,
2  you're misunderstanding.  I said, I'm not
3  misunderstanding anything.  Yesterday or two
4  days ago you stated that the team has a problem
5  working with us and that that's not safe -- and
6  that we're not safe out here.
7          And he tried to backpedal.  And then
8  he's like, well, you said somebody told you that
9  I said this.  Who told you?  I said, I'm not
10  going to divulge that information.  I want to
11  know who told you that.  I said, Sergeant --
12  Robert Walker stood up and said, I told her
13  Serge, I'm the one that told her because that's
14  what happened.
15     Q.  Okay.
16     A.  Ever then after that --
17     Q.  Do you recall anything else being said
18  in that conversation about this subject?
19     A.  No.  That meeting -- Sergeant Barnes
20  was very mad and that meeting was over very
21  quick after that.
22     Q.  Okay.  Other than what you already
23  testified to, is there anything else that you
24  consider retaliation by Sergeant Barnes?

Page 239

1      A.  Yes.
2      Q.  What else?
3      A.  Shortly after that, my partner and I
4  were called into a meeting with Sergeant Barnes,
5  Salemme and Cesario, at which point we were
6  removed from Sergeant Barnes' team.
7      Q.  Okay.  Let me stop you there.
8          MR. KING:  I've got to eat.
9          MR. SMITH:  Okay.
10         MR. KING:  Can we do a short maybe
11  30 minutes?
12         MR. SMITH:  Sounds good.
13             (Whereupon, a short break for
14              lunch was taken.)
15  BY MR. KING:
16     Q.  Officer Spalding, if I could direct
17  your attention back to the Amended Complaint in
18  Paragraphs 33 and 34.  In Paragraph 33, you make
19  the allegation that Defendant O'Grady began a
20  campaign of harassment, and then the next
21  paragraph you talked about the situation where
22  he refused to sign the confidential informant,
23  correct?
24     A.  Correct.

Page 240

1      Q.  Okay.  My question is am I correct,
2  that this confidential informant incident on or
3  about August 17, 2010 was the first incident of
4  alleged retaliation that you're claiming by
5  either the City of Chicago or any of the
6  Defendants in this case?
7      A.  That I'm aware of.
8      Q.  Okay.  That's the first incident?
9  You're not aware of any other incident?
10     A.  With O'Grady, that's the first
11  incident.
12     Q.  Okay.  And my question was, am I
13  correct that this first incident with O'Grady on
14  or about August 17th is the first incident of
15  alleged retaliation that you're claiming in this
16  lawsuit either by the City of Chicago or any of
17  the Defendants -- individual Defendants in the
18  case?
19         MR. SMITH:  I'm going to object, legal
20  conclusion.
21  BY MR. KING:
22     Q.  Can you answer the question?
23     A.  August of 2010.  No, I don't think that
24  would be the first with the whole City of

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
241–244

Page 241

1  Chicago. Because there's incidents that
2  happened before O'Grady. I mean, just --
3  correct.
4      Q.  Plaintiff Spalding, you allege that
5  Commander O'Grady began a campaign of harassment
6  and retaliation against you in August 2010.
7  Isn't it correct that you're not alleging that
8  there was any retaliation against you or your
9  partner, Officer Echeverria, prior to Defendant
10  O'Grady as you allege beginning that campaign of
11  harassment, you're not alleging that there was
12  any other retaliation against you for your
13  participation in Operation Brass Tax prior to
14  August, 2010?
15      MR. SMITH:  I'm going to the object to
16  the form of the question, a legal conclusion.
17      Go ahead.
18      THE WITNESS:  We were there in 2008,
19  and that's two years later. That is the first
20  incident that alerted me to -- I'm sorry, I have
21  to look at this, because you're asking me in a
22  two years' time span. Do have the timeline?
23  BY MR. KING:
24      Q.  You can't ask questions. I'm sorry.

Page 242

1  Okay.
2      A.  Well --
3      Q.  My question is I am correct, aren't I,
4  that the first incident of alleged retaliation
5  that you're claiming in this lawsuit against you
6  or your partner, Officer Echeverria, which you
7  allege was retaliation for your reporting or
8  your work on Operation Brass Tax, was the
9  August 17, 2010 incident where you allege that
10  O'Grady wouldn't approve your confidential
11  informant, correct?
12      A.  To the best of my recollection at this
13  time, I believe you are correct.
14      Q.  Okay. Ms. Spalding, you also testified
15  earlier about an incident where you came to
16  understand that Deb Kirby had denied knowing
17  about your involvement in Operation Brass Tax.
18  Do you recall that testimony?
19      A.  Yes, sir.
20      Q.  Okay. Other than that allegation that
21  in connection with that incident, Deb Kirby
22  denied -- allegedly denied knowing about your
23  involvement in Operation Brass Tax, are you
24  alleging that there was any other retaliation by

Page 243

1  Deb Kirby based on your involvement with
2  Operation Brass Tax?
3      A.  Yes.
4      Q.  Okay. What else did Deb Kirby do that
5  you're alleging was retaliation?
6      A.  We were informed by Chief Juan Rivera
7  that after the incident occurred, that Deb Kirby
8  admitted to him that she -- you know, that she
9  had denied knowing it and that these two are
10  going to have to be the fall guys now because
11  it's -- I'm not going to go back.
12      Q.  I understand that. And that relates to
13  Debbie -- Deb Kirby allegedly denying the
14  knowledge that you were involved in Operation
15  Brass Tax.
16      Other than that subject, Deb Kirby
17  allegedly denying knowing that you were involved
18  in that Operation Brass Tax, are you alleging
19  that there was any other retaliation by Deb
20  Kirby?
21      A.  No.
22      Q.  Okay. Am I correct that Lieutenant
23  Pascua never disciplined you in any fashion?
24      A.  Not that I'm aware of.

Page 244

1      Q.  Okay. And you're also not aware of
2  Lieutenant Sadowski ever disciplining you in any
3  fashion, correct?
4      A.  I was aware that he stated that we were
5  going to have a meeting for it, which never
6  occurred between himself and I.
7      Q.  Okay. So to the best of your
8  knowledge, Plaintiff Spalding, you're not aware
9  of Lieutenant Sadowski ever disciplining you in
10  any fashion, correct?
11      A.  Other than stating that he was going
12  to, what he did with that, to my knowledge, I
13  don't know.
14      Q.  Okay. Now, if I can direct your
15  attention back to the Amended Complaint,
16  Exhibit 1, and Paragraph 80 of the Complaint.
17      As alleged in Paragraph 80, who ordered
18  you to meet with Salemme, Cesario and Barnes?
19      A.  Sergeant Barnes informed us that.
20      Q.  And did he inform you the same day of
21  the meeting?
22      A.  No.
23      Q.  What did Sergeant Barnes inform you
24  about that meeting?

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO
November 18, 2014
245–248

Page 245

1    A.   Nothing, other than a few days prior,
2  he stated on this date that we were to meet him,
3  the commander and the lieutenant in the unit for
4  a meeting.
5    Q.   Okay.
6    A.   That's all he said.
7    Q.   Okay.  And this meeting did take place?
8    A.   Yes, sir.
9    Q.   And were you, Officer Echeverria,
10  Lieutenant Cesario, Sergeant Barnes and
11  Commander Salemme present?
12    A.   Yes.
13    Q.   Okay.  What do you recall being said in
14  that meeting by you or by any of the
15  participants in the meeting?
16    A.   Well, I know that we were called in and
17  we sat down.  And at first, Lieutenant Cesario
18  attempted to challenge our -- attempted to cite
19  our performance as a reason that he was going to
20  be kicking us off of the day team, which is a
21  CPD/marshal's team where CPD officers are
22  deputized.
23    Q.   Right.  But you and Officer Echeverria
24  were not deputized?

Page 246

1    A.   No, not at that time.  No, we were not.
2  Absolutely not.
3    Q.   Okay.  So Cesario indicated that he was
4  moving you from Barnes' team, day team,
5  correct?
6    A.   Correct.
7    Q.   And you said he attempted to cite your
8  performance.  By that, he mentioned your arrest
9  activity, correct?
10    A.   Well, that's what he said.
11    Q.   Okay.
12    A.   We challenged that.
13    Q.   Okay.
14    A.   And then Commander --
15    Q.   Tell me what you specifically recall
16  Cesario saying and --
17    A.   He pushed a paper and said, look at
18  this, these -- activity report.  And it was
19  based -- activity is --
20    Q.   I just want to know what was said in
21  meeting, I don't want to know anything else.
22      Okay.  He had some Activity Reports in
23  the meeting, correct?
24    A.   Correct.

Page 247

1    Q.   Okay.  What did he say about the
2  activity report?
3    A.   You know, this is your activity and
4  what do you think of that.  And I said, well,
5  activity is -- in a Detective Division, which
6  falls under the Detective Division, the Fugitive
7  Apprehension is based on your assignments.  So
8  your assignments are assigned to you.  So your
9  activity can be only what your assignments are.
10    Q.   Okay.
11    A.   So we can't -- if we don't get the
12  assignments, there -- we have to be assigned the
13  cases.
14    Q.   Okay.
15    A.   So then -- continue.
16    Q.   Sure.
17    A.   So then Commander Salemme stated, did
18  you or did you not ever work for IAD.  You work
19  for IAD?  And, you know, at that point we said,
20  at no time were we ever assigned to IAD; but did
21  we work investigations with IAD, yes.
22    Q.   Okay.
23    A.   Regarding internal corruption, yes.
24  But those are two very different subjects.  He

Page 248

1  said, you should have known better.  If you want
2  to go against other sworn personnel, you should
3  have known this shit was going to happen to you.
4  You brought this baggage here with you.  I
5  didn't give it to you, you came here with it.
6    Q.   Okay.  Commander Salemme said that?
7    A.   Yeah, Commander Salemme said that.
8    Q.   Do you recall anything else said in
9  this meeting by any participants?
10    A.   Yes.  Sergeant -- I mean, Lieutenant
11  Cesario said that he was taking us -- we were
12  being removed from Sergeant Barnes' day team.
13  And he said, you want to go against officers,
14  you want to do this type of activity, you are
15  going to be put on the night team way up north.
16  He stated, you will no longer work south, you
17  will no longer work days, you will no longer
18  have a take home car and if I can help it, you
19  will never be deputized.
20    Q.   Okay.
21    A.   And he said to me, you will never have
22  any of these things as long as you are here.
23  And then lieutenant -- the commander said,
24  you're still in the unit for now because we

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
249–252

Page 249

1  couldn't get you out just yet.  Meaning to me --
2      Q.  Commander Salemme said that?
3      A.  Yes, Commander Salemme said that.
4      Q.  Okay.  Do you recall anything else that
5  was said in the meeting?
6      A.  There was so much said.  It was a -- it
7  was a fairly long meeting.  They continued -- I
8  mean, the questioning about our involvement with
9  IAD and our working with IAD and what we had
10  done with them, was fairly extensive by the
11  commander and Cesario, the questionings into --
12     Q.  Other than what you've already
13  testified to, do you specifically remember
14  anything else said in the meeting?
15     A.  I remember that, you know -- I remember
16  that I asked -- I openly said, so if we had
17  never been assigned to work this case with IAD,
18  if we had never been involved with any of this,
19  would any of this be happening at all right now.
20  And I was told by Lieutenant Cesario, no.
21     Q.  Okay.
22     A.  Okay.  I was also -- I then also said,
23  you know, is it possible that I can go anywhere
24  else and work days, anywhere else.  And he said,

Page 250

1  for you, never.  You'll never see days again.
2      Q.  Okay.  You inquired about working days.
3  Did Officer Echeverria say anything about
4  wanting to work days?
5      A.  Well, he -- yes.  He stated, you know,
6  we're not asking to be moved to another shift or
7  the other side of the City, you know.  We don't
8  want this.  And Lieutenant Cesario said, well,
9  I'm the one that makes these decisions and
10  you're going.
11     Q.  Okay.  Other than what you've already
12  testified to, do you recall anything else that
13  was said by anyone in that meeting?
14     A.  You know, there was so much said, I
15  don't recall specifics.  There were -- there are
16  additional specifics, but I can't recall what
17  they are right now.
18     Q.  Okay.  Isn't it true that in that
19  meeting, somebody mentioned the fact that your
20  boyfriend, Anthony Hernandez, had had a
21  confrontation with Sergeant Barnes?
22     A.  Yes, yes.
23     Q.  Okay.  Who brought that up?
24     A.  It is true.  Now, I'm not sure if -- I

Page 251

1  believe, I believe that -- I don't know if it
2  was Barnes or -- I believe it was Cesario that
3  brought that up.  I believe that Lieutenant --
4      Q.  What do you recall Lieutenant Cesario
5  saying about that subject?
6      A.  I do recall Lieutenant Cesario saying
7  that in addition to that --
8      Q.  He said in addition to your activity,
9  right?
10     A.  Yes.
11     Q.  Okay.
12     A.  In addition to, meaning referring to
13  everything that I have previously stated --
14     Q.  Okay.
15     A.  In addition to that, you know, Officer
16  Hernandez -- he said, are you dating Officer
17  Hernandez.  And I said what does that have to do
18  with any of this.  I don't understand that.  And
19  he said, well, Officer Hernandez came over to
20  Barnes and talked -- had a confrontation with
21  him.
22     Q.  Okay.
23     A.  I don't know if he said confrontation
24  or communication with him.  I may not be using

Page 252

1  the word --
2      Q.  Okay.
3      A.  He may not have used the word
4  confrontation.
5      Q.  He may have, he may not have?
6      A.  Yeah.  He came over to talk to Sergeant
7  Barnes regarding some other -- the rumors of
8  sergeants, the rumors of the sergeants, me being
9  IAD, taking down the sergeants, you know, those
10  rumors.  Because now that you say that, it
11  reminds me that Sergeant Barnes, when we had our
12  meeting when I asked him about can we clear the
13  air with any of your concerns --
14     Q.  Yes.
15     A.  -- he had also brought up Sergeant Jay
16  Padar from Narcotics and an allegation against
17  him and said I was responsible for that.
18     Q.  Okay.
19     A.  And I stated that I was not responsible
20  for that.  And then --
21     Q.  Okay.  Let's go back to the meeting
22  that you're testifying about.  Cesario brings up
23  the fact that there was a confrontation or
24  communication between Anthony Hernandez and

SHANNON MARIE SPALDING                                    November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                        253–256

Page 253

1   Sergeant Barnes?
2      A.  Yes, yes.
3      Q.  What else is said about that?
4      A.  He said that because of that, because
5   of -- Sergeant Barnes said that he didn't like
6   the way that he approached him and that he
7   had -- I said, approached him?  Because I
8   actually now -- now that you bring this up --
9      Q.  Please only tell me what was said in
10  the meeting.
11     A.  Okay.  I'm sorry.
12     Q.  Do you recall anything else?
13     A.  Sergeant Barnes said -- Sergeant Barnes
14  said that it was -- maybe Sergeant Barnes said
15  it was a confrontation or something along the
16  lines of he didn't like the way he was
17  approached.  And I said, well, when I --
18     Q.  When Sergeant Barnes said he didn't
19  like the way he was approached, he meant by
20  Anthony Hernandez?
21     A.  Anthony Hernandez.
22     Q.  Correct?
23     A.  Yes, he did.
24     Q.  Okay.

Page 254

1      A.  And I said, when I talked to yesterday
2   after the conversation with Anthony Hernandez,
3   you guys exchanged phone numbers, you were
4   talking fine.  That's not the impression you
5   gave me yesterday.  It was just a conversation.
6   And he said, well, you know, he came up behind
7   me and it startled me.  And, you know, Loren
8   Guishnere is a witness to that.
9      Q.  Okay.  Let's just talk about the
10  meeting.
11     A.  That's what he said.  That's the
12  meeting.
13     Q.  No.  Loren Guishnere is not in the
14  meeting we're testifying about.
15     A.  Sergeant Barnes said Loren Guishnere is
16  a witness to the conversation between --
17     Q.  Sorry.
18     A.  -- me and Hernandez.  It was not --
19     Q.  Okay.
20     A.  You know, it was a little more than
21  friendly.  That was said in the meeting.
22     Q.  Okay.  Other than what you've testified
23  to, do you recall anything else said in the
24  meeting about --

Page 255

1      A.  Yes.
2      Q.  -- the confrontation between Anthony
3   Hernandez and Sergeant Barnes?
4      A.  Yes.
5      Q.  What else was said?
6      A.  Then I said, so if you are unhappy with
7   the actions of another officer, why don't you
8   take disciplinary action against that officer
9   and speak to his supervisors?  I don't see -- I
10  don't control a conversation between another
11  officer, especially when their offices are right
12  next door to each other and they cross paths, if
13  they happen to have a conversation --
14     Q.  Okay.
15     A.  -- and they work, the computers are
16  next to each other.
17     Q.  Please just tell me what was said in
18  the meeting.
19     A.  I said, I don't control that and I
20  don't feel that I should be accountable for some
21  other officer's actions, that he should be -- if
22  he has done something wrong, you should be
23  initiating disciplinary action against him for
24  that.  I said that in the meeting.

Page 256

1      Q.  Okay.  Do you recall that you
2   apologized in the meeting for Officer Hernandez'
3   actions?
4      A.  I told him I wasn't responsible for
5   that.  And Sergeant Barnes said, well, for a
6   minute there I thought you might have told him
7   to do that.  And I told him I'm sorry that you
8   feel that way.
9      Q.  Okay.
10     A.  And -- something else in the meeting.
11     Q.  Do you recall anything else said in the
12  meeting?
13     A.  Yes, I do.
14     Q.  Okay.
15     A.  Sergeant Barnes stated before we left,
16  he said, you know what, he said, give me a call,
17  we can talk about this.
18     Q.  Okay.  And other than what you've
19  already testified to, do you recall anything
20  else said in that meeting?
21     A.  I believe that Danny and I -- the
22  meeting was concluded with us being told, you
23  know, when we were going to start nights and all
24  of that information was provided to us.

SHANNON MARIE SPALDING                                 November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                      257–260

Page 257

1    Q.   Okay.
2    A.   And then Danny and I exited the
3    meeting, and Danny was not comfortable with the
4    way it was left.  He said, do you know what, I
5    have something else to say.
6    Q.   Okay.
7    A.   And we walked back into the room.
8    Q.   Okay.  And after you walked back in the
9    room, what do you recall being said?
10   A.   I remember Danny stating, you know
11   what, this is not right, this is all because of
12   retaliation for something and we did the right
13   thing and we wouldn't be getting kicked off by
14   Commander -- Lieutenant Cesario's own words, we
15   wouldn't be getting kicked off if we didn't do
16   this investigation and it wasn't right and we
17   didn't want this to happen and we were not
18   requesting this and --
19   Q.   Okay.  Do you recall anything else
20   being said in that second part of the meeting?
21   A.   No.  We exited -- we exited the office
22   and then Barnes follows us out and says, can I
23   talk to you.
24   Q.   Okay.  Did Barnes talk to you?

Page 258

1    A.   Yes, he did talk to Danny and I.
2    Q.   Okay.  And where did this conversation
3    take place?
4    A.   In the hallway in the building.
5    Q.   Okay.  And what do you recall said by
6    any of the participants in that conversation?
7    A.   Sergeant Barnes said, do you know what,
8    why don't you call me, we'll see what we can do
9    about this.  I said, for what, you already did
10   it?  You went up there and made me guilty for
11   whatever you felt, you know, and it's already
12   done.  There's -- you know, fix what?  It should
13   have never happened.
14   Q.   Okay.  Do you recall anything else
15   being said in that conversation?
16   A.   No, I don't.
17   Q.   Okay.  Did you ever have any further
18   conversations with Sergeant Barnes about that
19   subject of you been moved off of his team onto
20   another team?
21   A.   No, I don't think so.
22   Q.   Okay.  Now, at the time Fugitive
23   Apprehension was starting a new third watch,
24   correct?

Page 259

1    A.   Correct.
2    Q.   Okay.  And that third watch had to
3    obviously be staffed with officers, correct?
4    A.   Correct.
5    Q.   And at that time, when you were moved
6    to the third watch, you had only been in
7    Fugitive Apprehension for -- do you know how
8    long?
9    A.   Well, March to June.
10   Q.   Okay.  So a couple months?
11   A.   Correct.
12   Q.   A few months, okay.  And there were
13   other officers that were moved from the second
14   watch to the third watch, also, correct?
15   A.   I don't know about that.
16   Q.   Okay.  But on the third watch, you were
17   still in Fugitive Apprehension, you were just
18   working on the North Side and different hours
19   instead of the South Side, correct?
20   A.   It's not just that, no.
21   Q.   Okay.  At the time were you reassigned
22   to the third watch on the North Side, you were
23   living on the South Side, correct?
24   A.   Extreme South Side.

Page 260

1    Q.   Okay.  And Officer Echeverria was
2    living on the North Side, correct?
3    A.   Yes.
4    Q.   Okay.  What was his address at the
5    time?
6    A.   I don't know his exact address, but I
7    think it's 56 something North Mulligan.
8    Q.   Okay.  And your assignments out of the
9    third watch on the North Side were typically
10   chasing fugitives on the North Side, would that
11   be fair to say?
12   A.   It would be looking for offenders on
13   the North Side.
14   Q.   Okay.
15        (Whereupon, Spalding Deposition
16        Exhibit No. 5 was marked for
17        identification.)
18   BY MR. KING:
19   Q.   Officer Spalding, I'm showing you
20   another document that's been marked as
21   Deposition Exhibit No. 5.  I'll ask you if
22   you've seen it before.  But it appears to be
23   some arrest records for yourself between
24   March 22, 2012 and June, 21, 2012.  Take a look

SHANNON MARIE SPALDING
November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO
261–264

Page 261

1  at the first and the second pages.  Do you think
2  you've ever seen this document before?
3      A.  I know I have never seen it before.
4      Q.  Okay.  Do you know one way or another
5  whether this was the document that Lieutenant --
6  Lieutenant Cesario had with him in the meeting
7  that you were just testifying to that took place
8  on or about June 20, 2012?
9      A.  No.  I -- it could be.
10     Q.  It could be, okay.
11     A.  It might not be.
12     Q.  That's good enough.
13         And as you sit here today, do you have
14  any reason to believe this report is inaccurate
15  in terms of your arrest activity between
16  March 22, 2012 and June 21, 2012?
17     A.  I would have absolutely no way to know
18  if this is accurate or not.
19     Q.  Okay.  Now, when you were told that you
20  were moving to the right team on the North Side,
21  in that meeting, were you told that you were --
22  that you'd be assigned to Sergeant Mills or
23  when did you learn you'd be assigned to Sergeant
24  Mills?

Page 262

1      A.  I don't know if it was in that meeting
2  or afterwards.  I'm sorry, should I continue?
3      Q.  Sure.
4      A.  Yes, as a matter of fact, it was in
5  that meeting, now that you say that.
6      Q.  Okay.
7      A.  Because Commander Salemme said, we're
8  going to put you on Sergeant Mills' team.  He
9  came from IAD, maybe he can help you learn how
10  to deal with that baggage you brought with
11  yourselves since you came from IAD, as well.
12     Q.  Okay.  And when you first reported to
13  the third watch working for Sergeant Mills, do
14  you recall having an initial meeting, initial
15  conversation with Sergeant Mills?
16     A.  Yes.
17     Q.  And where did that take place?
18     A.  Outside the Fugitive unit in the
19  hallway.
20     Q.  Okay.  And were you and Officer
21  Echeverria present?
22     A.  Yes.
23     Q.  And just Sergeant Mills?
24     A.  Correct.

Page 263

1      Q.  And what do you recall being said in
2  that initial conversation with Sergeant Mills?
3      A.  Following the advice of Juan Rivera, we
4  decided to talk to Mills about the way that we
5  were moved and the reasons why we were moved
6  from Sergeant Barnes' team and explain the
7  situation to him.  As I said, we were told that,
8  you know, maybe he would, you know -- we
9  wanted -- we are tired of the trouble, we wanted
10  upfront here's the deal, this is what's going
11  on, we don't know what you were being told.
12     Q.  Sure.
13     A.  I said, you know, we don't know what
14  you were told --
15     Q.  Sure.
16     A.  -- but this is what happened on our
17  side and, you know.  He said, you know, fair
18  enough.  He said he was going to actually give
19  Juan Rivera a call and talk to him about us.
20     Q.  Okay.  Do you recall him saying
21  something along the lines of, you'd get a fresh
22  start with him, he wasn't going to hold anything
23  against you from the past?
24     A.  I remember him saying that he was going

Page 264

1  to contact Juan Rivera and then -- I don't know
2  if it was in that meeting or after he called
3  Juan that he did say something along those
4  lines.
5      Q.  Okay.
6      A.  But he did say it.
7      Q.  Okay.
8      A.  If it was at that time or a couple days
9  later, I'm not.
10     Q.  Okay.  Between the time you were told
11  you were going from Barnes' team to Mills' team,
12  did you contact Juan Rivera?
13     A.  Yes.
14     Q.  Okay.  And was that one conversation
15  before you reported to Mills or do you think
16  multiple conversations?
17     A.  I know Officer Echeverria had called
18  him.
19     Q.  Okay.
20     A.  And then I know that he called Officer
21  Echeverria back.  I also know that I contacted
22  him.  He said he was going into a meeting and
23  that he would call me back.
24     Q.  Okay.

SHANNON MARIE SPALDING                     November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO          265–268

Page 265

1    A.  But then he failed to do so.  So I then
2  called Tom Chester and said, this is what's
3  going on, you know.  I mean, this retaliation
4  that isn't supposed to be happening that we were
5  guaranteed by Tom Byrne would not happen in his
6  unit because it won't -- he wouldn't tolerate
7  it, is happening.  And Tom Chester said, I will
8  reach out to Chief Rivera and get him to call
9  you.
10     Q.  Okay.
11     A.  Juan's a good guy, but he doesn't
12  always do what he's supposed to do.  And then
13  Chief Rivera called me back after Tom Chester
14  reached out to him.
15     Q.  Okay.  So you had a phone conversation
16  with Chief Rivera before you met Sergeant
17  Mills?
18     A.  Yes, I did.
19     Q.  And what was said during that
20  conversation?
21     A.  During the conversation -- now, I
22  don't -- I don't know if it was -- I don't know
23  if -- the conversation was that -- and now I
24  don't know if he had this conversation with

Page 266

1  Danny and he was on speakerphone or I was on the
2  phone with him by myself.
3     Q.  Okay.
4     A.  Okay.  He said that Sergeant Mills, you
5  know, he knows him personally and that he made
6  him meritorious sergeant.  And he said that just
7  go to him and let him know what's going on.
8     Q.  Okay.
9     A.  And that was basically it.  He said --
10     Q.  Did he tell you that Sergeant Mills had
11  worked for him, Juan Rivera in IAD?
12     A.  Yes.  And that's why he meritoriously
13  promoted him from there.  I'm sorry, yes.
14     Q.  So he had a positive impression of
15  Sergeant Mills, is that fair to say?
16        MR. SMITH:  Objection.
17        THE WITNESS:  I don't know.  Because he
18  said we'll see -- after you reach out to him,
19  we'll see what kind of individual he is or where
20  his loyalties lie now.  That's what Juan Rivera
21  said, we'll see where his loyalties lie now.
22  BY MR. KING:
23     Q.  Okay.
24     A.  And then he also said, what they're

Page 267

1  doing in Fugitive Apprehension is building --
2  this is how they build a case against you.  He
3  said, so what I'm going to tell you to do is
4  document and record every incident that happens
5  and I will take it to the next level, obviously,
6  if it's necessary.
7     Q.  Okay.  Do you recall anything else
8  being said in that conversation with Juan
9  Rivera?
10     A.  I think that's the majority of the
11  ground that was covered.
12     Q.  Okay.  You can't recall anything else?
13  I'm not suggesting there was anything else.
14     A.  I mean, I think that covers the gist of
15  the conversation.
16     Q.  Okay.
17     A.  I could be forgetting something.
18     Q.  Okay.
19     A.  There's a lot of stuff to remember.
20     Q.  Okay.  So you have an initial meeting
21  with Sergeant Mills that goes okay, as far as
22  you're concerned?
23     A.  Yeah.
24     Q.  You indicate you have a subsequent

Page 268

1  meeting.  He said something along the lines of
2  you've got a fresh start with me, correct?
3     A.  Between one of those two times --
4     Q.  Sure, one of those two times.
5     A.  -- that conversation happened.
6     Q.  Okay.  My understanding is that you
7  allege in the Complaint that after you filed
8  your lawsuit and you and Officer Echeverria
9  spoke to the media, that Sergeant Mills
10  retaliated against you.  My question is, is it
11  your claim that Sergeant Mills engaged in any
12  retaliation against you or Officer Echeverria
13  before you filed your lawsuit?
14     A.  No.  Not -- no.
15     Q.  After you filed your lawsuit, is it
16  your allegation that Sergeant Mills engaged in
17  some retaliation against you?
18     A.  Yes.
19     Q.  And what retaliation are you alleging
20  that Sergeant Mills engaged in?
21     A.  Well, after the lawsuit was filed, it
22  was a whole different atmosphere when you return
23  back to work and a whole different attitude with
24  Sergeant Mills.  You absolutely could feel the

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
269–272

Page 269

1  tension.
2       You -- Sergeant Mills, I pulled him to
3  the side as soon as we came to work the next
4  day.  And I said, obviously you're aware of the
5  situation and obviously no, I couldn't tell you
6  ahead of time that this was going to happen.
7  And, you know, I'm curious as to how this is
8  going to, you know, affect us working here.  And
9  he said, it is what it is.
10       You know, at some point he informed me
11  that, you know, Juan Rivera and him were in the
12  Marines together.  I believe he said the
13  Marines.  It was the military.
14     Q.  Okay.
15     A.  And that him and Salemme have been
16  friends forever, they go golfing all the time
17  and that they've been friends for over 20 years
18  and the ties to these individuals run deep.
19     Q.  Okay.  Are you testifying to what
20  Sergeant Mills said in that first post-lawsuit
21  conversation?
22     A.  Yes.
23     Q.  Okay.  Do you recall anything else said
24  in that conversation?

Page 270

1     A.  I know he said it is what it is.  He
2  said, you know -- I said, well, can you tell me,
3  you know, how you were notified or what the team
4  thinks about this.
5       And he said, well, you know, I was
6  notified by the commander that you guys were
7  going to have a news conference and so I told
8  all the members of the team to come in, watch
9  the conference, we were going to see what's on
10  the news and see what happens and then we had a
11  team meeting about it.
12     Q.  Okay.  So you had a team meeting --
13     A.  Mills is telling me that they had a
14  team meeting about it.
15     Q.  Okay.  I see, okay.
16     A.  That night after the media aired.
17     Q.  And this post-lawsuit conversation
18  you're testifying to, was Officer Echeverria
19  also part of that conversation?
20     A.  Yes.
21     Q.  Okay.  It's just the two of you and
22  Sergeant Mills?
23     A.  Yes.
24     Q.  Okay.  Other than what you've already

Page 271

1  testified to, do you remember anything else
2  being said in that conversation?
3     A.  Yes.
4     Q.  What else?
5     A.  He said -- I said, what happened during
6  the team meeting.  He said, well, some people
7  hate you, you know, some people don't really
8  give a shit.  And he even said, one person said
9  Danny should have gotten a haircut before going
10  on TV.
11       He said, but different people have
12  different amounts of time on the job.  People
13  with more time, they're not really too concerned
14  about it.
15     Q.  Sure.
16     A.  But our team is a young team, a lot of
17  people with not a lot of time and they hate you
18  and maybe they don't even know why they hate
19  you.
20     Q.  Okay.
21     A.  He said, but, you know, it is what it
22  is.  I said, well, it's not easy, it was
23  something that was a very last resort where we
24  tried to resolve it internally.  And he said,

Page 272

1  I'm sure it's not easy.  He said -- I said, it's
2  nothing we wanted to do.  It's not a place we
3  wanted to be.  And we just wanted to come to
4  work and do our job and be left alone.
5       And he said, I understand that.  I'm
6  sure it's not easy.  I can't think that anybody
7  that would go to this extreme, it would be easy
8  for.
9     Q.  Sure.
10     A.  He said, I'm sure it's very difficult
11  and, you know.  So that's what happened and, you
12  know, that's it.  And that was the five minutes
13  after we walked in, the day after we hit the
14  media.
15     Q.  Okay.  And what retaliation are you
16  claiming that Sergeant Mills engaged in?
17     A.  Well, as time went on, Sergeant Mills
18  went from being -- from stating that -- at one
19  point he said, it's evident to me that they do
20  treat you differently and that they are working
21  against you and retaliating against you.  At one
22  point, he was completely on our side and --
23     Q.  When did Sergeant Mills --
24     A.  I'm explaining that.

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
273–276

Page 273

1   Q.  -- say that to you?
2   A.  When did he make that comment?
3   Q.  Yes.
4   A.  Sergeant Mills made that comment in
5   about July when I was banned from the building
6   by Commander O'Grady.
7   Q.  Okay.  We'll come back to that.
8       Okay.  I'm sorry for interrupting you.
9   My question was what retaliation are you
10  claiming that Sergeant Mills engaged in.
11  A.  Okay.  He did a 360 from the way he
12  used to be.  From the way that he would talk to
13  us, from the way that he would just throw the
14  keys down, from the point that he would send us,
15  you know, text messages not to come in until the
16  end of the tour.  At one point I went into the
17  unit to use the bathroom and he said, you know,
18  I told you don't come in from off the street
19  until the end of the tour, you know, you've got
20  to be out on the street.
21      I became so intimidated that every time
22  I was going to walk in there, I was going to be
23  yelled at like I was called into the principal's
24  office, that I started going to the McDonalds on

Page 274

1   the West Side to use the bathroom rather than
2   walking into the facilities and being screamed
3   at for just wanting to use the bathroom.
4   Q.  Okay.
5   A.  Okay.  So that's just part of it.  He
6   would send us out and switch our hours when we
7   needed to, to go work days, you know, whatever.
8       And there was a time that I had to get
9   this guy, I don't recall his name.  It was
10  around Valentine's Day.  But his previous
11  record, he had to be tased multiple times, it
12  was a chase, a foot pursuit, battery to PO or
13  some kind of, you know, incident where it took
14  multiple officers to take him down and
15  everything.  So now I've got to go get this guy
16  for battery or something, a domestic battery
17  and --
18  Q.  So Sergeant Mills gave you an
19  assignment to go and get this guy that you're
20  testifying?
21  A.  I don't know that Sergeant Mills gave
22  me the assignment, it came in an e-mail from the
23  unit.
24  Q.  Okay.

Page 275

1   A.  So I don't know who assigned it.  So we
2   switched our hours to go -- the victim was
3   cooperating, telling us where he was during the
4   day.  So we switched our hours.
5   Q.  Sure.
6   A.  Okay.  We came in during the day to
7   help other team members during the day, the day
8   before.  When we went to go leave that night, we
9   said in the presence of everyone, are you going
10  to be here for our case tomorrow morning.  Yes.
11  Q.  Okay.
12  A.  We're going to have the backup we need.
13  Because this guy, obviously, is violent.
14  Q.  And who do you recall being present
15  when you --
16  A.  We --
17  Q.  -- stated that you said in the presence
18  of everyone, you said, are you guys going to be
19  there tomorrow morning, who was present?
20  A.  Officer Chris Dingle, D-I-N-G-L-E.
21  Q.  Yes.
22  A.  Officer Roxanne Blarcheck (phonetic), I
23  don't know how you spell Blarcheck.
24  Q.  Okay.

Page 276

1   A.  A female detective, I don't know her
2   name.  She works up there --
3   Q.  Okay.
4   A.  -- in the financial crimes.
5   Q.  Okay.
6   A.  Officer Echeverria.
7   Q.  Okay.
8   A.  Myself and I don't know if -- I want to
9   say Sergeant Mills was there, as well.
10  Q.  Okay.  But you're not sure?
11  A.  No, I'm not 100 percent sure right
12  now.
13  Q.  Okay.  So you indicate, you asked
14  people that are going to be there to back you
15  up.  What happens next?
16  A.  Well, Sergeant Mills told me that Chris
17  Dingle and Roxanne were going to be coming in
18  the next day.
19  Q.  Okay.
20  A.  So we arrive on the scene and they're
21  not there.
22  Q.  Okay.
23  A.  Nobody is there to back us up.  Now, I
24  know that I either spoke or had a text message

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
277–280

Page 277

1  with Sergeant Mills.  I believe I talked to him
2  during that day where, you know, he said it's
3  just going to be the two of you, you know, be
4  careful with this guy.
5      Q.  Okay.
6      A.  But nobody else is coming.  I believe
7  at some point that I may have received a text
8  either that day -- we worked multiple days on
9  the same offender, but at some point of working
10 on this offender of, you know, be careful, but
11 it's just the two of us against this person.
12     Q.  Okay.  But you don't know why Dingle
13 and Roxanne didn't show up, do you?
14     A.  No.
15     Q.  Okay.
16     A.  But when the sergeant tells you that
17 you're going to switch your hours and you're
18 going to have backup --
19     Q.  I understand, I understand.
20         But you testified you were expecting
21 that Dingle and Roxanne would be there to back
22 you up.  Am I correct that you do not know why
23 Dingle and Roxanne weren't there to back you up,
24 correct?

Page 278

1      A.  I know there were no officers there to
2  back me up --
3      Q.  Can you answer my question?
4      A.  I don't know why.
5      Q.  Okay, thank you.
6          Okay.  Other than what you've already
7  testified to, is there anything else that
8  Sergeant Mills did that you believe was
9  retaliation against you?
10     A.  There's a very long list.  I'm going to
11 have trouble remembering every absolutely
12 incident -- every single incident.
13     Q.  Well, do your best.
14     A.  I'm going to do my best.
15     Q.  Okay.
16     A.  The lawsuit became a topic of
17 conversation almost on a daily basis.  Comments
18 would be made to me like, what are you going to
19 do when you lose this lawsuit, what the fuck do
20 you think is going to happen to you then?  I
21 don't even know why you're still in this unit.
22 Why are you still in the unit?
23         What do you think is going to happen if
24 you get in a police involved shooting?  He,

Page 279

1  pointing at Lieutenant Cesario's office, is
2  going to be the one that handles that for you.
3  How do you think that's going to go for you?
4  It's not going to go fucking well.
5          He said, the people on the team don't
6  want to work with you, they don't trust you.
7  For all we know, you could still be working IAD
8  investigating them.  They don't want to work
9  with you guys after all of this came out.
10     Q.  Okay.
11     A.  He said, I'm not here to -- I
12 requested, well, then maybe we can have a
13 meeting.  As a supervisor, is there anything you
14 can do to intervene on our behalf?  How would
15 you suggest that we handle this?  And he said,
16 I'm not here to be your social mediator.  That's
17 your problem, not mine.
18     Q.  Okay.
19     A.  How --
20     Q.  Statements along the lines that you
21 just testified to, did Sergeant Mills make them
22 once or approximately how many times?
23     A.  It continued from the time that we
24 filed the lawsuit until I went on the medical

Page 280

1  and did not return back to work.
2      Q.  Okay.
3      A.  And it progressively became worse.
4      Q.  Okay.
5      A.  To the point that I couldn't go back to
6  work.
7      Q.  Okay.  Have you testified to everything
8  that you believe Sergeant Mills did that was
9  retaliation against you?
10     A.  No.
11     Q.  What else?
12     A.  We would work what's called VRI, which
13 is overtime, and that is seniority based.
14 Usually everything that is done in Fugitive
15 Apprehension is based on your seniority number
16 of years on the job, not your time in the unit.
17     Q.  Okay.  Who told you that overtime would
18 be based on your seniority on the job?
19     A.  Sergeant Mills.
20     Q.  Okay.
21     A.  And it's -- it's definite --
22     Q.  Okay.
23     A.  And it's a fact.  Because everybody
24 would apply and they would take the people by

SHANNON MARIE SPALDING                                    November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                        281–284

Page 281

1  the top of seniority.
2     Q.  Okay.  Among those who apply, it's your
3  testimony that they would take them by
4  seniority?
5     A.  Yes, that's correct.
6     Q.  Okay.  And if two people were needed
7  for overtime and you didn't get your application
8  for overtime in before two other people did,
9  then you wouldn't get overtime, right?
10    A.  No.  There was -- you would have to
11  submit your applications to the secretary, one
12  of the secretaries, usually Jan Hannah.
13    Q.  Okay.
14    A.  And as long as you got it to her by a
15  specific date, it had to be in by that date.  It
16  didn't mean if he turned -- someone turned
17  theirs in three days ahead of me, that they got
18  it.  It wasn't by the date, it was by the
19  deadline.
20    Q.  Sure, sure.  How many times when you
21  were working on the third watch in Fugitive
22  Apprehension are you alleging that you put in
23  overtime requests on the time and individuals
24  with less seniority than you got the overtime

Page 282

1  and you didn't?
2     A.  I'm not --
3     Q.  How many times did that happen, if at
4  all?
5     A.  I'm not alleging that at all.
6     Q.  Okay, fair enough.
7        Okay.  You were testifying something
8  about VRI?
9     A.  Yes.
10    Q.  What was the point of that?
11    A.  So we were -- we were working that one
12  day on VRI, which was around March or April.  It
13  ended up being the last day that I would --
14  maybe the beginning of March.  It would end up
15  being the last day that I would put in for VRI,
16  because Sergeant Mills was very, very hard, very
17  retaliatory that day.
18    Q.  Can you explain what VRI is?
19    A.  Violent reduction initiative.
20    Q.  Okay.
21    A.  And it's funded by the U.S. Marshals
22  for people who are assigned to the U.S. Marshals
23  Apprehension unit to work on their days off.
24    Q.  So you're saying at times you put in to

Page 283

1  work on your days off.
2     A.  Correct.
3     Q.  Okay.  And who would control whether
4  you got to do that?
5     A.  Well, it was the U.S. Marshal's
6  program.
7     Q.  Okay.
8     A.  So they would control it, I suppose.
9     Q.  Okay.  So you'd put in your request for
10  VRI to the U.S. Marshals?
11    A.  No.  To the secretary.
12    Q.  The secretary?
13    A.  Jan Hannah.
14    Q.  Okay.  The secretary in Fugitive
15  Apprehension?
16    A.  Correct.
17    Q.  Okay.  And are you alleging that
18  somehow Sergeant Mills retaliated against you in
19  connection with VRI?
20    A.  What I'm saying is he happened to be my
21  sergeant on that day we were working VRI.  He
22  put in to work on his day off, as well.
23    Q.  Okay.  I see.
24    A.  And while we were working for the VRI

Page 284

1  program on our day off, Sergeant Mills was
2  working on his day off and was our supervisor.
3     Q.  I see.
4     A.  It was on a Sunday.
5     Q.  Okay.
6     A.  After we worked this overtime, okay, we
7  had -- we had been assigned to work in a South
8  Side district with Kevin Williams, Larry Odem,
9  multiple people.  And you got assigned wherever
10  you got assigned and we were under Sergeant
11  Mills for that day.
12    Q.  Sure.
13    A.  And on previous occasions, Sergeant
14  Mills had said, you know, this is federally
15  allocated money and we're in Fugitives.  So all
16  of our cases are Fugitive Apprehension related.
17    Q.  Okay.
18    A.  It's not like we're coming over from
19  Bomb and Arson where we can't work our cases.
20  If you have a fugitive that wants to turn
21  themselves in or somebody that you can pick up
22  on your regular case, we would get a list of
23  other cases.  He said, we're going to get him
24  because you're getting paid time and a half on

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
285–288

Page 285

1  federal money and it's still a -- it falls under
2  the Marshal's guidelines.
3       So if it wasn't on your assignment list
4  but it was an assignment --
5       Q.  Is he telling you this on the day that
6  you're working the Sunday, the VRI --
7       A.  Yes.
8       Q.  -- where you're under his supervision?
9       A.  No.  He told us this previously --
10      Q.  Previously?
11      A.  -- when we were under his supervision.
12      Q.  Okay.
13      A.  And subsequently after that, it had --
14  that is -- he instructed us that and he never
15  instructed us that it ever change.
16      Q.  Okay.  On this Sunday when you're
17  working under his supervision, are you alleging
18  that there was some sort of retaliation?
19      A.  Yes.
20      Q.  What was the retaliation?
21      A.  Okay.  When we first arrived to work,
22  one of Danny Echeverria's wanted subjects, who
23  was going to turn themselves in the night
24  before, had called and said I couldn't make it

Page 286

1  but you can come pick me up now.  We were
2  reporting to work in the 11th District out of
3  the 11th District that day, and this person was
4  right down the street in the 11th District.
5       Q.  Okay.
6       A.  So based on the fact that Sergeant
7  Mills had told us that while we're working this
8  program, that as long as it is a Fugitive
9  Apprehension case, you can work it.
10      Q.  Okay.
11      A.  Because it's still fugitives.
12      Q.  Okay.
13      A.  So we went in to -- we went to pick the
14  offender up who said, come and get me.  I'm
15  wanted, come and get me.  Processed that
16  offender, we sent Sergeant Mills that
17  information.
18      Q.  Okay.
19      A.  And then we proceeded to our area that
20  we were assigned to for that day, which was the
21  4th District.
22      Q.  Okay.
23      A.  Sergeant Mills lost his mind.
24      Q.  Okay.

Page 287

1       A.  Called screaming, yelling, what the
2  fuck are you doing over there in this 11th
3  District.  You're supposed to be in the
4  4th District.  You're misappropriating federal
5  funds, blah, blah, blah, blah.  I said, Serge --
6       Q.  This is a telephone conversation?
7       A.  Yes.
8       Q.  Okay.
9       A.  I said, Serge, I said, you are the one
10  who directed us to do this previously.
11      Q.  Okay.
12      A.  Everybody -- everyone does this.
13      Q.  Okay.
14      A.  No, you know, and I -- he started to
15  just really yell.  And I said, well, you know
16  what, this is Danny's case, I think you'll need
17  to talk to Danny.
18      Q.  Okay.
19      A.  And then he talked to Danny and, you
20  know, I can hear from Danny's end of the
21  conversation, it was the same thing, it was no
22  better.
23      Q.  Okay.
24      A.  Danny hung up the phone, we got in the

Page 288

1  car.  He said, I don't know what he's losing his
2  mind about.  He's absolutely -- Danny said, he's
3  hostile, and I don't -- we're doing our job, we
4  made the arrest.
5       Q.  Sure.
6       A.  So we went up there, we went to do our
7  sheet to go look for people.  After our tour was
8  over, Sergeant Mills sent us a text telling us
9  to report back to him in the 11th District,
10  which we normally would anyway.  But then he
11  called us in to the secretary's office and shut
12  the door.
13      Q.  Okay.
14      A.  I believe it was the secretary's office
15  in the Fugitive Apprehension unit in the 11th
16  District.
17      Q.  Okay.
18      A.  And, you know, in one of those offices.
19  And he just said that, you know, I don't know
20  what the hell you think you're doing, you guys
21  just go out there and do whatever you the fuck
22  you want to do.
23       And Danny says, well, wait a minute.
24  You've got all these other officers here that

Page 289

1   are doing exactly the same different -- as the
2   same thing, why is our arrests treated
3   differently than anybody else's. Don't worry
4   about what I do with other people. Because
5   Danny specifically named officers. Well, what
6   about this officer, and what about this officer.
7   How dare you bring up other officers.
8        Danny said, I'm not bringing them up,
9   I'm questioning why you are treating us
10  differently than you'd treat these officers.
11       Q.  Do you recall which officers Officer
12  Echeverria brought up in the meeting?
13       A.  I recall that it was -- his name will
14  come to me. Lopez, Joe Lopez.
15       Q.  Okay.
16       A.  And I don't know if it's -- I can't
17  recall the other ones.
18       Q.  Okay.
19       A.  Okay. So --
20       Q.  Do you think he brought up other
21  officers' names and you can't recall or the only
22  one you recall is Joe Lopez?
23       A.  Well, the only one I recall is Joe -- I
24  remember him specifically saying Joe Lopez.

Page 290

1        Q.  Okay.
2        A.  Okay.
3        Q.  What else is said in this meeting with
4   Sergeant Mills?
5        A.  Well, Sergeant Mills once again
6   reiterates the whole thing about, I don't know
7   why the fuck they left you in this unit, you
8   shouldn't have been left here, you know.
9        He told me, in fact, Chris Dingle
10  dropped paper on me this morning. And I said,
11  dropped paper on me this morning? Meaning did a
12  report. He said because of your comments about
13  Barnes. I said, what comments are you referring
14  to? He said, I don't know, you tell me. And I
15  said, do you want to know what the conversation
16  was? And he said, yeah, why don't you tell me.
17       I said at 6:00 when we start, we're
18  sitting here at our desk, Danny is sitting here.
19  There's about five of us. Chris Dingle sitting
20  there next to whoever. Oh, this is another
21  time. He says, Chris Dingle even dropped paper
22  on you. I don't know if it was that day.
23       Q.  Okay.
24       A.  Yeah, I don't know if it was that day

Page 291

1   that he dropped the paper or it was the day
2   before or another day.
3        But he said that Chris -- he told me
4   that Chris Dingle dropped paper on me because
5   another sergeant walked in, Sergeant Mason
6   walked and said to Chris Dingle, hey, have you
7   seen your sergeant today yet, you're working for
8   Sergeant Barnes. And he said, no, I haven't --
9   not today, do you want me to call him. And
10  Mason said, well, it's 6:30, he's sleeping off
11  somewhere, he'll get here when he gets here.
12       Okay. So little bit -- this is what
13  happened in this meeting. I'm telling Sergeant
14  Mills this.
15       Q.  You're telling Sergeant Mills about
16  this?
17       A.  Yes.
18       Q.  Okay.
19       A.  So then I said, then -- all I said to
20  Chris was, well, that was the one good thing
21  about working on Barnes' team is that, you know,
22  you get your cases, you know, you go work your
23  cases, you're treated like an adult. You go
24  out, you work it, you know, Sergeant Barnes is

Page 292

1   not hovering over you every minute, what are you
2   doing. That was my comment, along those lines.
3        Q.  Sure.
4        A.  That wasn't my exact wording.
5        Q.  Sure.
6        A.  So how in the hell are you going to
7   drop paper on me for a negative comment? And
8   Danny says, drop paper on her? If anything, why
9   don't you drop paper on Sergeant Barnes for not
10  being here when he's being paid by the Fugitive
11  Apprehension U.S. Marshals or Sergeant Mason for
12  not reporting him?
13       Q.  Okay. But to your understanding, Chris
14  Dingle is the one that dropped paper on you?
15       A.  That's what he told me.
16       Q.  Back to your conversation with Sergeant
17  Mills. Do you recall anything else being said
18  in that conversation?
19       A.  Yeah. He continued to say that people
20  don't want you in the car, we don't know if
21  you're -- you know, they think that you're
22  recording them. For all we know, you could
23  still be -- how do we know you're not working
24  with IAD? You could be working with them and

SHANNON MARIE SPALDING                                November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                  293–296

Page 293

1  recording us now.  I said --
2      Q.  Okay.
3      A.  -- I could be, you know.  Okay, you
4  know, you could be.  But if I was, I couldn't
5  tell you that anyway.  But you could be.  For
6  all I know, you are.
7      Q.  Okay.
8      A.  But who cares.  I mean, what does that
9  have to do with anything, you know?
10     Q.  Do you recall anything else being said
11 in that conversation?
12     A.  Yeah.  He said we weren't going to be
13 backed up and the team doesn't like us and he
14 doesn't know why we're there, he doesn't know
15 why we leave, he doesn't know how we're going to
16 have a career when this is over.
17         He said, do you know what the fuck is
18 going to happen to you when this is over?  I
19 said, I know what's not going to happen.  You're
20 not going to continue to retaliate against me.
21     Q.  Okay.
22     A.  And then I said, you have kept us here
23 an hour and a half past the time I'm supposed to
24 get off.  Unless you're going to pay me, I'm

Page 294

1  leaving.
2      Q.  Okay.  And did you leave?
3      A.  He said, okay, I'm done here.  I'm not
4  going to stop you.
5      Q.  Okay.
6      A.  And I left.
7      Q.  Okay.  And I think you were testifying
8  that this was shortly before you went out on
9  medical leave, that incident?
10     A.  Yeah.  It was somewhere shortly before
11 that.
12     Q.  Okay.
13     A.  You know, within a month or two or
14 sooner.
15     Q.  Okay.  Do you recall how soon that was
16 before you went out on medical leave?
17     A.  I could tell you that incident
18 happened -- after that incident happened, about
19 a week later, IAD supervisor Mike Barz and --
20 Sergeant Mike Barz and Sergeant -- and Sergeant
21 Moscolino, I don't know his first name.  Robert
22 Moscolino, came up to the unit.
23     Q.  Okay.
24     A.  I had received a -- no.  I walked into

Page 295

1  the unit.
2      Q.  Let me just stop you for a second.  I
3  know you're about to testify about another
4  incident.  My question is other than what you've
5  testified to so far, is there anything else that
6  you are claiming that was retaliation against
7  you by Sergeant Mills?
8      A.  Yes.
9      Q.  What else?
10     A.  I after -- and every one of these are
11 going to intertwine into another incident,
12 another incident, so you --
13     Q.  Okay.
14     A.  Okay.  So in July the day that
15 Commander O'Grady banned me from coming into the
16 building after Lieutenant Cesario had that
17 meeting with me and Mills present, I went
18 outside and I was so distraught and so shaken up
19 that I called Sergeant Mills and said, can you
20 meet, I need to talk to you.  So we went -- he
21 told us to meet him in the parking lot over at
22 Fugitives up on the roof.
23         So Danny, Sergeant Mills and I got out
24 of our vehicle.  It was summertime and we were

Page 296

1  out there.  And I said to Sergeant Mills, you
2  know, what just happened in there?  I mean, I
3  don't understand that.  How can you ban an
4  officer in good standing out of a building that
5  they're assigned to?  I don't understand how you
6  can do that.
7          He said, you know, I don't know, I
8  don't know what the fuck is wrong with that
9  lieutenant or the commander.  I was here when
10 O'Grady called in to Commander Salemme, he said,
11 and then Commander Salemme came in and told
12 Cesario, I want you to talk to her, have a
13 meeting with her.  You're to tell her she's to
14 stay the fuck out of that building, we're
15 banning her from the building, blah, blah, blah,
16 blah, blah.
17     Q.  You're telling me that Sergeant Mills
18 told you he heard what O'Grady said to Salemme
19 and then Salemme said to Cesario, is that what
20 you're saying?
21     A.  No.  I'm telling -- he said he was at
22 work when Commander O'Grady called Salemme and
23 then Salemme came into -- and then Salemme went
24 to Cesario and said -- you've got to remember,

SHANNON MARIE SPALDING                              November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                 297–300

Page 297

1    it's one big office and then there's a door.
2        Q.   I understand.
3        A.   And then Salemme said -- he told -- he
4    instructed Cesario to have a meeting with me and
5    ban me from the building.
6            He said, after that, I went to
7    Lieutenant Cesario and I said, listen,
8    Lieutenant, I don't think you can legally ban
9    her from that building.  I said, I thought I
10   questioned on my level, he said, and they put me
11   in a compromising position.  Because at this
12   point, I've got nothing I can do if this ends up
13   in a federal lawsuit except testify and tell the
14   truth that that's what the fuck they did.
15           But I'm going to tell you this much.
16   You need to be very concerned.  Commander
17   O'Grady hates you so much that if he could pop
18   you off, meaning shoot you, across the parking
19   lot while you're walking to or from your car to
20   work, he's going to take that shot.  So I advise
21   you, you need to wear your vest.
22       Q.   Sergeant Mills told you this?
23       A.   Sergeant Mills told me that.
24       Q.   Okay.

Page 298

1        A.   I was so distraught and so upset.  I
2    took time off until I went on vacation, however
3    many days that was.  And I told Sergeant Mills,
4    how can you stand here and tell me, knowing all
5    of this, and you don't initiate any action
6    against these supervisors for doing this.  How
7    can you stand here and tell me this?
8            You are mandated to get a CR number.
9    You come from IAD, you know this.  You're
10   supposed to take some kind of action on my
11   behalf.
12       Q.   Okay.
13       A.   And he said, you know what, just put
14   your time due slips in, don't worry about all of
15   this.  By the time you get back from furlough,
16   maybe things will resolve themselves.  He would
17   not take any supervisor action to protect me at
18   all.  Nothing.  You're going to stand on the
19   rooftop and tell me that that's what you're
20   going to do?
21       Q.   And this rooftop conversation was
22   shortly before you went on furlough and then
23   medical leave, correct?
24       A.   No.  This was in July before I filed

Page 299

1    the lawsuit.
2        Q.   Okay.
3        A.   The day that Commander O'Grady banned
4    me from the building, whatever day that was,
5    July or whatever, 2011.
6        Q.   Let's -- why don't we look at
7    Paragraph 90 of the Amended Complaint.  You
8    allege that Defendant Commander O'Grady banned
9    you from the Chicago Police Headquarters at
10   Homan Square where you were assigned a locker.
11           How did you come to know that O'Grady
12   so-called banned you from that facility?
13       A.   Sergeant Mills told me and Lieutenant
14   Cesario told me in that meeting that we just
15   discussed.
16       Q.   Okay.  I'm sorry, just so I'm clear.
17   There was a meeting with just you and Mills and
18   Cesario?
19       A.   Correct.
20       Q.   And was the only subject of that
21   meeting this allege ban of you -- how did that
22   meeting -- how were you told to meet with them
23   about that subject?
24       A.   Sergeant Mills called me and he said,

Page 300

1    hey, where are you at.  I said, Danny and I are
2    in the car.  We already left to get our
3    subjects, our offenders.
4        Q.   Okay.
5        A.   He said, well, can you come back in,
6    the lieutenant wants to meet with you.
7        Q.   Okay.
8        A.   So I told Danny in the car, here we go
9    again.  But when I walked in that day, I sent
10   Danny a text.  I said, something's in the air.
11   Because when I walked in, the commander and the
12   lieutenant were standing there waiting for me
13   and they were just -- the lieutenant's veins
14   were popping in his neck.  And the way they
15   looked at me, and the way they glared at me and
16   the tension in the air, I became extremely
17   nervous --
18       Q.   Okay.
19       A.   -- because this is going on constantly,
20   so I know that something is going to happen.
21   It's just walking in behind enemy lines.  So I
22   text Danny.  Now Mills calls me in and says, the
23   lieutenant wants to talk to me.  So now I'm
24   extremely nervous because I know that --

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
301–304

Page 301

1    Q.   Okay.
2    A.   -- something terribly negative is going
3  to happen.
4    Q.   And at that point, you don't know what
5  the meeting is about?
6    A.   I have no idea.  But all kinds of
7  things are happening that shouldn't be
8  happening.
9    Q.   Okay.  Did you call Officer Echeverria?
10   A.   I asked if I could -- we were together.
11  We both walked in.
12   Q.   Okay.
13   A.   And I said, can I have a witness in
14  this meeting and they said, no, you can't.  Only
15  Lieutenant Cesario can.
16   Q.   Okay.  So who's in the meeting?
17   A.   Lieutenant Cesario, Sergeant Mills and
18  me.
19   Q.   And what is said in this meeting that
20  you're basing your allegation in Paragraph 90?
21   A.   Lieutenant Cesario said, what did you
22  do before work today.  Could you be a little
23  more specific?  Like what did you do before
24  work.  Did you go over to Homan Square.  I said,

Page 302

1  yes, I did.  What are you -- what the -- what
2  are you doing in that building?  I said, I'm
3  assigned to that building, I don't understand
4  where this is coming from.
5    Q.   Okay.
6    A.   Did you see Commander O'Grady in there?
7  No, I never saw Commander O'Grady in there.
8    Q.   Okay.
9    A.   You know, he said, well -- he said,
10  Commander O'Grady doesn't want you in that
11  building.
12   Q.   Okay.
13   A.   He doesn't want you going in that
14  facility.  I said, it's a facility that has a
15  gym that is open to all officers in good
16  standing.  Anybody can go in there, use the
17  washroom, you know, park your car there.  I'm
18  assigned there anyway, you know.
19   Q.   And when you say you're assigned there,
20  you had a locker there, correct?
21   A.   At one point I had a locker there, I
22  don't know if I still had the locker.
23   Q.   Okay.
24   A.   I could still have a locker there now,

Page 303

1  for all I know, you know.
2    Q.   Okay.
3    A.   Yes.  But you're assigned to 189,
4  detailed to Fugitives.
5    Q.   Okay.
6    A.   So instead of assignment, detailed.
7  And so --
8    Q.   In your detail to Fugitive
9  Apprehension, you weren't -- your work location
10  was not Homan Square, correct?
11   A.   No.  We moved out of Homan.  It was at
12  Homan Square for part of the time up on the
13  fifth floor.
14   Q.   Okay.
15   A.   And then we moved out and we had just
16  moved into the 11th District.
17   Q.   Okay.  So at the time that you had this
18  meeting with Cesario and Mills, your work
19  location was no longer Homan Square, correct?
20   A.   Correct.
21   Q.   Okay.  What else, other than what
22  you've testified to, do you recall being said in
23  this meeting with Cesario and Mills?
24   A.   He said, I strongly -- Lieutenant

Page 304

1  Cesario said, I strongly encourage you for your
2  own benefit that you do not go back into that
3  building.  You be advised that you are banned
4  from that building.
5    Q.   Okay.  Do you recall anything else
6  being said in that meeting?
7    A.   It was a little bit longer meeting than
8  that so I'm sure that there was more that I just
9  can't recall at this moment.
10   Q.   Okay.  If you look at your Complaint,
11  Paragraph 89, you say, on August 17th, Sergeant
12  Watts and Officer Mohammed pled guilty.  And
13  then in Paragraph 90, you say around the same
14  time, Defendant O'Grady banned you from Homan
15  Square.
16      Do you have a recollection of whether
17  this alleged banning was after August 17, 2012?
18   A.   No.  I thought it was closer to July.
19   Q.   Okay.  Are you sure of when it was?
20   A.   No.
21   Q.   It could have been July, it could have
22  been August?
23   A.   Yeah.  I'm basing it on the fact that I
24  took time off until I went on vacation.  And I

SHANNON MARIE SPALDING                                  November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                    305–308

Page 305

1   always took vacation in July, so I could be
2   wrong.
3       Q.   Okay.
4       A.   But I don't have those records.
5       Q.   Okay.  And after that Homan Square
6   incident, is it your testimony that you shortly
7   thereafter took vacation or furlough and then
8   went right into medical leave?
9       A.   No.
10      Q.   Okay.
11      A.   I took time off using my comp time.
12      Q.   Okay.
13      A.   And I went on my assigned scheduled
14  furlough that I picked the previous November.
15      Q.   Okay.
16      A.   I believe that it was -- that's when
17  the incident occurred.
18      Q.   Okay.
19      A.   To the best of my recollection.
20      Q.   Okay.  I think where we were in this
21  whole thing, I was asking you if there was
22  anything else that Sergeant Mills did that you
23  believe was retaliatory.
24           You've told me about a lot of things.

Page 306

1   Is there anything else that you're alleging that
2   Sergeant Mills did that was retaliatory?
3       A.   There were things that occurred on a
4   daily basis almost and I just at this point
5   can't recall anything further specific at this
6   time.
7       Q.   Okay.  After you found out that
8   Commander O'Grady didn't want you in Homan
9   Square, did you make any further attempts to go
10  in the Homan Square building before you went out
11  on medical leave?
12      A.   I only went there one other time when I
13  was told, given an instruction by Sergeant Mills
14  that I had to go in there because we were issued
15  new stars or badges or something.
16      Q.   Sure.
17      A.   And that's where we had to go pick them
18  up.  And I even told them, Sergeant Mills that I
19  did not want to go into that building without a
20  supervisor escorting me.
21      Q.   Okay.
22      A.   Because Commander O'Grady had made
23  comments to other officers I would be arrested.
24      Q.   Okay.

Page 307

1       A.   So I was afraid.
2       Q.   Did you, in fact, go to Homan Square on
3   that occasion?
4       A.   On the day that Sergeant Mills said,
5   you guys need to go there now and pick it up, I
6   did follow his order.
7       Q.   Okay.  And you didn't have any problem
8   that day when you went there and picked up your
9   star or whatever you needed to pick up?
10      A.   No.  Because everybody was gone.  We
11  went there at night when it was closed up.
12      Q.   Okay.
13           (Whereupon, Spalding Deposition
14            Exhibit No. 6 was marked for
15            identification.)
16  BY MR. KING:
17      Q.   Officer Spalding, I'm showing you
18  what's been marked as Deposition Exhibit No. 6
19  and ask you to take a look at these.  And we can
20  actually just take this page by page.
21           So if you take a look at the first page
22  of Exhibit 6, which indicates it's a Portfolio
23  Report.  The subject is you, Shannon Spalding,
24  created by Thomas Mills.  Have you ever seen

Page 308

1   this first page of Exhibit 6 before?
2       A.   No.
3       Q.   Okay.  In the report, Sergeant Mills
4   indicates that he checked the activity of the
5   team and the involved member had low arrest
6   numbers for the time period of January 13, 2001
7   to February 13, 2001.  The involved member
8   worked 14 days and had only 2 arrests.
9            As you sit here, do you know if that
10  was correct in terms of your arrest activity
11  during that period?
12      A.   I have no idea to know if it's correct.
13      Q.   Okay.  But you don't recall ever
14  seeing -- well, strike that.
15           Sergeant Mills goes on to say that he
16  will provide the involved member with his
17  activity report.  Do you -- did Sergeant Mills
18  regularly provide you with Activity Reports?
19      A.   After we started -- after we filed the
20  lawsuit, he began to retaliate against us with
21  activity.
22           MR. KING:  Okay.  I move to strike that
23  response as nonresponsive.
24

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
309–312

Page 309

1    BY MR. KING:
2        Q.  Did Sergeant Mills regularly provide
3    you with Activity Reports on your activity?
4        A.  Not regularly, no.
5        Q.  Okay.  If you take a look at the second
6    page of Exhibit 6.  It indicates, again, it's a
7    Portfolio Report created by Sergeant Mills and
8    you are the subject.  Do you recall ever seeing
9    this document?
10       A.  I never saw any of these documents
11   before.
12       Q.  Okay.  Well, he writes that he spoke
13   with the involved member on March 19, 2013 about
14   spending excessive time in the Unit 606.  I
15   believe you testified to this, perhaps.
16          Do you recall that Sergeant Mills would
17   tell you that he felt that you were spending
18   excessive time in the unit and should be out on
19   the streets?
20       A.  I recall that he did not word it that
21   way.  I recall him saying that we should not be
22   in the building, that we, specifically us,
23   should not be in the building and that we should
24   not come in until 11:30.

Page 310

1        Q.  Okay.
2        A.  And that was his conversation.
3        Q.  Okay.  As you sit here, do you know
4    whether, in fact, he spoke to you on March 19,
5    2013 about spending excessive time in the unit?
6        A.  I know that -- I can't say that it was
7    March 19th, but I can say that one day we left
8    and we did return a couple of hours later
9    because my partner, Officer Echeverria, who had
10   recently been hospitalized and everything, was
11   feeling really ill and wasn't going to be able
12   to remain on the street.
13       Q.  Okay.
14       A.  But before we could even get a chance
15   to tell him why we were back in the unit, he
16   became very irate and exploded verbally at us
17   screaming at us what were we doing back in the
18   unit and why aren't we out on the street.
19       Q.  Okay.
20       A.  And at that point, Danny decided not to
21   tell him anything.  And I let him finish his
22   rant and then said that he was sick and couldn't
23   continue to work.
24       Q.  Okay.  And as far as you know, that

Page 311

1    incident may or may not have been on what's
2    documented in this Portfolio Report?
3        A.  It was close to that time.
4        Q.  Okay.
5        A.  It is more than likely this incident.
6        Q.  Okay.  If you look at the third page,
7    it indicates another Portfolio Report on -- the
8    subject is you, created by Sergeant Mills.
9           This is the incident that you
10   previously testified to, correct?  That you made
11   an arrest in the 11th District when you were not
12   assigned to the 11th District, correct?
13       A.  This is on the VRI program that I was
14   telling you about, yes.
15       Q.  Okay.  The next page, another Portfolio
16   Report dated March 24, 2013 says, the involved
17   member failed to make any arrests from the dates
18   of 19 March 2013 until 23 March 2013.
19          As you sit here, do you know whether
20   that's, in fact, correct or not?
21       A.  I don't know if those -- if that
22   information is correct or not.
23       Q.  Okay.
24

Page 312

1           (Whereupon, Spalding Deposition
2              Exhibit No. 7 was marked for
3              identification.)
4    BY MR. KING:
5        Q.  Officer Spalding, I'm showing you
6    another group of documents that's marked as
7    Deposition Exhibit No. 7.  And I'll just try to
8    identify them and I'll ask you if you've ever
9    seen these reports before.
10          They appear to be Officer Activity
11   Reports for you, Shannon Spalding, between
12   6/20/2012 and 4/30/2013.  Do you recall seeing
13   these documents before or Activity Reports like
14   this?
15       A.  I have seen Activity Reports, but I
16   don't know if they were exactly these same
17   reports.
18       Q.  Okay.
19       A.  Where are you seeing the dates?  Okay.
20       Q.  And the arrest totals that are listed
21   in Deposition Exhibit 7, you have no basis for
22   knowing whether they're correct or incorrect?
23   Let me strike that.  That's a bad question.
24          Do you know whether the arrest activity

SHANNON MARIE SPALDING                          November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO              313–316

Page 313

1  that's reflected in Deposition 7 is correct or
2  incorrect?
3      A.  I have no way of knowing that.
4      Q.  Okay.
5          (Whereupon, Spalding Deposition
6          Exhibit No. 8 was marked for
7          identification.)
8  BY MR. KING:
9      Q.  Officer Spalding, I'm showing you
10 another document that's been marked Deposition
11 Exhibit No. 8, which indicates anyway that it is
12 a report listing of arrests for Shannon Spalding
13 for January 1, 2013 until the end of the year,
14 December 31, 2013.
15        Are you able to tell me whether or not
16 these arrest reports are correct or incorrect?
17     A.  I have no idea.  I've never even seen
18 this report before.
19     Q.  Okay.  You've never seen this report?
20     A.  No.
21     Q.  Okay.  That's fine.
22        If you'll direct your attention to
23 Paragraph 104 of the Complaint, Deposition
24 Exhibit No. 1, and Paragraph 105 and 106.  My

Page 314

1  question is this is the incident that you
2  previously testified to, correct?
3      A.  Correct.
4      Q.  Okay.  You mentioned something about
5  secretly recording conversations.  Was there
6  some point when you were secretly recording --
7      MR. SMITH:  Objection to the form of
8  the question.
9      MR. KING:  Okay.  I don't need -- I
10 don't need to allude to the prior question.
11 I'll just ask you.
12 BY MR. KING:
13     Q.  Was there any point where you were
14 secretly recording any conversations that you
15 were having with Sergeant Mills?
16     A.  No.
17     Q.  Okay.  Is it your understanding that at
18 some point Sergeant Mills was under the
19 impression that you were recording conversations
20 with him?
21     A.  I don't know what Sergeant Mills'
22 impression was of anything.
23     Q.  Okay.  You never had a -- strike that.
24        Did you ever have a conversation with

Page 315

1  anyone about the subject of you recording
2  conversations with Sergeant Mills or Sergeant
3  Mills' belief that you were recording
4  conversations with him?
5      A.  Only in regards to a CR number with
6  IAD.
7      Q.  Okay.  Who --
8      A.  It was more -- yeah, a discussion.  I
9  wouldn't say a discussion.
10     Q.  Okay.  Who did you have a discussion
11 with that related to either recording
12 conversations with Sergeant Mills or his belief
13 that you were recording conversations?
14     A.  I didn't have a discussion, I was
15 working in -- I reported to work, along with
16 Officer Echeverria, shortly before I went on the
17 medical.
18     Q.  Okay.
19     A.  And Sergeant Mills stated that two
20 people of the team, Sergeant Steve -- or I'm
21 sorry, Detective Steve Becker and that Roxanne
22 Blarcheck would be in the unit late and that him
23 and the rest of the team were going north.  And
24 that he -- and ironically after telling us to

Page 316

1  out on the street more, instructed Danny and I
2  to stay inside the building.
3      Q.  Okay.
4      A.  Okay.  So we followed his instructions
5  and we didn't leave.
6      Q.  Okay.
7      A.  Shortly after Sergeant Mills left,
8  Sergeant Mike Barz and Sergeant Robert Moscolino
9  from IAD confidential section, approached me.
10 Now, Sergeant Mike Barz was a sergeant involved
11 with Operation Brass Tax with the Ronald Watts
12 situation.
13     Q.  Yes.
14     A.  So at first when I saw them, I thought
15 that he was coming to talk to us with something
16 with the operation --
17     Q.  Sure.
18     A.  -- because that has happened in the
19 past.
20     Q.  Okay.
21     A.  So when he approached me, he said to
22 me -- I said, oh, hey, you know, Serge, what's
23 going on.  Do you need to talk to us about the
24 Watts case?  And he said, no.  If I told you

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
317–320

Page 317

1  that you were under arrest right now, are you
2  going to come with me peacefully or not.
3      Q.  Sergeant Barz said this?
4      A.  Yes.  Yes, he did.
5      Q.  Okay.  And then what else was said?
6      A.  I said, no.  He said, okay, then we're
7  going to fucking do this here.  And he said, get
8  up.  And him and the other sergeant escorted me
9  into a room and shut the door and put me between
10  some desks, one sat here, and one stood there and I
11  was between two desks like this.
12          And he said, we have criminal federal
13  allegations that you are illegally recording.
14  And he said, these are allegations that you're
15  going to be arrested and charged for and will
16  lose your job over.  This is serious.
17      Q.  Okay.  Did they say anything else in
18  this meeting?
19      A.  They said a whole lot for whole long --
20  a long time.
21      Q.  Okay.  Did they indicate who you were
22  alleged to be recording?
23      A.  Yes.
24      Q.  Who?

Page 318

1      A.  Sergeant Mills.
2      Q.  Okay.  What else was said in this
3  conversation?
4      A.  He said to me that -- I said, well,
5  what are the charges?  He said, you're not
6  allowed to know that at this time.  I can't know
7  specifically what the charges are?  He said, no,
8  not at this time, you cannot.
9      Q.  By the way, was Officer Echeverria
10  present?
11      A.  No, no.
12      Q.  Okay.  That's my only question.
13      A.  Okay.
14      Q.  Okay.  What else was said in the
15  meeting?
16      A.  I was going to tell you.  Sorry.
17          As I was walking in the meeting, I was
18  able to get a text off that said, they're
19  arresting me, call our attorney.
20      Q.  Okay.
21      A.  To Danny Echeverria, okay.
22      Q.  Okay.
23      A.  But he was not in the room at any time.
24      Q.  Okay.  What else was -- other than what

Page 319

1  you've already testified to, what else was said
2  in this meeting?
3      A.  He said -- I said, I need to know
4  specifically what are you asking me.  He said,
5  that you were recording conversations.  I said,
6  well, there's different versions of recording.
7  Are you referring to recording as writing down
8  and documenting or are you referring to like
9  tape-recording, video recording.  He said, let's
10  just say using your cell phone or using a
11  recording device.
12      Q.  Okay.
13      A.  I said, no, you know, I have no idea
14  what are you talking about.
15      Q.  Okay.
16      A.  They continued to question me.  And
17  then he said, I'll tell you what, he said, give
18  us your phone right now, which by the way they
19  had out of my reach, and we'll go through it.
20  We'll go through it right now.  I'll tell you, I'll
21  tell you what, I have an affidavit here for your
22  phone.  I said, an affidavit?  You better get a
23  fucking search warrant.
24      Q.  Okay.

Page 320

1      A.  Because now I'm in a corner.  You've
2  got me trapped like a rat.
3      Q.  Okay.
4      A.  And you're alleging all of this stuff.
5  And I said, you want this phone?  I said if I
6  walk out of this room without giving you this
7  phone, you will swear there's something
8  incriminating on it and I got rid of it.
9          So I'll tell you what, you can have
10  this phone, but I want you to call my lawyer or
11  let me call my lawyer.  And as soon as my lawyer
12  gets here, you can go through the phone with his
13  permission.
14      Q.  Okay.
15      A.  And he said, okay.  He said, all right.
16  Let me ask you something --
17      Q.  So he -- so Barz and Moscolino did not
18  go through your phone, correct?
19      A.  No.
20      Q.  Is that correct?
21      A.  It is correct, they did not go through
22  the phone.
23      Q.  Okay.  They asked you if you were using
24  any kind of recording device to record Officer

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
321–324

Page 321

1  Mills.  What was your answer to that?
2      A.  No.
3      Q.  Okay.  What else was said in the
4  meeting?
5      A.  He said -- okay.  He said, we have a
6  Complaint here.  He said, do you have any
7  knowledge of anybody that would be dropping
8  paper on you.  And I immediately thought about
9  that whole last day that we walked -- worked VRI
10  and Mills saying, the people don't want to work
11  with you, they're dropping paper on you, in
12  fact, even Chris Dingle dropped paper on you.
13      So I said, well, Sergeant Mills had
14  mentioned last, and at the time, I knew the
15  date, I was able to say the date off the top of
16  my head, on such and such a date, it was a
17  Sunday we were working, Sergeant Mills had told
18  me that people were dropping paper on me.
19      He said, Sergeant Mills fucking told
20  you that?  And I said, yeah.  He said, why in
21  the fuck would Sergeant Mills give you a
22  heads-up and tell you that.  I said, what are
23  you talking about?  Like I said -- he said, why
24  would he tell you something like that?  I said,

Page 322

1  you'll have to go ask Sergeant Mills.  And he
2  said, well -- he said, okay, with that being
3  said --
4      Q.  Okay.  Did you ever learn in that
5  meeting or any time after that, who had accused
6  you of secretly using a recording device with
7  Sergeant Mills?
8      A.  Yes.
9      Q.  Who did?
10      A.  He said, with that being said, I will
11  now tell you Colleen Dugan along with -- no, I
12  think he just mentioned Colleen at the time, has
13  filed a CR number against you --
14      Q.  Okay.
15      A.  -- stating that on Monday, on such and
16  such a date on a Monday, she observed you in the
17  hallway with a recording device that she
18  believed could possibly be your cell phone and
19  she heard a man's voice coming from the cell
20  phone that she believed to be Sergeant Mills.
21      Q.  Okay.
22      A.  And she believed that it was a recorded
23  conversation.  And I said, that's what you're
24  detaining me here for?  And he said, yes.  I

Page 323

1  said that fucking might have been -- I could
2  have been listening to a saved voicemail, I
3  could have had Sergeant Mills on speakerphone.
4      Q.  Sure.
5      A.  You don't even know that it was
6  Sergeant fucking Mills.  I said, are you kidding
7  me?  You've got criminals like the rest of
8  Ronald Watts' team still out there not under
9  arrest for the crimes they've committed, and you
10  have this completely false made-up allegation
11  that you're going to detain me for and go to
12  prison for?
13      Q.  Okay.
14      A.  Okay.  And then he said -- I said, did
15  you approach Sergeant Mills with this?
16      Q.  Yes.
17      A.  And he said, yes, Sergeant Mills is the
18  victim.  I said, the victim?  So you've already
19  made a final conclusion on this and you haven't
20  even done the investigation, so I'm already
21  guilty?  And he said, well, of course, he's the
22  victim, so I did approach him.
23      Q.  Okay.
24      A.  And he said -- I said, you know what,

Page 324

1  this is further fucking retaliation.  Because
2  Sergeant Mills just told me in that VRI meeting
3  that people think that we might still be working
4  for IAD.  And now you two IAD bosses come up
5  here and you pull me in here in front of all
6  these coworkers and you're detaining me in here
7  and you're just going to solidify their
8  thoughts.
9      Q.  What coworkers were in the office when
10  Sergeant Barz and Sergeant Moscolino came and
11  took you in the room and interrogated you?
12      A.  Multiple members of the Bomb and Arson
13  team.
14      Q.  Okay.
15      A.  Steve Becker, Roxanne Blarcheck was
16  there.  She walked out, she walked in.  I don't
17  know if she was there at the exact moment,
18  because I was paying attention to them.
19      Q.  That's fine.
20      A.  Officer Echeverria.  And I don't know
21  the names of the people from Bomb and Arson, but
22  they were there, as well.
23      Q.  So Sergeant Barnes informed you that he
24  had shared this with Sergeant Mills?

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
325–328

Page 325

1    A.   Yes.
2    Q.   That there had been a Complaint that
3  you were secretly using a recording device
4  recording conversations with him; is that fair?
5    A.   He said that he approached him because
6  he was the victim.
7    Q.   Okay.
8    A.   And I said, well --
9    Q.   Other than what you've already
10  testified to, do you recall anything else being
11  said in that meeting?
12    A.   Yes.
13    Q.   Okay.  What else?
14    A.   I said, well, that's great.  I said, I
15  have a rough enough time with this sergeant
16  already, okay, ever since this lawsuit was
17  filed.  I said, and now you're going to go to
18  him and state this false allegation and make my
19  work situation 100 times worse.
20        You guys worked with me on this
21  operation, you were supposed to help me and
22  protect me and instead you're make it 100 times
23  worse.  And I said, now, what was Sergeant
24  Mills' reaction?  He said, Sergeant Mills stated

Page 326

1  at no time did he have any knowledge nor did he
2  believe that you have ever recorded him at any
3  time.
4    Q.   Okay.
5    A.   He said that was Sergeant Mills'
6  response.  So I didn't make your sergeant think
7  worse of you.
8        The conversation continued and I told
9  him, this is just further retaliation.  This --
10  you guys are coming after me.  You know, this is
11  a fishing expedition because my conversation
12  with the VRI.  And I wouldn't elaborate on
13  anything.  This is a fishing expedition because
14  I have a lawsuit filed and people are trying to
15  find out if I have recordings that are going to
16  surface in the lawsuit or not.  I said, that's
17  all that this is.
18    Q.   Okay.
19    A.   At some point in between this
20  conversation, my lawyer Dan Herbert at the
21  time called Mike Barz on his cell phone.
22    Q.   Okay.
23    A.   And said, I understand you have her.
24  And I could hear both sides of the -- because

Page 327

1  I'm so close.
2    Q.   Okay.
3    A.   And he said, yeah, he said, we are
4  holding her, we do have her.  I'm questioning
5  her regarding these federal charges that I have.
6    Q.   Yes.
7    A.   Mike Barz then continued and said, hey,
8  listen, listen -- in front of me.  He said
9  listen, Dan, where are you at, you out of town?
10  You're in Washington?  We're going to see you
11  for the game on Saturday or whatever?  Okay,
12  I'll see you then.  This is my attorney talking
13  to the guy that's detaining me, okay.
14    Q.   Okay.
15    A.   So now I said -- he said, okay, he
16  said, listen, buddy, do my a favor, don't make
17  this part of the retaliation in the lawsuit and
18  I'll make these charges disappear.
19    Q.   Who said that?
20    A.   Mike Barz said that.
21    Q.   Okay.
22    A.   To Dan Herbert.
23    Q.   Okay.
24    A.   And you're laughing.

Page 328

1    Q.   I'm sorry.  Go ahead.
2    A.   Like it's a joke, like something like
3  that is funny.
4    Q.   I'm sorry.  I apologize.  I was not
5  laughing at you.
6    A.   Yeah, you were.
7        And then Mike Barz handed me the phone.
8  And my attorney said, don't say another word to
9  them.  I said you're about 45 minutes too late.
10  I want to get the fuck out of here, they're not
11  letting me leave.
12    Q.   Okay.
13    A.   So when he hung up, I said, am I free
14  to go now?  And Mike Barz said, no, not yet.
15  Sit down.
16    Q.   Okay.
17    A.   He said, look, I'm sorry I came at you
18  the wrong way.  I said, you're right.  This
19  could be perceived as retaliation.
20        He said, you know what, I came here as
21  your friend.  My intention was to give you a
22  heads-up and let you know that I know that these
23  are false allegations and let you know that
24  these are not going to go anywhere.  We know

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
329–332

Page 329

1 that these are falls allegations. I came here
2 so that you would not be concerned about these
3 because we know that they're going nowhere, we
4 know they're false.
5    Q. Okay.
6    A. And he said and if you're having such a
7 hard time with everything, I'll tell you what,
8 isn't there a way to expedite this whole
9 situation and make it easier on you? I said, I
10 have no idea. Do you know of a way to expedite
11 a federal lawsuit? He said -- I said, oh, you
12 mean drop the lawsuit? And he said, if it makes
13 it easier.
14    I said, I can't and I fucking won't.
15 Am I free to leave now? He said, no. He said,
16 do you have Sergeant Mills' phone number? And I
17 said, yeah. He said, call him. I said, no, you
18 call him. He said, give me his phone number.
19 He said, you are distraught and psychologically
20 not fit to go out for duty. He said, you are
21 too distraught, you are too historical and --
22    Q. Sergeant Barz said this?
23    A. Yes. He said -- I said, I wasn't
24 before you guys came and did all this to me for

Page 330

1 the last hour and something.
2    Q. Okay.
3    A. And he said, listen, this is going to
4 disappear. There's going to be no criminal
5 charges, we're going to make this disappear,
6 okay. He called Sergeant Mills and he said, I
7 am -- Sergeant Mills I want to inform you that
8 Officer Spalding is not fit for duty, she's too
9 distraught over this situation and I am sending
10 her home. She is not fit to work the streets.
11    Q. Okay. Was that the last day that you
12 actually worked --
13    A. No.
14    Q. -- in Fugitive Apprehension?
15    A. No. I worked I believe two more days.
16    Q. Okay.
17    A. But I changed my duty hours to days and
18 I went to FOP the next day to inform them that I
19 was detained, wasn't read my rights --
20    Q. Okay.
21    A. -- wasn't given the charges and wasn't
22 free to leave even after my attorney called and
23 when I requested my attorney to be called. And
24 I talked to a lawyer there at the time named

Page 331

1 McCarthy. He said, you have a great case. He
2 said, they should not have done that to you.
3 That was an arrest and it was completely
4 illegal. However, the problem is the people
5 that would discipline him and make sure that
6 this is corrected is Juan Rivera and you're
7 suing Juan Rivera.
8    He said, in your best interest and for
9 safety reasons, you do have a benefit called
10 medical. And in your extreme situation, you can
11 go on medical because of the stress. It's a
12 stress leave. And I was unfamiliar with that.
13 Because I told him, I'm now to the point that I
14 can't even get in a car without shaking. I
15 don't know what's going to happen next.
16    How can I go chase wanted offenders in
17 that condition? I'm jeopardizing my partner's
18 safety and I'm mentally not able to do this
19 anymore. And he said, for your own good, I
20 advise you not to. I came, we worked days, like
21 the next day on that Sunday. It was like a
22 Thursday. Friday I went to FOP. I worked days
23 on Saturday. Sunday Danny started furlough. I
24 put in time, too for two weeks. Half way

Page 332

1 through that, I went to a therapist. I was just
2 so distraught and everything --
3    Q. Okay.
4    A. -- and then I went on the medical.
5    Q. Okay. So after the incident with
6 Sergeant Barz, you worked -- well, the following
7 day, you went to FOP?
8    A. Yes.
9    Q. And you worked days?
10    A. Yes, so I could go to FOP.
11    Q. And you're saying there was one more
12 day that --
13    A. I believe there was like one more day.
14    Q. Okay. So after the incident with --
15 well, after the incident with Sergeant Barz, did
16 you ever have a conversation with Sergeant Mills
17 about that incident?
18    A. No, I never had a conversation with
19 Sergeant Mills about it.
20    Q. Okay. And at the time of that incident
21 with Sergeant Barz, you had been reassigned from
22 nights to days at that point, correct?
23    A. But I never got to work days because of
24 the incidents that occurred. I never ever

SHANNON MARIE SPALDING                                    November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                      333—336

Page 333

1  worked one day on days.
2      Q.  Okay.  But you had requested you and
3  your partner to go back to days in Fugitive
4  Apprehension and you were ultimately sent back
5  to days with Sergeant Stack, correct?
6      A.  Yes.
7      Q.  Okay.  But you actually never reported
8  for duty on days with Sergeant Stack, correct?
9      A.  Correct.
10     Q.  Okay.
11         MR. ECHEVERRIA:  Do you want to take a
12  break?
13         MR. SMITH:  Why don't we take a break.
14         MR. KING:  Yeah, why don't we take a
15  break.
16         (Whereupon, a short break was
17             taken.)
18  BY MR. KING:
19     Q.  Officer Spalding, am I correct that
20  your allegations that Sergeant Barnes and
21  Sergeant Mills engaged in some retaliation
22  against you was all within the time period that
23  you were assigned to Fugitive Apprehension?
24     A.  Correct.

Page 334

1      Q.  And since you never reported to work
2  with Sergeant Stack, I assume you're not
3  alleging that Sergeant Stack retaliated against
4  you in any fashion?
5      A.  Correct.
6      Q.  When you were in Fugitive Apprehension,
7  did you have any understanding of what the
8  process was for officers such as yourself to get
9  recommended for the U.S. Marshal's Task Force?
10     A.  Prior to going to Fugitive
11  Apprehension, we met with Chief Tom Barnes, as I
12  stated earlier.  During that time, we met with
13  him to tell him what we were involved with with
14  Operation Brass Tax since it had concluded.
15         Because we wanted to lay all of the
16  cards on the table and let him know that we're
17  looking to go to a unit where there will be no
18  further retaliation and nothing else like this
19  will happen anymore.
20     Q.  Okay.  Did he tell you about this
21  process, my question?
22     A.  Yes, yes.
23     Q.  Okay.  And what did he say about it?
24     A.  What he said to us is, you two are

Page 335

1  great officers, you worked for me before.  He
2  said, I am about to start a night team; however,
3  with your experience, your resource and your
4  talents, I believe that it would be a waste to
5  put you on the night team.  I think you're
6  better suited for the day team to work in
7  fugitives with the U.S. Marshals on one of the
8  teams.  Right now, I don't have any openings to
9  have you deputized.
10     Q.  Okay.
11     A.  However, when the openings come up, I
12  will get you -- you will be deputized.  He said,
13  I'm not saying that you're better than the
14  officers that will go on -- that will go on
15  night, it's just at this point in your career,
16  it's going to be a completely different concept.
17  For you, it would be a glorified tact team and
18  it would be a big step back in your career.
19     Q.  Okay.  Let me ask it this way.  Did you
20  understand that in order to be deputized for the
21  U.S. Marshals Task Force, your sergeant had to
22  recommend you for deputization?
23     A.  No.  I -- later on being -- after I
24  have gotten -- at the time with Tom Barnes -- it

Page 336

1  wasn't explained that way.
2      Q.  Okay.
3      A.  He said, I will -- you guys -- I will
4  have you guys -- him, being the chief, I think
5  he could recommend it.
6      Q.  Okay.
7      A.  But after being in Fugitives, on the
8  night team, I did learn from Jan Hannah that
9  when they picked the people to be deputized on
10  that night team, that they did ask the
11  sergeants; however, when I did ask Sergeant
12  Mills about that --
13     Q.  Yes.
14     A.  -- he said that sergeants don't have
15  anything to do with that.
16     Q.  Okay.  Sergeant Mills told you
17  sergeants don't have anything to do with
18  recommending who gets deputized for the U.S.
19  Marshal's Task Force?
20     A.  Yeah.  He said with him -- that's what
21  he said when we first got to the night team.
22  But Jan Hannah told me later that that's not
23  accurate.
24     Q.  Okay.  To the best of your knowledge,

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
337–340

Page 337

1  did Sergeant Barnes or Sergeant Mills ever
2  recommend you and Officer Echeverria for the
3  U.S. Marshal's Task Force?
4      A.  Well, I -- I don't -- I didn't even --
5  when I was in Sergeant Barnes' team, I didn't
6  even have that information or know what it was,
7  so I would have no knowledge.
8      Q.  Right.
9      A.  And when I asked Sergeant Mills, he
10  said that he -- it wasn't done that way, so I
11  didn't even know.
12     Q.  Okay.  I assume that's a no?
13     A.  No.
14     Q.  To the best of your knowledge --
15     A.  No.
16     Q.  -- you're not aware of Sergeant Barnes
17  or Sergeant mills recommending you for the U.S.
18  Marshal's Task Force, correct?
19     A.  That's correct.
20     Q.  Okay.  And -- strike that.
21         So we've gotten to the point where you
22  go out on medical leave and you have talked
23  about certain people you complained to about
24  certain things.

Page 338

1         My question is, did you ever make any
2  Complaint in writing to anyone that you believed
3  you were retaliated against for working on
4  Operation Brass Tax?
5      A.  That's not -- you usually talk to a
6  supervisor.  No.
7         MR. KING:  Okay.  Can you read back the
8  question.
9             (Whereupon, the record was read
10                as requested.)
11        THE WITNESS:  I don't believe I did.
12  BY MR. KING:
13     Q.  Okay.  Are you aware that your attorney
14  at the time Patrick Walsh made a Complaint on
15  your and Officer Echeverria's behalf that did
16  result in a CR number being issued?
17     A.  No.
18        MR. SMITH:  I'm going to object to the
19  form of the question, it assumes facts not in
20  evidence.
21        MR. KING:  Well, let's see if we can
22  put it into evidence.
23        MR. SMITH:  Complaints that are Civil
24  lawsuits, generate CRs automatically.

Page 339

1         THE WITNESS:  Can you say that again?
2  I'm misunderstanding what you said.  Am I what?
3         MR. KING:  You can read back the
4  question to her.
5         THE WITNESS:  Please.
6             (Whereupon, the record was read
7                as requested.)
8         THE WITNESS:  No.  As a -- he filed a
9  CR number?
10            (Whereupon, Spalding Deposition
11               Exhibit No. 9 was marked for
12               identification.)
13  BY MR. KING:
14     Q.  Let me show you Deposition Exhibit
15  No. 9 and ask you to take a look at that
16  document.  It's a Summary Report Digest of the
17  Chicago Police Department.  Have you ever seen
18  this document before?
19     A.  No, I've never seen this.  Is this what
20  my attorney filed?
21     Q.  If you look in the allegation section
22  on the first page, it says, the Complainant
23  Attorney Patrick Walsh alleged that at an
24  unknown date, time and location, Chicago Police

Page 340

1  Officers you and Dan Echeverria were subjected
2  to retaliation from unknown Chicago Police
3  Officers because of their cooperation in an FBI
4  investigation that resulted in the arrest and
5  prosecution of Chicago Police Officers.
6         Is it your testimony that you're not
7  aware of your attorney --
8         MR. SMITH:  I'll object.  This is
9  misleading as to the process of how these claims
10  are initiated.
11        MR. KING:  Okay.
12        MR. SMITH:  I'm going to ask for my
13  client to have a minute to read -- review the
14  materials.
15        MR. KING:  Sure.
16        THE WITNESS:  I can't even see the
17  materials.  Can I talk to you for a minute?
18        MR. SMITH:  Can we take a break now or
19  do you want her to finish answering this
20  question?
21        MR. KING:  And I don't want to ask an
22  unfair question.  I'm not trying to do that.
23  Let me try to ask a better question.
24        THE WITNESS:  Well, if you could read

SHANNON MARIE SPALDING                                    November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                         341–344

Page 341

1  this whole thing.  My eyes are so blurry from
2  all this crying.  If you want to read that to
3  me, then I can answer your question.
4  BY MR. KING:
5      Q.  Let me ask it this way.  Are you aware
6  that at some point after you filed your lawsuit,
7  there was a CR number that was opened relating
8  to your allegations of retaliation?
9      A.  No.  This is the first I'm hearing of
10  it.
11      Q.  Okay.  Do you -- so you don't recall
12  having to make a decision at some point if you
13  wanted to pursue the CR or you just pursued your
14  lawsuit?
15      A.  No, never.
16      Q.  Okay.  Fair enough.
17          (Whereupon, Spalding Deposition
18            Exhibit No. 10 was marked for
19            identification.)
20  BY MR. KING:
21      Q.  Officer Spalding, are you familiar with
22  the Independent Police Review Authority?
23      A.  I know who they are.
24      Q.  Okay.  And is it your understanding

Page 342

1  that they investigate complaints of misconduct
2  by police officers?
3      A.  Yes.
4      Q.  Okay.  And when did you -- have you
5  known that your whole career essentially that
6  who IPRA is and that they investigate
7  complaints?
8      A.  I don't know that I've known that my
9  whole career.  I don't think IPRA has been in
10  existence my whole career.  I don't know much
11  about them.  You know, I've only had to deal
12  with IAD.
13      Q.  Okay.  So I'm assuming you never made
14  a -- you or as far as you know, Officer
15  Echeverria never made a Complaint to the
16  Independent Police Review Authority about any of
17  the retaliation that you allege you were
18  subjected to?
19      A.  No, I never did.
20      Q.  Okay.
21      A.  Not that I'm aware of.
22      Q.  And as far as you know, Officer
23  Echeverria did not, either, correct?
24      A.  No.  He didn't, either, as far as I

Page 343

1  know.
2      Q.  Let me show you another document that's
3  been marked as Deposition Exhibit No. 10 and ask
4  you to take a look at that.
5          Take a look at this first page of
6  Exhibit 10 and just let me know if you've ever
7  seen this e-mail before.
8      A.  No.
9      Q.  Okay.  And as of April 13, 2008, you
10  were still working in Narcotics, correct?
11      A.  As of -- yes.
12      Q.  And are you familiar with Kevin
13  Navarro?
14      A.  Yes.
15      Q.  Who was Kevin Navarro?
16      A.  He was a lieutenant in Narcotics.
17      Q.  Okay.  And to the best of your
18  knowledge, was he your lieutenant as of
19  April 13, 2008?
20      A.  Yes, I believe he was.
21      Q.  And was your sergeant at that time
22  Kevin Johnson?
23      A.  In April?
24      Q.  In April of 2008.

Page 344

1      A.  Do your records reflect that?  I'm not
2  sure who was my sergeant at that time.
3      Q.  Okay.  But it may have been Kevin
4  Johnson?
5      A.  It could have been, yes.
6      Q.  Okay.  If you would -- if you look at
7  the first line of the e-mail, Page 1 of
8  Exhibit 10, it says, from Kevin Navarro to Nick
9  Roti.  It says, boss, here are the personnel
10  assessments.  Sergeants were done by me and
11  their personnel were done by them.  Do you see
12  that?
13      A.  Yes.
14      Q.  Okay.  And then if you turn to
15  Page 149 -- at the bottom right, it's Page 1495,
16  which says, Lieutenant Kevin Navarro at the top
17  and then Sergeant Kevin Johnson underneath that.
18  Do you see that?
19      A.  I do.
20      Q.  Okay.  And if you turn to the next
21  page, you're identified on the next page
22  correct?
23      A.  Correct.
24      Q.  Okay.  And have you ever seen these

Page 345

1  pages, 1495 and 1496 before?
2      A.  I've never seen any of these pages.
3      Q.  Okay.  And during the time that you
4  were under Sergeant Kevin Johnson, were these
5  the individuals that were also under Sergeant
6  Johnson, as far as you know?
7      A.  Yes.
8      Q.  Officer -- those listed on Page 1495?
9      A.  Yes.
10     Q.  Yes?
11     A.  Uh-huh.
12     Q.  Okay, thank you.
13         And do you have any knowledge or
14  information that as of April 13, 2008 Kevin
15  Navarro was aware of your work with the FBI on
16  the Watts investigation?
17     A.  You know, I don't know who knew what at
18  what point.
19     Q.  Do you have any basis for believing
20  Kevin Navarro was aware of that as of April 13,
21  2008?
22     A.  I have no proof of that.
23     Q.  Do you have any basis for believing
24  that as of April, 2008, Kevin Johnson was aware

Page 346

1  of your work on the Watts investigation?
2      A.  No.  I don't know what Kevin Johnson
3  may or may not have known, but he was working in
4  the FBI building.
5      Q.  Okay.
6      A.  So it's possible, I don't know.
7      Q.  Okay.  Do you have any personal
8  knowledge of whether Kevin Johnson was aware of
9  as of April, 2008 that you were working on the
10  Watts investigation?
11     A.  No personal knowledge.
12     Q.  Okay.  You don't have any knowledge?
13  You don't have any knowledge that he was aware
14  of that, correct?
15     A.  Correct.
16     Q.  Okay.  If you look at the first page,
17  the e-mail from Kevin Navarro to Nick Roti, the
18  second paragraph starts to talk about a robbery
19  and battery of you, P.O. Spalding.  Is that what
20  you previously testified to, that incident?
21     A.  No.
22     Q.  Okay.  Do you recall what that incident
23  was about?
24     A.  Yes.  I was robbed and -- oh, with --

Page 347

1  yes, with the -- did we talk about that, with
2  Bates, where I was told to go out and make the
3  drug buy when I didn't feel comfortable?
4      Q.  Well, why don't you tell me what
5  this --
6      A.  Okay.
7      Q.  -- your understanding of the incident
8  was when you were robbed and --
9      A.  I was working under Bates, Tyron Bates.
10     Q.  Okay.
11     A.  And I don't know and I don't recall if
12  we did discuss this today already.  But we were
13  going to make a narcotics purchase on the West
14  Side.  We went over this, correct?  And I
15  explained that I wasn't comfortable going back
16  to the situation because my identity had already
17  been revealed?
18     Q.  Yes.
19     A.  Yes, this is the same subject that we
20  talked about.
21     Q.  Okay.  This is the same subject we
22  talked about?
23     A.  Yes.
24     Q.  And obviously by the date of this

Page 348

1  e-mail, that incident occurred sometime prior to
2  April 13, 2008, would you agree?
3      A.  I believe it was in February.
4      Q.  Okay.  Of 2008?
5      A.  Yes.
6      Q.  Okay.  That's fine.
7         And later on in the e-mail, Kevin
8  Navarro writes, I'm definitely going to have a
9  team meeting because there's animosity over this
10  incident, a split among team members including
11  P.O. Spalding going around the unit bad mouthing
12  the team for not backing her up.  I don't know
13  if you'd agree to bad mouthing, but would you
14  agree that you were expressing concern about the
15  team not backing you up in that situation?
16     A.  I was asked by multiple supervisors
17  about the incident, and I did express the -- I
18  did tell them the incident that did happen and
19  they expressed more concern than I did --
20     Q.  Okay.
21     A.  -- for the incident and related back to
22  me that they were trying to cover that up.
23     Q.  Okay.  Did you express concern in
24  connection with that incident about team members

SHANNON MARIE SPALDING                    November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO       349–352

Page 349

1    not being there to back you up?
2        A.   Yes.
3        Q.   Okay.  And then Kevin Navarro goes on
4    to write, quote, I talked to her personally on
5    the phone with her from Peoria and asked the
6    question specifically about backup and she told
7    me she had no problems.  Do you believe that's
8    correct?
9        A.   What I do know is that the
10   conversations took place when Kevin Navarro --
11   prior to his phone call.  I don't believe he was
12   informed immediately of the situation.
13       Q.   Okay.
14       A.   I think it was a day or the next day.
15       Q.   Okay.
16       A.   And so these conversations took place
17   immediately after the incident.
18       Q.   I understand.  I'm just asking if you
19   remember a phone conversation with Kevin
20   Navarro.
21       A.   I do remember Kevin Navarro calling.
22       Q.   Do you recall that you told him you
23   weren't concerned about the team members not
24   backing you up or do you not recall that?

Page 350

1        A.   I don't recall telling him that I
2    wasn't concerned.  I remember telling him that I
3    was okay.
4        Q.   Okay.  That's fine, that's fine.
5            And Tyron Bates, I assume you don't
6    have any knowledge that as of when that incident
7    occurred, he had any knowledge of your working
8    on the Watts investigation?
9        A.   I have no knowledge of him having
10   knowledge.
11       Q.   Okay.
12           (Whereupon, Spalding Deposition
13            Exhibit No. 11 was marked for
14            identification.)
15   BY MR. KING:
16       Q.   Officer Spalding, I'm showing you
17   another document that's been marked Deposition
18   Exhibit No. 11 and I will ask you to -- it's a
19   lengthy document.  But if you could tell me
20   whether or not you believe you've seen this
21   document before.
22       A.   I don't think I've ever seen this
23   document, the first page of it.  I don't know.
24   Hold on a second.

Page 351

1        Q.   And we can just look at the first page.
2        A.   Okay.
3        Q.   It appears to be what's called a
4    Summary Report Digest.  It indicates in the
5    allegation section that the allegation was that
6    a complainant Michael Murphy had made some
7    allegations relating to some actions by you and
8    Officer Echeverria relating to a dog.  Do you
9    recall that incident?
10       A.   Yes.
11       Q.   Okay.  And you are aware that as a
12   result of that incident, there was a CR number
13   and investigation was done, correct?
14       A.   Yes.
15       Q.   Okay.  And do you recall that Joseph
16   Stehlik with the Internal Affairs Division was
17   the one who conducted that investigation?
18       A.   I don't recall who conducted it.
19       Q.   Okay.  If you could turn -- strike
20   that.
21           To the best of your recollection, you
22   have not seen this document before?
23       A.   Well, I was just looking at the front
24   page and I don't ever recall seeing a Summary

Page 352

1    Report Digest.
2        Q.   Okay.  Do you ever recall seeing any
3    report concerning the investigation of this
4    incident?
5        A.   Well, these are the investigator's log,
6    so I wouldn't be privilege to this.
7        Q.   Okay.
8        A.   I wouldn't have any of this.
9        Q.   Okay.
10       A.   This is not what we would see.
11       Q.   I understand.  I'm just checking.
12           Just let me know if you think you've
13   seen any of these documents before.
14       A.   Well, I know that I would -- I know
15   that I saw a CR number for that.
16       Q.   Okay.
17       A.   But I don't -- it's not the same as
18   this, I don't believe.  But I did see CR
19   documents for that.
20       Q.   Okay.  And if you turn to the page at
21   the bottom, it's Number 923.  And do you see
22   that?
23       A.   Yes.
24       Q.   It says findings on this page.  And it

SHANNON MARIE SPALDING                    November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO              353—356

Page 353

1  indicates with respect to you, the accused,
2  Shannon Spalding, that allegation that's written
3  here anyway is sustained a violation of Rule 4
4  and sustained a violation of Rule 2.  Do you
5  remember learning at some point that the
6  violations against you, in what I'll refer to as
7  the dog incident, had been sustained?
8     A.  Yes.
9     Q.  Okay.  And if you turn to the next
10 page, it indicates that the violations or the
11 allegations against Officer Echeverria were
12 likewise sustained.  You learned of that, as
13 well, correct?
14    A.  Yes.
15    Q.  And if you turn to the following page,
16 which is the recommendation page, you learned
17 that at least -- did you learn at some point
18 that at least the recommendation was a
19 suspension for you and for Officer Echeverria?
20    Did you recall learning that a
21 suspension had been recommended for the both of
22 you?
23    A.  I recalled them sustaining that,
24 sustaining it.  I don't recall -- I know that we

Page 354

1  filed a grievance on it, so I know it was
2  sustained.
3     Q.  Okay.
4     A.  But I don't recall the specific --
5     Q.  You don't recall knowing --
6     A.  Yes.
7     Q.  -- what the recommended penalty would
8  be?
9     A.  Time.  Yeah, exactly.  But it says it
10 right here.
11    Q.  Sure, okay.  And ultimately is it your
12 understanding that those findings were changed
13 to not sustained?
14    A.  Yeah.  We filed a grievance with FOP.
15    Q.  Okay.  So my question is --
16    A.  Yes.
17    Q.  -- ultimately, did you learn that
18 these -- these findings were changed or
19 overruled such that they were not sustained?
20    A.  Correct.  Ultimately.
21    Q.  Okay.  And do you have any knowledge of
22 what happened to cause the findings to be
23 changed from sustained to not sustained?
24    A.  Yeah.  We went to FOP and I remember

Page 355

1  that we were upset and we wanted to file a
2  grievance --
3     Q.  Sure.
4     A.  -- because it was sustained.  And now
5  that -- I mean, I'm looking at this and four
6  days when you've never -- you know, usually it
7  doesn't --
8     Q.  That's fine.
9     A.  -- start out at four days.  So we
10 filed -- when we went to file the grievance --
11    Q.  Yes.
12    A.  -- we were informed by Kathy, who works
13 at FOP, she said, well, this --
14    Q.  I'm sorry.  Go ahead.
15    A.  We were informed by Kathy at some point
16 when we were talking to FOP about filing the
17 grievance, that this CR number was made by --
18 was called in as a favor to the complainant's
19 mother, who actually worked either for Nick Roti
20 or O'Grady as their secretary or something for
21 years.  So that is the kid's mother.  And so
22 they called it in and then they took the CR
23 number and we were told by --
24    MR. KING:  Okay.  I'm just going to

Page 356

1  move to strike that entire answer as
2  nonresponsive to my question.
3     THE WITNESS:  Okay.
4     MR. SMITH:  Not that striking testimony
5  in a deposition has any meaning at all.  It's
6  part of her answer.  If you don't want her to
7  answer your question about what they did and why
8  they did it --
9     MR. KING:  Okay.
10    MR. SMITH:  -- she could continue.  If
11 you want to withdraw the question, then withdraw
12 the question and ask another one.
13    MR. KING:  That's a good idea.  I'll
14 withdraw the question and I'm moving to strike
15 her answer.
16    MR. SMITH:  Again, that has no meaning
17 in a deposition.
18    MR. KING:  I appreciate the Civil
19 Procedure lesson.  I'll ask -- I'll rephrase my
20 question.
21 BY MR. KING:
22    Q.  Are you aware of whether someone
23 intervened on your behalf to change the finding
24 of sustained to not sustained?  Do you have any

SHANNON MARIE SPALDING                                    November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                        357—360

Page 357

1  knowledge of that?
2      A.  I understand that when you file a
3  grievance, that there will be a hearing and that
4  somebody will review it and make a decision on
5  that.  That is my understanding.
6      Q.  Do you know in this particular case how
7  the initial finding of sustained came to be
8  changed to unsustained?
9      A.  I was never told by FOP.
10     Q.  Okay.  So you don't know?
11     A.  No.
12     Q.  Okay.  If I could turn your attention
13  to Paragraph 116 of the Amended Complaint of
14  Exhibit 1.  Paragraph 116 indicates that the
15  allegation is that the Defendants -- let me
16  strike that.
17         Paragraph 116 alleges that as described
18  in the preceding paragraphs, Defendants acting
19  in concert with known and unknown conspirators,
20  reached an understanding to deprive Plaintiffs
21  of their Constitutional rights.
22         What Defendants are you alleging
23  reached an understanding, I guess, to retaliate
24  against you?

Page 358

1      A.  The Defendants named in the lawsuit.
2      Q.  Okay.  So it's your allegation that all
3  of the Defendants named in the lawsuit reached
4  an understanding to deprive you of your rights,
5  is that your testimony?
6      A.  I'm not sure I understand the question.
7      Q.  Okay.  Well, you testified that all of
8  the Defendants named in the case --
9      A.  The Defendants named in the case.
10     Q.  The Defendants named in the case you're
11  alleging reached an understanding to deprive you
12  of your rights.  I assume that means to
13  retaliate against you, correct?
14     A.  All the Defendants listed did engage in
15  retaliation at some point.
16     Q.  Okay.  You've testified as to all of
17  the Defendants engaging in some sort of
18  retaliation against you.  Is it also your
19  testimony that they all reached some
20  understanding to engage in this retaliation or
21  they -- or they just, on their own, engaged in
22  retaliation, if you know?
23     A.  I don't -- well, like Nick Roti and the
24  people from Organized Crime, obviously were

Page 359

1  aware of each other's actions, you know.
2      Q.  Okay.
3      A.  And Lieutenant Cesario, Barnes, Mills,
4  Salemme from 606, they have at different moments
5  been witnesses or there when things have taken
6  place.
7      Q.  Okay.  So is it your testimony that
8  your allegation that the Defendants reached an
9  understanding to retaliate against you, that's
10  based on your allegation that certain Defendants
11  knew about the alleged retaliation of other
12  Defendants, is that fair to say?
13     A.  Yes, they knew about it and failed to
14  stop it or report it or engaged in it.
15     Q.  Okay.  Is it your position in the case
16  that the Defendants that retaliated against you,
17  did they retaliate against you because you spoke
18  to the FBI specifically or simply because you
19  reported illegal activity on behalf of --
20  illegal activity by Watts and others?
21         MR. SMITH:  I'm going to object, it's a
22  compound question as to all the Defendants and
23  then --
24

Page 360

1  BY MR. KING:
2      Q.  My question is, is it your belief that
3  they retaliated against you because you went to
4  the FBI or simply because you had,
5  quote-unquote, ratted on fellow police officers?
6      A.  I believe that they retaliated against
7  my partner and myself because we went to an
8  outside agency to report criminal conduct within
9  the department that wasn't being addressed by
10  the department and we broke the code of silence
11  and reported supervisors within the department
12  to outside agencies so --
13     Q.  Okay.  And were you finished with your
14  answer?
15     A.  I could be.
16     Q.  Okay.  You mentioned this code of
17  silence.  As you understand the code of silence,
18  it's that you're -- I guess tell me what's your
19  understanding of what that means, the code of
20  silence?
21     A.  Well, I'm sure it's not the first time
22  that you've heard of the code of silence.  But
23  even when you're in the academy, they tell you
24  the fastest way to ruin your career is go

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
361–364

Page 361

1  against another police officer. So you know
2  that from the minute you walk in, that is taboo
3  within the department. Look the other way or
4  whatever.
5      Q. Okay.
6      A. And if you don't, it will cost you your
7  career, as we are examples of.
8      Q. Okay. So your understanding of the
9  code of silence is that you're not supposed to
10  report criminal or illegal activity by other
11  officers; is that correct?
12      A. My understanding of it is it is not
13  looked favorably by other officers or
14  supervisors if you are going against other
15  officers or reporting it. It's not -- it
16  doesn't make you popular. It will damage you
17  and make you an outsider.
18      Q. Okay. And that -- your understanding
19  is the same whether they're -- you know, I'll
20  strike that.
21          If I could turn your attention to
22  Paragraph 120 of the Complaint. And just have
23  you take a look at Paragraph 112(a). Are you
24  aware of any authority, any particular authority

Page 362

1  that the Chicago City Council has delegated to
2  the superintendent of police?
3      A. Personally?
4      Q. Yes.
5      A. No.
6      Q. Okay. Are you personally aware of any
7  authority that the superintendent of police may
8  have delegated to chiefs?
9      A. What do you mean by that? Like what,
10  the authority he allows them to have in their
11  position?
12      Q. My question is, are you aware of any
13  authority that the superintendent of police,
14  specific authority that a superintendent has
15  delegated to chiefs?
16      A. I know the authority that the chiefs
17  have under their position.
18      Q. Well, what's your understanding of the
19  authority that the chiefs have?
20      A. What division are you talking about?
21  Do I know what the superintendent personally
22  assign to chiefs or authorize them to do
23  personally, no.
24      Q. Either personally or based on

Page 363

1  documents, are you aware of specifically what
2  authority the superintendent of police has
3  delegated to individuals at the chief level?
4      A. I have not seen any documents from the
5  superintendent to the chiefs.
6      Q. Okay. You -- there's an allegation in
7  Paragraph 112(c) that -- strike that.
8          Is it your allegation in this case that
9  the superintendent of police, whoever the
10  superintendent was at any particular time, was
11  personally involved in any retaliation against
12  you?
13      A. Did the superintendent --
14      Q. Yes.
15      A. -- retaliate against me personally?
16      Q. Yes.
17      A. No.
18      Q. Or the same for Officer Echeverria, as
19  far as you know?
20      A. As far as I know.
21      Q. Okay. And --
22          MR. KING: Can we take a quick a break?
23          MR. SMITH: Sure.
24

Page 364

1          (Whereupon, a discussion was had
2          off the record.)
3  BY MR. KING:
4      Q. I don't think I asked this. Am I
5  correct that the alleged retaliation that you
6  say was engaged in by Commander Salemme and
7  Lieutenant Cesario was all during the period
8  that you were assigned the Fugitive
9  Apprehension?
10      A. You're correct.
11      Q. And with respect to Nick Roti, other
12  than your allegation that he did not allow you
13  to come back to work in Narcotics, is that the
14  extent of the alleged retaliation by Nick Roti?
15      A. No.
16      Q. Okay. How else did Nick Roti retaliate
17  against you?
18      A. By allowing Commander O'Grady to
19  continue his retaliation against me, you know.
20      Q. Okay. So other than not allowing you
21  back in the unit and to your knowledge Roti
22  allowing O'Grady to continue to retaliate, was
23  that the extent of the retaliation that you're
24  alleging by Nick Roti?

SHANNON MARIE SPALDING                                November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                 365–368

Page 365

1    A.  No.
2    Q.  Okay.  What else?
3    A.  After Echeverria tried to make attempts
4  to make the phone call, his conversation with
5  Juan Rivera telling us, you know, never to
6  contact him, we're never going to be allowed in
7  Organized Crime, we'll never go to any task
8  force, that conversation.
9    Q.  Okay.
10    A.  Other than that --
11    Q.  Maybe I'll ask it this way.
12    A.  Other than that --
13    Q.  Other than what you've already
14  testified to, is there anything else that you're
15  alleging is a retaliation by Nick Roti?
16    A.  No.
17    Q.  Okay.  You testified that the
18  superintendent you didn't believe was engaged in
19  retaliation.  Is it your position in this case
20  that the superintendent of police is somehow
21  responsible for the retaliation that you
22  suffered?
23    A.  The superintendent never engaged in
24  retaliation against --

Page 366

1    Q.  I understand.
2    A.  -- my partner or I.
3    Q.  And I'm asking is it your position that
4  nevertheless -- and I'm not saying that it is.
5  Is it your position that nevertheless the
6  superintendent is somehow responsible for those
7  under him who engaged in retaliation?
8        MR. SMITH:  I object it calls for a
9  legal conclusion.
10        THE WITNESS:  I think that the
11  superintendent is responsible for his chiefs
12  underneath him and the actions that they do.
13  And when there is retaliation to this extent and
14  he was involved in the operation, that it -- you
15  know with the -- all of -- all of this, that,
16  you know, once he becomes aware of this, you
17  know, it is his responsibility to address it.
18  BY MR. KING:
19    Q.  Okay.  And are you aware of any of the
20  retaliation that the superintendent was actually
21  aware of?
22    A.  I'm sure he was made aware of the
23  lawsuit.
24    Q.  My question is, are you -- do you have

Page 367

1  any personal knowledge of the superintendent of
2  police being aware of any of the alleged
3  retaliation against you before you filed the
4  lawsuit and it became public?
5    A.  No.
6    Q.  Okay.  You talked about this code of
7  silence.  And my question to you is other than
8  what you allege has happened to you and your
9  partner, Dan Echeverria, are you aware of any
10  other officers whom you believe have been
11  retaliated against for violating this so-called
12  code of silence?
13    A.  Michael Spaargaren.
14    Q.  Okay.
15    A.  S-P-A-A-R-G-A-R-E-N.
16    Q.  And what's your understanding of what
17  Michael Spaargaren did?  Is this what you
18  previously testified to?
19    A.  It's in addition to.
20    Q.  Okay.  What's your understanding of
21  what Michael Spaargaren did to violate or breach
22  the code of silence and what retaliation do you
23  believe happened to him?
24    A.  When we were in Public Housing South,

Page 368

1  at one point he was placed on Sergeant Ronald
2  Watts' team.  And he began to personally observe
3  activity that he believed was not according to
4  the rules and regulation of the police
5  department and he started to question their
6  conduct.
7        He had a -- he confronted Sergeant
8  Watts about it, at which point Sergeant Watts
9  then told him that -- Sergeant Watts threatened
10  him and told him that he needs to keep his mouth
11  shut and you know what, you'll be the one that I
12  do the paper on.  Don't -- you know, you're not
13  going to question what I do.  I'm the
14  supervisor.
15    Q.  Okay.
16    A.  And they got into a verbal altercation
17  over it, to the point that Michael Spaargaren
18  then went to lieutenant -- the lieutenant of
19  Public Housing at the time.
20    Q.  Do you recall who that was?
21    A.  Yes.  It was Spratt, S-P-R-A-T-T.  At
22  which point the lieutenant told Michael
23  Spaargaren that he better not go to IAD and
24  report any of this, that basically he would be

SHANNON MARIE SPALDING                                    November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                        369–372

Page 369

1    done and he better keep his mouth shut.
2        Q.  Okay.
3        A.  And at that point, Michael Spaargaren
4    began to fear that he would get a false case put
5    on him or false papers.  So he turned in his
6    papers -- he went down to headquarters to take a
7    leave of absence in fear of what would happen.
8        Q.  Okay.  And what you just testified to
9    that Lieutenant Spratt allegedly said to Michael
10   Spaargaren, you got that from Michael
11   Spaargaren, correct?
12       A.  I got that from Michael Spaargaren.
13   But also I heard them arguing upstairs.
14       Q.  Okay.
15       A.  I heard them screaming, so I could hear
16   part of that argument and I heard Spratt yelling
17   at him.
18       Q.  I understand Michael feared that there
19   might be some retaliation against him.  He went
20   on leave, I think you said?
21       A.  Yeah.
22       Q.  Okay.  Are you aware of any actual
23   retaliation that happened to Michael Spaargaren?
24       A.  No.  He left -- he left the job then.

Page 370

1        Q.  Okay.
2        A.  And then they changed the rules after
3    about a year and a half or two years, and he
4    came back.
5        Q.  Okay.  And he came back?
6        A.  Yes.
7        Q.  Okay.  And since Michael Spaargaren has
8    come back to work, are you aware of any
9    retaliation that he suffered?
10       A.  I'm not aware.
11       Q.  Okay.  Other than you and your partner
12   and Michael Spaargaren, are you aware of any
13   other officers who to your understanding
14   breached this code of silence and suffered any
15   retaliation?
16       A.  You know, a couple officers, after I
17   became public with this, did approach me and I
18   don't -- I don't know their names now.
19       Q.  Okay.
20       A.  And did approach me with their
21   situations, but I don't know their names.
22       Q.  Okay.  You don't know -- it's fair to
23   say you don't know their names or the details of
24   their situations?

Page 371

1        A.  Well, I do know that like they told me
2    their brief story.
3        Q.  Okay.
4        A.  And so I knew their incident.  One
5    person said that he had worked with Ronnie Watts
6    and when he complained about him in the 2nd
7    District, he was launched off.  And I don't
8    remember if he said he was put on midnights
9    somewhere on foot patrol or something, but he
10   had made it to traffic or something now.  But,
11   you know, situations like that.
12       Q.  Okay.
13       A.  But, you know, these officers would
14   know me from media and come up to me.
15       Q.  Sure.
16       A.  And I don't know these officers.  I
17   don't remember their names.
18       Q.  Other than what you've already
19   testified to, are you aware of any other
20   officers who to your knowledge breached the code
21   of silence and suffered some kind of
22   retaliation?
23       A.  I could possibly be aware of incidents
24   that I don't recall right now.

Page 372

1        Q.  Okay.  At any time that you were
2    suffering alleged retaliation, am I correct that
3    your pay was not cut, correct?
4        A.  No.  My salary?
5        Q.  Was your salary ever cut?
6        A.  No.
7        Q.  And, in fact, did you receive any
8    salary increases during the period of time that
9    you allege you were suffering retaliation?
10       A.  To be honest, I don't know.  I have
11   direct deposit, I never looked at my checks.  If
12   there was an increase, I didn't notice it.
13       Q.  Okay.  Do you know what your last
14   salary was before your pay was stopped?
15       A.  I don't even open up my W2s.  I just
16   bring them to the accountant.
17       Q.  So you don't know?
18       A.  No.
19       Q.  Okay.  And I assume also -- well,
20   strike that.
21           And during the period that you
22   allegedly suffered retaliation, none of your
23   employment benefits were cut, correct?
24       A.  Correct.

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
373—376

Page 373

1    Q.   Okay.  And are you alleging that you
2  suffered any monetary losses as a result of the
3  alleged retaliation?
4    A.   Well, I did -- you know, the
5  retaliation resulted in me not being able to
6  come to work now, it's resulted in me applying
7  for disability because of the post-traumatic
8  stress disorder, it's resulted in the City
9  doctor saying that me ever returning to legal
10  work -- I mean, to law enforcement, is very
11  unlikely.  So it's negatively effected my income
12  ultimately, yes.
13    Q.   So at this point, the monetary loss
14  that has been the result of the alleged
15  retaliation, would you agree that it is the fact
16  that you're no longer getting your full salary
17  while you're on disability?
18    A.   Or allowed to work overtime or have the
19  chance to advance or any of that.
20    Q.   Okay.  And with respect to overtime,
21  are you alleging that the retaliation impacted
22  your ability to work overtime just in Fugitive
23  Apprehension or in any other units?
24    A.   Well, there --

Page 374

1    Q.   Well, strike that.  Let me ask you.
2        With respect to the -- your claim that
3  the retaliation, are you alleging that that
4  caused you to lose overtime opportunities?
5    A.   The retaliation?
6    Q.   Yes.
7    A.   Yes.
8    Q.   Okay.  Do you have any knowledge as you
9  sit here of how much overtime you claim that
10  you've lost as a result of alleged retaliation?
11    A.   I lost the possibility of working
12  overtime.  There was no overtime in the units I
13  was put in like 126 or things like that.  For us
14  like to work later investigations or things like
15  that, like that was limited.
16    Q.   It was limited overtime opportunities?
17    A.   Yeah, in some of the units.  Like in
18  606, we weren't going to be working overtime
19  unless we worked our days off.
20    Q.   Okay.
21    A.   So it was limited where you couldn't
22  stay late.  We couldn't stay late.
23    Q.   Sure, okay.
24        Do you have any knowledge of in dollars

Page 375

1  how much overtime you may have lost or believe
2  you lost as a result of the alleged retaliation?
3    A.   I can't guess what I would have been --
4  worked or not worked.
5    Q.   Sure, that's fair.
6        Is it true that when you were working
7  on the third watch in Fugitive Apprehension,
8  you -- did you ever have to also go to court
9  during the days?
10    A.   No.
11    Q.   Okay.  You've alluded to that you've
12  seen some medical professionals in connection
13  with I guess medical conditions that you're
14  alleging were the result of the retaliation; is
15  that correct?
16    A.   I'm not alleging.  They are a result of
17  the retaliation.
18    Q.   Okay.  And can you tell me who each of
19  those medical providers were?
20    A.   The Therapist Deborah Weaver.
21    Q.   Okay.
22    A.   Psychiatrist Dr. Kaiser, Psychiatrist
23  Nancy Landre.
24    Q.   Okay.  Anyone else?

Page 376

1    A.   Yes.  I saw a doctor at the University
2  of Chicago for some stress-related testing for
3  the physical effects.  I don't remember his
4  name.  If you said the name --
5    Q.   Is that Dr. Robert Sargis?
6    A.   Yes.
7    Q.   Okay.
8    A.   If you say the names, I could tell you
9  what they did.
10    Q.   Okay.  Do you recall anyone else who
11  provided any treatment to you?
12    A.   Dr. Jessica Dietheim from Rush.
13    Q.   Okay.
14    A.   And then I went to see a cardiologist
15  at Rush, Dr. Jolly.
16    Q.   Okay.  Do you recall visiting at any
17  time -- does the name Joleen Hartland or Genesis
18  ring a bell to you?
19    A.   Yes, I did.  I did go see her at times
20  for -- she's a therapist, as well.
21    Q.   Okay.
22    A.   I'm trying to think.  There may be one
23  other name that you have on the list that I
24  can't --

SHANNON MARIE SPALDING                                    November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                        377–380

Page 377

1    Q.   Okay.  I'll just ask you a few
2  questions.  Our records, and we've obtained
3  records from all these providers, of course,
4  indicate that your first visit with Deborah
5  Weaver was on April 4, 2013.  Do you have any
6  reason to doubt that?
7    A.   No.
8    Q.   Okay.  And we've seen records that
9  indicate that you visited Joleen Hartland on
10  May 11, 2013.  Do you have any reason to doubt
11  that?
12    A.   No, no.
13    Q.   Do you recall having just that one
14  visit with Joleen Hartland or more than one?
15    A.   No.  I went to her multiple times, but
16  I don't recall how many times.
17    Q.   Okay.  And do you have any reason to
18  doubt that May 11, 2013 was the first time you
19  visited her?
20    A.   No.
21    Q.   Okay.  And our records indicate a visit
22  to the doctor you mentioned, Jessica at Rush
23  University Medical Center on June 5, 2013.  Do
24  you have any reason to question that?

Page 378

1    A.   No.
2    Q.   Do you know if you had the one visit
3  with Dr. Jessica, I guess it's, Dietheim --
4    A.   Yeah.
5    Q.   -- or multiple visits?
6    A.   One visit.
7    Q.   Okay.  And Dr. Robert Sargis at the U
8  of C Medical Center, our records indicate you
9  visited on December 5th of 2013.  Any reason to
10  doubt that?
11    A.   No.
12    Q.   Did you have one visit with Dr. Sargis
13  or multiple?
14    A.   I had one visit with Dr. Sargis and
15  then one return visit, but that was for labs,
16  for Dr. Sargis.  And then two phone
17  consultations over the phone with Dr. Sargis.
18    Q.   Any reason to doubt that the one main
19  visit with Dr. Sargis was on December 5, 2013?
20    A.   No.
21    Q.   Okay.  And you mentioned Dr. David
22  Kaiser.
23    A.   Kaiser.
24    Q.   Kaiser.  Our records indicate that your

Page 379

1  first visit with him was on February 3, 2014.
2  Do you have any reason to doubt that?
3    A.   No.  For some strange reason, I
4  remember that day.
5    Q.   Okay.  And Nancy Landre you testified
6  to, you visited her on one occasion, correct?
7    A.   Correct.
8    Q.   Okay.  And our records indicate that
9  that evaluation was done on July 15, 2014.  Does
10  that sound correct?
11    A.   That is correct.
12    Q.   Okay.  And the only other person I
13  think you mentioned was a Dr. Jolly?
14    A.   Yes.  I went to see him once.  He was a
15  cardiologist.  But I was having chest pains.
16    Q.   Do you recall when you visited
17  Dr. Jolly?
18    A.   I was -- no, I don't.
19    Q.   Okay.  In the other visits we've talked
20  about with medical professionals, the first one
21  appears to be the visit with Deborah Weaver on
22  April 4, 2013.  Do you know if your visit to
23  Dr. Jolly was after that date?
24    A.   After that?  You know what, I believe

Page 380

1  it was before that.
2    Q.   Okay.
3    A.   I believe I was still working at the
4  time in Fugitives, but I would have to check
5  that date for you.
6    Q.   Okay.
7    A.   I believe I was working at Fugitives
8  but --
9    Q.   But you're not positive?
10    A.   I can't be positive.  I'd have to check
11  for you.
12    Q.   Okay.  And you went to Dr. Jolly
13  because you were having chest pains?
14    A.   Yeah, I was having chest pains.  It was
15  from anxiety, but I didn't know they were
16  increasing.
17    Q.   Okay.  And do you recall where
18  Dr. Jolly's office is or what the address is?
19    A.   Yeah.  He's at Rush Professional
20  Building.
21    Q.   Okay.
22    A.   And that's like 1340 West Harrison or
23  something.
24    Q.   Okay.  Was he the one that referred you

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
381–384

Page 381

1   to Deborah Weaver?
2       A.   Did he refer me to Deborah Weaver?
3       Q.   Yes.
4       A.   No.  Jessica Dietheim said that I
5   should see somebody.
6       Q.   Okay.  You don't know when you visited
7   Dr. Jolly, whether it was before you went on
8   medical leave or after?
9       A.   I want to say it was before, but as I
10  stated, I'm not 100 percent positive.
11      Q.   Okay.  And is he located in the same
12  building as Jessica Dietheim at Rush?
13      A.   I think they are in the same building.
14      Q.   Okay.  And did you have just one visit
15  with Dr. Jolly or multiple?
16      A.   No, just one.
17      Q.   Okay.  And you indicated that it was
18  his diagnosis that you were having chest pains
19  from stress?
20      A.   It was his diagnosis that he believed
21  that it was not a heart attack or heart related,
22  but it was anxiety, stress related.
23      Q.   Okay.  Would I be correct to say that
24  all of the medical professionals that you

Page 382

1   visited, all of the information that they
2   received as to what was allegedly happening to
3   you at work at the Chicago Police Department was
4   provided to them by you?
5           THE WITNESS:  Well, yeah.
6           MR. SMITH:  Objection, foundation.
7   BY MR. KING:
8       Q.   And that would have been both things
9   that you told them verbally and in some cases
10  you provided some documents to some of the
11  medical professionals, correct?
12      A.   Yes.
13      Q.   Okay.  And were you at some point
14  diagnosed with any particular condition by any
15  of the medical professionals that we've talked
16  about?
17      A.   Yes.
18      Q.   And who diagnosed you with what?
19      A.   Deborah Weaver with post-traumatic
20  stress disorder; Dr. Kaiser post-traumatic
21  stress disorder, anxiety disorder; the City of
22  Chicago's Dr. Nancy Landre, post-traumatic
23  stress disorder, anxiety, mood disorder.
24      Q.   Anything else?

Page 383

1       A.   Dr. Sargis said that my condition is
2   stress-related and recommended that I see a
3   psychiatrist.
4       Q.   Okay.  You referred to Nancy Landre as
5   the City of Chicago's doctor.  Who referred you
6   to see Nancy Landre?
7       A.   That came -- I don't -- I don't
8   remember her name, but she is like a medical
9   caseworker for the City.
10      Q.   Okay.
11      A.   And she notified me that an appointment
12  was made on that date and that I needed to go
13  there for an evaluation.
14      Q.   Okay.  And the person that sent you for
15  the evaluation with Nancy Landre, do you recall
16  were they with the pension board?
17      A.   Yes, I think it was the case management
18  for -- I don't know if they worked at the
19  pension board or it's a company that -- it's
20  somebody that the pension board uses.
21      Q.   Okay.
22      A.   Or I don't know if they are employed at
23  the pension board.
24      Q.   Okay.  And you were -- other than what

Page 384

1   you've testified to, are there any other
2   conditions that you've been diagnosed with that
3   you're claiming is a result of the retaliation
4   in this case?
5       A.   No, not that I recall.  No.
6       Q.   Okay.  Did any of the medical
7   professionals you saw prescribe any medications
8   for you?
9       A.   Yes, they did.
10      Q.   Okay.  Who prescribed what medication
11  for you?
12      A.   I don't remember the names of the
13  medication that Dr. Sargis -- it was anxiety
14  medicine.
15      Q.   Okay.
16      A.   And I don't remember the names of the
17  medicine that Jessica Dietheim prescribed, but
18  it was also for anxiety.
19      Q.   Okay.
20      A.   And Dr. Kaiser has given me Clonazepam.
21  I know I'm going to get it wrong.  It's tromp --
22  they're -- there's three different anxiety
23  medicines.
24      Q.   Okay.  Have all of the medicines to

SHANNON MARIE SPALDING                                November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO              385–388

Page 385

1   your knowledge that have been prescribed to you
2   anti-anxiety medications?
3       A.  They are supposed to help alleviate the
4   anxiety and post-traumatic stress disorder.  So
5   if they're classified as anti-anxiety or
6   something else, but they're for that reason.
7       Q.  Okay.  So all the medications that
8   you've been prescribed, it's your understanding
9   that they were to help with the anxiety --
10      A.  Related to the --
11      Q.  -- related to the post-traumatic stress
12  disorder?
13      A.  Correct.
14      Q.  Okay.  And have you consistently taken
15  all of the medications that have been prescribed
16  for you by each of your doctors?
17      A.  With Dr. Sargis he said to try it and
18  see how it worked and then to see a
19  psychiatrist.  And the medicine he gave me, did
20  not work.  And I do take the medicine that I'm
21  prescribed from my psychiatrist regularly, yes.
22      Q.  And that's Deborah Weaver?
23      A.  No.  Dr. Kaiser.
24      Q.  Dr. Kaiser, okay.  So at this point,

Page 386

1   are you taking any medication?
2       A.  Yes, I am on three medicines and I
3   don't recall the names of all of them.
4       Q.  Okay.  And those are medications that
5   Dr. Kaiser prescribed for you?
6       A.  Yes.
7       Q.  Okay.
8           (Whereupon, Spalding Deposition
9           Exhibit No. 12 was marked for
10          identification.)
11  BY MR. KING:
12      Q.  Ms. Spalding, I'm showing you now
13  what's been marked as Deposition Exhibit
14  No. 12 and ask you to take a look at this and
15  let me know if you've seen these documents
16  before.
17      A.  Well, of course I have.
18      Q.  Okay.  And what is Deposition Exhibit
19  No. 12?
20      A.  They are notes that I had made for
21  myself.
22      Q.  Okay.
23          MR. SMITH:  Do you have another copy of
24  that one?

Page 387

1           MR. KING:  I'm sorry, yes.
2           MR. SMITH:  Thank you.
3           MR. KING:  There you go.  Yeah.
4           MR. SMITH:  Thank you.
5   BY MR. KING:
6       Q.  And they seem to be according to date
7   or some dates beginning on November 1, 2012.
8   Did you keep these on some kind of calendar?
9       A.  On the Gmail calendar.
10      Q.  Explain that to me.
11      A.  You know how you can just go onto your
12  phone calendar --
13      Q.  Okay.
14      A.  -- and type it in?  That's what I would
15  do.  Or you could do it from your computer.
16      Q.  Okay.  And would you always do it on
17  your phone or sometimes on the computer?
18      A.  I would do it at different times.
19      Q.  Okay.  My question to you is did you
20  always type this information in on the dates
21  that's indicated or would you sometimes do it
22  later and go back and type it in?
23      A.  These notes would pretty much be taken
24  like it would depend on the day.  I might write

Page 388

1   them like at the end of the day or I might write
2   them part way through the day or, you know, or
3   maybe the next day.
4       Q.  Okay.
5       A.  But they were always done --
6       Q.  Fairly soon after the day?
7       A.  Yeah, so I wouldn't forget.
8       Q.  Okay.  And did you first keep any
9   handwritten notes that you then used to type
10  this in or no?
11      A.  Yes, I did.
12      Q.  Okay.  Would that be true for all of
13  the entries on this exhibit, that originally
14  they were handwritten notes that you then typed
15  in?
16      A.  I have had handwritten notes that I
17  kept before, yes.
18      Q.  Do you still have any of those
19  handwritten notes?
20      A.  No, I don't.
21      Q.  If I could direct your attention
22  to the page that is numbered 656 at the bottom.
23  If you look at the entry at 4:00 p.m. on
24  March 21, 2013.  And I'll just ask you, right in

SHANNON MARIE SPALDING                                November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                    389–392

Page 389

1  the middle of that entry, you write, quote, but
2  I was just reminded again by Mills that the
3  activity have is unacceptable and I was also
4  informed that I should not be working cases
5  other than the ones assigned to me. Do you see
6  that?
7      A. This is on March 21st you're saying or
8  March 22nd?
9      Q. Yeah.
10     A. Okay.
11     Q. It appears based on the document that
12 on Thursday, March 21, 2013 at 4:00 p.m., you've
13 typed in, among other things, that you were just
14 informed by Mills that you should not be working
15 cases other than the ones assigned to you. Do
16 you see that?
17     A. Yes, I do.
18     Q. Okay. And do you have any reason to
19 believe that Mills did not inform you of that on
20 that date?
21     A. No, if I put it in there.
22     Q. Okay. And if you turn to the next
23 page, the entry for Sunday March 24, 2013. Do
24 you see that?

Page 390

1      A. Sunday, March 24th. Yes.
2      Q. And that, in fact, is the VRI incident
3  that you previously testified to where Mills got
4  upset because you made an arrest in the 11th
5  District, correct?
6      A. Uh-huh.
7      Q. Is that a yes?
8      A. Yes, yes.
9      Q. Okay. If you turn now to the page
10 marked 664, and your entries for Thursday,
11 April 11, 2013. Do you see that?
12     A. Yes.
13     Q. Okay. And here you're talking about
14 the situation with Mark Barz where you thought
15 you were going to be arrested, correct?
16     A. Yes.
17     Q. And you write -- in part, you say,
18 quote, I said now Mills will think I'm an idiot,
19 how would you feel Barz if you were told a
20 police officer who worked for you was recording
21 you? Barz said, yeah, I know. I, meaning you,
22 Shannon Spalding, said, you mean to tell me it
23 wouldn't negatively affect the work situation
24 Barz. Barz says, yeah, I know, I understand how

Page 391

1  it would. Do you see that?
2      A. Uh-huh.
3      Q. Is that accurate -- is that a yes?
4      A. Yes.
5      Q. Does that accurately reflect a part of
6  the discussion you had with Sergeant Barz?
7      A. Yes.
8      Q. Okay. So you were acknowledging that
9  you could understand that it would negatively
10 affect your working relationship with Sergeant
11 Mills if he believed you were secretly recording
12 him, correct?
13     A. Yes.
14     Q. Okay. If you turn to the page that's
15 Numbered 667. Do you see your entry for
16 Tuesday, April 16th at 2013, at 4:00 p.m. Do
17 you see that?
18     A. Yes.
19     Q. Okay. And a few lines in, you say,
20 quote, I'm not sure if Mills believes I have
21 recorded him or if Mills his part of this
22 make-up scheme. Do you see that?
23     A. Or his part in this make-up scheme.
24 Yeah.

Page 392

1      Q. Okay. So would it be fair to say that
2  as of that point, you weren't sure whether Mills
3  believed you actually recording him, correct?
4      A. No, I have no idea what he believed.
5      Q. Okay.
6      A. Even though Mike Barz said that he
7  didn't believe it.
8      Q. Okay. You typed in on April 16, 2013
9  that you weren't sure at that point if Mills
10 believed that you recorded him; is that correct?
11     A. That's correct.
12     Q. Okay. So at that point, you didn't
13 know whether Mills believed it, that you were
14 recording him or not, correct?
15     A. Yeah. But I don't -- but I don't know
16 about --
17     Q. I think you answered the question.
18     A. April 8, 2013, okay. Go ahead.
19     Q. Okay. On the page numbered 670, 6-7-0,
20 on April 25, 2013 under the heading all day, one
21 of the things that you indicated is that, quote,
22 Dan and I told Mills that due to our situation,
23 we were not comfortable going to the Marshal's
24 training. Do you see that?

SHANNON MARIE SPALDING                               November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                     393–396

Page 393

1    A.  I'm sorry, where are you at?  The first
2  one?
3    Q.  Under all -- the second paragraph, I'm
4  sorry, that says all day, which begins, Mills
5  had informed and later on in that paragraph.
6    A.  Yes, I see that.
7    Q.  Okay.  And so there was some Marshal
8  training that you and Officer Echeverria
9  declined to go to, correct?
10   A.  At this point, yes.
11   Q.  Okay.  Do you have a recollection of
12  what that Marshal's training was about?
13   A.  No.
14   Q.  Okay.  That's fine.
15   A.  I think I do recall.
16   Q.  If you turn to Page 673.
17   A.  Yes.
18   Q.  Under Thursday, March 2, 2013, the
19  second paragraph under all day.  Well, one of
20  the things you say is you're beyond sorry to see
21  Tina Skahill leave.  As far as your concerned,
22  she's the only ethical boss in this God forsaken
23  department.  Do you recall typing that?
24   A.  Where are you at, 673?

Page 394

1    Q.  Yes.
2    A.  Okay.  Are you under the first
3  paragraph?
4    Q.  The second paragraph.  It begins, I'm
5  beyond sorry.  We can strike that.  I don't need
6  to ask you about that.
7        In that paragraph, that second
8  paragraph under May 2, 2013, you say, quote,
9  Danny also said that unit launched four POs to
10  the district.  Ryan and Brian from Barnes' team
11  and Williams and Odem from Mason's team.  Wow
12  the four clout heavy officers.  Do you see that?
13   A.  Yes.
14   Q.  Okay.  And then you say, and Williams
15  and Odem are great officers, they're hardworking
16  in the unit since day one, tons of activity, but
17  they always treated the two of them like
18  outcasts, never included them in team activities
19  cases or overtime.  The nicest guys ever.  Do
20  you recall that?
21   A.  I do.
22   Q.  Okay.  And do you have any knowledge of
23  these four officers, Ryan and Brian from Barnes
24  team or Williams or Odem, ever breaching what

Page 395

1  you call the code of silence?
2    A.  I know that Kevin Williams was
3  suspicious to some people because his brother
4  was chief of IAD for a while, so they wondered
5  what his position was.  But breaching the code
6  of silence, I have no knowledge of them doing
7  that.
8    Q.  Okay.  Do you have any knowledge of why
9  these four officers were so called launched from
10  the district?
11   A.  No.
12   Q.  Okay.
13   A.  But I wasn't --
14   Q.  Okay.
15   A.  I wasn't even at work any longer.
16   Q.  Okay.
17   A.  I don't think.
18   Q.  If you turn to the next page, 674,
19  which is still under May 2, 2013.  You say that
20  you spoke with Guishnere who you've testified
21  about previously, correct?
22   A.  Yes.
23   Q.  And you say that, Guishnere said that
24  he would ask Barnes how come you and Danny

Page 396

1  didn't come back to Barnes' team, correct?
2    A.  On the first paragraph?
3    Q.  Yes.
4    A.  Yes.
5    Q.  Okay.  Then you write that you told
6  Gush that you wouldn't be mad if he said that to
7  Barnes but just don't say that I wanted you to
8  ask, correct?
9    A.  Yeah, that's correct.  Because I didn't
10  want Barnes to think I was the one inquiring,
11  because I wasn't.
12   Q.  Okay.  And was Guishnere on Barnes'
13  team at that point?
14   A.  He still is, as far as I know.
15   Q.  Okay.  And at this point, he was on
16  Barnes' team, correct?
17   A.  Yes.
18   Q.  Okay.  And then you write, quote, Gush
19  is a great guy, that is why we should be back on
20  that team.  They are the only officers that
21  treat me and Danny like officers with no
22  retaliation, period.  And they would back us up
23  100 percent.  It's the safest place for us,
24  that's why we were not put back there.  You're

SHANNON MARIE SPALDING                                    November 18, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                      397–400

Page 397

1   referring to being put back on Barnes' team,
2   correct?
3       A.  I'm --
4       Q.  Are you referring to being put back in
5   Barnes' team --
6       A.  No.
7       Q.  -- in the sentence I just read?
8       A.  No.
9       Q.  All right.  Let's break this down.  You
10  write, quote, Gush is a great guy, that is why
11  we should be back on that team.  Were you
12  referring to Barnes' team?
13      A.  I was referring to the officers that
14  worked for Barnes, not Barnes.  To clarify.
15      Q.  Were you referring -- you said --
16      A.  I wrote this from my personal notes.
17      Q.  I understand.
18      A.  And I was referring to myself saying
19  that the guys were great and they were officers
20  that would back us up.  I was not referencing
21  Barnes in any capacity.
22      Q.  Okay.  So when you wrote, Gush is a
23  great guy, that is why we should be put back on
24  that team, you weren't referring to the existing

Page 398

1   team under Sergeant Barnes?
2       A.  Not under Sergeant Barnes.  To work
3   with the team, not the supervisor.
4       Q.  So your desire was to work on a team
5   with all of Sergeant Barnes' officers, but not
6   under Sergeant Barnes?
7       A.  I would have loved to work with those
8   guys again, but not with Sergeant Barnes.
9       Q.  Okay.
10      A.  Correct.
11      Q.  And when you say, it's the safest place
12  for us, that's why we were not put back there,
13  you were talking about Sergeant Barnes' team,
14  correct?
15      A.  I was talking about the officers from
16  Sergeant Barnes' team.
17      Q.  Okay.
18      A.  And that was my personal opinion.
19      Q.  Okay.  But you indicated in here that
20  you told Guishnere that you wouldn't be mad if
21  he asked Sergeant Barnes how come you and Danny
22  didn't come back to Sergeant Barnes' team,
23  correct?
24      A.  Correct.

Page 399

1       Q.  Okay.
2       A.  But you're taking one sentence out of
3   context of an entire conversation.  And these
4   are summary notes.
5       Q.  Okay.
6       MR. KING:  I'm going to take a very
7   short break.
8       MR. SMITH:  Sure.
9           (Whereupon, a short break was
10          taken.)
11  BY MR. KING:
12      Q.  Officer Spalding, you testified that
13  during the period that you felt you were being
14  subjected to retaliation and you had a number of
15  conversations with Juan Rivera, correct?
16      A.  Yes.
17      Q.  Okay.  Do you recall whether you ever
18  specifically asked Juan Rivera to open a CR
19  investigation?
20      A.  Multiple times.
21      Q.  Okay.  And -- okay.  And do you recall
22  what his responses would be to that inquiry?
23      A.  Hang in there, it's going to get
24  better.

Page 400

1       Q.  Okay.  Do you -- strike that.
2           A question about Lieutenant Pascua.  Do
3   you ever recall anyone suggesting to you that
4   Lieutenant Pascua might have a problem with you
5   because you were a female police officer?
6       A.  No, that's inaccurate.  They said she
7   had a problem with anybody female.
8       Q.  Okay.  So someone told you that
9   Lieutenant Pascua had a problem with females?
10      A.  With -- in general.
11      Q.  Okay.  Who do you recall --
12      A.  I don't recall.
13      Q.  -- telling you that?
14      A.  I don't recall at this moment, I don't.
15      Q.  Is it your belief that any of the
16  issues you had with Lieutenant Pascua was
17  because you were a female?
18      A.  No.  I believe that they were because
19  of the investigation.
20      Q.  Okay.  I think I've asked you with
21  respect to each of the individual Defendants,
22  but I will ask you an overall question.  With --
23  with respect to each of the individual
24  Defendants, Rivera, Kirby, O'Grady, Roti,

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
401–404

Page 401

1 Sadowski, Pascua, Stanley, Barnes, Cesario,
2 Salemme and Mills, other than what you've
3 already testified to, is there -- are there any
4 incidents of alleged retaliation that you're
5 claiming in this lawsuit that were engaged in by
6 any of those individual Defendants?
7     A.  Like I stated throughout this
8 deposition, there are so many incidents.  But at
9 this time to the best of my recollection, I have
10 given you all the information.
11     Q.  Okay.
12         MR. KING:  I don't believe I have any
13 further questions.
14         THE WITNESS:  Are you kidding me?  All
15 right.
16         MR. SMITH:  No questions.  I think we
17 will reserve.
18         FURTHER DEPONENT SAITH NOT.
19             (The deposition concluded at
20             6:43 p.m.)
21
22
23
24

Page 402

1           CERTIFICATE OF OFFICER
2
3     I, SUSAN HASELKAMP, a Certified Shorthand
4 Reporter of the State of Illinois, do hereby
5 certify:
6
7     That previous to the commencement of the
8 examination of the witness, the witness was duly
9 sworn to testify the whole truth concerning the
10 matters herein;
11
12     That the foregoing deposition transcript
13 was reported stenographically by me, was
14 thereafter reduced to typewriting under my
15 personal direction and constitutes a true record
16 of the testimony given and the proceedings had;
17
18     That the said deposition was taken before
19 me at the time and place specified;
20
21     That I am not a relative or employee or
22 attorney or counsel, nor a relative or employee
23 of such attorney or counsel for any of the
24 parties hereto, nor interested directly or

Page 403

1 indirectly in the outcome of this action.
2
3     IN WITNESS WHEREOF, I do hereunto set my
4 hand at Chicago, Illinois, this 24th day of
5 November, 2014.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20 _____
21 Certified Shorthand Reporter
22 CSR Certificate No. 084-004022
23
24

Page 404

1
2            I N D E X
3 WITNESS                    EXAMINATION
4 SHANNON MARIE SPALDING,
5    By Mr. King.............................3
6
7
8
9
10         E X H I B I T S
11 NUMBER              MARKED FOR ID
12 Spalding Deposition Exhibit
13
         1..................................19
14       2................................103
         3................................199
15       4................................212
         5................................260
16       6................................307
         7................................312
17       8................................313
         9................................339
18      10................................341
        11................................350
19      12................................386
20
21
22
23
24

SHANNON MARIE SPALDING
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

November 18, 2014
405–406

Page 405

1          DEPOSITION ERRATA SHEET

2    Assignment No. 239697

3    Chicago Police Officers Shannon Spalding and

4    Daniel Echeverria vs. City of Chicago, et al.

5          DECLARATION UNDER PENALTY OF PERJURY

6

7          I declare under penalty of perjury that I

8    have read the entire transcript of my Deposition

9    taken in the captioned matter or the same has

10   been read to me, and the same is true and

11   accurate, save and except for changes and/or

12   corrections, if any, as indicated by me on the

13   DEPOSITION ERRATA SHEET hereof, with the

14   understanding that I offer these changes as if

15   still under oath.

16

17   Signed on the _____ day of

18   _____, 2014.

19

20   _____

21   SHANNON MARIE SPALDING

22

23

24

Page 406

1          DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to:_____

3    _____

4    Reason for change:_____

5    Page No._____Line No._____Change to:_____

6    _____

7    Reason for change:_____

8    Page No._____Line No._____Change to:_____

9    _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24          SHANNON MARIE SPALDING



| OFFICER | | BEAT | ROLE | O_LAST | O_FIRST | IR_NO | CB_NO | STAT_DESCR | TYPE | ARREST_DATE |
|---|---|---|---|---|---|---|---|---|---|---|
| SPALDING | SHANNON | 5754 | SAO | DILLARD | TIERRA | 1832713 | 18433424 | ISSUANCE OF WARRANT | | 21-Jun-2012 |
| SPALDING | SHANNON | 5752 | SAO | TURNER | JERREL | 1901564 | 18428506 | ISSUANCE OF WARRANT | | 14-Jun-2012 |
| SPALDING | SHANNON | 5752 | SAO | KRABBE | EDWARD | 2165586 | 18426901 | VIOL SEX OFFENDER REGISTATI | F | 12-Jun-2012 |
| SPALDING | SHANNON | 5752 | AAO | MORGA | JOSE | 1371109 | 18424289 | ROBBERY | F | 08-Jun-2012 |
| SPALDING | SHANNON | 5752 | SAO | REED | SHAUNDE | 1283051 | 18422602 | ISSUANCE OF WARRANT | | 06-Jun-2012 |
| SPALDING | SHANNON | 5752 | SAO | COOK | MARCUS | 743115 | 18422596 | ISSUANCE OF WARRANT | | 06-Jun-2012 |
| SPALDING | SHANNON | 5752 | SAO | PALM | RENATA | 775322 | 18419873 | BATTERY - CAUSE BODILY HAR | M | 02-Jun-2012 |
| SPALDING | SHANNON | 5754 | SAO | GORDEN | JAMES | 351892 | 18403176 | DOMESTIC BATTERY - PHYSICA | M | 09-May-2012 |
| SPALDING | SHANNON | 5752 | FAO | COOK | ALLEN | 1951186 | 18399556 | BURGLARY/SCH/DAY CARE/WO | F | 04-May-2012 |
| SPALDING | SHANNON | 5752 | AAO | PINKERTON | JESSE | 1360917 | 18398207 | MURDER - FIRST DEGREE | F | 02-May-2012 |
| SPALDING | SHANNON | 5752 | SAO | CHOATES | WILLIAM | 620465 | 18390276 | VIOL SEX OFFENDER REGISTATI | F | 21-Apr-2012 |
| SPALDING | SHANNON | 5752 | AAO | HOUSTON | GREGORY | 777585 | 18389469 | ISSUANCE OF WARRANT | | 20-Apr-2012 |
| SPALDING | SHANNON | 5752 | AAO | GREEN | JOHN | 1506608 | 18389449 | AGG BATTERY/DISCHARGE FIR | F | 20-Apr-2012 |
| SPALDING | SHANNON | 5752 | SAO | BROWN | ISHANNA | 1919741 | 18388831 | BATTERY - MAKE PHYSICAL CO | M | 19-Apr-2012 |
| SPALDING | SHANNON | 5752 | FAO | MORRIS | LASHORA | 1108937 | 18383842 | BATTERY - CAUSE BODILY HAR | M | 12-Apr-2012 |
| SPALDING | SHANNON | 5752 | FAO | NASH | MARTELL | 1254261 | 18378831 | DOMESTIC BATTERY - BODILY H | M | 05-Apr-2012 |
| SPALDING | SHANNON | 5752 | SAO | ALEXANDER | ZAVIER | 1632311 | 18377372 | AGG BATTERY/PEACE OFFICER | M | 03-Apr-2012 |
| SPALDING | SHANNON | 5752 | SAO | POUNCY | TROY | 1772691 | 18377263 | CANNABIS - POSSESS 30-500 GRM | F | 03-Apr-2012 |
| SPALDING | SHANNON | 5753 | AAO | STARKEY | LUTHER | 1332690 | 18373184 | ISSUANCE OF WARRANT | F | 28-Mar-2012 |
| SPALDING | SHANNON | 5752 | AAO | HOWARD | KIMANTI | 1497596 | 18372529 | DOMESTIC BATTERY - BODILY H | M | 27-Mar-2012 |
| SPALDING | SHANNON | 5752 | AAO | BONDS | YASHUA | 1262976 | 18370495 | DOMESTIC BATTERY - BODILY H | M | 24-Mar-2012 |
| SPALDING | SHANNON | 5752 | SAO | BERNARD | WALTER | 1034707 | 18368797 | ISSUANCE OF WARRANT | | 22-Mar-2012 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

DEFS01177

# Exhibit D

DANIEL ECHEVERRIA
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

December 02, 2014
1–4

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2       FOR THE NORTHERN DISTRICT OF ILLINOIS
 3              EASTERN DIVISION
 4   CHICAGO POLICE OFFICERS    )
     SHANNON SPALDING and       )
 5   DANIEL ECHEVERRIA,         )
                                )
 6        Plaintiffs,           )
       vs.                      ) No. 12 C 8777
 7                              )
     CITY OF CHICAGO, Chicago   )
 8   Police Chief JUAN          )
     RIVERA, Chicago Police     )
 9   Chief DEBRA KIRBY,         )
     Chicago Police Commander   )
10   JAMES O'GRADY, Chicago     )
     Police Chief NICHOLAS      )
11   ROTI, Chicago Police Lt.   )
     KEVIN SADOWSKI, Chicago    )
12   Police Lt. DEBORAH         )
     PASCUA, Chicago Police     )
13   Commander ADRIENNE         )
     STANLEY, Chicago Police    )
14   Sergeant MAURICE BARNES,   )
     Chicago Police Lt.         )
15   ROBERT CESARIO, Chicago    )
     Police Commander JOSEPH    )
16   SALEMME, Chicago Police    )
     Sergeant THOMAS MILLS,     )
17                              )
          Defendants.           )
18
          The deposition of DANIEL ECHEVERRIA,
19   called for examination, taken pursuant to the
     provisions of the Code of Civil Procedure and
20   the Rules of the Supreme Court of the State of
     Illinois pertaining to the taking of depositions
21   for the purpose of discovery taken before
     SUSAN HASELKAMP, CSR No. 084-004022, Certified
22   Shorthand Reporter of said state, on
     December 2, 2014, at the hour of 9:20 a.m. at
23   191 North Wacker Drive, Suite 3700, Chicago,
     Illinois, pursuant to notice.
24
```

Page 2

```
 1    APPEARANCES:

 2

 3        CHRISTOPHER SMITH TRIAL GROUP,

 4        MR. CHRISTOPHER R. SMITH,

 5        One North LaSalle Street

 6        Suite 3040

 7        Chicago, Illinois 60602

 8        (312) 432-0400

 9        office@crstrialgroup.com

10            Representing the Plaintiffs;

11

12        DRINKER, BIDDLE & REATH LLP, by

13        MR. ALAN S. KING and

14        MS. NOREEN H. CULL,

15        191 North Wacker Drive

16        Suite 3700

17        Chicago, Illinois  60606-1698

18        (312) 569-1334

19        alan.king@dbr.com

20        noreen.cull@dbr.com

21            Representing the Defendants.

22

23   ALSO PRESENT:  MS. SHANNON SPALDING

24
```

Page 3

1        (Whereupon, the witness was duly
2    sworn.)
3        DANIEL ECHEVERRIA,
4    having been first duly sworn, was examined and
5    testified as follows:
6            EXAMINATION
7    BY MR. KING:
8        Q.  Let the record reflect that this is the
9    deposition of one of the Plaintiffs, Daniel
10   Echeverria, being taken pursuant to notice and
11   in agreement of the parties and pursuant to
12   applicable provisions of the Federal Rules of
13   Civil Procedure and Federal Rules of Evidence.
14       Mr. Echeverria, can you state your full
15   name and spell your last name for the record.
16       A.  Daniel M. Echeverria,
17   E-C-H-E-V-E-R-R-I-A.
18       Q.  And have you ever given a deposition
19   before?
20       A.  No.
21       Q.  Okay.  I know you were here for your
22   partner's deposition.
23       A.  Yes.
24       Q.  I'm sure you've got a general sense of

Page 4

1    what's going to go on here.  I'll be asking you
2    questions that you've been sworn to answer
3    truthfully under oath.  If you don't understand
4    any of my questions or if I'm speaking too fast,
5    feel free to let me know and I'll try to repeat
6    the question or rephrase it.  Okay?
7        A.  Correct.
8        Q.  Okay.  And, again, verbal answers are
9    very important for the court reporter, as it's
10   difficult for her to take down nods of the head
11   and uh-huhs and things like that.  So I'd ask
12   you to respond verbally.
13       A.  Understood.
14       Q.  Okay.  And it's also difficult for the
15   court reporter if we're both talking at the same
16   time to take that down, so I'm going to do my
17   best to let you finish your answers if you do
18   your best to let me finish my questions before
19   you start speaking, okay?
20       A.  Understood.
21       Q.  Thank you.
22       Officer Echeverria, you're currently
23   employed by the City as a Chicago Police
24   Officer, correct?



DANIEL ECHEVERRIA                                    December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO              5–8

Page 5

1    A.   That's accurate.
2    Q.   Okay.  And you joined the force in
3  1999?
4    A.   Correct.
5    Q.   Okay.  What's your current home
6  address?
7    A.   5621 North Mulligan Avenue, Chicago,
8  Illinois 60646.
9    Q.   And how long have you lived at that
10 address?
11   A.   About ten years.
12   Q.   Okay.  And are you married?
13   A.   Yes.
14   Q.   Okay.  Does your wife live with you at
15 that address?
16   A.   Yes.
17   Q.   Okay.  Any kids?
18   A.   Yes.
19   Q.   Okay.  And they live with you at that
20 address?
21   A.   Yes.
22   Q.   Okay.  And since 1999, have you had any
23 employment other than with the City of Chicago?
24   A.   No.

Page 6

1    Q.   Okay.
2    A.   Let me rephrase that.  Some part-times
3  or something like that.
4    Q.   Okay.
5    A.   Side part-times.
6    Q.   Okay.  Doing like security?
7    A.   No.
8    Q.   Okay.
9    A.   I used to -- I have a degree in medical
10 imaging --
11   Q.   Okay.
12   A.   -- so I did some medical imaging work
13 for -- at some hospitals.
14   Q.   Okay.  And you mentioned your degree.
15 Why don't you tell me about your educational
16 background.  Where did you attend college or get
17 your degree?
18   A.   I'm sorry?
19   Q.   Where did you attend college or get
20 your degree?
21   A.   It's a two-year degree, Triton College.
22   Q.   And was that before you entered the
23 police force?
24   A.   Correct.

Page 7

1    Q.   Okay.  Any other college?
2    A.   No.
3    Q.   Okay.  Can you tell me starting in 1999
4  when you joined the force as best as you can
5  recall, kind of taking me chronologically
6  through the positions that you had and, to the
7  extent you can remember, who your supervisors or
8  sergeants were up until the time you were
9  detailed to Detached Services?
10   A.   Sure.
11   Q.   Thanks.
12   A.   I started obviously at the academy,
13 graduated the academy in February, 2000.  I was
14 assigned or detailed to the 1st District.  I
15 worked all watches there, days, afternoons,
16 midnights.  Supervisors rotate.  At that time I
17 want to say I completed my PPO status there, as
18 well.  And then I worked primarily midnights and
19 eventually moved to days.
20   Q.   Okay.
21   A.   Then I worked a gang and tactical unit
22 as well as a housing unit.  And I also did
23 saturation prior to going to gang and tactical.
24   Q.   Okay.

Page 8

1    A.   And then I went to Narcotics.  Well, we
2  got borrowed out to Narcotics, then eventually
3  assigned to Narcotics and then detailed to 543.
4    Q.   Okay.
5    A.   The 045 Academy, the -- or 044, the
6  retread thing.
7    Q.   Okay.
8    A.   And then the --
9    Q.   We can stop.
10   A.   Okay.
11   Q.   You've gotten to when you were detailed
12 to Detached Services, right?
13   A.   Yeah.
14   Q.   The 543?
15   A.   Correct.
16   Q.   Yeah, we'll get into that in a little
17 more detail.
18   A.   All right.
19   Q.   Thank you.  And when did Officer
20 Spalding become your partner?
21   A.   In the 1st District during the housing
22 tactical team.
23   Q.   Okay.  And has she remained your
24 partner ever since then at least up until the



DANIEL ECHEVERRIA
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

December 02, 2014
9–12

Page 9

1 time she went on medical leave?
2    A.  Yes.
3    Q.  Okay.  So consistently since then?
4    A.  Well, when we went to Narcotics, she
5 went to work Narcotics West, I went to work
6 Narcotics South or Central, whatever you want to
7 call it, Area 1.
8    Q.  So you and Officer Spalding were
9 partners for some period of time --
10    A.  Yes.
11    Q.  -- before you got to Narcotics and then
12 you were split up for a period of time --
13    A.  Right.
14    Q.  -- and then you came back together as
15 partners; is that correct?
16    A.  Correct.
17    Q.  Okay.  Do you recall how long you were
18 in Narcotics when you were not Officer
19 Spalding's partner?
20    A.  I cannot give you an exact.  I went to
21 work on one team, she went to work on a
22 different team.  I can't even approximate.
23    Q.  Okay.
24    A.  I would just like to give you an

Page 10

1 accurate answer, so I'd rather just...
2    Q.  Okay.  And you're currently in the
3 Fugitive Apprehension Unit, correct?
4    A.  Correct.
5    Q.  And are you on Sergeant Stack's team?
6    A.  That is correct.
7    Q.  And that's on the second watch --
8    A.  That's days.
9    Q.  -- over on days?
10    A.  That's correct.
11        (Whereupon, Echeverria
12         Deposition Exhibit No. 1 was
13         marked for identification.)
14 BY MR. KING:
15    Q.  Officer Echeverria, I'm showing you
16 what's been marked as Echeverria Deposition
17 Exhibit No. 1.
18        It's your Amended Complaint in the
19 litigation.  Have you seen this document before?
20    A.  Yes.
21    Q.  And if I could direct your attention to
22 Paragraph 20 of the Amended Complaint, which
23 indicates, in 2007 while working an undercover
24 Narcotics investigation, Plaintiffs uncovered

Page 11

1 evidence of illegal activity being committed by
2 various Chicago Police Officers.  In the next
3 paragraph it indicates that one of those
4 officers was Sergeant Ronald Watts.
5    A.  That's in Paragraph 21?
6    Q.  Yes.
7    A.  So 20 and 21?
8    Q.  Yes.
9    A.  Okay.
10    Q.  Were you personally involved in
11 uncovering any illegal activity of Sergeant
12 Watts?
13    A.  Yes.
14    Q.  What illegal activity did you or your
15 partner uncover?
16    A.  What didn't I uncover, is more like the
17 question.
18    Q.  Tell me what you uncovered.
19    A.  I uncovered that Ronald Watts was
20 extorting money from drug dealers, stealing
21 narcotics themselves, selling narcotics to rival
22 gangs or rival buildings.
23    Q.  Okay.
24    A.  Basically he was facilitating the

Page 12

1 narcotics trade.
2    Q.  Okay.  And --
3    A.  And participating in a criminal
4 enterprise, if you ask me.
5    Q.  Okay.  And did you discover this
6 activity when you were working for CHA -- or in
7 the CHA?
8    A.  I discovered that during debriefings of
9 arrestees.
10    Q.  Okay.
11    A.  Who had already committed a controlled
12 sale or buy, so undercover.
13    Q.  Okay.  So the arrestees would talk
14 about things that Sergeant Watts was engaged in?
15    A.  Yes.
16    Q.  And that's how you learned of that?
17    A.  Correct.
18    Q.  And at some point did you or your
19 partner, Officer Spalding, report anything that
20 you had learned about Sergeant Watts to anyone
21 within the Chicago Police Department?
22    A.  Yes.
23    Q.  And who did you report it to?
24    A.  Well, I brought it -- well, what I did



DANIEL ECHEVERRIA
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

December 02, 2014
13–16

Page 13

1 is at that time, I had a sergeant -- let me
2 think of his name. Give me a second. Roderick
3 Watson.
4     Q.  Okay.
5     A.  Was the immediate supervisor.
6     Q.  And are you saying you reported it to
7 Sergeant Watson?
8     A.  I had Sergeant Watson come upstairs
9 where the arrestee was being processed for his
10 debriefing by myself.
11     Q.  Okay.
12     A.  Where he had shared some information
13 regarding Ronald Watts. The arrestee asked for
14 a supervisor.
15     Q.  Okay.
16     A.  So at that time, it was Sergeant
17 Roderick Watson. I told Sergeant Watson if he
18 could come upstairs with me, the arrestee is
19 asking to speak to a supervisor. And he's ready
20 to come downstairs since my processing was
21 pretty much complete. And the arrestee repeated
22 to me, to Sergeant Watson. So at that point,
23 yes, it was reported to him.
24     Q.  Okay. So Sergeant Watts comes to the

Page 14

1 room --
2     A.  Watson.
3     Q.  Watson, I'm sorry, comes to the room
4 and it's just you, Sergeant Watson and the
5 arrestee; is that correct?
6     A.  Correct.
7     Q.  Tell me what the arrestee explains at
8 that time.
9     A.  At that time the arrestee asked if he
10 was a white shirt. Sergeant Watson replied,
11 yes. Then he said, I'm not going to go down for
12 this petty shit, is what he said, when they have
13 white shirts, and he named Ronald Watts,
14 stealing and doing his own dope line in the Ida
15 B. Wells complex.
16     Q.  Okay. Do you recall anything else
17 being said in that meeting?
18     A.  Yes. Then Sergeant Watson said, I'm
19 not trying to hear your shit.
20     Q.  Okay. Do you recall anything else said
21 in that meeting?
22     A.  And then he just -- the arrestee kept
23 repeating it and told him, man, this guy
24 really -- I mean, he steals, he does everything.

Page 15

1 He brings dope in for us, everything.
2     Q.  Okay.
3     A.  And it just went ignored.
4     Q.  Okay.
5     A.  And then we just took him downstairs to
6 be processed.
7     Q.  Okay. Was that the only occasion where
8 you -- strike that.
9         Was that the only occasion where
10 Sergeant Watson was present where an arrestee
11 was disclosing some criminal activity of
12 Sergeant Watts?
13     A.  Yes.
14     Q.  Were there any other occasions where
15 any other supervisors or white shirts were
16 present when an arrestee was disclosing alleged
17 criminal activity by Sergeant Watts?
18     A.  No.
19     Q.  No?
20     A.  No.
21     Q.  Okay. And separate and apart from
22 Sergeant Watson being present in the meeting
23 with the arrestee you just discussed --
24     A.  Yes.

Page 16

1     Q.  -- did you otherwise report Sergeant
2 Watts' alleged criminal activity to anyone else
3 within the Chicago Police Department?
4     A.  Later on when we did meet with Tina
5 Skahill.
6     Q.  Okay. And do you recall when
7 approximately that meeting was?
8     A.  I can't give you the definite date. I
9 know it was in August, I don't know.
10     Q.  Okay.
11     A.  If you let me refer to the Complaint,
12 I'll tell you what year.
13     Q.  That's fine.
14     A.  It's in the Complaint.
15     Q.  Okay. We'll talk about that later.
16     A.  All right.
17     Q.  But the meeting you're talking about
18 with Tina Skahill --
19     A.  That's forward.
20     Q.  -- what you were reporting to her is
21 after you have already been working on the Watts
22 investigation with the FBI, correct?
23     A.  Correct.
24     Q.  Okay. If I could direct your attention



Page 17

1  now to Paragraph 23 of the Amended Complaint.
2  It indicates that in 2007 while off duty, the
3  Plaintiffs reported to FBI Special Agent PS the
4  illegal activity by Sergeant Watts and others
5  who worked with him.  PS is Patrick Smith,
6  correct?
7     A.  Correct.
8     Q.  Okay.  And do you recall how that
9  information was reported to Patrick Smith?  Was
10  there a meeting or a telephone call?
11     A.  There was multiple conversations.  I
12  couldn't tell you if it was over the phone or
13  was it in person where that Watts topic came up.
14     Q.  Do you recall the first such
15  conversation?
16     A.  It's so far back.  I mean, there's so
17  many conversations that transpired.
18     Q.  Okay.  Well, initially you or your
19  partner makes the decision to contact the FBI.
20  Do you recall if you made that contact or
21  Officer Spalding did or both of you together?
22     A.  It may have been both of us.
23     Q.  Okay.  And you don't recall whether
24  that initial contact was a phone call or a

Page 18

1  meeting?
2     A.  It's hard to say.
3     Q.  Okay.  Do you know how long after the
4  situation you testified to with Sergeant Watson
5  being present when the arrestee provided
6  information about Sergeant Watts, how long after
7  that did you or your partner reach out to the
8  FBI?
9     A.  It can't be much time lapse.
10     Q.  Okay.  Are we talking days?
11     A.  Like I said, it's a short period of
12  time.  It was definitely not months or years or
13  anything like that.
14     Q.  Okay.  What's your best estimate of how
15  much time past, a few days?
16     A.  Well, can we backtrack it a little bit
17  to the Watson situation?  I'd like to elaborate
18  on that, too, and maybe that will make sense
19  with this one.  Or do you want to continue
20  forward?  It's up to you.
21     Q.  What more do you have to say about the
22  Watson situation?
23     A.  Well, when the arrestee communicated
24  the information to Sergeant Watson --

Page 19

1     Q.  Yes.
2     A.  -- he responded what he responded and
3  then we took him down to be processed.
4     Q.  Yes.
5     A.  And I needed to complete my debriefing
6  form, a document for it.  And I asked Sergeant
7  Watson, I said, Sarge, how do you want to make
8  this debriefing?  Do you want to make it a
9  negative or a positive, you know, with what he
10  said.  He said, make that shit a negative.
11     So at that point, my understanding was
12  maybe, you know, he was going to do a
13  confidential investigation or something and he
14  didn't want to reflect that in the report, then
15  it would take away from the confidential matter
16  that I would assume it would turn into.
17     Q.  Okay.
18     A.  So that's what I wanted to elaborate on
19  that.
20     Q.  Okay.  So when that was all
21  processed --
22     A.  Right.
23     Q.  -- you were under the impression that
24  Sergeant Watson might initiate a confidential

Page 20

1  investigation?
2     A.  Correct.
3     Q.  Okay.  Does that help you recall how
4  much time past between --
5     A.  It was a short period --
6     Q.  -- of when you contacted the FBI?
7     A.  It was a short period of time.  I know
8  that when we did make contact with the agent, it
9  was on our personal time, our off time.  It was
10  never during duty time.
11     Q.  Okay.
12     A.  Like I said, it may have been a very
13  short period of time.  I can't tell you that
14  months went by or anything like that.
15     Q.  Okay.
16     A.  Because I assumed everything was going
17  to be handled, but other incidents kept coming
18  up.  And I just said, well, I don't think it's
19  being handled.
20     Q.  Okay.  And in Paragraph 24 you say that
21  you and Officer Spalding continued meeting with
22  Patrick Smith intermittently through 2008; is
23  that correct?
24     A.  Yes.



DANIEL ECHEVERRIA                                    December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                   21–24

Page 21

1    Q.   Okay.  And is it your testimony that at
2  that time you never had a meeting or a phone
3  conversation with Patrick Smith about the Watts
4  matter during your regular work hours, is that
5  your testimony?
6    A.   Well, he would try and reach out, but
7  I -- during work time and it was not the right
8  thing to address at that time while we were
9  working, or at least when I was working.
10    Q.   Okay.
11    A.   So I tried to do everything in my
12  personal time.
13    Q.   Okay.  I understand you're trying to do
14  that.  But did you also do some work with the
15  FBI on the Watts investigation during your work
16  hours?
17    A.   Once we got assigned to Brass Tax, yes.
18    Q.   Now, the work that you and Officer
19  Spalding did on Operation Brass Tax --
20    A.   Yes.
21    Q.   -- would it be fair to say it consisted
22  of you managing and getting information from the
23  confidential informant?
24    A.   Absolutely, yes.

Page 22

1    Q.   Okay.  And that was your role in the
2  investigation, correct?
3    A.   Yeah, to acquire information,
4  intelligence, develop the CI, which we had
5  developed, set up scenarios in conjunction with
6  the FBI and IAD Confidentials.
7    Q.   And the CI was a confidential
8  informant, correct?
9    A.   Yes.
10    Q.   And then at some point in time -- well,
11  strike that.
12        Let's look at Paragraph 25, which
13  indicates that after approximately a year or so
14  of speaking with the FBI in your personal
15  capacities, the FBI agents were -- began to
16  request more time and that you and/or Officer
17  Spalding responded that you -- if they wanted
18  more of your time, it would have to be conducted
19  through the Chicago Police Department; is that
20  correct?
21    A.   Yes.
22    Q.   Okay.  And there was a meeting that's
23  alleged in the next paragraph in August of 2008.
24    A.   Okay.

Page 23

1    Q.   Do you recall was it August, 2008?
2    A.   That sounds right.
3    Q.   Okay.  And prior to that August, 2008
4  meeting, were you aware of any CPD officers at
5  any level that were aware of your and Officer
6  Spalding's involvement in the Watts
7  investigation?
8    A.   Not at that time.
9    Q.   Okay.  So during that time -- strike
10  that.
11        Paragraph 26 talks about an August,
12  2008 meeting.  Were you present at that
13  meeting?
14    A.   Yes.
15    Q.   Okay.  Can you tell me who all was
16  present at the August, 2008 meeting?
17    A.   It was Chief Skahill, her
18  administrative staff, which consisted of -- give
19  me a second to think of the lady's name.
20  Barbara West was a lieutenant I believe at that
21  time.
22    Q.   Okay.
23    A.   There was a Sergeant Tom Chester, who
24  was an FBI confidential liaison, my partner,

Page 24

1  myself and Patrick Smith.
2    Q.   Okay.  And your partner is Officer
3  Spalding?
4    A.   That is correct.
5    Q.   And as best as you can recall, what do
6  you recall being discussed in that meeting or
7  said by any of the participants in the meeting?
8    A.   Well, when we entered the room, we had
9  seen Patrick Smith in there already and we were
10  surprised to see him there.
11    Q.   Okay.
12    A.   We were asked to have a seat.  Tina
13  Skahill, Chief Skahill commended us for coming
14  forward.  She said it was a very important
15  investigation to the department as well as the
16  agency; however, it's pretty much going to be
17  governed by the outside agency, the federal
18  agency.  And she introduced her staff, which was
19  Tom Chester.
20    Q.   Did Chief Skahill indicate in the
21  meeting that there was already an ongoing
22  investigation of Sergeant Watts that she was
23  aware of?
24    A.   Yes.



DANIEL ECHEVERRIA
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

December 02, 2014
25–28

Page 25

1    Q.  Okay.  And did she indicate how long
2  that investigation had been going on?
3    A.  No, she did not.
4    Q.  Okay.  I'm sorry, continue.  What else
5  do you recall being said in the meeting?
6    A.  She kind of briefly asked us the nature
7  of how we came about with Watts, we just gave
8  her a quick synopsis of it, we discussed our
9  safety, we discussed many topics, our concerns
10  regarding our identity, she discussed as well
11  as -- she assured us that, you know, it would be
12  a very confidential matter and that nobody
13  outside this room knows about it.  And we went
14  on and emphasized about if our identity was
15  compromised, what that would do to us.  And she
16  said, we wouldn't do that to you, especially if
17  you're coming forward in a serious matter as
18  this one.
19    Q.  Okay.
20    A.  Because we were concerned of this code
21  of silence.
22    Q.  Did Chief Skahill say that nobody
23  outside of that room knew about it at that point
24  in time?

Page 26

1    A.  She said that basically the people in
2  this room know about it.  I want to also say she
3  mentioned the name of Brust.
4    Q.  Okay.
5    A.  And possibly Kirby.
6    Q.  She may have mentioned Brust and Kirby?
7    A.  Yes.  And the reason I say Brust for
8  sure, because when she went along in discussing
9  the nature of the assignment, she said it would
10  have to go through Kirby or Brust for approval
11  of how we were going to manage the detail to
12  keep it as confidential as possible.
13    Q.  Okay.
14    A.  And of course the supe.
15    Q.  Okay.
16    A.  Which I took that as the
17  superintendent.
18    Q.  Okay.  And was there some discussion
19  about a need to know, that only people with a
20  need to know would have knowledge?
21    A.  We were ordered to keep this quiet as
22  possible, not to discuss this with anyone.
23    Q.  Okay.
24    A.  Which we did not.

Page 27

1    Q.  Okay.
2    A.  We discussed assignment of cars and
3  radios.  We weren't aware of who we were to
4  report to.  That's when she said, you will
5  report directly, and pointed to Tom Chester.
6  He's going to be your immediate supervisor.
7    Q.  Okay.
8    A.  And also you will work, of course, with
9  Agent Smith.
10    Q.  Okay.  And was she telling you you were
11  to report to FBI headquarters?
12    A.  Yes, 2111 West Roosevelt.
13    Q.  Okay.  Do you remember the phrase need
14  to know, something about need to know coming up
15  in that meeting?
16    A.  Like I said, it's so long ago, I
17  just --
18    Q.  You don't recall?
19    A.  -- I don't recall at this time.
20    Q.  Okay.  But you understood by the end of
21  that meeting, if you didn't know it already,
22  that there had been an ongoing investigation of
23  Sergeant Watts even before you and Officer
24  Spalding got involved, correct?

Page 28

1    A.  Yes.
2    Q.  Okay.  Did you learn that in that
3  meeting or had you already known that?
4    A.  No.  I learned that coming out of that
5  meeting.
6    Q.  Okay.
7    A.  And then once we were in the FBI, we
8  knew for sure that the department was well aware
9  of what Ronald Watts was doing, along with
10  others.
11    Q.  Sure.  And others including Officer
12  Mohammed?
13    A.  Mohammed and others.
14    Q.  Okay.  Did you come to learn how long
15  the FBI and CPD had been investigating --
16    A.  Damn near a decade.
17    Q.  Okay.
18    A.  Sorry, my language.  I'm just --
19    Q.  That's okay.  So you understood the FBI
20  and CPD had been investigating officers,
21  including Ronald Watts and Officer Mohammed, for
22  nearly a decade before 2008; is that fair?
23    A.  Yes.
24    Q.  Okay.  And after the August -- strike



DANIEL ECHEVERRIA
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

December 02, 2014
29–32

Page 29

1 that.
2      Other than what you've testified to, do
3 you recall anything else said in that August,
4 2008 meeting?
5      A.  We just strongly emphasized our
6 concerns about officer safety.
7      Q.  Sure.
8      A.  And she just reiterated that, you know,
9 at no time will we be compromised and she
10 commended us for coming forward.
11      Q.  Okay.
12      A.  We asked, well, what happens next.  And
13 she said, well, what happens next is you're
14 going to work with these people.
15      Q.  Okay.
16      A.  So what do you say, no?
17      Q.  I mean --
18      A.  I mean, what are you asking me?
19      Q.  Was your work with the FBI on Operation
20 Brass Tax after that meeting, are you saying it
21 wasn't something that you and your partner
22 voluntarily agreed to and decided to do or were
23 you forced to do it?
24      A.  I think it was pretty much ordered to

Page 30

1 do so at that point.  And I mean, do you say no
2 to a chief?
3      Q.  I mean, was it something you wanted to
4 say no to and you felt you were being forced to
5 do?
6      A.  It's kind of hard to say what I felt at
7 that time.  I felt everything.
8      Q.  Okay.
9      A.  I felt I was ordered, I felt I needed
10 to do it, I felt it was the right thing, I felt
11 I was going to feel some consequences, I feared
12 the code of silence, I feared retaliation, I
13 felt everything.
14      Q.  Okay.
15      A.  Stress, everything.
16      Q.  I understand.  You start working on the
17 Watts investigation and reporting to the FBI.
18 And my question to you is was that something
19 that you agreed to do or you were compelled to
20 do against your wishes?
21      A.  I agreed to follow an order.
22      Q.  Okay.
23      A.  Does that answer it?
24      Q.  Yes.

Page 31

1      A.  Okay.
2      Q.  Paragraph 30 indicates that over the
3 next several years you and your partner continue
4 to work on Operation Brass Tax.  And it says
5 that during that time, you were also encouraged
6 by CPD command staff to develop other Narcotics
7 related cases; is that correct?
8      A.  Yes.
9      Q.  What CPD command staff encouraged you
10 to develop other Narcotics cases during this
11 period of time?
12      A.  Chief Rivera.
13      Q.  Anyone other than Chief Rivera?
14      A.  I want to say that's it primarily.
15      Q.  Okay.  And during this period of time,
16 did you --
17      A.  Develop information?
18      Q.  -- work on other Narcotics cases or
19 develop information for Narcotics cases?
20      A.  Yes.
21      Q.  And you and your partner did that
22 working with Sergeant Padar, correct?
23      A.  Correct.
24      Q.  Okay.  Did you do any other Narcotics

Page 32

1 work or develop any other Narcotics leads
2 separate and apart from working with Sergeant
3 Padar?
4      A.  Yes, we did.  We had to gather as much
5 intelligence as possible in the event that
6 Ronald Watts was to be engaged so that he would
7 have something positive, because the man knows
8 what he's doing.
9      Q.  Okay.  Other than working I guess under
10 the direction of Sergeant Padar during this
11 period, was there any other sergeants who were
12 directing your work in developing Narcotics
13 information?
14      A.  No.
15      Q.  Okay.  By the way, as of the time of
16 the August, 2008 meeting that you testified to,
17 do you have any personal knowledge as to whether
18 Nick Roti knew at that time that you and your
19 partner had been working with the FBI on
20 Operation Brass Tax?
21      A.  To the best of my knowledge, no.
22      Q.  You don't know?
23      A.  (Nodding.)
24      Q.  You don't know?



DANIEL ECHEVERRIA                                December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                33–36

Page 33

1    A.  No, no.
2    Q.  Okay.  Was there ever a time that you
3 reported to or were working with a Lieutenant
4 Cervanka?
5    A.  Yes.
6    Q.  Okay.  What period of time was that?
7    A.  That was my immediate lieutenant when I
8 got assigned to and borrowed to Narcotics.
9    Q.  Okay.  At any time after you started
10 working on the Watts investigation, either with
11 the FBI or later with the FBI and CPD, did you
12 work with or report to Lieutenant Cervanka?
13   A.  No.
14   Q.  Okay.
15   A.  Our direct order from Chief Skahill was
16 to report to Tom Chester and the agent at that
17 building on Roosevelt.
18   Q.  Okay.  Did you ever have occasion to
19 work for or report to a Lieutenant Navarro?
20   A.  No.
21   Q.  During the time that you were reporting
22 to the FBI but also developing Narcotics leads
23 under the direction of Sergeant Padar, was there
24 anyone else besides Sergeant Chester that you

Page 34

1 were reporting to at that time?
2    A.  No.
3    Q.  So did you tell the FBI you were
4 working on non-Watts Narcotics cases, as well?
5    A.  Everything was Watts.  Even the non --
6 even what you say is non or Padar, that was
7 information that you needed to know.  So in the
8 event Watts was to become a scenario, you have a
9 positive lead to give Watts, because he would
10 know if something was false or not.
11   Q.  Okay.  So all of the Narcotics leads
12 and work you did while you were reporting to the
13 FBI and working with Sergeant Padar, you felt
14 was related to the Watts investigation?
15   A.  Absolutely.
16   Q.  Okay.
17   A.  Watts was a big Narcotics person.
18   Q.  Okay.  I'm assuming the decision
19 itself -- well, strike that.
20      You were detailed to Detached Services
21 shortly -- was it shortly after the August, 2008
22 meeting?
23   A.  Yes.
24   Q.  Okay.  Do you remember how soon after?

Page 35

1    A.  Days, a week.
2    Q.  Okay.
3    A.  Roughly.
4    Q.  Okay.  So that was the plan coming out
5 of that meeting.  So I assume the fact that
6 the -- the detail to Detached Services you're
7 not claiming was retaliation, are you?
8    A.  No.
9    Q.  Okay.
10   A.  That was the way to go because they had
11 many units come out of Detached.  They had the
12 Mayor's detail.
13   Q.  Sure.
14   A.  I think a court section, you had a City
15 Hall detail.
16   Q.  Sure.
17   A.  I want to say DEA, Chicago Park
18 District.  I mean, there were many, many units
19 that would come out of there.  And I guess that
20 was the best way in the event Watts was to look
21 something up --
22   Q.  Sure.
23   A.  -- it wouldn't be very specific.
24   Q.  Sure.  That was the best place they

Page 36

1 thought to put you to allow you to work on this
2 confidential investigation?
3    A.  Yes.
4      MR. SMITH:  Objection, foundation.
5 BY MR. KING:
6    Q.  Okay.  And in Paragraph 31, it says, on
7 an unknown date, information that Plaintiffs had
8 reported criminal misconduct by a sworn officer
9 and were working with an outside investigation
10 was leaked within the department and became
11 known to Defendant Commander O'Grady.  Is that
12 your understanding?
13   A.  Yes.
14   Q.  What's the basis of that allegation,
15 that this became leaked and known to Commander
16 O'Grady?
17   A.  Chief Rivera stated that to us.
18   Q.  Okay.  And I know here it says, on an
19 unknown date.  Do you have any recollection of
20 approximately when this was?
21   A.  I wish I did.
22   Q.  Okay.  And you said Chief Rivera
23 related this to you.  Was this in a meeting or a
24 phone conversation?



DANIEL ECHEVERRIA                          December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO          37—40

Page 37

1    A.   It was in a meeting.
2    Q.   And was it you and Officer Spalding
3  both present?
4    A.   Yes.
5    Q.   And where did this meeting take place?
6    A.   It could have been in his office or in
7  the hallway at headquarters.
8    Q.   Okay.
9    A.   He stated --
10   Q.   Was anybody else present in the
11 meeting?
12   A.   No.
13   Q.   Okay.  What's your best recollection of
14 everything that was said in that conversation?
15   A.   I'm going to keep it sweet and short.
16 He said, I may have fucked up.
17   Q.   Okay.
18   A.   I told Ernie Brown about you and what
19 you guys are doing.
20   Q.   Okay.  Do you remember Chief Rivera
21 saying anything else?
22   A.   I said, why would you do that.
23   Q.   Who said that?
24   A.   We did, Shannon and myself.

Page 38

1    Q.   Okay.
2    A.   He said, I just fucked up.
3    Q.   Okay.  Do you recall --
4    A.   Ernie Brown at that time I think was
5  Chief of Patrol or Chief of Organized Crime or
6  something.  Not Organized Crime, but he was
7  chief, as well.  And --
8    Q.   Okay.  Let me just --
9    A.   Okay.
10   Q.   -- stop you.
11   A.   That's fine.
12   Q.   I just want to hear about the
13 conversation.
14   A.   All right.
15   Q.   Other than what you testified to, do
16 you recall anything else that you, Officer
17 Spalding or Chief Rivera, said in that
18 conversation?
19   A.   I mean, that was damaging enough to
20 me.
21   Q.   Is that a no?
22   A.   No.
23   Q.   Okay.  Paragraph 33 says, in August,
24 2010 Defendant O'Grady began a campaign of

Page 39

1  harassment.  And then the next paragraph talks
2  about an incident on approximately August 17,
3  2010 where O'Grady allegedly refused to approve
4  a confidential informant.
5       The August 17, 2010 incident where
6  O'Grady allegedly refused to approve a
7  confidential informant, that was the first
8  incident of alleged retaliation that you're
9  change in this lawsuit, correct?
10   A.   That's what made it very apparent.
11   Q.   That was the first incident of
12 retaliation that you're claiming in this
13 lawsuit, correct?
14      MR. SMITH:  Objection, form of the
15 question, asked and answered.
16      THE WITNESS:  Let me stop and think.  I
17 mean, there were so many incidents over the
18 course of time.  I don't recall if that was the
19 first or not.
20 BY MR. KING:
21   Q.   Okay.  Well, you're alleging that it
22 was in that month of August, 2010 when this
23 information got leaked to O'Grady, correct?
24   A.   Okay.

Page 40

1    Q.   And then you're also alleging that on
2  August 17th, O'Grady did something that you
3  allege is retaliatory, correct?
4    A.   Yes.
5    Q.   Correct?
6    A.   Yes.
7    Q.   So wouldn't you agree that the
8  August 17, 2010 incident involving the
9  confidential informant would have been the first
10 thing that you're claiming was retaliation?
11   A.   Sure.  Let's go ahead and say yes.
12   Q.   Okay.  And with respect to that
13 incident in Paragraph 34, it says that
14 Plaintiffs submitted paperwork to Defendant
15 O'Grady seeking approval of a confidential
16 informant.  Although he initially approved the
17 application --
18   A.   He rescinded it.
19   Q.   -- he rescinded it?
20   A.   Yes.
21   Q.   Do you recall that incident?
22   A.   Yes, I do.
23   Q.   What's the basis for your allegation
24 that he initially approved it and then rescinded



DANIEL ECHEVERRIA
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

December 02, 2014
41–44

Page 41

1 it?
2    A.  The statement made to us by Sergeant
3 James Padar.
4    Q.  Okay.  And was this an in-person
5 conversation?
6    A.  Yes, yes.
7    Q.  Was it just you and Officer Spalding
8 and Officer Padar present?
9    A.  Yes, he was present.
10    Q.  Okay.  Was anybody else present?
11    A.  To the best of my knowledge, that was
12 pretty much that.
13    Q.  What do you recall being said in that
14 conversation about the subject of O'Grady and
15 this confidential informant?
16    A.  James Padar said, O'Grady is not going
17 to approve this.
18    Q.  Okay.
19    A.  He said, scratch those two rats' names
20 off of that package and I'll sign it.  They're
21 IAD rats.
22    Q.  So Padar is telling you what O'Grady
23 allegedly said to him?
24    A.  Yes.

Page 42

1    Q.  Okay.  Do you recall anything else said
2 in those -- in that conversation?
3    A.  Yeah.  And he said that our paths are
4 not to cross again.
5    Q.  Padar told you that O'Grady said --
6    A.  That our -- they are not to cross our
7 path from that moment forward again.
8    Q.  Okay.
9    A.  And, God help them if they need some
10 help, it ain't coming, you're not to help them
11 out.
12    Q.  Okay.
13    A.  Padar was very forward saying it,
14 firm.
15    Q.  Okay.  And do you recall anything else
16 being said in that conversation?
17    A.  That was damaging enough to me.
18    Q.  Okay.  That would be a no?
19    A.  It could be more.  At that point I was
20 so shocked to hear that coming, that a commander
21 would say something like that.
22    Q.  Okay.
23    A.  There may have been more and I was just
24 focused on what was just said, because I was

Page 43

1 floored by it.
2    Q.  Okay.
3    A.  I was appalled.
4    Q.  That's assuming Padar was telling you
5 the truth about the conversation with O'Grady,
6 correct?
7    A.  Sure, you can assume that.
8    Q.  Do you recall anything else being said
9 in that conversation?
10    A.  Like I said, that was damaging enough
11 to me.
12    Q.  Do you recall anything else being said
13 in that conversation?
14    A.  To the best of my knowledge, that
15 summed it up.
16    Q.  Okay.  There's an allegation in
17 Paragraph 34 that O'Grady initially approved the
18 application.
19    A.  Yes.
20    Q.  What's the basis for your understanding
21 that he initially approved the application?
22    A.  I want to say Padar said it.  He
23 initially approved it -- he saw your names and
24 he said, take those -- you know what I said.

Page 44

1    Q.  Okay.
2    A.  I'm just going to be repeating myself.
3    Q.  Okay.  When Padar said that he
4 initially approved it, was it your understanding
5 that O'Grady had signed the request?
6    A.  I believed he did --
7    Q.  Okay.
8    A.  -- if he -- you know, a sergeant tells
9 you that.
10        (Whereupon, Echeverria
11         Deposition Exhibit No. 2 was
12         marked for identification.)
13 BY MR. KING:
14    Q.  Officer Echeverria, I'm showing you
15 what's been marked as Deposition Exhibit No. 2.
16        I just ask you if you've ever seen this
17 document before.
18    A.  Yes.
19    Q.  And this was the request for approval
20 of a confidential informant that you've been
21 testifying to, correct?
22    A.  Yes.
23    Q.  And is it your understanding that James
24 O'Grady signed this document?



Case: 1:12-cv-08777 Document #: 166-1 Filed: 02/02/16 Page 176 of 239 PageID #:845

DANIEL ECHEVERRIA                                    December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                    45–48

Page 45

1    A.  I can't read the signature.  But the
2  signature above commander, I would assume would
3  be his.
4    Q.  And by assuming that signature is his,
5  that's why you assumed that he initially
6  approved it?
7    A.  Yes.
8    Q.  Okay.
9    A.  Like I said, but I can't read that
10  chicken scratch.
11    Q.  Okay.
12    A.  Sorry.
13    Q.  That's fine.
14    A.  I'm assuming because it says commander
15  and his signature is right above it.
16    Q.  Right.
17    A.  Plus what Padar had said.
18    Q.  Okay.
19    A.  I mean, that was enough for me.
20      (Whereupon, Echeverria
21        Deposition Exhibit No. 3 was
22        marked for identification.)
23  BY MR. KING:
24    Q.  Officer Echeverria, I'm showing you

Page 46

1  another document that's been marked Deposition
2  Exhibit No. 3, which appears to be a copy of the
3  first page of Exhibit 2, but it has sort of a
4  note on it --
5    A.  Yes.
6    Q.  -- that says Sergeant Padar.
7    A.  Okay.
8    Q.  Have you ever seen this version of the
9  document?
10    A.  I may have, I may have not.  I can't
11  tell you.
12    Q.  You don't recall, okay.  That's fine.
13    A.  It looks like it's the same document.
14    Q.  Yeah, all right.
15      As far as you can tell, Exhibit 2 and
16  Exhibit 3 are the same document, just with a
17  note on it, correct?
18    A.  Correct.
19    Q.  Okay.  I'm directing your attention
20  back to Paragraph 35 of the Amended Complaint.
21  It states, Defendant O'Grady then informed
22  supervising personnel in the unit that
23  Plaintiffs were rats, meaning that they had
24  reported other police officers' misconduct.

Page 47

1  Defendant O'Grady ordered that the unit was not
2  to work with Plaintiffs and personnel in the
3  unit should not assist Plaintiffs.  Do you see
4  that?
5    A.  Yes.
6    Q.  Okay.  And is the basis for that
7  allegation what you've already testified to that
8  Sergeant Padar told you?
9    A.  Yes.
10    Q.  If you turn to the -- strike that.
11      Paragraph 36 of the Amended Complaint
12  indicates that Defendant O'Grady had
13  intentionally prohibited you and Officer
14  Spalding from earning overtime.  Is that your
15  impression?
16    A.  Yes.
17    Q.  What's the basis for that allegation?
18    A.  We could no longer participate in other
19  Narcotics intelligence as we were doing with
20  Sergeant Padar.
21    Q.  Okay.  So is it your testimony that
22  after Sergeant Padar related to you what
23  Commander O'Grady had allegedly said, you and
24  your partner did not do any more --

Page 48

1    A.  Correct.  It was clear.
2    Q.  Okay.  You and your partner did not do
3  any more working-up or providing intelligence on
4  Narcotics cases?
5    A.  Not -- right.
6    Q.  Okay.  If you'll just take a moment and
7  look at Paragraphs 38, 39 and 40 of the Amended
8  Complaint.  And there are references to a
9  meeting and certain things being said.  I'm just
10  asking if it's your understanding that
11  Paragraphs 38, 39 and 40 refer to a single
12  meeting.
13    A.  Let me read through it.
14    Q.  Sure.
15    A.  Okay.  What's the question?
16    Q.  Is it your understanding that those
17  paragraphs refer to a single meeting?
18    A.  Sure.
19    Q.  Okay.  And --
20    A.  I'm sorry.  Unless they -- unless those
21  Defendants had other meetings.
22    Q.  But you don't know whether they did or
23  not, correct?
24    A.  Right.



DANIEL ECHEVERRIA                                     December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                      49–52

Page 49

1    Q.   Correct?
2    A.   Correct.
3    Q.   Okay.  But there is a reference to a
4  meeting where Defendant O'Grady allegedly said
5  certain things and Chief Roti was allegedly
6  present at the meeting --
7    A.   Yes.
8    Q.   -- and concurred with Defendant
9  O'Grady.  How did you learn about that meeting?
10   A.   Chief Rivera.
11   Q.   Okay.  And you and Officer Spalding
12 were not present at that meeting, correct?
13   A.   No.
14   Q.   Okay.
15   A.   The only meeting we were present is
16 when we had it with Chief Rivera.
17   Q.   Okay.  And do you recall approximately
18 when Chief Rivera told you about this meeting?
19   A.   It had to have been right after it, a
20 day after it.  I'm sure it wasn't a week or two
21 weeks or three weeks after it.  It was probably
22 an immediate time frame.
23   Q.   Okay.  And was that an in-person
24 conversation?

Page 50

1    A.   Yes.
2    Q.   And just you and Officer Spalding and
3  Chief Rivera present?
4    A.   Correct.
5    Q.   What do you recall being said by Chief
6  Rivera or by either of you in the meeting?
7    A.   I want to say that he reiterated,
8  obviously, what Commander O'Grady stated.  He
9  said Nick Roti concurred with them.  I want to
10 say at that point he may have also told us our
11 careers were over.
12   Q.   Was it your understanding that Chief
13 Rivera was also in that meeting?
14   A.   Yes.
15   Q.   Okay.
16   A.   Because he was telling us what had
17 occurred during that meeting.
18   Q.   Do you recall him giving you any
19 context of why there was a meeting where the two
20 of you were discussed or how that came to be?
21   A.   Like I said, we had so many meetings.
22 And, again, I was appalled by him saying our
23 careers were over, the comments that he was
24 saying that O'Grady made, that we were rats.  I

Page 51

1  mean, all of this because we did the right thing
2  and came forward.  I may have zoned out
3  everything that may have been said.  But like I
4  said, those were very firm statements and I
5  never thought I would hear that coming from a
6  chief or a commander.
7    Q.   Okay.  But you don't remember Chief
8  Rivera explaining any sort of context of why
9  there was a meeting where Roti and O'Grady were
10 allegedly discussing you?
11   A.   Give me a second to review it again.
12   Q.   Sure.
13   A.   It's hard to pinpoint it.
14   Q.   Sure.
15   A.   At that time obviously our identities
16 were already compromised and it may have been a
17 meeting due to that.
18   Q.   You don't know the context of that
19 meeting?
20   A.   No.
21   Q.   Okay.  Do you recall --
22   A.   At least I don't recall at this time.
23   Q.   Sure.  Do you recall Chief Rivera
24 telling you anything else that was said in the

Page 52

1  meeting, other than what you've already
2  testified to?
3    A.   The best of my knowledge, not at this
4  time.
5    Q.   Okay.  Paragraph 43 indicates that
6  Defendant Chief Roti would not allow Plaintiffs
7  to work in any unit in the bureau.  What's your
8  basis for that understanding?
9    A.   I believe also Chief Rivera told us
10 that.
11   Q.   Okay.  And did he tell you that Chief
12 Roti had said that in that same meeting that we
13 were just discussing?
14   A.   Possibly, yes.
15   Q.   Okay.
16   A.   See, the thing is Chief Roti controls
17 like 98 percent or 99 percent of the Organized
18 Crime, which would be Vice, Violent Task Force,
19 Gang Intelligence, Narcotics.  And those were --
20   Q.   I understand.
21   A.   Those were all units that we were -- we
22 could have worked.  But because of the
23 compromise in our identity and what they
24 believed us being rats, he hindered that.



DANIEL ECHEVERRIA                                    December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                    53—56

Page 53

1    Q.   That's your belief?
2    A.   Yes.
3    Q.   Okay.
4    A.   I strongly believe so.
5    Q.   Okay.  And in Paragraph 44 it indicates
6    that you and Officer Spalding were informed that
7    none of the bosses wanted to work with you and
8    your careers are over.
9         That was all -- also you're claiming
10   what Chief Rivera told you had been said in that
11   meeting?
12   A.   Yes.
13   Q.   Okay.  Was Rivera giving his personal
14   opinion that, if you know, that your careers
15   were over or was he telling you that that was
16   said in the meeting?
17   A.   He was --
18   Q.   If you know.
19   A.   He was quoting it.
20   Q.   Okay.
21   A.   I don't think it was personal opinion.
22   It could have been both.
23   Q.   Okay.
24   A.   He quoted it because of what happened

Page 54

1    in the meeting, then gave his opinion agreeing
2    to it instead of putting a stop to it, if you
3    ask me.
4    Q.   Okay.
5    A.   He should have put a stop to it right
6    then.  He's chief, too.
7    Q.   Okay.  Let's go back for a minute to
8    the August, 2008 meeting with Chief Skahill --
9    A.   Okay.
10   Q.   -- and other individuals.
11   A.   Sure.
12   Q.   Was there any discussion in that
13   meeting of the subject of possible promotions
14   for you and Officer Spalding?
15   A.   I believe we did discuss what would
16   happen afterwards.
17   Q.   Okay.
18   A.   And there was some options, you know,
19   coming over to stay working IAD I think was one.
20   I had mentioned, you know, we both had taken
21   sergeant and detective exams.  And she said,
22   well, this is a merit -- you know it would be a
23   merit -- I commend you for coming forward and
24   that would not be out of the scope.

Page 55

1    Q.   Okay.  But Chief Skahill didn't promise
2    you that --
3    A.   Nothing was promised.
4    Q.   Nothing was promised you in the way of
5    a promotion, correct?
6    A.   No.
7    Q.   Okay.
8    A.   Nothing was said, like you do this and
9    I'm going to make you this.  It was nothing like
10   that.
11   Q.   Okay.  And, in fact, you understand the
12   way that meritorious promotions are made, you'd
13   have to be recommended for that, the merit board
14   would have to approve it and then ultimately the
15   superintendent would approve the promotion,
16   correct?
17   A.   I have a synopsis of how it works.  I
18   have a good idea, you know, but I can't cite to
19   you --
20   Q.   Sure.
21   A.   -- you know, step by step.
22   Q.   Okay.
23   A.   But that sounds accurate.
24   Q.   Okay, fair enough.

Page 56

1             (Whereupon, Echeverria
2              Deposition Exhibit No. 4 was
3              marked for identification.)
4    BY MR. KING:
5    Q.   Officer Echeverria, I'm showing you
6    another document that's been marked as
7    Deposition Exhibit No. 4.  I'll just ask you to
8    take a look at this document and let me know if
9    you've ever seen it before.  It's a two-page
10   Overtime/Compensatory Time Report.
11   A.   Uh-huh.
12   Q.   Have you seen this before?
13   A.   Yeah, it's a time due slip you get it
14   for overtime or comp time and paid time.
15   Q.   Okay.  And it indicates -- it's signed
16   by you on the first page and by Sergeant Padar,
17   correct?
18   A.   Yes.
19   Q.   Okay.  And do you recall whether this
20   was for some overtime that you worked?
21   A.   It had to be if I'm turning it in for
22   paid overtime worked.
23   Q.   Okay.  And can the sergeant approve
24   overtime or does that also have to be approved



DANIEL ECHEVERRIA                                    December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                  57—60

Page 57

1  by someone above the sergeant?
2      A.  Well, the sergeant is going to call and
3  say, hey, I have such overtime I'm going to do
4  and of course somebody is going to approve it.
5      Q.  Okay.
6      A.  They're going to leave it at the
7  discretion of the sergeant.
8      Q.  Okay.  Was it your understanding to get
9  this process and be paid, does somebody other
10  than the sergeant have to sign it --
11      A.  Yes.
12      Q.  -- if you know?  Who?
13      A.  Yeah.
14      Q.  And who has to sign off on it?
15      A.  The sergeant supervisor.
16      Q.  A lieutenant or a commander?
17      A.  Lieutenant, captain, commander, acting
18  commander, acting lieutenant.
19      Q.  Okay.  As you sit here today with
20  respect to this overtime dated August 4, 2010,
21  do you know one way or the other whether you and
22  Spalding were paid this overtime?
23      A.  I'm sure we did.
24      Q.  Okay.

Page 58

1      A.  I'd be grieving it, if I didn't.
2      Q.  Okay.  If I could turn your attention
3  now to paragraphs -- beginning with Paragraph 45
4  that indicate that Defendant Debra Kirby caused
5  the Plaintiffs to be removed from their detail
6  to Unit 543, Detached Services.
7          What's the basis for the allegation
8  that Defendant Kirby caused you to be removed
9  from Detached Services?
10      A.  Again, Chief Rivera.
11      Q.  Okay.  And was this an in-person
12  meeting that you had with Chief Rivera?
13      A.  It may have started as a phone and then
14  eventually in person or vise versa.  We had many
15  meetings with him in person and we had many
16  conversations with him on the phone.
17      Q.  I understand.
18      A.  I can't pinpoint, I mean.
19      Q.  Okay.  Well, explain to me what the
20  basis is for your allegation that Debra Kirby
21  caused you and your partner to be removed from
22  Detached Services.
23      A.  It was a change in command, I believe,
24  coming.  That's when the interim superintendent

Page 59

1  was there.
2      Q.  And that was Terry Hillard?
3      A.  Hillard, yeah.  I received a phone call
4  from Jill Stevens requesting -- I can't think of
5  the name of the form.
6      Q.  Okay.  And who is Jill Stevens?
7      A.  Jill Stevens was a sergeant in Detached
8  Services who was acting lieutenant at the time.
9  Because Lieutenant Glatz was the lieutenant and
10  acting commander.
11      Q.  Okay.
12      A.  And I believe she was on furlough about
13  that time.  And --
14      Q.  Okay.  And did you have an
15  understanding that Jill was calling for this
16  form?
17      A.  I didn't know what she was calling for
18  until I spoke to her.
19      Q.  Okay, sure.
20      A.  And when she asked me for the form, I
21  didn't know --
22      Q.  Do you recall what you said?
23      A.  -- what it was.  I said -- yeah, I
24  recall.  I spoke to the woman.

Page 60

1      Q.  Sure.
2      A.  She asked me for the form.  Let's just
3  call it the form.
4      Q.  Sure.
5      A.  And I said, well, can I call you back
6  regarding the form.
7      Q.  Sure.
8      A.  I'm unfamiliar with it.
9      Q.  Sure.
10      A.  And she said, yes, do so, please.
11      Q.  Okay.  Was that all you recall in that
12  first conversation?
13      A.  Yes.
14      Q.  Okay.  And then you do call her back?
15      A.  After I speak to Chief Rivera.
16      Q.  Okay.  Tell me about the conversation
17  with Chief Rivera.
18      A.  I called Chief Rivera and I tell him
19  I'm receiving a phone call from Jill Stevens and
20  she's requesting the form and I don't know what
21  she's speaking of.  And he directed me to --
22  what to answer her.
23      Q.  What did he tell you to answer her?
24      A.  He said, tell her it's all been taken



DANIEL ECHEVERRIA                                          December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO               61–64

Page 61

1  care of, the superintendent knows about it,
2  knows what you're doing.  He has full knowledge,
3  he's been briefed.
4      Q.  Okay.
5      A.  And you -- any more questions regarding
6  it, she needs to contact Debra Kirby.
7      Q.  Okay.
8      A.  And at no time are you to tell her that
9  I am the one instructing you to do so or they
10 will know.
11     Q.  Okay.
12     A.  I called her back, I stated verbatim.
13     Q.  Okay.  Let me just ask you this.
14     A.  Okay, go ahead.
15     Q.  Did you -- you understood that at that
16 point that Jill Stevens was calling requesting
17 the information that the superintendent wanted,
18 correct?
19     A.  She never mentioned the superintendent
20 wanted it.
21     Q.  Okay.  Did you have any understanding
22 of what -- of who she was requesting that
23 information for?
24     A.  Not at that time.  During the second

Page 62

1  conversation, yes.
2      Q.  Okay.  So after your conversation with
3  Chief Rivera, you called Jill Stevens back?
4      A.  Right.
5      Q.  And it's a conversation with just the
6  two of you on the phone?
7      A.  Correct.
8      Q.  And what do you recall being said by
9  you or by her in that conversation?
10     A.  I quoted verbatim what Chief Rivera
11 told me to quote.
12     Q.  Okay.
13     A.  And she said, who's telling you to say
14 this?
15     Q.  Okay.
16     A.  I told her, Sergeant, I apologize, I
17 don't want to sound condescending or
18 noncompliant, but I've been ordered not -- I
19 cannot disclose that information.  I've been
20 ordered not to disclose that information.
21     Q.  Okay.
22     A.  And again she asked me.
23     Q.  Okay.
24     A.  And I was apologetic to her, I repeated

Page 63

1  it again.
2          And she said, well, I will tell her,
3  meaning B. Cuello, that you won't give me this,
4  you are being -- you are refusing.  And I said,
5  no, I'm not refusing.  I said, why don't you
6  call Deb Kirby?  That's what I was instructed to
7  tell you.
8      Q.  Okay.
9      A.  And she hung up.  She literally left me
10 with the phone in my ear.
11     Q.  Okay.  And when Jill Stevens indicated
12 what she was going to tell her, it's your
13 understanding she was referring to B. Cuello?
14     A.  Yes.
15     Q.  Okay.  Did she say that or how did you
16 come to that understanding?
17     A.  She told me.
18     Q.  Okay.
19     A.  She said, her.  There's no her up there
20 that's above her.  It's B. Cuello.
21     Q.  Okay.  And do you recall --
22     A.  Or at least she wasn't going to tell
23 Nelly the secretary.
24     Q.  Do you recall what B. Cuello's position

Page 64

1  was at the time?
2      A.  I believe she was deputy superintendent
3  or one of the deputy superintendents.
4      Q.  Okay.  So you -- at least by the time
5  that conversation was over, you had an
6  understanding that the superintendent or at
7  least the deputy superintendent wanted this
8  information, correct?
9      A.  No.  I still understood that B. Cuello
10 was asking for it.
11     Q.  Okay.
12     A.  Based on Jill Stevens' conversation.
13     Q.  Okay.  Sure, right.
14     A.  At no time did she say the
15 superintendent wants it.
16     Q.  Sure.
17     A.  She said, I will tell her.  So I
18 wasn't -- I mean, there hasn't been a female
19 superintendent, to the best of my knowledge.
20     Q.  I got it.
21     A.  Sorry, but I mean, I've got to have
22 humor out of this whole situation sometimes to
23 keep me going.
24     Q.  Fair enough, fair enough.



DANIEL ECHEVERRIA
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

December 02, 2014
65–68

Page 65

1       After that conversation, the second
2   conversation with Jill Stevens, do you then call
3   Chief Rivera back?
4       A.   Yeah.
5       Q.   Okay.  And what do you recall being
6   said by you or by him in that conversation?
7       A.   Zero.  He never picked up the call
8   again.
9       Q.   Okay.  So you never had a follow-up
10  conversation with Chief Rivera?
11      A.   Not at that time.
12      Q.   Okay.  At some point you had a
13  conversation with Chief Rivera about your second
14  conversation with Jill Stevens?
15      A.   Yes.
16      Q.   And was that a telephone conversation?
17      A.   It may have, it may have been even in
18  person, I can't...
19      Q.   Okay.  Do you have any recollection of
20  what was said by you and by Chief Rivera in that
21  conversation?
22      A.   Yeah, I believe -- well, there was
23  other phone calls after that.
24      Q.   About the Jill Stevens second

Page 66

1   conversation?
2       A.   Okay.  I believe I explained -- I told
3   him what had happened.  Whether it was on the
4   phone or in person, I couldn't tell you.
5       Q.   Sure.
6       A.   At that point he said, that's bullshit,
7   Debra Kirby knows exactly what you were doing.
8   She denied knowing you guys or your involvement.
9       Q.   So Chief Rivera told you that Debra
10  Kirby denied knowing you and Officer Spalding --
11      A.   Yeah.
12      Q.   -- to report your involvement with
13  Operation Brass Tax?
14      A.   Yes.  And he also said, B. Cuello knows
15  damn well what you guys have been doing.  Shit,
16  you've been in her unit for X amount of time or
17  whatever he quoted.
18      Q.   Okay.
19      A.   He said, they all know.
20      Q.   So your allegation in Paragraph 45 of
21  the Amended Complaint that Debra Kirby caused
22  you and Officer Spalding to be removed from Unit
23  543, that's based on what Chief Rivera told you,
24  correct?

Page 67

1       A.   Yeah, he -- correct.  He also told us
2   that there was a meeting.  That may have been
3   the meeting with Roti and O'Grady again being
4   present.  B. Cuello was present.  I believe he
5   also quoted that.  He stated that after the
6   meeting --
7       Q.   Let me just stop you for one second.
8   What you're testifying to now, are you saying
9   that Chief Rivera told you about this in that
10  conversation where you discussed your second
11  phone call with Jill Stevens?
12      A.   No, yeah.  Yes, yeah.
13      Q.   Okay.  Go ahead.
14      A.   Whether this was on the phone or in
15  person, he said there was a meeting again.
16      Q.   Sure, right.
17      A.   I guess these people have a lot of
18  meetings about us.  And Deb Kirby had approached
19  him and said, you know, I know who they are, but
20  I didn't recall at the time or something along
21  to that effect.
22      Q.   Okay.
23      A.   But I can't -- there's no backpedaling
24  now for me.  They're going to have to just take

Page 68

1   the hit on this.  Something to that effect.
2       Q.   Okay.
3       A.   I can't backpedal at this time, it's
4   too late.
5       Q.   When Chief Rivera was telling you about
6   this meeting, was it your understanding that he
7   was -- had been in that meeting?
8       A.   Yes.
9       Q.   Okay.  Did he tell you who else was in
10  that meeting?
11      A.   I want to say that's when he said
12  B. Cuello was there and he had mentioned that
13  why would she be asking for that damn form,
14  you've been already in her unit for X amount of
15  time, something to that effect.  You know, he
16  said it was all bullshit.
17      Q.   Other than him --
18      A.   And I quote that.  That's what he said.
19      Q.   Okay.  Other than him -- strike that.
20      Other than your belief that Rivera was
21  in the meeting and Rivera telling you that
22  B. Cuello was in the meeting, did Rivera tell
23  you anyone else that was in that meeting?
24      A.   To the best of my knowledge, maybe



DANIEL ECHEVERRIA                                    December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                    69–72

Page 69

1  even -- like I said --
2     Q.  If you know, if you recall.
3     A.  I want to say he even said Roti was in
4  there.
5     Q.  You think he may have said Roti was in
6  there?
7     A.  Yeah.
8     Q.  Do you think he said O'Grady was in
9  that meeting?
10    A.  Yeah.  I believe so, too.
11    Q.  Okay.  When you spoke with Chief Rivera
12  about your second conversation -- actually,
13  either your first or second conversation with
14  Jill Stevens, do you remember telling Chief
15  Rivera that the conversation with Jill Stevens
16  didn't go well?
17    A.  Yeah.
18    Q.  Okay.  Was that after your second
19  conversation with her?
20    A.  Yeah.  Because I wasn't able to contact
21  him.
22    Q.  Right, okay.
23    A.  And I don't know why.  I mean, it was
24  like short time gaps.  It wasn't like I waited a

Page 70

1  day to call the man, it was moments.  You know,
2  hang up -- she hangs up on me, you know.  I was
3  like, what?  I dialed Rivera and he didn't pick
4  up.
5     Q.  Okay.
6     A.  And then certain other events happened
7  and that's when I had a conversation with him
8  later on.
9     Q.  Okay.  And you were discussing a
10  meeting that Chief Rivera told you about.  Other
11  than what you've already testified to, do you
12  recall anything else Chief Rivera told you about
13  that meeting?
14    A.  Yeah.
15    Q.  What else?
16    A.  He said that Roti didn't want us back
17  in Narcotics, he also said O'Grady spoke about
18  us being rats and things to that effect.  He
19  said B. Cuello said she didn't know what we were
20  doing in her unit.  And then he said that he had
21  briefed Cuello and she was very well aware and
22  he doesn't know why Jill Stevens even needed to
23  make that phone call.
24    Q.  Okay.  Do you remember Chief Rivera

Page 71

1  telling you anything else about that meeting?
2     A.  And then what I said about Kirby.
3     Q.  Okay.  And did you learn at some point
4  after that conversation that you and Officer
5  Spalding were going to be sent back to patrol?
6     A.  Yes.
7     Q.  How did you come to learn that?
8     A.  I received a phone call from Deputy
9  Superintendent James Jackson or Jimmy Jackson.
10    Q.  Okay.  And was that just you and Jimmy
11  Jackson on the phone?
12    A.  Yeah.  I spoke to him on the phone.
13    Q.  Okay.  And what did he say to you in
14  that conversation?
15    A.  He was very direct.  He said, effective
16  0700 or 0800 hours tomorrow, and he stated the
17  date, which I don't recall --
18    Q.  Right.
19    A.  -- you are no longer assigned to the
20  FBI.  You will report to Beatrice Cuello, Deputy
21  Cuello in Unit 543 in uniform.
22    Q.  Okay.
23    A.  And I tried to ask him something and he
24  just repeated it.  I tried to ask him again, he

Page 72

1  wasn't hearing it.
2     Q.  Okay.  Do you recall what you tried to
3  ask?
4     A.  What happened?
5     Q.  Yeah.
6     A.  Why, you know.
7     Q.  Sure.
8     A.  Any question that you, me, her, him
9  would ask.
10    Q.  Sure.
11    A.  You know, you want to know why you're
12  getting that phone call.
13    Q.  Okay.  And he didn't tell you why?
14    A.  He wasn't hearing it.  He just repeated
15  it.
16    Q.  Okay.
17    A.  I'd be in the middle of asking, I'd
18  say, but, boss.  Effective, and he would repeat
19  it.
20    Q.  Right, right.  So he didn't tell you
21  why this move was being made, correct?
22    A.  Correct.
23    Q.  And when he indicated that you were to
24  report to B. Cuello, was it your understanding



DANIEL ECHEVERRIA                                    December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                    73–76

Page 73

1  that you were then going to be reassigned to a
2  district?
3      A.  No.
4      Q.  Okay.  Did you have an understanding of
5  why were reporting to B. Cuello?
6      A.  No.
7      Q.  Okay.  And did you, in fact, report to
8  B. Cuello the following day?
9      A.  I never got the chance to.
10     Q.  Okay.  And what happened after that
11  that led you to not reporting to B. Cuello?
12     A.  I was en route to headquarters to Unit
13  543.
14     Q.  Yes.
15     A.  I got a phone call from the secretary
16  Veronica Castillo.
17     Q.  Okay.  And what did Ms. Castillo tell
18  you?
19     A.  She said, hey, Danny, where are you,
20  are you coming down here.  I said, I'm on my way
21  down.  She said, well, she wants you, the boss
22  wants you to go to training.
23     Q.  Okay.
24     A.  A one-day training at the academy.  Are

Page 74

1  you in uniform?  I said, yes.  She goes, yeah,
2  do that.  She wants you to do that.
3      Q.  Okay.  And by she, she was referring to
4  B. Cuello?
5      A.  Yes.
6      Q.  Okay.  Veronica Castillo was a
7  secretary in B. Cuello's office?
8      A.  She was one of the secretaries up
9  there.
10     Q.  Okay.  And do you recall her saying
11  anything else in that conversation?
12     A.  That was it.
13     Q.  Okay.  Do you recall anything you said?
14     A.  I said, okay.  I acknowledged her.
15     Q.  Okay.  And it's your recollection that
16  she said a one-day training?
17     A.  Yeah.
18     Q.  Okay.  And so you were then to report
19  to the police academy, correct?
20     A.  Yes.
21     Q.  Okay.  And at that point, did you have
22  any understanding that you were asked to report
23  to the police academy as part of the process of
24  sending you back to patrol?

Page 75

1      A.  No.
2      Q.  Okay.
3      A.  That came later.
4      Q.  Okay.  Explain that.  At some point you
5  became of the understanding that you were
6  detailed to the police academy as part of the
7  process of being sent back to patrol?
8      A.  Yeah.
9      Q.  How did you come about that knowledge?
10     A.  Well, when we got to the academy, at
11  that point I met up with my partner, Shannon
12  Spalding.  We were entering the building and
13  there's a duty desk, what they call where if you
14  don't know where you're going --
15     Q.  Sure.
16     A.  -- with different trainings and things
17  going on, you stop and you ask there.  And we
18  asked for where is this one-day training.  And
19  they asked, where are you coming from.
20     Q.  Sure.
21     A.  And then we were approached by a
22  Lieutenant Pigott.
23     Q.  Okay.  And did Lieutenant Pigott say
24  anything to you?

Page 76

1      A.  He said, you're not here for no one-day
2  training, you're here to be retreaded, you're
3  here to -- you're going back to patrol.  He
4  pointed at my partner.  He said, are you Officer
5  Spalding?  She acknowledged.  He said, you're
6  going to 3 midnights and you're going to fucking
7  15 midnights.
8      Q.  Okay.
9      A.  And at that point, we were -- it was
10  like we were hit by a brick.
11     Q.  Okay.
12     A.  The man was rude, the man needs some
13  personal -- he needs some social skills, if you
14  ask me, some training.
15     Q.  And do you remember him saying anything
16  else other than what you testified to?
17     A.  And then I told him, what do you mean?
18  He goes, don't pretend you don't know what this
19  is about, you know exactly what you did.
20     Q.  Okay.
21     A.  And at that point I got on the phone,
22  attempted to call Chief Rivera.
23     Q.  Did you reach Chief Rivera?
24     A.  Yeah.  I was in the middle of a



DANIEL ECHEVERRIA
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

December 02, 2014
77—80

Page 77

1 conversation with him. I don't know if he -- it
2 seemed to me like he wasn't aware of what was
3 going on.
4     Q.   Okay.
5     A.   I told him where we were at. Pigott
6 ordered me to get off the phone.
7     Q.   Okay.
8     A.   He said, you don't take no breaks here,
9 you're not going to be walking out when you
10 feel, you're not going to do what you please.
11     Q.   So you had walked outside of the
12 building to use the phone?
13     A.   I walked into the vestibule and he
14 followed me in there.
15     Q.   Okay.
16     A.   And then he said, and you don't use
17 your phones here like you want to. And I said,
18 well, there's somebody here that wants to speak
19 to you and I handed the phone to Lieutenant
20 Pigott.
21     Q.   Okay.
22     A.   And then they had a conversation, which
23 I don't know what was said between the two.
24     Q.   Okay. And after Chief Rivera spoke

Page 78

1 with Lieutenant Pigott, did you take the phone
2 back and speak again with Chief Rivera?
3     A.   Yes. And he said, let me look into
4 what's going on.
5     Q.   Okay.
6     A.   I don't know what exactly has been
7 done, but, you know, I expect to hear from you
8 later in the day or something along that effect,
9 or meet me later in the day or something to that
10 effect.
11     Q.   Okay. And obviously based on what
12 Lieutenant Pigott said, you then understood you
13 were at the academy to be retrained as part of a
14 process to be sent back to patrol, at least at
15 that time, correct?
16     A.   That process was unheard of to me.
17 I'm unfamiliar with that -- people who get
18 retread is usually when people were like away
19 from the job, military, extended medical or
20 something.
21     Q.   Okay.
22     A.   But not in our situation or under our
23 circumstances.
24     Q.   Okay.

Page 79

1     A.   Because we were still active in the
2 field.
3     Q.   But he indicated that you were being
4 retreaded and then you and your partner were
5 going to be sent back to districts, correct?
6     A.   Yes. I mean, he was firm about that.
7     Q.   Okay. And, in fact, you and your
8 partner never were sent back to patrol, correct?
9     A.   Correct.
10     Q.   And do you have any knowledge of what
11 happened or who intervened to cause that not to
12 happen?
13     A.   I want to say at that time, the academy
14 fell under Chief Skahill.
15     Q.   Okay.
16     A.   And I believe she intervened.
17     Q.   Okay. Did Chief Skahill or anyone else
18 tell you that or that's your assumption?
19     A.   I want to say she may have said
20 something to us. I can't give you the exact
21 detail of the conversation.
22     Q.   Okay.
23     A.   You know, it was a very difficult time.
24     Q.   Okay.

Page 80

1     A.   And a lot of stress and, I mean like I
2 said, it was a sudden interruption of --
3     Q.   Okay.
4     A.   It was just a situation that shouldn't
5 have happened.
6     Q.   Okay. And you don't know, do you,
7 whether Deb Kirby had any role in preventing you
8 guys from being sent back to patrol, do you?
9     A.   Other than the fact that she told
10 Rivera and Rivera told us that she denied
11 knowing us and that she wasn't going to
12 backpedal at that point, we were just going to
13 have to be the fall guys or the hit, take the
14 hit on it, comments to that effect.
15     Q.   Other than that testimony, you don't
16 know, do you, whether Deb Kirby was involved in
17 stopping you guys from being sent back to
18 patrol?
19     A.   Other than that, I can't tell you.
20     Q.   Okay. And you also don't know whether
21 Chief Rivera was involved in stopping you guys
22 from being sent back to patrol, meaning you and
23 Officer Spalding?
24     A.   Stopping us from going back? We



DANIEL ECHEVERRIA                                          December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                       81–84

Page 81

1  eventually went to work under him.
2      Q.  Okay.
3      A.  We went to Skahill and then again the
4  shifting in command again.
5      Q.  Okay.
6      A.  And then eventually the Unit 126, which
7  was the Audit Inspection Division fell under
8  Rivera.
9      Q.  Okay.  And I asked some bad questions.
10  Let me ask it this way.
11     A.  All right.
12     Q.  At a certain point in time after you
13  talked to Pigott, you were under the impression,
14  you and Officer Spalding, that you were going to
15  be sent back to patrol in a district, that never
16  happened.  Instead, you were then detailed to
17  Unit 126 Inspections, correct?
18     A.  Inspections slash Audit, correct.
19     Q.  Okay.  Do you have any knowledge as to
20  who was responsible for the decision to send you
21  to Inspections instead of back to patrol?
22     A.  I would say -- if I had to say it, I
23  would say it was Tina Skahill because
24  Inspections fell under her.

Page 82

1      Q.  Okay.
2      A.  So it would have to be her.
3      Q.  Okay.  But you don't know as you sit
4  here whether --
5      A.  Yeah, I would say yes.  Because there
6  was a conversation I had with Tina Skahill later
7  on after we were in Inspections.
8      Q.  Yes.
9      A.  And she said, we don't do that to our
10  people.  Not after what you and your partner did
11  coming forward, we don't do that to our people.
12  We don't throw our people back there like that.
13  It's a safety concern for you guys.
14     Q.  Okay.
15     A.  So I would say Tina Skahill.
16     Q.  Okay.  And you don't have any personal
17  knowledge of whether Deb Kirby agreed with Tina
18  Skahill to transfer you to 126?
19     A.  No.
20     Q.  Okay.  And do you have any personal
21  knowledge of whether Juan Rivera agreed with
22  Tina Skahill that you should go to 126?
23     A.  No.
24     Q.  Okay.  If I could direct your attention

Page 83

1  to Paragraph 50 on the Amended Complaint.  It
2  indicates that because Plaintiffs had been
3  labeled rats, they lost their specialized
4  assignments, weekends and holidays off,
5  take-home vehicle and the ability to work
6  unlimited overtime.
7      What do you mean by -- what's the basis
8  for the allegation in Paragraph 50?
9      A.  Well, we're still assigned to -- even
10  to this day, we're still assigned to Narcotics.
11  But I believe we're not welcome there still to
12  this day.
13     So that would not make it a -- an elite
14  unit, Narcotics was considered an elite unit.
15  They had take-home cars there.  You had
16  weekdays, weekends off.
17     Q.  Okay.
18     A.  Or you also had different days off.
19  Some people had weekends, some people had
20  Friday, Saturday, Sunday, Monday, whatever,
21  holidays off.  Like I said take-home vehicles.
22     Q.  Okay.
23     A.  Search warrants enabled you to get
24  overtime.

Page 84

1      Q.  Okay.
2      A.  Depending on the search warrant itself.
3      Q.  But you weren't allowed to work
4  unlimited overtime?
5      A.  No, no.
6      Q.  Okay.
7      A.  So that's what I mean by that.
8      Q.  Okay.  So Paragraph 50 you're talking
9  about the difference of being in Narcotics and
10  not being in Narcotics?
11     A.  I'm talking about in being Narcotics
12  and not allowed to be doing that, having the
13  benefit of that.
14     Q.  Okay.
15     A.  Because I'm still in Narcotics
16  assigned.
17     Q.  Okay.  How long were you told to report
18  I guess to the police academy, do you recall?
19     A.  It wasn't a day, I'll tell you that.
20     Q.  Okay.
21     A.  I couldn't tell you.  It was an
22  extended time.  To kind of give you a time
23  frame, we were even there when the Mayor's
24  detail -- when the Mayor switched over and Rahm



DANIEL ECHEVERRIA
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

December 02, 2014
85—88

Page 85

1  Emanuel became Mayer. He brought in, I guess,
2  his personnel or selected personnel to be part
3  of his detail and the officers that were there
4  for Daley, they got also --
5      Q.  Okay.
6      A.  So that kind of gives you a time frame
7  of when those chain of events or how long we
8  stayed there. Because we stayed there after
9  that, too.
10     Q.  Okay. So you were at the police
11 academy, Chief Rivera had told you essentially
12 let me work on this, and then you learned that
13 you're going to be detailed to Inspections,
14 correct?
15     A.  Correct.
16     Q.  Okay. And my understanding, you were
17 at the police academy maybe a couple of weeks.
18 Does that sound --
19     A.  It seemed longer than that.
20     Q.  Yeah.
21     A.  But I couldn't tell you.
22     Q.  You don't know for sure?
23     A.  It felt like an elephant pregnancy, if
24 you ask me. We were there for years.

Page 86

1      Q.  That's fine.
2      A.  I apologize.
3      Q.  No. That's --
4      A.  It's just sometimes you've got to look
5  at things with -- I mean, it's helped me move --
6      Q.  It's your case.
7      A.  It helps me move forward with this. I
8  don't feel I should be sitting here to begin
9  with with all this nonsense, just because I did
10 the right thing with my partner.
11     Q.  Okay. During the days that you were I
12 guess detailed to the police academy, do you
13 recall what you and Officer Spalding did or were
14 asked to do?
15     A.  We often sat there doing nothing. We
16 sat there with recruits, we sat there with --
17 sometimes the same class repetitively, sometimes
18 people wouldn't even show up, instructors and
19 we'd just sit there.
20     Q.  So you sat through some training
21 classes, correct?
22     A.  Very few.
23     Q.  Okay.
24     A.  What they would -- sure. Say that, if

Page 87

1  you want.
2      Q.  Okay. And --
3      A.  It was humiliating, if you ask me.
4      Q.  Okay. And were you asked at some point
5  to also teach some sort of training at the
6  police academy?
7      A.  At one time we went there. We were
8  there at the academy, then we were with Tina
9  Skahill. Then we thought we were going back to
10 training at the academy and I guess it wasn't
11 training, but it was some in-car camera
12 assistance or something like that.
13     Q.  Okay.
14     A.  And it was --
15     Q.  Were you asked to take some training or
16 conduct some training on the in-car cameras?
17     A.  I was under the impression that it was
18 to take in-car camera training.
19     Q.  Okay.
20     A.  And it wasn't, I guess.
21     Q.  Okay.
22     A.  Once we got there, it was something
23 different.
24     Q.  What was it once you got there?

Page 88

1      A.  Once I got there, I guess it was to
2  help instruct in-car training.
3      Q.  Okay.
4      A.  But I thought it was --
5      Q.  Okay. Did you have any knowledge of
6  whose decision it was to ask you to help
7  instruct in-car training?
8      A.  Off the top of my head, I -- since the
9  academy fell under Tina Skahill --
10     Q.  Yes.
11     A.  -- I would say it would be safe to say
12 Tina Skahill.
13     Q.  Okay.
14     A.  I mean, if this -- does that answer?
15     Q.  Sure.
16     A.  Okay.
17     Q.  Do you recall at some point earlier
18 when you were reporting to the FBI and after the
19 August, 2008 meeting so --
20     A.  Okay.
21     Q.  -- people in the City, some people are
22 aware that you're working with Brass Tax, you're
23 reporting to the FBI. Do you remember at some
24 point being told by the FBI that they no longer



DANIEL ECHEVERRIA                                December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                89–92

Page 89

1  wanted you and Officer Spalding reporting
2  there?
3      A.  You know, there was a time where the
4  investigation did go idle but Watts had suffered
5  some injury or something, so the investigation
6  went idle.  And then there was some stuff with
7  the agent where at that time that went idle, as
8  well, and then we started reporting directly for
9  Chief Rivera.
10     Q.  Okay.  Do you remember a situation
11  where you and your partner had been accused of
12  either stealing or losing --
13     A.  I think I'd be locked up if I was
14  accused of stealing a federal something,
15  anything.  I don't think I'd be sitting here.
16     Q.  Do you recall a point in time where you
17  or your partner had been accused of either
18  stealing or losing some piece of equipment and
19  as a result you were told, don't report any more
20  to the FBI?
21     A.  I remember an incident with the agent
22  where he asked for a recording device --
23     Q.  Yes.
24     A.  -- to be returned.  The recording

Page 90

1  device was in the vehicle and he had surplused
2  the vehicle.  So at that point the vehicle was
3  being swapped out or had been swapped out
4  already and he was disturbed because of that,
5  and maybe that led to his anger.
6      Q.  Okay.
7      A.  But I guess the equipment he borrowed
8  and didn't necessarily assign it out, was my
9  understanding, and that's why the guy was kind
10  of hot.
11     Q.  Okay.  So you do recall Agent Patrick
12  Smith getting angry about this device issue and
13  he told you all that he didn't want you
14  reporting to the FBI any more, correct?
15     A.  He said -- I don't know exact words.  I
16  mean, it was kind of like an awkward moment.
17  But at that point we did go straight to Chief
18  Rivera and started reporting to him and
19  continued the investigation through him.
20     Q.  And you understand that the FBI did not
21  want you reporting directly to them any more,
22  correct?
23     A.  Sure, I guess you can say that if you
24  want.  It went idle.  But we were recontacted by

Page 91

1  them.
2      Q.  Okay.
3      A.  So I wouldn't -- I don't know how you
4  want to take it.
5      Q.  Sometime later you were recontacted?
6      A.  Yeah.  If you want to take it as no or
7  idle or however you want to interpret it.  My
8  interpretation is they contacted us again, so I
9  would say no.
10     Q.  When they contacted you again to -- did
11  they ask you to start reporting directly to the
12  FBI building again?
13     A.  Yes.  We would report -- we would go
14  through -- at that point we were in 126.
15     Q.  Yes.
16     A.  And from my understanding, we were
17  supposed to be on the sheets for 126 --
18     Q.  Yes.
19     A.  -- to do Brass Tax.  Almost like the
20  543 situation but through 126.  And then report
21  to them as the investigation started to move
22  forward again.
23     Q.  Sure, okay.  And when they, as you say,
24  kind of called you back to the investigation,

Page 92

1  had the investigator changed?  It was no longer
2  Patrick Smith?
3      A.  Yes.
4      Q.  Okay.
5      A.  Do you want to know the agent's name?
6      Q.  Sure.
7      A.  It's Craig Henderson.
8      Q.  Thanks.
9      A.  That was the final agent that --
10     Q.  Okay.
11     A.  I think there was another one, but --
12  it changed two or three times, but this was the
13  last guy.
14     Q.  Okay.
15     A.  And at that point we were also
16  reporting to -- it wasn't to Tom Chester
17  anymore.  Al Bohmer, Sergeant Al Bohmer.
18     Q.  Okay.  At the time of the August, 2008
19  meeting with Chief Skahill and others that you
20  testified to, do you recall who your sergeant in
21  Narcotics was at that point?
22     A.  Say that again?
23     Q.  At the time of the August, 2008 meeting
24  with Chief Skahill and the others --



DANIEL ECHEVERRIA
December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO
93—96

Page 93

1    A.   The initial meeting?
2    Q.   Yes, that you testified to earlier.
3    A.   Tom Chester.  Oh, Narcotics?
4    Q.   Yes.  Who was your sergeant in
5    Narcotics at that point in time?
6    A.   Roderick Watson.
7    Q.   Okay.  And do you recall who the
8    lieutenant was above him?
9    A.   It may have still been Cervanka.
10   Q.   Okay.  And, again, prior to that
11   meeting, the August, 2008 meeting, do you have
12   any knowledge of whether or not Lieutenant
13   Cervanka knew that you were spending some of
14   your time working on this Watts investigation
15   with the FBI?
16   A.   Yeah, because it was my personal time.
17   Q.   I understand.  Even assuming it was
18   your personal time, do you have any knowledge of
19   Lieutenant Cervanka being aware of that?
20   A.   No.
21   Q.   Okay.  So you then get -- you and
22   Officer Spalding get reassigned to Inspections
23   Unit 126.  Our records indicate that that was
24   effective May 22, 2011.  Any reason to believe

Page 94

1    that is not correct?
2    A.   I mean, unless I see a document to say
3    that's the exact date --
4    Q.   Sure.
5    A.   -- I can't tell you what date it was.
6    I mean, it wasn't in the winter.  I can tell you
7    it was somewhat warm or spring-like or
8    something.
9    Q.   Okay.  As far as you know, May, 2011?
10   A.   Sure, if you want to say that.
11   Q.   Okay.  And then directing your
12   attention to Paragraph 56 of the Complaint.  In
13   the following paragraphs it indicates that
14   throughout the time that you were detailed to
15   126, that you were subjected to some harassment
16   and hostility by Lieutenant Pascua, correct?
17   A.   Yes.
18   Q.   Okay.  Now, am I correct that part of
19   the time that you were in Inspections, you were
20   under or reporting to Lieutenant Pascua and at a
21   certain point that changed to Lieutenant
22   Sadowski, correct?
23   A.   Yes.
24   Q.   Okay.  Do you recall how long your

Page 95

1    time there that you were under Lieutenant
2    Pascua?
3    A.   Too long.
4    Q.   Okay.  Any recollection of how long?
5    A.   Since day one, I don't -- the first day
6    there, we reported to her.
7    Q.   Right.  Do you remember when it changed
8    that you started reporting to Lieutenant
9    Sadowski?
10   A.   It changed after we voiced our opinion
11   about Lieutenant Pascua.
12   Q.   Okay.
13   A.   But I can't tell you if it was a month
14   or two months.
15   Q.   That's fine.  Paragraph 57 says,
16   Defendant Lieutenant Pascua called Plaintiffs
17   rat motherfuckers and told them that she did not
18   want them in the unit.
19        What's the basis for that allegation?
20   A.   It came out of her mouth.
21   Q.   Okay.  You heard that come out of her
22   mouth?
23   A.   Yeah.
24   Q.   Okay.  And approximately how soon after

Page 96

1    you started at Inspections did that happen?
2    A.   Immediately.  You know, I don't want to
3    say it happened the next day.
4    Q.   Sure.
5    A.   But as time went on, she started
6    voicing some of her opinions.
7    Q.   And where were you when you heard her
8    out of her mouth say --
9    A.   In the office.
10   Q.   Okay.  Do you recall who else was
11   present?
12   A.   At times she would say it in front of
13   other personnel up there, other lieutenants, her
14   sergeant.
15   Q.   You said you heard it yourself?
16   A.   Yes, I did.
17   Q.   Okay.  Do you recall on the occasion
18   when you heard it yourself, who, if anyone, else
19   was present?
20   A.   Her sergeant.
21   Q.   And who was that?
22   A.   Janice Barney.
23   Q.   Okay.  Was anyone else present?
24   A.   I mean, it's an office, there's people



DANIEL ECHEVERRIA                                          December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                      97–100

Page 97

1   present.  On the other side of the cubical, in
2   front of the cubical, in front of me.  I mean,
3   everything is within earshot.  So if they want
4   to say they heard it, I'm sure they did; if they
5   want to deny they heard it, they're going to
6   deny it.  But I know it came out of her mouth.
7      Q.   Okay.  And was Officer Spalding also
8   present?
9      A.   Sure.
10     Q.   Okay.
11     A.   She was a present during a lot of her
12  comments.  Some of her comments were made
13  directly to her, some of the comments were made
14  directly to me.
15     Q.   Okay.
16     A.   A lot of her comments were made to both
17  of us.
18     Q.   Okay.  We're going to talk about all of
19  them.
20     A.   Okay, good.
21     Q.   So --
22     A.   She would spread the word, too.
23     Q.   Okay.  So Paragraph 57 you've just been
24  testifying about hearing her from her mouth

Page 98

1   refer to you I guess and Officer Spalding as rat
2   motherfuckers.  Other than that occasion, did
3   you ever hear her refer to you as rat
4   motherfuckers?
5      A.   That occasion.  I mean, there were many
6   occasions she would have out loud within
7   earshot.  She would make comments that she's a
8   lawyer, she knows how to put a case together.
9   She would say, rat motherfuckers from
10  Narcotics --
11     Q.   Okay.
12     A.   -- we don't need them up here.  We
13  don't need nobody watching us.  I mean, many
14  comments.
15     Q.   Okay.
16     A.   Many incidents.
17     Q.   Okay.
18     A.   She even followed us in the parking
19  lot -- or followed me in the parking lot.
20     Q.   Okay.
21     A.   I mean, I don't know why she was doing
22  it, but I double backed her and I caught her
23  following me.
24     Q.   Okay.  Did you say anything to her

Page 99

1   about it?
2      A.   I looked at her and she looked at me
3   like she was surprised I caught her and she
4   turned around and walked away.
5      Q.   Okay.
6      A.   I mean, I worked surveillance in
7   Narcotics, so I would know if somebody is
8   following me.  And I know that she was following
9   me and I double backed her and I caught her
10  following me.
11     Q.   During this period of time that you're
12  talking about, you were both -- you and Officer
13  Spalding were both doing work in the Inspections
14  unit and also spending some of your time on the
15  Watts investigation, correct?
16     A.   Correct.
17     Q.   Okay.  And what kind of
18  responsibilities did you have in the Inspection
19  unit?
20     A.   Nothing.
21     Q.   Okay.
22     A.   I think we got a whole three
23  assignments or four assignments the whole time
24  we were there.

Page 100

1      Q.   Okay.  And do you recall what those
2   assignments consisted of?
3      A.   Some light data entry.
4      Q.   Okay.
5      A.   I mean, light.
6      Q.   Okay.
7      A.   There was a time I think they were
8   auditing some equipment when -- I don't know if
9   it was the TRU Unit or something got dismantled
10  or something along those lines.
11     Q.   Okay.
12     A.   Some fire drills.
13     Q.   Okay.
14     A.   And then a lot of times chauff -- for
15  being her chauffeur or for her personal
16  business.
17     Q.   Okay.  Now, on days that you either
18  came into the office in Inspections but then
19  went out to work on Operation Brass Tax or you
20  just went directly out to work on Operation
21  Brass Tax, were you supposed to inform
22  Lieutenant Pascua, we won't be in today, we're
23  doing something else?
24     A.   We would do so.



DANIEL ECHEVERRIA                                          December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                       101–104

Page 101

1    Q.  You were supposed to and your testimony
2  is you would do so?
3    A.  Yes.
4    Q.  Okay.
5    A.  Whether it was her or Sadowski.
6    Q.  Okay.
7    A.  When the change in lieutenants came,
8  there was times he would -- she was informed,
9  Pascua, and there was times where the lieutenant
10  was informed.
11   Q.  Let's just talk about the period with
12  Lieutenant Pascua.
13   A.  Okay.
14   Q.  Is it your testimony that you always
15  did that without fail?
16   A.  Without fail.
17   Q.  Without fail, okay.
18       And what would you tell Lieutenant
19  Pascua or Lieutenant Sadowski you were doing
20  when you weren't coming in?
21   A.  At that point, they knew we were doing
22  something with the FBI, so we would say we're
23  going to report to Sergeant Bohmer --
24   Q.  Okay.

Page 102

1    A.  -- and we would go to 2111 Roosevelt.
2    Q.  And what's your understanding of how
3  Lieutenant Pascua learned that you were doing
4  something with the FBI at that time?
5    A.  Well, when we started doing Brass Tax,
6  then she -- she would -- she knew.  But I think
7  she knew prior to that what we were doing.  Who
8  made her aware of it, I can't tell you.
9    Q.  When you were --
10   A.  Because I don't know.
11   Q.  Okay.  When you were transferred over
12  to the Inspection Division or any time after
13  that, did you or Officer Spalding tell
14  Lieutenant Pascua that you were working on
15  Operation Brass Tax?
16   A.  No.
17   Q.  Did you or Officer Spalding tell
18  Lieutenant Pascua that you were working on a
19  confidential investigation with the FBI?
20   A.  Not until Brass Tax, we needed to go
21  to, then we would say, we're going to report to
22  Al Bohmer.
23   Q.  Okay.
24   A.  We're going to report to the FBI

Page 103

1  building.
2    Q.  Okay.
3    A.  I mean, we have to give her specifics.
4    Q.  Sure.
5    A.  I mean, we wouldn't tell her what it
6  involved, who it involved or --
7    Q.  Sure.
8    A.  But we told her where we would be and
9  who we were reporting to.
10   Q.  Okay.
11   A.  And I'm sure Sergeant Bohmer had
12  conversations with that unit, as well.
13   Q.  Okay.
14   A.  And maybe even Tom Chester.
15   Q.  Okay.
16   A.  Do you want to know what my first day
17  was like there?
18   Q.  Your first day in --
19   A.  In Inspections?
20   Q.  -- the Inspections?
21   A.  Yeah.
22   Q.  No, I don't want to know what your
23  first day was like there.
24   A.  Okay.

Page 104

1    Q.  But I'm sure you'll find a way to tell
2  me.
3    A.  Do you want to know?  I mean --
4    Q.  No.  Let me ask you this.
5    A.  Okay.
6    Q.  You testified about one incident where
7  you personally heard in earshot Lieutenant
8  Pascua referring to you as rat motherfuckers.
9  With respect to similar comments, rats, et
10  cetera --
11   A.  Yes.
12   Q.  -- did you personally hear Lieutenant
13  Pascua saying that on any other occasion?
14   A.  Yeah, many occasions.
15   Q.  On many occasions?
16   A.  Yeah.
17   Q.  Okay.
18   A.  She would say that as she would walk by
19  my cubical.
20   Q.  Okay.
21   A.  I mean, we were the only two up there
22  from Narcotics, so why say it.
23   Q.  Okay.
24   A.  Unless she had Tourette's or something.



DANIEL ECHEVERRIA                                December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO              105–108

Page 105

1    Q.   Okay.
2    A.   That woman was something.
3    Q.   And you said it didn't happen right
4  away?
5    A.   No.
6    Q.   About how long do you think you were
7  there before her first --
8    A.   Outburst.
9    Q.   -- outburst, as you refer to it?
10  Referencing you being rats or doing work with
11  the FBI.
12   A.   It didn't take much time.
13   Q.   Okay.
14   A.   A couple weeks, a best guess.  I'm
15  guessing.  I mean, I can't tell you a definite,
16  oh, ten days and then it kicked in.
17   Q.   Sure, that's fine.
18   A.   I mean, it was -- and it also became
19  progressive.  It wasn't like subtle, it was --
20  it progressed.
21   Q.   Okay.  Do you have any personal
22  knowledge of James O'Grady telling anyone in
23  Inspections that you and Officer Spalding had
24  worked on Operation Brass Tax?

Page 106

1    A.   I can't say that.
2    Q.   Okay.  So other than -- well, strike
3  that.
4        So it's your testimony then on many
5  occasions Lieutenant Pascua would make reference
6  to you and Officer Spalding as rats or similar
7  comments?
8    A.   Yes.  She wasn't the only one, but she
9  was primarily the one.
10   Q.   Okay.  Was there anyone else in the
11  Inspections Division that made such comments?
12   A.   Yeah, Jan Barney.
13   Q.   And Jan Barney.
14   A.   That was her --
15   Q.   How many times do you recall Jan Barney
16  making such comments?
17   A.   As many times as -- I mean, it was,
18  like as I said, it's many.  I mean, not one, not
19  two, many.
20   Q.   Okay.  So you heard Jan Barney many
21  times --
22   A.   Yes.
23   Q.   -- refer to you and Officer Spalding as
24  rats?

Page 107

1    A.   Yeah, she would say it.
2    Q.   Okay.
3    A.   She would say, we know how some white
4  females get into elite units like Narcotics, you
5  know, they sleep their way in there or they're
6  blond and blue eyes or things to that effect.
7  And I think I responded to her, then maybe she
8  should buy a wig.
9    Q.   Right, okay.  And my question --
10   A.   Because I was getting to a point where
11  I was really fed up with their direct or
12  indirect comments and their innuendos and
13  everything else.  We even met with Adrienne
14  Stanley, who was the commander at that time.
15   Q.   Okay.  You just told me about a
16  conversation where Jan Barney made a reference
17  to white females getting into Narcotics.  My
18  question is did you personally hear Jan Barney
19  refer to you and Officer Spalding as rats?
20   A.   Yeah.
21   Q.   Or rat motherfuckers?
22   A.   She would make comments just as much as
23  Lieutenant Pascua.  They would all have
24  outbursts up there.

Page 108

1    Q.   Okay.
2    A.   They made it no secret that they knew
3  what we were doing or have done or are still
4  doing.  I mean, they never said, I know you're
5  doing Brass Tax, I know you're working on Watts.
6  They never made that comment.
7    Q.   Okay.
8    A.   It would be unfair of me to say so.
9    Q.   Okay.
10   A.   But they knew we were doing IAD.
11   Q.   Okay.  And other than Lieutenant Pascua
12  and Jan Barney, did you ever hear anyone else in
13  the Inspections unit refer to you as rats or rat
14  motherfuckers or similar comments?
15   A.   Prime, the main person there making
16  those comments was Lieutenant Pascua.
17   Q.   Okay.  No one other than Pascua and
18  Barney, correct?
19   A.   Barney was like her right hand.  So if
20  Pascua said jump, she'd say, how high.
21   Q.   No one other than Pascua and Barney,
22  correct?
23   A.   Correct, we can say that.
24   Q.   Okay.  And then at a certain point



DANIEL ECHEVERRIA                                              December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                        109–112

Page 109

1   you --
2       A.  No, let's backtrack.  There was an
3   officer there, George Flores.
4       Q.  Okay.
5       A.  Who also went around the unit.  Not 126
6   as much, but it was like -- I don't know if it
7   was another -- it was a different area on the
8   same floor, I don't know within like 50, 60 feet
9   from where we would sit.  It was also
10  partitioned off.  It was -- I don't know if it
11  was the CAPS unit or Domestic Violence unit
12  where George Flores sat.
13      And he would go around speaking to
14  other employees up there, whether they were
15  civilian or sworn, saying that, you know, we're
16  there to watch them and we're there -- we're
17  from IAD and we're there to build a case on
18  people there.
19      Q.  Okay.  Did you personally hear George
20  Flores saying these things or someone told you?
21      A.  Somebody told us.
22      Q.  Okay.  Do you recall who told you
23  George Flores said such things?
24      A.  I want to say her name was Robinson,

Page 110

1   the last name.
2       Q.  Okay.
3       A.  I can't think of her first name right
4   now.  Aileen, Aileen, something like that.
5       Q.  Do you know what her position was?
6       A.  I think she was a civilian up there.
7       Q.  Okay.
8       A.  And I think she said something to the
9   effect of Flores was -- that she thought we
10  should know what Flores is saying and Flores can
11  say that with certainty because it came from
12  Lieutenant Pascua because they were very close
13  together.
14      Q.  Okay.  And Ms. Robinson worked in the
15  Inspections Division?
16      A.  I want to say it was a different area
17  of the office.
18      Q.  But on the same floor?
19      A.  But on the same floor.  Like I said,
20  within 60 feet or so.
21      Q.  Okay.
22      A.  I want to say it was a Domestic
23  Violence or CAPS type of setting there.
24      Q.  Okay.  And did Ms. Robinson tell you

Page 111

1   this personally?
2       A.  Yeah.  She told my partner and myself.
3       Q.  Okay.
4       A.  Or I was present during it.
5       Q.  Okay.  And in Paragraph 60 of the
6   Complaint, there's an allegation that Lieutenant
7   Pascua said, fuck them from Narcotics, I'm a
8   lawyer, I know how to put a case together, I'm
9   going to work on getting them fucking launched.
10      A.  Yes.
11      Q.  Did you personally hear that, her
12  stating that?
13      A.  Yeah.  It came out of her mouth.
14      Q.  All right.  And that particular
15  reference to being a lawyer and putting a case
16  on you --
17      A.  That's what I testified before.
18      Q.  Okay.
19      A.  Yes.
20      Q.  And that only occurred once, correct?
21      A.  That sentence, yeah.  That statement.
22      Q.  Okay.
23      A.  But, I mean, she'd make comments
24  constantly.

Page 112

1       Q.  Okay.  And then the next paragraph
2   says, on September 13, 2011, you met with
3   Commander Stanley?
4       A.  What paragraph?
5       Q.  61.  I'm sorry.
6       A.  Okay.
7       Q.  And I'm just going to ask you about
8   that meeting --
9       A.  Okay.
10      Q.  -- with Commander Stanley.  Was that
11  you and Officer Spalding and Commander Stanley
12  present?
13      A.  Yes.
14      Q.  Okay.  What do you recall being said by
15  any of the participants in that meeting?
16      A.  Well, I know I addressed my concerns
17  about Pascua's unprofessional conduct, I know my
18  partner, Shannon Spalding, addressed the same
19  comments, the comments that we testified
20  before -- I testified before.
21      Q.  I'm going to need you to tell me as
22  best as you can recall, specifically what you or
23  Officer Spalding said to Commander Stanley.
24      A.  I told her, it's very hostile up there,



DANIEL ECHEVERRIA
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

December 02, 2014
113–116

Page 113

1 we feel unwanted, the comments and I quoted the
2 comments.
3    Q.   Which comments do you recall quoting to
4 her?
5    A.   Fuck them from Narcotics, I'm a case --
6 I'm a manager -- I'm a lawyer, I know how to put
7 a case.  We expressed that she stated that she
8 wants to get us -- she's working on getting us
9 launched, she called us rat motherfuckers.  Just
10 total, you know, unprofessional stuff that you
11 wouldn't expect from --
12    Q.   Sure.  And what do you recall Commander
13 Stanley saying?
14    A.   She said that she don't want to hear
15 it.  In fact, she would interrupt me and my
16 partner when we were in the middle of doing a
17 statement to her.  And she would repeat, I don't
18 want to hear it.  We told her, we want a
19 complaint from this.  And she said, you're not
20 going to get it here.
21    Q.   Okay.
22    A.   She said, if you want a complaint, a
23 CR, if that's what you're asking for, and she
24 pointed like to the area where IAD would be at,

Page 114

1 she said, you get it from them over there.
2    Q.   Okay.
3    A.   You're his people, is what she said.
4    Q.   Okay.
5    A.   At least that's what I recall her
6 saying.
7    Q.   Okay.  Do you remember --
8    A.   I told her, no, you are going to hear
9 it, and I reiterated it.  I'm sure she heard
10 every thing I had to say.
11    Q.   Okay.
12    A.   I mean, I heard what she said, I know
13 she had to hear what I said or at least
14 partially.
15    Q.   Okay.  And do you recall anything else
16 Commander Stanley said in that meeting?
17    A.   She said that she's not -- like I said,
18 she said she's not going to take that -- she
19 won't take the number if we wanted it.  She
20 pointed towards the IAD section.
21    Q.   Okay.
22    A.   She said that she's going to -- I want
23 to say she may go -- she may address it, is what
24 she said.

Page 115

1    Q.   She said she may address it?
2    A.   Yeah.
3    Q.   Okay.  Do you recall her saying
4 anything else?
5    A.   That was it.
6    Q.   Okay.  And following that meeting at
7 some point your reporting assignment was changed
8 from Lieutenant Pascua to Lieutenant Sadowski,
9 correct?
10    A.   Yes.
11    Q.   Do you remember how soon after that
12 meeting that occurred?
13    A.   There was a meeting I think Adrienne
14 Stanley had where -- like a staff meeting.
15    Q.   Okay.
16    A.   And I don't know if they had those
17 regularly or if that was her way of addressing
18 it during a staff meeting.
19    Q.   Sure, sure.
20    A.   But I think that infuriated Pascua even
21 more.
22    Q.   Okay.  And what do you remember
23 Commander Stanley saying in that staff meeting
24 about?

Page 116

1    A.   She emphasized professionalism, she
2 emphasized something abut working together.  But
3 it didn't seem to me that she was being very
4 specific to what I had expressed concerns or
5 what Shannon had -- Officer Spalding had
6 expressed concerns.  It seemed like a very
7 broad, vague statement to me.
8    Q.   Okay.
9    A.   But then --
10    Q.   But she held a staff meeting and she
11 discussed along the lines of people being
12 respectful and working well together; is that
13 fair?
14    A.   Yeah, something like that may have --
15 but it's like a very vague statement.
16    Q.   Okay.
17    A.   It didn't seem like it was
18 addressing --
19    Q.   She didn't mention you or Officer
20 Spalding specifically, correct?
21    A.   No.
22    Q.   Okay.  In that same staff meeting, did
23 she announce that you were now going to be
24 reporting to Lieutenant Sadowski?



DANIEL ECHEVERRIA
December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO
117–120

Page 117

1    A.  I don't know -- no, not during that
2  meeting.  I don't know if later on she told us
3  or I think Lieutenant Sadowski may have
4  approached us and said that we were going to
5  report to him.
6    Q.  Okay.  Do you think that was after that
7  staff meeting that you learned you were
8  reporting to Sadowski or before?
9    A.  I want to say after it.
10    Q.  Okay.  How long after the staff meeting
11  do you think that?
12    A.  I don't know, I don't know.  I couldn't
13  tell you a time frame.
14    Q.  Okay.
15    A.  It wasn't no hours after, you know.
16    Q.  Sure, sure.
17        And do you recall approximately how
18  long after your meeting with Commander Stanley
19  that she held the staff meeting?
20    A.  I don't recall, either.
21    Q.  Okay.
22    A.  It wasn't hours after, either.
23    Q.  Sure.
24    A.  I mean, like said, there may have -- I

Page 118

1  think they used to have these staff meetings
2  regularly and I think this was just something
3  that she used to --
4    Q.  Address the issues?
5    A.  -- attempt to address the issue, if you
6  ask me.
7    Q.  Okay, fair enough.
8        MR. SMITH:  Objection, foundation.
9        THE WITNESS:  And, in fact, when we met
10  with Adrienne Stanley, Lieutenant Sadowski had
11  approached us and he said that -- because, see,
12  I had moved my cubical.  I moved from one
13  cubical to another.  And I used the excuse as
14  the computer doesn't work there.
15  BY MR. KING:
16    Q.  Okay.
17    A.  And Sadowski said, bullshit, I know why
18  you're moving, because you don't want to hear
19  her nonsense, her bullshit.  And I said, what
20  are you talking about.  He says, it's no secret,
21  it's no secret what she is up here and what
22  she's doing up here.  I've heard it, I've
23  witnessed it.
24    Q.  Okay.

Page 119

1    A.  Because Mike, who used to sit there,
2  used to complain about the computer that doesn't
3  work there at all, either.  So you can tell
4  somebody else that story.
5    Q.  All right.
6    A.  And I just said, well, then you know.
7    Q.  Okay.
8    A.  And he also said, maybe you should meet
9  with the commander.
10    Q.  Okay.  Other than what you just
11  testified to, do you recall --
12    A.  I mean --
13    Q.  -- Lieutenant Sadowski saying anything
14  else in that conversation?
15    A.  No.
16    Q.  Okay.  Now, when he referenced Mike, do
17  you know who he was referring to?
18    A.  There was a gentleman, an officer that
19  used to sit there.
20    Q.  Okay.
21    A.  And I think his name was Mike.
22    Q.  Okay.  And did you understand his point
23  was that Mike had also had problems with
24  Lieutenant Pascua?

Page 120

1    A.  No.
2    Q.  Okay.
3    A.  I didn't understand that from that
4  conversation at all.
5    Q.  Okay.
6    A.  In fact, I think when he said that, he
7  knew what we were talking about.  Because at
8  that point, even Shannon may have been present.
9  He said -- I think we asked him as well about a
10  CR number.  He said, oh, no, you talk to her
11  about that.  Meaning Adrienne Stanley.
12    Q.  Sure.  Do you recall specifically you
13  asked Sadowski about a CR number or are you not
14  sure?
15    A.  I want to say it's pretty sure.
16    Q.  Okay.
17    A.  I said, can't you address it with a
18  complaint?  He said, no.
19    Q.  Okay, all right.  And that's before
20  you --
21    A.  Something along those effect -- that
22  effect.
23    Q.  That's fine.  And that's before you
24  have the meeting that you testified to with



DANIEL ECHEVERRIA                                          December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                      121–124

Page 121

1    Commander Stanley?
2        A.   Correct, yeah.
3        Q.   Okay.  Once you're reassigned to
4    Lieutenant Sadowski, is it your position that
5    Lieutenant Pascua engaged in any further
6    retaliation or harassment against you?
7        A.   Yeah, it would still continue.
8        Q.   What would still continue?
9        A.   Her comments.  I mean, everybody sat
10   there within earshot.
11       Q.   Okay.
12       A.   I mean, the Inspection Division may
13   have been maybe this size on each side of the
14   cubical.  So it's not a big area, you know.  And
15   she was not quiet when she spoke.  She don't --
16   she spoke so that you can hear her, is the way
17   she spoke.
18       Q.   Okay.  After the commander holds a
19   staff meeting and after you're reassigned to
20   Lieutenant Sadowski, is it your testimony that
21   after that, Lieutenant Pascua --
22       A.   Continued.
23       Q.   -- continued to refer to you as rats
24   and rat motherfuckers and the like?

Page 122

1        A.   Yes.
2        Q.   Okay.
3        A.   It never stopped.
4        Q.   Okay.
5             MR. SMITH:  When you get to a
6    transition point, can we take a short break?
7             MR. KING:  Yes.  We can do it now.
8             (Whereupon, a short break was
9                 taken.)
10   BY MR. KING:
11       Q.   Officer Echeverria, you testified to
12   the staff meeting that Commander Stanley held.
13   Lieutenant Pascua was at that meeting, correct?
14       A.   Yes.
15       Q.   Okay.  And Lieutenant Sadowski, also?
16       A.   Yes.
17       Q.   And if I can direct your attention back
18   to the Amended Complaint, Paragraph 64.  You
19   indicate that Lieutenant Sadowski joined in
20   Lieutenant Pascua's campaign by repeatedly
21   attempting to lodge false allegations of
22   wrongdoing against Plaintiffs.
23       A.   Yes.
24       Q.   Before we get to that, Lieutenant

Page 123

1    Sadowski didn't also refer to you all as rats or
2    make similar comments, correct?
3        A.   No.
4        Q.   Is that correct?
5        A.   Correct.
6        Q.   Okay.  What do you mean in Paragraph 64
7    that he repeatedly attempted to lodge false
8    allegations against you?
9        A.   Well, he attempted to write me up.  It
10   had to do something along the lines of OPY and
11   this -- some overtime or time due slip with some
12   question.
13       Q.   Why don't we look at this document.
14             (Whereupon, Echeverria
15              Deposition Exhibit No. 5 was
16              marked for identification.)
17   BY MR. KING:
18       Q.   Officer Echeverria, I'm showing you a
19   document that's been marked as Deposition
20   Exhibit No. 5.  It's a counseling session report
21   with your name on it and Kevin Sadowski.  Is
22   this what you're referring to in Paragraph 64
23   where you indicate that Lieutenant Sadowski
24   attempted to lodge false allegations against

Page 124

1    you?
2        A.   Yes.
3        Q.   Okay.  And --
4        A.   Page 2 of the -- I'm sorry, Page 2 of
5    this is the same?
6        Q.   Page 1 is addressed to you and I
7    believe Page 2 is addressed to Lieutenant -- or
8    excuse me, Officer Spalding.
9        A.   Okay.
10       Q.   And did Lieutenant Sadowski have a
11   meeting with you about this subject?
12       A.   He attempted to.  It was very brief.
13       Q.   Okay.  Explain that, how he attempted
14   to have a meeting.
15       A.   He had us come in, I want to say,
16   prior -- at that point, we were operational with
17   Brass Tax.  And he, I want to say, instructed us
18   to come in earlier or something to that
19   effect --
20       Q.   Okay.
21       A.   -- and he presented this to me.
22       Q.   Okay.  Was Officer Spalding also
23   present?
24       A.   No, she was not.



DANIEL ECHEVERRIA                                    December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                    125–128

Page 125

1    Q.  Okay.  So this Exhibit 5, are you
2  saying that Lieutenant Sadowski handed it to
3  you?
4    A.  Yes.  We met.  We sat at a cubical.
5    Q.  And what do you recall him saying and
6  you saying?
7    A.  He presented this to me.
8    Q.  Okay.
9    A.  I looked at it and I said, you know,
10 this is not accurate.
11   Q.  Okay.
12   A.  And then he asked me to explain how is
13 it not accurate.  Then he also presented the
14 time due slips to me, as well.
15   Q.  Which is the third page of this
16 exhibit, correct?
17   A.  Yes.
18   Q.  Okay.  Well, let's look at -- let's
19 take these two incidents separately.  The first
20 incident he's written, fail to notify a
21 supervisor assigned to Unit 126 about the status
22 of eligibility for OPY, Operation Project Youth.
23   A.  Uh-huh.
24   Q.  Are you saying that's incorrect?

Page 126

1    A.  Yeah, I'm saying that.
2    Q.  Okay.  Do you recall Operation Project
3  Youth?
4    A.  Yes, I know exactly what it is.
5    Q.  Okay.  And were you ever asked to
6  indicate your eligibility for that?
7    A.  Yes, I was.
8    Q.  And who asked you that?
9    A.  It may have been Lieutenant Sadowski
10 himself.
11   Q.  Okay.  But you don't recall if it was
12 Sadowski or somebody else?
13   A.  Yeah.  I say it may have been him
14 himself.
15   Q.  I understand you're saying it may have
16 been.  My question --
17   A.  Okay.  It was Lieutenant Sadowski.
18   Q.  That's your recollection?
19   A.  Yes.
20   Q.  Okay.  And how did he ask you about
21 your availability, in person, in an e-mail?
22   A.  In person.
23   Q.  Okay.  And how long prior to this
24 meeting that we're talking about had he asked

Page 127

1  you about --
2    A.  I couldn't tell you a time frame
3  without being exact.
4    Q.  What did you respond to him when he
5  asked you about your availability for OPY?
6    A.  He explained what OPY was.
7    Q.  Okay.
8    A.  I acknowledged what it was.  And
9  basically what it was, it's operation to protect
10 the youth.  So people who work a desk position
11 were to rotate in the field.
12   Q.  Okay.
13   A.  And during the -- I think it was during
14 the school.  It's similar to what is Safe
15 Passage today.
16   Q.  Sure.
17   A.  And I told him that we were not
18 eligible or we are not to do that because we are
19 not a desk assigned personnel.  We are field
20 personnel since we are doing this junction with
21 IAD Confidentials with our investigation that we
22 were assisting at.
23   Q.  Okay.  So let me get this -- tell me if
24 this is correct.  You essentially told the

Page 128

1  lieutenant that despite the fact that you were
2  detailed to Unit 126 Inspections, you didn't
3  have to participate in OPY because you were also
4  working in the confidential investigation?
5    A.  Right.
6    Q.  Okay.  And the second item here that he
7  mentions, failed to notify supervisor assigned
8  to 126 when you worked overtime on November 21,
9  2011.
10       And as you said, the third page of this
11 exhibit refers to that overtime, correct?
12   A.  Yes.
13   Q.  Okay.  And that overtime was --
14   A.  That was fieldwork.
15   Q.  -- was field work.  And was that
16 approved by Juan Rivera?
17   A.  Yes, it was.
18   Q.  Okay.  But that overtime work was not
19 requested by or approved by anyone in Unit 126,
20 correct?
21   A.  No.  Yes, it was.  That -- to that date
22 in question --
23   Q.  Yes.
24   A.  -- Lieutenant Sadowski was informed



DANIEL ECHEVERRIA                                     December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO              129–132

Page 129

1 that we would be in the field with -- whether it
2 was Al Bohmer or Chester --
3     Q.   Okay.
4     A.   -- or FBI personnel or the liaison at
5 the FBI building, and he was informed.  He knew
6 we were going there, he knew our start time.
7 And I had text him -- he was very specific that
8 he wanted me to use my personal equipment to
9 text him when we were done.
10    Q.   Okay.
11    A.   So he can note when we were finished.
12    Q.   Okay.
13    A.   And when we expressed that concern to
14 the liaison, the supervisor we were reporting
15 to, CPD personnel, they said that's unheard of.
16    Q.   Okay.
17    A.   You're reporting to us, you're
18 dismissed by us.  Why would you have to do that?
19 Just go ahead and do that so that -- they're
20 strange up there is what they quoted.  So we did
21 so.
22    Q.   Okay.
23    A.   And so let's just -- I'll give you an
24 example.  Don't -- do you want me to finish or

Page 130

1 do you want me to continue?
2     Q.   I don't think your example is
3 responsive to my question.
4     A.   Okay.  Let's leave it alone, then.
5     Q.   So let me ask you a question.
6     A.   All right.
7     Q.   So is it your testimony that on this
8 date, November 21, 2011, Lieutenant Sadowski
9 knew that you worked overtime?
10    A.   Yes.
11    Q.   Okay.  And he knew it that same day?
12    A.   Yes.
13    Q.   Okay.  And when you had the meeting
14 with him, was there any discussion about why he
15 was claiming you failed to notify him?
16    A.   Yes.
17    Q.   Okay.  What did you say about that?
18    A.   He stated that I had text him at X
19 hours --
20    Q.   Okay.
21    A.   -- and the slip reflects a different
22 time.
23    Q.   Okay.
24    A.   And that's why he was attempting to do

Page 131

1 this counseling or write up or intervention or
2 whatever you want to call it.
3     Q.   I see.
4     A.   And I told him, that's not accurate.  I
5 said I had sent him another text message, as
6 well.  And he claimed he did not receive it.
7     Q.   Okay.
8     A.   Or he didn't -- he said, well, show me
9 or prove it to me.  And I printed it up and I
10 gave it to him.  And then he said, well, that
11 doesn't read the content of the text.  And at
12 that time I told him he was being unreasonable
13 because it doesn't timestamp the message in and
14 message out.
15    Q.   Okay.
16    A.   And then at that point, I said, and in
17 fact right now we're in the middle of having to
18 go to the FBI building.  And then we met with
19 FBI personnel and CPD personnel and we even met
20 with Chief Rivera.
21    Q.   Okay.
22    A.   And I expressed to Chief Rivera what is
23 transpiring.
24    Q.   Sure.

Page 132

1     A.   And he said, I had addressed that with
2 him already.
3     Q.   Okay.
4     A.   So that's why the write up never got
5 signed.
6     Q.   Right.
7     A.   Because at that point --
8     Q.   It's your understanding that this write
9 up never got signed because Chief Rivera
10 intervened, correct?
11    A.   Sure.
12    Q.   Okay.
13    A.   Because I had explained to Lieutenant
14 Sadowski that we were field personnel and OPY
15 did not --
16    Q.   You told me.
17    A.   Correct.
18    Q.   Explain to me the two texts you sent
19 Lieutenant Sadowski.
20    A.   He wanted -- like I said, I may have
21 text him and -- see, this day in question, we
22 did a scenario, I want to say, with the
23 investigation.  So I may have texted him at
24 whatever time.



DANIEL ECHEVERRIA
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

December 02, 2014
133–136

Page 133

1    Q.   Right.
2    A.   And then the slip got signed for
3 whatever time.
4    Q.   Right.
5    A.   It was because we were detained by
6 Chief Rivera.
7    Q.   Okay.  So just so I'm clear, you texted
8 him a time that you were done working?
9    A.   Yeah.
10    Q.   And then when you presented the
11 overtime slip to him, it showed that you
12 continued to work more time, correct?
13    A.   Correct.
14    Q.   Okay.  The second text that you
15 referred to, what did that text say?
16    A.   I want to say I told him, we are
17 leaving now or we're just leaving now or we got
18 detained, something along to that effect.
19    Q.   Okay.
20    A.   I can't recall.
21    Q.   Okay.
22    A.   But he did get informed of the
23 different times.
24    Q.   Okay.  And you said he indicated he

Page 134

1 didn't get that text or that it didn't convey
2 the accurate information?
3    A.   That's something like -- something that
4 he said to that effect.  Or he said no, you
5 didn't inform me or something along to that
6 effect.
7    Q.   Okay.  So to the best of your
8 knowledge, this discipline was never finalized,
9 is that fair to say?
10    A.   Right.  Because when we met with Chief
11 Rivera, I said, you know -- he said, how did it
12 go.  And I said, you know what, Lieutenant
13 Sadowski attempted to do this.  And he said,
14 wow, okay, well, let me address that.
15    Q.   Okay.
16    A.   So I don't know what he may have
17 explained to them or not.
18    Q.   Okay.  And is it your testimony that
19 Lieutenant Sadowski's attempt to discipline you
20 here was somehow retaliation for working on
21 Operation Brass Tax, is that what you're
22 claiming?
23    A.   Sure.
24    Q.   Okay.  Other than Lieutenant Sadowski's

Page 135

1 attempt to discipline you as reflected in
2 Exhibit 5, is there anything else that
3 Lieutenant Sadowski did that you felt was
4 retaliation against you?
5    A.   Other than -- I mean, it's black and
6 white here.  So this is it.
7    Q.   Other than Exhibit 5?
8    A.   That would be it.
9    Q.   Okay, thank you.
10       And I assume any alleged retaliation or
11 harassment that you're claiming with respect to
12 Lieutenant Pascua was only during the period
13 that you were assigned to Inspections, correct?
14    A.   Yes.
15    Q.   Okay.  In Paragraph 65 of the Amended
16 Complaint, there's a reference to two sergeants
17 of the Internal Affairs Division telling
18 Plaintiffs, quote, sometimes you have to turn a
19 blind eye to misconduct.  Did you hear that?
20    A.   Yes.
21    Q.   Are you aware of who those two
22 sergeants were?
23    A.   Yes.
24    Q.   Who were they?

Page 136

1    A.   Mike Barz and I can't remember the
2 second gentleman's name.  I don't know, but he
3 was definitely also a confidential personnel.
4    Q.   Okay.
5    A.   He may have even been introduced to me,
6 but I don't remember his name.
7    Q.   And was this statement in a single
8 conversation where Mike Barz was there and the
9 other officer was there?
10    A.   Yes.
11    Q.   Okay.  And do you remember where that
12 conversation took place?
13    A.   Yeah, at headquarters.
14    Q.   Okay.  And was Officer Spalding also
15 present?
16    A.   Yes.
17    Q.   And do you recall what was said in the
18 conversation that led to one of the sergeants
19 making that statement?
20    A.   We were talking something along the
21 lines of -- he was mentioning something along
22 the lines -- it was in reference to Brass Tax,
23 that it's not so much what you know, it's what
24 you can prove.  Sometimes you have to turn a



DANIEL ECHEVERRIA
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

December 02, 2014
137–140

Page 137

1   blind eye to what you know because you can't
2   prove it.
3       Q.   Okay.
4       A.   Something to that effect.
5       Q.   Okay.  Talking about information you
6   were developing on Watts?
7       A.   I can't tell you with certainty at this
8   time.
9       Q.   Okay.  Do you recall if it was Mike
10  Barz or the other officer that made the
11  statement, sometimes you have to turn a blind
12  eye?
13      A.   Mike Barz.
14      Q.   Okay.  In Paragraph 68 of the Complaint
15  you indicate that after the indictments of Watts
16  and Mohammed, because you had already been
17  established to be rats, you weren't allowed to
18  go back to Narcotics.
19           That allegation that Chief Roti didn't
20  allow you to go back to Narcotics or any other
21  division, was that based on what you previously
22  testified to that you had been told about a
23  meeting where Roti was present?
24      A.   Yes, from Chief Rivera.

Page 138

1       Q.   Okay.  So Roti didn't tell you or make
2   any statements new after the Watts and Mohammed
3   indictments that you couldn't come back,
4   correct?
5       A.   No.  I've never spoken to him.
6       Q.   Right, okay.  Did you at some point try
7   to speak with Chief Roti about --
8       A.   I believe I may have reached out to him
9   once.
10      Q.   Okay.  And that was by telephone?
11      A.   Correct.
12      Q.   Okay.  Do you recall when that was?
13      A.   I can't give an exact date, but it
14  never happened.  I never got an appointment to
15  see him.  It was denied.
16      Q.   Okay.  Do you know if that conversation
17  or that phone call you placed was in March of
18  2012?
19      A.   I can't tell you an exact date.
20      Q.   Okay.  Tell me what you recall about
21  that phone conversation.
22      A.   I called the Organized Crime unit, I
23  believe the phone was answered by a gentleman
24  and then I was placed on hold.

Page 139

1       Q.   Okay.
2       A.   And then a female voice, which I think
3   may have been his secretary, asked how she may
4   help me.  And I said, I would like to make an
5   appointment to speak with the chief.
6       Q.   Okay.
7       A.   And she questioned me as to what it was
8   in regards to.  I told her it was a confidential
9   matter.
10      Q.   Okay.
11      A.   She said, are you -- she asked me, who
12  I was, I identified myself.
13      Q.   Yeah.
14      A.   She asked me if I was Unit 189
15  personnel.
16      Q.   Yes.
17      A.   And I said, yes, I am.  She asked me if
18  I was detailed or assigned anywhere else.  I
19  said, I'm assigned but detailed to this unit,
20  to --
21      Q.   Did you tell her you were assigned
22  to --
23      A.   To Narcotics, to 189.
24      Q.   Okay.  But you were detailed to another

Page 140

1   unit?
2       A.   Right, to an outside unit.
3       Q.   Okay.  Did you remember if you told her
4   at the time you were detailed to Inspections or
5   did you just say to an outside unit?
6       A.   I want to say I was specific.
7       Q.   Do you think it was Inspections at the
8   time?
9       A.   Yes, I was specific.
10      Q.   Okay.
11      A.   And then she asked me again, well, you
12  need to tell me what this is in regards to.
13      Q.   Okay.
14      A.   And I told her, it was a confidential
15  matter.
16      Q.   Okay.
17      A.   And she said, well, I cannot give you
18  and I won't give you an appointment unless
19  you -- if you can't tell me this information,
20  confidential or not, I can't give you an
21  appointment.  And I said -- I said, it's very
22  confidential, I cannot disclose that
23  information.
24      Q.   Okay.



DANIEL ECHEVERRIA                                                   December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                         141–144

Page 141

1    A.  And she said, well, then I can't give
2  you an appointment and she hung up.  That was
3  the end of the conversation.
4    Q.  Okay.  And did you swear at all in the
5  conversation?
6    A.  No, I did not.
7    Q.  Okay.
8    A.  It's not my style.
9    Q.  Would you say you were heated or
10  agitated?
11    A.  Not at all.
12    Q.  And do you know who this female was
13  that you were speaking to?
14    A.  I would guess it was -- it would be if
15  you would call and make -- ask for an
16  appointment --
17    Q.  Sure.
18    A.  -- you would have to speak to his
19  direct secretary, is what I would guess.
20    Q.  Okay.
21    A.  So I would guess maybe it was his
22  direct secretary.
23    Q.  Okay.  Do you recall in that same
24  conversation also the phone being given to a

Page 142

1  sergeant?  Were you talking to a sergeant?
2    A.  Not at all.  I spoke to two people.
3    Q.  Okay.
4    A.  One was a gentleman who said, can you
5  hold please.
6    Q.  Okay.
7    A.  I was placed on hold momentarily and
8  then the phone was picked up by a female
9  person.
10    Q.  Okay.  Do you remember the female
11  telling you something to the effect that you
12  needed to go through the chain of command?
13    A.  No, I cannot remember that.
14    Q.  Okay.  She may have said that, may not?
15    A.  It was basically what I told you, that
16  was it.
17    Q.  Did you ever complain, you or
18  Officer Spalding, to your knowledge, complain
19  about any alleged retaliation to Tina Skahill?
20    A.  No.
21    Q.  Okay.  And you never asked Tina Skahill
22  to pull a CR number for you, correct?
23    A.  Correct.
24    Q.  Okay.  Did you ever specifically ask

Page 143

1  Chief Juan Rivera to open a CR number for you?
2    A.  Yes, we asked him for intervention.
3  Yes, absolutely.
4    Q.  Okay.  I understand you asked him for
5  intervention.  Did you ever ask him to open a
6  CR?
7    A.  Yes.
8    Q.  Okay.  Did that happen once or how many
9  times do you think you asked him to open a CR?
10    A.  Many times.
11    Q.  Many times?
12    A.  Yeah.  Definitely not once.
13    Q.  Okay.  And do you recall what he would
14  say in response to that request?
15    A.  Hang in there.
16    Q.  He'd say, hang in there?
17    A.  Hang in there.
18    Q.  Okay.  And Commander Stanley, any
19  alleged retaliation that you claim she engaged
20  in was all during the time that you were
21  assigned to Inspections, correct?
22    A.  Correct.
23    Q.  And at a certain point, you and Officer
24  Spalding applied for positions in the Fugitive

Page 144

1  Apprehension unit, correct?
2    A.  Yes.
3    Q.  Okay.  And you put in applications,
4  both Chief Rivera and Lieutenant Skahill
5  provided --
6    A.  Chief Skahill, yes.
7    Q.  I'm sorry.  Chief Skahill provided
8  letters of recommendation for you?
9    A.  Yes.
10    Q.  And Officer Spalding, correct?
11    A.  Correct.
12    Q.  Okay.  And you got in to Fugitive
13  Apprehension?
14    A.  Yes.
15    Q.  Okay.  I assume you're not claiming
16  that the move to Fugitive Apprehension was
17  retaliation?
18    A.  No.  It was supposed to be a clean
19  slate.
20    Q.  Okay.  Would you agree that Fugitive
21  Apprehension is a very desirable unit in the
22  police department?
23    A.  It's a specialized unit, among others.
24    Q.  Okay.  Fair to say it's desirable,



DANIEL ECHEVERRIA                                              December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                           145–148

Page 145

1  something a lot of people apply for?
2      A.  I don't know -- I can't say what a lot
3  of people might want or not want.
4      Q.  Okay.
5      A.  But it is a specialized unit.
6      Q.  Okay.
7      A.  I mean, different strokes for different
8  folks, you know.
9      Q.  Sure.  And during the time that you and
10  Officer Spalding have worked in Fugitive
11  Apprehension, you were never part of a U.S.
12  Marshal's Task Force, correct?
13     A.  We worked on a task force team but
14  never deputized as a Marshal or received any
15  credentials as a...
16     Q.  So you worked on a team where some of
17  the officers had been deputized by the U.S.
18  Marshal?
19     A.  Pretty much.
20     Q.  But you and Officer Spalding --
21     A.  Were not.
22     Q.  -- were not, correct?
23     A.  Right.
24

Page 146

1          (Whereupon, Echeverria
2           Deposition Exhibit No. 6 was
3           marked for identification.)
4  BY MR. KING:
5      Q.  Officer Echeverria, I'm showing you
6  another e-mail or a couple of e-mails that have
7  been marked Deposition Exhibit No. 6.  The
8  bottom half is an e-mail to you from Juan Rivera
9  and the upper half is an e-mail from you to Juan
10  Rivera.  Do you recall these e-mails?
11     A.  Sure.
12     Q.  Okay.
13     A.  I mean, it's written from me, right?
14     Q.  Yes.
15     A.  Yeah.
16     Q.  Yes.  And in your e-mail at the top of
17  the page in the second paragraph you write, we
18  agree with you that we should meet with the supe
19  and request the Fed Task Force.  Do you see
20  that?
21     A.  Yes.
22     Q.  Is that something that Juan Rivera had
23  suggested that you do?
24     A.  We had -- we had met with Juan Rivera

Page 147

1  in one of our many meets and we asked maybe we
2  can get a federal task force.
3      Q.  Okay.
4      A.  Maybe we can meet with the
5  superintendent.  And he said, I would agree, you
6  should meet with him.
7      Q.  Okay.  Did you ever have a meeting with
8  the superintendent?
9      A.  Never.
10     Q.  Okay.
11     A.  I never met the man.
12     Q.  Okay.  So you never met and requested a
13  federal task force.  So you understood when you
14  were going into Fugitive Apprehension, you
15  weren't part of a federal task force, correct?
16     A.  Correct.
17     Q.  Okay.
18     A.  At that time.
19     Q.  Okay.  And then the next paragraph
20  says, Chief Byrne reiterated to us, it won't be
21  like a fed unit, it will be a CPD tact concept.
22  Had you had a conversation with Chief Byrne?
23     A.  Yes, I did.
24     Q.  And this was about you and Officer

Page 148

1  Spalding going into Fugitive Apprehension?
2      A.  Correct.
3      Q.  And what do you recall being said in
4  that conversation?
5      A.  We had met with him.  He used to be our
6  commander in the 1st District at one time, so he
7  was aware of our -- of our work ethic.
8      Q.  Sure.
9      A.  And he was the chief I believe at that
10  time of the Bureau of Detectives.  And we had
11  confided in him with our investigation.  He said
12  that there are no openings at the present time.
13     Q.  Okay.
14     A.  For the U -- to be deputized as a U.S.
15  Marshal.  And that at that time, he can have us
16  come over.  But once -- but it would be like a
17  tact team concept.
18     Q.  Okay.
19     A.  And that once opportunity came or
20  openings came, of course we were -- we will be
21  eligible for it.
22     Q.  Okay.
23     A.  That was the sum of it.
24     Q.  Okay.  And you write that he, Chief



DANIEL ECHEVERRIA
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

December 02, 2014
149–152

Page 149
1 Byrne, also feels that a task force is what you
2 should request?
3    A.   Yes.
4    Q.   Okay.
5    A.   He said that you should be on a task
6 force.
7    Q.   Okay.  So when he was indicating, when
8 there are openings, you should request to be on
9 a task force, correct?
10    A.   Correct.  That's how I interpret it.
11    Q.   And then your last sentence of your
12 e-mail says, if all else fails, we agree working
13 with you in CIS would be best.
14        So you are indicating whatever -- if
15 all else -- if all else fails, you and Officer
16 Spalding would be agreeable to work -- working
17 for Chief Rivera, correct?
18    A.   That's what it says.
19    Q.   Okay.  And do you have any personal
20 knowledge of James O'Grady speaking to anyone in
21 Fugitive Apprehension about you or Officer
22 Spalding?
23    A.   Yes.
24    Q.   And what's that based on?

Page 150
1    A.   That's based on when we first got
2 there, the comment made to us by administrative
3 secretaries who are also sworn personnel and by
4 a phone call I received from another
5 administrative secretary informing me of a
6 reassignment to Fugitive Apprehension.
7    Q.   Okay.  And which of those things
8 happened first, the phone call or the --
9    A.   The phone call definitely happened
10 first.
11    Q.   Okay.  Do you recall who that phone
12 conversation was with?
13    A.   It was with -- I can't think of her
14 last name.  They call her Mo.  Her name is
15 Maureen.
16    Q.   Okay.
17    A.   But I don't know her last name.  She's
18 the sister of the officer that got shot, that
19 evidence technician.  Maureen.  I can't think of
20 her last name.
21    Q.   But Maureen was an administrative
22 secretary --
23    A.   Yes.
24    Q.   -- in Fugitive Apprehension?

Page 151
1    A.   Yes, she is.
2    Q.   And she called you prior to you coming
3 into the unit?
4    A.   Yes.  She called the day before, the
5 night before, something like that.
6    Q.   And what do you recall her saying to
7 you and you saying to her in that conversation?
8    A.   That we are -- that she identified
9 herself, she was calling us to -- calling me to
10 inform me that the effective change date, which
11 whatever date that may have been --
12    Q.   Sure.
13    A.   -- that we are to report to the
14 Fugitive Apprehension.  She was welcoming us
15 there.  And she said, I don't know if you know
16 or don't know yet, but she goes, the effective
17 change date.  She said, that there was a meeting
18 going on with Commander O'Grady, I guess.  She
19 said maybe -- with personnel there and maybe
20 he's upset that he's losing such great officers
21 or two of his officers.  Something along those
22 lines.
23    Q.   She told you there was a meeting going
24 on --

Page 152
1    A.   Yeah.
2    Q.   -- with Commander O'Grady?
3    A.   Yeah.  I don't know if you know, but
4 you're coming over is what she said.
5    Q.   Okay.  And my question is it's your
6 testimony that she told you there was a meeting
7 going on with Commander O'Grady and Fugitive
8 Apprehension personnel?
9    A.   Yes.
10    Q.   Okay.
11    A.   She said, I don't know if you know from
12 your unit yet or not, but I'm calling to let you
13 know you're coming over.
14    Q.   Okay.
15    A.   That was the end of the conversation.
16    Q.   Okay.  Did she say anything else about
17 this meeting?
18    A.   No.
19    Q.   And did you also testify that some
20 other administrative secretary --
21    A.   Yes.
22    Q.   -- said something about Commander
23 O'Grady?
24    A.   When we came into the unit?



DANIEL ECHEVERRIA                                    December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO               153–156

Page 153

1     Q.  Yeah.
2     A.  I don't think we were there more than a
3  whole 10, 15 minutes.  She said, so you guys are
4  the IAD rats or implants, to that effect.
5     Q.  And do you recall who made that
6  statement?
7     A.  Sure.  It was two secretaries.  One was
8  Jan Hannah, Colleen Dugan.
9     Q.  Okay.
10    A.  So I don't know who said it first, but
11  they both echoed each other.
12    Q.  Okay.  And did Ms. Hannah or Ms. Dugan
13  say anything else in this conversation?
14    A.  That was a shock to even hear that
15  coming 10 minutes, 15 minutes in the door.  That
16  was the most -- I mean, that was --
17    Q.  Do you recall them saying anything
18  else?
19    A.  That was it.  So, you know, the way I
20  see it is, you know, that explained the meeting
21  with O'Grady and the personnel there.
22    Q.  That's the conclusion you came to?
23    A.  Yes, initially, at that time.  Later
24  on, yes, I confirmed it.

Page 154

1     Q.  Later on you confirmed what?
2     A.  That had to be it.
3     Q.  Okay.  How did you confirm that that
4  had to be it?
5     A.  When we met with Cesario, Barnes and
6  Commander Salemme.
7     Q.  We'll get to that.
8        When you first went over to Fugitive
9  Apprehension, you were on Sergeant Barnes' team,
10  correct?
11    A.  Yes.
12    Q.  Okay.
13    A.  The day team.
14    Q.  Day team, second watch?
15    A.  Yes.
16    Q.  And the commander was --
17    A.  Joseph Salemme.
18    Q.  -- Salemme and your lieutenant was
19  Cesario?
20    A.  Yes.
21    Q.  Okay.  Paragraph 75 of the Complaint
22  talks about Defendant O'Grady informing your new
23  supervisors that you were rats and should be
24  treated accordingly.  That allegation is based

Page 155

1  on the two conversations you just testified to,
2  correct?
3     A.  Yes.  And other things, as well.
4     Q.  Okay.  What other things?
5     A.  Well, once we were in Barnes' team,
6  some officers reached out to us and said, we
7  knew you guys were coming from IAD before you
8  guys got here.
9     Q.  Okay.
10    A.  He said, Sergeant Barnes told us.
11    Q.  Okay.  Well, let's look at Paragraph 76
12  of the Amended Complaint.  It says, Sergeant
13  Barnes thereafter informed your new team that
14  you were rats and that you should not being
15  trusted or backed up.  Is that your testimony?
16    A.  Yes, it is.
17    Q.  Okay.  And where did you get that
18  information?
19    A.  From team members.
20    Q.  Okay.  And team members told you
21  specifically that Sergeant Barnes called you
22  rats --
23    A.  Yes.
24    Q.  -- and said you should not be trusted

Page 156

1  or backed up?
2     A.  Yes.
3     Q.  Which team member told you that?
4     A.  The first one that I want to say that
5  expressed their honesty, I guess, was Robert
6  Walker.
7     Q.  Okay.  And was this in a conversation
8  with Robert Walker and you and Officer Spalding?
9     A.  Yes.
10    Q.  And where did that conversation take
11  place?
12    A.  It either took place at the area, which
13  would be where we would report into the office
14  on, what's that, Area 2 on 111th and Ellis, I
15  believe it is.  111th and Ellis and it also may
16  have occurred in a vehicle or it could have been
17  both.  Because we had many conversations with
18  Robert Walker, as well.
19    Q.  Okay.  And what do you recall Robert
20  Walker saying to you as it relates to
21  Paragraph 76 of the Complaint?
22    A.  He said that he knew we were IAD before
23  we got there, he knew we were rats or had called
24  it -- referenced us as rats because we had



Case: 1:12-cv-08777 Document #: 166-1 Filed: 02/02/16 Page 204 of 239 PageID #:873

DANIEL ECHEVERRIA                                    December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO          157–160

Page 157

1  worked on IAD cases with other officers,
2  involving officers.
3      He said that he made his assessment of
4  us and he doesn't have a problem working with us
5  and that people that have a problem with us it's
6  probably because they have something to worry
7  about and he has nothing to worry about, he will
8  work with us any time.  And he said that
9  Sergeant Barnes is the one that informed him of
10 that.
11     Q.  Okay.  Other than that conversation
12 that you just testified to with Robert Walker,
13 is there anything else that you're basing your
14 allegation that Barnes told your new team that
15 you were rats and they shouldn't work with you?
16     A.  Yeah.
17     Q.  What else?
18     A.  Officer Guishnere, Loren Guishnere.
19     Q.  Yes.
20     A.  He expressed similar comments, as well.
21 And he said that they were informed to be bad to
22 us.  And he said, he can't be bad to anybody who
23 hasn't done anything to him personally.
24     Q.  Okay.  And he --

Page 158

1      A.  And he said Sarge is the one who told
2  us all about you guys.  Sarge, referencing
3  Sergeant Barnes.
4      Q.  Okay.  In the conversation with
5  Guishnere, did he say anything about rats?
6      A.  I mean, it was clear.
7      Q.  In the conversation with Guishnere, did
8  he say anything about rats?
9      A.  No.
10     Q.  Thank you.
11     A.  Okay.
12     Q.  Other than those two conversations with
13 Robert Walker and Guishnere, is there anything
14 else you're basing your allegation on that
15 Sergeant Barnes told the team that you were rats
16 and shouldn't be trusted or backed up?
17     A.  Yes.
18     Q.  What else?
19     A.  Well, there was an incident where he
20 held like a team meeting or something and I took
21 advantage of that team meeting and I addressed
22 the issue, did anybody have a problem working
23 with my partner and myself, did anybody think we
24 were rats or not.  And Barnes tried to interrupt

Page 159

1  the meeting from going forward.
2      And he said, where are you getting this
3  from.  And I said, what difference does it make,
4  I'm addressing the team.
5      Q.  Okay.
6      A.  And Robert Walker said, shit, I said
7  it.  I said you said it.
8      Q.  Okay.
9      A.  So that confirmed that, as well.
10     Q.  And what else was said after Robert
11 Walker said, I said it?
12     A.  He adjourned the meeting.  He didn't
13 want the meeting to go forward anymore.
14     Q.  So Robert Walker says, I said it, and
15 Barnes immediately adjourns the meeting with no
16 further discussion?
17     A.  That's right.
18     Q.  Is that your testimony?
19     A.  Yes.
20     Q.  Okay.  And prior to that team meeting,
21 had you had -- you or Officer Spalding had any
22 conversation with Sergeant Watts about --
23     A.  Sergeant Watts?
24     Q.  I'm sorry.

Page 160

1      A.  No.
2      Q.  I'm sorry.  Sergeant Barnes.  I'm
3  sorry.  Sergeant Barnes about the subject of him
4  allegedly referring to you as rats or telling
5  team members not to work with you or back you
6  up?
7      A.  No.
8      Q.  Okay.
9      A.  I don't think Sergeant Watts would like
10 to talk to me.  He'd like to put his hands
11 around my neck, more like it.  That man's
12 dangerous.  He's a gangster.
13     Q.  I don't doubt that.
14     Paragraph 77 talks about at one point,
15 Sergeant Barnes removed you and Officer Spalding
16 from a high profile case.  Do you know what
17 that's referring to?
18     A.  Yes.
19     Q.  Can you explain that to me?
20     A.  Shannon was assigned I believe a
21 homicide case that had been in the media
22 overnight or something like that and we had
23 worked -- Shannon had worked it up.  And we were
24 in transit to go meet some of the victims or



DANIEL ECHEVERRIA                                              December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                          161–164

Page 161

1    witnesses.
2        Q.  And who was with you?
3        A.  I want to say it was either Larry Odem
4    or Kevin Williams or maybe even both.
5        Q.  Okay.
6        A.  I can't say with -- I mean, I can't --
7        Q.  But it was definitely you --
8        A.  Shannon.
9        Q.  -- Officer Spalding and Larry Odem
10   and/or Kevin Williams?
11       A.  Correct.
12       Q.  Okay.  And what happens next?
13       A.  And I believe Shannon got a phone call
14   inquiring where she was at or what we were
15   doing.
16       Q.  Okay.
17       A.  Shannon said, she stated where we were
18   en route to.  We were literally minutes away
19   from our destination and Barnes instructed her
20   to abort it.
21       Q.  Okay.  Could you hear the conversation
22   through the phone or no?
23       A.  I can hear a conversation, I can hear a
24   male voice.

Page 162

1        Q.  Okay.
2        A.  And based on what Shannon's answers
3    were, I know she was talking to Barnes.
4        Q.  Okay.
5        A.  Because she said, oh, hey, Sarge,
6    what's going on.
7        Q.  Sure, sure.
8        A.  But to hear the definite
9    conversation --
10       Q.  Right.
11       A.  -- I don't -- I can't hear Barnes'
12   words, but I can --
13       Q.  Do you recall Officer Spalding saying
14   in that conversation to Barnes that Larry Odem
15   and/or Kevin Williams were with you?
16       A.  Yeah, yes.
17       Q.  He knew that, right?
18       A.  Yeah.
19       Q.  Okay.  And to your understanding, he
20   asked you guys to abort.  And was that the end
21   of you and Officer Spalding working on that
22   case?
23       A.  That was the end of it.
24       Q.  Okay.  Do you know who, if anyone, else

Page 163

1    in Fugitive Apprehension worked on that case or
2    picked up that case?
3        A.  I couldn't tell you the status of that
4    case.
5        Q.  Okay.  Paragraph 78 in the Complaint
6    talks about Plaintiff Spalding talking to
7    Sergeant Barnes and Barnes repeatedly
8    referencing that you and Officer Spalding had
9    brought down a sergeant.
10       Did you ever hear Barnes making
11   references to the fact that you and Officer
12   Spalding had brought down a sergeant?
13       A.  Yes.
14       Q.  When did this occur?
15       A.  At the area while we were working on
16   Barnes' team.
17       Q.  Okay.  Was that one conversation or
18   multiple conversations?
19       A.  Barnes had multiple conversations with
20   Shannon.
21       Q.  Okay.  I'm asking about you personally.
22   Did you personally ever have a conversation with
23   Barnes where he referenced the fact that you and
24   Shannon had brought down a sergeant?

Page 164

1        A.  Other than that one, no.
2        Q.  Okay.  You think you personally heard
3    one?
4        A.  Yes.
5        Q.  Okay.  And do you know if this was
6    before the team meeting you testified to or
7    after?
8        A.  I couldn't tell if it was before or
9    after.
10       Q.  Okay.
11       A.  I don't want to misinform you.
12       Q.  That's fine.
13       Paragraph 79 has an allegation about
14   what Barnes allegedly told Plaintiff Spalding.
15   Did you personally hear Barnes saying the words
16   that are quoted in Paragraph 79?
17       A.  Yes.
18       Q.  You were present for that?
19       A.  I stood within earshot to hear the
20   conversation.
21       Q.  Okay.  Is that the same conversation
22   you were referring to in Paragraph 78?
23       A.  No.  That's different.
24       Q.  Okay.  And the one you heard in



DANIEL ECHEVERRIA                                    December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO          165–168

Page 165

1  earshot, what do you recall hearing?
2     A.   I recall Sergeant Barnes taking Shannon
3  to, I don't know if it was a rear storage room
4  or an interview room converted to a storage room
5  or something like that, but it was off -- a
6  room --
7     Q.   Okay.
8     A.    -- up in the Detective Division.
9          And I just found it awkward that -- I
10 mean, okay, so he wanted -- Shannon, let me talk
11 to you, they went back in the room.  But then it
12 just seemed odd to me that why would he talk to
13 her -- I mean, I was looking at the clock, I'm
14 like, man, they're in there for a while.  I
15 better go check up on what's going on because I
16 was concerned for my partner based on the
17 incidents and conversations and stuff.  So the
18 door was open.
19    Q.   Okay.
20    A.   So I stood there for a minute and I can
21 hear Barnes saying, you know, referencing
22 Shannon -- having to tell Shannon's daughter
23 that she will be coming home in a box and things
24 to that effect.

Page 166

1          And then I said, well, that's enough, I
2  heard enough.  So then I went back and I said,
3  hey, Kev, you know -- meaning Kevin Williams.  I
4  said, you know, come over here with me.  He
5  said, hey, what's going on.  We walked into --
6  then I went ahead and I interrupted the meeting.
7     Q.   Okay.
8     A.   And I said, hey, Sarge, is there
9  something you want to talk to me about, as well?
10 He said, no, you played with her all day -- you
11 know, you play with her all day, let me play
12 with her for a little bit.  Let me talk to her.
13 She's a big girl.
14    Q.   Okay.
15    A.   You know, I'll give her back, you could
16 play with her afterwards.
17    Q.   Okay.
18    A.   Things to that effect.
19    Q.   And Kevin Williams was present at that
20 point, too?
21    A.   I believe so.  Because he walked up
22 there with me.  I don't know if he entered the
23 room behind me or if he stood outside the
24 doorway, as well.

Page 167

1     Q.   Okay.
2     A.   Like I had initially did.
3     Q.   Do you recall Sergeant Barnes, hearing
4  Sergeant Barnes saying anything else in that
5  incident?
6     A.   Yeah.  He referred to back up not
7  coming or the team not liking us any more or the
8  team never liked us and things to that effect.
9     Q.   Okay.  And --
10    A.   I mean, I don't want to go stick my
11 head in and -- I mean, I had to, you know, I
12 just -- I followed my instinct and I heard what
13 I heard and that was enough for me to say it was
14 inappropriate.
15    Q.   Before you went to check on what was
16 going on in that meeting, you couldn't hear
17 anything being said, correct?
18    A.   No.  Correct.
19    Q.   Okay.  Paragraphs 80 and following
20 refer to a meeting on or about June 20, 2012
21 with you, Officer Spalding, Commander Salemme,
22 Lieutenant Cesario and Sergeant Barnes.
23    A.   Yes.
24    Q.   Do you recall that meeting?

Page 168

1     A.   Yes, I do.
2     Q.   Do you recall how you were told about
3  that meeting was going to take place?
4     A.   Via phone call.
5     Q.   A phone call from who?
6     A.   Sergeant Barnes.
7     Q.   And what did he tell you?
8     A.   He said, come meet -- he gave us a
9  time, I don't know what time it was.  It was
10 whatever time.
11    Q.   Sure.
12    A.   Why don't you meet me at Homan Square.
13    Q.   Okay.  And was that basically the gist
14 of that conversation?
15    A.   No.  Yeah, that conversation.  Yes.
16    Q.   All right.  So you -- do you have any
17 conversation with anybody else about that
18 meeting before you attend the meeting?
19    A.   No.
20    Q.   Okay.
21    A.   Just, you know, Shannon reiterated to
22 me or I reiterated to Shannon we have to go up
23 there and meet Barnes.
24    Q.   Okay.  And what do you recall being



DANIEL ECHEVERRIA
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

December 02, 2014
169–172

Page 169

1  said by all of the participants in that
2  meeting?
3    A.  At that point, we had a closed-door
4  meeting.
5    Q.  Okay.  To the best you can recall from
6  the start of the meeting until the end of the
7  meeting, what do you recall being said?
8    A.  Do you want to know who was present
9  there first?
10    Q.  Sure.
11    A.  It was Commander Salemme.
12    Q.  Yes.
13    A.  Lieutenant Cesario, Sergeant Barnes, my
14  partner Shannon Spalding and myself.
15    Q.  Okay.  And what do you recall being
16  said or saying yourself in that meeting?
17    A.  At first we were presented with some
18  activity, some numbers for activity and we were
19  questioned, what do you think of this activity.
20    Q.  And did Lieutenant Cesario present you
21  with that?
22    A.  Yes.
23    Q.  And by activity, it meant your --
24    A.  Arrest.

Page 170

1    Q.  -- arrest activity, correct?
2    A.  Yes.
3    Q.  And did he have a document with him?
4    A.  Yeah.  He provided like a printout with
5  Shannon's name on it, my name on it.  He asked,
6  what did I think of that, of that activity.  And
7  I asked him, what are you comparing -- who are
8  you comparing it to.  I mean, it's just me and
9  her name.  I mean, are you comparing it to
10  Robert Walker, are you comparing it to other
11  people in the unit?  What are you comparing it
12  to?  He said, what difference does it make, I'm
13  presenting it to you.  And then I --
14    Q.  Okay.  Do you recall whether you
15  actually looked at the activity?
16    A.  Yeah, I looked at it.  Because I was --
17  I can't tell you what the numbers were on it,
18  but it was just Shannon and my name.  What are
19  you comparing it to?  What other officer are you
20  comparing it to?
21    Q.  Right.
22    A.  Our numbers are going to reflect
23  basically the same because we both work
24  together.

Page 171

1    Q.  Sure, sure.
2      But you didn't have a sense that those
3  numbers were incorrect, you were just concerned
4  about --
5    A.  I don't know what I had a sense of the
6  number, because there was nothing to compare it
7  to.  You know, maybe we were leading the team, I
8  don't know.
9    Q.  Right.  But when you looked at the
10  arrest activity, you didn't think that it was
11  incorrect, you just didn't -- you wanted to know
12  who it was being compared to, right?
13    A.  Correct.
14    Q.  Okay.
15    A.  I mean, if you're going to talk about
16  activity, tell me what you're comparing it to.
17    Q.  Okay.  And what happened next in the
18  meeting?
19    A.  The meeting went south after that.
20    Q.  Okay.
21    A.  He said, well, you know, he goes -- he
22  asked us about our involvement with IAD.
23    Q.  Okay.
24    A.  That's how I guess he started it.  He

Page 172

1  said -- he said, why don't you tell me about IAD
2  and your involvement with it.
3    Q.  And that was Lieutenant Cesario?
4    A.  Yeah.
5    Q.  Okay.
6    A.  And then Commander Salemme pretty much
7  echoed it, as well.  Yeah, why don't you tell us
8  about that.
9    Q.  Okay.  And did you or Officer Spalding
10  respond?
11    A.  I responded and I said, well, what
12  about it.  He said, have you ever been assigned
13  to IAD.
14    Q.  Okay.  And, again, this is Lieutenant
15  Cesario?
16    A.  Lieutenant Cesario.
17    Q.  Okay.  And what was said after that?
18    A.  And then I said, no, we've never been
19  assigned to IAD.
20    Q.  Okay.
21    A.  Which is true.
22    Q.  What do you recall else being said?
23    A.  Then he said -- he said, well -- and
24  along with Barnes, you know, they all had



DANIEL ECHEVERRIA                                    December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                173-176

Page 173

1  something to say.  He said, you know, he goes,
2  are you sure about that?  He goes, because this
3  is what happens when you work against other
4  officers.
5      Q.  Lieutenant Cesario said that?
6      A.  Yes, followed by Barnes, followed by
7  Salemme.
8      Q.  Okay.
9      A.  They all had something to say.
10     Q.  Okay.  Lieutenant Cesario said, this is
11 what happens when what?
12     A.  You work against other officers.
13     Q.  Okay.  And is it your testimony that
14 Barnes and Salemme said the exact same thing?
15     A.  Yeah, they would echo.
16     Q.  So your testimony is they said the
17 exact same thing that Lieutenant Cesario said?
18     A.  Yes.  They would echo.  They all had
19 something to say.
20     Q.  Okay.
21     A.  Then I said, well, what are you talking
22 about?  He goes, you know, you brought this
23 baggage with you.
24     Q.  Again, this is Lieutenant Cesario?

Page 174

1      A.  Yes.  You brought this baggage with
2  you.  He said, you will never be deputized.
3      Q.  Okay.
4      A.  You will never have a take-home car,
5  you will never work days, with his finger, as
6  long as I'm in command here.
7      Q.  Okay.
8      A.  And I said, well, why is that?  He
9  goes, like I said, you brought this baggage with
10 you.  This is what happens when you work against
11 other officers.
12     Q.  Okay.  Do you remember anything else
13 said in that meeting?
14     A.  We got removed.  Basically we got
15 removed from the day team.
16     Q.  They told you you were going to a night
17 team?
18     A.  Yes.
19     Q.  Did they tell you with Sergeant Mills?
20     A.  Yes, with Sergeant Mills.  And then --
21 you know, it's hard to say who said what.
22     Q.  Sure.
23     A.  But I know Cesario said a lot, Salemme
24 said a lot, as well.  I mean, they all backed

Page 175

1  each other's statements up.
2      Q.  Okay.
3      A.  He said, maybe he can help you better
4  manage your baggage since he came from IAD
5  himself.
6      Q.  Referring to Sergeant Mills?
7      A.  Yes.
8      Q.  Okay.
9      A.  And you're lucky you're still in this
10 unit for now.
11     Q.  Lieutenant Cesario said this?
12     A.  Yes.
13     Q.  Okay.  Do you recall anything else
14 being said in that meeting?
15     A.  Basically that was it.  That was the
16 summary of it.
17     Q.  Okay.  I'll take a summary, if that's
18 the most you've got.
19     A.  I mean, it's so many --
20     Q.  Do you recall anything else --
21     A.  There's so many --
22     Q.  -- specifically being said?
23     A.  I mean, there's so many things that's
24 happened from point A to that point --

Page 176

1      Q.  I understand.
2      A.  -- and so many comments.  You know, it
3  was a stressful --
4      Q.  I understand.  I'm just asking if you
5  specifically recall anything else being said at
6  the meeting.
7      A.  If I can recall something else, I'll
8  let you know.  But that's the best of my
9  knowledge, what I can recall at this time.
10     Q.  Okay.  Do you recall in that meeting
11 some discussion about the subject that Officer
12 Spalding's boyfriend, Anthony Hernandez, had
13 confronted Sergeant Barnes?
14     A.  I don't remember if that was touched
15 when I was there or if it was touched lightly.
16     Q.  Okay.
17     A.  But then again, you know, I had no part
18 of that.
19     Q.  Okay.
20     A.  And if that's what happened, I think
21 Barnes should address that with Officer
22 Hernandez.
23     Q.  All right.  I'm just asking you if you
24 recall that being discussed in the meeting.



DANIEL ECHEVERRIA                                    December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO            177–180

Page 177

1    A.  It may have, to the best of my
2  knowledge.  I can't tell you with a fine-toothed
3  comb the details of that, either.
4    Q.  Okay.  Let's put the --
5    A.  At the time being.
6    Q.  Let's put the details aside for the
7  moment.
8    A.  All right, sure.
9    Q.  In the meeting, do you remember the
10  subject of Spalding's boyfriend, Anthony
11  Hernandez, having had a confrontation or a
12  conversation with Sergeant Barnes?
13    A.  I think it may have been touched, yes.
14    Q.  Okay.  Was there a part of the meeting
15  where only Officer Spalding was present and you
16  weren't present or were the both of you present
17  for the entire meeting?
18    A.  We were both present for most of it,
19  but then, you know, there was times where --
20  there was a time where I think Shannon Spalding
21  may have spoken to Barnes in reference to that.
22    Q.  Inside the same meeting?
23    A.  I can't recall.
24    Q.  Okay.  What do you recall being

Page 178

1  referenced in the meeting about the
2  confrontation between Anthony Hernandez and
3  Barnes?
4    A.  It didn't sound like a confrontation to
5  me, but I can't tell you with exact.
6    Q.  Okay.  You don't recall what that
7  discussion was?
8    A.  Not at this time.  Maybe later I might
9  remember, but not at this time.
10    Q.  Okay.  Do you have a recollection that
11  that was at least part of the reason that you
12  were being told you were taken off of Barnes'
13  team?
14    A.  No.
15    Q.  Okay.
16    A.  That we were simply moved because of
17  the IAD thing.
18    Q.  Okay.
19    A.  To better handle our -- manage our
20  baggage, as they stated.
21    Q.  And when you were moved to nights,
22  Fugitive Apprehension was actually starting a
23  new night shift, correct?
24    A.  Yes.

Page 179

1    Q.  And they needed officers to fill that
2  shift, correct?
3    A.  That's correct.
4    Q.  Okay.
5    A.  People applied for it.
6    Q.  And people applied for it?
7    A.  Yeah.
8    Q.  And at that time when you were moved to
9  the third watch, you and Officer Spalding had
10  not been in Fugitive Apprehension that long,
11  correct?
12    A.  We were there since March, I want to
13  say.
14    Q.  Okay.
15    A.  And that took in effect, I don't know,
16  June.  I can't tell you.
17    Q.  So you were there two, three months,
18  approximately?
19    A.  It could be more, it could be less.
20    Q.  Okay.
21    A.  I can't tell you exactly.
22    Q.  Okay.  And are you aware of any other
23  officers that were moved from the second watch
24  to the third watch?

Page 180

1    A.  Not to the best of my knowledge, no,
2  I'm not.
3    Q.  There may have been, but you don't
4  know?
5    A.  Correct.
6    Q.  And the third watch was a North Side
7  team, correct?
8    A.  I wouldn't call it a North Side, I'd
9  call it an Area North team.
10    Q.  Okay, thank you.  Area North.
11    A.  Because Area North doesn't just deal
12  with the North Side, it has some South Side in
13  it.
14    Q.  Okay.
15    A.  So I wouldn't say just North Side.
16    Q.  So what areas would you work under
17  Sergeant Mills in terms of Area North?  What
18  would that encompass?
19    A.  It would encompass some South Side
20  districts and addresses.
21    Q.  Okay.
22    A.  As well as some West Side addresses.  I
23  don't think I ever went far north into any
24  decent neighborhood.



DANIEL ECHEVERRIA
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

December 02, 2014
181–184

Page 181

1    Q.  Okay.
2    A.  It's pretty much still the West Side.
3  Pretty active districts.
4    Q.  Okay.  But you -- it's fair to say you
5  did some work on the North Side, also?
6    A.  What do you consider North Side?  North
7  of Madison?  Sure, we did some stuff north of
8  Madison.
9    Q.  Okay.
10   A.  We didn't do nothing like in Evanston
11  or 24th District.
12   Q.  Okay.
13   A.  Nothing desirable.  I mean, people say
14  North Side, oh, you're going to the glamorous
15  North Side.  Nothing -- anything south of --
16  north of Madison is rough.
17   Q.  So prior to the move to Sergeant Mills'
18  team, on Sergeant Barnes' team, you were working
19  South and West Side, correct?
20   A.  South?  Not so much southwest, but
21  southeast.
22   Q.  Okay.
23   A.  But then again, anything West of State
24  would be West.

Page 182

1    Q.  Sure, sure.
2    A.  However you want to interpret it.
3    Q.  Sure.  Is it your point that you were
4  working largely in the same areas when you were
5  under Barnes and Mills?
6    A.  What do you mean, Barnes and Mills?
7    Q.  Yes.
8    A.  Different areas.
9    Q.  Okay.
10   A.  They didn't overlap.
11   Q.  Okay.
12   A.  At least I didn't get any overlap in
13  addresses.
14   Q.  Okay.  Other than the fact that when
15  you were working for Sergeant Mills, you were
16  working a different area than you were working
17  with Barnes --
18   A.  That's fair.
19   Q.  -- and you had different hours?
20   A.  That's fair to say.
21   Q.  And you had different days off.  Did
22  you have different days off?
23   A.  That's fair to say, as well.
24   Q.  Okay.  Other than those things, it was

Page 183

1  essentially the same job, correct?
2    A.  Yes and no.
3    Q.  Okay.  The yes part I get.  How is it
4  not essentially the same job other than those
5  things?
6    A.  The same job about it as far as locking
7  people up.  It's all about locking people up in
8  Fugitive Apprehension.  The crimes were
9  different.
10   Q.  Okay.
11   A.  You would get better cases, better like
12  cases working that task force team, Barnes' team
13  as opposed to Mills' team, turnstile jumping,
14  dead-end cases, people that were deceased
15  assigned to you.  You know, I mean, ridiculous.
16   Q.  Okay.  You felt like you got better
17  cases under Barnes than Mills?
18   A.  Absolutely.
19   Q.  Okay.  Would you say you got safer
20  cases under Mills than Barnes?
21   A.  No.
22   Q.  Okay.
23   A.  The area that you got is still violent.
24   Q.  Okay.  So the turn --

Page 184

1    A.  Hostile.
2    Q.  So the turnstile jumpers and the like
3  were just as violent as the fugitives you were
4  apprehending?
5    A.  No.  The area is just as violent.
6    Q.  Okay.  Any other way that the jobs were
7  different, other than what you've already
8  testified to?
9    A.  I can't tell you.
10   Q.  Is that a no?
11   A.  It's subject to interpretation.  I
12  mean --
13   Q.  Okay.
14   A.  It's all violent.  Everybody in the
15  street can be violent.
16   Q.  Sure.  I agree with you there.
17   A.  I mean, they've got sons of policemen
18  killing people.
19   Q.  Do you have an understanding or have
20  you had an understanding at any point since
21  you've been in Fugitive Apprehension what the
22  process was to get deputized for a U.S. Marshal
23  task force?
24   A.  Different versions of it.



DANIEL ECHEVERRIA                                    December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO            185–188

Page 185

1    Q.  Okay.
2    A.  But no exact version of it.
3    Q.  Okay.  So you've heard from people
4  different versions of it?
5    A.  Yes.
6    Q.  Okay.
7    A.  Some people say it's the sergeant that
8  has to put you in, some people say it doesn't
9  work like that, some people say based on
10  seniority, some people say it's based on time in
11  the unit.  I mean, different versions of it.
12    Q.  Okay.
13    A.  But no one has presented me a black and
14  white and said, this is the way it works, this
15  is protocol.
16    Q.  Okay.  Has anyone at the sergeant level
17  or above ever explained to you what the process
18  or procedure is for getting deputized?
19    A.  It depends on who you ask.
20    Q.  I'm asking you about whether any
21  lieutenant or higher ranking -- I'm sorry, a
22  sergeant or a higher ranking officer has told
23  you, Officer Echeverria, what the process is for
24  getting deputized for a U.S. Marshal status.

Page 186

1    A.  Nobody has told me the process of it,
2  they told me I wouldn't get it, ever.  I'll tell
3  you that for sure.  But to answer your question
4  for sure, I can't tell you.
5    Q.  Okay.
6    A.  Me or my partner would ever -- never
7  get it.
8    Q.  Okay.  I've got that one.
9    A.  Okay.
10    Q.  When you were on Sergeant Mills'
11  team --
12    A.  Yes.
13    Q.  -- the Area North, where did you
14  report?
15    A.  At that point the Fugitive Apprehension
16  unit moved out of Homan Square so they were no
17  longer at Fillmore.  They were at 3151 Harrison.
18    Q.  Okay.
19    A.  Up in the old -- they had converted the
20  Detective Division there to encompass Fugitive,
21  Financial Crime, Bomb and Arson.
22    Q.  Okay.
23    A.  So they used that whole second floor,
24  pretty much.

Page 187

1    Q.  And was that just the Area North team
2  reported there or everyone reported there?
3    A.  Area North reports there.
4    Q.  Okay.
5    A.  From time to time you see some
6  personnel that do come in there from other
7  areas.
8    Q.  Okay.  And would you have to report
9  there at the beginning of your shift and at the
10  end or how did that work --
11    A.  Yeah, yes.
12    Q.  -- when you were working for Sergeant
13  Mills?
14    A.  Yeah, we'd start there.
15    Q.  Okay.  And that was true for everybody
16  that was on Sergeant Mills' team, correct?
17    A.  No.
18    Q.  Okay.  Who was it true for and who was
19  it not true for?
20    A.  It was true for me and Shannon and it's
21  not true for some people who get dismissed from
22  the field.
23    Q.  Okay.
24    A.  Except for me and Shannon.  We would

Page 188

1  have to arrive at the area and dismissed at the
2  area.
3    Q.  Okay.  So you're saying that at certain
4  times, certain individuals under Sergeant Mills
5  would be dismissed from field and you and
6  Shannon Spalding were never dismissed from the
7  field.  Is that your testimony?
8    A.  Yes.
9    Q.  Aside from those times when individuals
10  were dismissed from the field, was it generally
11  the case where everyone on Sergeant Mills' team
12  was -- had to come back to the unit to be
13  dismissed?
14    A.  Yes.
15    Q.  Okay.  Do you have any recollection of
16  who ever got dismissed from the field?
17    A.  Yeah.
18    Q.  What officers were dismissed from the
19  field?
20    A.  Other team members on Sergeant Mills'
21  team, some people from VRI when we worked --
22  when we were allowed to work VRI, they got
23  dismissed from the South Side.
24    Q.  Okay.



Page 189

1    A.   But we had to come in to be dismissed.
2    Q.   Did you ever have a conversation with
3  Sergeant Mills about that subject, why you had
4  to come in rather than being dismissed from the
5  field?
6    A.   Yeah.
7    Q.   And what do you recall about that
8  conversation?
9    A.   He'd spin you.
10   Q.   What do you recall him saying in that
11  conversation?
12   A.   He's the sergeant.
13   Q.   He'd say, I'm the sergeant?
14   A.   He really wouldn't answer you directly.
15   Q.   Okay.  Do you recall your first
16  meeting, you and Officer Spalding, with Sergeant
17  Mills when you were assigned to his unit?
18   A.   We had a few meetings with Sergeant
19  Mills.
20   Q.   Do you remember the first time meeting
21  him?
22   A.   Yes.
23   Q.   Okay.  And do you recall a conversation
24  with him and Officer Spalding present?

Page 190

1    A.   Yes.
2    Q.   What do you recall about that
3  conversation?
4    A.   One of the meetings is we had talked to
5  him about what we did, where we came from in
6  reference to Brass Tax.
7    Q.   Sure.
8    A.   We had expressed -- we had told him
9  what -- the meeting we had with Sergeant Barnes,
10  Salemme, Cesario; we told him we were being
11  moved, why we were moved or how we ended up on
12  this team.  He said, good to know.  He said,
13  he's going to be observing.  And then we had
14  other meetings where he acknowledged the
15  differential treatment, stuff like that.
16   Q.   All right.  In that first meeting with
17  Sergeant Mills, did he indicate that he had
18  previously been in IAD?
19   A.   Yes.
20   Q.   Okay.  Did he tell you that he had
21  previously worked for --
22   A.   Juan Rivera.
23   Q.   -- Chief Rivera?
24   A.   Yeah.  Juan Rivera also instructed us

Page 191

1  to speak with Mills.  He said, talk to him
2  before they brainwash him.  We'll see where his
3  loyalty is.  I made him sergeant.
4    Q.   Okay.
5    A.   We were in the Marine Corps together.
6    Q.   Okay.
7    A.   So he made me believe that they knew
8  each other from before the job.
9    Q.   Okay.  And I believe your partner,
10  Officer Spalding, testified the other day that
11  any alleged retaliation by Sergeant Mills didn't
12  start until after the two of you filed your
13  lawsuit; is that correct?
14   A.   That's correct.
15   Q.   Okay.
16   A.   That's also when the dismissal thing
17  changed, too.
18   Q.   Okay.
19   A.   You know, the having to come in the
20  unit and other people didn't have to come in the
21  unit.
22   Q.   Okay, all right.  Let's talk about
23  that.
24   A.   All right.

Page 192

1    Q.   Other than the fact that the two of
2  you, you say, were never dismissed from the
3  field, what other retaliation did --
4    A.   After the lawsuit?
5    Q.   -- Sergeant Mills engage in after the
6  lawsuit was filed?
7    A.   After the lawsuit?
8         Well, there was differential treatment
9  at that moment on and I can understand why.  I
10  mean, they were friends.  They all were friends.
11  I mean, they all had worked together for a long
12  time.  Mills had expressed that himself.
13   Q.   Okay.
14   A.   He had worked for Salemme in the past,
15  that's why he's there now.
16   Q.   Okay.
17   A.   He has worked with Cesario, as well.
18   Q.   Sure.
19   A.   He elaborated about Juan Rivera in the
20  Marine Corps. and things of that effect.
21   Q.   Okay.  Other than the issue of being
22  not dismissed from the field, is there anything
23  else that Sergeant Mills said or did that you
24  are alleging was retaliation for --



DANIEL ECHEVERRIA                                    December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO          193–196

Page 193

1    A.  Yeah.  He would say something along the
2  lines of -- well, I can remember one meeting, to
3  be specific, one of many incidents.  There was
4  an incident where he kept us past quitting time
5  like an hour, hour and a half and all he did was
6  reference the lawsuit.  How it would be like for
7  us if we were to lose, did you ever think about
8  that.
9    Q.  Okay.
10    A.  You know, how do you think the
11  department is going to, you know, handle that
12  and the people you work with, how do you think
13  that's going to go for you.  It was comments
14  like that.
15    Q.  Okay.
16    A.  There was a comment about --
17    Q.  Let me just ask you.
18    A.  Okay.
19    Q.  Was there a reason he was keeping you
20  past quitting time?  I understand you're saying
21  what he said, but was there some work related
22  reason that he was keeping you?
23    A.  You know, it depends.  I think he kept
24  me just to keep us.  I mean, he talked a lot of

Page 194

1  nonsense.
2    Q.  Do you recall any work related reason?
3    A.  Yes.  I'll get into it.
4    Q.  Okay.
5    A.  There was a question about a warrant
6  arrest that I had.
7    Q.  Okay.
8    A.  I had received a phone call and it was
9  a warrant arrest where I was to pick up -- the
10  mother was giving up the daughter, is what it
11  was, and she had information where the daughter
12  was going to be.  And it was during the VRI, the
13  Violence Reduction Initiative.  And you would
14  have to work off of a warrant list.
15    Q.  Okay.
16    A.  But there was also cases that you were
17  allowed to work, like if it was a case of yours,
18  you can work that case, as well, on the VRI.
19    Q.  Okay.
20    A.  And I had locked up this girl that was
21  not on the VRI list but was a case of mine.
22    Q.  All right.  This was a --
23    A.  And he was upset about that and that's
24  what he kept pondering over about and kept on

Page 195

1  pounding into us.  And I had told him, well,
2  other officers do it.  And I was specific.  I
3  said, Joseph Lopez does it.
4    Q.  Okay.
5    A.  And that infuriated him.  He said, how
6  dare you bring Joseph Lopez into this.  I said,
7  how can I?  I mean, he does it.  He did it
8  today.
9    Q.  Okay.
10    A.  And I said, well, what do you want me
11  to do?  This is a warrant arrest.  You let her
12  fucking go, that's what you do.  If it's not on
13  the list, you let her fucking go.  So you want
14  me to let go, I told him, a person that has a
15  warrant, a court issued from a judge warrant,
16  let go?  So disobey a court warrant?
17    Q.  And what did he say?
18    A.  He said, yes, that's what I'm telling
19  you.
20    Q.  Okay.  And we'll talk a little bit more
21  about that.  That was a situation where you
22  arrested an individual in the 11th District?
23    A.  And it was in the 11th District.
24    Q.  It was not on your list, correct?

Page 196

1    A.  Correct.
2    Q.  Okay.
3    A.  I think that day we were supposed to
4  focus on some South Side areas.
5    Q.  Okay.
6        (Whereupon, Echeverria
7         Deposition Exhibit No. 7 was
8         marked for identification.)
9  BY MR. KING:
10    Q.  Officer Echeverria, I'm showing you a
11  document that's been marked as Deposition
12  Exhibit No. 7.
13    A.  Okay.
14    Q.  And I'm going to take you back to the
15  meeting that you previously testified to with
16  Cesario and others where you were told you were
17  moving to Mills' team.
18        Do you recall if this report was the
19  activity report that Lieutenant Cesario had in
20  that meeting?
21    A.  I've never seen the front page in my
22  life.
23    Q.  Okay.  What about the second page?
24    A.  The second page looks similar, but I



DANIEL ECHEVERRIA                                    December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO          197–200

Page 197

1  can't say this was what was presented to me.
2      Q.  Okay.
3      A.  I don't think it had the breakdown of
4  this.
5      Q.  Okay.
6      A.  But it looks familiar, but I can't say
7  this is what exactly he presented to me.
8      Q.  Okay.  Well, but it purports, anyway,
9  to be a listing of arrest activity from
10 March 22, 2012 to June 21, 2012 for you.  As you
11 sit here --
12     A.  Okay.  Pretty much --
13     Q.  -- are you able to say whether this is
14 accurate or not?
15     A.  I can't tell you.
16     Q.  Okay.
17     A.  Because I can't tell you if this is an
18 exact document that he presented to me.  I'll
19 tell you what, this document was never made
20 available to you.  I'll tell you that.
21     Q.  The first page of it?
22     A.  Right.  I'll tell you that 100.
23     Q.  But the second page may have been, but
24 you're not positive?

Page 198

1      A.  I can't say that with certainty.
2      Q.  Okay.
3      A.  It doesn't look --
4      Q.  Okay.  Whether this document, Page 1 or
5  Page 2, whether or not that was presented to you
6  in the meeting, as you sit here now, can you say
7  whether this arrest activity between March 22,
8  2012 and June 21, 2012 is accurate or not?
9      A.  I can't say.
10     Q.  Okay.
11         (Whereupon, Echeverria
12          Deposition Exhibit No. 8 was
13          marked for identification.)
14 BY MR. KING:
15     Q.  Officer Echeverria, I'm showing you
16 another document that's been marked Deposition
17 Exhibit No. 8, which -- let me know if you've
18 ever seen this Activity Report or Activity
19 Reports like this.
20     A.  Do you want me to just look at the
21 front page or do you want me to look at the
22 whole thing?
23     Q.  You can look at the whole thing.
24     A.  Okay.  I may have seen something like

Page 199

1  this --
2      Q.  Okay.
3      A.  -- in my work experience.
4      Q.  It indicates anyway that it's your
5  Activity Report for -- if you go from the
6  beginning to the end, it's 6/20/2012 through
7  4/30/2013.
8      A.  Yes.
9      Q.  As you sit here now, are you able to
10 say whether this is an accurate reflection of
11 your activity?
12     A.  It could be.
13     Q.  Okay.
14     A.  But then again, we don't write traffic
15 citations, driver cards.  We don't do any of
16 that in Fugitives.
17     Q.  Okay.
18     A.  We strictly do arrests, or assist
19 arrests.  We don't do case reports, we don't do
20 search warrants.  That's why the zeros are
21 there.
22     Q.  That's why the zeros are there?
23     A.  Yeah.  That's not a Fugitive thing.
24     Q.  As far as you know, you don't have any

Page 200

1  reason to say that this is inaccurate?
2      A.  Unless it's been altered, no.
3      Q.  Okay.
4          (Whereupon, Echeverria
5           Deposition Exhibit No. 9 was
6           marked for identification.)
7  BY MR. KING:
8      Q.  Officer Echeverria, I'm showing you
9  another document that indicates, anyway, it's
10 your Arrest Listing for the calendar year of
11 2013.  Do you think you've seen this document
12 before?
13     A.  I haven't seen this, but I have seen a
14 format similar to this.
15     Q.  Okay.  As you sit here now --
16     A.  I haven't seen a graph like this ever
17 printed before.
18     Q.  Okay.
19     A.  I haven't seen this type of spreadsheet
20 printed before like this.  I've seen something
21 along these lines but.
22     Q.  As you sit here now, do you have any
23 reason to believe this doesn't accurately
24 reflect your arrest activity in 2013?



DANIEL ECHEVERRIA
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

December 02, 2014
201–204

Page 201

1    A.   It could or could not be.  Because I
2  don't know if they're taking an incorporation of
3  my leave of absence, as well, my medical role.
4  So if they're incorporating that time where I
5  was gone for like seven, eight months,
6  thereabouts, then it would be inaccurate because
7  the dates.
8    Q.   I see.
9    A.   Do you see what I'm saying?  Because
10  then the activity would be rendered.
11    Q.   So it could accurately reflect your
12  actual arrest activity in 2013, but obviously
13  you wouldn't have any activity when you're out
14  on medical leave?
15    A.   That's correct.  And that would be the
16  same for this.
17    Q.   Exhibit --
18    A.   8.
19    Q.   -- 8?
20    A.   Correct.
21    Q.   Sure.  Thanks.
22        (Whereupon, Echeverria
23         Deposition Exhibit No. 10 was
24         marked for identification.)

Page 202

1  BY MR. KING:
2    Q.   Officer Echeverria, I'm showing you --
3    A.   Yes.
4    Q.   -- another document that's been
5  marked --
6    A.   Make room for this.
7    Q.   -- Deposition Exhibit No. 10 and ask
8  you to take a look at that.  It's a few pages of
9  what's called Portfolio Reports.  Just let me
10  know if you've ever seen any or all of these
11  pages.
12    A.   You know what, this is the first time
13  I'm seeing this.  Because when I went to work, I
14  checked my portfolio and I didn't see any of
15  these comments in there.  So I don't know when
16  these were generated.
17    Q.   Okay.  And what does that mean?  How do
18  you check your portfolio?
19    A.   You log into the Clear system, you can
20  check your portfolio.
21    Q.   Okay.
22    A.   So I've never seen this in my portfolio
23  until today.  The last time I checked was maybe
24  sometime last week.

Page 203

1    Q.   Okay.
2    A.   So I don't know when this was created.
3    Q.   Okay.  And you believe Portfolio
4  Reports like this would show up in your
5  portfolio and you could view them?
6    A.   Yes.
7    Q.   Okay.
8    A.   And I would question Page 2 of this, as
9  well.
10    Q.   Okay.
11    A.   The involved failed to make any arrests
12  for the last -- for March 19th through 23rd.
13  Does that incorporate my days off or it doesn't
14  and who are you comparing it to?  Are you
15  comparing it to Joe Lopez, other team members?
16  Did they get this too in their Portfolio?
17  Because not everybody makes arrests every day.
18    Q.   I understand that.
19    A.   It's just not like that.  It's the luck
20  of the draw.
21    Q.   Let me ask you some questions about
22  these.
23    A.   Sure.
24    Q.   The first page of Exhibit 10 is the

Page 204

1  incident you previously testified to where you
2  made an arrest in the 11th District when you
3  were assigned to other districts, correct?
4    A.   Yeah, that's probably it.
5    Q.   Okay.  The second page you were just
6  talking about, it indicates that you failed to
7  make any arrests between March 19 and March 23.
8  As you sit here, you don't know whether that's
9  correct or incorrect?
10    A.   Correct.
11    Q.   Okay.  And then the third page
12  indicates that you had lower arrest numbers for
13  the time period January 1 through February 1.
14  You worked 15 days and only had 2 arrests.  As
15  you sit here, do you know whether that's true or
16  not?
17    A.   I don't know if that's true.
18    Q.   Okay.
19    A.   I'd like to comment on this, though.  I
20  find this very interesting.  I remember a
21  conversation with Mills, and I believe Shannon
22  Spalding, my partner, was present where he
23  expressed concern about the two detectives
24  assigned to the unit on the team that hadn't



DANIEL ECHEVERRIA
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

December 02, 2014
205–208

Page 205

1   made an arrest from day one.  And we had already
2   been in the unit for quite sometime.  So I'd
3   like to know if they have that in their
4   Portfolio.
5       Q.  Okay.  And who were those individuals?
6       A.  It was Detective Zanos (phonetic) and
7   Detective Becker.  I'd like to know what their
8   Portfolio looked like since Mills told us they
9   hadn't made an arrest and he was concerned about
10  that, being detectives and all.
11      Q.  Okay.  Were they, Zanos and Becker, on
12  your team?
13      A.  Yeah.  They reported directly for
14  Mills.  So I'd like to see that.  That would be
15  interesting to see.
16      Q.  The next page of Exhibit 10.
17      A.  Oh, we're not done.  I'm sorry.  What
18  page are we talking about now?
19      Q.  This would be the last page of the
20  exhibit.  It's a report dated March 20, 2013.
21      A.  Okay.
22      Q.  It indicates that Mills spoke with you
23  on the 19th of March about spending excessive
24  time in the unit.  It indicates that Sergeant

Page 206

1   Mills explained that more time should be spent
2   out in the field on assigned cases.
3           Do you remember that conversation with
4   Sergeant Mills?
5       A.  Vaguely.
6       Q.  Okay.  But you at least vaguely recall
7   at least one conversation where he was
8   suggesting that you and Officer Spalding were
9   spending too much time in the office and should
10  spend more time out in the field; is that fair?
11      A.  No, because I disagree with him.
12      Q.  Okay.  But you recall him raising the
13  issue, whether you agree with him or not?
14      A.  Vaguely.
15      Q.  Okay.  And --
16      A.  I'd like to --
17      Q.  He indicates again on the last page --
18      A.  Okay.  We're not done yet?  I'm sorry.
19      Q.  -- on the date in question, that you
20  and your partner, Officer Spalding, didn't leave
21  I guess the headquarters until 1820 and then you
22  returned back at 2130.
23      A.  Was that 10:30?  Yeah, that's 10:30.
24      Q.  Do you recall that that day?

Page 207

1       A.  I can't recall that.  I can't recall
2   specific dates like that.
3       Q.  Okay.  So that may be true, you don't
4   know?
5       A.  I don't know.  I know he used to tell
6   us, make sure you work these cases up.  So if we
7   did stay in the unit, it was because we were
8   working these cases.  It wasn't like we were
9   playing poker.  There is some administrative
10  stuff you need to do before you lock somebody
11  up.  You can't just shoot in the dark.
12      Q.  That makes sense.
13      A.  Again, I checked my Portfolio last week
14  and I didn't see that, so I'd like to know when
15  that was generated since I -- I didn't see it.
16          I'd like to know if Becker and Zanos
17  were told the same thing or what their portfolio
18  reflects, since they hadn't locked anybody up,
19  according to Mills.  And I can vouch for that.
20      Q.  I know counsel doesn't like me to say
21  this, but I move to strike the last statements
22  as not only being nonresponsive to the question,
23  there was no question.
24      A.  All right.

Page 208

1       Q.  Other than what you've already
2   testified to, is there anything else that you're
3   alleging that Sergeant Mills did that was
4   retaliation against you and Officer Spalding?
5       A.  Sure.
6       Q.  What else?
7       A.  What else do you want to know?
8       Q.  What else?  What else have you got on
9   Mills?
10      A.  Get your pen ready.  Mills had a
11  conversation up in the parking lot where he
12  addressed Officer Spalding saying that she
13  should wear her vest to and from work.  Because
14  if O'Grady can have a pop at her, he would.
15      Q.  And you were present for this
16  conversation?
17      A.  Yes, I was.
18      Q.  Okay.  And where did this conversation
19  take place?
20      A.  At the 11th District parking lot.  I
21  mean, shit, that's -- that's a strong statement.
22      Q.  That's a very strong statement.  And
23  it's a very serious topic.
24      A.  Yes, it is.



DANIEL ECHEVERRIA                                    December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO              209–212

Page 209

1    Q.  But was Sergeant Mills joking when he
2  said that?
3    A.  I don't think that's a joking matter.
4  I wouldn't joke about somebody's life like that.
5    Q.  I agree, I agree.  So it's your
6  testimony that he said that and he was serious
7  about it?
8    A.  Yes, he was.
9    Q.  Okay.
10    A.  He should take action on that.  He
11  should address that, he didn't, to the best of
12  my knowledge.
13       There are other statements that I was
14  present for, then again I wasn't present for.
15  There's a statement where he had mentioned to my
16  partner that my partner reiterated to me.  And I
17  was present for part of it --
18    Q.  Sure.
19    A.  -- but there's some that I wasn't
20  present for, where Sergeant Mills said -- well,
21  I was present for this one.  He said, I don't
22  know why you two are still in this unit.  It may
23  have been in that meeting.
24    Q.  Okay.

Page 210

1    A.  Where he kept us over and we didn't get
2  paid for it and gave the City a good two hours
3  and hour and a half hours of my time when
4  everybody else went home.  Where Mills said, I
5  don't know why you two are still in this unit.
6    Q.  Okay.
7    A.  They don't want you up here.  I don't
8  know why you're still up here, and he touched
9  the lawsuit again.
10    Q.  Okay.
11    A.  That, I was present.  That happened at
12  that meeting.
13    Q.  That was the meeting that you testified
14  to earlier --
15    A.  Yes.
16    Q.  -- where you were sort of held over
17  after regular hours?
18    A.  Yes.  Not sort of, definitely held
19  over.  There's no sort of about it.
20    Q.  Okay.
21    A.  And then there's the one I was present
22  for as well was the parking lot that I testified
23  earlier.
24    Q.  Okay.

Page 211

1    A.  Another one where I wasn't present but
2  he did tell Shannon, I believe Shannon, because
3  Shannon told me.  And he said that along the
4  lines of if either one of us got in a shooting,
5  how do you think it would go for you when you
6  work for the lieutenant who hates you fucking
7  guys.  How would that go for you?  How do you
8  think that shooting would go for you?
9    Q.  Okay.
10    A.  I think that's kind of threatening.
11    Q.  Okay.
12    A.  I think that's inappropriate.  I mean,
13  you count on management to do their job and it
14  hasn't been done.
15    Q.  Anything else that Officer Mills said
16  or did that you consider retaliation?
17    A.  I mean, there's a lot.  But at the top
18  of my head, that would be it.  If it comes to
19  me, I'll let you know.
20    Q.  Okay.
21    A.  But for the time being, that's what I
22  recall, the standout points.
23    Q.  That's fair enough.
24       Do you recall an incident where you --

Page 212

1  or a time where you parked your vehicle in the
2  lieutenant's parking space?
3    A.  Sure, I recall that.
4    Q.  Okay.  And you did that deliberately?
5    A.  No, I did not.
6    Q.  No?  Why did you park in the
7  lieutenant's parking spot?
8    A.  Because there were no other parking
9  spots.  I didn't think it was a crime either,
10  since the lieutenant has four parking spots.
11    Q.  Do you have a conversation with the
12  lieutenant about that --
13    A.  No.
14    Q.  -- either before or after you --
15    A.  He never addressed me.
16    Q.  Did anybody ever address you about
17  parking in the lieutenant's parking?
18    A.  Sergeant Mills said.
19    Q.  What did he say to you?
20    A.  He asked why did I park in the
21  lieutenant's spot.  And I said, oh, I sure did.
22  I said, there was no other parking, we were
23  bringing in a prisoner.  I had parked there and
24  we had process the prisoner and I forgot to move



DANIEL ECHEVERRIA                                        December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                      213–216

Page 213

1  the car back.
2     Q.  You didn't say, fuck them?
3     A.  No, I did not.
4     Q.  In reference to the lieutenant?
5     A.  No.
6     Q.  You didn't say, fuck them, maybe now
7  they'll listen?  You didn't say that?
8     A.  No, I did not.
9     Q.  Okay.
10    A.  That's funny you say that.
11    Q.  Are you aware of Officer Spalding ever
12 using her phone or some other recording device
13 to record --
14    A.  No.
15    Q.  -- Sergeant Mills?
16    A.  No.
17    Q.  Okay.
18    A.  The first I heard of that was this
19 whole thing, the CR number and stuff like that.
20    Q.  Okay.  When was the first you heard
21 about that?
22    A.  During the CR number.
23    Q.  Okay.  There was a CR number on Officer
24 Spalding for allegedly --

Page 214

1     A.  The first I heard of that --
2     Q.  -- secretly recording Sergeant Mills?
3     A.  The first I heard of that was when Mike
4  Barz and another person, that I can't think of
5  the name because I don't know it, it may have
6  been told to me at one time, but I just can't
7  remember the name --
8     Q.  Sure.
9     A.  -- pulled Shannon off the floor and
10 took her to a back area by herself.  Two males
11 by herself with a female, I think that's against
12 protocol, too.
13    Q.  Were you present?
14    A.  I was present --
15    Q.  Okay.
16    A.  -- when it happened.  I wasn't present
17 or privilege to the conversation.
18    Q.  Okay.
19    A.  But that's the first I heard of it.
20    Q.  Okay.  So whatever happened in that
21 room, you -- whatever you know about that --
22    A.  Came from Officer Spalding and what I
23 observed.
24    Q.  -- you learned about it later from

Page 215

1  Officer Spalding?
2     A.  Yes, and what I observed.
3     Q.  Do you remember before Officer Spalding
4  went in that room or at any point while she's in
5  the room, her texting you?
6     A.  Yes, she did.
7     Q.  Okay.  Was it before she went in the
8  room or when she was in the room?
9     A.  When she was in the room.
10    Q.  Do you recall what she texted you?
11    A.  To call the lawyer.
12    Q.  Is that all it said?
13    A.  I believe that was it, to call our
14 lawyer.
15    Q.  Okay.
16    A.  The best of my knowledge.
17    Q.  And do you know if you still have that
18 text?
19    A.  No, I don't.
20    Q.  You don't?
21    A.  No.
22    Q.  Okay.
23    A.  I can't say I do.
24    Q.  And did you call your lawyer?

Page 216

1     A.  I called multiple times before somebody
2  called back.  And I guess he called Sergeant
3  Barz back and spoke with Sergeant Barz.
4     Q.  Okay.  Did you personally ever speak to
5  the lawyer before the lawyer spoke to Sergeant
6  Barz?
7     A.  I don't think I did.
8     Q.  Okay.
9     A.  I never made contact.  I remember I
10 left multiple messages, voicemail.  I believe I
11 did multiple texts to him, as well.
12    Q.  And who was the lawyer at the time?
13    A.  I can't think of his name off the top
14 of my head.  But --
15    Q.  Is it Don Herbert?
16    A.  Dan Herbert.
17    Q.  Dan Herbert, I'm sorry.
18    A.  And another associate.
19    Q.  Okay.  And do you recall who you left
20 messages with?
21    A.  The associate.
22    Q.  Okay.  And --
23    A.  Or co-counsel.
24    Q.  Sure, sure.



DANIEL ECHEVERRIA                                           December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                        217–220

Page 217

1    When Officer Spalding was in that room
2  with Mike Barz and the other officer, did you
3  stay in the area outside that room the whole
4  time she was in there?
5    A.  I stayed at a desk not far from there.
6    Q.  Okay.  Do you have a recollection of
7  approximately how long she was in that room?
8    A.  It's pretty close to an hour.
9    Q.  Okay.  I guess when she emerged from
10 that room, did you have a conversation with
11 her?
12   A.  It was hard to have a conversation with
13 her immediately because she was not in the right
14 frame of mind to speak.  She was very upset --
15   Q.  Okay.
16   A.  -- and very stressed out.  She didn't
17 look herself, she didn't look normal.
18   Q.  Okay.
19   A.  I walked with her to her car.  She
20 explained to me what had happened.
21   Q.  Okay.  What do you remember her telling
22 you about what had happened in that room?
23   A.  That they had accused her of
24 eavesdropping, I want to say.

Page 218

1    Q.  Okay.
2    A.  And the eavesdropping was with Mills.
3    Q.  Okay.
4    A.  And that it has all to do with the
5  lawsuit.  She said that Mike Barz had mentioned
6  to her that this can all go away.  And she had
7  questioned him, how can it go away.  And then he
8  implied, well, drop the lawsuit and this can all
9  go away.
10   Q.  Okay.  She said he implied that?
11   A.  Yes.
12   Q.  Do you remember her telling you
13 anything else about this?
14   A.  Like I said, she was very upset.  She
15 was crying.  Shit, it made me want to cry.
16   Q.  All right.  Anything else you remember
17 about her telling you about the incident?
18   A.  Not at the present time.
19   Q.  Okay.  At some point you and -- well,
20 strike that.
21      I assume that after you were reassigned
22 from Sergeant Barnes' team to Sergeant Mills'
23 team, you're not claiming that Sergeant Barnes
24 continued some retaliation against you?

Page 219

1    A.  I wouldn't see him much other than
2  crossing and, you know.
3    Q.  Sure.  You're not aware of any other
4  retaliation after you were no longer on his
5  team?
6    A.  No.
7    Q.  Okay.
8    A.  I wouldn't see him much.
9    Q.  Sure.  At some point you and Officer
10 Spalding applied to or submitted a To-From
11 asking to go back to second watch, correct?
12   A.  Yes.
13   Q.  Okay.  And that was ultimately granted,
14 correct --
15   A.  Yes.
16   Q.  -- you were sent back?
17      And you were sent back to the second
18 watch on -- what was the sergeant?
19   A.  Stack.
20   Q.  Sergeant Stack's team that you're still
21 on now, correct?
22   A.  Yes.
23   Q.  Okay.  Since you've been assigned to
24 Sergeant Stack's team, are you claiming that

Page 220

1  there's been any retaliation for your work in
2  Operation Brass Tax?
3    A.  I can't say that.
4    Q.  Okay.  Am I correct that neither you
5  nor Officer Spalding made any written complaints
6  to anyone about alleged retaliation or
7  harassment you were suffering as a result of
8  your work on Operation Brass Tax?
9    A.  To who?
10   Q.  To anyone.
11   A.  Yeah, we told Rivera once it started.
12   Q.  My question is about written
13 complaints.  Am I correct that you did not put
14 in writing any complaints to anyone about
15 alleged retaliation or harassment that you were
16 subjected to or allegedly subjected to as a
17 result of your work --
18   A.  No.
19   Q.  -- on the confidential investigation?
20   A.  No.
21   Q.  Okay.  And are you familiar with the
22 Independent Police Review Authority, IPRA?
23   A.  I've heard of it.
24   Q.  Okay.



DANIEL ECHEVERRIA                                    December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO              221–224

Page 221

1    A.  But I can't say that I'm very familiar
2  with it.
3    Q.  Okay.  Are you aware that they
4  investigate misconduct by police officers?
5    A.  Sure.  I believe IAD does some part of
6  it, IPRA does some part of it, Confidentials
7  does some part of it depending on the crime, is
8  my understanding of it.
9    Q.  Okay.  And am I correct that you and
10  Officer Spalding never made a Complaint to the
11  Independent Police Review Authority about any
12  alleged retaliation?
13    A.  No, I did not.
14    Q.  As far as you know, Officer Spalding
15  did not, either?
16    A.  That's correct, to the best of my
17  knowledge.
18    Q.  Okay.
19        (Whereupon, Echeverria
20         Deposition Exhibit Nos. 11 and
21         12 were marked for
22         identification.)
23  BY MR. KING:
24    Q.  Officer Echeverria, I'm showing you two

Page 222

1  other documents that have been marked Deposition
2  Exhibit Nos. 11 and 12.  And can you take a look
3  at both of these.  Exhibit 11 is a General Order
4  on Allegations of Misconduct Specific
5  Responsibilities and then Exhibit 12 is a
6  Special Order that's labeled Special Situations
7  Involving Allegations of Misconduct.
8    A.  Okay.
9    Q.  Do you think you've seen either of
10  these, the General Order or the Special Order
11  before?
12    A.  No, I can't say I've researched it or
13  looked at it.
14    Q.  Okay.
15    A.  I may have once in my life, but I can't
16  really tell you.
17    Q.  Okay.
18    A.  Maybe during a study session when I
19  took a sergeant's exam or a detective's exam, I
20  may have briefly looked at something along these
21  lines.
22    Q.  But you don't remember having any
23  particular familiarity with these two
24  ordinances?

Page 223

1    A.  No, I don't.
2    Q.  Okay.  Well, they both deal with
3  allegations of misconduct.  As you sit here, do
4  you know whether these orders would apply to
5  allegations of retaliation like you and Officer
6  Spalding were allegedly subjected to?
7    A.  I'm sure.
8    Q.  Would that include -- would that be
9  included in allegations of misconduct?
10    A.  I'm sure somebody would have -- I'm
11  reading Exhibit No. 12.
12    Q.  Yes.
13    A.  And it says, ascertain if a log number
14  has been obtained.  I think that's reference to
15  a CR number, that would be my best guess or
16  that's as to City -- I don't know.  Well,
17  anyway, if you complain to somebody, the CR
18  number is what I understand should be taken.
19    Q.  Sure.
20    A.  And when we've complained, I don't
21  think a CR number was ever generated.
22    Q.  Okay.  And I'm only asking you if you
23  know whether the General Order and the Special
24  Order, Exhibits 11 and 12, when they refer to

Page 224

1  allegations of misconduct, would that include
2  allegations of retaliation like --
3    A.  I'm sure it would.
4    Q.  Okay.  Well, let's take a look at
5  Exhibit 11, the General Order.  If you look at
6  the second page --
7    A.  This one.
8    Q.  -- of that exhibit.  And there's a
9  subsection B.  It says, Initiation,
10  Responsibilities and Procedures.  Do you see
11  that?
12    A.  Yes.
13    Q.  Okay.  In Paragraph 1 says, quote, when
14  misconduct is observed or a complaint relative
15  to misconduct is received by a non-supervisory
16  member, such member will immediately notify a
17  supervisory member and prepare a written report
18  to the commanding officer containing the
19  information received, observations made and any
20  action taken.  Do you see that?
21    A.  Yes.
22    Q.  Okay.  And am I correct that you and
23  Officer Spalding never prepared a written report
24  to any commanding officer about alleged



DANIEL ECHEVERRIA
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

December 02, 2014
225–228

Page 225

1 retaliation that you suffered; is that correct?
2     MR. SMITH: I'll object to this line of
3 questioning that -- the initiation
4 responsibilities.
5 BY MR. KING:
6     Q. Is that correct?
7     MR. SMITH: It's not clear whether it's
8 to a receiving member of a complaint. You can
9 answer if you can.
10     THE WITNESS: Can you repeat it? Did I
11 write something on paper?
12 BY MR. KING:
13     Q. My question is, am I correct that
14 neither you nor Officer Spalding, both being
15 non-supervisory members, ever prepared a written
16 report to any commanding officer or to anyone
17 else about alleged retaliation that you were
18 being subjected to?
19     A. Correct. I didn't write nothing. I
20 thought voicing --
21     Q. Let's look at Exhibit 12.
22     A. Okay. I thought voicing my opinion to
23 Chief Rivera would suffice.
24     Q. Let's look at Exhibit 12, which is a

Page 226

1 Special Order.
2     A. Okay.
3     Q. And if you could turn to the page, the
4 bottom right, it's Defendant 1338.
5     A. What page?
6     Q. It says 1338 at the bottom right.
7     A. 1338. Page 5, okay.
8     Q. And Section H is entitled Allegations
9 of Misconduct By Another Department Member.
10 Section 1 says, and I'll just read it. Quote,
11 whenever an allegation of misconduct is made
12 against another department member, the member
13 alleging misconduct will immediately notify,
14 prepare and submit a Two-From-Subject report of
15 the alleged allegations to their immediate
16 supervisor, unless the immediate supervisor is
17 the member accused of the misconduct. If a
18 member is accusing their immediate supervisor of
19 misconduct, the member will submit a
20 To-From-Subject report to the members' next
21 level supervisor in the member's chain of
22 command. Do you see that?
23     A. Yes.
24     Q. And am I correct that neither you nor

Page 227

1 Officer Spalding at any time submitted a
2 To/From --
3     A. To/From?
4     Q. -- Subject report to either your
5 supervisor or anyone above your supervisor or to
6 anyone at all with respect to the alleged
7 retaliation that you were being subjected to?
8     A. No.
9     Q. Is that correct?
10     A. That's correct. I mean, what good is
11 it to beef on Mills if you're going to beef to
12 Cesario? Then you beef on Cesario, it goes to
13 Salemme?
14     Q. I move to strike the commentary, which
15 is not responsive to any question.
16     A. Who are you going to beef to Rivera
17 about, the superintendent? I'm sure he'll be
18 glad to take a To-From from you.
19     Q. Officer Echeverria, are you aware of
20 any particular authority that the City Council
21 has delegated to the superintendent of police?
22     A. Not that I know of.
23     Q. Okay. And likewise, are you aware of
24 any particular authority the superintendent of

Page 228

1 police has or has not delegated to the chiefs in
2 the department?
3     A. Like what?
4     Q. My question is are you aware of what
5 authority the superintendent has delegated to
6 chiefs?
7     A. The authority to run the bureaus they
8 might be assigned to.
9     Q. That's your understanding?
10     A. According to the department guidelines.
11     Q. Okay.
12     A. That would be my understanding.
13     Q. Okay. And your understanding is the
14 department guidelines are made by the
15 superintendent?
16     A. Sure. Or at least signed off by him.
17     Q. Okay.
18     MR. SMITH: Objection, foundation.
19 BY MR. KING:
20     Q. You've made some references to the code
21 of silence.
22     A. Yes.
23     Q. Can you explain what your understanding
24 is of the code of silence?



DANIEL ECHEVERRIA
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

December 02, 2014
229–232

Page 229

1    A.   The code of silence, if you want to
2  call it the code of silence, the blue badge, the
3  blue wall, I mean, it's all the same.
4    Q.   Okay.  And what does it mean?
5    A.   You basically you don't go and report
6  police misconduct, you look the other way.  If
7  you do report police misconduct, you're out.
8  You become a target of retaliation.  That's
9  existed for many years.
10   Q.   How did you come to be familiar with
11 this alleged code of silence?
12   A.   Me sitting here.
13   Q.   Okay.
14   A.   That's for one.  I live it.
15   Q.   Okay.  Anything other than the fact
16 that you believe you've been retaliated against
17 where you've -- had you heard of this code of
18 silence prior to that, prior to --
19   A.   People talk about it in the academy.
20   Q.   Okay.  Do cadets talk about it?
21   A.   Cadets.
22   Q.   Okay.
23   A.   You could pull in -- pick officers at
24 random out of a hat, they'll elaborate the same.

Page 230

1    Q.   Okay.  When you were in the police
2  academy, do you have any recollection of anyone
3  talking about the code of silence, as you've
4  just described?
5    A.   Other cadets.
6    Q.   Okay.
7    A.   I can't be specific.
8    Q.   Sure, okay.  It wasn't something you
9  were taught at the police academy by the
10 trainers, correct?
11   A.   They teach you ethics, as well.
12   Q.   Okay.
13   A.   In fact, Tina Skahill was an ethics
14 instructor there.  That's why when I first
15 reported this, I felt confident reporting it to
16 her because I remember her from the academy.
17 And then she was chief of IAD, so I said, what
18 better person to report it to.
19   Q.   I asked you earlier if you reported
20 alleged retaliation to Tina Skahill and you said
21 no.
22   A.   I did not.
23   Q.   Are you changing your testimony that
24 you did report to Tina Skahill that --

Page 231

1    A.   I never said I reported anything to
2  Tina Skahill.
3    Q.   Okay.  So you're not alleging that?
4    A.   The only thing I reported to her is
5  initially the Sergeant Watts thing once we met
6  with the agent and her command staff and were
7  assigned to the Watts investigation, the Brass
8  Tax.  That's the only time I've ever spoken to
9  Tina Skahill about any corruption.
10   Q.   Just to be clear, you've not reported
11 any of the alleged retaliation that you or
12 Officer Spalding --
13   A.   No.
14   Q.   -- suffered to Tina Skahill, correct?
15   A.   No.  Correct.
16   Q.   Okay.  And this code of silence you
17 mentioned about not reporting police misconduct,
18 in your understanding of the code of silence,
19 that would apply whether you reported other
20 officers internally to CPD or externally to an
21 organization --
22   A.   Both.
23   Q.   -- like the FBI?  Both, right?
24   A.   Yes.

Page 232

1    Q.   Okay.  And in this case, you and
2  Officer Spalding worked on this investigation
3  first with the FBI and then with -- and then on
4  your work time as CPD both, correct?
5    A.   Yes.
6    Q.   Okay.  And you've alleged that various
7  incidents of retaliation have happened.  Do you
8  have any knowledge of whether that retaliation
9  was because you went to the FBI or simply
10 because you broke the code of silence?
11   A.   Broke the code of silence.
12   Q.   Okay.  Thank you.
13   A.   That would incorporate both, whether I
14 did it internally or externally.
15   Q.   Okay.
16   A.   I did what nobody else did, but my
17 partner.
18   Q.   Okay.  And if people were motivated to
19 retaliate against you, it's just because you
20 broke the code of silence, correct?
21   A.   Yes.
22   Q.   Okay.
23       MR. SMITH:  Objection, vague.
24       THE WITNESS:  I mean, I didn't



DANIEL ECHEVERRIA                                      December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                    233–236

Page 233

1   experience any retaliation prior to that.
2   BY MR. KING:
3       Q.   All right.  In fact, you didn't
4   experience any retaliation until after you were
5   working on the Watts investigation on your work
6   time for CPD, correct?
7       A.   Correct.
8       Q.   Other than yourself and Officer
9   Spalding, are you aware of any other officers
10  who you believe broke this code of silence by
11  reporting a misconduct by other police
12  officers --
13      A.   Yes.
14      Q.   -- that subject -- that were then
15  subjected to some retaliation?
16      A.   Yes.
17      Q.   Who else?
18      A.   Anthony Hernandez with Sergeant Padar.
19  He received retaliation after he reported
20  misconducted by Sergeant Padar.
21      Q.   Okay.
22      A.   The SOS scandal with Finnigan.
23      Q.   Let's go back to Anthony Hernandez.
24  What's your understanding of what he reported

Page 234

1   and how he's been retaliated against.
2       A.   He reported some misconduct with
3   Officer -- with Sergeant Padar and he's been
4   retaliated as far as like taken off of
5   Narcotics teams, placed in guard shacks.  I
6   mean, you'd have to speak to him to get a lot of
7   detail.
8       Q.   And that's some current, ongoing
9   litigation, correct?
10      A.   I believe so.
11      Q.   Okay.  And where did you learn of these
12  facts or these alleged facts about the Hernandez
13  case?
14      A.   I think it was made public at one time,
15  too.  But I got a lot of it from the media.
16      Q.   Okay.  And you got some of it from --
17      A.   Some of it from him, as well.
18      Q.   And some of it from Officer Spalding,
19  correct?
20      A.   Correct.
21      Q.   Okay, all right.  Other than the
22  Anthony Hernandez situation, what other
23  incidents of alleged --
24      A.   The SOS scandal.

Page 235

1       Q.   And what is the SOS scandal?
2       A.   Where I guess Officer Finnigan
3   attempted to hire a hit man to take out who he
4   thought was providing information to outside
5   agencies as well as the CPD for misconduct, also
6   going on the Special Operations Section.
7       Q.   And what's the basis for your knowledge
8   of what you call the SOS scandal?
9       A.   The same thing.  The same thing.  It's
10  been in the media, it's public.  I've looked at
11  it, I've read it.
12      Q.   Okay.  But other than what you've read
13  about it, you don't have any personal knowledge
14  of the circumstances involved in the SOS
15  scandal?
16      A.   No.  Just what's been in public.
17      Q.   Is that something that's
18  currently ongoing or was this something that
19  happened a long time ago?
20      A.   I want to say a long time ago, but it's
21  definitely within a reasonable time back.  I
22  wouldn't say it's ten years ago, I wouldn't say
23  it's 20 years ago.
24      Q.   Sure.  How long ago do you think this

Page 236

1   SOS --
2       A.   It's definitely before the Brass Tax.
3   So Brass Tax was maybe about five years now or
4   so, that we initially did.  Maybe seven or
5   eight years.
6       Q.   Okay.
7       A.   Is that safe?  I mean, an
8   approximation.
9       Q.   I'm trying to get your best
10  recollection.  But it was before 2007 when you
11  and Officer Spalding started working on
12  Operation Brass Tax?
13      A.   Thereabouts, yes.
14      Q.   Okay.  Other than Anthony Hernandez and
15  what you described as the SOS scandal, are you
16  aware of any other incidents where an officer
17  allegedly broke the code of silence and then was
18  subjected to some retaliation?
19      A.   That would be the best examples I have.
20      Q.   Okay.
21      A.   Other than mine.
22      Q.   Okay.
23          MR. KING:  How are you holding up?
24          THE COURT REPORTER:  I'm fine.



DANIEL ECHEVERRIA                                    December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO              237–240

Page 237

1        MR. KING:  Are you guys okay --
2        MR. SMITH:  Yeah.
3        MR. KING:  -- continuing?  That's fine?
4    BY MR. KING:
5        Q.   I understand that you're claiming and
6    you've testified that each of the individual
7    Defendants engaged in certain kinds of
8    retaliation against you and Officer Spalding; is
9    that correct?
10       A.   Yes.
11       Q.   Okay.  You're not claiming that each of
12   these individual Defendants reached some
13   understanding or agreement with other people
14   that they were going to retaliate against you,
15   are you?
16       A.   Other people as to who?  Among
17   themselves, yes.
18       Q.   Among themselves?
19       A.   Yes, I agree that they have.
20       Q.   Okay.  Let's talk about them.  Let's
21   talk about Chief Rivera.
22       Are you claiming that Chief Rivera
23   reached some understanding or agreement with
24   anyone to retaliate against you?

Page 238

1        A.   Yes.
2        Q.   Okay.  Who do you think he reached an
3    understanding or agreement with to retaliate
4    against you?
5        A.   The other Defendants.
6        Q.   And that's based on what?
7        A.   Based on the fact that I'm still
8    sitting here being deposed, based on the fact
9    that I had to file a lawsuit, based on comments
10   that we've been subject to, based that we've
11   brought to his attention things, based that he's
12   confided in us and explained to us meetings that
13   he was present.  As far as not -- we were
14   referred to as IAD rats by other -- by James
15   O'Grady, Nick Roti not wanting us back, telling
16   us our careers are over.  Sure, send them back,
17   let's see if they get help on the street.  All
18   of that.
19       Q.   Okay.  So would it be fair to say that
20   you are inferring because the individual
21   Defendants committed acts of retaliation, that
22   they must have agreed or reached some
23   understanding to do that?
24       A.   Yes.

Page 239

1        Q.   Okay.
2        MR. SMITH:  I'm just going to object
3    vague as the word inferring.
4        THE WITNESS:  They allowed it to
5    happen.
6    BY MR. KING:
7        Q.   Okay.  Yeah, let's explore that even
8    further.
9        A.   Okay.
10       Q.   You're alleging that because each of
11   the individual Defendants engaged in some form
12   of retaliation and the fact that some -- you
13   know what, strike that.
14       A.   Okay.
15       Q.   And I assume you're not alleging that
16   each of the individual Defendants even had
17   knowledge of all of the retaliation that other
18   Defendants committed, would that be fair to say?
19       A.   No.
20       Q.   You think each of the Defendants had
21   knowledge of what everybody else did?
22       A.   Yes.
23       Q.   Okay.  So you think the people in
24   Inspections had knowledge of the retaliation

Page 240

1    that you suffered in Fugitive Apprehension?
2        A.   They do now.
3        Q.   Okay.  Other than --
4        A.   I mean --
5        Q.   You're right, you're right.
6        A.   Right?
7        Q.   You're right.
8        A.   Okay.
9        Q.   Other than through your lawsuit, other
10   than through your publicly filed lawsuit and
11   your famous television appearances --
12       A.   I'm not camera shy.
13       Q.   -- you're not alleging, are you, that
14   all of the individual Defendants even had
15   knowledge of the harassment or retaliation that
16   was allegedly committed by other individual
17   Defendants, would you agree with that?
18       A.   I can't agree or I can't disagree.
19       Q.   You don't know, right?
20       A.   I'd say -- I'd say they all know, to a
21   degree.
22       Q.   Okay.
23       A.   Prior to the lawsuit and more so after
24   the lawsuit.



DANIEL ECHEVERRIA                                December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO             241–244

Page 241

1    Q.   Okay.
2    A.   My opinion.
3    Q.   Okay.  I'll just take that same
4  example.  Is it your testimony that Lieutenant
5  Pascua and Lieutenant Sadowski had knowledge of
6  the alleged retaliation that you suffered in the
7  Fugitive Apprehension unit before you publicized
8  those events by filing a lawsuit and going on
9  television?
10   A.   Hard to say.  Like I said, to a degree.
11   Q.   Do you have any basis for that
12 assertion, other than --
13   A.   My personal opinion.
14   Q.   Okay.  Other than your personal
15 opinion?
16   A.   No.  Other than my personal opinion,
17 no.
18   Q.   Okay.  We've gone all the way through
19 to your employment with Sergeant Stack.  You're
20 still on that team?
21   A.   Yes.
22   Q.   I'm just going to ask you for each of
23 the individual Defendants, Rivera, Kirby,
24 O'Grady, Roti, Sadowski, Pascua, Stanley,

Page 242

1  Barnes, Cesario, Salemme and Mills, other than
2  what you've already testified to, are you aware
3  of any retaliation by any of those individuals
4  resulting from your work on Operation Brass
5  Tax?
6    A.   Other than Brass Tax?
7    Q.   No.  Other than what you've testified
8  to already, are you aware of any other
9  retaliation or alleged retaliation by those
10 individuals resulting from your work on
11 Operation Brass Tax?
12   A.   The best of my knowledge, what I have
13 explained to you today.
14   Q.   Okay.  To the best of your knowledge,
15 there's nothing else?
16   A.   The best of my knowledge at this time,
17 nothing else.
18   Q.   Okay.  Thank you.
19   A.   If I think of something else, I'll let
20 you know.
21   Q.   I appreciate that.
22          (Whereupon, Echeverria
23           Deposition Exhibit No. 13 was
24           marked for identification.)

Page 243

1  BY MR. KING:
2    Q.   Officer Echeverria, I'm showing you
3  another document that's been marked as
4  Deposition Exhibit No. 13.  It's a Summary
5  Report Digest, at least the first page
6  indicates.  And this document refers to the CR
7  where you and Officer Spalding and Sergeant
8  Pasquinelli were named relating to efforts to
9  recover a dog?
10   A.   Rin Tin Tin thing yeah.
11   Q.   Do you recall this?
12   A.   Yeah.
13   Q.   Okay, all right.  And you're aware that
14 a CR had been filed against you --
15   A.   Yeah, I'm aware of that.
16   Q.   -- regarding that incident?
17        Okay.  Do you know whether you've seen
18 this document before?
19   A.   I don't know if I got the whole
20 breakdown of it like this.
21   Q.   Okay.
22   A.   I can't recall.
23   Q.   Okay.  Well, if you --
24   A.   I know I was interviewed.

Page 244

1    Q.   You were interviewed?
2    A.   And my partner was interviewed.
3    Q.   She was?
4    A.   I remember somebody telling me they
5  interviewed everybody except the dog.
6    Q.   That's a good line.
7    A.   It was true.  It's a true story, a true
8  statement.
9    Q.   All right.
10   A.   I think it was by investigative
11 Shipwreck (phonetic) or something along those
12 lines.  He said that to me.
13   Q.   Do you recall that the investigator was
14 Joseph Stehlik?
15   A.   That's the second one.
16   Q.   There was one prior to that?
17   A.   Yeah, I think so.  The Shipwreck guy.
18   Q.   Okay.  It was something like Shipwreck
19 was his name?
20   A.   Something like that, along those lines.
21 I don't know if I'm saying it right.  It was
22 like Shipwreck, Shipwreck.  I don't know, agent
23 something or other.
24   Q.   Do you have any knowledge of why the



DANIEL ECHEVERRIA                                    December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO              245–248

Page 245

1   investigator changed on this?
2       A.   I don't know.  I don't know if the guy
3   was on vacation or something.  I don't know.
4       Q.   Sure, okay.
5       A.   I don't know how they do things like
6   that up there.
7       Q.   When you gave your statement or
8   interview, was that by -- let's just call him
9   Shipwreck.  Was that by him or was it by this
10  Joseph Stehlik?
11      A.   I think Stehlik.
12      Q.   Okay.
13      A.   Yeah.  A taller, white gentleman.
14      Q.   If you look at the page, go by the
15  numbers at the bottom right, it's Page 924.
16      A.   Okay.
17      Q.   And it indicates here that the
18  allegations against you for violation of Rule 4
19  and violation of Rule 2 were sustained.  Do you
20  see that?
21      A.   Yes.
22      Q.   Is that your understanding that at
23  least the initial finding was a sustained on
24  those two violations?

Page 246

1       A.   Yes.
2       Q.   Okay.  And on the next page it
3   references a recommendation and a recommendation
4   that you be suspended for two days.  Were you
5   aware of -- are you aware of that
6   recommendation?
7       A.   I believe so.
8       Q.   Okay.  And ultimately this was changed
9   to a finding of not sustained, correct?
10      A.   Yeah.  I grieved it, I think.
11      Q.   Okay.
12      A.   Yeah.
13      Q.   And you did not receive any discipline,
14  correct?
15      A.   Correct.
16      Q.   Okay.  And do you have any personal
17  knowledge of knowing who made the decision to
18  change the finding from sustained to
19  unsustained?
20      A.   I think I talked to an FOP lawyer.
21  Maybe they know.  I don't know off the top of my
22  head, no.
23      Q.   Okay, that's fine.
24      A.   It says here Daniel Mahoney.  Maybe he

Page 247

1   did it.
2       Q.   Okay.
3       A.   That's 929.
4       Q.   I just wanted to know if you know from
5   your personal knowledge.
6       A.   I grieved it.
7       Q.   That's fine.
8               (Whereupon, Echeverria
9               Deposition Exhibit No. 14 was
10              marked for identification.)
11  BY MR. KING:
12      Q.   Officer, I'm showing you another
13  document that's been marked Echeverria
14  Deposition Exhibit No. 14.  It's an overtime
15  report that we've produced in the case from
16  January 1, 2006 through November 11, 2014.  It's
17  overtime by year for you and Officer Spalding.
18          As you sit here -- well, let me ask
19  you, have you seen this report before?
20      A.   I've never seen a report like this
21  before.
22      Q.   Okay.  As you sit here, do you have any
23  reason to question whether these are your
24  accurate overtime hours worked in the years

Page 248

1   listed?
2       A.   It encompasses eight years of a time
3   span, so I don't know how --
4       Q.   You don't know one way or the other --
5       A.   No.
6       Q.   -- whether it's accurate?
7       A.   Eight years?  Jesus, no, I wouldn't
8   know.
9       Q.   Okay.  I'm just asking.
10          At any point during the period where
11  you allege that you've been retaliated against,
12  you and officer, your salaries were not reduced,
13  correct?
14      A.   Well, some overtime was impeded, so
15  maybe it was.  But other than that, no.
16      Q.   Okay.
17      A.   It's not like I took a demotion in pay.
18  I'm being paid as a police officer.
19      Q.   Right.
20      A.   I'm not a detective pay or sergeant pay
21  and then reduced a pay grade.
22      Q.   Right.  So aside from overtime
23  potentially, you're not alleging that as a
24  result of this retaliation, your salaries were



DANIEL ECHEVERRIA
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

December 02, 2014
249–252

Page 249

1  cut?
2      A.  No, no.
3      Q.  In fact, during the years that you've
4  alleged that the retaliation has been going on,
5  have you received any pay increases?
6      A.  A step increase.
7      Q.  Okay.
8      A.  A contract increase.
9      Q.  Okay.  And do you get those every year?
10     A.  I don't know.  I think they're like
11  benchmark type.  I think one is off of your
12  probation time, I think you get one on the
13  anniversary there.  And then -- I mean, don't
14  quote me.  Like a five-year step increase, a
15  ten-year step increase.  I recently made a
16  15-year benchmark, I think I got an increase
17  there --
18     Q.  Okay.
19     A.  -- by contract.  Something like that.
20     Q.  Sure.
21     A.  But other than step increase, no.
22     Q.  Okay.  But none of your step increases
23  have been impeded in any way --
24     A.  No.

Page 250

1      Q.  -- as a result of the allegation of
2  retaliation?
3      A.  No.
4      Q.  Okay.  And you believe there may be
5  some overtime opportunities that were lost as a
6  result of the alleged retaliation?
7      A.  Yes.
8      Q.  Okay.  As you sit here, do you -- I
9  mean, are you able to quantify how much overtime
10  you've lost?
11     A.  I can't put a dollar number on it
12  because overtime is always a variable.
13     Q.  Sure.
14     A.  You could have one hour, you could have
15  five hours.
16     Q.  Sure.
17     A.  You could do a double shift.  I mean,
18  it's a variable.  It's a case by case.
19     Q.  Sure.  Have you worked any overtime --
20  well, strike that.
21         Since you've been in Fugitive
22  Apprehension, has there been any difference in
23  the overtime opportunities, let's say from
24  Sergeant Barnes' team on days to Sergeant Mills'

Page 251

1  team on nights and Sergeant Stack's team back on
2  days, has overtime opportunities been pretty
3  similar for all of those?
4      A.  No.  It's been different.
5      Q.  How has it been different?
6      A.  I believe on Barnes' team, we didn't
7  get overtime because everybody there was
8  deputized.
9      Q.  Okay.
10     A.  So they got overtime through the
11  Marshal's program because of their credentials,
12  Marshal funding.  So we weren't allotted that.
13  Then on Mills' team, we weren't allotted
14  overtime there, either.  But I don't know, I
15  can't speak for the rest of the team, either.
16  Sergeant Stack's team, I've been allotted some
17  overtime being non-deputized.
18     Q.  Okay.
19     A.  But then again, it has also been
20  limited to deputized or task force officers, as
21  well.
22     Q.  Okay.
23     A.  So, I mean, I don't know.  Does that
24  answer your question?

Page 252

1      Q.  Yeah, yeah.
2      A.  All right.
3      Q.  Just to be clear, I mean, you're not
4  alleging that you've worked some overtime hours
5  and not been paid for it, you just --
6      A.  I'd grieve it, if I was.
7      Q.  So that would be a no, right?
8      A.  That would be a no.
9      Q.  Okay, fair enough.  And it sounded like
10  you're saying that in Fugitive Apprehension,
11  there's some difference between overtime
12  opportunities for Marshal's Task Force officers
13  and non-task force officers?
14     A.  Yes.
15     Q.  Okay.  And whatever overtime
16  opportunities you or Officer Spalding would get
17  or wouldn't get, would be the same as other
18  non-task force officers, correct?
19     A.  That's hard to answer.  I mean, because
20  Officer Spalding and myself were treated
21  differently than other officers, as well.
22     Q.  Are you aware of any other officers,
23  non-task force officers in Fugitive Apprehension
24  getting overtime opportunities that you believe



DANIEL ECHEVERRIA                                    December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO              253–256

Page 253

1  were not afforded to you and Officer Spalding?
2      A.  I mean, there are non-task force
3  officers that do get overtime and there are some
4  that don't, so how do you want me to answer
5  that?
6      Q.  Are you aware of any particular
7  circumstances where other non-task force
8  officers had the opportunity to get overtime and
9  you and Officer Spalding didn't, as you sit
10 here?
11     A.  Could be.  Like I said, it's difficult
12 to answer that.
13     Q.  Okay.  As you sit here, you're not
14 aware of any particular circumstances; is that
15 correct?
16     A.  It's difficult to answer, sir.
17     Q.  Okay.
18     A.  I mean --
19     Q.  Okay.
20     A.  I'm being as honest as I can.
21     Q.  Okay.  I understand.
22     A.  I'm answering you the best I can at the
23 moment.
24     Q.  I understand.

Page 254

1          And you're not claiming that as a
2  result of the alleged retaliation, that you've
3  been demoted in rank or anything like that?
4      A.  I still wear a blue shirt.
5      Q.  That would be a no?
6      A.  Correct.
7      Q.  Okay, thanks.
8          And you mentioned earlier that you went
9  on medical leave for a period of time --
10     A.  Yes.
11     Q.  -- correct?  Okay.  And our records I
12 think show that you went out on medical leave
13 from on or about May 14, 2013 to December 10,
14 2013.
15     A.  That sounds about right.
16     Q.  Does that sound about right?  Yes?
17     A.  That sounds about right, plus or minus
18 a day or two here and there.
19     Q.  All right.  And are you seeking to
20 recover damages in this case for --
21     A.  For burning my time?
22     Q.  -- for emotional distress?
23     A.  Absolutely.
24     Q.  Okay.  And have you visited any doctors

Page 255

1  or other medical professionals for the emotional
2  distress?
3      A.  Yes, I have.
4      Q.  And do you recall what doctors or other
5  medical professionals you've seen?
6      A.  I visited my primary care physician
7  first.
8      Q.  Okay.
9      A.  Who in her medical opinion believed it
10 would be beneficial for me to take this medical
11 leave.
12     Q.  Take a medical leave.  And what's that
13 doctor's name?
14     A.  Her name is Dr. Vesna Sternic.
15     Q.  Okay.  She had a hard name to
16 pronounce.  I was just going to call her Dr. V.
17 Would that work?
18     A.  Vesna is the first name, I think, and
19 Sternic is the last name.
20     Q.  Sternic.  We'll go with Sternic, okay.
21 And that was your primary care physician?
22     A.  Yes.
23     Q.  So how long has Dr. Sternic been your
24 doctor or when did you think you first visited

Page 256

1  with her?
2      A.  She's been my doctor for a while.  I
3  want to say -- I'm trying to use a reference
4  guide.
5      Q.  Sure.
6      A.  Well, my kid's about eight-years old.
7  My kid is eight.  I've been seeing her at least
8  that time.
9      Q.  Okay.
10     A.  I don't know if I saw her before.
11     Q.  Eight years, somewhere along there?
12     A.  Thereabouts.
13     Q.  Okay.  That's fine.
14     A.  I'm trying to use that as kind of like
15 a guideline.
16     Q.  Sure.
17     A.  I mean, I can't tell you my first day I
18 went to see her.
19     Q.  Sure.  And who else have you seen?
20     A.  And then I received a referral from
21 Dr. Sternic to see a Dr. Ruzycki.
22     Q.  And Dr. Ruzycki is a psychologist?
23     A.  Yes.
24     Q.  Okay.  And, again, I think our records



DANIEL ECHEVERRIA
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

December 02, 2014
257–260

Page 257

1 indicate you first saw Dr. Ruzycki on May 16,
2 2013. Does that sound right?
3    A.  Whatever is on the medical record, I'm
4 sure that's pretty accurate.
5    Q.  Okay.  And other than Dr. Sternic and
6 Dr. Ruzycki, have you seen anyone else --
7    A.  Yeah.
8    Q.  -- for conditions that you're claiming
9 were the result of retaliation?
10    A.  Yeah.  I saw a doctor at the Medical
11 Section.  I can't think of her name.
12    Q.  The CPD Medical Section?
13    A.  Yeah.
14    Q.  Okay.  Dr. Arjmand?
15    A.  Arjmand.  I saw her once or twice.
16    Q.  Okay.
17    A.  Then I also saw -- I can't think -- I
18 don't know her name.  A City doctor when I was
19 evaluated to return to work.
20    Q.  Was that Dr. Lynsey Stewart?
21    A.  I couldn't tell you.  I mean, if that's
22 what's on record.
23    Q.  Okay, that's fine.
24    A.  I'm sure that's accurate.  I saw her

Page 258

1 once.  No, I saw another doctor, too, who did a
2 medical physical.
3    Q.  Okay.
4    A.  At the Twin Towers, I think -- not the
5 Twin Towers.  The Presidential Towers.
6    Q.  Yeah.  I think that may have been
7 Dr. Stewart.
8    A.  I don't know.  And then I saw a
9 psychologist, as well.  So I saw my two doctors,
10 a City -- Arjmand, a City doctor, a City doctor.
11 This is five doctors?
12    Q.  And are you saying you saw a
13 psychologist in addition to Dr. Ruzycki or she
14 was the psychologist?
15    A.  Ruzycki was the psychologist referred
16 by my primary.
17    Q.  Sure.
18    A.  So I saw Sternic, Ruzycki on my own
19 accord.  The other two doctors, I had to see due
20 to the City.
21    Q.  Okay, that's fine.
22    A.  In compliance with the City.
23    Q.  That's fine.
24    A.  Does that sound right?

Page 259

1    Q.  I think so.
2    A.  All right.
3        (Whereupon, a discussion was had
4        off the record.)
5        (Whereupon, Echeverria
6        Deposition Exhibit Nos. 15 and
7        16 were marked for
8        identification.)
9 BY MR. KING:
10    Q.  Officer Echeverria, I'm showing you a
11 couple of medical reports that have been marked
12 Deposition Exhibit 15 and 16.
13    A.  All right.
14    Q.  And these are reports from -- that we
15 got pursuant to subpoena, I think --
16    A.  Okay.
17    Q.  -- from Dr. Sternic.
18    A.  All right.
19    Q.  Let's look at the first one, which is
20 Exhibit 15.  It mentions an encounter date of
21 8/23/2012.  It says reason for visit,
22 hypertension.  Do you see that?
23    A.  Where are you at?
24    Q.  Up here.

Page 260

1    A.  Just point at it with your pen and I'll
2 follow you where you're at.
3    Q.  Reason for visit, hypertension.
4    A.  Okay.
5    Q.  Do you recall seeing Dr. Sternic for
6 hypertension?
7    A.  Yeah.  She prescribes me medication for
8 it.
9    Q.  When do you think you first saw her for
10 hypertension?
11    A.  I can't put a finger on it, but she
12 seems to agree that it's -- stress is a big
13 factor in it.
14    Q.  Okay.  To the best of your
15 recollection, it wasn't on this 8/23/2012 date
16 that she first --
17    A.  First gave me medication?
18    Q.  -- first gave you medication for
19 hypertension?
20    A.  I can't tell you.  Unless it says
21 somewhere in the narrative it does, I couldn't
22 tell you with exact definition of it.
23    Q.  Well, just from your own recollection,
24 if you can recall.  I mean, do you think it was



DANIEL ECHEVERRIA                                    December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO              261—264

Page 261

1   August of 2012 when she first started giving you
2   medication for hypertension or before?
3      A.  Like I said, I can't tell if it's
4   before or that day.
5      Q.  Okay.
6      A.  The best of my knowledge.
7      Q.  All right.
8      A.  I mean, unless it's -- unless it's
9   referenced somewhere where she says yes, then I
10  would say it would be accurate.
11     Q.  Well, here on the first page, it says
12  in this paragraph, Daniel has a past medical
13  history of HTN, hypertension.
14     A.  Okay.  That's kidney stone, calculi.
15  Renal calculi.
16     Q.  That's kidney stones?
17     A.  Renal calculi, yes.
18     Q.  Does that help you at all remember
19  whether you had a history of hypertension?
20     A.  Well, she puts a medical history, then
21  it must be prior to that date.
22     Q.  Right.
23     A.  Okay.
24     Q.  Okay.  But you don't know how long

Page 262

1   prior to 8/23/2012 she diagnosed you with
2   hypertension?
3      A.  No, I don't, the best of my knowledge.
4      Q.  And she also indicates that you have a
5   family history of hypertension in both your
6   father and your mother; is that correct?
7      A.  Yes.
8      Q.  Okay.  Now, if you look at the next
9   exhibit, 16.  It's another visit with Dr. --
10     A.  Sternic.
11     Q.  -- Sternic dated May --
12     A.  March.  May?
13     Q.  May 8, 2013.
14     A.  Yes, okay.
15     Q.  Do you see that?
16     A.  Yes, I do.
17     Q.  Okay.  And in the section HPI on this
18  exhibit, it says, patient is in a very stressful
19  situation at work, which influences his life,
20  blood pressure.  Do you see that?
21     A.  Yes.
22     Q.  Okay.  And in Exhibit 15, the earlier
23  visit, there's no mention of anything about work
24  or stress at work, correct?

Page 263

1      A.  Yeah, I remember this visit.
2      Q.  Okay.  Am I correct?
3      A.  Correct.
4      Q.  Okay.  So am I correct that the May 8,
5   2013 visit was the first time you --
6      A.  I confide in her about work, yes.
7      Q.  Okay, thank you.  So that was the first
8   time you told her about things that you were
9   going through at work?
10     A.  Yes.
11     Q.  Okay.  And did anyone recommend to you
12  that you talk to your doctor about the things
13  that were going on at work?
14     A.  I thought I should be open to her and
15  explain to her --
16     Q.  Okay.
17     A.  -- the stress I was going through and
18  her giving me her opinion if she thought that
19  would be a factor in the hypertension, as well.
20     Q.  Okay.
21     A.  Having myself some kind of medical
22  background.
23     Q.  And you don't know when she first
24  prescribed you medication for hypertension?

Page 264

1      A.  I can't tell you an exact date.  I
2   mean, if you want to ask her.  I mean, I'm sure
3   if you contact her she -- that will be
4   available.
5      Q.  Are you still currently taking
6   hypertension medication?
7      A.  Yes, I do.
8      Q.  Okay.  That's something you take daily?
9      A.  Yeah, once a day, three pills.
10     Q.  Okay.
11     A.  Even though she says that the pressure
12  is better now, she said, see -- and, in fact,
13  that was my last visit with her.  My last visit,
14  if you let me look at the calendar, I'll tell
15  you.  She said, see, the stress is down, you
16  know, the hypertension is down.  And I told her,
17  well, I'm going to a deposition.  And she said,
18  well, just try and work on your stress.
19     Q.  Okay.
20     A.  Let's keep it down.
21     Q.  In your last visit with her?
22     A.  Yes.
23     Q.  Okay.  That's fine.
24         Do you see her regularly for



DANIEL ECHEVERRIA                                December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                   265–268

Page 265

1  hypertension or --
2      A.  Whenever she tells me to make an
3  appointment, I make an appointment.
4      Q.  Okay.
5      A.  I trust her with my life.
6      Q.  So Exhibit 16 has an encounter date of
7  May 8, 2013.  Do you have any recollection of
8  how many times you've seen her since May 8th of
9  2013?
10     A.  Since then, I can't tell you.
11     Q.  Okay.
12     A.  You know, I saw her -- was that during
13  my leave?  If it was during my leave, I would
14  see her whenever she told me to make an
15  appointment to see her.
16     Q.  Okay.  And what she treated you for --
17     A.  Basically, she --
18     Q.  -- Dr. Sternic, was always hypertension
19  or --
20     A.  Anything that related to a medical
21  condition that I needed a prescription, I would
22  see her.
23     Q.  Okay.  Did she prescribe any other
24  medications for you other than medication

Page 266

1  relating to hypertension?
2      A.  I think she's prescribing it to me now.
3  Now or then?  It's up to you.  You tell me.
4      Q.  Let's say now.
5      A.  Now?  Maybe some cholesterol
6  medication.
7      Q.  Okay.
8      A.  But that's it.
9      Q.  Okay.
10     A.  That's all she prescribes me.
11     Q.  Okay.  All she -- Dr. Sternic
12  prescribes you --
13     A.  Yeah.
14     Q.  -- is medication for hypertension --
15     A.  Hypertension.
16     Q.  -- and cholesterol?
17     A.  Cholesterol.
18     Q.  Do you know when she first prescribed
19  you the cholesterol medicine?
20     A.  Again, hard to say.
21     Q.  That's fine.
22     A.  It's fairly recent.  I don't know, I
23  can't say.
24     Q.  Do you think in 2014?

Page 267

1      A.  I couldn't tell you.  I mean, it's not
2  like I've been taking the thing for five years
3  or anything like that.
4             (Whereupon, Echeverria
5             Deposition Exhibit No. 17 was
6             marked for identification.)
7  BY MR. KING:
8      Q.  Officer Echeverria, I'm showing you
9  another document that's been marked as
10  Deposition Exhibit No. 17.  It's a psychological
11  assessment from Dr. Ruzycki.  Do you know if
12  you've ever seen this before?
13     A.  I may have seen this.  Because she
14  would give me some letters when I needed to take
15  to the Medical Section.  I would have her fax it
16  as well as I would take a hard copy.
17     Q.  Okay.
18     A.  I don't know if my age was right at
19  that point.  I think there was a typo with that.
20     Q.  Okay.  In that first paragraph, she
21  says, Daniel was first seen on 5/16/13.  Any
22  reason to doubt that that's the date you first
23  saw her?
24     A.  I mean, if it's in the medical record

Page 268

1  and it concurs with Dr. Sternic, it would be
2  accurate.
3      Q.  Okay, that's fine.  And, in fact, she
4  says at the start of the next paragraph, you're
5  currently on medical leave which started
6  5/14/13.  Do you see that?
7      A.  5/14, yes.  Paragraph 2.
8      Q.  Okay.  And in the last paragraph
9  that --
10     A.  The treatment?
11     Q.  The treatment --
12     A.  Yes.
13     Q.  -- will address his mood and coping
14  skills.  And then in the next sentence begins,
15  Daniel denies feeling depressed.  Do you
16  remember denying to her that you felt that you
17  were depressed?
18     A.  I'm not depressed.
19     Q.  Okay.  So that's a yes?
20     A.  Yeah, I'm not depressed.  Yes.
21     Q.  Okay, that's fine.  And then she goes
22  on to say, treatment will address approaches to
23  handling stress.
24     A.  It was a lot of stuff we discussed.



DANIEL ECHEVERRIA            December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO       269–272

Page 269

1    Q.   Okay.
2    A.   Stress, insomnia.  I made Dr. Ruzycki
3  aware of exactly what I was going through at
4  work.  I thought it was fair to let her know so
5  that she could advise me with coping and
6  everything else accurately.
7    Q.   Okay.
8    A.   I mean, I can't keep nothing out if I
9  want to get fair treatment.  And I did the same
10 with Dr. Sternic.
11   Q.   So the things that you reported to your
12 doctors that you believe were the result of the
13 retaliation were stress, insomnia?
14   A.   Stress, insomnia.
15   Q.   Anything else?
16   A.   The hypertension.  They all agree,
17 yeah, it's all stress related.  It's a stress
18 disorder they told me.
19   Q.   Okay, that's fine.  Did Dr. Ruzycki
20 ever prescribe any medication for you?
21   A.   No.
22   Q.   And how many times have you --
23   A.   Seen Dr. Ruzycki?
24   Q.   -- seen Dr. Ruzycki?

Page 270

1    A.   Many times.
2    Q.   Many times?
3    A.   More than I saw Dr. Sternic.
4    Q.   Okay.
5    A.   Because we did biweekly.
6    Q.   Okay.
7    A.   I don't know if it was weekly and then
8  biweekly or biweekly and then eventually
9  monthly.
10   Q.   Okay.
11   A.   It just -- it was ongoing.
12   Q.   Okay.  When was the last time you saw
13 her, if you know?
14   A.   You'd have to ask her.  I can't tell
15 you with an exact definition of a date.
16   Q.   I mean, are you still on --
17   A.   Have I seen her?
18   Q.   Are you still on a schedule to see her
19 periodically?
20   A.   No, no.
21   Q.   When did your periodic visits with her
22 come to an end?
23   A.   Sometime after I came back off of --
24   Q.   Off of medical leave?

Page 271

1    A.   -- off of medical.
2    Q.   Okay.  And did she indicate you no
3  longer needed to see her or did you just decide
4  to stop seeing her or how did that end come
5  about?
6    A.   We discussed many topics.  We discussed
7  coping, we discussed a support network.  Just
8  the ways how to cope with --
9    Q.   Sure.
10   A.   -- things that I was going through.
11 And then we worked on maybe tapering off the
12 medical leave as I progressed.  I left it up to
13 her discretion.  She saw that I was progressing.
14 And then I was ordered back to work by
15 Dr. Arjmand and that was it.
16   Q.   Let's talk about that.
17   A.   Okay.
18   Q.   Since you've come back from your
19 medical leave, have you seen any doctors
20 relating to conditions that you believe are
21 resulting from the retaliation?
22   A.   Just the hypertension with Dr. Sternic.
23   Q.   Okay.
24   A.   I haven't seen Dr. Ruzycki since I've

Page 272

1  been back.
2    Q.   Okay.
3    A.   Dr. Sternic, like I said, I saw not too
4  long ago.
5    Q.   Sure.  And since you've been back from
6  the medical leave, I mean, how are you feeling
7  in terms of stress, hypertension, sleeping?
8    A.   Every day is stressful.
9    Q.   Yeah, okay.
10   A.   But I've got to move forward.  I mean,
11 I've learned to cope with it.
12   Q.   Okay.
13   A.   Every day is a stressful day in that
14 unit.
15   Q.   It's a stressful job.
16   A.   Yes, it is.  But the stress I go
17 through is not typical of the job.  It's other
18 factors --
19   Q.   Okay.
20   A.   -- that contribute to it.
21   Q.   Are you still having difficulty
22 sleeping or is that --
23   A.   On and off.  I can't -- I mean,
24 sometimes I sleep three hours, sometimes I sleep



Case: 1:12-cv-08777 Document #: 166-1 Filed: 02/02/16 Page 233 of 239 PageID #:902

DANIEL ECHEVERRIA                                    December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO              273–276

Page 273

1 longer, sometimes I sleep five hours.
2    Q.  Okay.
3    A.  It just depends.
4    Q.  Okay.
5         (Whereupon, Echeverria
6          Deposition Exhibit No. 18 was
7          marked for identification.)
8 BY MR. KING:
9    Q.  Officer, I'm showing you another
10 medical record that's been marked Deposition
11 Exhibit 18.  It's a letter from
12 Dr. Sternic dated June 13, 2013.  Do you recall
13 seeing this before?
14    A.  Sure.  It's signed by my doctor.  And
15 like I said, there's letters that I had her fax
16 as well as I had to take --
17    Q.  Okay.
18    A.  -- in compliance with the Medical
19 Section.
20    Q.  Okay.  So when she would give you
21 something relating to your ability to return to
22 work, it's your understanding it would be faxed
23 to the Medical Section and you'd also bring a
24 hard copy, correct?

Page 274

1    A.  Yes.  I'd take the extra measure and
2 take it to them.
3    Q.  Okay.  And she mentions in Exhibit 18,
4 symptoms including anxiety and insomnia.  And
5 then a little further down, she says, it started
6 a few months.  But as of 5/18/13, he was advised
7 to stay off of work.  Do you see that?
8    A.  What started a few months ago?  Oh,
9 yeah.  Yes.
10    Q.  Okay.  So would you agree that you told
11 Dr. Sternic that the symptoms you were having,
12 anxiety, insomnia, started a few months prior to
13 5/8/13?
14    A.  No.  I mean, maybe my -- when did my
15 leave start?  Maybe my hypertension worsened a
16 few months ago prior to that.  I don't know what
17 she -- I can't interpret her letter.
18    Q.  Okay.
19    A.  With exact.  I mean, you'd have to ask
20 her.
21    Q.  She says, it started a few months ago.
22 But as of 5/8/13, he was advised to stay off the
23 work.  Would you agree that you told Dr. Sternic
24 that the symptoms, anxiety and insomnia, started

Page 275

1 a few months prior to 5/8/13?
2    A.  Sure, I can -- I'll agree to that.
3    Q.  During the period that you were on
4 medical leave, you were still able to drive,
5 correct?
6    A.  Yes.
7    Q.  Okay.  And you were still able to
8 ambulate or get around?
9    A.  Yes.
10    Q.  Okay.  And during that period, you were
11 also still able to carry a firearm, correct?
12    A.  Yes.
13    Q.  And during the period that you were on
14 medical leave, did you feel that you were still
15 capable of arresting a suspect?
16    A.  I wasn't physically impeded.  I mean,
17 sure.
18    Q.  Okay.
19    A.  I was ambulatory.
20         (Whereupon, Echeverria
21          Deposition Exhibit No. 19 was
22          marked for identification.)
23 BY MR. KING:
24    Q.  Officer, I'm showing you another

Page 276

1 document that's been marked Deposition
2 Exhibit 19, which is a letter from Susan
3 Arjmand, M.D. to Dr. Ruzycki dated November 5,
4 2013.  Have you ever seen this letter before?
5    A.  Yes, I believe I have seen this.
6    Q.  Okay.  And what were the circumstances
7 under which you saw the letter?
8    A.  I believe that's when I met with
9 Dr. Ruzycki.
10    Q.  Okay.
11    A.  And I had already met with Dr. Arjmand.
12    Q.  Okay.  And when you met with
13 Dr. Arjmand at any time, do you remember her
14 discussing these issues with you, your ability
15 to drive, your ability to ambulate?
16    A.  No.
17    Q.  Okay.  And do you recall any discussion
18 you had with Dr. Ruzycki about this letter?
19    A.  Yes.
20    Q.  And what was discussed about the
21 letter?
22    A.  I had told her what had transpired
23 with -- as well as with Dr. Sternic what had
24 transpired with Dr. Arjmand and that was it.



DANIEL ECHEVERRIA
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

December 02, 2014
277–280

Page 277

1    Q.   Okay.  And what do you mean when you
2  say, what had transpired with respect to
3  Dr. Arjmand?
4    A.   I had an appointment with the Medical
5  Section --
6    Q.   Yes.
7    A.   -- to meet with my designated nurse.
8  And I did not meet with my regular nurse, I met
9  with somebody else.
10   Q.   Okay.
11   A.   And then once I got there, they didn't
12  ask me much about my physical or medical
13  condition, they asked me more about my
14  litigation with the City.
15   Q.   Okay.  And do you recall who that was?
16   A.   If you say the name, I'll tell you yes
17  or no.  Put some names out there and I'll tell
18  you who it was.
19   Q.   That's fine.  It wasn't Dr. Arjmand,
20  though?
21   A.   Yes.  Her, as well.
22   Q.   Okay.
23   A.   I saw a nurse that was not my regular
24  nurse.

Page 278

1    Q.   Sure.
2    A.   And then I saw Dr. Arjmand.  After I
3  sat there for like four hours or three hours.
4    Q.   Okay.  And they both asked you some
5  questions about your lawsuit with the City?
6    A.   Yes, they did.
7    Q.   Okay.  Do you remember specifically
8  what they asked about the lawsuit?
9    A.   When I got there, at first they asked
10  me about my letter, did I turn it in or not turn
11  it in.  I don't know which one they were talking
12  about.  But it was a letter from either
13  Dr. Ruzycki or either from Dr. Sternic.  And I
14  brought the hard copy, as well, because they --
15  I don't think they got it via fax.
16   Q.   Okay.
17   A.   So that was the extra measure I spoke
18  of earlier.  Then they asked me why I was on
19  medical, I told them it was a stress leave.
20   Q.   Okay.
21   A.   Then they asked me my name again, I
22  told them, the nurse, initially.  She said, oh,
23  you're the guy that has the litigation with the
24  City, your lawsuit.  And I was surprised for her

Page 279

1  to say that.  And I said, what does that have to
2  do with my visit with you?  She said, tell me
3  about it.  I said, why don't you Google it.
4    Q.   Okay.
5    A.   She didn't like that answer.  She had
6  me sit back out front and I waited for like
7  three or four hours.  And then I saw
8  Dr. Arjmand, who was inquisitive in the same
9  manner.  And I told her the same answer and she
10  didn't like that answer, either.  Then she asked
11  me if I'm on -- what are the symptoms I'm
12  feeling.
13   Q.   Sure.
14   A.   I said hypertension, insomnia, stress.
15  I said, there's medication for all of that.  She
16  said if I wanted to be at home all day sitting
17  on the sofa watching TV or did I want to come
18  back to work.
19   Q.   And what did you say?
20   A.   I said, wow.  I said, I've never been
21  on medical before, it's the first time.  She
22  said, well, I think you and your doctors are
23  abusing the Medical Section, is what she said.
24   Q.   Did Dr. Arjmand say that or the other

Page 280

1  nurse?
2    A.   Dr. Arjmand said I'm abusing the
3  Medical Section.  She said she will no longer
4  approve my medical.
5    Q.   Okay.
6    A.   She said, you go and you tell your
7  doctor that I said you need to come back.
8    Q.   Okay.
9    A.   And I said -- and she asked me when my
10  next appointment was.  I looked on my phone on
11  my calendar, I gave her an appointment date.  I
12  think she gave me a date to return like a day or
13  two after I saw Dr. Sternic.  And Dr. Sternic
14  and Dr. Ruzycki wrote letters to reflect me
15  coming back.
16   Q.   Okay.
17   A.   That's a summary of it.
18   Q.   Sure.  That's fine.
19   A.   I mean, that's a lot of other stuff she
20  said.
21   Q.   Would you agree that when you did go
22  back to work at the end of your medical leave,
23  you believe you were fit to return to work?
24   A.   I was there.



DANIEL ECHEVERRIA                                    December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO          281–284

Page 281

1    Q.  Do you believe you were fit to return
2  to work?
3    A.  I returned to work.  I was fit.  I was
4  found fit and I returned.
5    Q.  And I'm asking you if you believe that
6  you were fit to return to work.
7    A.  Yes, I'm fit to --
8       MR. SMITH:  I object to a legal and
9  medical conclusion.
10      THE WITNESS:  I had other meetings with
11  Dr. Arjmand, too, where she addressed the letter
12  that she was not in agreement with.  That wasn't
13  the end of our conversation or our meets with
14  her.
15  BY MR. KING:
16   Q.  You had other conversations with
17  Dr. Arjmand?
18   A.  Yeah.  When I returned with my
19  letter --
20   Q.  Right.
21   A.  -- she wasn't happy with the way the
22  letter was stated.
23   Q.  Okay.
24   A.  She expressed that concern and I think

Page 282

1  that's where this letter comes to play.
2    Q.  So what you're saying was
3  Dr. Arjmand --
4    A.  She denied saying what she said, is
5  what I'm saying.
6    Q.  Okay.
7    A.  And that's -- that's what this letter
8  kind of entails.
9    Q.  Okay.
10   A.  And I told Dr. Arjmand, well, she's a
11  medical professional, Dr. Sternic is a medical
12  professional, Dr. Ruzycki is a medical
13  profession, maybe you should express your
14  concern with them.
15   Q.  Okay.
16   A.  And I can't dictate to my doctor what
17  they write or don't write.  Those are medical
18  professionals.
19   Q.  Sure.
20   A.  And she agreed.  I guess she only made
21  contact with Dr. Ruzycki.  When I asked
22  Dr. Sternic, Dr. Sternic said she never received
23  any correspondence from Dr. Arjmand.
24   Q.  Okay.

Page 283

1    A.  Do you want to know more about the
2  Dr. Arjmand meeting, the second one?
3    Q.  Not right now.
4    A.  Okay.  Because it didn't stop there.
5       (Whereupon, Echeverria
6        Deposition Exhibit No. 20 was
7        marked for identification.)
8  BY MR. KING:
9    Q.  Officer Echeverria, I'm showing you
10  another medical record from Dr. Sternic and it's
11  been marked as Deposition Exhibit No. 20.  And
12  it refers to an encounter date of 3/3/2014.
13      Our records that we received indicate
14  that this was the first visit to Dr. Sternic
15  after you came back from medical leave.  Is
16  that -- do you know whether that's true or not?
17   A.  It could be.  I mean, if that's what
18  she says, then yeah.
19   Q.  Okay.  And in this visit, it indicates
20  that you were seeing her -- the reason for the
21  visit was a cough.
22   A.  Yeah.
23   Q.  And she says this is a new problem,
24  correct?

Page 284

1    A.  Yeah, a cold or something.
2    Q.  Okay.  I assume you're not claiming
3  your cold was a result of retaliation by
4  Defendants?
5    A.  Maybe.  You never know.
6    Q.  You'll give me that one, won't you?
7    A.  I'll give you that one.
8    Q.  All right.  Thank you.
9    A.  Touché.
10   Q.  Do you recall as you sit here whether
11  you've seen Dr. Sternic since March 3rd of 2014?
12   A.  Like I said, I saw her recently.  I
13  can't tell you.
14   Q.  Okay.  Do you recall what you were
15  seeing her for recently?
16   A.  Again, the hypertension is always
17  something she checks.
18   Q.  Okay.  So just periodic appointments?
19   A.  Yeah.  Just --
20   Q.  Okay.
21   A.  -- a wellbeing check, I guess,
22  maintenance.
23
24



DANIEL ECHEVERRIA
December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO
285–288

Page 285

1              (Whereupon, Echeverria
2              Deposition Exhibit No. 21 was
3              marked for identification.)
4     BY MR. KING:
5        Q.   Officer Echeverria, I'm showing you
6     another document that's been marked as
7     Defendants' Exhibit 21. It's a letter from U.S.
8     Health Works of Dr. Lynsey Stewart.
9        A.   Yeah, that's the -- yeah, okay.
10       Q.   That's the person you saw for a
11    physical examination?
12       A.   Yeah, I knew it was at the Towers
13    there.
14       Q.   Okay, right. 614 West Monroe?
15       A.   Right.
16       Q.   And she indicates that she performed a
17    mandatory physical examination on November 25,
18    2013; is that correct?
19       A.   Yeah.
20       Q.   And later down she indicates some
21    results of the examination, blah, blah, blah.
22    If you go to Number 3, she says, the patient has
23    a diagnosis of adjustment disorder and saw a
24    therapist in the past but is not currently in

Page 286

1     therapy. Was that correct at that time?
2        A.   If that's what she wrote, yeah.
3        Q.   Okay. And then she writes that you
4     reported no current symptoms. Is that --
5        A.   I'm sorry, what -- hold on a second.
6     What's this date? November? No, I still would
7     see Dr. Ruzycki by then. So that's wrong.
8        Q.   Okay. She writes that in your
9     examination on that date, you reported no
10    current symptoms. Do you think that's correct?
11       A.   Yeah, I told her. She asked me why was
12    I seeing a therapist and I told her. And then
13    she said, okay.
14       Q.   Okay.
15       A.   Okay.
16            MR. KING:  Can you read back his
17    answer?
18            (Whereupon, the record was read
19            as requested.)
20    BY MR. KING:
21       Q.   Do you think it's correct that she
22    indicates in here that you reported no current
23    symptoms at that point in time?
24            MR. SMITH:  I'm going to --

Page 287

1            THE WITNESS:  What symptoms, stress,
2     hypertension? I mean, I don't know.
3     BY MR. KING:
4        Q.   The doctor writes that you saw a
5     therapist in the past but you're currently not
6     in therapy.
7        A.   That's inaccurate.
8        Q.   And that you reported no current
9     symptoms. Would you agree that you reported to
10    her that you were not having any current
11    symptoms that would --
12       A.   I told her -- that is inaccurate. As
13    far as current symptoms, that might be accurate.
14       Q.   Okay.
15       A.   I told her I did see a therapist.
16       Q.   Okay.
17       A.   And, in fact, she said -- she
18    acknowledged it.
19       Q.   Okay. So you think she's inaccurate
20    when she says you weren't currently in therapy?
21       A.   Correct. Because there's dates.
22       Q.   That's fine.
23       A.   With Dr. Sternic's letters -- I mean,
24    Dr. Ruzycki's letters that I have seen her

Page 288

1     after.
2        Q.   Right.
3        A.   I'd even seen her after I came back.
4        Q.   I understand that.
5        A.   So that would be inaccurate.
6        Q.   Okay.
7        A.   Maybe a typo.
8        Q.   That's fine.
9            MR. KING:  Let's break for a few
10    minutes.
11            (Whereupon, a short break was
12            taken.)
13    BY MR. KING:
14       Q.   Officer Echeverria, you testified that
15    on one or more occasions, you asked Chief Juan
16    Rivera to open a CR; is that correct?
17       A.   Yes.
18       Q.   Okay. Other than Chief Rivera, did you
19    ask any of the other individual Defendants in
20    the case, specifically did you ask them to open
21    a CR?
22       A.   Sadowski.
23       Q.   Okay.
24       A.   Agent Stanley.



DANIEL ECHEVERRIA
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO

December 02, 2014
289–292

Page 289

1    Q.  Okay.
2    A.  And I already testified to their
3  answers.
4    Q.  Okay.  Is that it?
5    A.  Yes.
6    Q.  Okay.
7       MR. KING:  I don't think I have any
8  further questions.
9       MR. SMITH:  Okay.  We'll reserve.
10        FURTHER DEPONENT SAITH NOT.
11          (The deposition concluded at
12            2:39 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24

Page 291

1   indirectly in the outcome of this action.
2
3       IN WITNESS WHEREOF, I do hereunto set my
4   hand at Chicago, Illinois, this 10th day of
5   December, 2014.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21   Certified Shorthand Reporter
22   CSR Certificate No. 084-004022
23
24

Page 290

1               CERTIFICATE OF OFFICER
2
3        I, SUSAN HASELKAMP, a Certified Shorthand
4   Reporter of the State of Illinois, do hereby
5   certify:
6
7        That previous to the commencement of the
8   examination of the witness, the witness was duly
9   sworn to testify the whole truth concerning the
10  matters herein;
11
12       That the foregoing deposition transcript
13  was reported stenographically by me, was
14  thereafter reduced to typewriting under my
15  personal direction and constitutes a true record
16  of the testimony given and the proceedings had;
17
18       That the said deposition was taken before
19  me at the time and place specified;
20
21       That I am not a relative or employee or
22  attorney or counsel, nor a relative or employee
23  of such attorney or counsel for any of the
24  parties hereto, nor interested directly or

Page 292

1
2                   I N D E X
3   WITNESS                          EXAMINATION
4   DANIEL ECHEVERRIA,
5     By Mr. King...........................3
6
7
8             E X H I B I T S
9   NUMBER                      MARKED FOR ID
10  Echeverria Deposition Exhibit
11
        1....................................10
12      2....................................44
        3....................................45
13      4....................................56
        5...................................123
14      6...................................145
        7...................................195
15      8...................................198
        9...................................199
16      10..................................201
        11..................................221
17      12..................................221
        13..................................242
18      14..................................247
        15..................................259
19      16..................................259
        17..................................267
20      18..................................273
        19..................................275
21      20..................................283
        21..................................285
22
23
24



800.211.DEPO (3376)
EsquireSolutions.com

DANIEL ECHEVERRIA                                    December 02, 2014
SPALDING and ECHEVERRIA vs. CITY OF CHICAGO                 293–294

```
                              Page 293
 1              DEPOSITION ERRATA SHEET
 2     Assignment No. 239707
 3     Chicago Police Officers Shannon Spalding and
 4     Daniel Echeverria vs. City of Chicago, et al.
 5           DECLARATION UNDER PENALTY OF PERJURY
 6
 7          I declare under penalty of perjury that I
 8     have read the entire transcript of my Deposition
 9     taken in the captioned matter or the same has
10     been read to me, and the same is true and
11     accurate, save and except for changes and/or
12     corrections, if any, as indicated by me on the
13     DEPOSITION ERRATA SHEET hereof, with the
14     understanding that I offer these changes as if
15     still under oath.
16
17     Signed on the _____ day of
18     _____, 2014.
19
20     _____
21     DANIEL ECHEVERRIA
22
23
24
```

```
                              Page 294
 1              DEPOSITION ERRATA SHEET
 2     Page No.____Line No.____Change to:_____
 3     _____
 4     Reason for change:_____
 5     Page No.____Line No.____Change to:_____
 6     _____
 7     Reason for change:_____
 8     Page No.____Line No.____Change to:_____
 9     _____
10     Reason for change:_____
11     Page No.____Line No.____Change to:_____
12     _____
13     Reason for change:_____
14     Page No.____Line No.____Change to:_____
15     _____
16     Reason for change:_____
17     Page No.____Line No.____Change to:_____
18     _____
19     Reason for change:_____
20     Page No.____Line No.____Change to:_____
21     _____
22     Reason for change:_____
23     SIGNATURE:_____DATE:_____
24              DANIEL ECHEVERRIA
```

| OFFICER | BEAT | ROLE | O_LAST | O_FIRST | IR_NO | CB_NO | STAT_DESCR | TYPE | ARREST_DATE |
|---------|------|------|--------|---------|-------|-------|-----------|------|-------------|
| ECHEVERRIA,DANIEL | 5754 | AAO | DILLARD | TIERRA | 1832713 | 18433424 | ISSUANCE OF WARRANT | | 21-Jun-2012 |
| ECHEVERRIA,DANIEL | 5752 | FAO | RHODES | CORNELL | 1728230 | 18430588 | ISSUANCE OF WARRANT | | 17-Jun-2012 |
| ECHEVERRIA,DANIEL | 5752 | AAO | BLACKWELL | DENAE | 2037635 | 18430576 | ISSUANCE OF WARRANT | | 17-Jun-2012 |
| ECHEVERRIA,DANIEL | 5752 | FAO | TURNER | JERREL | 1901564 | 18428506 | ISSUANCE OF WARRANT | | 14-Jun-2012 |
| ECHEVERRIA,DANIEL | 5752 | FAO | KRABBE | EDWARD | 2165586 | 18426901 | VIOL SEX OFFENDER REGISTRATI | F | 12-Jun-2012 |
| ECHEVERRIA,DANIEL | 5752 | AAO | MORGA | JOSE | 1371109 | 18424289 | ROBBERY | F | 08-Jun-2012 |
| ECHEVERRIA,DANIEL | 5752 | AAO | REED | SHAUNDE | 1283051 | 18422602 | ISSUANCE OF WARRANT | | 06-Jun-2012 |
| ECHEVERRIA,DANIEL | 5752 | FAO | COOK | MARCUS | 743115 | 18422596 | ISSUANCE OF WARRANT | | 06-Jun-2012 |
| ECHEVERRIA,DANIEL | 5752 | FAO | PALM | RENATA | 775322 | 18419873 | BATTERY - CAUSE BODILY HAR | M | 02-Jun-2012 |
| ECHEVERRIA,DANIEL | 5752 | AAO | BARNES | AARON | 1905141 | 18414715 | MURDER- FIRST DEGREE | F | 25-May-2012 |
| ECHEVERRIA,DANIEL | 5754 | AAO | GORDEN | JAMES | 351892 | 18403176 | DOMESTIC BATTERY - PHYSICA | M | 09-May-2012 |
| ECHEVERRIA,DANIEL | 5752 | FAO | MOORE | DARCEL | 827207 | 18400370 | ISSUANCE OF WARRANT | | 05-May-2012 |
| ECHEVERRIA,DANIEL | 5752 | SAO | COOK | ALLEN | 1951186 | 18399556 | BURGLARY/SCH/DAY CARE/WO | F | 04-May-2012 |
| ECHEVERRIA,DANIEL | 5752 | AAO | PINKERTON | JESSE | 1360917 | 18398207 | MURDER- FIRST DEGREE | F | 02-May-2012 |
| ECHEVERRIA,DANIEL | 5752 | SAO | BROWN | LAMONT | 2020043 | 18394602 | BURGLARY - RESIDENTIAL | F | 27-Apr-2012 |
| ECHEVERRIA,DANIEL | 5752 | AAO | HOUSTON | GREGORY | 777585 | 18389469 | ISSUANCE OF WARRANT | | 20-Apr-2012 |
| ECHEVERRIA,DANIEL | 5752 | AAO | GREEN | JOHN | 1506608 | 18389449 | AGG BATTERY/DISCHARGE FIR | F | 20-Apr-2012 |
| ECHEVERRIA,DANIEL | 5752 | FAO | BROWN | ISHANNA | 1919741 | 18388831 | BATTERY - MAKE PHYSICAL CO | M | 19-Apr-2012 |
| ECHEVERRIA,DANIEL | 5752 | SAO | MORRIS | LASHORA | 1108937 | 18383842 | BATTERY - CAUSE BODILY HAR | M | 12-Apr-2012 |
| ECHEVERRIA,DANIEL | 5752 | SAO | NASH | MARTELL | 1254261 | 18378831 | DOMESTIC BATTERY - BODILY H | M | 05-Apr-2012 |
| ECHEVERRIA,DANIEL | 5752 | AAO | ALEXANDER | ZAVIER | 1632311 | 18377372 | AGG BATTERY/PEACE OFFICER | F | 03-Apr-2012 |
| ECHEVERRIA,DANIEL | 5752 | FAO | POUNCY | TROY | 1772691 | 18377263 | CANNABIS - POSSESS 30-500 GRM | F | 03-Apr-2012 |
| ECHEVERRIA,DANIEL | 5753 | AAO | STARKEY | LUTHER | 1332690 | 18373184 | ISSUANCE OF WARRANT | | 28-Mar-2012 |
| ECHEVERRIA,DANIEL | 5752 | AAO | HOWARD | KIMANTI | 1497596 | 18372529 | DOMESTIC BATTERY - BODILY H | M | 27-Mar-2012 |
| ECHEVERRIA,DANIEL | 5753 | AAO | DOTSON | JOHN | 484820 | 18372404 | AGG BATTERY/GREAT BODILY H | F | 27-Mar-2012 |
| ECHEVERRIA,DANIEL | 5752 | AAO | BONDS | YASHUA | 1262976 | 18370495 | DOMESTIC BATTERY - BODILY H | M | 24-Mar-2012 |
| ECHEVERRIA,DANIEL | 5752 | AAO | BERNARD | WALTER | 1034707 | 18368797 | ISSUANCE OF WARRANT | | 22-Mar-2012 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER