# Exhibit E

Page 1

1
2

       IN THE UNITED STATES DISTRICT COURT

3       FOR THE NORTHERN DISTRICT OF ILLINOIS

           EASTERN DIVISION

4
5

CHICAGO POLICE OFFICER SHANNON    )

6 SPALDING and CHICAGO POLICE       )

OFFICER DANIEL ECHEVERRIA,       )

7                            )

             Plaintiffs, )

8                       )

       vs.              ) 12 C 8777

9                       )

CITY OF CHICAGO, et al.,       )

10                       )

           Defendants. )

11
12
13

           Deposition of TINA SKAHILL, taken before

14
Linda M. Benda, C.S.R., Notary Public, in the County of Cook

15
and State of Illinois, at One North LaSalle Street, Suite

16
3040, Chicago, Illinois, on the 5th day of December 2014, at

17
the hour of approximately 9:30 o'clock a.m.

18
19
20
21
22
23
24

Page 2

1       There were present during the taking of
2  this deposition the following counsel:
3
4
            CHRISTOPHER SMITH TRIAL GROUP, by
5           MR. CHRISTOPHER SMITH
            One North LaSalle Street, Suite 3040
6           Chicago, IL  60602
            (312) 432-0400
7
            On behalf of the Plaintiffs;
8
9
            DRINKER, BIDDLE & REATH, by
10          MR. ALAN S. KING
            191 North Wacker Drive, Suite 3700
11          Chicago, IL  60606
            (312) 569-1334
12
            On behalf of the Defendants.
13
14
15
16  ALSO PRESENT:  Daniel Echeverria.
17
18
19
20
21
22
23
24

Page 3

1                    I N D E X
2
3  WITNESS:                          PAGE
4  TINA SKAHILL
5   Examination by Mr. Smith          4
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1  (Witness sworn.)
2            TINA SKAHILL,
3  called as a witness herein, having been first duly sworn,
4  was examined upon oral interrogatories and testified as
5  follows:
6            EXAMINATION
7            by Mr. Smith:
8     Q   Good morning.  Can you please state your name and
   spell your name for the court reporter?
10    A   Tina Skahill, Tina, T-i-n-a, Skahill,
11  S-k-a-h-i-l-l.
12    Q   What is your current occupation?
13    A   Retired.
14    Q   Have you ever given a deposition before?
15    A   Yes.
16    Q   And before you retired what was your position?
17    A   Chief of the Chicago Police Department.
18    Q   How long were you chief of the Chicago Police
19  Department?
20    A   I was chief in the Chicago Police Department from
21  2008 to 2013.
22    Q   What was your position in 2008?
23    A   In 2008 I was chief of Internal Affairs Division.
24    Q   How long were you chief of the Internal Affairs

Page 5

1  Division?
2    A   Until 2009.
3    Q   Until 2009?
4    A   Early 2009.
5    Q   Where were you transferred to at that point?
6    A   I then became chief of the CAPS, chief of CAPS.
7    Q   Do you know why you transferred or what was the
8  reason for the transfer?
9    A   At the -- it's at the discretion of the
10  superintendent.
11    Q   Thank you.  In terms of -- you understand you're
12  here on a deposition relating to a lawsuit filed by Shannon
13  Spalding and Daniel Echeverria?
14    A   Yes.
15    Q   And do you recall when you first met Shannon
16  Spalding and Daniel Echeverria?
17    A   I don't know as to the first.  I may have seen them
18  before.
19    Q   Did you -- when you first -- were you with IAD --
20  when you were the chief of IAD did you have a time where you
21  actually met with them?
22    A   Yes.
23    Q   And was that your first significant meeting with
24  either one of them?

2 (Pages 2 - 5)

1  A  Yes.

2  Q  So basically you may have seen them in passing,

3  hellos and things of that nature up until that time?

4  A  Yes, possibly.

5  Q  And maybe even more just based on the course of

6  business as a police officer?

7  A  Possibly.

8  Q  But certainly nothing that raises to the level of a

9  memorable occasion where you were either socially with them

10  or working closely hand in hand; is that fair to say?

11  A  That's correct.

12  Q  All right.  In terms of do you recall back in 2008

13  meeting with a special agent, Patrick Smith?

14  A  Yes.

15  Q  And do you also recall that shortly before that

16  meeting you were contacted by Shannon and Danny?

17  A  I don't specifically recall that, but I do recall

18  meeting with Patrick Smith and Shannon and Danny.

19  Q  And it was roughly the same time?

20  A  Yes.

21  Q  And do you remember at all what happened in your

22  first meeting with Danny and Shannon?

23  A  Yes.

24  Q  And it was -- was it your understanding that

1  Shannon and Danny had gone and spoken with individuals at

2  the F.B.I. concerning a matter that involved Chicago Police

3  Officers?

4  A  It was my understanding that they had been working

5  with IAD and the F.B.I. on an investigation.

6  Q  When you first met with them?

7  A  Yes.

8  Q  In terms of where did you learn that they were

9  working with IAD at that point in time?

10  A  When I became chief of the Internal Affairs

11  Division I was briefed on confidential investigations and

12  with -- that the IAD was conducting.

13  Q  Who were you briefed by?

14  A  I was briefed by then Assistant Deputy

15  Superintendent Kirby.

16  Q  And did Assistant Deputy Kirby tell you anything

17  about Danny and Shannon?

18  A  Other than -- overall I don't remember specifics

19  but just that investigation on the Watts investigation and a

20  myriad of others.

21  Q  In terms of when Kirby told you about -- Debra

22  Kirby told you about the Watts investigation, are you sure

23  at that point she was telling you that Danny and Shannon

24  were involved in the investigation?

1  A  That was my understanding that they were working

2  with the F.B.I. and Chicago Police Department's IAD.

3  Q  How did Danny and Shannon first come to you?

4  A  With Patrick Smith.

5  Q  And what was your understanding of why Patrick

6  Smith came to you?

7  A  He needed them to work more closely with him on a

8  regular basis.

9  Q  Did you learn at that meeting how Shannon and Danny

10  had come to Patrick Smith?

11  A  I don't recall.

12  Q  Did you ever learn that Patrick and -- I mean that

13  Danny and Shannon went to the F.B.I. on their off time to

14  provide information to the F.B.I.?

15  A  I never heard that.

16  Q  Would there be any records that would show when

17  Shannon and Danny started working with the IAD?

18  A  I wouldn't know now if there would be any records.

19  I'm not sure.

20  Q  In terms of was there somebody who it was your

21  understanding that they were reporting to at IAD in relation

22  to this matter?

23  A  I don't recall specifically because that would have

24  been before I became chief of IAD.

1  Q  And who was the chief before you?

2  A  There was no chief.  There was an assistant deputy

3  superintendent, and that was Assistant Deputy Superintendent

4  Kirby.

5  Q  How long before this meeting with Patrick Smith,

6  the first meeting with Patrick Smith had you become head of

7  IAD?

8  A  I became head of IAD in March of 2008.

9  Q  When do you think this meeting with Patrick Smith

10  was?

11  A  Sometime in the summer.

12  Q  Had you ever learned or seen or heard of Danny and

13  Shannon -- and/or Shannon working with someone at IAD

14  between March and that meeting in the summer?

15  A  When I was briefed by ADS Kirby about the Watts

16  investigation.

17  Q  Other than coming from Debra Kirby, did you learn

18  or see any sign that Danny or Shannon were working with IAD

19  between March and the summer when there was the meeting with

20  Patrick Smith?

21  A  No, I don't recall any other --

22  Q  So do you believe that Debra Kirby knew that Danny

23  and Shannon had gone to the F.B.I. even before Patrick Smith

24  came to meet with you?

3 (Pages 6 - 9)

Page 10

1  MR. KING: Just object to the form of the question,
2  misstates the testimony but you can answer.
3  BY MR. SMITH:
4  Q  Do you believe that Debra Kirby knew that Danny and
5  Shannon had gone to the F.B.I. before the meeting with you?
6  MR. KING: Same objections, lack of foundation.
7  BY MR. SMITH:
8  Q  Did she specifically tell you anything about Danny
9  or Shannon being involved with the F.B.I. before Patrick
10  Smith's meeting with you? Did Debra Kirby tell you anything
11  specifically about Danny or Shannon?
12  MR. KING: Objection to the extent asked and answered
13  but if you remember anything else more specific.
14  THE WITNESS: Nothing other than what I said originally
15  that she briefed me on the Watts investigation when I became
16  chief of IAD and that Danny and Shannon were working with
17  IAD and the F.B.I. on the Watts investigation.
18  BY MR. SMITH:
19  Q  If I told you that Danny and Shannon went to the
20  F.B.I. on their off time and were not working with the
21  F.B.I. until they came to see you and Patrick Smith, would
22  that surprise you?
23  A  Yes, it would.
24  Q  In terms of do you recall ever discussing with

Page 11

1  anyone from IAD who would have been supervising Danny or
2  Shannon between March and the meeting with Patrick Smith?
3  A  No, they were not assigned to IAD. They were
4  assigned to narcotics.
5  Q  In what capacity were they working with IAD?
6  A  Assisting.
7  Q  Assisting whom?
8  A  Assisting in the investigation of Sergeant Watts.
9  Q  Who would have been -- who was involved in the
10  investigation of Sergeant Watts from IAD?
11  A  I don't recall specifically at this time.
12  Q  And do you know who IAD was working with, what
13  F.B.I. agents they were working with from the summer of -- I
14  mean, from March till the summer of when the meeting was?
15  A  I don't recall.
16  Q  That was the first time you met Patrick Smith,
17  correct?
18  A  In the summer, yes.
19  Q  Had you met any other F.B.I. personnel relating to
20  the Watts investigation prior to the meeting in the summer?
21  A  I don't recall.
22  Q  Did Debra Kirby tell you -- give you the name of
23  any F.B.I. personnel working with IAD before you met Patrick
24  Smith?

Page 12

1  A  I don't recall specifically.
2  Q  At the meeting what did Patrick Smith tell you was
3  the reason that he needed Shannon and Danny?
4  A  He just said he needed them to be more available.
5  Q  Did he tell you why he needed them to be more
6  available?
7  A  Just to help conclude the Watts investigation, to
8  help the investigation.
9  Q  And did he -- do you remember why they -- at that
10  point in time they weren't available enough?
11  A  They were in narcotics. They were not assigned to
12  IAD.
13  Q  In terms of did you have any idea as to when they
14  were able to work with the F.B.I. if they were assigned to
15  narcotics?
16  A  They would be available to work during their
17  working hours.
18  Q  Even when -- before the meeting with Patrick Smith?
19  A  Yes.
20  Q  In terms of how were they supposed to know which
21  location to go to?
22  MR. KING: Just object to the lack of foundation.
23  MR. SMITH: If you know.
24  THE WITNESS: I don't know.

Page 13

1  BY MR. SMITH:
2  Q  All right. So at the meeting did you approve Danny
3  and Shannon being assigned to -- over to the F.B.I., to work
4  with the F.B.I.?
5  MR. KING: Just object to the form of the question,
6  misstates the earlier testimony.
7  BY MR. SMITH:
8  Q  I'm sorry. At the meeting when Patrick Smith asked
9  to make the -- Danny and Shannon available to him what was
10  your response?
11  MR. KING: Same objection. The testimony was more
12  available.
13  BY MR. SMITH:
14  Q  More available, available -- more available to him.
15  What was your response?
16  A  I agreed.
17  Q  And so was there any discussion at that meeting
18  about how they were going to be made more available?
19  A  Yes.
20  Q  What was the plan with respect to that?
21  A  That I thought they could be detailed to 543.
22  Q  And why were they going to be detailed to 543?
23  A  That way it wouldn't indicate that they were
24  assigned to -- that they were working with IAD directly.

4 (Pages 10 - 13)

1    Q    And why was that -- why were you doing that? Why
2    was it important to make sure that it didn't appear that
3    they were working for IAD directly?
4    A    Because they were still operating as narcotics
5    officers.
6    Q    And in terms of was there -- are there -- were
7    there safety issues that would be raised if it was clear
8    they were working with IAD at that time?
9    A    No. The issue was for the integrity of the
10   investigation.
11   Q    And how would that protect the integrity of the
12   investigation?
13   A    Because they -- their use of confidential
14   informants from their narcotics assignment was going to be
15   utilized.
16   Q    Why would detailing them to 543 protect the use of
17   their confidential informants?
18   A    Because when they were operating in a district,
19   people saw them operating in a district. They wouldn't know
20   where -- that they were not operating as narcotics. If they
21   were to look they wouldn't know where they were operating
22   from.
23   Q    Who wouldn't know where they would be operating
24   from?

1    A    No one would.
2    Q    In terms of were they given -- Danny and Shannon
3    given a story to tell people if they were asked what they
4    were doing?
5    A    They might have been.
6    Q    Were they told that the matter would be -- the fact
7    that they were investigating a police officer would be kept
8    confidential?
9    A    It's a confidential -- the Watts investigation was
10   already confidential.
11   Q    Were Danny and Shannon assured that their
12   identities as being involved in the Watts investigation and
13   being involved in an investigation of other police officers
14   would be kept confidential?
15   A    Any involvement of any personnel in a confidential
16   investigation is confidential.
17   Q    During the meeting were safety issues and
18   confidentiality issues discussed, the meeting with Shannon
19   and Danny when Patrick Smith came in?
20   A    Confidential -- the confidentiality of the
21   investigation was stressed.
22   Q    And did Danny or Shannon specifically ask for
23   assurances that their identity would be kept quiet in terms
24   of being involved in an investigation like this?

1    A    Their investigation, their participation in an
2    investigation was the same as any other officer assigned to
3    that investigation.
4    Q    I understand that, but I'm asking you did Shannon
5    or Danny express to you a concern about if they were working
6    on a matter like this that they would be assured that their
7    identities would be kept confidential?
8    A    They were assured that their -- they were assured
9    that they would receive the same level of confidentiality as
10   all officers assigned to confidential investigations.
11   Q    And what level of confidentiality would that be?
12   A    A need to know. Only persons who need to know.
13   Q    What was your understanding of who needed to know
14   that Danny and Shannon were assigned to work with the F.B.I.
15   through Detail 543?
16   A    That depends upon a person's role. It also depends
17   on the information that they seek and the time of that
18   information.
19   Q    What was your understanding as to who knew that
20   Danny and Shannon were involved in the Watts investigation
21   immediately after the meeting with Patrick Smith?
22   A    Well, I knew and a confidential sergeant would
23   know, confidential lieutenant in IAD would --
24   Q    And that would be -- Mr. Chester would be the

1    sergeant or no?
2    A    I can't recall specifically but --
3    Q    Tom Chester, does that ring a bell?
4    A    Yes.
5    Q    Who would the lieutenant have been?
6    A    At that time it would have been Lieutenant West.
7    Q    And who else, if anyone?
8    A    I needed permission from Deputy Superintendent
9    Brust.
10   Q    Anyone else?
11   A    And he needed to make the request to the first
12   deputy.
13   Q    Who was that?
14   A    James Jackson.
15   Q    Is that your understanding of who knew at the time
16   of the meeting that they were going to be -- or shortly
17   after the meeting that they were going to be involved?
18   A    Well, and then when they worked for -- their
19   commanding officers of their units know that they're going
20   to 543.
21   Q    And who would those have been?
22   A    You know, Commander Roti and I can't remember who
23   was the chief of organized crime at that time.
24   Q    What was -- did you contact Commander Roti to tell

Page 18

1 him about Danny and Shannon's reassignment?
2     A    You know what? I don't recall. I may have.
3     Q    What would you have told him?
4     MR. KING: Object to the form.
5     THE WITNESS: I don't recall.
6 BY MR. SMITH:
7     Q    Would you have told him the nature of the
8 investigation?
9     MR. KING: Object to the form of the question. She
10 doesn't recall whether she spoke to him. You're asking a
11 hypothetical.
12 BY MR. SMITH:
13    Q    Hypothetically, when you're working as chief in IAD
14 and you had a confidential investigation, would you tell the
15 commander, Roti, that -- the nature or the type of
16 investigation that the confidential officers were working
17 on?
18    MR. KING: Same objections.
19    THE WITNESS: Again it would depend on the
20 investigation, and it also would depend on what information
21 they would need to know. Everything remains fluid.
22 BY MR. SMITH:
23    Q    In a situation such as this where there was going
24 to be officers investigating fellow Chicago Police

Page 19

1 Department officers including a sergeant related to
2 extorting narcotics from drug dealers or money, would you
3 have told that to Roti?
4     MR. KING: Objection, lack of foundation, calling for
5 speculation, hypothetical situation.
6 BY MR. SMITH:
7     Q    Or would you keep something like that confidential?
8 Again this is hypothetically speaking.
9     A    Hypothetically the individual would not need to
10 know a lot of details.
11    Q    And you certainly wouldn't want to tip off even
12 Commander Roti of the whereabouts of where the target was,
13 the -- who was the target and so on and so forth, correct?
14    A    That's correct.
15    Q    In terms of when you're in confidentials, would you
16 agree that you also consider that in addition to compromising
17 the investigation you also would not want the targets to
18 learn who the officers were that were investigating them for
19 the safety of the officers in the confidential
20 investigation?
21    A    Safety is always paramount for any police officer
22 in any investigation, confidential or otherwise.
23    Q    In terms of other than asking to make Danny and
24 Shannon more available, do you remember anything else

Page 20

1 Patrick Smith told you in that initial meeting?
2     A    I don't recall anything else.
3     Q    Do you remember anything Shannon Spalding told you
4 in that initial meeting?
5     A    No.
6     Q    Do you remember anything Danny Echeverria told you
7 in that initial meeting?
8     A    No.
9     Q    Do you remember assigning Danny and Shannon in --
10 getting permission to assign Danny and Shannon to Unit 543
11 within days of that meeting?
12    A    I don't know if it was within days, but I didn't --
13 I don't assign. First deputy approves assignments.
14    Q    Correct, but in terms of your contacting Brust,
15 that was within days of the meeting with Patrick Smith,
16 correct?
17    A    I don't know if it was days but it was shortly
18 thereafter.
19    Q    What would you consider shortly thereafter?
20    A    That could be within a month or two.
21    Q    Did you calendar the -- would you have calendared
22 the issue, or what would have triggered the event to call in
23 a month if you would have waited that long? Why would you
24 wait at all?

Page 21

1     A    I don't make the assignment. I make the request.
2 When the request is granted was not up to me.
3     Q    So when did you make the request?
4     A    Sometime shortly after the meeting.
5     Q    That would have been within days, correct?
6     A    I don't know.
7     Q    Would there be any reason you would have waited?
8     A    I don't know.
9     Q    Do you recall anything going on that would have
10 caused you to wait?
11    A    That was five, six years ago, so I don't recall.
12    Q    You have -- do you have any reason to believe that
13 as you sit here today that there was -- let's put it this
14 way. Is it possible that you called immediately after the
15 meeting?
16    A    It's possible.
17    Q    Did you keep any records relating to that meeting?
18    A    Not to my knowledge. I don't recall.
19    Q    Would you have made any notation or anything
20 relating to the meeting?
21    A    I don't recall keeping anything.
22    Q    So when is the first time that there is any
23 indication or notation that Danny Echeverria or Shannon
24 Spalding were informed that they would be joining the

6 (Pages 18 - 21)

Page 22

1 investigation with the F.B.I. in their official capacity as
2 police officers?
3     MR. KING: Just object to the form of the question.
4     THE WITNESS: I don't know when they learned of it.
5 You'd have to ask them.
6 BY MR. SMITH:
7    Q If I told you that they had never been officially
8 assigned in their capacity as police officers until that
9 meeting, would you have any way of showing that that was
10 wrong?
11     MR. KING: Objection. She's already testified to
12 knowing that before the meeting. Object to the form of the
13 question.
14 BY MR. SMITH:
15    Q If I told you that it was their understanding that
16 they had never been officially assigned in their official
17 capacity as police officers to the F.B.I. -- to working with
18 the F.B.I. until after that meeting, would there be any
19 records or anything to establish that was incorrect?
20    A I wouldn't know.
21    Q You are aware that at some point in time Danny and
22 Shannon were assigned to detached services, Unit 543?
23    A Yes.
24    Q And at that time they were to report directly to

Page 23

1 F.B.I. headquarters on Operation Brass Tax?
2    A Yes.
3    Q At some point in time you no longer were head of
4 IAD, correct?
5    A Yes.
6    Q And you were replaced by Juan Rivera?
7    A Yes.
8    Q And did you brief Juan Rivera in relation to
9 Operation Brass Tax?
10    A Yes.
11    Q Do you recall what you indicated regarding Danny
12 and Shannon's role with Operation Brass Tax?
13    A No, I don't recall.
14    Q At any point in time did you learn that a -- do you
15 know who Commander O'Grady is?
16    A Yes.
17    Q Did you ever learn that Commander O'Grady was aware
18 that Danny and Shannon were working on Operation Brass Tax?
19    A I don't know what Jim O'Grady knew.
20    Q So it's fair to say that you didn't know -- you
21 didn't tell Juan Rivera that James O'Grady knew about
22 Operation Brass Tax?
23    A I don't know.
24    Q And in terms of when -- did you have any meetings

Page 24

1 or contact with Danny and Shannon during the time they were
2 working in Unit 543 when you were still the head of IAD?
3    A Yes. I would have had some contact probably.
4    Q And what was the nature of that contact?
5    A Status updates on the investigation.
6    Q In terms of those status updates, was there
7 anything that -- during those status updates that made you
8 feel that Danny and Shannon were doing their jobs?
9    A Oh, yes. I thought they were doing their job.
10    Q And in terms of did you hear anyone make any
11 complaints about Danny or Shannon during the time that you
12 were supervising or head of IAD?
13    A No. In their capacity in the investigation, no.
14    Q In any capacity?
15    A No, not to my knowledge.
16    Q Did anyone communicate to you that there was any
17 difficulties with Danny or Shannon while they were in the
18 narcotics unit before being assigned to Unit 543?
19    A I don't recall any complaint.
20    Q And in terms of when Danny and Shannon were working
21 in Unit 543, were you aware that at times during the
22 investigation into the police officers on Watts' team that
23 they were getting information on other narcotics activities?
24    A I don't recall.

Page 25

1    Q In terms of did you ever tell them that they
2 shouldn't develop leads for other narcotics arrests and
3 busts during the time that they were working on Operation
4 Brass Tax?
5    A No.
6    Q In fact, would you encourage -- if they found out
7 information about other narcotics activities that wasn't
8 directly involved in Operation Brass Tax but the information
9 developed through Operation Brass Tax, would you encourage
10 them to share it with fellow officers so that a bust could
11 be made?
12     MR. KING: Just objection to the lack of foundation and
13 calling for speculation.
14     THE WITNESS: If that were to occur I would encourage
15 and request and require that the information be shared.
16 BY MR. SMITH:
17    Q Did you ever learn of a time when Danny and Shannon
18 believed that the fact that they were working on developing
19 information of crimes by a fellow sworn officer was leaked
20 outside of the confidential circle? Did you ever become
21 aware of a time when Danny or Shannon thought the fact that
22 they were working on an investigation of officers was leaked
23 beyond the confidential circle of individuals?
24     MR. KING: Just object to the form and the use of

7 (Pages 22 - 25)

Page 26

1  confidential circle.  The testimony was on a need to know
2  basis, but you can answer.
3     THE WITNESS:  Anybody who was involved in the
4  investigation or had knowledge was on a need to know basis
5  and that knowledge would have been limited.  Everybody had
6  different levels of knowledge, and then it would change
7  depending on the time in people's roles as they changed
8  throughout the years.
9  BY MR. SMITH:
10    Q   Did you ever learn that Commander O'Grady became
11 somebody who needed to know of Danny and Shannon's
12 involvement in Operation Brass Tax?
13    A   I don't know what Commander O'Grady knew or didn't
14 know.
15    Q   Did you ever come to know that Ernie Brown became
16 somebody who needed to know about Operation Brass Tax?
17    A   I don't know what Ernie Brown knew or didn't know.
18    Q   Did you ever come to know that Nick Roti became
19 somebody who needed to know about information concerning
20 Operation Brass Tax?
21    A   Other than Commander Roti knowing that Danny and
22 Shannon were being detailed to 543 to assist IAD he would
23 not probably have known particulars of the investigation.
24    Q   Was there ever a time where Danny or Shannon came

Page 27

1  to you with any -- to discuss the possibility that
2  individuals outside -- other than people that were involved
3  or aware of the investigation were finding out about
4  Operation Brass Tax or their involvement in an
5  investigation?
6     A   While I was chief of IAD nothing of that sort was
7  brought to my attention.  After I was no longer chief of
8  IAD, I was prohibited from any discussions about that
9  confidential investigation.
10    Q   So after you were outside of -- did you ever speak
11 with Danny or Shannon after you were no longer chief of IAD?
12    A   Yes.
13    Q   And did you ever speak to them about their concerns
14 with Operation Brass Tax after you left?
15    MR. KING:  Object to the form of the word concerns.
16    THE WITNESS:  Any discussions about Operation Brass Tax
17 were completely prohibited, and they were told to talk about
18 anything connected with that investigation with Chief
19 Rivera.
20 BY MR. SMITH:
21    Q   And did they follow your orders and do that?
22    A   I don't know if they did or not.  You'd have to ask
23 them.
24    Q   In terms of that they didn't talk to you anymore

Page 28

1  about Brass Tax?
2     A   Any conversations having to deal with that
3  investigation with -- was prohibited with me, so -- but they
4  were told to talk to Chief Rivera about anything connected
5  with that investigation.
6     Q   What did you talk to Shannon and Danny about after
7  you were no longer chief of IAD?
8     A   They were assigned to me when I was chief of the
9  Office of Compliance, and they were assigned to detail to
10 Unit 126, which was inspections, so they were under my
11 command.
12    Q   Before they were assigned to Unit 126 did you ever
13 speak to them at all?
14    A   Yes.
15    Q   What did you speak to them about?  And I'm talking
16 about after you were no longer chief of IAD.
17    A   I received information from them that they were no
18 longer being detailed to 543.
19    Q   How did you receive that information?
20    A   I don't recall if it was either a text or an
21 E-mail.
22    Q   Do you know who it was from?
23    A   Either Danny or Shannon.
24    Q   And do you recall specifically what the E-mail or

Page 29

1  text said?
2     A   Just that they thought they were being detailed to
3  the 15th District.
4     Q   And did they say anything about being detailed to
5  the 15th District in the text or E-mail?
6     A   I don't recall specifically but once they gave me
7  that information, then I requested from then Deputy
8  Superintendent Kirby if they could be detailed to 126
9  inspections.
10    Q   Why did you do that?
11    A   Because they then would be under me and Brass Tax
12 was still an ongoing investigation.
13    Q   And why did you think that it was important that
14 they were under you rather than being detailed to the 15th
15 District?
16    A   Well, if they were there then IAD could still
17 continue and the F.B.I. could still continue to utilize them
18 for that investigation, which was still ongoing.
19    Q   And why wouldn't they have been able to do that if
20 they were in the 15th District?
21    A   It would have been more difficult.
22    Q   Because why?
23    A   Logistically.
24    Q   When you say logistically, what do you mean by

8 (Pages 26 - 29)

Page 30

1 that?
2    A    Because their duties would have been patrol duties.
3 They would have been answering calls for service.
4    Q    So they couldn't have done both jobs at the same
5 time effectively?
6    A    That would have been difficult to answer calls for
7 service.
8    Q    Did you have any discussions with either Danny or
9 Shannon about you being brought -- them being brought to
10 Unit 126?
11    A    I probably did.  I just don't recall specifically,
12 but I know they were in agreement with the -- coming over to
13 126.
14    Q    Did you ever discuss with them any issues relating
15 to the fact that it might be better to assign them to IAD?
16    A    I know they wanted to be assigned to IAD.
17    Q    And is it true that you indicated that you thought
18 that would have been a good position for them to be assigned
19 to it as well?
20    A    I thought it would have been a good place.
21    Q    Did you, in fact, ever indicate that you didn't
22 understand why the chief of IAD, Rivera, wouldn't have
23 assigned them to that position?
24    A    The chief does not have discretion as to who is

Page 31

1 assigned to his unit.  Assignments are not made by the
2 chief.
3    Q    In terms of did you ever talk to them about the
4 fact that you couldn't understand why Rivera wouldn't have
5 made efforts to have them brought to IAD?
6    A    I know Chief Rivera was very supportive of their
7 participation in the investigation and so, you know, you'd
8 have to talk to Juan if he was able to bring them over.  He
9 may have tried.
10    Q    Well, I'm asking you, though, did you ever talk to
11 Danny or Shannon personally and indicate to them that you
12 were surprised that Officer -- that Chief Rivera was not
13 making more efforts to bring them into IAD?
14    A    No, I don't recall that.
15    Q    Do you recall indicating any information to Danny
16 or Shannon about your disappointment with where they were
17 assigned?
18    A    To --
19    Q    The fact that they were being sent to District 15.
20    A    Oh, yes.  I did not -- again I did not agree that
21 they should go to the 15th District, which is why myself and
22 Chief Rivera and Deputy Superintendent Kirby agreed that 126
23 in inspections would have been better.
24    Q    And in terms of did you ever ask in terms of -- did

Page 32

1 you ever talk with -- at that time with Kirby or Rivera
2 about the possibility of putting them in IAD?
3    A    We discussed various places, I'm sure, but we had
4 agreed and specifically discussed about 126, which was under
5 me, and it was agreed that we would pursue -- that they
6 would pursue that request.
7    Q    But I'm asking you did you talk to Kirby and Rivera
8 specifically about putting them in -- the possibility of
9 putting them in IAD?
10    A    It may have been in discussions about where they
11 could be detailed, but again those assignments were not at
12 the discretion of myself or Deputy Superintendent Kirby or
13 Chief Rivera.  We have no authority to assign or detail
14 people anywhere.
15    Q    Okay.  Understanding that, was there any discussion
16 in terms of sending them to IAD and the reasons why it would
17 be good versus the reasons why it could or couldn't happen?
18    A    Our discussion was primarily about 126 and that is
19 where they were eventually detailed to.
20    Q    Was there any discussion about IAD?
21    A    As I said, I don't recall specifics on that point.
22    Q    Do you recall anything Kirby said at all about the
23 issue --
24    MR. KING:  Object to form.

Page 33

1 BY MR. SMITH:
2    Q    Before the agreement to send them to Unit 126 --
3    A    No.
4    Q    -- do you recall anything Debra Kirby said?
5    A    No, I don't.
6    Q    Do you recall anything Juan Rivera said before the
7 agreement to send them to 126?
8    A    Not specifically, no.
9    Q    Do you recall what you said?
10    A    No.
11    Q    While in Unit 126, did Danny and Shannon report to
12 you at all?
13    A    Yes.
14    Q    In what way?
15    A    Because I was chief of the Office of Compliance and
16 so I was in command, and during the first part of -- what
17 year was that?  2011, I think it was, the commander of
18 inspections was absent for medical reasons, so I was the
19 only exec commanding officer.
20    Q    How often would they report to you during that time
21 period when they were with Unit 126?
22    A    Not often but at times they did.  In fact, one time
23 Danny drove me to a meeting.  I had to go on a Sunday, and
24 so he took me there.  So it's a small unit so we all worked

9 (Pages 30 - 33)

Page 34

1 together.
2   Q  So what -- was there any type of regular reporting
3 where they would actually come and meet with you and tell
4 you what they were doing and what their assignments were
5 or --
6   A  No. That wasn't required at that level.
7   Q  Okay. And in terms of how often would you see them
8 physically in terms of just --
9   A  It's a close office so that could vary. I could
10 see people daily, weekly, regularly going in and out because
11 it's a small unit.
12   Q  And in terms of when they came to Unit 126, did you
13 know what their assignment was going to be?
14   A  Yes.
15   Q  What were they assigned to do?
16   A  They were going to be assigned whatever needed to
17 be done in that unit in inspections that was -- primarily
18 responsible for auditing and any other tasks that arose.
19   Q  And in terms of -- what tasks needed to be done at
20 that point in time in Unit 126?
21   A  Well, one of the things that I requested to be done
22 was in the summer we were tasked with assisting the
23 education and training division in training the entire
24 Bureau of Patrol in in-car camera.

Page 35

1   Q  Do you know who within 126 was in charge of doing
2 that?
3   A  Well, I requested that Danny and Shannon be sent to
4 assist the academy in that training.
5   Q  And when would that have been?
6   A  Sometime, I think, in the summer of 2011.
7   Q  Who was their supervisor at that point in time,
8 their immediate supervisor?
9   A  I don't know who their sergeant was at the time.
10   Q  How long was that in camera training assignment
11 supposed to last?
12   A  Until the Bureau of Patrol was trained.
13   Q  Do you know a Lieutenant Pascua?
14   A  Yes.
15   Q  How do you know Lieutenant Pascua?
16   A  She was assigned to inspections and I've known her
17 for many years as well.
18   Q  How did you first know her?
19   A  I first knew her when she was, I believe, sergeant
20 in the Office of Legal Affairs.
21   Q  Do you know about when that was?
22   A  Oh, it would have been, I think, either in early
23 2000s, late 1990s, I think. I'm not sure.
24   Q  And Lieutenant Pascua, was she assigned to Unit 126

Page 36

1 before you got there or --
2   A  Yes.
3   Q  Do you know -- I take it you know Commander
4 Stanley?
5   A  Yes.
6   Q  And how do you know Commander Stanley?
7   A  She was the commanding officer of inspections, and
8 I was her boss but I've known Adrian Stanley for years as
9 well.
10   Q  How did you first come to know Adrian Stanley?
11   A  Well, when I became a lieutenant I was assigned to
12 the 21st District where she was the commander of the 21st
13 District, and that was in 2001, and I was her CAPS
14 lieutenant and also worked as her watch commander.
15   Q  In terms of when did you leave Unit 126?
16   A  In August of 2012 I became chief of special
17 functions.
18   Q  Were, to your knowledge --
19   A  Oh, of 2011.
20   Q  August of 2011?
21   A  2011, right.
22   Q  To your knowledge, were Danny and Shannon still
23 assigned to Unit 126 when you left?
24   A  Yes, to my knowledge.

Page 37

1   Q  Do you know who replaced you?
2   A  That office was done away with.
3   Q  The -- your position at 126 was done away with?
4   A  Yes.
5   Q  Do you know why that was?
6   A  No.
7   Q  So how long -- so it was only a short period of
8 time that you were actually supervising Danny and Shannon in
9 inspections?
10   A  Yes.
11   Q  When I say short period of time, I mean roughly
12 the -- sometime in the beginning of the summer until August
13 approximately?
14   A  Yes.
15   Q  Were you aware that Danny and Shannon stayed at
16 Unit 126 until -- within 126 until sometime in the spring of
17 2012?
18   A  Yes.
19   Q  In terms of once you left your position at 126, did
20 you have any contact with Danny or Shannon?
21   A  Yes.
22   Q  In what way?
23   A  They asked me to recommend them for the fugitive
24 apprehension unit.

10 (Pages 34 - 37)

1   Q   In between the time you left and -- Unit 126 and
2 the time that you -- they asked you to recommend them for
3 the fugitive unit, did you have any contact with them, phone
4 calls, meetings or anything?
5   A   No, not that I recall, no specific meetings or
6 anything, but we see each other all the time, talk, speak.
7   Q   Casual conversation, okay. And in terms of when
8 they were in Unit 126 while you were the chief, were you
9 aware of any complaints about them?
10   A   No.
11   Q   In terms of did you have any problems with their
12 work commitment while they were in Unit 126 under your
13 command?
14   A   No, I did not.
15   Q   In terms of were you aware of any issues or
16 problems they were having in terms of work at the F.B.I.
17 during that time period?
18   A   No, I was not.
19   Q   And in terms of as far as you were concerned, were
20 they properly notifying you or people within 126 when they
21 would be working with the F.B.I.?
22   MR. KING: Object to the lack of foundation.
23   THE WITNESS: I don't know if that was an issue or not.
24 I just know that was never brought to my attention.

1 BY MR. SMITH:
2   Q   So nobody ever told you that we don't know when
3 Danny and Shannon are supposed to be with the F.B.I. and
4 with us, correct?
5   A   Not that I recall.
6   Q   And in terms of they certainly were allowed to work
7 for the F.B.I. during that time period whenever needed?
8   A   It was my understanding that's why they were there.
9   Q   All right. So when they asked you for a
10 recommendation or assistance in going to the -- how did they
11 approach you relating to their attempt to move from Unit 126
12 to the fugitive division?
13   A   I think I remember -- I think Shannon asked me to
14 write a recommendation for the fugitive apprehension unit,
15 and I know it was a short window of time that it was needed,
16 and so I was able to write them up and hand deliver it.
17   Q   Who did you write up something to?
18   A   I wrote it to Chief Tom Byrne of the detective --
19 Bureau of Detectives and hand delivered the recommendations
20 to him.
21   Q   Did Shannon or Danny tell you any details about why
22 they were receiving the recommendations?
23   A   No, just that they wanted to go there.
24   Q   And in terms of do you recall what you wrote in the

1 recommendation?
2   A   Yes.
3   Q   What was that?
4   A   Basically about their work experience, that I felt
5 their work experience and their character -- they would be
6 good for the fugitive apprehension unit.
7   Q   Did you believe that their character was good and
8 appropriate for the fugitive unit?
9   A   Yes.
10   Q   Did you believe that they had a good work ethic to
11 work in the fugitive apprehension unit?
12   A   Yes.
13   Q   Did you have any personal complaints with the
14 quality of either Officer Echeverria or Spalding's work?
15   A   No, I did not.
16   Q   Did you ever have any complaints with them on a
17 personal level?
18   A   No.
19   Q   Did you perceive Shannon Spalding as any type of a
20 complainer during the time you knew her?
21   A   No.
22   Q   Did you perceive Danny Echeverria as any type of a
23 complainer during the times you worked with him?
24   A   No.

1   Q   Did you perceive Danny and Shannon as people who
2 wanted to be Chicago Police Officers?
3   A   Yes.
4   Q   Did you perceive them as people who really enjoyed
5 being Chicago Police Officers?
6   A   Yes.
7   Q   Did you ever hear of any complaints about Danny or
8 Shannon after you left Unit 126 relating to their work in
9 Unit 126?
10   A   Not to my knowledge. I don't recall.
11   Q   Did you ever personally -- were you ever personally
12 told by any supervisors within the Chicago Police Department
13 prior to the time of the filing of this lawsuit that there
14 was any problems or work-related deficiency by either
15 Shannon Spalding or Daniel Echeverria?
16   A   I don't recall it.
17   Q   How about after the lawsuit was filed, did anyone
18 ever complain to you about Danny or Shannon or tell you that
19 they were substandard officers?
20   A   I don't recall.
21   Q   In terms of did you actually speak to Tom Byrne
22 about your recommendation?
23   A   Yes. I hand delivered it.
24   Q   Did Tom Byrne -- to your knowledge, did Tom Byrne

11 (Pages 38 - 41)

Page 42

1 already know Shannon and Danny?

2    A  I don't know if he did or not.

3    Q  Did you have any conversation with Tom Byrne about

4 the recommendations?

5    A  Other than that I hand delivered it, and I thought they

6 would be good candidates for that unit.

7    Q  In terms of while they were -- and were you aware

8 that at one point in time Danny and Shannon were sent to the

9 academy -- the training division of the academy after they

10 were in Unit 543?

11    A  Yes. That's when I got the E-mail or the text

12 message, whichever.

13    Q  Were you aware of what they were asked to do at the

14 training academy?

15    A  No, I wasn't.

16    Q  I'm going to show you -- in terms of after you made

17 the recommendation to put them in fugitive apprehensions,

18 did you ever have any conversations with Danny or Shannon

19 about their assignment and the work at fugitive

20 apprehensions?

21    A  I don't recall.

22    Q  Did you have any conversations with them about

23 Brass Tax after they were assigned to the fugitive

24 apprehension division?

Page 43

1    A  Any conversations about Brass Tax when that

2 investigation was still ongoing was prohibited.

3    Q  Did you have any conversations with them about

4 Brass Tax during the time where Watts and Mohammed were --

5 after they were already charged and during the time in which

6 they were being prosecuted?

7    A  I think just in passing them saying it was over.

8    Q  But nothing in terms of details?

9    A  No, no.

10    Q  And then in terms of while they were with the

11 fugitive apprehension unit did you have any conversations of

12 any significance during the time period that they were

13 there?

14    A  No, not that I recall.

15    Q  Did they -- did you contact them on a regular basis

16 even after they were at fugitive apprehensions?

17    A  No.

18    Q  Did they contact you on a regular basis?

19    A  No.

20    Q  Would you ever ask them questions about whether or

21 not they were having problems because they had been involved

22 in investigating fellow officers?

23    A  I don't recall that.

24    Q  When did you first hear about the lawsuit, if ever?

Page 44

1    A  I think when it was in the paper.

2    Q  Did you talk to anybody about the lawsuit?

3    A  Other than the attorney.

4    Q  Well, other than the attorney. When you first

5 heard about it.

6    A  I don't recall specific -- any specific

7 conversations about it.

8    Q  Do you know -- of course you know Juan Rivera,

9 correct?

10    A  Yes.

11    Q  When did you first meet Juan Rivera?

12    A  Juan and I were both made sergeant at the same

13 time. We were in the same sergeants class.

14    Q  Is that when you met him?

15    A  Yes.

16    Q  At least that you know of?

17    A  Right, that I know of.

18    Q  And I may have already asked you this. When did

19 you first meet Debra Kirby?

20    A  For many years. It's many, many years.

21    Q  Over 15, over 10 years?

22    A  It would probably be over ten years.

23    Q  And just -- what year did you start with the

24 Chicago Police Department?

Page 45

1    A  1982.

2    Q  Did you do any other law enforcement before then?

3    A  No.

4    Q  And do you know James O'Grady?

5    A  Yes.

6    Q  When did you first meet James O'Grady?

7    A  I don't recall specifically.

8    Q  Do you remember being involved in any meetings with

9 James O'Grady relating to Shannon or Danny's assignment?

10    A  I don't recall.

11    Q  Do you recall being involved -- and you knew

12 Nicholas Roti. How long did you know Nicholas Roti for?

13    A  A number of years.

14    Q  More than ten?

15    A  Possibly.

16    Q  Do you remember Nicholas being involved in any

17 meetings where Nicholas Roti was present concerning the

18 assignment of Shannon or Danny?

19    A  Not that I can recall offhand.

20    Q  Do you know Sergeant Maurice Barnes by any chance?

21    A  I may but I can't recall.

22    Q  Okay. Do you know Lieutenant Robert Cesario?

23    A  I do but I don't know how long I've known him.

24    Q  Do you know what way you came to know him?

12 (Pages 42 - 45)

Page 46

1 A No. Some people I'm familiar with because I was at
2 the training academy for six years and so people came
3 through there, so --
4 Q Joseph Salemme, S-a-l-e-m-m-e?
5 A Yes, I know him.
6 Q Do you know him socially?
7 A No.
8 Q In terms of do you consider yourself social friends
9 with Juan Rivera?
10 A No, no.
11 Q How about Debra Kirby?
12 A No, not socially, friends, colleagues but not
13 socially.
14 Q Friends through work?
15 A Friends through work, yes.
16 Q James O'Grady, social friend?
17 A No.
18 Q Friends through work?
19 A Just acquaintance.
20 Q Nick Roti?
21 A Again more of an acquaintance.
22 Q Deborah Pascua, would you consider that a friend
23 through work or --
24 A More of an acquaintance.

Page 47

1 Q What about Adrian Stanley?
2 A More of a friend.
3 Q So that would be more of a friend?
4 A More of a friend, right, relationship with
5 Commander Stanley.
6 Q Do you know a Thomas Mills?
7 A I don't recall.
8 Q Obviously you've met a lot of people over the
9 course of -- I'm not even going to say how many years but --
10 if we could take a couple minute break. I don't think it's
11 going to be much longer. Maybe my guess at this point is
12 ten minutes more.
13 (Brief recess was taken.)
14 BY MR. SMITH:
15 Q I'm going to take you back to the meeting where you
16 first met with Patrick Smith and you first talked with
17 Shannon and Danny about the investigation. How was Shannon
18 and Danny's appearance to meet with you arranged?
19 A You know, I don't recall specifically.
20 Q Were you aware that Danny and Shannon called and
21 made an appointment with you?
22 A That's quite possible. I just don't recall.
23 Q And were you aware that Danny and Shannon would
24 have put in a slip for their time to come in reflecting that

Page 48

1 they were somewhere else at the time of the meeting?
2 A I don't recall.
3 Q A time due slip, do you know what a time due slip
4 is?
5 A I know what a time due slip is but --
6 Q Were you aware that they had called and asked for a
7 meeting the day before you met with Patrick Smith?
8 A I don't recall.
9 Q And that they were told to come in for a meeting
10 the next day after they called?
11 A I don't recall.
12 Q Do you know how it was that the meeting with
13 Patrick Smith was set up?
14 A No, I don't recall.
15 Q Do you recall that Patrick Smith -- at all how the
16 fact that Patrick Smith came in separate from Danny and
17 Shannon?
18 A I don't recall who came in first or --
19 Q Do you remember having a discussion with Patrick
20 Smith before or at least separate from Danny and Shannon?
21 A I don't remember.
22 Q In terms of when you met with -- first met with
23 Danny and Shannon, they never used the term Brass Tax,
24 correct?

Page 49

1 A I don't recall.
2 Q Okay. Is it fair to say that if you got a message
3 from an officer, even an officer you didn't know and -- when
4 you were the head of IAD, if they had requested a meeting
5 with you that was confidential that you would have honored
6 that and most likely arranged for a meeting?
7 MR. KING: Objection to the form and lack of foundation,
8 calls for a hypothetical. You can answer it.
9 THE WITNESS: Hypothetically speaking it's probable.
10 BY MR. SMITH:
11 Q Because you understand as chief of IAD if somebody
12 has something confidential, it may well be something that
13 needs to be private and protected information?
14 A If an officer -- even if I wasn't head of IAD, if a
15 member wants to talk to me in private, I normally honor that
16 request with a supervisor present.
17 Q And do you know who Barb West is?
18 A Yes.
19 Q Who was she when you were the chief of IAD?
20 A When I was chief of IAD she was my lieutenant over
21 at confidential investigations.
22 Q And at times would she tell you if somebody was
23 requesting a meeting?
24 A She could but --

13 (Pages 46 - 49)

Page 50

1  Q   Taking you to the point in time where you were
2  involved in helping Danny and Shannon get reassigned to your
3  Unit 126 at the time, do you recall finding out that they
4  were sent from the -- to the academy before being sent to
5  your unit?
6  A   Yes.  They told me, I believe, in the E-mail or
7  text message.  I knew that they were at the academy and were
8  leaving there possibly to go to 15th.
9  Q   And do you recall that they were taken off Brass
10 Tax abruptly at that time?
11 A   All I know was that they were at the academy and
12 were possibly being detailed to the 15th District.
13 Q   Do you have any idea why they were taken off Brass
14 Tax at that time?
15 A   No.
16 Q   Were you aware that -- do you know who Jill Stevens
17 is?
18 A   A sergeant, I believe.
19 Q   Were you aware that at the time that they were
20 being taken out of Detail 543 that Jill Stevens asked for
21 documents and a statement relating to the nature of what
22 Danny and Shannon were doing in 543?
23 A   I never spoke to Jill Stevens.
24 Q   Were you aware that Juan Rivera was contacted by

Page 51

1  Danny Echeverria about the move to -- being taken off Brass
2  Tax and being sent to the academy?
3  MR. KING:  Just object to the -- I'll withdraw it.  Go
4  ahead.
5  THE WITNESS:  I wasn't present in any conversation
6  between Danny and Chief Rivera.
7  BY MR. SMITH:
8  Q   Were you at any meeting where -- with either Debra
9  Kirby or Juan Rivera or Beatrice Cuello relating to their
10 move, Danny and Shannon's being taken off Brass Tax and
11 being sent to the academy?
12 A   No.
13 Q   Did you learn that Patrick Smith was considered at
14 one point in time a rogue agent or an agent who was having
15 problems in terms of with the F.B.I. itself?
16 A   Danny and Shannon told me that Patrick Smith was no
17 longer a member of the F.B.I.
18 Q   When was that?
19 A   I don't remember exactly when.
20 Q   In terms of when you were briefed about the -- when
21 you first came to IAD you were briefed about the Watts
22 investigation, how long was it your belief that the Watts
23 investigation had been going on for?
24 A   I don't recall but at least prior to 2008.

Page 52

1  Q   Were you aware that it was an -- over a ten year
2  investigation?
3  A   I don't recall specifically.
4  Q   When you were being briefed about -- were you
5  briefed at all from the F.B.I. about what was going on in
6  the investigation?
7  A   I would meet monthly with the F.B.I. to discuss all
8  confidential investigations including the Watts
9  investigation.
10 Q   And when you were briefed by the investigation --
11 by the F.B.I., did they tell you that they were
12 investigating the entire Watts team?
13 A   Anything prior -- anything leading from the
14 investigation was -- so all of it, I mean, Watts and any of
15 his people who worked with him.  That's always understood.
16 Q   Were they giving you names of some of the people
17 that were underneath him that they suspected of wrongdoing?
18 A   Well, we know Mohammed was arrested with him.
19 Q   Were they telling you in terms of during the
20 investigation the names of other officers who, for instance,
21 were identified by informants or arrestees of indicating
22 that other officers on his team were actively involved in
23 extortion and things of that nature?
24 A   I don't recall any specifics of that nature.

Page 53

1  Q   Do you recall any specifics of what they told you
2  Watts was doing?
3  A   Just what he was arrested for.
4  Q   And --
5  A   I went to the federal complaint.
6  Q   Do you know what he was federally charged with?
7  A   Just as far as extortion and stealing money and so
8  forth.
9  Q   Were you aware that the initial developments and
10 surveillance and the stings where Watts was seen doing
11 illegal things wasn't used in that investigation, that a
12 subsequent sting was used?
13 A   I can't say.
14 Q   So as you sit here today do you remember any of the
15 details about how -- what you were being told during the
16 time you were chief of IAD of how Watts was operating in
17 terms of the criminal activity he was doing?
18 A   I don't recall specifics of those discussions.
19 Q   Do you remember anything about the extent of how
20 big his organization was that was working with him?
21 A   No, I don't recall.
22 Q   Has your opinion in terms of Danny and Shannon
23 being good police officers changed in any way at this time?
24 A   No.

14 (Pages 50 - 53)

Page 54

1  MR. SMITH: Nothing further.
2  MR. KING: No questions. We'll reserve.
3  MR. SMITH: We'll order it.
4  MR. KING: I'll take a copy.
5        DEPONENT FURTHER SAITH NOT.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 55

1  STATE OF ILLINOIS )
2            ) ss:
3  COUNTY OF C O O K )
4
5        I, Linda M. Benda, C.S.R., Notary Public, do
6  hereby certify that I reported in shorthand the testimony
7  held at the deposition of Tina Skahill on December 5, 2014,
8  and that this transcript is a true and accurate
9  transcription of my shorthand notes so taken, to the best of
10 my ability, and contains all of the proceedings given at
11 said deposition.
12
13
14            <%Signature%>
15            Linda M. Benda
16            No. 084-003550
17
18
19
20
21
22
23
24

Page 56

1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
       ASSIGNMENT NO: 1975326
3  CASE NAME: Spaulding v. City Of Chicago
   DATE OF DEPOSITION: 12/5/2014
4  WITNESS' NAME: Skahill
5      In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7      I have made no changes to the testimony
   as transcribed by the court reporter.
8
   _____   _____
9    Date          Tina Skahill
10     Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
       They have read the transcript;
13     They signed the foregoing Sworn
       Statement; and
14     Their execution of this Statement is of
       their free act and deed.
15
       I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17
   _____
18   Notary Public
19
   _____
20   Commission Expiration Date
21
22
23
24
25

Page 57

1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
   ASSIGNMENT NO: 1975326
3  CASE NAME: Spaulding v. City Of Chicago
   DATE OF DEPOSITION: 12/5/2014
4  WITNESS' NAME: Skahill
5      In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7      I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9      I request that these changes be entered
   as part of the record of my testimony.
10
       I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
   that both be appended to the transcript of my
12 testimony and be incorporated therein.
13 _____   _____
     Date          Tina Skahill
14
       Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
   the referenced witness did personally appear
16 and acknowledge that:
17     They have read the transcript;
       They have listed all of their corrections
18 in the appended Errata Sheet;
       They signed the foregoing Sworn
19     Statement; and
       Their execution of this Statement is of
20     their free act and deed.
21     I have affixed my name and official seal
22 this _____ day of_____, 20____.
23
   _____
24   Notary Public
25
   _____
     Commission Expiration Date

15 (Pages 54 - 57)

Page 58

```
1            ERRATA SHEET
          VERITEXT LEGAL SOLUTIONS MIDWEST
2            ASSIGNMENT NO: 1975326
3  PAGE/LINE(S) /      CHANGE      /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19
   _____    _____
20   Date           Tina Skahill
21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22 DAY OF _____, 20_____ .
23    _____
      Notary Public
24
      _____
25    Commission Expiration Date
```

16 (Page 58)

# Exhibit F

```
                                                    Page 1

 1
 2
                IN THE UNITED STATES DISTRICT COURT
 3              FOR THE NORTHERN DISTRICT OF ILLINOIS
                          EASTERN DIVISION
 4
 5
     CHICAGO POLICE OFFICER SHANNON      )
 6   SPALDING and CHICAGO POLICE         )
     OFFICER DANIEL ECHEVERRIA,          )
 7                                       )
                          Plaintiffs,    )
 8                                       )
                vs.                      ) 12 C 8777
 9                                       )
     CITY OF CHICAGO, et al.,            )
10                                       )
                          Defendants.    )
11
12
13
                     Deposition of NICHOLAS ROTI, taken before
14
     Linda M. Benda, C.S.R., Notary Public, in the County of Cook
15
     and State of Illinois, at One North LaSalle Street, Suite
16
     3040, Chicago, Illinois, on the 3rd day of December 2014, at
17
     the hour of approximately 9:30 o'clock a.m.
18
19
20
21
22
23
24
```

Page 2

1
2 APPEARANCES:
3
4
5        CHRISTOPHER SMITH TRIAL GROUP, by
       MR. CHRISTOPHER SMITH
       One North LaSalle Street, Suite 3040
6        Chicago, IL 60602
       (312) 432-0400
7
       On behalf of the Plaintiffs;
8
9
       DRINKER, BIDDLE & REATH, by
10        MR. ALAN S. KING
       191 North Wacker Drive, Suite 3700
11        Chicago, IL 60606
       (312) 569-1334
12
       On behalf of the Defendants.
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1            I N D E X
2
3 WITNESS:                PAGE
4 NICHOLAS ROTI
5  Examination by Mr. Smith        4
6
7
8         E X H I B I T S
9 Exhibit No. 1          80
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1 (Witness sworn.)
2        NICHOLAS ROTI,
3 called as a witness herein, having been first duly sworn,
4 was examined upon oral interrogatories and testified as
5 follows:
6        EXAMINATION
7        by Mr. Smith:
8  Q   Please state your name for the record.
9  A   My name is Nicholas Roti, R-o-t-i.
10  Q   And have you ever given a deposition before?
11  A   Yes.
12  Q   Approximately how many times?
13  A   Over ten.
14  Q   Were you a defendant in a lawsuit for any of those?
15  A   Yes.
16  Q   And how many times would you say that would be the
17 case? Well, let's stick with -- were any of them work
18 related?
19  A   Most, if not all.
20  Q   How many times did you give a deposition in cases
21 that you were a defendant?
22  A   You know, I said over ten earlier, but it's right
23 around ten, I would guess. I don't know exactly.
24  Q   Do you remember the names of any of them?

Page 5

1  A   I mean, one was a car accident. I do not remember
2 the name.
3  Q   Anything where you ended up going to trial?
4  A   I went to trial once.
5  Q   What case was that?
6  A   I do not remember the plaintiff's name because it
7 was literally back in like 1987 or '8 or something. It was
8 a very long time ago. It was claimed he got injured during
9 an arrest.
10  Q   What was your position? I'm not going to ask you
11 about the facts.
12  A   I was a police officer.
13  Q   Okay. Now, how are you currently employed?
14  A   The Chicago Police Department.
15  Q   As what -- in what position?
16  A   I am the chief of the Bureau of Organized Crime.
17  Q   And in terms of the narcotics unit, Unit 189, would
18 that be underneath the Bureau of Organized Crime or within?
19  A   Yes.
20  Q   How long have you been the chief of the Bureau of
21 Organized Crime?
22  A   I've been the chief since 2010, so a little more
23 than four years.
24  Q   And what position did you hold before that?

2 (Pages 2 - 5)

Page 6

1    A    I was -- immediately before this I was the deputy
2 chief in the Bureau of Organized Crime.
3    Q    How long were you the deputy chief?
4    A    Almost two years, I believe.
5    Q    What was your position before that?
6    A    I was an acting deputy chief. Well, I think part
7 of the time I was actually a promoted deputy chief, but I
8 was a deputy chief in the detective division for a period
9 before that, not very long, though, less than a year.
10    Q    What was your position before that?
11    A    The commander of the narcotics section. It used to
12 be called the narcotics section as opposed to now it's the
13 narcotics division, but that was only for approximately five
14 months.
15    Q    What was the position before that?
16    A    Commander of the gang -- it's currently called the
17 gang investigations division. I believe it was called gang
18 intelligence section back then.
19    Q    And the position before that?
20    A    I was commander in -- I don't remember the exact
21 name of the unit, but it was like a management
22 accountability unit. That was for a short time, less than a
23 year.
24    Q    What did you do before that?

Page 7

1    A    Before that I was the commanding officer/lieutenant
2 in the -- for the homicide unit for Area 4, detective
3 division.
4    Q    And before that?
5    A    I was the lieutenant commanding officer in the
6 detective division for Area 2, robbery, burglary and theft
7 section or unit.
8    Q    And before that?
9    A    I was lieutenant. I was a tactical lieutenant in
10 the Second District.
11    Q    And before that?
12    A    I was the watch commander in the Fifth District at
13 the rank of the lieutenant.
14    Q    And then before that?
15    A    I was a sergeant in the Sixth District.
16    Q    And before that?
17    A    I was a sergeant in public transportation section.
18    Q    Before that?
19    A    I was a sergeant in the Second District.
20    Q    And before that?
21    A    We're getting back into like the '80s and the
22 early --
23    Q    You're doing much better than most people.
24    A    -- early '90s now.

Page 8

1    Q    This is not meant to be a quiz.
2    A    I was a police officer. I had various duties
3 during that time from public transportation section to
4 Seventh District tactical team to -- yeah, I mean, various
5 assignments.
6    Q    Were you ever personally a police officer in a
7 narcotics unit?
8    A    No.
9    Q    Were you ever a police officer in a unit that would
10 be underneath the label organized crime?
11    A    No.
12    Q    Okay. And just so -- when did you start with the
13 Chicago Police Department?
14    A    June of 1986.
15    Q    Did you have any career before you became a police
16 officer?
17    A    I did some construction work, and I was going to
18 college and school. I started when I was relatively young.
19    Q    All right. In terms of your position as -- well,
20 first of all, you're aware that you're here -- did you
21 review any documents in preparation for this deposition?
22    A    I reviewed the lawsuit. I reviewed -- I mean, what
23 time period are you talking? Just in general?
24    Q    Yesterday, the day before.

Page 9

1    A    Not in the last few days.
2    Q    Today?
3    A    I mean, but over time when I tried to search for
4 documents that might be related to this, I definitely looked
5 at things via either E-mails when I was searching to see if
6 there was anything or I located the evaluations from way
7 back in 2008, things like that.
8    Q    So did you find evaluations?
9    A    Yes.
10    Q    And did you find any other documents that you felt
11 were related to the lawsuit?
12    A    The only thing that I have I think that's -- where
13 I actually have the document in hand would be a note where
14 Daniel Echeverria called my office, and the note was from my
15 administrative assistant to let me know that he called, but
16 I think that's the only like document that I actually
17 possess that I could think of.
18    Q    Were you -- I believe Shannon Spalding who was one
19 of the Plaintiffs was assigned to narcotics in approximately
20 May of 2006. Would you have been with the narcotics unit, a
21 commander or a chief or had any assignment related to
22 narcotics back in 2006?
23    A    No. I was assigned to the -- as the commander of
24 the gang investigations section or gang intelligence

3 (Pages 6 - 9)

Page 10

1 section, whatever.
2    Q   And in terms of -- in terms of do you recall when
3 the first time you heard of Shannon Spalding was?
4    A   Not exactly but in general, yes.
5    Q   What do you recall?
6    A   I recall that when I took over, which was sometime
7 in, I believe, March of 2008, like any business or any
8 organization that you become the head of, you do an
9 evaluation and you talk to your command staff, and I talked
10 to the lieutenants that were assigned at the time, and I
11 think that's the first time I heard of Shannon Spalding and
12 Daniel Echeverria.
13    Q   Do you remember what lieutenants you spoke to about
14 Shannon Spalding?
15    A   I believe the -- I mean, there were several
16 lieutenants in the room, but I believe to my recollection
17 the lieutenants that informed me of information about them
18 was Lieutenant Robert Cervenka and Lieutenant Navarro.
19    Q   Do you remember what Lieutenant Navarro said about
20 Shannon Spalding?
21    A   I don't recall exactly who said exactly what, but I
22 just recall that they brought their names up and it was
23 something along the lines of here's some people you need to
24 be aware of because they -- there's some issues with them

Page 11

1 personnelwise. They're not getting along with other people
2 and their sergeants, and we had to separate them not too
3 long ago before I got there. That's not what they said.
4 That's what I'm saying. They had to separate them. They're
5 on two different teams right now and just generally that
6 they did not think very highly of them at the time.
7    Q   Do you remember specifically anything Lieutenant
8 Navarro said about either Danny Echeverria or Shannon
9 Spalding?
10    A   Specifically, no.
11    Q   Do you remember anything specifically Lieutenant
12 Cervenka said about Shannon Spalding or Danny Echeverria?
13    MR. KING: Just object to the form of the question. I
14 think he's testified to several things already but --
15 BY MR. SMITH:
16    Q   In terms of I'm correct that you're saying that
17 generally you didn't know which one said it but --
18    A   I think they both --
19    Q   -- do you remember anything specifically from
20 Cervenka personally?
21    A   No. I believe they were both commenting because
22 when they were split up, I believe one went to teams that
23 would be under Cervenka's supervision and one went to a team
24 that would be under Navarro's supervision, so I believe both

Page 12

1 of them made comments.
2    Q   Did you speak to any other supervisor of Danny
3 Echeverria or Shannon Spalding after you learned of that?
4    A   Not officially, not to my recollection. I'm not
5 going to say I never did, but I don't recall in that time
6 period where I really followed up on it. It just kind of
7 went into my memory banks and as usual, I would, you know,
8 let the lieutenants filter information up to me if there was
9 any additional information that arose.
10    Q   Did you document that conversation or information
11 in any way personally?
12    A   No.
13    Q   Did you learn anything of Shannon Spalding or
14 Daniel Echeverria's career prior to getting to narcotics?
15    A   No.
16    Q   Did you -- were you familiar with the Fentanyl case
17 at all?
18    A   Well, yes.
19    Q   How were you familiar with that?
20    A   Well, there was -- there were several -- there was
21 a couple different cases involving Fentanyl. There were
22 joint -- the one main one that I recall, I was a commander
23 in gang investigations, and the main portion of the
24 investigation as far as the investigative angle into the

Page 13

1 voluntary manslaughter charges and things like that were
2 basically run out of gang investigations. Often gang
3 investigations would work hand in hand with narcotics
4 section on cases where we would utilize narcotics officers
5 to assist in making buys of narcotics, and they would be
6 what we would term a joint investigation.
7    Q   Were you familiar with Shannon Spalding's role in
8 any Fentanyl investigations?
9    A   No, not specifically. There were -- she was not a
10 case officer in that case. She didn't run the case. I know
11 that. But she might have been involved in some way. Her
12 team might have been involved to make buys, but there was --
13 she or Dan were not the case officers. They were not
14 running the case.
15    Q   Were you aware of how Shannon Spalding first came
16 to the narcotics unit?
17    A   Was I aware?
18    Q   Yes.
19    A   At the time, no.
20    Q   Did you ever become aware?
21    A   Not specifically. People have said she didn't go
22 through -- they didn't go through the normal process of
23 applying and having an interview I've been told. I've been
24 told that they worked on some cases when they were in a

1 different unit, either two or housing, that they assisted,

2 and I've been told that someone took a liking to them and

3 asked that they be assigned there or something, but I don't

4 know the detail. It's purely hearsay.

5     Q   Do you know who the person was that took a liking

6 to them?

7     A   At one point I heard Deputy Chief Michael Cronin,

8 but --

9     Q   Did you hear anything as to why?

10     A   No. I mean, not specifically.

11     Q   In terms of as chief of the organized crime

12 division, what -- how often would you review officers,

13 individual officers in terms of their kind of reviews and

14 work history?

15     A   As chief of the Bureau of Organized Crime, seldom,

16 if ever, would I look into the details of an officer's work

17 history. There's several layers of supervision in between

18 me and the officers, and there's systems in place and I

19 would rely on the commanders and then possibly even a deputy

20 chief who are stationed over at Homan Square, as opposed to

21 me who is stationed at headquarters, to fill me in and

22 update me if there's any issues with officers.

23     Q   So there wasn't any -- there wasn't scheduled

24 meetings where you would go over each officer in the unit

1 and say how's this person doing or how's this person doing?

2     A   No. You know, in the Bureau of Organized Crime

3 there's literally like close to a thousand police officers

4 assigned that would be ultimately under my supervision

5 as the chief. So it's definitely broken down. At the most

6 sometimes we do case reviews, but that's not -- doesn't get

7 into individual officers. It's just we review the cases

8 that they work on.

9     Q   After -- with respect to in the initial -- when you

10 initially got there, other than Shannon Spalding and Daniel

11 Echeverria, did you hear about any other potentially problem

12 officers that you were supervising?

13     A   Yeah. I mean, I can't recall exactly who but, you

14 know, when you come in -- like I said earlier, when you come

15 in and take over a new command, people generally try to get

16 you up-to-date on what the issues are and what the potential

17 problems might be. I will say that the issues with Officer

18 Spalding and Officer Echeverria were brought up relatively

19 quick, I mean, right in the beginning, and they kind of rose

20 to the level where I recall it as opposed to some of the

21 other personnel. Now -- yeah.

22     Q   Can you remember any other personnel that you have

23 been told were -- was a problem during your time as the

24 chief of the organized crime division?

1     A   During my time as chief, can I remember individual

2 names? If I probably really think about it, but I could say

3 that numerous people over the years have been reassigned out

4 of the Bureau of Organized Crime for various reasons from

5 performance to personnel and personality issues to lack of

6 teamwork to misuse of department equipment. You name it. I

7 mean, virtually -- we have a transfer order every police

8 period, and almost every period some people go out and some

9 people come in.

10     Q   Can you think of any name that was told to you when

11 you first came in that was being identified as a problem

12 officer besides Shannon Spalding or Daniel Echeverria?

13     A   Off the top of my head I cannot, but I do know

14 on -- there was evaluation forms that were done, and people

15 were evaluated on those forms and some were not evaluated

16 highly, and almost all of those people were subsequently

17 moved out of narcotics at some point.

18     Q   After you became chief of the organized crime

19 division did you hear any other -- other than in that

20 initial period where you were being given information about

21 general things within the narcotics division, did you ever

22 hear again of any problems with either Shannon Spalding or

23 Daniel Echeverria?

24     A   Well, I mean, the question will be hard to answer

1 because I think you're mixing different time frames and

2 different commands because when I heard about them, I was in

3 narcotics, which was only for about five months, and it

4 wasn't until two plus years later that I became the chief of

5 organized crime.

6     Q   Okay. And did you hear anything further between

7 that first initial conversation you had with lieutenants

8 including Navarro and Cervenka between the time you first

9 came to narcotics and the two years later when you became

10 the chief?

11     A   Well, during that five-month period that I was in

12 narcotics, after the first initial assessment I recall that

13 at some point there was an issue with Officer Spalding where

14 she was making a buy and I don't recall the details, but

15 something happened where it necessitated backup and

16 enforcement officers to come in. Backup officers, which we

17 call enforcement officers, did come in. And then there was

18 an issue that the surveillance officers who we call the

19 eyeballs that are supposed to be watching her were not the

20 first ones in. The surveillance officers were the first

21 ones in. I mean -- I'm sorry. The enforcement officers

22 were the first ones to assist her, and I recall being told

23 by Lieutenant Navarro and I believe in person and then

24 subsequently -- via E-mail first and then later in person

Page 18

1 that Shannon Spalding was upset about the incident and that
2 she was, as it was put in their terms, bad mouthing the
3 other officers and bad mouthing the team and it was causing
4 a derision and -- but that they were going to handle it and
5 let me know, and I assumed they handled it because I didn't
6 hear much about it after that. That was while I was still
7 the commander.
8          Later, which is -- remember this is only a
9 five-month time frame. Not long after that is when I was
10 called by Tina Skahill and almost immediately after the call
11 from Tina Skahill they were assigned to work, which was
12 supposed to be on an as-needed/part-time basis with the
13 F.B.I. on the corruption case, but really after that I
14 didn't -- the only time I heard of them is when lieutenant
15 came in to tell me that he hasn't heard from them and they
16 have not been showing up to the narcotics section to work.
17 And then I subsequently called Tina Skahill, told her she
18 would have to detail them out of narcotics because I
19 didn't -- I couldn't keep track of what they were doing, and
20 she did, and then after that that's the last I really heard
21 of updates on them.
22     Q     Just so it's clear for the record, what was your
23 position during that five-month period?
24     A     Commander of narcotics.

Page 19

1     Q     What period are we talking about roughly?
2     A     March 2008 to about August 2008.
3     Q     And in terms of did you -- that incident with --
4 that you heard about from Lieutenant Navarro, did you feel
5 Shannon Spalding did anything wrong in that incident?
6     A     I don't really know because all I -- she didn't do
7 anything wrong operationally that I know of. I believe the
8 issue with her that was brought to me was just that her
9 comments and some of her actions post incident were causing
10 some turmoil among the team in the instant, but again the
11 lieutenants and the sergeants, that's typically something
12 they would handle. We have those issues from time to time.
13 As far as operationally whenever there's anything that does
14 not go perfectly, we always do an assessment after with the
15 lieutenants and try to figure out what went wrong and what
16 we can do to improve. So I think the -- that's it.
17     Q     In terms of were you aware of what the so-called
18 bad mouthing comments were?
19     A     Not specifically.
20     Q     Did you ever learn why the surveillance team was
21 not on the scene first?
22     A     No.
23     Q     Did you ever learn that Shannon Spalding had
24 indicated before the buy that she was an individual who had

Page 20

1 been identified or known as a police officer at that
2 location on a previous occasion before the buy?
3     A     That's the first I heard of that.
4     Q     And did you instruct in any way the lieutenant to
5 figure out why the -- where the surveillance team was during
6 this buy?
7     A     In the lieutenant's E-mail to me he stated that
8 they were going to look into it and follow up on it.
9     Q     Did you ever hear any follow-up in terms of what
10 the result of that investigation was?
11     A     I'm sure I did but I do not recall the details.
12     Q     Did -- were you aware that Shannon Spalding was a
13 victim of a robbery in that incident?
14     A     I was not aware -- I am not aware of that, no.
15     Q     Would you have thought that Lieutenant Navarro
16 would have made an effort to figure out why his team failed
17 to or the surveillance failed to assist her when she was
18 being robbed?
19     MR. KING: Object to the form of the question, calls for
20 speculation, lack of foundation. You can answer if you
21 understand it.
22     THE WITNESS: Well, I think in the way you're depicting
23 it, it's not 100 percent accurate because the -- there's
24 eyeball surveillance people that technically get as close as

Page 21

1 they can to observe what's going on and call -- they call in
2 for help. I mean, the system has backups in it, and the
3 enforcement officers did go in to assist her, so it wasn't
4 like the whole system did not work. There was some question
5 that Shannon felt and others maybe felt -- I don't know --
6 that the enforcement officers were closer and -- I'm sorry.
7 The surveillance officers were closer and might have been
8 able to assist her, but the enforcement officers who tend to
9 be just a little farther away because they're identifiable
10 as police officers were the first ones to actually get to
11 the scene and then assist her and make the arrest, but I
12 don't -- all the details that you're bringing up I'm not
13 aware of.
14 BY MR. SMITH:
15     Q     In terms of -- okay. The -- in terms of Shannon's
16 thoughts or positions, I assume you're just -- you didn't
17 talk with Shannon about that, correct?
18     A     Correct.
19     Q     You're just making an assumption about what you
20 thought might be the issue?
21     A     Yes. An assumption based on what I was told from
22 Lieutenant Navarro.
23     Q     Do you know if that incident was -- when you were
24 speaking with -- in the initial time you spoke with

6 (Pages 18 - 21)

1 Lieutenant Navarro and Cervenka about Spalding and
2 Echeverria, did you have any -- did you have a review, a
3 performance review with you at that time?
4    A    No, and to be clear, the meeting was not about
5 them.  It was a meeting just about general operations and
6 personnel in narcotics.
7    Q    Do you know if there was a review, a written review
8 at that point in time, the point in time that you -- did you
9 find any written review for a period that was generated
10 before that meeting indicating anything wrong with either
11 Shannon Spalding or Danny Echeverria?
12    A    Before that meeting, which would have taken place
13 in March, no.  I had them do a review of all the personnel
14 in narcotics.  Sometime around that meeting I told them to
15 do a review, which I received the results of sometime in
16 April of 2008.
17    Q    Do you know if the incident with the -- that you
18 spoke to Lieutenant Navarro about with the buy that went
19 wrong was before or after that review in April?
20    A    I don't know for sure, but I think it can be nailed
21 down if it had to be.
22    Q    By looking at the documents?
23    A    Documents.
24    Q    And do you know of any specific incident that

1 either Navarro or Cervenka told you about at your initial
2 meeting where they came up about either Shannon Spalding or
3 Daniel Echeverria that they spoke of?
4    A    I don't recall offhand of a specific incident that
5 they told me.  I don't recall at this point.
6    Q    Do you know how you learned about how Shannon
7 Spalding was brought into the narcotics unit in terms of the
8 information that she might have gotten favor -- I think it
9 was McGrath.  Do you know how you learned of that?
10    MR. KING:  Just object to the form of the question,
11 misstates his testimony.
12 BY MR. SMITH:
13    Q    Do you understand the question?
14    A    Do I understand the question?
15    Q    I can ask it more generally.  Do you know how you
16 got information about how Shannon Spalding came to the unit?
17    A    You know, it was a long time ago.  I don't recall
18 exactly, but someone said -- told me that -- and I think it
19 was -- I don't know.  I really don't know.  I'd have to
20 really try to guess to remember who told me.
21    Q    Do you know if it was at the time of that initial
22 meeting or conversations with Navarro and Cervenka?
23    A    I don't think so.
24    Q    Do you know if it was before that?

1    A    Oh, no, it wouldn't have been before that because I
2 didn't even know who they were before that.
3    Q    Do you believe it was after that?
4    A    Yeah.  Sometime after that, I believe.
5    Q    Do you know -- do you have any idea how long after
6 that?
7    A    I don't.
8    Q    Do you know if it was during the time that you were
9 a commander of narcotics?
10    A    I really don't recall where I -- who told me or
11 when.
12    Q    So in terms of -- you indicated that you then at
13 some point around -- during your time you were commander, I
14 believe, that you contacted Tina Skahill to have Shannon
15 Spalding and Echeverria reassigned?
16    A    Well, the technical term would be detailed at that
17 point.
18    Q    Okay.  And in terms of do you recall approximately
19 when that would have been?
20    A    It was approximately four weeks after -- between
21 four and five weeks after Tina Skahill called me to ask if
22 they could work -- if I would allow them to work with the
23 F.B.I. on that case, and it was sometime in -- I don't
24 recall exactly but it was sometime around maybe -- you want

1 to know when I called her?
2    Q    Yes.
3    A    When I called her would be sometime in July, I
4 believe.
5    Q    Okay.  And, first of all, when Tina Skahill called
6 you that was on the phone?
7    A    Yes.  The first time I heard this ever was put on
8 the table was from a phone call from Tina Skahill to me.  I
9 was in my office at Homan Square in narcotics.
10    Q    And did you -- what did Tina Skahill say to you?
11    A    In essence but not verbatim she said, Nick, there's
12 a case that we're working on and the F.B.I. is working on,
13 and would you allow Shannon Spalding and Daniel Echeverria
14 to work periodically with the F.B.I. because they have an
15 informant that the F.B.I. wants to use to further their
16 case.
17    Q    Did you ask her any questions about it?
18    A    Not specifically that I recall, but she said -- she
19 told me I knew it was a corruption case.  I know it was some
20 type of corruption case, and I knew she said she wanted to
21 keep it quiet obviously.  That was -- she didn't want like
22 everyone to know, you know, what was going on there, which
23 is common with all our cases whether it be corruption or a
24 regular investigation.  You try to keep that very

7 (Pages 22 - 25)

Page 26

1 compartmentalized.

2    Q   When you say corruption case, are you indicating

3 that you knew it was an investigation that somehow had

4 something to do with another Chicago Police Officer?

5    A   Yeah.  I'm pretty sure I knew then, but I

6 definitely knew a few days later when the F.B.I. came to see

7 me.

8    Q   So -- and did you have any idea of what like area

9 the officer that was being investigated would have been

10 working in?

11    A   From Tina Skahill?

12    Q   Correct.

13    A   I don't think so.  I think later when I talked to

14 the F.B.I. maybe I had an idea.

15    Q   Did you tell anybody about your conversation with

16 Tina Skahill at that point in time?

17    A   I told -- the only people I told, which I didn't

18 tell them the details of the conversation, but I told them

19 because, of course, people don't just not show up to work or

20 disappear.  You have to have a reason why.  So I told

21 their -- I told the lieutenant, Cervenka, I believe, that --

22 because I think by that time Navarro might have been

23 assigned somewhere else.  So I told Cervenka that there's --

24 that those two were going to be working with the F.B.I. on a

Page 27

1 case, but they're to call you -- they're to call you when

2 they're not going to show up here to work so that we could

3 keep track of when they're here and when they're not here.

4    Q   Was this --

5    A   But I didn't tell him why.  I told him I can't tell

6 you what the details are, and their sergeant isn't to know.

7 All he's to know -- well, actually they had two different

8 sergeants, which was part of the problem because they

9 weren't working together.  So I said their sergeants can't

10 know.  All you got to tell the sergeants is they're working

11 on a special project.  Someone wants to use a CI or

12 something, and periodically they're not going to be working

13 with their team.

14    Q   And do you remember who the two sergeants were back

15 then?

16    A   Yeah.  I believe one was Kevin Johnson and one was

17 either Roderick Robinson or Roderick Watson.  I'm not 100

18 percent sure.

19    Q   And did you have any conversation with them about

20 their reassignment?

21    A   No.

22    Q   Or detailing?

23    A   No.

24    Q   And in terms of when you had the conversation with

Page 28

1 Cervenka, was that over the phone or in person?

2    A   I'm pretty sure it was in person, my office.

3    Q   Do you know if anyone else was in for the meeting?

4    A   No.  Just him.

5    Q   And what system did you set up for checking in

6 with -- when they would go to the F.B.I. to work with the

7 F.B.I.?

8    A   I didn't set up a specific system.  I told Cervenka

9 that they were to notify him when they weren't going to show

10 up to work with their teams at the CPD.

11    Q   And was it to be written or documented in any way?

12    A   No.

13    Q   And in terms of was it just to be a phone

14 notification or an in-person?

15    A   A phone notification, but I didn't specify that, to

16 be honest with you.  I just told them they're supposed to

17 notify him.

18    Q   Do you know if there were any records kept of that?

19    A   I don't believe there was.

20    Q   In terms of the F.B.I., you indicated that you

21 spoke to them about two days after the Skahill call?

22    A   Somewhere within a week.  I don't remember the

23 exact amount of days.

24    Q   Do you remember who it was --

Page 29

1    A   Yes.

2    Q   -- who came to you.  Who was it?

3    A   Agent Patrick Smith and Agent Julie Anderson.

4    Q   Did they -- where did they speak with you?

5    A   In my office.

6    Q   Did they contact you by phone before coming?

7    A   I'm sure they did, yeah.

8    Q   Do you remember having any conversation at that

9 point in time on the phone?

10    A   No.  They just said they want to come and talk to

11 me about, you know, the case and something and what they

12 were going to be doing.  It was probably more of a courtesy

13 than anything.

14    Q   Did you have any conversation with either Shannon

15 Spalding or Daniel Echeverria about the F.B.I. coming to see

16 you?

17    A   No.

18    Q   Did you call Tina Skahill and let her know that the

19 F.B.I. was coming?

20    A   No.

21    Q   So who was present for the meeting you had with

22 them?

23    A   Just me and those two.

24    Q   What did they say to you?

8 (Pages 26 - 29)

Page 30

1     A    They basically told me, and Patrick Smith did most
2  of the talking as I recall, that they wanted to thank me for
3  letting the two officers work with them.  They -- he told me
4  that they had a case.  It's been going on for a long time,
5  but there were some snags in the investigation, and this is
6  my term.  This is in essence, not verbatim, and that they
7  needed to shore up some parts of the case so they could
8  bring it to charging, and to do that they needed an
9  informant that worked in the area that the case was taking
10  place and that Spalding and Echeverria had a CI that
11  operated and lived and worked in that area, so to speak,
12  that they really just needed the CI but that Echeverria --
13  Spalding and Echeverria told them that the CI would only
14  work for them and with them, so that's why they needed
15  Spalding and Echeverria so that they could use their CI.
16         I -- without getting into exact details, I
17  knew it was a corruption case.  I knew it was about officers
18  that were stealing money from -- probably from dope dealers
19  and gang members, and they told me they were only going to
20  need them on a part-time basis.  They didn't need them
21  full-time.  They only needed them -- when I say them I mean
22  Spalding and Echeverria.  They only needed them when they
23  needed to utilize the informant.  They gave me their cards.
24  I said call me if you got -- any issues come up.  It was all

Page 31

1  very cordial.  It wasn't very long, and that was it.
2     Q    In terms of -- and this was while you were
3  commander, correct?
4     A    Yes.
5     Q    And then did you document that in any way?
6     A    No.
7     Q    And in terms of did they indicate to you that this
8  was related to Public Housing South?
9     A    You know, I can't recall exactly.  I had an idea of
10  the basic area that this investigation was, but I didn't
11  know like exact addresses and I -- they gave me an idea
12  basically in their comments.  I mean, I've been a policeman
13  in the city for a long time.  I knew it was projects.  I
14  knew it was kind of south.  I knew it wasn't Cabrini-Green,
15  so I kind of had an idea where it was.
16     Q    Did you tell anybody about that meeting?
17     A    At the time, no.
18     Q    At any point in time within a year of the meeting
19  did you tell anyone?
20     A    I don't know.  I mean, not -- no, not while the
21  investigation was going on, no.
22     Q    Did you tell Tina Skahill, for instance?
23     A    I did -- you know what?  That's correct.  I did in
24  a subsequent phone call to Tina Skahill -- I forgot -- I

Page 32

1  told Tina that I think it would be best if she officially
2  detailed Spalding and Echeverria to IAD as opposed to this
3  kind of ad hoc favor that we had because we thought this was
4  going to be a shorter term thing and just being used once in
5  a while, coupled with the fact that I was uneasy because it
6  came to my attention that Spalding and Echeverria were not
7  showing up to work at narcotics, and I could not verify
8  through the F.B.I. that they were with them all the time, so
9  we don't operate like that.  We don't have officers that
10  just go out without supervision and no one knows where
11  they're at.  So I told Tina since I can't really properly
12  supervise them from here, you need to take them, which she
13  said -- and I told her at that point about -- that the
14  F.B.I. told me that they were only going to use them
15  part-time, which she told me in the first place, and also
16  that I did subsequently recontact Agent Smith and ask him if
17  he was utilizing the CI and Spalding and Echeverria every
18  day, which he told me, no, he wasn't.  So at that point Tina
19  agreed and she had them detailed out.
20     Q    Anything else said in that conversation?
21     A    The one to Tina?
22     Q    Yes.
23     A    No, just basically what I said.  I mean, that I was
24  very uneasy and I didn't -- I was very uneasy.  I could not

Page 33

1  account for their time, and I couldn't let this arrangement
2  go on any longer in its present form and she would have
3  to -- if she wanted -- they wanted to keep it going they
4  needed to be detailed so that a supervisor that, you know,
5  had knowledge of the investigation could actually supervise
6  them and know where they were every day and account for all
7  their time.
8     Q    Did you make any efforts to verify with the F.B.I.
9  that Shannon Spalding or Daniel Echeverria were working with
10  them on the days they weren't showing up for work?
11     A    Yeah.  As I stated in that earlier long answer that
12  I called Patrick Smith, and I asked him if he was using --
13  utilizing them and working with them every day because I
14  have not -- they have not been coming to work at Homan
15  Square.  He told me no.  He was only using them on a
16  part-time basis.
17     Q    In terms of did you ever have a conversation about
18  a specific day?
19     A    No.  We didn't get into the details.
20     Q    In other words, did you ever say, hey, they didn't
21  come in on Friday, were they with you on Friday?
22     A    I did not get into the details with them.
23     Q    So there was never a day where you determined that,
24  oh, they weren't working at all even though they were

9 (Pages 30 - 33)

Page 34

1 claiming to be working?

2    A   No.  The investigation never went that far.  I was

3 told by the lieutenant that, hey, I have not heard from them

4 or seen them in several -- in a couple of weeks, do you know

5 if they've been working with the F.B.I. every day, and I

6 said I don't know.  I will call.  That's when I called

7 Patrick Smith.

8    Q   All right.  And the -- in terms of did you know

9 back when you -- at any time before you were the commander

10 of narcotics did you know a Sergeant Ronald Watts?

11    A   I know the name.  I don't know that I know him

12 personally.  I don't think so.  I think I know his face

13 maybe because he was on TV, but I think I've crossed paths

14 with him.  I used to be a sergeant in the Second District

15 and I don't know for sure, but I think he might have worked

16 in housing at the time or something.  I don't really know.

17    Q   And the Second District is the district where

18 Public Housing South would be?

19    A   It covers part of the -- what used to be the Robert

20 Taylor Homes were in the Second District and Housing South

21 covered parts of that as well as some other -- Ickes and

22 some other -- not Ickes.  It's another housing project.  I

23 can't think of the name of it but --

24    Q   In terms of when were you at the Second District?

Page 35

1    A   I was assigned to the Second District as a sergeant

2 in -- sometime in 1994 for over -- I want to say till -- and

3 this is all documented somewhere, so I don't know the exact

4 dates.  I mean, we could pull personnel files, but I want to

5 say sometime till around '96-ish for two years or so, and

6 then I was -- I went somewhere else.  And then later I went

7 back to the Second District as a tactical lieutenant and

8 that was sometime around -- and again this could be

9 verified.  I don't have the exact dates.  I want to say

10 around 2000-ish.

11    Q   For how long?

12    A   I was there as a tac lieutenant for at least a

13 year, maybe a little bit longer.

14    Q   As a sergeant did you supervise in any way any

15 public housing officers?

16    A   No.

17    Q   And as a --

18    A   Not directly.

19    Q   When you say -- well, as a sergeant did you ever

20 work with Public Housing South teams?

21    A   No, not in -- I don't recall any joint operations

22 but, you know, you show up on a scene of a shooting or

23 something.  There might be some public housing officers

24 there and there's some of your officers, but I don't -- like

Page 36

1 I said, that's what I mean by not directly because, you

2 know, a sergeant is a sergeant for everybody, anyone that's

3 a PO, but you don't directly supervise them unless a need

4 arises, but in general, though, no.

5    Q   As a tactical lieutenant what kind of a unit are

6 you supervising?

7    A   Those are general -- tactical officers are officers

8 in the district.  You're assigned to the district, and they

9 are officers that work in quasi civilian dress.  They can

10 easily transform themselves to be identifiable police

11 officers, to put themselves in a dress manner that they can

12 be not technically undercover but they can blend in and do

13 surveillance, and they generally focus on gangs, narcotics,

14 burglaries, shootings, any of the major problems.  They're

15 kind of a district's problem solvers as opposed to a regular

16 beat officer who answers calls that come in and is in

17 uniform.

18    Q   Do you know Ernie Brown?

19    A   Yes.

20    Q   How long have you known Ernie Brown?

21    A   I made lieutenant with Ernie Brown, but I didn't

22 know him in 1998.  I mean, I don't recall ever really

23 knowing him to where you could say like I'd have a

24 conversation with him till years later when he was -- he was

Page 37

1 the -- he came back as the chief of organized crime, and I

2 think I was the deputy chief at the time, and that's where I

3 got to know him.  But, I mean, I knew of him because there's

4 only so many people at certain ranks, but I didn't really

5 know him.

6    Q   Did you ever tell Ernie Brown about your

7 conversations with the F.B.I. concerning Shannon Spalding

8 and Danny Echeverria?

9    A   Ernie Brown was not in organized crime at that

10 time.  The chief was Frank Limon and due to the nature of

11 the thing, I don't recall even mentioning it much to Frank

12 Limon to tell you the truth.  If I did, it was just like,

13 hey, we got some guy -- but I don't recall specifically

14 mentioning it to him, and Ernie Brown wasn't -- he was -- I

15 think at that point he got -- for some issue he was a -- he

16 was not in organized crime.  I'm not sure where he was.

17 Maybe in a detective division maybe, but I don't know at

18 that time.

19    Q   In terms of -- you mentioned detailing out.  I

20 mean, it is -- when you're a commander of narcotics or even

21 in your current position, you're aware that sometimes

22 officers who are assigned to narcotics are detailed out to

23 other assignments?

24    A   Yeah.  People sometimes get detailed out, detailed

10 (Pages 34 - 37)

Page 38

1 in. Sometimes you might get detailed from narcotics to
2 gangs, you know, within the Bureau of Organized Crime. In
3 fact, it's kind of a messy system. I'm not really sure how
4 it developed over time. Details were meant to be temporary,
5 and at some point in the department they became long-term
6 and were almost synonomous with reassignment. I know
7 currently in the last -- we're trying to clean up details.
8 We're trying to get away from that practice and just either
9 assigning people or if it's a detail, it's only temporary
10 for a certain amount of days because of the nature that it
11 is a little sloppy.
12    Q    Well, in terms of some details are clearly just for
13 a temporary period, correct?
14    A    Yes.
15    Q    I mean, it might be like a summer-type assignment?
16    A    Yes.
17    Q    And what is the normal -- can you give me an
18 example of a summer-type assignment? You know more than I
19 do.
20    A    The only ones I could think of offhand that are
21 kind of like a -- set details, we used to -- I don't think
22 we do anymore. We used to have what was called summer
23 mobile where someone would get -- they pull people from
24 districts usually on a volunteer basis and assign them to

Page 39

1 the lakefront for the summer months, but then after it was
2 over they'd go back to their districts.
3    Q    Was there a procedure in place to -- in terms of
4 how procedurally they would be reassigned back to their
5 prior assignment?
6    A    No. See, kind of the difference is when -- as
7 opposed to what details developed into and what most details
8 are is like with summer mobile when they had that, it was
9 specified the day you signed up for it you will -- you know,
10 from -- and I'm guessing, say from June 1st to September
11 1st, you know, you'll be detailed to summer mobile, at which
12 point, you know, you go back to your unit of assignment.
13 Now, there's all kinds of other details where people get
14 detailed from the patrol division into narcotics, from -- or
15 organized crime or to any other unit or out of -- I mean, as
16 a matter of fact, I just cleaned up a detail long ago where
17 people were detailed in for over eight years into -- from
18 patrol their technical assignment was a district or the
19 detective division, and they were working in narcotics or
20 gang investigations for six, seven, eight years. And I --
21 recently we've been making efforts to try to clean those up
22 because it's just -- details became synonymous almost with
23 assignments. There was almost no delineation between the
24 two, and it's not what they were meant to be.

Page 40

1    Q    At the end of the detail, even if it was a long
2 detail, where would the -- where would those people go? I
3 mean, would they come back to their prior assignments?
4    MR. KING: Just object to the form of the question, lack
5 of foundation. Are you just asking generally?
6    MR. SMITH: Let me withdraw it. It was a little too
7 vague.
8 BY MR. SMITH:
9    Q    In terms of -- first of all, for an assignment
10 with, you know, a term like the summer assignment you spoke
11 of, was there -- was any type of paperwork that was done to
12 get them back in their regular assignment, back in their
13 narcotics unit?
14    MR. KING: Just object to the form as well.
15    MR. SMITH: Do you understand?
16    MR. KING: If you know, I guess.
17    THE WITNESS: In the example you're giving where there
18 is a very defined term of the detail, no. They would
19 usually just go back to where they came from because that
20 was part of the agreement on that detail, and they'll
21 define -- and that defined -- a very defined detail.
22 BY MR. SMITH:
23    Q    When there wasn't a defined detail, how would
24 people get reassigned back into narcotics?

Page 41

1    MR. KING: Just object to the form of the question.
2    MR. SMITH: Or moved back in. Let's put it that way.
3    THE WITNESS: Well --
4    MR. KING: Again object to the form, lack of foundation.
5    THE WITNESS: Kind of a hard question to answer because
6 generally people from narcotics didn't go to details like
7 summer mobile. So, I mean, you know, you're specifying
8 narcotics, and I don't recall that ever, you know, occurring
9 like that where they would go to a summer mobile detail.
10 That's usually a district draw type of detail.
11 BY MR. SMITH:
12    Q    So let's go to a district draw --
13    A    And the reason is -- the reason is why it's a hard
14 question to answer, because all of the units in the Bureau
15 of Organized Crime are managerial units, which means they're
16 not subject to the same contract provisions that people
17 assigned in patrol, detective division, et cetera, are
18 assigned to. We don't have -- you can't bid into narcotics.
19 You can't get into narcotics, but I'm just saying narcotics
20 in general, but any unit in organized crime based on
21 seniority. It's all managerial. It's 100 percent
22 managerial assignment, so that's why it's very hard to
23 define in the terms.
24    Q    Well, how would it work if somebody was assigned

11 (Pages 38 - 41)

Page 42

1 managerially to the narcotics unit, how would one be removed
2 from that assignment?
3  A  Well, it kind of depends on time period a little
4 bit. About five years ago and earlier or more, literally
5 people could be assigned there and if they were not working
6 out, they were not -- and even now to a point it's the same.
7 They could be assigned out of any unit in organized crime
8 based on the recommendations of the chain of the organized
9 crime command. So generally it would be the commander up to
10 the deputy chief up to the chief, so -- and people are
11 reassigned every day -- I'm sorry. Every period they're
12 assigned out.
13      Generally in the last at least five years or
14 so there's been a little bit of a shift to where -- and I'm
15 part of that to where we've been requiring a little bit of
16 extra documentation because even though it's a managerial
17 unit, there have been people that have filed grievances and
18 said, well, I was moved out of there without cause, and so
19 we have to backtrack then. Now we make sure we have
20 paperwork that delineates. It doesn't have to be a lot but
21 at least shows that there are reasons, and it isn't
22 arbitrary. I'm very firm on that. All the commanders know.
23 It's been like that as I was a deputy chief ever. You have
24 to give -- you have to have a defined reason why you want

Page 43

1 somebody -- we don't just move people out because we just
2 don't like them. There has to be reasons.
3  Q  In terms of you would agree if somebody was
4 assigned to the narcotics unit, 181, and they were detailed
5 out to another assignment or detailed out outside the unit
6 that, managerially speaking, they were technically still
7 assigned to the narcotics unit?
8  A  Yes. If that was their assignment, they are
9 assigned -- that's their -- on paper assigned, yeah.
10  Q  In terms of in -- well, when you were moved or two
11 years later when you became a chief --
12  A  That would be around 2010.
13  Q  Around 2010, did you hear anything in between that
14 five-month period when you were commander and when you
15 became a chief about -- more about Shannon Spalding or that
16 F.B.I. assignment or Danny Echeverria?
17  A  In the time frame between there did I hear
18 anything? The only thing I recall hearing -- I didn't hear
19 anything about their work over there. I recall hearing
20 briefly about the incident that resulted in the CR number
21 where they -- there was some incident with Shannon Spalding
22 and a dog and some whole big mess with that.
23  Q  Do you know who you heard that about -- from
24 rather?

Page 44

1  A  Originally -- I'm trying to think who was the
2 commander at the time. Some supervisor in vice mentioned it
3 to me, and I don't recall if it was Hector Rodriguez who was
4 the commander or one of the lieutenants like Ozzie Valdez
5 maybe. Someone mentioned it to me, and then they called
6 Mary Legittino over and she kind of told me about what
7 happened, and she told me she had a CR number on him. I
8 said, okay, well --
9  Q  Who's Mary Legittino?
10  A  Mary Legittino is a police officer. She worked in
11 vice and I came to know later was the mother of the
12 complainant in the CR number in question as well as the
13 mother of another police officer who is somehow involved in
14 the incident and had knowledge of it.
15  Q  Do you know why Hector Rodriguez would have come to
16 you to tell you about that?
17  MR. KING: Just object to the form.
18  MR. SMITH: I'm sorry if I said the name wrong.
19  MR. KING: Just object to the form and lack of
20 foundation. I don't think he testified who it was
21 definitely.
22 BY MR. SMITH:
23  Q  Do you know why Rodriguez came to you?
24  A  No. I think someone came to me just because

Page 45

1 Officer Legittino was very upset about the incident, and I
2 believe that the complainant, her son, was just out of the
3 military and, you know, she was upset about it. It was
4 almost like they mentioned it to me in passing, and it was
5 such an odd type of incident, and I think they brought it up
6 to me because of the fact that Spalding and Echeverria, you
7 know, had a connection to organized crime and narcotics and
8 because of, you know, they were working there at one time.
9  Q  What was your position at that point in time when
10 you heard about the CR?
11  A  I think I was deputy chief.
12  Q  Of?
13  A  Organized crime, I think, because, yeah, I was in
14 the building, I remember. I was at Homan Square.
15  Q  Do you know if it was an ongoing CR at the time you
16 heard about it?
17  A  I think I heard about it like -- as I recall, and I
18 don't know the date, but my sense is that I heard about it
19 relatively soon after it happened, the incident happened.
20 But then I didn't hear about it again until at least a year
21 or more later when it came up through command channel
22 review. The investigation came up through command channel
23 review and I saw it in my queue on-line.
24  Q  Were you a part of the command channel review of

12 (Pages 42 - 45)

1  that CR?

2    A   Yes.

3    Q   Did you do anything in connection with that command

4  channel review?

5    A   Well, you have options.  You could concur or not

6  concur, and I concurred with the findings of the

7  investigation.

8    Q   Did you in any way indicate that you had prior

9  conversations with Mary Legittino about the incident?

10   A   No.

11   Q   Did you feel that that was any way a conflict in

12  your being involved in the command channel review?

13   A   Not at all because I didn't do the investigation.

14  Someone else did.  All I am signing onto is that the

15  investigation looks proper and the findings look proper and

16  that was it.

17   Q   Was it --

18   A   I didn't have intimate details of the incident

19  beforehand.

20   Q   Would -- in your position at that point in time did

21  people routinely come to you with information about CRs?

22   A   You know, it was not uncommon.  I mean, we

23  generated a lot of CR numbers out of organized crime that

24  affected police officers, from corruption issues through

1  all kinds of different -- I was usually told about every one

2  of them if I was around someone -- whether I was the

3  commander, deputy chief and sometimes even the chief.

4  Someone would tell me, you know, hey, we're working on this

5  case and we have what might be a corrupt police officer that

6  we're uncovering on our case and we're getting a

7  confidential CR number, and I would say okay.

8    Q   Can you tell me any others that are not active CRs

9  at this time?

10   A   Do you want to know names?

11   Q   Names.

12   A   I don't know offhand, but I know I could get it,

13  the information, but there are -- I could give you examples.

14  I mean, we'd be on a wire investigation where we're

15  overhearing gang members and a couple that pop into my head,

16  one was -- well, here's a recent one.  I can't think of the

17  guy's name, but the guy actually worked in the fugitive

18  unit, and we were on an investigation into a narcotics group

19  and gang, the Conservative Vice Lords, that operated in the

20  11th District.  And we -- on our overhears, we hear -- our

21  officers hear subjects referring to and then calling a

22  police officer who works, as I said, in the fugitive unit

23  and they're asking him for information and asking him for

24  help and -- which -- in a corrupt manner like for -- because

1  he lived in that neighborhood, and he probably grew up with

2  them, I guess, but -- so they informed me of this, and we

3  get a confidential CR number.  That CR number is sent

4  through the defined chains up to IAD, and then IAD does what

5  they do.  They investigate, bring in federal agents or

6  whatever they do and, in fact, that officer is -- I know

7  that one is not too long ago.  That officer is currently

8  stripped of duty, and he's -- I don't know what he does.

9  They usually put them on some kind of non-police function

10  while the case is pending.  I can recall --

11   Q   In terms of that instance, do you know if there was

12  an investigation of that officer that had begun before that

13  time or --

14   A   There was not.

15   Q   -- was that the start of the investigation?

16   A   That was the start as is almost all of the ones

17  that I know of because we -- our officers come across it --

18   Q   Do you know if that officer was a -- had any rank

19  beyond patrol officer?

20   A   I believe he was a police officer.

21   Q   In other words, he wasn't a sergeant or higher?

22   A   No.

23   Q   And was that officer under your supervision?

24   A   The one who was stripped of duty?

1    Q   Correct.

2    A   No.  He was in the fugitive unit, which is under

3  the detective division.

4    Q   And do you know if there's any criminal

5  prosecution?

6    A   I don't.

7    Q   Okay.  And an additional example?

8    A   I recall another similar case.  We're again on a

9  wire and gang members refer to, hey, call our officer or --

10  I don't know what they say -- call our girl.  One was a

11  female officer that was observed hanging out with gang

12  members and going in and out of houses and parties and we

13  got a confidential CR number on her.  That was on the north

14  side.  And one that -- and there's dozens of these, but the

15  one that stands out the most in my opinion -- and I actually

16  have her name because I actually handcuffed her, and she was

17  criminally prosecuted -- was along the same lines, a case

18  where -- again another drug case.  It was against the Mickey

19  Cobras street gang, and they were selling heroin, and there

20  were some heroin overdoses resulted with that one, too.  But

21  they were selling heroin in the Dearborn Projects, and the

22  case was started at a low level but then it kicked into a

23  high level while I was the commander of gang investigations.

24  And during the investigation it was uncovered that there was

13 (Pages 46 - 49)

Page 50

1 a female police officer who apparently had a relationship
2 with one of the gang member drug dealers and was doing
3 things illegally to try to help facilitate that drug
4 conspiracy, and I actually handcuffed her and took her into
5 custody and she was charged with federal drug conspiracy
6 charges.
7    Q   Who was that officer?
8    A   Her name was Tashika Sledge, and I remember it
9 because she's actually the daughter of a police officer that
10 I worked with back in Englewood back in the '80s who I
11 worked with on the tactical team there. So it was, you
12 know, a friend. She was kind of a friend of mine but it was
13 her daughter.
14    Q   When you say there was a low level investigation at
15 one point and then it went into a high level investigation,
16 are you referring to a low level investigation into the
17 Mickey Cobra activity that went high level or a low level
18 investigation into the activity of this female officer?
19    A   No. Low level into -- they didn't even know about
20 the officer at the onset. That came later on wires and
21 stuff. When I say low level I'm talking about street level,
22 gathering information, you know, trying to put something
23 together. When I say high level I'm talking about a
24 coordinated effort with wire taps and surveillance and

Page 51

1 things like that.
2    Q   The coordinated effort was the time -- the other
3 time you talked about where the officer was stripped, was
4 that a coordinated effort?
5    A   Yes.
6    Q   Was it coordinated with the F.B.I. or DEA or any
7 outside agency?
8    A   I believe that was. That was a joint federal and
9 state. A lot of our investigations are joint federal and
10 state. We have a very good working relationship working
11 from both angles.
12    Q   And what about the --
13    A   But our officers are the ones who --
14    Q   -- Mickey Cobra investigation, was that joint in
15 any way?
16    A   Yes. I recall that one was mostly our people, but
17 we had DEA involved in it.
18    Q   And -- okay. In terms of have you ever had an
19 instance where an officer -- one of your officers has come
20 forward against another police officer for activity they saw
21 in terms of either drug sales or stealing drugs where they
22 actually saw with their eyes on the streets?
23    A   That they were selling drugs on the street?
24    Q   Not necessarily selling drugs on the street. That

Page 52

1 they saw personally where one officer says I saw another
2 officer committing a crime involving narcotics or narcotics
3 related money.
4    A   Well, I mean, they uncover that in their
5 investigations sometimes over listening to stuff over a
6 wire. I'm trying to recall if any -- I mean, you know, I'm
7 trying to recall if any of them fit that exact criteria that
8 you just laid out.
9    Q   I'm trying to see if there's anything that wasn't
10 over a wire or heard over a wire that led to where an
11 officer said we need to make a CR against another officer
12 because I think they're involved in narcotics activity or
13 gang activity.
14    MR. KING: Just object to the form. Are you asking him
15 if someone's come to him personally with that information?
16    MR. SMITH: Come to him personally.
17    THE WITNESS: Well, I would say no with a qualification
18 that, A, I'm not saying it never happened, but generally as
19 I've been a commander or above in these situations,
20 generally the officer would go to his sergeant or lieutenant
21 and then the sergeant or lieutenant would then come to me,
22 so very seldom, if ever, did a police officer come directly
23 to me as a command member with information. We usually
24 follow the chain of command.

Page 53

1 BY MR. SMITH:
2    Q   Well, do you know of any instances where an officer
3 under your command came to a sergeant and indicated that he
4 believed and had information that one of Chicago Police
5 Officers was selling drugs or involved in gang activity?
6    A   I think there's dozens of those situations. Can I
7 recall them specifically? No, but even the ones that I
8 delineated to you were not federal agents bringing those
9 cases. Those were Chicago Police Officers who uncovered the
10 information, told their supervisors and then their
11 supervisors typed out a confidential CR number investigation
12 and sent them up the chain.
13    Q   Were there any instances that you're aware of that
14 an officer came to a sergeant under your command about
15 information that he believed or she believed that a fellow
16 officer was involved in gangs or narcotics activity that was
17 not an instance that involved a wire?
18    MR. KING: If you can recall.
19    THE WITNESS: I think there has been, but I can't
20 recall. In fact, one of the cases is, I recall, of someone
21 on a surveillance. Yeah, as a matter of fact, yeah.
22 There's one of surveillance where I know our officers
23 observed a police officer working what looked like security,
24 and I can't really think of the exact parameters but

14 (Pages 50 - 53)

Page 54

1 security at a -- I remember it was a barber shop, but it was
2 very late at night past barber shop hours, and we were on
3 surveillance because they were having gang meetings in the
4 barber shop, and our officers observed what they knew -- one
5 of them knew the guy as a police officer, and then we
6 reported that. They reported that as well and got a
7 confidential CR number, sent it up.
8 BY MR. SMITH:
9   Q   Do you remember who that officer was?
10   A   I do not.
11   Q   Do you know if that was any type of joint
12 investigation?
13   A   I believe it was just our surveillance. The ones
14 that I'm talking of, dozens of them, some are just ours.
15 Some are joint. They're not all joint investigations.
16   Q   Do you know if anything happened with that CR?
17   A   I don't. It goes to the hands of IAD after that
18 point.
19   Q   Did you have any conversations about the CR
20 relating to the dog with any other supervisors after you
21 were spoken to by -- sorry. I forget her name -- in terms
22 of the woman who was the mother or related to one of the
23 people involved in the dog incident?
24   A   I don't recall that I did, not until much later

Page 55

1 anyway.
2   Q   Did the woman give you any details about what
3 happened in the dog incident?
4   A   The officer, if I recall, just gave me a brief
5 overview basically that she was upset, though, and she
6 thought that -- I think the reason she talked to me is she
7 thought that the incident -- she felt that she -- that they
8 were wronged but they had to give the dog back to Officer
9 Spalding because she was afraid that if she didn't, her son
10 who was the possessor of the dog at the time was trying to
11 get on the police department, and she felt that somehow this
12 whole incident would hurt his chances of becoming a police
13 officer and that was one of her main concerns, I recall, and
14 that might have been why she brought it up to me.
15   Q   And that was Mary Legittino who said that?
16   A   Yes.
17   Q   Did she say anything else about it?
18   A   Well, she told me the brief overview that -- and
19 again this is not verbatim but it's from a
20 five-plus-year-old memory that Shannon Spalding had a dog
21 she wanted to get rid of. Somehow it came into the
22 possession of her son, I believe, through word of mouth
23 through the police department, and it came out as anyone
24 looking for a home for this dog. The son was looking for a

Page 56

1 dog, just got home from the military or something, took the
2 dog. If I recall, Spalding wanted the dog back. He gave it
3 back to her. Then she wanted to get rid of it again so gave
4 it back to him again.
5         In the meantime, he had it for a while. He
6 got -- she -- it got veterinary stuff like shots or dog
7 license, things like that, and then she called him back and
8 wanted it back for the second time stating that her daughter
9 was all upset, very upset and needed the dog back, and we
10 were under the impression the daughter was a child but the
11 daughter was an adult child and that the guy said -- the guy
12 who possessed the dog said I'm not giving it back to you
13 this time, you know, I got the license for it, I paid for
14 veterinary bills, et cetera, et cetera. The dog has become
15 part of my family, you know, I'm not giving it back. And
16 then I think the thing that was really the big issue with
17 Officer Legittino and frankly one of the reasons why I
18 believe that that CR number was sustained through most of
19 the process was that at some point late at night like -- and
20 I don't know the exact time that Officer Spalding and
21 Officer Echeverria show up at this guy's house on the north
22 side in police garb, like wearing a vest and et cetera and
23 are knocking on his door. He refuses to answer the door.
24 They call for a supervisor from the district. He shows up

Page 57

1 and at some point he's knocking on the door telling him open
2 the door, give the dog back or I'm going to have you
3 arrested. He calls his mother. The mother says, listen,
4 just give the dog up, we don't want you to get arrested,
5 it's going to hurt your chances coming on the police
6 department, et cetera, et cetera. So that's kind of just
7 the basic overview. I mean, I definitely might be
8 intermingling some of the facts that I learned later when I
9 reviewed the investigation. It's very hard to delineate
10 what I knew five years ago and what I knew three years ago,
11 you know, but --
12   Q   In terms of did that young man ever become a police
13 officer?
14   A   I don't know.
15   Q   Okay. So other than that incident with the dog,
16 did you hear of any other events relating to Danny
17 Echeverria or Shannon Spalding after your time as commander
18 in narcotics?
19   MR. KING: I just object to the form. I think he may
20 have testified to some but --
21 BY MR. SMITH:
22   Q   Did anybody make any complaints to you about them?
23   A   Not officially.
24   Q   How about unofficially?

15 (Pages 54 - 57)

Page 58

1  A  I just -- I recall later, much later and when some
2  of this stuff was going on back and forth with where they
3  were going to be assigned and things, and during that whole
4  time frame I recall the issues were brought to my attention
5  of Shannon Spalding showing up at Homan Square to meet with
6  this Officer Hernandez, I think, who was on the guard duty
7  desk and she was doing something there. I also remember
8  hearing of an incident when she was -- they were assigned
9  to --
10  Q  Can we slow down for a second? In terms of the
11  guard duty desk, that she was showing up at the guard duty
12  desk, did you hear anything further of what that meant, or
13  did you have an understanding of what that meant?
14  A  Well, there's a 24-hour desk. Then there's a guard
15  shack, I should say, where you're supposed to be watching to
16  make sure that only authorized people are let into the
17  building and let into the parking lot, and I believe that he
18  was assigned to that desk, and I believe she was there in
19  the desk -- in the area of the guard shack and as I recall,
20  I believe then she was told by Commander O'Grady -- I don't
21  know if directly or through a supervisor or whoever that,
22  you know, she shouldn't be in that area or, you know, on
23  duty -- not on official duty because you're impeding what
24  he's supposed to be doing, and this isn't like -- and this

Page 59

1  is my terms but just the general -- this isn't like a social
2  hour, you know, where you just hang out and, you know.
3  Q  Did you learn that from O'Grady?
4  A  I think so.
5  Q  And did -- were you informed that Shannon Spalding
6  was banned from the building entirely?
7  A  No.
8  MR. KING: Just object to the form of the question.
9  BY MR. SMITH:
10  Q  Is that a no?
11  A  Yeah.
12  Q  Have you ever heard that she was banned from the
13  Homan Square building?
14  A  In the complaint.
15  Q  Before the complaint?
16  A  No.
17  Q  Have you ever talked to O'Grady and asked him
18  whether he ever banned her from the building?
19  A  No, not specifically, no.
20  Q  When you say not specifically, what do you mean?
21  A  I just mean I don't want to -- I don't believe so,
22  put it that way. I don't recall ever talking about that
23  specifically.
24  Q  Would it be appropriate for an officer to be banned

Page 60

1  from a building?
2  MR. KING: Object to the form, calling for speculation,
3  lack of foundation.
4  THE WITNESS: Just answer?
5  MR. KING: If you feel like you can answer.
6  THE WITNESS: Well, I mean, would it be appropriate? If
7  a subject -- if an officer is not -- is supposed to be
8  working and is not supposed to be in an area and is impeding
9  other people's work, it's appropriate for a supervisor to
10  take action to stop that. I don't know the term banned. I
11  never really heard of that before, banned from a building.
12  I've never heard that term used before in --
13  BY MR. SMITH:
14  Q  Would you expect that supervisor to make a CR,
15  another officer was impeding another officer from working?
16  MR. KING: Same objection to the form.
17  THE WITNESS: Supervisors take supervisory action every
18  day multiple times a day to -- I should say corrective
19  supervisory action that does not result in the form of a CR
20  number or anything else because there is a level of
21  corrective action that can be taken by a supervisor verbally
22  or through other means. If something rises to the level of
23  a CR number, then it's usually something pretty serious.
24

Page 61

1  BY MR. SMITH:
2  Q  In terms of you were about to say another incident
3  besides the -- I believe you were about to say there was
4  another complaint you heard of -- regarding either Danny or
5  Shannon other than the desk guard incident.
6  A  I don't remember how I heard it. There was
7  something and I really don't recall how I heard it. There
8  was something along the lines of that when they were
9  assigned to the inspection division, which is an offshoot of
10  IAD, that -- and this is after the point of when there was
11  the issue of whether or not they would come back to work in
12  narcotics. They were working in the inspection division, I
13  believe. It's somewhere in that gray area of transition
14  that they were taking it upon themselves to come to Homan
15  Square, which is where the narcotics unit and the organized
16  crime units are housed, and they were taking it upon
17  themselves to pick that location to do some type of
18  inspections, enforcement action. I really don't recall who
19  told me about that. I think multiple people saw them in the
20  parking lot looking at -- inspecting cars or something, and
21  again why I hesitate to bring it up is because I don't have
22  all the facts as far as who told me what, but I remember
23  that somehow there was a conversation and that they were
24  said -- well, you know, they were -- somehow it was being

16 (Pages 58 - 61)

Page 62

1 done in a vindictive manner to get back at O'Grady and
2 possibly me, so that's why they were focusing there in an
3 effort to embarrass us or something.
4 So I recall calling someone and asking them
5 are they assigned to work in this area inspecting, are they
6 assigned to do -- and they said no, and they said they'll
7 look into it. It was someone in inspections that was
8 working there or it -- maybe it might have been Juan Rivera.
9 I'm not 100 percent sure. I called someone and asked them
10 are they supposed to be -- is that their duties to be here,
11 you know, inspecting vehicles and things like that on
12 multiple days, and they told me no, and then that was the
13 last I heard of it. I guess someone must have talked to
14 them and they didn't come back there.
15 Q So you heard it from a person, but you don't recall
16 who you heard it from at this point?
17 A Uh-huh.
18 Q But you then called Juan Rivera to ask about it?
19 MR. KING: Object to the form. It misstates his
20 testimony.
21 THE WITNESS: I'm not 100 percent sure.
22 BY MR. SMITH:
23 Q You're not 100 percent sure, but you think it was
24 Juan Rivera?

Page 63

1 A I don't know because I -- I don't know if that's
2 why we -- I don't know 100 percent. I thought it might be
3 Juan Rivera. I might have asked him are they supposed to be
4 working there, and he might have said I'll look into it, but
5 I'm not 100 percent sure because I might have called someone
6 in the inspections division, but that's why I hesitated to
7 bring it up because I don't really have all the facts. I
8 don't really recall.
9 Q Okay. And then in terms of -- in between the
10 narcotics -- well, between the first time you heard from the
11 F.B.I. and the time frame of where you -- two years later
12 when you became the chief, did you hear anything else from
13 the F.B.I. about the investigation?
14 A No.
15 Q At any point later did you hear from the F.B.I.
16 more about the investigation?
17 A No.
18 Q Did you at any point in time hear that Patrick
19 Smith had problems with the -- that the F.B.I. was having
20 problems with Patrick Smith, the F.B.I. agent?
21 A You know, I know of that but I didn't hear about
22 that till much later like even maybe recently.
23 Q How did you hear about that?
24 A I think I heard about it from -- I think maybe

Page 64

1 Sergeant Chester might have told me, Tom Chester, I believe,
2 but I'm not 100 percent sure on that. Someone told me that
3 because he resigned, and plus I work with the F.B.I. a lot,
4 a lot of my task force, so I might have heard it from one of
5 the F.B.I. supervisors later, but it really was just -- when
6 Officer Spalding and Echeverria went on TV and held a press
7 conference, a lot of people talked to me. I don't remember
8 who, so --
9 Q Did -- what did you learn about Patrick Smith in
10 terms of with respect to the problems or the reasons he
11 resigned?
12 A Nothing. All I know is something -- just the way
13 you framed it. There were some issues and he resigned. I
14 don't know the details.
15 Q Did you learn anything about a lost recording
16 device during the time relating to either Patrick Smith or
17 Shannon Spalding or Dan Echeverria within the F.B.I.?
18 A No.
19 Q Did you learn anything in terms of misappropriated
20 funds with respect to Patrick Smith?
21 A No.
22 Q Did you learn anything further about -- and when I
23 say -- did you learn anything further from anyone within the
24 F.B.I. about the investigation into Sergeant Watts?

Page 65

1 A No.
2 Q Did you learn anything about Danny Echeverria or
3 Shannon Spalding's performance with respect to their duties
4 with the F.B.I.?
5 A A little bit from Sergeant Chester who was at the
6 time IAD's liaison and worked on the F.B.I. corruption task
7 force, but I don't think he was intimately involved in that
8 investigation, but he did have, I think, some working
9 knowledge of it, and I believe that he basically stated
10 that, which -- that they were there to handle the
11 confidential informant and to shore up parts of the case,
12 which is basically in line with what Patrick Smith and Julie
13 Anderson told me in the beginning, to shore up some parts of
14 the case so they could bring the case to charging. They
15 were not undercover in the case. They were -- they handled
16 the CI.
17 Q When did you have that conversation with Chester
18 about --
19 A I have no idea.
20 Q Was it after the lawsuit?
21 A I think so.
22 Q And --
23 A Well, I'm not sure. Actually I'm not sure because
24 there's -- a lot of time passed in there.

17 (Pages 62 - 65)

Page 66

1  Q   And was there specifics about who was the targets
2  of the investigation?
3  A   Definitely not before the indictments were made
4  public.
5  Q   Did you ever learn what officers were targets of
6  that investigation?
7  A   No.  Oh, did I ever?
8  Q   Yes.
9  A   Oh, yeah.  I mean, it was on the news.
10  Q   Did you ever learn if any other officers besides
11  Mohammed and Watts were targets of the investigation?
12  A   No.  Actually this is the first I'm hearing if
13  that's even a -- that was even a possibility.
14  Q   Did you ever hear anything relating to the team
15  members who worked for Sergeant Watts?
16  A   No.
17  Q   Have you ever been made privy to the information
18  that the F.B.I. uncovered during their over ten-year
19  investigation?
20  A   I'm sorry?
21  Q   Have you ever been made -- given access to the
22  information that the F.B.I. uncovered during their over
23  ten-year investigation of Sergeant Watts?
24  A   No, I have not been.

Page 67

1  Q   Do you know anyone within the Chicago Police
2  Department who would have access to that information, if
3  anyone?
4  A   I don't know.  I don't know.  I don't know what
5  access IAD has or not.
6  Q   Were you ever told by anybody from the F.B.I. that
7  Shannon Spalding or Dan Echeverria did a good job, bad job,
8  mediocre job?
9  A   No.
10  Q   Anybody within Chicago Police Department ever tell
11  you that Shannon Spalding or Danny Echeverria did a poor job
12  with the Watts investigation or helping the F.B.I. out?
13  A   No.
14  Q   I believe sometime after -- obviously sometime
15  after they were detailed to 543 in terms of that
16  conversation with Tina Skahill you had way back like about a
17  month after the Patrick Smith and you were informed that
18  they were working with the F.B.I., they were -- you had the
19  conversation with Tina Skahill and they were eventually
20  assigned to Unit 543; is that your understanding?
21  A   Yeah.  I mean, they were --
22  Q   Or detailed to 543.
23  A   All I know is they were detailed out of narcotics
24  to where -- I thought they were getting detailed to IAD

Page 68

1  specifically, but subsequently, I guess, they were detailed
2  to 543, which is detached services, but I don't know.  I
3  mean --
4  Q   Were you aware of what they were going to be doing
5  in -- with respect to -- in that detail?
6  A   Well, that detail was to facilitate them working
7  with the F.B.I. on a full-time basis to my knowledge.
8  Q   Was it your understanding that they were supposed
9  to be doing anything else at the time you had the
10  conversations with Tina Skahill?
11  A   No.
12  Q   Did you ever learn that they were supposed to have
13  any other activity in the outside detail at 543 other than
14  working with the F.B.I.?
15  A   No.
16  Q   Just so it's clear, what is 543?  What would you
17  call it?
18  A   543 is not technically a unit as some of the others
19  are.  It's a -- it's called detached services and people are
20  assigned/detailed to detached services when they work at
21  various -- when they work in various jobs that are outside
22  of the Chicago Police Department.  So, for instance, say
23  they work on the mayor's detail or they work process servers
24  for the Corporation Counsel, things like that.  In general

Page 69

1  people are not assigned to detached services to my knowledge
2  to work on a task force with the F.B.I. because I have a lot
3  of task forces that work with me and they stay detailed or
4  assigned to whatever their units are and then work there as
5  a task force officer.  So I'm not sure the genesis -- whose
6  idea it was or why they were assigned to detached services.
7  All I can say is if it was me, I would have detailed them to
8  IAD and then had them work in detached -- I mean had them
9  work with the F.B.I., but you would have to ask them.
10  Q   In terms of did you hear any -- of any -- from any
11  Chicago Police Officer personnel that neither Danny or
12  Shannon failed to do any type of work while detailed to --
13  failed to do any type of assignment or job that they were
14  supposed to do in connection with special detail when they
15  were assigned to 543?
16  A   No.  I barely ever heard of them during the vast
17  stretches of time.
18  Q   At some point in time did you become aware that
19  Danny and Shannon were going to be taken off of special
20  detail, 543?
21  A   Not until after like -- not during that -- whoever
22  was making that decision process.
23  Q   Who did -- when did you learn it?
24  A   I don't know when I learned it specifically, if I

18 (Pages 66 - 69)

Page 70

1 even did. I mean, I don't know.
2 Q Sometime in April of 2011, was there -- were you
3 present for a meeting with -- first of all, do you know
4 Beatrice Cuello?
5 A I do.
6 Q And you already indicated you know Commander --
7 sorry. I don't want to understate a title. Commander
8 O'Grady, you've indicated you know him?
9 A Oh, yes.
10 Q Do you know a Jim Jackson?
11 A Yes.
12 Q And you've indicated you know Juan Rivera?
13 A Yes.
14 Q Were you ever involved in a meeting with Beatrice
15 Cuello in particular relating to Shannon Spalding or Danny
16 Echeverria's assignment in narcotics and the removal from
17 the detail at 543?
18 A Short answer is no.
19 Q Is there a long answer?
20 A Yes.
21 Q What's the long answer?
22 A I do not recall there ever being a meeting, at
23 least not that I was involved in that was specifically held
24 to address any issues with Shannon Spalding and Daniel

Page 71

1 Echeverria. The only meeting that I could think of or a
2 couple of meetings that I could think of that came up
3 along -- that their names were brought up in was a meeting
4 that then Acting Interim Superintendent Hillard called and
5 it was not a meeting just about this, but during the
6 meetings when he took over for the time period, they were
7 looking for manpower, and he held a meeting and wanted
8 anyone who had a task force officer where officers were
9 assigned to outside agencies, we had to come up with a list
10 of all of our officers that were assigned outside of the
11 Chicago Police Department. So it was a meeting about task
12 force officers, and I don't even know if it was specifically
13 just a task -- it was a meeting about many operational
14 things in the police department. One of the things was task
15 force officers.
16 I did recall being present at some point later
17 where Beatrice Cuello mentioned to then Interim
18 Superintendent Hillard that there was an issue with two
19 officers, and I felt she -- again they were -- that they
20 were -- she felt that -- someone in her chain of command
21 felt they are insubordinate and they wouldn't tell her
22 exactly what they were working on. I don't know in this
23 time frame if that is before or after the investigation into
24 Sergeant Watts was completed or not. I don't know. I'm not

Page 72

1 privy to that. But Superintendent Hillard was less than
2 pleased to hear that the two officers were not -- were
3 insubordinate, I should say, and were not -- you know, well,
4 were insubordinate, and he said, well, send them -- pull
5 them back from their detail and send them back to patrol. I
6 don't recall then what happened after, but I know that at
7 some point Juan Rivera talked to Superintendent Hillard and
8 was able to somehow mitigate that issue and they were not
9 sent back to patrol. But around that time, I believe -- and
10 again this is -- I'm kind of outside of this circle looking
11 in. They were assigned to do something else, which might
12 have been when they went to the inspections division. Also
13 because you mentioned his name, at those meetings O'Grady
14 was not present that I can recall. It was a deputy chief,
15 chief, deputy superintendent kind of meeting. I don't
16 recall commanders being at that meeting.
17 Q Was Jim Jackson at that meeting?
18 A He was the first deputy superintendent at the time
19 and he was at that meeting.
20 Q Was Juan Rivera at that meeting?
21 A I believe Juan was the deputy chief in IAD, but I
22 think Tina Skahill -- you know, at that time Juan might have
23 been the chief because there was a lot of change.
24 MR. KING: Just tell him if you can recall.

Page 73

1 THE WITNESS: I don't recall, but I think he was at the
2 meeting.
3 BY MR. SMITH:
4 Q How about Tina Skahill? Was she at the meeting?
5 A I think so.
6 Q And how about anyone else you remember being at the
7 meeting? Was Debra Kirby at the meeting?
8 A She should have been, but I really can't place her
9 there. I can't recall. But as a deputy superintendent, she
10 normally would have been.
11 Q And were the officers --
12 MR. KING: Don't guess.
13 BY MR. SMITH:
14 Q Were the officers' names mentioned in terms of who
15 the insubordinate officers were? Were they mentioned by
16 name?
17 A I'm not 100 percent. I believe so, but I'm not 100
18 percent.
19 Q I mean, otherwise would you know -- would you have
20 known who she was talking about? How would you have
21 connected this incident to -- or this meeting to Echeverria
22 and Spalding at this time?
23 A Well, you know, it's hard when you go back that
24 many years to -- when things are happening to put them all

19 (Pages 70 - 73)

Page 74

1  in the same exact time frame of when you heard something and
2  when you didn't but, you know, I don't recall. I mean,
3  there was a lot of things going on at that meeting. The
4  meeting -- that was just one part of the meeting. That
5  meeting wasn't focused on them, so I'm sure Bea Cuello
6  probably mentioned their name or I'm relatively sure, but
7  I'm not 100 percent.
8     Q  In terms of did you ever know of a time where after
9  they had been detailed out to 543 that Danny Echeverria or
10  Shannon Spalding were trying to get back into the narcotics
11  unit?
12    A  They never approached me. They never sent any
13  correspondence to me. I don't know that they sent any
14  correspondence or approached anyone in our chain of command.
15  The only time that I -- this even came up was I believe Juan
16  Rivera said do you want to take them back to organized
17  crime. I believe I checked with O'Grady, do you want them
18  back. O'Grady said not really. They don't get along with
19  the people here. None of the sergeants want them on their
20  team. And based with the knowledge that I happened to know
21  and the fact that I usually take the commander's
22  recommendations, I agreed and told Juan, hey, Juan, we
23  really don't want them back.
24    Q  Do you know when that conversation happened?

Page 75

1     A  After this -- whenever this task force officer
2  meeting was, after that sometime. So whatever dates those
3  were, so you could narrow that down, which I don't know
4  exactly, but that would have been before Jody Weis took over, so
5  that -- that would have been before Jody Weis took over, so
6  whenever Superintendent Jody Weis -- right around the time
7  he took over when Hillard was leaving and Jody Weis was
8  coming in, somewhere in that time frame.
9     Q  But that was after -- shortly after the meeting
10  where Beatrice Cuello mentioned that there were two
11  individuals who were insubordinate?
12    A  Yeah. To my knowledge, I never heard of them
13  wanting to come back or asking to come back until the issue
14  was brought up with Hillard, and then there was a spotlight
15  on them as to what they were doing and then when they were
16  then given some type of work assignment, which apparently
17  they didn't like and they wanted to come back. But when
18  they -- they never asked to come back before that, to my
19  knowledge, and they never asked me to come back. They -- it
20  was strictly through an unofficial question from Juan Rivera
21  in the hallway, do you want them back. I said no.
22    Q  Did Rivera tell you anything as to why you should
23  take them back?
24    A  No.

Page 76

1     Q  Did Rivera ask you any further follow-up questions
2  after you told him that?
3     A  I don't recall. I mean, I believe he might have
4  mentioned -- Tina Skahill might have been there, too, at one
5  point, and I remember telling him, listen, they don't get
6  along with the people there. They were -- they were on the
7  verge -- before they left to go to IAD, they were on the
8  verge of being -- they already separated to work on two
9  different teams. They had -- at least Spalding had a bad
10  review and they were on the verge of being under some
11  scrutiny there as to whether they were going to stay there
12  or not to start with. Then coupled in with the discrepancy
13  in whether they were working or not or showing up to duty,
14  coupled in with that CR number, we said we really don't want
15  them back, so that was it, and they just said okay.
16    Q  In terms of what was your understanding of why
17  Danny Echeverria was -- would have been under scrutiny
18  before he was assigned to the detail 543?
19    A  Well, because he -- at some point he was Shannon
20  Spalding's partner, and at some point they were separated by
21  the supervisors in that unit. We don't generally separate
22  partners unless there's some type of issue.
23    Q  Was there anything specific to Danny Echeverria
24  that put him under scrutiny?

Page 77

1     A  I think mostly his association with Shannon and
2  that they were partners and that there was some type of
3  disruption on the team. The team -- and I don't recall what
4  or why, and it actually happened before I got there, so --
5     Q  Did you ever hear from any team members or any --
6  that Danny Echeverria was a disruption to a team?
7     A  Not -- no, I never heard from any team. The team
8  members don't talk to the commanders about that kind of
9  stuff.
10    Q  How about from any supervisors that Danny
11  Echeverria was considered by the team to be a disruption?
12    A  I would say that in my opinion -- well, I can't
13  say -- to your specific question I would say no.
14    Q  You had not heard anything specific about Danny
15  Echeverria?
16    A  Not about him specifically as opposed to them as a
17  team.
18    Q  In terms of when you say them as a team, did you
19  hear anything about him doing anything personally in
20  connection with that team or them doing anything together
21  specifically that disrupted the team?
22    A  Most of the negative information and evaluation
23  centered around Officer Spalding.
24    Q  Did you hear any specific negative evaluation of --

20 (Pages 74 - 77)

Page 78

1  Officer Echeverria?
2    A  I don't think so.
3    Q  Was there any discussion with Officer Rivera
4  bringing back Danny Echeverria and not Shannon Spalding?
5    A  No.
6    Q  Were you aware of the fact that at some point in
7  time Danny Echeverria and/or Shannon Spalding were assigned
8  or told to go to the academy, Unit 144?
9    A  I didn't know or hear about that until, I think,
10  maybe it was in the complaint.
11    Q  In terms of the incident where they were banned
12  from the building where you heard about the -- what else --
13  did you hear anything else about the incident involving
14  O'Grady and any instructions relating to Shannon Spalding
15  not to interfere with the officer in Homan?
16    A  No, just what I said.  He mentioned it.  It wasn't
17  some big thing that we dwelled on.  He told me that
18  people -- supervisors told him.  He went and observed or
19  took action or something, and then he called her supervisors
20  and told them if she's on duty, she should be out working,
21  she shouldn't be here or if she's not on duty, she shouldn't
22  be here bothering an on-duty officer, and they said, okay,
23  we'll talk to her or whatever, and that's the last I heard
24  of it.

Page 79

1    Q  Did you hear anything about -- in connection with
2  that incident concerning either Shannon Spalding or Danny
3  Echeverria being taken off of fugitive assignments or jobs
4  in fugitive apprehension?
5    A  No.
6    Q  I think you mentioned early on that you found a
7  document that you believe related to the case concerning a
8  phone call or a notation of a phone call.  Do you recall?
9    A  Yeah, yeah.  From Echeverria?
10    Q  Right.
11    A  Yeah.
12    Q  When did you do the search for the documents that
13  you were talking about, the -- specifically the reviews and
14  for that message, when you found the message?
15    A  Well, the message, I think, I kept or I had on my
16  desk.  I didn't really put it in a file.  I just had it on
17  my desk and I didn't get rid of it because at that point it
18  just seemed like this thing was -- whatever they were trying
19  to do -- and we had -- I had heard from someone that -- I
20  had heard something that they were going to try to embarrass
21  us or do something.  I said, you know, I better keep some of
22  this stuff, so whatever.  I don't know.  And then I -- a
23  search, I don't know.
24    Q  Did you -- do you know who you heard that from that

Page 80

1  they were going to try and embarrass you?
2    A  I believe O'Grady told me that he heard from
3  someone else and he didn't necessarily tell me who that,
4  hey, I heard they're going to try to embarrass us.
5    Q  What time period would you say that was that you
6  heard that from O'Grady that they were going to try and
7  embarrass you?
8    A  It was after the -- it's sometime like when they
9  were like in that transition period around the whole moving
10  from IAD to the fugitive unit, you know, when we -- like
11  right around after when we said, well, we don't want them
12  back in organized crime, right around that time frame.  I
13  don't know the date.
14    Q  I'm going to show you what we'll mark as Roti
15  Deposition Exhibit No. 1 for identification.
16        (Document marked as requested.)
17  BY MR. SMITH:
18    Q  Go ahead and take a look at what we marked as Roti
19  Deposition Exhibit No. 1 for identification.
20    A  Uh-huh.
21    Q  Do you recognize that document?
22    A  I do.
23    Q  Is that the message you were talking about that you
24  kept on your desk?

Page 81

1    A  Yes.
2    Q  And that's the message you were talking about that
3  was related to Daniel Echeverria?
4    A  Yes.
5    Q  And you'd agree that at the top it says date of
6  March 2 -- March 2, '12, or -- you believe that refers to
7  March 2nd, 2012?
8    A  Yes.
9    Q  And do you see there the name at the very bottom of
10  the message?
11    A  Yes.
12    Q  Sue?
13    A  Yes.
14    Q  Do you know who that is?
15    A  Yes.
16    Q  Who is that?
17    A  That is Police Officer Sue Ballauer,
18  B-a-l-l-a-u-e-r.  She was an administrative assistant
19  working in the chief's office at the time.  She has retired.
20    Q  And how long did she work with you?
21    A  Sue Ballauer worked for me -- with me in an
22  administrative capacity since sometime in like 2005, 2006.
23    Q  And were you aware that she had a husband or at one
24  time had a husband who was a police officer?

21 (Pages 78 - 81)

Page 82

1   A   Yes.

2   Q   Who was later convicted of crimes?

3   A   Yes.

4   Q   In the Marquette 10?

5   A   Yes.

6   Q   And in terms of --

7   A   She was divorced from him, I believe.

8   Q   Do you know if the divorce was before or after he

9 was indicted?

10   A   I don't. I didn't know her back then.

11   Q   Did you know her husband?

12   A   No.

13   Q   All right. So first of all, do you recall

14 receiving this message?

15   A   I recall getting this piece of paper, yes.

16   Q   Did you make any effort to call Daniel Echeverria

17 back after receiving this message?

18   A   Definitely not.

19   Q   Why not?

20   A   Multiple reasons. First of all, when it was

21 brought to me, Officer Ballauer was extremely upset in the

22 manner that Dan -- Daniel Echeverria talked to her and

23 talked on the phone. She was so upset that she handed it

24 off to the sergeant, Sergeant Maryet Hall, whose name is

Page 83

1 actually referenced in that letter, who was his

2 administrative sergeant in Bureau of Organized Crime. The

3 sergeant tried to talk to him. He would not tell her why he

4 wanted to and basically was threatening me through her

5 saying he better talk to me, he's going to want to talk to

6 me. And so I actually contemplated getting a CR number on

7 this if I wanted to be vindictive or try to do something

8 that I for whatever was trying to be framed, like this is --

9 I would have done that but I didn't. I let it go because I

10 figured, well, he's upset. But third of all, as a chief of

11 the Bureau of Organized Crime, this is not a proper protocol

12 for him to talk to me. It's not a proper way for him to

13 talk to me. It borders on insubordination and if he -- I

14 have a pretty open policy. If he would have came to my

15 office or her at any time during the -- since the beginning

16 of this, that this started, I would have been happy to talk

17 to them. They never once tried to talk to me until their

18 detail was changed and went to -- wherever they went, out of

19 IAD.

20       And as a matter of fact, I passed them in the

21 hall many times over the years, and I've actually said hello

22 to them and they have ignored my hello and walked right by

23 me, and actually Officer Echeverria has scowled at me, for

24 lack of a better term, numerous times in the hallway, which

Page 84

1 bordered on insubordination. So, yes, I would not return

2 his call. I don't -- if people want to see me as the chief,

3 they'll come and see me in my office in person, like I would

4 to any one of my superiors on the job, the superintendent,

5 the first deputy, et cetera.

6   Q   When did you first meet Daniel Echeverria?

7   A   I don't know if I ever formally met him.

8   Q   When did you first meet Shannon Spalding?

9   A   I don't know that I've ever formally been

10 introduced or met her. I've seen her, talked to her, not

11 even talked to her, seen her. They've never come to talk to

12 me. They don't -- a lot of times when people get detailed,

13 the officers will come in, even as commander, and say, hey,

14 you know, Commander, just letting you know thanks, we're

15 going to be going to this detail, but I've never talked to

16 them and I've passed them in the hallways at headquarters

17 several times over this time period, and never once have

18 they tried to talk to me.

19   Q   And in terms of did Daniel Echeverria ever scowl at

20 you before March of -- March 2nd of 2012?

21   A   Yes.

22   Q   Would you have any idea why Daniel Echeverria would

23 have scowled at you before March 2nd of 2012?

24   A   I believe so.

Page 85

1   Q   What would that have been?

2   A   I believe that they were upset when I called Tina

3 Skahill and told her that I didn't believe -- that they were

4 not showing up to work in narcotics and that when I called

5 Patrick Smith, Patrick Smith said, well, I'm not using them

6 every day. And again if I wanted to be vindictive, I would

7 have got a CR number at that point, but I didn't. I just

8 wanted to handle the situation, and I told Tina, you're

9 going to have to detail them so that they have supervision.

10 Ever since then whenever I ran into them, I would get that

11 look. She would look straight ahead. I said good morning

12 to them several times, she would look straight ahead and

13 not acknowledge me, and he would give me what I would term a

14 scowl.

15   Q   Do you know if Tina Skahill ever told Daniel

16 Echeverria or Shannon Spalding about that conversation

17 relating to their assignment with the F.B.I.?

18   A   I have no way of knowing that, but I do know they

19 must have known something was changed when they had their

20 detail changed from being in -- being detailed to narcotics

21 to then that 543. They must have known there was some

22 reason for that.

23   Q   In terms of the note itself, first of all, your

24 handwriting is nowhere on this, correct?

22 (Pages 82 - 85)

Page 86

1   A  Correct.

2   Q  You see a phone number, (773) 962-1269?

3   A  Yes.

4   Q  Did you believe that to be Daniel Echeverria's

5 number?

6   A  No idea. I guess, yeah.

7   Q  Based on the way the message appears?

8   A  Yes, based on the message.

9   Q  You didn't recognize that as a number you knew?

10   A  Correct.

11   Q  It then says Daniel Echeverria, correct?

12   A  Yes.

13   Q  And then it says wanted to talk to you but would

14 not tell me why, started swearing on phone, correct?

15   A  Yes.

16   Q  And the next sentence then reads said he got

17 dumped. Did you have an idea what Daniel Echeverria may

18 have been referring to when it said he got dumped?

19   A  No.

20   Q  You didn't believe that that had something to do

21 with the fact that he was no longer a member of the

22 narcotics unit?

23   A  I mean, he didn't get sent back to patrol, which

24 generally when someone -- when you use the term dumped, that

Page 87

1 means you go from a specialized unit back to patrol on a

2 beat car. He was still in specialized units, so I don't

3 know. I didn't know all the details of what he was -- what

4 was going on in his head. So, I mean, I knew that it

5 probably referred to something about him not coming back to

6 narcotics but --

7   Q  So as you sit here today, do you think back then

8 you believed that it had something to do with him not coming

9 back to narcotics that he got dumped?

10   A  I can only assume that, yes, or surmise that. I

11 don't know, whatever is the right word.

12   Q  So if the word swearing on the phone wasn't on

13 here, do you believe you would have called him back?

14   A  I think if it was a respectful call to me without

15 all that in there and not to mention my administrator was

16 quite upset at the call, yeah, if he would have said please

17 call me back, I need to discuss a matter with you, I don't

18 see why I wouldn't. I'm pretty open. I could bring in 500

19 people that could tell you that I'm very respectful to

20 police officers, and people come in to see me in my office

21 all the time. If I'm in the middle of eating lunch or

22 writing a report, they say -- my secretary will say, hey, so

23 and so would like to say hi to you, they come right in, hi,

24 how are you, how are you doing, all the time. I'm very

Page 88

1 accommodating.

2   Q  In terms of did you direct anyone to call Daniel

3 Echeverria back after this?

4   A  No.

5   Q  Did you ever show it to anyone at any point in time

6 before this lawsuit?

7   MR. KING: You're referring to Exhibit 1?

8   MR. SMITH: I'm referring to Exhibit 1, yes.

9   THE WITNESS: I mean, the only -- I mean, Sue Ballauer,

10 Sergeant Maryet Hall and me. I don't recall if I showed it

11 to -- I don't -- I didn't show it to anyone officially like

12 as far as a complaint or anything like that. I just figured

13 he was upset. Again I was going to just let it go, and that

14 was it.

15 BY MR. SMITH:

16   Q  Did you ever tell Juan Rivera about the call you

17 received or the message you received about Daniel

18 Echeverria?

19   A  I don't recall mentioning it to him but that's not

20 to say I might not have. After the lawsuit came out that we

21 never had a meeting but, you know, you have an off the cuff

22 conversation. I might have said it but I don't even recall

23 saying it to him. I don't want to pigeonhole myself in

24 saying I didn't because I don't remember.

Page 89

1   Q  Before the lawsuit did you mention it to him?

2   A  I do not recall mentioning it to him.

3   Q  Did you mention it to O'Grady?

4   A  I might have mentioned it to him. I'm not 100

5 percent.

6   Q  Why would you have mentioned it to O'Grady?

7   A  Well, I think it's pretty pertinent to the fact

8 that we knew he did not want them back in the unit based on

9 his recommendation from his sergeants and his lieutenants

10 and I assume based on their recommendations and some past

11 history, and we knew that Daniel and Shannon were the center

12 of this discrepancy with coming back or not coming back, so

13 I think it was pertinent that that was something -- like I

14 said, it wasn't an official meeting. I probably at some

15 point told him, you know, Echeverria called me the other day

16 and was swearing at Sue Ballauer on the phone, and probably

17 that was it. I don't recall the exact details of the

18 conversation, but I do believe I mentioned it to him.

19   Q  Do you remember James O'Grady saying anything back

20 to you at that point?

21   A  I think if -- no.

22   Q  Were you ever shown any arrest -- data concerning

23 arrests that Echeverria or Shannon Spalding made in terms of

24 like how many arrests they make per a period of time while

23 (Pages 86 - 89)

Page 90

1 working in narcotics, that sort of thing?

2    A.   No.

3    Q.   Just in terms of -- I think we're close to it now

4 being done, but just in terms of the people -- Juan Rivera,

5 when did you first meet him and under what circumstances?

6    A.   I think Juan Rivera came on the job the same year I

7 did in 1986, but I didn't -- you know, I know of people.

8 You know them.  We never worked together.  We never worked

9 in the same units together.  We were never partners, so I

10 don't socialize with him or I've never actually even talked

11 to him outside of work that I could recall, so I've known

12 him.  If you want to say who Juan Rivera is, I've known him

13 since '86, I think.  I think that's -- he came on the job

14 the same year I did.

15    Q.   In terms of conversation obviously with your

16 attorney present you don't have to speak of, but did you

17 ever talk to Juan Rivera about this lawsuit outside of the

18 presence of your attorney?

19    A.   Yeah.  I've never spoken to him with my attorneys

20 present, and I've spoken to him briefly.  We never had a sit

21 down meeting about it or anything, but it was mostly, I

22 would say, maybe commiserating like can you believe they

23 went on TV and said that or -- you know, but Juan was --

24 didn't really -- Juan is very -- doesn't talk a lot, so he

Page 91

1 didn't really talk about it.  Just kind of an off the cuff,

2 hey, did you get the lawsuit today, you know, they said --

3 they said they did this and I don't think they ever did

4 that.  You know, it would be me talking.  He would say I

5 don't know.  We never got into a deep factual conversation

6 about the case.

7    Q.   What did you say that they claimed they did that

8 you didn't believe they did?

9    A.   I was paraphrasing like just -- like, for instance,

10 I could actually pick out a couple of things.  Like for

11 instance, they said they said -- like in the news conference and

12 stuff that they were undercover and that their identities

13 were given out.  Well, A, they were never undercover in that

14 investigation.  Undercover entails that they would have been

15 a facilitator between some of the direct conversation or

16 direct hand-to-hand transactions with the target of the

17 investigation, which they were not.  Just some of the things

18 that they -- that came out in the complaint and on TV that

19 were in my estimation fabrications.

20    Q.   Anything else beyond that?

21    A.   No.  There was no -- no.

22    Q.   Do you know Debra Kirby?

23    A.   Yes.

24    Q.   How long have you known Debra Kirby?

Page 92

1    A.   Again I think she came on the job in 1986, but I

2 never really crossed paths with her in 20 plus years until I

3 was in the command staff, so sometime after 2005, you know,

4 but again I don't socialize with her, you know, but I just

5 know her.  I've probably known who she was for many years.

6 I think she made lieutenant the same year I made lieutenant,

7 but I'm not sure.  It was a big class but -- so I've known

8 her for many years who she was, but there's probably been

9 slots of 20 years I didn't talk to her.

10    Q.   Have you ever talked to her about Danny Echeverria

11 or Shannon Spalding?

12    A.   No, I never talked -- I don't recall ever talking

13 to her about this at all.

14    Q.   Did you ever talk to her about the F.B.I.

15 investigation of Watts?

16    A.   No.

17    Q.   You already mentioned James O'Grady.  How did you

18 first know James O'Grady?

19    A.   James O'Grady did come on the job in 1986 as well.

20 I knew his name because he happened to be in the same class

21 with a guy who was my partner for a while, so I somehow knew

22 who he was because of that, but again he worked on the north

23 and like west side.  I always worked on the south side in

24 the years coming up, and I didn't really get to know him to

Page 93

1 where I could say I know him better than average until I

2 became the commander of narcotics is probably when I first

3 started to get to know him because he was a lieutenant there

4 for a while.  And then when I moved up to deputy chief, he

5 became the commander of narcotics, so then he stayed as the

6 commander of narcotics through those years till I went to

7 chief, so I got to know him in those years.

8    Q.   In terms of James O'Grady, when you first became

9 commander of narcotics, did he tell you anything about

10 Shannon Spalding or Danny Echeverria at that point?

11    A.   I don't think so, no.  I don't think they were

12 under his supervision.

13    Q.   Did you ever speak to James O'Grady about the

14 lawsuit outside the presence of your attorney?

15    A.   Yes.

16    Q.   What did you talk about?

17    A.   Just a little bit of commiserating again some of

18 the facts of the case that we thought were just -- thought

19 were outlandish in some ways, the fact that we were being

20 painted -- and he was very upset that he couldn't believe he

21 was actually being accused of things and being sued by

22 fellow police officers, commiserating a little bit about,

23 you know, trying to take supervisory or corrective action

24 and, you know, how it kind of got turned around and just,

24 (Pages 90 - 93)

Page 94

1  you know -- really that's kind of the main gist of the
2  conversations.  Yeah.
3     MR. KING:  Don't guess.
4  BY MR. SMITH:
5     Q   Did you ever talk about anything in terms of the
6  complaint indicating that people were calling Spalding and
7  Echeverria rats?
8     A   Yeah, actually because we thought -- because I
9  don't know if I'm accused of that or not.  I don't recall,
10  but I know he was accused of that and I remember again i
11  would almost be like commiserating but I was saying, well,
12  you'd have to be a heck of a hypocrite to call them rats
13  because you worked in IAD for a while yourself, didn't you,
14  or something like that.  He said yeah.  And I said, and me,
15  I've had the role in the arrest of police officers myself on
16  as or more important of cases than that, you know, just kind
17  of like a commiserating, you know, type of conversation
18  but -- and to say why would I call them rats -- and
19  especially we were saying because I thought somewhere it
20  says that, you know -- I don't know.  Maybe like that they
21  said that Juan Rivera said that O'Grady said that or
22  something like -- so he called them rats in front of the
23  chief of IAD.  That doesn't seem very credible or something
24  like that.

Page 95

1     Q   When you say you were involved in a more important
2  arrest potentially than of a fellow officer, potentially
3  than Echeverria and Spalding, what were you referring to?
4     A   Specifically I guess in that case I was referring
5  to that Tashika Sledge case where she was actually charged
6  with federal narcotics conspiracy -- drug conspiracy as
7  opposed to -- I don't know all the details of the case.
8  What's the -- Sergeant --
9     Q   Watts.
10     A   -- Watts except for I thought it was like official
11  misconduct and theft and things like that as opposed to like
12  an ongoing conspiracy but --
13     Q   Were you under the impression that the Watts matter
14  wasn't about an ongoing conspiracy?
15     A   Well, I knew it was long, but I thought it was --
16  to my knowledge, it was that he was stealing money and
17  extorting gangbangers and drug dealers as opposed to
18  facilitating the distribution of narcotics.  I could be
19  wrong but that's just what I thought.
20     Q   Have you ever heard of any rumors that he was
21  involved in homicides?
22     A   No, I never heard that.
23     Q   Did you talk with O'Grady about the allegation
24  relating to -- let me make sure it's in here.  It might not

Page 96

1  have been in here.  Was there any talk about the banning
2  from the building with O'Grady when he talked about the
3  lawsuit?
4     A   No, not about the lawsuit, just that -- when we
5  talked briefly about it.
6     Q   Do you know Kevin Sadowski?
7     A   I do not know him personally.  I think I know who
8  he is but I don't know him.  I think I could pick him out
9  but I'm not sure.
10     Q   Do you know a Lieutenant Deborah Pascua,
11  P-a-s-c-u-a?
12     A   I know who she is, but I don't recall ever having a
13  conversation with her in my career.
14     Q   Do you know a police commander, Adrian Stanley?
15     A   Yes, but again I don't know if I've ever had a
16  conversation with her either in my career.
17     Q   Do you know a Chicago police sergeant, Maurice
18  Barnes?
19     A   I do.
20     Q   How do you know Maurice Barnes?
21     A   I never really worked with Maurice but at one point
22  when we were young police officers, we both worked security
23  at the stadium I think is where I first met him, and I've
24  just kind of known him over the years, say hi if I see him.

Page 97

1     Q   Did you ever talk with him about Shannon Spalding
2  or Danny Echeverria?
3     A   I did not.
4     Q   Did you ever talk with him about the lawsuit again
5  outside the presence of your attorney?
6     A   I have not.
7     Q   Do you know Lieutenant Robert Cesario?
8     A   I do.
9     Q   How did you know Robert Cesario?
10     A   I first met Robert -- Lieutenant Cesario when I was
11  assigned as a lieutenant in Area 4 homicide division, and he
12  came in near the end of my tenure as a sergeant and he
13  worked briefly under my supervision.  I don't know how long.
14  I wasn't that long.  I was only there for about a year
15  and a half or so, and for a while he was there as a
16  sergeant.  And then I haven't worked with him since, but I
17  just know who he is and cordial to him.
18     Q   Have you ever talked with him about Danny
19  Echeverria or Shannon Spalding?
20     A   I have not.
21     Q   Did you ever talk to him about the lawsuit outside
22  the presence of an attorney?
23     A   I have not.
24     Q   Do you know Commander Salemi?

25 (Pages 94 - 97)

1    A    Salemi, yeah, I do.
2    Q    How do you know him?
3    A    I first met Commander Salemi when I became the
4  commander of the gang investigations or gang intelligence at
5  the time, and he was a lieutenant there.  So he worked under
6  my supervision for, oh, about over a year, year and a half
7  maybe, two years.
8    Q    And did you ever talk with him about Danny
9  Echeverria or Shannon Spalding?
10   A    No.
11   Q    And did you ever talk to him about the lawsuit
12 outside the presence of an attorney?
13   A    Nothing in-depth other than -- no.  I'm going to
14 say it's been mentioned in passing but no specifics of the
15 case, just I see you're on the lawsuit, too, type of thing
16 or whatever.
17   Q    Anything -- did he say anything to you at that
18 point in time?
19   A    No, just -- I mean, nothing of substance.
20   Q    Do you know Thomas Mills, police sergeant?
21   A    I know who Tom Mills is.  I do know him, yes.
22   Q    How do you know him?
23   A    I don't recall where I first came across Tom Mills.
24 It was many years ago, but I've never really worked with him

1  since or, you know, come across him, but I know him.  We
2  always say hi to each other when we see each other, but I
3  don't know him well.
4    Q    Did you ever talk with him about Danny Echeverria
5  or Shannon Spalding?
6    A    I have not.
7    Q    Were you at all aware of any CR in relation to
8  Shannon Spalding and concerning a recording of a Thomas
9  Mills?
10   A    The what of a Thomas Mills?
11   Q    A recording like a tape recording.
12   A    No, I don't know of that.
13   Q    In terms of have you ever -- my mind skipped a
14 beat.  Did I ask you -- I might have already asked you this,
15 but did you ever talk to Thomas Mills about this lawsuit
16 outside the presence of your attorney?
17   A    I have not.
18   Q    In terms of would you agree that if an officer went
19 to a supervisor and asked that a CR should be made or a
20 report should be made that fellow officers or -- who are
21 supervisors are calling them rats or words to that effect or
22 inferring that people wouldn't back them up on the streets
23 if they were in a dangerous situation, would you agree that
24 it would be the obligation of the supervisor to initiate a

1  CR?
2       MR. KING:  Just object to the lack of foundation and
3  calling for speculation in a hypothetical situation but to
4  the extent --
5  BY MR. SMITH:
6    Q    Hypothetically speaking.
7    A    Can you just rephrase it a little bit?
8    Q    Hypothetically speaking, if an officer under the
9  command of a sergeant or a lieutenant or higher up went to
10 that supervisor and said, you know, I've been the -- I've
11 been harassed and retaliated against, supervisors and police
12 officers are calling me a rat and saying that they will not
13 protect me in the streets, would it be the obligation of the
14 supervisor to initiate a CR if they were requested to?
15      MR. KING:  Same objections.  You can answer if you can.
16      THE WITNESS:  I mean, in general if an officer is being
17 in a hostile work environment or in a dangerous work
18 environment or being harassed some way and feels they have a
19 legitimate complaint and they bring it to a supervisor, the
20 supervisor should take some type of action which could
21 include a CR number.
22 BY MR. SMITH:
23   Q    Would they be required under the general orders to
24 take a CR if requested?

1       MR. KING:  Same objections.
2       THE WITNESS:  When there's an allegation brought to a
3  supervisor of certain types of wrongdoing, they are required
4  by order to get a CR number.  I mean, the way you phrased
5  that, I mean, under that exact circumstance it might be the
6  safe bet.  I mean, there's a little gray area in there, but
7  it might be the safe bet to get a CR number.
8       MR. SMITH:  I think we're done.  If I could just go
9  through my notes real quick.  Okay.  I think I'm all done.
10      MR. KING:  I don't have any questions.  We'll reserve.
11      MR. SMITH:  I guess I'll order a copy.  I'll order it
12 that way you can have a copy this time.
13      MR. KING:  If he orders it, we'll take a copy.
14           DEPONENT FURTHER SAITH NOT.
15
16
17
18
19
20
21
22
23
24

Page 102

```
 1  STATE OF ILLINOIS  )
 2                     ) ss:
 3  COUNTY OF C O O K  )
 4
 5        I, Linda M. Benda, C.S.R., Notary Public, do
 6  hereby certify that I reported in shorthand the testimony
 7  held at the deposition of Nicholas Roti on December 3, 2014,
 8  and that this transcript is a true and accurate
 9  transcription of my shorthand notes so taken, to the best of
10  my ability, and contains all of the proceedings given at
11  said deposition.
12
13
14        <%Signature%>
15        Linda M. Benda, C.S.R., Notary Public
16        No. 084-003550
17
18
19
20
21
22
23
24
```

Page 103

```
 1        DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
 2
    ASSIGNMENT NO: 1975322
 3  CASE NAME: Spalding, Shannon v. City of Chicago
    DATE OF DEPOSITION: 12/3/2014
 4  WITNESS' NAME: Nicholas Roti
 5        In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7        I have made no changes to the testimony
    as transcribed by the court reporter.
 8
    _____
 9     Date          Nicholas Roti
10        Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
          They have read the transcript;
13        They signed the foregoing Sworn
          Statement; and
14        Their execution of this Statement is of
          their free act and deed.
15
    I have affixed my name and official seal
16
    this _____ day of_____, 20____.
17
18     _____
          Notary Public
19
    _____
          Commission Expiration Date
20
21
22
23
24
25
```

Page 104

```
 1        DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
 2
    ASSIGNMENT NO: 1975322
 3  CASE NAME: Spalding, Shannon v. City of Chicago
    DATE OF DEPOSITION: 12/3/2014
 4  WITNESS' NAME: Nicholas Roti
 5        In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7        I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
 8  well as the reason(s) for the change(s).
 9        I request that these changes be entered
    as part of the record of my testimony.
10
          I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____
       Date          Nicholas Roti
14
          Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17        They have read the transcript;
          They have listed all of their corrections
18        in the appended Errata Sheet;
          They signed the foregoing Sworn
19        Statement; and
          Their execution of this Statement is of
20        their free act and deed.
21  I have affixed my name and official seal
22  this _____ day of_____, 20____.
23  _____
          Notary Public
24
    _____
25        Commission Expiration Date
```

Page 105

```
 1        ERRATA SHEET
          VERITEXT LEGAL SOLUTIONS MIDWEST
 2        ASSIGNMENT NO: 1975322
 3  PAGE/LINE(S) /      CHANGE      /REASON
 4  _____
 5  _____
 6  _____
 7  _____
 8  _____
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
    _____       _____
20     Date          Nicholas Roti
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
          Notary Public
24
    _____
25        Commission Expiration Date
```

27 (Pages 102 - 105)

# Exhibit G

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| Chicago Police Officer SHANNON SPALDING, | ) | |
| Chicago Police Officer DANIEL ECHEVERRIA, | ) | Case No. 12-cv-8777 |
| | ) | |
| Plaintiffs, | ) | Judge Gary Feinerman |
| | ) | Magistrate Judge Shelia Finnegan |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

### <u>DECLARATION OF NICHOLAS ROTI</u>

I, Nicholas Roti, declare under penalty of perjury that this statement is true and correct.

1.     I was employed with the Chicago Police Department ("CPD") from June 1996 until March 2015.  From in or about March 2008 to in or about August 2008, I was the Commander of the Narcotics Section of the Bureau of Organized Crime.  From in or about August 2008 until in or about October 2008, I was the Deputy Chief of the Detective Division. In or about October 2008, I became the Deputy Chief of Organized Crime.  In or about July 2010, I became the Chief of the Bureau of Organized Crime, and I remained in that position until I retired from CPD in March 2015.

2.     When I took over the Narcotics Division in 2008, I spoke with and received information from the assigned lieutenants regarding the personnel in my new unit.  Some of that information included personnel assessments of the officers in Narcotics completed by their supervisors, which were emailed to me by Lt. Navarro on April 13, 2008.  With respect to Shannon Spalding, the personnel assessment completed by her sergeant at the time, Sergeant Kevin Johnson, stated as follows:

> P.O. Spalding, Shannon #17887.
> Strengths:  none

> Weakness: Source of conflict and division within team. Questions orders and missions. Very deceptive in. manner. Fails to follow directions. Surveillance abilities average; buy abilities hampered by her approach and attitude towards targets. Will not take initiative during operations and fails to adapt to changing conditions. Bypasses chain of command on a consistent basis. Criticial of supervision and fellow team members to other personnel.

(A copy of this assessment is attached hereto as Exhibit 1.)

3. In or about June 2008, I was asked and authorized Plaintiffs Shannon Spalding and Daniel Echeverria (collectively, "Plaintiffs") to work with the Internal Affairs Division ("IAD") and the FBI on as-needed basis on a corruption investigation. However, prior to November 2012 when Plaintiffs filed their federal lawsuit and their lawsuit was discussed in the media, I had no knowledge that either Plaintiff reported to the FBI any alleged criminal misconduct or corruption by Sergeant Ronald Watts ("Watts"), Sergeant Kallat Mohammad ("Mohammad") or any other Chicago Police officer.

4. Similarly, while I was aware and authorized Plaintiffs to work with IAD and the FBI on as-needed basis on a corruption investigation, prior to November 2012 when Plaintiffs filed their federal lawsuit and their lawsuit was discussed in the media, I also had no knowledge that either Plaintiff reported or disclosed information to the FBI, to any government or law enforcement agency or to anyone within CPD that Watts, Mohammad or any other Chicago Police officer violated any state or federal law, rule, or regulation.

5. In May 2011, I was asked informally by then Chief Juan Rivera of IAD about taking Plaintiffs back in the Bureau of Organized Crime, Narcotics Division. I consulted with Commander of Narcotics, James O'Grady, and we agreed that we were not interested in taking Plaintiffs back, and I so informed Chief Rivera. One of the reasons that I was not interested in taking Plaintiffs back in Narcotics was because Spalding had received the extremely poor performance evaluation in April 2008, when she was previously in Narcotics. (See Exhibit 1.)

6.      I never made any statements to or about Plaintiffs or took any action against or relating to Plaintiffs based on any reports they may have made to the FBI of alleged criminal misconduct or corruption by Watts, Mohammad or any other Chicago Police officer.

7.      I never made any statements to or about Plaintiffs or took any action against or relating to Plaintiffs based on the fact that Plaintiffs may have disclosed information to the FBI, to any government or law enforcement agency or to anyone within CPD that Watts, Mohammad or any other Chicago Police officer violated any state or federal law, rule, or regulation.

_____
Nicholas Roti

Executed on February 2, 2016

# Exhibit H

Page 1

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3

   SHANNON SPAULDING and      )
4  DANIEL ECHEVERRIA,         )
                              )
5       Plaintiffs,           )
                              )
6       -vs-                  )  No. 12 CV 8777
                              )
7  CITY OF CHICAGO, et.       )
   al.,                       )
8                             )
        Defendants.           )

9

10

11

12

13

14

15

16

17

18

19          The Deposition of JAMES O'GRADY taken before
20  Thomas A. Manno, C.S.R., pursuant to the Federal Rules of
21  Civil Procedure pertaining to the taking of depositions
22  for the purpose of discovery, at Christopher Smith Trial
23  Group, One North LaSalle Street, Suite 3040, Chicago,
24  Illinois 60602 on March 5, 2015, at 9:30 a.m.

Page 2

1 APPEARANCES:
2      CHRISTOPHER SMITH TRIAL GROUP
       One North LaSalle Street, Suite 3040
3      Chicago, Illinois 60602
       BY:  MR. CHRISTOPHER SMITH
4      Chris@lawsja.com
       312-432-0400
5          Appearing on behalf of the Plaintiffs;
6      DRINKER, BIDDLE & REATH, LLP
       191 North Wacker Drive, Suite 3700
7      Chicago, Illinois 60606
       BY:  MR. ALAN S. KING
8      312-569-1334
       Alan.king@dbr.com
9          Appeared on behalf of the Defendants.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1                I N D E X
2
3  WITNESS:                        PAGE:
4  James O'Grady
5  (Exam. By Mr. Smith)              4
   (Exam. By Mr. King)             87
6  (Further Exam. By Mr. Smith)    88
7
8  EXHIBITS:
9  No exhibits were marked.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1          (Witness sworn.)
2          JAMES O'GRADY,
3  being first duly sworn, was examined and testified as
4  follows:
5          EXAMINATION
6          BY MR. SMITH:
7  Q.  Can you please state your name and spell your
8  name for the record?
9  A.  James O'Grady, O-G-R-A-D-Y.
10 Q.  Where are you currently employed?
11 A.  The Village of Harwood Heights, Illinois.
12 Q.  And what is your position there?
13 A.  I'm the Chief of Police.
14 Q.  And when did you become the Chief of Police
15 there?
16 A.  December of 2013.
17 Q.  Prior to that, where did you work?
18 A.  I was employed by the Chicago Police Department
19 from 1986 until 2013.
20 Q.  What reason did you leave?
21 A.  I retired from the Chicago Police Department
22 and I took another position.
23 Q.  And I know that's a long period of time, but
24 essentially if you could try to do your best to give me

Page 5

1  your main assignments and the years, timeframe, as to
2  when you moved or were promoted--
3  A.  Sure.
4  Q.  --within the Chicago Police Department.
5  A.  I started with the Chicago Police Department in
6  July of 1986.  I was first assigned to the academy for
7  training.  Subsequent to that, I was assigned to the 13th
8  District, west side of Chicago.  I worked there until
9  1988, when I was detailed to the Area 4 Gang Task Force.
10 I worked there until approximately 1990.
11         I returned to 13th District and was then
12 assigned to the Narcotics Division in 1991.  I worked
13 there until 1997, I believe, when I applied for and was
14 assigned to the Internal Affairs Unit, where I worked
15 undercover on police impersonators and police corruption
16 cases.
17         I was then promoted as sergeant in 1998 and
18 assigned to the 15th Police District until 1999, where I
19 returned to the Narcotics Division as a sergeant.
20         Approximately 2002, I was detailed to the
21 Office of Legal Affairs as the commanding officer, where
22 I dealt with issues, legal issues, affecting the Chicago
23 Police Department, including contract issues, labor
24 issues, suspensions, terminations, investigations

2 (Pages 2 - 5)

Page 6

1 involving police officers.
2        And then returned to the Narcotics Unit, I
3 believe, in 2003, at which point I was assigned to the
4 DEA Task Force, Group 47, Federal Task Force, operating
5 out of Homan Square.
6        I was promoted to the rank of lieutenant in
7 2006, assigned to the 15th District again as a watch
8 commander on the third watch.
9        In 2008, I returned to the Narcotics Division
10 as a lieutenant, and promoted to the rank of commander
11 in, I believe, August of 2008, commander of the Narcotics
12 Division.
13        And then assigned as the commander of the 11th
14 District in 2013, October of 2013.  And then I retired in
15 December of 2013.
16    Q.   Thank you.
17    A.   I was all over the place.
18    Q.   Could you explain a little how you got the
19 position within IAD when you were assigned there?  How
20 did that come about?
21    A.   I applied for it.  There was an opening.
22        My former commander, Michael Hoke, he was a
23 former commander of the Narcotics Division.  He took over
24 as the Deputy Superintendent of Internal Affairs.

Page 7

1        He and I had a conversation regarding me
2 working for him.  I thought that was an exciting for
3 myself to learn more and to assist and helping the police
4 department.  I then applied for it and was accepted to
5 the position.
6    Q.   Okay.  You mentioned also that you had worked a
7 position where you were kind of, I don't want to misquote
8 you, but you essentially had a role in reviewing
9 suspensions and viewing contracts and things of that
10 nature.
11    A.   Correct.
12    Q.   What would have been your role with respect to,
13 if there was somebody who was recommended for a
14 suspension?  At what stage would you be involved in that
15 process?
16    A.   The General Counsel would receive I think it
17 was any suspension of 15 days or more, or any termination
18 cases.  The General Counsel, she would then refer them to
19 attorneys in the office.
20        I was one of the attorneys who, we would review
21 these CR numbers for legal sufficiency, that the
22 investigations were done properly.
23        And then we would do a cover sheet for the
24 Superintendent to review to determine whether or not

Page 8

1 there was sufficient grounds to terminate or to suspend.
2    Q.   Okay.  So at that stage you weren't making the
3 initial assessment of whether to recommend a suspension
4 or termination, you were essentially helping the process
5 of reviewing whether that was appropriate?
6    A.   Correct.
7    Q.   And were there times where you would disagree
8 with a suspension or a termination, and believe that it
9 wasn't sufficient evidence for a suspension or a
10 termination?
11    A.   Yes.
12    Q.   And other times you would agree there was?
13    A.   Other times we would concur.  Sometimes concur
14 with the investigation, but not concur with the penalty,
15 maybe suggesting an alternate penalty.
16        On several occasions, I personally didn't feel
17 there was legal sufficiency to support termination, and I
18 would draft a synopsis of that for the Superintendent to
19 review.
20    Q.   Was there ever a situation where somebody
21 recommended a suspension, or something short of
22 termination, where you recommended that there should be a
23 termination?
24    A.   I don't recall specifically.

Page 9

1        I do remember when I was in Internal Affairs I
2 recommended termination on a couple of cases.  But when I
3 was in Legal Affairs, I don't remember.
4        There were so many CR numbers.  I mean, on a
5 daily basis, I'd have four or five CR numbers waiting for
6 me.
7    Q.   Now, in terms of both as somebody who worked in
8 IAD and as an officer with 30 years experience, including
9 years as a commander, would it be fair to say that you
10 have a fairly good understanding of the rules and
11 regulations and general orders?
12    A.   A general understanding.  Obviously our general
13 orders are quite large.  To say I know every single
14 general order, no, I wouldn't.  No, I don't.
15    Q.   In other words, you certainly don't have them
16 all memorized?
17    A.   Absolutely not.
18    Q.   However, would you agree that, generally, you
19 feel that you tried to have a decent understanding, and
20 you also know where to go if you have a question about a
21 general order?
22    A.   Correct.
23    Q.   For the most part, when you look at the general
24 orders, in particular with respect to harassment and

3 (Pages 6 - 9)

Page 10

1 issues of, retaliation-type issues within the Chicago
2 Police Department, you would agree that all the
3 department members should follow the rules and
4 regulations, that there's no exception based on rank?
5    A.  Correct.
6    Q.  And with respect to the rules regarding the
7 complaint registers in terms of when officers should
8 report misconduct, and when they should report crimes by
9 other officers, you would agree that those rules and
10 regulations don't have exceptions based on rank?
11    A.  Correct.
12    Q.  When you were first assigned to narcotics as a
13 lieutenant, what shift were you working?
14    A.  When I first returned to the Narcotics Division
15 as the lieutenant, I was running the Asset Forfeiture
16 Unit, which is a sub-unit. At that time it had changed.
17       Asset Forfeiture at one time was under
18 Narcotics. Then it moved to Vice, then it was back to
19 Narcotics and back to Vice.
20       But at that time, in 1998, they needed a
21 lieutenant to work, to cover that forfeiture. So I was
22 still assigned to the Narcotics Division, but I was
23 working in the Asset Forfeiture Unit.
24    Q.  And then when you were promoted to commander,

Page 11

1 what units would you be overseeing? You'd be overseeing
2 Asset Forfeitures and other units as well?
3    A.  It was the Narcotics Section then, and their
4 Asset Forfeiture Unit.
5    Q.  And the Narcotics Section would be teams of
6 officers who were going out with a primary goal of
7 investigating narcotics traffic and the related crimes?
8    A.  Correct.
9    Q.  Who did you replace as the commander of
10 Narcotics?
11    A.  Nicholas Roti.
12    Q.  And when you first replaced Commander Roti, did
13 you have any type of meeting where you reviewed what was
14 going on with the Narcotics Unit and were given a
15 briefing of what concerns there were, and generally the
16 way things were working?
17    A.  Yes. I mean, I was one of his lieutenants, so
18 I had a pretty fair understanding. And obviously having
19 been there for most of my career, I would say I had a
20 fair grasp of -- obviously he brought me up to speed on
21 certain things I didn't know about as a lieutenant, but
22 yes, that would be fair to say.
23    Q.  When you were arrived as either a lieutenant or
24 the commander, were you informed of any corruption

Page 12

1 investigations being conducted against any members within
2 the Narcotics Unit?
3    A.  Did our office conduct any investigations, or
4 that our officers were being investigated?
5    Q.  That your officers were being investigated.
6    A.  Not to my memory, no.
7    Q.  Were you briefed about any officers being
8 suspected for use, sale or possession of narcotics within
9 the unit?
10    A.  My unit? No.
11    Q.  During your course as the commander of
12 Narcotics, were you a made aware of any corrupt officers
13 involved in the sale, use or possession of illegal drugs?
14    A.  My unit or outside units?
15    Q.  Any of the units. Any of the individuals
16 within the Narcotics Unit.
17    A.  No.
18    Q.  As a commander of Narcotics, were you ever
19 informed by any outside agencies of any investigations of
20 members of the department being investigated for criminal
21 activity?
22    A.  My officer or outside?
23    Q.  That question would be outside.
24       Essentially outside agencies, like the DEA or

Page 13

1 FBI, did they come to you and say, we're investigating
2 any Chicago police officers for criminal activity?
3    A.  Not that I can recall.
4       We did have our own independent investigations
5 that, but nothing from the outside agencies, like DEA,
6 ATF or FBI.
7    Q.  When you say you had your own independent
8 investigations, were there investigations by narcotics
9 officers of other officers in different units suspected
10 of criminal activity?
11    A.  Well, where violation of department orders were
12 involved, yes. So I would say, yes.
13    Q.  When you say violations of orders involved, are
14 we talking about crimes, or just...
15       When I say "crimes," I mean like narcotics,
16 stealing, or more serious crimes even.
17    A.  I mean, during the course of many of our wire
18 investigations, a police officer would come on the wire
19 as either an associate or some type of involvement with a
20 target.
21       And then in that case, we always initiated a CR
22 number on that officer.
23    Q.  And were those investigations with wires, did
24 any of them involve co-op investigations that also

4 (Pages 10 - 13)

Page 14

1  involved the DEA?
2      A.  Some yes and some no.
3      Q.  When you first arrived at Narcotics -- I'm
4  sorry.
5          When you first arrived as a lieutenant in
6  Narcotics, were you aware of Shannon Spaulding and
7  Danny Echeverria?
8      A.  By reputation.  I had heard about them.
9      Q.  And what had you heard?
10     A.  That Danny was a decent officer.
11         That Shannon Spaulding was very, very
12  difficult.  She was difficult to supervise, difficult to
13  work with.  She wasn't well regarded.  She wasn't well
14  liked by supervisors or other officers.
15     Q.  And when did you hear this?
16     A.  When I returned to the unit.
17         At some point, Chief Nick Roti, the Deputy
18  Chief, informed me that they were still on our sheets but
19  working on a special investigation.  So their names came
20  up.
21     Q.  And was that when you were made a commander or
22  was that when you were a lieutenant?
23     A.  Made commander.
24     Q.  And before that time, had you ever heard

Page 15

1  anything about them?
2      A.  Yes.
3      Q.  From whom?
4      A.  Other officers in the unit.
5      Q.  Anyone in particular?
6      A.  One in particular, but I can't remember when he
7  had this discussion.  It was either when I was just made
8  commander, or it might have been prior to that.  That was
9  Lieutenant Robert Cervenko.
10     Q.  And what did he tell you?
11     A.  That Shannon and Danny had to be split up.
12  That she was very difficult to supervise.  That she
13  didn't get along with her team members.  That she thought
14  very highly of herself.  She didn't work well with --
15  basically didn't work well with anyone else.
16         She was very adamant that she had to work with
17  her partner.  She was very, very upset that they split
18  up, that they were split up, her and Echeverria, that
19  they were put on separate teams, and she did not like
20  that.
21     Q.  At that time you were not supervising Danny and
22  Shannon, correct?
23     A.  I never supervised Danny and Shannon, ever.
24  Never met them.

Page 16

1      Q.  Do you know what circumstance he came to you to
2  have that conversation?
3      A.  No.  Just in his office, having an informal
4  talk about officers in the unit, what's going on with the
5  teams, how guys are getting along, how are the teams
6  working.
7      Q.  Did you ask him if he had any specific examples
8  of what Spaulding did that was inappropriate, or made it
9  difficult for her to work with?
10     A.  Just the general -- argumentative with the
11  supervisors.  Didn't get along with people.  More general
12  than specific.
13     Q.  Had you met Shannon Spaulding at that point in
14  time?
15     A.  I've never met her.
16     Q.  Was there anyone else present when you had this
17  conversation?
18     A.  No.  I think that was just in his office.
19     Q.  Did he talk to you about any other officers
20  besides Spaulding and Echeverria at that time?
21     A.  Yes, I'm sure we did.  I don't recall
22  specifically who, but just the overall well-being of the
23  unit and officers on different teams.  I can't remember
24  specifically who.

Page 17

1      Q.  Do you remember any comments he made about any
2  other officers?
3      A.  I think one of the supervisors, too, we were
4  also having an issue with.
5      Q.  And who was that?
6      A.  Sergeant Danny Allen.
7      Q.  What did he say about Danny Allen?
8      A.  Danny Allen just had a -- he had a difficult
9  time keeping him focused on tasks, and wanting to do
10  different things other than what he was assigned to.
11     Q.  Did you give him any advice as to what he
12  should do with respect to Shannon Spaulding?
13     A.  They were already gone.
14     Q.  And do you have any idea why he brought that to
15  your attention at that time?
16     A.  Basically grateful that they were gone, that
17  she was out of the unit.  He said he dodged a bullet on
18  that one, she's gone, because she's very difficult to
19  work with.
20     Q.  So, do you know how long after
21  Shannon Spaulding was gone that you had this conversation
22  with Robert Cervenka?
23     A.  No.  She was gone by the time I took over.
24     Q.  Did you know what Shannon Spaulding's

5 (Pages 14 - 17)

Page 18

1 assignment was when Cervenka was having these issues with
2 her?
3    A.  I'm not saying that Cervenka had issues with
4 her.  I'm just saying that that was her reputation.  He
5 was telling me about her.
6    Q.  Did you know what her assignment was when she
7 allegedly had difficulties with other officers?
8    A.  When she was having difficulty with other
9 officers, she was on one of the teams in Narcotics.
10    Q.  Did you ever talk to any of those team members
11 about Shannon Spaulding?
12    A.  No.  It didn't come up.  She was already gone.
13    Q.  When was the next time after that conversation
14 that you became aware of Officer Spaulding, or
15 Echeverria?
16    A.  Became aware of them?  I mean, Chief Roti, he
17 was at that point Deputy Chief Roti.
18       He informed me Shannon Spaulding and
19 Danny Echeverria were informally on loan to Internal
20 Affairs, working on a police corruption case.
21    Q.  When did he inform you of that?
22    A.  When I took over as commander.
23    Q.  And did he tell you any details about what they
24 were doing?

Page 19

1    A.  Nothing specific.  Just that they were working
2 on a police corruption case.
3    Q.  And did he tell you that it involved
4 Officer Watts and Mohammed, or any officers in Public
5 Area Housing South?
6    A.  I don't believe so.
7    Q.  When did you first learn, if ever, that they
8 were involved in -- when did you first learn, if ever,
9 that there was an investigation regarding corruption of
10 Watts and Mohammed?
11    A.  There was some rumors that they were being
12 looked at, but I didn't know either one of them.
13       So I didn't really -- it didn't really come up
14 on my radar.
15    Q.  And where did you hear those rumors?
16    A.  Sometime in late 2008, perhaps.
17    Q.  Do you know who you heard them from?
18    A.  I don't recall.
19    Q.  Did you ever work with Sergeant Watts or
20 Mohammed?
21    A.  No.  I don't know either one of them.
22    Q.  Did you ever have any conversations with either
23 -- what was your understanding of how the arrangement
24 worked where they were being loaned out?

Page 20

1    A.  That was something Chief Roti -- I keep saying
2 "Chief," it's Deputy Chief then -- Deputy Chief Roti had
3 worked out with Chief Scale from Internal Affairs.
4    Q.  Did you ever talk with Chief Scale about that?
5    A.  No.
6    Q.  Did you have an understanding how practically
7 that was working, in terms of where they would report,
8 Danny and Shannon would report, and who they would report
9 to and how they would report?
10    A.  I have no information whatsoever, other than at
11 some point they were officially detailed to Internal
12 Affairs, I'm not sure of the date.
13    Q.  Did Nicholas Roti tell you anything about
14 Spaulding and Echeverria, in terms of whether they were
15 good officers, not great officers, hard working, not hard
16 working?
17    A.  He did, but I don't recall when that took
18 place.
19    Q.  What did he say?
20    A.  He said that they couldn't account for them.
21 They didn't know where they were.  He said he had checked
22 with the FBI, and he verified how often they were
23 actually coming to work.  And they said, we only use them
24 sporadically.  So no one really knew where they were.

Page 21

1       So I think Deputy Chief Roti told me his
2 concern was, no one was supervising them.
3       So, he wanted to ensure that they were
4 adequately supervised and formally under the IAD
5 umbrella, because he didn't us to be responsible for
6 them, because we didn't know where they were.
7    Q.  When was that conversation?  Was that at the
8 same time--
9    A.  I think it was subsequent.  It was after that.
10    Q.  Do you know how long after that?
11    A.  No.  I don't remember physically when.
12    Q.  Did you ask him any questions about in what
13 manner they were assigned to the FBI?
14    A.  No.  It didn't affect me.
15    Q.  Were they under your supervision as commander
16 at that time?
17    A.  No.  I never supervised either one of them.
18    Q.  When they were being loaned out, at that point
19 in time when they were being loaned out from Narcotics,
20 would technically you have been their supervisor or
21 commander?
22    A.  Technically I would have been in their chain of
23 command, but I had no idea who they were working for, or
24 on what, or their hours or their duties.  I had no idea

6 (Pages 18 - 21)

Page 22

1 what they were doing.
2    Q.  Would you even have known who to contact to see
3 if they were doing their jobs?
4    A.  No.
5    Q.  Did you ask Roti who he had contacted to
6 confirm whether or not they were doing their job?
7    A.  No.  Deputy Chief Roti told me that they were
8 on a special assignment and on loan to Internal Affairs.
9 And other than, that that's all I knew.
10   Q.  Well, at some point it was brought up that they
11 working with the FBI, correct?
12   A.  At some point, yes.
13   Q.  And did you know what -- did Roti tell you what
14 he did to check on whether they were showing up on time,
15 and working a full day and so on and so forth?
16   A.  He did, but I'm not sure when.
17       He said he contacted the FBI agent assigned to
18 that case, and he apparently said they had no idea where
19 they were.
20   Q.  Did you have any sense of what timeframe the
21 FBI agent was asked about?
22   A.  No.
23   Q.  Did you come up with any plan to deal with, you
24 know, knowing where they were and how to account for them

Page 23

1 with Deputy Commander Roti?
2    A.  It was Deputy Chief Roti.
3    Q.  Deputy Chief Roti.
4    A.  I had no involvement with them whatever.  They
5 were on loan, supposed reporting to Internal Affairs.
6       At some point they were officially, Roti and
7 Scale worked out a deal, or worked out an arrangement,
8 where they would be officially detailed over.  I'm not
9 even sure of the date.
10   Q.  Did he mention whether he spoke to Juan Rivera
11 about where they were working, and what their assignment
12 was at that time, Deputy Chief Roti?
13   A.  He didn't mention it to me.
14   Q.  Was anybody else present for the conversation
15 you had with Deputy Chief Roti about Spaulding,
16 Echeverria, and him contacting the FBI?
17   A.  I don't recall.  I don't know if I was present
18 or not.
19   Q.  Did Deputy Chief Roti make any comments about
20 either Spaulding or Echeverria's character?
21   A.  They did at some point.  I believe when that CR
22 number came in.
23   Q.  When was that?
24   A.  I don't recall if there was a CR number

Page 24

1 initiated.  It was online on my cue for me to review, to
2 either concur or not concur.  And I don't even remember
3 the date it came through.
4    Q.  Do you remember if it was before or after the
5 conversation you had with Roti about Spaulding and
6 Echeverria working with the FBI?
7    A.  The CR number was after.  I already knew they
8 were working with the FBI and Internal Affairs on this
9 special investigation.  The CR number came in subsequent
10 to that.
11   Q.  So, had Deputy Chief Roti mentioned anything
12 about Shannon or Danny's character at any time before
13 that CR?
14   A.  I don't recall.
15   Q.  And did you talk to Deputy Chief Roti about the
16 CR?
17   A.  Yes.
18   Q.  What did Deputy Chief Roti tell you about the
19 CR?
20   A.  That he was very concerned about it.  It was
21 very -- it was pretty disgraceful.  I mean, just that she
22 definitely was in violation of department rules.
23       MR. KING:  Who is she?
24       THE WITNESS:  That Officer Spaulding was in

Page 25

1 violation of department rules, and it borderlined -- in
2 my personal opinion, it was borderline criminal, what she
3 did.
4       But I once I reviewed it, it was then submitted
5 to Roti for his review of that same CR number.
6       MR. SMITH:  Q.  And did you do any investigating of
7 that personally, the incident itself?
8       Other than reviewing the report, you didn't do
9 any actual investigating on your own regarding the
10 incident?
11   A.  No.
12   Q.  Did Nicholas Roti tell you what his
13 relationship was to the individuals, to the complainants
14 in the case, in the CR?
15   A.  I don't recall, no.
16   Q.  Were you aware that Nicholas Roti had a
17 relationship to individuals who were related to the
18 complainants?
19       MR. KING:  Object to the lack of foundation.
20 You can answer.
21       THE WITNESS:  I don't recall.
22       MR. SMITH:  Q.  Would it be appropriate for a
23 supervisor to be involved and investigating, or
24 commenting on a CR, if they had relatives that were the

7 (Pages 22 - 25)

Page 26

1  complainants?
2      MR. KING:  Object to the form, lack of
3  foundation.
4      THE WITNESS:  He had no role in the
5  investigation.  I know that.
6      MR. SMITH:  Q.  Do you know if he had any role in
7  initiating the CR?
8  A.  I don't know.
9  Q.  So you had a role in reviewing the CR, correct?
10  A.  Yes.
11  Q.  And he was aware of that?
12  A.  Yes, he was aware of it.
13  Q.  You heard rumors about a possible investigation
14  of corruption of Watts and Mohammed.
15      Did you ever become formally aware that there
16  was an investigation like, where you knew that there had
17  been an investigation?
18  A.  Only when I read about it.
19  Q.  Did you become aware of whether or not there
20  were other officers under investigation at that time who
21  were connected with Watts or Mohammed?
22  A.  No.
23  Q.  Did you have any conversations with
24  high-ranking officers within the Chicago Police

Page 27

1  Department about the indictments of Watts and Mohammed?
2  A.  No.  It didn't affect me whatsoever.
3  Q.  You know Chief Juan Rivera, correct?
4  A.  Yes.
5  Q.  How long have you known Chief Rivera?
6  A.  Almost 20 years.
7  Q.  And were you ever personal friends with him?
8  A.  I wouldn't say personal, not friends, but
9  certainly friendly.  He was a sergeant in Narcotics when
10  I was an officer.
11      So I knew him and certainly had respect for him
12  and was friendly with him.  I wouldn't say he was a
13  friend.
14  Q.  Did Chief Rivera ever tell you about an
15  investigation of members outside Unit 189 relating to
16  drug crimes?
17  A.  No.
18  Q.  Did Chief Rivera ever tell you that Shannon or
19  Danny were involved with IAD?
20  A.  No.  I don't recall that.
21  Q.  Did Chief Rivera ever tell you that Danny or
22  Shannon were working with the FBI?
23  A.  I don't believe so, no.
24  Q.  Did you ever have a conversation with

Page 28

1  Chief Rivera about Shannon or Danny?
2  A.  No, I don't think so.
3  Q.  And again, that's Shannon Spaulding and Danny
4  Echeverria.
5  A.  I don't believe I did, no.
6  Q.  Were you ever present in a meeting with
7  Chief Rivera in which Danny Echeverria or
8  Shannon Spaulding's positions were being discussed
9  A.  Absolutely not.
10  Q.  Did you have any reason to believe any of your
11  unit members were under suspicion for any criminal
12  activity during your tenure as commander in the Narcotics
13  Division?
14  A.  One of my officers was arrested for a DUI that
15  resulted in him going to prison.
16  Q.  Anything beyond that?
17  A.  Criminal, no.  Well, I take it back.  A
18  domestic.  One of my officers was arrested for a
19  domestic.
20  Q.  Anything related to drugs, drug use or drug
21  sales, other than the DUI?
22  A.  No.
23  Q.  In your 30-plus years of experience, you're
24  aware of corruption investigating regarding officers

Page 29

1  within the department such as Finnegan, Majanowski,
2  Edward Lee Jackson?  Are you familiar with those three
3  examples?
4  A.  I'm familiar with -- I heard about the SOS
5  scandal.  I heard about Jerry Finnegan being involved in
6  that.  I never met him.  I had met Majanowski.
7      And the other one was Reginald Lee?  Is that
8  the 15th District officer?
9  Q.  Edward Lee Jackson is known as Pacman, 15th
10  District.
11  A.  I definitely heard of him, yeah.
12  Q.  Are you aware he was accused of home invasions
13  and other criminal acts, in that light?
14  A.  I'm aware of it, yes.
15  Q.  Were you aware that all three of those
16  investigations were done by a joint investigation between
17  the federal agencies and the Chicago Police Department?
18  A.  Just general.  What I read in the newspaper.
19  Q.  Do you know or do you think it's a benefit when
20  federal agencies join together with the CPD to
21  investigate Chicago police officers?
22  A.  Sure it's a benefit.  However, when I was with
23  Internal Affairs, I arrested officers for home invasion
24  and drug crimes.

8 (Pages 26 - 29)

Page 30

1  Q.  And do you recall who they were?
2  A.  The team I was on, we arrested
3  Officer John Labiak, Karaster and Hutchinson (phonetic
4  spellings) for home invasion and robbing of drug dealers,
5  and I was the one who arrested them.
6  Q.  While you were in IAD, when officer were
7  charged with crimes by the federal agencies, did you ever
8  then reopen CRs to see if there was potentially other
9  officers who worked with them were also involved in
10 corruption?
11 A.  I didn't.  I wouldn't of at that point in my
12 career.  I was an investigator.  I wasn't a supervisor.
13 Q.  Did anyone ever tell you to do that, to go back
14 and look at CRs that involved the indicted officers to
15 see if other officers were involved in corruption?
16 A.  When we did the Labiak case, I do remember the
17 team I was on, we did some follow-up.  I don't recall
18 specifically.  It's been so long.  It was back in '97, so
19 I don't recall specifically.
20 But we did look into furthering an
21 investigation.  I remember we did a search warrant on one
22 of the lockers in the 11th District.  I don't remember if
23 other officers were involved in that.
24 Q.  Were those officers investigated at this point

Page 31

1  then?
2  A.  I know they were investigated.  I don't recall
3  the specifics though.
4  Q.  Were there attempts to look at other older
5  allegations of criminal activity?
6  In other words, when you learned there was
7  sufficient evidence to believe there was a potential for
8  the criminality in the instance that you were involved in
9  investigating, did you then go back and look at older CRs
10 that involved different people in different instances
11 connected to those officers?
12 A.  I remember we looked at old allegations against
13 those officers to see if -- obviously there was a common
14 thread, because they were subsequently charged with home
15 invasion, but I don't recall when we did it.  Just prior
16 to the arresting or post arrest, I don't recall.
17 Q.  Were there supervisors interviewed concerning
18 their activities?
19 A.  I don't know.
20 Q.  If a member of your command came to you with an
21 allegation of corruption within the Chicago Police
22 Department, what were you required to do?
23 A.  Obtain a CR number.
24 Q.  Has anyone ever approached you regarding

Page 32

1  corruption of another officer either who was inside your
2  unit?
3  In other words, one Chicago police officer says
4  that somebody in the Narcotics Unit is committing crimes.
5  A.  No one ever made that allegation to me, no.
6  Q.  Did anyone at any point in time -- well, has
7  anyone ever approached you while you were in Narcotics
8  about a police officer outside of your unit committing
9  crimes?
10 A.  I mean, I can speak of specific examples.
11 My team, when I was supervisor, we encountered
12 a -- in one of our investigations, it became apparent
13 that a police officer was involved, and we seized a
14 substantial amount of narcotics from his residence.  I
15 obtained a CR number on him.
16 And then I was the affiant of a search warrant
17 on his vehicle, because we believed his vehicle was used
18 for transportation of narcotics.  I was the affiant of
19 the warrant for that.
20 As a lieutenant, we did a search warrant on an
21 apartment that, a state search warrant where one of my
22 officers had a search warrant, and it ended up being the
23 residence of a Chicago police officer.
24 We obtained CR number on her, and I ordered her

Page 33

1  in to be drug-tested.
2  There was someone potentially selling drugs out
3  of her apartment.  So, yes.
4  And then as a commander, I would be informed
5  that an officer had touched one of the investigations in
6  some regard, and the CR number would be obtained on that
7  officer.
8  Q.  Was there ever an instance where a Chicago
9  police officer came to you about something that you
10 weren't involved in an investigation, there wasn't an
11 ongoing investigation where they simply just came to you
12 to report illegal acts that they saw another officer do?
13 A.  I don't recall any of those, no.
14 Q.  Are there instances where breaches of
15 confidentiality concerning IAD investigation could
16 potentially be dangerous to the investigators who were
17 working on a case?
18 MR. KING:  Just object to the form of the
19 question.
20 MR. SMITH:  Q.  Is it something you consider when
21 working in IAD that people finding out, officers finding
22 out that they're being investigated, could be a dangerous
23 situation for the officers who are investigating them?
24 A.  Well, personally, I worked undercover in

9 (Pages 30 - 33)

Page 34

1 Internal Affairs. I was working on police corruption
2 cases. And yeah, that would be an issue.
3     Q.  What things are done to protect IAD officers
4 from being exposed when they're investigating other
5 officers?
6     A.  Investigations are relatively closed. Only a
7 few people usually know. It's not widely discussed or
8 brought up.
9     Q.  And is there anything said to assure that it
10 doesn't leave that circle of the people who are in the
11 know of the investigation?
12     A.  I can only speak from personal experience.
13          When I was in Internal Affairs, my team knew
14 what I was doing, my supervisor, and that was pretty much
15 it.
16          I'm sure my supervisor informed her lieutenant,
17 the lieutenants, who would inform the Deputy
18 Superintendent.
19     Q.  Beyond that, would you think people were free
20 to talk to other high-ranking members within the police
21 department?
22     A.  Regarding...
23     Q.  Regarding a confidential investigation?
24     A.  No. It was confidential. It's implied by the

Page 35

1 name that it's confidential. It's not to be discussed,
2 unless it's for briefing purposes, yes.
3          I mean, in that case, high-ranking officers in
4 the department customarily are aware of confidential,
5 ongoing investigations.
6     Q.  Did you ever learn that -- aside from the
7 media, when you read about the Watts investigation, did
8 you ever learn what type of case Spaulding and Echeverria
9 were working on with the FBI?
10     A.  There was a police corruption case, and I
11 believe at some point I learned it had something to do
12 with housing, public housing.
13     Q.  And who did you learn that from?
14     A.  I don't remember.
15     Q.  Do you know who else was present when you found
16 out about that?
17     A.  I don't remember.
18     Q.  You indicated that if another officer came to
19 you with corruption, that he saw corruption of a criminal
20 nature of another officer, you would start a CR
21 concerning that issue.
22          Would you agree that the general orders would
23 require that you, as a supervisor, would start a CR if
24 you were told of corruption of another officer?

Page 36

1     A.  Absolutely get a CR number, and if it's
2 appropriate, make an arrest.
3          If an officer witnessed another officer
4 committing a criminal act, then that officer should take
5 immediate action, not just get a CR number.
6     Q.  If a situation like that, a hypothetical
7 situation arose, where someone under you in Narcotics,
8 say a patrol officer, came to you and said, I saw another
9 officer dealing drugs, would the officer who came forward
10 with the complaint, would his identity be kept
11 confidential, or hers?
12          MR. KING:  Just object to the form and lack of
13 foundation. It's a hypothetical. If you can answer.
14          THE WITNESS:  In that specific situation, it
15 would be documented and reported up the chain of command.
16     MR. SMITH:  Q.  Would you expect that it be
17 confidential in terms of the identity of that
18 complainant?  Would it be confidential within the
19 confines of the investigation in terms of, that you
20 wouldn't feel free to talk to other officers who weren't
21 in the loop or the circle of who would be involved in
22 getting the complaint and investigating the complaint
23 about who the identity of the person making a claim
24 against another officer?

Page 37

1     A.  In that situation, it would be documented.
2 The name of the complaining officer would be documented
3 and it would be forwarded to my deputy chief, then to the
4 chief, and then obviously to Internal Affairs.
5     Q.  And would you expect that name be kept
6 confidential within the circle of the investigation until
7 the investigation was completed?
8     A.  Probably, yes.
9     Q.  And you wouldn't consider an officer who made
10 such an allegation against a fellow officer to be a rat?
11 You'd agree with that?
12     A.  I would agree with that, considering I worked
13 Internal Affairs and I worked undercover in Internal
14 Affairs, and I arrested police officers. And I worked in
15 Legal Affairs.
16          I would not consider anyone coming forward with
17 that information to be any type of -- anything less than
18 a hero.
19     Q.  And certainly you didn't consider yourself or
20 your fellow IAD officers to be rats?
21     A.  No, we did not.
22     Q.  And you never told Nick Roti that you didn't
23 want those two, referring to Shannon and Danny, IAD rats,
24 to be here, meaning in Narcotics, correct?

10 (Pages 34 - 37)

Page 38

1    A.  I never referred to them as rats in my capacity
2  at any time in my career.
3        I was asked at some point, did I want
4  Shannon Spaulding and Echeverria back in the Narcotics
5  Division, and my opinion was no.
6    Q.  And who asked you that?
7    A.  Chief Nick Roti.
8    Q.  And who else was present when he asked you
9  that?
10   A.  I don't remember.  It might have been a phone
11 conversation.  It might have been in person.  I don't
12 remember.
13   Q.  At that point in time, he was a supervisor
14 above you in rank, correct?
15   A.  He was always above me in rank.
16   Q.  And was he recommending that they be put in
17 Narcotics?
18   A.  No.
19   Q.  Or kept in Narcotics?
20   A.  No.
21   Q.  Were they technically assigned to narcotics at
22 that time, when you had that conversation?
23   A.  At that point they were detailed out.  They
24 were out of the unit.

Page 39

1    Q.  You would agree that in terms of when you say
2  they were detailed out, were they detailed in a manner
3  that they were still technically assigned to Narcotics,
4  or that they were fully transferred to a different unit?
5    A.  They were assigned to the Narcotics Division,
6  but detailed to another unit.  So, no longer under my
7  command.
8    Q.  Did Nick Roti have any position or tell you his
9  position on whether they should be returned to Narcotics?
10   A.  I believe he concurred.  He asked me, do you
11 want them back.  I said no.  And essentially he agreed
12 based on what he knew of them and that CR number.
13   Q.  Have you ever given, as part of a discipline in
14 connection with a CR, that somebody be transferred out of
15 a unit, or their assignment?
16   A.  I don't recall specifically.
17       Sometimes on occasion I reduced the penalty if
18 I thought the penalty was unjust.  Sometimes I would
19 concur.  Sometimes I wouldn't concur with the
20 investigation, but I don't recall...
21       I did ask on occasion that officers be
22 transferred out or detailed out.  I don't remember if it
23 was associated with a CR number.  I don't believe so.
24   Q.  Do you know at the time that you had the

Page 40

1  conversation with Roti about Danny and Shannon not coming
2  back to Narcotics, do you know whether, on that CR, there
3  had been a finding on the CR?  I believe we're talking
4  about the one regarding the dog, where you believe you
5  said where she stole the dog?
6    A.  Essentially that's what I believe, yes.
7    Q.  Had that CR come back with any type of finding
8  at the point you had conversation with Nick Roti?
9    A.  Yes.  It was sustained.
10   Q.  Do you know if that CR being sustained was
11 upheld?
12   A.  No.  I didn't know.
13   Q.  Were you aware that it was not upheld?
14   A.  I learned subsequent later.  Much later.
15   Q.  And were you aware of what the recommended
16 punishment would have been in connection with the CR?
17   A.  At the time I reviewed it, the punishment for
18 Shannon Spaulding was four days suspension.  And I
19 believe for Echeverria, it was two.
20       I reviewed it carefully.  I believe that the
21 punishment of four days was excessive.
22       I then recommended an alternate penalty that it
23 be reduced to two days for her, and then reducing it one
24 day for him.

Page 41

1    Q.  When you say essentially Shannon stole a dog,
2  are you aware of whose dog it was?
3       MR. KING:  Object to the form.  At the time
4  he's reviewing it or--
5       MR. SMITH:  Any time.
6       THE WITNESS:  I believe that it was -- the best
7  that I -- I don't recall the specifics.  It was quite a
8  while ago.
9       Specifically it was Shannon's daughter's dog
10 that they gave to a gentleman who adopted the dog.  And
11 at some point, Shannon decided she wanted the dog back,
12 or daughter wanted the dog back, and they then engaged
13 and on-duty member to go to the residence to essentially
14 threaten the guy with arrest if he didn't return the dog
15 to them.
16       MR. SMITH:  Q.  And do you know who the officer was
17 that allegedly threatened arrest?
18   A.  My memory was that it was Officer Spaulding, or
19 I believe it was Officer Spaulding who at least implied
20 that there could be an arrest if the dog was not
21 returned.
22   Q.  Were you aware of the relationship between her
23 daughter and the other individual who had possession of
24 the dog?

11 (Pages 38 - 41)

Page 42

1    A.  I don't recall.
2    Q.  Did you know that they were -- well, okay.
3        Did you ever find out why the suspension was
4  not enforced?
5    A.  No.
6    Q.  Did you ever find out why the finding was
7  reversed or vacated?
8    A.  No.
9    Q.  Did you ever talk with Nick Roti about the
10  incident again?
11    A.  At some point I mentioned to Nick that that --
12  it was one thing that Officer Spaulding had a problematic
13  reputation with the unit for me to learn that -- that CR
14  number really cemented the fact that I didn't want her
15  under my supervision.
16    Q.  Was there any discussion or consideration of
17  having Danny come back to the unit without Shannon?
18    A.  No.  My impression was that they had come
19  together.  I would have taken Officer Echeverria.  Had he
20  contacted me, I would have taken Echeverria back.
21    Q.  Did you in any way make that known to
22  Echeverria?
23    A.  I've never spoken to Echeverria.  He never
24  contacted me.

Page 43

1    Q.  Did you make that known to Chief Roti?
2    A.  I don't recall if I said specifically that to
3  him or not.
4    Q.  Were you aware that Spaulding and Echeverria
5  wanted to return to their unit assignment in 189?
6    A.  No.  They never spoke to me, either one of
7  them.
8    Q.  Did Nick Roti in any way indicate to you that
9  they wanted to come back?
10    A.  There was an inference there.  He just asked
11  me, do you want them back in the unit and my opinion was
12  no.  It was as simple as that.
13    Q.  Did you ever consider the work that Danny and
14  Shannon were doing with the FBI as a factor in deciding
15  whether or not to bring them back to the Narcotics Unit,
16  189?
17    A.  No.  It didn't really play a role.
18    Q.  Did you make any recommendation as to what
19  should be done with Danny and Shannon?
20    A.  No.  It was beyond my authority.
21    Q.  At any point in time, were Danny or Shannon
22  actually active as members within Unit 189 when you were
23  a supervisor in Narcotics?
24    A.  No.  Well, I take that back.

Page 44

1        They were in 189.  I was a supervisor, but I
2  was in DEA at that time, so I never met them.
3    Q.  So you weren't directly supervising them at
4  that time?
5    A.  I never did, no.
6    Q.  Did you review any of their internal reviews of
7  their performance before making a decision to recommend
8  they not be brought back to Unit 189?
9    A.  No.
10    Q.  When you reviewed the CR concerning the dog,
11  did you review their performance evaluations at that
12  time?
13    A.  No.
14    Q.  Have you ever reviewed any of their performance
15  evaluations, Danny's or Shannon's?
16    A.  Yes.
17    Q.  And when was that?
18    A.  At some point subsequent to the filing of this
19  litigation, I found old evaluations in a file, a number
20  of them.  And I was going through them, and I did in fact
21  find one for Shannon, from Lieutenant Navarro.  The
22  direct supervisor was Sergeant Johnson.
23        And there was one in there for Shannon, I
24  believe, for Officer Spaulding as well as Echeverria.

Page 45

1    Q.  And when would that have been?
2    A.  May 2012, maybe.
3    Q.  And why did you do that?
4    A.  Because of this litigation, I knew there had to
5  be some type of paper trail regarding their old
6  evaluations, and I wanted to see if I could find them.
7    Q.  And other than that evaluation, did you find
8  any evaluations regarding Danny or Shannon?
9    A.  Those were the only ones I found.
10    Q.  Were either of those evaluations good
11  evaluations?
12    A.  His was okay.  He was decent.  Hers was
13  terrible.  She was toxic.
14    Q.  Do you know how long Shannon Spaulding worked
15  for -- well, who was the evaluator again?
16    A.  Sergeant Johnson was the direct supervisor and
17  Lieutenant Kevin Navarro would have been the lieutenant.
18    Q.  Do you know how long Shannon worked with
19  Sergeant Johnson?
20    A.  No.
21    Q.  Do you have any idea what instances
22  Sergeant Johnson saw Shannon perform in or do that led to
23  any negative evaluation?
24    A.  No.

12 (Pages 42 - 45)

Page 46

1    Q.   Did you ever talk with Sergeant Johnson about
2  that?
3    A.   No.
4    Q.   And when you were doing a search, did you come
5  across anything else that reflected negatively on Shannon
6  or Danny?
7    A.   No.
8    Q.   Did you search for the CR that you knew about,
9  the dog incident?
10       When you did that search, looking for
11  evaluations, did you also search for records about the CR
12  involving the dog and Shannon?
13    A.   The only record that made available to me was
14  that CR number which was in my cue, we call it, online.
15  Once I hit "submit," it was out of -- there was no paper
16  trail then.
17    Q.   So, that wasn't something that you had access
18  to at that point in time?
19    A.   No.
20    Q.   Did you come across any other papers that
21  involved Danny or Shannon at all?
22    A.   No.
23    Q.   Did you ever talk with other supervisors who
24  Shannon or Danny worked with?

Page 47

1    A.   I did speak to Sergeant Rod Watson.
2    Q.   And who's Rod Watson?
3    A.   He's a Narcotics Division sergeant.
4    Q.   And when did you speak to him?
5    A.   Sometime after the litigation was filed, I had
6  a discussion with him.
7    Q.   And who else was present for the discussion?
8    A.   I don't recall.  I believe it was in the
9  hallway of the Narcotics Division.
10    Q.   And did you approach him or did he approach
11  you?
12    A.   I don't remember.
13    Q.   And what was the discussion about?
14    A.   Just about the allegations that she had made in
15  the media, about this case specifically.  About her being
16  somehow damaged by her having worked in Internal Affairs.
17    Q.   And what did he say?
18    A.   He just thought it was ironic.  My memory is,
19  he thought it was ironic that she's stating that she was
20  working undercover, when apparently his memory of it was
21  that Sergeant Watts knew her.  They worked together in
22  the same building.
23       So, for her to say she was undercover working
24  on Sergeant Watts when he knew her didn't make any sense

Page 48

1  to him.
2    Q.   Did you say anything in response to that?
3    A.   I think he just agreed that was kind of odd.
4    Q.   Did you think it was odd?
5    A.   Yes.
6    Q.   Why would you think that was odd?
7    A.   Her characterization in the media that she was
8  working undercover on a corrupt police officer who knew
9  her, I thought that was kind of -- usually you don't --
10  you can't go undercover and conduct operations on someone
11  who knows you, knows that you're a police officer.
12  You're not really undercover.
13    Q.   Would you agree that if somebody didn't know
14  you were investigating them, that would be a form of
15  being undercover?
16    A.   My interpretation of undercover is someone
17  doesn't know your identity, and you're conducting some
18  type of surveillance, or narcotics transaction, or some
19  type of an elicit activity.  That to me is working
20  undercover.
21    Q.   And were you aware of the timeframe that
22  Shannon Spaulding worked with Sergeant Watts at Public
23  Housing South?
24    A.   No.

Page 49

1    Q.   Were you where it was years before the
2  investigation?
3    A.   I don't have any details of it.
4    Q.   Were you aware that Sergeant Watts had been
5  under investigation even before Shannon Spaulding and
6  Danny Echeverria started to work on the investigation?
7    A.   I have no information whatsoever on
8  Sergeant Watts.
9    Q.   Do you know who Officer Shar Khalid is?
10    A.   Yes.
11    Q.   And was Shar Khalid an individual who was
12  involved or accused of a domestic battery?
13    A.   Yes.
14    Q.   And do you know if he was convicted?
15    A.   Criminally?
16    Q.   Criminally.
17    A.   I don't believe he was.  Not to my knowledge.
18    Q.   Do you know if there was a CR against him
19  related to the domestic battery charges?
20    A.   Yes.
21    Q.   And was there a finding regarding that CR?
22    A.   I don't remember.
23    Q.   Do you know if he was stripped, at some point
24  in time, of his badge or his gun during the course of the

13 (Pages 46 - 49)

Page 50

1  investigation?
2     A.  I believe so.  He was, yes.
3     Q.  Did you allow Shar Khalid to continue, remain
4  working in Narcotics, even after he was stripped in
5  relation to that domestic battery CR?
6     A.  I had no authority to determine where he was
7  assigned.  He was assigned there.
8     Q.  But did you allow them to continue to work with
9  you there?
10    A.  Yes.
11    Q.  Did you ask that he be transferred out of
12  Narcotics?
13    A.  No.
14    Q.  Did you think that the incident with Shannon
15  and the dog was more serious than the domestic battery
16  charge?
17    A.  Well, first of all, at that point the
18  allegation against Shar Khalid had not been resolved.
19  I didn't know whether it was sustained or not sustained.
20       Secondly, Shannon was already away from my
21  unit.  She wasn't in my unit and got the CR number.  She
22  was out of my unit when she got the CR number.
23       So she was not under my control.  It's apples
24  to oranges.

Page 51

1     Q.  Did you ever come to have an opinion of whether
2  the charges against Shar Khalid were -- let me re-ask the
3  question.
4       Did you ever have any opinions about the
5  seriousness of the charges against Shar Khalid?
6     A.  I have an opinion.  I didn't believe, based on
7  what I knew -- and obviously I was only hearing his side
8  of it.
9       But I knew that him and his wife were still
10  together, and they have a daughter together, and she was
11  supporting him.  So, I didn't think there was any
12  substance to it.
13       My memory of it, which is not very good, was
14  that she was not the complainant against him.  It was
15  some other individuals that he had arrested or had an
16  altercation with.  They were the accusers against him.
17    Q.  If somebody would have asked you whether you
18  thought Shar Khalid should remain in the Narcotics Unit,
19  would you have had an opinion one way or the other?
20    A.  Yes, I have an opinion.
21    Q.  What's the opinion?
22    A.  I thought he was a good officer.  He worked
23  well with his team members.  He was very well-liked.
24       And to my knowledge, that CR number is still

Page 52

1  open, so I didn't make a determination one way or the
2  other yet.
3     Q.  Do you know a Sergeant Avery?
4     A.  Yes.
5     Q.  What is Sergeant Avery's first name, if you
6  know?
7     A.  Vincent.
8     Q.  Do you know an Officer Tony Hernandez?
9     A.  Yes.
10    Q.  Did you ever learn that Shar Khalid was
11  bragging about punching his wife in the face in front of
12  Sergeant Avery and Officer Hernandez?
13    A.  I did not know that.
14    Q.  Do you know Officer Hernandez, Tony Hernandez?
15    A.  Yes.
16    Q.  Did you ever ask Officer Tony Hernandez to
17  allow Khalid to work in his position so that Khalid could
18  remain in days and keep weekends off?
19    A.  No.
20    Q.  How do you know Tony Hernandez?
21    A.  Tony Hernandez was an officer that was assigned
22  to the Narcotics Division during my tenure there as
23  commander.
24    Q.  And were you aware that Tony Hernandez was an

Page 53

1  officer was assigned to a guard shack at one point in
2  time?
3     A.  He was assigned to the 24 hour -- the security
4  detail at Homan Square.  If you want to characterize it
5  as a guard shack, that's not really accurate.
6     Q.  I mean, is that a phrase you would use, "guard
7  shack," in relation to his position?
8     A.  He was assigned that number of positions within
9  Homan Square for the 24-hour security detail.
10    Q.  And what positions would they have been?
11    A.  Fillmore side security detail.  There was the
12  Spaulding Street detail, and then the 24-hour desk.
13    Q.  And was he under your command at that time?
14    A.  Yes.
15    Q.  Are you familiar with a Sergeant Padar?
16    A.  Yes.
17    Q.  How are you familiar with Sergeant Padar?
18    A.  Sergeant Padar was one of the sergeants
19  assigned to the Narcotics Division during my tenure as
20  commander.
21    Q.  And how long have you known Sergeant Padar?
22    A.  From '08 until present.
23    Q.  And did you become aware that Sergeant Padar
24  was being criminally investigated at some point?

14 (Pages 50 - 53)

Page 54

1    A.   Yes.
2    Q.   And when did you become aware that
3 Sergeant Padar was being criminally investigated for?
4    A.   Sometime in 2014, I believe.
5    Q.   What did you find out that he was being
6 criminally investigated for?
7    A.   Some issue on testifying at a criminal
8 proceeding.  I was already gone from the Chicago Police
9 Department at that point.
10   Q.   Were you ever made aware that there was CR
11 against Sergeant Padar relating to falsifying records in
12 connection with Tony Hernandez?
13   A.   Yes.
14   Q.   When did you become aware of that?
15   A.   During my tenure as commander.
16   Q.   And after you found out about that CR, you
17 continued to allow Padar to work with you, underneath
18 you, in your command?
19   A.   Yes.
20   Q.   Were you aware of any allegations made against
21 a Sergeant Mel Roman while you were working as a
22 commander in Narcotics?
23   A.   No.
24   Q.   Do you know who a Tracy walker is?

Page 55

1    A.   I know who she is.  I'm not really clear I
2 remember hearing the name.  I don't know her.
3    Q.   If I told you she might be an officer in
4 Narcotics, would that ring any bells?
5    A.   I don't believe she's in Narcotics.  Not to my
6 memory.
7    Q.   Were you aware that she made allegations that
8 she was being sexually harassed by a Sergeant Mel Roman?
9    A.   No.
10   Q.   Did you have any role in promoting a
11 Lieutenant Noel Sanchez?
12   A.   Yes.
13   Q.   Were you aware if he was ever a subject of a
14 Federal criminal investigation?
15   A.   I'm not sure of the details.  I remember that
16 he was -- somehow he worked with an officer that was
17 under investigation.  I'm not sure if Noel himself was
18 the subject of an investigation or not.
19   Q.   And that person was Officer Glen Lewellyn
20 (phonetic spelling)?
21   A.   Yes.
22   Q.   Who is serving 18 years in a Federal prison?
23   A.   Yes.
24   Q.   And was a partner on the team with Lewellyn for

Page 56

1 some of the time period in which Lewellyn was
2 investigated and charged?  Were you aware of that?
3    A.   I don't believe that he was his partner.
4    Q.   In terms of on the team.
5    A.   I believe he was on the same team, yes.
6    Q.   Do you know who a Sergeant Herrera is?
7    A.   Yes.
8    Q.   Was he a sergeant who came to be assigned to
9 Narcotics?
10   A.   Yes.  He was from Internal Affairs.
11   Q.   Did you ever talk with Chief Juan Rivera about
12 a Sergeant Herrera?
13   A.   Yes.
14   Q.   What circumstances did you talk with
15 Chief Rivera about Sergeant Herrera?
16   A.   I don't recall when, but Chief Rivera asked me
17 if Sergeant Herrera could be assigned to the Narcotics
18 Division, and I was happy to have him.
19   Q.   And do you know what the circumstances of that
20 situation was, why Rivera came to you?
21   A.   First, I don't believe he came to me.  I think
22 it was a phone call.
23       My memory is that Sergeant Herrera wanted to
24 return to Narcotics because that was first love and he

Page 57

1 had a passion for it.
2       And he had served with distinction in Internal
3 Affairs, and wanted to come back to the Narcotics
4 Division.
5    Q.   Did you have a pending CR at the time you had
6 that conversation with Juan Rivera?
7    A.   Did I have a pending CR?
8    Q.   Correct.
9    A.   I don't remember if I did or not.
10   Q.   You've had CRs, correct?
11   A.   Yes.
12   Q.   How many CRs have you had, approximately?
13   A.   In my career?
14   Q.   Yes.
15   A.   I don't know.  I couldn't even tell you.
16   Q.   Is it more than 10?
17   A.   Yes.
18   Q.   Is it more than 20?
19   A.   Probably.
20   Q.   Is it more than 30?
21   A.   I'm not sure.
22   Q.   Is it less than 50?
23   A.   Probably.
24   Q.   Have you ever had any CRs sustained against

15 (Pages 54 - 57)

Page 58

1  you?

2     A.  No.

3     Q.  Have you ever been suspended or disciplined in

4  any way as a Chicago police officer?

5     A.  I think I might have taken a day suspension for

6  not having a City sticker on my new wife's car, my wife's

7  car.

8        We had just gotten married, and I drove her car

9  to work, not thinking, and she didn't have a City

10  sticker.

11     Q.  Do you know how many CRs Shannon Spaulding has

12  against her?

13     A.  No.

14     Q.  Do you know if it's more than 10?

15     A.  I have no idea.

16     Q.  Did you ever investigate any complaint made by

17  any of your command staff in Narcotics against either

18  Shannon Spaulding or Danny Echeverria?

19     A.  No.

20     Q.  And I believe you mentioned that you learned of

21  a...

22        (Brief pause.)

23        Did Chief Rivera ever release to you any

24  confidential information regarding any investigations

Page 59

1  regarding Chicago police officers?

2     A.  No.

3     Q.  Do you believe that you became aware that

4  Spaulding and Echeverria were involved in a confidential

5  investigation involving police corruption?

6     A.  Can you repeat the question, please?

7     Q.  Do you believe, before the lawsuit, that you

8  were aware that Spaulding and Echeverria were involved in

9  a confidential investigation involving police corruption?

10     A.  Yes.

11     Q.  Did you think it could be a problem to have an

12  officer in Narcotics who was involved in investigating

13  undercover corruption?

14     A.  Well, considering I worked in Internal Affairs

15  working corruption cases.  Sergeant Herrera worked in

16  Internal Affairs on corruption cases.

17  Sergeant Noel Sanchez, who then I assisted in promoting

18  to lieutenant, worked in Internal Affairs on police

19  corruption cases.

20        Lieutenant Karen Kono, who ran the

21  investigations on police officers, I requested her

22  specifically to work for me.

23        So I would say I had no problem with anyone

24  having worked in Internal Affairs at anytime in their

Page 60

1  career.

2     Q.  Did you ever become aware that Shannon and

3  Danny Echeverria never were assigned to IAD?

4     A.  No.  I have no idea.

5     Q.  Did anyone ever tell you they were assigned to

6  IAD, Internal Affairs Division?

7     A.  I was under the impression they were assigned

8  or detailed there.

9     Q.  Who told you they were detailed there?

10     A.  I don't recall.  Probably Chief Roti.

11     Q.  Were you aware of any situations where officers

12  had gone to the FBI and reported police corruption

13  outside of the chain of command?

14     A.  I don't personally recall that, no.

15     Q.  Were you aware of any situations where officers

16  within the Chicago Police Department decided to go to the

17  FBI when supervisors were not investigating reported

18  corruption?

19     A.  In my experience, anytime police corruption has

20  been reported to a supervisor, they have taken

21  appropriate action.  That's my understanding and

22  recollection.

23     Q.  How would you be able to know that?

24     A.  It's my impression and recollection that any

Page 61

1  cases that came to me, I forwarded, and cases that came

2  to my similar-ranking officers did the same.

3     Q.  Would you expect an officer who was assigned to

4  you to report corruption directly to you rather than go

5  to an outside agency?

6     A.  I always expect officers who work for me to

7  follow the chain of command, yes.  They should be

8  reported to the supervisor.

9     Q.  If an officer who saw drug dealing or extortion

10  being committed by a fellow Chicago police officer did

11  not go to their supervisors, would you think that was a

12  problem?

13     A.  Yes.

14     Q.  If they chose to go to an outside agency

15  instead of a supervisor, would that be a problem?

16        MR. KING:  Just object to form and the word

17  "problem," but you can answer.

18        THE WITNESS:  They should follow the directives

19  of the Chicago Police Department and notify the chain of

20  command -- obtain a CR number and notify the chain of

21  command so they can protect the department and other

22  officers.

23        MR. SMITH:  Q.  Why would you feel that going to an

24  outside agency would somehow jeopardize the department or

16 (Pages 58 - 61)

Page 62

1 other officers?

2     A.  If you have a corrupt police officer actively

3 involved in narcotics or gang involvement, then not only

4 are you placing the general public at risk, because

5 obviously an officer has access to information and arrest

6 powers, you're exposing other officers, the officers that

7 work with them on a daily basis -- officers that are

8 encountering them.  You're placing everyone in jeopardy.

9     Q.  Would it surprise you that Officer Watts was

10 engaged in narcotics distribution and sales for over 10

11 years while he was a Chicago police officer, without the

12 Chicago Police doing anything to discipline or take him

13 off the force?

14        MR. KING:  Object to the form, and lack of

15 foundation.

16        THE WITNESS:  I don't know Sergeant Watts.

17        MR. SMITH:  Q.  Did you ever receive a confidential

18 informant packet from a Sergeant Padar?

19     A.  Yes.

20     Q.  Did you ever receive a confidential information

21 packet that included Shannon Spaulding and

22 Danny Echeverria's name on it?

23     A.  Yes.

24     Q.  Did you have a conversation with Sergeant Padar

Page 63

1 regarding their request -- and by their, I mean Danny and

2 Shannon's request for approval for a CI?

3     A.  Yes.

4     Q.  What did that conversation entail?

5     A.  First of all, I informed Sergeant Padar that

6 Officer Shannon Spaulding and Danny Echeverria were not

7 working in the Organized Crime Division.  Therefore, they

8 should not be signing up informants.

9        Secondly, I looked at the documents.  And

10 Officer Hernandez, who was in fact assigned to the

11 Narcotics Division, wasn't on there, at least one of

12 documents that I reviewed.

13     Q.  What do you mean by that in terms of, he wasn't

14 on?  Or--

15     A.  His name was not included on one of the pages

16 of the CI, the package.

17     Q.  Why would that be a problem or an issue?

18     A.  Because they don't work for me.

19 Shannon Spaulding and Danny Echeverria were not working

20 in the Organized Crime Division.  They're not authorized

21 to sign up informants in the Organized Crime Division if

22 they're not working in the Organized Crime Division.

23     Q.  And when was that?  Was that before or after

24 your conversation with Deputy Chief Roti about having

Page 64

1 them stay within the Narcotics Division?

2     A.  This was before I had that conversation with

3 Roti, to the best of my memory.

4     Q.  So weren't they technically still within the

5 Narcotics Division at that point in time?

6     A.  I don't believe they were.

7     Q.  What did you believe they were doing?

8     A.  I believe they were detailed out of the unit,

9 out of Organized Crime.  They weren't working in

10 Organized Crime.

11     Q.  And what did you believe they were doing?

12     A.  I had no idea what they were doing.

13     Q.  And so what made you believe that they couldn't

14 work with confidential informants?

15     A.  I don't care if they worked with confidential

16 informants.

17     Q.  So what exactly was the problem that you had

18 with Danny and Shannon seeking a confidential informant

19 approval, request for approval for a confidential

20 informant?

21     A.  No problem at all.  However--

22     Q.  I would ask that counsel not gesture to the

23 witness to make further statements.

24        Did you ever direct Sergeant Padar to inform

Page 65

1 Spaulding and Echeverria what you thought of their

2 request for approval of a CI?

3     A.  I told Sergeant Padar that if his team wanted

4 to work with Shannon Spaulding and Danny Echeverria, I

5 did not have a problem with it, but their supervisors

6 needed to contact me, because apparently no one knew what

7 she was doing.

8     Q.  And did Sergeant Padar say anything in response

9 to that?

10     A.  He said okay.

11     Q.  Did you approve the request for a CI?

12     A.  I couldn't.  They don't work for me.

13     Q.  Do you know if anyone did approve the request

14 for a CI?

15     A.  To clarify, anyone can work with informants,

16 Internal Affairs.

17        However, to assign an informant up with the

18 Organized Crime Division, you have to work in the

19 Organized Crime Division.  They were not working in the

20 Organized Crime Division, Echeverria or Spaulding.

21 Neither one of them was working in the Organized Crime

22 Division.  Therefore, they could not sign up an informant

23 in the Organized Crime Division.

24        They're more than free to sign up an informant

17 (Pages 62 - 65)

Page 66

1 with any other -- Detective Division, Internal Affairs,
2 whatever.
3         When I was in Internal Affairs, I was not
4 allowed to sign up informants in the Organized Crime
5 Division because I was not working in the Organized Crime
6 Division.
7     Q.  Do you know if that particular confidential
8 informant was approved to work with any other unit or
9 division?
10    A.  I have no idea.
11    Q.  Would Sergeant Padar...
12        (Brief pause.)
13        Did you ever instruct supervisors or officers
14 within Narcotics not to work with Spaulding and
15 Echeverria?
16    A.  Honestly, just the opposite.
17        I told Sergeant Padar I had no problem with him
18 working with Spaulding and Echeverria, if it was
19 assisting in their investigation, if their supervisors
20 knew what they were doing and would contact me.
21    Q.  Did you have any conversations with anyone
22 other than Sergeant Padar within Narcotics as to
23 Spaulding and Echeverria?
24    A.  No.

Page 67

1     Q.  So in your view, who would have been Shannon
2 and Danny's chain of command supervisors who could
3 approve a confidential informant working with a unit at
4 that time?
5     A.  Whatever unit they were working under.
6         At that point, Shannon Spaulding and
7 Danny Echeverria had a chain of command.  They had some
8 type of supervision.
9         They should have gone through that proper chain
10 to work with that informant.
11    Q.  Did you know who that was?
12    A.  No.  They never called me.
13    Q.  Did anyone ever tell you who that was?
14    A.  No.
15    Q.  Did anyone ever tell you that they weren't
16 under your chain of command?
17    A.  I knew they weren't under my chain of command.
18    Q.  When somebody is loaned out from a unit to
19 another detail, whose chain of command is that under?
20    A.  They'd follow the chain of command of the
21 person they're detailed to, or the unit they're detailed
22 to.
23    Q.  Were you aware of any of the supervisors in
24 your unit telling Spaulding and Echeverria that if they

Page 68

1 called for help, that the members of Unit 189 would not
2 be there to back them up?
3     A.  I doubt very highly that ever happened.  I have
4 no knowledge of that whatsoever.
5     Q.  If you had become aware of a statement like
6 this being made, what actions would you have taken?
7     A.  I probably have initiated a CR number on the
8 supervisor who made that statement.  It's totally
9 inappropriate.
10    Q.  Did you ever issue an order, either verbal or
11 written, that Spaulding was not allowed in the Homan
12 Square building?
13    A.  No.
14    Q.  Do you know whether or not Spaulding had a
15 locker in the Homan Square building?
16    A.  I don't know.
17    Q.  Did you ever call Lieutenant Cesario and tell
18 him that Spaulding was not allowed in Homan Square?
19    A.  I don't believe I did, no.
20    Q.  Did you ever tell any member of the Fugitive
21 Apprehension Unit that Spaulding was not allowed in the
22 Homan Square building?
23    A.  I never said that.
24    Q.  Did you ever tell Lieutenant Cesario that

Page 69

1 Shannon Spaulding should not go to any part of the Homan
2 Square building?
3     A.  I never said that.
4     Q.  Did you ever give any directive to anyone
5 relating to that Shannon Spaulding be allowed to -- let
6 me re-ask the question.
7         Did you ever tell anyone that Shannon Spaulding
8 should not be or should be restricted from going to any
9 part of Homan Square?
10    A.  I did contact Commander Salemi and asked him if
11 Shannon Spaulding was at Homan Square on a specific date,
12 if she was working and if she was doing some type of
13 police work.  He said no, on this specific date.
14        I said, well, she's over here goofing off,
15 visiting her boyfriend, are you aware of it.  He said no,
16 and that he would handle it.
17    Q.  Did you ever indicate to Commander Salemi that
18 Spaulding shouldn't be visiting her boyfriend at Homan
19 Square?
20    A.  I did tell him unless she was there for a
21 proper police purpose, she shouldn't be in a restricted
22 area.
23    Q.  Did you tell him that she should not be at the
24 restricted area of Homan Square?

18 (Pages 66 - 69)

1     A.  Yes.  She should not be at the restricted area.
2     Q.  And did you any way limit this -- strike that.
3         What's the address of Homan Square?
4     A.  3340 West Fillmore.
5     Q.  Is this in any way a restricted access
6  building?
7     A.  Yes.
8     Q.  How so?
9     A.  The general public can't walk into the
10  building, and only officers allowed in the Organized
11  Crime or for a proper police purpose are allowed on the
12  2nd floor.
13        And the east parking lot is restricted to
14  undercover officers and supervisors only.
15     Q.  And is there an identification system in place
16  to determine what officers are allowed to go into the
17  Home Square building?
18     A.  The general building, any police officer can go
19  into it.  However, the 2nd floor is where the Narcotics
20  Division and the Gang Intelligence Unit are located.
21  That's restricted by keypad on -- that would be the south
22  side of the building and then on the 24-hour desk.
23        There's an officer assigned there to challenge
24  anyone that comes up to the 2nd floor.

1     Q.  Do you know if Shannon Spaulding had access to
2  that 2nd floor?
3     A.  She shouldn't have, but I don't know if she
4  did.
5     Q.  Do you know if she was allowed to be in the
6  building generally?
7     A.  Sure.
8     Q.  And was there any restriction that would have
9  been placed on her that -- was there any area, other than
10  the 2nd floor, she would much restricted from going to?
11     A.  She should not have been in the east parking
12  lot.
13     Q.  And was there any written directive relating to
14  officers not being allowed in the east parking lot?
15     A.  I'm not sure if it's in writing somewhere.
16  It's the policy of -- the Deputy Chief of Organized Crime
17  is in charge.  He's basically the landlord of the
18  building.
19        And it was the policy not allow anyone other
20  than authorized officers, undercover officers, to go in
21  that east parking lot.
22        There was a guardrail, and there's an officer
23  assigned there always to verify the identify of anyone
24  who came through.

1     Q.  How would the word get out that officers
2  weren't supposed to go to the east parking lot?
3     A.  They would be challenged.
4         If someone tried to walk in -- the license
5  plates of authorized vehicles are encoded into the
6  system.  Where an undercover officer that is assigned to
7  Narcotics or Gang Intelligence would pull up, it would
8  read the plate and let them in.
9     Q.  Did you ever see Shannon Spaulding inside the
10  east parking lot?
11     A.  No.
12     Q.  Did you ever see Shannon Spaulding internally
13  at Homan Square?
14     A.  I've never seen her.  I've never met her.
15     Q.  How was it that you came to know that she was
16  at Homan Square?
17     A.  Somebody informed me, I don't recall who, that
18  Officer Hernandez had left his assigned post and was
19  visiting his girlfriend, Shannon Spaulding, in the area
20  where she was not supposed to be.
21     Q.  And you don't remember who that was?
22     A.  No.
23     Q.  Did you ask Tony Hernandez if that was true?
24     A.  Yes.

1     Q.  And what did Mr. Hernandez say,
2  Officer Hernandez say?
3     A.  She was his girlfriend and she was dropping
4  something off to him.
5     Q.  Did he say she was in the restricted area?
6     A.  I'm sorry?
7     Q.  Did he say she was in the restricted area?
8     A.  He did not say that, no.
9     Q.  Did you ask him.
10     A.  No.  I didn't have to.
11     Q.  Did you make any effort to contact
12  Shannon Spaulding to determine whether, to let her know
13  that she was doing something that she wasn't supposed to
14  do?
15     A.  No.  I contacted her supervisor.
16     Q.  Was this in any way documented?
17     A.  Yes.
18     Q.  How so?
19     A.  I documented in the Departmental Evaluation
20  System regarding Officer Hernandez visiting his
21  girlfriend when he was supposed to be working.
22     Q.  And when did you do that?
23     A.  I believe that day or the day after.
24     Q.  Have you seen that document in connection with

19 (Pages 70 - 73)

Page 74

1 this litigation?
2     A.   In this litigation, no.
3     Q.   What documents did you review before this
4 deposition, if any?
5     A.   I did in fact review the command channel review
6 for the CR number where it indicated I reduced the
7 penalty against Shannon Spaulding from four days to two
8 days, and reduced the penalty on Danny Echeverria from
9 two days to one day.
10        I knew it existed, and I spoke to counsel
11 regarding that.
12    Q.   Did you talk to Mr. Hernandez about -- did you
13 tell Mr. Hernandez that he shouldn't meet with
14 Shannon Spaulding at Homan Square?
15    A.   I don't believe her name specifically came up.
16        I said, you're not supposed to be visiting your
17 girlfriend while you're working, and you're not supposed
18 to leave your assigned post unless your supervisor knows
19 about it.
20    Q.   Was there any indication of how long
21 Shannon Spaulding was with Mr. Hernandez on that
22 occasion?
23    A.   No, I don't believe so.  I don't recall.
24    Q.   Was there any inquiry done as to, did you ask

Page 75

1 Mr. Hernandez how long she was there for?
2     A.   No.  He admitted though that he had left his
3 post without supervisory approval.
4     Q.   How far from his post did he go?
5     A.   I don't recall.
6     Q.   Is IAD allowed on the 2nd floor in Homan
7 Square?
8     A.   They are allowed, but they have to be checked
9 in.  They can't just walk in off the street, if that's
10 what you're asking.
11    Q.   Did you ever tell Tony Hernandez that if
12 Shannon Spaulding returned to the building at Homan
13 Square, he was to arrest her?
14    A.   No, I did not.
15    Q.   You aware of the residency requirements for the
16 Chicago Police Department?
17    A.   Yes.
18    Q.   When you were a commander in CPD, were you
19 aware of the school district you lived in?
20    A.   The school district I lived in?
21    Q.   Yes.
22    A.   I believe it was Ebinger.
23    Q.   Did you ever falsify your address to send your
24 kids to Park Ridge?

Page 76

1     A.   No.
2     Q.   Did your kids ever attend school in Park Ridge?
3     A.   Yes.
4     Q.   Were you living in Park Ridge at that time?
5     A.   No.
6     Q.   Is that a private school?
7     A.   Yes.  St. Paul of the Cross grade school.
8 Believe me, I've got the receipts to prove it.
9     Q.   Did you ever send your children to any suburban
10 public school?
11    A.   Ever?
12    Q.   Yes.
13    A.   Yes.
14    Q.   While you were a Chicago Police Department
15 officer?
16    A.   Yes.
17    Q.   How did you make those arrangements?
18    A.   I owned a condo in the 1400 block of Touhy in
19 Park Ridge, Illinois, and my father-in-law lived at that
20 location with my daughter.
21    Q.   And did you list that address as their
22 residence?
23    A.   That was listed as his.  He lived there.  That
24 was his residence.

Page 77

1     Q.   As your children's residence?
2     A.   My oldest daughter, yes, she lived there, you
3 know, when she was in high school, the last year of high
4 school.
5     Q.   Did you go to law school?
6     A.   Yes.
7     Q.   And what law school did you go to?
8     A.   John Marshall.
9     Q.   Were you going to law school while you were
10 working as a Chicago police officer?
11    A.   Yes.
12    Q.   Did you ever take classes during your hours as
13 a Chicago police officer?
14    A.   No.
15    Q.   Are you familiar with orders from the Chicago
16 Police Department and the City of Chicago relating to
17 whistle blower rules?
18    A.   Not specifically.
19    Q.   Have you ever spoken with Nick Roti about
20 Shannon Spaulding -- I'm sorry.  I believe we already
21 brought that up.
22        Have you ever spoken with anyone other than
23 Nick Roti about Shannon Spaulding or Danny Echeverria
24 being involved or working with the FBI?

20 (Pages 74 - 77)

Page 78

1      A.   No.
2      Q.   Were you ever present at any meeting where a
3  discussion of where Danny and Shannon were assigned was
4  brought up?
5      A.   Never.
6      Q.   Were you ever present in any meeting where
7  Danny and Shannon working with the FBI was brought up?
8      A.   Never.
9      Q.   Did you ever tell anyone, other than
10  Deputy Chief Roti, that you didn't want Danny or Shannon
11  back in your unit?
12      A.   No.
13      Q.   Did you think that not bringing Danny or
14  Shannon back to your unit might hurt their careers?
15      A.   No, not at all.
16      Q.   Do you know if Sergeant Padar was ever stripped
17  for any alleged felony criminal act?
18      A.   Yes, he was stripped.
19      Q.   Do you know if this occurred while you were
20  still commander of Narcotics?
21      A.   No, it was not then.
22      Q.   Were the allegations concerning his criminal
23  acts, did they occur while you were his commander?
24      A.   I don't know.

Page 79

1      Q.   How did you become aware of the criminal
2  allegations regarding Padar?
3      A.   I believe I read it in the paper.
4      Q.   Do you know if any other sworn members working
5  under your command were also accused, together with
6  Padar?
7      A.   Of the criminal act?
8      Q.   Yes.
9      A.   Yes.
10      Q.   Who?
11      A.   Vince Morgan.
12      Q.   And how did you learn about that?
13      A.   I read it in the paper.
14      Q.   Did you take any action when you learned of
15  these allegations?
16      A.   I told my wife.
17      Q.   Were you still a commander at that point?
18      A.   No.
19      Q.   Are you aware of a specific general order that
20  protects whistle blowers within the Chicago Police
21  Department?
22      A.   No.
23      Q.   Are you aware of any general order that
24  protects a member of CPD who makes a complaint or

Page 80

1  allegations against another sworn member?
2      A.   Not specifically, no.
3      Q.   Were you aware of any general order that
4  protects members of CPD who make complaints or
5  allegations against another sworn member when you were
6  working in IAD?
7      A.   I don't remember.  That was many years ago.
8      Q.   Were you aware of a general order that
9  protected whistle blowers when you were working IAD?
10      A.   No.
11      Q.   Were you aware of a general order that protects
12  a member of CPD who makes a complaint or allegations
13  against another sworn member when you were the commander
14  of Narcotics?
15      A.   I don't recall it specifically, no.
16      Q.   Are you aware of any employee rights that
17  protect whistle blowers?
18      A.   As far as an attorney or as far as a general
19  order?
20      Q.   In terms of within the CPD, the Chicago Police
21  Department?
22      A.   Like specific provisions or general orders, no.
23      Q.   Would you have knowledge of how -- I'm sorry.
24          (Brief pause.)

Page 81

1          MR. SMITH:  If I could have just a few minutes,
2  and I'm pretty sure we'll be less than 15 minutes, but
3  I'm probably going to go through names.
4          (Brief recess.)
5          MR. SMITH:  Q.  Do you know a Jan Hanna?
6      A.   No.
7      Q.   Do you know a Kevin Sadowski?
8      A.   No.
9      Q.   Do you know a Lieutenant Deborah Pasqua?
10      A.   No.
11      Q.   Do you know a Commander Adrienne Stanley?
12      A.   I do know her, yes.
13      Q.   How long have you known her?
14      A.   Probably met her in '08 when I first made
15  commander, and we went to meetings together.  I've never
16  really -- I don't really know her well at all.
17      Q.   Do you know a Sergeant Maurice Barnes?
18      A.   Yes.
19      Q.   How do you know Sergeant Maurice Barnes?
20      A.   Sergeant Barnes and I worked together in the
21  Narcotics Division, I believe, when I was a police
22  officer.
23      Q.   And did you work on the same team or just in
24  the same unit?

21 (Pages 78 - 81)

Page 82

1  A. In the same unit.
2  Q. And do you know a Lieutenant Robert Cesario?
3  A. I know him. I spoke to him a couple of times,
4 and I was involved with the Chicago Police Memorial
5 Foundation. I presented a check to his family for his
6 brother who had cancer, I believe.
7      But I don't know him really well. I met him a
8 couple of times.
9  Q. Do you know Joseph Salemi?
10  A. Yes.
11  Q. How long have you known Joseph Salemi?
12  A. Approximately 15 years.
13  Q. And are you personal friends?
14  A. I don't see him socially. However, as
15 commanders at one time we were both in Investigative
16 Services, Narcotics, the Detective Division. We went to
17 the same meetings together.
18      I'm certainly friendly with him. I would
19 consider him a friend, but I don't see him socially.
20  Q. Do you know Thomas Mills, a sergeant?
21  A. Yes.
22  Q. How do you know Sergeant Mills?
23  A. Sergeant Mills and I worked together in
24 Narcotics.

Page 83

1  Q. Have you ever spoken to Thomas Mills about
2 Danny or Shannon?
3  A. No.
4  Q. Have you ever spoken to Thomas Mills about that
5 this lawsuit?
6  A. I might have mentioned it, that it was, you
7 know, that this lawsuit was filed.
8  Q. Did he say anything about the lawsuit?
9  A. How sad he was. He just kind of, you know,
10 bothered by it.
11  Q. Anything beyond that?
12  A. Not really.
13  Q. Did you discuss any details of the allegations
14 n the lawsuit with Thomas Mills?
15  A. No.
16  Q. Were you friends with Thomas Mills?
17  A. I would say yes, he's a friend. I don't see
18 him socially, but I certainly consider him a friend.
19  Q. The time you spoke to him about the lawsuit,
20 where was that?
21  A. I don't remember. Maybe at a police function.
22  Q. Were you still a police officer with Chicago at
23 that time?
24  A. I believe, yes.

Page 84

1  Q. Did you ever talk with Joseph Salemi about the
2 lawsuit itself?
3  A. Not specifically.
4  Q. Did you ever talk with Robert Cesario about the
5 lawsuit?
6  A. No, not at all.
7  Q. Did you ever talk with Robert Cesario about
8 either Danny or Shannon?
9  A. I don't believe so.
10  Q. Did you ever talk with Sergeant Barnes about
11 Shannon or Danny?
12  A. No.
13  Q. Did you ever talk with Sergeant Barnes about
14 the lawsuit?
15  A. No.
16  Q. Did you ever talk with Adrienne Stanley about
17 the lawsuit?
18  A. Not at all, no.
19  Q. Did you ever talk with Adrienne Stanley about
20 Shannon or Danny?
21  A. No.
22  Q. I think you said you didn't know
23 Deborah Pasqua.
24  A. No.

Page 85

1  Q. And you didn't know Kevin Sadowski?
2  A. No.
3  Q. We may have already talked about something with
4 Nicholas Roti, but did you ever talk with Nicholas Roti
5 about the lawsuit?
6  A. Yes.
7  Q. Did you ever talk to him about the specifics in
8 the lawsuit?
9  A. Some of the allegations.
10  Q. Which allegations?
11  A. Specifically that I would refer to anyone
12 having worked in Internal Affairs as being rats.
13      Having spent a very important part of my career
14 in Internal Affairs, it really bothered me personally.
15  Q. Any other allegations that you talked to him
16 about?
17  A. Nothing specific.
18  Q. When you talked about the lawsuit, did you
19 discuss the incident concerning Homan Square at all with
20 Nicholas Roti in terms of Shannon Spaulding visiting
21 Tony Hernandez?
22  A. I spoke to Nick, Chief Roti, on a daily basis.
23 I'm sure I mentioned to him that I contacted
24 Commander Salemi to inform him one of his officers was

22 (Pages 82 - 85)

Page 86

1  goofing off.
2     Q.  And would that have been at the time shortly
3  after it happened or when you were talking about the
4  lawsuit?
5     A.  Probably shortly thereafter, to the best of my
6  memory.
7     Q.  Shortly after the incident itself?
8     A.  Correct.
9     Q.  Have you talked to Deborah Kirby about the
10 lawsuit?
11    A.  No, not at all.
12    Q.  And I think you already indicated you didn't
13 talk to Juan Rivera about the lawsuit?
14    A.  No.
15    Q.  I am correct, you did not talk to him?
16    A.  No, I did not.
17    Q.  Have you ever talked to Deborah Kirby about
18 Shannon Spaulding or Danny Echeverria?
19    A.  No.
20    Q.  Now, do you know Jimmy Jackson?
21    A.  Yes, sir.  Yes, I know him.
22    Q.  Who has been a high-ranking member in the
23 Chicago Police Department?
24    A.  Yes.

Page 87

1     Q.  Is he still with the Chicago Police Department,
2  if you know?
3     A.  No.
4     Q.  How long did you know him?
5     A.  From at least from 1999 on.  So, 15 years.
6     Q.  Did you ever discuss Sergeant Watts with
7  Jimmy Jackson?
8     A.  No.  I don't know Sergeant Watts.
9     Q.  And have you ever talked with Jimmy Jackson
10 about Shannon Spaulding or Danny Echeverria?
11    A.  Never.
12    MR. SMITH:  Nothing further.
13    MR. KING:  I have a couple of questions.
14       EXAMINATION
15    BY MR. KING:
16    Q.  Mr. O'Grady, counsel was asking you some
17 questions earlier in the deposition about, if a police
18 officer observed or witnessed another police officer
19 potentially engaging in illegal conducts.
20       I think you indicated that you would expect
21 them to report that internally within CPD through the
22 chain of command; is that correct?
23    A.  Yes.  However, that doesn't preclude them from
24 -- if an officer observes another officer commit a

Page 88

1  criminal act, he's got to -- he has to take police
2  action.  He should, if necessary, make an arrest.
3     Q.  Okay.  So, they should report it under their
4  chain of command and potentially make an arrest, is that
5  your...
6     A.  Yes.
7     Q.  Hypothetically speaking, if that circumstance
8  occurs, an officer reports another officer through their
9  chain of command, if the reporting officer, for whatever
10 reason, doesn't feel the response is appropriate, do you
11 have any problem with that reporting officer then going
12 outside of the Chicago Police Department to a third party
13 law enforcement agency, such as the FBI?
14    A.  Not at all, as long as they follow the
15 protocols initially as they're required to do, whatever
16 step they feel necessary to safeguard the department is
17 fine with me.
18       MR. KING:  No further questions.
19          FURTHER EXAMINATION
20       BY MR. SMITH:
21    Q.  Do you know any instances where that's
22 occurred?
23    A.  Not personally, no.
24    Q.  What would be a sufficient amount of activity

Page 89

1  within your chain of command if you saw an officer
2  engaged in criminal action, for an officer to take before
3  going to outside agency, in your opinion?
4     A.  In my opinion, if an officer witnessed a
5  criminal act, he has to take proper police action.  That
6  very well could be, make an arrest or intercede.
7        If one of my teams was out there conducting a
8  narcotic surveillance, and a subject was engaged in a
9  narcotics transaction, and they knew that subject to be a
10 police officer, they wouldn't merely file a report.
11 They'd have to make an arrest.
12    Q.  Okay.
13    A.  And officers in the division have arrested
14 police officers before.
15    Q.  Let's take it back a notch.
16       If an officer gets seemingly strong evidence
17 that another police officer is engaged in a crime, and
18 they, according to you, are then supposed to go to their
19 supervisor to report, that would that be fair to say, if
20 they can't make an arrest at the time?
21    A.  Then they should definitely report and obtain a
22 CR number, see that a CR number is obtained.
23    Q.  And to what extent would you believe they would
24 have to go internally before they should go to an outside

23 (Pages 86 - 89)

Page 90

1  agency?
2      A.  Well, any officer can get a CR number at any
3  time.  All you have to do is pick up the phone and call
4  Internal Affairs or IPRA and obtain the CR number.
5      So, there's no -- it doesn't eliminate that
6  duty.  They're required to obtain a CR number, but they
7  should go through the chain of command.  They should
8  notify a supervisor.
9      Q.  If they notify their immediate supervisor, and
10  the immediate supervisor did not obtain a CR, do you
11  think they would be in a position to then go to an
12  outside agency?
13      A.  They should still obtain the CR number
14  themselves.  They don't need a supervisor to get the CR
15  number.  They should get the CR number themselves.
16      Q.  Do you think that would be a problem if they
17  didn't get the CR number themselves?
18      A.  If they didn't get a CR number, that would
19  definitely be a problem.
20      Q.  If they had suspicions that the police
21  department wouldn't take any action, would you believe it
22  would be okay to go to the outside agency at that point?
23      A.  If that officer subjectively felt that that was
24  the only way to safeguard the police department and the

Page 91

1  well-being of the general public, yes.  I have no
2  problem.
3      I worked with the FBI myself.  I worked with
4  DEA myself.  So I have no problem with them going to
5  outside agencies.
6      Q.  When you worked with the FBI and the DEA
7  agencies, that was within your job as a Chicago police
8  officer within the Chicago Police Department, correct?
9      A.  Correct.
10      Q.  You weren't going to them outside of your work
11  at the Chicago Police Department to report--
12      A.  No.
13      MR. SMITH:  Nothing further.
14      MR. KING:  Okay.  We'll reserve.
15          (The deposition ended at 11:52 a.m.)
16
17
18
19
20
21
22
23
24

Page 92

1  STATE OF ILLINOIS   )
              ) SS.
2  COUNTY OF C O O K   )
3
4      I, THOMAS A. MANNO, C.S.R. and Notary Public,
5  do hereby certify that I reported in machine shorthand
6  the testimony held at the deposition of JAMES O'GRADY
7  taken on March 5th, 2015, and that this transcript is a
8  true and accurate transcription of my machine shorthand
9  notes so taken to the best of my ability, and contains
10  all of the proceedings given at said deposition.
11
12      _____
              THOMAS A. MANNO, C.S.R.
13              License No. 84-001174
14
15
16
17
18
19
20
21
22
23
24

Page 93

1              Veritext Legal Solutions
              1 North Franklin Street - Suite 3000
2              Chicago, Illinois 60606
              Phone: 312-442-9087
3
4
    May 22, 2015
5
    To: Alan S. King
6
    Case Name: Spaulding, Shannon, et al. v. City Of Chicago, et al.
7
    Veritext Reference Number: 2026015
8
    Witness:  James O'Grady      Deposition Date:  3/5/2015
9
10  Dear Sir/Madam:
11  Enclosed please find a deposition transcript.  Please have the witness
12  review the transcript and note any changes or corrections on the
13  included errata sheet, indicating the page, line number, change, and
14  the reason for the change.  Have the witness' signature at the bottom
15  of the sheet notarized and forward errata sheet back to us at the
16  address shown above, or email to production-midwest@veritext.com.
17
18  If the errata is not returned within thirty days of your receipt of
19  this letter, the reading and signing will be deemed waived.
20
21
22  Sincerely,
23
24  Production Department

24 (Pages 90 - 93)

Page 94

1  DEPOSITION REVIEW
   CERTIFICATION OF WITNESS
2
   ASSIGNMENT NO: 2026015
3  CASE NAME: Spaulding, Shannon, et al. v. City Of Chicago
   DATE OF DEPOSITION: 3/5/2015
4  WITNESS' NAME: James O'Grady
5     In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7     I have made no changes to the testimony
   as transcribed by the court reporter.
8
   _____   _____
9    Date            James O'Grady
10    Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
      They have read the transcript;
13    They signed the foregoing Sworn
      Statement; and
14    Their execution of this Statement is of
      their free act and deed.
15
   I have affixed my name and official seal
16
   this _____ day of_____, 20_____.
17
      _____
18    Notary Public
19    _____
   Commission Expiration Date
20
21
22
23
24
25

Page 95

1  DEPOSITION REVIEW
   CERTIFICATION OF WITNESS
2
   ASSIGNMENT NO: 2026015
3  CASE NAME: Spaulding, Shannon, et al. v. City Of Chicago
   DATE OF DEPOSITION: 3/5/2015
4  WITNESS' NAME: James O'Grady
5     In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7     I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9     I request that these changes be entered
   as part of the record of my testimony.
10
      I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
   that both be appended to the transcript of my
12 testimony and be incorporated therein.
13 _____   _____
      Date           James O'Grady
14
      Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
   the referenced witness did personally appear
16 and acknowledge that:
17    They have read the transcript;
      They have listed all of their corrections
18    in the appended Errata Sheet;
      They signed the foregoing Sworn
19    Statement; and
      Their execution of this Statement is of
20    their free act and deed.
21    I have affixed my name and official seal
22 this _____ day of_____, 20_____.
23    _____
      Notary Public
24    _____
25    Commission Expiration Date

Page 96

1  ERRATA SHEET
      VERITEXT LEGAL SOLUTIONS MIDWEST
2     ASSIGNMENT NO: 2026015
3  PAGE/LINE(S) /        CHANGE        /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19
   _____   _____
20   Date            James O'Grady
21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22 DAY OF _____, 20_____ .
23    _____
      Notary Public
24    _____
25    Commission Expiration Date

25 (Pages 94 - 96)

# Exhibit I

1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

CHICAGO POLICE
OFFICERS SHANNON
SPALDING AND DANIEL
ECHEVERRIA,

       Plaintiffs,

 vs.                                No. 12 C 8777

CITY OF CHICAGO,
CHICAGO POLICE CHIEF
JUAN RIVERA, CHICAGO
POLICE CHIEF DEBRA
KIRBY, CHICAGO POLICE
COMMANDER JAMES
O'GRADY, CHICAGO
POLICE CHIEF NICHOLAS
ROTTI, CHICAGO POLICE
LT. DEBORAH PASCUA,
CHICAGO POLICE
SERGEANT MAURICE
BARNES, CHICAGO POLICE
LT. ROBERT CESARIO,
CHICAGO POLICE
COMMANDER JOSEPH
SALEMME, CHICAGO
POLICE SERGEANT THOMAS
MILLS, CHICAGO POLICE
SERGEANT MICHAEL BARZ
and CHICAGO POLICE
SERGEANT ROBERT
MUSCOLINO,

       Defendants.

DEPOSITION OF JAMES W. PADAR

MAY 21, 2015

1:26 p.m.

James Padar    Spalding, Echeverria v. City of Chicago    5/21/15

---

**2**

1    The deposition of JAMES W. PADAR,
2  called for examination pursuant to the Rules
3  of Civil Procedure for the United States
4  District Courts pertaining to the taking of
5  depositions, taken before MARIBETH REILLY,
6  C.S.R., and notary public within and for the
7  County of DuPage and State of Illinois, at
8  One North LaSalle Street, Suite 2000,
9  Chicago, Illinois, on May 21, 2015,
10 commencing at the hour of 1:37 p.m.
11
12  APPEARANCES:
13    KINOY, TAREN & GERAGHTY, P.C., by,
14    MR. JEFFREY TAREN
15    224 South Michigan Avenue
16    Suite 490
17    Chicago, Illinois  60604
18      -and-
19    CHRISTOPHER SMITH TRIAL GROUP, by,
20    MR. CHRISTOPHER SMITH
21    One North Lasalle Street
22    Suite 3040
23    Chicago, Illinois  60602
24      Representing the Plaintiffs;

---

**4**

1                 I N D E X
2  WITNESS              EXAMINATION
3  JAMES W. PADAR
4   By Mr. Taren              6
5
6
7           EXHIBITS
8
9  NUMBER              MARKED FOR ID
10 Deposition Exhibit
11  No. 1              54
12
13
14
15
16
17
18
19
20
21
22
23
24

---

**3**

1  APPEARANCES:  (Continued)
2
3    DRINKER BIDDLE & REATH, LLP, by,
4    MR. ALAN KING
5    191 North Wacker Drive
6    Suite 3700
7    Chicago, Illinois  60606
8      Representing the Defendants;
9
10  MS. SHANNON SPALDING,
11    Also present.
12
13
14
15
16
17
18
19
20
21
22
23
24

---

**5**

1             (Witness duly sworn.)
2       MR. TAREN:  Would you state and
3  spell your full name for the record.
4       THE WITNESS:  James William Padar,
5  J-a-m-e-s, W-i-l-l-i-a-m, P-a-d-a-r.
6       MR. TAREN:  Thank you.  This is
7  the deposition of James William Padar taken
8  in the case Shannon Spalding and Daniel
9  Echeverria versus the City of Chicago, et
10 al., Northern District of Illinois, Number
11 12 C 8777.
12       My name is Jeffrey Taren.  I
13 am one of the attorneys for the Plaintiffs,
14 and I will be taking your deposition today.
15       You have had your deposition
16 taken before; is that correct?
17       THE WITNESS:  Yes.
18       MR. TAREN:  Well, I will just
19 briefly tell you how things will proceed
20 here.  I am going to be asking you a series
21 of questions concerning your employment with
22 the Chicago Police Department, knowledge you
23 may have of some of the facts in the matter
24 brought by Shannon Spalding and Danny

---

2 (Pages 2 to 5)

James Padar    Spalding, Echeverria v. City of Chicago         5/21/15

6

1  Echeverria.  None of the questions I ask are
2  meant to trick or deceive you in any way.
3  So if you don't understand the question, let
4  me know.  I will be happy to rephrase the
5  question.
6          In terms of our rules, the
7  primary rule is that all answers must be
8  audible.  So if you nod your head, like you
9  just did, and we all do, the court reporter
10 can't take that down.  So I would ask you to
11 please articulate all of your answers.
12 Okay?
13         THE WITNESS:  Yes.
14         MR. TAREN:  If you need to take a
15 break, let us know.  I will be a happy to do
16 that.
17         And then as I tell everyone,
18 some of the questions that I ask you are
19 going to be somewhat personal.  We do that
20 for everyone.  There is background
21 information that's necessary, and so please
22 don't take offense.
23
24

7

1          JAMES W. PADAR,
2  called as a witness herein, was examined and
3  testified as follows:
4          EXAMINATION
5  BY MR. TAREN:
6      Q.  And can we start with some
7  background information.  Can you give me
8  your current address, home address.
9      A.  7825 West Thorndale, and that's in
10 Chicago, 60631.
11     Q.  How long have you lived there?
12     A.  Approximately 11 years.
13     Q.  Are you married?
14     A.  Yes.
15     Q.  Can I have your date of birth,
16 please?
17     A.  18, December, 1973.
18     Q.  Do you also go by the name of Jay
19 sometimes?
20     A.  Yes.
21     Q.  Are there other names that you
22 have gone by either professionally or
23 personally?
24     A.  Some people have called me Jim,

8

1  but that's it.
2      Q.  Do you have kids?
3      A.  Yes.
4      Q.  How old are they?
5      A.  I have six-year old twins.
6      Q.  So they are, obviously, not
7  employed by the Chicago Police Department?
8      A.  That's correct.
9      Q.  Is that right?
10         Do you currently have other
11 members of your family who are employed by
12 the Chicago Police Department?
13     A.  No.
14     Q.  Other members of your family have
15 been Chicago police officers in the past; is
16 that correct?
17     A.  Yes.
18     Q.  And who would that be?
19     A.  My father.
20     Q.  His name is also James; is that
21 correct?
22     A.  Yes.
23     Q.  Anyone else?  Any siblings or
24 uncles?

9

1      A.  No, not that I can think of.
2      Q.  All right.  What is your
3  educational background?  Let's start with
4  high school.  Where did you go to high
5  school?
6      A.  Loyola Academy.
7      Q.  When did you graduate?
8      A.  '92.
9      Q.  And after high school, have you
10 had other formal education?
11     A.  I attended Western Illinois
12 University and graduated in 1996.
13     Q.  What was your degree in?
14     A.  Criminal justice.
15     Q.  How about after '96, have you had
16 any graduate level educational courses?
17     A.  I completed my Master's degree at
18 Lewis University.
19     Q.  When was that?
20     A.  I would be estimating, but I
21 believe it was approximately 2005.
22     Q.  What is your Master's in?
23     A.  Criminal justice.
24     Q.  After college, what was your first

3 (Pages 6 to 9)

James Padar     Spalding, Echeverria v. City of Chicago          5/21/15

                                                                    10

1    full-time employment?
2        A.  I worked for Toyota Motor Credit
3    Corporation and Lexus Financial Services.
4        Q.  For what period of time?
5        A.  I believe the years were 1996
6    through 1998.
7        Q.  When did you enter the Chicago
8    Police Department?
9        A.  1998.
10       Q.  And have you been a full-time
11   employee of the police department ever
12   since?
13       A.  Yes.
14       Q.  What is your current status with
15   the Chicago Police Department?
16       A.  I'm assigned to Narcotics,
17   detailed to the Alternate Response Section.
18       Q.  What's the Alternate Response
19   Section?
20       A.  They take nonemergency police
21   reports over the phone.
22       Q.  That's the 311 center?
23       A.  Yes.
24       Q.  How long have you been at 311?

                                                                    11

1        A.  Just over a year.
2        Q.  Have you been on suspension at
3    some point over the last two years?
4        A.  I have not been suspended.
5        Q.  Were you on some kind of paid
6    leave?
7        A.  I am -- I have been assigned to
8    administrative duties.
9        Q.  We will get into some of that
10   later.
11           And are there restrictions,
12   some restrictions on your duties at the
13   Chicago Police Department now currently?
14       A.  Yes.
15       Q.  What are those restrictions?
16       A.  I cannot carry a gun.  I cannot
17   take police action.
18       Q.  You are also an author; is that
19   correct?
20       A.  Yes.
21       Q.  And you have written with your
22   father a book called "On Being a Cop"; is
23   that correct?
24       A.  Yes.

                                                                    12

1        Q.  Have you written any other books?
2        A.  No.
3        Q.  Is there some book that you are
4    currently working on?
5        A.  No.
6        Q.  I understand from the blogosphere
7    that when you started -- starting in 1999,
8    you began writing emails to your father
9    about your work at the Chicago Police
10   Department; is that correct?
11       A.  Yes.
12       Q.  Do you still do that?
13       A.  I can't recall the last time I
14   wrote an email to my father about the work I
15   have done on the police department.
16       Q.  Well, tell me for what period of
17   time -- and by the way, I will let you know,
18   I am getting this from an interview that's
19   online that you gave to NBC in February
20   of 2014.
21       A.  Sure.
22       Q.  Are you familiar -- you recall
23   that email?
24       A.  Yes.

                                                                    13

1        Q.  And you are aware of this?  Anyone
2    could go online and see the interview?
3        A.  Yes.
4        Q.  And in that you state that you
5    were writing emails about your adventures to
6    your father.
7            My question is:  For what
8    period of time did you continue to do that?
9        A.  I know I wrote emails, I believe,
10   beginning in 1998.
11       Q.  Okay.
12       A.  The last story which I wrote,
13   which I did email to my father, was
14   probably -- I don't know if it was 2013 or
15   2014.
16       Q.  Okay.
17       A.  It was close to not this past
18   Christmas, maybe the Christmas before.
19       Q.  All right.  So these emails that
20   you would send to your father, would they
21   detail some of the experiences that you had
22   as a Chicago police officer?
23       A.  Yes.
24       Q.  Did they form the basis of some of

                                                4 (Pages 10 to 13)

James Padar    Spalding, Echeverria v. City of Chicago    5/21/15

14

1   the stories that you have written?
2       A. Yes.
3       Q. Do you have all the emails that
4   you sent to your father?
5       A. No.
6       Q. Where did you send them from?
7       A. From different computers. Most
8   likely, different email accounts. I had
9   AT&T as my service provider at one point.
10  Comcast was my service provider for another
11  point.
12      Q. Let me stop you there. So for
13  what period of time did you have AT&T as
14  your service provider?
15      A. I can't recall those dates, but I
16  can tell you that I currently have AT&T as
17  my service provider.
18      Q. And that's an email -- what email
19  address did you have with AT&T?
20      A. Jaypadar@att.net.
21      Q. And do you know what period of
22  time you had Comcast as a service provider?
23      A. I don't recall the exact date. I
24  would estimate that I have had AT&T for two

15

1   to three years. And prior to that, I had
2   Comcast.
3       Q. What email addresses did you use
4   with regard to Comcast as a service
5   provider?
6       A. I don't recall.
7       Q. You don't recall any of your email
8   addresses for Comcast?
9       A. For Comcast, no. I don't know
10  what they assigned me.
11      Q. Do you know was it something
12  @comcast.net?
13      A. I would assume so.
14      Q. Did you have more than one email
15  address with Comcast?
16      A. Not that I'm aware of.
17      Q. Are you aware of any other email
18  providers that -- service providers that you
19  used in sending emails about your work
20  experiences?
21      A. I have used the email address of
22  jay@padar.org.
23      Q. Okay.
24      A. And there is an email address

16

1   associated with the web site "On Being a
2   Cop" that gets forwarded to me, which is
3   jay@onbeingacop.com.
4       Q. Is it your testimony that you have
5   not archived any of the emails that you sent
6   about your work experiences?
7       A. I have saved some of them. I have
8   not archived all of my emails that I sent to
9   my father.
10      Q. In what format did you save them?
11      A. I have stories that I have written
12  to my father, and I believe I have them on a
13  laptop at home.
14      Q. During the period 2010 through
15  2012, did you send emails about some of your
16  work experiences to your father to anyone
17  else?
18      A. I don't recall at this point.
19      Q. So you may have, or you may not
20  have; is that correct?
21      A. That is correct.
22      Q. What email address did you send
23  your stories about your experiences to?
24      A. I know my father's email address,

17

1   which I may have sent it to this address is
2   jim@padar.org.
3       Q. Do you know how long he's had that
4   email address?
5       A. I don't.
6       Q. Do you know whether he has kept
7   any or all of the emails that you have sent
8   him concerning your experiences at work?
9       A. I am not certain what he's kept.
10      Q. Have you ever sent an email to
11  your father or anyone else which has
12  anything to do with Shannon Spalding or
13  Danny Echeverria?
14      A. I don't recall if I have.
15      Q. So I am clear about your answer,
16  it's possible and perhaps you did, perhaps
17  you did not; is that correct?
18      A. Yes.
19      MR. TAREN: I am going to ask you
20  to please preserve any and all emails that
21  you have in your possession until we can
22  issue a subpoena.
23      THE WITNESS: Okay.
24

5 (Pages 14 to 17)

James Padar      Spalding, Echeverria v. City of Chicago            5/21/15

---

18

BY MR. TAREN:
 Q.  In any of your emails concerning your employment at the Chicago Police Department, do you mention anything about crooked cops?
 A.  I don't recall mentioning anything about crooked cops.
 Q.  Do any of your emails discuss anything about Internal Affairs?
 A.  I don't recall.
 Q.  In any of the emails that you sent, do you refer to anyone as a rat, or recount anyone you have worked -- well, take it one at a time.
  In any of your emails that you sent concerning your experiences at the police department, do you ever refer to anyone as a rat?
 A.  I don't recall ever referring to anyone as a rat.
 Q.  Do you recall recounting anyone else referring to someone as a rat in your emails?
 A.  I don't recall that.

---

19

 Q.  I hate to ask this question, but how many emails do you think you have sent over the years concerning your employment?
 A.  Concerning my employment?
 Q.  Yes.
 A.  Would probably be well into the thousands.
 Q.  Do you have a Twitter account?
 A.  I do not have a Twitter account. There is a Twitter account associated with On Being a Cop.
 Q.  By the way, have you turned over -- Has anyone from the City of Chicago asked you to look through your emails to see if there is anything that refers to Shannon Spalding or Danny Echeverria?
 A.  I don't recall anyone asking me to look for that material.
 Q.  And is it accurate then that you have not turned those emails over, any of your emails over to the City for -- in anything to do with this lawsuit, the Spalding/Echeverria lawsuit?
 A.  I don't believe I have.

---

20

 Q.  So there is a Twitter account associated with On Being a Cop blog; is that right?
 A.  Yes.
 Q.  Who handles that Twitter account?
 A.  My father does.
 Q.  Do you have an Instagram account?
 A.  I don't.
 Q.  Does the blog have one?
 A.  Not that I'm aware of.
 Q.  What about Facebook, do you have a Facebook account?
 A.  I do not have a Facebook account.
 Q.  I know your father does.
 A.  Yes.
 Q.  Correct?
  Do you ever post things on your father's Facebook account?
 A.  I do not.
 Q.  Does your blog have a Facebook account?
 A.  Yes.
 Q.  Who handles that?
 A.  My father.

---

21

 Q.  Do you have any other social media accounts?
 A.  I can't think of any other social media accounts that I have.
 Q.  All right.  Do you follow any other Chicago police -- strike that.
  I want to keep this limited to just matters involving law enforcement of the Chicago Police Department.  I don't care about other personal issues, blogs that you might follow.
  Are there any blogs that you follow that are either by Chicago police officers, current or former, or deal with matters of the Chicago Police Department?
 A.  I have read Second City Cop Blog Spot.
 Q.  Any others?
 A.  There is nothing that I read regularly.  However, I am certain on that blog spot, there are probably attachments to other sites that I have looked at, but nothing with any regularity.
 Q.  Do you know who runs Second City

---

6 (Pages 18 to 21)

James Padar     Spalding, Echeverria v. City of Chicago     5/21/15

22

1  Cop Blog Spot?
2      A.  I don't.
3      Q.  I apologize for having to ask this
4  question about a specific blog spot, but I
5  do.  Have you ever accessed a blog called
6  "shavedlongcock.blogspot"?
7      A.  I believe that's one of the links
8  on Second City Cop, so I may have.
9      Q.  Do you know who writes or is
10  involved with that blog spot?
11      A.  I do not.
12      Q.  Have you read any articles in that
13  blog spot that refer to Chicago police
14  officers who cooperated with the FBI?
15      A.  I don't recall what I have read on
16  that blog spot.
17      Q.  Do you have any recollection of
18  reading a blog spot that refers to Officer
19  Keith Herrera as a rat fink?
20      MR. KING:  I'd just object to the
21  form of the question and the lack of
22  foundation, and frankly, the relevance.
23  Maybe we are moving towards something
24  relevant.  I don't know, but you can answer

23

1  the question.
2      THE WITNESS:  Can you repeat the
3  question.
4      MR. TAREN:  Can you read it back.
5      (Whereupon, the record was
6      read as requested.)
7      THE WITNESS:  I don't recall if I
8  have or haven't.
9  BY MR. TAREN:
10      Q.  Do you know who Officer Keith
11  Herrera is?
12      A.  I do.
13      Q.  Did you know Keith Herrera?
14      A.  I did not personally know him.
15      Q.  And did you understand that he was
16  an officer who wore a wire in the
17  investigation of his partner?
18      A.  That's what I read.
19      Q.  Have you ever had any discussions
20  with anyone about Officer Herrera?
21      A.  Not that I can recall.
22      Q.  Are there any other blog spots or
23  blogs that you are aware of that deal with
24  the Chicago Police Department?

24

1      A.  Nothing that I can recall at this
2  point.
3      Q.  When you say that there is a link
4  to that blog spot on your blog -- I'm sorry,
5  is that what you said?
6      A.  No.
7      Q.  Have you kept a diary of any of
8  your activities on the Chicago Police
9  Department during your career?  And by
10  diary, I mean either handwritten or
11  electronic?
12      A.  No.
13      Q.  Did you keep a calendar or a
14  notebook that dealt with your employment
15  with the Chicago Police Department?
16      A.  I have had FOP books which has a
17  calendar that I receive each year from the
18  FOP.  I know I have the current one.  I
19  don't know if I have any subsequent ones.
20      Q.  What I am really focusing on is
21  whether there are any documents in which you
22  made recordations of what conversations you
23  had or meetings that you had or
24  investigations you were involved in with the

25

1  Chicago Police Department?
2      A.  I have a calendar on my phone that
3  shows meetings I had with my attorneys, City
4  attorneys, depositions and so forth.
5      Q.  Now, how long have you kept your
6  calendar on your phone?
7      A.  On my personal phone, I have kept
8  a calendar since I have opened the account,
9  which is approximately two to three years
10  ago.
11      Prior to that, I had a
12  department-issued BlackBerry, but I don't
13  recall if I utilized that calendar function
14  on the BlackBerry or not.  I haven't had it
15  in a couple of years.
16      Q.  When was the last time that you
17  had the department-issued BlackBerry?
18      A.  Some point prior to April of 2014.
19      Q.  In calendar year 2010, did you
20  have a smart phone?
21      A.  I had a department-issued
22  BlackBerry.
23      Q.  And is it your testimony that they
24  took it back at some point?

7 (Pages 22 to 25)

James Padar     Spalding, Echeverria v. City of Chicago          5/21/15

26

1     A. I turned it in, yes.
2     Q. And that was around April of 2014?
3     A. Yes.
4     Q. When you turned it in, do you know
5  what the policy is of the police department
6  with regard to copying anything that's on
7  your BlackBerry?
8     A. I don't know what their policy is.
9     Q. You have never seen an image of
10 the BlackBerry that you used at that time?
11 By "image," I mean just a copy of anything.
12    A. I tried to save photos, personal
13 photos, and I believe they trans -- someone
14 assisted me in transferring my contacts.
15    Q. Did you transfer anything else,
16 such as emails or texts?
17    A. I don't recall transferring texts.
18 And as for the emails, I kept the same email
19 account, so I didn't transfer, but they
20 still would be under that same email
21 account.
22    Q. I understand. Did you ever go to
23 Wright Junior College?
24    A. Are you asking if I attended as a

27

1  student?
2     Q. Yes.
3     A. No.
4     Q. At the beginning of this
5  deposition, you acknowledged that you have
6  given other depositions in the past. Can
7  you tell me how many depositions you have
8  given prior to today's?
9     A. I recall two.
10    Q. When was the last time?
11    A. Within the last few months.
12    Q. Was that the deposition in the
13 Hernandez case in February?
14    A. Yes.
15    Q. And how about before that, what
16 was the other deposition?
17    A. I believe it was the year prior,
18 some time in 2014.
19    Q. What case was that involved in?
20    A. I believe it's Jeff Allen versus
21 City of Chicago.
22    Q. Were you a party or a witness in
23 that case?
24    A. I am part of a class action

28

1  lawsuit.
2     Q. As a Plaintiff?
3     A. Yes.
4     Q. What does that involve?
5     A. Overtime.
6     Q. When you say "overtime," what's
7  the issue?
8     A. The issue is, as I understand it,
9  is a number of officers, supervisors, within
10 the Bureau of Organized Crime had been
11 working during off-duty hours and not being
12 compensated for it.
13    Q. Who is representing the Plaintiff
14 in the Jeff Allen case?
15    A. I believe the attorney's name is
16 Paul Geiger.
17    Q. And do you have a copy of the
18 deposition that you gave in that case, or
19 would Mr. Geiger have it?
20    A. Mr. Geiger should have it.
21    Q. And those are the only two
22 depositions in a civil matter that you have
23 given; is that correct?
24    A. That's all that I can recall.

29

1     Q. Were there any depositions given
2  in the Sperling, the Joseph Sperling matter?
3     A. I was not deposed.
4     Q. And have you testified under oath
5  in a trial or court proceeding in the past?
6     A. Yes.
7     Q. On about how many occasions?
8     A. I would say well over a hundred.
9     Q. And were these all matters that
10 were during the scope of your employment as
11 a Chicago police officer?
12    A. I believe so.
13    Q. Did you ever testify in a civil
14 action?
15    A. I don't recall ever testifying in
16 a civil action other than the Anthony
17 Hernandez case.
18    Q. Can you tell me what you did to
19 prepare for today's deposition?
20    A. I don't recall specifically doing
21 anything to prepare for today's deposition.
22    Q. Did you meet with counsel?
23    A. I did meet with counsel.
24    Q. So that's something, at least?

8 (Pages 26 to 29)

James Padar    Spalding, Echeverria v. City of Chicago    5/21/15

---

30

1    A.  Okay.
2    Q.  And by "counsel," we are talking
3  about Mr. King?
4    A.  Yes.
5    Q.  And did you review any documents?
6    A.  I did.
7    Q.  Can you tell me what you reviewed?
8    A.  I reviewed a confidential
9  informant packet, and I am not certain if
10  there were additional items presented to me.
11  I don't recall any additional items.
12    Q.  Did you review the complaint in
13  this case?
14    A.  Not at my meeting with my
15  attorney.
16    Q.  Some other time you did?
17    A.  Yes.
18    Q.  When?
19    A.  Most likely immediately after
20  finding out I was named in the case.
21    Q.  You understand you are not
22  currently a party in this case?
23    A.  Yes.
24    Q.  And have you prior to today's

---

31

1  deposition, have you reviewed any testimony;
2  that is, transcripts of other depositions or
3  excerpts from transcripts of other
4  depositions taken already in this case?
5    A.  I have been asked questions
6  regarding other depositions that I
7  understand that have been taken for this
8  case.
9    Q.  Okay.
10    A.  I have not personally handled
11  depositions, but I have been read to from
12  depositions.
13    Q.  Okay.  Was that from counsel or
14  from someone else?
15    A.  From counsel.
16    Q.  By the way, just so it's clear,
17  are you represented by Mr. King in this
18  deposition --
19    A.  Yes.
20    Q.  -- is he your attorney?  All
21  right.
22        Do you recall whose
23  depositions you heard excerpts from?
24    A.  Shannon Spalding.

---

32

1    Q.  Anyone else?
2    A.  No.
3    Q.  Not Danny?
4    A.  Not that I recall, no.
5    Q.  We talked about documents that you
6  reviewed.  Have you had any conversations
7  with anyone who was previously deposed in
8  this case about the case?
9        MR. KING:  I'll just object to the
10  form and the timing.  About the depositions
11  after their depositions?
12        MR. TAREN:  Correct.  Yes.
13        THE WITNESS:  Not that I know of,
14  but I don't know who is being deposed in
15  this case, and I don't know who has been
16  deposed in this case necessarily.
17  BY MR. TAREN:
18    Q.  So what my question was focusing
19  on is whether anyone ever told you, I gave a
20  deposition and here is what happened with
21  regard to the Spalding versus City case?
22    A.  No.
23    Q.  Can you take me through your job
24  history at the Chicago Police Department.  I

---

33

1  know you have been there for a while, but
2  what assignments or what departments you
3  have been in?
4    A.  When I first became a police
5  officer, I was assigned to the 24th
6  district, Rogers Park.  I was assigned there
7  for six years.  Then I was promoted to
8  sergeant.
9    Q.  What year was that?
10    A.  2004.
11    Q.  Okay.
12    A.  I was assigned to the 17th
13  district, and then detailed to the 11th
14  district.
15    Q.  For how long?
16    A.  Just a matter of a few months,
17  maybe four months in the 11th district.
18    Q.  All right.  Then what?
19    A.  I returned back to the 17th
20  district, and then I was assigned to the
21  Area 3 Deputy Chief's Office as an
22  administrative sergeant.
23    Q.  When was that?
24    A.  Approximately 2006.

---

9  (Pages 30 to 33)

James Padar    Spalding, Echeverria v. City of Chicago    5/21/15

34

1    Q. Who was the deputy that you were
2  assigned to at that time?
3    A. Lee Epplen.
4    Q. How long were you in that
5  position?
6    A. Approximately six months.
7    Q. Then what?
8    A. From there I went to Narcotics.
9    Q. For what period of time?
10   A. From -- I believe it was either
11  2006 or 2007.  I am currently assigned there
12  now.  But like I said, for the last year, I
13  have been detailed to Alternate Response.
14   Q. So with regard to the assignment
15  as opposed to being detailed, you have been
16  assigned to Narcotics then continuously from
17  2006 or '07 until the present; is that
18  correct?
19   A. Yes.
20   Q. All right.  During that period of
21  time, tell me who you reported to.  I know
22  it changed but --
23   A. Yes.  I will give you the
24  lieutenants I remember being there.

35

1    Q. That will help.
2    A. Peter Piazza, Bill Dunn, Bill
3  Kilroy, Jose Ramirez, Susan Schmidt, Eric
4  Carter, Deputy Chief Steve Caluris.  And at
5  this point, I can't recall if there were
6  others.
7    Q. Who are the commanders that you
8  worked under?
9    A. Commander O'Grady.
10   Q. For that whole period of time?
11   A. No.  I went to Narcotics under
12  Deputy Chief Caluris.
13   Q. When did you start working under
14  Commander O'Grady?
15   A. I don't recall when he arrived in
16  Narcotics, but I know I had been in
17  Narcotics at least a year prior to him
18  becoming the new commander.
19   Q. So when did you first encounter
20  Shannon Spalding?  We will take them one at
21  a time as opposed to Shannon and Danny.
22   A. I don't recall exactly when I
23  first met Shannon Spalding.  I believe it
24  was during my time in Narcotics.

36

1    Q. And would that be the same for
2  Danny Echeverria?
3    A. Yes.
4    Q. Did they report to you for some
5  period of time?
6    A. I was never assigned as their
7  supervisor.
8    Q. Were you familiar with the work
9  that they did in Narcotics?
10   A. Nothing specific.  I knew they
11  were in Narcotics.
12   Q. By the way, had you known anything
13  about either of them before they came to
14  Narcotics, either by reputation or personal
15  encounter?
16   A. I don't recall anything.
17   Q. Is Narcotics considered an elite
18  unit to be in?
19      MR. KING:  I'd just object to the
20  lack of foundation, but you can give your
21  opinion.
22      THE WITNESS:  I know I wanted to
23  be there.  I don't know if I ever referred
24  to it as elite.

37

1  BY MR. TAREN:
2    Q. So why don't we just focus on you
3  then.  Why did you want to be there?
4    A. I personally wanted to be there
5  because we weren't necessarily tied to a
6  district, to radio calls.  We had more
7  freedom to chase bigger criminals, make
8  bigger cases.
9    Q. Was it a difficult assignment for
10  you to get?
11   A. I applied.  I filled out an
12  application, and I was interviewed, and I
13  received the position as a sergeant.
14   Q. Do you know whether it is a
15  difficult position for an officer, a patrol
16  officer, to get into the Narcotics Division?
17      MR. KING:  Same objection to the
18  lack of foundation.  But if you know, you
19  can answer.
20      THE WITNESS:  People are brought
21  to Narcotics for all different reasons.
22  Some people apply because they think they
23  have great numbers, and they would be an
24  asset to the unit.

10 (Pages 34 to 37)

James Padar    Spalding, Echeverria v. City of Chicago    5/21/15

38

1    Some people, it's my
2  understanding, have been asked to go to
3  Narcotics because of what they do on the
4  street. So I think it depends on the
5  individual officer. So I can't speak for
6  everyone that's in Narcotics.
7    There is competition to get in
8  Narcotics, and I would say it's difficult
9  for some people to get into Narcotics, yes.
10 BY MR. TAREN:
11   Q. Is it the kind of thing that when
12 people get in, they tend to stay for long
13 periods of time?
14   A. I can speak for myself. I
15 intended to stay for a long period of time.
16   Q. I am asking because, I assume,
17 that you have talked with other sergeants
18 and other patrol officers about their
19 experiences in Narcotics, and wondering
20 whether you have arrived at a conclusion
21 that, you know, this is the kind of division
22 people don't pass-through, but come in to
23 make a career of?
24   A. I would say that the majority of

39

1  the people I have spoken to would like to
2  stay in Narcotics.
3    Q. Is one of the perks of being in
4  Narcotics the fact that because of the
5  nature of the work, you have opportunities
6  to work a lot of overtime?
7    A. Depends on which team you are on.
8  My team, we worked a lot of overtime. Some
9  teams choose not to work a lot of overtime.
10   Q. What is it about the teams that
11 would determine whether there was a lot of
12 overtime available or not?
13   A. I believe it would be up to the
14 supervisor and the people on the team. Some
15 people have family obligations. Some
16 supervisors have family obligations that
17 don't allow for them to work a lot of
18 overtime.
19   Q. So when I say, "the opportunity,"
20 do I understand then that if you're
21 ambitious and you want to work overtime,
22 that the Narcotics Division gives you that
23 opportunity?
24   A. Depending on your sergeant, you

40

1  definitely can have an opportunity to work a
2  lot of overtime.
3    Q. During your time in Narcotics,
4  have you ever been involved in any of the
5  decision-making with regard to giving
6  assignments to patrol officers to come in;
7  that is, either the interview process or
8  anything of that sort?
9    Do you understand the
10 question? That's a terrible question.
11   MR. KING: Come into the Narcotics
12 Division?
13   MR. TAREN: Right.
14 BY MR. TAREN:
15   Q. Have you been involved in the
16 selection process in any way, either as a
17 decision-maker or giving input, into the
18 decisions to allow someone to come into
19 Narcotics?
20   A. Yes.
21   Q. Tell me what roles you have played
22 in that regard? Have you been a
23 decision-maker?
24   A. I cannot decide if someone comes

41

1  into Narcotics or leaves Narcotics. I have
2  been part of the interview process, where a
3  candidate has been interviewed by two
4  sergeants and a lieutenant, and then we
5  discuss the pluses and negatives for each
6  candidate. And we complete an interview
7  packet for that candidate with their
8  responses to questions, and we put our own
9  personal recommendations in those packets,
10 and they are submitted up the chain of
11 command.
12   Q. And then someone above you makes
13 the final decision?
14   A. Yes.
15   Q. Tell me what factors you consider
16 when determining assignments to Narcotics --
17 when interviewing potential applicants?
18   A. I would consider their arrest
19 numbers, complaints against them. I would
20 consider attendance. I would consider any
21 additional skills.
22    Some people on their
23 application list language skills, which
24 would be beneficial. Previous experience in

11 (Pages 38 to 41)

James Padar     Spalding, Echeverria v. City of Chicago          5/21/15

---

42

1    making undercover narcotic purchases with
2    either other departments, or within their
3    unit of assignment.  So items of that
4    nature.
5        Q.  Anything else?
6        A.  To be honest with you, I would
7    have to look at everything that would be
8    presented to me, and every -- I would
9    consider everything that's presented to me.
10       Q.  Were you involved in any way in
11   the application process for Danny Echeverria
12   or Shannon to come into Narcotics?
13       A.  No.
14       Q.  Tell me between 2007 and 2010 what
15   kind of working relationship did you have
16   with either Danny or Shannon, if any?
17       A.  I was never -- that I recall, they
18   were never assigned to a team that I was
19   responsible for.  I don't recall any
20   specific instances where I was watching them
21   or their team while their supervisor was
22   gone.
23           I do know in 2010 -- I believe
24   it was 2010, Officers Spalding and

---

43

1    Echeverria worked with my team because they
2    had information that they wanted to act
3    upon, and it was my understanding that they
4    needed assistance through the Narcotics
5    Division.
6        Q.  When you say they worked with your
7    team at that time, was that at a time where
8    they were working within Narcotics or --
9        A.  I believe at the time, they were
10   -- they were detailed to Detached Services.
11       Q.  Who was on your team at that time?
12       A.  My team has changed dramatically
13   over the period of seven years, so I can say
14   I know that Anthony Hernandez was on the
15   team at the time.  Vince Morgan was on the
16   team at the time.  I am trying to think who
17   else.  I would be guessing if I gave out --
18       Q.  Well, let me focus because you
19   mentioned that you had looked at the
20   confidential informant packet, and I am
21   going to be showing you that as well.  But
22   at that period of time in, August of 2010,
23   do you recall who was on your team?
24       A.  Off the top of my head, I don't

---

44

1    remember every member that was on my team.
2        Q.  If I gave you some names, can you
3    tell me if it refreshes your recollection?
4        A.  Sure.
5        Q.  Craig; was Craig on your team?
6        A.  He very well could have been on my
7    team.
8        Q.  I am saying August of 2010.
9            MR. KING:  Don't guess.
10   BY MR. TAREN:
11       Q.  What about Marco?
12       A.  Yes, he could have been on my team
13   at that time.
14       Q.  Mickey?
15       A.  He could have been on my team at
16   that time.
17       Q.  Do you think that rounds up your
18   team, or is there somebody that we don't
19   know about?
20       A.  I typically had six to ten people
21   on my team at any time.  To be honest with
22   you, that was five years ago, approximately.
23       Q.  Yes.
24       A.  And there was a lot of turnover.

---

45

1    So without reviewing my, you know, time
2    sheets, I wouldn't know exactly who was
3    there five years ago on that date.
4        Q.  Did you become aware when Danny
5    and Shannon were first detailed to Detached
6    Services?
7        A.  I don't recall when I became aware
8    that they were detailed to Detached
9    Services.
10       Q.  Am I correct in saying it was well
11   before August of 2010?
12       A.  To be honest with you, I don't
13   know when they were detailed there.
14       Q.  At some point, did you find out
15   from any source what Danny and Shannon's
16   assignment was at Detached Services, and who
17   they were working with?
18       A.  At one point, myself and my team
19   were assigned to the -- to Area 1, and
20   that's where we were supposed to generate
21   the majority of our activity.  One of the
22   districts within Area 1 is the 2nd district.
23   This was one of our areas of responsibility.
24           I remember seeing Officers

---

12 (Pages 42 to 45)

James Padar    Spalding, Echeverria v. City of Chicago    5/21/15

46

1    Spalding and Echeverria driving around in
2    the 2nd district, and speaking to them.  I
3    knew them from -- knew of them from
4    Narcotics, and I am trying to recall if
5    that's when I found out they were detailed
6    to Detached Services because I had spoken
7    with them when I had seen them in the
8    district.
9           I believe Officer Spalding
10   told me that they were working on dirty cops
11   in the 2nd district, but that was the extent
12   of that.
13       Q.  Any idea when that was?
14       A.  All I could say is it was prior --
15   I believe it would be prior to August
16   of 2010.  I don't recall how many months or
17   weeks before.
18       Q.  Did that surprise you when she
19   allegedly told you that she was working on
20   dirty cops?
21       A.  No.
22       Q.  Why not?
23       A.  Well, when I realized that she was
24   working for Detached Services, I am not

47

1    exactly certain what they do or what they
2    don't do, but they are doing something above
3    and beyond Narcotics is my assumption.
4           So it wouldn't surprise me
5    that her and her partner would be working on
6    dirty cops.
7        Q.  Had you prior to that conversation
8    that you say you had, had you heard from any
9    other source that either Danny or Shannon
10   were working on dirty cops at that time?
11       A.  Not that I recall.
12       Q.  Had you heard from any source
13   prior to that time that they were working
14   with the FBI on some kind of investigation?
15       A.  Not that I recall.
16       Q.  Now that question was:  Prior to
17   that conversation, at some point, did you
18   learn that Danny and Shannon were detailed
19   to Detached Services and were working with
20   the FBI?
21       MR. KING:  I'll object to the
22   form.  He answered for before, so now you
23   are saying after.
24       MR. TAREN:  Now I am just asking

48

1    after.
2        MR. KING:  At some point, at any
3    point?
4        MR. TAREN:  At some point
5    afterwards because then I am going to ask
6    you when you first learned that.
7        MR. KING:  Can you rephrase the
8    question or repeat it.
9    BY MR. TAREN:
10       Q.  At some point, did you learn that
11   Danny and Shannon were working with the FBI
12   on some investigation?
13       A.  Yes.
14       Q.  When was the first time you
15   learned that?
16       A.  When I read about it in the media.
17       Q.  And that was associated with
18   publicity around the filing of their
19   lawsuit, is that your testimony?
20       A.  I don't know when it was in
21   comparison to the filing of their lawsuit.
22       Q.  But you say when you read about it
23   in the media.  Where?  In the newspaper?
24       A.  In the newspaper.

49

1        Q.  And prior to that time, had you
2    heard from any source that Danny and Shannon
3    had been working along with the FBI on some
4    investigation?
5        A.  Prior to that, I don't recall ever
6    hearing that they were working with the FBI.
7        Q.  Before whatever media that you
8    saw, had you heard from any source what, in
9    fact, other than what you just said about
10   this conversation with -- you said you had
11   with Shannon, what, in fact, they were
12   working on in Detached Services?
13       A.  Other than my conversation with
14   her, I wasn't aware of what they were
15   working on in Detached Services.
16       Q.  So you never heard anyone in
17   Narcotics -- strike that.
18           Did you ever hear anyone in
19   Narcotics talk about what Danny and Shannon
20   were doing in Detached Services?
21       A.  I don't recall ever hearing
22   anything regarding what they were doing in
23   Detached Services from anyone other than
24   Shannon Spalding.

13 (Pages 46 to 49)

James Padar    Spalding, Echeverria v. City of Chicago       5/21/15

50

1    Q. At some point, did you become
2  aware that Danny and Shannon were involved
3  in an investigation of Officers Watts and
4  Mohammed?
5    A. Yes.
6    Q. When did you first become aware of
7  that?
8    A. When it was presented in the
9  media.
10   Q. Now you talked about your
11 conversation with Shannon.  Did you ever
12 have a conversation with Danny Echeverria
13 about what they were doing in Detached
14 Services or in the 2nd district?
15   A. Not that I recall.  I don't recall
16 if Mr. Echeverria was present when Shannon
17 and I had spoke in the 2nd district.
18   Q. It's possible he was present
19 during that time?
20   A. Yes.
21   Q. Was anyone else with him?  Was
22 Officer Hernandez present with him at that time?
23   A. I wouldn't think so because
24 Officer Hernandez was one of my team

51

1  members, and shouldn't have been with them.
2    Q. Is it your testimony that you have
3  never heard -- prior to the publicity of the
4  filing of their lawsuit, I believe we are
5  talking November of 2012, is it your
6  testimony that you never heard anyone in
7  Narcotics, from patrol officers up to
8  commander, talk about Danny and Shannon?
9    A. Again, I don't know when the media
10 reported on this versus when they filed
11 their lawsuit.
12   Q. So I am -- the time period I am
13 placing is prior to you hearing from the
14 media, whenever that was, prior to you
15 hearing from the media, is it your testimony
16 that no one -- you never heard anyone in
17 Narcotics talk about Danny or Shannon?
18   MR. KING:  I'd just object to the
19 form.
20     About anything about them?
21   MR. TAREN:  About anything, and
22 then I will narrow it down.
23   MR. KING:  That's a different
24 question than what he's been testifying to

52

1  but...
2    THE WITNESS:  I have heard people
3  talk about Shannon in Narcotics prior to
4  that being released in the media, yes.
5  BY MR. TAREN:
6    Q. Who did you hear talk about
7  Shannon?
8    A. He is now Captain Navarro, Kevin
9  Navarro.
10   Q. When did you hear him talk about
11 Shannon?
12   A. It could have been maybe 2008,
13 2009.
14   Q. What was the subject matter that
15 you recall?
16   A. He asked me if I knew Shannon
17 Spalding, and I said I knew of her.  And he
18 asked me if I would handle a CR number, an
19 investigation, into an allegation of
20 insubordination on her part.
21   Q. Okay.
22   A. And I said, I was willing to
23 accept the investigation.
24   Q. Did you do that?

53

1    A. Yes.
2    Q. What did that investigation
3  involve?  What was the CR about?
4    A. If I recall correctly, it had
5  something to do with Officer Spalding on the
6  medical and not appearing in court, and I
7  conducted an investigation into the
8  allegations.
9      And if I recall correctly, my
10 investigation led me to put a recommendation
11 to exonerate it forward.
12   Q. Are there any other instances that
13 you recall having a discussion with someone
14 from Narcotics about Shannon?
15   A. Are you talking about prior to
16 this?
17   Q. Yes, prior to the media exposure.
18   A. I can't recall any specific
19 conversations, but I do know -- I believe
20 her boyfriend is Tony Hernandez, and he was
21 on my team, so I may have spoken to him
22 about her, but I don't recall specific
23 conversations.
24   Q. That's my next question.

14  (Pages 50 to 53)

James Padar     Spalding, Echeverria v. City of Chicago          5/21/15

---

54

1      A. Okay.
2      Q. You have no recollection of a
3  specific conversation with Mr. Hernandez
4  about Shannon; is that correct?
5      A. I don't recall anything
6  specifically at this point.
7      Q. But it's likely that you had
8  conversations at times with him that may
9  have mentioned --
10     A. Absolutely.
11     Q. -- Shannon?
12         And you were aware that they
13  were in a boyfriend-girlfriend relationship,
14  correct?
15     A. Yes.
16     Q. Let's talk about the Cooperating
17  Individual Requests. Could you mark this as
18  Padar Exhibit 1.
19         (Whereupon, Padar Deposition
20          Exhibit No. 1 was marked for
21          identification.)
22  BY MR. TAREN:
23     Q. I am showing you what we have
24  marked as Padar Deposition Exhibit Number 1.

---

55

1  Take your time, take a look at it, and then
2  tell me if you recognize that?
3      A. I do recognize it.
4      Q. And what is that?
5      A. It's a request to register a
6  cooperating individual.
7      Q. How did this first come to your
8  attention?
9      A. If I recall correctly, Officer
10  Spalding handed it to me to review and
11  approve and present up my chain of command
12  for approval.
13     Q. You are going to have to educate
14  me on what the process is for getting
15  approval of a cooperating individual request
16  at that time. What's the process? What was
17  the process in August of 2010?
18     A. Well, the process for getting the
19  packet approved is to present it to a
20  supervisor, have the supervisor review it
21  for -- to make sure it's complete, and
22  accurate, and then send it up the chain to
23  have a lieutenant review it and have a
24  commander review it and approve it.

---

56

1      Q. Where were you when Shannon handed
2  this to you?
3      A. I believe I was at Homan Square.
4      Q. Did you have a conversation with
5  her at that time about the purpose of this?
6      A. I don't recall any specific
7  conversation, but I would assume that if she
8  handed this to me for approval that we had
9  conversation about it.
10     Q. Was this informant familiar to
11  you?
12     A. Not that I'm aware of, and I don't
13  recognize him on today's date.
14     Q. And is it your testimony that you
15  don't recall any discussion about what the
16  investigation was that Shannon asked to have
17  David Holmes registered for?
18     A. Correct.
19     Q. Do you have any recollection of
20  being told that David Holmes was cooperating
21  with the Feds in any way in any kind of
22  investigation?
23     A. I don't recall that.
24     Q. How do you go about handing this

---

57

1  up the chain of command? Do you do this by
2  oral presentation to your lieutenant, or do
3  you submit a form or a memo or anything of
4  that sort?
5      A. It's been my practice in the past
6  to present it in person to the next step in
7  my chain of command, which would be the
8  lieutenant.
9          In this instance, to be honest
10  with you, I don't recall if I presented it
11  in person or not. I very well may have.
12     Q. Who is the lieutenant that you
13  would present it to?
14     A. At that time, I am not -- I don't
15  recall which lieutenant I presented it to.
16  I don't recognize the -- I can't make out
17  the signature on here.
18     Q. Do you recall anything about the
19  presentation that you made to the lieutenant
20  to seek approval of this cooperating
21  individual?
22     A. I don't.
23     Q. Was anyone else with you at the
24  time that you made your presentation?

15 (Pages 54 to 57)

James Padar    Spalding, Echeverria v. City of Chicago    5/21/15

---

58

1     A.  I don't recall.
2     Q.  When you make a presentation like
3  that, do you take notes or anything?
4     A.  No.
5     Q.  Do you submit any to/froms or
6  memos?
7     A.  No, I don't recall ever that.
8     Q.  Do you recall what the result was
9  of your presentation with regard to approval
10  of David Holmes as a CI?  Was it approved?
11      MR. KING:  I just want to object
12  to the word "presentation."  I think he
13  testified he can't recall whether he did it
14  in person or exactly how he did it in this
15  instance.  Assuming that's what we mean when
16  we say "presentation," that's fine.
17      THE WITNESS:  I would assume by
18  looking at this document that it was
19  approved by a lieutenant.  I don't recall if
20  it was in person or how it was presented.
21  BY MR. TAREN:
22      Q.  Is your signature on this
23  document?
24      A.  Yes, it is.

---

59

1     Q.  And that's the signature under the
2  word "sergeant" with Star Number 1210?
3     A.  Yes.
4     Q.  And does that indicate that you
5  signed this on August 17th of 2010?
6     A.  Yes.
7     Q.  I know you alluded.  I am pretty
8  sure I know what the answer is going to be,
9  but I have to ask you whose signature is
10  right underneath yours?
11      A.  I don't know.
12      Q.  And are there any lieutenants
13  other than the names that you gave me
14  earlier in this deposition that would have
15  been authorized to sign this approval?
16      So my question, is it one of
17  those guys, the lieutenants whose names you
18  recounted, or is it someone else?
19      A.  It could have been someone else.
20  I don't recall every lieutenant that's been
21  there over the period of time that I was
22  there.  I don't recall what lieutenants were
23  assigned to Narcotics on August 17, 2010.
24      I know there is a lieutenant

---

60

1  who I believe is now a commander.  I can't
2  think of his name, but he is not included on
3  your list, but I don't -- I don't recall his
4  name.  He was there for a very brief period
5  of time, and then he became the commander of
6  the 25th district.
7     Q.  After this presentation to the
8  lieutenant, what was the process after that
9  with regard to this request for approval of
10  the cooperating individual?
11      A.  The process would require that
12  this be forwarded to the commander.
13      Q.  And that would have been O'Grady
14  at the time, James O'Grady; is that correct?
15      A.  Yes.
16      Q.  Did you forward this to James
17  O'Grady?
18      A.  I don't recall if I did or the
19  lieutenant did.
20      Q.  How would we determine who did?
21  Is there some document that would indicate
22  who made the presentation -- who presented
23  it to Commander O'Grady?
24      A.  If there is, I am not aware of a

---

61

1  document on who handed this to Mr. O'Grady.
2     Q.  Is there any form that you are
3  required to fill out when you are presenting
4  this up the chain of command that's not
5  contained in Padar Exhibit 1?
6     A.  I have to say I don't know.
7     Q.  Do you have recollection of having
8  any contact with James O'Grady concerning
9  the request of Shannon Spalding and Danny
10  Echeverria to register this informant, David
11  Holmes?
12      A.  I did have communication with him.
13      Q.  And what was the nature of that
14  communication?
15      A.  I remember Commander O'Grady
16  asking me why I signed it.  I remember him
17  asking why their sergeant didn't sign it.  I
18  remember him asking me if I knew who their
19  sergeant was, and I remember him asking me
20  if their sergeant was aware of what they
21  were doing with this, and that they were
22  signing this gentleman up.
23      Q.  What did you tell him?
24      A.  I told him that I wasn't aware of

---

16 (Pages 58 to 61)

James Padar    Spalding, Echeverria v. City of Chicago    5/21/15

62

1  who their sergeant was, and I told him that
2  I wasn't aware of whether or not their
3  supervisor was aware what they were doing or
4  that they were signing up this informant.
5      Q. And what else was said in this
6  conversation then?
7      A. He told me that he wouldn't sign
8  it at this point, and that I would have to
9  have them get their supervisor to sign it,
10  so he could ensure that their supervisors
11  were aware of what was going on.
12      Q. And did you say anything further?
13      A. I don't recall saying anything
14  further.
15      Q. Do you recall if Commander O'Grady
16  said anything further?
17      A. I don't recall him saying anything
18  further.
19      Q. Did you discuss in that
20  conversation -- strike that.
21          First of all, does this
22  refresh your recollection that, in fact, you
23  did have a personal communication with James
24  O'Grady concerning this cooperating

63

1  individual request?
2      A. Yes.
3      Q. Was this face-to-face?
4      A. Yes.
5      Q. Was anyone else present?
6      A. Not that I recall.
7      Q. Did O'Grady ask you anything about
8  the nature of the investigation that Shannon
9  and Danny were conducting with the use of
10  this informant?
11      A. Not that I recall.
12      Q. Did you tell him that they were
13  working on investigating dirty cops?
14      A. No.
15      Q. Did that come up at all?
16      A. No.
17      Q. Did O'Grady ask you anything about
18  the investigation that Shannon -- about your
19  knowledge of what Shannon and Danny were
20  doing?
21          MR. KING: I'd object; asked and
22  answered.
23          You can answer again.
24          THE WITNESS: I don't recall

64

1  having any knowledge of what investigation
2  this individual was going to be part of, and
3  I don't recall Commander O'Grady asking me
4  any questions about what this person was
5  going to be involved in.
6  BY MR. TAREN:
7      Q. Did Commander O'Grady ask you
8  anything about what Danny and Shannon were
9  involved in?
10      A. Not that I recall.
11      Q. Did you discuss with Commander
12  O'Grady the fact that Danny and Shannon
13  were, at that time, in Detached Services?
14      A. I think our conversation alluded
15  to the fact that they were in Detached
16  Services because I was not their supervisor,
17  and he asked if their supervisor was aware
18  of this.
19      Q. And when he asked if their
20  supervisor was aware of this, then you --
21  did you allude to the fact that they were
22  not reporting directly to Narcotics but were
23  in Detached Services?
24          MR. KING: Objection; asked and

65

1  answered to what he alluded to.
2          But you can state the
3  conversation again.
4          THE WITNESS: Commander O'Grady
5  asked me if Shannon and Danny's supervisor
6  was aware of this informant and how they
7  were planning on using the informant, and I
8  said, I don't know. I didn't know who their
9  supervisor was. I didn't know the purposes
10  for which this informant was going to be
11  used specifically.
12  BY MR. TAREN:
13      Q. Now you knew at that time that
14  they were in Detached Services, correct?
15      A. Yes.
16      Q. And are you telling me that you
17  did not mention that to James O'Grady in
18  that conversation?
19      A. I don't know why I would have
20  mentioned that. I don't recall mentioning
21  it. I don't know why I would have mentioned
22  it. I would assume that the commander of a
23  unit would know who is assigned to his unit.
24      Q. So based on your encounter with

17 (Pages 62 to 65)

James Padar      Spalding, Echeverria v. City of Chicago              5/21/15

---

66

1    and your discussion with James O'Grady that
2    we have just been talking about, were you
3    under the impression that he was aware of
4    what Danny and Shannon's assignment was at
5    that time?
6          MR. KING:  Object to the form.
7            You can answer.
8          THE WITNESS:  I don't know what he
9    was aware of at the time, other than my own
10   assumptions that he was aware that they
11   weren't in Narcotics.
12   BY MR. TAREN:
13        Q.  So what did you do after the --
14   after Commander O'Grady refused to sign the
15   approval?
16         MR. KING:  I'd just object to the
17   characterization "refusal," but you can
18   answer.
19         THE WITNESS:  I believe I returned
20   it to Officer Spalding and let her know the
21   reasoning behind why it was not signed.
22   BY MR. TAREN:
23        Q.  Before returning it to Officer
24   Spalding, did you make an effort to talk to

---

67

1    any of the other sergeants?
2          A.  I don't recall talking to any
3    sergeants regarding this.
4          Q.  Did you go back to talk to the
5    lieutenant who had -- who we don't know
6    whose signature that is?
7          A.  I don't recall going back to a
8    lieutenant.
9          Q.  How did you arrange to speak with
10   Shannon?  Did you call her up?
11         A.  I don't recall.
12         Q.  Did you meet with her somewhere?
13         A.  I believe I did.
14         Q.  Where was that?
15         A.  I am not certain of the location
16   where we met.  I believe it was at the Homan
17   Square facility.
18         Q.  In the parking lot?
19         A.  That I don't know.
20         Q.  And do you recall who was present
21   when you met with her?
22         A.  I don't.
23         Q.  Was this a prearranged meeting?
24         A.  I don't recall if it was

---

68

1    prearranged.  I know that we were working --
2    we had worked together on other cases;
3    Officer Spalding and Officer Echeverria,
4    along with my team.  And I don't know if
5    they were present because of something else
6    we were working on, or if I went to meet
7    them, or if they were at Homan Square, that
8    I don't recall.
9          Q.  You are not suggesting that the
10   next meeting you had with regard to this
11   cooperating individual request was just a
12   chance encounter, are you?  Did you just run
13   into her?
14         A.  I am not certain if she was at
15   Homan Square because she had been at Homan
16   Square on numerous occasions before that
17   working with my team.
18         Q.  Okay.
19         A.  So like I said before, I don't
20   recall exactly where we met.  So I can't be
21   certain, no.
22         Q.  Do you have a recollection of this
23   meeting taking place in the 7th district
24   parking lot?

---

69

1          A.  No.
2          Q.  Is it possible?
3          A.  It could be possible.
4          Q.  Do you have a recollection of
5    Danny Echeverria and Anthony Hernandez being
6    present for this conversation?
7          A.  I don't.
8          Q.  And that's another thing that
9    possibly you just don't recall; is that
10   correct?
11         A.  It's possible.
12         Q.  Tell me what you recall saying to
13   Shannon and what she said to you in this
14   encounter.
15         A.  I recall letting her know that
16   Commander O'Grady wanted her to have the
17   supervisor approve this and then forward it
18   back up to him.  I don't recall what her
19   response was.
20         Q.  Do you recall whether she was
21   happy with that?
22         A.  Do you recall whether anyone else
23         Q.  Do you recall whether anyone else
24   participated in this conversation?

18  (Pages 66 to 69)

James Padar   Spalding, Echeverria v. City of Chicago        5/21/15

---

70

1      A.  I don't.
2      Q.  How long was it after Shannon had
3   presented you with the request that is
4   Exhibit 1 that you gave it back to her?
5      A.  I don't recall.
6      Q.  Well, just exploring your memory,
7   are we talking about the same day?  Was it
8   the same day?
9      A.  From reviewing this document --
10     Q.  Yes.
11     A.  -- I don't believe it was the same
12  day.
13     Q.  Okay.  And is that because we have
14  one signature on the 17th and one on the
15  18th?
16     A.  Yes.
17     Q.  Do you recall whether you went to
18  see Commander O'Grady the same day you went
19  to and received this signature from the
20  lieutenant?
21     A.  I don't recall.
22     Q.  Do you recall whether you went to
23  see Shannon to give her back the request the
24  same day that you spoke with Commander

---

71

1   O'Grady?
2      A.  I don't recall.
3      Q.  Was it within two or three days?
4      A.  This is going on almost five
5   years, so I don't recall if there was five
6   days in between or one day in between or ten
7   days in between.  I don't recall.
8      Q.  Before returning the cooperating
9   individual request to Shannon, did you speak
10  with any other officers about anything to do
11  with the approval of David Holmes?
12     A.  Not that I recall.
13     Q.  How unusual was it for Commander
14  O'Grady to refuse to approve a cooperating
15  individual request?
16     MR. KING:  Object to the form of
17  the question.  Lack of foundation.
18     MR. TAREN:  Strike that.  Let me
19  try and lay a foundation.  You are right.
20  BY MR. TAREN:
21     Q.  On how many occasions have you
22  presented a cooperating individual request
23  to Commander O'Grady?
24     A.  Maybe a dozen times.

---

72

1      Q.  And how many times did he refuse
2   to sign the requests?
3      MR. KING:  I still object to the
4   lack of foundation.
5      MR. TAREN:  I am just talking
6   about the ones that he presented.
7      MR. KING:  I understand.  But are
8   you talking about ones that he presented for
9   people that were detailed to other
10  departments?
11     MR. TAREN:  No, no.  In general.
12     MR. KING:  Let's talk apples and
13  apples.
14  BY MR. TAREN:
15     Q.  I was just going to say, of the
16  dozen cooperating individual requests that
17  you presented to Commander O'Grady, how many
18  did he refuse to sign?
19     MR. KING:  And I'd object to the
20  use of "refuse to sign."
21  BY MR. TAREN:
22     Q.  Let's say, how many he did not
23  sign?
24     A.  I don't recall.

---

73

1      Q.  Any other than this one that you
2   can point to?
3      A.  I can't think of any off the top
4   of my head.  However, things that are
5   incomplete or incorrect are often sent back
6   to me to have them complete or corrected
7   prior to his approval.
8      Q.  Is there a record kept of approved
9   cooperating individual requests with your
10  signature on them?
11     A.  I believe there are.
12     Q.  Where would that be kept?
13     A.  I believe at headquarters.
14     Q.  All right.  So if we looked at all
15  of the cooperating individual requests that
16  you signed during a particular period of
17  time, we are either going to see a
18  commander's signature or not; is that
19  correct?
20     A.  No.
21     Q.  No.  Why not?
22     A.  Because I don't know if they keep
23  ones that aren't approved.
24     Q.  What happens to them?

MARIBETH REILLY & ASSOCIATES
630.408.2237        Chicago & Suburbs   maribeth.reilly@gmail.com

James Padar     Spalding, Echeverria v. City of Chicago          5/21/15

74

1     A. I would assume they are returned
2 to the officer for corrections.
3     Q. So how long was this encounter
4 that you had with Shannon in which you
5 returned the cooperating individual request
6 to her? Are we talking about a minute,
7 two minutes? Ten minutes? An hour?
8     A. I don't recall meeting at the 7th
9 district, so I don't know the length of our
10 meeting.
11     Q. Well, would this -- regardless of
12 where it took place, do you recall whether
13 this was a brief encounter or anything more
14 extended?
15     A. I don't recall.
16     Q. After you returned the cooperating
17 individual request to Shannon Spalding, was
18 it ever re-presented to you?
19     A. Not that I recall.
20     Q. Did you ever speak with anyone
21 else about David Holmes -- another
22 sergeant -- about approving a cooperating
23 individual request regarding David Holmes?
24     A. Not that I recall.

75

1     Q. Other than the one conversation
2 you just testified to between you and
3 Commander O'Grady concerning this
4 cooperating individual request, have you
5 ever had any other conversations with
6 Commander O'Grady involving Spalding and
7 Echeverria's request for approval of David
8 Holmes as a cooperating individual?
9     A. Not that I recall.
10     Q. Did you ever have any other
11 conversations with James O'Grady that had
12 anything to do with Shannon Spalding?
13     A. I don't recall specific
14 conversations with him regarding Shannon
15 Spalding.
16     Q. Did you ever have any
17 conversations with James O'Grady about Danny
18 Echeverria?
19     A. Not that I recall.
20     Q. Did Commander O'Grady ever tell
21 you not to work with Spalding and
22 Echeverria?
23     A. No.
24     Q. Or either of them?

76

1     A. No.
2     Q. Did you ever tell Shannon Spalding
3 or Danny Echeverria that O'Grady had told
4 you that you were not to work with them?
5     A. No.
6     Q. Did Commander O'Grady ever speak
7 to you about not backing up or assisting
8 Shannon or Danny?
9     A. No.
10     Q. Did he ever say anything to you
11 about what would happen to Shannon or Danny
12 if there was a 10-1?
13     A. No.
14     Q. Did you ever hear Commander
15 O'Grady refer to either Danny or Shannon as
16 an IAD rat?
17     A. No.
18     Q. Did you ever hear anyone say that?
19     A. No.
20     Q. Did you ever hear anyone refer to
21 them -- now I am taking the word IAD out --
22 as a rat?
23     A. No.
24     Q. Did you ever hear anyone speculate

77

1 or state that they believed that Danny or
2 Shannon were working with IAD?
3     A. I don't recall ever hearing that.
4     Q. Anything like it? I am asking you
5 because you are hesitating on this one.
6     A. I am trying to think with the
7 media coverage surrounding the case if there
8 was mention that they were working with IAD.
9 And I can't recall if there was mention of
10 that in the news reports after the two --
11 the sergeant and the PO from the 2nd
12 district were arrested.
13     Q. Who did you tell that Shannon said
14 they were working investigating dirty cops?
15     A. I don't recall who I told.
16     Q. Did you ever hear another officer
17 say they didn't want to work with either
18 Danny or Shannon?
19     A. I can't think of anyone that I
20 have heard say that.
21     Q. To your knowledge, there was no
22 problem with the quality of their work while
23 they were at Narcotics, was there?
24     A. Not to my knowledge.

20  (Pages 74 to 77)

James Padar     Spalding, Echeverria v. City of Chicago         5/21/15

78

1      Q. Prior to any of the publicity
2   surrounding the filing of this lawsuit, did
3   you ever hear anyone express any animosity
4   towards Danny or Shannon?
5      A. No.
6      Q. Are you saying that until you
7   heard something in the publicity associated
8   with the lawsuit, you were unaware that
9   Danny or Shannon were working with IAD?
10     A. That's correct.
11     Q. And is it your testimony that
12  before reading anything in the newspaper,
13  you were unaware that they were working in
14  conjunction with the FBI?
15     A. That's correct.
16     Q. So when did you first learn that
17  they were involved in any way in the
18  investigation of Officers Mohammed and
19  Watts?
20     A. When the media reports broke
21  around the arrest of Mohammed and Watts.
22     Q. Did you hear from any source prior
23  to that time that Mohammed and Watts were
24  being investigated for possible criminal

79

1   activity?
2      A. No.
3      Q. Have you ever heard the word --
4   the phrase "Brass Tax" in connection with
5   any kind of investigation before it was
6   released to the public?
7      A. No.
8      Q. Did you know either Officer Watts
9   or Mohammed?
10     A. No.
11     Q. At any point did you learn that
12  Danny or Shannon were working and reporting
13  to Juan Rivera?
14     A. No.
15     Q. Do you know who Juan Rivera is?
16     A. Yes.
17     Q. Were you aware of what his
18  position was with IAD?
19     A. I believe he's the chief of IAD.
20     MR. TAREN: Could we take a break?
21     MR. KING: Sure.
22     (Whereupon, a break was taken
23        from 3:13 p.m. to 3:26 p.m.)
24

80

1      (Whereupon, the record was
2         read as requested.)
3   BY MR. TAREN:
4      Q. I am going to bounce back a little
5   bit.
6         In your conversation with
7   James O'Grady that you were testifying
8   about, did he tell you who specifically
9   Shannon should present the cooperating
10  individual request to?
11     A. Not specifically.  She -- he told
12  me to have her present it to her supervisor.
13  I don't know who the supervisor was.
14     Q. Did he clarify to you that he was
15  referring to her supervisor in Detached
16  Services?
17     A. He didn't clarify.
18     Q. Well, what individuals are
19  authorized to approve cooperating individual
20  requests at that time?
21     MR. KING:  Object to the lack of
22  foundation.
23  BY MR. TAREN:
24     Q. Do you know?

81

1      A. I am not certain, no.
2      Q. Didn't it have to be a sergeant in
3   Narcotics?
4      A. That I am not aware of.
5      Q. Do you see what I am getting at?
6   I am trying to find out whether in returning
7   -- strike that.
8         In returning Exhibit 1 to
9   Shannon, did you tell her who she should
10  present it to?
11     A. Her supervisor.
12     Q. Her supervisor in Detached
13  Services, is that what you were referring
14  to?  Or someone else in Narcotics?
15     A. She didn't, to my knowledge, have
16  a supervisor in Narcotics because she wasn't
17  working in Narcotics.
18     Q. But this request for cooperating
19  individual was for an operation in which she
20  was assisting Narcotics, isn't that true?
21     A. I don't recall the circumstances
22  how this cooperating individual was going to
23  be used.
24     Q. Well, didn't you say earlier that

21 (Pages 78 to 81)

James Padar    Spalding, Echeverria v. City of Chicago    5/21/15

82

1    you had worked with Danny and Shannon on
2    some other matters while they were at
3    Detached Services?
4        A. Yes.
5        Q. What kind of matters were they?
6        A. I recall specifically one search
7    warrant that we conducted together.
8        Q. And this was on Narcotics leads
9    that they had helped you develop; is that
10   correct?
11       A. I believe they developed the
12   leads, and we assisted them with the search
13   warrant.
14       Q. So were you aware that the request
15   for authorization of the cooperating
16   individual request was something that would
17   customarily go through Narcotics and not
18   Detached Services?
19       MR. KING: Again, I'd object to
20   the lack of foundation.
21       THE WITNESS: I have never worked
22   in Detached Services, so I don't know if
23   their supervisors would approve something
24   like this.

83

1    BY MR. TAREN:
2        Q. Did you have any idea who their
3    supervisors were at that time in August
4    of 2010?
5        A. No.
6        Q. As far as you were concerned, was
7    this going to be -- returning the
8    cooperating individual request the end of
9    that request because there was really nobody
10   to authorize it?
11       MR. KING: Object to the form. It
12   misstates the testimony, but you can answer.
13       THE WITNESS: I was never aware
14   that there would be no one to approve it in
15   Detached Services.
16   BY MR. TAREN:
17       Q. Are you familiar with the general
18   order that only unit 189 can approve CI
19   packs?
20       A. I am not certain if that means the
21   final approval or every aspect of it. I am
22   not certain. I believe that the commander
23   of Narcotics has to approve it.
24       Q. Have you ever seen a CI pack that

84

1    was signed by an officer outside of 189?
2        A. Not that I can recall.
3            Can I clarify?
4        Q. Sure, please.
5        A. When you say signed by an officer
6    outside of 189 or approved by a supervisor?
7        Q. Approved by a supervisor.
8        A. I have not seen that's been
9    approved by a supervisor outside of 189.
10       Q. So did it strike you as unusual
11   that Commander O'Grady wanted her to present
12   this for approval to someone outside of 189?
13       MR. KING: Object to the form of
14   the question, which again I think misstates
15   the testimony, but you can answer.
16       THE WITNESS: With the reason he
17   gave me, I was not surprised that it was
18   being returned back for her supervisor to
19   review.
20   BY MR. TAREN:
21       Q. Why?
22       A. As a supervisor myself, I think
23   it's important that supervisors are aware of
24   what their subordinates are doing and

85

1    working on. In this case, I wasn't certain,
2    and I believe Commander O'Grady wasn't
3    certain if her supervisor was aware of what
4    she was doing.
5        Q. Well, you didn't have any problem
6    signing Exhibit 1, did you?
7        A. Correct.
8        Q. So, obviously, at that time, you
9    knew what the purpose was, and what was
10   being worked on, isn't that true?
11       A. I didn't know what the purpose
12   was. I assumed he would be working with
13   Officer Spalding in the future with more
14   intelligence to follow up on, but I didn't
15   know of any specific project that was being
16   worked on or case that was being worked on
17   with this individual.
18       Q. And did the lieutenant that you
19   presented Exhibit 1 to raise any issues
20   about whether you should be signing this as
21   opposed to some other supervisor?
22       A. That I don't recall. I don't even
23   recall if I met personally with the
24   lieutenant or if I put it in his in-box.

22  (Pages 82 to 85)

James Padar    Spalding, Echeverria v. City of Chicago    5/21/15

86

1    Q. Did you ever ask Shannon whether
2  the supervisor she was working with was
3  aware of this request?
4    A. Not that I recall.
5    Q. When this was presented to you,
6  did it have Officer Hernandez's name on it?
7    A. That I don't recall.
8    Q. And you see at the bottom
9  left-hand part of Exhibit 1, is that Officer
10 Hernandez's signature?
11   A. I believe so, yes.
12   Q. So was it your understanding that
13 Officer Hernandez was working with Officers
14 Spalding and Echeverria on the matter that
15 required this request to be presented?
16   A. Yes.
17   Q. Were you Officer Hernandez's
18 supervisor?
19   A. Yes.
20   Q. Is that correct?
21   A. Yes.
22   Q. Did you talk about that to
23 Commander O'Grady?
24   A. Not that I recall.

87

1    Q. So why was it necessary if Officer
2  Hernandez was also making this request and
3  his supervisor was aware and had approved
4  the request that there be -- that this be
5  rejected because Shannon Spalding's
6  supervisor hadn't signed off on it?
7    MR. KING: Object to the lack of
8  foundation.
9      If you know, you can answer.
10   THE WITNESS: I don't know any
11 specifics. I could only speculate as to why
12 her supervisor should know about this.
13 BY MR. TAREN:
14   Q. By the way, do you recall that you
15 returned this to Shannon at around midnight
16 at the same day that you presented it to
17 Commander O'Grady?
18   A. That I don't recall.
19   Q. That's possible?
20   A. It's possible.
21   Q. Do you recall seeing a cooperating
22 individual request that had a yellow sticky
23 Post-it note on it telling you to go see
24 Commander O'Grady?

88

1    MR. KING: Just object to the form
2  and lack of foundation and assuming facts
3  not in evidence.
4    THE WITNESS: I don't recall.
5  BY MR. TAREN:
6    Q. Did you ever tell Shannon or Danny
7  or Anthony Hernandez that O'Grady had told
8  you that he'd sign the CI pack for Holmes if
9  you'd scratch those two rat's names off the
10 packet?
11   A. No.
12   Q. You are smirking. Is there a
13 reason for that?
14   A. I had previously testified that I
15 never heard Shannon be referred to as a rat
16 or an IAD rat.
17   Q. Are you aware that there are three
18 individuals that are going to testify that,
19 in fact, that is what he said?
20   A. I am not aware of what they are
21 going to testify to.
22   Q. Do you know whether Shannon and
23 Danny had been authorized to wear a wire
24 pursuant to their investigation with

89

1  Detached Services?
2    A. I don't know.
3    Q. Do you know whether any of the
4  conversations that you had with Shannon or
5  Danny had been recorded?
6    A. I don't know.
7    Q. Did you ever tell Danny that
8  O'Grady had said to you that their paths
9  were not to cross again, meaning the paths
10 of Danny and Shannon and the Narcotics
11 squad?
12   A. No.
13   Q. Did you tell Danny that James
14 O'Grady had said to you, "God help them if
15 they need some help, it ain't coming. You
16 are not to help them out"?
17   A. No.
18   Q. Did you tell Danny or Shannon
19 anything about O'Grady being upset with them
20 for any reason?
21   A. No.
22   Q. Your recollection of this
23 conversation was it was just a routine
24 returning deficient CI pack; is that

23 (Pages 86 to 89)

James Padar    Spalding, Echeverria v. City of Chicago    5/21/15

90

1  correct?
2      A. Yes.
3      Q. And your recollection is that
4  neither Danny or Shannon reacted in any
5  unusual or upset way during that
6  conversation?
7      A. I don't recall any adverse
8  reaction.
9      Q. There must have been some
10  reaction, was there? Do you recall any
11  reaction at all?
12      A. I don't.
13      Q. Do you recall telling Shannon that
14  you had your orders and -- from O'Grady, and
15  you can't mess up your job, or something to
16  the effect, you are just doing your job?
17      A. No.
18      Q. By the way, Commander O'Grady had
19  directed you to return this to Shannon; is
20  that correct?
21      A. Yes.
22      Q. And I understand -- do I
23  understand correctly that he instructed you
24  to tell them why he was not signing it; is

91

1  that correct?
2      A. Yes.
3      Q. So in this meeting that we are
4  referring to where you are not exactly sure
5  where it took place, you were carrying out
6  Commander O'Grady's orders; is that correct?
7      A. Yes.
8      Q. To your knowledge, did you -- you,
9  being Narcotics, ever use this informant,
10  David Holmes, to make confirmation buys for
11  search warrant?
12      A. I don't recall personally using
13  him. That's not to say that someone on my
14  team may have used him, or Shannon or Danny
15  may have used him.
16      Q. Do you recall ever seeing any
17  reports, any buy reports, reflecting that
18  David Holmes was making a buy?
19      A. I don't. But I don't believe his
20  name would ever be used on a buy report.
21      Q. Do you recall ever seeing a report
22  that stated that an undercover officer made
23  a buy when, in fact, it was the cooperating
24  individual that did?

92

1      A. No.
2      Q. Now in August of 2010, you were on
3  good terms with Anthony Hernandez; is that
4  correct?
5      A. Yes.
6      Q. And were you social friends with
7  Mr. Hernandez at that time?
8      A. I have never been to his house.
9  We have never really gone out together
10  outside of work, other than possibly
11  promotional parties or police-related
12  events.
13      Q. Okay.
14      A. He has been to my house. We were
15  friendly.
16      Q. And in August of 2010, you had no
17  bad dealings or animosity towards either
18  Shannon or Danny, isn't that true?
19      A. That's true.
20      Q. Did you ever hear from any source
21  that Shannon Spalding was not to be allowed
22  to be present at Homan Square?
23      A. I don't recall hearing from anyone
24  that she wasn't allowed to be at Homan

93

1  Square, no.
2      Q. Did you hear from anyone that she
3  wasn't to be either at the guard shack or to
4  -- or anywhere near Homan?
5      A. No, I was not given any direction
6  or instructions to make sure she was not at
7  Homan Square.
8      Q. That would be a pretty unusual
9  direction, wouldn't it?
10      A. Yes.
11      Q. Do you know who Tom Chester is?
12      A. Yes.
13      Q. How do you know Mr. Chester?
14      A. I was introduced to him one day
15  when he was at Homan Square as a supervisor
16  in Internal Affairs.
17      Q. Do you recall when that was?
18      A. I don't recall if it was 2011 or
19  2012.
20      Q. At any point, did you learn that
21  Shannon and Danny were reporting to Tom
22  Chester?
23      A. No.
24      Q. And do you recall what the

24 (Pages 90 to 93)

James Padar    Spalding, Echeverria v. City of Chicago    5/21/15

94

1    circumstances were of why Tom Chester was at
2    Homan Square when you encountered him?
3        A. He and Sergeant Mike Barz were
4    requesting an interview with me.
5        Q. Okay. And what was that
6    regarding?
7        A. Regarding allegations that Anthony
8    Hernandez made against me.
9        Q. Was this before or after Hernandez
10   filed his lawsuit against you?
11       A. I believe it was after.
12       Q. And did you give an interview to
13   them at that time?
14       A. No.
15       Q. Have you ever given them an
16   interview with regard to those allegations?
17       A. No.
18       Q. Is there an outstanding CR with
19   regard to the Hernandez allegations and you?
20       A. Yes.
21       Q. Do you know what the status of
22   that is?
23       A. I don't know what the status of it
24   is.

95

1        Q. And that's the complaint that
2    alleges that you held back time slips that
3    were submitted by Mr. Hernandez; is that
4    correct?
5        A. Yes.
6        Q. And that's the case that you were
7    deposed on in February of this year?
8        A. Yes.
9        Q. You said there was an ongoing CR
10   with regard to the Hernandez allegations.
11   Do you know whether there is a criminal
12   investigation with regard to the Hernandez
13   allegations?
14       A. I'm aware that it was reviewed by
15   the State's Attorney's Office.
16       Q. Okay.
17       A. And I was informed by my attorney
18   that there would be no charges criminally.
19       Q. Did you get anything from the
20   State's Attorney, any letters?
21       A. I did not.
22       Q. I'd like to ask you some questions
23   about your involvement with the arrest of
24   Joseph Sperling in June of 2013.

96

1        MR. KING: And I am going to
2    object to the relevance of those questions,
3    but you may ask.
4    BY MR. TAREN:
5        Q. All right. Did you participate in
6    a surveillance of Joseph Sperling in and
7    around June of 2013?
8        A. In regards to this case, I'm aware
9    that there -- this case is being reviewed by
10   the State's Attorney's Office. So I am not
11   at liberty to discuss this case because
12   there could potentially be criminal charges.
13       Q. Are you going to assert your right
14   not to testify -- not to incriminate
15   yourself under the Fifth Amendment and
16   refuse to answer questions?
17       A. Yes, I am.
18       Q. Now I am going to have to tell
19   you, since I have been through this before,
20   that in order to make a record, I am
21   required to ask you the questions, and you
22   are going to have to assert your Fifth
23   Amendment right as to any question that you
24   believe may tend to incriminate you. And

97

1    those that do not, you are supposed to be
2    answering the question but I can't just take
3    the blanket "I won't testify."
4        So I did this for three hours
5    once. It was not a pleasant deposition.
6    This won't take three hours.
7        Can you tell me who
8    participated in the surveillance of Joseph
9    Sperling?
10       MR. KING: And I want to show a
11   continuing line of objection as to the
12   relevance of the Sperling matter to this
13   lawsuit, in addition to the rights that the
14   witness is asserting.
15   BY MR. TAREN:
16       Q. If you want to just say, you know,
17   I will take the Fifth or assert my rights,
18   so we can short-circuit it, that's fine with
19   me, too. Anyway you want to say it.
20       A. I will assert my rights.
21       Q. In conjunction with the arrest of
22   Joseph Sperling, were you acting as a member
23   of the Chicago Police Department Narcotics
24   squad?

25 (Pages 94 to 97)

James Padar    Spalding, Echeverria v. City of Chicago    5/21/15

98

1    A. Yes.
2    Q. And did Officers Vince Morgan and
3  William Pruente participate in the
4  surveillance with you?
5    A. I will assert my rights.
6    Q. Prior to pulling Mr. Sperling
7  over, did you participate in any
8  conversations with other officers where you
9  planned how to pull Mr. Sperling over in his
10  car?
11    A. I will assert my rights.
12    Q. Were you accompanied by two
13  Village of Glenview police officers that
14  day?
15    A. Yes.
16    Q. And were those officers Horn and
17  Urbanowski?
18    A. Yes.
19    Q. Had you worked with them before?
20    A. I had met Sergeant Urbanowski on
21  one occasion when the Postal team and
22  Narcotics was doing a controlled delivery,
23  and she was present for the debriefing at
24  the Glenview police station.

99

1    Q. Are you listed as an arresting
2  officer with regard to the June 6th arrest
3  of Joseph Sperling?
4    A. I don't recall.
5    Q. Were you present at the traffic
6  stop of Sperling's car that day?
7    A. I will assert my rights.
8    Q. Was Mr. Sperling pulled over
9  because he failed to use his turn signal?
10    A. I will assert my rights.
11    Q. Did he, in fact, fail to use his
12  turn signal?
13    A. I will assert my rights.
14    Q. Did you testify in the suppression
15  hearing held on March 31, 2014, before Cook
16  County Circuit Court Judge Catherine
17  Haberkorn in the case captioned, "State
18  versus Sperling"?
19    A. Yes.
20    Q. Did you testify falsely under oath
21  in that suppression hearing?
22    A. I will assert my rights.
23    Q. Prior to the suppression hearing,
24  did you participate in the conversation with

100

1  Officers Morgan, Pruente, Horn or Urbanowski
2  where you agreed upon a false story to
3  testify to under oath regarding the
4  stop-and-frisk of Joseph Sperling?
5    A. I will assert my rights.
6    Q. Did you falsely testify under oath
7  in that hearing that the officers had
8  initially asked Sperling for his driver's
9  license and registration?
10    A. I will assert my rights.
11    Q. Did you falsely testify under oath
12  that you or one of your fellow officers
13  asked Sperling if he had any illegal
14  narcotics on him?
15    A. I will assert my rights.
16    Q. Did you falsely testify under oath
17  that Sperling admitted that he had illegal
18  narcotics on him?
19    A. I will assert my rights.
20    Q. Did you falsely testify under oath
21  that Sperling was walked to the rear of his
22  car with Glenview Police Officer Horn, while
23  Officer Pruente searched Sperling's car?
24    A. I will assert my rights.

101

1    Q. Did you falsely testify under oath
2  that drugs were found in plain view in
3  Sperling's vehicle?
4    A. I will assert my rights.
5    Q. Did you falsely testify under oath
6  that Sperling was not arrested until after
7  marijuana was found in the vehicle, and he
8  admitted to possessing it?
9    A. I will assert my rights.
10    Q. Were you aware at the time of your
11  court testimony at the time of the
12  suppression hearing that your encounter with
13  Joseph Sperling on June 6, 2013, had been
14  videotaped by Officer Urbanowski's squad
15  car?
16    A. I will assert my rights.
17    Q. Did you conspire with the other
18  officers mentioned above to testify falsely
19  under oath in that suppression hearing?
20    A. I will assert my rights.
21    Q. Did Judge Haberkorn announce in
22  court on March 31, 2014, that "All officers
23  lied on the stand today. All their
24  testimony was a lie. So there is strong

26 (Pages 98 to 101)

James Padar    Spalding, Echeverria v. City of Chicago    5/21/15

102

1  evidence it was a conspiracy to lie in this
2  case for everyone to come up with the same
3  lie.  Many, many, many times they all lied"?
4      A.  I'll assert my rights.
5      Q.  Have you been notified by the
6  State's Attorney that you are a target of a
7  criminal investigation with regard to your
8  testimony that was given in the Joseph
9  Sperling matter?
10      A.  No.
11      Q.  Have you been called before a
12  Grand Jury?
13      A.  No.
14      Q.  Is your assignment to the 311
15  center a result of any investigation into
16  your testimony at the March -- at the
17  March 31, 2014, suppression hearing?
18      A.  Yes.
19      Q.  Have you written about your
20  involvement in the Sperling case anywhere in
21  your blogs or emails?
22      A.  No.
23      Q.  Have you written about anything to
24  do with Shannon Spalding on any blog or

103

1  email?
2      A.  No.
3      Q.  Have you ever posted any anonymous
4  comments on any police-related blogs that
5  have anything to do with Shannon Spalding or
6  Danny Echeverria or Anthony Hernandez?
7      A.  No.
8      Q.  Have you ever given any oral
9  interviews about your involvement in the
10  Sperling case?
11      A.  No.
12      Q.  Have you talked to your father
13  about your involvement in this Sperling
14  case?
15      A.  Yes.
16      Q.  On how many occasions?
17      A.  I am not certain how many
18  conversations I have had with him.
19      Q.  And were those conversations in
20  the presence of counsel or not?
21      A.  No.
22      Q.  What have you talked to your
23  father about with regard to the Sperling
24  case?

104

1      MR. KING:  Again, object to the
2  relevance.
3      THE WITNESS:  I have -- I spoke to
4  him about how I have been reassigned while
5  they investigate -- the department
6  investigates allegations made against me.
7      I have spoken to him about the
8  media coverage, and about the video that was
9  shown on the news.
10  BY MR. TAREN:
11      Q.  What did you tell him about the
12  video that was shown on the news?
13      A.  I asked him if he could get a copy
14  for me, seeing as at that point, I had never
15  seen the video.  I was not present in court
16  when any video was played, and I was not
17  recalled into court to view any video.
18      Q.  Did he get you a copy?
19      A.  I believe he emailed a copy of the
20  video that was on the news.
21      Q.  Did you communicate with him by
22  email or texts with regard to the Sperling
23  matter?
24      A.  I don't recall other --

105

1  specifically other than receiving an email
2  from him with the attached video.
3      Q.  Have you talked to him about the
4  substance of the allegations made against
5  you with regard to the Sperling testimony?
6      A.  I have not received any
7  allegations.  So it's difficult to answer
8  the question because I still haven't
9  received any allegations as to what the City
10  is alleging I did wrong.
11      Q.  Have you talked to your father
12  with regard to any of the allegations in the
13  Spalding case?
14      A.  Again, I have not received any
15  allegations of the Spalding case -- oh, I'm
16  sorry, in the Spalding case?
17      Q.  Spalding case, right.
18      You were initially named as a
19  Defendant in the Spalding case, correct?
20      A.  Yes, yes.
21      Q.  It was before my time.
22      A.  Yes.
23      Q.  And did you communicate with your
24  father about those allegations?

27 (Pages 102 to 105)

James Padar    Spalding, Echeverria v. City of Chicago    5/21/15

106

1    A. I believe I did, yes.
2    Q. And did you communicate in
3  writing, by text or e-mail?
4    A. I don't recall exactly how I
5  communicated.  I do recall speaking to him
6  on the phone when I found out about it.
7    Q. Did you tell him what the specific
8  allegations with regard to you were?
9    A. I believe -- I remember when I
10  found out about the lawsuit, I was at work,
11  and I believe I called him to see if he
12  could find the complaint because I had not
13  been served with any complaint, and I wasn't
14  certain what allegations were made against
15  me.
16    Q. And did he do that for you?
17    A. I don't recall if he found
18  anything else at the time because I don't
19  think I could find anything at the time.  I
20  think it was too new, and it wasn't entered
21  in, or it wasn't in public record or on the
22  Internet yet.
23    Q. Have you ever communicated with
24  your father about the substance of the

107

1  allegations that are in the Spalding case?
2    A. I don't recall specifically what
3  we spoke about.  I am -- I believe we spoke
4  about the complaint, but I don't recall the
5  specifics of the conversation.
6    Q. You are aware that the gravamen of
7  Danny and Shannon's claims are that they
8  were retaliated against because they
9  cooperated in investigation of dirty cops;
10  Watts and Mohammad?
11    A. Yes.
12    Q. Have you ever had any discussions
13  with anyone about the truth or falsity of
14  those allegations other than counsel, other
15  than counsel?
16    A. Not that I can recall.
17    Q. With regard to the Sperling
18  matter, there was a civil action that was
19  filed as well, isn't that correct?
20    A. Yes.
21    Q. And you were named as a Defendant?
22    A. I believe so, yes.
23    Q. And that case was settled rather
24  quickly, was it not?

108

1    A. It was settled.
2    Q. Did you sign a settlement
3  agreement in that case?
4    A. I did not sign anything.
5    Q. Did you pay any money with regard
6  to the settlement of the Sperling case?  You
7  personally?
8      MR. KING:  Again, I object to the
9  relevance of anything related to Sperling.
10      You can answer, unless it's a
11  confidential settlement to your knowledge.
12      THE WITNESS:  No.
13  BY MR. TAREN:
14    Q. No.  No what?
15    A. I am sorry.  No to your question.
16  I have not paid anything.
17    Q. You have not paid any money for
18  that?
19    A. I have not personally paid any
20  money.
21    Q. Have you received a release of
22  claims personally from Joseph Sperling with
23  regard to any of the allegations made in the
24  civil action against you?

109

1    A. No.
2    Q. Have you signed anything presented
3  to you by the City of Chicago with respect
4  to the civil action filed by Mr. Sperling?
5    A. No, not that I can recall.
6    Q. Have you ever given false
7  testimony under oath in connection with your
8  employment with the Chicago Police
9  Department?
10    A. I am going to assert my rights.
11    Q. Are you aware of any other police
12  officers associated in the Narcotics
13  Division who have given false testimony
14  under oath in connection with their
15  employment?
16    A. I am going to assert my rights.
17    Q. Who else have you discussed
18  anything to do with the allegations in the
19  Spalding matter other than counsel and
20  discussions with your father?
21    A. My wife.
22    Q. Anyone else?
23    A. I don't recall specifically.
24    Q. Have you ever talked to James

28  (Pages 106 to 109)

James Padar    Spalding, Echeverria v. City of Chicago    5/21/15

110

1 O'Grady about any of the allegations that
2 were made against him in the Spalding
3 matter?
4     A.  No.  I am not really aware what
5 the allegations are against him.
6     Q.  Have you ever spoken with Nicholas
7 Roti with regard to any of the allegations
8 made by Shannon or Danny?
9     A.  No.
10    Q.  How about with Deborah Pascua?
11    A.  No.
12    Q.  Maurice Barnes?
13    A.  No.
14    Q.  Robert Cesario?
15    A.  No.
16    Q.  Joseph Salemme?
17    A.  No.
18    Q.  Thomas Mills?
19    A.  No.
20    Q.  Have you ever spoken with anyone
21 at IAD with regard to the allegations that
22 were made by Shannon Spalding and Danny
23 Echeverria?
24    A.  I don't recall speaking to anyone

111

1 in IAD regarding these allegations.
2     Q.  To your knowledge, is there an
3 outstanding CR number with regard to any of
4 the allegations made as a result of a civil
5 action in Spalding versus City?
6     A.  Not that I'm aware of.
7     Q.  Have you been testifying
8 truthfully today?
9     A.  Yes.
10    Q.  Do you know of any reason why
11 Shannon Spalding would lie about what she
12 claims you told her James O'Grady said about
13 her?
14    A.  It's my belief that she is lying
15 because she is upset that her boyfriend and
16 I got into a business arrangement that ended
17 poorly.
18    Q.  And when did that business
19 arrangement end?
20    A.  I believe it was the end of 2011.
21    Q.  And do you believe that her
22 allegations, therefore, that are contained
23 in this lawsuit are all as a result of you?
24    A.  I'm sorry, can you read that back,

112

1 please.
2         (Whereupon, the record was
3          read as requested.)
4     THE WITNESS:  Maybe I am not
5 understanding the question.  I don't know if
6 she filed the lawsuit -- I don't believe she
7 filed this lawsuit all because of me.  Is
8 that the question?
9 BY MR. TAREN:
10    Q.  Yes.
11    A.  Okay.  No, I don't believe that.
12    Q.  And are you aware of any motive
13 that she has to lie about James O'Grady?
14    A.  I can only give you my own
15 beliefs.
16    Q.  Sure.
17    A.  I believe it's monetary gain.
18    Q.  What do you base that on?
19    A.  I don't know exactly what else she
20 would get out of this other than money.
21    Q.  In the course of your employment
22 with the Chicago Police Department, were you
23 aware of other officers who investigated
24 dirty cops?

113

1     A.  It's a difficult question to
2 answer.  I know of people who have come from
3 Internal Affairs, and they investigate
4 allegations against police officers.  I
5 know -- I believe Commander O'Grady came
6 from Internal Affairs.  My assumption would
7 be that he investigated officers that
8 allegations were made about.
9         I know another sergeant that
10 O'Grady brought to the unit, Rick Herrera,
11 came from Internal Affairs.  I would assume
12 that he investigated allegations against
13 police officers.  But again, I am not
14 certain what their role was in Internal
15 Affairs.
16    Q.  Have you observed how officers who
17 criminally investigate other police officers
18 are treated on the job?
19    MR. KING:  I'd just object to the
20 lack of foundation.  I am not sure he's
21 testified that he's aware of any, yet you
22 can answer.
23    THE WITNESS:  I'm aware of the
24 Internal Affairs sergeant who played a part

29  (Pages 110 to 113)

James Padar    Spalding, Echeverria v. City of Chicago         5/21/15

---

114

1  in my investigation, and I am still able to
2  freely speak to him and have a fine
3  relationship with him.
4  BY MR. TAREN:
5      Q.  Have you written in your blog or
6  in your book about anything relating to the
7  code of silence within the Chicago Police
8  Department?
9          MR. KING:  I'd just object to the
10 form of the question and lack of foundation.
11         If you understand the
12 question, you can answer.
13         THE WITNESS:  I don't recall
14 making any writings regarding a code of
15 silence within the police department.
16 BY MR. TAREN:
17     Q.  Have you heard that term used in
18 the past?
19     A.  Yes.
20     Q.  What is your understanding of what
21 that term refers to?
22     A.  My understanding is that if police
23 officers see wrongdoing by other police
24 officers, that they could potentially remain

---

115

1  silent.
2      Q.  When did you first hear about that
3  concept?
4      A.  I don't -- I don't recall if it
5  was on TV or in the movies or when.
6      Q.  Is it your belief that there is
7  such a code of silence within the Chicago
8  Police Department?
9      A.  I don't believe so.
10     Q.  You are aware that allegations of
11 such a code have been made in the past,
12 isn't that true?
13     A.  Yes.
14     Q.  Are you aware of the reluctance of
15 police officers to inform on other police
16 officers that they observe doing acts that
17 might be considered criminal?
18         MR. KING:  Object to the lack of
19 foundation.
20         You can answer.
21         THE WITNESS:  I don't have any
22 specific knowledge on that.
23 BY MR. TAREN:
24     Q.  By the way, the IAD officer that

---

116

1  you were referring to earlier that you could
2  still talk to, who is that?
3      A.  Sergeant Mike Barz.
4      Q.  Did you ever speak with Sergeant
5  Barz about anything to do with Danny and
6  Shannon?
7      A.  Not that I can recall.
8      Q.  Let me just check and see if we
9  are done here.
10         Have you been notified how
11 long you may remain in the 311 center?
12     A.  No.
13     Q.  Have any formal proceedings,
14 disciplinary in nature, been taken against
15 you as a result of the Sperling matter?
16     A.  No.
17     Q.  What about as a result of the
18 Hernandez matter?
19     A.  No.
20     Q.  And what about as a result of any
21 of the allegations in the Spalding case?
22     A.  No.
23         MR. TAREN:  That's all I have.
24         MR. KING:  I don't have any

---

117

1  questions.
2          We will reserve.
3
4      (FURTHER DEPONENT SAITH NOT.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

30  (Pages 114 to 117)

James Padar    Spalding, Echeverria v. City of Chicago        5/21/15

---

**118**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          NORTHERN DISTRICT OF ILLINOIS
 3               EASTERN DIVISION
 4
 5   CHICAGO POLICE
     OFFICERS SHANNON
 6   SPALDING and
     DANIEL ECHEVERRIA,
 7        Plaintiffs,
          vs.
 8   CITY OF CHICAGO,
     CHICAGO POLICE
 9   CHIEF JUAN RIVERA,
     et al.,
10        Defendants.
11        I, JAMES PADAR, being first duly
12   sworn, on oath say that I am the deponent in
13   the aforesaid deposition taken on May
14   21, 2015; that I have read the foregoing
15   transcript of my deposition, consisting of
16   pages 1 - 121, and affix my signature to
17   same.
18          JAMES PADAR
19          Number of errata sheets
            attached_____
20
     Subscribed and sworn to
21   before me this       day
     of        , 2016.
22
23
24   Notary Public
```

---

**119**

```
 1   STATE OF ILLINOIS  )
 2              )  SS:
 3   COUNTY OF DU PAGE  )
 4
 5        I, MARIBETH REILLY, a notary public
 6   within and for the County of DuPage County
 7   and State of Illinois, do hereby certify
 8   that heretofore, to-wit, on May 21, 2015,
 9   personally appeared before me, at One North
10   LaSalle Street, Chicago, Illinois, JAMES
11   PADAR, in a cause now pending and
12   undetermined in the Northern District of
13   Illinois, wherein Chicago Police Officers
14   SHANNON SPALDING and DANIEL ECHEVERRIA are
15   the Plaintiffs, and CITY OF CHICAGO, et al.,
16   are the Defendants.
17        I further certify that the said JAMES
18   PADAR was first duly sworn to testify the
19   truth, the whole truth and nothing but the
20   truth in the cause aforesaid; that the
21   testimony then given by said witness was
22   reported stenographically by me in the
23   presence of the said witness, and afterwards
24   reduced to typewriting by Computer-Aided
```

---

**120**

```
 1   Transcription, and the foregoing is a true
 2   and correct transcript of the testimony so
 3   given by said witness as aforesaid.
 4        I further certify that the signature
 5   to the foregoing deposition was reserved by
 6   counsel for the respective parties and that
 7   there were present at the deposition the
 8   attorneys hereinbefore mentioned.
 9        I further certify that I am not
10   counsel for nor in any way related to the
11   parties to this suit, nor am I in any way
12   interested in the outcome thereof.
13        IN TESTIMONY WHEREOF:  I have hereunto
14   set my hand and affixed my notarial seal
15   this 17th day of January, 2016.
16
17
18
19        NOTARY PUBLIC, DU PAGE COUNTY, ILLINOIS
20        C.S.R. No. 084-002306
21
22
23
24
```

---

**121**

```
 1   (James Padar, 5/2/15 - Spalding v. City)
 2            ERRATA SHEET
 3   PG/LN         CORRECTION
 4   ___/___Change from:_____
 5       Change to:_____
 6   ___/___Change from:_____
 7       Change to:_____
 8   ___/___Change from:_____
 9       Change to:_____
10   ___/___Change from:_____
11       Change to:_____
12   ___/___Change from:_____
13       Change to:_____
14   ___/___Change from:_____
15       Change to:_____
16   ___/___Change from:_____
17       Change to:_____
18   ___/___Change from:_____
19       Change to:_____
20   ___/___Change from:_____
21       Change to:_____
22   ___/___Change from:_____
23       Change to:_____
24   WITNESS SIGNATURE:_____
```

31 (Pages 118 to 121)

```
James Padar   Spalding, Echeverria v. City of Chicago      5/21/15
```

```
                                              122
 1    (James Padar, 5/2/15 - Spalding v. City)
 2           ERRATA SHEET
 3   PG/LN           CORRECTION
 4   ___/___Change from:_____
 5        Change to:_____
 6   ___/___Change from:_____
 7        Change to:_____
 8   ___/___Change from:_____
 9        Change to:_____
10   ___/___Change from:_____
11        Change to:_____
12   ___/___Change from:_____
13        Change to:_____
14   ___/___Change from:_____
15        Change to:_____
16   ___/___Change from:_____
17        Change to:_____
18   ___/___Change from:_____
19        Change to:_____
20   ___/___Change from:_____
21        Change to:_____
22   ___/___Change from:_____
23        Change to:_____
24   WITNESS SIGNATURE:_____
```

32 (Page 122)

# Exhibit J

Page 1

1       IN THE UNITED STATES DISTRICT COURT

         FOR THE NORTHERN DISTRICT OF ILLINOIS

2              EASTERN DIVISION

3

  CHICAGO POLICE OFFICER       )

4  SHANNON SPALDING and        )

  CHICAGO POLICE OFFICER       )

5  DANIEL ECHEVERRIA,         )

                         )

6           Plaintiffs,  )

                         )

7       -vs-          )  No. 12 C 8777

                         )

8  CITY OF CHICAGO, et al    )  Judge Feinerman

                         )

9           Defendants.   )

10

11

12        The deposition of LIEUTENANT JUAN RIVERA,

13  taken pursuant to the Federal Rules of Civil Procedure

14  of the United States District Courts pertaining to the

15  taking of depositions, taken before CHRISTINE

16  LIUBICICH, Certified Shorthand Reporter of the State of

17  Illinois, at One North LaSalle Street, Suite 3040

18  Chicago, Illinois, on Thursday, December 4, 2014, at

19  1:00  p.m.

20

21

22

23

24

Page 2

```
1   APPEARANCES:
2      CHRISTOPHER SMITH TRIAL GROUP
       One North LaSalle Street
3      Suite 3040
       Chicago, Illinois 60602, by
4      MR. CHRISTOPHER SMITH
       office@crstrialgroup.com
5
          appeared on behalf of Plaintiffs;
6
7      DRINKER BIDDLE & REATH LLP
       191NorthWacker Drive
8      Suite 3700
       Chicago, Illinois 60606-1698, by
9      MR. ALAN S. KING
       Alan.King@dbr.com
10
11        appeared on behalf of Defendants.
12
13
    ALSO PRESENT:
14
    SHANNON SPAULDING.
15
16
17
18  REPORTED BY CHRISTINE LIUBICICH, CSR.
19
20
21
22
23
24
```

Page 4

```
1   Exhibit No. 16 E-mail .....................136
2   Exhibit No. 17 E-mail .....................137
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
1              I N D E X
2   WITNESS                      PAGE
3   LIEUTENANT JUAN RIVERA
4      Examination By Mr. Smith ...................5
5
6            E X H I B I T S
7
                        MARKED
8   NUMBER                    FOR ID
9   Lieutenant Juan Rivera Deposition Exhibit
```

```
10     Exhibit No. 1 Letter of recommendation .......9
11     Exhibit No. 2 Overtime slips ...............115
12     Exhibit No. 3 Counseling session report ....115
13     Exhibit No. 4  E-mail .....................118
14     Exhibit No. 5 E-mail .....................119
15     Exhibit No. 6 Notice .....................120
16     Exhibit No. 7 E-mail .....................122
17     Exhibit No. 8 E-mail .....................124
18     Exhibit No. 9 E-mail .....................125
19     Exhibit No. 10 E-mail .....................126
20     Exhibit No. 11 E-mail .....................128
21     Exhibit No. 12 E-mail .....................128
22     Exhibit No. 13 E-mail .....................132
23     Exhibit No. 14 Note .....................133
24     Exhibit No. 15 Two e-mails ...............134
```

Page 5

```
1              (Witness duly sworn.)
2              LIEUTENANT JUAN RIVERA,
3   called as a witness herein, having been first duly
4   sworn, was examined and testified as follows:
5              EXAMINATION
6   BY MR. SMITH:
7      Q.  Can you please state your name and spell your
8   name for the court reporter?
9      A.  Juan, J-U-A-N, Rivera, R-I-V-E-R-A.
10     Q.  What is your current position?
11     A.  I'm the Chief of the Bureau of Internal
12  Affairs.
13     Q.  Did you review any documents in preparation
14  for this deposition?
15     A.  Yes.
16     Q.  What documents did you review?
17     A.  I believe it was certain e-mails, reports, I
18  think, was tendered to you for discovery.
19     Q.  Do you recall any e-mails in particular that
20  you reviewed?
21     A.  I think there were e-mails between myself and
22  some of the exempts, Kirby.  I believe e-mails from
23  Echeverria.
24     Q.  What reports did you review?
```

2 (Pages 2 - 5)

Page 6

1    A.   Some of the reports that were generated by
2  Echeverria.
3    Q.   Were there reports in connection with
4  Operation Brass Tacks or reports relating to
5  Mr. Echeverria outside of Brass Tacks?
6    A.   It was related to Brass Tacks.
7    Q.   I'm going to ask you basically why don't
8  we --
9        First of all, before you were a Chicago
10  police officer, did you have any other law enforcement
11  jobs?
12    A.   No.
13    Q.   What was your first assignment after the
14  Academy.
15    A.   After the Academy I was a patrol officer in
16  the 3rd District.
17    Q.   What did you do after that?  And when was
18  that that you started?
19    A.   I started the Academy in '86.  I believe I
20  was in the 3rd District until '89.
21    Q.   Then what was your next assignment?
22    A.   I was detailed to the gun -- a gun task force
23  specialized unit.
24    Q.   Then what was your next assignment?

Page 7

1    A.   From there I went to the 1st District as a
2  Tact officer.
3    THE COURT REPORTER:  T-A --
4    THE WITNESS:  Tactical officer.
5  BY MR. SMITH:
6    Q.   After that where did you go?
7    A.   I was promoted to sergeant.  I went to the
8  4th District as a sergeant.
9    Q.   When was that?
10    A.   '94, I believe.
11    Q.   And what was the next assignment after that?
12    A.   From there I was detailed to Summer Mobile as
13  a sergeant in '96, I believe.
14    Q.   After that where were you assigned?
15    A.   From there I went to Narcotics.
16    Q.   How long were you at Narcotics?
17    A.   I was there till, I'd say, 2003.
18    Q.   So from what about --
19    A.   '96 or so.
20    Q.   To 2003?
21    A.   Yes.
22    Q.   Did you supervise a convicted officer by the
23  name of Len Lewellyn during that time?
24    A.   No.

Page 8

1    Q.   Where did you go after that?
2    A.   I was promoted to lieutenant and assigned to
3  the 5th District.
4    Q.   And then where did you go after that?
5    A.   From there I was assigned to Internal Affairs
6  as lieutenant in charge of the confidential
7  investigation section.
8    Q.   So what year was that?
9    A.   I believe 2004.
10    Q.   What was next assignment?
11    A.   From there I was promoted to commander of the
12  25th District.  I believe that was in '05.
13    Q.   And where would you go after that?
14    A.   After commander of the 25th District I was --
15  I took a lateral move to Area 4 Detective Division
16  Commander, Detectives.
17    Q.   And then where did you go after that?
18    A.   From there I was promoted to deputy chief and
19  I was put in charge of Area 5.
20    Q.   When was that?
21    A.   It would have been -- Let's see.  Probably
22  '08, somewhere in that range.
23    Q.   And where were you moved to after that?
24    A.   From there I went to, I was promoted to chief

Page 9

1  and was put in charge of the Bureau of Internal
2  Affairs.
3    Q.   Do you know the date specifically you were
4  promoted to chief and put in charge of the
5  Bureau of Internal Affairs?
6    A.   I don't know, March of '09, I believe, is
7  when I --
8    Q.   March of 2009.
9    A.   Yes.
10    Q.   And then were moved at any time after that?
11    A.   No, still in place.  Presently still there.
12    Q.   I'm going to show you what has been marked
13  as -- or I will have marked as Rivera deposition
14  Exhibit No. 1 for identification.
15        (Lieutenant Juan Rivera Exhibit 1
16        marked.)
17  BY MR. SMITH:
18    Q.   And it's also Bates stamped DEFS1527; do you
19  recognize that document?
20    A.   Yes.
21    Q.   What do you recognize Exhibit No. 1 to be?
22    A.   It's my letter of recommendation for
23  Officer Echeverria to be considered for assignment in
24  the fugitive.

3 (Pages 6 - 9)

1    Q.  Did you also do a letter of recommendation --
2        And this is dated February 22, 2012.
3    A.  Correct.
4    Q.  Did you do a letter of recommendation for
5  Officer Shannon Spalding at that time, also?
6    A.  I believe so, yes.
7    Q.  And if you could take a look at the letter of
8  recommendation and I'm going to ask you if you believe
9  everything in that letter of recommendation to be
10  correct in your opinion?
11    A.  Again, this is based on my conversations with
12  the officer when I inquired as to his accomplishments.
13  So that's what I based it on.
14    Q.  Well, did you believe -- Did you believe you
15  were truthfully stating your opinions of Mr. Echeverria
16  when you made this letter of recommendation?
17    A.  I had no reason at the time to doubt the
18  officer, so I ...
19    Q.  And then with respect to the letter of
20  recommendation that you did for Shannon Spalding, did
21  you also believe you were being accurate when creating
22  that letter of recommendation?
23    MR. KING:  Object to the form.  I think it
24  misstates his testimony.  But you can answer it if you

1  understand it.
2  BY THE WITNESS:
3    A.  Again, it's based largely on a conversation
4  that I with the officer and their explanation of their
5  work history.
6        And again, I had no reason to doubt the
7  officers.
8  BY MR. SMITH:
9    Q.  Well, let's go through it then.
10    A.  Uh-huh.
11    Q.  Did you unequivically recommend after
12  Officer Daniel Echeverria for consideration of the
13  assignment of the Department Fugitive Units on
14  February 22, 2012?
15    A.  Yes.
16    Q.  Did you also do that for Shannon Spalding?
17    A.  Yes.
18    Q.  It notes here:
19        "Officer Echeverria is currently detailed
20  into the Bureau of Internal Affairs from the Narcotics
21  Unit"; do you see that sentence?
22    A.  Yes.
23    Q.  And you were the chief of the
24  Bureau of Internal Affairs, correct?

1    A.  Yes.  Not -- Not at the time he was detailed,
2  but after he was already there I took the position of
3  the chief.  He was already in place, yes.
4    Q.  And you were at the time you wrote this
5  letter, correct?
6    A.  That's correct.
7    Q.  And you indicated that Officer Echeverria was
8  instrumental in a highly confidential investigation
9  involving corrupt police personnel, correct?
10    A.  Yes, he provided a source.
11    Q.  And you believe that -- You were aware of
12  what -- that Mr. Echeverria was involved in a highly
13  confidential investigation, correct?
14    A.  Yes.
15    Q.  In fact you were -- You were overseeing, at
16  least in part, that investigation with the FBI?
17    A.  It was a joint -- joint operation, yes.  I
18  wasn't -- I wasn't overseeing it.  It was just
19  cooperating the with the federal investigation.
20    Q.  You're not indicating that you didn't agree
21  with that sentence that you wrote at the time of this
22  letter, correct?
23    A.  Correct.
24    Q.  And you were aware that Mr. Echeverria and

1  Miss Spalding were involved in extensive surveillance,
2  federal wire taps, use of confidential informant and
3  the ultimately covert operations, correct?
4    MR. KING:  Just object to the form of the
5  question.
6        Go ahead.
7  BY THE WITNESS:
8    A.  Again, I'm basing it on what I had been told
9  and had learned when I arrived there as the chief.
10  BY MR. SMITH:
11    Q.  You were aware of Operation Brass Tacks,
12  correct?
13    A.  That's correct.
14    Q.  In fact, you were getting documents even from
15  the FBI for your review; isn't that correct?
16    A.  No, I was not.
17    Q.  You've never seen any of the documents
18  prepared by FBI personnel relating to
19  Operation Brass Tacks?
20    A.  No, that's strictly all -- As far as I'm
21  concerned, or at least I was told, that's grand jury,
22  16 material.
23    Q.  And you were getting to-from memos to you
24  from Mr. Echeverria and Miss Spalding regarding things

4 (Pages 10 - 13)

Page 14

1 that they were doing in connection with that?
2    A. Yes. Throughout the time frame that this was
3 going on I would get certain reports from them.
4    Q. On February 22, 2012 you believed that to be
5 true that Mr. Echeverria was involved in extensive
6 surveillance, federal wire taps, use of confidential
7 informant and the ultimately covert operations,
8 correct?
9    A. I believe that to be true, yes.
10    Q. Do you have any reason to believe that's not
11 true at this time?
12    A. Again, I have no reason to doubt it.
13    Q. You indicated.
14     "That his experience, knowledge and
15 exceptional efforts contributed to the successful
16 conclusion of Operation Brass Tacks, correct?
17    A. Yes.
18    Q. And in your conclusion -- In your opinion
19 Operation Brass Tacks had a successful conclusion?
20    A. Yes.
21    Q. And you had no reason at this point in time
22 to not believe that Mr. Echeverria made exceptional
23 efforts to the contribute to this that success?
24    A. I'm sorry. Can you repeat that?

Page 15

1    Q. You had no reason to believe at this time
2 that Mr. Echeverria did not make exceptional efforts to
3 contribute to that successful conclusion?
4    A. No, I -- I -- I believe they made the effort.
5    Q. And the same for Shannon Spalding?
6    A. That's correct.
7    Q. You indicated in the second paragraph:
8     "Mr. Echeverria's willingness to take on some
9 of the most dangerous and highly sensitive assignments
10 demonstrate his commitment to the department's
11 mission," correct?
12    A. Yes.
13    Q. Did you believe that at the time you wrote
14 that?
15    A. I had no reason to doubt the officer.
16    Q. Do you have any reason to doubt that at this
17 time?
18    A. No.
19    Q. Did you also say that about Shannon Spalding?
20    A. Yes.
21    Q. Do you have any reason to doubt that at this
22 time?
23    A. No.
24    Q. You also put in the third paragraph:

Page 16

1     "Officed Echeverria also has extensive
2 experience as a gang tactical officer working in public
3 housing complexes which is ing challenge environment,"
4 correct?
5    A. Yes, I indicated that.
6    Q. And you were aware that Shannon Spalding was
7 also involved in public housing, correct?
8    A. Yes.
9    Q. As a tactical officer?
10    A. This is based on what the officers related to
11 me.
12    Q. You agree that both Shannon Spalding and
13 Daniel Echeverria have extensive experiences as gang
14 tactical officers working in public housing, correct?
15    MR. KING: Object to the form. Asked and
16 answered.
17 BY THE WITNESS:
18    A. Again, I had no reason do doubt.
19 BY MR. SMITH:
20    Q. Have you ever reviewed any of their
21 performance review?
22    A. No.
23    Q. You were aware that -- You had learned that
24 Officer Echeverria and Officer Spalding were

Page 17

1 instrumental in the successful conclusion of
2 Operation Fall Out?
3    A. Yes.
4    Q. And you indicated that you believe that
5 Officer Echeverria possesses the necessary skills and
6 traits that would allow him to contribute tremendously
7 to the department's Fugitive Unit, correct?
8    MR. KING: Just show a continuing objection to the
9 form of the questions.
10     He testified the basis of that knowledge and
11 then Counsel is asking him questions without
12 referencing the basis of that knowledge. I think it's
13 improper form.
14     But you can answer his question.
15 BY THE WITNESS:
16    A. Again, I had no reason to doubt the officers.
17 BY MR. SMITH:
18    Q. And you indicated in your recommendation that
19 it was your belief that Officer Echeverria possessed
20 the necessary skills and traits that would allow to
21 contribute tremendously it the department's
22 Fugitive Unit, correct?
23    A. It was my belief at the time, yes.
24    Q. Is there anything that's occurred since that

5 (Pages 14 - 17)

Page 18

1  time that you're aware of that has changed your view of
2  that?
3      A. I haven't had any contact with the officer,
4  so no.
5      Q. In terms of Officer Shannon Spalding, you
6  also believed that she possessed the necessary skills
7  and traits that would allow her to contribute
8  tremendously to the department's Fugitive Unit?
9      A. That was my belief, yes.
10     Q. Has anything changed that belief?
11     A. Again, I have not had any contact with the
12  officer since then, so no.
13     Q. When is the first time that you met
14  Officer Shannon Spalding, if you recall?
15     A. I'm not sure of date, but it was shortly
16  after I took the position of chief.
17     Q. And what were the circumstances in which you
18  met Officer Shannon Spalding?
19     A. Scahill -- During the transition, Scahill
20  actually walked into my office and introduced me to the
21  officers.
22     Q. The officers, Danny and Shannon?
23     A. Yes.
24     Q. Who else was present during that meeting?

Page 19

1      A. Just Scahill and myself and the officers.
2      Q. What were you informed of at that time?
3      A. She briefed me on their role in the
4  investigation of Brass Tacks.
5      Q. And what did she tell you that their role was
6  within Brass Tacks?
7      A. Essentially that they had -- They had
8  provided a source and that they were handling or
9  handlers -- They were be handling the source.
10     Q. Anything else?
11     A. That was it. She didn't stay long. She left
12  after the introduction and the briefing.
13     Q. Was there any information given about the
14  investigation itself in that meeting?
15     A. Not from -- from -- Who? From anyone in
16  particular? Scahill didn't, other than briefing me as
17  to their involvement. She didn't give me a status or
18  anything regarding the investigation.
19     Q. Did she tell you what the investigation was
20  about?
21     A. Yes.
22     Q. And what did she tell you that was?
23     A. She told me it was regarding a sergeant and
24  an officer that were, I believe she put it, extorting

Page 20

1  money from the drug sellers.
2      Q. Did she tell you the name of the officers at
3  that time?
4      A. She mentioned -- I think it's the
5  Sergeant Watts, the officer, I believe, Mohammed.
6      Q. Were you familiar with Sergeant Watt's name
7  from your time previously within Internal Affairs?
8      A. I don't think at that meeting, but
9  eventually, yes, I recalled -- After reading some
10  reports, I recalled that back I believe in 2004 there
11  was a complaint made and investigation initiated on the
12  same information.
13     Q. Do you recall that you assigned that
14  complaint to Thomas Mill?
15     A. That I don't recall. I believe the agent
16  that was with me was -- I might be mistaken, but
17  believe it was Caldwell, I believe.
18     Q. Did Tina Scahill tell you anything else at
19  the time?
20     A. No, that's it. Again, she didn't stay.
21     Q. Did Tina Scahill tell you what Shannon and
22  Danny's assignments were at that time?
23     A. Again, other than they were handling the
24  informant.

Page 21

1      Q. Did you talk to Danny and Shannon at that
2  point in time?
3      A. Yes, I did.
4      Q. What did you say to them and what did they
5  say to you?
6      A. They basically stated that -- which kind of
7  through me a little bit, but they were like, well, this
8  is a good investigation. We were looking to get
9  promoted -- or task force from this investigation. And
10  at that point I asked, Well, is it at the point where
11  it's going to be concluded here shortly and they were
12  like, no. I said, well, where exactly is it? And from
13  what I recall, they were telling me that they were
14  still trying to create a scenario or a sting utilizing
15  their informant.
16     Q. Did they tell you anything else at that time?
17     A. I think for the most part that was -- that I
18  could recall more or less the gist of the conversation.
19     Q. Did you recall which one of them said those
20  things?
21     A. Shannon, I believe was the one who was
22  talking.
23     Q. In terms of -- So at that time you were aware
24  that were working with the FBI, correct?

6 (Pages 18 - 21)

Page 22

1   A. Yes.
2   Q. Were you told that the investigation was --
3   Were you told at all who knew of their involvement in
4   the investigation?
5   A. They kind of filled me in on -- I can't
6   remember the dates, but they told me how they came
7   across the source and how they passed the information
8   along to the FBI, and as a result they were asked to
9   work with Internal Affairs and the FBI regarding the
10  investigation.
11  Q. Did you ever learn that to be untrue?
12  A. No.
13  Q. Did you have an understanding of who within
14  the Chicago Police Department was aware at that point
15  in time that Shannon and Danny were investigating
16  police officers misconduct?
17  A. Well, as far as -- Again, from the
18  conversation, they told me that their superiors were
19  aware of it and they allowed them to assist.
20  Q. Who did you believe was their superiors?
21  A. I would assume O'Grady and I'm assuming their
22  sergeant and I have no idea who he is, but their
23  Sergeant O'Grady and Roti.
24  Q. Did they ever tell you specifically that

Page 23

1   O'Grady was aware -- and that in this meeting that
2   O'Grady was aware that they were investigating
3   undercover police?
4   A. Yes, they told me.
5   Q. Did they tell you personally that they were
6   aware that Roti was aware that they were investigation
7   undercover police?
8   A. Yes.
9   Q. I mean, police officers for corruption?
10  A. Yes.
11  Q. Do you know who said that?
12  A. Shannon .
13  Q. Was Officer Scahill in the room at that point
14  in time?
15  A. No.
16  Q. Who else did you believe knew about them
17  investigating police officers?
18  MR. KING: Object to the form.
19  MR. SMITH: At that point in time?
20  MR. KING: Who else did she tell him, or who did
21  he believe?
22  MR. SMITH: Who was it his belief that was aware
23  that they were investigating police officers.
24

Page 24

1   BY THE WITNESS:
2   A. Again, that would be me speculating, but I
3   would assume everybody above Scahill. I would assume
4   she would be briefing her superiors.
5   BY MR. SMITH:
6   Q. Who would that have been at the time?
7   A. Obviously, I'm not sure who she would have
8   briefed, but it would have been whoever was her
9   superior, including, I would assume, the superintendent
10  at that time.
11  Q. Who was that?
12  A. I think -- believe, Weese.
13  Q. Anybody else who was above her besides Weese?
14  A. I'm not sure if Brus would have known or --
15  Q. Did you find it unusual in any way that
16  Officer O'Grady would have known that --
17  A. What was that?
18  Q. Did you find it unusual at all that Shannon
19  said that Officer O'Grady knew that she was
20  investigating undercover -- I mean police officers for
21  wrongdoing?
22  A. Commander O'Grady?
23  Q. Commander O'Grady.
24  A. That's her superior. Obviously, they would

Page 25

1   have had to give her permission to work the operations.
2   Q. Did Tina Scahill ever tell you that
3   officer -- Commander O'Grady was aware that they were
4   working that mission?
5   A. No.
6   Q. Did Tina Scahill ever tell you that Roti was
7   aware they were working that mission?
8   A. No, Tina didn't.
9   Q. Did you make a list of -- in any way of all
10  the people who with aware of -- that you believe were
11  aware that Shannon and Danny were working an
12  investigation of corrupt police officers?
13  A. No.
14  Q. Did you think it was important to be aware of
15  who was in the know of this investigation?
16  A. I just assumed they had been working on it, I
17  don't know how many years, prior to me arriving there
18  that, you know -- Those were her superiors. They
19  would, obviously, have given her permission to
20  cooperate in the investigation.
21  Q. Why did you assume that?
22  A. That's what Shannon told me.
23  Q. So only because Shannon told you you assumed
24  it?

7 (Pages 22 - 25)

1    A.  No, not just because she told me and,
2  obviously, she's not -- she's detailed out to the FBI.
3    Q.  Was it your understanding that she was
4  detailed out to the FBI at that time?
5    A.  That's what Scahill had mentioned, yes.
6    Q.  Did anyone tell you that Danny and Shannon's
7  identities involvement in this case to were remain
8  confidential?
9    A.  No, it was -- it's assumed they -- no one had
10  compromised them.  They were working on it.
11    Q.  You assumed that nobody compromised them on
12  it?
13    A.  Right.  It was still an ongoing
14  investigation.
15    Q.  Did anyone say, we've got to keep their names
16  confidential and their identities confidential and
17  their involvement in the case confidential?
18    A.  No.
19    Q.  Was that ever an expressed concern by anyone?
20    A.  "Anyone" meaning?
21    Q.  Anyone either Danny, Shannon, Scahill or --
22  at any point in time to you?
23    A.  No.
24    Q.  And in your role as Chief of the Bureau of

1  Internal Affairs, you understand the importance of
2  keeping officers who are investigating other officers
3  confidential, correct?
4    A.  Yes.
5    Q.  Obviously -- Wouldn't did be fair to say that
6  in order to keep something confidential you would have
7  to know who you could tell and who you couldn't tell
8  you?
9    MR. KING:  Just object to the form and lack of
10  foundation.
11  BY THE WITNESS:
12    A.  First of all, I would only be discussing that
13  with my superiors.  So there would be no reason and I
14  had no reason to speak to anybody else other than my
15  superiors about the investigation.
16  BY MR. SMITH:
17    Q.  So you would have never spoken to anybody who
18  wasn't your superior about this investigation at the
19  point in time it was going on?
20    A.  No, other than my command staff.
21    Q.  Were you aware of who the targets of the
22  investigation were at the time?
23    A.  The sergeant and the officer?
24    MR. KING:  Just object as asked and answered.

1  BY MR. SMITH:
2    Q.  Were you aware of who all the targets of the
3  investigation were?
4    A.  I was told it was a sergeant and a police
5  officer.
6    Q.  Did you ever learn that other individuals
7  were identified as potential other -- other officers
8  were potentially identified as people who may have been
9  involved with Watts and Mohammed?
10    A.  Obviously, it's from -- From when I can
11  recall, it was a team of officers.  But at the point in
12  time where I was involved, the FBI and US Attorney were
13  targeting the just sergeant and the PO.
14    Q.  You were never told that the other team
15  members weren't involved in potential drug operations,
16  correct?
17    A.  I was not told.
18    Q.  Did you make any efforts to know who
19  Sergeant Watts had worked with in the past?
20    A.  I personally did not, but -- Again, I know
21  the FBI was looking at all that.  They were the lead
22  agency in the investigation.  So everything you're
23  telling me is more so something that the FBI would be
24  following up or ...

1    MR. KING:  Just answer his question.
2  BY MR. SMITH:
3    Q.  Were you aware of what type of danger Danny
4  or Shannon might be in if Sergeant Watts were to find
5  out that they were investigating him and other Chicago
6  police officers?
7    MR. KING:  Object to the form.  Lack of
8  foundation.
9  BY THE WITNESS:
10    A.  Yeah, I -- I'm trying to understand, danger
11  in terms of ...
12  BY MR. SMITH:
13    Q.  The potential dangers of being found out that
14  they were informants -- I mean that they were working a
15  confidential investigation against Chicago police
16  officers for corruption?
17    MR. KING:  Same objection.
18  BY THE WITNESS:
19    A.  There is always a potential for danger.
20  BY MR. SMITH:
21    Q.  Were you ever made aware that individuals
22  suspected Sergeant Watts of murders?
23    A.  The officers did mention that that was part
24  of the investigation.

8 (Pages 26 - 29)

Page 30

1    Q.  Do you have any reason to doubt that at this
2  time?
3    A.  No.
4    Q.  Were you aware that while they were -- while
5  Danny -- when Danny and Shannon first met you and were
6  working with the FBI they were assigned to the
7  Narcotics Unit still?
8    A.  Yes.
9    Q.  Were you aware that they were detailed to
10  Detached Services Unit 153?
11    A.  Yes.
12    Q.  And that they were to report directly to FBI
13  headquarters to work directly on Operation Brass Tacks?
14    MR. KING:  Just object to the lack of foundation
15  without a time frame.
16  BY MR. SMITH:
17    Q.  When you first met with them?
18    A.  Yes, they were reporting to the FBI facility.
19    Q.  Did you believe them to have any other work
20  assignments at that point in time other than reporting
21  to FBI headquarters to work on Operation Brass Tacks?
22    A.  No.
23    Q.  Were you aware that -- In fact, did you allow
24  them, encourage them to develop other narcotics-related

Page 31

1  cases which overlapped with their work on
2  Operation Brass Tacks; in other words, if an informant
3  or a lead in working on Brass Tacks lead to a possible
4  other narcotics delivery or sales or operation that
5  they were encouraged to actually continue to develop
6  those leads?
7    A.  No.
8    Q.  You never told them that it was okay for them
9  to gather information and help other officers make
10  busts, narcotic-related busts at the time they were
11  working on Operation Brass Tacks?
12    A.  No.
13    Q.  Did you ever know of them to develop and help
14  other officers get narcotics-related arrests while they
15  were still working with Operation Brass Tacks?
16    A.  They did inform me they had developed
17  information and I immediately told them to pass that
18  information along, yes.
19    Q.  Well, it was -- Were you doing it in a way
20  that was -- Or did you tell them to not do that or stop
21  doing that?
22    A.  I didn't encourage them.
23    Q.  Did you think there was anything wrong with
24  doing that?

Page 32

1    A.  I mentioned to them that the bottom line is
2  the more contact they have out there the chances
3  increase that they could get compromised.
4    Q.  And did you ever tell them not to cell other
5  narcotic-related cases when they were working on
6  Operation Brass Tacks?
7    A.  No.
8    Q.  At some point in time before August of 2010
9  did you tell an individual by the name of Ernie Brown
10  that Shannon Spalding and Danny Echeverria were doing
11  an operation investigating officers?
12    A.  No.
13    Q.  Did you ever talk to Ernie Brown about
14  Operation Brass Tacks?
15    A.  No.
16    Q.  You know Ernie Brown, correct?
17    A.  I know who he is, yes.
18    Q.  Were you ever confronted by Shannon or Danny
19  that Commander O'Grady came to know that they were
20  investigating police officers?
21    MR. KING:  Object to the form of the question.
22  BY THE WITNESS:
23    A.  No.
24

Page 33

1  BY MR. SMITH:
2    Q.  Did you ever tell or talk to
3  Commander O'Grady about Shannon or Danny being involved
4  in Operation Brass Tacks?
5    A.  No.
6    Q.  Or any type of investigation of police
7  officers?
8    A.  No.
9    Q.  Have you ever had any conversations with
10  Defendant O'Grady about Shannon or Danny?
11    A.  No.
12    Q.  Did you ever talk to Nicholas Roti about
13  Danny or Shannon?
14    A.  Are you -- Regarding that time frame?
15    Q.  Well, let's start with regarding that time
16  frame, sometime around August of 2010?
17    A.  No.
18    Q.  Did you ever talk to Nicholas Roti about
19  Shannon Spalding or Danny Echeverria ever?
20    A.  Yes.
21    Q.  When was that?
22    A.  This was -- Had to be sometime after the
23  conclusion of the operation and I think it was the time
24  the lawsuit was filed.

9 (Pages 30 - 33)

Page 34

1    Q.  And what did you talk with Nicholas Roti
2  about at that time?
3    A.  In a conversation he mentioned how he had had
4  an issue with them and he explained to me the issue.
5    Q.  What was the issue?
6    A.  According to Chief Roti, he related to me
7  that he had allowed the officers to work with the FBI
8  on this operation and that he had called the agent, I'm
9  not sure who it was, and he spoke to them and asked
10  them if the officers were working out.  At that point
11  in time the agent said, yes, we used them twice or
12  something like that during a week.  And Roti at that
13  point in time told me he went to Shannon's supervisors
14  in Narcotics and asked him whether they had been to
15  work and the sergeant had told them that, no, they had
16  been gone for the entire week.
17    Q.  Anything else he said?
18    A.  He stated that he saw that as an issue and he
19  then had a conversation, I believe, he mentioned
20  Scahill and that he basically told her it's best to
21  detail them to Internal Affairs so that they can be
22  supervised.
23    Q.  And what time frame did you believe he was
24  talking about?

Page 35

1    A.  I believe it was early on when they were
2  detailed.
3    Q.  And where were you when you had that meeting
4  with Roti?
5    MR. KING:  Object to the form, "meeting."
6  BY MR. SMITH:
7    Q.  Spoke with Roti.
8    A.  I'm sure it was during -- From what I can
9  recall it was during some other meeting or something
10  where we were sitting in a room.  I'm not sure about a
11  date or a meeting or a time.
12    Q.  Who else was present?
13    A.  At that point in time it was just me and
14  Roti, I believe.
15    Q.  Other than it being after the filing of the
16  lawsuit or after the lawsuit was filed, do you remember
17  an approximate date?
18    A.  No.
19    Q.  Was it within the year, the year from now?
20    A.  Honestly, I wouldn't be able to tell you more
21  or less.
22    Q.  It would be fair to say that it was at least
23  four years after the period that Shannon and Danny were
24  first assigned to investigate Operation Brass Tacks?

Page 36

1    A.  Again, I'm speculating.  I mean, all I can
2  tell you is it's after the conclusion of the operation
3  and after the lawsuit was filed.
4    Q.  That's the first time you ever talked to
5  Nicholas Roti about Operation Brass Tacks or
6  Shannon Spalding or Danny Echeverria?
7    A.  That I can recall, yes.
8    Q.  Did you ever tell Danny or Shannon that it
9  may have been your fault that -- or you may have leaked
10  the fact they were involved in investigation of police
11  officers?
12    A.  No.
13    Q.  So after the first meeting with Shannon and
14  Danny, what was your next involvement with Shannon and
15  Danny?
16    A.  I think we had -- I -- I'm trying to think
17  back.  I think I had the sergeant, Tom Chester, in a
18  separate meeting and, again, I'm just -- I'm not sure
19  what date or whatnot, but with the officers.
20    Q.  And what was that meeting concerning?
21    A.  Status.
22    Q.  And what was the status that was given to
23  you?
24    A.  My understanding is they were, again, trying

Page 37

1  to create a scenario, I believe a sting.
2    Q.  Were they going into details about the
3  scenarios that they were trying to create?
4    A.  You know, I can't recall if they went into
5  details.  I do recall they were referring to a
6  scenario.
7    Q.  Did you have any complaints about what they
8  were doing at that time?
9    A.  No.
10    Q.  Did you hear any complaints by any
11  supervisors in relation to or even other officers about
12  Danny or Shannon at point in time?
13    A.  At that second -- No.  Second meeting.
14    Q.  Or at any time between the first meeting and
15  the second meeting?
16    A.  No.
17    Q.  Do you know approximately when the second
18  meeting would have been, about how long after the first
19  one?
20    A.  I'm, again, speculating, maybe a couple of
21  days or ...
22    Q.  And then what is the next involvement?  How
23  often would you meet with Danny and Shannon during that
24  period of time?

10 (Pages 34 - 37)

Page 38

1    A.   It became almost every other day and it was
2  actually Spalding or Echeverria that would meet me at
3  the lobby area of the headquarters and try and engage
4  me in conversations.
5    Q.   Almost every other day after the first
6  meeting with them?
7    A.   Yes.
8    Q.   For how long did that go on for?
9    A.   It may have went on for a few months.
10  However, I discouraged them from doing that, obviously,
11  because of the issue of compromise.
12    Q.   And what were the discussions during these
13  meetings at the lobby of headquarters about?
14    A.   It varied.  It could have been from them
15  trying to tell me of a scenario that would work, um,
16  with regards to a sting or something directed to the
17  targets.  It would be conversations regarding vehicles
18  that they would use.
19    Q.   And when you discouraged them from continuing
20  to do that on an every-other-day basis, did you tell
21  them what they should do instead or did you tell them
22  how often you wanted to see them or any information as
23  to in what manner they should report to you?
24    A.   Yes, I told them go directly to their

Page 39

1  sergeant which was Tom Chester or if it was important
2  call.
3    Q.   Did they have your personal cell phone?
4    A.   No, they had my work cell phone, BlackBerry.
5    Q.   But it was a cell phone?
6    A.   Yes.
7    Q.   And were you -- had you met with
8  Patrick Smith or spoken to Patrick Smith on the phone
9  at any point in time during this first period or first
10  month or two that you had learned of Shannon's
11  involvement with the FBI?
12    A.   I'm sorry.  Can you repeat that?
13    Q.   Do you know who Patrick Smith is?
14    A.   I was aware of Agent Smith, yes.
15    Q.   Did you speak with him or meet with him at
16  some point in time about Operation Brass Tacks?
17    A.   I don't recall.  We may have, because we had
18  quarterly meetings with the FBI for updates.
19    Q.   In those quarterly meetings, did you get
20  updates about Operation Brass Tacks?
21    A.   I'm sure I did, yes.
22    Q.   Do you know who would give you the updates on
23  Operation Brass Tacks?
24    A.   I don't recall who was all in the meeting

Page 40

1  there.
2    Q.   Did anyone from the FBI ever come to you to
3  talk about Shannon and Danny in particular?
4    A.   No.
5    Q.   And anyone ever make a complaint to you from
6  the FBI or the federal government about
7  Danny Echeverria or Shannon Spalding?
8    THE WITNESS:  Could I --
9    MR. KING:  Just -- Object to the form of the
10  question.
11        If you understand it, you can answer.
12  BY THE WITNESS:
13    A.   No.
14  BY MR. SMITH:
15    Q.   So after you told Danny and --
16    MR. KING:  Do you want to take a break?
17    MR. SMITH:  Do you need a break.
18    MR. KING:  Yeah, take a quick one.
19    MR. SMITH:  Sure.
20        (Recess taken.)
21  BY MR. SMITH:
22    Q.   In terms of when -- Were you aware that when
23  Shannon and Danny were detailed to Unit 543 that they
24  were -- their immediate supervisor was a Liz Glass?

Page 41

1    A.   Well, she's not their immediate supervisor.
2  Tom Chester was their immediate supervisor.
3    Q.   Were you aware that they were to report to a
4  Liz Glass?
5    A.   Administratively they reported to her, yes.
6    Q.   And the ANA sheets -- Where did you believe
7  the ANA sheets that they were assigned -- they were to
8  to sign were at that point in time?
9    A.   I'm assuming Detached Services were handling
10  that.
11    Q.   And were you aware that they weren't supposed
12  to report to Narcotics Unit 189 at that time?
13    MR. KING:  Just object to the form of the
14  question.
15  BY THE WITNESS:
16    A.   I'm sorry.  Can you rephrase that?
17  BY MR. SMITH:
18    Q.   Were you aware of any directive that Shannon
19  and Danny were supposed to report to Unit 189 Narcotics
20  during the time that they were signed to Detail 543?
21    A.   No.  I mean, they should have been working
22  with Internal Affairs and the FBI.
23    Q.   So did you ask Nick Roti why the heck he
24  would have thought that Shannon Spalding and

11 (Pages 38 - 41)

Page 42

1  Danny Echeverria should be reporting to his unit at
2  that point in time?
3      MR. KING:  Just object to the form, lack of
4  foundation, different time frames, misstates his
5  testimony.
6  BY THE WITNESS:
7      A.  Different time frame.
8  BY MR. SMITH:
9      Q.  Were you aware of any point in time where
10  the -- that before Shannon Spalding and
11  Danny Echeverria were reporting -- were detailed to
12  Unit 543 by Tina Scahill that Shannon Spalding and
13  Danny Echeverria were working for the FBI and the
14  Chicago Police Department -- with the
15  Chicago Police Department?
16      MR. KING:  Just object to the lack of foundation.
17  BY THE WITNESS:
18      A.  Repeat that.
19  BY MR. SMITH:
20      Q.  Was there any point in time to your knowledge
21  that Shannon Spalding and Danny Echeverria were working
22  at Narcotics, Unit 189, and assigned to work with the
23  FBI?
24      A.  That would have been prior to me taking the

Page 43

1  position of chief, yes.
2      Q.  Who told you that?
3      A.  I'm sorry.
4      Q.  Who told you that that was happening?
5      A.  Who told me that?
6      Q.  That Shannon Spalding and Danny Echeverria
7  were working with the FBI while they were assigned to
8  Narcotics Unit 189?
9      A.  The officers did.
10      Q.  Danny and Shannon?
11      A.  Yes.
12      Q.  Did anyone else ever tell you that before a
13  meeting with Nick Roti after the lawsuit was filed?
14      A.  Other than the officers that I can recall.
15      Q.  No one?
16      A.  I can't recall anybody.
17      Q.  Tina Scahill never told you that, correct?
18      A.  I'm not sure if -- Again, she may have.  I'm
19  not sure if she mentioned what had happened prior to
20  all that.
21      Q.  When did this conversation with -- where
22  Shannon Spalding or Danny Echeverria told you that they
23  were working at Narcotics 189 and reporting to FBI,
24  when did that happen?

Page 44

1      A.  When they briefed me on how they became
2  involved in this.
3      Q.  And when was that?
4      A.  It was probably early on.  I'm not sure.  I
5  wouldn't be able to tell you what day or meeting.
6      Q.  What did they tell you in terms of -- What
7  made them talk to you about the -- How did they tell
8  you that they worked -- had been working in Narcotics
9  and assigned to the FBI?
10      A.  Basically they told me that they came up with
11  the source, the information and they were given
12  permission to work with the FBI when the FBI needed
13  their assistance.
14      Q.  And by who were they given permission to work
15  with the FBI for is their assistance?
16      A.  The way they put, it was their supervisors
17  O'Grady and Roti and their sergeant was aware of it.
18      Q.  Are you aware that Shannon Spalding and
19  Danny Echeverria went to the FBI on their own without
20  permission from supervisors?
21      MR. KING:  Just object to the form.  You can
22  answer it.
23  BY THE WITNESS:
24      A.  Yes.  The way it was relayed to me was that

Page 45

1  they had information and they went to the FBI with the
2  information and they were allowed to work the
3  investigation with the FBI.
4  BY MR. SMITH:
5      Q.  You believe that they went to the FBI after
6  talking to supervisors?
7      A.  My understanding was that they had -- the
8  information they had related to the supervisors in
9  their unit.
10      Q.  Well, if I told you that Danny Echeverria and
11  Shannon Spalding went to the FBI without the knowledge
12  of supervisors, including Tina Scahill, would that
13  surprise you?
14      MR. KING:  Just object to the --
15  BY MR. SMITH:
16      Q.  In connection with the CI?
17      MR. KING:  -- to the form and lack of foundation.
18      Are you saying when they initially went to
19  the FBI?
20      MR. SMITH:  Yes.
21  BY THE WITNESS:
22      A.  It would surprise me, because normally
23  something like that, some type of misconduct is,
24  according to the directive, should have been reported

12 (Pages 42 - 45)

Page 46

1  to their immediate supervisor.
2  BY MR. SMITH:
3      Q.  So you're saying that you never even heard,
4  to this date, until right now, is this the first time
5  you ever heard that somebody claiming that
6  Shannon Spalding and Danny Echeverria went to the FBI
7  on their own, in their off time before going to any
8  supervisor, including Tina Scahill?
9      A.  Again, I wasn't aware of that.  The way it
10  was put to me was that this they had information and
11  went to the FBI and were allowed to work the
12  investigation.
13      Q.  And were you aware that -- that the FBI went
14  to Tina Scahill's office and had a meeting with
15  Tina Scahill asking that she be allowed to work with
16  them?
17      MR. KING:  Just object to the form and lack of
18  foundation, assuming facts not necessarily in evidence,
19  certainly for this deposition.
20  BY THE WITNESS:
21      A.  Again, that was before I was there, so ...
22  BY MR. SMITH:
23      Q.  Do you have any idea of the time period, the
24  date that Shannon and Danny were first assigned to the

Page 47

1  FBI?
2      A.  I mean, I would be speculating.  I'm sure
3  they kind of mentioned it to me, but it was prior to me
4  taking the position of chief.
5      Q.  Do you know how -- If it was within days of
6  being assigned to 543 -- the detail to 543?
7      MR. KING:  Just --
8  BY THE WITNESS:
9      A.  I think would it be days.  It would be
10  speculating.  Do really don't know the time frame they
11  would be there.
12  BY MR. SMITH:
13      Q.  How long do you think it was  between the
14  time they got permission to work with the FBI by the
15  Chicago police department supervisors and the time they
16  were assigned to Unit 543?
17      A.  Again, I -- I would be speculating.
18      Q.  It possible that it was two days?
19      A.  Again, you're asking me to speculate on
20  something ...
21      Q.  In terms of -- Can you give any time period
22  that in terms of specific time periods, even weeks,
23  days, months, in which you believe that
24  Shannon Spalding and Danny Echeverria were working both

Page 48

1  in Narcotics and with the FBI?
2      MR. KING:  Objection.  Asked and answered at least
3  fours times.
4  BY THE WITNESS:
5      A.  Again, I would be speculating.
6  BY MR. SMITH:
7      Q.  Is it correct that you don't know any dates?
8      MR. KING:  Five times.
9      THE WITNESS:  Yes.
10  BY MR. SMITH:
11      Q.  Is that correct?
12      A.  That's correct.  I would be speculating.
13      Q.  In terms of Danny or Shannon, did they
14  ever -- either one of them ever communicate to you that
15  they were feeling that people were mistreating them or
16  treating them differently because they were
17  investigating police officers?
18      A.  Investigating police officers, no.
19      Q.  Involved in Operation Brass Tacks?
20      A.  No.
21      Q.  Did they feel that people were treating them
22  unfairly?  Did they make any complaints to you at all
23  that they were being treated unfairly?
24      A.  There was a conversation that Spalding

Page 49

1  initiated and that's probably the only time I heard her
2  make an issue of what she believed was compromising her
3  and Officer Echeverria.
4      Q.  When was that?
5      A.  You know, I don't have specific dates,
6  because we had, you know, numerous conversations.  But
7  in one particular -- I can recall one conversation
8  where she initiated -- where that she stated that she
9  had been concerned because there was talk in Narcotics,
10  the people were calling or telling people that they
11  were snitches or rats.  And at that point in time I
12  asked her, Where are you hearing this and she's saying,
13  It's talk.  I then went into, she's asking me, you
14  know, if I thought maybe that was happening -- I told
15  her, I had not heard it.  Is it possible that people
16  maybe saying stuff, anything is possible, I told her
17  but I have not heard it.  I then asked her -- I said
18  where or who's telling you this and she then tells me
19  it's a friend in Narcotics by the name of Hernandez.
20      Q.  Was Danny Echeverria there for that
21  conversation?
22      A.  No.
23      Q.  Did she tell you what Hernandez was saying to
24  her?

13 (Pages 46 - 49)

Page 50

1    A.  Basically the same thing.  I said -- I asked
2  her is Hernandez a witness to any of this, she says, No
3  it's rumors.
4    Q.  So she told you Hernandez didn't witness it
5  but he had heard it?
6    MR. KING:  Objection.  Misstates his testimony.
7  BY THE WITNESS:
8    A.  According to Shannon he had told her it was
9  rumors.
10  BY MR. SMITH:
11    Q.  Did Shannon Spalding ever tell you that she
12  had heard that Defendant O'Grady was informing his
13  personnel that she and Officer Echeverria were rats?
14    A.  She mentioned O'Grady and Roti.
15    Q.  And did she say the words "Rat" in particular
16  at that point in time?
17    A.  She said "Snitch" and "Rat," yes.
18    Q.  Did she tell you that she had heard that
19  O'Grady had ordered the unit not to work with her and
20  Echeverria and they should is not assist Shannon or
21  Danny?
22    A.  No, that was never said.
23    Q.  Did she tell you that O'Grady was prohibiting
24  her from earning of overtime?

Page 51

1    A.  No.
2    Q.  Did you make any contact with O'Grady or Roti
3  at that time to investigate her concerns?
4    A.  No.  It's -- According to Shannon, it was
5  rumors.
6    Q.  Did you make any efforts to in any way to
7  investigate that at all?
8    A.  Again, they're unsubstantiated rumors.
9    Q.  Did you tell her anything in relation to her
10  concerns?
11    A.  Other than I -- I basically told her, I said,
12  do you have or does your friend have witnesses.
13    Q.  And what did she tell you?
14    A.  Again, she reiterated, according to her
15  friend, Hernandez, it was rumors.
16    Q.  And do you remember the time periods
17  generally when that occurred?
18    A.  Nah.  I said I would be speculating because
19  there was numerous conversations throughout the time
20  when they were involved.
21    Q.  Were you aware that it was at a time,
22  certainly, that they were still assigned to the
23  Narcotics Unit 189?
24    MR. KING:  Just object to the lack of foundation

Page 52

1  without more specific time frame.
2    And also detailed to 543?
3    MR. SMITH:  No, assigned.
4  BY MR. SMITH:
5    Q.  You know the difference between assigned and
6  detailed?
7    A.  Yes.
8    Q.  You were aware that they were still assigned
9  to the Narcotics Unit 189 at that point in time when
10  she raised those concerns about O'Grady and Roti?
11    MR. KING:  Object --
12    Can you repeat that question?
13    ( Record read.)
14  BY THE WITNESS:
15    A.  As far as I understand, yeah, I believe they
16  were assigned to 189 and to 543, I believe.
17  BY MR. SMITH:
18    Q.  In terms of -- We titled the discussion
19  about -- In terms of the overtime issues, we talked
20  about how you did not tell Shannon or Danny that they
21  could not develop other narcotics leads while they were
22  working on Operation Brass Tacks; do you remember that?
23    A.  I'm sorry.  Can you repeat that?
24    Q.  We talked about earlier in the deposition

Page 53

1  that you did not tell Shannon or Danny Echeverria they
2  couldn't develop other narcotics leads while they were
3  working in Operation Brass Tacks; do you remember us
4  talking about that?
5    MR. KING:  Just object.  I think it misstates his
6  testimony, but you can answer if you --
7  BY THE WITNESS:
8    A.  Can you repeat that?
9  BY MR. SMITH:
10    Q.  Do you remember us talking about Danny and
11  Shannon in connection with developing other narcotics
12  leads while they were working with
13  Operation Brass Tacks?
14    A.  I recall, yes.
15    Q.  In fact, isn't it true that you approved of
16  overtime for them in connection with some of the work
17  they did in developing other leads while working on
18  Operation Brass Tacks?
19    A.  When they informed me that they had
20  information I allowed them to work it and I also
21  discouraged them from doing it, because they could get
22  compromised.
23    Q.  It's true you actually approved overtime for
24  Danny and Shannon for doing work on other cases

14 (Pages 50 - 53)

Page 54

1  while -- other leads while they were assigned to
2  Operation Brass Tacks?
3      A.  Yes, once they had the information yes, I
4  allowed it.
5      Q.  Do you recall at some point in time
6  approximately August of 2010 Shannon and Danny coming
7  to you relating to an issue with a sergeant or a
8  Officer Padar about work or information that he got
9  that led to a search warrant and that they had met with
10 Padar and had a conversation with Padar relating to
11 coming him others in his unit with information from
12 confidential informants?
13     A.  No.
14     Q.  Do you remember an indication that -- being
15 told that Sergeant Padar had informed them that O'Grady
16 does not want anybody in his unit to work with them on
17 any leads?
18     A.  No.
19     Q.  Do you recall ever seeing or approving
20 overtime or work for a search warrant that Shannon and
21 Danny did with Sergeant Padar?
22     A.  I don't recall.  Again, if you have something
23 that can refresh my memory.
24     Q.  Do you know who Sergeant Padar is?

Page 55

1      A.  Yes, I do.
2      Q.  How do you know Sergeant Padar?
3      A.  Sergeant Padar came up -- Again, with Shannon
4  came to me and asked for advice.  I met with her and
5  that's when she informed me that, again, her friend
6  Hernandez was doing work with Sergeant Padar and there
7  was a dispute over the payment of whatever work he was
8  doing at his summer home.  At that
9  point in time in that conversation I told her, To me,
10 it's a civil matter, you know.  That's, obviously,
11 contractual issues.  And at one point she then stated
12 that he's also holding slips for Hernandez while he's
13 out working at his summer home, I'm like, Okay, there's
14 an issue here.  At that point in time I told her,
15 Shannon, call your friend in -- and this is at
16 Internal Affairs -- and we're going to initiate a
17 complaint register number.
18     Q.  Had you ever heard of Padar other than that,
19 relating to that incident?
20     A.  I don't recall ever hearing about him until
21 that date.
22     Q.  And do you know what "holding slips" meant?
23     A.  Yes.
24     Q.  What did it mean?

Page 56

1      A.  The sergeant was not submitting the slips,
2  therefore, the officer was not -- Obviously, his hours
3  were not being removed, so he was keeping his hours
4  while not at work.
5      Q.  Did you ever have any conversations with
6  Commander O'Grady about possible reassignment of either
7  Danny or Shannon within the department?
8      A.  No.
9      Q.  Did you have any conversations with Nick Roti
10 about possible reassignment within the department --
11     A.  No.
12     Q.  -- of Danny or Shannon --
13     A.  No.
14     Q.  Were you ever involved in a meeting --
15     MR. SMITH:  Strike that.
16 BY MR. SMITH:
17     Q.  Did you ever inform -- In discussing overtime
18 work, were you ever told by Shannon or Danny that they
19 were being told that O'Grady wasn't allowing them to
20 work with them to get overtime with Unit 181?
21     A.  No.
22     Q.  I mean 189.
23         Were you ever told that if they were told
24 that they are ever in a 10-1, Unit 189 officers were

Page 57

1  told not to assist?
2      A.  No.
3      Q.  You know what a 10-1, correct?
4      A.  Yes.
5      Q.  Officer in need of assistance?
6      A.  Yes.
7      Q.  You don't recall having a conversation in
8  which you said -- where they asked you at that time if
9  O'Grady knew that they were working on an investigation
10 of officers?
11     A.  No, they never asked that.
12     Q.  Do you have any idea who their supervisor was
13 at the time or --
14     MR. SMITH:  Change that question.
15 BY MR. SMITH:
16     Q.  Do you have any idea if O'Grady was their
17 supervisor at the time that they were assigned to
18 Unit 543 -- I mean detailed to 543 from 189?
19     A.  O'Grady being their supervisor?
20     Q.  Yeah?
21     A.  No.
22     Q.  Do you have any idea if O'Grady was their
23 supervisor at the time that they were in 189 when they
24 were first met with the FBI?

15 (Pages 54 - 57)

Page 58

1     A.  Again, I wasn't in place at the time.  I'm
2  not -- I would be speculating if he was or not.
3     Q.  But you're confident and certain that
4  Shannon Spalding told you that her supervisor, O'Grady,
5  knew that she was working with the FBI?
6     A.  She stated -- I'm not sure if she used the
7  name "O'Grady"; my commander and and the chief were
8  aware, they've given us permission to work with ...
9     Q.  So she never used the name "O'Grady"?
10     A.  Again, I don't recall.  I don't know if she
11  mentioned O'Grady, Roti or chief, but she basically
12  said her superiors were aware and they had given her
13  permission to work with FBI.
14     Q.  And you also -- You don't you recall telling
15  Shannon or Danny that you told Ernie Brown and that's
16  how O'Grady knows?
17     A.  No.
18     Q.  Do you recall being involved in a meeting in
19  which Nicholas Roti was present where -- and O'Grady
20  were present in which the subject of Shannon and Danny
21  came up?
22     A.  Can you repeat that?
23     Q.  Do you recall being at a meeting with
24  Nicholas Roti and James O'Grady in which

Page 59

1  Shannon Spalding and/or Danny Echeverria came up during
2  the meeting?
3     A.  No.
4     Q.  Did you ever talk to a Debra Kirby about
5  Shannon or Danny's involvement in
6  Operation Brass Tacks?
7     A.  Yes.
8     Q.  When was that?
9     A.  Again, I don't know the specific time frame,
10  but Kirby was promoted, I believe, to Deputy
11  Superintendent of the Bureau of Professional Standards.
12  So in essence she was my superior.  As such I would
13  give her weekly updates on all the cases.
14     Q.  Did you give her weekly updates on
15  Operation Brass Tacks?
16     A.  Yes.
17     Q.  When would that have been that you started
18  giving those weekly updates?
19     A.  I would be speculating, but she was put in
20  that position, Deputy Superintendent, and at that point
21  in time she was my superior and I reported to her.
22     Q.  So you had made her aware that certainly that
23  Shannon and Danny were assigned to work with the FBI
24  while they were detailed to Unit 543?

Page 60

1     A.  Yes.
2     Q.  Do you know who Beatrice Cuello is?
3     A.  Yes.
4     Q.  Did you ever talk to Beatrice Cuello about
5  Shannon Spalding or Danny Echeverria?
6     A.  There was -- I was called to the
7  superintendent's office and she was the assistant
8  superintendent at the time and that point in time in
9  that I had a conversation with Beatrice Cuello.
10     Q.  What did you talk to her about?
11     A.  It was regarding the assignment of Spalding
12  and Echeverria to 543.
13     Q.  What did you talk to her about regarding that
14  assignment?
15     A.  I was asked by Beatrice Cuello, as well as
16  the interim superintendent, Terry Hilliard, as to what
17  the two officers were involved in.
18     Q.  What did you tell them?
19     A.  I told them the -- I don't recall the exact
20  wording or -- you know, I'm not sure how it was, but I
21  basically informed them of the investigation and the
22  status.
23     Q.  What did you tell them about the
24  investigation and the status?

Page 61

1     A.  I told them the investigation at this point
2  in time was involving the sergeant and an officer.  I
3  explained to them the allegation and I also informed
4  them that the investigation was not making progress due
5  to a review by the US Attorney and the FBI, that they
6  were looking at assigning a new case agent to the
7  investigation and I told them it was, obviously, still
8  a viable investigation.
9     Q.  And in terms of -- Do you know what time
10  frame that would have been in?
11     A.  In -- I'm not sure if it's April, May,
12  somewhere in that range, 2011.  I'm not sure.  I'm
13  speculating on that.
14     Q.  How did you learn that the FBI was looking
15  for a new case agent?
16     A.  I was told that there was an issue with the
17  previous agent.  I believe his name is Smith.
18     Q.  Who told you that?
19     A.  This came, I'm almost positive, from Chester,
20  Tom Chester.
21     Q.  Did he tell you what the issue was?
22     A.  I don't know if he went into -- I can't
23  recall if there was details -- I recall that there was
24  some documentation or use of the informant that was in

16 (Pages 58 - 61)

Page 62

1 question.
2    Q. Did either Hilliard or Beatrice Cuello ask
3 you what -- any questions specifically about Danny or
4 Shannon's assignment at that time?
5    A. It was mentioned that they were looking to
6 put officers back into patrol and that the -- I believe
7 it would Bea Cuello's sergeant had reach out to the
8 officers and I believe there was a conversation with
9 Echeverria regarding what they were involved in and
10 that phone conversation went bad. I'm not sure what
11 happened at that point in time, but that's when I was
12 called over by the interim supervisor and by
13 Bea Cuello.
14    Q. Were you contacted before that by either
15 Danny or Shannon?
16    A. Yes.
17    Q. What did they tell you? Which was one it
18 first of all?
19    A. It was Danny Echeverria, basically he told
20 me -- he made me aware that they were -- that 543
21 personnel were asking the people detailed there as to
22 what they were assigned to or involved in and I
23 basically told them if they were to contact them that
24 they were to refer them to me and I believe shortly

Page 63

1 thereafter they were. I think Danny Echeverria was
2 contacted and that's when that conversation took place
3 with the sergeant from Bea Cuello office.
4    Q. Did Beatrice Cuello inform you that Danny
5 had refused to give specifics about what he was doing?
6    A. No, she didn't mention that. She just
7 basically said he was -- like borderline insubordinate
8 to her sergeant or something to that effect.
9    Q. Did she tell you or were you aware that it
10 was concerning disclosure of his assignment?
11    A. Yes, because that's the -- that's what she
12 explained to me. Bea Cuello, the sergeant was asking
13 personnel what their assignment was or what they were
14 involved in.
15    Q. Were you aware and were you in agreement that
16 Danny and Shannon were told that they shouldn't tell
17 anyone outside of the confidential circle who knew
18 about their assignment or what they were doing in
19 specifics?
20    MR. KING: Object to the form and lack of
21 foundation, but ...
22 BY THE WITNESS:
23    A. Again, I gave them direction. I told them to
24 have -- to refer whoever it is that called them to me

Page 64

1 and I would deal with the situation.
2 BY MR. SMITH:
3    Q. In your view, they certainly weren't under an
4 obligation to tell Beatrice Cuello what they were
5 investigating, correct?
6    MR. KING: Object to the lack of foundation.
7 BY THE WITNESS:
8    A. Again, the way Echeverria put it to me was
9 people were calling individuals that were detailed
10 there, so again, I would speculate -- Obviously, I
11 didn't know or wouldn't know who was going to call him
12 and ask.
13 BY MR. SMITH:
14    Q. Well, you would agree that he was -- if
15 somebody was -- if a person in the same position as
16 Beatrice Cuello called him, you know, and asked him
17 what his assignment was, he did not have to tell them
18 he was investigating police officers?
19    A. I directed him not to and for him to refer
20 anybody that called him to me. That's the way I
21 directed him.
22    Q. Did you ever become aware that Debra Kirby
23 was asked by either Beatrice Cuello or
24 Superintendent Hilliard if Danny and Shannon were

Page 65

1 assigned to work with the FBI at that time?
2    MR. KING: Object to the the form and assuming
3 facts not in evidence.
4 BY MR. SMITH:
5    Q. Working with an undercover investigation at
6 that time?
7    A. I'm sorry.
8    Q. Were you aware of whether or not anybody
9 asked Debra Kirby about Shannon and Danny's assignment?
10    A. No.
11    Q. Were you aware of any point in time where
12 Debra Kirby indicated to -- Did you ever direct
13 Sergeant Steven to call Debra Kirby about Danny and
14 Shannon?
15    A. No.
16    Q. Do you know who Sergeant Steven is?
17    A. I believe it's the sergeant that worked for
18 Beatrice Cuello.
19    Q. Did you ever speak to Sergeant Steven about
20 Shannon and Danny?
21    A. No.
22    Q. Did you ever receive a call from
23 Sergeant Steven in which he was talking about
24 individuals who were assigned to Detail 543 about what

17 (Pages 62 - 65)

Page 66

1  they -- whether they could be to assigned out to
2  another unit.
3     A.  No.
4     Q.  Did you ever direct anyone regarding -- Did
5  you ever tell Danny Echeverria to have Sergeant Steven
6  or Beatrice Cuello call Kirby?
7     A.  No.
8     Q.  Did you ever tell Danny Echeverria to have an
9  individual who was asking about what he was doing in
10 Unit 543 to call Debra Kirby?
11    A.  No.
12    Q.  Did you ever learn from either
13 Beatrice Cuello or Shannon or Danny Echeverria or
14 Sergeant Steven or anyone else that there was an
15 instance where Debra Kirby failed to inform either
16 Beatrice Cuello or Sergeant Steven that Danny and
17 Shannon were working with the FBI while they were
18 detailed to Unit 543?
19    A.  No.
20    Q.  Did you ever speak to Danny or Shannon about
21 Beatrice Cuello's call to you about moving them from
22 Unit 543?
23    A.  There was no call.
24    Q.  Okay.  Did you meet with -- I'm sorry.  If it

Page 67

1  wasn't a call, when you met with Hilliard and Cuello
2  and discussed removal from 543, did you ever discuss
3  with Danny  or Shannon that conversation?
4     A.  Yes.
5     Q.  And what was the discussion about?
6     A.  They questioned me with regards to,
7  obviously, the phone call and the manner in which
8  apparently the conversation went, and I confirmed that
9  they were not happy with the way the conversation had
10 gone and I had told them that, in essence, they were
11 looking at reassigning them to patrol and they had
12 mentioned that they would not be going back to their
13 unit of assignment.  And at that time they -- I heard
14 in the conversation mentioned that Roti had an issue
15 with them and they would not be going back to 189.
16    Q.  Who told you that, Roti had an issue with
17 them?
18    A.  That was a conversation that Hilliard and
19 Bea Cuello were having.
20    Q.  So you overheard Cuello and Hilliard having a
21 conversation that Roti had a problem with them?
22    A.  An issue, yes.
23    Q.  Did you hear what it was?
24    A.  No.

Page 68

1     Q.  Did you hear anything about what O'Grady's
2  position was with respect to their being removed from
3  the unit?
4     A.  He was not mentioned.
5     Q.  Did you ever tell Danny or Shannon that Roti
6  said he didn't want them back?
7     A.  I told them that he had an issue, that the
8  discussion was that they would not go back to 189.
9     Q.  Did they ask you what the issue was?
10    A.  Yes.
11    Q.  What did you say?
12    A.  I told them exactly what I knew.  I said I
13 did not know, they did not tell me.
14    Q.  Did you ever tell either Danny or Shannon
15 that O'Grady said that he didn't want those IAD rats
16 back?
17    A.  No.
18    Q.  And that, God help them if they need help in
19 the street, it ain't coming?
20    A.  No.
21    Q.  So was that an actual meeting that was had?
22    A.  No, it was -- Apparently, there was a meeting
23 prior.  I was called in after the fact.
24    Q.  Who was at the meeting?

Page 69

1     MR. KING:  Object to the form.
2  BY MR. SMITH:
3     Q.  That you saw that was still there?
4     A.  When I was called over I don't recall
5  everybody, but I know the interim superintendent was
6  there, Bea Cuello, and I'm not sure.  I don't know if
7  there was any other person of rank there.
8     Q.  Did you see Tina Scahill there?
9     A.  No.
10    Q.  Did you see in any unranked people who
11 weren't of rank there?
12    A.  Um, while this conversation was going on I
13 don't believe I mentioned anything in front of anybody
14 else.
15    Q.  Did you see Debra Kirby there?
16    A.  No.
17    Q.  In the area of the meeting?
18    A.  No.
19    Q.  I'm sorry.  You may have already said it, was
20 Nick Roti there at the time?
21    A.  No.
22    MR. SMITH:  Can we take a minute break?
23    MR. KING:  Sure.
24

18 (Pages 66 - 69)

1        (Recess taken.)
2    MR. SMITH:  Back on the record.
3    BY MR. SMITH:
4    Q.  When you saw Hilliard and Cuello concerning
5 Shannon and Danny, did you know specifically what they
6 were working on at that time with -- within the
7 Operation Brass Tacks investigation?
8    A.  I'm sorry.  Repeat that.
9    Q.  When the meeting happened where Cuello and
10 Hilliard had mentioned to you the possibility of
11 reassigning Officers Spalding and Echeverria, were you
12 aware of what Danny and Shannon were working on
13 concerning Operation Brass Tacks?
14    A.  Was I aware?
15    Q.  Yes.
16    A.  Yes.
17    Q.  Did you know what they were specifically
18 doing that day?
19    A.  I would be speculating.  I don't recall that
20 day.
21    Q.  Did you know at some point in time that Danny
22 and Shannon were meeting with a relative, I believe a
23 brother of somebody who was killed in connection with
24 selling narcotics in the area where Watts was suspected

1 to be shaking down drug dealers?
2    A.  I don't recall.
3    Q.  In terms of -- so at the conclusion of the --
4 Did either Hilliard or Beatrice Cuello ask you any
5 questions as to what should be done with Danny or
6 Shannon?
7    A.  Ask me?
8    Q.  Yes.
9    A.  No.
10    Q.  Did you tell either Hilliard or Cuello at
11 that point in time that Danny and Shannon were still
12 actively working with the FBI?
13    A.  They were aware that they were assisting it.
14 Right, yes.
15    Q.  Were you aware that Danny and Shannon were
16 scheduled to sign out an individual, Monk Fagus
17 (phonetic) from jail the next morning to proffer and
18 work with the FBI?
19    A.  I don't recall.
20    Q.  Have you ever heard the name -- nickname
21 "Monk" in connection with Operation Brass Tacks?
22    A.  Yes, I believe so.
23    Q.  And were you aware that the next day after
24 that meeting that Shannon and Danny were removed

1 in Brass Tacks?
2    MR. KING:  Object to the lack of foundation of the
3 question.
4    BY THE WITNESS:
5    A.  To my knowledge they were not removed the
6 next day.
7    BY MR. SMITH:
8    Q.  Do you know if they were ever removed
9 from Brass Tacks?
10    A.  They were -- well, again --
11    Q.  I guess --
12    A.  -- can't give you a time frame, but there was
13 an order that came out transferring them to patrol.
14    Q.  And do you know when that was in relation to
15 the meeting?
16    A.  Again, I would be speculating.  I don't know
17 if it's a week, two weeks.  I'm not sure.
18    Q.  Do you know if they were ordered to report
19 anywhere before the transfer to patrol?
20    A.  Yes, they were -- which is common practice.
21 They were told to report to the academy for retraining.
22    Q.  Were you aware that they were told at some
23 point in time that they were actually transferred there
24 to train other people?

1    A.  No.
2    Q.  What training were they supposed to report
3 for?
4    A.  It's retraining.  Basically when you're
5 returning back to patrol after I believe -- and I'm
6 speculating -- after a certain time frame, I believe
7 it's over six months, they, what they call retread or
8 retrain you to make sure that you proficient at report
9 writing and so on, usage of the computer and so on.
10 That's my understanding.
11    Q.  Do you know if it's a class or do they just
12 report to a particular individual?
13    A.  That I won't be able to tell you.
14    Q.  Do you know how long this retraining takes?
15    A.  No.
16    Q.  Do you know anything that it would entail
17 besides the computer?
18    A.  I'm sure they touch on other subjects, but I
19 wouldn't be able to tell you.
20    Q.  Do you have any idea how they were supposed
21 to know who was going to retrain them?
22    A.  Apparently the academy personnel were going
23 to do it.
24    Q.  Do you know in any way, shape or form how,

Page 74

1  generally, retraining takes place?
2      A.  I'm not familiar.  I mean, I couldn't tell
3  you details, but that's, again, I gave you a summary of
4  what I -- that I know.
5      Q.  And you're not aware that they were sent
6  there the next day after the meeting?
7      A.  I don't recall them being sent immediately
8  the next day.  I know it did happen.  I would be
9  speculating as to the time frame.  But there was an
10  order, it came out and they were transferred.
11      Q.  In terms of -- Have you ever recommended that
12  following a police officer's working with FBI
13  investigating other police officers that the police
14  officer, when the job is done, be reassigned to work in
15  IAD?
16      A.  I'm sorry.  Repeat that again.
17      Q.  In terms of -- When you've had a situation
18  where an officer is working with FBI and investigating
19  other officers and when that -- that job, whatever
20  operation it is, is done or it stalls temporarily or
21  whatever, have you ever recommended that that officer
22  or those officers be reassigned to Confidents in IAD?
23      A.  I never had that situation happen to me,
24  so ...

Page 75

1      Q.  Why didn't you recommend or ask that Danny
2  and Shannon be put into Confidentials at IAD to
3  continue Operation Brass Tacks at that time when Cuello
4  and Hilliard spoke to you?
5      A.  Again, that's -- it's their decision.
6  They're my superiors.  Basically, the way they
7  explained it to me is, they were looking to put people
8  back in patrol and that Spalding and Echeverria may end
9  up assigned to patrol.
10      Q.  In terms of -- In terms of are you indicating
11  you didn't think you could even tell them you thought
12  one way or the other whether they should be put in
13  Confidentials and continue to work on
14  Operation Brass Tacks?
15      MR. KING:  Object to the form of the question.
16  BY THE WITNESS:
17      A.  Again, I mentioned it earlier.  I explained
18  to them that it was a viable investigation and that
19  this could conclude in a positive manner.
20  BY MR. SMITH:
21      Q.  Did you recommend what should be done with
22  Danny and Shannon at all?
23      A.  They didn't ask me, but I explained to them
24  that this was still viable.

Page 76

1      Q.  Did you ever talk with Tina Scahill about
2  what you should do with Danny and Shannon and whether
3  they should be moved into IAD?
4      A.  I don't --
5      MR. KING:  I'm going to object to the form which I
6  think was two-part question.  If you understand it, you
7  can answer.
8  BY THE WITNESS:
9      A.  I don't recall a conversation going to
10  assigning them to Internal Affairs.  We did have
11  conversations regarding trying to mask them and the
12  best way of doing that was there was supervision and we
13  can account for their tour of duty and there was an
14  agreement between myself, it was a discussion, but is
15  was an agreement that Scahill would have them detailed
16  to inspections when she was the chief of
17  accountability.
18  BY MR. SMITH:
19      Q.  Did Scahill ever mention that it made sense,
20  or words to that effect, that would you consider taking
21  them into -- moving them into IAD?
22      A.  I don't recall any conversation like that.
23      Q.  You ever tell Scahill that you would consider
24  moving them to IAD?

Page 77

1      A.  I don't recall ever having a conversation
2  like that.
3      Q.  You're aware that Danny and Shannon were
4  detailed to the police academy for three weeks?
5      A.  You know, again, I don't recall the time
6  frame, but I know they were sent there for retraining.
7      Q.  Do you know if anyone ever trained them
8  during that time?
9      A.  That I don't -- I don't recall.  I wouldn't
10  be able to tell you.
11      Q.  Do you have any idea what they were doing
12  there?
13      A.  I didn't ask.  No, I don't.
14      Q.  Did they ever call you and ask you what's
15  going on with me here?
16      A.  They asked if I could help them and I told
17  them that I would started making phone calls and trying
18  to do what I can.
19      Q.  Did they tell you they were doing nothing at
20  the time, just sitting in front of a desk?
21      A.  No.
22      Q.  Do you know who called you and asked you if
23  you could help them?
24      A.  I believe it was Shannon.

20 (Pages 74 - 77)

Page 78

1    Q.  In terms of was it before or after that
2  conversation with Shannon about where they were at that
3  you had the conversation with Tina Scahill about their
4  assignment?
5    A.  The conversation was after and it was after
6  Kirby was able to reverse the transfer to patrol.
7    Q.  How do you know that Kirby reversed the
8  transfer to patrol?
9    A.  Because I went there to see her and I
10  explained to her that we should not allow that to
11  occur.  It would not be a good message.  We need
12  officers to come forward when there's misconduct or
13  corruption and that would be the wrong message to send.
14  She agreed and she told me she was going to talk to
15  someone above her to try to change or undo the
16  transfer.
17    Q.  Did she ask you any questions on how Danny
18  and Shannon got moved in the first place?
19    A.  I think we had a discussion as to what took
20  place.  From what I recall, I mentioned to Kirby the
21  fact that I was called in to Interim Hilliard's office
22  with Bea Cuello on the conversation that took place.
23    Q.  Did you tell Kirby about the perceived
24  insubordination?

Page 79

1    A.  Yes.
2    Q.  Did you discuss what that was about?
3    A.  No.  It was put as -- The conversation didn't
4  go well.
5    Q.  Did Kirby tell you anything about what was
6  happening with Cuello and Hilliard?
7    A.  No.
8    Q.  Did Kirby know that Shannon and Danny were
9  moved at that time based on what you had heard from
10  her?
11    A.  Yes, she's -- She's the one that actually
12  forwarded an e-mail to me with the personal transfer
13  which listed Spalding and Echeverria being transfer the
14  out to patrol.
15    Q.  And that was before you even knew they were
16  being transferred out?
17    A.  Yes.
18    Q.  Did Brass Tacks ever start back up again
19  after Danny and Shannon were initially removed?
20  MR. KING:  Object to the form.
21  BY MR. SMITH:
22    Q.  Let's put it this way:
23      Were they ever reassigned back
24  to Brass Tacks, Danny and Shannon, in some form?

Page 80

1    A.  Yes.
2    Q.  How did that occur?
3    A.  Again, Deputy Superintendent Kirby was able
4  to undo the transfer and, as I mentioned earlier, the
5  decision was made to -- while nothing was -- no
6  progress was being made on the investigation to detail
7  them Office of Accountability under Scahill and that's
8  where they were detailed to, and during that time frame
9  eventually the investigation started to take -- to show
10  progress, I should say.
11    Q.  Were you actually contacted by the FBI to
12  have them start working again?
13    A.  Yes.
14    Q.  Were you told why they were asked to start
15  working again?
16    A.  The source.  To make contact with the source.
17    Q.  Were you aware that -- then that -- In terms
18  of when Debra Kirby reversed the prior reassignment to
19  patrol, were you involved in determining where Shannon
20  and Danny should be assigned to after that?
21    A.  Yes.
22    Q.  Who else was involved in that?
23    A.  Regarding inspections?
24    Q.  Correct.

Page 81

1    A.  I believe I had a conversation with Scahill
2  who, as I mentioned before, was in charge of
3  inspections.  It was under her Office of Accountability
4  and, obviously, our superior, which is Kirby, who
5  arranged the detail.
6    Q.  Were Danny or Shannon asked if they wanted to
7  go to inspections?
8    A.  No.
9    Q.  Was there any discussion at that time with
10  respect to Danny or Shannon to see if they wanted to go
11  back to the Narcotics Unit?
12    A.  No.
13    Q.  Did you have any understanding of where Danny
14  and Shannon wanted to be assigned at that time?
15    A.  As far as I know they wanted to work the
16  investigation.
17    Q.  You're aware that they were moved to
18  inspections in approximately July of 2011?
19    A.  You know what; I wouldn't recall the dates,
20  but I could say that they were detailed to inspections.
21    Q.  Were you ever told that Patrick Smith was
22  being investigated and was removed from Brass Tacks?
23    A.  I was told that there was an issue and I
24  think I mentioned it earlier that either it was some

21 (Pages 78 - 81)

Page 82

1  failure of documenting the use of the informant or
2  misuse of the informant.
3      Q.  Was the investigation under Smith ever used
4  to prosecuted Watts, Mohammed or any of his team
5  members?
6      A.  That, I don't know.  That's something I
7  wouldn't know.
8      Q.  Did the FBI ever admit that -- to you that
9  their Agent Smith had messed up the investigation and
10  it was not the fault of Officers Echeverria and
11  Spalding?
12      A.  No.
13      Q.  Did they ever tell you anything to the effect
14  of that Agent Smith had messed of the investigation of
15  Brass Tacks in any way?
16      A.  No.
17      Q.  Did they ever tell you that the investigation
18  under Patrick Smith and his removal had anything to do
19  with Danny or Shannon?
20      A.  No.
21      Q.  Did they ever tell that you Danny or Shannon
22  ever did anything inappropriate while they were working
23  with the FBI?
24      A.  The only thing I can recall was a situation

Page 83

1  where I believe it was mid -- I don't know if it was
2  July 2010 Echeverria called me and stated to me that, I
3  believe it was Agent Smith had questioned him regarding
4  some kind of equipment.  I don't know if it was a
5  transponder or eavesdropping equipment that was
6  missing, and at that point in time the conversation or
7  the discussion got heated and I believe -- I believe it
8  was Patrick Smith told them that they were no longer to
9  report to the FBI facility.
10      Q.  Do you remember when that was?
11      A.  I think I mentioned, I don't know if it was
12  July of 2010 or somewhere in that range.
13      Q.  Was that incident ever cleared up?
14      A.  We -- I think, and again I'm going back here,
15  from what I could recall, I think there was inquiries
16  as to whether this was an issue for Echeverria or
17  Spalding and nothing came of it.
18      Q.  And who did you ask if it was an issue?
19      A.  I don't know if I went through Chester or we
20  called someone in my office, one of my command staff
21  called.  I don't recall.  I can't recall.
22      Q.  Did you learn that Smith did not do the
23  proper paperwork to allow them to have an FBI vehicle
24  or equipment and the vehicle was taken away with all

Page 84

1  the equipment in it?
2      A.  No.
3      Q.  Did you hear anything about improper
4  paperwork by Smith regarding the vehicle?
5      A.  No.
6      Q.  Did you ever hear anything about the fact
7  that the vehicle -- a vehicle was taken away with
8  equipment in it?
9      A.  No.
10      Q.  Did you ever have a meeting with Rivera?
11          (Discussion between Mr. Smith and
12          Shannon Spalding sotto voce.)
13  BY MR. SMITH:
14      Q.  Did you ever have a meeting with IAD
15  Commander Klimas in which this incident was brought up
16  and there was a refusal -- that there was a
17  determination that Danny and Shannon were going to
18  refuse to go -- report back to the FBI until the matter
19  was cleared up?
20      A.  No.
21      Q.  Would you remember any meeting with Klimas
22  and yourself regarding an issue concerning Shannon and
23  Danny and the FBI?
24      A.  Again, I'm sure we discussed the missing

Page 85

1  piece of equipment and the fact that they were told
2  they could no longer report to the FBI facility.  So we
3  had to make other arrangements and I'm sure we had
4  conversations regarding that.
5      Q.  Do you remember Tom Chester being present for
6  that?
7      A.  I wouldn't -- I wouldn't be able to recall.
8  It's possible.  I don't know.  I can't remember.
9      Q.  Do you remember that you issued Danny and
10  Shannon an IAD vehicle when the FBI vehicle was taken
11  away?
12      A.  Yes.
13      Q.  Did Danny or Shannon ever inform you that
14  they were being harassed by individuals in Unit 126
15  including Lieutenant Pasqua?
16      A.  No, they didn't -- They didn't tell me they
17  were being harassed.  What they basically said was they
18  did not want to be inside in administrative capacity
19  and they wanted to go back out and they wanted me to
20  assign a vehicle to them and radios.  And I basically
21  told them that that would compromise them.  I told them
22  they had to take direction from the supervisors there,
23  and they were having a hard time doing that.  And there
24  was a lot of miscommunication with regards to what they

22 (Pages 82 - 85)

Page 86

1 were being told to do and their refusal to cooperate.
2    Q.   Did you have any idea what they were doing at
3 Unit 126, what type of work?
4    A.   Whatever inspections, whatever the
5 supervisors assign them to.
6    Q.   Did they ask with discuss with you at all
7 what the actual work was?
8    A.   Administrative work.
9    Q.   In terms of what type of administrative work?
10    A.   No, I didn't get into details.
11    Q.   Did they ever tell you that they went to
12 Commander Stanley about the retaliation and
13 inappropriate contact of Lieutenant Pasqua.
14    MR. KING:  Object to the form of the question.
15 "Inappropriate."
16    THE COURT REPORTER:  Did you answer?
17    THE WITNESS:  I'm sorry.  Can you repeat it.
18 BY MR. SMITH:
19    Q.   I can repeat it.
20        Did they ever tell you that they went to
21 defendant -- I mean, went to Adrienne Stanley about the
22 conduct and harassment of Lieutenant Pasqua at 126?
23    MR. KING:  Same objection to the form.  Lack of
24 foundation.

Page 87

1 BY THE WITNESS:
2    A.   No.
3 BY MR. SMITH:
4    Q.   Do you know Lieutenant Pasqua?
5    A.   I know of her.
6    Q.   Was there an occasion where you had to issue
7 or ask for a CR with respect to her?
8    A.   No.
9    Q.   Did she ever ask for a CR with respect to
10 you?
11    A.   "She" meaning?
12    Q.   Lieutenant Pasqua.
13    A.   No.
14    Q.   Did you ever have an issue with
15 Lieutenant Pasqua in terms of that was a negative
16 situation?
17    A.   No, I had very little contact with Pasqua.
18    Q.   Did you ever tell Shannon or Danny that
19 Lieutenant Pasqua is nuts?
20    A.   No.
21    Q.   Did you ever tell Shannon and Danny that
22 Pasqua is nuts and hates you for working with Rivera
23 because he had a past issue with her and asked for a CR
24 number?

Page 88

1    A.   No.
2    Q.   Did you ever tell them to hang in there?
3    A.   No.
4    Q.   If Shannon or Danny Echeverria had told you
5 that Pasqua was calling them "Rat" and harassing them
6 for being individuals who had worked in
7 police-on-police investigations and that they felt that
8 they were being harassed and weren't getting treated
9 fairly in Unit 126, would you have initiated a CR
10 against Lieutenant Pasqua.
11    MR. KING:  Just object to the form and
12 hypothetical, but you can answer.
13 BY THE WITNESS:
14    A.   If that was brought to my attention?
15 BY MR. SMITH:
16    Q.   Hypothetically speaking.
17    A.   Yes.
18    Q.   Do you think it would be your obligation to
19 do so?
20    A.   Yes, and I would expect the officers to
21 document and submit a report regarding the details.
22    Q.   In terms of -- Do you know a Mike Barts?
23    A.   Yes.
24    Q.   Did you know that he was assigned to

Page 89

1 investigate a CR with respect to Shannon Spalding?
2    A.   Yes.
3    Q.   Did you know that he was also assigned to
4 investigate the CR that was initiated because of the
5 filing of this lawsuit?
6    A.   Again, I don't recall if that's the case or
7 not.  I'd have to ...
8    Q.   Would it surprise you to learn that an
9 investigator who was assigned to investigate a CR
10 against for another incident involving the allegations
11 in a complaint would be assigned also to investigate
12 the complaint itself?
13    A.   No.
14    Q.   Did you know any of the details of what
15 Mike Barts did during the investigation of Shannon?
16    A.   No, I wouldn't have details on it.
17    Q.   Would you think it would be appropriate for
18 an investigator in Internal Affairs tell a police
19 officer who had a CR that she was under arrest --
20    MR. KING:  Object to the form.  Calling for
21 speculation and lack of foundation.
22 BY MR. SMITH:
23    Q.   -- while investigating a CR?
24    A.   Again, your asking me to speculate on

23 (Pages 86 - 89)

Page 90

1 something. I can't answer that.
2    Q. Are you familiar at all with that CR?
3    A. I don't have details. I wouldn't know
4 details, no.
5    Q. Did you ever review that CR?
6    A. No.
7    Q. Would you have -- we already mentioned --
8 Would you agree that it was probably around
9 October 2011 that Danny and Shannon were called back to
10 assist the FBI with the completion of
11 Operation Brass Tacks?
12    A. I would be speculating. I don't know the
13 exact date.
14    Q. Would you agree that Danny and Shannon
15 continue to work with the FBI until the arrest -- with
16 the case until the FBI until there was arrests and
17 indictments of Ronald Watts an Kallatt Mohammed?
18    A. Yes.
19    Q. Would you have any problem with the date of
20 February 2012?
21    A. That sounds about right.
22    Q. After that time you would agree that Shannon
23 and Danny weren't sent back to Narcotics or Organized
24 Crime Division, correct?

Page 91

1    A. That's correct.
2    Q. They returned instead to Unit 126?
3    A. They were in Unit 126. They were detailed.
4    Q. Was there any effort at that time to find
5 another unit for Danny and Shannon?
6    A. They had asked me to help them. They wanted
7 to go to an FBI task force and I think I had mentioned
8 the Fugitive Apprehension Unit which is a sought after
9 position unit and they were okay with either one. I
10 told them I would have to check with my superiors and
11 that's what I did.
12    Q. Do you recall if Shannon at or about that
13 time told you that she was experiencing anxiety
14 attacks?
15    A. No.
16    Q. Do you recall if at any point in time Shannon
17 ever told you that she was experiencing anxiety
18 attacks?
19    A. No.
20    Q. Did you recall having any conversations with
21 Shannon indicating that she was upset and having real
22 difficulties being in Unit 126?
23    A. No. She just wanted to -- They insisted on
24 an FBI task force and their whole object was to get

Page 92

1 overtime stipend and a vehicle, and I told them that
2 wouldn't be up to me, that I would take it up the
3 chain.
4    Q. Did you ever sit down and talk with them and
5 say what's going on here? How urgent is the situation
6 for you to move? Why is it so bad?
7    A. No.
8    Q. And Shannon Spalding never ever told you that
9 it's a hostile work environment and they wanted you to
10 initiate a CR investigation into what people in 126
11 were doing with respect to her?
12    A. No, and again, I would a expected a to-from
13 detailing the alleged misconduct.
14    Q. When you took that CR you spoke of regarding
15 Hernandez and Sergeant Padar when she reported to you,
16 did you have her do a written report at that time?
17    A. In that circumstances, no, because she
18 approached me as advice is the way she put it.
19    Q. So even -- and if you -- She would have
20 orally asked you to do a CR against Pasqua,
21 Lieutenant Pasqua, would you have refused to do a CR.
22    MR. KING: Just object to the lack of foundation.
23    THE WITNESS: I'm sorry.
24    MR. KING: No evidence what the CR would be about.

Page 93

1 BY MR. SMITH:
2    Q. If she had said Pasqua was hostile calling
3 her rats and treating her poorly because of what she
4 thought of her having investigated a fellow officers,
5 would you have refused to do a CR if there was no
6 written report she had created?
7    A. The fact is that never happened.
8    Q. I'm asking you hypothetically.
9    A. Again, you want me to speculate on something
10 and I wouldn't be able to answer that. You want me to
11 speculate on something that didn't happen.
12    Q. So it you might -- You might have done one
13 anyhow without a written report and you might not have?
14    MR. KING: Objection to the form. Calling for
15 speculation and asked and answered already.
16 BY THE WITNESS:
17    A. Again, I would have expected the officer to
18 have a written to-from documenting the details of the
19 allegations.
20 BY MR. SMITH:
21    Q. And the Hernandez incident, did you have
22 Hernandez do a written report?
23    A. I had him meet with a supervisor and I took a
24 statement, obviously, because I was in the field.

24 (Pages 90 - 93)

1    Q.   But he didn't do a written report?

2    A.   Again, he met with the investigators and they

3  took his complaint.

4    Q.   As you sit here today, do you know if

5  Hernandez did a written report or not?

6    A.   I don't recall.  What I recall is I referred

7  them to my supervisor and he went into Internal Affairs

8  where the supervisor spoke to him and took his

9  information and documented it.

10    Q.   Do all CR numbers have written reports that

11  come from officers?

12    MR. KING:  Object to the lack of foundation, the

13  form of the question.

14  BY THE WITNESS:

15    A.   Again, they should.

16  BY MR. SMITH:

17    Q.   As  far as you know, you have been working

18  IAD for a long time now; do the CRs you've seen, do all

19  of them are reports from the officer?

20    A.   There is some anonymous complaints that come

21  in.  There's some complaints that came through e-mail

22  to IPRA.

23    Q.   And some are verbally made, correct?

24    A.   Usually, if they were verbally made to a

1  supervisor it's a report, according to the directive,

2  is generated the supervisor initiates the log.

3    Q.   Isn't it true that if an officer goes to a

4  supervisor and tells them about improper conduct that

5  the supervisor's actually mandated to write a written

6  report, a CR, take the CR?

7    MR. KING:  Just object to the form of the

8  question.  The use of the term "improper conduct."

9  BY THE WITNESS:

10    A.   That's a separate report.  That's the

11  initiation report.

12  BY MR. SMITH:

13    Q.   The supervisor, the one who is told about it,

14  is the one who has to do the initiation report; is that

15  correct?

16    A.   That's correct.

17    Q.   Did Shannon and Danny ever tell you that when

18  they were in Unit 126 they would have is sit idly for

19  an entire shift?

20    A.   No.

21    Q.   You're aware that at some point in time Danny

22  and Shannon were detailed to the bureau of Detective

23  Fugitive Apprehension Unit?

24    A.   Was I aware?

1    Q.   Yes.

2    A.   Yes, I arranged it.

3    Q.   In terms of -- Before you arranged that, did

4  you receive a call from Chief Tom Bryne telling you

5  that Danny and Shannon should be sent to Fugitives?

6    A.   No, approached Tom Bryne after the officers

7  told me they knew him.

8    Q.   And when you approached Tom Bryne, did he

9  already know of the situation?

10    A.   No.

11    Q.   And Tom Bryne didn't call you first?

12    A.   No.

13    Q.   Were you aware -- Did he make you aware that

14  Danny and Shannon had talked to him?

15    A.   If he had, he didn't mention it.  I wasn't

16  aware.

17    Q.   And Tom Bryne, he did indicate that he knew

18  Danny and Shannon?

19    A.   Yes.

20    Q.   Did he indicate that he would be happy to

21  have them work for him in Fugitives?

22    A.   Yes.

23    Q.   Do you recall an occasion where

24  Danny Echeverria told you that if you didn't get a CR

1  relating to the retaliation that Danny would go to an

2  outside unit to file a complaint?

3    A.   No.

4    Q.   Did you ever talk to Shannon or Danny about

5  their assignment -- the work and what it was like when

6  they were assigned to Fugitive Apprehensions?

7    A.   They enjoyed it.  We had a conversation where

8  they said they were fine.  Um, and then at a certain

9  point, I'm not sure of the time frame, I believe

10  Echeverria called me and stated they had concerns

11  because they were getting reassigned to a different

12  team and they were complaining that the team they were

13  on was US Marshals team and they were going to a

14  fugitive -- I'm not sure what they referred to it as, a

15  fugitive street team.  I questioned them about it

16  because I understood that they were going to a street

17  team in the first place.

18    So I told them that I was going to make an

19  inquiry with Tom Bryne and I subsequently did talk or

20  speak to chief Bryne and I asked him what was going on

21  with the movement of Shannon and Echeverria and he

22  stated that, in essence, they're increasing the size of

23  the Fugitives or creating additional teams and that

24  they were going to be part of the a new team.  And I

25 (Pages 94 - 97)

1 asked him if it was true whether they were on a --
2 US Marshals team and being moved to to street team. He
3 said, no it's the same type of team doing the same type
4 of work. At that point in time I called Echeverria
5 back and I told him this is the situation, you're not
6 being moved to a -- you weren't a US Marshals team and
7 you're not being moved to a street team. You're going
8 to continue to work the same type of assignments that
9 you were working on the team that you were on.
10     At that point in time I asked them if they
11 knew who the sergeant was that was on a new team and
12 they gave me his name which was Tommy Mills. I then
13 told them -- I informed them that I knew him and that
14 he had worked for me and I told them that I would call
15 him and put a good word in with the sergeant.
16     Q.  Is that the first time you talked to them
17 about their work at ...
18     A.  Yes.
19     Q.  At the Fugitives Unit.
20     Did either Danny or Shannon ever talk to you
21 about continuing being passed up for deputization with
22 the marshal?
23     A.  No.
24     Q.  And were you aware that at one point in time

1 they were reassigned to nighttime fugitive
2 apprehension?
3     A.  No.
4     Q.  Did Danny or Shannon ever tell you that they
5 were upset about being put in a nighttime unit?
6     A.  No.
7     Q.  Did Danny and Shannon ever tell you that they
8 were being mistreated and harassed and retaliated
9 against in the Fugitive Unit?
10     A.  No.
11     Q.  Specifically did they tell you any complaints
12 about Sergeant Brynes?
13     A.  No.
14     Q.  Do you know Sergeant Maurice Brynes?
15     A.  I know of him and they -- Obviously, the
16 conversation I mentioned earlier, Shannon Spalding had
17 mentioned that that was the sergeant that they had been
18 working with and they were being moved to, like I
19 mentioned, a different team and they were upset about
20 having to move.
21     Q.  You would agree that if a lieutenant or a
22 commander told their personnel that we got IAD rats
23 coming to the unit, that would be something that would
24 be inappropriate?

1     MR. KING:  Object to the form and the lack of
2 foundation. Calling for speculation.
3 BY THE WITNESS:
4     A.  Again, you want me to speculate on something
5 that didn't happen. I don't know.
6 BY MR. SMITH:
7     Q.  Hypothetically speaking.
8     A.  Repeat it.
9     Q.  Would you agree that if the supervisor within
10 Fugitives -- or lieutenant or -- and/or the commander
11 of the Fugitive Branch Unit told the personnel working
12 in the unit that two rats from IAD were coming to work
13 here that that would be inappropriate conduct?
14     MR. KING:  Same objections as to form, lack of
15 foundation and calling for speculation.
16 BY THE WITNESS:
17     A.  Again, I would be speculating, but basically
18 in the manner you put it, yes.
19 BY MR. SMITH:
20     Q.  Isn't it true that you warned Danny and
21 Shannon that they should be careful because stats in a
22 unit is a way for supervisors to falsify a case against
23 an individual or an officer, so that they should
24 document everything?

1     A.  No.
2     Q.  Do you recall having any conversation of that
3 effect ever?
4     A.  No.
5     Q.  Did Tom Chester ever call you about Danny and
6 Shannon's difficulties at Fugitive Apprehension?
7     A.  No, as I mentioned earlier the conversation
8 where they claimed they were being moved from a
9 US Marshals team to a street team, during that
10 conversation apparently he had called Chester and also
11 pointed that out to him. He then calls me and tells me
12 to expect a call because they're now complaining that
13 they were moved from a US Marshal's team to a street
14 team and shortly, thereafter, like I mentioned,
15 Echeverria did call me.
16     Q.  Did you tell them that you were calling
17 Mills, Danny or Shannon, that were you calling Mills to
18 put in a good word for them?
19     A.  Yes.
20     Q.  Did you tell them that you were a person that
21 promoted Mills?
22     A.  Yes. I --
23     Well, strike that. If I can correct that.
24     MR. KING:  Go a head.

26 (Pages 98 - 101)

Page 102

1  BY THE WITNESS:
2      A.  I did not promote him.  I nominated him.
3  BY MR. KING:
4      Q.  But you told Danny and Shannon that you had
5  helped promote Mills?
6      A.  That I had submitted him for promotion.
7      Q.  And, in fact, you told them that when you
8  were doing it you said to them, We'll see where his
9  loyalty lies now?
10     A.  No.
11     Q.  Why did you tell them that you promoted
12  Mills?
13     A.  Because I wanted to establish the fact
14  that -- that they realized that I had a good
15  relationship with the sergeant and that he had also
16  worked in Internal Affairs.
17     Q.  Why did you think it was important to make
18  sure that they know that he already worked in
19  Internal Affairs?
20     A.  Because, obviously, they were concerned that
21  they were going to be mistreated and they were
22  complaining that they were being moved from one team to
23  to another and I told them, you know, Tommy Mills
24  definitely will not have issues.  He's a good person.

Page 103

1      Q.  You told them --
2      A.  Good supervisor.
3      Q.  -- you thought there was a chance that he
4  might not have a problem with them being from IAD when
5  they complaining about everybody else calling them
6  Rats, isn't that correct?
7      MR. KING:  Objection to the form.  Lack of
8  foundation.  States facts not in evidence.  Certainly
9  misstates this witness' testimony.
10  BY THE WITNESS:
11     A.  No.  Again, I was not even aware that he was
12  the supervisor on a team that they were going to be
13  reassigned to until they told me.
14  BY MR. SMITH:
15     Q.  Were you aware that -- Or did you ever speak
16  to Shannon or Danny about Shannon's being banned from
17  Chicago Police Headquarters at Homan square?
18     A.  I'm sorry.  Can you repeat that.
19     Q.  Did you ever talk to Shannon or Danny about
20  the complaints that Shannon was being banned from
21  Chicago Police Headquarters at Homan Square?
22     A.  Headquarters.
23     Q.  Homan Square, period.
24     A.  No.

Page 104

1      Q.  Do you recall telling Shannon and Danny
2  that -- or Shannon and telling them about your efforts
3  with Mills and indicating that your hands were tied and
4  this is their last chance, if you can't make is it here
5  your careers are over?
6      A.  No.
7      Q.  Do you believe after you spoke to Tom Bryne
8  that you explained to Bryne why Danny and Shannon were
9  being kicked off the team?  I'm sorry.
10         Do you recall explaining to Tom Bryne that
11  Danny and Shannon were being kicked off of the team?
12     MR. KING:  Just object to the form of the
13  question.
14  BY THE WITNESS:
15     A.  First of all, it was put to me that they were
16  being move to a different team, not kicked off.  And
17  like I said, I had a conversation with Tom Bryne.  He
18  explained what was taking place and his explanation was
19  they were expanding the Fugitives Unit and they were
20  creating new teams and they were being assigned to a
21  new team.
22  BY MR. SMITH:
23     Q.  So you didn't have a conversation with them
24  saying that they were getting kicked off?

Page 105

1      A.  No.
2      Q.  And there was no response by Bryne that he
3  was shocked and surprised that they were getting kicked
4  off a team?
5      A.  No, he knew exactly why it was taking place.
6      Q.  And you didn't think that -- Did you ever to
7  Shannon or Danny that things might get worse because
8  you're going over people's heads?
9      A.  No.
10     Q.  So you never heard -- Did you ever hear
11  anything about Shannon being told she shouldn't be
12  around Homan Square?
13     A.  No.
14     Q.  Or a guard house at Homan Square?
15     A.  No.
16     Q.  You're aware that Watts and Mohammed plead
17  guilty to extorting drug dealers?
18     A.  Yes, the plead guilty.
19     Q.  You're aware that in the plea it was
20  described that the criminal misconduct went back to at
21  least 2007?
22     A.  Again, can you repeat that.
23     Q.  Were you aware that in the plea Watts
24  described that his criminal misconduct went back to at

27 (Pages 102 - 105)

Page 106

1 least 2007?
2    A. Again, I don't recall reading that, but it's
3 possible.
4    Q. Did you ever talk to Sergeant Mills about
5 Danny or Shannon after they began to work with him?
6    A. I believe we may have had a conversation and
7 he was fine with them.
8    Q. Anything after that?
9    A. Afterwards he did call me, um, asking me for
10 advice and basically what he told me was that an
11 officer had relayed to him that they had heard or they
12 had observed Shannon and she was playing what they
13 believe was a recorded conversation on her phone with
14 regards to Tommy Mills and, obviously, the allegation
15 was that Shannon had recorded Tommy Mills.
16    Q. And what about did you tell him?
17    A. I basically told him that at that point in
18 time I don't know exactly where the eavesdropping law
19 was. I guess it was the eavesdropping laws were being
20 changed or so and I -- I advised him to call Legal
21 Affairs for advice.
22    Q. Did you ask him if he knew who or how
23 somebody says that they believed Shannon was taping
24 Sergeant Mills?

Page 107

1    A. Again, what he told me was there was an
2 officer who actually -- there was an officer who
3 actually had told him.
4    Q. Did he give you the name of the officer?
5    A. If he did, I don't recall.
6    Q. Did they do a written report? Did you have
7 him do a written report?
8    A. I don't know. I told him to get advice from
9 Legal Affairs and Tommy Mills apparently initiated a
10 number, an investigation.
11    Q. Do you know if he ever did a written report?
12    A. That I wouldn't be able to tell you.
13    Q. Did you know if it even met the criteria of a
14 CR?
15    A. Again, apparently after seeking advice from
16 Legal it must have met the criteria and he went
17 forward, I believe, with the CR.
18    Q. How long in your experience between the time
19 the CR was filed and -- a CR is filed and an
20 investigation initiated, is it usually within IAD or
21 within -- afterwards is interview done of the subject
22 of the alleged complaint?
23    A. Again, I would be speculating. It all is
24 contingent on the investigation.

Page 108

1    Q. Is notification given in any way to the
2 subject of the complaint?
3    A. To the accused?
4    Q. Yes.
5    A. I'm sure it is.
6    Q. Do you know if this was done in this case?
7    A. That I wouldn't --
8    MR. KING: Object to the form of "this case."
9 BY MR. SMITH:
10    Q. In the case of Shannon's CR and the
11 Tommy Mills complaint?
12    A. Can you repeat that?
13    Q. Do you know if Shannon Spalding was given any
14 notice that Sergeant Mills -- or there was a CR
15 initiated against her relating to this Sergeant Mills
16 accusation?
17    A. I don't recall if it was or not.
18    Q. Would it surprise you if she wasn't and she
19 was -- two male officers came to her unit and took her
20 into a room?
21    A. Again, you're asking me to speculate as to
22 something that I -- I don't know or have knowledge of.
23    Q. I'm asking you as the chief of IAD if it
24 would surprise you that that happened?

Page 109

1    MR. KING: Object to the form and lack of
2 foundation and calling for speculation.
3 BY THE WITNESS:
4    A. Again, I'm speculating and I would -- I would
5 not know what their motives are as far as going to
6 what, interview?
7 BY MR. SMITH:
8    Q. Do you know if that would be proper
9 procedure?
10    A. To --
11    Q. So approach and accuse at their work without
12 giving notification and take that person, a female,
13 into -- with two male investigators and take her into a
14 room at their job location?
15    MR. KING: Same objection.
16 BY THE WITNESS:
17    A. Again, you you want me to speculate. If it's
18 an allegation of criminal nature, yes, they would do
19 that.
20 BY MR. SMITH:
21    Q. Would that require a probable cause to do
22 that then?
23    MR. KING: Same objection. Go ahead.
24

28 (Pages 106 - 109)

Page 110

1 BY THE WITNESS:
2    A.   Again, it's not -- no one is being placed
3 under arrest.  They're just being interviewed or
4 questioned regarding ...
5 BY MR. SMITH:
6    Q.   You're aware that if somebody is not allowed
7 to leave they're under arrest?
8    MR. KING:  Objection to the form and calling for a
9 legal conclusion.
10 BY MR. SMITH:
11    Q.   Correct.
12    A.   Again, you want me to speculate as to whether
13 the person was or wasn't allowed to leave.
14    Q.   No, I want you to acknowledge that if two of
15 your investigators or two people working under you took
16 somebody into a room and refused to let them leave,
17 that would have been tantamount to an arrest?
18    MR. KING:  Same objection.
19 BY THE WITNESS:
20    A.   Again, I would be speculating whether it was
21 criminal in nature as to what they were asking or
22 administrative.
23 BY MR. SMITH:
24    Q.   Are your investigators informed that if they

Page 111

1 are going to take somebody -- arrest that they should
2 give them their Miranda Rights?
3    A.   Again, you're asking me to speculate.  If
4 they are going to arrest them, then, obviously, you
5 would give them the Miranda Rights.  If your conducting
6 an administrative case or investigation that's totally
7 separate and apart.
8    Q.   Did anyone ever find out if it's even against
9 again the law to record an officer while you were on
10 duty at that time?
11    A.   Apparently and, again, you want me to
12 speculate, apparently sergeant pills spoke to someone
13 in Legal and they stated that it was illegal and he
14 moved forward with the CR.
15    Q.   Did you ever talk to Sergeant Mills again
16 about at that CR?
17    A.   No.
18    Q.   In terms of this lawsuit, did you ever talk
19 to James O'Grady about this lawsuit?
20    A.   No.
21    Q.   Did you ever talk to Nick Roti about this
22 lawsuit?
23    A.   Yes.  We discussed, again, that's when he
24 mentioned the issue and I think we covered that

Page 112

1 earlier, after the lawsuit.
2    Q.   Did you talk about any other allegations that
3 plaintiffs had made in the lawsuit?
4    A.   No.
5    Q.   Did you talk about the press conference and
6 all with him?
7    A.   I don't recall.  I don't believe so.
8    Q.   Did you see the press conference?
9    A.   Yes.
10    Q.   Did you talk to Debra Kirby about this
11 lawsuit?
12    A.   I don't recall if I did or not.
13    Q.   Did you talk to Kevin Sedowski about this
14 lawsuit?
15    A.   No.
16    Q.   Debra Pasqua about this lawsuit?
17    A.   No.
18    Q.   Commander Stanley about this lawsuit?
19    A.   I think we did discuss that, you no, the
20 lawsuit was filed.  I don't believe we got into
21 details.
22    Q.   How long have you known Debra Kirby?
23    A.   Again, off and on.  I would say I knew of
24 her -- We came on the Police Department together, 1986,

Page 113

1 but our paths didn't cross until probably 2005 when she
2 was the Assistant Deputy Superintendent of
3 Internal Affairs while I was the lieutenant there in
4 confidential.
5    Q.   Did Nicholas Roti start with you in 1986,
6 also?
7    A.   I'm not sure if he did.  Possibly.
8    Q.   How long have you known him?
9    A.   I'm trying to think about that.  It may have
10 been -- I might have met him years ago when I was in --
11 I'm not sure if it's a specialized unit.
12    Q.   How about James O'Grady, do you remember when
13 you met him?
14    A.   I met him when he was in Narcotics.  He was a
15 PO and I was a sergeant.
16    Q.   And what -- Were you the sergeant of a team
17 that he was on?
18    A.   No.
19    Q.   I asked you a question about Len Lewellyn.
20       Did you ever work with Len Lewellyn?
21    A.   No.
22    Q.   Do you know Maurice Barnes?
23    A.   I know of him from -- I believe he was in
24 narcotics also as a PO.

29 (Pages 110 - 113)

Page 114

1    Q.  Did you ever talk to him about this lawsuit?
2    A.  No.
3    Q.  Do you know Lieutenant Robert Cesario?
4    A.  Yes.
5    Q.  How long have you known Robert Cesario?
6    A.  Again, I don't know him all that well.  I
7  think we took courses together, college courses.
8  That's -- That's a few years back.
9    Q.  Did you ever talk to him about this lawsuit?
10   A.  No.  This lawsuit.
11   Q.  Do you know Joseph Salemme?
12   A.  Yes.
13   Q.  How long have you known him?
14   A.  Again, I believe he was in Narcotics when I
15  was there.
16   Q.  Did you ever talk to him about the lawsuit?
17   A.  I don't recall talking to him, no.
18   Q.  Did you talk to Thomas Mills about the
19  lawsuit?
20   A.  We may have mentioned the fact that there was
21  a lawsuit filed, but I don't believe we went into
22  details.  I believe at the time we spoke he wasn't part
23  of the -- he wasn't part of the lawsuit.
24   Q.  And do you recall him telling you that -- Do

Page 115

1  you recall him calling you prior to the lawsuit and
2  talking to you about the treatment of Danny and
3  Shannon?
4    A.  No.
5    MR. SMITH:  I'm just going to mark this as Exhibit
6  No. 2 for identification.
7         (Lieutenant Juan Rivera Exhibit 2
8            marked.)
9  BY MR. SMITH:
10   Q.  Do you recognize Exhibit No. 2 for
11  identification?
12   A.  Yes.
13   Q.  And did you, in fact, sign off on the
14  overtime slips over Danny and Shannon for
15  November 21, 2011?
16   A.  Yes.
17   MR. SMITH:  I'm going to show you what's marked,
18  as well, marked as Exhibit No. 3 for identification.
19         (Lieutenant Juan Rivera Exhibit 3
20            marked.).
21   MR. SMITH:  It's a two-page document.
22   MR. KING:  It's two separate pages.
23   MR. SMITH:  Yeah, it's two different.
24

Page 116

1  BY MR. SMITH:
2    Q.  Do you see Exhibit No. 3 for identification?
3  Is a counseling session report.  It's actually two
4  different pages.
5    Have you ever seen those before?
6    A.  The first time I seen these were at the -- my
7  counselor's office.
8    Q.  Do you recall ever speaking with either
9  Kevin Sedowski or, I guess, Adrienne Stanley about a
10  situation where Danny and Shannon were being given a
11  counseling session report?
12   A.  I didn't speak to Sedowski.  I e-mailed him.
13   Q.  Why did you e-mail him?
14   A.  Um, the day I e-mailed Sedowski, earlier in
15  that day Echeverria had called me and he informed me
16  that Lieutenant Sedowski had prepared counseling forms
17  and wanted to present them to them that morning.
18    At that point in time, I believe the officers
19  were involved in the investigation which had restarted.
20  I was not aware of the counseling forms until
21  Echeverria pointed it out to me, so I then e-mailed
22  Sedowski and, in essence, told him to hold off, because
23  I wanted to have a conversation, obviously, because I
24  was unaware of what the counseling forms were or what

Page 117

1  the issues were and so I e-mailed him to hold off.
2    Q.  Did you have a conversation with anybody
3  about them?
4    A.  No.
5    Q.  Did you do anything further in relation to
6  the issue?
7    A.  No.
8    Q.  So you just sent an e-mail with just to hold
9  off?
10   A.  Yes.
11   Q.  And you never gave any further instruction on
12  them?
13   A.  The instruction is we were going to have a
14  conversation, but it never -- it never came to fruition
15  and counseling forms were never presented to the
16  officers.
17   Q.  Did you ever -- Do you know if you sent
18  that -- signed off -- did --
19    After you signed off on the overtime, did you
20  give it to anybody?
21   A.  I wouldn't even recall if I did or who --
22  Normally, the officers take it to whoever handles that
23  either in 126 or 543 -- wherever they were assigned at
24  that time.

30 (Pages 114 - 117)

1    MR. SMITH: Okay. Thank you.
2        I'm going to show you what we will mark as
3    Exhibit 4.
4            (Lieutenant Juan Rivera Exhibit 4
5            marked.)
6    BY MR. SMITH:
7    Q.  Do you recognize Exhibit No. 4 for
8    identification?
9    A.  I recall the e-mail, yes.
10   Q.  Can you see the date on it?
11   A.  Let's see. Fifth of November. Yes.
12   Q.  Fifth of November of what year, just for the
13   record?
14   A.  2010.
15   Q.  Do you have any recollection of what that was
16   about?
17   A.  No.
18   Q.  Do you have any recollection at all about an
19   urgent situation that Danny was calling but at that
20   time?
21   A.  I can't recall every -- no.
22   MR. SMITH: I'm going to show you what we'll mark
23   as Rivera Exhibit No. 5 for identification.
24

1            (Lieutenant Juan Rivera Exhibit 5
2            marked.)
3    BY THE WITNESS:
4    A.  Yes, I recall this.
5    BY MR. SMITH:
6    Q.  Do you recall -- Can you read the date of
7    that e-mail?
8    A.  The 27th, July, 2010.
9    Q.  And is this an e-mail that you received or
10   sent?
11   A.  This was an e-mail I received from
12   Commander Klimas.
13   Q.  Do you recall what this e-mail was about?
14   A.  If I am correct, it's with regards to the
15   officers being told they were no longer to report to
16   the FBI and at that point we were working at trying to
17   determine how we were going to make arrangements.
18   Q.  Did you contact Robert Klimas after receiving
19   that e-mail?
20   MR. KING: You mean -- object to the form. Since,
21   I believe, they're two separate e-mails on this
22   exhibit, so ...
23   BY MR. SMITH:
24   Q.  Are there two separate e-mails on the same

1    sheet?
2    A.  Yes.
3    Q.  So --
4    A.  I acknowledged it, 10-4.
5    Q.  And what did you acknowledge?
6    A.  The fact that they were at the offices there.
7    Q.  Did you contact Mr. Klimas receiving that
8    e-mail?
9    MR. KING: Object -- Other than him replying to
10   the e-mail?
11   BY MR. SMITH:
12   Q.  Yes. Other than the 104.
13   A.  I don't recall. I know they were there for
14   one specific reason and that was to determine how we
15   were going to deal with the fact that they had nowhere
16   to report.
17   MR. SMITH: I'm showing you what we'll mark as
18   Rivera No. 6 for identification.
19           (Lieutenant Juan Rivera Exhibit 6
20           marked.)
21   BY MR. KING:
22   Q.  Do you recognize what we've marked as
23   Exhibit No. 6 for identification?
24   A.  It's the notice that they were going to be

1    sent to the academy for retraining and then assigned to
2    to patrol.
3    Q.  Do you recall getting that notice at the
4    time?
5    A.  Yeah, I received it.
6    Q.  Did you make any calls to anyone after
7    receiving that?
8    A.  If I'm not mistaken -- Again, I'm trying to
9    recall, actually received calls from Spalding and
10   Echeverria after this came out.
11   Q.  You believe you did receive calls after that
12   came out?
13   A.  Yes.
14   Q.  Did you already speak of those calls in the
15   deposition earlier?
16   Let me ask you -- Let me just ask you:
17   What were the calls about?
18   A.  They were -- They were upset that they were
19   going out to the academy for retraining and to patrol
20   and they wanted me to intervene and help them.
21   Q.  Did you indicate you would?
22   A.  Yes.
23   Q.  And what did you do to help them?
24   MR. KING: Just object to -- to the extent that

31 (Pages 118 - 121)

Page 122

1  this has already been asked and answered. And if it
2  hasn't I withdraw that.
3  BY THE WITNESS:
4      A.  Again, I told them I was going to look into
5  it and make calls. I was positive I spoke to Scahill
6  and, eventually, I think I mentioned it earlier, I went
7  in to see Kirby sometime after.
8  BY MR. SMITH:
9      Q.  I think you did. Okay. Thank you.
10     MR. SMITH: I will show I what we'll mark as
11 Rivera 7 now.
12          (Lieutenant Juan Rivera Exhibit 7
13              marked.)
14 BY MR. SMITH:
15     Q.  Do you recognize the e-mail that we've marked
16 as Exhibit No. 7 for identification?
17     A.  Yes.
18     Q.  Do you see this is an exhibit, May 9, 2011
19 e-mail from Robert Klimas?
20     A.  Correct.
21     Q.  Is that what you're looking at?
22     A.  Yes.
23     Q.  Do you see that you're cc'd on it?
24     A.  Yes.

Page 123

1      Q.  Do you recall receiving this?
2      A.  Yeah, I recall the -- I recall the e-mail,
3  yes.
4      Q.  Do you know if anyone did a written synopsis
5  of what the officers were trying to do?
6      A.  You know, I -- I don't recall and I believe
7  the commander was asking for it, so the commander might
8  have knowledge of this, the synopsis.
9      Q.  Do you know if anybody -- Do you know who was
10 supposed to do the written synopsis?
11     A.  Again, I'm just assuming. It says "Tom."
12 I'm assuming it's Tom Chester. I'm not 100 percent
13 sure.
14     Q.  Do you have any recollection of talking to
15 Robert Klimas concerning a written synopsis on or about
16 that time?
17     A.  I don't recall.
18     Q.  Do you have any idea why was Robert Klimas
19 was seeking a written synopsis at that time?
20     A.  I would assume the Superintendent's office
21 had made the request.
22     MR. SMITH: Mark this was Exhibit No. 8 for
23 identification.
24

Page 124

1          (Lieutenant Juan Rivera Exhibit 8
2              marked.)
3  BY MR. KING:
4      Q.  Do you recognize the e-mail that appears to
5  be an e-mail from Debra Kirby to Juan Rivera dated
6  May 12, 2011 regarding -- it indicates:
7          "Howard Spalding and Echeverria will not be
8  released for posttraining until I approve it. I will
9  be notified before anybody outside of the academy is
10 noticed. Thanks. Debra Kirby."
11         Do you recall receiving that e-mail?
12     A.  Yes.
13     Q.  Did you talk with Debra Kirby at all about
14 this e-mail or the content of it?
15     A.  No.
16     MR. KING: Just object to the extent the response
17 calls for testimony that's already been given.
18 BY THE WITNESS:
19     A.  No. Again, this e-mail was sent out by Kirby
20 after I went in and spoke to her and told her that we
21 should not allow the officers to be reassigned to
22 patrol and, therefore, she put a stop.
23 BY MR. SMITH:
24     Q.  Anything further you recall about that?

Page 125

1      A.  That's about it.
2      MR. SMITH: No. 9. Rivera No. 9 for
3  identification.
4          (Lieutenant Juan Rivera Exhibit 9
5              marked.)
6  BY MR. SMITH:
7      Q.  Do you see that Exhibit No. 9 for
8  identification is an e-mail from Karen Konow dated
9  September 19, 2011.
10     A.  Yes.
11     Q.  To Robert Klimas, Juan Rivera and it reads:
12         "FYI, the next interview SIS will conduct in
13 the above case is PO Shannon Spalding. Let me know if
14 you need any additional info."
15         Do you see that?
16     A.  Yes.
17     Q.  Do you know what case this is -- Do you know
18 what case this is referring to?
19     A.  No. I initiated two CRs. I'm not sure which
20 number this one is. I initiated one for
21 Shannon Spalding when she came in and made an issue of
22 Hernandez and Padar incident. And then I also
23 initiated -- I'm not sure -- I can't tell -- I don't
24 know what days -- But I was also contacted by her --

32 (Pages 122 - 125)

Page 126

1  now I understand it's actually her boyfriend,
2  Hernandez, months later asking me to initiate a number
3  for retaliation based on the first CR. So I'm not sure
4  which one this one is. I'd have to research and look
5  the number up.
6      Q. Just from my knowledge, what is "SIS"?
7      A. Special investigations.
8      Q. But this definitely dealt with something
9  related to the Hernandez-Padar incidents regardless of
10  which one or --
11      It's not related to a CR directed at
12  Shannon Spalding?
13      A. She, I believe, is a witness.
14      MR. SMITH: No. 10. Mark that as Rivera No. 10
15  for identification.
16          (Lieutenant Juan Rivera Exhibit 10
17          marked.)
18  BY MR. SMITH:
19      Q. Do you recognize what's been marked as
20  Exhibit No. 10 for identification?
21      A. Yes.
22      Q. Do you see the it's from a Cynthia Curry do
23  you?
24      A. Uh-huh.

Page 127

1      Q. On October 5, 2011?
2      A. Yes.
3      Q. And it reads that:
4      "Spalding a partner we're looking for you a
5  few minutes ago. If you need a ride and want Rick to
6  meet you downstairs, let's us know."
7      Do you know what -- Do you know if you spoke
8  to Shannon her partner after receiving this?
9      A. No, I don't recall if I did or not.
10      Q. Do you have any idea what this concerned?
11      A. No. Like I said, Spalding and Echeverria
12  would try to come on a regular basis to meet me and I
13  tried to discourage them, because they were doing it in
14  the open lobby. And then they started coming up to the
15  Internal Affairs front door which, again, I tried to
16  discourage.
17      Q. Do you know who Richard Pakula is?
18      A. He's a sergeant -- also an administrative
19  sergeant in Internal Affairs.
20      Q. Do you know why he would have been cc'd on
21  this memo?
22      A. He's administrative sergeant along with the
23  Cynthia Curry.
24      MR. SMITH: I'm going to show you what we'll mark

Page 128

1  as Exhibit No. 11 for identification.
2          (Lieutenant Juan Rivera Exhibit 11
3          marked.)
4  BY MR. SMITH:
5      Q. Do you recognize this to be an e-mail from a
6  Robert Klimas as that you were cc'd on October 5, 2011?
7      A. Yes.
8      Q. It reads that a:
9      "FBI needs assistance from Shannon Spalding
10  and Echeverria this afternoon. If possible please have
11  them contact Sergeant Boehmer for further
12  instructions."
13      A. Yes.
14      Q. Do you have any idea what, in particular,
15  this was concerning?
16      A. It involved Brass Tacks. Obviously, the FBI
17  needed them, if I am not mistaken, to contact the
18  source.
19      MR. SMITH: I'm going to show you what we'll mark
20  as Rivera No. 12 for identification.
21          (Lieutenant Juan Rivera Exhibit 12
22          marked.)
23  BY MR. SMITH:
24      Q. I think, if I'm not mistaken, the first part

Page 129

1  is -- I will ask you later.
2      But if you look down at the bottom half that
3  starts with, "Cynthia Curry," it appears to be
4  October 14, 2011 to and you were cc'd amongst along
5  with Klimas, Welsh, Stanley, Mahoney, Pakula and Clark
6  and it was to Judith Martin and a Renata Adamovitz, and
7  then it reads:
8      "The Bureau of Internal Affairs submits the
9  names indicated below as requested; PO George Flores,
10  PO Daniel Echeverria, PO Matthew Kerlin,
11  PO Bridgid Hixson and PO Shannon Spalding."
12      Do you know what this was about?
13      A. This personnel was being detailed to the
14  International Association of Chiefs of Police
15  Conference.
16      Q. What would that be for?
17      A. Just police presence at the conference.
18      Q. Do you know why certain officers are
19  requested for that?
20      A. No, they just -- When there's a need for
21  officers, the First Deputy's Office looks for personnel
22  and details them out.
23      Q. So is this like for security or something?
24      A. It's possible. I'm not sure exactly what

33 (Pages 126 - 129)

Page 130

1 they were used for, but they're detailed out and that's
2 their tour of duty. That's their assignment.
3    Q.  Okay. The top part of it, do you know if
4 that had -- the one that's from Cynthia Curry to
5 Judith Martin, do you know if that's just something
6 related to this assignment be present at headquarters?
7    A.  It sounds as though -- Yeah. Rhodes is, I
8 believe, a police officer in Internal Affairs that was
9 also being detailed, but was being -- her -- her detail
10 was being changed to work the command post.
11    Q.  Were you aware that Adrienne Stanley
12 called -- called Spalding at an FBI meeting telling her
13 she was going to called Eddy Walsh to have her thrown out of
14 the unit for going to the FBI?
15    A.  Who?
16    MR. KING:  Object to the form and lack of
17 foundation.
18 BY MR. SMITH:
19    Q.  Were you aware that -- Were you ever told
20 that Adrienne Stanley called Spalding --
21    Turning back to the October 5, 2011 memo from
22 Klimas to Adrienne Stanley that reads:
23    "The FBI needs assistance of PO Spalding and
24 Echeverria this afternoon. Is it possible? Please

Page 131

1 have them contact Sergeant Boehmer for further
2 instructions."
3    MR. KING:  What exhibit is that?
4    MR. SMITH:  I think its --
5    MR. KING:  It's this one.
6    MR. SMITH:  Here I can hand you this. It's also
7 DEFS00994 for identification.
8    MR. KING:  We have that. That's already marked as
9 Exhibit 11.
10 BY MR. SMITH:
11    Q.  Were you aware that after Spalding went to
12 that meeting that Adrienne Stanley indicated that she
13 was going to call Eddy Walsh to have her thrown out of
14 the unit for going to the FBI?
15    MR. KING:  Objection to the lack of foundation.
16 BY MR. SMITH:
17    Q.  Did Shannon and Danny ever tell you that?
18    A.  No.
19    Q.  Did Tom Chester ever tell you that?
20    A.  No.
21    Q.  Did Tom Chester ever tell you that Shannon or
22 Danny told her that Adrienne Stanley was going to do
23 that?
24    A.  No. And, again, I would expect the officers

Page 132

1 to document it on to-from.
2    Q.  In terms of -- Would you have expected
3 Tom Chester to document it on to-from if he had been
4 told by Adrienne Stanley that she was going to go to
5 Eddy Walsh.
6    A.  No, I would have expected him to initiate a
7 number if Sergeant Mills received a report from the
8 officers.
9    MR. KING:  Was it Mills?
10 BY MR. SMITH:
11    Q.  Tom Chester, not Mills.
12    A.  I'm sorry. Tom Chester.
13    Q.  I'm going to show you what we'll mark as
14 Rivera No. 13 for identification.
15       (Lieutenant Juan Rivera Exhibit 13
16       marked.)
17 BY MR. SMITH:
18    Q.  This appears to be an e-mail from -- it looks
19 like it might have something to do with the detail of
20 headquarters personnel, but it -- the second part is
21 from Adamovitz to Cuello and yourself as one of about
22 eight people named there, October 14, 2011, and it
23 indicates that:
24    "Attached, please comply with the attached

Page 133

1 directive."
2    Do you know what attached directive this is
3 referring to? And it looks like it might be that that
4 had to do with the headquarters, but if you don't know,
5 I mean, that's ...
6    A.  No, I would be speculating, but I don't know.
7    MR. SMITH:  I'm going to show you what we'll mark
8 as 14 for identification. DEFS00999 on the bottom.
9       (Lieutenant Juan Rivera Exhibit 14
10       marked.)
11 BY THE WITNESS:
12    A.  Yes.
13 BY MR. SMITH:
14    Q.  I'm also going to hand you a DEFS00997 and
15 998, because they may be related to that and I don't
16 want you to not have information available to you.
17    Do you see in the Exhibit 14 that it appears
18 to be a note from originally from Alan Boehmer to
19 Robert Klimas about Spalding, Echeverria saying that
20 they need their services tomorrow to find the source
21 and it's dated October 27, 2011?
22    A.  Yes.
23    Q.  It says:
24    "We now have a phone for him."

34 (Pages 130 - 133)

Page 134

1    Do you know what this was about?
2    A.   Other than they're directed by the FBI to
3  find the source, because they were trying to work the
4  investigation.
5    Q.   Okay.  Thank you.
6    MR. SMITH:  I'm going to show you what we'll mark
7  as 15.
8        (Lieutenant Juan Rivera Exhibit 15
9        marked.)
10 BY MR. SMITH:
11   Q.   Do you recognize, this appears to be -- I
12 have two e-mails, one from Adrienne Stanley to
13 Cynthia Curry which your cc'd on and the second from
14 Cynthia to Adrienne Stanley which your cc'd on.  And
15 the first one reads:
16   "Hi Sgt., We have two people who currently do
17 OPY, Sergeant Janice Barney, PO Jose Flores.  I was
18 having PO Shannon and Echeverria sign up for it, but
19 they have been in the field for the last month."
20   Do you recall receiving that e-mail?
21   A.   Um, I know I received it, but -- I mean --
22   Q.   Do you know what this concerns?
23   A.   Just from reading it, it's obvious that the
24 commander wanted to utilize them for Operation Protect

Page 135

1  Youth.
2    Q.   And the second e-mail on this page appears to
3  be Commander Stanley:
4    "The Office of the First Deputy
5  Superintendent is conducting an audit of members
6  required to participate in Operation Project Youth for
7  the calendar years 2012.  Members of rank Sergeant or
8  below in full duty status and assigned to the nonfield
9  duties on the 2nd Watch are required to participate.
10 Can you please provide me with the names of whoever
11 this applies to in the Inspection Division.  Our
12 response is due no later than Thursday the
13 8th of December, 2011."
14   Do you recall receiving is that e-mail?
15   A.   I received it, yes.
16   Q.   Do you know if anyone had brought up these
17 e-mails at the time that you were informed of the
18 counseling review by Danny Echeverria?
19   A.   No.
20   Q.   Are you aware when somebody is and isn't
21 eligible for OPY?
22   A.   I'm sorry.  Repeat that.
23   Q.   Do you know when somebody is eligible for OPY
24 and when one somebody isn't; is that something that you

Page 136

1  would have knowledge of?
2    A.   No.
3    MR. SMITH:  Exhibit No. 16.
4        (Lieutenant Juan Rivera Exhibit 16
5        marked.)
6  BY MR. SMITH:
7    Q.   Do you recognize Exhibit No. 16 to be an
8  e-mail that you sent to Danny Echeverria on
9  January 27, 2011?
10   A.   Yes.
11   Q.   And were you intending to inform
12 Danny Echeverria of any positions that were available?
13   A.   Yes, and opportunities.
14   Q.   And what positions in particular were you
15 trying to notify him about?
16   A.   The Fugitive Apprehension Unit that had just
17 started.
18   Q.   Did you have any intent to notify him about
19 the sergeant's applications or detective applications?
20   A.   Specific to the Fugitive.
21   Q.   Did you send anything to the Shannon Spalding
22 about that?
23   A.   I don't believe so.  I really don't recall,
24 but I don't believe I did.

Page 137

1    Q.   Did you intentionally not send Shannon one,
2  or was it more so that you just thought Danny would
3  pass the word on?
4    A.   Danny Echeverria was usually the one that
5  would pass the word.
6    MR. SMITH:  Number 17 for identification.
7        (Lieutenant Juan Rivera Exhibit 17
8        marked.)
9  BY MR. SMITH:
10   Q.   Do you recognize that?
11   A.   Yes.
12   Q.   Did you receive that or send that?
13   Is that from Danny Echeverria to you?
14   A.   I believe that's his response.
15   Q.   Do you know what that response was regarding?
16   A.   Again, they were looking for positions in the
17 FBI task force because of the overtime stipend, the
18 overtime extra money and the vehicle, and I already had
19 the conversation and I told them that wasn't up to me
20 and I would present it to my superiors.
21   Q.   Did you present it to your superiors?
22   A.   Yes.
23   Q.   What superior?
24   A.   First Deputy Weisinger.

35 (Pages 134 - 137)

Page 138

1 MR. SMITH: Let's take a two-minute break.
2 (Recess taken.)
3 BY MR. SMITH:
4 Q. Just a question on Nick Roti.
5 Is it fair to say that other than the
6 Fugitive Apprehension Division, Nick Roti is in charge
7 of every other task force within the department?
8 A. I would be speculating. I'm not sure how
9 many tasks forces the department has.
10 Q. Do you know of any other task force other
11 than Fugitive Apprehensions that Nick Roti is not in
12 charge of?
13 A. I have one.
14 Q. What would that be?
15 A. Internal Affairs.
16 Q. Other than Internal Affairs?
17 A. Again, I -- Speculating, no.
18 Q. But other than Internal Affairs, are you
19 aware of any others, personally?
20 A. I don't have that knowledge.
21 Q. Did you think back at the time that Shannon
22 and Danny were asking to be assigned or not to be in
23 Fugitive Apprehensions or not to be in training or not
24 to be in investigations, were you aware of any task

Page 139

1 force other than Fugitive Apprehension and IAD that
2 were available that were not supervised by Nick Roti?
3 MR. KING: Objecting to the form. Compound.
4 Misstates evidence in the record.
5 BY THE WITNESS:
6 A. Again, I'm not familiar enough with all the
7 other bureaus. I wouldn't be able to give you an
8 answer.
9 BY MR. SMITH:
10 Q. Now, how often during Operation Brass Tacks
11 would the FBI update you either directly or through
12 Tom Chester about what was going on?
13 A. Again, it varied. Depending on what's taking
14 place with the investigation.
15 Q. Were you aware or did you become aware that
16 that there was a surveillance back -- in March of 2010
17 that there was a surveillance done where Ronald Watts
18 was seen stealing approximately $8,600 in a backpack in
19 the area of 11 West 26th Street, Chicago, Illinois?
20 A. Again, I was aware. I don't have -- You're
21 giving me details that I don't have. I was aware that
22 there was an attempt or there was a sting operation
23 conducted against him.
24 Q. And were you aware that he was seen driving a

Page 140

1 police vehicle on a day off and in uniform going and
2 making an arrest and then taking a backpack that the
3 FBI was aware contained $8,600?
4 A. Again, I'm sure I was briefed, but I don't
5 recall the facts.
6 Q. Do you know why after that operation or
7 surveillance of Ronald Watts was left on the streets --
8 I mean, in his position as a Chicago police officer?
9 A. Again, that's something that I don't know.
10 That's -- The FBI was the lead investigative agency and
11 US Attorney's Office was prosecuting.
12 Q. When Brass Tacks was postponed for that
13 period, was there any discussion on your part with any
14 supervisors to take Ronald Watts off the force or to
15 strip him of his badge and gun?
16 MR. KING: Object to the form and use of the term
17 "postpone."
18 BY MR. SMITH:
19 Q. The periods in which Brass Tacks -- When
20 Shannon and Danny Echeverria were removed from
21 brass Tacks, during that period, was there any
22 discussion about taking Ronald Watts off of active duty
23 in the Chicago Police Department?
24 A. I don't recall any conversations to that

Page 141

1 effect. Again, I would have to refer back to the fact
2 that the FBI was the lead investigative agency and
3 US Attorney was the prosecutor. It was their
4 investigation.
5 Q. During your briefings, were you aware that
6 several team members of Ronald Watts through the years
7 had been suspected of being part of Watts' team that
8 was extorting drug dealers?
9 A. Again, I wouldn't have detailed information
10 on that. That's something, again, that the FBI is the
11 lead investigative agency and the US Attorney is the
12 prosecutor, they would, obviously, have that
13 information.
14 Q. Were you given the names of active police
15 officers including current police officers in addition
16 to Ronald Watts and Kallatt Mohamad?
17 A. I personally was not given any names, but
18 again, the FBI was the lead investigative agency.
19 Q. Don't you, as IAD chief, have authority to
20 remove a sworn member from the department even if the
21 FBI is the lead?
22 A. Do not have the authority. I would have to
23 seek approval from the superintendent.
24 Q. And the superintendent could do that?

36 (Pages 138 - 141)

Page 142

1    A.  Yes.
2    Q.  Were you ever given the name Alvin Jones by
3 the FBI?
4    A.  By the FBI, no. I don't recall the name.
5    Q.  Anyone in connection with Brass Tacks ever
6 tell you about Alvin Jones being involved with
7 Ronald Watts?
8    A.  Again, I don't recall, so ...
9    Q.  Robert Gonzalez?
10    A.  Again, I don't recall.
11    Q.  Doreen Smith?
12    A.  Again, I don't recall that name.
13    Q.  Brian Bolton?
14    A.  Again, I don't recall.
15    Q.  You don't recall any of the names they
16 provided?
17    A.  Again, you're saying "provided."
18    Q.  Or gave information about?
19    MR. KING: Object to the form of the question.
20      There's been no testimony that any of those
21 names were given to Chief Rivera.
22 BY MR. SMITH:
23    Q.  Did you ever get any other names besides
24 Watts and Mohamad? I mean Sergeant Watts and Mohamad?

Page 143

1    A.  Again, when I was involved the targets were
2 Watts and Mohamad.
3    Q.  In terms of that were suspects at least, were
4 you given any other names?
5    A.  Again, I would have to defer to the FBI.
6 They had the lead on the investigation.
7    Q.  But did they ever apprize you of any other
8 officers that were suspected for being involved?
9    A.  I'm sure if they suspected them they would
10 have targeted them. I would have been aware of it.
11    Q.  Did you produce any CRs to the FBI of
12 instances where Watts had previously been accused of
13 committing crimes, such as extortion, from drug
14 dealers?
15    A.  Me personally, no.
16    Q.  Do you know if they were given to the FBI?
17    A.  Again, this operation was already ongoing
18 when I arrived there, so I would not ...
19    (Simultaneous speaking.)
20 BY MR. SMITH:
21    Q.  Did you inform anyone in the FBI of the CR or
22 CRs that came across your desk while you were working
23 in IAD back in 2004, 2006?
24    A.  With regards to?

Page 144

1    Q.  With regards to Sergeant Watts?
2    A.  Again, I don't recall CRs coming through at
3 the time, so I can't answer that.
4    Q.  Did IAD conduct its own investigation at all
5 of officers in relation to Operation Brass Tacks or
6 Ronald Watts in addition to the FBI?
7    A.  Again, it was a joint investigation with the
8 FBI as the lead investigative agency and US Attorney as
9 the prosecutor. We assisted.
10    Q.  Will IAD make any attempts to obtain FBI
11 information now that the Watts investigation and
12 Mohammed investigation resulted in convictions to see
13 what other information existed against other officers?
14    MR. KING: Objection. Calls for speculation and
15 certainly irrelevant.
16 BY THE WITNESS:
17    A.  That was a question that was posed to the FBI
18 and US Attorney's office and they basically stated
19 there were no additional targets.
20 BY MR. SMITH:
21    Q.  Who was that that made --
22    A.  I would have to -- I would have to refer to
23 Commander Klimas that had a conversation, I believe,
24 with Boehmer.

Page 145

1    Q.  Were you present for the conversation?
2    A.  I'm not sure if I was present for that
3 conversation. I know that information was relayed back
4 to me.
5    Q.  By?
6    A.  Commander Klimas.
7    Q.  As a boss in IAD, were you aware of any
8 criminal allegations against Watts or Mohammed separate
9 from the Brass Tacks investigation?
10    A.  This all -- Obviously, this investigation
11 stemmed from information that I was made aware of back
12 in '04. So is it was open investigation then.
13    Q.  What happened with the separate
14 investigation?
15    A.  Again, it wasn't a separate investigation.
16 It's related to the same investigation that was opened
17 up in 2004 when I was there.
18    Q.  Were any findings made on any of the other --
19 any of the CRs that existed?
20    MR. KING: Object to the form. Lack of
21 foundation.
22 BY THE WITNESS:
23    A.  Again, I couldn't answer that. I wouldn't be
24 able to answer that.

37 (Pages 142 - 145)

Page 146

1    MR. SMITH: I think we're almost done.
2  BY MR. SMITH:
3    Q. Do you know who Lieutenant Pigott is by any
4  chance?
5    A. I know of him, yes.
6    Q. Did you ever talk to a Lieutenant Pigott
7  about Danny and Shannon being at the academy?
8    A. I don't recall if I did or not.
9    Q. With respect to any other -- any CRs relating
10 to Watts and Mohamad, are you aware of any action that
11 was taken against either Watts or Mohamad in any of the
12 CRs?
13   MR. KING: Again, object to the form and lack of
14 foundation.
15 BY THE WITNESS:
16   A. Like I said, I wouldn't have any knowledge of
17 that.
18 BY MR. SMITH:
19   Q. Was there any discussion with IAD or with any
20 supervisors that, we're not going to take action so
21 that it doesn't interfere with the investigation?
22   A. It was no --
23   MR. KING: Same objection.
24

Page 147

1  BY THE WITNESS:
2    A. There was no such conversation that I was
3  involved in.
4    MR. SMITH: I'm going to put an end to it unless
5  there is a --
6    SHANNON SPAULDING: Okay. No.
7    MR. SMITH: No more questions.
8    MR. KING: We don't have any, either.
9      We'll reserve signature.
10   THE COURT REPORTER: Are you ordering?
11   MR. SMITH: Yes.
12   THE COURT REPORTER: What would you like?
13   MR. SMITH: Mini electric.
14   MR. KING: I'll take a copy, regular and mini
15 electronic.
16      (Proceedings concluded at
17        5:09 p.m.)
18
19
20
21
22
23
24

Page 148

1  STATE OF ILLINOIS  )
            ) SS:
2  COUNTY OF C O O K  )
3
4      I, CHRISTINE LIUBICICH, a Certified Shorthand
5  Reporter within and for the State of Illinois, do
6  hereby certify:
7
8      That previous to the commencement of the
9  examination of the witness, the witness was duly sworn
10 to testify the whole truth concerning the matters
11 herein;
12
13     That the foregoing deposition was reported
14 stenographically by me, was thereafter reduced to a
15 printed transcript by me, and constitutes a true record
16 of the testimony given and the proceedings had;
17
18     That the said deposition was taken before me
19 at the time and place specified;
20
21     That the reading and signing by the witness
22 of the deposition transcript was agreed upon as stated
23 herein;
24

Page 149

1      That I am not a relative or employee or
2  attorney or counsel, nor a relative or employee of such
3  attorney or counsel for any of the parties hereto, nor
4  interested directly or indirectly in the outcome of
5  this action.
6
7      IN WITNESS WHEREOF, I do hereunto set my hand
8  at Chicago, Illinois, this 22nd day of December, 2014.
9
10
11
     Christine Liubicich
     Certified Shorthand Reporter
12   State of Illinois
13
14 CSR License No. 084-004594.
15
16
17
18
19
20
21
22
23
24

38 (Pages 146 - 149)

Page 150

```
1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
      ASSIGNMENT NO: 1975323
3  CASE NAME: Spalding, Shannon v. City Of Chicago
      DATE OF DEPOSITION: 12/4/2014
4  WITNESS' NAME: Lieutenant Juan Rivera
5      In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7      I have made no changes to the testimony
      as transcribed by the court reporter.
8
      _____
9    Date            Lieutenant Juan Rivera
10     Sworn to and subscribed before me, a
      Notary Public in and for the State and County,
11  the referenced witness did personally appear
      and acknowledge that:
12
         They have read the transcript;
13       They signed the foregoing Sworn
         Statement; and
14       Their execution of this Statement is of
         their free act and deed.
15
      I have affixed my name and official seal
16
    this _____ day of_____, 20____.
17
      _____
18    Notary Public
19    _____
      Commission Expiration Date
20
21
22
23
24
25
```

Page 152

```
1        ERRATA SHEET
         VERITEXT LEGAL SOLUTIONS MIDWEST
2      ASSIGNMENT NO: 1975323
3  PAGE/LINE(S) /      CHANGE      /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19
      _____     _____
20   Date            Lieutenant Juan Rivera
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23
      Notary Public
24
      _____
25    Commission Expiration Date
```

Page 151

```
1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
      ASSIGNMENT NO: 1975323
3  CASE NAME: Spalding, Shannon v. City Of Chicago
      DATE OF DEPOSITION: 12/4/2014
4  WITNESS' NAME: Lieutenant Juan Rivera
5      In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7      I have listed my changes on the attached
      Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9      I request that these changes be entered
      as part of the record of my testimony.
10
         I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
      that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____
      Date            Lieutenant Juan Rivera
14
         Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
      the referenced witness did personally appear
16  and acknowledge that:
17       They have read the transcript;
         They have listed all of their corrections
18       in the appended Errata Sheet;
         They signed the foregoing Sworn
19       Statement; and
         Their execution of this Statement is of
20       their free act and deed.
21       I have affixed my name and official seal
22  this _____ day of_____, 20____.
23  _____
      Notary Public
24
      _____
25    Commission Expiration Date
```

39 (Pages 150 - 152)

# Exhibit K

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| Chicago Police Officer SHANNON SPALDING, | ) | |
| Chicago Police Officer DANIEL ECHEVERRIA, | ) | Case No. 12-cv-8777 |
| | ) | |
| Plaintiffs, | ) | Judge Gary Feinerman |
| | ) | Magistrate Judge Shelia Finnegan |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

## <u>DECLARATION OF JAMES O'GRADY</u>

I, James O'Grady, declare under penalty of perjury that this statement is true and correct.

1.     I was employed with the Chicago Police Department ("CPD") from 1986 until 2013. In or about 1997, I applied for and was assigned to the Internal Affairs Division where I worked undercover on police impersonators and police corruption cases. After several years in various CPD positions, in or about August 2008 I became the Commander of the Narcotics Division, Bureau of Organized Crime. I stayed in that role until October of 2013, when I was assigned to Commander of 11th District. I retired from CPD in December 2013.

2.     Prior to November 2012 when Plaintiffs Shannon Spalding and Daniel Echeverria (collectively, "Plaintiffs") filed their federal lawsuit and their lawsuit was discussed in the media, I had no knowledge that either Plaintiff went to the FBI and reported any alleged criminal misconduct or corruption by Sergeant Ronald Watts ("Watts"), Sergeant Kallat Mohammad ("Mohammad") or any other Chicago Police officer.

3.     Prior to November 2012 when Plaintiffs filed their federal lawsuit and their lawsuit was discussed in the media, I also had no knowledge that either Plaintiff reported or disclosed information to the FBI, to any government or law enforcement agency or to anyone

within CPD that Watts, Mohammad or any other Chicago Police officer violated any state or federal law, rule, or regulation.

4.    I never made any statements to or about Plaintiffs or took any action against or relating to Plaintiffs based on any reports they may have made to the FBI of alleged criminal misconduct or corruption by Watts, Mohammad or any other Chicago Police officer.

5.    I never made any statements to or about Plaintiffs or took any action against or relating to Plaintiffs based on the fact that Plaintiffs may have disclosed information to the FBI, to any government or law enforcement agency or to anyone within CPD that Watts, Mohammad or any other Chicago Police officer violated any state or federal law, rule, or regulation.

6.    I never spoke to anyone in the Fugitive Apprehension Unit about Plaintiffs prior to Plaintiffs' joining the Fugitive Apprehension Unit in or about March 2012.

James O'Grady

Executed on February 3, 2016

# Exhibit L

Page 1

1              IN THE UNITED STATES DISTRICT COURT

              FOR THE NORTHERN DISTRICT OF ILLINOIS

2                     EASTERN DIVISION

3    Chicago Police Officer SHANNON

     SPALDING and Chicago Police Officer

4    DANIEL ECHEVERRIA,

5           Plaintiffs,

6       vs.                        No. 12 C 8777

7    CITY OF CHICAGO, et al.,

8           Defendants.

                                        /

9

10                  The discovery deposition of

11   SERGEANT MAURICE BARNES, taken in the above-entitled

12   case, on the 25th day of February, 2015, at 10:10

13   o'clock a.m. at the offices of Christopher Smith Trial

14   Group, One North LaSalle Street, Suite 3040, Chicago,

15   Illinois, pursuant to agreement of counsel.

16

17   Reported by:  Karyn H. Chalem, RPR, CSR

     License No.:  084-004167

18

19

20

21

22

23

24

Page 2

1  A P P E A R A N C E S
2      CHRISTOPHER SMITH TRIAL GROUP
       One North LaSalle Street
3      Suite 3040
       Chicago, Illinois  60602
4      BY:  CHRISTOPHER SMITH
       ANNA SZYMCZAK
5      (312) 432-0400
       chris@lawsja.com
6          On behalf of the Plaintiffs;
7      DRINKER BIDDLE & REATH
       191 North Wacker Drive
8      Suite 3700
       Chicago, Illinois  60606
9      BY:  ALAN S. KING
       (312) 569-1334
10     alan.king@dbr.com
           On behalf of the Defendants.
11
12  Also Present:
13     SHANNON SPALDING
14
15
16
17
18
19
20
21
22
23
24

Page 3

1              I N D E X
2  WITNESS:                    PAGE:
3  SERGEANT MAURICE BARNES
4     Examination by Mr. Smith        4
5
      EXHIBITS:
6
       (NO EXHIBITS MARKED.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1         (Witness sworn.)
2              SERGEANT MAURICE BARNES,
3  called as a witness herein, having been first duly
4  sworn, was examined and testified as follows:
5         THE WITNESS:  I do.
6              EXAMINATION
7  BY MR. SMITH:
8     Q.  Can you please state your name for the
9  record.
10    A.  Maurice Barnes.
11    Q.  And will you spell your name.
12    A.  M-A-U-R-I-C-E, B-A-R-N-E-S.
13    Q.  Thank you.
14       How are you currently employed?
15    A.  City of Chicago Police Department.
16    Q.  And what is your unit of assignment and
17  detail at this time?
18    A.  It's central investigations section, fugitive
19  apprehension unit.
20    Q.  And how long have you been with the fugitive
21  apprehension unit?
22    A.  Close to seven years.
23    Q.  When were you hired by the Chicago Police
24  Department?

Page 5

1     A.  11 August 1986.
2     Q.  And can you give me a history of your
3  assignments.
4     A.  I trained in the 23rd District for my field
5  service training.  I was then transferred to the
6  17th District for about a year.  Then I was in the
7  11th District for about four-and-a-half years.  Then
8  I was in narcotics for close to 14 years, but during
9  my time in narcotics, I was detailed to a state's
10  attorneys task force and I was also detailed to the
11  FBI's joint terrorism task force.
12    Q.  And --
13    A.  Then --
14    Q.  Go ahead.
15    A.  Then I was promoted to sergeant in 2006 and
16  assigned back to the 11th District as a sergeant.
17    Q.  How were you assigned to the FBI task force
18  or work along with the FBI, how did that come
19  about?
20    A.  They have Chicago police officers assigned to
21  different task forces within the city, like the FBI,
22  DEA, things of that nature, and they just randomly
23  picked from the higher-ups.  Superintendent, or
24  whoever picks -- makes these assignments, picks you,

2 (Pages 2 - 5)

1 and then they get assigned to those units.
2    Q. Were you in any way investigating fellow
3 Chicago police officers while you were working with
4 the FBI?
5    A. No.
6    Q. Are you deputized as a U.S. Marshal?
7    A. Yes.
8    Q. How did you become deputized as a U.S.
9 Marshal while working with the CPD?
10    A. I think -- well, I think all supervisors that
11 are currently assigned to that unit are deputized.
12 So being a sergeant and assigned over there, that's
13 pretty much how I got deputized.
14    Q. So it is your understanding that the
15 supervisors are automatically deputized if they're
16 in that unit?
17    A. I don't know if it's automatically. I mean,
18 you have to go through whatever background checks to
19 see if you're deemed appropriate to be deputized,
20 so...
21    Q. And who pays your salary, the U.S. Marshals
22 or Chicago Police Department?
23    A. Chicago Police Department.
24    Q. And do you know who pays overtime?

1    A. The U.S. Marshals pay a stipend to each
2 person who is deputized.
3    Q. And how much is that stipend?
4    A. I'm not sure right now. They budgeted for,
5 you know, different amounts, so I don't have the
6 paperwork on that. I think the marshals keep a
7 record of that.
8    Q. And would that be for officers who aren't
9 ranked beyond patrol officers, who are also U.S.
10 Marshals, they would receive a stipend?
11    A. Yes.
12    Q. In other words, it's not just the
13 supervisors --
14    A. Right.
15    Q. -- who receive a stipend?
16    A. Right.
17    Q. And do you have a take-home vehicle?
18    A. Yes.
19    Q. And is that provided through the Chicago
20 Police Department or the U.S. Marshals?
21    A. U.S. Marshals.
22    Q. And do you get any other special equipment
23 because you're a U.S. Marshal?
24    A. Radios. What else?

1    Q. Do you have a special phone?
2    A. Oh, yeah, a phone.
3    Q. Anything else?
4    A. That's pretty much it.
5    Q. In your opinion, is the fugitive
6 apprehension unit considered a desirable,
7 specialized unit within the CPD?
8    A. It's one of many. There are other units
9 within the department. It all depends on who you
10 are and how you see "specialized" and...
11    Q. What other units have you heard are
12 considered desirable, specialized units in the --
13    A. Anything out of patrol to me would be
14 specialized, so...
15    Q. Is there any other units that you consider
16 to be particularly desirable within the CPD?
17    A. No. No.
18    Q. Now, in terms of officers who are not
19 deputized within the fugitive apprehension
20 division, they do not get take-home vehicles, is
21 that correct?
22    A. That's correct.
23    Q. And it is true that overtime may be
24 available to somebody who's deputized, both with

1 the CPD and the U.S. Marshals, that is not
2 available to officers who are not deputized as U.S.
3 Marshals. Is that fair to say?
4    A. Repeat that for me. I'm trying to...
5    Q. Is there certain overtime that somebody
6 who's been deputized as a U.S. Marshal while also a
7 CPD may be eligible for that other officers who are
8 not deputized are not eligible for?
9    A. The overtime that the officers that are
10 deputized, that's through that stipend that I
11 mentioned earlier.
12    Q. Do POs -- do the police officers in the
13 fugitive apprehension unit get take-home vehicles?
14    A. Police, they're not -- if they're not
15 deputized, no.
16    Q. Do you know if Danny Echeverria was
17 deputized?
18    A. No.
19    Q. Do you know if he ever had a take-home
20 vehicle while he was in the fugitive apprehension
21 unit?
22    A. Not to my knowledge.
23    Q. Have you ever been deposed before?
24    A. Yes.

3 (Pages 6 - 9)

Page 10

1    Q. How many times have you been deposed?
2    A. Twice.
3    Q. And were either of those in connection with
4  lawsuits against yourself related to a Chicago
5  police officer activity?
6    A. No.
7    Q. Were either of those cases involving
8  incidents concerning Chicago police officer
9  activity?
10   A. No.
11   Q. Were these personal -- involved matters
12  where you were a personal defendant or plaintiff in
13  a lawsuit?
14   A. Yes.
15   Q. Defendant or plaintiff or both?
16   A. Both.
17   Q. In terms of the -- if it's a personal
18  situation, I'm not going to get too far into it,
19  but what type of case was it that was where you
20  were a defendant?
21   A. Divorce.
22   Q. Okay. And in terms of as a plaintiff, was
23  it against the City of Chicago?
24   A. Yes.

Page 11

1    Q. Okay. And was it against the Chicago Police
2  Department in particular?
3    A. Yes.
4    Q. Was it related to employment fairness?
5    A. No.
6    Q. Can you tell me what type of --
7    A. It was a shooting, police-involved shooting.
8    Q. And you were suing the Chicago Police
9  Department?
10   A. I'm sorry, I've probably mistaken one of your
11  questions. I was -- me and my partner were being
12  sued because of a shooting. I'm sorry.
13   Q. And what time frame was this?
14   A. This is about almost 20 years ago.
15   Q. Do you recall what the results of the
16  lawsuit were?
17   A. It was found in our favor.
18   Q. Okay. So you actually had a trial?
19   A. No trial. It was just found in our favor. I
20  guess the other party's -- I guess their attorney
21  was like it was a good shooting, so we weren't held
22  liable for anything.
23   Q. So you think the case was dismissed?
24   A. I believe so. Don't quote me on it, but I

Page 12

1  believe so.
2    Q. Okay. In terms of have you ever been
3  disciplined in connection with your job at the
4  Chicago Police Department?
5    A. No.
6    Q. Have you ever received any written types
7  of -- types of reprimands?
8    A. Probably. Years ago. None that I can
9  recall, though.
10   Q. Okay. Are you aware of any complaint
11  registers against you?
12   A. Years ago that probably aren't even on record
13  anymore.
14   Q. How many would you say you've had?
15   A. Against me personally? Probably two in 28
16  years.
17   Q. Do you know if any of them involved any type
18  of harassment?
19   A. No.
20   Q. In terms of were any of them made by fellow
21  officers?
22   A. No.
23   Q. Do you know if you've ever been accused of
24  any type of sexual harassment?

Page 13

1    A. No.
2    Q. In terms of your responsibilities as a
3  sergeant in the fugitive apprehension unit, what
4  are your -- do you have a team, first of all?
5    A. Yes.
6    Q. Okay. And how many members, sworn police
7  officers, are on this team?
8    A. Typically ten.
9    Q. Okay. And how many of those ten are
10  deputized?
11   A. On my current team right now, five.
12   Q. So five members of your team are not
13  deputized --
14   A. Yes.
15   Q. -- on your current team?
16   A. That's correct.
17   Q. Okay. Is that -- do you know if back in,
18  say, 2012, did you have a team back then?
19   A. Yes.
20   Q. How many members would have, approximately,
21  would have been on the team back then?
22   A. I think at the time, I think I had eight, I
23  think. I would have to check my records and see.
24   Q. And at one point in time, Danny and Shannon,

4 (Pages 10 - 13)

Page 14

1 the plaintiffs in this lawsuit, were assigned to
2 your team, correct?
3 A. That's correct.
4 Q. How many of the team members back at that
5 time were deputized and how many weren't?
6 A. I want to say there was five or six. I'm
7 just trying to remember the names right now.
8 Q. Five or six that were deputized?
9 A. Were deputized, right.
10 Q. Other than Danny or Shannon, did you know of
11 anyone who was not deputized that were part of the
12 team when they were?
13 A. I'd have to look at the roster itself to
14 actually, you know, recall that.
15 Q. As you sit here today, does anyone come to
16 mind who was not deputized when Danny and Shannon
17 were part of your team?
18 A. I really can't recall if -- I can't think of
19 anyone else who was not at that time. I'd have to
20 look at the roster, though.
21 Q. And you're aware that Danny and Shannon were
22 not deputized?
23 A. Yes, definitely.
24 Q. Did you personally do anything to attempt to

Page 15

1 assist them in becoming deputized?
2 A. No.
3 Q. Were there any discussions with Danny or
4 Shannon with you about getting them to become
5 deputized?
6 A. The only thing I discussed was how the
7 deputization process worked, not about personally
8 getting them deputized, no.
9 Q. And what did you tell them about how the
10 deputization process worked?
11 A. Well, basically, based on how your cases were
12 worked, arrests and things of that nature, how they
13 were made, the final word or say so comes from the
14 lieutenant at the time.
15 Q. Okay. Who would have been that lieutenant
16 at the time?
17 A. Cesario.
18 Q. And in terms of anything else beyond that
19 that you told either Danny or Shannon?
20 A. Other than just general stuff about the whole
21 process, I mean, nothing that stands out, no.
22 Q. Did you -- and did you tell both of them or
23 just one of them?
24 A. I told both.

Page 16

1 Q. Did you tell them about -- if there was any
2 type of applications that they needed to fill out
3 or...
4 A. No.
5 Q. Do you know if there were any types of
6 applications that they would need to fill out?
7 A. If they got to that point, there were things
8 that the marshal service were bringing, not the CPD.
9 Q. And how would they get to the point where
10 they would be -- be essentially required to do
11 applications for the marshals?
12 A. Well, again, based on what I told them about
13 the whole process, that would then come from the
14 lieutenant, who has the final say on who would
15 probably get deputized or who wouldn't. So I was
16 just -- I wasn't even involved in that part of it,
17 so...
18 Q. Well, what did you tell them about the
19 process of becoming deputized?
20 A. Well, like I said earlier, based on the cases
21 that you worked, how you worked them, arrests, if
22 you made, you know, X amount of arrests -- there
23 wasn't a standard number, but just showing you could
24 work the cases and make arrests or effect arrests

Page 17

1 based on how you worked your cases.
2 Q. And did you tell them that there was any
3 type of number of arrests they were looking for?
4 A. No. No.
5 Q. And did you tell them how they would be in a
6 position to make these numbers of arrests?
7 A. Just work the cases that they were assigned.
8 Q. And did you know what case -- who assigned
9 cases to them?
10 A. Our CMO office.
11 Q. And who would be in charge of the
12 assignments through the CMO office?
13 A. Well, based on, I guess, a worksheet that
14 they have, depending on what cases came out, they
15 would give them to you as they saw what kind -- what
16 your caseload was.
17 So you could have a murder case that you were
18 working on. You probably wouldn't get another
19 murder case for another week or so because you just
20 had one assigned to you, so the next person up gets
21 a case assigned and so on and so forth.
22 Q. Do you know how long Danny was on your team?
23 A. I don't remember the exact time frame.
24 Q. Do you know if it was longer than three

5 (Pages 14 - 17)

1  months, for instance?

2    A. Yeah.

3    Q. Do you know how long Shannon was on your

4  team?

5    A. Not offhand, but they were assigned the same

6  time, so -- the same period of time. They were on

7  the team -- my team at the same time.

8    Q. So it was at least three months?

9    A. At least three months, right.

10    Q. How many murders do you recall Danny being

11  assigned to?

12    A. None.

13    Q. How many murders do you recall Shannon being

14  assigned to?

15    A. None.

16    Q. Do you know why that was?

17    A. Because they were new to the team, to the

18  unit, and anybody coming in new to the unit, they

19  start them off with certain types of cases, like

20  misdemeanor cases, things of that nature. The TFOs

21  would get the murders, the more in-depth cases.

22    Q. The TFOs?

23    A. Task force officers, the ones who were

24  deputized.

1    Q. Okay. And then in terms of -- were you

2  aware of any other members of your team that

3  weren't getting murders during that time frame that

4  you were supervising Danny and Shannon?

5    A. Sure. Sure.

6    Q. Who?

7    A. I don't recall who, but, again, it depends on

8  how our cases came up in the area that we worked.

9  So certain people would get certain cases based on

10  what caseload they already had. If you had a ton of

11  cases on your books already, you wouldn't get a case

12  assigned to you unless it was deemed necessary.

13    Q. And would you personally watch to see what

14  kind of caseloads an officer was getting?

15    A. No.

16    Q. Officers were getting.

17    A. No.

18    Q. Who was -- who was responsible?

19    A. The CMO office.

20    Q. And who would that be?

21    A. At the time it was Officer Hanna, Officer

22  Dugan. And who else was in there?

23    I think that was all that -- oh, Officer --

24  what's Nancy's last name?

1    I can't recall the other officer's last name,

2  but it was three officers in the CMO.

3    Q. And were there any discussions with Danny or

4  Shannon relating to that they wouldn't be getting

5  murders until they were more experienced within the

6  unit?

7    A. I don't recall having that discussion.

8    Q. Do you recall having any discussions with

9  your supervisors relating to what type of

10  assignments to give Danny or Shannon?

11    A. No.

12    Q. Do you recall having conversations with

13  any -- who were your supervisors back when you were

14  in charge of Danny and Shannon?

15    A. My immediate supervisor was Lieutenant

16  Cesario, and then Commander Salemme was there.

17    Q. And do you recall having any conversations

18  with either Lieutenant Cesario or Salemme about the

19  fact that -- about who could be assigned to, say,

20  murder cases and who could not be?

21    A. No.

22    Q. Well, where did you first learn that new

23  officers for the unit would not be assigned murder

24  cases?

1    A. The non-TFOs, the discussions we would

2  have -- again, the non-TFOs are the task force

3  officers who were given the stipends and things of

4  that nature, who could work later hours. They would

5  be given the top five cases, so homicides,

6  shootings, things of that nature, so they could work

7  longer hours on those cases. That's how it was set

8  up.

9    Q. Who told you that that's the way it would be

10  done in the fugitive apprehension unit?

11    A. That's the way it's always been since I've

12  been there.

13    Q. And did somebody tell you that?

14    A. Well, the lieutenant and the commander told

15  me that. Even the commander previous to him told me

16  that.

17    Q. So Lieutenant Cesario told you that?

18    A. Yes.

19    Q. Did you -- were you aware that at one point

20  in time, Shannon was assigned a murder case and

21  that murder case was taken away?

22    A. No.

23    Q. You never even heard that that had occurred?

24    A. No.

Page 22

1    Q. You didn't call Shannon Spalding personally
2  to talk about that assignment?
3    A. I don't recall having a conversation about
4  that.
5    Q. In terms of the deputizations, is it true
6  that sergeants are the ones who submit names of who
7  is going to be recommended to be deputized?
8       MR. KING: Just object to the form
9  without a time frame. Are you still talking about
10  the time period when he was supervising --
11      MR. SMITH: The time period that you
12  were supervising Danny and Shannon.
13      MR. KING: Do you need to have the
14  question read back?
15      THE WITNESS: Yeah.
16  BY MR. SMITH:
17    Q. At the time period you were supervising
18  Danny and Shannon, was it true that sergeants would
19  be the persons who would submit names of
20  recommendations of who should be deputized?
21    A. Not to my recollection, no.
22    Q. Has it ever been that way?
23    A. No, not to my recollection.
24    Q. Was there any function of you as a sergeant

Page 23

1  in fugitives apprehension where you would submit
2  names to the marshals?
3    A. No.
4    Q. Or for -- within the Chicago Police
5  Department as to who would be eligible for being
6  deputized?
7    A. No. Not at that time frame, no.
8    Q. In terms of the five -- on your current
9  team, the five individuals who are not sworn
10  members, do you remember -- do you know any of
11  their names at this time?
12    A. That are currently assigned to my team?
13    Q. Correct.
14    A. Yes.
15    Q. And who -- can you name -- name two -- just
16  one of them, for instance?
17    A. Tomika Rainey.
18    Q. And how long has she been with your team?
19    A. Two-plus years.
20    Q. Have you discussed with her whether she
21  wanted to be deputized or not?
22    A. It probably came up in a conversation, but
23  not to, you know, say that I can make you a marshal,
24  no.

Page 24

1    Q. And did she indicate that she wanted to be
2  deputized?
3    A. Yes.
4    Q. And do you know what reasons there are that
5  she has not been deputized in two-and-a-half years?
6    A. That would be the captain's call, so I don't
7  know.
8    Q. Do you know if it has anything to do with
9  the amounts of arrests she's made?
10    A. Again, I wouldn't even know that answer.
11    Q. Do you know that she had had meetings with
12  the lieutenant and the commander, but the
13  possibility of her being deputized was stopped?
14      MR. KING: Just object to the form of
15  the question. If you know anything about it, you
16  can answer.
17      (Off record discussion.)
18  BY MR. SMITH:
19    Q. Do you know if she was denied to be
20  deputized?
21    A. Yeah. I found that out later, yes.
22    Q. Did you recommend that she be deputized?
23    A. During this now new period that we're in,
24  yes.

Page 25

1    Q. And do you have any idea why that she wasn't
2  deputized?
3    A. I have no idea.
4    Q. You didn't find anything out as to why she
5  wasn't deputized?
6    A. No.
7    Q. How long have you been deputized? Obviously
8  the whole time you've been in fugitive
9  apprehension?
10    A. Yes. It took a few months when I got there
11  for clearances or whatever to go through.
12    Q. So about --
13    A. They had to do a background check and all
14  that stuff, so...
15    Q. So about how long?
16    A. About six-and-a-half years maybe.
17    Q. Okay. And are team members required to
18  report to the unit before going on the streets
19  every day within the fugitive apprehension unit?
20    A. When you say "the unit," what are you
21  referring to?
22    Q. Your unit. Well, the fugitive apprehension
23  unit, in terms of members of your team would be
24  also members of the fugitive apprehension unit,

7 (Pages 22 - 25)

1 correct?

2    A.  Okay.  Right.

3    Q.  So the members of your team, would they have

4 to report to the fugitive apprehension unit on a

5 daily -- when they were -- on the days they were

6 working, would they have to report to that unit

7 before going to the street?

8    A.  No.  They would report to whoever the

9 sergeant deemed necessary for them to report to.

10    Q.  So other than the unit, where would that be?

11    A.  Most of the time, we would meet in Area

12 South, where we were assigned, 111th Street.

13    Q.  Were there times where you would -- they

14 would report by either radio or phone?

15    A.  Yes.

16    Q.  And so it wouldn't always be an in-person

17 reporting?

18    A.  Yeah, depending on what they were working on.

19    Q.  And were there times where they would

20 essentially start working even before they had

21 conversations with you?

22    A.  No.

23    Q.  Never?

24    A.  Never.

1    Q.  Were there ever times where -- and why would

2 you need to talk with them before they would start

3 working?

4    A.  Well, I would need to know what they were

5 working on and what their location was and things of

6 that nature, so that's why I would have them talk to

7 me before they started working.

8    Q.  Okay.  Were there times where you were --

9 would have been aware of what they were working on

10 from the day before and would be aware of their

11 location from, say, the day before?

12    A.  If they told me, yes.

13    Q.  And would that be sufficient for

14 communicating their location for the next day?

15    A.  No.  I would still talk to them the same day

16 that they were actually working.

17    Q.  Okay.  Are team members required to return

18 to -- come back to the fugitive apprehension unit

19 on a daily basis before they complete their shift

20 or tour of duty?

21    A.  No.  Depending on what time they finished

22 their assignments, no, they wouldn't have to come

23 back.

24    Q.  So sometimes if they were working at a

1 location and an assignment that required them being

2 at a different location, they wouldn't have to --

3 they could go straight home from that location?

4    A.  Sure.

5    Q.  Do you know if Shannon had to always -- when

6 she was assigned to your team, had to always return

7 back to Area South before going home?

8    A.  Not all the time.

9    Q.  How about most of the time?

10    A.  Well, if they had a vehicle that they had to

11 drop off because they didn't have a take-home car,

12 yes, but not most -- I would say probably 60, 70

13 percent of the time, but not all the time, though.

14    Q.  So if you had to -- if you didn't have a

15 take-home vehicle, you would agree that -- and you

16 were using a vehicle in your job, you would have a

17 need to return back to Area South to return the

18 vehicle?

19    A.  Correct.

20    Q.  Do you know anyone other than Shannon

21 Spalding who was on your team who didn't have a

22 vehicle?

23    A.  Again, I would have to look at that roster of

24 my team at that time to tell you.

1    Q.  Did you make any efforts to try and get

2 Shannon Spalding a vehicle?

3    A.  No.

4    Q.  Why not?

5    A.  Because that wasn't a requirement.

6    Q.  Wouldn't you have liked her -- have Shannon

7 be able to work longer at the location that she'd

8 be at rather than have her to take the time to

9 drive back?

10    A.  Well, per the lieutenant, that's how things

11 were set up at the time, so that was for everybody,

12 every non-TFO on every team, not just my team.

13    Q.  And which lieutenant are you talking about

14 when you say that?

15    A.  Cesario.

16    Q.  Can you think of one person other than

17 Shannon, that was within the fugitive apprehension

18 unit, who -- who was in the same situation, that

19 she was without a vehicle or he was without a

20 vehicle?

21    A.  Unless I had those -- I'm sorry.

22        MR. KING:  No.  Go ahead.

23        THE WITNESS:  Unless I had those

24 rosters in front of me to tell you actually who

Page 30

1  that was, I couldn't tell you right now, no.
2  BY MR. SMITH:
3     Q.  Do you believe there was somebody other than
4  Shannon?
5     A.  Sure.  There were tons of people.
6     Q.  Tons of people who were actually patrol
7  officers assigned to fugitive apprehension?
8     A.  Sure, on other teams.
9     Q.  How about on your team?
10    A.  Again, I would have to see that roster to let
11 you know who that was.
12    Q.  Okay.  Without, you know, letting me know
13 who that was in particular, do you believe that
14 anyone on your team, other than Shannon, didn't
15 have a take-home vehicle?
16    A.  It's -- it's possible, but I'd need to see
17 the roster, though.
18    Q.  Okay.  But you're not sure as you sit here?
19    A.  I'm not sure.
20    Q.  It could be -- it's also possible that no
21 one other than Shannon did not have a car at that
22 time?
23    A.  It's possible.
24    Q.  What hours are you typically assigned to?

Page 31

1     A.  Depending on the day, but typically 7 to 3, 7
2  to 3:30.
3     Q.  And back when you were supervising Shannon
4  Spalding and Danny, was that the same back then?
5     A.  Yes.
6     Q.  Just one question with regard to Ms. Rainey
7  that we brought up, are you aware of her having any
8  type of issue that relates to an auto accident
9  while on duty?
10    A.  Issue, what kind of issue?
11    Q.  Where there was any type of indication that
12 it was possible that one -- either the driver might
13 have been drinking in terms of while driving on the
14 job.
15    A.  I'm aware of it now, yes.
16    Q.  And do you know what -- whether there's been
17 any discipline as a result of that?
18    A.  Not -- not that I can recall, no.
19    Q.  And was that individual a part of your team
20 at that time?
21    A.  Yes.
22    Q.  Okay.  I'll come back to that.
23       In terms of are you aware of -- I'm sorry.
24 When do you first recall meeting Shannon Spalding

Page 32

1  or Danny Echeverria?
2     A.  I want to say March of 2012.
3     Q.  And was that when they came to the fugitive
4  apprehension unit or before?
5     A.  The exact date, I don't know, but it was in
6  March of 2012, I believe.
7     Q.  You didn't know them before --
8     A.  No.
9     Q.  -- they came to that unit?
10    A.  No.  No.
11    Q.  And in terms of how were you made aware of
12 the fact that they were coming to be part of the
13 fugitive apprehension unit?
14    A.  I got a phone call from Lieutenant Cesario,
15 and he told me that I was getting two new people on
16 my team.
17    Q.  Okay.  And in terms of do you know how long
18 before you actually met Spalding, Shannon, or
19 Danny, you had received that phone call?
20    A.  He called me on a Friday, and they reported
21 to me on a Tuesday, the following week.
22    Q.  And what were you told about Danny and
23 Shannon in that phone call?
24    A.  When he told me that I had two new people

Page 33

1  coming, I asked him their names.  He told me their
2  names.  I said where are they from.  He said
3  narcotics.
4     Q.  And anything else --
5     A.  That was it.
6     Q.  -- that he told you?
7        Had you heard anything negative about
8  Spalding or Echeverria prior to their arrival on
9  your team?
10    A.  No.
11    Q.  And did you hear anything else from anybody,
12 other than Lieutenant Cesario, from the time that
13 you heard they were -- you were told they were
14 coming to the time that they arrived and you
15 actually met them in person?
16    A.  No.
17    Q.  And do you know Commander O'Grady?
18    A.  Yes.
19    Q.  How long have you known him?
20    A.  For over 20 years.
21    Q.  And has he ever told you anything about
22 Shannon Spalding?
23    A.  No.
24    Q.  Has he ever told you anything about Danny

9 (Pages 30 - 33)

Page 34

1 Echeverria?
2     A. No.
3     Q. And is it true you went to the academy with
4 O'Grady or graduated from the academy with O'Grady?
5     A. I don't know when -- I don't know when he
6 graduated. I graduated -- I came on in August of
7 '86, and I don't know what month he came on, so...
8     Q. Would it surprise you if he also came on in
9 '86?
10    A. It wouldn't surprise me.
11    Q. And were you aware that Officer O'Grady at
12 any point in time met with Lieutenant Cesario
13 concerning either...
14     All right. Were you aware that Commander
15 O'Grady at any point in time met with Lieutenant
16 Cesario about Shannon and Danny's re-reassignment
17 to fugitive apprehension?
18    A. No.
19    Q. Did Lieutenant Cesario ever tell you
20 anything negative about Danny or Shannon?
21    A. No.
22    Q. Did the lieutenant or commander of fugitive
23 apprehensions ever inform you that Spalding and/or
24 Echeverria were coming from IAD?

Page 35

1    A. No.
2    Q. Had you ever heard anybody claim or state
3 they believed that Shannon Spalding or Danny came
4 from IAD?
5    A. No.
6    Q. Did you ever ask Danny or Shannon what work
7 they had been doing over the last year or two years
8 before arriving with you?
9    A. When I first met them, the day we met, on
10 that Tuesday, I gave them my background and I asked
11 for their background.
12    Q. And what did they tell you?
13    A. They told me pretty much their history, like
14 you asked me when I first came in, but they never
15 mentioned anything about internal affairs, IAD.
16 They just told me the different places that they
17 worked, things that they did, and that was it.
18    Q. And did you consider them to be experienced
19 officers based on their statement?
20    A. Sure.
21    Q. In terms of did you see any reason why they
22 would need to be assigned misdemeanor cases?
23        MR. KING: Objection, asked and
24 answered already, but if you understand the

Page 36

1 question, you can answer it.
2        THE WITNESS: No. There was -- repeat
3 that for me, please.
4 BY MR. SMITH:
5    Q. In terms of after talking to them, did you
6 see any reason that they would need to be assigned
7 misdemeanor cases while starting out in fugitive
8 apprehensions?
9        MR. KING: Same objection, asked and
10 answered.
11        THE WITNESS: I didn't see any reason
12 why, but, again, that was how they did the
13 things -- how they assigned the cases while I was
14 there, so it wasn't my call.
15 BY MR. SMITH:
16    Q. Did you have any conversation with your
17 supervisors to indicate to them that it appeared
18 that Spalding and Echeverria were experienced
19 enough officers who previously handled felonies and
20 things of that nature?
21    A. No.
22    Q. Did you want Spalding and Echeverria to be
23 able to handle all types of cases --
24    A. Eventually.

Page 37

1    Q. -- as soon as possible?
2    A. Eventually.
3    Q. And what time frame would you have expected
4 to be able to allow them to handle other types of
5 cases?
6    A. There was no set time frame.
7    Q. So what was it based on?
8    A. Again, it was based on they're new to the
9 unit, and everybody new to the unit gets the cases
10 that they get.
11    Q. At what point are you no longer new to the
12 unit?
13    A. It could be three months, four months. I
14 don't know. It all depends.
15    Q. And...
16        (Off record discussion.)
17 BY MR. SMITH:
18    Q. Did you have any conversation with anyone
19 other than -- at any other time, other than the
20 initial call indicating that Shannon and Danny were
21 coming, with any of your supervisors that concerned
22 Shannon Spalding or Danny Echeverria --
23    A. No.
24    Q. -- prior to their arrival?

10 (Pages 34 - 37)

Page 38

1    A.  No.
2    Q.  Do you recall a conversation taking place in
3  the sergeant's office, in the presence of you
4  yourself and other sergeants, where Lieutenant
5  Cesario was warning or informing that Shannon and
6  Danny were from IAD?
7    A.  No.
8    Q.  Did you ever -- in terms of did you -- were
9  you involved in a conversation where Lieutenant
10 Cesario in any way indicated that either Danny or
11 Shannon could not be trusted?
12   A.  No.
13   Q.  Were you involved in a meeting in which
14 Lieutenant Cesario in any way indicated that
15 yourself and your fellow sergeants needed to relay
16 information about concerns with Danny or Shannon
17 being IAD to your team members?
18   A.  No.
19   Q.  Do you know a Jan Hanna?
20   A.  Yes.
21   Q.  How do you know Jan Hanna?
22   A.  She was one of the officers I mentioned
23 earlier that was in CMO.
24   Q.  Okay.  And how long have you known Jan

Page 39

1  Hanna?
2    A.  At the time, I didn't know her.  She had just
3  gotten over there herself.  So at that time, maybe a
4  couple months.
5    Q.  Have you ever had any arguments or personal
6  disputes with Jan Hanna?
7    A.  No.
8    Q.  Do you know of her to have any with
9  Lieutenant Cesario?
10   A.  None.  Not to my recollection, no.
11   Q.  How about Commander Salemme?
12   A.  No.
13   Q.  Are you -- and do you know where physically
14 within the office Jan Hanna worked back in the time
15 you were supervising Danny and Shannon?
16   A.  She was more near the financial crime
17 section, and the commander's office was way up
18 front, and so, yeah, she was -- she's quite a
19 distance away.
20   Q.  And in terms of when you say "the
21 commander's office," you're referring to whose
22 office?
23   A.  Commander Salemme.  This is at the Homan
24 Square facility.

Page 40

1    Q.  And do you know where her office was with
2  respect to Lieutenant Cesario?
3    A.  Across maybe -- maybe 50 feet away or so, but
4  she didn't have an office.  She was sitting in like
5  an open area.  She didn't have a -- she didn't have
6  an actual office.
7    Q.  In terms of what we're talking, are we
8  talking about the office at Kedzie and Harrison or
9  a different office?
10   A.  At Homan Square.
11   Q.  Homan Square.
12      Okay.  In terms of are you aware that Jan
13 Hanna has given a sworn affidavit indicating that
14 she witnessed you in a meeting with other sergeants
15 and Cesario, where Cesario stated that Shannon and
16 Danny were IAD rats?
17   A.  No.
18   Q.  And that Cesario stated that to tell -- that
19 the sergeants should tell the team members not to
20 work with Shannon and Danny?
21   A.  No.
22   Q.  Do you have any idea or information as to
23 why Jan Hanna would make a statement like that?
24      MR. KING:  Just object to the form and

Page 41

1  lack of foundation, but you can answer.
2      THE WITNESS:  I have no idea.
3  BY MR. SMITH:
4    Q.  Have you ever heard fellow officers use the
5  word "rats"?
6    A.  No.
7    Q.  Never?
8    A.  Never.
9    Q.  In terms of have you ever used the word
10 "rats"?
11   A.  No.
12   Q.  Have you ever heard officers discuss concern
13 that a fellow officer might be working in some
14 undercover capacity with IAD?
15   A.  No.
16   Q.  Have you ever heard concerns or supervisors
17 talking about that you should be aware that you
18 could be working alongside individuals who were
19 employed to watch and make sure there's no improper
20 actions taken by police officers?
21   A.  No.
22   Q.  Have you ever had discussions with your team
23 members about the fact that it's possible that
24 individuals could be a part of IAD and working in

11 (Pages 38 - 41)

Page 42

1 undercover capacities investigating officers?
2    A.  No.
3    Q.  In terms of have you ever known a time when
4 Jan Hanna was working -- her space was simply
5 separated by a wall from Lieuetnant Cesario's
6 space?
7    A.  Yes, when we moved to Harrison and Kedzie.
8    Q.  Did you ever personally have conversations
9 with your team members in which you told anyone on
10 your team to be cautious around Spalding and
11 Echeverria?
12   A.  No.
13   Q.  Did you ever have a conversation with a
14 member of your team, warning them that they may --
15 that Shannon or Danny may have been IAD or IAD
16 rats?
17   A.  No.
18   Q.  Did you ever tell them that -- anyone on
19 your team that they should be leery of working with
20 either Danny or Shannon --
21   A.  No.
22   Q.  -- in any manner?
23   A.  No.
24   Q.  Did you ever tell members of your team to

Page 43

1 treat Shannon or Danny differently in any manner?
2    A.  No.
3    Q.  Did you ever tell anyone on your team not to
4 work with Shannon or Danny?
5    A.  No.
6    Q.  Did you ever tell any sworn members of your
7 team not to back up Spalding or Echeverria on the
8 streets?
9    A.  No.
10   Q.  In terms of did you ever tell them not to
11 back -- any members of your team not to back up
12 Shannon or Danny in any way?
13   A.  No.
14   Q.  Did you ever tell any member of Unit 606 or
15 any other -- other units that worked in the same
16 area as fugitive apprehensions, to -- for example,
17 bomb and arson, financial crimes, that Spalding and
18 Echeverria were from IAD and not to trust them?
19   A.  No.
20   Q.  Did you ever have any conversations with any
21 of the office staff in fugitive apprehensions
22 regarding Spalding or Echeverria?
23   A.  Other than work-related stuff, no.
24   Q.  And in terms of when you say work-related

Page 44

1 stuff, were there any conversations relating to
2 poor performance?
3    A.  No.
4    Q.  Were there any conversations relating to
5 where they had come from?
6    A.  No.
7    Q.  Well, did anyone ever ask you a question
8 about where Danny or Shannon ever came from?
9    A.  They may have asked.
10   Q.  And what was your answer?
11   A.  I don't know.
12   Q.  And who asked you?
13   A.  I don't recall.  There's so many people in
14 that office.  I don't know.
15   Q.  Did you ever get a sense from any of those
16 people that asked you that they were concerned
17 about where they came from?
18        MR. KING:  Just object to the form.  I
19 think he testified they may have asked, but I don't
20 know that he testified --
21        THE WITNESS:  What was the question
22 again?
23 BY MR. SMITH:
24   Q.  Did you ever ask anyone if, in response --

Page 45

1 did you ever give any -- did you ever find out why
2 anyone would have been concerned where they came
3 from?
4    A.  No.
5    Q.  Did any members of your team or members of
6 the fugitive apprehension unit ever have a
7 conversation with you about not wanting to work
8 with Spalding or Echeverria?
9    A.  No.
10   Q.  While Spalding and Echeverria were assigned
11 to your team, do you ever recall telling Spalding,
12 while in Area South in your presence, in the
13 presence of other sworn members and detectives of
14 Area South, that she should do a homicide arrest
15 report for an offender or for an offender that
16 actually Detective Gushiniere apprehended?
17   A.  I don't recall that conversation.
18   Q.  Let me come back to that.
19        Was there a time where -- do you know an
20 officer by the name of Walker who worked in
21 fugitive apprehension?
22   A.  Yes.
23   Q.  Do you recall a meeting in which Walker
24 stood up and told you that -- and indicated that

12 (Pages 42 - 45)

1  you informed the team that they should not work
2  with Danny or Shannon?
3      A. I don't recall that.
4      Q. Do you recall at any point Walker standing
5  up and addressing concerns in a meeting about Danny
6  and Shannon?
7      A. I don't recall that.
8      Q. Do you recall Walker at any point standing
9  up and in any way indicating that he was under the
10 impression that you did not want him or other team
11 members to back up Danny or Shannon?
12     A. I don't recall that.
13     Q. If somebody on your team, such as Walker,
14 would make a statement like that, would that be
15 something you would remember?
16     A. Sure.
17     Q. That would be a fairly substantial claim for
18 somebody to think that they weren't supposed to
19 back up other officers on the street, correct?
20     A. Definitely.
21     Q. And what would you do if somebody said that?
22     A. Would definitely take it higher.
23     Q. Do you recall having any instance with
24 Officer Walker in which he made any complaint or

1  any concern during a team meeting?
2      A. During a team meeting that I've had when
3  Shannon and Danny were on the team, I'd talk about
4  just general stuff that's going on within the unit,
5  and then I open up the floor to whoever wants to
6  speak about whatever is going on. So they can speak
7  on whatever once I finish talking about what I need
8  to talk about.
9      Q. Okay. Do you recall a team meeting where
10 the issue of whether Danny and Shannon may have
11 come from IAD was addressed during a meeting?
12     A. During one of the team meetings after I
13 opened up the floor to everyone, Danny stood up and
14 pretty much addressed the room at that point and
15 asked if anyone had a problem working with them,
16 people were speculating that they were from internal
17 affairs and things of that nature. So Danny posed
18 the question to everybody in the room.
19     Q. And did anybody respond to Danny?
20     A. Everybody responded, from what I recall, very
21 favorably, telling Danny and Shannon we don't have a
22 problem with you guys, we'll work with you guys,
23 things to that effect.
24     Q. Do you recall Danny indicating that he

1  believed that somebody had told the team that they
2  were IAD?
3      A. I don't recall that statement.
4      Q. And do you recall Danny claiming that
5  somebody had told him that you had indicated to
6  team members that they shouldn't back Danny or
7  Shannon?
8      A. No.
9      Q. Do you recall that -- demanding to know
10 who -- demanding to know who claimed that you said
11 that they were IAD?
12     A. No.
13     Q. You don't recall Officer Walker standing up
14 and admitting that he was the person who told Danny
15 and Shannon that you had indicated that they could
16 be IAD or words to that effect?
17     A. No.
18     Q. Or that -- and that you had indicated that
19 you should treat them differently or shouldn't work
20 with them?
21     A. No.
22     Q. Do you know Officer Gushiniere?
23     A. Yes.
24     Q. Do you recall that when Danny and Shannon

1  were addressing concerns about the team, that
2  Gushiniere asked why -- that they asked Gushiniere
3  why...
4          (Off record discussion.)
5  BY MR. SMITH:
6      Q. Okay. Are you aware that Gushiniere asked
7  Danny and Shannon at the meeting why Danny and
8  Shannon thought there was an issue?
9      A. I don't recall that.
10     Q. Do you recall anyone saying that they had
11 heard that you had indicated that Danny and Shannon
12 were IAD?
13     A. No.
14     Q. In terms of did you ask Danny personally why
15 he thought that team members had concerns and why
16 he raised that in that meeting?
17     A. I don't remember asking him that. Again, I
18 opened up the floor to anybody who wants to speak
19 after I spoke, so that was a concern Danny so he
20 addressed the room. And everybody, like I said
21 earlier, said they had no problems working with
22 Danny or Shannon.
23     Q. Who stated that?
24     A. Everybody on the team, that was on the team

1  at that time.
2      Q.  Other than that statement, do you recall any
3  officer making a statement about the issue?
4      A.  No, I don't.
5      Q.  Do you know if Walker said anything during
6  that meeting other than I have no problem working
7  with Danny or Shannon?
8      A.  Other than that statement, no, I don't recall
9  him saying anything else.
10     Q.  Do you know if Gushiniere said anything at
11 that meeting?
12     A.  I don't recall if he did.
13     Q.  Do you recall anyone standing up during that
14 meeting to make a point?
15     A.  Danny stood up.
16     Q.  Other than Danny.
17     A.  No.
18     Q.  And do you know who was at that meeting?
19     A.  Whoever was on my team at the time.
20     Q.  And who would that have been?
21     A.  I got to look at my roster again.
22     Q.  Would Gushiniere have been part of that
23 team?
24     A.  Yes.

1      Q.  Do you remember anyone else at this moment?
2      A.  Tony Robinson, his partner.  I want -- I
3  think Harry Strong.  I think.  I'm not certain.
4  Milton Scott.
5      Q.  If an officer had concerns that other
6  officers weren't going to back them on the street,
7  would you agree that it would be your
8  responsibility, as sergeant of the team, to address
9  those concerns?
10     A.  Definitely.  Most definitely.
11     Q.  Would you agree that you would -- would you
12 feel that you would need to go to your supervisors?
13     A.  Yes.
14     Q.  What did you do to address those concerns?
15     A.  Those concerns were never brought to me, so I
16 didn't address them.
17     Q.  Okay.  In terms of I had mentioned -- asked
18 you a question about a time in Area South where --
19 I asked you if you recalled ever asking Shannon to
20 do a report relating to a homicide arrest that
21 was -- that Detective Gushiniere was the individual
22 who apprehended the suspect.
23     A.  Okay.
24     Q.  Do you recall ever having that situation

1  arise as you sit here today?
2      A.  I don't recall it, but if there's some
3  reports out there that will reflect that, it's
4  possible, but I don't recall it.
5      Q.  In terms of did you ever ask Shannon
6  Spalding to prepare a homicide-related arrest
7  report?
8      A.  Again, I don't recall that.
9      Q.  In terms of you're aware that if somebody
10 completes an arrest report, they must attest to the
11 facts as being true in terms of what -- what's been
12 put in the arrest report?
13     A.  Yes.
14     Q.  And would you agree that if somebody wasn't
15 present for the arrest, that -- and they were
16 attesting to the facts of an arrest instead of the
17 officer who was actually involved in the arrest,
18 that could be considered falsifying an arrest
19 report?
20     A.  It could be, depending on the circumstances,
21 yes.
22     Q.  What circumstances would there be where
23 somebody who wasn't present could do an arrest
24 report attesting to the facts of the arrest?

1      A.  Well, if they gave information or had
2  information leading up to that arrest, even though
3  they weren't physically there, but they actually had
4  information or gave information to the officers who
5  made the arrest, I could consider them being on the
6  arrest report.
7      Q.  Okay.  But in terms of being on the arrest
8  report, in terms of actually attesting to and
9  preparing the arrest report, would you believe
10 their presence would need to be there?
11     A.  Again, depending on the circumstances in my
12 estimation.  If you gave me information based on
13 that and I made that arrest, I could -- I could
14 consider putting you there.
15     Q.  Did you ever have an instance where Shannon
16 was involved and had knowledge or gave information
17 leading to or in connection with a homicide arrest
18 by Officer Gushiniere?
19     A.  Again, I don't recall that.
20     Q.  Did you have any situation where Shannon
21 Spalding gave information or had knowledge about a
22 homicide arrest where you later asked her to do the
23 arrest report?
24     A.  I don't recall that.

14 (Pages 50 - 53)

Page 54

1    Q. Do you recall an instance where Shannon
2  Spalding told you that she was uncomfortable with
3  preparing an arrest report because she wasn't
4  present?
5    A. No.
6    Q. Do you recall an instance where Shannon
7  Spalding voiced her concerns about doing an arrest
8  report at any point in time?
9    A. No.
10   Q. Do you recall an instance where Officer
11  Gushiniere was upset or in any way talked to you
12  about the fact that having Shannon Spalding do an
13  arrest report for his arrest was not appropriate?
14   A. No.
15   Q. Do you recall an incident in which -- do you
16  recall ever having an argument with Shannon
17  Spalding?
18   A. An argument?
19   Q. Yes.
20   A. No.
21   Q. Do you recall an instance where -- in terms
22  of do you recall an instance in which Officer
23  Gushiniere told Shannon Spalding not to do a report
24  on a homicide?

Page 55

1    A. No.
2    Q. Do you recall an instance where -- how far
3  is your -- in Area South, how far was your desk
4  from where Shannon Spalding's desk was when she was
5  on your team?
6    A. We don't have particular desks. We just sit
7  where we sit. Where we find an open seat, we sit.
8    Q. Okay. Was there a time where you sat next
9  to or at a desk immediately in front of Shannon
10  Spalding and you told Shannon Spalding that --
11  after turning up a radio to the District 3
12  zone --
13   A. Uh-huh.
14   Q. -- that you told Shannon Spalding that
15  that's the District 3 and I can have you launched
16  to District 3 and you better watch yourself?
17   A. No, that wasn't the conversation.
18   Q. Was there any conversation at all similar to
19  that?
20   A. Sure.
21   Q. What was the conversation?
22   A. The conversation was, she had just come in
23  with an arrest with her partner and two other
24  officers from our unit, and at some point she voiced

Page 56

1  her displeasure about the cases that she was
2  working. I then told her -- I turned the radio on
3  to the zone. Just the zone. I didn't know if it
4  was District 3. I just turned the radio on.
5    And I just asked her the question, would you
6  rather be doing what you're doing or would you
7  rather being doing what they're doing on this radio,
8  and that's all I said.
9    Q. And you didn't snap your fingers and said I
10  could have you launched to District 3?
11   A. No, sir.
12   Q. You never in any way indicated you better
13  watch yourself?
14   A. No.
15   Q. Do you know if Kevin Williams was in the
16  vicinity when you were having that conversation?
17   A. I'm sure he was.
18   Q. And do you recall there being two detectives
19  in the area when you were having that conversation?
20   A. Yes.
21   Q. And do you recall one of those detectives
22  saying to you that you were way out of line and
23  that you're making me uncomfortable with how you're
24  treating this officer and you need to stop?

Page 57

1    A. What I remember those detectives doing were
2  laughing, and they said something. I don't know
3  what they said, but I know they were laughing about
4  it.
5    Q. And did you hear one of them say that --
6  "can you say hostile work environment?"
7    A. I don't remember that.
8    Q. Well, what did you think they were laughing
9  about?
10   A. Well, I know the detectives, so they were
11  just probably laughing at me and what I said.
12  That's all.
13   Q. Who are the detectives?
14   A. One is Detective Shergen, and I can't
15  remember her partner's name, but he's no longer
16  there, but I can't remember his name.
17   Q. Do you know how to spell Shergen?
18   A. S-H-E-R-G-E-N maybe. I don't know.
19   Q. Do you know his first name?
20   A. It's a female.
21   Q. Or her first name?
22   A. Rita.
23   Q. And you don't know Rita's partner's name?
24   A. No, I don't know his name.

15 (Pages 54 - 57)

Page 58

1    Q. Was it a female or a male?
2    A. It was a male.
3    Q. Do you know -- can you give any kind of
4  description.
5    A. A little bit taller than me, bald, white
6  male, kind of a little stomach, a little gut on him.
7  That's pretty much it.
8        (Off record discussion.)
9  BY MR. SMITH:
10   Q. In terms of did you ever have a conversation
11 with either of those detectives about that
12 discussion or incident?
13   A. I probably did later on. Like I said, he was
14 joking about it, but probably did later on.
15   Q. And what was that discussion about?
16   A. Pretty much what happened, the incident that
17 happened and what I said.
18   Q. And what did you tell them?
19   A. I pretty much told them what I said, again I
20 repeated what I said.
21   Q. Why did you feel the need to repeat what you
22 said to them?
23   A. They asked me about it.
24   Q. What did they ask you?

Page 59

1    A. What the hell was that all about.
2    Q. And then what did you say?
3    A. I said I don't know, I just told her -- I
4  told them that I gave her an assignment, I guess she
5  didn't like the assignment, and I told her these are
6  her options, what would she rather be doing, this or
7  that.
8    Q. And wasn't it in fact true that that
9  assignment that she didn't like was -- you asked
10 her to do a report?
11   A. I don't know what I asked her to do. Like I
12 said, they came in with an arrest, so I don't
13 know -- so I don't even recall what the arrest was
14 for --
15   Q. Do you remember --
16   A. -- if it was her arrest or the other
17 officer's arrest, but they came in with an arrest.
18   Q. So it's possible that it was another
19 officer's arrest?
20   A. It's possible, but, again, I don't know for
21 sure whose arrest it was.
22   Q. And it's possible that it was Officer
23 Gushiniere's arrest?
24   A. I don't know whose arrest it was.

Page 60

1    Q. And it's possible that it was a homicide
2  arrest?
3    A. I don't know what kind of arrest it was.
4    Q. And it -- you did not agree with Shannon in
5  that she should be upset with not wanting to follow
6  your directive to do that report, isn't that
7  correct?
8    A. I didn't take it as her being upset. She
9  just made a statement to me and I gave a statement
10 back.
11   Q. Well, in terms of was Shannon not -- was she
12 happy with the assignment?
13   A. Well, apparently not. I don't know. You
14 have to ask her.
15   Q. And in fact, Shannon Spalding refused to do
16 the report, isn't that correct?
17   A. I have no idea what she refused to do.
18   Q. Did she do the report?
19   A. I have no idea.
20   Q. Well, if she refused to do a report after
21 you gave her a direct command to do one, that would
22 be a problem, wouldn't it be?
23       MR. KING: Just object to the form of
24 the question. There's been no testimony that he

Page 61

1  asked her to do a report, other than your
2  questions.
3        THE WITNESS: Would you repeat the
4  question?
5  BY MR. SMITH:
6    Q. If she had refused to do a report that you
7  directed her to do, that would be -- that would be
8  a -- an officer failing to do their job, correct?
9    A. Right, if I had directed them to do a report.
10 I didn't direct her to do a report, though.
11   Q. And what would you do if somebody refused to
12 do a report that you asked them to do that was
13 under your command?
14   A. If that were to happen, I would counsel them.
15   Q. Okay. And would you potentially tell them
16 that they could work somewhere else?
17   A. No.
18   Q. How would you counsel them?
19   A. We have different forms of discipline within
20 the department. It starts with a verbal counseling
21 or verbal reprimand, and it goes up the chain from
22 there.
23   Q. In terms of if somebody were to tell you
24 that they didn't feel comfortable with doing a

16 (Pages 58 - 61)

1 report because they weren't there, would you
2 consider that a potential reason to maybe not take
3 disciplinary action?
4    A. If that were the case.
5    Q. And do you recall if you at all got mad at
6 Shannon's position that she didn't want to -- she
7 didn't like the assignment?
8    A. No, I didn't get mad.
9    Q. And in terms of when you brought up the
10 district zone three, what was the purpose of
11 bringing up the district zone three?
12       MR. KING: Object to the form of the
13 question, which misstates his testimony. He didn't
14 say anything about district zone three, but you can
15 answer.
16 BY MR. SMITH:
17    Q. In terms of the zone, other than -- or the
18 other type of job other than fugitive
19 apprehensions, when you brought that up, what was
20 your purpose in doing that?
21    A. My purpose of doing that was saying I think
22 what you're doing is better than what they're doing.
23 That's the only reason I did that.
24    Q. And was that in any way a joke?

1    A. Yeah.
2    Q. And in terms of did you tell the detectives
3 that that was a joke?
4    A. Yes.
5    Q. And how was it a joke that what you're doing
6 is better than district zone three?
7    A. Well, in my estimation -- again, I don't know
8 what zone it was. Like I said, I just merely
9 turned the radio on, but in my estimation, driving
10 around in a beat car all day, going from job to job
11 to job to job, as opposed to working at your pace,
12 having pretty much the run of the city to do your
13 job or any investigations, is a better position than
14 being in a district, being set in boundaries and
15 just going from job to job to job. So that was my
16 purpose for saying that.
17    Q. And did you expect that to get Shannon to be
18 happy with the assignment you had just given her?
19    A. I didn't expect her to do anything, other
20 than I just made a statement.
21    Q. And did it appear that Shannon perceived
22 that comment as a joke?
23    A. I have no idea.
24    Q. Have you ever talked with Officer Williams

1 about that conversation that you had with Shannon?
2    A. Not that I can recall, no.
3    Q. Did he ever indicate to you that he heard
4 the conversation?
5    A. No, he didn't. He didn't say to me he heard
6 it, but...
7    Q. Immediately after the conversation, do you
8 recall that you walked with Shannon to a back room
9 upstairs in Area South?
10    A. I don't recall.
11    Q. Is it possible?
12    A. It's possible, but I don't recall it right
13 now.
14    Q. And you had a conversation with her in a
15 closed office?
16       MR. KING: Object to the question,
17 assuming facts not in evidence.
18       THE WITNESS: Again, I don't recall if
19 I did have a conversation with her, and if I did,
20 it wasn't in a closed office.
21 BY MR. SMITH:
22    Q. Where would it have been?
23    A. In a roll call room, where we normally have
24 our meetings at.

1    Q. Do you know if anyone else was in the roll
2 call room?
3       MR. KING: Same objection, to form of
4 the question, since he's testified he can't recall
5 any conversations. You can answer to the best of
6 your ability.
7       THE WITNESS: If the conversation did
8 take place, there was no one else there but myself
9 and Shannon.
10 BY MR. SMITH:
11    Q. And in terms of -- I believe I asked you if
12 it was in a closed office. Is it possible it was
13 in an open door office other than the roll call
14 room?
15    A. It's possible.
16    Q. After that discussion about the assignment,
17 when you -- isn't it true that when you were alone
18 with Shannon, you talked with her about knowing who
19 she and Echeverria were before they arrived?
20    A. No.
21    Q. Isn't it true that you told Spalding, during
22 the conversation in a room where just the two of
23 you were, that the team was uncomfortable working
24 with her and Danny?

17 (Pages 62 - 65)

Page 66

1   A. No.
2   Q. Isn't it true that you told her -- well,
3  what would you have taken her up to a room to talk
4  about?
5       MR. KING: Object to the form of the
6  question.
7       THE WITNESS: If that conversation took
8  place, basically to talk about what just happened
9  out on the floor when we talked about that
10  assignment.
11  BY MR. SMITH:
12   Q. And how do you recall -- if the conversation
13  happened, how would you know that it would have
14  been alone with Shannon?
15   A. Because there was nobody else there, if that
16  happened. Nobody else was in that room but myself
17  and her.
18   Q. Was -- how would you have known, for
19  instance, Shannon didn't express other concerns in
20  that meeting if it happened?
21   A. Again, I don't recall if she expressed any
22  other concerns if we had that conversation.
23   Q. In terms of did you tell Shannon Spalding,
24  during that conversation, that you were warned by

Page 67

1  the lieutenant that she and Danny were from IAD?
2   A. No. If we had that conversation, I don't
3  recall that.
4   Q. Have you ever told Shannon that you were
5  very good friends with Commander O'Grady?
6   A. No.
7   Q. Do you have any idea how she knows that
8  you're very good friends with Commander O'Grady?
9       MR. KING: Object to the form of the
10  question and lack of foundation.
11       THE WITNESS: I have no idea.
12  BY MR. SMITH:
13   Q. Isn't it true during that meeting you told
14  her that you were very good friends with Commander
15  O'Grady?
16   A. If that meeting took place, I don't recall
17  making that statement to her.
18   Q. And in terms of you also told her that you
19  had a conversation with O'Grady about Shannon and
20  Danny prior to their arrival with -- at the
21  fugitive apprehension unit?
22       MR. KING: Same objection, to form and
23  lack of foundation about a conversation that may or
24  not exist, but you can answer.

Page 68

1       THE WITNESS: As I answered previously,
2  no.
3  BY MR. SMITH:
4   Q. In terms of have you ever worked with
5  Commander O'Grady?
6   A. Yes.
7   Q. Where have you worked with him?
8   A. In narcotics.
9   Q. And in what --- was he your supervisor there
10  or were you on the same team or...
11   A. We were on different teams, but we were both
12  police officers there.
13   Q. And how long were you working in narcotics
14  at the same time with O'Grady?
15   A. Like I said previously, I was there for 14
16  years, so it was some point during those 14 years
17  that we worked in some capacity together.
18   Q. And did you know him even before you worked
19  at narcotics?
20   A. No.
21   Q. Are you social friends with Commander
22  O'Grady?
23   A. No.
24   Q. Have you ever been over to his house?

Page 69

1   A. No.
2   Q. Have you ever gone to non-police activities
3  together?
4   A. No.
5   Q. In terms of had you worked with Commander
6  O'Grady anywhere beyond -- besides narcotics?
7   A. No. Other than narcotics, no.
8   Q. Do you know Commander O'Grady's -- any of
9  Commander O'Grady's family members?
10   A. No.
11   Q. Did you tell Shannon Spalding that the guys
12  on the team, including yourself, don't trust her?
13   A. No.
14   Q. Did you tell her that the guys on the team
15  don't trust her because she doesn't socialize with
16  the guys?
17   A. No.
18   Q. Did you ever have a conversation about the
19  fact that, with Shannon Spalding, about the fact
20  that she was -- wasn't socializing with members of
21  her team?
22   A. No.
23   Q. Did you ever have a conversation with
24  Shannon Spalding about the need to socialize with

18 (Pages 66 - 69)

Page 70

1 members of the team?
2    A. No.
3    Q. Did the majority of team members, in your
4 opinion, socialize with each other more than
5 Shannon and the team members?
6    A. I'd say everybody socialized with everyone,
7 Shannon and Danny included. That's what I saw.
8    Q. Did you ever tell Shannon that she was
9 uncomfortable with her and Danny and that you
10 personally feared that if they needed help, the
11 team might not respond?
12    A. No.
13    Q. Did you ever tell Shannon that you did not
14 want to tell her daughter that she, referring to
15 Shannon, was coming home in a box?
16    A. No.
17    Q. Do you recall anything about what you said
18 to Shannon Spalding in a private meeting?
19    A. No.
20    Q. Did you -- after your initial conversation
21 about the other district and her unhappiness with
22 the assignment, did you tell Spalding that you
23 wanted to address some concerns about her and her
24 partner Danny?

Page 71

1    A. No.
2    Q. Do you recall having a meeting with Shannon
3 Spalding in which Danny and Kevin Williams walked
4 in to see what was going on?
5    A. No.
6    Q. This meeting that would have been alone with
7 Shannon, do you recall if anyone walked in?
8    A. No.
9    Q. Do you recall -- do you recall that -- do
10 you recall making a joke to Danny to the effect of,
11 Danny, you get to play with her all day and I'll
12 give her back when I'm done?
13    A. No, sir.
14        MS. Spalding: That's funny.
15 BY MR. SMITH:
16    Q. Did you -- do you recall Shannon indicating
17 that since this may be an issue concerning herself
18 and Danny, that maybe Danny should stay and just
19 have a discussion with you?
20    A. No.
21    Q. Do you recall telling Danny to leave a
22 meeting with you and Shannon?
23    A. No, I don't.
24    Q. Do you know if -- do you know if Danny

Page 72

1 waited outside the door of a meeting?
2    A. No.
3    Q. Are you familiar with the general orders
4 relating to protecting any sworn member, who
5 reports another member for corruption, should be
6 protected from retaliation or a hostile work
7 environment?
8    A. I'm not familiar with it, but I've heard of
9 it.
10    Q. Isn't it true that every member is trained
11 in that procedure?
12    A. As far as I know.
13    Q. So how is it that you are not familiar with
14 it?
15    A. I mean, I'm not familiar with it verbatim.
16 There's so many orders out, that we go through these
17 things daily, so we don't specifically concentrate
18 on one order and just let it stick with us.
19    Q. Are you aware of any laws that protect
20 whistleblowers from retaliation?
21    A. I've heard of them, yes.
22    Q. Isn't it your responsibility, as a
23 supervisor, to be familiar with the general orders
24 relating to a hostile work environment?

Page 73

1    A. Yes.
2    Q. And as a boss, aren't you supposed to
3 monitor and make sure that there is no hostile work
4 environment?
5    A. Sure.
6    Q. When's the last time you familiarized
7 yourself with general orders relating to a hostile
8 work environment or retaliation?
9    A. Probably a while because I don't have a
10 hostile work environment around me, so I guess I
11 don't keep up with that unless it occurs.
12    Q. As a member of the police department, sworn
13 member of the police department, is it your
14 responsibility, if you become aware of a sworn
15 member being harassed -- retaliated against or
16 harassed, to report it?
17    A. Yes.
18    Q. Well, what are your responsibilities as a
19 supervisor or a sergeant to protect a member once
20 they have voiced concerns about harassment or
21 retaliation?
22    A. Well, from my understanding, if that were to
23 occur, I would document the allegation and take it
24 up the chain, as far as my supervisors and so on and

19 (Pages 70 - 73)

Page 74

1 so forth.
2   Q. When Danny expressed concerns in the meeting
3 about being concerned about other people, other
4 team members treating them differently or being
5 fearful that they were from IAD, did you document
6 it in any way?
7   A. Well, what Danny did, he -- he didn't express
8 concern. He asked a question. He didn't express
9 concern.
10   Q. Did you in any way document that?
11   A. No.
12   Q. Did you in any way take that up the chain of
13 command?
14   A. No.
15   Q. What made you believe that his question was
16 not a concern?
17   A. The way it was posed.
18   Q. And in what way was it posed that made you
19 believe it was not a concern?
20   A. He just asked if anyone had any issues
21 working with him and Shannon, and everybody answered
22 individually that they didn't.
23   Q. Well, he also indicated that he was
24 concerned that people didn't want to work with

Page 75

1 them, correct?
2   A. He may have said that. I'm not sure if he
3 said that or not.
4   Q. He also indicated concern that people
5 thought he was with -- they were -- that he and
6 Shannon were from IAD?
7   A. He may have said that. I'm not sure if he
8 said that for sure or not.
9   Q. He also indicated that he was concerned that
10 people were going to treat them differently and not
11 want to work with them on the streets?
12   A. He may have said that. Again, I'm not sure
13 if he said it.
14   Q. As an officer, you would be aware of the
15 dangers that would be posed to a fellow officer if
16 they didn't believe that they could get backup on
17 the street?
18   A. Definitely.
19   Q. In fact, it could be -- it could be a
20 situation of life and death?
21   A. Definitely.
22   Q. And you didn't believe that that would be a
23 concern --
24     MR. KING: Object to the form and lack

Page 76

1 of foundation.
2 BY MR. SMITH:
3   Q. -- that Danny was expressing?
4   A. I didn't believe it wasn't a concern because
5 it never happened.
6   Q. And you don't remember that at that time
7 that a fellow officer on your team stood up to
8 voice the fact that he understood where Danny's
9 concerns were coming from?
10     MR. KING: Again, objection, asked and
11 answered several times, but...
12     THE WITNESS: Again, I don't recall if
13 anyone stood up and voiced their concerns or
14 opinions about that.
15 BY MR. SMITH:
16   Q. Is there anything in the general orders that
17 allows a supervisor to wait until something
18 actually happens or somebody is harmed before they
19 take action?
20   A. No.
21   Q. Do you recall during a meeting with Shannon
22 Spalding that she voiced concerns with you about
23 the rumors that were circulating regarding her and
24 Danny being IAD rats?

Page 77

1   A. In the team meeting?
2   Q. No, in any meeting.
3   A. Probably in the team meeting, I think she
4 expressed some concerns. What they were, I don't
5 recall what they were.
6   Q. How about any other time?
7   A. That would have been the only time I recall,
8 during a team meeting.
9   Q. What did Shannon say about that?
10   A. Just said -- I don't recall what she said.
11   Q. Did you do anything to document that?
12   A. No. Again, I don't recall what she said.
13   Q. Did you create a CR about the -- concerning
14 that?
15   A. No, I didn't.
16   Q. Did you approach any supervisors about that?
17   A. No, I didn't.
18   Q. Did you ever tell Shannon Spalding that even
19 your supervisor -- or even supervisors from
20 narcotics had told you that she and Danny put a
21 sergeant in prison?
22   A. No.
23   Q. Did anyone from narcotics ever tell you that
24 Shannon and Danny were responsible for putting a

20 (Pages 74 - 77)

Page 78

1 sergeant in prison?
2    A. No.
3    Q. Did you ever learn that Danny and Shannon
4 had anything to do with putting a sergeant in
5 prison?
6    A. No.
7    Q. You're saying never?
8    A. No, never.
9    Q. Did Spalding ever express to you concerns
10 that she might not -- the team members wouldn't
11 back her up?
12    A. As I answered previously, no.
13    Q. Did you call for a team meeting -- did you
14 call for the team meeting in which Danny expressed
15 his concern?
16    A. I have a team meeting probably quarterly. I
17 meet with my team on different occasions about, like
18 I said earlier, general stuff that's going on within
19 the office, keep them apprised of what's going on
20 with the unit. And once I have that meeting with
21 everybody and tell them what's going on, I open up
22 the floor for any other concerns or things of that
23 nature.
24    Q. So was there ever a meeting in relation to

Page 79

1 what Shannon had talked to you about -- did you
2 ever call a -- a separate meeting or a second
3 meeting to discuss the concerns of Shannon?
4    A. Not that I can recall.
5    Q. And did you ever -- in terms of did you ever
6 see in the media anything about -- that made you
7 aware that Shannon or Danny had any involvement
8 with putting a sergeant in prison?
9    A. Yeah, in the media.
10    Q. When did you learn that?
11    A. They were gone from my team at that point, so
12 I don't -- it could have been over a year ago, if
13 not longer.
14    Q. Were they still in fugitive apprehension?
15    A. Yes.
16    Q. And did you know who their supervisor was?
17    A. Through the media I found out who it was.
18    Q. Did you know who their supervisor was at the
19 time you found out about it in the media?
20    A. I believe they were on Sergeant Mill's team
21 at the time.
22    Q. Did you ever have a conversation with
23 Sergeant Mills about what you read in the media?
24    A. No, other than what we saw on TV.

Page 80

1    Q. And what did you talk about?
2    A. Just what we saw on TV.
3    Q. And do you recall what you said to Mills and
4 what Mills said to you about that?
5    A. No.
6    Q. Were you surprised by that?
7    A. That this thing had occurred?
8    Q. Yes.
9    A. Yeah, I was. I didn't know the guy, so -- I
10 mean, like, that, so...
11    Q. Did Mills indicate in any way that he was
12 aware that Shannon or Danny were involved in any
13 kind of investigation?
14    A. Not to me, no.
15    Q. Did you ever talk to anybody, other than
16 potentially your attorney, who indicated they were
17 aware that Shannon and Danny were involved in any
18 type of investigation of an officer?
19    A. No.
20       MR. KING: Do you want to take a break
21 or are you good?
22       THE WITNESS: I'm fine.
23       MR. SMITH: Okay.
24 /////

Page 81

1 BY MR. SMITH:
2    Q. Do you recall Danny indicating during that
3 meeting where he voiced concerns -- saying that now
4 is the time, if anyone has any questions about he
5 or Shannon, to ask them and they will answer it?
6       MR. KING: I'll just object to the form
7 of the question. The witness testified that he
8 didn't interpret it as Danny expressing any
9 concerns, but, rather, asking a question. But
10 subject to that, you can answer.
11       THE WITNESS: I don't recall him asking
12 that, but he could have. I don't recall him saying
13 it, though.
14 BY MR. SMITH:
15    Q. Do you recall Danny saying that all we want
16 is to come to work and be allowed to do our jobs in
17 peace?
18    A. Again, I don't recall him saying it, but it's
19 possible he said it.
20    Q. Do you recall at that point Officer
21 Gushiniere asking Danny why he was asking?
22    A. I don't recall that being said from Officer
23 Gushiniere.
24    Q. Do you recall Danny saying at that point in

21 (Pages 78 - 81)

Page 82

1  time that he was asking because -- do you recall
2  anyone at that point in time stating:  Because
3  Sergeant Barnes had told me that the team is
4  uncomfortable working with us?
5      A.  No, don't recall that.
6      Q.  And -- okay.  Did you ever have a
7  conversation with Officer Hernandez?
8      A.  Yes.
9      Q.  Do you recall having a conversation with
10  Officer Hernandez after the team meeting that Danny
11  spoke in a back room at Area South?
12      A.  The meeting I recall with Officer Hernandez
13  was after Shannon and I spoke about this zone --
14  this turning the radio on incident.
15      Q.  And where did that take place?
16      A.  In the roll call room at Area South.
17      Q.  And who else was present, if anyone?
18      A.  No one.  Just me and him.
19      Q.  And in terms of Officer Hernandez, your
20  office was essentially down the hall from his
21  office in Area South?
22      A.  I didn't have an office at Area South.
23      Q.  Do you recall indicating to Officer -- in
24  terms of -- he had an office in the same general

Page 83

1  area or his work area was in the same general area
2  as yours, correct, Officer Hernandez?
3      A.  Not in the same general area.  Narcotics had
4  offices down the hall, somewhere by the radio room.
5      Q.  And how far about?
6      A.  Over a hundred feet maybe, if not longer.
7      Q.  Do you recall why you had a meeting with
8  Officer Hernandez?
9      A.  He approached me.
10      Q.  Do you know why he approached you?
11      A.  Well, I found out eventually why he
12  approached me, but I didn't know -- initially when
13  he walked up to me, I didn't know what was going on.
14      Q.  And in terms of what -- do you know what
15  Officer Hernandez's assignment was at that time?
16      A.  As far as I know, he worked in narcotics.
17      Q.  And what was the meeting about?
18      A.  About Shannon.
19      Q.  Okay.  And what did Officer Hernandez tell
20  you about Shannon?
21      A.  Well, he didn't tell me.  He kind of -- how
22  would I say?  He approached me in an angry,
23  pissed-off manner about Shannon, and he said what's
24  this I'm hearing, you're trying to dump my

Page 84

1  girlfriend.
2      Q.  And what was your response to that?
3      A.  Well, my response was what the hell are you
4  talking about.
5      Q.  And what did he say --
6      A.  He went further and he started talking
7  about -- he said, you told my girlfriend that you
8  were going to dump her, for whatever reason he gave.
9          So at that point, I said call her, which he
10  did.  And we were still in the room talking about
11  this situation, and he says to Shannon, while -- he
12  had it on speaker phone, for whatever reason, and
13  while he was on speaker phone -- and I don't know if
14  Shannon knew he was on speaker phone, but at some
15  point Shannon got upset and started apologizing to
16  me about telling -- well, telling Officer Hernandez,
17  why do you have me on this phone, Serg, I'm sorry,
18  I'm sorry, hang up this damn phone, hang up this
19  phone, telling Officer Hernandez this.
20      Q.  Anything else?
21      A.  Well, I guess at that point, he hung up the
22  phone, and I told him never to approach me like that
23  again.  And then I let his supervisor know what
24  happened.

Page 85

1      Q.  Who was his supervisor?
2      A.  Sergeant Blanks.
3      Q.  Did you know Sergeant Blanks before this?
4      A.  Yes.
5      Q.  How did you know Sergeant Blanks?
6      A.  We worked together in the 11th District over
7  20 years ago and then we worked together in
8  narcotics.
9      Q.  And in terms of isn't it true that you
10  indicated in that meeting that information about a
11  CR against Padar?
12      A.  No.
13      Q.  Do you know a Sergeant Padar?
14      A.  No.
15      Q.  Did you in any way indicate when you're
16  meeting with Mr. Hernandez that either he or
17  Shannon -- did you accuse either he or Shannon of
18  filing a CR against Padar?
19      A.  The only conversation that myself and Officer
20  Hernandez had was regarding Shannon.  It wasn't
21  regarding anyone or anything else.
22      Q.  Did you have any indication that Shannon had
23  any knowledge that Hernandez was going to talk to
24  you?

22 (Pages 82 - 85)

Page 86

1    A. Based on her reaction, no, I don't think she
2  knew.
3    Q. And isn't it true that Officer Gushiniere
4  was present when Hernandez came to speak with you?
5    A. My whole team pretty much was present on the
6  floor in the area. We were all sitting there typing
7  reports when he approached me.
8    Q. Do you recall that Officer Gushiniere was at
9  a computer in the area where you were talking to
10 Officer Hernandez?
11   A. Well, there are computers at all the desks,
12 so he could have been.
13   Q. And in terms of did you believe that
14 anything -- any aspect of Officer Hernandez's
15 demeanor was in any way threatening?
16   A. When he initially approached me.
17   Q. How so?
18   A. Well, he yelled out my first name, and this
19 is from somebody I don't even know, or didn't know
20 at the time.
21   Q. And how loud was he when he yelled it out?
22   A. I mean, he just kind of walked up as he was
23 approaching me, Maurice, I need to talk to you. So
24 it was a normal tone, but it was just kind of like

Page 87

1  you can tell something was going on the way he said
2  my name.
3    Q. Did Officer Gushiniere ever tell you that he
4  thought Hernandez was being unprofessional in any
5  way?
6    A. Not to my recollection. We never had a
7  conversation.
8    Q. Did anyone say to you that he saw what -- he
9  or she saw what -- how Hernandez approached you and
10 heard the conversation and thought it was
11 unprofessional?
12   A. No.
13   Q. Did anyone ever tell you that -- that
14 Hernandez -- Officer Hernandez -- did anyone ever
15 ask you what was that all about?
16   A. His sergeant did.
17   Q. In terms of that was around at the time that
18 you had the conversation with him?
19   A. They may have, and I didn't -- I didn't
20 expound on it. I didn't tell them anything.
21   Q. Is it true that you shook hands with
22 Mr. Hernandez?
23   A. We probably did once everything was cleared.
24   Q. Is it true that you exchanged phone numbers?

Page 88

1    A. I'm not sure if we did. We could have, but
2  I'm not sure.
3    Q. Has Tony Hernandez ever called you?
4    A. No.
5    Q. Is it true that you told Shannon Spalding
6  that you and Tony Hernandez were fine or cool or
7  words to that effect?
8    A. I think the following day, Shannon and I met
9  in that same room, and she pretty much apologized
10 for his actions. And I just told her that wasn't
11 cool what he did, but I'm fine now. So that was
12 pretty much it.
13   Q. Did you -- did you tell him that -- tell
14 Shannon that he seemed like a nice guy?
15   A. It's possible.
16   Q. Is it true that approximately a week later,
17 that Shannon and Danny were called into a meeting
18 with yourself, Lieutenant Cesario and Commander
19 Spalding -- and Commander Salemme?
20   A. I don't recall a time frame, but I'm sure
21 shortly after that, it was.
22   Q. And is it true that after this incident in
23 the -- after the meeting or during the meeting,
24 Shannon and Danny were taken off your team and put

Page 89

1  onto a nightshift?
2    A. Yes.
3    Q. Is it true that -- that -- whose decision
4  was it to take them off your team and put them on a
5  night team?
6    A. The lieutenant.
7    Q. Did you ask the lieutenant to take them off
8  your team?
9    A. No, I didn't ask.
10   Q. Did you suggest that they should be taken
11 off your team?
12   A. No.
13   Q. Why did -- do you know why the lieutenant
14 took them off your team?
15   A. I think he did it -- I think that he did it
16 based on the incident that I had with Shannon's
17 boyfriend, because I definitely reported it to him
18 the next day and told him what happened, and I think
19 he did it based on that.
20   Q. Did he ever tell you that he did it based on
21 that?
22   A. I think at some point he did.
23   Q. At what point?
24   A. It could have been prior to the meeting or

23 (Pages 86 - 89)

Page 90

1 during the meeting. I'm not sure exactly when he
2 expressed that to me, but he did express that to me,
3 that he didn't think it was a good thing that --
4 that that confrontation happened and it so happened
5 to be her boyfriend, so...
6 Q. Did you agree with him in any way or tell
7 him you agreed with him in any way?
8 A. Well, I told him it doesn't feel good to have
9 other people, outside people, approaching me because
10 of other issues or things that's going on on the
11 team, so it probably would be best if we just parted
12 ways.
13 Q. Isn't it true that you described your
14 interaction with Hernandez as hostile to the
15 lieutenant?
16 A. Yeah, I told him it was hostile in the
17 beginning, but in the end, everything pretty much
18 washed itself out.
19 Q. And is it true you told the lieutenant and
20 commander that if Shannon stayed on the team, you
21 would be in fear of a future altercation?
22 A. No.
23 Q. And isn't it true that you went on to say
24 that Officer Gushiniere was a witness to the

Page 91

1 hostile altercation with Hernandez?
2 A. No, sir.
3 Q. Did you ever tell anybody that anyone else
4 was around during this incident with Mr. Hernandez?
5 A. Well, I told him that everybody saw him
6 approach me. They don't know what happened in the
7 room, though.
8 Q. Did you specifically mention that Gushiniere
9 was present?
10 A. No, sir.
11 Q. Have you ever talked -- was Hernandez
12 assigned to fugitives at that time?
13 A. No. As I stated earlier, he was assigned to
14 narcotics as far as I knew.
15 Q. Did you or the lieutenant or any of your
16 supervisors initiate a CR against Hernandez for his
17 actions?
18 A. No.
19 Q. If you felt like you were threatened by
20 Hernandez in any way, would you ask to initiate a
21 CR or done a CR against Hernandez?
22 A. If I felt that I was threatened. I don't
23 feel like I was threatened, though.
24 Q. Did you feel in any way that it would be

Page 92

1 unfair to take an officer off his assignment and
2 send them to nights based on another officer's
3 actions?
4 MR. KING: Object to the form and lack
5 of foundation.
6 THE WITNESS: That's not my call to
7 make.
8 BY MR. SMITH:
9 Q. Was there any discussion of that?
10 A. No, not that I can recall.
11 Q. So was there any discussion of the need to
12 do a CR against Officer Hernandez ever had between
13 yourself, Lieutenant Cesario or Commander Salemme?
14 A. Myself and Lieutenant Cesario did talk about
15 it briefly.
16 Q. What was that conversation?
17 A. Well, he pretty much put the ball in my
18 court. He said, Maurice, you could generate a
19 number if you want, but if you feel like you handled
20 it the way you wanted to handle it, then just let it
21 go, and I did. I felt that it was handled the way I
22 wanted to handle it. We talked about everything
23 doesn't need to be generated with paperwork and
24 things of that nature. That's just my opinion.

Page 93

1 Q. And in terms of Shannon Spalding, was there
2 any discussion as to whether she would want to be
3 put on nights?
4 A. I don't recall that conversation, no.
5 Q. Did she ever tell you that she was fine with
6 being put on nights, or anyone in that meeting?
7 A. Not that I can remember, no.
8 Q. Did you think that she would be happy to be
9 taken off days and put on nights?
10 A. I have no idea.
11 Q. Was there any discussion, in terms of with
12 Cesario or Salemme, relating to the fact that
13 Shannon Spalding did anything wrong in relation to
14 the incident with Mr. Hernandez?
15 A. I don't recall anybody having a conversation
16 to that effect.
17 Q. Was there any conversation as to what to do
18 with Danny with respect to being taken off your
19 team -- in addition to Shannon, why Danny would
20 need to be taken off as well?
21 A. I have no recollection to that.
22 Q. Was there any discussion to the effect of
23 because of Shannon having a boyfriend, that
24 Danny -- who had a conversation with you, that

24 (Pages 90 - 93)

Page 94

1 Danny shouldn't suffer and be moved from the days
2 to nights?
3    A. I have no idea.
4    Q. I mean, is that customary to take action
5 against one officer because of the actions of
6 another officer?
7    A. Not to my knowledge, no.
8    Q. I mean, did anyone present any reason as to
9 why Danny needed to be taken off the team?
10    A. Not that I know of, no.
11    Q. Was there ever any option given to Danny for
12 him to stay on the team?
13    A. Not to my recollection.
14    Q. Isn't it true that Officer Salemme said to
15 Shannon and Danny that they brought this baggage
16 with -- with them to fugitive apprehension and that
17 you should have known that if you go against bosses
18 and work with IAD, this would happen?
19    A. No, he didn't say that.
20    Q. What reason was given for lumping Danny
21 together with Shannon with respect to this
22 incident?
23    A. I have no idea.
24    Q. What reason was there for taking any action

Page 95

1 against Danny for something that Tony Hernandez did
2 to you?
3    A. I have no idea.
4    Q. Isn't it true that there was discussion
5 about the fact that Danny and Shannon would have to
6 stay together because they were being assigned
7 there because of what work they had done in the
8 past and that they would stay as a team and they'd
9 be moved as a team?
10    A. No.
11    Q. Have you ever seen any incidents in which
12 one officer was taken off a team for the actions of
13 another officer that they had nothing to do with?
14    A. Not in the places I've been, sir, no.
15    Q. Except for this one?
16    A. It's the first time.
17    Q. Did you ever ask Shannon Spalding or Danny
18 Echeverria, ever ask them if they worked for IAD?
19    A. Never.
20    Q. Did Salemme or Cesario ever ask Shannon or
21 Danny if they worked for IAD in your presence?
22    A. Not in my presence, not to my knowledge, no.
23    Q. Were they asked by Commander Salemme if they
24 had investigated bosses and put them in prison?

Page 96

1    A. No. Not to my knowledge, no.
2    Q. What -- to move somebody from days to nights
3 without their request, what would be the normal
4 procedure to do that?
5    A. I've never been in that position to do that,
6 so I wouldn't know.
7    Q. Was there any discussion about Hernandez
8 being moved?
9    A. He's not in our unit, so I couldn't tell you
10 what discussions were given on his behalf.
11    Q. When you talked to Blanks, what did you tell
12 Blanks about -- did you talk to Blanks at all about
13 moving Hernandez?
14    A. No. I just told him about the incident.
15    Q. Did you talk to Blanks at all about having
16 any disciplinary action against Hernandez?
17    A. The only thing Blanks told me was he would
18 handle it. Whatever -- when I told him about the
19 incident, he said I'll take care of it.
20    Q. And did you ever learn how Blanks handled
21 it?
22    A. No.
23    Q. Did you ever learn what Blanks meant by
24 that?

Page 97

1    A. No.
2    Q. Did you believe Blanks was going to generate
3 a CR?
4    A. I don't know what he was going to do. He
5 just told me he was going to handle it. I let
6 sergeants do their thing. If that's his team
7 member, he handled it the way he wanted to handle
8 it.
9    Q. If a sergeant -- if you, as a sergeant,
10 receive a complaint or knowledge of a complaint
11 against a fellow officer -- against one of your
12 team members --
13    A. Uh-huh.
14    Q. -- for acting inappropriately or in a manner
15 unprofessional towards a supervisor, would you
16 generate a CR?
17    A. Not necessarily.
18    Q. If -- if you had received a complaint that
19 one of your team members had threatened a
20 supervisor, would you generate a CR?
21    A. Yeah.
22    Q. Was there any discussion that this might be
23 an excuse for getting rid of Shannon Spalding?
24    A. No.

25 (Pages 94 - 97)

Page 98

1  Q. Was there any reason given as to why
2  Spalding would be moved for Hernandez's actions?
3  A. There was no reason given to me.
4  Q. Was there any discussion had in any way
5  during that meeting?
6  A. No.
7  (Off record discussion.)
8  BY MR. SMITH:
9  Q. Okay. In terms of generally speaking, we
10 talked a little bit already about how Spalding
11 and -- or Shannon and Danny would be assigned their
12 cases.
13     Do you recall what type of cases they
14 typically received?
15 A. They were misdemeanor cases, like criminal
16 trespass cases, people wanted for failure to
17 register for sex offenses, things like that.
18 Q. And in terms of a misdemeanor criminal
19 trespass --
20 A. Uh-huh.
21 Q. -- would this be a situation where there was
22 a warrant for, like, failure to show up for court
23 and they were assigned that, or how --
24 A. It could have been a warrant, it could have

Page 99

1  been a person named in a case report, it could have
2  been an investigative alert the division put out.
3  There's a number of ways that they can -- there's a
4  number of ways these people are wanted, so...
5  Q. And in terms of what part did you have in
6  how their assignments were given to them, if any?
7  A. The only time I would play a part is if,
8  depending like I told you earlier, if someone just
9  had a -- they were just overloaded with cases. And
10 I would say, okay, they have like, say, ten cases
11 that they're working on, give this case to
12 so-and-so, so if they were just overloaded with
13 stuff.
14     I try to keep it fair across the board as far
15 as what -- you know, how many cases they had working
16 at one particular time.
17 Q. Was there any point in time where anyone
18 came to you and said that they were overloaded, in
19 your team?
20 A. There were a few times guys were like, Serg,
21 I got this going on, I got this going on, you know,
22 give me -- can I -- you know, can you get somebody
23 else for this case or whatever. So I would see --
24 you know, I would check with the officers first, or

Page 100

1  call them on occasion.
2  Q. Was there any time that that had happened
3  and you decided to assign those cases to either
4  Danny or Shannon?
5  A. It's possible. I don't remember.
6  Q. In terms of is there any time where you
7  actually remember doing that?
8  A. Again, it's possible. I don't remember.
9  Q. Is it possible that you didn't do that?
10 A. It's possible.
11 Q. And in terms of was there any point in time
12 where you addressed Danny or Shannon about their
13 caseload?
14 A. It's possible. I'd probably -- I try to
15 address everybody about their caseload, so it's
16 possible that I did.
17 Q. Do you have any recollection of talking to
18 Danny or Shannon about their caseload being too
19 high or too low?
20 A. No.
21 Q. Do you have any -- is there any type of
22 indication, when somebody's handling misdemeanors
23 as opposed to serious felonies, such as homicides
24 or, you know, residential burglaries or things of

Page 101

1  that nature, that the caseload is made higher for
2  people handling the misdemeanor, or would it be the
3  same?
4  A. It could be the same, it could be higher, it
5  could be lower. Each area is different, so it all
6  depends on where we're working and what we're
7  working on.
8  Q. Within fugitive apprehension, is there any
9  type of attempt to put an importance on certain
10 warrants and certain crimes over others?
11 A. Yeah. I could say that, yes.
12 Q. I mean, isn't it fair to say that more
13 emphasis is put on felonies and serious crimes in
14 terms of fugitive apprehension?
15 A. Depending on the area, yes.
16 Q. And in terms of with respect to the area
17 that Danny and Shannon were assigned to, would you
18 agree that area would be one where there was more
19 emphasis put on felonies and serious crimes?
20 A. Sure.
21 Q. In fact, it's not -- it certainly would be a
22 much higher priority to pick up somebody who had a
23 warrant for a murder rather than somebody who is
24 wanted on a criminal trespass, correct?

26 (Pages 98 - 101)

Page 102

1    A. Sure.
2    Q. What did you do in an attempt to determine
3  whether -- and in terms with respect to a homicide
4  or -- or a residential burglary, things of that
5  effect, you would expect there to be more
6  information developed in relation to the suspects
7  in those cases than potentially somebody in a
8  misdemeanor situation?
9    A. When you say "information developed," meaning
10  by who?
11    Q. By the police officers or detectives who
12  were involved in initially investigating the case.
13    A. I would say no, because sometimes we were
14  given information -- very scarce information, and
15  the officers who were assigned to those cases then
16  had to go out and do their own, you know, legwork
17  and really try to shore up the case, so to speak.
18    Q. In your experience, would you agree, though,
19  that, in connection with the average homicide, you
20  would generally have more paperwork and more
21  investigation than something like the average
22  criminal trespass to land?
23    A. Yes.
24    Q. In terms of did you do anything in

Page 103

1  connection with Danny or Shannon to make any
2  investigation to see if they were given -- being
3  given a high enough caseload?
4    A. No.
5    Q. Who would have been responsible for that?
6    A. The CMO office.
7    Q. And who would that have been?
8    A. Officer Hanna, Officer Dugan, the other
9  officer that was in the office. Again, they have a
10  spreadsheet that they work off of, and they look at
11  the different cases, who is assigned and what their
12  caseload is.
13    Q. Okay. In terms of -- I think I already
14  asked you, but did you ever become aware that
15  Shannon was assigned to homicide?
16    A. Again, it's possible, but I don't recall her
17  being assigned a homicide.
18    Q. Isn't it true that Lieutenant Cesario
19  specifically instructed you to reassign her and
20  take her off a homicide?
21    A. No, no one specifically told me to do
22  anything like that.
23    Q. Isn't it true that you made a phone call,
24  which there would be a record of, to Shannon

Page 104

1  Spalding relating to -- right during the time that
2  she was taken off a homicide?
3    A. Again, I'm not a hundred percent sure. It's
4  possible, but I'm not -- I'm not sure if it was or
5  wasn't.
6    Q. Would taking one of your officers off a
7  homicide be something that you would generally
8  recall?
9    A. It depends on how long ago it was and if
10  somebody else was working the case already.
11    Q. Do you have any idea why Shannon would or
12  wouldn't be taken off a homicide that was assigned
13  to her?
14    A. Again, if someone else was working the case.
15  Other than that, I don't know. Again, I'd have to
16  see whatever information that's out there to recall
17  that.
18    Q. Are you aware that Jan Hanna gave a sworn
19  affidavit stating that you and Lieutenant Cesario
20  became aware of Shannon being assigned to a
21  homicide and became irate and took her -- took the
22  assignment away from her?
23    A. Other than you telling me now, no, I'm not
24  aware.

Page 105

1    Q. Were you aware that the lieutenant
2  instructed yourself and other officer personnel to
3  only assign Spalding and Echeverria dead-end
4  assignments?
5    A. No.
6    Q. Are you cc'd on the emails from fugitive
7  apprehensions unit office personnel regarding the
8  assignments of Danny and Shannon --
9    A. You.
10    Q. -- when you were their team sergeant?
11    A. Yes. Yes.
12    Q. So were you aware that many, if not most, of
13  Shannon Spalding's assignment were either
14  individuals who were already in jail, deceased
15  or -- or where a warrant was not serviceable?
16    A. I'm sure she had cases, along with other
17  members in the unit, like that.
18    Q. Do you know if she had more cases like that
19  than the average member of the unit?
20    A. No, I'm not.
21    Q. Was anything done to check and see if that
22  was true or not?
23    A. Not that I know of.
24    Q. Would it concern you if one of your officers

27 (Pages 102 - 105)

1 was getting mostly assignments where somebody was
2 either in jail or dead?
3    A. No, because like I said before, everybody --
4 she's not the only one who had cases like that, so
5 it wouldn't be my concern.
6    Q. Well, you wouldn't expect the other officers
7 on your team to get assignments that were mostly
8 cases in which the warrants were concerning
9 individuals who were in jail, dead or where the
10 warrant was not serviceable?
11    A. Again, everybody got cases like that, so
12 that's -- that's how we do business over there.
13 Everybody got cases like that. She wasn't the only
14 one getting cases like that.
15    Q. But did -- did everybody mainly get cases
16 like that who were on your team?
17    A. Again, everybody got cases like that.
18 Everybody.
19    Q. Well, you would -- you would agree there
20 would be a difference between ten percent of the
21 cases being assigned to one of your team members
22 like that versus 95 percent of the cases like that
23 being assigned to one of your team members?
24    MR. KING: Just object to the form and

1 lack of foundation.
2    THE WITNESS: I don't assign the cases,
3 so, again, everybody got cases like that.
4 Everybody in the whole unit got cases like that.
5 BY MR. SMITH:
6    Q. Is it true that everybody in the whole unit
7 got -- the majority of their cases that were
8 assigned to them were situations where individuals
9 were in jail, dead or where the warrant was not
10 serviceable?
11    A. Everybody got cases that the people were
12 dead, in jail, the warrant wasn't serviceable. They
13 also got cases that they had to go out and find
14 these people. So everybody got cases across the
15 board and equally.
16    Q. So you think that Shannon got an equal
17 number of assignments that -- percentage of
18 assignments that the individuals were not in jail,
19 not dead and where the warrants were serviceable,
20 to the other members of your team?
21    A. I believe she got -- again, everybody got the
22 same type of cases, as far as people who were in
23 jail already, people whose warrants weren't
24 serviceable, people that they probably were found

1 deceased. Everybody had cases like that in the
2 whole unit, my team included.
3    Q. What did you do to check to see whether
4 Shannon was getting an ordinary amount of cases
5 that were already in jail, dead or where the
6 warrants were not serviceable?
7    A. I didn't do anything.
8    Q. Well, how would you know if she was getting
9 more, less or the same amount?
10    A. CMO assign the cases. I don't assign the
11 cases. No one knows where these people are until
12 they start doing their research. So even if I had a
13 name in front of me, until I started doing my
14 research, nobody knows this person is dead, in jail
15 or the warrant isn't serviceable.
16    Q. So it is fair to say you don't know
17 personally if Shannon Spalding was getting more
18 cases that were leading to individuals who were,
19 for instance, in jail than the average member of
20 your team?
21    A. Sure.
22    Q. And it's fair to say that you don't know
23 whether or not Shannon Spalding was getting
24 cases -- a higher percentage of cases where

1 individuals were dead than other members of your
2 team?
3    A. Sure.
4    Q. And did you do anything to try and suggest
5 to the people who assign cases to try and make it
6 more balanced in that regard?
7    MR. KING: Object to the form and lack
8 of foundation and asked and answered, but...
9    THE WITNESS: No.
10 BY MR. SMITH:
11    Q. Did anyone ever complain -- did Shannon
12 Spalding ever express to you that she was concerned
13 that because of the number of dead cases she was
14 getting, that they would reflect poorly on her
15 activity?
16    A. No.
17    Q. Did anyone ever ask you questions about
18 Shannon Spalding's activity and her number of
19 arrests or her -- strike the question.
20    Did any one of your supervisors ever ask you
21 about the type of activity that -- the type of
22 cases that Shannon Spalding was getting or the type
23 of results that Shannon Spalding was getting?
24    A. No.

28 (Pages 106 - 109)

1   Q. Did anyone ever express to you any type of
2   problem with the results that Shannon Spalding was
3   producing?
4   A. No.
5   Q. Did you feel that Shannon Spalding worked
6   her cases and closed them out appropriately?
7   A. Yes.
8   Q. With respect to Danny, did anyone ever
9   express to you that he was not closing out enough
10  cases?
11  A. No.
12  Q. Did anyone ever express to you a concern
13  with Danny's work level?
14  A. No.
15  Q. Did you feel that Danny worked his cases and
16  closed them out appropriately while he was under
17  your supervision?
18  A. Yes.
19  Q. Do you recall Commander O'Grady ever coming
20  to narcotics -- coming from narcotics upstairs to
21  the fugitive apprehension unit within a few days
22  prior to Spalding and Echeverria arriving at the
23  unit?
24  A. No.

1   Q. Do you recall O'Grady having a meeting about
2   Spalding or Echeverria's reassignment with the
3   supervisors in fugitive apprehension?
4   A. As answered previously, no.
5   Q. Did you -- during the time that Danny and
6   Shannon worked under you at fugitive apprehensions,
7   there were no complaints about Shannon or Danny
8   while they were assigned to work with you, your
9   team?
10  A. Not to my knowledge, no.
11  Q. Did you believe they were good officers?
12  A. Yeah.
13  Q. Did you hear of any complaints about Shannon
14  or Danny at any time while they were in fugitive
15  apprehension?
16  A. As I answered previously, no.
17  Q. Did you hear anyone from fugitive
18  apprehensions ever say that they were not good
19  officers?
20  A. No.
21  Q. Did Commander Salemme ever say that they
22  were not -- I mean, I'm sorry. Did Salemme ever
23  say they were not good officers?
24  A. No.

1   Q. Did Cesario ever say they were not good
2   officers?
3   A. No.
4   Q. Did O'Grady ever say they were not good
5   officers?
6   A. No.
7   Q. Did Sergeant Mills ever say they were not
8   good officers?
9   A. No.
10  Q. Did any fellow teammates of -- in the
11  fugitive apprehension unit ever say they were not
12  good officers?
13  A. No.
14      MR. SMITH: If we could take a
15  two-minute break, I'm just going to get a bottle of
16  water. Does anyone else want one?
17      (Recess taken from 12:23 to 12:31.)
18  BY MR. SMITH:
19  Q. After the meeting with Cesario and Salemme
20  with Danny and Shannon in which they were moved to
21  nights, is it true that you had a conversation with
22  Danny and Shannon in which you told them that you
23  would see what you could do about getting them back
24  on days or on the team?

1   A. I don't recall.
2   Q. Isn't it true that Shannon was upset at the
3   time and said that you'd already done enough damage
4   and she didn't want to call you about that?
5   A. I don't recall.
6   Q. Now, we talked a little bit about reporting
7   to the unit before, you know -- before --
8   physically reporting to the unit, at the location
9   of the unit, before the day would start or the
10  shift would start. And you've indicated, I
11  believe, that at times people could communicate to
12  you from their locations rather than come in first,
13  if there was a need to go to a different
14  location --
15  A. Right.
16  Q. -- to actively work on the warrant.
17  A. Right.
18  Q. Did you ever require Spalding and Echeverria
19  to report to the unit at the beginning of the tour,
20  but not other members of the team?
21  A. When you say "the unit," are you talking --
22  Q. Your team.
23  A. No, I'm saying, the unit, which place are you
24  referring to?

29 (Pages 110 - 113)

Page 114

1  Q. The physical location of fugitive
2  apprehensions, would have been 111th Street.
3  A. No. Well, fugitive apprehension at the time
4  was in Homan Square.
5  Q. I'm sorry. Area South, at 111th, did you
6  ever have them physically report to that area when
7  other members of the team didn't need to for the
8  beginning of their tours?
9  A. There were probably a few occasions where
10 that happened, but it was depending on what we were
11 probably working on or doing, but it wasn't an
12 everyday thing, no.
13 Q. Do you remember any particular occasion
14 where that was done?
15 A. No.
16 Q. Do you know why that would have been done
17 for only Danny and Shannon?
18 A. Well, it could have been for a vehicle
19 purposes. They may have had to pick up a car at
20 that unit, at that place, where we stored all the
21 cars and stuff. It could have been something like
22 that, or it could have been, you know, any other
23 operation we were probably working on or depending
24 on what -- you know, it wasn't a set thing just for

Page 115

1  them. Other people also came there.
2  Q. But was there ever a time that they were
3  required to report to the physical area at 111th
4  Street, Area South, when other members of the team
5  did not as a general rule?
6  A. Not as a general rule, no.
7  Q. What about at the end of the tour, was there
8  ever a time period where they had to report to
9  111th Street, at Area South, as a general rule when
10 other members of the team didn't?
11 A. Not as a general rule, no.
12 Q. And then what about with -- were there times
13 where they did, but other members of the team did
14 not have to report at the end of their tour to Area
15 South?
16 A. Again, everything was fluid, so everything
17 wasn't the same for all -- for every time. So we
18 did things differently. Every team operated
19 differently. So it depended again, like I said, on
20 vehicles, where we ended our day at, things of that
21 nature, that's how we ended our day.
22 Q. Do you know why Officer Spalding was not
23 given a take-home vehicle?
24 MR. KING: Objection, asked and

Page 116

1  answered, but you can answer again.
2  THE WITNESS: All non-TFOs were not
3  given vehicles, not just Officer Spalding, all
4  non-TFOs in the whole unit.
5  (Off record discussion.)
6  BY MR. SMITH:
7  Q. Do you know if Danny or Shannon had access
8  to the police databases while they were a member of
9  your team?
10 A. The CPD databases, sure. Definitely.
11 Everybody had access to those.
12 Q. What about Accurint Leads 2000?
13 A. Everybody had -- was given those by me. The
14 team had an account, so everybody had that
15 information, which I'd share with everybody.
16 Q. Do you know if you shared that information
17 with Shannon Spalding?
18 A. I believe I did.
19 Q. When did you do that?
20 A. Probably weeks or maybe a month or so after
21 she got there.
22 Q. How did you do that?
23 A. I physically gave it -- the information to
24 my -- the password and the log-in information.

Page 117

1  Q. And was anybody else present when you did
2  that?
3  A. I don't remember if there were or not.
4  Q. Would you have done it by email?
5  A. I could have done it by email, but I know I
6  physically give you that stuff. I've -- I've always
7  done that.
8  Q. What about Danny?
9  A. Same thing.
10 Q. Would it surprise you if Shannon or Danny
11 made complaints that they weren't given the
12 account -- the information to be -- access Accurint
13 Leads 2000?
14 A. It would surprise me, but they were never --
15 they never addressed me on that.
16 Q. Would that be a beneficial tool for somebody
17 in fugitive apprehensions?
18 A. It would help. It would help outside the
19 regular databases, sure.
20 Q. And it's certainly true that the rest of the
21 team had access to Accurint Leads 2000?
22 A. Yes.
23 Q. You would agree that even if you're not
24 deputized, an officer in fugitive apprehension

30 (Pages 114 - 117)

1 would be allowed to utilize the U.S. Marshal
2 databases?
3   A. If they're not deputized, they can't use
4 them.
5   Q. Is Accurint Leads 2000 a marshal database?
6   A. No.
7   Q. Did you know that Danny and Shannon believe
8 that they were in the unit for nearly a year before
9 they received access to the Leads 2000?
10   A. Again, it was never brought to my attention,
11 so I wouldn't know that.
12   Q. Did you ever go to Lieutenant Cesario or
13 Commander Salemme and specifically request that
14 either Spalding or Echeverria be removed off your
15 team?
16   A. No.
17   Q. Did you tell Spalding and Echeverria, in the
18 meeting with the commander and lieutenant, that
19 their numbers of arrests were low and that was part
20 of the reason they were being moved?
21   A. No.
22   Q. Did Lieutenant Cesario bring up arrest
23 numbers to justify moving Danny or Shannon from the
24 team?

1   A. He may have brought numbers up, but I don't
2 know what the purpose of them was for, though.
3   Q. Do you recall Danny and Shannon challenging
4 the numbers based on the fact that they were only
5 allowed to work the cases that they were assigned
6 and not any other cases?
7   A. I don't recall if that was or not.
8   Q. Do you recall Commander Salemme stating that
9 it was because -- they were moved because they
10 worked with IAD?
11   A. As answered previously, no.
12   Q. Did you talk about -- during the meeting
13 where it was said that Danny and Shannon were being
14 moved, did you specifically talk about the details
15 of your conversation with Officer Hernandez?
16   A. I didn't go into details. I just kind of
17 gave a thumbnail sketch of what happened.
18   Q. Do you recall what the thumbnail sketch was
19 that you gave?
20   A. Basically he confronted me about Shannon and
21 some conversation that he thought Shannon and I had,
22 and I told him that wasn't the case, and we pretty
23 much ended it right there.
24   Q. Did you say anything else about that

1 conversation?
2   A. Not that I can remember, no.
3   Q. Did you say anything about what you had
4 heard the conversation was that he and -- that
5 Shannon was talking about to Hernandez?
6     In other words, you said that there was a
7 conversation about a conversation you and Shannon
8 had. Did you say anything about the details of
9 what Hernandez was claiming that conversation was
10 about?
11   A. Again, I probably touched on it, but I didn't
12 go into detail.
13   Q. Well, what would you have touched on?
14   A. Just that she was surprised that he had her
15 on speaker phone or something to that effect, that
16 she was apologetic about it. That's pretty much it.
17   Q. Was there any discussion of what the
18 situation between you and Shannon was that
19 Hernandez was approaching you about?
20   A. Probably I told him that he thought I was
21 trying to dump her from, you know, the unit or the
22 team or something like that, something to that. I
23 don't recall verbatim what I said to him.
24   Q. Did you equate it with the fact that you

1 were playing -- or talking about a district -- a
2 different district?
3   A. Could you repeat that question?
4   Q. In terms of when you said that it was --
5 something about that you were trying to dump --
6 that he said you were trying to dump Shannon --
7   A. Uh-huh.
8   Q. -- did you -- did you bring up anything
9 about the discussion in which you had told her
10 about other assignments or the district assignment
11 as opposed to being a fugitive in the fugitive
12 apprehension unit?
13   A. Not in -- not in that conversation. When I
14 told the lieutenant what happened, just one-on-one
15 when I told the lieutenant what happened that next
16 day, I told him all the details, but in that
17 meeting, no, I didn't -- I didn't bring that back
18 up, no.
19   Q. You told -- when you say you told the
20 lieutenant, which --
21   A. My lieutenant, Lieutenant Cesario. The next
22 day after the incident happened with Hernandez, I
23 told him everything that happened.
24   Q. Did you tell Lieutenant -- your lieutenant

31 (Pages 118 - 121)

Page 122

1  about what had happened relating to the incident in
2  which you were talking about the 3rd District --
3      A.  Again --
4      Q.  -- and that she was lucky to be in fugitive
5  apprehensions?
6      A.  Again, I don't know what district that I was
7  referring to, again, just turned the radio on
8  randomly, but I told him everything the following
9  day, after Hernandez approached me about that.
10     Q.  Including --
11     A.  Everything.
12     Q.  -- details --
13     A.  Everything.
14     Q.  -- relating to your conversation with
15 Shannon Spalding?
16     A.  Yes.
17     Q.  Do you recall what you said to Lieutenant
18 Cesario about what your conversation was with
19 Shannon Spalding?
20         MR. KING:  I'm just going to object,
21 asked and answered.  He detailed that entire
22 conversation previously, but you can answer him
23 again.
24         THE WITNESS:  I told him how Hernandez

Page 123

1  approached me, how he said he was upset that I was
2  trying to dump Shannon from the district -- or from
3  the unit, rather, and I told him that wasn't the
4  case.
5          He then, in turn, called her on the
6  phone, put her on speaker phone unbeknownst to her,
7  and she was adamant, like get me off the phone,
8  hang up the damn phone, whatever she was screaming
9  and yelling at him.  He hung up the phone.  We
10 continued our conversation for a short minute or
11 two, and then we were done with it.
12 BY MR. SMITH:
13     Q.  Did you tell him about -- Lieutenant Cesario
14 about your conversation with Shannon Spalding?
15     A.  Yeah.  I told him she was apologetic to me
16 after that happened.
17     Q.  Not about after that happened.  I'm talking
18 about the conversation in which you turned on the
19 radio --
20     A.  I told him all that, everything that led up
21 to that.  I told him everything.
22     Q.  What did you tell him about that
23 conversation you had with Shannon Spalding?
24     A.  I told him about she was unhappy, where she

Page 124

1  appeared to be unhappy about the cases that she was
2  getting, and I turned the radio on and asked her
3  would she rather be doing what she was doing or
4  would she rather be doing this that they're doing in
5  the district.  I told him everything.
6      Q.  Anything else besides that?
7      A.  No.
8      Q.  Anything further about what happened during
9  the conversation with Shannon Spalding?
10     A.  No.
11     Q.  Who all was at the meeting -- was anyone
12 there besides yourself, Danny, Shannon, Cesario and
13 Salemme, at the meeting in which she was -- it was
14 decided that she was going to be moved to nights?
15     A.  No.
16     Q.  Am I correct that those people were --
17     A.  Yeah.
18     Q.  -- there?
19     A.  Everybody was there that you just mentioned.
20     Q.  Did Salemme indicate in that meeting that
21 Shannon and Danny were going to nights on the north
22 side and at least they would still be in the unit
23 for now until I can have you moved?
24     A.  I don't recall Commander Salemme saying much

Page 125

1  of anything.  He was pretty much quiet the whole
2  time.
3      Q.  Did anyone say -- did anyone say that they
4  were going to nights on the north side and were
5  still going to be in the unit at least for now?
6      A.  I don't recall what was being said -- or what
7  was said, actually, about that.
8      Q.  Well, did anyone say that they were going to
9  nights?
10     A.  I think Lieutenant Cesario said that.
11     Q.  And did Lieutenant Cesario say that you will
12 never work days again as long as I'm on this job?
13     A.  No.
14     Q.  And did Lieutenant Cesario say you will
15 never be deputized?
16     A.  No.
17     Q.  Did Lieutenant Cesario say you'll never have
18 a take-home car?
19     A.  No.
20     Q.  Did Shannon Spalding request to be moved to
21 days -- be moved anywhere in the city as long as it
22 was in days?
23     A.  I don't recall if she said that or not.
24     Q.  Do you remember her saying anything about

32 (Pages 122 - 125)

1  what her preference was?
2  A. No.
3  Q. Did she say anything about whether she
4  wanted days or nights?
5  A. I don't remember anything being said about
6  that.
7  Q. What about Danny?
8  A. Don't remember.
9  Q. Did you ever have a conversation with
10 Detective Gushiniere about Shannon Spalding or
11 Danny Echeverria prior to them arriving on the
12 team?
13 A. No.
14 Q. Did you ever speak with Walker about Danny
15 and Shannon before they arrived on your team?
16 A. Not that I can recall. I'm sure I told
17 everybody we're getting two people, new people, on
18 our team in general, but that's about it.
19 Q. Did you ever work the violence reduction
20 program paid for by the U.S. Marshals?
21 A. Paid for by who?
22 Q. Well, let's start with: Did you ever work
23 the violence reduction program?
24 A. Yes.

1  Q. Do you know who pays for your time when
2  you're on -- in the violence reduction program?
3  A. The city.
4  Q. Are the marshals involved in that in any
5  way?
6  A. No.
7  Q. Do you know if the marshals have a violence
8  reduction program?
9  A. Not that I know of.
10 Q. Do you know if there's a program where you
11 can work for time-and-a-half pay to look for
12 fugitives?
13 A. That's within the city. That's what the city
14 does. That's CPD, not marshals.
15 Q. And have you worked that program?
16 A. Yes.
17 Q. And are you entitled to time-and-a-half when
18 you work that?
19 A. Yes. Everybody is.
20 Q. Would Shannon and Danny have been eligible
21 for that?
22 A. Yes.
23 Q. In terms of what would be your tour of duty
24 hours in the VRI?

1  A. 6 to 2:30, I believe. Yeah, 6 to 2:30 on
2  Saturdays and Sundays; on your days off, so to
3  speak.
4  Q. When you work in the VRI, were you always
5  present for the very start of the VRI tour?
6  A. No.
7  Q. Were you ever on the VRI and also at the
8  same time on duty with your regular job as a
9  Chicago Police Department officer?
10 A. As I said before, it's on your days off, so,
11 no, I can't be working. That's like double dipping.
12 You can't do that.
13 Q. Do you know if you were ever -- why would
14 you not be present for the start of VRI?
15 A. Well, the assignments were given out
16 previous, the night before, the day before. So
17 everybody had their assignments. They knew their
18 cases. They knew what they had to work up, so that
19 wouldn't require my presence to do that.
20 Q. Were there times where any member of the
21 team you were supervising during VRI would ever
22 leave early or come in late?
23 A. Not to my knowledge.
24 Q. Would you always work a full tour of duty

1  while assigned to fugitive apprehension unit, full
2  eight-hour tour of duty?
3  A. Yes.
4  Q. As a sergeant, were you required to come in
5  and make sure your officers were -- as a sergeant,
6  were you required to come in and make sure that
7  your officers were at the VRI?
8  A. Yes, that was one of the requirements.
9  Q. And were you required to do the ANAs for
10 them?
11 A. Yes.
12 Q. Were there ever ANAs showing that somebody
13 was working at the VRI and also working on duty
14 with the fugitive apprehension unit that you're
15 aware of?
16 A. Again, it's during your days off, so you
17 can't do both.
18 Q. At the start, were there ever any times
19 where they were shown as working at fugitive
20 apprehension at the start of the tour of the VRI?
21 Or is it the other way around?
22 (Off record discussion.)
23 BY MR. SMITH:
24 Q. Did you ever have a conversation with an

33 (Pages 126 - 129)

Page 130

1  Officer Chris Dingle, working with the VRI, and
2  informed him he needed to drop paper or to complete
3  a to/from form in regards to Officer Spalding?
4      A. No.
5      Q. Were you aware of any situation in which
6  Chris Dingle completed a to/from form in regards to
7  Shannon Spalding?
8      A. No.
9      Q. Do you know -- did you even know that Chris
10  Dingle created a to/from report relating to Shannon
11  Spalding?
12     A. No.
13     Q. In terms of...
14         (Off record discussion.)
15  BY MR. SMITH:
16     Q. Why wouldn't you have to be present at the
17  beginning of the VRI at 6 a.m. to account for your
18  officers if you were working the VRI?
19     A. Well, it could have been a number of reasons.
20  I could have been doing other reports. I could have
21  been getting gas. I could have been doing a number
22  of things, but I was always available.
23     Q. So in terms of you would not need to be
24  present at the start of the VRI to make sure your

Page 131

1  officers, who were working under you, were there?
2      A. I knew they were there.
3      Q. But you would not -- you're saying you don't
4  believe your physical presence was necessary at the
5  start of --
6      A. It wasn't necessary all the time, no, I don't
7  believe so.
8      Q. So sometimes you weren't there for the start
9  of the VRI?
10     A. Sometimes. Not that often, though.
11     Q. Did you ever speak to Shannon Spalding about
12  a report made by Chris Dingle in regards to the VRI
13  relating to her?
14     A. Not that I know of, no.
15     Q. So it's fair to say that you didn't take any
16  actions relating to a report made by Chris Dingle
17  about Shannon Spalding?
18     A. I don't have any information about a report
19  being generated by a Chris Dingle, so I wouldn't
20  know.
21     Q. Have you ever discussed the lawsuit with any
22  fellow police officers since you learned of it?
23     A. Sure.
24     Q. And, again, this is not any conversation

Page 132

1  with your attorney. Who have you talked to about
2  the lawsuit?
3      A. With my wife.
4      Q. Is she a sworn officer?
5      A. Yes.
6      Q. Oh. Anyone other than your wife?
7      A. No.
8      Q. How did -- well, other than -- did you learn
9  about the lawsuit through an attorney or someone
10  else?
11     A. Through an attorney.
12     Q. Were you ever present while the lawsuit was
13  being discussed among officers in fugitive
14  apprehensions?
15     A. I'm sure I was at some point.
16     Q. Did you ever hear any members talking about
17  the lawsuit?
18     A. I'm -- yes.
19     Q. What members?
20     A. I can't name -- I don't know any names off
21  the top of my head, but everybody talks about it.
22  It's public knowledge now, so everybody is talking
23  about it.
24     Q. Did --

Page 133

1      A. Even --
2      Q. Go ahead.
3      A. I'm saying even people outside our unit are
4  talking about it, so everybody knows about it.
5      Q. Did the lieutenant or commander ever meet
6  with any members of the fugitive apprehensions
7  unit, including you, regarding the lawsuit?
8      A. No.
9      Q. Did you discuss this lawsuit with any
10  members of your team at any time?
11     A. No.
12     Q. Are you aware of any criminal allegations
13  against any member of your team or the members of
14  the fugitive apprehension unit?
15     A. No.
16     Q. Did you ever tell Tomika Rainey that Shannon
17  and Danny were IAD officers?
18     A. No.
19     Q. Did you ever tell -- have a conversation
20  with Officer Rainey about either Shannon or Danny?
21     A. No.
22         (Off record discussion.)
23  BY MR. SMITH:
24     Q. Are you aware of any -- I asked you,

34 (Pages 130 - 133)

Page 134

1  generally speaking, criminal -- criminal
2  allegations. Included in that, I was referring to
3  even something such as a DUI.
4      Are you aware of any DUI allegations against
5  any of your team members?
6      A. No.
7      Q. Are you aware of Officer Rainey suffering
8  injuries in an auto accident?
9      A. Yes.
10     Q. And you're not aware of any allegations,
11  criminal, that have been made in relation to that
12  incident?
13     A. No.
14     Q. Are you aware of a CR number relating to
15  that accident that caused injuries to Officer
16  Rainey?
17     A. There was a CR number generated, yes. I'm
18  aware.
19     Q. Did any officer from the team members ever
20  approach you and tell you that -- that an officer
21  involved in that incident had been drinking?
22     A. Yes, they approached me and made that
23  allegation.
24     Q. What officers approached you and made the

Page 135

1  allegation?
2      A. I want to say it was Officer Rawls, who is no
3  longer in the unit.
4      Q. And do you recall who they said it was
5  against?
6      A. He made the allegation against Robert Walker.
7      Q. Was anyone else present for this
8  conversation?
9      A. No.
10     Q. What action did you take once you learned
11  this information?
12     A. I informed the lieutenant and then I
13  generated a CR number.
14     Q. Did Walker remain on your team?
15     A. Yes.
16     Q. Where is Walker currently assigned?
17     A. He's now a -- he's now a sergeant in the 4th
18  District.
19     Q. Did you ever discuss -- did you recommend
20  him for that position of sergeant?
21     A. No.
22     Q. Were you asked your opinion about Officer
23  Walker at any point?
24     A. No.

Page 136

1      Q. Did you ever discuss a CR that was filed
2  against Officer Spalding concerning a recording of
3  Sergeant Mills --
4      A. No.
5      Q. -- at any time with any members of the unit?
6      A. No.
7      Q. Were you aware that someone accused Officer
8  Spalding of recording Sergeant Mills?
9      A. No, I was not.
10     Q. Did you ever -- do you know if when -- while
11  Officer Spalding was assigned to your team, did she
12  report to duty on time?
13     A. Yes.
14     Q. What about Officer Echeverria, did he report
15  to duty on time?
16     A. Yes.
17     Q. And did she file and turn in reports,
18  including the U.S. Marshal reports and paperwork,
19  on time?
20     A. Yes.
21     Q. And what about Officer Echeverria, did he
22  turn in his reports on time?
23     A. Yes.
24     Q. If she was asked to backup and assist other

Page 137

1  team members in their cases, would she back them
2  up?
3      A. Yes, she would.
4      Q. And what about Officer Echeverria, would he
5  backup his fellow team members in cases?
6      A. Yes.
7      Q. Do you recall that on Shannon Spalding's
8  first day in the fugitive apprehension unit, that
9  she went into a swamp along the highway to
10  apprehend an offender that was fleeing the U.S.
11  Marshals and the team?
12     A. We all went into the swamp, but, yes, I'm
13  aware of it.
14     Q. Did you ever complete a performance
15  evaluation for either Spalding or Echeverria?
16     A. Yes, I did.
17     Q. And what were -- do you recall what kind of
18  scores you gave Spalding and Echeverria?
19     A. I don't recall what the -- the parameters
20  were, but they were pretty high.
21     Q. Do you know if officers on your team sign
22  off on evaluations you give them?
23     A. Yes.
24     Q. Do you know if Shannon or Danny signed off

35 (Pages 134 - 137)

Page 138

1  on any of your evaluations?
2  A. Yes.
3  Q. Okay. In terms of -- I'm going to ask you a
4  few names, and then we'll be done.
5  Do you know Jimmy Jackson?
6  A. Yes.
7  Q. How do you know Jimmy Jackson?
8  A. Well, former first deputy of the police
9  department, but he was also my commander when I was
10  in the 11th District as a sergeant.
11  Q. Okay. Is he a personal friend?
12  A. Not a personal friend.
13  Q. Do you know Tina Scahill?
14  A. Yes.
15  Q. How do you know Tina Scahill?
16  A. She was a -- I believe her position was
17  deputy chief, I think, I'm not for sure, on the
18  department.
19  Q. Have you ever talked to Tina Scahill about
20  either Danny or Shannon?
21  A. No.
22  Q. Do you know a Deborah Kirby?
23  A. Yes.
24  Q. How do you know Deborah Kirby?

Page 139

1  A. I think she's a chief or she was a
2  superintendent's legal counsel. I believe. Don't
3  quote me on that.
4  Q. Are you personal friends with her?
5  A. No.
6  Q. Did you ever talk with her about Shannon or
7  Danny?
8  A. No.
9  Q. Do you know Juan Rivera?
10  A. Yes.
11  Q. How do you know Juan Rivera?
12  A. I worked for Juan Rivera in narcotics when he
13  was a sergeant there. Now he's, I think, the chief
14  of IAD.
15  Q. Have you ever talked with Juan Rivera about
16  Shannon or Danny?
17  A. No.
18  Q. How about about this lawsuit?
19  A. No.
20  Q. As we -- we already talked about Commander
21  O'Grady.
22  Have you ever talked with Commander O'Grady
23  about Danny or Shannon?
24  A. No.

Page 140

1  Q. How about the lawsuit?
2  A. No.
3  Q. Do you know Beatrice Cuello?
4  A. Yes.
5  Q. How do you know her?
6  A. From being one of the bosses on the job. I
7  think she was a chief or something to that effect.
8  Q. Did you ever talk to her about Danny or
9  Shannon?
10  A. No.
11  Q. Do you know Liz Glatz?
12  A. No.
13  Q. Sergeant Jill Stevens?
14  A. No.
15  Q. Lieutenant Pasqua?
16  A. I know of her. I don't know her like
17  personally or anything.
18  Q. Okay. Is it fair to say you never talked to
19  her about Danny, Shannon or the lawsuit?
20  A. Right, that's correct.
21  Q. Do you know Nick Roti?
22  A. Yes.
23  Q. How do you know Nick Roti?
24  A. I think he's the chief of organized crime.

Page 141

1  Q. Did you ever talk to him about Danny,
2  Shannon or the lawsuit?
3  A. No.
4  Q. Are you friends with Nick Roti?
5  A. No.
6  Q. Do you know Lieutenant Sadowski?
7  A. No.
8  Q. Do you know Commander Stanley?
9  A. I know of her.
10  Q. It's fair to say you've never talked to her
11  about Danny, Shannon or the lawsuit?
12  A. That's correct.
13  Q. Do you know an Aileen Robertson?
14  A. No.
15  Q. How long have you known Joseph Salemme?
16  A. Probably off and on. I knew of him when I
17  came on the job, but just -- just in seeing him
18  around the different -- the various departments --
19  the various units or assignments.
20  Q. Before you even worked under him?
21  A. Right.
22  Q. Okay. And did you ever work under him at
23  any other time?
24  A. No.

36 (Pages 138 - 141)

Page 142

1    Q.  In terms of directly now.
2    A.  No.
3    Q.  How about Robert Cesario, did you know him
4  before going to fugitive apprehensions?
5    A.  Yes.
6    Q.  How did you know him?
7    A.  He was a sergeant in a major case, which was
8  part of 606, so I would see him just around with his
9  team periodically.
10    Q.  Did you ever talk with Cesario about Shannon
11  or Danny -- the lawsuit --
12    A.  No.
13    Q.  -- in relation to ---
14    A.  No.
15    Q.  Did you ever talk to Salemme about the
16  lawsuit?
17    A.  No.
18    Q.  Do you know Tom Byrne?
19    A.  Yes.
20    Q.  Have you ever talked to Tom Byrne about
21  Danny or Shannon?
22    A.  No.
23    Q.  Have you ever talked to Lorne Gushiniere
24  about the lawsuit?

Page 143

1    A.  No.
2    Q.  Do you know Colleen Dugan?
3    A.  Yes.
4    Q.  And have you ever talked with her about an
5  incident involving Shannon Spalding and Tom Mills?
6    A.  No.
7    Q.  Has she ever made any complaints to you
8  about Shannon Spalding or Dan Echeverria?
9    A.  No.
10    MR. SMITH:  If we could take a
11  two-minute break, I think I'm basically done, if
12  not done.
13    MR. KING:  Okay.
14    (Recess taken from 1:09 to 1:15.)
15  BY MR. SMITH:
16    Q.  I mentioned earlier that -- the name Padar
17  in connection with conversation -- the conversation
18  you had with Tony Hernandez.
19    A.  Uh-huh.
20    Q.  Do you recall any mention of a Sergeant
21  Padar in that conversation?
22    A.  No.
23    Q.  Do you recall any explanation in relation to
24  the fact that it's not Shannon who made a complaint

Page 144

1  about Padar, it's me, Tony, who made a complaint?
2    A.  No.  I don't remember him saying.  He was
3  focused on what was going on with her.
4    Q.  Well, do you remember any conversation in
5  relation to the way you were treating Shannon
6  relating to the fact that there was a CR against a
7  sergeant?
8    A.  No.  No.
9    MR. SMITH:  Nothing further.
10    MR. KING:  Nothing.  Reserve.
11    (Deposition concluded at 1:16.)
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 145

1    CERTIFICATE
2    OF
3    CERTIFIED SHORTHAND REPORTER
4
5    I, KARYN H. CHALEM, a Certified Shorthand
6  Reporter of the State of Illinois, CSR License No.
7  084-004167, do hereby certify:
8    That previous to the commencement of the
9  examination of the aforesaid witness, the witness was
10  duly sworn by me to testify the whole truth concerning
11  the matters herein;
12    That the foregoing deposition transcript was
13  stenographically reported by me and was thereafter
14  reduced to typewriting under my personal direction and
15  constitutes a true and accurate record of the testimony
16  given and the proceedings had at the aforesaid
17  deposition;
18    That the said deposition was taken before me
19  at the time and place specified;
20    That I am not a relative or employee or
21  attorney or counsel for any of the parties herein, nor a
22  relative or employee of such attorney or counsel for any
23  of the parties hereto, nor am I interested directly or
24

37 (Pages 142 - 145)

Page 146

1  indirectly in the outcome of this action.
2       IN WITNESS WHEREOF, I do hereunto set my
3  hand at Chicago, Illinois, this 9th day of March, 2015.
4
5
6
7
                *Karyn Chalem*
8    KARYN CHALEM, CSR, RPR
     CSR No: 084-004167
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 148

1       DEPOSITION REVIEW
        CERTIFICATION OF WITNESS
2
   ASSIGNMENT NO: 2022283
3  CASE NAME: Spaulding, Shannon v. City of Chicago
   DATE OF DEPOSITION: 2/25/2015
4  WITNESS' NAME: Sergeant Maurice Barnes
5     In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7     I have made no changes to the testimony
   as transcribed by the court reporter.
8  _____
9   Date          Sergeant Maurice Barnes
10    Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
      They have read the transcript;
13    They signed the foregoing Sworn
      Statement; and
14    Their execution of this Statement is of
      their free act and deed.
15
   I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17
   _____
18    Notary Public
19 _____
   Commission Expiration Date
20
21
22
23
24
25

Page 147

1            Veritext Legal Solutions
             1 North Franklin Street - Suite 3000
2            Chicago, Illinois 60606
             Phone: 312-442-9087
3
4
   March 11, 2015
5
   To: Alan S. King
6
   Case Name: Spaulding, Shannon, et al. v. City of Chicago, et al.
7
   Veritext Reference Number: 2022283
8
   Witness: Sergeant Maurice Barnes     Deposition Date: 2/25/2015
9
10 Dear Sir/Madam:
11 Enclosed please find a deposition transcript. Please have the witness
12 review the transcript and note any changes or corrections on the
13 included errata sheet, indicating the page, line number, change, and
14 the reason for the change. Have the witness' signature at the bottom
15 of the sheet notarized and forward errata sheet back to us at the
16 address shown above, or email to production-midwest@veritext.com.
17
18 If the errata is not returned within thirty days of your receipt of
19 this letter, the reading and signing will be deemed waived.
20
21
22 Sincerely,
23
24 Production Department

Page 149

1       DEPOSITION REVIEW
        CERTIFICATION OF WITNESS
2
   ASSIGNMENT NO: 2022283
3  CASE NAME: Spaulding, Shannon v. City of Chicago
   DATE OF DEPOSITION: 2/25/2015
4  WITNESS' NAME: Sergeant Maurice Barnes
5     In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7     I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9     I request that these changes be entered
   as part of the record of my testimony.
10
      I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
   that both be appended to the transcript of my
12 testimony and be incorporated therein.
13 _____
   Date          Sergeant Maurice Barnes
14
      Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
   the referenced witness did personally appear
16 and acknowledge that:
17    They have read the transcript;
      They have listed all of their corrections
18    in the appended Errata Sheet;
      They signed the foregoing Sworn
19    Statement; and
      Their execution of this Statement is of
20    their free act and deed.
21    I have affixed my name and official seal
22 this _____ day of_____, 20____.
23 _____
      Notary Public
24 _____
   Commission Expiration Date
25

38 (Pages 146 - 149)

Page 150

1       ERRATA SHEET
       VERITEXT LEGAL SOLUTIONS MIDWEST
2       ASSIGNMENT NO: 2022283
3  PAGE/LINE(S) /      CHANGE    /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19

    _____    _____

20  Date      Sergeant Maurice Barnes
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23      _____
      Notary Public
24
      _____
25      Commission Expiration Date

39 (Page 150)