**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Chicago Police Officer SHANNON SPALDING, | ) | |
| Chicago Police Officer DANIEL ECHEVERRIA, | ) | Case No. 12-cv-8777 |
| | ) | |
| Plaintiffs, | ) | Judge Gary Feinerman |
| | ) | |
| v. | ) | Magistrate Judge Shelia Finnegan |
| | ) | |
| CITY OF CHICAGO, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

I.      **INTRODUCTION**

After being instructed by their superior officers to ignore direct evidence of public

corruption committed by multiple CPD officers working within the 2nd District Public

Housing/Tactical Team, Officers Shannon Spalding and Danny Echeverria, on their own time

and without the knowledge or approval of anyone at the CPD, went to the FBI and blew the

whistle.  For breaking the Code of Silence that allowed this police misconduct to flourish for

over ten years, the Plaintiffs paid a heavy toll.  They were labelled "Rats".  They were given

dead end cases, unwanted shifts and assignments. Their fellow officers were instructed not to

back them up even in an emergency. On one occasion, expected police backup was not available.

Personnel were instructed to destroy their requests for overtime.  Plaintiffs were warned that

their lives could be in danger from commanding officers. In the case of Officer Spalding, the

retaliation pushed her over the edge and drove her out of the job she loved.  Defendants' Motion

for Summary Judgment must be denied because Plaintiffs' speech was constitutionally protected

and it was clearly established at the time that retaliating against a public employee who blows the

whistle on public corruption by going to an outside agency was unconstitutional. In addition, there are ample material facts that, construed in the light most favorable to Plaintiffs, establish violations of the Illinois Whistleblower Statue against the City and each of the Defendants.

## II.    PLAINTIFFS' STATEMENT OF FACTS[1]

In 2007, police officers Spalding and Echeverria uncovered evidence of criminal acts being committed by Sergeant Ronald Watts and his squad. (PSOF ¶4-6). Echeverria shared that evidence with his direct supervisor, Sgt. Roderick Watson, and was instructed to ignore it. (PSOF ¶7). When it became obvious to Plaintiffs that the criminal conduct was being swept under the rug, Plaintiffs decided to go to the FBI. (PSOF ¶8).

Plaintiffs went to the FBI on their own personal time and met with FBI agents Patrick Smith and Julie Anderson. Spalding had initially asked to speak with agent Ken Samuels, who had telephoned her ten years earlier to ask if she had any knowledge of illegal activity by several different officers. (*Spalding,* pp. 24-26.)[2]. There is no evidence that Spalding or Echeverria was aware of any ongoing FBI or CPD investigation of Watts ten years later when they went to the FBI. (PSOF ¶17).

Plaintiffs met with the FBI agents at the FBI offices and presented their information concerning police corruption. When they left the building that day, they believed that would be the end of their involvement. (*Spalding*, p. 45.). However, after the initial meeting, Plaintiffs agreed to help agent Smith with his investigation. Over several months, they met with agent Smith, only while off duty and on their own personal time. (PSOF ¶9).

---

[1] Plaintiffs will refer to Defendants Local rule 56.1 Statement of Facts as "DSOF ¶__". Plaintiffs will refer to Plaintiffs Local Rule 56.1 (b)(2)(C) Statement of Additional Facts that Require Denial of Summary Judgment as "PSOF ¶__". Specific Deposition testimony will be referenced as "*Deponent* p. __".
[2] Samuels was asking primarily about officer Joe Seinitz. Spalding believes that Ronald Watts' name came up, but she had no information at that time about any illegal activity by Officer Watts or anyone else. (*Spalding,* p. 26.)

By August of 2008, the FBI's demand for information began to take up too much of Plaintiffs' personal time.  Spalding then told agent Smith that she could not meet because she was working. (PSOF ¶10.). Feeling uncomfortable when Smith started asking to meet during work hours, plaintiff Echeverria called Chief Tina Skahill, then head of the CPD's Internal Affairs Division and requested a meeting. (PSOF ¶11). The purpose of the meeting was to tell the CPD that they had been blowing the whistle to the FBI on these crooked cops. Plaintiff Echeverria told agent Smith that he was going to the Chief of IAD. (PSOF ¶10).

Smith obviously contacted Skahill, because to Plaintiffs' surprise, when they showed up for their meeting, Smith and the CPD's FBI liaison, Tom Chester, were there. (PSOF ¶12). It was decided at that meeting that Plaintiffs' informal work for the FBI would become formal. They learned at this meeting for the first time that there had been an ongoing, but inactive, investigation of Sgt. Watts. (PSOF ¶17). Spalding and Echeverria were then detailed to the FBI, through their assignment to Unit 543 – Detached Services, while they retained their official assignment with Narcotics. (PSOF ¶15).

For approximately two years, the Plaintiffs worked exclusively on the Watts investigation, operating out of the FBI offices. Plaintiffs' troubles began when their cover was blown by Defendant Juan Rivera, Skahill's successor as IAD Chief.[3]  Once it was revealed that Plaintiffs had gone to the FBI and were working to arrest and convict Sgt. Watts and his squad, Plaintiffs' lives were placed in jeopardy. They had violated the unwritten Chicago Police Code of Silence, and the CPD made sure they paid the price.  The Police Code of Silence was enforced from the top down, starting with Commander James O'Grady and Deputy Chief Roti. (PSOF ¶¶2-24, 29-43).

---

[3] It's important to remember that at no time during their careers were officers Spalding or Echeverria detailed to IAD. While they worked with the FBI, first on their own time and later at Detached Services, they remained officially members of the prestigious Narcotics Division.

Plaintiffs learned that their cover had been blown when, in August of 2010, Commander O'Grady refused to approve a Confidential Informant for them. O'Grady's reasons for denying approval were relayed to them by Sgt. James Padar and are admissible as a party statement pursuant to Fed. R. Evid. 801(d)(2)(D). See *Bordelon v. Board of Education of the City of Chicago*, 7th Cir. Slip Opinion No 14-3240 at p. 12 (Feb. 3, 2016)(statement made by agent of a party within scope of employment relationship falls within exclusion from hearsay) O'Grady said "I will not approve this with these two IAD Rats Spalding and Echeverria on here. If you want to remove their names, I will approve the informant for Hernandez only. Furthermore, you are no longer to ever work with them. I don't want them in this building, you never cross their paths. And if you are out there and they call a 10-1, which is a police emergency, you or any member of this division is not to respond" (PSOF ¶24). Though he used the words "IAD Rats", O'Grady was aware that the Plaintiffs were working with the FBI on a special investigation. (PSOF ¶32). Though both Padar and O'Grady deny these statements, there were three witnesses to the conversation with Padar. (PSOF ¶24). And, O'Grady separately made similar direct statements about Spalding to her boyfriend, Officer Anthony Hernandez. (PSOF ¶66).

In April or May of 2011, it was decided that the Plaintiffs would be transferred out of Unit 543 and back to patrol. (PSOF ¶¶29-30, 34). Defendant Roti, then Chief of Organized Crime, upon O'Grady's recommendation, refused to allow the Plaintiffs to return to Narcotics Division. At a meeting where Defendants O'Grady, Roti and Rivera were present and that all of the Defendants now deny occurred, O'Grady said "I'm not taking those F-ing IAD Rats back; and furthermore, God help them if they need help on the street…it's not going to come." (PSOF ¶¶34, 38) Rivera's statement to Plaintiffs about this meeting is also admissible as a party statement.

After a short stint at the Police Academy and in Investigations Division, Plaintiffs were eventually assigned to the Fugitive Apprehension Unit (FAU). A jury will be able to find that O'Grady made sure that Plaintiffs' reputation preceded them; they were considered Rats who helped arrest their own.[4]  Much of the evidence in the record about the retaliatory treatment of Plaintiffs while at FAU comes from an insider – Officer Jan Hanna, the personal administrator for Defendants Commander Joseph Salemme and Lt. Robert Cesario.  Salemme admits that he heard that at least one of the Plaintiffs was "IAD" before they arrived at the FAU.[5] (PSOF ¶44). Only weeks earlier, the FBI had publically announced the arrests of Sgt. Ron Watts and Kallatt Mohammed. (PSOF ¶43).

The day before Plaintiffs arrived at FAU, Defendant Cesario told Hanna that two new officers were coming who were supposedly "IAD Rats" and to be very leery of them. (PSOF ¶45).

Cesario gave the following orders to Hanna regarding the Plaintiffs:

    a. He instructed Hanna, when distributing case assignments, to only give Plaintiffs dead end cases that would not lead to arrests or officer activity. (PSOF ¶47)
    b. He personally reviewed all of their case assignments and would highlight which ones they should get. (PSOF ¶48)
    c. He instructed Hanna to destroy their overtime requests. (PSOF ¶51).
    d. He instructed his team of officers not to provide backup to Plaintiffs or to work with them at all. (PSOF ¶52).
    e. He had Hanna fabricate a request for a shift change for Echeverria. (PSOF ¶53)
    f. He denied them access to two data bases necessary for them to do their job. (PSOF ¶55).
    g. And he removed them from their day shift and placed them on third shift under Sgt. Tom Mills, telling them at a meeting with Commander Salemme

---

[4] Officer Spalding testified that she had no personal knowledge of Commander O'Grady speaking to Sgt. Barnes or Lt. Cesario.  However, she was told the day before she was to report to FAU by the former secretary in Narcotics Division, that O'Grady was up there "very upset with the commanders over us coming there." (*Spalding* p. 222)
[5] Plaintiffs contend that Defendants used the term "IAD Rats" to refer to Plaintiffs' work with the FBI, in arresting and convicting Officers Watts and Mohammed on federal charges.  While eventually Plaintiffs reported to the Chief of IAD, while working with the FBI, all of their involvement in ferreting out this police corruption flowed from their initial personal, off-duty complaints to the FBI.

present: "you want to go against officers, you want to do this type of activity, you are going to be put on the night team way up north…you will no longer work days, you will no longer have a take home car and if I can help it, you will never be deputized." (PSOF ¶56).

Cesario's hostility was conveyed to the Plaintiffs' immediate supervisor, Defendant Maurice Barnes, who it made clear that Plaintiffs' employment in his squad was unwelcome. Before the Plaintiffs had even arrived at the squad, Barnes had informed another member of the squad, Robert Walker, "that two officers from IAD were coming." (PSOF ¶58).[6] When Spalding asked to meet with Barnes to address statements that had been made to her by other team members that they had been instructed not to work with Plaintiffs or back them up, Barnes made it clear what the problem was. Barnes said "I know that, you know, you worked for IAD, you brought a sergeant down. …you like to bring sergeants down, huh? You like to have sergeants arrested?" (PSOF ¶59-60). Then he upped the ante, saying: "to be honest with you. I'd hate to one of these days have to be the one to knock on your door and tell your daughter you're coming home in a box. That's how serious it is." (PSOF ¶61).

Not long after that conversation, Plaintiffs were removed from Barnes' team and placed on Third Watch. At the meeting where this occurred, Commander Salemme told Plaintiffs "you should have known better. If you want to go against other sworn personnel, you should have known this shit was going to happen to you. You brought this baggage here with you." (PSOF ¶65).

Plaintiffs have presented admissible evidence of other acts of retaliation on the part of Defendants related to their protected speech and whistleblowing. (See e.g. PSOF ¶66-69 *e.g.* Spalding being threatened with arrest if she set foot at the Homan Square facility). O'Grady told

---

[6] In fact, Plaintiffs will testify that they were told Barnes informed the entire squad, before they arrived, that they were "Rats" or from IAD.

Anthony Hernandez to arrest Spalding if she entered the Homan Square facility, telling him "Look at all the trouble she's caused Tony, investigating other sworn member[s] for corruption, even bosses, trying to put them in prison, she can't be trusted she's an IAD rat…."  (PSOF ¶66).

In November of 2012, the Plaintiffs, unable to tolerate the retaliatory treatment any longer, filed the instant lawsuit. Things only got worse as a result. Sgt. Thomas Mills, who had instructed all of his team members to watch the news conference announcing the case, then held a meeting to discuss it. (PSOF ¶70).  Mills, who had previously treated the Plaintiffs favorably, changed his tune after the lawsuit was filed. (PSOF ¶71).  Plaintiffs' biggest fears were realized when they were scheduled to make a particularly dangerous arrest. Arrangements were made for backup to be available, and yet the backup officers were nowhere to be found. (PSOF ¶72). Mills told Spalding that the people on the team don't want to work with Plaintiffs. He told them, "For all we know, you could still be working IAD investigating them.  They don't want to work with you guys after all of this came out." (PSOF ¶70). Mills also told Plaintiffs they "weren't going to be backed up and the team doesn't like us and he doesn't know why we're there, he doesn't know why we [don't] leave, he doesn't know how we're going to have a career when this is over." (PSOF ¶73).   And Mills warned Spalding that Commander O'Grady hated her so much, he could shoot her across the parking lot while she was walking to her car.  Mills warned Spalding to wear her vest. (PSOF ¶74).

The last straw for  Spalding was when Mills caused her to be effectively arrested while at work, by baselessly filing a CR against her alleging, based upon no credible evidence, that she had secretly taped recorded him. (PSOF ¶75-76). Sergeant Barz, after taking Spalding into custody, told her that the charges could "go away" if she dropped her federal court lawsuit. (PSOF ¶76).

7

Spalding cracked. According to the City's own consulting psychiatrist and psychologist (See Report of Dr. Susan Pearlson and Report of Police Pension Board psychologist Nancy Landre) the harassment and retaliation experienced by Spalding resulted in Post-Traumatic Stress (or an Adjustment Disorder) which both doctors agree prevents her from currently working as a police officer. (PSOF ¶ 77) Officer Spalding has been on ordinary disability at half of her salary since July, 2014. (*Spalding* p. 7-8). That disability will end after four (4) years. Her economic losses resulting from her inability to work will exceed $2,272,000. (PSOF ¶ 77). Officer Echeverria went on medical leave due to the harassment from May until December, 2013. (PSOF ¶78).

## III.  ARGUMENT

### 1.  PLAINTIFFS' COMPLAINTS TO THE FBI ABOUT PUBLIC CORRUPTION, MADE ON THEIR OWN TIME WITHOUT THE KNOWLEDGE OR APPROVAL OF THE CPD, CONSTITUTE SPEECH ON A MATTER OF PUBLIC CONCERN – NOT UNPROTECTED EMPLOYEE SPEECH

The Seventh Circuit's recent decision in *Kubiak v. City of Chicago*, 2016 WL 106868 (7th Cir. Jan. 11, 2016) sets the parameters for when a police officer's speech involves a matter of public concern entitled to First Amendment protection, and when it is unprotected employee speech. It compels a finding that Plaintiffs spoke as private citizens. The Court in *Kubiak* found that the officer had spoken as an employee and not as a private citizen for the following reasons:

(1) Kubiak's complaints about a fellow employee's treatment of her were made to her supervisor. ("Generally, an employee who is verbally assaulted by a colleague would be expected to report the inappropriate behavior to a supervisor.") Id. at *8; (2) her speech was intimately connected to her job. ("Kubiak's complaints about Zala rejected an employee's attempt to improve her work environment so that she would not be harassed again.") *Id.* at *9. (3) The content, form and context of Kubiak's speech showed that the objective of her

complaints was to further her personal interest in remedying an employee grievance and did not address a matter of public concern because (a) the content focused on a work related incident and her concern for her own safety; (b) the form – reporting it "up the chain of command"- indicates that her objective was to air a personal grievance and (c) the context shows that the grievance arose from a personal confrontation at work. (4) Finally, the *Kubiak* court considered the officer's motive *e.g.* was she primarily motivated by personal concerns or by a concern for public safety. *Kristofek v. Village of Orland Hills*, 712 F.3d 979 (7th Cir. 2013).

In contrast to *Kubiak*, Plaintiffs Spalding and Echeverria's speech had nothing to do with their personal employment situation at the Chicago Police Department. Echeverria was instructed by his supervisor to ignore evidence of police corruption and illegal activity by other police officers and reported that conduct to an outside law enforcement agency – the FBI. (PSOF ¶¶7-8). The Plaintiffs' complaints about fellow police corruption and cover-ups were not intimately connected to their jobs. As in *Kristofek*, Plaintiffs went to the FBI with complaints of corruption within the police force. Their objective had nothing to do with remedying a personal grievance. At the time of their speech, they had no such grievance. They were not working with the Watts/Mohammed unit. They were simply told, in so many words, to honor the Code of Silence and ignore evidence that fellow officers were taking bribes and stealing and selling drugs. Like any other citizen with evidence of a federal crime, they reported their complaints to the FBI.

Defendants make much of the fact that Shannon Spalding received a telephone call ten (10) years earlier from FBI agent Ken Samuels asking her if she had witnessed any illegal activity from several different officers. Defendants wrongly contend that this removes First

9

Amendment protection from any contact she or her partner had with the FBI a decade later.[7]

There is no evidence that Spalding or Echeverria was aware of any ongoing FBI or CPD

investigation of Watts ten years later when they went to the FBI.  (PSOF ¶17).  The context of

Plaintiffs' contact with Agent Patrick Smith at the FBI and their subsequent behind the scenes

assistance *on their own time*, clearly establishes that the Plaintiffs' motives were directly related

to issues of public concern and not to any type of private employment grievance.[8]

The Court in *Garcetti v. Ceballos*, 547 U.S. 410, 419, 126 S. Ct. 1951, 1958, 164 L. Ed.

2d 689 (2006), recognized that a citizen who works for the government is nonetheless a citizen.

("So long as employees are speaking as citizens about matters of public concern, they must face

only those speech restrictions that are necessary for their employers to operate efficiently and

effectively").  The fundamental principle underlying *Garcetti* can be found in one sentence in the

---

[7] Spalding has testified that Samuels was asking primarily about officer Joe Seinitz. Spalding believes that Ronald Watts' name came up, but she had no information at that time about any illegal activity by Officer Watts or anyone else. (*Spalding*, p. 27).

[8] *Sigworth v. City of Aurora*, 487 F.3d 506 (7th Cir. 2007), cited by defendants, involved an officer who was a member of a joint Aurora/FBI/ATF Task Force and who reported to her supervisor, her suspicion that fellow officers tipped off suspected gang members to an impending raid. *Sigworth* admitted that in reporting his suspicions, he was merely doing what was expected of him as a member of the task force charged with organizing and overseeing the planning and execution of the arrest warrants. *Sigworth*, 487 F.3d at 509.  Because Sigworth's speech was clearly part of the tasks he was employed to perform, the Court found that he was speaking not as a citizen but as a public employee. Similarly, in *Spiegla v. Hull*, 481 F.3d 961 (7th Cir. 2007), a correctional officer who was responsible for maintaining prison security spoke pursuant to her official duties when she reported her immediate supervisor's breach of prison security policy to another supervisor. In *Vose v. Kliment*, 506 F.3d 565 (7th Cir. 2007) a Narcotics supervisor reported to his Deputy Chief and Chief, alleged misconduct by other officers regarding the use of "trash rips" to obtain documents. The Court held that, like *Spiegla*, Vose was merely doing his job when he reported to his superiors, his suspicions which, if correct, could compromise the narcotics unit's investigations. *Houskins v. Sheahan*, 549 F.3d 480 (7th Cir. 2009) is more of the same. An internal complaint made by the plaintiff concerning an alleged fight between her and another officer, was held to be just a classic example of employee speech.  The court found however that, like Plaintiffs' complaints in the case at bar to the FBI, Houskin's statement to the police about the alleged assault, was made as a private citizen and not as part of her normal course of duties. *Houskins* Id. at 491. Houskins lost out solely because she was speaking about a private or personal interest (getting assaulted by another officer) and not about a matter of public concern. (such as public corruption) Finally, *Fairley v. Andrews*, 578 F.3d 518 (7th Cir. 2009) involved a correctional officer who submitted an internal affairs complaint about being bullied on the job.

decision: "When he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee" *Garcetti* at 422.[9]

Shannon Spalding and Daniel Echeverria were not paid by the Chicago Police Department to go to the FBI on their own time to report that their colleagues were crooks and their bosses were covering it up. Defendants concede that Plaintiffs contacted the FBI on their own time and disclosed evidence of police corruption and continued to deal with agent Smith after hours, outside of their Chicago Police Department duties until August 17, 2008. Plaintiffs have presented evidence that will allow a jury to determine that Plaintiffs were acting as private citizens specifically because they were ordered as Chicago Police Officers to ignore the criminal activities of their fellow police officers and had to go to an outside agency to report the crimes.

## 2. DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY BECAUSE IT HAS LONG BEEN CLEARLY ESTABLISHED THAT BLOWING THE WHISTLE ON CROOKED COPS CONSTITUTES PROTECTED SPEECH

It has been clearly established law since *Garcetti*, 547 U.S. 410, that the First Amendment protects a public employee who complains about public corruption in a forum outside of his or her official job duties. Each of the Seventh Circuit cases cited by the Defendants merely apply the well-established *Garcetti* test to the individualized facts. *Sigworth v. City of Aurora*, 487 F.3d 506 (7th Cir. 2007); *Spiegla v. Hull*, 481 F.3d 961 (7th Cir. 2007); *Vose v. Kliment*, 506 F.3d 565 (7th Cir. 2007); *Houskins v. Sheahan*, 549 F.3d 480 (7th Cir. 2009); *Fairley v. Andrews*, 578 F.3d 518 (7th Cir. 2009). The Supreme Court's decision in *Lane v. Franks,* —573 U.S. —, 134 S. Ct. 2369, 189 L.Ed.2d 312 (2014) did not alter First Amendment

---

[9] The parties in *Garcetti* did not dispute the fact that Mr. Ceballos wrote his disposition memo pursuant to his employment duties. *Id.* at 424. The Court stated, therefore, that it had no occasion to set forth a comprehensive framework for defining the scope of an employee's duties where there was room for serious debate. Should this Court decide that there is serious debate whether plaintiffs were acting pursuant to their official duties when they went to the FBI that factual determination should be left for the jury. See *e.g. McGreal v. Ostrov*, 386 F.3d 657, 674 (7th Cir. 2004)(In First Amendment retaliation case, whether speech was matter of public concern hinged upon questions for fact, which were for the jury)

jurisprudence in any way that would render the currently applicable law not clearly established under these facts. *Hardesty v. Cochran*, 621 F. App'x 771, 780-81 (5th Cir. 2015).

The Defendants argue that *Kristofek v. Village of Orland Hills*, 712 F.3d 979 (7th Cir. 2013) demonstrates that it was an open question in the Seventh Circuit whether a police officer's external speech regarding illegal activity in his own department could be speech of a citizen entitled to protection. (Defendants' Memorandum at p. 12) The Court in *Kristofek, Id*. at 986, perhaps anticipating that a defendant would try to advance this position someday, forcefully rejects the argument:

> We pause to stress that nothing in the above discussion should be construed as establishing new law, for we are simply reaffirming the already well-established *Connick* rule that whether speech is a matter of public concern depends on content, form and context …

The Fifth Circuit has denied qualified immunity where the central dispute in the case, brought by the Director of a State University art gallery, was whether the plaintiff was speaking as a citizen on a matter of public concern or pursuant to his official duties. *Cutler v. Stephen F. Austin State Univ.*, 767 F.3d 462, 472 (5th Cir. 2014). The Court cited numerous post-*Garcetti* (pre-2010) decisions that had given the Defendants fair warning, including *Davis v. McKinney*, 518 F.3d 304, 316 (5th Cir. 2008), where a public employee's complaint to the FBI was held to be clearly citizen speech.[10]

---

[10] In *Hardesty v. Cochran*, 621 F. App'x 771,780-81 (5th Cir. 2015), cited herein for its persuasive, not precedential value, the court applied *Cutler* to reject a claim of qualified immunity, stating: "In *Cutler v. Stephen F. Austin State University*, 767 F.3d 462 (5th Cir. 2014), we considered whether First Amendment retaliation principles regarding public employees were clearly established prior to 2010. We concluded that numerous Supreme Court and Fifth Circuit decisions gave the defendants clear warning that when a public employee engages in speech outside of his employment duties, and the employee directs his speech externally rather than within the chain of command, the employer may not discipline the employee for engaging in the speech in question. The law was therefore clearly established when the Board Defendants took adverse employment actions against Hardesty in 2011 and 2012. The Supreme Court's recent decision in *Lane v. Franks*, ⸺ U.S. ⸺, 134 S. Ct. 2369, 189 L.Ed.2d 312 (2014) did not alter First Amendment jurisprudence in any way that would render the currently applicable law not clearly established under these facts.

The case of *Gibson v. Kilpatrick*, 734 F.3d 395 (5th Cir. 2013) *Certiori Granted, Judgment Vacated by* 134 S. Ct. 2874 (June 30, 2014), *rehearing denied by* 134 S. Ct. 23 (U.S. August 11, 2014), *and on remand,* 773 F.3d 661 (5th Cir. 2014), *Certiori Denied by* 135 S. Ct. 2318 (May 18, 2015) bears careful analysis.  A municipality's Chief of Police brought an action against the mayor and the municipality alleging that he had been retaliated against after he had reported to outside law enforcement agencies, including the FBI, that the mayor had misused a municipal gas card. The Fifth Circuit, on its initial review, held that the mayor was entitled to qualified immunity since it was not clearly established law that the Chief's complaint to the FBI was made as a citizen.  The United States Supreme Court granted *certiorari* and vacated the decision in light of *Lane v. Franks*, 573 U.S. ___, 134 S. Ct. 2369, 189 L. Ed. 2d 312 (2014).  Upon remand, the Fifth Circuit first found that the Chief's reports to the OSA ("Office of the State Auditor") was made pursuant to his official duties because, "Gibson did not make a report to the OSA *on his personal time after work*.  He met with the investigator in his office, he coordinated his department's resources with the OSA and he instructed his employees to aid extensively in the investigation." *Gibson*, 773 F.3d 661, 671 (emphasis added).   Similarly, reprimanding the Chief for his report to the Attorney General was found not to have violated his clearly established First Amendment right since the communication was made at the "Chief of Police Conference" to the Attorney General in person.   With regard to the report to the FBI, however, the Court reasoned as follows:

> The reports to the FBI and DEA present a closer case. Gibson made a call to an FBI agent that he had met through his law enforcement work. He then met with two FBI agents, including the agent he already knew, at schools in Drew rather than at his office. He testified that he believed his report to the FBI was confidential. He also made his initial complaint to the DEA via telephone, then met with DEA agents, and agents from other federal law enforcement agencies, at the DEA office in Oxford, Mississippi, again not at his office in Drew. Gibson testified that he believed his report to the DEA was also confidential. Gibson did, however, testify that he had previously met the agents he contacted at the FBI and the DEA through his official duties. Further, he stated in a letter to the Mayor and Board of Aldermen that he generally worked with outside agencies, including the DEA and FBI, "to help with crimes within the city of Drew." Additional facts could elucidate Gibson's role when he made his complaints in this case. Whether he spoke

with the agents during working hours, whether he was in uniform, and whether he offered the assistance of local law enforcement would all be instructive as to whether he acted pursuant to his official duties. But those facts are not present in the record, and, there being no genuine dispute as to the facts, we take the record as it is. Given the lack of evidence clarifying Gibson's role when he made his reports to the FBI and the DEA, we hold that Gibson has not met his burden of producing evidence sufficient to show that Kilpatrick violated his clearly established constitutional rights, and, as such, summary judgment should have been granted for Kilpatrick. *See Kovacic*, 628 F.3d at 211; *Michalik v. Hermann*, 422 F.3d 252, 258 (5th Cir.2005) ("The plaintiff bears the burden of proving that a government official is not entitled to qualified immunity."). We do not hold that, as the Chief of Police, *any* report of criminal activity Gibson made to outside agencies was part of his official duties. We hold only that Gibson has adduced insufficient evidence here to meet his burden of producing evidence showing that his reports here were made as a citizen rather than in his official capacity. He has therefore failed to come forward with evidence showing that his clearly established constitutional rights were violated.

*Gibson v. Kilpatrick*, 773 F.3d 661, 672 (5th Cir. 2014) *cert. denied,* 135 S. Ct. 2318, 191 L. Ed. 2d 980 (2015).

It is clear from this decision that: (1) had Chief Gibson initially spoken to the FBI agents on his own time and not during working hours; (2) had he not offered the assistance of his employees in the investigation; and (3) had his duties as Chief of Police not included working with outside agencies to help with crimes within the city of Drew, the results would have been different.

In finding that Lorenzo Davis, an Independent Police Review Authority ("IPRA") investigator who alleged that he was terminated for refusing to alter his internal investigative reports was not acting as a private citizen but was taking actions that were part of his customary job duties, Judge Kokoras distinguished between the conduct of the plaintiff in *Kristofek* who went to the FBI concerning allegations of corruption, and that of *Kubiak* who's complaints were all made internally suggesting that she was primarily motivated by personal concerns. *Davis v. City of Chicago, Illinois*, No. 15 C 7771, 2016 WL 521069, at *3 (N.D. Ill. Feb. 10, 2016).

Since it was clearly established that the First Amendment protected communications to

the FBI about public corruption, even if made by a cop, the Defendants are not entitled to qualified immunity.[11]

Additionally, since part of Plaintiffs' allegations allege post-lawsuit retaliation for having filed a lawsuit involving a matter of public concern, this conduct is, without a doubt, *not* entitled to qualified immunity. *Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 648 (7th Cir. 2013); *Salas v. Wisconsin Dep't of Cons.,* 493 F.3d 913, 925 (7th Cir.2007); *Spiegla v. Hull,* 371 F.3d 928, 936 (7th Cir.2004); *Zorzi v. County of Putnam,* 30 F.3d 885, 896 (7th Cir.1994) (public employee was constitutionally protected against retaliation for filing lawsuit involving a matter of public concern).

### 3. THERE IS AMPLE TESTIMONY IN THE RECORD FOR A JURY TO CONCLUDE THAT PLAINTIFFS WERE RETALIATED AGAINST FOR REPORTING PUBLIC CORRUPTION TO THE FBI

Plaintiffs have presented admissible evidence that each of the Defendants knew or had reason to know that Plaintiffs had worked with the FBI.  O'Grady has admitted that he knew Plaintiffs were working with the FBI. (PSOF ¶32). Roti and O'Grady were with Rivera at a meeting when it was decided to pull Plaintiffs out from Detached Services and put them back on patrol, and where these Defendants refused to allow them back to Narcotics Division because they were "Rats."  (PSOF ¶34, 38.).  And Roti testified that the he was aware in 2008 that Plaintiffs had been working with the FBI. (PSOF ¶21).

The Fugitive Apprehension Unit Defendants (Salemme, Cesario, Barnes and Mills) had all been briefed about the Plaintiffs' protected conduct before Plaintiffs ever arrived.  This is

---

[11] In *McGreal v. Ostrov*, 368 F.3d 657, 683 (7th Cir. 2004), a First Amendment retaliation case, the court stated: "The Supreme Court has rejected a requirement that previous cases be "fundamentally similar" before officials can be held to know their conduct was unlawful. *Hope,* 536 U.S. at 741, 122 S.Ct. 2508. The salient question is not whether there is a prior case on all fours with the current claim but whether the state of the law at the relevant time gave the defendants fair warning that their treatment of the plaintiff was unconstitutional. *Hope,* 536 U.S. at 741, 122 S. Ct. 2508; *Gregorich v. Lund,* 54 F.3d 410, 415 (7th Cir.1995)."

obvious from the testimony of Officers Hanna and Robert Walker. Each of these Defendants made statements indicating that their actions were directed at Plaintiffs because they had taken down Sergeants. As of February 13, 2012, it was public knowledge that Watts and Mohammed were arrested on federal charges by the FBI. Each of these supervisory officers had the ability to look at Plaintiffs' records and determine that they had never been assigned or detailed to IAD. The testimony shows that the Plaintiffs specifically informed Cesario, Salemme and Barnes on their first day at FAU that they had not been assigned to IAD. (*Echeverria* p. 172.). A jury can reasonably find from all of the facts presented, that the Defendants were aware that Plaintiffs were responsible for the arrests and convictions of Sgt. Watts and Mohammed, and that this had occurred as a result of their complaints to the FBI.

Rivera's sins were of omission, rather than commission. He was complicit in the retaliatory acts because he was aware of them, had a duty to stop them by filing a CR on the offenders, and had the ability to do so. He was present when Roti and O'Grady decided they would not allow Plaintiffs to return to Narcotics because they were "Rats". Yet, all he did was tell the Plaintiffs what took place in that meeting and took no other action.

Mills' conduct, including the filing of a false CR resulting in Spalding's effective arrest, was in retaliation for their protected activity of filing a federal court lawsuit. This conduct is clearly protected by the First Amendment. See, *Fairley v. Andrews*, 578 F.3d 518, 524-25 (7th Cir. 2009).

## 4. THE INCIDENTS PRIOR TO NOVEMBER 1, 2010 ARE NOT TIME BARRED UNDER 42 U.S.C. § 1983 PURSUANT TO THE DOCTRINE OF CONTINUING VIOLATION

*Heard v. Sheahan*, 253 F.3d 316, 319-20 (7th Cir. 2001) applies the continuing violation doctrine to actions brought pursuant to 42 U.S.C. § 1983. A violation is called "continuing," signifying that a plaintiff can reach back to its beginning, even if that beginning lies outside the

16

statutory limitations period, when it would be unreasonable to require or even permit a plaintiff to sue separately over every incident of the defendant's unlawful conduct. *Id.*

In the employment context, the doctrine applies to claims like sexual harassment, where an individual act cannot be made the subject of a lawsuit when it occurs because 'its character as a violation did not become clear until it was repeated during the limitations period.' *Stepney v. Naperville Sch. Dist. 203,* 392 F.3d 236, 240 (7th Cir.2004) (quoting *Dasgupta v. Univ. of Wis. Bd. of Regents,* 121 F.3d 1138, 1139 (7th Cir.1997)). In those cases, duration and repetition are necessary to convert merely offensive behavior into an actionable change in the plaintiff's working conditions. *Kentaft v. Laporte Cty. Sheriff's Dep't,* No. 3; 13-CV-50-TLS, 2014 WL 4209535, at *4 (N.D. Ind. Aug. 26, 2014)

Where it is asserted that the defendants acted in concert in a campaign of harassment, the continuing violation doctrine is applicable, see *e.g. Mosely ex rel Jackson v. City of Chicago*, No. 03 C 4915, 2008 WL 818261, at *6 (N.D. Ill. Mar. 21, 2008), and the statute of limitation starts to run when a reasonable plaintiff would reasonably be expected to perceive and be injured by the offensive conduct. *Pitts v. City of Kankakee, Ill.*, 267 F.3d 592, 595 (7th Cir. 2001).

The reason for this doctrine is a practical one. Employees should not be encouraged to file a lawsuit the first time a potentially harassing act takes place, before it becomes apparent that his or her statutory or constitutional rights are being violated. *Taylor v. Bd. of Educ. of City of Chicago*, 2014 IL App (1st) 123744, ¶ 46, 10 N.E.3d 383, 395-96, *reh'g denied* (June 5, 2014), *appeal denied,* 20 N.E.3d 1264 (Ill. 2014) and *appeal denied,* 20 N.E.3d 1264 (Ill. 2014) (applying the continuing violation theory in an action under the Illinois Whistleblower Act.).

With this doctrine in mind, the Defendants contend that the first incident of retaliation alleged in this case, the August 17, 2010 refusal by Defendant O'Grady to approve Plaintiffs' request for a confidential informant because Plaintiffs were "IAD Rats," is three months outside

17

of the statute of limitations. That single incident, in and of itself, could not possibly have placed

Plaintiffs on notice that their careers with the CPD were in the process of being destroyed due to

their blowing the whistle on the criminal activities of the Watts/Mohammed squad. It was not

until they experienced the full range of retaliatory acts while at the Fugitive Apprehension Unit,

(a time period well within the two year statute of limitations) that their cause of action began to

accrue. Indeed, Plaintiffs would agree that merely denying a request for a confidential

informant, without more, would not have risen to the level of an adverse action regardless of the

motivation of Commander O'Grady at that time. Therefore, Defendants are not entitled to partial

summary judgment with regard to incidents occurring prior to November 10, 2010.

5. **THE CONSPIRACY CLAIMS SURVIVE SINCE THERE ARE UNDERLYING CONSTITUTIONAL VIOLATIONS AND SUFFICIENT EVIDENCE FOR A JURY TO FIND AGREEMENT AMONG THE DEFENDANTS**

Like the plaintiff in *Geinsosky v. City of Chicago,* 675 F.3d 743 (7th Cir. 2012), the

Plaintiffs' here can present evidence of a pattern of retaliatory harassment by several officers

over a period of months – all tied to Plaintiffs' protected activities that resulted in the conviction

of two corrupt police officers. As the Court stated in *Geinsosky*, "[I]t is a challenge to imagine a

scenario in which that harassment would not have been the product of a conspiracy. " *Id*. at 749.

("If several members of the same police unit allegedly acted in the same inexplicable way

against a plaintiff on many different occasions, we will not dismiss a complaint for failure to

recite language explicitly linking these factual details to their obvious suggestion of collusion.

Geinosky's allegations of a conspiracy among the officers of Unit 253 to harass him by issuing

bogus parking tickets go well beyond the required threshold.") *Geinosky* at 749.

To sustain a § 1983 conspiracy claim at the summary judgment stage, plaintiffs must

make a showing that the defendants shared a "common unlawful motive and participated in some

concert of action." *Smith v. Bray*, 681 F.3d 888, 905-06 (7th Cir. 2012). It is not necessary for

18

the plaintiffs to prove that there was an express agreement among all the conspirators as long as evidence exits that they share the same general conspiratorial objective. *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013); *Hampton v. Hanrahan,* 600 F.2d 600, 621 (7th Cir.1979), *rev'd in part,* 446 U.S. 754, 100 S. Ct. 1987, 64 L.Ed.2d 670 (1980)).

The record in the instant case contains ample evidence that, tied together by the glue of the Code of Silence, the individual Defendants took actions against the Plaintiffs, both in concert and individually, which shared the common objective of punishing Plaintiffs for having worked with the FBI to pursue criminal charges against officers Watts and Mohammed. Those acts included the following:

1. Commander O'Grady instructed Sergeant Padar to inform Plaintiffs that he would not approve a Confidential Informant as long as their names were on the request because they were "Rats"; officers under his control would not work with them; and they would not be backed up, even if in danger; (PSOF ¶24).

2. Sergeant Rivera attended a meeting with Defendants O'Grady, Roti and others, where Plaintiffs' protected activities were discussed and these Defendants made it clear that they would not take Plaintiffs back into the Narcotics Unit because they had broken the code of silence. (PSOF ¶34). Rivera subsequently told the Plaintiffs the reasons they could not return. (PSOF ¶34). Rivera took no action as Chief of IAD to remedy this misconduct despite his ability and duty to do so.

3. Deputy Superintendent Cuello attended a meeting with Defendants O'Grady, Roti and Deputy Superintendent Jackson, where it was agreed that Plaintiffs would not be returned to Narcotics because Roti and O'Grady viewed them as "Rats." (PSOF ¶38)

4. Defendant Cesario met with Officer Hanna before Plaintiffs ever arrived at the Fugitive Apprehension Unit and warned her that they were "Rats" and to watch what she says around them. He then specifically instructed Hanna to retaliate against them by assigning them dead end cases. (PSOF ¶45-47). And, Commander Salemme heard that the plaintiffs were IAD before they ever arrived at FAU. (PSOF ¶44). Where did Cesario get the information about the Plaintiffs? It can reasonably be inferred that it was communicated to him by one or more of the other conspirators.

5. Defendant Cesario held a meeting with his sergeants, including Defendants Barnes and Mills and according to a firsthand report from Officer Hanna, told the sergeants not to work with Plaintiffs, and not to back up Plaintiffs if they were in

danger. (PSOF ¶52). Barnes and Mills' subsequent actions were based upon the same motivation communicated to them by Cesario.

6. Defendant O'Grady banned Spalding from the Homan Square facility, ordering her to be arrested if she appeared there. (PSOF ¶66). He conveyed his Orders to Commander Salemme and Lt. Cesario. (PSOF ¶¶67-69).

7. Finally, Defendants Salemme, Cesario and Barnes made it clear to the Plaintiffs when they removed them from Barnes team and placed them on Third Watch, reporting to Mills, that their actions were related to Plaintiffs prior protected activities. (PSOF ¶¶62-65). And Mills closed the loop by retaliating against the Plaintiffs, and causing Spalding to be falsely arrested, because they had filed a lawsuit against the CPD.

To the extent that the Defendants plan on arguing in their Reply Brief that the evidence of these acts are inadmissible hearsay, we would direct the court's attention first to *Smith v. Bray*, 681 F.3d 888, 904 (7th Cir. 2012) where the Court stated:

> Smith argues that Bray and Bianchetta conspired to retaliate against him after he complained about discrimination. Although this is not the sort of undertaking the word "conspiracy" normally brings to mind, Rule 801(d)(2)(E) encompasses a broad definition that goes well beyond the more confined concept of criminal conspiracy. See, *e.g., United States v. Kelley*, 864 F.2d 569, 573 (7th Cir.1989) ("Rule 801(d)(2)(E) applies not only to conspiracies but also to joint ventures, and ... a charge of criminal conspiracy is not required to invoke the evidentiary rule."); *United States v. Coe*, 718 F.2d 830, 835 (7th Cir.1983) ("Conspiracy as an evidentiary rule differs from conspiracy as a crime. The crime of conspiracy comprehends much more than just a joint venture or concerted action, whereas the evidentiary rule of conspiracy is founded on concepts of agency law. Recognizing this, some courts refer to the co-conspirator exception as the 'joint venture' or 'concert of action' exception.") (internal citations omitted).

In addition, it is clear that these statements constitute party admissions pursuant to Fed. R. Evid. 801(d)(2)(D), See *Bordelon v. Board of Education of the City of Chicago*, 7th Cir. Slip Opinion No 14-3240 at p. 12 (Feb. 3, 2016).

## 6. MONELL LIABILITY EXISTS BASED UPON THE CITY'S FAILURE TO ACKNOWLEDGE THE POTENTIAL OF A CODE OF SILENCE AND ITS FAILURE TO TAKE ANY ACTION TO TRAIN OFFICERS REGARDING THE CODE OR TO DISCIPLINE OFFICERS WHO ENGAGE IN MISCONDUCT OR RETALIATORY ACTION

Defendants' Memorandum argues that while Plaintiffs' expert Lou Reiter may have presented evidence of a widespread practice within the Chicago Police Department of maintaining a Code of Silence, Plaintiffs have not shown that there is a custom or practice of

retaliation against officers who break that Code. (Defendants' Memorandum at p. 26). That is simply not the case. In fact, Mr. Reiter made it clear in both his report and his deposition, that the very definition of a Police Code of Silence includes the concept of retaliation. Reiter testified that the "Code of silence is a concept where officers -- any employees, but officers, the way I use it, police officers do not bring forth negative testimony against fellow employees for fear of retaliation." (PSOF ¶80; *Reiter*, p. 35.).

Plaintiffs' first base their *Monell* liability claims on the now admitted (by the highest official in the City of Chicago) widespread practice of the Chicago Police Department of maintaining a Police Code of Silence where officers are trained to ignore misconduct on the part of their fellow officers, and where the Code is enforced by retaliating against any officer that breaks the Code. The evidence elicited in this case far exceeds that accepted in *Obrycka v. City of Chicago*, Not Reported in F. Supp. 2nd, 2012 WL 601810 (Feb. 23, 2012); *Johnson,* 2009 WL 1657547, *Arias v. Allegretti,* No. 05 C 05940, 2008 WL 191185 (N.D. Ill. Jan.22, 2008), *Garcia v. City of Chi.,* No. 01 C 08945, 2003 WL 1715621 (N.D.Ill. Mar.20, 2003), *Kindle,* 2002 WL 230779, and *Robinson v. City of Harvey,* No. 99 C 3696, 2001 WL 138901 (N.D.Ill. Feb.16, 2001). But see*, Sigle v. City of Chicago*, No. 10 C 04618, 2013 WL 1787579, at *3-4.

In *Rossi v. City of Chicago*, 790 F.3d 729, 737-38 (7th Cir. 2015), Judge Manion makes it clear that the plaintiffs' theory of *Monell* liability ("…a code of silence, namely a failure on the part of the police department to discipline and train officers regarding ethical conduct") would have supported municipal liability had plaintiffs properly presented an appropriate expert. Instead, counsel for Rossi merely offered the reports that had been submitted in *Obrycka*, which the District Court refused to consider.

Plaintiffs in this case presented both compelling anecdotal evidence of the use of retaliation to suppress reports of misconduct on the part of the Watts unit and others, (PSOF ¶¶2-

3), including death threats; *and* the expert testimony of police procedural expert Lou Reiter, the main expert witness in the *Obrycka* case, with regard to the specific practices of the Chicago Police Department. (PSOF ¶80 and Report of Lou Reiter).

As a preliminary matter, the statements of the highest policymaker in the City of Chicago, Mayor Rahm Emanuel that a code of silence exists throughout the Chicago Police Department should be binding upon the City. (Report of Lou Reiter). Plaintiffs have presented evidence through their expert from which a jury can find that there are multiple widespread customs and practices related to the Code of Silence, within the Chicago Police Department, that resulted in the Plaintiffs' injuries. Much of Mr. Reiter's testimony is based directly upon policies and practices (and the lack of policies) testified to by the Defendants' 30(b)6 witnesses, Officers Piggott and Klimas. These policies and practices include the following:

a. The maintenance and/or tolerance of a Police Code of Silence whereby police officers do not report the misconduct of other police officers even if that misconduct is criminal, out of fear of retaliation. (*Reiter,* Dep. p. 35.);

b. The conscious decision to ignore the Code of Silence[12] and to refuse to develop any training materials that address issues relating to a Code of Silence; (*Reiter,* Dep. pp. 42-43.);

c. The conscious decision to refuse to acknowledge the potential of the Code of Silence, and take affirmative steps to minimize its influence. (Reiter Report p. 9, *Reiter* p. 49.);

---

[12] The Defendant's own expert witness, Jon Schorle, testified that he was surprised that the City's 30(b)6 witness, Captain Michael Pigott, who was held out as the City's most knowledgeable person concerning the Code of Silence, indicated that he had never reviewed any materials regarding the Code of Silence. Schorle testified, "What I agreed with Chief Reiter's opinion was that the Chicago Police Department has apparently made a conscious choice to deny the potential existence and impact of a code of silence." (*Schorle* Dep. p. 25-26*)* Schorle just didn't think that was a problem.

    d.   The failure to discipline officers who engage in retaliation against others who break the Code of Silence and report the misconduct of their fellow officers;[13]

    e.   The failure to discipline officers who engage in misconduct. (Reiter Dep., pp. 51-53.).

Plaintiffs have presented evidence of a practice whereby police officers refuse to report misconduct of their fellow police officers out of fear of retaliation. What Mr. Reiter's scholarship has shown is that it is the City of Chicago's failure to acknowledge that a Code of Silence even has the potential to exist in law enforcement and its failure to take any action whatsoever – even in the face of decades of celebrated examples of its existence – which has allowed the type of retaliation that occurred to the Plaintiffs in this case to flourish.  (PSOF ¶80.).

In short, *Monell* liability attaches where a known problem exists and the City makes a conscious decision to stick its municipal head in the ground and pretend it doesn't. It's not necessary to prove, and Plaintiffs don't contend, that every Chicago Police Officer follows the Code of Silence. A city's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution. *Connick v. Thompson*, 563 U.S. 51, 61-62, 131 S. Ct. 1350, 1360, 179 L. Ed. 2d 417 (2011).

Officer Michael Spaagaren gave testimony which will allow a jury to conclude that, (1) for almost ten years the Code of Silence was used to specifically protect crooked officer Ronald Watts from prosecution; (2) that the City was made aware of his squad's misconduct and

---

[13] Pigott testified that he was unaware of any officers who have been fired for covering up for the acts of fellow officers. (*Pigott* Dep p. 47). He testified that he was aware of only one instance of an officer who was disciplined for not reporting misconduct of a fellow officer. (*Pigott* Dep., p. 18). He admitted that there is no training at all given at the Chicago Police Academy in relation to a Code of Silence. (*Pigott* Dep., p. 11). Incredibly, Captain Pigott testified that he has never even heard that allegations have been made that the Chicago Police Department has a code of silence. (*Pigott* Dep., p. 12).

consciously failed to take any disciplinary action against him; and (3) that when he, Spaagaren,

informed his Lieutenant about Watts' criminal conduct, Spaagaren's life was threatened, he was

transferred from the squad, and told he would be accused of complicity (or worse) if he reported

the conduct to IAD. And, he was driven out of the force for over 18 months. (PSOF ¶¶2-3).

The Seventh Circuit has stated that there is no bright-line rules defining a "widespread

custom or practice":

> As we stated in *Cosby v. Ward,* there is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability, "except that it must be more than one instance," 843 F.2d 967, 983 (7th Cir.1988), or even three, *Gable,* 296 F.3d at 538 ("[T]hree incidents where vehicle owners were erroneously told that their vehicles were not at Lot 6 do not amount to a persistent and widespread practice.") (internal quotation marks omitted). But the plaintiff must demonstrate that there is a policy at issue rather than a random event. This may take the form of an implicit policy or a gap in expressed policies, *Phelan v. Cook County,* 463 F.3d 773, 790 (7th Cir.2006) (citing *Calhoun v. Ramsey,* 408 F.3d 375, 380 (7th Cir.2005)), or "a series of violations to lay the premise of deliberate indifference." *Palmer,* 327 F.3d at 596 (citation omitted). Beyond these threshold requirements, the jury must make a factual determination as to whether the evidence demonstrates that the County had a widespread practice that the alleged constitutional harm. *See Woodward v. Corr. Med. Serv. of Ill., Inc.,* 368 F.3d 917, 928 (7th Cir.2004).

*Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). Defendants argument

that Reiter's testimony does not sufficiently establish a widespread custom or practice of

retaliating against officers who violate the Code of Silence is conclusory, unsupported, and at the

very least, creates a genuine issue of material fact necessary to deny summary judgment.

The wrinkle in this case makes *Monell* liability even more compelling than in the more

traditional Code of Silence cases such as *Obrycka*. In *Obrycka,* the plaintiffs proved, through

much of the same testimony being presented in the instant case, that a Code of Silence exists

within the CPD whereby officers conceal each other's misconduct in contravention of their

sworn duties. *Obrycka v. City of Chicago*, No. 07 C 2372, 2012 WL 601810, at *6 (N.D. Ill. Feb.

23, 2012). Evidence was presented in *Obrycka* that this *de facto* policy and the Code of Silence

are evidenced and caused by the CPD's failure, among other things, to: (1) sufficiently

investigate allegations of police misconduct; (2) accept citizen complaints against police officers;

(3) promptly interview suspected officers or take witness statements and preserve evidence; (4)

24

properly and sufficiently discipline officers; and (5) maintain accurate and complete records of complaints and investigations of misconduct. *Obrycka* maintained that this *de facto* policy and the Code of Silence encourage Chicago police officers to engage in misconduct with impunity and without the fear of official consequences. *Obrycka* at *6.  As a result officers feel free to break the law, and therefore the injury to Ms.  Obrycka was a direct consequence of the policy.

The instant case is much less attenuated than *Obrycka*.  Plaintiffs have put forth testimony of the existence of the Code of Silence[14] along with expert testimony explaining that for the policy to be maintained, it must be enforced through punitive actions against those officers who break the code.  Mr. Reiter will also testify, as he did in his deposition, that the City's practice of ignoring the existence of the policy in training its officers is responsible for the maintenance of that policy. In addition, Reiter has presented evidence that demonstrates that the City has repeatedly refused to discipline police officers for refusing to report misconduct of other cops and has never disciplined a police officer for retaliating against someone who has broken the Code of Silence. (Reiter Report ¶¶22- 31.)  Each of these policies support *Monell* liability.

## 7.  SUFFICIENT EVIDENCE EXISTS TO ESTABLISH PLAINTIFFS' ILLINOIS WHISTLEBLOWER ACT CLAIMS

The Defendants make a one-paragraph, conclusory assertion that the Plaintiffs have insufficient evidence of causation to prove a violation of the Illinois Whistleblower Act ("IWA") 740 ILCS 174/15 *et seq*.  This Court, in granting the Plaintiffs leave to file their Second Amended Complaint, has already ruled that the IWA creates a cause of action against the City and against any individual supervisor who retaliates against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable

---

[14] In addition to presenting the testimony of their expert, Lou Reiter, Plaintiffs intend to call Mayor Rahm Emanuel to admit the existence of the policy. See e.g. http://www.nbcchicago.com/news/local/Emanuel-Address-at-Special-City-Council-Meeting-361205381.html.

cause to believe that the information discloses a violation of a State or federal law, rule, or regulation. 740 ILCS 174/15(b).    *Bello v. Village of Skokie*, 2014 WL 4344391 (N.D. Ill. Sept. 2, 2014); *Thompson v. Board of Education of the City of Chicago*, No. 11 C 1712, 2014 WL 1322958, at *7 (N.D. Ill. Apr. 2, 2014); *Harris v. State of Illinois et al*, 753 F.Supp.2d 734,742 (N.D. IL 2010).

Plaintiffs' claims under the Illinois Whistleblower Act allege that the City and the individual Defendants retaliated against them "for disclosing to the FBI what they reasonably believed and in fact knew were multiple violations of state and federal laws by Watts, Mohammed and other Chicago Police Officers" (Second Amended Complaint ¶129), and that the Defendants retaliated against them "for disclosing to the City's Internal Affairs Department what they reasonable believed and in fact knew were multiple violations of state and federal laws by Watts, Mohammed and other Chicago Police Officers." (Second Amended Complaint ¶129).

The Illinois Appellate Court has held that retaliatory actions taken against a police officer, including changing that officer's shift, because that officer has internally disclosed criminal activity by other officers, is actionable under the IWA. See, *Brame v. City of N. Chicago*, 2011 IL App (2d) 100760, ¶ 3, 955 N.E.2d 1269, 1271:

> Plaintiff raises an issue of first impression on appeal: whether section 15(b) of the Act supports a cause of action for disclosing suspected unlawful activity to one's own employer who also happens to be a government or law-enforcement agency. We hold that the plain language of the Act supports such a cause of action and that no exceptions apply if the government or law-enforcement agency is also the employer.

In addition, the Seventh Circuit in *dicta* has opined that in those cases where First Amendment protections are not available for *Garcetti* reasons, officers are not without a remedy, since the statutory Whistleblower protections should attach. *Sigsworth v. City of Aurora, Ill.*, 487 F.3d 506, 511 (7th Cir. 2007) ("[E]ven employees who face retaliation for speech connected to a job duty may be entitled to protection under their state whistleblower statutes. *See id.* at 1962;

740 Ill. Comp. Stat. §§ 174/15 & 30 (2007)"); *See* also, *Fairley v. Andrews*, 578 F.3d 518, 523 (7th Cir. 2009).

There is ample evidence in the record to allow a jury to decide that each of the individual Defendants retaliated against the Plaintiffs because, not only did they disclose the criminal activity of the Watts/Mohammed squad, but they developed the criminal case that put them in jail. It is uncontested that the Plaintiffs disclosed criminal activity of their fellow officers, both to the FBI and to the Chicago Police Department.

The two cases cited by the Defendants have no applicability to the instant case. In *Pignato v. Givaudan Flavors Corp.*, 2013 WL 995157 (N.D. IL March 13, 2013) a maintenance supervisor called the FDA hotline and informed his own supervisor that his production manager wouldn't shut down production when he found paint chips throughout the facility. The defendants claimed that they had decided to terminate plaintiff's employment before he ever made the calls. The court held that the only evidence the plaintiff had produced to link the termination to the FDA complaint was the timing. Plaintiff presented no evidence even suggesting that his employer knew he had contacted the FDA prior to his termination. In *Noe v. R.R. Donnelley & Sons*, 2011 WL 5078770 (N.D. IL Oct. 25, 2011), the plaintiff was terminated for violation of the company's attendance policy. His entire IWA claim was based upon the fact that in the midst of his absences, he filed an OSHA complaint but, "He never informed anyone at Donnelley of the complaint, he does not know if anyone at Donnelley knew of it." *Id* at *3. And he admitted the Department of Labor never revealed his identity to the company. *Id at *10.*

In *LaRiviere v. Bd. of Trustees of S. Illinois Univ.*, 2015 IL App (5th) 140443-U, ¶ 23 (a non-precedential Order which, pursuant to Illinois Supreme Court Rule 23 may not be cited by any party except to support contentions of double jeopardy, *res judicata*, collateral estoppel or law of the case.), the Court simply held that an "oral reprimand" does not rise to the level of an

adverse employment action as a matter of law.  We would agree with that.  However, it strains belief that Defendants would equate the retaliatory adverse actions taken against the Plaintiffs, including threats to their jobs and their lives, to an oral reprimand. Spalding alleges that she was constructively terminated as a result of the harassing actions taken against her. She has suffered both emotional and financial ruin. (PSOF ¶77). Echeverria, though still employed by the CPD, was so emotionally damaged that he was forced to take a six-month medical leave.  (PSOF ¶ 78). While employed, their lives were placed in imminent danger by Defendants' orders not to back them up in an emergency. They were prohibited from returning to prestigious and sought-after positions in the Narcotics Division; they were assigned dead end cases and third watch assignments. They were essentially prevented from effectively performing their jobs. Any one of these actions far exceed the single adverse action allowed to go to the jury as a potential violation of the IWA in *Brame v. City of N. Chicago*, 2011 IL App (2d) 100760, ¶ 3, 955 N.E.2d 1269, 1271.

### 8.  THE PLAINTIFFS' IWA CLAIMS ARE NOT BARRED BY THE TORT IMMUNITY ACT

The Court in *Bello v. Vill. of Skokie*, No. 14 C 1718, 2015 WL 9582986, at *12 (N.D. Ill. Dec. 31, 2015) (not cited by the Defendants, though clearly on point), held that acts that are taken against a police officer by a supervisor in retaliation for protected activity under the IWA, are not insulated from liability by the Tort Immunity Act because the supervisors "were not balancing competing interests."

> The decisions that the individual defendants made regarding Bello's discipline are discretionary as that word is understood under the TIA, because defendants made decisions, without a prescribed mandate, that only they (as Bello's superiors) were entitled to make. *See Johnson v. Mers*, 279 Ill.App.3d 372, 380, 216 Ill. Dec. 31, 664 N.E.2d 668, 675 (1996); *cf. Stratman*, 291 Ill.App.3d at 131, 225 Ill.Dec. 448, 683 N.E.2d at 957 (decisions are not discretionary where they are not unique to defendant's public office). But if defendants were retaliating against Bello when they ordered him to cease responding 'kill' in roll call, ordered him to attend counseling, and suspended him, they were not balancing competing interests, and they are not entitled to immunity under the TIA. *See Weiler v. Vill. of Oak Lawn*, 86 F.Supp.3d 874, 885–86 (N.D.Ill.2015). Like *Weiler*, this case is reminiscent of *Valentino v. Village of South Chicago Heights*, 575 F.3d 664 (7th Cir.2009), in which the Seventh Circuit stated that a 'one-time decision to fire one

28

employee [ ] does not amount to a 'judgment call between competing interests.' In fact, we are at a loss to identify any competing interests at all.' *Id.* at 679 (quoting *Van Meter*, 207 Ill.2d at 379, 278 Ill.Dec. 555, 799 N.E.2d at 285). For these reasons, defendants are not entitled to summary judgment on counts 2 and 3.

*Id.* 2015 WL 9582986 (N.D.Ill.), 13.

With regard to Plaintiffs' claims against the City of Chicago as their employer (as distinct from the individual Defendants), the Illinois Supreme Court has held that Section 2-109 does not apply where the employer, not the employee, ultimately causes the injury. *Smith v. Waukegan Park Dist.*, 231 Ill. 2d 111, 117, 896 N.E.2d 232, 236 (2008), *as modified on denial of reh'g* (Sept. 22, 2008).

## 9. THE CONTINUING VIOLATION THEORY MAKES ALL CLAIMS ACTIONABLE

While a one-year statute of limitation may be applicable to a governmental entity under the Illinois Whistleblower Act where the retaliatory action is a one-off termination of employment, see *e.g.*, *Padilla v. County of Cook*, 100 F.Supp.2d 1145, 1147 (N.D. IL 2000), that is so because having no statute of limitations, the court borrows the state limitations applicable to a retaliatory discharge claim. However, where the cause of action under the IWA involves a series of retaliatory harassment, traditional continuing violation theory requires that the statute of limitations begin to run from the last in the series of retaliatory acts. *Taylor v. Bd. of Educ. of City of Chicago*, 2014 IL App (1st) 123744, ¶ 46, 10 N.E.3d 383, 395-96, *reh'g denied* (June 5, 2014), *appeal denied,* 20 N.E.3d 1264 (Ill. 2014) and *appeal denied,* 20 N.E.3d 1264 (Ill. 2014):

The parties do not dispute that actions under the Act against public employers are subject to the one-year limitations period set forth in the Local Governmental and Governmental Employees Tort Immunity Act. See 745 ILCS 10/8–101(a) (West 2010); *Padilla v. County of Cook,* 100 F.Supp.2d 1145, 1147 (N.D.Ill.2000). In general, the limitations period begins to run when the interest at issue is invaded. *Pavlik v. Kornhaber,* 326 Ill.App.3d 731, 744–45, 260 Ill. Dec. 331, 761 N.E.2d 175 (2001). However, under the "continuing tort" or "continuing violation" theory, where the tort involves continuous or repeated injurious behavior, by the same actor and of a similar nature, the limitations period is held in abeyance and the plaintiff's cause of action does not accrue until the date the final injury occurs or the tortuous acts cease. *Feltmeier v. Feltmeier,* 207 Ill.2d 263, 278, 798 N.E.2d 75 (2003); **311 *396; Pavlik,* 326 Ill.App.3d at 745, 260 Ill. Dec. 331, 761 N.E.2d 175. A continuing tort is not established by ongoing injuries resulting from one discreet act (see *Hyon Waste Management Services, Inc. v. City of Chicago,* 214 Ill.App.3d 757, 762, 158 Ill. Dec. 335, 574 N.E.2d 129 (1991)), but instead involves viewing the defendant's conduct as a

series of tortuous acts amounting to a continuous whole. *Feltmeier,* 207 Ill.2d at 279, 278 Ill. Dec. 228, 798 N.E.2d 75. The continuing tort theory has been held applicable to claims for emotional distress. *Id.*

In this case, the basis for the plaintiff's claim under the Act was that from the period immediately following his report of suspected abuse in May 2007, through the nonrenewal of his contract in January of 2009, and to the end of his employment in June 2009, he was subjected to a continuous pattern of petty harassment by the Board in direct retaliation for that report. … We conclude that the evidence established a continuous course of conduct at the hands of Lewis and other Board employees, which gave rise to the plaintiff's claim under the Act. Accordingly, the court did not abuse its discretion in denying the Board's motion *in limine,* and allowing the evidence of retaliatory conduct dating back to January of 2008.

Plaintiffs have adequately alleged, and presented evidence of, a course of conduct that began with the City's refusal to return them to their Narcotics Unit because they were "Rats" responsible for the arrest and conviction of fellow officers and continuing through their harassment during their time in the Fugitive Apprehension Unit. As in *Taylor,* the continuing violation theory renders all of these acts timely.

## IV.    CONCLUSION

For the reasons set forth herein, evidencing substantial disputes as to genuine issues of material facts, the Plaintiffs respectfully request that this Court deny the Defendants' Motion for Summary Judgment in its entirety.

Respectfully submitted,

**/s/ Jeffrey L. Taren**

Jeffrey L. Taren
Miriam Geraghty
Kinoy, Taren & Geraghty, P.C.
224 S. Michigan Ave., Ste. 490
Chicago, IL 60604
(312) 663-5210
Fax: (312) 663-6663
jtaren@ktglawyer.com
mgeraghty@ktglawyer.com

Christopher R. Smith
1 N. LaSalle St., Ste. 2000
Chicago, IL 60602
(312) 432-0400
chris@crstrialgroup.com

30