**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Chicago Police Officer SHANNON SPALDING, | ) | |
| Chicago Police Officer DANIEL ECHEVERRIA, | ) | Case No. 12-cv-8777 |
| | ) | |
| Plaintiffs, | ) | Judge Gary Feinerman |
| | ) | Magistrate Judge Shelia Finnegan |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT
OF UNDISPUTED MATERIAL FACT**

Now comes the Plaintiffs, by their counsel, and hereby respond to the Defendants' Local

Rule 56.1 Statement of Undisputed Fact.

**<u>Parties, Jurisdiction and Venue</u>**

1.      Plaintiff Spalding is and has been since 1996 a police officer employed by

Defendant City of Chicago (the "City"). (First Amended Complaint ("FAC") and Answer to

FAC, ¶ 3.) Plaintiff Echeverria is and has been since 1999 a police officer employed by the City.

(FAC and Answer to FAC, ¶ 4.)

**<u>RESPONSE</u>**:  Admit

2.      Defendant City of Chicago is now and was at all times complained of a

municipality incorporated in the State of Illinois, and was the employer of the individually

named defendants for certain periods of time. (FAC and Answer to FAC, ¶ 5.)

**<u>RESPONSE</u>**:  Admit

3.      Defendant Juan Rivera ("Rivera") is or was at all times complained of employed

by the City as a Chicago Police Officer. Defendant James O'Grady ("O'Grady") is or was at all

times complained of employed by the City as a Chicago Police Officer. Defendant Nicholas Roti ("Roti") is or was at all times complained of employed by the City as a Chicago Police Officer. (FAC and Answer to FAC, ¶ 9.)

**RESPONSE**:  Admit

4.      Defendant Maurice Barnes ("Barnes") is or was at all times complained of employed by the City as a Chicago Police Officer. Defendant Robert Cesario ("Cesario") is or was at all times complained of employed by the City as a Chicago Police Officer. (FAC and Answer to FAC, ¶ 13.)

**RESPONSE**:  Admit

5.      Defendant Joseph Salemme ("Salemme") is or was at all times complained of employed by the City as a Chicago Police Officer. Defendant Thomas Mills ("Mills") is or was at all times complained of employed by the City as a Chicago Police Officer. (FAC and Answer to FAC, ¶ 15.)

**RESPONSE**:  Admit

6.      Plaintiffs assert that this Court has jurisdiction of the action pursuant to the Civil Rights Act, 42 U.S.C. § 1983, 28 U.S.C. § 1331 and 1343(a), and the Constitution of the United States; and that it also has supplemental jurisdiction under 28 U.S.C. § 1367. (FAC, ¶ 1.) Plaintiffs assert that venue is proper under 28 U.S.C. § 1391(b). (FAC, ¶ 2.)

**RESPONSE**:  Admit

### Spalding Learns of the Ongoing Watts Investigation

7.      In May 2006, Plaintiffs were assigned to the Narcotics Division of Unit 189, Bureau of Organized Crime. (FAC and Answer to FAC, ¶ 19.)

**RESPONSE**:  Admit

8. In approximately 1997, while Spalding was working as a Chicago Police Officer assigned to Public Housing South, FBI Special Agent Ken Samuels contacted Spalding and asked her if she had any knowledge of illegal activity by multiple officers, including Sergeant Ronald Watts ("Watts"), who was also then working in Public Housing South. Spalding told Agent Samuels that she was not aware of any illegal activity by Watts or the other officers. (Deposition of Shannon Spalding, pp. 20-25.)

**RESPONSE**: Admit

9. Based on that contact to her by Agent Samuels, Spalding knew then that the FBI was looking into allegations of illegal activity by Watts and other officers. (Spalding Dep., pp. 25-26.)

**RESPONSE**: Deny. Spalding admits the FBI was looking into misconduct. She believed the focus of the investigation was on Officer Seinitz. Officer Watts' name was also mentioned. (Spalding Dep., p. 25-26)

**Plaintiffs' Internal Reporting within CPD**

10. Plaintiffs allege that approximately ten years later, during an intelligence debriefing of one suspect in 2007 by Chicago Police Department ("CPD") officers including Plaintiff Echeverria, the suspect informed Echeverria of certain alleged illegal activity by Watts. (Echeverria Dep., pp. 10-11; Spalding Dep., pp. 28-33.)

**RESPONSE**: Admit, but not as an allegation, as a fact. (See PSOF ¶4-5)[1]

---

[1] "PSOF __¶" refers to Plaintiffs' Statement of Facts in Opposition to Summary Judgment filed along with this Response. Each paragraph in the PSOF references deposition or affidavit testimony attached as Exhibits to both the Defendants' and the Plaintiffs' 56.1 Statement of Facts.

11.     Plaintiffs allege that Echeverria reported the alleged illegal activity conveyed by the suspect to his supervisor, CPD Sergeant Roderick Watson ("Watson"). (Echeverria Dep., pp. 12-15, 18-19; Spalding Dep., pp. 34-35.) At that time, Echeverria's understanding was that Watson was going to do a "confidential investigation or something" with respect to the information reported about Watts. (Echeverria Dep., p. 19.)

**RESPONSE**:  Plaintiffs admit the first sentence, but deny the second sentence. Echeverria believed that Watson "might" initiate a CI, but had no understanding that he "was" going to do a CI. (Echeverria Dep., p. 19.)

### Plaintiffs' External Reporting to the FBI

12.     In 2007, shortly after Echeverria reported the alleged illegal activity of Watts to Watson, Spalding reported the same information concerning Watts' alleged criminal activity to Agent Patrick Smith ("Smith") with the FBI. (Spalding Dep., p. 37; Echeverria Dep., p. 17.) According to Spalding, she did so because she did not have confidence that a fair investigation would happen within CPD. (Spalding Dep., p. 36.)

**RESPONSE**:  Plaintiffs admit the first sentence. Deny second sentence. (See PSOF ¶8.)

13.     When Spalding contacted Agent Smith, she asked him to put her in contact with Agent Ken Samuels or if she could meet with Samuels so that she could give the Watts information to Samuels. Spalding knew that Samuels had previously been investigating Watts. (Spalding Dep., pp. 37-39.)

**RESPONSE**:  Plaintiffs admit the first sentence, but deny knowledge of any investigation into Watts. (Spalding Dep., p. 25-26)

14.     According to Spalding, when she contacted him, FBI Agent Smith informed her that he was already "well aware of the Watts investigation" and had been involved in it.

4

(Spalding Dep., pp. 38-39.) According to Plaintiffs, prior to August 2008 Plaintiffs assisted the FBI on the Watts investigation during their non-work time at CPD. (Spalding Dep., pp. 41-49.)

**RESPONSE**: Plaintiffs admit Paragraph 14, but object to the characterization that it is only according to Plaintiffs.

## CPD Approves Plaintiffs to Work on Watts on CPD Time

15. When Tina Skahill ("Skahill") became the Chief of CPD's Internal Affairs Division ("IAD") in March of 2008, she was briefed on confidential investigations that IAD was conducting and that included the Watts investigation. (Skahill Dep., pp. 7, 9.) When she was briefed at that time, Skahill learned that IAD had been investigating Watts going back at least prior to 2008, and that Plaintiffs had been, prior to March 2008, working with IAD and the FBI on the Watts' investigation. (Id., pp. 7-10; 51.)

**RESPONSE**: Deny that it was possible Skahill was briefed regarding any involvement by the Plaintiffs in the confidential Watts investigation prior to March, 2008 since Plaintiffs were not working with IAD prior to that time. (PSOF ¶12-14)

16. Sometime in or about June 2008, Skahill called Defendant Roti, then Commander of Narcotics, and asked his permission for Plaintiffs to work with the FBI on an as-needed/part-time basis on a corruption case, and Roti agreed. (Roti Dep., pp. 18, 25-26; Roti Decl ¶ 3.)

**RESPONSE**: Deny. Plaintiffs did not inform Skahill of their involvement with the FBI until the August 2008 meeting. (PSOF ¶12-14)

17. Shortly after Skahill called Roti, Agent Smith and another FBI agent came to see Roti and thanked him for letting Plaintiffs work with them. With respect to the case they were working on, the FBI agents informed Roti that they had a case involving police corruption that had been going on for a long time, and that they needed Plaintiffs only when they needed to

utilize a certain confidential informant whom Plaintiffs said would only work with them. (Roti Dep., pp. 29-31.)

**RESPONSE**:  Deny. (PSOF ¶12-14, 17)

18.     Several weeks later, Roti learned from his lieutenant, Lt. Cervenka, that Plaintiffs had not been showing up to the Narcotics section to work. (Roti Dep., pp. 18, 32.) Roti contacted Agent Smith, and confirmed that the FBI only had been utilizing Plaintiffs on a part-time basis, not every day. (Id., pp. 32-33.)

**RESPONSE**:  Deny.  Prior to August, 2008 Plaintiffs were working full time in the Narcotics Unit and reporting to the FBI only on their off duty hours. (PSOF ¶9, 18-19)

19.     In or about July 2008, Roti called Skahill and told her that he was uneasy about not being able to account for Plaintiffs' time or properly supervise them and that he thought Plaintiffs needed to be detailed so that a supervisor with knowledge of the investigation could supervise them and know where they were every day. Skahill agreed. (Roti Dep., pp. 24-25, 31-33.)

**RESPONSE**:  Deny. (PSOF ¶17)

20.     In August 2008, Skahill met with Plaintiffs, along with FBI Agent Smith, CPD Sergeant Tom Chester from IAD and CPD Lieutenant Barbara West from IAD. (Spalding Dep., p. 49; Echeverria Dep., pp. 23-24; Skahill Dep., p. 49.) At the meeting Plaintiffs were informed that they would be detailed to CPD Unit 543, known as Detached Services, and would be working on the Watts investigation (also known as Operation Brass Tax) during their regular CPD work hours. (Spalding Dep., pp. 52, 73-74.; Skahill Dep., p. 13.)

**RESPONSE**:  Admit

21.     According to Plaintiffs, Skahill met with Plaintiffs in August 2008 because they became uncomfortable with Agent Smith's requests to meet and talk with them about the Watts investigation during their regular CPD work hours. (Spalding Dep., pp. 47-49.)

**RESPONSE**:  Admit the underlying facts, but object to the words "According to Plaintiffs."

22.     Skahill made the decision to detail Plaintiffs to Detached Services so it wouldn't indicate that they working with IAD directly. (Skahill Dep., p. 13.)

**RESPONSE**:  Plaintiffs admit that Skahill made the decision to detail Plaintiffs to Detached Services so it wouldn't indicate that they were working with IAD directly. Plaintiffs were detailed to Detached Services (Unit 543) to work directly with the FBI. (PSOF ¶17-18)

23.     According to Plaintiffs, within days of the August 2008 meeting Plaintiffs were detailed to Detached Services and began to work on Operation Brass Tax during their regular CPD work hours. (Spalding Dep., pp. 73-74; Echeverria Dep., pp. 34-35.) Plaintiffs are not claiming that their detail to Detached Services was retaliatory. (Echeverria Dep., p. 35.)

**RESPONSE**: Admit

24.     Echeverria learned in the August 2008 meeting that the FBI and CPD had been investigating Watts and an Officer Mohammed ("Mohammed") for nearly a decade before 2008. (Echeverria Dep., pp. 27-28.)

**RESPONSE**:  Admit.  But the Watts investigation was inactive. (PSOF ¶17)

**Defendants Roti and O'Grady**

25.     Other than knowing that Plaintiffs were being detailed to Detached Services to assist IAD, Skahill believes Roti probably would not have known particulars of the investigation.

(Skahill Dep., p. 26.) Skahill has no knowledge of O'Grady knowing that Plaintiffs were
working on Operation Brass Tax. (Id.)

> **RESPONSE**:  Objection to Paragraph 25 being irrelevant and speculative.  Deny that
>
> Plaintiffs were being detailed to Detached Services to assist IAD.  Plaintiffs were detailed
>
> to Detached Services (Unit 543) to work with the FBI. (PSOF ¶17-18)

26.     When Defendant O'Grady took over as Commander of the Narcotics Division,
Roti told O'Grady that Plaintiffs were on loan to IAD working on a police corruption case.
(O'Grady Dep., pp. 18-19.) Roti did not tell O'Grady the names of the officers who were being
investigated or any other specifics about the case. (Id.)

> **RESPONSE**:  Admit that O'Grady testified that Roti told him Plaintiffs were on loan to
>
> IAD working on a police corruption case.  Deny that Plaintiffs were on loan to IAD.
>
> (PSOF ¶18)

27.     O'Grady has never met either of the Plaintiffs and has never supervised them.
(O'Grady Dep., pp. 15-16, 21.) O'Grady doesn't know Watts. (Id., p. 62.)

> **RESPONSE**:  Admit that O'Grady never directly supervised Plaintiffs.  However,
>
> O'Grady was their Commander while they were detailed out of Narcotics into Unit 543.
>
> (Spalding Dep., pp. 63-65, 95).  Admit that O'Grady does not know Watts.

28.     According to Plaintiffs, the first incident of retaliation that Plaintiffs are alleging
in this lawsuit occurred on August 17, 2010, more than two years after Plaintiffs claim they
started working on Operation Brass Tax during their regular CPD work hours. (Spalding Dep., p.
242; Echeverria Dep., pp. 38-40.)

> **RESPONSE**:  Plaintiffs admit to the facts in Paragraph 28. Object to the words
>
> "According to Plaintiffs."

29.     In connection with the August 17, 2010 incident, O'Grady would not approve a request from Plaintiffs for a confidential informant on a narcotics case unrelated to Watts that was presented to him by Sergeant James Padar ("Padar") because Plaintiffs were not then working in the Bureau of Organized Crime (which included the Narcotics Division) as they had been detailed elsewhere, O'Grady had no idea what Plaintiffs were doing, and O'Grady wanted Plaintiffs' supervisors to contact him to make sure they knew what Plaintiffs were doing. (O'Grady Dep., pp. 62-65.)

**RESPONSE**:  Deny. O'Grady would not approve a request from Plaintiffs for a confidential informant because he viewed Plaintiffs as "rats." (PSOF ¶22-24)

30.     In the conversation between O'Grady and Padar concerning Plaintiffs' request for approval of the confidential informant, O'Grady did not refer to Plaintiffs as "rats" or make any reference to Plaintiffs reporting or investigating misconduct by police officers. (O'Grady Dep., pp. 62-65; Padar Dep., pp. 61-62.)

**RESPONSE**:  Deny. (PSOF ¶22-24)

31.     O'Grady never told Padar not to work with Plaintiffs or not to back up or assist Plaintiffs, never said anything to Padar about what would happen to Plaintiffs if there was a 10-1, and never referred to Plaintiffs as IAD rats. (Padar Dep., pp. 75-76.) O'Grady never instructed any supervisors or officers in Narcotics not to work with Plaintiffs. (O'Grady Dep., p. 66.)

**RESPONSE**:  Deny. (PSOF ¶22-24)

32.     At some point prior to working in Narcotics, O'Grady had worked in IAD and had personally arrested other officers for home invasion and robbing drug dealers. (O'Grady Dep., pp. 29-30.) O'Grady did not consider himself or fellow IAD officers to be rats. (Id., p. 37.)

**REPSONSE**:  Object to Paragraph 32 as irrelevant.

9

33. O'Grady never referred to Plaintiffs at any time as rats. (O'Grady Dep., pp. 37-38.)

**RESPONSE**: Deny. (PSOF ¶24, 38)

34. At some point in his career at CPD, Roti had been involved in the arrest of other Chicago police officers who were charged with a federal narcotics conspiracy. (Roti Dep., pp. 94-95.)

**RESPONSE**: Object to Paragraph 34 as irrelevant.

35. When Defendant Rivera succeeded Skahill as Chief of IAD, Skahill introduced Plaintiffs to Rivera and told Rivera that the Watts investigation involved an allegation that Watts and Mohammed were extorting money from drug sellers, and that Plaintiffs' role in the investigation was handling an informant. (Rivera Dep., pp. 18-20.)

**RESPONSE**: Admit that Skahill told Rivera that Plaintiffs were involved with the Watts investigation. Deny that Plaintiffs' role was limited to handling a confidential informant. (PSOF ¶18)

36. Later, after reading some reports, Rivera recalled that a complaint about Watts had been made to IAD back in 2004 based on this same activity, and an investigation had been initiated. (Rivera Dep., p. 20.)

**RESPONSE**: Admit. Plaintiffs do not admit that the complaint involved the same activity reported to the Plaintiffs in 2007.

37. Skahill never told Rivera that O'Grady or Roti knew that Plaintiffs were working on the Watts investigation. (Rivera Dep., p. 23.) Rivera never told O'Grady about Plaintiffs being involved in Operation Brass Tax or any type of investigation of police officers. (Rivera Dep., p. 33; O'Grady Dep., pp. 27-28, 86.)

**RESPONSE**: Plaintiffs deny the first sentence. Skahill testified that she doesn't know whether she told Rivera that O'Grady knew about Operation Brass Tax. (Skahill Dep., p. 23) Plaintiffs also deny the second sentence. (PSOF ¶26, 32-34)

38.     Rivera never spoke to an individual named Ernie Brown about Operation Brass Tax or the fact that Plaintiffs were involved in an operation investigating officers. (Rivera Dep., p. 32.)

**RESPONSE**: Deny. (PSOF ¶25-26)

39.     Rivera was never in a meeting with O'Grady and Roti in which Plaintiffs came up. (Rivera Dep., pp. 58-59; O'Grady Dep., p. 78.)

**RESPONSE**: Deny. (PSOF ¶ 34)

40.     Rivera never spoke to Roti about Plaintiffs until sometime after Plaintiffs had filed their lawsuit. (Rivera Dep., pp. 33-35.)

**RESPONSE**: Deny. (PSOF ¶34)

41.     After being detailed out of Narcotics, Plaintiffs never asked O'Grady if they could return to the Narcotics Division at any time. (Spalding Dep., p. 194; O'Grady Dep., p. 42.) After being detailed out of Narcotics, Plaintiffs never spoke to Roti or sent any correspondence to Roti asking to return to the Narcotics Division at any time. (Roti Dep., pp. 74, 84; Echeverria Dep., p. 138.)

**RESPONSE**: Admit that after Rivera told Plaintiffs they would not be assigned back to Narcotics, Plaintiffs did not ask to return. (PSOF ¶30)

42.     When Roti took over the Narcotics Division in 2008, he spoke with and received information from the assigned lieutenants regarding the personnel in his new unit. Some of that information included personnel assessments of the officers in Narcotics completed by their

supervisors, which were emailed to him on April 13, 2008. With respect to Spalding, the

personnel assessment completed by her sergeant at the time, Sergeant Kevin Johnson, stated as

follows:

> P.O. Spalding, Shannon #17887.
> Strengths: none
> Weakness: Source of conflict and division within team. Questions
> orders and missions. Very deceptive in. manner. Fails to follow
> directions. Surveillance abilities average; buy abilities hampered by
> her approach and attitude towards targets. Will not take initiative
> during operations and fails to adapt to changing conditions.
> Bypasses chain of command on a consistent basis. Critical of
> supervision and fellow team members to other personnel.

(Roti Decl., ¶ 2, and Exhibit 1 attached thereto.)

**RESPONSE**:  Object to Paragraph 42 for being inadmissible hearsay and irrelevant.

43.     In May 2011, Roti was asked informally by then Chief Rivera of IAD about

taking Plaintiffs back in the Bureau of Organized Crime, Narcotics Division. Roti consulted with

O'Grady, and Roti and O'Grady agreed that they were not interested in taking Plaintiffs back to

Narcotics, and Roti so informed Rivera. (Roti Decl. ¶ 5.)

**RESPONSE**: Admit, but clarify that O'Grady and Roti's actions effectively removed

Plaintiffs for the Narcotics Division to which they had been assigned.

44.     O'Grady did not want Spalding to come back to Narcotics because Spalding's

reputation in Narcotics from her previous stint was bad in terms of not getting along with her

team members and being very difficult to supervise, and because of an incident when Plaintiffs

were previously in Narcotics that had resulted in a CR against Plaintiffs. In the CR matter,

O'Grady understood that Spalding had engaged an on-duty officer to go with her to threaten an

individual to return a dog to Spalding that Spalding had previously given away to the individual.

(O'Grady Dep., pp. 15, 39-41.)

**RESPONSE**: Deny. (PSOF ¶33-39)

45.     O'Grady had a role in reviewing the CR resulting from the "dog incident" and agreed that the finding against both Plaintiffs should be sustained, but recommended lesser penalties for Plaintiffs. (O'Grady Dep., p. 40.) O'Grady told Roti that Spalding's problematic reputation in the unit and the "dog incident" that resulted in the CR "really cemented the fact that [O'Grady] didn't want her under [his] supervision." (Id., p. 42.)

**RESPONSE**: Plaintiffs admit the first sentence, but deny the second sentence. (PSOF ¶33-39)

46.     Roti also knew about the "dog incident" because the resulting CR case came to him for review. (Roti Dep., pp. 45-46, 54-57.)

**RESPONE**: Admit

47.     Roti agreed with O'Grady's recommendation not to take Plaintiffs back in Narcotics. (Roti Dep., pp. 74-76.) Roti's reasons for not wanting them back in Narcotics were Plaintiffs' prior history when they previously worked in Narcotics, the dog incident that resulted in the CR investigation, and what Roti found to be a discrepancy at one point in terms of whether Plaintiffs were showing up for work on days when they weren't working with the FBI on Operation Brass Tax. (Id., pp. 32-33, 74-76.)

**RESPONSE**: Deny. (PSOF ¶33-39)

48.     One of the reasons that Roti was not interested in taking Plaintiffs back in Narcotics was because Spalding had received the extremely poor performance evaluation in April 2008, when she was previously in Narcotics. (See Roti Decl., ¶ 5.)

**RESPONSE**: Deny. (PSOF ¶33-39)

13

**<u>Plaintiffs Join Fugitive Apprehension Unit</u>**

49.     After the conclusion of Operation Brass Tax, Plaintiffs applied for positions in the Fugitive Apprehension Unit, Unit 606, and Rivera and Skahill wrote letters of recommendation in support of their applications. Plaintiffs were reassigned to the Fugitive Apprehension Unit on or about March 18, 2012. (Spalding Dep., pp. 214-215; Echeverria Dep., pp. 143-144.)

**<u>RESPONSE</u>**: Admit

50.     Plaintiffs are not claiming that there was anything retaliatory about their move to the Fugitive Apprehension Unit. (Spalding Dep., p. 210; Echeverria Dep., p. 144.)

**<u>RESPONSE</u>**: Admit

51.     Plaintiffs have no personal knowledge that O'Grady spoke to Defendant Barnes in Fugitive Apprehension about anything prior to Plaintiffs starting in Fugitive Apprehension. (Spalding Dep., p. 221.) Plaintiffs have no personal knowledge that O'Grady spoke to Defendants Salemme or Cesario in a negative manner about them before Plaintiffs started in Fugitive Apprehension. (Id., pp. 221-222.)

**<u>RESPONSE</u>**: Admit.

52.     O'Grady never spoke to anyone in the Fugitive Apprehension Unit about Plaintiffs before Plaintiffs' first day in the Fugitive Apprehension Unit. (O'Grady Decl., ¶ 6.)

**<u>RESPONSE</u>**: Plaintiffs deny Paragraph 52 based on the inferences contained in PSOF ¶44-57.

**Plaintiffs on Barnes' Team**

53.     Plaintiffs' first assignment in the Fugitive Apprehension Unit was on Barnes' team. (Barnes Dep., pp. 31-32.) Prior to their arrival on his team, Barnes had not heard anything negative about Plaintiffs. (Id., p. 33.)

**RESPONSE**: Plaintiffs admit the first sentence, but deny the second sentence. (PSOF ¶58-60)

54.     Barnes has never spoken to O'Grady, Roti or Rivera about Plaintiffs or their lawsuit. (Barnes Dep., pp. 33, 139-141; O'Grady Dep., p. 84.)

**RESPONSE**: Admit.

55.     Cesario never told Barnes anything negative about Plaintiffs. (Barnes Dep., p. 34.)

**RESPONSE**: Deny. (PSOF ¶52)

56.     Barnes did not have any conversations with Cesario or Salemme about the types of assignments to give to Plaintiffs. (Barnes Dep., p. 20.) Cesario never told Barnes to give Plaintiffs dead-end assignments. (Id., p. 105.)

**RESPONSE**: Admit

57.     Barnes did not make case assignments. (Barnes Dep., p. 108.)

**RESPONSE**: Admit.

58.     Cesario never spoke to O'Grady about Plaintiffs. (Cesario Dep., pp. 75-76.)

**RESPONE**: Deny. (PSOF ¶69)

59.     Barnes never told team members to not back up Plaintiffs on the streets or that Plaintiffs were from IAD and not to trust them. (Barnes Dep., p. 43.)

**RESPONSE**: Deny. (PSOF ¶58-61)

60.     Prior to learning it in the media after Plaintiffs were no longer on his team, no one ever told Barnes that Plaintiffs were responsible for putting a sergeant in prison or were involved in any type of investigation of an officer. (Barnes Dep., pp. 77-80.)

**RESPONSE**: Deny. (PSOF ¶58-61)

61.     On one occasion when Plaintiffs were on Barnes' team, Spalding's boyfriend Officer Tony Hernandez ("Hernandez"), approached Barnes in what Barnes perceived to be an angry, pissed-off manner alleging that Barnes was trying to dump Spalding from the Fugitive Apprehension Unit. (Barnes Dep., pp. 83-84.) Barnes reported the incident with Spalding's boyfriend to Cesario the next day. (Id., p. 89.)

**RESPONSE**: Admit.

62.     Barnes was in a meeting with Plaintiffs and Salemme and Cesario at which Plaintiffs were informed they were being removed from Barnes' team. (Spalding Dep., pp. 239, 244-258.)

**RESPONSE**: Admit

63.     Barnes did not make the decision to remove Plaintiffs from his team and did not ask or suggest that Plaintiffs be removed from his team. (Barnes Dep., pp. 88-89.) Cesario made the decision to move Plaintiffs from Barnes' team to Defendant Mills' team. (Cesario Dep., p. 78.)

**RESPONSE**: Admit

64.     At the June 2012 meeting attended by Plaintiffs, Cesario, Salemme and Barnes, Plaintiffs were removed from Barnes' team because of the confrontation Hernandez had with Barnes and because of Plaintiffs' poor performance. (Cesario Dep., pp. 55, 78-79.) With respect to Plaintiffs' poor performance, Cesario was relying on reports that showed Plaintiffs' arrest

activity between March 22, 2012 and June 21, 2012. (Cesario Dep., pp. 51-52; Cesario Decl., ¶ 2 and Exhibits 1 and 2 to Cesario Decl.)

**RESPONSE**: Deny. (PSOF ¶62-65)

65.     Plaintiffs agree that at the June 2012 meeting where they were informed of their transfer from Barnes' team to Mills' team, Cesario had arrest activity reports with him in the meeting and cited their low arrest activity from March to June 2012, and that the incident between Hernandez and Barnes was also discussed. (Spalding Dep., pp. 245-246, 250-251; Echeverria Dep., pp. 169-171, 177.)

**RESPONSE**: Admit.

66.     Plaintiffs do not know whether their arrest activity from March 22, 2012 to June 21, 2012, as reflected in CPD records that were presented to them by Cesario at the June 2012 meeting, is correct or not. (Spalding Dep., pp. 260-261 and Ex. 5 to Spalding Dep.; Echeverria Dep., pp. 196-198 and Ex. 7 to Echeverria Dep.)

**RESPONSE**: Admit.

67.     Based on the confrontation between Hernandez and Barnes, Salemme agreed that it would be best to remove Spalding from Barnes' team. (Salemme Dep., p. 29.)

**RESPONSE**: Deny. (PSOF ¶62-65)

68.     At some point in his career at CPD, Salemme reported to his supervisor information Salemme learned regarding another officer's illegal conduct. Salemme was put in charge of the investigation, which included the handling of three confidential informants, and Salemme arrested that officer, who was ultimately convicted. (Salemme Dep., pp. 12-13.)

**RESPONSE**: Object to Paragraph 68 based on relevance.

17

69.     Plaintiffs were then moved from Barnes' team on the Second Watch to Defendant Mills' team on the Third Watch. (Spalding Dep., p. 262.)

**RESPONSE**: Admit.

70.     Plaintiffs are not alleging that there was any retaliation by Barnes after they were moved to Mills' team. (Echeverria Dep., pp. 218-219.)

**RESPONSE**: Admit.

### Plaintiffs on Mills' Team

71.     At the time Plaintiffs were moved from Barnes' team to Mills' team, the Fugitive Apprehension Unit was starting a new Third Watch that had to be staffed by officers. At that time, Plaintiffs had only been in the Fugitive Apprehension Unit a few months. (Spalding Dep., pp. 258-259; Echeverria Dep., pp. 178-179.)

**RESPONSE**: Admit.

72.     Mills was not working in Fugitive Apprehension when Plaintiffs were on Barnes' team, and had never met Plaintiffs before he was transferred to Fugitive Apprehension and Plaintiffs were assigned to his team. (Mills Dep., p. 7.) The transfer order that sent Mills to Fugitive Apprehension included three sergeants and approximately 30 officers. (Id., p. 8.)

**RESPONSE**: Admit.

73.     In his CPD career before coming to Fugitive Apprehension Unit, Mills previously worked in IAD. (Mills Dep., p. 5; Spalding Dep., p. 266.) While in IAD, Mills recommended the discipline of other officers. (Mills Dep., p. 155.)

**RESPONSE**: Object based on relevance.

74.     In one of their first conversations with Mills, Mills told Plaintiffs something along the lines that they'd have a fresh start with Mills. (Spalding Dep., pp. 287-288; Mills Dep., p. 24.)

**RESPONSE**: Admit.

75.     Plaintiffs do not allege that Mills engaged in any retaliation against them until after they filed their lawsuit on November 1, 2012. (Spalding Dep., p. 268; Echeverria Dep., p. 191.)

**RESPONSE**: Admit.

76.     Mills did not have any conversations with anyone about Plaintiffs before they joined his team. (Mills Dep., p. 22.) O'Grady never spoke to Mills about Plaintiffs before their lawsuit was filed. (O'Grady Dep., pp. 83-84.)

**RESPONSE**: Admit.

77.     On one occasion, Detective Steve Becker told Mills that he believed Spalding had illegally recorded a conversation Mills was having with Plaintiffs using Spalding's cellphone. (Mills Dep., p. 37.)

**RESPONSE**: Plaintiffs deny Paragraph 77. Paragraph 77 mischaracterizes Mills' testimony. (Mills Dep., pp. 63-64)

78.     Mills initiated a CR against Spalding based on what Becker reported to Mills. (Mills Dep., p. 63.) When Mills was interviewed by Officers Barz and Musculino who were investigating the matter, Mills told them that during the subject conversation Mills did not see anything that appeared to be evidence of Plaintiffs recording the conversation. (Id., pp. 54-55.)

**RESPONES**: Admit.

79.     Mills never spoke with Cesario about the types of cases that Plaintiffs were being assigned. (Mills, pp. 133-134.) Mills had no control of how assignments were dispensed to his team. (Mills Dep., p. 134.)

**RESPONSE**: Admit.

80.     O'Grady never issued an order, verbal or written, that Spalding was not allowed in Homan Square. (O'Grady Dep., p. 68.) On one particular occasion when O'Grady saw Spalding visiting her boyfriend Officer Hernandez who was on duty at Homan Square, O'Grady called Commander Salemme in Fugitive Apprehension and told him that unless Spalding was there on police business she shouldn't be at Homan Square, which was a restricted area. (Id., pp. 69-70, 73.)

**RESPONE**: Deny. (PSOF ¶66-69)

### Plaintiffs on Stack's Team

81.     At some point, Plaintiffs requested to be moved back to days in Fugitive Apprehension. That request was granted and Plaintiffs were reassigned to Sergeant Stack's team on days. (Spalding Dep., p. 333; Echeverria Dep., p. 219.)

**RESPONSE**: Admit.

82.     Spalding never reported for duty on days with Sergeant Stack. (Spalding Dep., p. 333.) Echeverria is not claiming that he has suffered any retaliation since he's been on Sergeant Stack's team. (Echeverria Dep., pp 219-220.)

**RESPONSE**: Admit.

### Defendants' Lack of Knowledge of Protected Activity

83.     Prior to November 2012 when Plaintiffs filed their federal lawsuit and their lawsuit was discussed in the media, Roti had no knowledge that either Plaintiff reported to the

FBI any alleged criminal misconduct or corruption by Watts, Mohammad or any other Chicago Police officer. (Roti Decl., ¶ 3.) Roti never made any statements to or about Plaintiffs or took any action against or relating to Plaintiffs based on any reports they may have made to the FBI of alleged criminal misconduct or corruption by Watts, Mohammad or any other Chicago Police officer. (Roti Decl., ¶ 6.)

 **RESPONSE**: Deny. (PSOF ¶21, 30, 31, 34, 37-38)

 84. While Roti was aware and authorized Plaintiffs to work with IAD and the FBI on as-needed basis on a corruption investigation, prior to November 2012 when Plaintiffs filed their federal lawsuit and their lawsuit was discussed in the media, Roti also had no knowledge that either Plaintiff reported or disclosed information to the FBI, to any government or law enforcement agency or to anyone within CPD that Watts, Mohammad or any other Chicago Police officer violated any state or federal law, rule, or regulation. (Roti Decl., ¶ 4). Roti never made any statements to or about Plaintiffs or took any action against or relating to Plaintiffs based on the fact that Plaintiffs may have disclosed information to the FBI, to any government or law enforcement agency or to anyone within CPD that Watts, Mohammad or any other Chicago Police officer violated any state or federal law, rule, or regulation. (Roti Decl., ¶ 7).

 **RESPONSE**: Deny. (PSOF ¶21, 30, 31, 34, 37-38)

 85. Prior to November 2012 when Plaintiffs filed their federal lawsuit and their lawsuit was discussed in the media, O'Grady had no knowledge that either Plaintiff went to the FBI and reported any alleged criminal misconduct or corruption by Watts, Mohammad or any other Chicago Police officer. (O'Grady Decl., ¶ 2). O'Grady never made any statements to or about Plaintiffs or took any action against or relating to Plaintiffs based on any reports they may

have made to the FBI of alleged criminal misconduct or corruption by Watts, Mohammad or any other Chicago Police officer. (O'Grady Decl., ¶ 4).

**RESPONSE**: Deny. (PSOF ¶22-24, 31-36, 38)

86.     Prior to November 2012 when Plaintiffs filed their federal lawsuit and their lawsuit was discussed in the media, O'Grady also had no knowledge that either Plaintiff reported or disclosed information to the FBI, to any government or law enforcement agency or to anyone within CPD that Watts, Mohammad or any other Chicago Police officer violated any state or federal law, rule, or regulation. (O'Grady Decl., ¶ 3). O'Grady never made any statements to or about Plaintiffs or took any action against or relating to Plaintiffs based on the fact that Plaintiffs may have disclosed information to the FBI, to any government or law enforcement agency or to anyone within CPD that Watts, Mohammad or any other Chicago Police officer violated any state or federal law, rule, or regulation. (O'Grady Decl., ¶ 5).

**RESPONSE**: Deny. (PSOF ¶22-24, 31-36, 38)

87.     Prior to November 2012 when Plaintiffs filed their federal lawsuit and their lawsuit was discussed in the media, Salemme had no knowledge that either Plaintiff reported to the FBI any alleged criminal misconduct or corruption by Watts, Mohammad or any other Chicago Police officer. (Salemme Decl., ¶ 2). Salemme never made any statements to or about Plaintiffs or took any action against or relating to Plaintiffs based on any reports they may have made to the FBI of alleged criminal misconduct or corruption by Watts, Mohammad or any other Chicago Police officer. (Salemme Decl., ¶ 4).

**RESPONSE**: Deny. (PSOF ¶44, 57, 65)

88.     Prior to November 2012 when Plaintiffs filed their federal lawsuit and their lawsuit was discussed in the media, Salemme also had no knowledge that either Plaintiff

reported or disclosed information to the FBI, to any government or law enforcement agency or to anyone within CPD that Watts, Mohammad or any other Chicago Police officer violated any state or federal law, rule, or regulation. (Salemme Decl., ¶ 3). Salemme never made any statements to or about Plaintiffs or took any action against or relating to Plaintiffs based on the fact that Plaintiffs may have disclosed information to the FBI, to any government or law enforcement agency or to anyone within CPD that Watts, Mohammad or any other Chicago Police officer violated any state or federal law, rule, or regulation. (Salemme Decl., ¶ 5).

**RESPONSE**: Deny. (PSOF ¶44, 57, 65)

89.     Prior to November 2012 when Plaintiffs filed their federal lawsuit and their lawsuit was discussed in the media, Cesario had no knowledge that either Plaintiff went to the FBI and reported any alleged criminal misconduct or corruption by Watts, Mohammad or any other Chicago Police officer. (Cesario Decl., ¶ 3). Cesario never made any statements to or about Plaintiffs or took any action against or relating to Plaintiffs based on any reports they may have made to the FBI of alleged criminal misconduct or corruption by Watts, Mohammad or any other Chicago Police officer. (Cesario Decl., ¶ 5).

**RESPONSE**: Deny. (PSOF ¶45-57)

90.     Prior to November 2012 when Plaintiffs filed their federal lawsuit and their lawsuit was discussed in the media, Cesario also had no knowledge that either Plaintiff reported or disclosed information to the FBI, to any government or law enforcement agency or to anyone within CPD that Watts, Mohammad or any other Chicago Police officer violated any state or federal law, rule, or regulation. (Cesario Decl., ¶ 4). Cesario never made any statements to or about Plaintiffs or took any action against or relating to Plaintiffs based on the fact that Plaintiffs may have disclosed information to the FBI, to any government or law enforcement agency or to

anyone within CPD that Watts, Mohammad or any other Chicago Police officer violated any state or federal law, rule, or regulation. (Cesario Decl., ¶ 6).

**RESPONSE**: Deny. (PSOF ¶45-57)

91.     Prior to November 2012 when Plaintiffs filed their federal lawsuit and their lawsuit was discussed in the media, Barnes had no knowledge that either Plaintiff went to the FBI and reported any alleged criminal misconduct or corruption by Watts, Mohammad or any other Chicago Police officer. (Barnes Decl., ¶ 2).6 Barnes never made any statements to or about Plaintiffs or took any action against or relating to Plaintiffs based on any reports they may have made to the FBI of alleged criminal misconduct or corruption by Watts, Mohammad or any other Chicago Police officer. (Barnes Decl., ¶ 4).

**RESPONSE**: Deny. (PSOF ¶43, 58-62)

92.     Prior to November 2012 when Plaintiffs filed their federal lawsuit and their lawsuit was discussed in the media, Barnes also had no knowledge that either Plaintiff reported or disclosed information to the FBI, to any government or law enforcement agency or to anyone within CPD that Watts, Mohammad or any other Chicago Police officer violated any state or federal law, rule, or regulation. (Barnes Decl., ¶ 3). Barnes never made any statements to or about Plaintiffs or took any action against or relating to Plaintiffs based on the fact that Plaintiffs may have disclosed information to the FBI, to any government or law enforcement agency or to anyone within CPD that Watts, Mohammad or any other Chicago Police officer violated any state or federal law, rule, or regulation. (Barnes Decl., ¶ 5).

**RESPONSE**: Deny. (PSOF ¶43, 58-62)

93.     Prior to November 2012 when Plaintiffs filed their federal lawsuit and their lawsuit was discussed in the media, Mills had no knowledge that either Plaintiff went to the FBI

and reported any alleged criminal misconduct or corruption by Watts, Mohammad or any other Chicago Police officer. (Mills Decl., ¶ 2).7 Mills never made any statements to or about Plaintiffs or took any action against or relating to Plaintiffs based on any reports they may have made to the FBI of alleged criminal misconduct or corruption by Watts, Mohammad or any other Chicago Police officer. (Mills Decl., ¶ 4)

**RESPONSE**: Admit.

94.     Prior to November 2012 when Plaintiffs filed their federal lawsuit and their lawsuit was discussed in the media, Mills also had no knowledge that either Plaintiff reported or disclosed information to the FBI, to any government or law enforcement agency or to anyone within CPD that Watts, Mohammad or any other Chicago Police officer violated any state or federal law, rule, or regulation. (Mills Decl., ¶ 3). Mills never made any statements to or about Plaintiffs or took any action against or relating to Plaintiffs based on the fact that Plaintiffs may have disclosed information to the FBI, to any government or law enforcement agency or to anyone within CPD that Watts, Mohammad or any other Chicago Police officer violated any state or federal law, rule, or regulation. (Mills Decl., ¶ 5).

**RESPONSE**: Admit.

### **Plaintiffs' Failure to Complain of Retaliation/Defendant Rivera**

95.     Plaintiffs never made any written complaints to anyone about any alleged retaliation against them. (Echeverria Dep., p. 220, 225; Spalding Dep., p. 338.) Plaintiffs never made any complaint to the Independent Police Review Authority ("IPRA") about any alleged retaliation against them. (Echeverria Dep., p. 221; Spalding Dep., pp. 342-343.)

**RESPONSE**: Admit

96.     Plaintiffs never told Rivera that they were feeling that people were mistreating them or treating them differently because they were investigating police officers or working on Operation Brass Tax. (Rivera Dep., p. 48.)

**RESPONSE**: Deny. (PSOF ¶27, 28)

97.     Plaintiffs never told Rivera that they were being mistreated and harassed and retaliated against in the Fugitive Apprehension Unit. (Rivera Dep., p. 99.)

**RESPONSE**: Deny. Echeverria complained to Rivera when Plaintiffs were being transferred to third watch. (Rivera Dep., p. 97) Plaintiffs talked to Rivera about the reasons they were being moved from Barnes' team. (Spalding Dep., p. 263; Echeverria Dep., p. 225)

98.     Rivera testified that on one occasion, Spalding told him that her boyfriend, Mr. Hernandez, who worked in narcotics, told her that there were rumors that O'Grady and Roti were referring to Plaintiffs as "snitch" and "rat." Spalding told Rivera that Hernandez did not witness any of this, and that according to Hernandez it was just rumors. (Rivera Dep., p. 51.)

**RESPONSE**: Admit.

99.     Plaintiffs claim that they asked Rivera to open a CR investigation multiple times. (Spalding Dep., p. 399.)

**RESPONSE**: Plaintiffs admit that they asked Rivera to open a CR investigation multiple times.

**Plaintiffs' Conspiracy Claim**

100.    With respect to Plaintiffs' conspiracy claim, Plaintiffs' allegation that the individual Defendants reached an understanding to retaliate against Plaintiffs is based on the allegation that certain individual Defendants knew about the alleged retaliation of other individual defendants and allegedly failed to stop it, report it or engaged in it. (Spalding Dep.,

pp. 357-359.) Plaintiffs are inferring that because the individual defendants allegedly committed acts of retaliation they must have agreed or reached some understanding to retaliate. (Echeverria Dep., p. 238.)

> **RESPONSE**: Plaintiffs object to Paragraph 100 as it represents a legal argument. Plaintiffs refer the Court to Page 18 of Plaintiffs' Memorandum in Support.

### Plaintiffs Suffered No Adverse Employment Actions

101. During the time Spalding was allegedly being retaliated against, her salary was never cut and none of her employment benefits were cut. (Spalding Dep., p. 372.) Spalding is not sure if she received salary increases during this time. (Id.)

> **RESPONSE**: Plaintiffs admit to Paragraph 101 to the extent that Plaintiff Spalding was on active-duty. (PSOF ¶77)

102. Spalding believes she lost some overtime opportunities because of the units she was in after Narcotics, but she does not know how much overtime she may have lost as a result of alleged retaliation because she "can't guess what [she] would have been – worked or not worked." (Spalding Dep., pp. 374-375.) While in the Fugitive Apprehension Unit, Spalding is not claiming that she ever put in an overtime request and individuals with less seniority received the overtime. (Id., pp. 281-282.)

> **RESPONSE**: Plaintiffs admit the first sentence of Paragraph 102, but deny the second sentence. (PSOF ¶51)

103. During the time Echeverria was allegedly being retaliated against, his salary was never cut and his step salary increases were not impeded. (Echeverria Dep., pp. 248-249.)

> **RESPONSE**: Admit

104.    Echeverria believes that as a result of alleged retaliation some overtime opportunities were impeded, but he "can't put a dollar number on it because overtime is always a variable." (Echeverria Dep., pp. 248-250.) While in the Fugitive Apprehension Unit, Echeverria is unaware of any circumstances where other non-task force officers like Plaintiffs had an opportunity to get overtime and Plaintiffs did not. (Id., p. 253.)

**RESPONSE**: Admit

## No Basis for Monell Liability

105.    The Municipal Code of Chicago, § 2-84-040 (2013), states as follows: "The superintendent of police shall be the chief executive officer of the police department. He shall be appointed by the mayor upon recommendation of the police board and with the advice and consent of the city council and shall serve at the pleasure of the mayor. The superintendent shall be responsible for the general management and control of the police department and shall have full and complete authority to administer the department in a manner consistent with the ordinances of the city, the laws of the state, and the rules and regulations of the police board." Municipal Code of Chicago, § 2-84-040 (2013). Rule 1 of the Chicago Police Board's Rules of Conduct prohibits "[v]iolation of any law or ordinance." (Attached as Exhibit T is the Chicago Police Board's Rules of Conduct.)

**RESPONSE**: Admit

106.    Plaintiffs believe the Chicago Police Department has a "code of silence" that means you do not report police misconduct internally at CPD or externally to an organization like the FBI. (Echeverria Dep., p. 231; Spalding Dep., p. 361.)

**RESPONSE**: Plaintiffs admit that the Chicago Police Department has a Code of Silence "that means you do not report police misconduct internally at CPD or externally to an organization like the FBI."

107.     With respect to the alleged retaliation against Plaintiffs, Echeverria believes it was just because they broke the code of silence, not because they went to the FBI. (Id., p. 232.)

**RESPONSE**: Plaintiffs deny Paragraph 107. Plaintiff Echeverria testified:

> Q: Okay. And you've alleged that various incidents of retaliation have happened. Do you have any knowledge of whether that retaliation was because you went to the FBI or simply because you broke the code of silence?
> A: Broke the code of silence.
> Q: Okay. Thank you.
> A: That would incorporate both, whether I did it internally or externally.

(Echeverria Dep., p. 232)

108.     When asked at her deposition if she was aware of any other CPD officers besides Plaintiffs who were allegedly retaliated against for breaching the code of silence, Spalding identified one officer, Michael Spaargaren, and also mentioned that a couple of other officers approached her but she does not know them or know their names. (Spalding Dep., pp. 367-371.)

**RESPONSE**: Admit.

109.     When asked at his deposition if he was aware of any other CPD officers besides Plaintiffs who were allegedly retaliated against for breaching the code of silence, Echeverria identified two other officers, Anthony Hernandez (Spalding's boyfriend) and an Officer Finnigan in a so-called "SOS scandal." (Echeverria Dep., pp. 233-236.)

**RESPONSE**: Admit.

110.     Lou Reiter, Plaintiffs' expert on a so-called "code of silence" within the Chicago Police Department, defined the alleged code of silence as follows: "Code of silence is a concept

where officers—any employees, but officers, the way I use it, police officers do not bring forth negative testimony against fellow employees for fear of retaliation." (Reiter Dep., p. 35.)

**RESPONSE**: Admit.

111.     At his deposition with respect to alleged retaliation against Chicago police officers who report misconduct in violation of this alleged code of silence: "So, yes, I'm, aware of two instances where they have reported it. And in both of the cases, these employees have alleged that they've suffered significant personal and employment consequences because of that." (Reiter Dep, p. 61.) The two instances Reiter was referring to are the instant case involving Spalding and Echeverria, and the Michael Spaargaren case cited by Spalding as a case of retaliation. (Reiter Dep, pp. 60-61.)

**RESPONSE**: Admit.

112.     Reiter does not know the percentage of police officers who report misconduct on behalf of other police officers who suffer some level of retaliation. (Reiter Dep, p. 61.)

**RESPONSE**: Admit.

Respectfully submitted,

**/s/ Jeffrey L. Taren**

Jeffrey L. Taren
Miriam Geraghty
Kinoy, Taren & Geraghty, P.C.
224 S. Michigan Ave., Ste. 490
Chicago, IL 60604
(312) 663-5210
Fax: (312) 663-6663
jtaren@ktglawyer.com
mgeraghty@ktglawyer.com

Christopher R. Smith
1 N. LaSalle St., Ste. 2000
Chicago, IL 60602
(312) 432-0400
chris@crstrialgroup.com