**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Chicago Police Officer SHANNON SPALDING, | ) | |
| Chicago Police Officer DANIEL ECHEVERRIA, | ) | Case No. 12-cv-8777 |
| | ) | |
| Plaintiffs, | ) | Judge Gary Feinerman |
| | ) | Magistrate Judge Shelia Finnegan |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' LOCAL RULE 56.1 (b)(3)(C) STATEMENT OF ADDITIONAL FACTS
THAT REQUIRE DENIAL OF SUMMARY JUDGMENT**

**Plaintiffs**

1.  In May 2006, Plaintiffs Shannon Spalding and Daniel Echeverria were assigned to
    the "Narcotics Division," Unit 189 of the Chicago Police Department, where
    their work involved pro-active police efforts to combat drug crimes. They
    worked to develop confidential informants, obtain and conduct search warrants
    and conducted conspiracy investigations. (Spalding Dep., pp. 13-14.)

**The Start of the Cover-up and Retaliation**

2.  In 2004, Officer Michael Spaargaren confronted officer Ronald Watts about
    missing inventory. After that conversation, Watts told Spaagaren that the
    Lieutenant wanted to see him. ( Spaargaren Dep., p. 59.) Spaargaren went to
    his Lieutenant Jimmy Spratt with information that suggested Sgt. Ronald Watts
    was corrupt. Lt. Spratt told him "You're accusing my Sergeant and a fellow
    officer of stealing? Well, I don't believe you. You should have gone to a
    supervisor the same day it happened." Lt. Spratt also said, "You know what? I

1

think *you're* the corrupt one, and that's why you didn't go to a supervisor."
"Pack your fucking bags, you need to get out of this unit. I'm moving you to
another team tomorrow. And don't even think about going to IAD now. I can
call anyone and make your life miserable." (Spaargaren Dep. pp. 60-65.) "You
better keep your mouth shut. You don't want to lose your life over this. If you
report a Sergeant to IAD, how long do you think you will last?"  (Spaargaren
Affidavit ¶ 15.)

3.      As a result, Spaargaren left the force for approximately 18 months.
        (Spaargaren Dep., p. 20, 65.)

**Evidence of Illegal Conduct Discovered by the Plaintiffs**

4.      In 2007, while working an undercover narcotics investigation, Plaintiffs uncovered
        evidence of illegal activity being committed by various Chicago Police Officers.
        (Echeverria Dep., p.14, Shannon Dep., p. 31)

5.      An arrestee/informant told Echeverria that a fellow police officer, Ronald Watts, was
        stealing and doing his own dope line in the Ida B. Wells complex. (Echeverria Dep. p.
        14, Spalding Dep., p. 34)

6.      At Echeverria's request, the informant also told Sgt. Roderick Watson, Echeverria's
        supervisor, that Ronald Watts "steals, he does everything.  He brings in dope for
        us…"  (Echeverria Dep., p. 14)

**Instructions to Ignore Illegality**

7.      After the informant provided the information to Sgt. Roderick Watson about the
        criminal acts, Danny Echeverria asked him how he should document the report. Sgt.

Watson gave Plaintiff Echeverria a direct order to disregard all that information. (Echeverria Dep., pp. 18-19, Spalding, Dep., p. 35.)

**The Report to the FBI**

8.  Believing that no investigation was going to be done by the Chicago Police Department about these crimes, Plaintiffs Spalding and Echeverria, before the end of 2007, while off-duty, reported to the Federal Bureau of Investigation, Special Agent Patrick Smith the illegal activity by Sgt. Watts and others who worked with him. (Spalding Dep., pp. 35-37.)

9.  Plaintiffs continued to meet with Special Agent Smith, who was assigned to the bureau's public corruption unit, intermittently through August of 2008 to discuss the information on Sgt. Watts that they continued to learn. Plaintiffs always did so while off-duty and in their personal capacities. (Spalding Dep., pp. 43, 46.)

10. After several meetings with the F.B.I. in their personal capacities, the F.B.I. agents began to request that Plaintiffs spend more time assisting on the case. Because additional involvement with the investigation would encroach on their professional time, Plaintiff Echeverria informed Smith he was going to speak with the Chief of IAD. (Spalding Dep., pp. 47-48, 51.)

11. In August of 2008, Echeverria called to set up an appointment with then-Chief of the Internal Affairs Division ("IAD") Tina Skahill. (Spalding Dep., pp. 49, Echeverria Dep p. 22)

12. In August 2008, when Plaintiffs went to meet with Tina Skahill they were met by Chief Skahill and Special Agent Patrick Smith, Tom Chester and Barb West. During the meeting, Skahill stated that just prior to Plaintiffs' arrival, she had met

3

with Patrick Smith, Tom Chester and Barb West and they were filled in by Patrick Smith about the Watts investigation and Plaintiffs' involvement. (Spalding Dep., pp. 49-51.)

13. Echeverria told Skahill and the others at this meeting how they had obtained their information, who he had reported it to and that he and Spalding had decided to go on their own to the FBI. (Spalding Dep., p. 53.)

14. Chief Skahill indicated she was detailing Danny and Shannon to Unit 543 as a cover so they could report directly to the FBI building on a daily basis without their identities being compromised, or the nature of the investigation being connectable to Operation Brass Tax and investigating Chicago Police Officers. (Spalding Dep., pp. 59-65.)

15. Plaintiffs' were to report to Sgt. Tom Chester who was a CPD Sergeant working as the FBI liaison for the IAD confidential section. Plaintiffs remained assigned to the Narcotics Unit, though they were detailed to "Detached Services," Unit 543, and reported directly to F.B.I. headquarters to work on Operation Brass Tax. (Spalding Dep., pp. 63-65.)

16. Other than the Chicago Police personnel in the meeting (Skahill, West and Chester) only then Superintendent Weiss, his assistant Brust, Deputy Superintendent Kirby and Liz Glatz, the Commander of unit 543, were supposed to know of Plaintiffs' involvement in the federal investigation (known as "Operation Brass Tax"). (Spalding Dep., pp. 60-61, 63.)

17. Prior to the August 2008 meeting, Plaintiffs were unaware of any CPD officers at any level that were aware of the Plaintiffs' involvement with the FBI investigating Watts.

4

(Echeverria Dep., p. 23.) It was at this meeting that Plaintiffs learned for the first time that there was an open investigation of Sergeant Watts that was "inactive" even before Plaintiffs had gone to the FBI. (Echeverria Dep., pp. 27-28)

**Plaintiffs' Work with the FBI**

18.     Two days after the August 17, 2008 meeting, Plaintiffs were detailed to unit 543 and their full time work responsibility was to work on Operation Brass Tax and report in at the FBI building. (Spalding Dep., pp. 74-75.)

19.     During the time Plaintiffs worked on Operation Brass Tax, they were also encouraged by CPD command staff to develop other narcotics related cases, which overlapped with their work on Operation Brass Tax. (Spalding Dep., pp. 75-76.) Plaintiffs were to use the confidential informant pack and were instructed to have it signed by Commander O'Grady after a Narcotics Sergeant signs off on it. (Spalding Dep., pp. 80-87.)

**Plaintiffs' Cover is Blown**

20.     On an unknown date to the Plaintiffs, information that Plaintiffs had reported criminal misconduct by a sworn officer and were working with an outside investigation was leaked within the Department and became known to Defendant Commander O'Grady. (Spalding Dep. pp. 85-89.)

21.     According to Defendant Nicholas Roti, he was aware in 2008, before O'Grady became a supervisor, that Plaintiffs had been working with the FBI on a police corruption case. (Echeverria Dep., pp. 24-25.) Roti told O'Grady that Plaintiffs were on loan to IAD working on a police corruption case. (O'Grady Dep., pp. 18-19.)

**O'Grady's Refusal to Approve a Confidential Informant**

22.  O'Grady refused to approve a confidential informant requested by Plaintiffs'
     Spalding and Echeverria. (O'Grady Dep., p. 64)  The request for confidential
     informant had been signed by Sgt. James Padar and presented to O'Grady for his
     authorization by Padar. (Padar Dep. pp. 56-62)

23.  Padar returned the request for approval of Confidential Informant to Plaintiffs and
     relayed the reasons why O'Grady would not sign it. (Padar Dep., p. 66.)

24.  On August 17, 2010, Padar told Spalding, Echeverria and Anthony Hernandez, a
     member of the Narcotics squad, that O'Grady said "I will not approve this with these
     two IAD rats Spalding and Echeverria on here. If you want to remove their names, I
     will approve the informant for Hernandez only.  Furthermore, you are no longer to
     ever work with them.  I don't want them in this building, you never cross their paths.
     And if you are out there and they call a 10-1, which is a police emergency, you or any
     member of this division is not to respond." (Spalding Dep., p. 89; Echeverria Dep., p.
     41-42.)

**Defendant Rivera's Involvement**

25.  Plaintiffs' spoke with then Chief of IAD, Juan Rivera within a day or two of the
     incident in the parking lot and complained to Rivera about what Padar said.
     Spalding asked Rivera "how the hell Commander O'Grady knew to the point that
     a sergeant would tell me that he would go the other way if I was being shot at and
     that they would not respond…How the hell did O'Grady find out to the point that
     you put my life and my partner's life in jeopardy." (Spalding Dep., pp. 98-100)

26.  Rivera responded stating "That might be my fault; I might have f……d up."

Rivera then told Spalding that he had informed Chief Ernie Brown (the current Chief of Organized Crime) about their role in the investigation and he had told Deputy Chief Nick Roti and Commander O'Grady and his command staff. (Spalding Dep p. 98-100).

27. Spalding told Rivera that Defendant O'Grady was informing his personnel that she and Officer Echeverria were "snitches" and "rats" (Rivera Dep., p. 50.) This took place while Plaintiffs were still assigned to Narcotics but detailed to Detached Services. (Rivera Dep., p. 52.) Rivera did not investigate Spalding's complaints. (Rivera Dep., p. 51)

28. Plaintiffs on multiple occasions asked Defendant Rivera to open a C.R. investigation into the retaliation they were experiencing. (Spalding Dep., p. 399.)

**Defendants O'Grady, Roti and the Decision Not to Allow Plaintiffs to Return to Narcotics**

29. In approximately April or May, 2011, Superintendent Hilliard and Assistant Superintendent Cuello were looking into transferring Plaintiffs out of Unit 543 and back to patrol. (Rivera Dep., p. 67).

30. Juan Rivera told Plaintiffs that Chief Roti had an "issue" with Plaintiffs and they would not be assigned back to narcotics. (Rivera Dep., pp. 67-68.)

31. When Defendant O'Grady returned to Narcotics unit as Commander, then Deputy Chief Roti told him that Shannon Spalding and Danny Echeverria were on loan to Internal Affairs, working on a police corruption case. (O'Grady Dep., p. 18.) O'Grady was aware of rumors at that time, that Watts and Mohammed were being looked at regarding allegations of corruption. (O'Grady Dep., p. 19.)

32. O'Grady was aware that the Plaintiffs were working with the FBI on a special investigation. (O'Grady Dep., p. 20, 22, 24) At some point he learned it was a police corruption case having something to do with public housing. (O'Grady Dep., p. 35)

33. O'Grady told Deputy Chief Roti that he didn't want Spalding and Echeverria back in the Narcotics Division. (O'Grady Dep., p. 38) O'Grady had inferred from his conversation with Roti that the Plaintiffs wanted to return to their unit assignment in Narcotics after being detailed to the FBI. (O'Grady Dep., p. 43)

34. Juan Rivera told Plaintiffs that he was present at the meeting where it was decided that Plaintiffs would be reassigned from Unit 543. Also present were Nick Roti, James O'Grady, Beatrice Cuello and others. (Spalding Dep., p. 109.) At that meeting O'Grady said that "I'm not taking those F-ing IAD rats back; and furthermore, God help them if they need help on the street…it's not going to come." (Spalding Dep., p. 111)

35. O'Grady gave this opinion to Roti despite the fact that he never met the Plaintiffs, and had never reviewed their performance evaluations and had never directly supervised them. (O'Grady Dep., pp. 43-44)

36. O'Grady always expects the officers who work for him to follow the chain of command. (O'Grady Dep., p. 61)

37. Early on during their detail to Detached Services, Roti told Defendant Rivera that he had allowed the Plaintiffs to work with the FBI. (Roti Dep., p. 31-32.) Roti told Tina Skahill that Plaintiffs should be detailed to Internal Affairs so that they can be supervised. (Rivera Dep., pp. 31-32)

38.    After Shannon and Danny informed Peter Koconis that they had been removed from
       their detail of 543, Koconis had a telephone conversation with Deputy Superintendent
       Beatrice Cuello inquiring why either of these Officers would be removed from their
       assignments. During this conversation, Cuello told Koconis that both officers were
       good officers and Cuello never had experienced any problems with them.  However,
       she said that during a meeting where she was present, which included Deputy Chief
       James Jackson, Commander James O'Grady, and Chief Nicholas Roti, that James
       O'Grady and Nicholas Roti refused to allow either officer to return to their units of
       assignment within "189", due to the fact that Shannon and Danny were "IAD rats."
       (Koconis Dep., pp.42,95,96)

39.    Despite Plaintiffs  having years of experience conducting undercover operations,
       eavesdropping operations, developing informants and other valuable police work,
       Defendants O'Grady and Roti would not allow Plaintiffs to return to any unit within
       Organized Crime,  including their own unit of assignment, thus losing their
       specialized assignments, weekends and holidays off, take-home vehicles, and the
       ability to work  unlimited overtime. (Echeverria Dep., p. 82-83.)

40.    Plaintiffs were first detailed to the Police Academy, where Plaintiffs often did nothing
       more than sit at desks. (Echeverria Dep., p. 86.)

41.    Around the end of July 2011, Plaintiffs were moved to the Police Academy and then
       the Inspections Division, Unit 126, a unit that normally deals with auditing functions;
       and not criminal police work. (Spalding Dep., pp. 157-158.)

42.    In October 2011, Plaintiffs were called back to assist the F.B.I. with the
       completion of Operation Brass Tax. (Spalding Dep., pp.160-161)

Plaintiffs continued to periodically work on Operation Brass Tax with the F.B.I.

43. The F.B.I publically announced the arrests of Chicago Police Officers Watts and Mohammad on February 13, 2012. (https://www.fbi.gov/chicago/press-releases/2012/chicago-police-sergeant-and-officer-charged-with-stealing-5-200-from-individual-they-believed-was-transporting-drug-proceeds). Approximately three weeks later, Plaintiffs were assigned to the Fugitive Apprehension Unit.

**Retaliation While Assigned to the Fugitive Apprehension Unit (FAU)**

44. Commander Salemme heard that at least one of the Plaintiffs was "IAD" before they arrived at the Fugitive Apprehension Unit. (Salemme Dep., p. 6.) Salemme also had knowledge that Plaintiffs were involved in the Watts' Investigation prior to the filing of the lawsuit in November 2012. (Salemme Dep., p. 14-15)

45. The day prior to the Plaintiffs' arrival at the Fugitive Apprehension Unit, Lt. Cesario spoke with Officer Jan Hanna. He told Hanna that two new officers were coming who were supposedly IAD rats and to be very leery of them. (Hanna Dep., p. 47.)

46. Hanna was introduced to Plaintiffs by Lt. Cesario. When Cesario left, Hanna said to the Plaintiffs, "So you two are the IAD rats?" (Hanna Dep., p. 50.)

47. Very soon after Plaintiffs arrived at Fugitive Apprehension Unit, Lt. Cesario ordered Hanna, whose job duties included distributing new cases, to only give Plaintiffs "dead end cases that would not lead to arrests or officer activity." (Hanna Dep., p. 52-53.) Hanna understood that meant not to give them any high profile cases. "You don't want to give them work. You know, they're just here to take up space." (Hanna Dep.,

p. 53.)   Hanna acknowledged the Lieutenant and said "yes" or "okay". (Hanna Dep., p. 54.)

48.     Initially, Lt. Cesario handpicked the Plaintiffs' assignments. When he arrived at work in the morning, he always printed out all the warrants, as well, and he would highlight which cases went to Danny and which cases went to Shannon. (Hanna Dep., p. 60.)

49.     Cesario required that he be copied on all of the Plaintiffs' assignments, as well as the Commander and their Sergeant. (Hanna Dep., p. 55.)

50.     When Hanna inadvertently assigned Plaintiffs a homicide case, it was taken away from them by their sergeant. (Hanna Dep., p. 56.)

51.     Cesario instructed Officer Jan Hanna to act as if she didn't receive Officers Spalding and Echeverria's requests for overtime and to toss them in the garbage. (Hanna Dep. p. 36.) He told her he was giving her a direct order to throw their sheets out, their slips out and do not put them on the schedule. (Hanna Dep., p. 38.)   She went along with the order for two or three months. (Hanna Dep., 39.)   Hanna recalls two times for certain when she pretended not to receive Plaintiffs' requests for overtime. (Hanna Dep., p. 96.)

52.     In June of 2012, Officer Hanna heard Lt. Cesario instruct his team of officers not to provide any backup for Plaintiffs and to not work with them at all. (Hanna Dep., p. 70.)  He also informed all of the sergeants at that meeting, to inform their team members not to provide backup for Shannon and Danny. (Hanna Dep., p. 71.)

53.     Lt. Cesario instructed Jan Hanna to write a To/From report stating that Danny had requested to go on afternoons due to family reasons. (Hanna Dep., p. 67.)

54.    While working in the Fugitive Apprehension Unit, team members did not include Plaintiffs on their arrest reports despite the fact that it was a common practice to include most all team members on a report, whether they participated in the arrest or not, so the member would get credit for the arrest statistic. (Hanna Dep., p. 81-82.)

55.    Detective Kevin Culhane told Jan Hanna that he had been told directly by Lt. Cesario not to give Plaintiffs access to both Accurint and Leads 2000 data bases. (Hanna Dep., p. 88.)

56.    Cesario participated in the decision to remove Plaintiffs from Sgt. Barnes' team. At that meeting, Cesario told Plaintiffs they were being removed from Barnes' day team. He said, "you want to go against officers, you want to do this type of activity, you are going to be put on the night team way up north…you will no longer work days, you will no longer have a take home car and if I can help it, you will never be deputized. (Spalding Dep., P. 248.)

57.    During this meeting, Lt. Cesario and Commander Salemme questioned Plaintiffs about their working with IAD and what they had done for them. (Spalding Dep., p. 249.)

**Retaliation on the part of Plaintiffs' Supervisor, Maurice Barnes and the Reassignment from Barnes' Team to Third Shift**

58.    Before Plaintiffs arrived at the Fugitive Apprehension Unit, Sgt. Maurice Barnes had already told a member of the squad, Robert Walker, that two officers "from IAD" were coming. (Walker Dep. pp. 21,23,27,56)

59.    Not long after being assigned to his team, Spalding had a conversation with Defendant Barnes. It took place in the storage room area in the Detective Division. Spalding had requested the meeting to address statements made to her that the rest of

the squad had been instructed not to work with Plaintiffs or back them up, that they were IAD. (Spalding Dep., pp. 225,233.) He also said, "The team doesn't like you. They're not going to back you up, they don't trust you." (Spalding Dep., pp. 231-233)

60. After Spalding told Barnes what she had heard from other officers, Barnes said "I know that, you know, you worked for IAD, you brought a sergeant down. …you like to bring sergeants down, huh? You like to have sergeants arrested?" (Spalding Dep., p. 233.)

61. During this conversation, Barnes said, "to be honest with you. I'd hate to one of these days have to be the one to knock on your door and tell your daughter you're coming home in a box. That's how serious it is." (Spalding Dep., p. 235.)

62. Not long after that conversation, Plaintiffs were called into a meeting with Sgt. Barnes, Commander Salemme and Lt. Cesario and were removed from Sgt. Barnes' team and placed on third watch. (Spalding Dep., p. 239.)

63. Sgt. Barnes was unaware of any complaints about Danny or Shannon while they were working for his team at FAU. (Barnes Dep., p. 111.)

64. Barnes believed that officers Spalding and Echeverria were good officers. He never heard from any of the other Defendants that they were not good officers. (Barnes Dep., p. 111-112.)

65. Commander Salemme removed Plaintiffs from Sgt. Barnes' team. At the meeting where this occurred, Salemme told Plaintiffs "you should have known better. If you want to go against other sworn personnel, you should have known this shit was going to happen to you. You brought this baggage here with you." (Spalding Dep., p. 247-248.)

**Plaintiff Spalding Being Banned from Homan Square**

66.     In July of 2011, Defendant O'Grady told Anthony Hernandez that Shannon Spalding
        was banned from the Homan Square facility. He ordered Hernandez to arrest her if
        she entered the facility. When asked why she was banned, O'Grady said "Look at all
        the trouble she's caused, Tony, investigating other sworn members for corruption,
        even bosses, trying to put them in prison, she can't be trusted she's an IAD rat. I don't
        want her in this building. (Hernandez Affidavit ¶¶ 3-6)

67.     Salemme testified that O'Grady told him that Spalding should not go to "Homan
        Square" unless she had a specific police purpose. (Salemme Dep., p. 20. )  He
        referred to the entire "facility." (Salemme Dep., p. 22.)

68.     O'Grady says that he contacted Defendant Joseph Salemme and told him that
        Shannon Spalding should not be in a restricted area at Homan Square. He did this
        after someone told him they saw Plaintiff Spalding talking to her boyfriend, Officer
        Hernandez. O'Grady does not recall who told him. O'Grady never saw Spalding at
        Homan Square. O'Grady has no idea how long she was there or whether she was in a
        restricted area. O'Grady never spoke to Spalding before issuing this directive.
        (O'Grady Dep., pp.69-75)  O'Grady told Defendant Roti that he had called
        Spalding's supervisors and told them that she shouldn't be at Homan Square.  (Roti
        Dep., pp. 58-59)

69.     Officer Jan Hanna was in the room when a telephone conversation came in for Lt.
        Cesario from Commander O'Grady.  She heard Cesario say "hello Commander
        O'Grady." (Hanna Dep.,. p. 86.) She did not hear the conversation.  As soon as
        Cesario hung up the telephone, Lt. Cesario told Hanna "that was Commander

O'Grady and he just informed me that Shannon is no longer allowed, like I said, she's no longer permitted, she's banned from Homan Square and if she goes there, she will be arrested. (Hanna Dep., p. 86.)

**Post-lawsuit Retaliation by Defendant Mills**

70.     Defendant Mills instructed the officers under his command, to watch the Plaintiffs' news conference and then they would have a team meeting about it. (Spalding Dep., p. 270.) Mills told Spalding that the people on the team don't want to work with Plaintiffs. He told Plaintiffs, "For all we know, you could still be working IAD investigating them. They don't want to work with you guys after all of this came out. (Spalding Dep., p. 279.)

71.     After the lawsuit was filed, Mills' treatment of Plaintiffs changed for the worse. (Spalding Dep., p. 273) He ordered Plaintiffs not to come in from the street until the end of the tour. He began to switch their hours. (Spalding Dep., p. 274.)

72.     On one occasion after the lawsuit was publicized, Mills told Plaintiffs that two fellow officers, Chris Dingle and Roxanne Blarzcek, would be coming in to the office and available to back them up in connection with a specific arrest which was expected to be dangerous. When the arrest was set to take place, no officers were available to back Plaintiffs up. (Spalding Dep., p. 277-278)

73.     Post-lawsuit, Mills had told Plaintiffs they "weren't going to be backed up and the team doesn't like us and he doesn't know why we're there, he doesn't know why we [don't] leave, he doesn't know how we're going to have a career when this is over. (Spalding Dep., p. 293.)

74.     After Spalding was ordered not to go to the Homan Square building, Mills told

        Spalding that Commander O'Grady hates her so much that "if he could pop you off,

        meaning shoot you, across the parking lot while you're waking to or from your car to

        work, he's going to take that shot.  So I advise you, you need to wear your vest."

        (Spalding Dep., p. 297)

75.     In late March or early April, 2013, Defendant Mills filed a CR on Spalding accusing

        her criminally of secretly tape recording a conversation with him. (Spalding Dep., p.

        316-317) Mills initiated this CR even though he had not seen Spalding recording him,

        and in fact had no direct evidence that Spalding had illegally recorded his

        conversation with her.  (Mills Dep.,  pp. 54-55, 64)

76.     Spalding was taken into custody by Sgt. Barz and Moscolino while working at the

        FAU.  (Spalding Dep., p.  317). Sgt. Barz told Spalding that these were serious

        charges and that she could lose her job because of them.  (Spalding Dep.,  p. 317)

        Officer Barz told Spalding that the charges could "go away" if she dropped her

        federal lawsuit. (Spalding Dep., p. 329.)

**Financial and Emotional Damages**

77.     Shannon Spalding became unable to continue active employment with the Chicago

        Police Department beginning in April or May of 2013 and continuing to the present.

        She has been diagnosed as having Post Traumatic Stress Disorder or Adjustment

        Disorder related to the retaliation she has experienced at the CPD, by her treating

        psychiatrist, Dr. Kaiser, her therapist Deborah Weaver and the City of Chicago

        Police Pension Board's evaluating psychologist, Dr. Nancy Landre. (See, Spalding

        Dep. p. 382; Report of Dr. David A. Kaiser M.D; Report of Nancy Landre, Ph.D.;

16

and Report of Susan Pearlson, M.D.) Plaintiff's financial damages expert, Dr. Thomas Donley, has reported that Officer Spalding's financial loss resulting from her inability to return to work with the Chicago Police Department, will be between $2,272,279 and $3,025,389. (Report of Thomas Donley, Ph.D.)

78. On or about May 14, 2013, as a result of the retaliation, Daniel Echeverria suffered emotional distress that required him to take a medical leave until December 10, 2013. (Echeverria Dep., p. 254-258)

**Code of Silence**

79. Instructors at the Police Academy told officers "over and over again we do not break the code of silence. Blue is Blue. You stick together. If something occurs on the street that you don't think is proper, you go with the flow. And after that situation, if you have an issue with that officer or what happened, you can confront them. If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner. But you never break the code of silence. (Hanna Dep., p. 45-46.)

80. Police procedural expert Lou Reiter has concluded based upon his review of the record in this case, including the 30(b)6 witnesses designated to speak for the City of Chicago, and his vast study of CPD practices and procedures, that the City maintains *de facto* policies and practices that resulted in the injuries to the Plaintiffs. Reiter Expert Report and Deposition) These practices include:

a. The maintenance and/or tolerance of a Police Code of Silence whereby police officers do not report the misconduct of other police officers even if that misconduct is criminal, out of fear of retaliation. (Reiter Dep., p. 35.)

17

    b.   The conscious decision to ignore the Code of Silence and to refuse to develop any training materials that address issues relating to a Code of Silence; (Reiter Dep., 42-43; Shorle Dep pp. 25-26)

    c.   The conscious decision to fail acknowledge the potential of the code of silence and take affirmative steps to minimize its influence. (Reiter Report p. 9, Reiter Dep., p. 49.)

    d.   The failure to discipline officers who engage in retaliation against others who break the Code of Silence and report the misconduct of their fellow officers;

    e.   The failure to discipline officers who engage in misconduct. (Reiter Dep., p. 51-53.)

Respectfully Submitted,

**/s/ Jeffrey L. Taren**

Jeffrey L. Taren
Miriam Geraghty
Kinoy, Taren & Geraghty, P.C.
224 S. Michigan Ave., Ste. 490
Chicago, IL 60604
(312) 663-5210
Fax: (312) 663-6663
jtaren@ktglawyer.com
mgeraghty@ktglawyer.com

Christopher R. Smith
Christopher Smith Trial Group LLC
1 N. LaSalle St., Ste. 2000
Chicago, IL 60602
(312) 432-0400
chris@crstrialgroup.com