James Padar      Spalding, Echeverria v. City of Chicago      5/21/15

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
CHICAGO POLICE
OFFICERS SHANNON
SPALDING AND DANIEL
ECHEVERRIA,

　　　Plaintiffs,

vs.　　　　No. 12 C 8777

CITY OF CHICAGO,
CHICAGO POLICE CHIEF
JUAN RIVERA, CHICAGO
POLICE CHIEF DEBRA
KIRBY, CHICAGO POLICE
COMMANDER JAMES
O'GRADY, CHICAGO
POLICE CHIEF NICHOLAS
ROTTI, CHICAGO POLICE
LT. DEBORAH PASCUA,
CHICAGO POLICE
SERGEANT MAURICE
BARNES, CHICAGO POLICE
LT. ROBERT CESARIO,
CHICAGO POLICE
COMMANDER JOSEPH
SALEMME, CHICAGO
POLICE SERGEANT THOMAS
MILLS, CHICAGO POLICE
SERGEANT MICHAEL BARZ
and CHICAGO POLICE
SERGEANT ROBERT
MUSCOLINO,

　　　Defendants.

DEPOSITION OF JAMES W. PADAR
MAY 21, 2015
1:26 p.m.

---

**Page 2**

1　　　　The deposition of JAMES W. PADAR,
2　called for examination pursuant to the Rules
3　of Civil Procedure for the United States
4　District Courts pertaining to the taking of
5　depositions, taken before MARIBETH REILLY,
6　C.S.R., and notary public within and for the
7　County of DuPage and State of Illinois, at
8　One North LaSalle Street, Suite 2000,
9　Chicago, Illinois, on May 21, 2015,
10　commencing at the hour of 1:37 p.m.
11
12　APPEARANCES:
13　　KINOY, TAREN & GERAGHTY, P.C., by,
14　　MR. JEFFREY TAREN
15　　224 South Michigan Avenue
16　　Suite 490
17　　Chicago, Illinois  60604
18　　　-and-
19　　CHRISTOPHER SMITH TRIAL GROUP, by,
20　　MR. CHRISTOPHER SMITH
21　　One North Lasalle Street
22　　Suite 3040
23　　Chicago, Illinois  60602
24　　　Representing the Plaintiffs;

---

**Page 3**

1　APPEARANCES:  (Continued)
2
3　　DRINKER BIDDLE & REATH, LLP, by,
4　　MR. ALAN KING
5　　191 North Wacker Drive
6　　Suite 3700
7　　Chicago, Illinois  60606
8　　　Representing the Defendants;
9
10　MS. SHANNON SPALDING,
11　　Also present.
12
13
14
15
16
17
18
19
20
21
22
23
24

---

**Page 4**

1　　　　I N D E X
2　WITNESS　　　　　EXAMINATION
3　JAMES W. PADAR
4　 By Mr. Taren　　　　6
5
6
7　　　EXHIBITS
8
9　NUMBER　　　MARKED FOR ID
10　Deposition Exhibit
11　 No. 1　　　　54
12
13
14
15
16
17
18
19
20
21
22
23
24

1 (Pages 1 to 4)

James Padar      Spalding, Echeverria v. City of Chicago       5/21/15

---

Page 5

1          (Witness duly sworn.)
2          MR. TAREN:  Would you state and
3    spell your full name for the record.
4          THE WITNESS:  James William Padar,
5    J-a-m-e-s, W-i-l-l-i-a-m, P-a-d-a-r.
6          MR. TAREN:  Thank you.  This is
7    the deposition of James William Padar taken
8    in the case Shannon Spalding and Daniel
9    Echeverria versus the City of Chicago, et
10   al., Northern District of Illinois, Number
11   12 C 8777.
12          My name is Jeffrey Taren.  I
13   am one of the attorneys for the Plaintiffs,
14   and I will be taking your deposition today.
15          You have had your deposition
16   taken before; is that correct?
17          THE WITNESS:  Yes.
18          MR. TAREN:  Well, I will just
19   briefly tell you how things will proceed
20   here.  I am going to be asking you a series
21   of questions concerning your employment with
22   the Chicago Police Department, knowledge you
23   may have of some of the facts in the matter
24   brought by Shannon Spalding and Danny

---

Page 6

1    Echeverria.  None of the questions I ask are
2    meant to trick or deceive you in any way.
3    So if you don't understand the question, let
4    me know.  I will be happy to rephrase the
5    question.
6          In terms of our rules, the
7    primary rule is that all answers must be
8    audible.  So if you nod your head, like you
9    just did, and we all do, the court reporter
10   can't take that down.  So I would ask you to
11   please articulate all of your answers.
12   Okay?
13          THE WITNESS:  Yes.
14          MR. TAREN:  If you need to take a
15   break, let us know.  I will be a happy to do
16   that.
17          And then as I tell everyone,
18   some of the questions that I ask you are
19   going to be somewhat personal.  We do that
20   for everyone.  There is background
21   information that's necessary, and so please
22   don't take offense.
23
24

---

Page 7

1          JAMES W. PADAR,
2    called as a witness herein, was examined and
3    testified as follows:
4          EXAMINATION
5    BY MR. TAREN:
6          Q.  And can we start with some
7    background information.  Can you give me
8    your current address, home address.
9          A.  7825 West Thorndale, and that's in
10   Chicago, 60631.
11          Q.  How long have you lived there?
12          A.  Approximately 11 years.
13          Q.  Are you married?
14          A.  Yes.
15          Q.  Can I have your date of birth,
16   please?
17          A.  18, December, 1973.
18          Q.  Do you also go by the name of Jay
19   sometimes?
20          A.  Yes.
21          Q.  Are there other names that you
22   have gone by either professionally or
23   personally?
24          A.  Some people have called me Jim,

---

Page 8

1    but that's it.
2          Q.  Do you have kids?
3          A.  Yes.
4          Q.  How old are they?
5          A.  I have six-year old twins.
6          Q.  So they are, obviously, not
7    employed by the Chicago Police Department?
8          A.  That's correct.
9          Q.  Is that right?
10          Do you currently have other
11   members of your family who are employed by
12   the Chicago Police Department?
13          A.  No.
14          Q.  Other members of your family have
15   been Chicago police officers in the past; is
16   that correct?
17          A.  Yes.
18          Q.  And who would that be?
19          A.  My father.
20          Q.  His name is also James; is that
21   correct?
22          A.  Yes.
23          Q.  Anyone else?  Any siblings or
24   uncles?

2 (Pages 5 to 8)

James Padar     Spalding, Echeverria v. City of Chicago     5/21/15

Page 9

1      A. No, not that I can think of.
2      Q. All right. What is your
3  educational background? Let's start with
4  high school. Where did you go to high
5  school?
6      A. Loyola Academy.
7      Q. When did you graduate?
8      A. '92.
9      Q. And after high school, have you
10 had other formal education?
11     A. I attended Western Illinois
12 University and graduated in 1996.
13     Q. What was your degree in?
14     A. Criminal justice.
15     Q. How about after '96, have you had
16 any graduate level educational courses?
17     A. I completed my Master's degree at
18 Lewis University.
19     Q. When was that?
20     A. I would be estimating, but I
21 believe it was approximately 2005.
22     Q. What is your Master's in?
23     A. Criminal justice.
24     Q. After college, what was your first

Page 10

1  full-time employment?
2      A. I worked for Toyota Motor Credit
3  Corporation and Lexus Financial Services.
4      Q. For what period of time?
5      A. I believe the years were 1996
6  through 1998.
7      Q. When did you enter the Chicago
8  Police Department?
9      A. 1998.
10     Q. And have you been a full-time
11 employee of the police department ever
12 since?
13     A. Yes.
14     Q. What is your current status with
15 the Chicago Police Department?
16     A. I'm assigned to Narcotics,
17 detailed to the Alternate Response Section.
18     Q. What's the Alternate Response
19 Section?
20     A. They take nonemergency police
21 reports over the phone.
22     Q. That's the 311 center?
23     A. Yes.
24     Q. How long have you been at 311?

Page 11

1      A. Just over a year.
2      Q. Have you been on suspension at
3  some point over the last two years?
4      A. I have not been suspended.
5      Q. Were you on some kind of paid
6  leave?
7      A. I am -- I have been assigned to
8  administrative duties.
9      Q. We will get into some of that
10 later.
11         And are there restrictions,
12 some restrictions on your duties at the
13 Chicago Police Department now currently?
14     A. Yes.
15     Q. What are those restrictions?
16     A. I cannot carry a gun. I cannot
17 take police action.
18     Q. You are also an author; is that
19 correct?
20     A. Yes.
21     Q. And you have written with your
22 father a book called "On Being a Cop"; is
23 that correct?
24     A. Yes.

Page 12

1      Q. Have you written any other books?
2      A. No.
3      Q. Is there some book that you are
4  currently working on?
5      A. No.
6      Q. I understand from the blogosphere
7  that when you started -- starting in 1999,
8  you began writing emails to your father
9  about your work at the Chicago Police
10 Department; is that correct?
11     A. Yes.
12     Q. Do you still do that?
13     A. I can't recall the last time I
14 wrote an email to my father about the work I
15 have done on the police department.
16     Q. Well, tell me for what period of
17 time -- and by the way, I will let you know,
18 I am getting this from an interview that's
19 online that you gave to NBC in February
20 of 2014.
21     A. Sure.
22     Q. Are you familiar -- you recall
23 that email?
24     A. Yes.

3 (Pages 9 to 12)

James Padar      Spalding, Echeverria v. City of Chicago      5/21/15

---

Page 13

1    Q.  And you are aware of this?  Anyone
2  could go online and see the interview?
3    A.  Yes.
4    Q.  And in that you state that you
5  were writing emails about your adventures to
6  your father.
7        My question is:  For what
8  period of time did you continue to do that?
9    A.  I know I wrote emails, I believe,
10  beginning in 1998.
11    Q.  Okay.
12    A.  The last story which I wrote,
13  which I did email to my father, was
14  probably -- I don't know if it was 2013 or
15  2014.
16    Q.  Okay.
17    A.  It was close to not this past
18  Christmas, maybe the Christmas before.
19    Q.  All right.  So these emails that
20  you would send to your father, would they
21  detail some of the experiences that you had
22  as a Chicago police officer?
23    A.  Yes.
24    Q.  Did they form the basis of some of

---

Page 14

1  the stories that you have written?
2    A.  Yes.
3    Q.  Do you have all the emails that
4  you sent to your father?
5    A.  No.
6    Q.  Where did you send them from?
7    A.  From different computers.  Most
8  likely, different email accounts.  I had
9  AT&T as my service provider at one point.
10  Comcast was my service provider for another
11  point.
12    Q.  Let me stop you there.  So for
13  what period of time did you have AT&T as
14  your service provider?
15    A.  I can't recall those dates, but I
16  can tell you that I currently have AT&T as
17  my service provider.
18    Q.  And that's an email -- what email
19  address did you have with AT&T?
20    A.  Jaypadar@att.net.
21    Q.  And do you know what period of
22  time you had Comcast as a service provider?
23    A.  I don't recall the exact date.  I
24  would estimate that I have had AT&T for two

---

Page 15

1  to three years.  And prior to that, I had
2  Comcast.
3    Q.  What email addresses did you use
4  with regard to Comcast as a service
5  provider?
6    A.  I don't recall.
7    Q.  You don't recall any of your email
8  addresses for Comcast?
9    A.  For Comcast, no.  I don't know
10  what they assigned me.
11    Q.  Do you know was it something
12  @comcast.net?
13    A.  I would assume so.
14    Q.  Did you have more than one email
15  address with Comcast?
16    A.  Not that I'm aware of.
17    Q.  Are you aware of any other email
18  providers that -- service providers that you
19  used in sending emails about your work
20  experiences?
21    A.  I have used the email address of
22  jay@padar.org.
23    Q.  Okay.
24    A.  And there is an email address

---

Page 16

1  associated with the web site "On Being a
2  Cop" that gets forwarded to me, which is
3  jay@onbeingacop.com.
4    Q.  Is it your testimony that you have
5  not archived any of the emails that you sent
6  about your work experiences?
7    A.  I have saved some of them.  I have
8  not archived all of my emails that I sent to
9  my father.
10    Q.  In what format did you save them?
11    A.  I have stories that I have written
12  to my father, and I believe I have them on a
13  laptop at home.
14    Q.  During the period 2010 through
15  2012, did you send emails about some of your
16  work experiences to your father to anyone
17  else?
18    A.  I don't recall at this point.
19    Q.  So you may have, or you may not
20  have; is that correct?
21    A.  That is correct.
22    Q.  What email address did you send
23  your stories about your experiences to?
24    A.  I know my father's email address,

4 (Pages 13 to 16)

James Padar      Spalding, Echeverria v. City of Chicago                5/21/15

---

Page 17

1    which I may have sent it to this address is
2    jim@padar.org.
3         Q.  Do you know how long he's had that
4    email address?
5         A.  I don't.
6         Q.  Do you know whether he has kept
7    any or all of the emails that you have sent
8    him concerning your experiences at work?
9         A.  I am not certain what he's kept.
10         Q.  Have you ever sent an email to
11    your father or anyone else which has
12    anything to do with Shannon Spalding or
13    Danny Echeverria?
14         A.  I don't recall if I have.
15         Q.  So I am clear about your answer,
16    it's possible and perhaps you did, perhaps
17    you did not; is that correct?
18         A.  Yes.
19         MR. TAREN:  I am going to ask you
20    to please preserve any and all emails that
21    you have in your possession until we can
22    issue a subpoena.
23         THE WITNESS:  Okay.
24

---

Page 18

1    BY MR. TAREN:
2         Q.  In any of your emails concerning
3    your employment at the Chicago Police
4    Department, do you mention anything about
5    crooked cops?
6         A.  I don't recall mentioning anything
7    about crooked cops.
8         Q.  Do any of your emails discuss
9    anything about Internal Affairs?
10         A.  I don't recall.
11         Q.  In any of the emails that you
12    sent, do you refer to anyone as a rat, or
13    recount anyone you have worked -- well, take
14    it one at a time.
15         In any of your emails that you
16    sent concerning your experiences at the
17    police department, do you ever refer to
18    anyone as a rat?
19         A.  I don't recall ever referring to
20    anyone as a rat.
21         Q.  Do you recall recounting anyone
22    else referring to someone as a rat in your
23    emails?
24         A.  I don't recall that.

---

Page 19

1         Q.  I hate to ask this question, but
2    how many emails do you think you have sent
3    over the years concerning your employment?
4         A.  Concerning my employment?
5         Q.  Yes.
6         A.  Would probably be well into the
7    thousands.
8         Q.  Do you have a Twitter account?
9         A.  I do not have a Twitter account.
10    There is a Twitter account associated with
11    On Being a Cop.
12         Q.  By the way, have you turned
13    over -- Has anyone from the City of Chicago
14    asked you to look through your emails to see
15    if there is anything that refers to Shannon
16    Spalding or Danny Echeverria?
17         A.  I don't recall anyone asking me to
18    look for that material.
19         Q.  And is it accurate then that you
20    have not turned those emails over, any of
21    your emails over to the City for -- in
22    anything to do with this lawsuit, the
23    Spalding/Echeverria lawsuit?
24         A.  I don't believe I have.

---

Page 20

1         Q.  So there is a Twitter account
2    associated with On Being a Cop blog; is that
3    right?
4         A.  Yes.
5         Q.  Who handles that Twitter account?
6         A.  My father does.
7         Q.  Do you have an Instagram account?
8         A.  I don't.
9         Q.  Does the blog have one?
10         A.  Not that I'm aware of.
11         Q.  What about Facebook, do you have a
12    Facebook account?
13         A.  I do not have a Facebook account.
14         Q.  I know your father does.
15         A.  Yes.
16         Q.  Correct?
17         Do you ever post things on
18    your father's Facebook account?
19         A.  I do not.
20         Q.  Does your blog have a Facebook
21    account?
22         A.  Yes.
23         Q.  Who handles that?
24         A.  My father.

5 (Pages 17 to 20)

James Padar     Spalding, Echeverria v. City of Chicago     5/21/15

Page 21

1       **Q. Do you have any other social media**
2 **accounts?**
3       A. I can't think of any other social
4 media accounts that I have.
5       **Q. All right. Do you follow any**
6 **other Chicago police -- strike that.**
7       **I want to keep this limited to**
8 **just matters involving law enforcement of**
9 **the Chicago Police Department. I don't care**
10 **about other personal issues, blogs that you**
11 **might follow.**
12       **Are there any blogs that you**
13 **follow that are either by Chicago police**
14 **officers, current or former, or deal with**
15 **matters of the Chicago Police Department?**
16       A. I have read Second City Cop Blog
17 Spot.
18       **Q. Any others?**
19       A. There is nothing that I read
20 regularly. However, I am certain on that
21 blog spot, there are probably attachments to
22 other sites that I have looked at, but
23 nothing with any regularity.
24       **Q. Do you know who runs Second City**

Page 22

1 **Cop Blog Spot?**
2       A. I don't.
3       **Q. I apologize for having to ask this**
4 **question about a specific blog spot, but I**
5 **do. Have you ever accessed a blog called**
6 **"shavedlongcock.blogspot"?**
7       A. I believe that's one of the links
8 on Second City Cop, so I may have.
9       **Q. Do you know who writes or is**
10 **involved with that blog spot?**
11       A. I do not.
12       **Q. Have you read any articles in that**
13 **blog spot that refer to Chicago police**
14 **officers who cooperated with the FBI?**
15       A. I don't recall what I have read on
16 that blog spot.
17       **Q. Do you have any recollection of**
18 **reading a blog spot that refers to Officer**
19 **Keith Herrera as a rat fink?**
20       MR. KING: I'd just object to the
21 form of the question and the lack of
22 foundation, and frankly, the relevance.
23 Maybe we are moving towards something
24 relevant. I don't know, but you can answer

Page 23

1 the question.
2       THE WITNESS: Can you repeat the
3 question.
4       MR. TAREN: Can you read it back.
5       (Whereupon, the record was
6       read as requested.)
7       THE WITNESS: I don't recall if I
8 have or haven't.
9 BY MR. TAREN:
10       **Q. Do you know who Officer Keith**
11 **Herrera is?**
12       A. I do.
13       **Q. Did you know Keith Herrera?**
14       A. I did not personally know him.
15       **Q. And did you understand that he was**
16 **an officer who wore a wire in the**
17 **investigation of his partner?**
18       A. That's what I read.
19       **Q. Have you ever had any discussions**
20 **with anyone about Officer Herrera?**
21       A. Not that I can recall.
22       **Q. Are there any other blog spots or**
23 **blogs that you are aware of that deal with**
24 **the Chicago Police Department?**

Page 24

1       A. Nothing that I can recall at this
2 point.
3       **Q. When you say that there is a link**
4 **to that blog spot on your blog -- I'm sorry,**
5 **is that what you said?**
6       A. No.
7       **Q. Have you kept a diary of any of**
8 **your activities on the Chicago Police**
9 **Department during your career? And by**
10 **diary, I mean either handwritten or**
11 **electronic?**
12       A. No.
13       **Q. Did you keep a calendar or a**
14 **notebook that dealt with your employment**
15 **with the Chicago Police Department?**
16       A. I have had FOP books which has a
17 calendar that I receive each year from the
18 FOP. I know I have the current one. I
19 don't know if I have any subsequent ones.
20       **Q. What I am really focusing on is**
21 **whether there are any documents in which you**
22 **made recordations of what conversations you**
23 **had or meetings that you had or**
24 **investigations you were involved in with the**

6 (Pages 21 to 24)

James Padar      Spalding, Echeverria v. City of Chicago      5/21/15

Page 25

1  **Chicago Police Department?**
2      A.  I have a calendar on my phone that
3  shows meetings I had with my attorneys, City
4  attorneys, depositions and so forth.
5      **Q.  Now, how long have you kept your**
6  **calendar on your phone?**
7      A.  On my personal phone, I have kept
8  a calendar since I have opened the account,
9  which is approximately two to three years
10 ago.
11         Prior to that, I had a
12 department-issued BlackBerry, but I don't
13 recall if I utilized that calendar function
14 on the BlackBerry or not.  I haven't had it
15 in a couple of years.
16     **Q.  When was the last time that you**
17 **had the department-issued BlackBerry?**
18     A.  Some point prior to April of 2014.
19     **Q.  In calendar year 2010, did you**
20 **have a smart phone?**
21     A.  I had a department-issued
22 BlackBerry.
23     **Q.  And is it your testimony that they**
24 **took it back at some point?**

Page 26

1      A.  I turned it in, yes.
2      **Q.  And that was around April of 2014?**
3      A.  Yes.
4      **Q.  When you turned it in, do you know**
5  **what the policy is of the police department**
6  **with regard to copying anything that's on**
7  **your BlackBerry?**
8      A.  I don't know what their policy is.
9      **Q.  You have never seen an image of**
10 **the BlackBerry that you used at that time?**
11 **By "image," I mean just a copy of anything.**
12     A.  I tried to save photos, personal
13 photos, and I believe they trans -- someone
14 assisted me in transferring my contacts.
15     **Q.  Did you transfer anything else,**
16 **such as emails or texts?**
17     A.  I don't recall transferring texts.
18 And as for the emails, I kept the same email
19 account, so I didn't transfer, but they
20 still would be under that same email
21 account.
22     **Q.  I understand.  Did you ever go to**
23 **Wright Junior College?**
24     A.  Are you asking if I attended as a

Page 27

1  student?
2      **Q.  Yes.**
3      A.  No.
4      **Q.  At the beginning of this**
5  **deposition, you acknowledged that you have**
6  **given other depositions in the past.  Can**
7  **you tell me how many depositions you have**
8  **given prior to today's?**
9      A.  I recall two.
10     **Q.  When was the last time?**
11     A.  Within the last few months.
12     **Q.  Was that the deposition in the**
13 **Hernandez case in February?**
14     A.  Yes.
15     **Q.  And how about before that, what**
16 **was the other deposition?**
17     A.  I believe it was the year prior,
18 some time in 2014.
19     **Q.  What case was that involved in?**
20     A.  I believe it's Jeff Allen versus
21 City of Chicago.
22     **Q.  Were you a party or a witness in**
23 **that case?**
24     A.  I am part of a class action

Page 28

1  lawsuit.
2      **Q.  As a Plaintiff?**
3      A.  Yes.
4      **Q.  What does that involve?**
5      A.  Overtime.
6      **Q.  When you say "overtime," what's**
7  **the issue?**
8      A.  The issue is, as I understand it,
9  is a number of officers, supervisors, within
10 the Bureau of Organized Crime had been
11 working during off-duty hours and not being
12 compensated for it.
13     **Q.  Who is representing the Plaintiff**
14 **in the Jeff Allen case?**
15     A.  I believe the attorney's name is
16 Paul Geiger.
17     **Q.  And do you have a copy of the**
18 **deposition that you gave in that case, or**
19 **would Mr. Geiger have it?**
20     A.  Mr. Geiger should have it.
21     **Q.  And those are the only two**
22 **depositions in a civil matter that you have**
23 **given; is that correct?**
24     A.  That's all that I can recall.

7 (Pages 25 to 28)

James Padar     Spalding, Echeverria v. City of Chicago          5/21/15

---

Page 29

1      Q. Were there any depositions given
2  in the Sperling, the Joseph Sperling matter?
3      A. I was not deposed.
4      Q. And have you testified under oath
5  in a trial or court proceeding in the past?
6      A. Yes.
7      Q. On about how many occasions?
8      A. I would say well over a hundred.
9      Q. And were these all matters that
10 were during the scope of your employment as
11 a Chicago police officer?
12     A. I believe so.
13     Q. Did you ever testify in a civil
14 action?
15     A. I don't recall ever testifying in
16 a civil action other than the Anthony
17 Hernandez case.
18     Q. Can you tell me what you did to
19 prepare for today's deposition?
20     A. I don't recall specifically doing
21 anything to prepare for today's deposition.
22     Q. Did you meet with counsel?
23     A. I did meet with counsel.
24     Q. So that's something, at least?

---

Page 30

1      A. Okay.
2      Q. And by "counsel," we are talking
3  about Mr. King?
4      A. Yes.
5      Q. And did you review any documents?
6      A. I did.
7      Q. Can you tell me what you reviewed?
8      A. I reviewed a confidential
9  informant packet, and I am not certain if
10 there were additional items presented to me.
11 I don't recall any additional items.
12     Q. Did you review the complaint in
13 this case?
14     A. Not at my meeting with my
15 attorney.
16     Q. Some other time you did?
17     A. Yes.
18     Q. When?
19     A. Most likely immediately after
20 finding out I was named in the case.
21     Q. You understand you are not
22 currently a party in this case?
23     A. Yes.
24     Q. And have you prior to today's

---

Page 31

1  deposition, have you reviewed any testimony;
2  that is, transcripts of other depositions or
3  excerpts from transcripts of other
4  depositions taken already in this case?
5      A. I have been asked questions
6  regarding other depositions that I
7  understand that have been taken for this
8  case.
9      Q. Okay.
10     A. I have not personally handled
11 depositions, but I have been read to from
12 depositions.
13     Q. Okay. Was that from counsel or
14 from someone else?
15     A. From counsel.
16     Q. By the way, just so it's clear,
17 are you represented by Mr. King in this
18 deposition --
19     A. Yes.
20     Q. -- is he your attorney? All
21 right.
22         Do you recall whose
23 depositions you heard excerpts from?
24     A. Shannon Spalding.

---

Page 32

1      Q. Anyone else?
2      A. No.
3      Q. Not Danny?
4      A. Not that I recall, no.
5      Q. We talked about documents that you
6  reviewed. Have you had any conversations
7  with anyone who was previously deposed in
8  this case about the case?
9      MR. KING: I'll just object to the
10 form and the timing. About the depositions
11 after their depositions?
12     MR. TAREN: Correct. Yes.
13     THE WITNESS: Not that I know of,
14 but I don't know who is being deposed in
15 this case, and I don't know who has been
16 deposed in this case necessarily.
17 BY MR. TAREN:
18     Q. So what my question was focusing
19 on is whether anyone ever told you, I gave a
20 deposition and here is what happened with
21 regard to the Spalding versus City case?
22     A. No.
23     Q. Can you take me through your job
24 history at the Chicago Police Department. I

---

MARIBETH REILLY & ASSOCIATES
630.408.2237          Chicago & Suburbs  maribeth.reilly@gmail.com

James Padar      Spalding, Echeverria v. City of Chicago      5/21/15

Page 33

1  know you have been there for a while, but
2  what assignments or what departments you
3  have been in?
4       A.  When I first became a police
5  officer, I was assigned to the 24th
6  district, Rogers Park.  I was assigned there
7  for six years.  Then I was promoted to
8  sergeant.
9       Q.  What year was that?
10      A.  2004.
11      Q.  Okay.
12      A.  I was assigned to the 17th
13  district, and then detailed to the 11th
14  district.
15      Q.  For how long?
16      A.  Just a matter of a few months,
17  maybe four months in the 11th district.
18      Q.  All right.  Then what?
19      A.  I returned back to the 17th
20  district, and then I was assigned to the
21  Area 3 Deputy Chief's Office as an
22  administrative sergeant.
23      Q.  When was that?
24      A.  Approximately 2006.

Page 34

1       Q.  Who was the deputy that you were
2  assigned to at that time?
3       A.  Lee Epplen.
4       Q.  How long were you in that
5  position?
6       A.  Approximately six months.
7       Q.  Then what?
8       A.  From there I went to Narcotics.
9       Q.  For what period of time?
10      A.  From -- I believe it was either
11  2006 or 2007.  I am currently assigned there
12  now.  But like I said, for the last year, I
13  have been detailed to Alternate Response.
14      Q.  So with regard to the assignment
15  as opposed to being detailed, you have been
16  assigned to Narcotics then continuously from
17  2006 or '07 until the present; is that
18  correct?
19      A.  Yes.
20      Q.  All right.  During that period of
21  time, tell me who you reported to.  I know
22  it changed but --
23      A.  Yes.  I will give you the
24  lieutenants I remember being there.

Page 35

1       Q.  That will help.
2       A.  Peter Piazza, Bill Dunn, Bill
3  Kilroy, Jose Ramirez, Susan Schmidt, Eric
4  Carter, Deputy Chief Steve Caluris.  And at
5  this point, I can't recall if there were
6  others.
7       Q.  Who are the commanders that you
8  worked under?
9       A.  Commander O'Grady.
10      Q.  For that whole period of time?
11      A.  No.  I went to Narcotics under
12  Deputy Chief Caluris.
13      Q.  When did you start working under
14  Commander O'Grady?
15      A.  I don't recall when he arrived in
16  Narcotics, but I know I had been in
17  Narcotics at least a year prior to him
18  becoming the new commander.
19      Q.  So when did you first encounter
20  Shannon Spalding?  We will take them one at
21  a time as opposed to Shannon and Danny.
22      A.  I don't recall exactly when I
23  first met Shannon Spalding.  I believe it
24  was during my time in Narcotics.

Page 36

1       Q.  And would that be the same for
2  Danny Echeverria?
3       A.  Yes.
4       Q.  Did they report to you for some
5  period of time?
6       A.  I was never assigned as their
7  supervisor.
8       Q.  Were you familiar with the work
9  that they did in Narcotics?
10      A.  Nothing specific.  I knew they
11  were in Narcotics.
12      Q.  By the way, had you known anything
13  about either of them before they came to
14  Narcotics, either by reputation or personal
15  encounter?
16      A.  I don't recall anything.
17      Q.  Is Narcotics considered an elite
18  unit to be in?
19          MR. KING:  I'd just object to the
20  lack of foundation, but you can give your
21  opinion.
22          THE WITNESS:  I know I wanted to
23  be there.  I don't know if I ever referred
24  to it as elite.

9 (Pages 33 to 36)

James Padar       Spalding, Echeverria v. City of Chicago       5/21/15

Page 37

1  BY MR. TAREN:
2      Q.  So why don't we just focus on you
3  then.  Why did you want to be there?
4      A.  I personally wanted to be there
5  because we weren't necessarily tied to a
6  district, to radio calls.  We had more
7  freedom to chase bigger criminals, make
8  bigger cases.
9      Q.  Was it a difficult assignment for
10 you to get?
11     A.  I applied.  I filled out an
12 application, and I was interviewed, and I
13 received the position as a sergeant.
14     Q.  Do you know whether it is a
15 difficult position for an officer, a patrol
16 officer, to get into the Narcotics Division?
17     MR. KING:  Same objection to the
18 lack of foundation.  But if you know, you
19 can answer.
20     THE WITNESS:  People are brought
21 to Narcotics for all different reasons.
22 Some people apply because they think they
23 have great numbers, and they would be an
24 asset to the unit.

Page 38

1      Some people, it's my
2  understanding, have been asked to go to
3  Narcotics because of what they do on the
4  street.  So I think it depends on the
5  individual officer.  So I can't speak for
6  everyone that's in Narcotics.
7      There is competition to get in
8  Narcotics, and I would say it's difficult
9  for some people to get into Narcotics, yes.
10 BY MR. TAREN:
11     Q.  Is it the kind of thing that when
12 people get in, they tend to stay for long
13 periods of time?
14     A.  I can speak for myself.  I
15 intended to stay for a long period of time.
16     Q.  I am asking because, I assume,
17 that you have talked with other sergeants
18 and other patrol officers about their
19 experiences in Narcotics, and wondering
20 whether you have arrived at a conclusion
21 that, you know, this is the kind of division
22 people don't pass-through, but come in to
23 make a career of?
24     A.  I would say that the majority of

Page 39

1  the people I have spoken to would like to
2  stay in Narcotics.
3      Q.  Is one of the perks of being in
4  Narcotics the fact that because of the
5  nature of the work, you have opportunities
6  to work a lot of overtime?
7      A.  Depends on which team you are on.
8  My team, we worked a lot of overtime.  Some
9  teams choose not to work a lot of overtime.
10     Q.  What is it about the teams that
11 would determine whether there was a lot of
12 overtime available or not?
13     A.  I believe it would be up to the
14 supervisor and the people on the team.  Some
15 people have family obligations.  Some
16 supervisors have family obligations that
17 don't allow for them to work a lot of
18 overtime.
19     Q.  So when I say, "the opportunity,"
20 do I understand then that if you're
21 ambitious and you want to work overtime,
22 that the Narcotics Division gives you that
23 opportunity?
24     A.  Depending on your sergeant, you

Page 40

1  definitely can have an opportunity to work a
2  lot of overtime.
3      Q.  During your time in Narcotics,
4  have you ever been involved in any of the
5  decision-making with regard to giving
6  assignments to patrol officers to come in;
7  that is, either the interview process or
8  anything of that sort?
9      Do you understand the
10 question?  That's a terrible question.
11     MR. KING:  Come into the Narcotics
12 Division?
13     MR. TAREN:  Right.
14 BY MR. TAREN:
15     Q.  Have you been involved in the
16 selection process in any way, either as a
17 decision-maker or giving input, into the
18 decisions to allow someone to come into
19 Narcotics?
20     A.  Yes.
21     Q.  Tell me what roles you have played
22 in that regard?  Have you been a
23 decision-maker?
24     A.  I cannot decide if someone comes

10 (Pages 37 to 40)

James Padar      Spalding, Echeverria v. City of Chicago      5/21/15

Page 41

1  into Narcotics or leaves Narcotics.  I have
2  been part of the interview process, where a
3  candidate has been interviewed by two
4  sergeants and a lieutenant, and then we
5  discuss the pluses and negatives for each
6  candidate.  And we complete an interview
7  packet for that candidate with their
8  responses to questions, and we put our own
9  personal recommendations in those packets,
10  and they are submitted up the chain of
11  command.
12      Q.  And then someone above you makes
13  the final decision?
14      A.  Yes.
15      Q.  Tell me what factors you consider
16  when determining assignments to Narcotics --
17  when interviewing potential applicants?
18      A.  I would consider their arrest
19  numbers, complaints against them.  I would
20  consider attendance.  I would consider any
21  additional skills.
22          Some people on their
23  application list language skills, which
24  would be beneficial.  Previous experience in

Page 42

1  making undercover narcotic purchases with
2  either other departments, or within their
3  unit of assignment.  So items of that
4  nature.
5      Q.  Anything else?
6      A.  To be honest with you, I would
7  have to look at everything that would be
8  presented to me, and every -- I would
9  consider everything that's presented to me.
10      Q.  Were you involved in any way in
11  the application process for Danny Echeverria
12  or Shannon to come into Narcotics?
13      A.  No.
14      Q.  Tell me between 2007 and 2010 what
15  kind of working relationship did you have
16  with either Danny or Shannon, if any?
17      A.  I was never -- that I recall, they
18  were never assigned to a team that I was
19  responsible for.  I don't recall any
20  specific instances where I was watching them
21  or their team while their supervisor was
22  gone.
23          I do know in 2010 -- I believe
24  it was 2010, Officers Spalding and

Page 43

1  Echeverria worked with my team because they
2  had information that they wanted to act
3  upon, and it was my understanding that they
4  needed assistance through the Narcotics
5  Division.
6      Q.  When you say they worked with your
7  team at that time, was that at a time where
8  they were working within Narcotics or --
9      A.  I believe at the time, they were
10  -- they were detailed to Detached Services.
11      Q.  Who was on your team at that time?
12      A.  My team has changed dramatically
13  over the period of seven years, so I can say
14  I know that Anthony Hernandez was on the
15  team at the time.  Vince Morgan was on the
16  team at the time.  I am trying to think who
17  else.  I would be guessing if I gave out --
18      Q.  Well, let me focus because you
19  mentioned that you had looked at the
20  confidential informant packet, and I am
21  going to be showing you that as well.  But
22  at that period of time in, August of 2010,
23  do you recall who was on your team?
24      A.  Off the top of my head, I don't

Page 44

1  remember every member that was on my team.
2      Q.  If I gave you some names, can you
3  tell me if it refreshes your recollection?
4      A.  Sure.
5      Q.  Craig; was Craig on your team?
6      A.  He very well could have been on my
7  team.
8      Q.  I am saying August of 2010.
9      MR. KING:  Don't guess.
10  BY MR. TAREN:
11      Q.  What about Marco?
12      A.  Yes, he could have been on my team
13  at that time.
14      Q.  Mickey?
15      A.  He could have been on my team at
16  that time.
17      Q.  Do you think that rounds up your
18  team, or is there somebody that we don't
19  know about?
20      A.  I typically had six to ten people
21  on my team at any time.  To be honest with
22  you, that was five years ago, approximately.
23      Q.  Yes.
24      A.  And there was a lot of turnover.

11 (Pages 41 to 44)

MARIBETH REILLY & ASSOCIATES
630.408.2237      Chicago & Suburbs maribeth.reilly@gmail.com

James Padar      Spalding, Echeverria v. City of Chicago      5/21/15

Page 45

```
 1   So without reviewing my, you know, time
 2   sheets, I wouldn't know exactly who was
 3   there five years ago on that date.
 4       Q. Did you become aware when Danny
 5   and Shannon were first detailed to Detached
 6   Services?
 7       A. I don't recall when I became aware
 8   that they were detailed to Detached
 9   Services.
10       Q. Am I correct in saying it was well
11   before August of 2010?
12       A. To be honest with you, I don't
13   know when they were detailed there.
14       Q. At some point, did you find out
15   from any source what Danny and Shannon's
16   assignment was at Detached Services, and who
17   they were working with?
18       A. At one point, myself and my team
19   were assigned to the -- to Area 1, and
20   that's where we were supposed to generate
21   the majority of our activity. One of the
22   districts within Area 1 is the 2nd district.
23   This was one of our areas of responsibility.
24       I remember seeing Officers
```

Page 46

```
 1   Spalding and Echeverria driving around in
 2   the 2nd district, and speaking to them. I
 3   knew them from -- knew of them from
 4   Narcotics, and I am trying to recall if
 5   that's when I found out they were detailed
 6   to Detached Services because I had spoken
 7   with them when I had seen them in the
 8   district.
 9       I believe Officer Spalding
10   told me that they were working on dirty cops
11   in the 2nd district, but that was the extent
12   of that.
13       Q. Any idea when that was?
14       A. All I could say is it was prior --
15   I believe it would be prior to August
16   of 2010. I don't recall how many months or
17   weeks before.
18       Q. Did that surprise you when she
19   allegedly told you that she was working on
20   dirty cops?
21       A. No.
22       Q. Why not?
23       A. Well, when I realized that she was
24   working for Detached Services, I am not
```

Page 47

```
 1   exactly certain what they do or what they
 2   don't do, but they are doing something above
 3   and beyond Narcotics is my assumption.
 4       So it wouldn't surprise me
 5   that her and her partner would be working on
 6   dirty cops.
 7       Q. Had you prior to that conversation
 8   that you say you had, had you heard from any
 9   other source that either Danny or Shannon
10   were working on dirty cops at that time?
11       A. Not that I recall.
12       Q. Had you heard from any source
13   prior to that time that they were working
14   with the FBI on some kind of investigation?
15       A. Not that I recall.
16       Q. Now that question was: Prior to
17   that conversation, at some point, did you
18   learn that Danny and Shannon were detailed
19   to Detached Services and were working with
20   the FBI?
21       MR. KING: I'll object to the
22   form. He answered for before, so now you
23   are saying after.
24       MR. TAREN: Now I am just asking
```

Page 48

```
 1   after.
 2       MR. KING: At some point, at any
 3   point?
 4       MR. TAREN: At some point
 5   afterwards because then I am going to ask
 6   you when you first learned that.
 7       MR. KING: Can you rephrase the
 8   question or repeat it.
 9   BY MR. TAREN:
10       Q. At some point, did you learn that
11   Danny and Shannon were working with the FBI
12   on some investigation?
13       A. Yes.
14       Q. When was the first time you
15   learned that?
16       A. When I read about it in the media.
17       Q. And that was associated with
18   publicity around the filing of their
19   lawsuit, is that your testimony?
20       A. I don't know when it was in
21   comparison to the filing of their lawsuit.
22       Q. But you say when you read about it
23   in the media. Where? In the newspaper?
24       A. In the newspaper.
```

12 (Pages 45 to 48)

James Padar      Spalding, Echeverria v. City of Chicago      5/21/15

---

Page 49

1      Q.  And prior to that time, had you
2  heard from any source that Danny and Shannon
3  had been working along with the FBI on some
4  investigation?
5      A.  Prior to that, I don't recall ever
6  hearing that they were working with the FBI.
7      Q.  Before whatever media that you
8  saw, had you heard from any source what, in
9  fact, other than what you just said about
10  this conversation with -- you said you had
11  with Shannon, what, in fact, they were
12  working on in Detached Services?
13      A.  Other than my conversation with
14  her, I wasn't aware of what they were
15  working on in Detached Services.
16      Q.  So you never heard anyone in
17  Narcotics -- strike that.
18          Did you ever hear anyone in
19  Narcotics talk about what Danny and Shannon
20  were doing in Detached Services?
21      A.  I don't recall ever hearing
22  anything regarding what they were doing in
23  Detached Services from anyone other than
24  Shannon Spalding.

---

Page 50

1      Q.  At some point, did you become
2  aware that Danny and Shannon were involved
3  in an investigation of Officers Watts and
4  Mohammed?
5      A.  Yes.
6      Q.  When did you first become aware of
7  that?
8      A.  When it was presented in the
9  media.
10      Q.  Now you talked about your
11  conversation with Shannon.  Did you ever
12  have a conversation with Danny Echeverria
13  about what they were doing in Detached
14  Services or in the 2nd district?
15      A.  Not that I recall.  I don't recall
16  if Mr. Echeverria was present when Shannon
17  and I had spoke in the 2nd district.
18      Q.  It's possible he was present
19  during that time?
20      A.  Yes.
21      Q.  Was anyone else with him?  Was
22  Officer Hernandez with him at that time?
23      A.  I wouldn't think so because
24  Officer Hernandez was one of my team

---

Page 51

1  members, and shouldn't have been with them.
2      Q.  Is it your testimony that you have
3  never heard -- prior to the publicity of the
4  filing of their lawsuit, I believe we are
5  talking November of 2012, is it your
6  testimony that you never heard anyone in
7  Narcotics, from patrol officers up to
8  commander, talk about Danny and Shannon?
9      A.  Again, I don't know when the media
10  reported on this versus when they filed
11  their lawsuit.
12      Q.  So I am -- the time period I am
13  placing is prior to you hearing from the
14  media, whenever that was, prior to you
15  hearing from the media, is it your testimony
16  that no one -- you never heard anyone in
17  Narcotics talk about Danny or Shannon?
18      MR. KING:  I'd just object to the
19  form.
20          About anything about them?
21      MR. TAREN:  About anything, and
22  then I will narrow it down.
23      MR. KING:  That's a different
24  question than what he's been testifying to

---

Page 52

1  but...
2      THE WITNESS:  I have heard people
3  talk about Shannon in Narcotics prior to
4  that being released in the media, yes.
5  BY MR. TAREN:
6      Q.  Who did you hear talk about
7  Shannon?
8      A.  He is now Captain Navarro, Kevin
9  Navarro.
10      Q.  When did you hear him talk about
11  Shannon?
12      A.  It could have been maybe 2008,
13  2009.
14      Q.  What was the subject matter that
15  you recall?
16      A.  He asked me if I knew Shannon
17  Spalding, and I said I knew of her.  And he
18  asked me if I would handle a CR number, an
19  investigation, into an allegation of
20  insubordination on her part.
21      Q.  Okay.
22      A.  And I said, I was willing to
23  accept the investigation.
24      Q.  Did you do that?

13 (Pages 49 to 52)

James Padar       Spalding, Echeverria v. City of Chicago       5/21/15

---

Page 53

1      A. Yes.
2      Q. What did that investigation
3   involve? What was the CR about?
4      A. If I recall correctly, it had
5   something to do with Officer Spalding on the
6   medical and not appearing in court, and I
7   conducted an investigation into the
8   allegations.
9          And if I recall correctly, my
10  investigation led me to put a recommendation
11  to exonerate it forward.
12      Q. Are there any other instances that
13  you recall having a discussion with someone
14  from Narcotics about Shannon?
15      A. Are you talking about prior to
16  this?
17      Q. Yes, prior to the media exposure.
18      A. I can't recall any specific
19  conversations, but I do know -- I believe
20  her boyfriend is Tony Hernandez, and he was
21  on my team, so I may have spoken to him
22  about her, but I don't recall specific
23  conversations.
24      Q. That's my next question.

---

Page 54

1      A. Okay.
2      Q. You have no recollection of a
3   specific conversation with Mr. Hernandez
4   about Shannon; is that correct?
5      A. I don't recall anything
6   specifically at this point.
7      Q. But it's likely that you had
8   conversations at times with him that may
9   have mentioned --
10     A. Absolutely.
11     Q. -- Shannon?
12         And you were aware that they
13  were in a boyfriend-girlfriend relationship,
14  correct?
15     A. Yes.
16     Q. Let's talk about the Cooperating
17  Individual Requests. Could you mark this as
18  Padar Exhibit 1.
19         (Whereupon, Padar Deposition
20         Exhibit No. 1 was marked for
21         identification.)
22  BY MR. TAREN:
23     Q. I am showing you what we have
24  marked as Padar Deposition Exhibit Number 1.

---

Page 55

1   Take your time, take a look at it, and then
2   tell me if you recognize that?
3      A. I do recognize it.
4      Q. And what is that?
5      A. It's a request to register a
6   cooperating individual.
7      Q. How did this first come to your
8   attention?
9      A. If I recall correctly, Officer
10  Spalding handed it to me to review and
11  approve and present up my chain of command
12  for approval.
13     Q. You are going to have to educate
14  me on what the process is for getting
15  approval of a cooperating individual request
16  at that time. What's the process? What was
17  the process in August of 2010?
18     A. Well, the process for getting the
19  packet approved is to present it to a
20  supervisor, have the supervisor review it
21  for -- to make sure it's complete, and
22  accurate, and then send it up the chain to
23  have a lieutenant review it and have a
24  commander review it and approve it.

---

Page 56

1      Q. Where were you when Shannon handed
2   this to you?
3      A. I believe I was at Homan Square.
4      Q. Did you have a conversation with
5   her at that time about the purpose of this?
6      A. I don't recall any specific
7   conversation, but I would assume that if she
8   handed this to me for approval that we had
9   conversation about it.
10     Q. Was this informant familiar to
11  you?
12     A. Not that I'm aware of, and I don't
13  recognize him on today's date.
14     Q. And is it your testimony that you
15  don't recall any discussion about what the
16  investigation was that Shannon asked to have
17  David Holmes registered for?
18     A. Correct.
19     Q. Do you have any recollection of
20  being told that David Holmes was cooperating
21  with the Feds in any way in any kind of
22  investigation?
23     A. I don't recall that.
24     Q. How do you go about handing this

---

14 (Pages 53 to 56)

James Padar        Spalding, Echeverria v. City of Chicago        5/21/15

Page 57

1  up the chain of command?  Do you do this by
2  oral presentation to your lieutenant, or do
3  you submit a form or a memo or anything of
4  that sort?
5       A.  It's been my practice in the past
6  to present it in person to the next step in
7  my chain of command, which would be the
8  lieutenant.
9            In this instance, to be honest
10  with you, I don't recall if I presented it
11  in person or not.  I very well may have.
12       Q.  Who is the lieutenant that you
13  would present it to?
14       A.  At that time, I am not -- I don't
15  recall which lieutenant I presented it to.
16  I don't recognize the -- I can't make out
17  the signature on here.
18       Q.  Do you recall anything about the
19  presentation that you made to the lieutenant
20  to seek approval of this cooperating
21  individual?
22       A.  I don't.
23       Q.  Was anyone else with you at the
24  time that you made your presentation?

Page 58

1       A.  I don't recall.
2       Q.  When you make a presentation like
3  that, do you take notes or anything?
4       A.  No.
5       Q.  Do you submit any to/froms or
6  memos?
7       A.  No, I don't recall ever that.
8       Q.  Do you recall what the result was
9  of your presentation with regard to approval
10  of David Holmes as a CI?  Was it approved?
11       MR. KING:  I just want to object
12  to the word "presentation."  I think he
13  testified he can't recall whether he did it
14  in person or exactly how he did it in this
15  instance.  Assuming that's what we mean when
16  we say "presentation," that's fine.
17       THE WITNESS:  I would assume by
18  looking at this document that it was
19  approved by a lieutenant.  I don't recall if
20  it was in person or how it was presented.
21  BY MR. TAREN:
22       Q.  Is your signature on this
23  document?
24       A.  Yes, it is.

Page 59

1       Q.  And that's the signature under the
2  word "sergeant" with Star Number 1210?
3       A.  Yes.
4       Q.  And does that indicate that you
5  signed this on August 17th of 2010?
6       A.  Yes.
7       Q.  I know you alluded.  I am pretty
8  sure I know what the answer is going to be,
9  but I have to ask you whose signature is
10  right underneath yours?
11       A.  I don't know.
12       Q.  And are there any lieutenants
13  other than the names that you gave me
14  earlier in this deposition that would have
15  been authorized to sign this approval?
16            So my question, is it one of
17  those guys, the lieutenants whose names you
18  recounted, or is it someone else?
19       A.  It could have been someone else.
20  I don't recall every lieutenant that's been
21  there over the period of time that I was
22  there.  I don't recall what lieutenants were
23  assigned to Narcotics on August 17, 2010.
24            I know there is a lieutenant

Page 60

1  who I believe is now a commander.  I can't
2  think of his name, but he is not included on
3  your list, but I don't -- I don't recall his
4  name.  He was there for a very brief period
5  of time, and then he became the commander of
6  the 25th district.
7       Q.  After this presentation to the
8  lieutenant, what was the process after that
9  with regard to this request for approval of
10  the cooperating individual?
11       A.  The process would require that
12  this be forwarded to the commander.
13       Q.  And that would have been O'Grady
14  at the time, James O'Grady; is that correct?
15       A.  Yes.
16       Q.  Did you forward this to James
17  O'Grady?
18       A.  I don't recall if I did or the
19  lieutenant did.
20       Q.  How would we determine who did?
21  Is there some document that would indicate
22  who made the presentation -- who presented
23  it to Commander O'Grady?
24       A.  If there is, I am not aware of a

15 (Pages 57 to 60)

James Padar      Spalding, Echeverria v. City of Chicago      5/21/15

---

Page 61

1  document on who handed this to Mr. O'Grady.
2      **Q. Is there any form that you are**
3  **required to fill out when you are presenting**
4  **this up the chain of command that's not**
5  **contained in Padar Exhibit 1?**
6      A. I have to say I don't know.
7      **Q. Do you have recollection of having**
8  **any contact with James O'Grady concerning**
9  **the request of Shannon Spalding and Danny**
10 **Echeverria to register this informant, David**
11 **Holmes?**
12     A. I did have communication with him.
13     **Q. And what was the nature of that**
14 **communication?**
15     A. I remember Commander O'Grady
16 asking me why I signed it. I remember him
17 asking why their sergeant didn't sign it. I
18 remember him asking me if I knew who their
19 sergeant was, and I remember him asking me
20 if their sergeant was aware of what they
21 were doing with this, and that they were
22 signing this gentleman up.
23     **Q. What did you tell him?**
24     A. I told him that I wasn't aware of

---

Page 62

1  who their sergeant was, and I told him that
2  I wasn't aware of whether or not their
3  supervisor was aware what they were doing or
4  that they were signing up this informant.
5      **Q. And what else was said in this**
6  **conversation then?**
7      A. He told me that he wouldn't sign
8  it at this point, and that I would have to
9  have them get their supervisor to sign it,
10 so he could ensure that their supervisors
11 were aware of what was going on.
12     **Q. And did you say anything further?**
13     A. I don't recall saying anything
14 further.
15     **Q. Do you recall if Commander O'Grady**
16 **said anything further?**
17     A. I don't recall him saying anything
18 further.
19     **Q. Did you discuss in that**
20 **conversation -- strike that.**
21         **First of all, does this**
22 **refresh your recollection that, in fact, you**
23 **did have a personal communication with James**
24 **O'Grady concerning this cooperating**

---

Page 63

1  **individual request?**
2      A. Yes.
3      **Q. Was this face-to-face?**
4      A. Yes.
5      **Q. Was anyone else present?**
6      A. Not that I recall.
7      **Q. Did O'Grady ask you anything about**
8  **the nature of the investigation that Shannon**
9  **and Danny were conducting with the use of**
10 **this informant?**
11     A. Not that I recall.
12     **Q. Did you tell him that they were**
13 **working on investigating dirty cops?**
14     A. No.
15     **Q. Did that come up at all?**
16     A. No.
17     **Q. Did O'Grady ask you anything about**
18 **the investigation that Shannon -- about your**
19 **knowledge of what Shannon and Danny were**
20 **doing?**
21         MR. KING: I'd object; asked and
22 answered.
23         You can answer again.
24         THE WITNESS: I don't recall

---

Page 64

1  having any knowledge of what investigation
2  this individual was going to be part of, and
3  I don't recall Commander O'Grady asking me
4  any questions about what this person was
5  going to be involved in.
6  BY MR. TAREN:
7      **Q. Did Commander O'Grady ask you**
8  **anything about what Danny and Shannon were**
9  **involved in?**
10     A. Not that I recall.
11     **Q. Did you discuss with Commander**
12 **O'Grady the fact that Danny and Shannon**
13 **were, at that time, in Detached Services?**
14     A. I think our conversation alluded
15 to the fact that they were in Detached
16 Services because I was not their supervisor,
17 and he asked if their supervisor was aware
18 of this.
19     **Q. And when he asked if their**
20 **supervisor was aware of this, then you --**
21 **did you allude to the fact that they were**
22 **not reporting directly to Narcotics but were**
23 **in Detached Services?**
24         MR. KING: Objection; asked and

---

16 (Pages 61 to 64)

James Padar       Spalding, Echeverria v. City of Chicago       5/21/15

Page 65

1    answered to what he alluded to.
2             But you can state the
3    conversation again.
4             THE WITNESS:  Commander O'Grady
5    asked me if Shannon and Danny's supervisor
6    was aware of this informant and how they
7    were planning on using the informant, and I
8    said, I don't know.  I didn't know who their
9    supervisor was.  I didn't know the purposes
10   for which this informant was going to be
11   used specifically.
12   BY MR. TAREN:
13        **Q.  Now you knew at that time that**
14   **they were in Detached Services, correct?**
15        A.  Yes.
16        **Q.  And are you telling me that you**
17   **did not mention that to James O'Grady in**
18   **that conversation?**
19        A.  I don't know why I would have
20   mentioned that.  I don't recall mentioning
21   it.  I don't know why I would have mentioned
22   it.  I would assume that the commander of a
23   unit would know who is assigned to his unit.
24        **Q.  So based on your encounter with**

Page 66

1    **and your discussion with James O'Grady that**
2    **we have just been talking about, were you**
3    **under the impression that he was aware of**
4    **what Danny and Shannon's assignment was at**
5    **that time?**
6             MR. KING:  Object to the form.
7             You can answer.
8             THE WITNESS:  I don't know what he
9    was aware of at the time, other than my own
10   assumptions that he was aware that they
11   weren't in Narcotics.
12   BY MR. TAREN:
13        **Q.  So what did you do after the --**
14   **after Commander O'Grady refused to sign the**
15   **approval?**
16             MR. KING:  I'd just object to the
17   characterization "refusal," but you can
18   answer.
19             THE WITNESS:  I believe I returned
20   it to Officer Spalding and let her know the
21   reasoning behind why it was not signed.
22   BY MR. TAREN:
23        **Q.  Before returning it to Officer**
24   **Spalding, did you make an effort to talk to**

Page 67

1    **any of the other sergeants?**
2        A.  I don't recall talking to any
3    sergeants regarding this.
4        **Q.  Did you go back to talk to the**
5    **lieutenant who had -- who we don't know**
6    **whose signature that is?**
7        A.  I don't recall going back to a
8    lieutenant.
9        **Q.  How did you arrange to speak with**
10   **Shannon?  Did you call her up?**
11       A.  I don't recall.
12       **Q.  Did you meet with her somewhere?**
13       A.  I believe I did.
14       **Q.  Where was that?**
15       A.  I am not certain of the location
16   where we met.  I believe it was at the Homan
17   Square facility.
18       **Q.  In the parking lot?**
19       A.  That I don't know.
20       **Q.  And do you recall who was present**
21   **when you met with her?**
22       A.  I don't.
23       **Q.  Was this a prearranged meeting?**
24       A.  I don't recall if it was

Page 68

1    prearranged.  I know that we were working --
2    we had worked together on other cases;
3    Officer Spalding and Officer Echeverria,
4    along with my team.  And I don't know if
5    they were present because of something else
6    we were working on, or if I went to meet
7    them, or if they were at Homan Square, that
8    I don't recall.
9        **Q.  You are not suggesting that the**
10   **next meeting you had with regard to this**
11   **cooperating individual request was just a**
12   **chance encounter, are you?  Did you just run**
13   **into her?**
14       A.  I am not certain if she was at
15   Homan Square because she had been at Homan
16   Square on numerous occasions before that
17   working with my team.
18       **Q.  Okay.**
19       A.  So like I said before, I don't
20   recall exactly where we met.  So I can't be
21   certain, no.
22       **Q.  Do you have a recollection of this**
23   **meeting taking place in the 7th district**
24   **parking lot?**

17 (Pages 65 to 68)

James Padar      Spalding, Echeverria v. City of Chicago      5/21/15

Page 69

1    A. No.
2    Q. Is it possible?
3    A. It could be possible.
4    Q. Do you have a recollection of
5  Danny Echeverria and Anthony Hernandez being
6  present for this conversation?
7    A. I don't.
8    Q. And that's another thing that
9  possibly you just don't recall; is that
10 correct?
11   A. It's possible.
12   Q. Tell me what you recall saying to
13 Shannon and what she said to you in this
14 encounter.
15   A. I recall letting her know that
16 Commander O'Grady wanted her to have the
17 supervisor approve this and then forward it
18 back up to him. I don't recall what her
19 response was.
20   Q. Do you recall whether she was
21 happy with that?
22   A. I don't.
23   Q. Do you recall whether anyone else
24 participated in this conversation?

Page 70

1    A. I don't.
2    Q. How long was it after Shannon had
3  presented you with the request that is
4  Exhibit 1 that you gave it back to her?
5    A. I don't recall.
6    Q. Well, just exploring your memory,
7  are we talking about the same day? Was it
8  the same day?
9    A. From reviewing this document --
10   Q. Yes.
11   A. -- I don't believe it was the same
12 day.
13   Q. Okay. And is that because we have
14 one signature on the 17th and one on the
15 18th?
16   A. Yes.
17   Q. Do you recall whether you went to
18 see Commander O'Grady the same day you went
19 to and received this signature from the
20 lieutenant?
21   A. I don't recall.
22   Q. Do you recall whether you went to
23 see Shannon to give her back the request the
24 same day that you spoke with Commander

Page 71

1  O'Grady?
2    A. I don't recall.
3    Q. Was it within two or three days?
4    A. This is going on almost five
5  years, so I don't recall if there was five
6  days in between or one day in between or ten
7  days in between. I don't recall.
8    Q. Before returning the cooperating
9  individual request to Shannon, did you speak
10 with any other officers about anything to do
11 with the approval of David Holmes?
12   A. Not that I recall.
13   Q. How unusual was it for Commander
14 O'Grady to refuse to approve a cooperating
15 individual request?
16   MR. KING: Object to the form of
17 the question. Lack of foundation.
18   MR. TAREN: Strike that. Let me
19 try and lay a foundation. You are right.
20 BY MR. TAREN:
21   Q. On how many occasions have you
22 presented a cooperating individual request
23 to Commander O'Grady?
24   A. Maybe a dozen times.

Page 72

1    Q. And how many times did he refuse
2  to sign the requests?
3    MR. KING: I still object to the
4  lack of foundation.
5    MR. TAREN: I am just talking
6  about the ones that he presented.
7    MR. KING: I understand. But are
8  you talking about ones that he presented for
9  people that were detailed to other
10 departments?
11   MR. TAREN: No, no. In general.
12   MR. KING: Let's talk apples and
13 apples.
14 BY MR. TAREN:
15   Q. I was just going to say, of the
16 dozen cooperating individual requests that
17 you presented to Commander O'Grady, how many
18 did he refuse to sign?
19   MR. KING: And I'd object to the
20 use of "refuse to sign."
21 BY MR. TAREN:
22   Q. Let's say, how many he did not
23 sign?
24   A. I don't recall.

18 (Pages 69 to 72)

James Padar      Spalding, Echeverria v. City of Chicago          5/21/15

---

Page 73

1      Q. Any other than this one that you
2  can point to?
3      A. I can't think of any off the top
4  of my head.  However, things that are
5  incomplete or incorrect are often sent back
6  to me to have them complete or corrected
7  prior to his approval.
8      Q. Is there a record kept of approved
9  cooperating individual requests with your
10 signature on them?
11     A. I believe there are.
12     Q. Where would that be kept?
13     A. I believe at headquarters.
14     Q. All right.  So if we looked at all
15 of the cooperating individual requests that
16 you signed during a particular period of
17 time, we are either going to see a
18 commander's signature or not; is that
19 correct?
20     A. No.
21     Q. No.  Why not?
22     A. Because I don't know if they keep
23 ones that aren't approved.
24     Q. What happens to them?

---

Page 74

1      A. I would assume they are returned
2  to the officer for corrections.
3      Q. So how long was this encounter
4  that you had with Shannon in which you
5  returned the cooperating individual request
6  to her?  Are we talking about a minute,
7  two minutes?  Ten minutes?  An hour?
8      A. I don't recall meeting at the 7th
9  district, so I don't know the length of our
10 meeting.
11     Q. Well, would this -- regardless of
12 where it took place, do you recall whether
13 this was a brief encounter or anything more
14 extended?
15     A. I don't recall.
16     Q. After you returned the cooperating
17 individual request to Shannon Spalding, was
18 it ever re-presented to you?
19     A. Not that I recall.
20     Q. Did you ever speak with anyone
21 else about David Holmes -- another
22 sergeant -- about approving a cooperating
23 individual request regarding David Holmes?
24     A. Not that I recall.

---

Page 75

1      Q. Other than the one conversation
2  you just testified to between you and
3  Commander O'Grady concerning this
4  cooperating individual request, have you
5  ever had any other conversations with
6  Commander O'Grady involving Spalding and
7  Echeverria's request for approval of David
8  Holmes as a cooperating individual?
9      A. Not that I recall.
10     Q. Did you ever have any other
11 conversations with James O'Grady that had
12 anything to do with Shannon Spalding?
13     A. I don't recall specific
14 conversations with him regarding Shannon
15 Spalding.
16     Q. Did you ever have any
17 conversations with James O'Grady about Danny
18 Echeverria?
19     A. Not that I recall.
20     Q. Did Commander O'Grady ever tell
21 you not to work with Spalding and
22 Echeverria?
23     A. No.
24     Q. Or either of them?

---

Page 76

1      A. No.
2      Q. Did you ever tell Shannon Spalding
3  or Danny Echeverria that O'Grady had told
4  you that you were not to work with them?
5      A. No.
6      Q. Did Commander O'Grady ever speak
7  to you about not backing up or assisting
8  Shannon or Danny?
9      A. No.
10     Q. Did he ever say anything to you
11 about what would happen to Shannon or Danny
12 if there was a 10-1?
13     A. No.
14     Q. Did you ever hear Commander
15 O'Grady refer to either Danny or Shannon as
16 an IAD rat?
17     A. No.
18     Q. Did you ever hear anyone say that?
19     A. No.
20     Q. Did you ever hear anyone refer to
21 them -- now I am taking the word IAD out --
22 as a rat?
23     A. No.
24     Q. Did you ever hear anyone speculate

---

MARIBETH REILLY & ASSOCIATES
630.408.2237          Chicago & Suburbs maribeth.reilly@gmail.com

James Padar      Spalding, Echeverria v. City of Chicago      5/21/15

Page 77

1  or state that they believed that Danny or
2  Shannon were working with IAD?
3      A. I don't recall ever hearing that.
4      Q. Anything like it? I am asking you
5  because you are hesitating on this one.
6      A. I am trying to think with the
7  media coverage surrounding the case if there
8  was mention that they were working with IAD.
9  And I can't recall if there was mention of
10 that in the news reports after the two --
11 the sergeant and the PO from the 2nd
12 district were arrested.
13     Q. Who did you tell that Shannon said
14 they were working investigating dirty cops?
15     A. I don't recall who I told.
16     Q. Did you ever hear another officer
17 say they didn't want to work with either
18 Danny or Shannon?
19     A. I can't think of anyone that I
20 have heard say that.
21     Q. To your knowledge, there was no
22 problem with the quality of their work while
23 they were at Narcotics, was there?
24     A. Not to my knowledge.

Page 78

1      Q. Prior to any of the publicity
2  surrounding the filing of this lawsuit, did
3  you ever hear anyone express any animosity
4  towards Danny or Shannon?
5      A. No.
6      Q. Are you saying that until you
7  heard something in the publicity associated
8  with the lawsuit, you were unaware that
9  Danny or Shannon were working with IAD?
10     A. That's correct.
11     Q. And is it your testimony that
12 before reading anything in the newspaper,
13 you were unaware that they were working in
14 conjunction with the FBI?
15     A. That's correct.
16     Q. So when did you first learn that
17 they were involved in any way in the
18 investigation of Officers Mohammed and
19 Watts?
20     A. When the media reports broke
21 around the arrest of Mohammed and Watts.
22     Q. Did you hear from any source prior
23 to that time that Mohammed and Watts were
24 being investigated for possible criminal

Page 79

1  activity?
2      A. No.
3      Q. Have you ever heard the word --
4  the phrase "Brass Tax" in connection with
5  any kind of investigation before it was
6  released to the public?
7      A. No.
8      Q. Did you know either Officer Watts
9  or Mohammed?
10     A. No.
11     Q. At any point did you learn that
12 Danny or Shannon were working and reporting
13 to Juan Rivera?
14     A. No.
15     Q. Do you know who Juan Rivera is?
16     A. Yes.
17     Q. Were you aware of what his
18 position was with IAD?
19     A. I believe he's the chief of IAD.
20     MR. TAREN: Could we take a break?
21     MR. KING: Sure.
22         (Whereupon, a break was taken
23         from 3:13 p.m. to 3:26 p.m.)
24

Page 80

1          (Whereupon, the record was
2          read as requested.)
3  BY MR. TAREN:
4      Q. I am going to bounce back a little
5  bit.
6          In your conversation with
7  James O'Grady that you were testifying
8  about, did he tell you who specifically
9  Shannon should present the cooperating
10 individual request to?
11     A. Not specifically. She -- he told
12 me to have her present it to her supervisor.
13 I don't know who the supervisor was.
14     Q. Did he clarify to you that he was
15 referring to her supervisor in Detached
16 Services?
17     A. He didn't clarify.
18     Q. Well, what individuals are
19 authorized to approve cooperating individual
20 requests at that time?
21     MR. KING: Object to the lack of
22 foundation.
23 BY MR. TAREN:
24     Q. Do you know?

20 (Pages 77 to 80)

James Padar     Spalding, Echeverria v. City of Chicago          5/21/15

Page 81

1        A. I am not certain, no.
2        Q. Didn't it have to be a sergeant in
3    Narcotics?
4        A. That I am not aware of.
5        Q. Do you see what I am getting at?
6    I am trying to find out whether in returning
7    -- strike that.
8            In returning Exhibit 1 to
9    Shannon, did you tell her who she should
10   present it to?
11       A. Her supervisor.
12       Q. Her supervisor in Detached
13   Services, is that what you were referring
14   to? Or someone else in Narcotics?
15       A. She didn't, to my knowledge, have
16   a supervisor in Narcotics because she wasn't
17   working in Narcotics.
18       Q. But this request for cooperating
19   individual was for an operation in which she
20   was assisting Narcotics, isn't that true?
21       A. I don't recall the circumstances
22   how this cooperating individual was going to
23   be used.
24       Q. Well, didn't you say earlier that

Page 82

1    you had worked with Danny and Shannon on
2    some other matters while they were at
3    Detached Services?
4        A. Yes.
5        Q. What kind of matters were they?
6        A. I recall specifically one search
7    warrant that we conducted together.
8        Q. And this was on Narcotics leads
9    that they had helped you develop; is that
10   correct?
11       A. I believe they developed the
12   leads, and we assisted them with the search
13   warrant.
14       Q. So were you aware that the request
15   for authorization of the cooperating
16   individual request was something that would
17   customarily go through Narcotics and not
18   Detached Services?
19          MR. KING: Again, I'd object to
20   the lack of foundation.
21          THE WITNESS: I have never worked
22   in Detached Services, so I don't know if
23   their supervisors would approve something
24   like this.

Page 83

1    BY MR. TAREN:
2        Q. Did you have any idea who their
3    supervisors were at that time in August
4    of 2010?
5        A. No.
6        Q. As far as you were concerned, was
7    this going to be -- returning the
8    cooperating individual request the end of
9    that request because there was really nobody
10   to authorize it?
11          MR. KING: Object to the form. It
12   misstates the testimony, but you can answer.
13          THE WITNESS: I was never aware
14   that there would be no one to approve it in
15   Detached Services.
16   BY MR. TAREN:
17       Q. Are you familiar with the general
18   order that only unit 189 can approve CI
19   packs?
20       A. I am not certain if that means the
21   final approval or every aspect of it. I am
22   not certain. I believe that the commander
23   of Narcotics has to approve it.
24       Q. Have you ever seen a CI pack that

Page 84

1    was signed by an officer outside of 189?
2        A. Not that I can recall.
3           Can I clarify?
4        Q. Sure, please.
5        A. When you say signed by an officer
6    outside of 189 or approved by a supervisor?
7        Q. Approved by a supervisor.
8        A. I have not seen that's been
9    approved by a supervisor outside of 189.
10       Q. So did it strike you as unusual
11   that Commander O'Grady wanted her to present
12   this for approval to someone outside of 189?
13          MR. KING: Object to the form of
14   the question, which again I think misstates
15   the testimony, but you can answer.
16          THE WITNESS: With the reason he
17   gave me, I was not surprised that it was
18   being returned back for her supervisor to
19   review.
20   BY MR. TAREN:
21       Q. Why?
22       A. As a supervisor myself, I think
23   it's important that supervisors are aware of
24   what their subordinates are doing and

21 (Pages 81 to 84)

James Padar        Spalding, Echeverria v. City of Chicago        5/21/15

Page 85

1    working on.  In this case, I wasn't certain,
2    and I believe Commander O'Grady wasn't
3    certain if her supervisor was aware of what
4    she was doing.
5        Q.  Well, you didn't have any problem
6    signing Exhibit 1, did you?
7        A.  Correct.
8        Q.  So, obviously, at that time, you
9    knew what the purpose was, and what was
10   being worked on, isn't that true?
11       A.  I didn't know what the purpose
12   was.  I assumed he would be working with
13   Officer Spalding in the future with more
14   intelligence to follow up on, but I didn't
15   know of any specific project that was being
16   worked on or case that was being worked on
17   with this individual.
18       Q.  And did the lieutenant that you
19   presented Exhibit 1 to raise any issues
20   about whether you should be signing this as
21   opposed to some other supervisor?
22       A.  That I don't recall.  I don't even
23   recall if I met personally with the
24   lieutenant or if I put it in his in-box.

Page 86

1        Q.  Did you ever ask Shannon whether
2    the supervisor she was working with was
3    aware of this request?
4        A.  Not that I recall.
5        Q.  When this was presented to you,
6    did it have Officer Hernandez's name on it?
7        A.  That I don't recall.
8        Q.  And you see at the bottom
9    left-hand part of Exhibit 1, is that Officer
10   Hernandez's signature?
11       A.  I believe so, yes.
12       Q.  So was it your understanding that
13   Officer Hernandez was working with Officers
14   Spalding and Echeverria on the matter that
15   required this request to be presented?
16       A.  Yes.
17       Q.  Were you Officer Hernandez's
18   supervisor?
19       A.  Yes.
20       Q.  Is that correct?
21       A.  Yes.
22       Q.  Did you talk about that to
23   Commander O'Grady?
24       A.  Not that I recall.

Page 87

1        Q.  So why was it necessary if Officer
2    Hernandez was also making this request and
3    his supervisor was aware and had approved
4    the request that there be -- that this be
5    rejected because Shannon Spalding's
6    supervisor hadn't signed off on it?
7        MR. KING:  Object to the lack of
8    foundation.
9            If you know, you can answer.
10       THE WITNESS:  I don't know any
11   specifics.  I could only speculate as to why
12   her supervisor should know about this.
13   BY MR. TAREN:
14       Q.  By the way, do you recall that you
15   returned this to Shannon at around midnight
16   at the same day that you presented it to
17   Commander O'Grady?
18       A.  That I don't recall.
19       Q.  That's possible?
20       A.  It's possible.
21       Q.  Do you recall seeing a cooperating
22   individual request that had a yellow sticky
23   Post-it note on it telling you to go see
24   Commander O'Grady?

Page 88

1        MR. KING:  Just object to the form
2    and lack of foundation and assuming facts
3    not in evidence.
4        THE WITNESS:  I don't recall.
5    BY MR. TAREN:
6        Q.  Did you ever tell Shannon or Danny
7    or Anthony Hernandez that O'Grady had told
8    you that he'd sign the CI pack for Holmes if
9    you'd scratch those two rat's names off the
10   packet?
11       A.  No.
12       Q.  You are smirking.  Is there a
13   reason for that?
14       A.  I had previously testified that I
15   never heard Shannon be referred to as a rat
16   or an IAD rat.
17       Q.  Are you aware that there are three
18   individuals that are going to testify that,
19   in fact, that is what he said?
20       A.  I am not aware of what they are
21   going to testify to.
22       Q.  Do you know whether Shannon and
23   Danny had been authorized to wear a wire
24   pursuant to their investigation with

22 (Pages 85 to 88)

James Padar      Spalding, Echeverria v. City of Chicago        5/21/15

Page 89

1    Detached Services?
2        A. I don't know.
3        Q. Do you know whether any of the
4    conversations that you had with Shannon or
5    Danny had been recorded?
6        A. I don't know.
7        Q. Did you ever tell Danny that
8    O'Grady had said to you that their paths
9    were not to cross again, meaning the paths
10   of Danny and Shannon and the Narcotics
11   squad?
12       A. No.
13       Q. Did you tell Danny that James
14   O'Grady had said to you, "God help them if
15   they need some help, it ain't coming. You
16   are not to help them out"?
17       A. No.
18       Q. Did you tell Danny or Shannon
19   anything about O'Grady being upset with them
20   for any reason?
21       A. No.
22       Q. Your recollection of this
23   conversation was it was just a routine
24   returning deficient CI pack; is that

Page 90

1    correct?
2        A. Yes.
3        Q. And your recollection is that
4    neither Danny or Shannon reacted in any
5    unusual or upset way during that
6    conversation?
7        A. I don't recall any adverse
8    reaction.
9        Q. There must have been some
10   reaction, was there? Do you recall any
11   reaction at all?
12       A. I don't.
13       Q. Do you recall telling Shannon that
14   you had your orders and -- from O'Grady, and
15   you can't mess up your job, or something to
16   the effect, you are just doing your job?
17       A. No.
18       Q. By the way, Commander O'Grady had
19   directed you to return this to Shannon; is
20   that correct?
21       A. Yes.
22       Q. And I understand -- do I
23   understand correctly that he instructed you
24   to tell them why he was not signing it; is

Page 91

1    that correct?
2        A. Yes.
3        Q. So in this meeting that we are
4    referring to where you are not exactly sure
5    where it took place, you were carrying out
6    Commander O'Grady's orders; is that correct?
7        A. Yes.
8        Q. To your knowledge, did you -- you,
9    being Narcotics, ever use this informant,
10   David Holmes, to make confirmation buys for
11   search warrant?
12       A. I don't recall personally using
13   him. That's not to say that someone on my
14   team may have used him, or Shannon or Danny
15   may have used him.
16       Q. Do you recall ever seeing any
17   reports, any buy reports, reflecting that
18   David Holmes was making a buy?
19       A. I don't. But I don't believe his
20   name would ever be used on a buy report.
21       Q. Do you recall ever seeing a report
22   that stated that an undercover officer made
23   a buy when, in fact, it was the cooperating
24   individual that did?

Page 92

1        A. No.
2        Q. Now in August of 2010, you were on
3    good terms with Anthony Hernandez; is that
4    correct?
5        A. Yes.
6        Q. And were you social friends with
7    Mr. Hernandez at that time?
8        A. I have never been to his house.
9    We have never really gone out together
10   outside of work, other than possibly
11   promotional parties or police-related
12   events.
13       Q. Okay.
14       A. He has been to my house. We were
15   friendly.
16       Q. And in August of 2010, you had no
17   bad dealings or animosity towards either
18   Shannon or Danny, isn't that true?
19       A. That's true.
20       Q. Did you ever hear from any source
21   that Shannon Spalding was not to be allowed
22   to be present at Homan Square?
23       A. I don't recall hearing from anyone
24   that she wasn't allowed to be at Homan

23 (Pages 89 to 92)

James Padar      Spalding, Echeverria v. City of Chicago      5/21/15

Page 93

1   Square, no.
2        Q.  Did you hear from anyone that she
3   wasn't to be either at the guard shack or to
4   -- or anywhere near Homan?
5        A.  No, I was not given any direction
6   or instructions to make sure she was not at
7   Homan Square.
8        Q.  That would be a pretty unusual
9   direction, wouldn't it?
10       A.  Yes.
11       Q.  Do you know who Tom Chester is?
12       A.  Yes.
13       Q.  How do you know Mr. Chester?
14       A.  I was introduced to him one day
15   when he was at Homan Square as a supervisor
16   in Internal Affairs.
17       Q.  Do you recall when that was?
18       A.  I don't recall if it was 2011 or
19   2012.
20       Q.  At any point, did you learn that
21   Shannon and Danny were reporting to Tom
22   Chester?
23       A.  No.
24       Q.  And do you recall what the

Page 94

1   circumstances were of why Tom Chester was at
2   Homan Square when you encountered him?
3        A.  He and Sergeant Mike Barz were
4   requesting an interview with me.
5        Q.  Okay.  And what was that
6   regarding?
7        A.  Regarding allegations that Anthony
8   Hernandez made against me.
9        Q.  Was this before or after Hernandez
10   filed his lawsuit against you?
11       A.  I believe it was after.
12       Q.  And did you give an interview to
13   them at that time?
14       A.  No.
15       Q.  Have you ever given them an
16   interview with regard to those allegations?
17       A.  No.
18       Q.  Is there an outstanding CR with
19   regard to the Hernandez allegations and you?
20       A.  Yes.
21       Q.  Do you know what the status of
22   that is?
23       A.  I don't know what the status of it
24   is.

Page 95

1        Q.  And that's the complaint that
2   alleges that you held back time slips that
3   were submitted by Mr. Hernandez; is that
4   correct?
5        A.  Yes.
6        Q.  And that's the case that you were
7   deposed on in February of this year?
8        A.  Yes.
9        Q.  You said there was an ongoing CR
10   with regard to the Hernandez allegations.
11   Do you know whether there is a criminal
12   investigation with regard to the Hernandez
13   allegations?
14       A.  I'm aware that it was reviewed by
15   the State's Attorney's Office.
16       Q.  Okay.
17       A.  And I was informed by my attorney
18   that there would be no charges criminally.
19       Q.  Did you get anything from the
20   State's Attorney, any letters?
21       A.  I did not.
22       Q.  I'd like to ask you some questions
23   about your involvement with the arrest of
24   Joseph Sperling in June of 2013.

Page 96

1        MR. KING:  And I am going to
2   object to the relevance of those questions,
3   but you may ask.
4   BY MR. TAREN:
5        Q.  All right.  Did you participate in
6   a surveillance of Joseph Sperling in and
7   around June of 2013?
8        A.  In regards to this case, I'm aware
9   that there -- this case is being reviewed by
10   the State's Attorney's Office.  So I am not
11   at liberty to discuss this case because
12   there could potentially be criminal charges.
13       Q.  Are you going to assert your right
14   not to testify -- not to incriminate
15   yourself under the Fifth Amendment and
16   refuse to answer questions?
17       A.  Yes, I am.
18       Q.  Now I am going to have to tell
19   you, since I have been through this before,
20   that in order to make a record, I am
21   required to ask you the questions, and you
22   are going to have to assert your Fifth
23   Amendment right as to any question that you
24   believe may tend to incriminate you.  And

MARIBETH REILLY & ASSOCIATES
630.408.2237         Chicago & Suburbs  maribeth.reilly@gmail.com

James Padar      Spalding, Echeverria v. City of Chicago      5/21/15

Page 97

1    those that do not, you are supposed to be
2    answering the question but I can't just take
3    the blanket "I won't testify."
4            So I did this for three hours
5    once.  It was not a pleasant deposition.
6    This won't take three hours.
7            Can you tell me who
8    participated in the surveillance of Joseph
9    Sperling?
10        MR. KING:  And I want to show a
11   continuing line of objection as to the
12   relevance of the Sperling matter to this
13   lawsuit, in addition to the rights that the
14   witness is asserting.
15   BY MR. TAREN:
16       Q.  If you want to just say, you know,
17   I will take the Fifth or assert my rights,
18   so we can short-circuit it, that's fine with
19   me, too.  Anyway you want to say it.
20       A.  I will assert my rights.
21       Q.  In conjunction with the arrest of
22   Joseph Sperling, were you acting as a member
23   of the Chicago Police Department Narcotics
24   squad?

Page 98

1        A.  Yes.
2        Q.  And did Officers Vince Morgan and
3    William Pruente participate in the
4    surveillance with you?
5        A.  I will assert my rights.
6        Q.  Prior to pulling Mr. Sperling
7    over, did you participate in any
8    conversations with other officers where you
9    planned how to pull Mr. Sperling over in his
10   car?
11       A.  I will assert my rights.
12       Q.  Were you accompanied by two
13   Village of Glenview police officers that
14   day?
15       A.  Yes.
16       Q.  And were those officers Horn and
17   Urbanowski?
18       A.  Yes.
19       Q.  Had you worked with them before?
20       A.  I had met Sergeant Urbanowski on
21   one occasion when the Postal team and
22   Narcotics was doing a controlled delivery,
23   and she was present for the debriefing at
24   the Glenview police station.

Page 99

1        Q.  Are you listed as an arresting
2    officer with regard to the June 6th arrest
3    of Joseph Sperling?
4        A.  I don't recall.
5        Q.  Were you present at the traffic
6    stop of Sperling's car that day?
7        A.  I will assert my rights.
8        Q.  Was Mr. Sperling pulled over
9    because he failed to use his turn signal?
10       A.  I will assert my rights.
11       Q.  Did he, in fact, fail to use his
12   turn signal?
13       A.  I will assert my rights.
14       Q.  Did you testify in the suppression
15   hearing held on March 31, 2014, before Cook
16   County Circuit Court Judge Catherine
17   Haberkorn in the case captioned, "State
18   versus Sperling"?
19       A.  Yes.
20       Q.  Did you testify falsely under oath
21   in that suppression hearing?
22       A.  I will assert my rights.
23       Q.  Prior to the suppression hearing,
24   did you participate in the conversation with

Page 100

1    Officers Morgan, Pruente, Horn or Urbanowski
2    where you agreed upon a false story to
3    testify to under oath regarding the
4    stop-and-frisk of Joseph Sperling?
5        A.  I will assert my rights.
6        Q.  Did you falsely testify under oath
7    in that hearing that the officers had
8    initially asked Sperling for his driver's
9    license and registration?
10       A.  I will assert my rights.
11       Q.  Did you falsely testify under oath
12   that you or one of your fellow officers
13   asked Sperling if he had any illegal
14   narcotics on him?
15       A.  I will assert my rights.
16       Q.  Did you falsely testify under oath
17   that Sperling admitted that he had illegal
18   narcotics on him?
19       A.  I will assert my rights.
20       Q.  Did you falsely testify under oath
21   that Sperling was walked to the rear of his
22   car with Glenview Police Officer Horn, while
23   Officer Pruente searched Sperling's car?
24       A.  I will assert my rights.

25 (Pages 97 to 100)

James Padar      Spalding, Echeverria v. City of Chicago      5/21/15

Page 101

1      **Q. Did you falsely testify under oath**
2  **that drugs were found in plain view in**
3  **Sperling's vehicle?**
4      A. I will assert my rights.
5      **Q. Did you falsely testify under oath**
6  **that Sperling was not arrested until after**
7  **marijuana was found in the vehicle, and he**
8  **admitted to possessing it?**
9      A. I will assert my rights.
10     **Q. Were you aware at the time of your**
11 **court testimony at the time of the**
12 **suppression hearing that your encounter with**
13 **Joseph Sperling on June 6, 2013, had been**
14 **videotaped by Officer Urbanowski's squad**
15 **car?**
16     A. I will assert my rights.
17     **Q. Did you conspire with the other**
18 **officers mentioned above to testify falsely**
19 **under oath in that suppression hearing?**
20     A. I will assert my rights.
21     **Q. Did Judge Haberkorn announce in**
22 **court on March 31, 2014, that "All officers**
23 **lied on the stand today. All their**
24 **testimony was a lie. So there is strong**

Page 102

1  **evidence it was a conspiracy to lie in this**
2  **case for everyone to come up with the same**
3  **lie. Many, many, many times they all lied"?**
4      A. I'll assert my rights.
5      **Q. Have you been notified by the**
6  **State's Attorney that you are a target of a**
7  **criminal investigation with regard to your**
8  **testimony that was given in the Joseph**
9  **Sperling matter?**
10     A. No.
11     **Q. Have you been called before a**
12 **Grand Jury?**
13     A. No.
14     **Q. Is your assignment to the 311**
15 **center a result of any investigation into**
16 **your testimony at the March -- at the**
17 **March 31, 2014, suppression hearing?**
18     A. Yes.
19     **Q. Have you written about your**
20 **involvement in the Sperling case anywhere in**
21 **your blogs or emails?**
22     A. No.
23     **Q. Have you written about anything to**
24 **do with Shannon Spalding on any blog or**

Page 103

1  email?
2      A. No.
3      **Q. Have you ever posted any anonymous**
4  **comments on any police-related blogs that**
5  **have anything to do with Shannon Spalding or**
6  **Danny Echeverria or Anthony Hernandez?**
7      A. No.
8      **Q. Have you ever given any oral**
9  **interviews about your involvement in the**
10 **Sperling case?**
11     A. No.
12     **Q. Have you talked to your father**
13 **about your involvement in this Sperling**
14 **case?**
15     A. Yes.
16     **Q. On how many occasions?**
17     A. I am not certain how many
18 conversations I have had with him.
19     **Q. And were those conversations in**
20 **the presence of counsel or not?**
21     A. No.
22     **Q. What have you talked to your**
23 **father about with regard to the Sperling**
24 **case?**

Page 104

1      MR. KING: Again, object to the
2  relevance.
3      THE WITNESS: I have -- I spoke to
4  him about how I have been reassigned while
5  they investigate -- the department
6  investigates allegations made against me.
7      I have spoken to him about the
8  media coverage, and about the video that was
9  shown on the news.
10 BY MR. TAREN:
11     **Q. What did you tell him about the**
12 **video that was shown on the news?**
13     A. I asked him if he could get a copy
14 for me, seeing as at that point, I had never
15 seen the video. I was not present in court
16 when any video was played, and I was not
17 recalled into court to view any video.
18     **Q. Did he get you a copy?**
19     A. I believe he emailed a copy of the
20 video that was on the news.
21     **Q. Did you communicate with him by**
22 **email or texts with regard to the Sperling**
23 **matter?**
24     A. I don't recall other --

26 (Pages 101 to 104)

James Padar       Spalding, Echeverria v. City of Chicago       5/21/15

Page 105

1    specifically other than receiving an email
2    from him with the attached video.
3         Q. Have you talked to him about the
4    substance of the allegations made against
5    you with regard to the Sperling testimony?
6         A. I have not received any
7    allegations. So it's difficult to answer
8    the question because I still haven't
9    received any allegations as to what the City
10   is alleging I did wrong.
11        Q. Have you talked to your father
12   with regard to any of the allegations in the
13   Spalding case?
14        A. Again, I have not received any
15   allegations of the Spalding case -- oh, I'm
16   sorry, in the Spalding case?
17        Q. Spalding case, right.
18            You were initially named as a
19   Defendant in the Spalding case, correct?
20        A. Yes, yes.
21        Q. It was before my time.
22        A. Yes.
23        Q. And did you communicate with your
24   father about those allegations?

Page 106

1         A. I believe I did, yes.
2         Q. And did you communicate in
3    writing, by text or e-mail?
4         A. I don't recall exactly how I
5    communicated. I do recall speaking to him
6    on the phone when I found out about it.
7         Q. Did you tell him what the specific
8    allegations with regard to you were?
9         A. I believe -- I remember when I
10   found out about the lawsuit, I was at work,
11   and I believe I called him to see if he
12   could find the complaint because I had not
13   been served with any complaint, and I wasn't
14   certain what allegations were made against
15   me.
16        Q. And did he do that for you?
17        A. I don't recall if he found
18   anything else at the time because I don't
19   think I could find anything at the time. I
20   think it was too new, and it wasn't entered
21   in, or it wasn't in public record or on the
22   Internet yet.
23        Q. Have you ever communicated with
24   your father about the substance of the

Page 107

1    allegations that are in the Spalding case?
2         A. I don't recall specifically what
3    we spoke about. I am -- I believe we spoke
4    about the complaint, but I don't recall the
5    specifics of the conversation.
6         Q. You are aware that the gravamen of
7    Danny and Shannon's claims are that they
8    were retaliated against because they
9    cooperated in investigation of dirty cops;
10   Watts and Mohammad?
11        A. Yes.
12        Q. Have you ever had any discussions
13   with anyone about the truth or falsity of
14   those allegations other than counsel, other
15   than counsel?
16        A. Not that I can recall.
17        Q. With regard to the Sperling
18   matter, there was a civil action that was
19   filed as well, isn't that correct?
20        A. Yes.
21        Q. And you were named as a Defendant?
22        A. I believe so, yes.
23        Q. And that case was settled rather
24   quickly, was it not?

Page 108

1         A. It was settled.
2         Q. Did you sign a settlement
3    agreement in that case?
4         A. I did not sign anything.
5         Q. Did you pay any money with regard
6    to the settlement of the Sperling case? You
7    personally?
8         MR. KING: Again, I object to the
9    relevance of anything related to Sperling.
10            You can answer, unless it's a
11   confidential settlement to your knowledge.
12        THE WITNESS: No.
13   BY MR. TAREN:
14        Q. No. No what?
15        A. I am sorry. No to your question.
16   I have not paid anything.
17        Q. You have not paid any money for
18   that?
19        A. I have not personally paid any
20   money.
21        Q. Have you received a release of
22   claims personally from Joseph Sperling with
23   regard to any of the allegations made in the
24   civil action against you?

27 (Pages 105 to 108)

James Padar        Spalding, Echeverria v. City of Chicago        5/21/15

Page 109

1      A. No.
2      Q. Have you signed anything presented
3  to you by the City of Chicago with respect
4  to the civil action filed by Mr. Sperling?
5      A. No, not that I can recall.
6      Q. Have you ever given false
7  testimony under oath in connection with your
8  employment with the Chicago Police
9  Department?
10     A. I am going to assert my rights.
11     Q. Are you aware of any other police
12 officers associated in the Narcotics
13 Division who have given false testimony
14 under oath in connection with their
15 employment?
16     A. I am going to assert my rights.
17     Q. Who else have you discussed
18 anything to do with the allegations in the
19 Spalding matter other than counsel and
20 discussions with your father?
21     A. My wife.
22     Q. Anyone else?
23     A. I don't recall specifically.
24     Q. Have you ever talked to James

Page 110

1  O'Grady about any of the allegations that
2  were made against him in the Spalding
3  matter?
4      A. No. I am not really aware what
5  the allegations are against him.
6      Q. Have you ever spoken with Nicholas
7  Roti with regard to any of the allegations
8  made by Shannon or Danny?
9      A. No.
10     Q. How about with Deborah Pascua?
11     A. No.
12     Q. Maurice Barnes?
13     A. No.
14     Q. Robert Cesario?
15     A. No.
16     Q. Joseph Salemme?
17     A. No.
18     Q. Thomas Mills?
19     A. No.
20     Q. Have you ever spoken with anyone
21 at IAD with regard to the allegations that
22 were made by Shannon Spalding and Danny
23 Echeverria?
24     A. I don't recall speaking to anyone

Page 111

1  in IAD regarding these allegations.
2      Q. To your knowledge, is there an
3  outstanding CR number with regard to any of
4  the allegations made as a result of a civil
5  action in Spalding versus City?
6      A. Not that I'm aware of.
7      Q. Have you been testifying
8  truthfully today?
9      A. Yes.
10     Q. Do you know of any reason why
11 Shannon Spalding would lie about what she
12 claims you told him James O'Grady said about
13 her?
14     A. It's my belief that she is lying
15 because she is upset that her boyfriend and
16 I got into a business arrangement that ended
17 poorly.
18     Q. And when did that business
19 arrangement end?
20     A. I believe it was the end of 2011.
21     Q. And do you believe that her
22 allegations, therefore, that are contained
23 in this lawsuit are all as a result of you?
24     A. I'm sorry, can you read that back,

Page 112

1  please.
2          (Whereupon, the record was
3          read as requested.)
4      THE WITNESS: Maybe I am not
5  understanding the question. I don't know if
6  she filed the lawsuit -- I don't believe she
7  filed this lawsuit all because of me. Is
8  that the question?
9  BY MR. TAREN:
10     Q. Yes.
11     A. Okay. No, I don't believe that.
12     Q. And are you aware of any motive
13 that she has to lie about James O'Grady?
14     A. I can only give you my own
15 beliefs.
16     Q. Sure.
17     A. I believe it's monetary gain.
18     Q. What do you base that on?
19     A. I don't know exactly what else she
20 would get out of this other than money.
21     Q. In the course of your employment
22 with the Chicago Police Department, were you
23 aware of other officers who investigated
24 dirty cops?

28 (Pages 109 to 112)

James Padar        Spalding, Echeverria v. City of Chicago        5/21/15

---

Page 113

1    A. It's a difficult question to
2 answer. I know of people who have come from
3 Internal Affairs, and they investigate
4 allegations against police officers. I
5 know -- I believe Commander O'Grady came
6 from Internal Affairs. My assumption would
7 be that he investigated officers that
8 allegations were made about.
9        I know another sergeant that
10 O'Grady brought to the unit, Rick Herrera,
11 came from Internal Affairs. I would assume
12 that he investigated allegations against
13 police officers. But again, I am not
14 certain what their role was in Internal
15 Affairs.
16    **Q. Have you observed how officers who**
17 **criminally investigate other police officers**
18 **are treated on the job?**
19        MR. KING: I'd just object to the
20 lack of foundation. I am not sure he's
21 testified that he's aware of any, yet you
22 can answer.
23        THE WITNESS: I'm aware of the
24 Internal Affairs sergeant who played a part

---

Page 114

1 in my investigation, and I am still able to
2 freely speak to him and have a fine
3 relationship with him.
4 BY MR. TAREN:
5    **Q. Have you written in your blog or**
6 **in your book about anything relating to the**
7 **code of silence within the Chicago Police**
8 **Department?**
9        MR. KING: I'd just object to the
10 form of the question and lack of foundation.
11        If you understand the
12 question, you can answer.
13        THE WITNESS: I don't recall
14 making any writings regarding a code of
15 silence within the police department.
16 BY MR. TAREN:
17    **Q. Have you heard that term used in**
18 **the past?**
19    A. Yes.
20    **Q. What is your understanding of what**
21 **that term refers to?**
22    A. My understanding is that if police
23 officers see wrongdoing by other police
24 officers, that they could potentially remain

---

Page 115

1 silent.
2    **Q. When did you first hear about that**
3 **concept?**
4    A. I don't -- I don't recall if it
5 was on TV or in the movies or when.
6    **Q. Is it your belief that there is**
7 **such a code of silence within the Chicago**
8 **Police Department?**
9    A. I don't believe so.
10    **Q. You are aware that allegations of**
11 **such a code have been made in the past,**
12 **isn't that true?**
13    A. Yes.
14    **Q. Are you aware of the reluctance of**
15 **police officers to inform on other police**
16 **officers that they observe doing acts that**
17 **might be considered criminal?**
18        MR. KING: Object to the lack of
19 foundation.
20        You can answer.
21        THE WITNESS: I don't have any
22 specific knowledge on that.
23 BY MR. TAREN:
24    **Q. By the way, the IAD officer that**

---

Page 116

1 **you were referring to earlier that you could**
2 **still talk to, who is that?**
3    A. Sergeant Mike Barz.
4    **Q. Did you ever speak with Sergeant**
5 **Barz about anything to do with Danny and**
6 **Shannon?**
7    A. Not that I can recall.
8    **Q. Let me just check and see if we**
9 **are done here.**
10        **Have you been notified how**
11 **long you may remain in the 311 center?**
12    A. No.
13    **Q. Have any formal proceedings,**
14 **disciplinary in nature, been taken against**
15 **you as a result of the Sperling matter?**
16    A. No.
17    **Q. What about as a result of the**
18 **Hernandez matter?**
19    A. No.
20    **Q. And what about as a result of any**
21 **of the allegations in the Spalding case?**
22    A. No.
23        MR. TAREN: That's all I have.
24        MR. KING: I don't have any

---

29 (Pages 113 to 116)

James Padar     Spalding, Echeverria v. City of Chicago     5/21/15

---

Page 117

1    questions.
2              We will reserve.
3
4         (FURTHER DEPONENT SAITH NOT.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

Page 118

1        IN THE UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF ILLINOIS
3              EASTERN DIVISION
4
5    CHICAGO POLICE
     OFFICERS SHANNON
6    SPALDING and
     DANIEL ECHEVERRIA,
7         Plaintiffs,
          vs.
8    CITY OF CHICAGO,
     CHICAGO POLICE
9    CHIEF JUAN RIVERA,
     et al.,
10        Defendants.
11        I, JAMES PADAR, being first duly
12   sworn, on oath say that I am the deponent in
13   the aforesaid deposition taken on May
14   21, 2015; that I have read the foregoing
15   transcript of my deposition, consisting of
16   pages 1 - 121, and affix my signature to
17   same.
18        JAMES PADAR
19        Number of errata sheets
          attached_____
20
     Subscribed and sworn to
21   before me this      day
     of        , 2016.
22
23
24   Notary Public

---

Page 119

1    STATE OF ILLINOIS  )
2                       )  SS:
3    COUNTY OF DU PAGE  )
4
5        I, MARIBETH REILLY, a notary public
6    within and for the County of DuPage County
7    and State of Illinois, do hereby certify
8    that heretofore, to-wit, on May 21, 2015,
9    personally appeared before me, at One North
10   LaSalle Street, Chicago, Illinois, JAMES
11   PADAR, in a cause now pending and
12   undetermined in the Northern District of
13   Illinois, wherein Chicago Police Officers
14   SHANNON SPALDING and DANIEL ECHEVERRIA are
15   the Plaintiffs, and CITY OF CHICAGO, et al.,
16   are the Defendants.
17       I further certify that the said JAMES
18   PADAR was first duly sworn to testify the
19   truth, the whole truth and nothing but the
20   truth in the cause aforesaid; that the
21   testimony then given by said witness was
22   reported stenographically by me in the
23   presence of the said witness, and afterwards
24   reduced to typewriting by Computer-Aided

---

Page 120

1    Transcription, and the foregoing is a true
2    and correct transcript of the testimony so
3    given by said witness as aforesaid.
4        I further certify that the signature
5    to the foregoing deposition was reserved by
6    counsel for the respective parties and that
7    there were present at the deposition the
8    attorneys hereinbefore mentioned.
9        I further certify that I am not
10   counsel for nor in any way related to the
11   parties to this suit, nor am I in any way
12   interested in the outcome thereof.
13       IN TESTIMONY WHEREOF:  I have hereunto
14   set my hand and affixed my notarial seal
15   this 17th day of January, 2016.
16
17
18
19        NOTARY PUBLIC, DU PAGE COUNTY, ILLINOIS
20        C.S.R. No. 084-002306
21
22
23
24

---

30 (Pages 117 to 120)

MARIBETH REILLY & ASSOCIATES
630.408.2237     Chicago & Suburbs  maribeth.reilly@gmail.com

James Padar    Spalding, Echeverria v. City of Chicago          5/21/15

Page 121

1    (James Padar, 5/2/15 - Spalding v. City)
2         ERRATA SHEET
3    PG/LN          CORRECTION
4    ___/___Change from:_____
5       Change to:_____
6    ___/___Change from:_____
7       Change to:_____
8    ___/___Change from:_____
9       Change to:_____
10   ___/___Change from:_____
11      Change to:_____
12   ___/___Change from:_____
13      Change to:_____
14   ___/___Change from:_____
15      Change to:_____
16   ___/___Change from:_____
17      Change to:_____
18   ___/___Change from:_____
19      Change to:_____
20   ___/___Change from:_____
21      Change to:_____
22   ___/___Change from:_____
23      Change to:_____
24   WITNESS SIGNATURE:_____

Page 122

1    (James Padar, 5/2/15 - Spalding v. City)
2         ERRATA SHEET
3    PG/LN          CORRECTION
4    ___/___Change from:_____
5       Change to:_____
6    ___/___Change from:_____
7       Change to:_____
8    ___/___Change from:_____
9       Change to:_____
10   ___/___Change from:_____
11      Change to:_____
12   ___/___Change from:_____
13      Change to:_____
14   ___/___Change from:_____
15      Change to:_____
16   ___/___Change from:_____
17      Change to:_____
18   ___/___Change from:_____
19      Change to:_____
20   ___/___Change from:_____
21      Change to:_____
22   ___/___Change from:_____
23      Change to:_____
24   WITNESS SIGNATURE:_____

31 (Pages 121 to 122)

James Padar     Spalding, Echeverria v. City of Chicago     5/21/15

## A

**able** 114:1
**absolutely** 54:10
**academy** 9:6
**accept** 52:23
**accessed** 22:5
**accompanied** 98:12
**account** 19:8,9,10 20:1,5
  20:7,12,13,18,21 25:8
  26:19,21
**accounts** 14:8 21:2,4
**accurate** 19:19 55:22
**acknowledged** 27:5
**act** 43:2
**acting** 97:22
**action** 11:17 27:24 29:14
  29:16 107:18 108:24
  109:4 111:5
**activities** 24:8
**activity** 45:21 79:1
**acts** 115:16
**addition** 97:13
**additional** 30:10,11
  41:21
**address** 7:8,8 14:19
  15:15,21,24 16:22,24
  17:1,4
**addresses** 15:3,8
**administrative** 11:8
  33:22
**admitted** 100:17 101:8
**adventures** 13:5
**adverse** 90:7
**affairs** 18:9 93:16 113:3
  113:6,11,15,24
**affix** 118:16
**affixed** 120:14
**aforesaid** 118:13 119:20
  120:3
**ago** 25:10 44:22 45:3
**agreed** 100:2
**agreement** 108:3
**aint** 89:15
**al** 5:10 118:9 119:15
**alan** 3:4
**allegation** 52:19

**allegations** 53:8 94:7,16
  94:19 95:10,13 104:6
  105:4,7,9,12,15,24
  106:8,14 107:1,14
  108:23 109:18 110:1,5
  110:7,21 111:1,4,22
  113:4,8,12 115:10
  116:21
**allegedly** 46:19
**alleges** 95:2
**alleging** 105:10
**allen** 27:20 28:14
**allow** 39:17 40:18
**allowed** 92:21,24
**allude** 64:21
**alluded** 59:7 64:14 65:1
**alternate** 10:17,18 34:13
**ambitious** 39:21
**amendment** 96:15,23
**animosity** 78:3 92:17
**announce** 101:21
**anonymous** 103:3
**answer** 17:15 22:24
  37:19 59:8 63:23 66:7
  66:18 83:12 84:15 87:9
  96:16 105:7 108:10
  113:2,22 114:12 115:20
**answered** 47:22 63:22
  65:1
**answering** 97:2
**answers** 6:7,11
**anthony** 29:16 43:14
  69:5 88:7 92:3 94:7
  103:6
**anyway** 97:19
**apologize** 22:3
**appearances** 2:12 3:1
**appeared** 119:9
**appearing** 53:6
**apples** 72:12,13
**applicants** 41:17
**application** 37:12 41:23
  42:11
**applied** 37:11
**apply** 37:22
**approval** 55:12,15 56:8

**approve** 55:11,24 69:17
  71:14 80:19 82:23
  83:14,18,23
**approved** 55:19 58:10,19
  73:8,23 84:6,7,9 87:3
**approving** 74:22
**approximately** 7:12 9:21
  25:9 33:24 34:6 44:22
**april** 25:18 26:2
**archived** 16:5,8
**area** 33:21 45:19,22
**areas** 45:23
**arent** 73:23
**arrange** 67:9
**arrangement** 111:16,19
**arrest** 41:18 78:21 95:23
  97:21 99:2
**arrested** 77:12 101:6
**arresting** 99:1
**arrived** 35:15 38:20
**articles** 22:12
**articulate** 6:11
**asked** 19:14 31:5 38:2
  52:16,18 56:16 63:21
  64:17,19,24 65:5 100:8
  100:13 104:13
**asking** 5:20 19:17 26:24
  38:16 47:24 61:16,17
  61:18,19 64:3 77:4
**aspect** 83:21
**assert** 96:13,22 97:17,20
  98:5,11 99:7,10,13,22
  100:5,10,15,19,24
  101:4,9,16,20 102:4
  109:10,16
**asserting** 97:14
**asset** 37:24
**assigned** 10:16 11:7
  15:10 33:5,6,12,20 34:2
  34:11,16 36:6 42:18
  45:19 59:23 65:23
**assignment** 34:14 37:9
  42:3 45:16 66:4 102:14

**assignments** 33:2 40:6
  41:16
**assistance** 43:4
**assisted** 26:14 82:12
**assisting** 76:7 81:20
**associated** 16:1 19:10
  20:2 48:17 78:7 109:12
**assume** 15:13 38:16 56:7
  58:17 65:22 74:1
  113:11
**assumed** 85:12
**assuming** 58:15 88:2
**assumption** 47:3 113:6
**assumptions** 66:10
**att** 14:20
**attached** 105:2 118:19
**attachments** 21:21
**attendance** 41:20
**attended** 9:11 26:24
**attention** 55:8
**attorney** 30:15 31:20
  95:17,20 102:6
**attorneys** 5:13 25:3,4
  28:15 95:15 96:10
  120:8
**audible** 6:8
**august** 43:22 44:8 45:11
  46:15 55:17 59:5,23
  83:3 92:2,16
**author** 11:18
**authorization** 82:15
**authorize** 83:10
**authorized** 59:15 80:19
  88:23
**available** 39:12
**avenue** 2:15
**aware** 13:1 15:16,17
  20:10 23:23 45:4,7
  49:14 50:2,6 54:12
  56:12 60:24 61:20,24
  62:2,3,11 64:17,20 65:6
  66:3,9,10 79:17 81:4
  82:14 83:13 84:23 85:3
  86:3 87:3 88:17,20
  95:14 96:8 101:10
  107:6 109:11 110:4

James Padar      Spalding, Echeverria v. City of Chicago      5/21/15

111:6 112:12,23 113:21
113:23 115:10,14

**B**

**back** 23:4 25:24 33:19
67:4,7 69:18 70:4,23
73:5 80:4 84:18 95:2
111:24
**background** 6:20 7:7 9:3
**backing** 76:7
**bad** 92:17
**barnes** 1:14 110:12
**barz** 1:18 94:3 116:3,5
**base** 112:18
**based** 65:24
**basis** 13:24
**becoming** 35:18
**began** 12:8
**beginning** 13:10 27:4
**belief** 111:14 115:6
**beliefs** 112:15
**believe** 9:21 10:5 13:9
16:12 19:24 22:7 26:13
27:17,20 28:15 29:12
34:10 35:23 39:13
42:23 43:9 46:9,15 51:4
53:19 56:3 60:1 66:19
67:13,16 70:11 73:11
73:13 79:19 82:11
83:22 85:2 86:11 91:19
94:11 96:24 104:19
106:1,9,11 107:3,22
111:20,21 112:6,11,17
113:5 115:9
**believed** 77:1
**beneficial** 41:24
**beyond** 47:3
**biddle** 3:3
**bigger** 37:7,8
**bill** 35:2,2
**birth** 7:15
**bit** 80:5
**blackberry** 25:12,14,17
25:22 26:7,10
**blanket** 97:3
**blog** 20:2,9,20 21:16,21

22:1,4,5,10,13,16,18
23:22 24:4,4 102:24
114:5
**blogosphere** 12:6
**blogs** 21:10,12 23:23
102:21 103:4
**blogspot** 22:6
**book** 11:22 12:3 114:6
**books** 12:1 24:16
**bottom** 86:8
**bounce** 80:4
**boyfriend** 53:20 111:15
**boyfriendgirlfriend**
54:13
**brass** 79:4
**break** 6:15 79:20,22
**brief** 60:4 74:13
**briefly** 5:19
**broke** 78:20
**brought** 5:24 37:20
113:10
**bureau** 28:10
**business** 111:16,18
**buy** 91:17,18,20,23
**buys** 91:10

**C**

**c** 1:7 2:6,13 5:11 120:20
**calendar** 24:13,17 25:2,6
25:8,13,19
**call** 67:10
**called** 2:2 7:2,24 11:22
22:5 102:11 106:11
**calls** 37:6
**caluris** 35:4,12
**candidate** 41:3,6,7
**cant** 6:10 12:13 14:15
21:3 35:5 38:5 53:18
57:16 58:13 60:1 68:20
73:3 77:9,19 90:15 97:2
**captain** 52:8
**captioned** 99:17
**car** 98:10 99:6 100:22,23
101:15
**care** 21:9
**career** 24:9 38:23

**carry** 11:16
**carrying** 91:5
**carter** 35:4
**case** 5:8 27:13,19,23
28:14,18 29:17 30:13
30:20,22 31:4,8 32:8,8
32:15,16,21 77:7 85:1
85:16 95:6 96:8,9,11
99:17 102:2,20 103:10
103:14,24 105:13,15,16
105:17,19 107:1,23
108:3,6 116:21
**cases** 37:8 68:2
**catherine** 99:16
**cause** 119:11,20
**center** 10:22 102:15
116:11
**certain** 17:9 21:20 30:9
47:1 67:15 68:14,21
81:1 83:20,22 85:1,3
103:17 106:14 113:14
**certify** 119:7,17 120:4,9
**cesario** 1:15 110:14
**chain** 41:10 55:11,22
57:1,7 61:4
**chance** 68:12
**change** 121:4,5,6,7,8,9,10
121:11,12,13,14,15,16
121:17,18,19,20,21,22
121:23 122:4,5,6,7,8,9
122:10,11,12,13,14,15
122:16,17,18,19,20,21
122:22,23
**changed** 34:22 43:12
**characterization** 66:17
**charges** 95:18 96:12
**chase** 37:7
**check** 116:8
**chester** 93:11,13,22 94:1
**chicago** 1:4,8,9,9,10,11
1:12,13,14,15,16,17,18
2:9,17,23 3:7 5:9,22
7:10 8:7,12,15 10:7,15
11:13 12:9 13:22 18:3
19:13 21:6,9,13,15
22:13 23:24 24:8,15

25:1 27:21 29:11 32:24
97:23 109:3,8 112:22
114:7 115:7 118:5,8,8
119:10,13,15
**chief** 1:9,10,12 35:4,12
79:19 118:9
**chiefs** 33:21
**choose** 39:9
**christmas** 13:18,18
**christopher** 2:19,20
**ci** 58:10 83:18,24 88:8
89:24
**circuit** 99:16
**circumstances** 81:21
94:1
**city** 1:8 5:9 19:13,21
21:16,24 22:8 25:3
27:21 32:21 105:9
109:3 111:5 118:8
119:15 121:1 122:1
**civil** 2:3 28:22 29:13,16
107:18 108:24 109:4
111:4
**claims** 107:7 108:22
111:12
**clarify** 80:14,17 84:3
**class** 27:24
**clear** 17:15 31:16
**close** 13:17
**code** 114:7,14 115:7,11
**college** 9:24 26:23
**com** 16:3
**comcast** 14:10,22 15:2,4
15:8,9,12,15
**come** 38:22 40:6,11,18
42:12 55:7 63:15 102:2
113:2
**comes** 40:24
**coming** 89:15
**command** 41:11 55:11
57:1,7 61:4
**commander** 1:11,16 35:9
35:14,18 51:8 55:24
60:1,5,12,23 61:15
62:15 64:3,7,11 65:4,22
66:14 69:16 70:18,24

James Padar     Spalding, Echeverria v. City of Chicago          5/21/15

Page 3

71:13,23 72:17 75:3,6
75:20 76:6,14 83:22
84:11 85:2 86:23 87:17
87:24 90:18 91:6 113:5
**commanders** 35:7 73:18
**commencing** 2:10
**comments** 103:4
**communicate** 104:21
105:23 106:2
**communicated** 106:5,23
**communication** 61:12,14
62:23
**comparison** 48:21
**compensated** 28:12
**competition** 38:7
**complaint** 30:12 95:1
106:12,13 107:4
**complaints** 41:19
**complete** 41:6 55:21 73:6
**completed** 9:17
**computeraided** 119:24
**computers** 14:7
**concept** 115:3
**concerned** 83:6
**concerning** 5:21 17:8
18:2,16 19:3,4 61:8
62:24 75:3
**conclusion** 38:20
**conducted** 53:7 82:7
**conducting** 63:9
**confidential** 30:8 43:20
108:11
**confirmation** 91:10
**conjunction** 78:14 97:21
**connection** 79:4 109:7,14
**consider** 41:15,18,20,20
42:9
**considered** 36:17 115:17
**consisting** 118:15
**conspiracy** 102:1
**conspire** 101:17
**contact** 61:8
**contacts** 26:14
**contained** 61:5 111:22
**continue** 13:8
**continued** 3:1

**continuing** 97:11
**continuously** 34:16
**controlled** 98:22
**conversation** 47:7,17
49:10,13 50:11,12 54:3
56:4,7,9 62:6,20 64:14
65:3,18 69:6,24 75:1
80:6 89:23 90:6 99:24
107:5
**conversations** 24:22 32:6
53:19,23 54:8 75:5,11
75:14,17 89:4 98:8
103:18,19
**cook** 99:15
**cooperated** 22:14 107:9
**cooperating** 54:16 55:6
55:15 56:20 57:20
60:10 62:24 68:11 71:8
71:14,22 72:16 73:9,15
74:5,16,22 75:4,8 80:9
80:19 81:18,22 82:15
83:8 87:21 91:23
**cop** 11:22 16:2 19:11
20:2 21:16 22:1,8
**cops** 18:5,7 46:10,20 47:6
47:10 63:13 77:14
107:9 112:24
**copy** 26:11 28:17 104:13
104:18,19
**copying** 26:6
**corporation** 10:3
**correct** 5:16 8:8,16,21
11:19,23 12:10 16:20
16:21 17:17 20:16
28:23 32:12 34:18
45:10 54:4,14 56:18
60:14 65:14 69:10
73:19 78:10,15 82:10
85:7 86:20 90:1,20 91:1
91:6 92:4 95:4 105:19
107:19 120:2
**corrected** 73:6
**correction** 121:3 122:3
**corrections** 74:2
**correctly** 53:4,9 55:9
90:23

**counsel** 29:22,23 30:2
31:13,15 103:20 107:14
107:15 109:19 120:6,10
**county** 2:7 99:16 119:3,6
119:6 120:19
**couple** 25:15
**course** 112:21
**courses** 9:16
**court** 1:1 6:9 29:5 53:6
99:16 101:11,22 104:15
104:17 118:1
**courts** 2:4
**coverage** 77:7 104:8
**cr** 52:18 53:3 94:18 95:9
111:3
**craig** 44:5,5
**credit** 10:2
**crime** 28:10
**criminal** 9:14,23 78:24
95:11 96:12 102:7
115:17
**criminally** 95:18 113:17
**criminals** 37:7
**crooked** 18:5,7
**cross** 89:9
**current** 7:8 10:14 21:14
24:18
**currently** 8:10 11:13
12:4 14:16 30:22 34:11
**customarily** 82:17

---

**D**

**d** 4:1
**daniel** 1:5 5:8 118:6
119:14
**danny** 5:24 17:13 19:16
32:3 35:21 36:2 42:11
42:16 45:4,15 47:9,18
48:11 49:2,19 50:2,12
51:8,17 61:9 63:9,19
64:8,12 66:4 69:5 75:17
76:3,8,11,15 77:1,18
78:4,9 79:12 82:1 88:6
88:23 89:5,7,10,13,18
90:4 91:14 92:18 93:21
103:6 107:7 110:8,22

116:5
**dannys** 65:5
**date** 7:15 14:23 45:3
56:13
**dates** 14:15
**david** 56:17,20 58:10
61:10 71:11 74:21,23
75:7 91:10,18
**day** 70:7,8,12,18,24 71:6
87:16 93:14 98:14 99:6
118:21 120:15
**days** 71:3,6,7
**deal** 21:14 23:23
**dealings** 92:17
**dealt** 24:14
**deborah** 1:13 110:10
**debra** 1:10
**debriefing** 98:23
**deceive** 6:2
**december** 7:17
**decide** 40:24
**decision** 41:13
**decisionmaker** 40:17,23
**decisionmaking** 40:5
**decisions** 40:18
**defendant** 105:19 107:21
**defendants** 1:20 3:8
118:10 119:16
**deficient** 89:24
**definitely** 40:1
**degree** 9:13,17
**delivery** 98:22
**department** 5:22 8:7,12
10:8,11,15 11:13 12:10
12:15 18:4,17 21:9,15
23:24 24:9,15 25:1 26:5
32:24 97:23 104:5
109:9 112:22 114:8,15
115:8
**departmentissued** 25:12
25:17,21
**departments** 33:2 42:2
72:10
**depending** 39:24
**depends** 38:4 39:7
**deponent** 117:4 118:12

James Padar    Spalding, Echeverria v. City of Chicago    5/21/15

Page 4

**deposed** 29:3 32:7,14,16 95:7
**deposition** 1:22 2:1 4:10 5:7,14,15 27:5,12,16 28:18 29:19,21 31:1,18 32:20 54:19,24 59:14 97:5 118:13,15 120:5,7
**depositions** 2:5 25:4 27:6 27:7 28:22 29:1 31:2,4 31:6,11,12,23 32:10,11
**deputy** 33:21 34:1 35:4 35:12
**detached** 43:10 45:5,8,16 46:6,24 47:19 49:12,15 49:20,23 50:13 64:13 64:15,23 65:14 80:15 81:12 82:3,18,22 83:15 89:1
**detail** 13:21
**detailed** 10:17 33:13 34:13,15 43:10 45:5,8 45:13 46:5 47:18 72:9
**determine** 39:11 60:20
**determining** 41:16
**develop** 82:9
**developed** 82:11
**diary** 24:7,10
**didnt** 26:19 61:17 65:8,9 77:17 80:17 81:2,15,24 85:5,11,14
**different** 14:7,8 37:21 51:23
**difficult** 37:9,15 38:8 105:7 113:1
**directed** 90:19
**direction** 93:5,9
**directly** 64:22
**dirty** 46:10,20 47:6,10 63:13 77:14 107:9 112:24
**disciplinary** 116:14
**discuss** 18:8 41:5 62:19 64:11 96:11
**discussed** 109:17
**discussion** 53:13 56:15 66:1

**discussions** 23:19 107:12 109:20
**district** 1:1,2 2:4 5:10 33:6,13,14,17,20 37:6 45:22 46:2,8,11 50:14 50:17 60:6 68:23 74:9 77:12 118:1,2 119:12
**districts** 45:22
**division** 1:3 37:16 38:21 39:22 40:12 43:5 109:13 118:3
**document** 58:18,23 60:21 61:1 70:9
**documents** 24:21 30:5 32:5
**doing** 29:20 47:2 49:20 49:22 50:13 61:21 62:3 63:20 84:24 85:4 90:16 98:22 115:16
**dont** 6:3,22 13:14 14:23 15:6,7,9 16:18 17:5,14 18:6,10,19,24 19:17,24 20:8 21:9 22:2,15,24 23:7 24:19 25:12 26:8 26:17 29:15,20 30:11 32:14,15 35:15,22 36:16,23 37:2 38:22 39:17 42:19 43:24 44:9 44:18 45:7,12 46:16 47:2 48:20 49:5,21 50:15 51:9 53:22 54:5 56:6,12,15,23 57:10,14 57:16,22 58:1,7,19 59:11,20,22 60:3,3,18 61:6 62:13,17 63:24 64:3 65:8,19,20,21 66:8 67:2,5,7,11,19,22,24 68:4,8,19 69:7,9,18,22 70:1,5,11,21 71:2,5,7 72:24 73:22 74:8,9,15 75:13 77:3,15 80:13 81:21 82:22 85:22,22 86:7 87:10,18 88:4 89:2 89:6 90:7,12 91:12,19 91:19 92:23 93:18 94:23 99:4 104:24

106:4,17,18 107:2,4 109:23 110:24 112:5,6 112:11,19 114:13 115:4 115:4,9,21 116:24
**dozen** 71:24 72:16
**dramatically** 43:12
**drinker** 3:3
**drive** 3:5
**drivers** 100:8
**driving** 46:1
**drugs** 101:2
**du** 119:3 120:19
**duly** 5:1 118:11 119:18
**dunn** 35:2
**dupage** 2:7 119:6
**duties** 11:8,12

───────── E ─────────

**e** 4:1
**earlier** 59:14 81:24 116:1
**eastern** 1:3 118:3
**echeverria** 1:5 5:9 6:1 17:13 19:16,23 36:2 42:11 43:1 46:1 50:12 50:16 61:10 68:3 69:5 75:18,22 76:3 86:14 103:6 110:23 118:6 119:14
**echeverrias** 75:7
**educate** 55:13
**education** 9:10
**educational** 9:3,16
**effect** 90:16
**effort** 66:24
**either** 7:22 21:13 24:10 34:10 36:13,14 40:7,16 42:2,16 47:9 73:17 75:24 76:15 77:17 79:8 92:17 93:3
**electronic** 24:11
**elite** 36:17,24
**email** 12:14,23 13:13 14:8,18,18 15:3,7,14,17 15:21,24 16:22,24 17:4 17:10 26:18,20 103:1 104:22 105:1 106:3

**emailed** 104:19
**emails** 12:8 13:5,9,19 14:3 15:19 16:5,8,15 17:7,20 18:2,8,11,15,23 19:2,14,20,21 26:16,18 102:21
**employed** 8:7,11
**employee** 10:11
**employment** 5:21 10:1 18:3 19:3,4 24:14 29:10 109:8,15 112:21
**encounter** 35:19 36:15 65:24 68:12 69:14 74:3 74:13 101:12
**encountered** 94:2
**ended** 111:16
**enforcement** 21:8
**ensure** 62:10
**enter** 10:7
**entered** 106:20
**epplen** 34:3
**eric** 35:3
**errata** 118:19 121:2 122:2
**estimate** 14:24
**estimating** 9:20
**et** 5:9 118:9 119:15
**events** 92:1
**evidence** 88:3 102:1
**exact** 14:23
**exactly** 35:22 45:2 47:1 58:14 68:20 91:4 106:4 112:19
**examination** 2:2 4:2 7:4
**examined** 7:2
**excerpts** 31:3,23
**exhibit** 4:10 54:18,20,24 61:5 70:4 81:8 85:6,19 86:9
**exhibits** 4:7
**exonerate** 53:11
**experience** 41:24
**experiences** 13:21 15:20 16:6,16,23 17:8 18:16 38:19
**exploring** 70:6

James Padar    Spalding, Echeverria v. City of Chicago    5/21/15

Page 5

**exposure** 53:17
**express** 78:3
**extended** 74:14
**extent** 46:11

**F**

**facebook** 20:11,12,13,18 20:20
**facetoface** 63:3
**facility** 67:17
**fact** 39:4 49:9,11 62:22 64:12,15,21 88:19 91:23 99:11
**factors** 41:15
**facts** 5:23 88:2
**fail** 99:11
**failed** 99:9
**false** 100:2 109:6,13
**falsely** 99:20 100:6,11,16 100:20 101:1,5,18
**falsity** 107:13
**familiar** 12:22 36:8 56:10 83:17
**family** 8:11,14 39:15,16
**far** 83:6
**father** 8:19 11:22 12:8,14 13:6,13,20 14:4 16:9,12 16:16 17:11 20:6,14,24 103:12,23 105:11,24 106:24 109:20
**fathers** 16:24 20:18
**fbi** 22:14 47:14,20 48:11 49:3,6 78:14
**february** 12:19 27:13 95:7
**feds** 56:21
**fellow** 100:12
**fifth** 96:15,22 97:17
**filed** 51:10 94:10 107:19 109:4 112:6,7
**filing** 48:18,21 51:4 78:2
**fill** 61:3
**filled** 37:11
**final** 41:13 83:21
**financial** 10:3
**find** 45:14 81:6 106:12,19

**finding** 30:20
**fine** 58:16 97:18 114:2
**fink** 22:19
**first** 9:24 33:4 35:19,23 45:5 48:6,14 50:6 55:7 62:21 78:16 115:2 118:11 119:18
**five** 44:22 45:3 71:4,5
**focus** 37:2 43:18
**focusing** 24:20 32:18
**follow** 21:5,11,13 85:14
**follows** 7:3
**fop** 24:16,18
**foregoing** 118:14 120:1,5
**form** 13:24 22:21 32:10 47:22 51:19 57:3 61:2 66:6 71:16 83:11 84:13 88:1 114:10
**formal** 9:10 116:13
**format** 16:10
**former** 21:14
**forth** 25:4
**forward** 53:11 60:16 69:17
**forwarded** 16:2 60:12
**found** 46:5 101:2,7 106:6 106:10,17
**foundation** 22:22 36:20 37:18 71:17,19 72:4 80:22 82:20 87:8 88:2 113:20 114:10 115:19
**four** 33:17
**frankly** 22:22
**freedom** 37:7
**freely** 114:2
**friendly** 92:15
**friends** 92:6
**froms** 58:5
**full** 5:3
**fulltime** 10:1,10
**function** 25:13
**further** 62:12,14,16,18 117:4 119:17 120:4,9
**future** 85:13

**G**

**gain** 112:17
**geiger** 28:16,19,20
**general** 72:11 83:17
**generate** 45:20
**gentleman** 61:22
**geraghty** 2:13
**getting** 12:18 55:14,18 81:5
**give** 7:7 34:23 36:20 70:23 94:12 112:14
**given** 27:6,8 28:23 29:1 93:5 94:15 102:8 103:8 109:6,13 119:21 120:3
**gives** 39:22
**giving** 40:5,17
**glenview** 98:13,24 100:22
**go** 7:18 9:4 13:2 26:22 38:2 56:24 67:4 82:17 87:23
**god** 89:14
**going** 5:20 6:19 17:19 43:21 48:5 55:13 59:8 62:11 64:2,5 65:10 67:7 71:4 72:15 73:17 80:4 81:22 83:7 88:18,21 96:1,13,18,22 109:10 109:16
**good** 92:3
**graduate** 9:7,16
**graduated** 9:12
**grand** 102:12
**gravamen** 107:6
**great** 37:23
**group** 2:19
**guard** 93:3
**guess** 44:9
**guessing** 43:17
**gun** 11:16
**guys** 59:17

**H**

**haberkorn** 99:17 101:21
**hadnt** 87:6
**hand** 120:14
**handed** 55:10 56:1,8 61:1
**handing** 56:24

**handle** 52:18
**handled** 31:10
**handles** 20:5,23
**handwritten** 24:10
**happen** 76:11
**happened** 32:20
**happens** 73:24
**happy** 6:4,15 69:21
**hate** 19:1
**havent** 23:8 25:14 105:8
**head** 6:8 43:24 73:4
**headquarters** 73:13
**hear** 49:18 52:6,10 76:14 76:18,20,24 77:16 78:3 78:22 92:20 93:2 115:2
**heard** 31:23 47:8,12 49:2 49:8,16 51:3,6,16 52:2 77:20 78:7 79:3 88:15 114:17
**hearing** 49:6,21 51:13,15 77:3 92:23 99:15,21,23 100:7 101:12,19 102:17
**hed** 88:8
**held** 95:2 99:15
**help** 35:1 89:14,15,16
**helped** 82:9
**hereinbefore** 120:8
**heretofore** 119:8
**hereunto** 120:13
**hernandez** 27:13 29:17 43:14 50:22,24 53:20 54:3 69:5 86:13 87:2 88:7 92:3,7 94:8,9,19 95:3,10,12 103:6,19 116:18
**hernandezs** 86:6,10,17
**herrera** 22:19 23:11,13 23:20 113:10
**hes** 17:3,9 51:24 79:19 113:20,21
**hesitating** 77:5
**high** 9:4,4,9
**history** 32:24
**holmes** 56:17,20 58:10 61:11 71:11 74:21,23 75:8 88:8 91:10,18

James Padar     Spalding, Echeverria v. City of Chicago     5/21/15

**homan** 56:3 67:16 68:7 68:15,15 92:22,24 93:4 93:7,15 94:2
**home** 7:8 16:13
**honest** 42:6 44:21 45:12 57:9
**horn** 98:16 100:1,22
**hour** 2:10 74:7
**hours** 28:11 97:4,6
**house** 92:8,14
**hundred** 29:8

**I**

**iad** 76:16,21 77:2,8 78:9 79:18,19 88:16 110:21 111:1 115:24
**id** 4:9 22:20 36:19 51:18 63:21 66:16 72:19 82:19 95:22 113:19 114:9
**idea** 46:13 83:2
**identification** 54:21
**ill** 32:9 47:21 102:4
**illegal** 100:15
**illinois** 1:2 2:7,9,17,23 3:7 5:10 9:11 118:2 119:1,7,10,13 120:19 10:16 15:16 20:10 24:4 56:12 95:14 96:8 105:15 111:6,24 113:23
**image** 26:9,11
**immediately** 30:19
**important** 84:23
**impression** 66:3
**inbox** 85:24
**included** 60:2
**incomplete** 73:5
**incorrect** 73:5
**incriminate** 96:14,24
**indicate** 59:4 60:21
**individual** 38:5 54:17 55:6,15 57:21 60:10 63:1 64:2 68:11 71:9,15 71:22 72:16 73:9,15 74:5,17,23 75:4,8 80:10 80:19 81:19,22 82:16

83:8 85:17 87:22 91:24
**individuals** 80:18 88:18
**inform** 115:15
**informant** 30:9 43:20 56:10 61:10 62:4 63:10 65:6,7,10 91:9
**information** 6:21 7:7 43:2
**informed** 95:17
**initially** 100:8 105:18
**input** 40:17
**instagram** 20:7
**instance** 57:9 58:15
**instances** 42:20 53:12
**instructed** 90:23
**instructions** 93:6
**insubordination** 52:20
**intelligence** 85:14
**intended** 38:15
**interested** 120:12
**internal** 18:9 93:16 113:3 113:6,11,14,24
**internet** 106:22
**interview** 12:18 13:2 40:7 41:2,6 94:4,12,16
**interviewed** 37:12 41:3
**interviewing** 41:17
**interviews** 103:9
**introduced** 93:14
**investigate** 104:5 113:3 113:17
**investigated** 78:24 112:23 113:7,12
**investigates** 104:6
**investigating** 63:13 77:14
**investigation** 23:17 47:14 48:12 49:4 50:3 52:19 52:23 53:2,7,10 56:16 56:22 63:8,18 64:1 78:18 79:5 88:24 95:12 102:7,15 107:9 114:1
**investigations** 24:24
**involve** 28:4 53:3
**involved** 22:10 24:24 27:19 40:4,15 42:10 50:2 64:5,9 78:17

**involvement** 95:23 102:20 103:9,13
**involving** 21:8 75:6
**isnt** 81:20 85:10 92:18 107:19 115:12
**issue** 17:22 28:7,8
**issues** 21:10 85:19
**items** 30:10,11 42:3

**J**

**james** 1:11,22 2:1 4:3 5:4 5:5,7 7:1 8:20 60:14,16 61:8 62:23 65:17 66:1 75:11,17 80:7 89:13 109:24 111:12 112:13 118:11,18 119:10,17 121:1 122:1
**january** 120:15
**jay** 7:18 15:22 16:3
**jaypadar** 18:20
**jeff** 27:20 28:14
**jeffrey** 2:14 5:12
**jim** 7:24 17:2
**job** 32:23 90:15,16 113:18
**jose** 35:3
**joseph** 1:16 29:2 95:24 96:6 97:8,22 99:3 100:4 101:13 102:8 108:22 110:16
**juan** 1:9 79:13,15 118:9
**judge** 99:16 101:21
**june** 95:24 96:7 99:2 101:13
**junior** 26:23
**jury** 102:12
**justice** 9:14,23

**K**

**keep** 21:7 24:13 73:22
**keith** 22:19 23:10,13
**kept** 17:6,9 24:7 25:5,7 26:18 73:8,12
**kevin** 52:8
**kids** 8:2
**kilroy** 35:3

**kind** 11:5 38:11,21 42:15 47:14 56:21 79:5 82:5
**king** 3:4 22:20 30:3 31:17 32:9 36:19 37:17 40:11 44:9 47:21 48:2,7 51:18 51:23 58:11 63:21 64:24 66:6,16 71:16 72:3,7,12,19 79:21 80:21 82:19 83:11 84:13 87:7 88:1 96:1 97:10 104:1 108:8 113:19 114:9 115:18 116:24
**kinoy** 2:13
**kirby** 1:10
**knew** 36:10 46:3,3 52:16 52:17 61:18 65:13 85:9
**know** 6:4,15 12:17 13:9 13:14 14:21 15:9,11 16:24 17:3,6 20:14 21:24 22:9,24 23:10,13 23:14 24:18,19 26:4,8 32:13,14,15 33:1 34:21 35:16 36:22,23 37:14 37:18 38:21 42:23 43:14 44:19 45:1,2,13 48:20 51:9 53:19 59:7,8 59:11,24 61:6 65:8,8,9 65:19,21,23 66:8,20 67:5,19 68:1,4 69:15 73:22 74:9 79:8,15 80:13,24 82:22 85:11 85:15 87:9,10,12 88:22 89:2,3,6 93:11,13 94:21 94:23 95:11 97:16 111:10 112:5,19 113:2 113:5,9
**knowledge** 5:22 63:19 64:1 77:21,24 81:15 91:8 108:11 111:2 115:22
**known** 36:12

**L**

**lack** 22:21 36:20 37:18 71:17 72:4 80:21 82:20

James Padar     Spalding, Echeverria v. City of Chicago     5/21/15

Page 7

87:7 88:2 113:20
114:10 115:18
**language** 41:23
**laptop** 16:13
**lasalle** 2:8,21 119:10
**law** 21:8
**lawsuit** 19:22,23 28:1
48:19,21 51:4,11 78:2,8
94:10 97:13 106:10
111:23 112:6,7
**lay** 71:19
**leads** 82:8,12
**learn** 47:18 48:10 78:16
79:11 93:20
**learned** 48:6,15
**leave** 11:6
**leaves** 41:1
**led** 53:10
**lee** 34:3
**lefthand** 86:9
**length** 74:9
**letters** 95:20
**letting** 69:15
**level** 9:16
**lewis** 9:18
**lexus** 10:3
**liberty** 96:11
**license** 100:9
**lie** 101:24 102:1,3 111:11
112:13
**lied** 101:23 102:3
**lieutenant** 41:4 55:23
57:2,8,12,15,19 58:19
59:20,24 60:8,19 67:5,8
70:20 85:18,24
**lieutenants** 34:24 59:12
59:17,22
**limited** 21:7
**line** 97:11
**link** 24:3
**links** 22:7
**list** 41:23 60:3
**listed** 99:1
**little** 80:4
**lived** 7:11
**llp** 3:3

**ln** 121:3 122:3
**location** 67:15
**long** 7:11 10:24 17:3 25:5
33:15 34:4 38:12,15
70:2 74:3 116:11
**look** 19:14,18 42:7 55:1
**looked** 21:22 43:19 73:14
**looking** 58:18
**lot** 39:6,8,9,11,17 40:2
44:24 67:18 68:24
**loyola** 9:6
**lt** 1:13,15
**lying** 111:14

## M

**m** 1:24 2:10 79:23,23
**majority** 38:24 45:21
**making** 42:1 87:2 91:18
114:14
**march** 99:15 101:22
102:16,17
**marco** 44:11
**maribeth** 2:5 119:5
**marijuana** 101:7
**mark** 54:17
**marked** 4:9 54:20,24
**married** 7:13
**masters** 9:17,22
**material** 19:18
**matter** 5:23 28:22 29:2
33:16 52:14 86:14
97:12 102:9 104:23
107:18 109:19 110:3
116:15,18
**matters** 21:8,15 29:9
82:2,5
**maurice** 1:14 110:12
**mean** 24:10 26:11 58:15
**meaning** 89:9
**means** 83:20
**meant** 6:2
**media** 21:1,4 48:16,23
49:7 50:9 51:9,14,15
52:4 53:17 77:7 78:20
104:8
**medical** 53:6

**meet** 29:22,23 67:12 68:6
**meeting** 30:14 67:23
68:10,23 74:8,10 91:3
**meetings** 24:23 25:3
**member** 44:1 97:22
**members** 8:11,14 51:1
**memo** 57:3
**memory** 70:6
**memos** 58:6
**mention** 18:4 65:17 77:8
77:9
**mentioned** 43:19 54:9
65:20,21 101:18 120:8
**mentioning** 18:6 65:20
**mess** 90:15
**met** 35:23 67:16,21 68:20
85:23 98:20
**michael** 1:18
**michigan** 2:15
**mickey** 44:14
**midnight** 87:15
**mike** 94:3 116:3
**mills** 1:17 110:18
**minute** 74:6
**minutes** 74:7,7
**misstates** 83:12 84:14
**mohammad** 107:10
**mohammed** 50:4 78:18
78:21,23 79:9
**monetary** 112:17
**money** 108:5,17,20
112:20
**months** 27:11 33:16,17
34:6 46:16
**morgan** 43:15 98:2 100:1
**motive** 112:12
**motor** 10:2
**movies** 115:5
**moving** 22:23
**muscolino** 1:19

## N

**n** 4:1
**name** 5:3,12 7:18 8:20
28:15 60:2,4 86:6 91:20
**named** 30:20 105:18

107:21
**names** 7:21 44:2 59:13,17
88:9
**narcotic** 42:1
**narcotics** 10:16 34:8,16
35:11,16,17,24 36:9,11
36:14,17 37:16,21 38:3
38:6,8,9,19 39:2,4,22
40:3,11,19 41:1,1,16
42:12 43:4,8 46:4 47:3
49:17,19 51:7,17 52:3
53:14 59:23 64:22
66:11 77:23 81:3,14,16
81:17,20 82:8,17 83:23
89:10 91:9 97:23 98:22
100:14,18 109:12
**narrow** 51:22
**nature** 39:5 42:4 61:13
63:8 116:14
**navarro** 52:8,9
**nbc** 12:19
**near** 93:4
**necessarily** 32:16 37:5
**necessary** 6:21 87:1
**need** 6:14 89:15
**needed** 43:4
**negatives** 41:5
**neither** 90:4
**net** 14:20 15:12
**never** 26:9 36:6 42:17,18
49:16 51:3,6,16 82:21
83:13 88:15 92:8,9
104:14
**new** 35:18 106:20
**news** 77:10 104:9,12,20
**newspaper** 48:23,24
78:12
**nicholas** 1:12 110:6
**nod** 6:8
**nonemergency** 10:20
**north** 2:8,21 3:5 119:9
**northern** 1:2 5:10 118:2
119:12
**notarial** 120:14
**notary** 2:6 118:24 119:5
120:19

James Padar     Spalding, Echeverria v. City of Chicago     5/21/15

note 87:23
notebook 24:14
notes 58:3
notified 102:5 116:10
november 51:5
number 4:9 5:10 28:9
  52:18 54:24 59:2 111:3
  118:19
numbers 37:23 41:19
numerous 68:16

O

oath 29:4 99:20 100:3,6
  100:11,16,20 101:1,5
  101:19 109:7,14 118:12
object 22:20 32:9 36:19
  47:21 51:18 58:11
  63:21 66:6,16 71:16
  72:3,19 80:21 82:19
  83:11 84:13 87:7 88:1
  96:2 104:1 108:8
  113:19 114:9 115:18
objection 37:17 64:24
  97:11
obligations 39:15,16
observe 115:16
observed 113:16
obviously 8:6 85:8
occasion 98:21
occasions 29:7 68:16
  71:21 103:16
offduty 28:11
offense 6:22
office 33:21 95:15 96:10
officer 13:22 22:18 23:10
  23:16,20 29:11 33:5
  37:15,16 38:5 46:9
  50:22,24 53:5 55:9
  66:20,23 68:3,3 74:2
  77:16 79:8 84:1,5 85:13
  86:6,9,13,17 87:1 91:22
  99:2 100:22,23 101:14
  115:24
officers 1:4 8:15 21:14
  22:14 28:9 38:18 40:6
  42:24 45:24 50:3 51:7

71:10 78:18 86:13 98:2
98:8,13,16 100:1,7,12
101:18,22 109:12
112:23 113:4,7,13,16
113:17 114:23,24
115:15,16 118:5 119:13
ogrady 1:11 35:9,14
  60:13,14,17,23 61:1,8
  61:15 62:15,24 63:7,17
  64:3,7,12 65:4,17 66:1
  66:14 69:16 70:18 71:1
  71:14,23 72:17 75:3,6
  75:11,17,20 76:3,6,15
  80:7 84:11 85:2 86:23
  87:17,24 88:7 89:8,14
  89:19 90:14,18 110:1
  111:12 112:13 113:5,10
ogradys 91:6
oh 105:15
okay 6:12 13:11,16 15:23
  17:23 30:1 31:9,13
  33:11 52:21 54:1 68:18
  70:13 92:13 94:5 95:16
  112:11
old 8:4,5
onbeingacop 16:3
once 97:5
ones 24:19 72:6,8 73:23
ongoing 95:9
online 12:19 13:2
opened 25:8
operation 81:19
opinion 36:21
opportunities 39:5
opportunity 39:19,23
  40:1
opposed 34:15 35:21
  85:21
oral 57:2 103:8
order 83:18 96:20
orders 90:14 91:6
org 15:22 17:2
organized 28:10
outcome 120:12
outside 84:1,6,9,12 92:10
outstanding 94:18 111:3

overtime 28:5,6 39:6,8,9
  39:12,18,21 40:2

P

p 1:24 2:10,13 79:23,23
pack 83:24 88:8 89:24
packet 30:9 41:7 43:20
  55:19 88:10
packets 41:9
packs 83:19
padar 1:22 2:1 4:3 5:4,5
  5:7 7:11 15:22 17:2
  54:18,19,24 61:5
  118:11,18 119:11,18
  121:1 122:1
page 119:3 120:19
pages 118:16
paid 11:5 108:16,17,19
park 33:6
parking 67:18 68:24
part 27:24 41:2 52:20
  64:2 86:9 113:24
participate 96:5 98:3,7
  99:24
participated 69:24 97:8
particular 73:16
parties 92:11 120:6,11
partner 23:17 47:5
party 27:22 30:22
pascua 1:13 110:10
passthrough 38:22
paths 89:8,9
patrol 37:15 38:18 40:6
  51:7
paul 28:16
pay 108:5
pending 119:11
people 7:24 37:20,22
  38:1,9,12,22 39:1,14,15
  41:22 44:20 52:2 72:9
  113:2
period 10:4 12:16 13:8
  14:13,21 16:14 34:9,20
  35:10 36:5 38:15 43:13
  43:22 51:12 59:21 60:4
  73:16

periods 38:13
perks 39:3
person 57:6,11 58:14,20
  64:4
personal 6:19 21:10 25:7
  26:12 36:14 41:9 62:23
personally 7:23 23:14
  31:10 37:4 85:23 91:12
  108:7,19,22 119:9
pertaining 2:4
peter 35:2
pg 121:3 122:3
phone 10:21 25:2,6,7,20
  106:6
photos 26:12,13
phrase 79:4
piazza 35:2
place 68:23 74:12 91:5
placing 51:13
plain 101:2
plaintiff 28:2,13
plaintiffs 1:6 2:24 5:13
  118:7 119:15
planned 98:9
planning 65:7
played 40:21 104:16
  113:24
pleasant 97:5
please 6:11,21 7:16 17:20
  84:4 112:1
pluses 41:5
po 77:11
point 11:3 14:9,11 16:18
  24:2 25:18,24 35:5
  45:14,18 47:17 48:2,3,4
  48:10 50:1 54:6 62:8
  73:2 79:11 93:20
  104:14
police 1:4,9,10,10,12,12
  1:13,14,15,17,17,18
  5:22 8:7,12,15 10:8,11
  10:15,20 11:13,17 12:9
  12:15 13:22 18:3,17
  21:6,9,13,15 22:13
  23:24 24:8,15 25:1 26:5
  29:11 32:24 33:4 97:23

James Padar     Spalding, Echeverria v. City of Chicago     5/21/15

Page 9

98:13,24 100:22 109:8
109:11 112:22 113:4,13
113:17 114:7,15,22,23
115:8,15,15 118:5,8
119:13
**policerelated** 92:11
103:4
**policy** 26:5,8
**poorly** 111:17
**position** 34:5 37:13,15
79:18
**possessing** 101:8
**possession** 17:21
**possible** 17:16 50:18 69:2
69:3,11 78:24 87:19,20
**possibly** 69:9 92:10
**post** 20:17
**postal** 98:21
**posted** 103:3
**postit** 87:23
**potential** 41:17
**potentially** 96:12 114:24
**practice** 57:5
**prearranged** 67:23 68:1
**prepare** 29:19,21
**presence** 103:20 119:23
**present** 3:11 34:17 50:16
50:18 55:11,19 57:6,13
63:5 67:20 68:5 69:6
80:9,12 81:10 84:11
92:22 98:23 99:5
104:15 120:7
**presentation** 57:2,19,24
58:2,9,12,16 60:7,22
**presented** 30:10 42:8,9
50:8 57:10,15 58:20
60:22 70:3 71:22 72:6,8
72:17 85:19 86:5,15
87:16 109:2
**presenting** 61:3
**preserve** 17:20
**pretty** 59:7 93:8
**previous** 41:24
**previously** 32:7 88:14
**primary** 6:7
**prior** 15:1 25:11,18 27:8

27:17 30:24 35:17
46:14,15 47:7,13,16
49:1,5 51:3,13,14 52:3
53:15,17 73:7 78:1,22
98:6 99:23
**probably** 13:14 19:6
21:21
**problem** 77:22 85:5
**procedure** 2:3
**proceed** 5:19
**proceeding** 29:5
**proceedings** 116:13
**process** 40:7,16 41:2
42:11 55:14,16,17,18
60:8,11
**professionally** 7:22
**project** 85:15
**promoted** 33:7
**promotional** 92:11
**provider** 14:9,10,14,17
14:22 15:5
**providers** 15:18,18
**pruente** 98:3 100:1,23
**public** 2:6 79:6 106:21
118:24 119:5 120:19
**publicity** 48:18 51:3 78:1
78:7
**pull** 98:9
**pulled** 99:8
**pulling** 98:6
**purchases** 42:1
**purpose** 56:5 85:9,11
**purposes** 65:9
**pursuant** 2:2 88:24
**put** 41:8 53:10 85:24

**Q**
**quality** 77:22
**question** 6:3,5 13:7 19:1
22:4,21 23:1,3 32:18
40:10,10 47:16 48:8
51:24 53:24 59:16
71:17 84:14 96:23 97:2
105:8 108:15 112:5,8
113:1 114:10,12
**questions** 5:21 6:1,18

31:5 41:8 64:4 95:22
96:2,16,21 117:1
**quickly** 107:24

**R**
**r** 2:6 120:20
**radio** 37:6
**raise** 85:19
**ramirez** 35:3
**rat** 18:12,18,20,22 22:19
76:16,22 88:15,16
**rats** 88:9
**reacted** 90:4
**reaction** 90:8,10,11
**read** 21:16,19 22:12,15
23:4,6,18 31:11 48:16
48:22 80:2 111:24
112:3 118:14
**reading** 22:18 78:12
**realized** 46:23
**really** 24:20 83:9 92:9
110:4
**rear** 100:21
**reason** 84:16 88:13 89:20
111:10
**reasoning** 66:21
**reasons** 37:21
**reassigned** 104:4
**reath** 3:3
**recall** 12:13,22 14:15,23
15:6,7 16:18 17:14 18:6
18:10,19,21,24 19:17
22:15 23:7,21 24:1
25:13 26:17 27:9 28:24
29:15,20 30:11 31:22
32:4 35:15,22 36:16
42:17,19 43:23 45:7
46:4,16 47:11,15 49:5
49:21 50:15,15 52:15
53:4,9,13,18,22 54:5
55:9 56:6,15,23 57:10
57:15,18 58:1,7,8,13,19
59:20,22 60:3,18 62:13
62:15,17 63:6,11,24
64:3,10 65:20 67:2,7,11
67:20,24 68:8,20 69:9

69:12,15,18,20,23 70:5
70:17,21,22 71:2,5,7,12
72:24 74:8,12,15,19,24
75:9,13,19 77:3,9,15
81:21 82:6 84:2 85:22
85:23 86:4,7,24 87:14
87:18,21 88:4 90:7,10
90:13 91:12,16,21
92:23 93:17,18,24 99:4
104:24 106:4,5,17
107:2,4,16 109:5,23
110:24 114:13 115:4
116:7
**recalled** 104:17
**receive** 24:17
**received** 37:13 70:19
105:6,9,14 108:21
**receiving** 105:1
**recognize** 55:2,3 56:13
57:16
**recollection** 22:17 44:3
54:2 56:19 61:7 62:22
68:22 69:4 89:22 90:3
**recommendation** 53:10
**recommendations** 41:9
**record** 5:3 23:5 73:8 80:1
96:20 106:21 112:2
**recordations** 24:22
**recorded** 89:5
**recount** 18:13
**recounted** 59:18
**recounting** 18:21
**reduced** 119:24
**refer** 18:12,17 22:13
76:15,20
**referred** 36:23 88:15
**referring** 18:19,22 80:15
81:13 91:4 116:1
**refers** 19:15 22:18
114:21
**reflecting** 91:17
**refresh** 62:22
**refreshes** 44:3
**refusal** 66:17
**refuse** 71:14 72:1,18,20
96:16

James Padar     Spalding, Echeverria v. City of Chicago     5/21/15

Page 10

**refused** 66:14
**regard** 15:4 26:6 32:21
  34:14 40:5,22 58:9 60:9
  68:10 94:16,19 95:10
  95:12 99:2 102:7
  103:23 104:22 105:5,12
  106:8 107:17 108:5,23
  110:7,21 111:3
**regarding** 31:6 49:22
  67:3 74:23 75:14 94:6,7
  100:3 111:1 114:14
**regardless** 74:11
**regards** 96:8
**register** 55:5 61:10
**registered** 56:17
**registration** 100:9
**regularity** 21:23
**regularly** 21:20
**reilly** 2:5 119:5
**rejected** 87:5
**related** 108:9 120:10
**relating** 114:6
**relationship** 42:15 54:13
  114:3
**release** 108:21
**released** 52:4 79:6
**relevance** 22:22 96:2
  97:12 104:2 108:9
**relevant** 22:24
**reluctance** 115:14
**remain** 114:24 116:11
**remember** 34:24 44:1
  45:24 61:15,16,18,19
  106:9
**repeat** 23:2 48:8
**rephrase** 6:4 48:7
**report** 36:4 91:20,21
**reported** 34:21 51:10
  119:22
**reporter** 6:9
**reporting** 64:22 79:12
  93:21
**reports** 10:21 77:10
  78:20 91:17,17
**represented** 31:17 74:18
**representing** 2:24 3:8

28:13
**reputation** 36:14
**request** 55:5,15 60:9 61:9
  63:1 68:11 70:3,23 71:9
  71:15,22 74:5,17,23
  75:4,7 80:10 81:18
  82:14,16 83:8,9 86:3,15
  87:2,4,22
**requested** 23:6 80:2
  112:3
**requesting** 94:4
**requests** 54:17 72:2,16
  73:9,15 80:20
**require** 60:11
**required** 61:3 86:15
  96:21
**reserve** 117:2
**reserved** 120:5
**respect** 109:3
**respective** 120:6
**response** 10:17,18 34:13
  69:19
**responses** 41:8
**responsibility** 45:23
**responsible** 42:19
**restrictions** 11:11,12,15
**result** 58:8 102:15 111:4
  111:23 116:15,17,20
**retaliated** 107:8
**return** 90:19
**returned** 33:19 66:19
  74:1,5,16 84:18 87:15
**returning** 66:23 71:8
  81:6,8 83:7 89:24
**review** 30:5,12 55:10,20
  55:23,24 84:19
**reviewed** 30:7,8 31:1
  32:6 95:14 96:9
**reviewing** 45:1 70:9
**rick** 113:10
**right** 8:9 9:2 13:19 20:3
  21:5 31:21 33:18 34:20
  40:13 59:10 71:19
  73:14 96:5,13,23
  105:17
**rights** 97:13,17,20 98:5

98:11 99:7,10,13,22
  100:5,10,15,19,24
  101:4,9,16,20 102:4
  109:10,16
**rivera** 1:9 79:13,15 118:9
**robert** 1:15,19 110:14
**rogers** 33:6
**role** 113:14
**roles** 40:21
**roti** 110:7
**rotti** 1:12
**rounds** 44:17
**routine** 89:23
**rule** 6:7
**rules** 2:2 6:6
**run** 68:12
**runs** 21:24

---
## S

**s** 2:6 120:20
**saith** 117:4
**salemme** 1:16 110:16
**save** 16:10 26:12
**saved** 16:7
**saw** 49:8
**saying** 44:8 45:10 47:23
  62:13,17 69:12 78:6
**schmidt** 35:3
**school** 9:4,5,9
**scope** 29:10
**scratch** 88:9
**seal** 120:14
**search** 82:6,12 91:11
**searched** 100:23
**second** 21:16,24 22:8
**section** 10:17,19
**see** 13:2 19:14 70:18,23
  73:17 81:5 86:8 87:23
  106:11 114:23 116:8
**seeing** 45:24 87:21 91:16
  91:21 104:14
**seek** 57:20
**seen** 26:9 46:7 83:24 84:8
  104:15
**selection** 40:16
**send** 13:20 14:6 16:15,22

55:22
**sending** 15:19
**sent** 14:4 16:5,8 17:1,7,10
  18:12,16 19:2 73:5
**sergeant** 1:14,17,18,19
  33:8,22 37:13 39:24
  59:2 61:17,19,20 62:1
  74:22 77:11 81:2 94:3
  98:20 113:9,24 116:3,4
**sergeants** 38:17 41:4
  67:1,3
**series** 5:20
**served** 106:13
**service** 14:9,10,14,17,22
  15:4,18
**services** 10:3 43:10 45:6
  45:9,16 46:6,24 47:19
  49:12,15,20,23 50:14
  64:13,16,23 65:14
  80:16 81:13 82:3,18,22
  83:15 89:1
**set** 120:14
**settled** 107:23 108:1
**settlement** 108:2,6,11
**seven** 43:13
**shack** 93:3
**shannon** 1:4 3:10 5:8,24
  17:12 19:15 31:24
  35:20,21,23 42:12,16
  45:5 47:9,18 48:11 49:2
  49:11,19,24 50:2,11,16
  51:8,17 52:3,7,11,16
  53:14 54:4,11 56:1,16
  61:9 63:8,18,19 64:8,12
  65:5 67:10 69:13 70:2
  70:23 71:9 74:4,17
  75:12,14 76:2,8,11,15
  77:2,13,18 78:4,9 79:12
  80:9 81:9 82:1 86:1
  87:5,15 88:6,15,22 89:4
  89:10,18 90:4,13,19
  91:14 92:18,21 93:21
  102:24 103:5 110:8,22
  111:11 116:6 118:5
  119:14
**shannons** 45:15 66:4

James Padar    Spalding, Echeverria v. City of Chicago    5/21/15

Page 11

107:7
**shavedlongcock** 22:6
**sheet** 121:2 122:2
**sheets** 45:2 118:19
**shortcircuit** 97:18
**shouldnt** 51:1
**show** 97:10
**showing** 43:21 54:23
**shown** 104:9,12
**shows** 25:3
**siblings** 8:23
**sign** 59:15 61:17 62:7,9
  66:14 72:2,18,20,23
  88:8 108:2,4
**signal** 99:9,12
**signature** 57:17 58:22
  59:1,9 67:6 70:14,19
  73:10,18 86:10 118:16
  120:4 121:24 122:24
**signed** 59:5 61:16 66:21
  73:16 84:1,5 87:6 109:2
**signing** 61:22 62:4 85:6
  85:20 90:24
**silence** 114:7,15 115:7
**silent** 115:1
**site** 16:1
**sites** 21:22
**six** 33:7 34:6 44:20
**sixyear** 8:5
**skills** 41:21,23
**slips** 95:2
**smart** 25:20
**smirking** 88:12
**smith** 2:19,20
**social** 21:1,3 92:6
**somebody** 44:18
**somewhat** 6:19
**sorry** 24:4 105:16 108:15
  111:24
**sort** 40:8 57:4
**source** 45:15 47:9,12
  49:2,8 78:22 92:20
**south** 2:15
**spalding** 1:5 3:10 5:8,24
  17:12 19:16,23 31:24
  32:21 35:20,23 42:24

46:1,9 49:24 52:17 53:5
  55:10 61:9 66:20,24
  68:3 74:17 75:6,12,15
  75:21 76:2 85:13 86:14
  92:21 102:24 103:5
  105:13,15,16,17,19
  107:1 109:19 110:2,22
  111:5,11 116:21 118:6
  119:14 121:1 122:1
**spaldings** 87:5
**speak** 38:5,14 67:9 71:9
  74:20 76:6 114:2 116:4
**speaking** 46:2 106:5
  110:24
**specific** 22:4 36:10 42:20
  53:18,22 54:3 56:6
  75:13 85:15 106:7
  115:22
**specifically** 29:20 54:6
  65:11 80:8,11 82:6
  105:1 107:2 109:23
**specifics** 87:11 107:5
**speculate** 76:24 87:11
**spell** 5:3
**sperling** 29:2,2 95:24
  96:6 97:9,12,22 98:6,9
  99:3,8,18 100:4,8,13,17
  100:21 101:6,13 102:9
  102:20 103:10,13,23
  104:22 105:5 107:17
  108:6,9,22 109:4
  116:15
**sperlings** 99:6 100:23
  101:3
**spoke** 50:17 70:24 104:3
  107:3,3
**spoken** 39:1 46:6 53:21
  104:7 110:6,20
**spot** 21:17,21 22:1,4,10
  22:13,16,18 24:4
**spots** 23:22
**squad** 89:11 97:24
  101:14
**square** 56:3 67:17 68:7
  68:15,16 92:22 93:1,7
  93:15 94:2

**ss** 119:2
**stand** 101:23
**star** 59:2
**start** 7:6 9:3 35:13
**started** 12:7
**starting** 12:7
**state** 2:7 5:2 13:4 65:2
  77:1 99:17 119:1,7
**stated** 91:22
**states** 1:1 2:3 95:15,20
  96:10 102:6 118:1
**station** 98:24
**status** 10:14 94:21,23
**stay** 38:12,15 39:2
**stenographically** 119:22
**step** 57:6
**steve** 35:4
**sticky** 87:22
**stop** 14:12 99:6
**stopandfrisk** 100:4
**stories** 14:1 16:11,23
**story** 13:12 100:2
**street** 2:8,21 38:4 119:10
**strike** 21:6 49:17 62:20
  71:18 81:7 84:10
**strong** 101:24
**student** 27:1
**subject** 52:14
**submit** 57:3 58:5
**submitted** 41:10 95:3
**subordinates** 84:24
**subpoena** 17:22
**subscribed** 118:20
**subsequent** 24:19
**substance** 105:4 106:24
**suggesting** 68:9
**suit** 120:11
**suite** 2:8,16,22 3:6
**supervisor** 36:7 39:14
  42:21 55:20,20 62:3,9
  64:16,17,20 65:5,9
  69:17 80:12,13,15
  81:11,12,16 84:6,7,9,18
  84:22 85:3,21 86:2,18
  87:3,6,12 93:15
**supervisors** 28:9 39:16

62:10 82:23 83:3 84:23
**supposed** 45:20 97:1
**suppression** 99:14,21,23
  101:12,19 102:17
**sure** 12:21 44:4 55:21
  59:8 79:21 84:4 91:4
  93:6 112:16 113:20
**surprise** 46:18 47:4
**surprised** 84:17
**surrounding** 77:7 78:2
**surveillance** 96:6 97:8
  98:4
**susan** 35:3
**suspended** 11:4
**suspension** 11:2
**sworn** 5:1 118:12,20
  119:18

---

### T

**t** 14:9,13,16,19,24
**take** 6:10,14,22 10:20
  11:17 18:13 32:23
  35:20 55:1,1 58:3 79:20
  97:2,6,17
**taken** 2:5 5:7,16 31:4,7
  79:22 116:14 118:13
**talk** 49:19 51:8,17 52:3,6
  52:10 54:16 66:24 67:4
  72:12 86:22 116:2
**talked** 32:5 38:17 50:10
  103:12,22 105:3,11
  109:24
**talking** 30:2 51:5 53:15
  66:2 67:2 70:7 72:5,8
  74:6
**taren** 2:13,14 4:4 5:2,6
  5:12,18 6:14 7:5 17:19
  18:1 23:4,9 32:12,17
  37:1 38:10 40:13,14
  44:10 47:24 48:4,9
  51:21 52:5 54:22 58:21
  64:6 65:12 66:12,22
  71:18,20 72:5,11,14,21
  79:20 80:3,23 83:1,16
  84:20 87:13 88:5 96:4
  97:15 104:10 108:13

James Padar      Spalding, Echeverria v. City of Chicago      5/21/15

Page 12

112:9 114:4,16 115:23
116:23
**target** 102:6
**tax** 79:4
**team** 39:7,8,14 42:18,21
43:1,7,11,12,15,16,23
44:1,5,7,12,15,18,21
45:18 50:24 53:21 68:4
68:17 91:14 98:21
**teams** 39:9,10
**tell** 5:19 6:17 12:16 14:16
27:7 29:18 30:7 34:21
40:21 41:15 42:14 44:3
55:2 61:23 63:12 69:12
75:20 76:2 77:13 80:8
81:9 88:6 89:7,13,18
90:24 96:18 97:7
104:11 106:7
**telling** 65:16 87:23 90:13
**ten** 44:20 71:6 74:7
**tend** 38:12 96:24
**term** 114:17,21
**terms** 6:6 92:3
**terrible** 40:10
**testified** 7:3 29:4 58:13
75:2 88:14 113:21
**testify** 29:13 88:18,21
96:14 97:3 99:14,20
100:3,6,11,16,20 101:1
101:5,18 119:18
**testifying** 29:15 51:24
80:7 111:7
**testimony** 16:4 25:23
31:1 48:19 51:2,6,15
56:14 78:11 83:12
84:15 101:11,24 102:8
102:16 105:5 109:7,13
119:21 120:2,13
**text** 106:3
**texts** 26:16,17 104:22
**thank** 5:6
**thats** 6:21 7:9 8:1,8 10:22
12:18 14:18 22:7 23:18
26:6 28:24 29:24 38:6
40:10 42:9 45:20 46:5
51:23 53:24 58:15,16

59:1,20 61:4 69:8 78:10
78:15 84:8 87:19 91:13
92:19 95:1,6 97:18
116:23
**thereof** 120:12
**thing** 38:11 69:8
**things** 5:19 20:17 73:4
**think** 9:1 19:2 21:3 37:22
38:4 43:16 44:17 50:23
58:12 60:2 64:14 73:3
77:6,19 84:14,22
106:19,20
**thomas** 1:17 110:18
**thorndale** 7:9
**thousands** 19:7
**three** 15:1 25:9 71:3
88:17 97:4,6
**tied** 37:5
**time** 10:4 12:13,17 13:8
14:13,22 18:14 25:16
26:10 27:10,18 30:16
34:2,9,21 35:10,21,24
36:5 38:13,15 40:3 43:7
43:7,9,11,15,16,22
44:13,16,21 45:1 47:10
47:13 48:14 49:1 50:19
50:22 51:12 55:1,16
56:5 57:14,24 59:21
60:5,14 64:13 65:13
66:5,9 73:17 78:23
80:20 83:3 85:8 92:7
94:13 95:2 101:10,11
105:21 106:18,19
**times** 54:8 71:24 72:1
102:3
**timing** 32:10
**today** 5:14 101:23 111:8
**todays** 27:8 29:19,21
30:24 56:13
**told** 32:19 46:10,19 56:20
61:24 62:1,7 76:3 77:15
80:11 88:7 111:12
**tom** 93:11,21 94:1
**tony** 53:20
**top** 43:24 73:3
**towit** 119:8

**toyota** 10:2
**traffic** 99:5
**trans** 26:13
**transcript** 118:15 120:2
**transcription** 120:1
**transcripts** 31:2,3
**transfer** 26:15,19
**transferring** 26:14,17
**treated** 113:18
**trial** 2:19 29:5
**trick** 6:2
**tried** 26:12
**true** 81:20 85:10 92:18
92:19 115:12 120:1
**truth** 107:13 119:19,19
119:20
**truthfully** 111:8
**try** 71:19
**trying** 43:16 46:4 77:6
81:6
**turn** 99:9,12
**turned** 19:12,20 26:1,4
**turnover** 44:24
**tv** 115:5
**twins** 8:5
**twitter** 19:8,9,10 20:1,5
**two** 11:3 14:24 25:9 27:9
28:21 41:3 71:3 74:7
77:10 88:9 98:12
**typewriting** 119:24
**typically** 44:20

---

**U**

**unaware** 78:8,13
**uncles** 8:24
**undercover** 42:1 91:22
**underneath** 59:10
**understand** 6:3 12:6
23:15 26:22 28:8 30:21
31:7 39:20 40:9 72:7
90:22,23 114:11
**understanding** 38:2 43:3
86:12 112:5 114:20,22
**undetermined** 119:12
**unit** 36:18 37:24 42:3
65:23,23 83:18 113:10

**united** 1:1 2:3 118:1
**university** 9:12,18
**unusual** 71:13 84:10 90:5
93:8
**upset** 89:19 90:5 111:15
**urbanowski** 98:17,20
100:1
**urbanowskis** 101:14
**use** 15:3 63:9 72:20 91:9
99:9,11
**utilized** 25:13

---

**V**

**v** 121:1 122:1
**vehicle** 101:3,7
**versus** 5:9 27:20 32:21
51:10 99:18 111:5
**video** 104:8,12,15,16,17
104:20 105:2
**videotaped** 101:14
**view** 101:2 104:17
**village** 98:13
**vince** 43:15 98:2
**vs** 1:7 118:7

---

**W**

**w** 1:22 2:1 4:3 7:1
**wacker** 3:5
**walked** 100:21
**want** 21:7 37:3 39:21
58:11 77:17 97:10,16
97:19
**wanted** 36:22 37:4 43:2
69:16 84:11
**warrant** 82:7,13 91:11
**wasnt** 49:14 61:24 62:2
81:16 85:1,2 92:24 93:3
106:13,20,21
**watching** 42:20
**watts** 50:3 78:19,21,23
79:8 107:10
**way** 6:2 12:17 19:12
31:16 36:12 40:16
42:10 56:21 78:17
87:14 90:5,18 115:24
120:10,11

James Padar     Spalding, Echeverria v. City of Chicago     5/21/15

Page 13

**wear** 88:23
**web** 16:1
**weeks** 46:17
**went** 34:8 35:11 68:6
   70:17,18,22
**west** 7:9
**western** 9:11
**whats** 10:18 28:6 55:16
**whereof** 120:13
**wife** 109:21
**william** 5:4,5,7 98:3
**willing** 52:22
**wire** 23:16 88:23
**witness** 4:2 5:1,4,17 6:13
   7:2 17:23 23:2,7 27:22
   32:13 36:22 37:20 52:2
   58:17 63:24 65:4 66:8
   66:19 82:21 83:13
   84:16 87:10 88:4 97:14
   104:3 108:12 112:4
   113:23 114:13 115:21
   119:21,23 120:3 121:24
   122:24
**wondering** 38:19
**wont** 97:3,6
**word** 58:12 59:2 76:21
   79:3
**wore** 23:16
**work** 12:9,14 15:19 16:6
   16:16 17:8 36:8 39:5,6
   39:9,17,21 40:1 75:21
   76:4 77:17,22 92:10
   106:10
**worked** 10:2 18:13 35:8
   39:8 43:1,6 68:2 82:1
   82:21 85:10,16,16
   98:19
**working** 12:4 28:11
   35:13 42:15 43:8 45:17
   46:10,19,24 47:5,10,13
   47:19 48:11 49:3,6,12
   49:15 63:13 68:1,6,17
   77:2,8,14 78:9,13 79:12
   81:17 85:1,12 86:2,13
**wouldnt** 45:2 47:4 50:23
   62:7 93:9

**wright** 26:23
**writes** 22:9
**writing** 12:8 13:5 106:3
**writings** 114:14
**written** 11:21 12:1 14:1
   16:11 102:19,23 114:5
**wrong** 105:10
**wrongdoing** 114:23
**wrote** 12:14 13:9,12

### X

**x** 4:1

### Y

**year** 11:1 24:17 25:19
   27:17 33:9 34:12 35:17
   95:7
**years** 7:12 10:5 11:3 15:1
   19:3 25:9,15 33:7 43:13
   44:22 45:3 71:5
**yellow** 87:22
**youd** 88:9
**youre** 39:20

### Z

### 0

**07** 34:17
**084002306** 120:20

### 1

**1** 1:24 2:10 4:11 45:19,22
   54:18,20,24 61:5 70:4
   81:8 85:6,19 86:9
   118:16
**101** 76:12
**11** 7:12
**11th** 33:13,17
**12** 1:7 5:11
**121** 118:16
**1210** 59:2
**13** 79:23
**15** 121:1 122:1
**17** 59:23
**17th** 33:12,19 59:5 70:14
   120:15
**18** 7:17

**189** 83:18 84:1,6,9,12
**18th** 70:15
**191** 3:5
**1973** 7:17
**1996** 9:12 10:5
**1998** 10:6,9 13:10
**1999** 12:7

### 2

**2** 121:1 122:1
**2000** 2:8
**2004** 33:10
**2005** 9:21
**2006** 33:24 34:11,17
**2007** 34:11 42:14
**2008** 52:12
**2009** 52:13
**2010** 16:14 25:19 42:14
   42:23,24 43:22 44:8
   45:11 46:16 55:17 59:5
   59:23 83:4 92:2,16
**2011** 93:18 111:20
**2012** 16:15 51:5 93:19
**2013** 13:14 95:24 96:7
   101:13
**2014** 12:20 13:15 25:18
   26:2 27:18 99:15
   101:22 102:17
**2015** 1:23 2:9 118:14
   119:8
**2016** 118:21 120:15
**21** 1:23 2:9 118:14 119:8
**224** 2:15
**24th** 33:5
**25th** 60:6
**26** 1:24 79:23
**2nd** 45:22 46:2,11 50:14
   50:17 77:11

### 3

**3** 33:21 79:23,23
**3040** 2:22
**31** 99:15 101:22 102:17
**311** 10:22,24 102:14
   116:11
**37** 2:10

**3700** 3:6

### 4

**490** 2:16

### 5

**5** 121:1 122:1
**54** 4:11

### 6

**6** 4:4 101:13
**60602** 2:23
**60604** 2:17
**60606** 3:7
**60631** 7:10
**6th** 99:2

### 7

**7825** 7:9
**7th** 68:23 74:8

### 8

**8777** 1:7 5:11

### 9

**92** 9:8
**96** 9:15