JANET HANNA
SPALDING, et al. vs. CITY OF CHICAGO

August 12, 2015

---

**1**

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

CHICAGO POLICE OFFICER        )
SHANNON SPALDING and          )
CHICAGO POLICE OFFICER        )
DANIEL ECHEVERRIA,            )
            Plaintiffs,       )
        vs.                   )  No. 12 C 8777
CITY OF CHICAGO, et al.,      )
            Defendants.       )

      The deposition of JANET HANNA, taken
pursuant to the Federal Rules of Civil Procedure of
the United States District Courts pertaining to the
taking of depositions, taken before JULIE A.
CONROY, CSR No. 84-2251, a Notary Public within and
for the County of DuPage, State of Illinois, and a
Certified Shorthand Reporter of said state, at
Suite 3700, 191 North Wacker Drive, Chicago,
Illinois, on the 12th day of August, A.D. 2015,
commencing at 9:41 a.m.

---

**2**

1      PRESENT:
2
3      KINOY, TAREN & GERAGHTY,
4      (224 South Michigan Avenue, Suite 490,
5      Chicago, Illinois 60604,
6      312-663-5210), by:
7      MR. JEFFREY TAREN,
8      jtaren@ktglawyer.com,
9          appeared on behalf of the Plaintiffs;
10
11     DRINKER BIDDLE & REATH LLP,
12     (191 North Wacker Drive, Suite 3700,
13     Chicago, Illinois 60606,
14     312-569-1334), by:
15     MR. ALAN S. KING,
16     alan.king@dbr.com,
17         appeared on behalf of the Defendants.
18
19
20
21
22     REPORTED BY:  JULIE A. CONROY, CSR, RPR,
23             CSR No. 84-2251
24

---

**3**

1      MR. KING:  Swear the witness.
2          (WHEREUPON, the witness was duly
3          sworn.)
4          JANET HANNA,
5      called as a witness herein, having been first duly
6      sworn, was examined and testified as follows:
7          EXAMINATION
8      BY MR. KING:
9      Q.  Can you please state your name and spell
10     your last name for the record?
11     A.  Janet L. Hanna, H-a-n-n-a.
12     Q.  Thank you.  Ms. Hanna, my name is Alan
13     King.  I'm the attorney representing the defendants
14     in this litigation that's been filed by Shannon
15     Spalding and Danny Echeverria.  Obviously I'm going
16     to be asking you some questions today.
17         Have you ever given a deposition before?
18     A.  No.
19     Q.  Okay.  Well, the process is pretty
20     simple.  Obviously you've been sworn in to testify
21     truthfully under oath.  I'll be asking you a series
22     of questions relating to the case.  If you don't
23     understand any of my questions or if I'm speaking
24     too quickly, feel free to ask me to rephrase the

---

**4**

1      question or slow down.  Okay?
2      A.  Okay.
3      Q.  It's also important that you give
4      audible responses because the court reporter needs
5      to take down everything that we say in the room
6      today.  So a nod of the head or a shake of the head
7      isn't good enough for the court reporter.  So just
8      try to make sure that your responses are audible.
9      Okay?
10     A.  Okay.
11     Q.  The other important rule is that you
12     and I try our best not to talk over each other
13     because, again, the court reporter can't take it
14     down accurately if we're both talking at the same
15     time.  So I'd ask you if you'd do your best to let
16     me finish my questions even though you may think
17     you know where I'm going and you want to answer
18     already.  If you do your best to let me finish my
19     questions, I will do my best to let you finish your
20     answers before I start speaking.  Okay?
21     A.  Okay.
22     Q.  Ms. Hanna, are you represented by an
23     attorney here today?
24     A.  Yes.

---

JANET HANNA                                    August 12, 2015
SPALDING, et al. vs. CITY OF CHICAGO

---

**5**

1   Q.   And is that Mr. Taren?
2   A.   Yes.
3   Q.   You've retained Mr. Taren to represent
4   you?
5   A.   Yes.
6   Q.   When did you retain Mr. Taren to
7   represent you?
8   Three days ago.
9   Q.   And can you tell me what, if anything,
10  you did to prepare for your deposition today?
11  A.   We went over my affidavit.
12  Q.   You and Mr. Taren?
13  A.   Yes.
14  Q.   Were there any other documents that
15  Mr. Taren showed you or that you otherwise looked
16  at in preparation for your deposition today?
17  A.   No.
18  Q.   Did you meet with Shannon Spalding
19  or Dan Echeverria about your deposition today?
20  A.   No.
21  Q.   Did you meet with anyone other than
22  Mr. Taren in preparation for your deposition today?
23  A.   No.
24  Q.   Can you please give me your current home

---

**6**

1   address?
2   A.   4953 North Meade Avenue, M-e-a-d-e.
3   That's Chicago, Illinois 60630.
4   Q.   And a home phone number?
5   A.   I only have a cell.
6   Q.   I'll take that.
7   A.   773-620-9337.
8   Q.   And are you currently employed?
9   A.   I am on disability with the Chicago
10  Police Department.
11  Q.   And what does that mean exactly that
12  you're on disability?
13  A.   I was awarded ordinary disability, which
14  means I'm receiving 50 percent of my pay.
15  Q.   And have you sought some other status
16  other than ordinary disability?
17  A.   Yes.  I sought for duty disability, at
18  which time on May 29th of 2015 I was denied and
19  have since filed an appeal with the Circuit Court
20  of Cook County.
21  Q.   And so you have a pending appeal right
22  now with the Circuit Court of Cook County?
23  A.   Correct.
24  Q.   And so the City denied you the duty

---

**7**

1   disability, correct?
2   A.   Correct.
3   Q.   And if you had been granted duty
4   disability, what would be the difference in that
5   versus ordinary disability?
6   A.   75 percent tax free and free insurance
7   until you're 63.
8   Q.   So fair to say there's a pretty
9   significant difference between ordinary disability
10  and duty disability?
11  A.   Absolutely.
12  Q.   And also fair to say I'm imagining that
13  you think the City was wrong in rejecting your
14  request for duty disability?
15  MR. TAREN:  Objection.
16  BY MR. KING:
17  Q.   You can answer.
18  A.   Absolutely.
19  Q.   Are you angry that the City rejected
20  that request?
21  MR. TAREN:  I'm going to object to the use of
22  the City, the term "City" in these questions.  The
23  pension board makes the decision, not the City.
24  BY MR. KING:

---

**8**

1   Q.   Well, are you angry that your request
2   for duty disability was denied?
3   A.   No, I'm not angry.  I'm disappointed.
4   Q.   Do you have any sense of when your
5   appeal will be ruled on?
6   A.   I do not.
7   Q.   I want to ask a little bit about your
8   educational background.  Where did you attend high
9   school?
10  A.   I went to Regina Dominican High School
11  in Wilmette, Illinois.
12  Q.   And did you graduate?
13  A.   I did.
14  Q.   What year?
15  A.   1986.
16  Q.   And have you had any formal education
17  after high school?
18  A.   I went to Western Illinois University
19  for a short time.
20  Q.   You did not obtain a degree at Western
21  Illinois?
22  A.   I did not.
23  Q.   How long were you at Western Illinois?
24  A.   I was there for approximately two

---

JANET HANNA
SPALDING, et al. vs. CITY OF CHICAGO

August 12, 2015

---

9

1  months.
2      Q.   Okay.  And have you had any other formal
3  education other than high school and Western
4  Illinois University?
5      A.   We receive credits, college credits for
6  our education that we receive in the Police
7  Academy.
8      Q.   Any other formal education?
9      A.   No.
10     Q.   You mentioned the Police Academy.  Are
11  you a sworn police officer?
12     A.   I was.
13     Q.   And when you say you were, you mean
14  before you went out on disability or --
15     A.   Yes.
16     Q.   Okay.  So you attended the Police
17  Academy?
18     A.   Yes, I did.
19     Q.   Prior to attending the Police Academy,
20  did you have any other employment?
21     A.   Yes.
22     Q.   Can you tell me about your employment
23  that preceded your employment with the Chicago
24  Police Department?

---

10

1      A.   I was a bank teller at Columbia National
2  Bank while I was in high school.  Then I was a
3  waitress at a restaurant in Wisconsin Dells for
4  many years.  And then I was a blackjack dealer at
5  Ho-Chunk Casino in Baraboo, Wisconsin.
6      Q.   Any other employment?
7      A.   No.
8      Q.   Did any of those employment situations
9  end involuntarily for you?  In other words, were
10  you ever fired from any of these jobs?
11     A.   Never.
12     Q.   You voluntarily left each of these jobs?
13     A.   Yes, sir.
14     Q.   And when did you enter, what year or
15  month, if you know, enter the Police Academy?
16     A.   31 May, '94.
17     Q.   And when was your graduation from the
18  Police Academy?
19     A.   December of '94.
20     Q.   I know it's been a number of years, but
21  I'm going to ask you to sort of recount for me all
22  of your assignments where you worked within the
23  Chicago Police Department, let's say,
24  chronologically leading up to when you joined the

---

11

1  Fugitive Apprehension Unit.  What was your first
2  assignment out of the Police Academy?
3      A.   25th District.
4      Q.   That was just as a police officer?
5      A.   Yes.
6      Q.   And how long were you in the
7  25th District?
8      A.   Approximately three years.
9      Q.   Okay.  And what happened next?
10     A.   Then I went to school patrol.  I was a
11  school officer.  And I was there --
12     Q.   How long -- I'm sorry.
13     A.   I was there approximately five years.
14     Q.   And what was your next position?
15     A.   Alternate response section.
16     Q.   Is that like 311 center?
17     A.   Correct.
18     Q.   How long were you there?
19     A.   Five to six years.
20     Q.   And what was your next position?
21     A.   Area 5 Detective Division.
22     Q.   How long?
23     A.   Three years.
24     Q.   What was your next position?

---

12

1      A.   Fugitive Apprehension.
2      Q.   Okay.  Do you recall what month and year
3  you joined the Fugitive Apprehension Unit?
4      A.   I believe to the best of my knowledge it
5  was January of 2012.
6      Q.   And in your work in Fugitive
7  Apprehension or any of your prior positions with
8  the Chicago Police Department, have you ever been
9  the subject of discipline?
10     A.   No.
11     Q.   In the Fugitive Apprehension Unit or any
12  of the prior positions within the Chicago Police
13  Department have you ever been the subject of a
14  CR number?
15     A.   Yes.
16     Q.   How many times have you been the subject
17  of a CR?
18     A.   I would say a handful.
19     Q.   Can you tell me what you recall about
20  each of those cases, what the allegations were
21  against you?
22     A.   The allegations were police brutality.
23     Q.   In all of the cases police brutality?
24     A.   Yes.

---

JANET HANNA
SPALDING, et al. vs. CITY OF CHICAGO

August 12, 2015

---

13

1  Q.  And were any of the CRs sustained or, in
2  other words, they found against you?
3  A.  No.
4  Q.  You were exonerated on all of them?
5  A.  Yes.
6  Q.  Okay.  Other than your pending case
7  with respect to your duty disability, have you been
8  involved in any other lawsuits?  And when I say
9  "involved," I mean as either a plaintiff bringing
10  the lawsuit or a defendant, someone who's been
11  sued?
12  A.  Yes.
13  Q.  How many times have you been a party to
14  a lawsuit?
15  A.  Twice.
16  Q.  And were both of those cases in
17  connection with your work for the police
18  department?
19  A.  No.
20  Q.  Were either of those cases in connection
21  with your work for the police department?
22  A.  No.
23  Q.  Why don't you tell me about the earliest
24  case and then the second case?

---

14

1  A.  The first case was filed in February
2  of 2015 and that is for a divorce.
3  Q.  Did you make the filing?
4  A.  I did.  And the other case was filed
5  in I want to say '95 and that was for a divorce,
6  as well.
7  Q.  Were these divorce proceedings filed in
8  Cook County, Illinois?
9  A.  Yes.
10  Q.  Is the most recent proceeding still
11  pending or are you divorced?
12  A.  Still pending.
13  Q.  Do you have any children?
14  A.  I do.
15  Q.  You mentioned your current home address.
16  Who lives at that address with you?
17  A.  My one daughter.
18  Q.  How old is your daughter?
19  A.  24.
20  Q.  When you started at in the Fugitive
21  Apprehension Unit in approximately January of 2012,
22  what was your position at that time?
23  A.  Administrative assistant.
24  Q.  And did your position change at all or

---

15

1  were you always an administrative assistant while
2  you were in Fugitive Apprehension?
3  A.  I was always an administrative
4  assistant.
5  Q.  And were your duties under that title
6  essentially the same from when you started in the
7  unit until the time that you went on medical
8  leave?
9  A.  No, they changed throughout.
10  Q.  Okay.  Let's talk about what were your
11  initial duties when you joined the unit as an
12  administrative assistant.
13  A.  My original duties and the reason why I
14  was brought to that unit was to form a database for
15  the unit to keep track of all of the officers'
16  assignments because prior to that there was no
17  database.  There was no accountability.  Sergeants
18  didn't know what their officers were working, you
19  know, that sort of thing.
20  So I myself and Coleen Dugan were
21  brought to the unit from Commander Salemme, who was
22  the commander at Area 5, and we both worked at
23  Area 5 together.  He brought us to Fugitive
24  Apprehension.  That's where he was transferred.

---

16

1  And those were our duties, to develop a database
2  and to be able to keep track of all of the
3  assignments.  And then after that, that's when I
4  began giving out assignments.
5  Q.  Okay.  So you and Coleen Dugan had
6  previously worked together under Commander Salemme
7  in Area 5?
8  A.  Yes.
9  Q.  And he left to go to Fugitive
10  Apprehension and essentially took the two of you
11  along with him?
12  A.  Yes.
13  Q.  Other than creating this database and
14  then beginning to give out assignments, did you
15  have any other responsibilities when you first
16  started in Fugitive Apprehension?
17  A.  No.
18  Q.  When you first started in Fugitive
19  Apprehension, how were assignments being given out
20  until this database was created, if you know?
21  A.  Randomly.  From January until March they
22  were given out randomly.  We had a north team, a
23  south team, and a central team.  So needless to
24  say, if it was a south, an incident that occurred

---

JANET HANNA
SPALDING, et al. vs. CITY OF CHICAGO

August 12, 2015

---

**17**

1  south, we would give it to south team, any member
2  from the south team.  If it was north, we would
3  give it to a member on the north team.  And if it
4  was -- you understand.
5      Q.   Sure.  And that was the case after you
6  created the database --
7      A.   Yes.
8      Q.   -- that you would --
9      MR. TAREN:  Wait for the question.
10  BY MR. KING:
11      Q.   -- that you would typically give
12  assignments depending on where the offender is or
13  their last known address?  As you said, if it's an
14  offender on the north side, you would typically
15  assign it to a north side team.  If it's somebody
16  with a south side address, you would typically
17  assign it to the south side team, correct?
18      A.   Correct.
19      Q.   Is it your testimony that I guess we'll
20  call it the new system or database was effective in
21  about March of 2012?  Is that what you testified?
22      A.   I would say that it was up and running
23  by February.
24      Q.   Okay.  And when you joined Fugitive

---

**18**

1  Apprehension, was Lieutenant Cesario already in the
2  unit?
3      A.   Yes.
4      Q.   And at any time after you joined the
5  unit, did anyone give you any instructions on how
6  assignments were to be given out?
7      A.   Yes.  That was our job by
8  Lieutenant Cesario.  We worked directly for
9  him and he instructed us to come up with this
10  database and give out assignments based on
11  where the offender lives.
12      Q.   Okay.  And you're aware that in the
13  Fugitive Apprehension Unit there were what were
14  known as task force officers and also non-task
15  force officers, correct?
16      A.   Correct.
17      Q.   The task force officers means they had
18  been essentially -- why don't you tell me your
19  understanding of the difference between that.
20      A.   When I first arrived to the unit, I was
21  told that there were task force officers, but there
22  was never any instruction as to what a task force
23  officer was, you know, able to get or what
24  assignment they were supposed to get or there was

---

**19**

1  never any difference between a task force officer
2  and another officer.
3      Q.   Okay.  So it's your testimony that
4  Lieutenant Cesario never instructed you in any
5  manner about the types of cases that should go
6  to task force officers and the types of cases that
7  should go to non-task officers?  Is that your
8  testimony?
9      A.   No, that's not my testimony.  Initially
10  when I went to the unit I was not instructed to do
11  that.  Once we had relocated to Harrison and Kedzie
12  that is when he came out with a list of who was on
13  teams, north, south, and central, and he wrote next
14  to their names TFOs and he wanted them to receive
15  top five cases.
16      Q.   And do you recall when that move to
17  Harrison and Kedzie took place?
18      A.   Approximately June, 2012.
19      Q.   And you're saying that's the first
20  time that you learned about top five cases or any
21  difference in cases that should be assigned to
22  task force officers and non-task force officers?
23      A.   Yes.
24      Q.   You said there was something in writing

---

**20**

1  to that effect?
2      MR. TAREN:  Objection.
3  BY MR. KING:
4      Q.   I believe you said there was a --
5  Cesario gave you a list of some sort that made that
6  indication on it?
7      A.   He just gave us a list of teams, north
8  team, south team, central team, and next to the
9  officers who were task force officers it said TFO.
10      Q.   I see.  But you said Lieutenant Cesario
11  instructed you about top five cases.  Was that
12  verbally or in writing?
13      A.   That was verbally.
14      Q.   And do you recall if Coleen Dugan was
15  also present at that time?
16      A.   Yes.
17      Q.   She was?
18      A.   Yes.
19      Q.   Prior to that conversation with
20  Lieutenant Cesario, had you ever heard anyone
21  in the unit talk about any differences in the types
22  of cases that should be assigned to task force
23  officers and non-task force officers?
24      A.   Prior to June of 2012?

---

JANET HANNA
SPALDING, et al. vs. CITY OF CHICAGO

August 12, 2015

---

21

1    Q.   Correct.
2    A.   No.
3    Q.   Okay.  When did you first meet
4  Shannon Spalding or Dan Echeverria?
5    A.   March of 2012.
6    Q.   Was that when they joined the Fugitive
7  Apprehension Unit?
8    A.   Yes.
9    Q.   You did not know either of them before
10 that?
11   A.   No.
12   Q.   And are you aware that Officers Spalding
13 and Echeverria were not task force officers,
14 correct?
15   A.   Yes, I was aware of that.
16   Q.   Other than Shannon Spalding or
17 Dan Echeverria, do you ever recall other officers
18 that complained about the types of assignments
19 they got?
20   MR. TAREN:  Objection.
21 BY THE WITNESS:
22   A.   No.
23 BY MR. KING:
24   Q.   You have no recollection of anyone ever

---

22

1  complaining or questioning an assignment that they
2  received?
3    A.   No.
4    Q.   So let's talk about -- strike that.
5       So you don't recall, for example, anyone
6  ever complaining, hey, I'm on the north side team,
7  you're giving me a south side assignment, anything
8  like that?
9    A.   Not directly from an officer.
10   Q.   Okay.  Would you hear that from a
11 sergeant, for example?
12   A.   Yes.
13   Q.   So you might send out an assignment, for
14 example, the offender's on the south side but it
15 goes to a north side team, the sergeant on the
16 north side team may say, hey, you know, we should
17 reassign this, that kind of thing, correct?
18   A.   Yes.
19   Q.   And that's fairly common, correct?
20   A.   Yes.
21   Q.   Once you were advised that certain kinds
22 of assignments should go to task force officers and
23 non-task force officers, do you ever remember
24 sergeants or others similarly telling you, hey,

---

23

1  you sent a top five case to a non-task force
2  officer that needs to get reassigned to a task
3  force officer?
4    A.   Yes.
5    Q.   And did that happen fairly frequently?
6    A.   I wouldn't say frequently.
7    Q.   From time to time?
8    A.   Yes.
9    Q.   And that would happen from time to time
10 not in connection with Shannon Spalding or Dan
11 Echeverria, correct?
12   A.   Yes.
13   MR. TAREN:  Objection.
14 BY MR. KING:
15   Q.   And what you testified to a few minutes
16 ago where sergeants may direct you to reassign from
17 the north side to the south side, you said that
18 happened with respect to officers other than
19 Shannon Spalding and Dan Echeverria, correct?
20   MR. TAREN:  Objection; foundation.
21 BY MR. KING:
22   Q.   Correct?
23   A.   Could you make that statement again,
24 please?

---

24

1    Q.   Sure.  You testified that there were
2  occasions where sergeants would let you know that a
3  case needs to be reassigned because, for example,
4  it may have been assigned to the north side but the
5  offender's on the south side and you said that
6  would happen from time to time.
7       My question is that would happen from
8  time to time involving officers other than Shannon
9  Spalding and Dan Echeverria, correct?
10   MR. TAREN:  Same objection.
11 BY THE WITNESS:
12   A.   Yes.
13 BY MR. KING:
14   Q.   Thank you.
15      Did you ever hear officers or sergeants
16 or others letting you know that after you'd made an
17 assignment of a particular offender that they
18 discovered that that person had already been taken
19 into custody?
20   A.   Yes.
21   Q.   And that would happen fairly frequently,
22 correct?
23   A.   Yes.
24   Q.   And that would happen with respect to

---

JANET HANNA                                    August 12, 2015
SPALDING, et al. vs. CITY OF CHICAGO

---

**25**

1    officers other than Shannon Spalding and Dan
2    Echeverria, correct?
3        A.   Yes.
4        Q.   And do you recall circumstances where
5    you would make an assignment of a particular
6    suspect and then you'd be told either by an
7    officer or a sergeant or someone above that some
8    other officers or another team were already
9    working on that, that fugitive?
10       A.   Yes.
11       Q.   And that would happen fairly often?
12       A.   No.
13       Q.   From time to time?
14       A.   Yes.
15       Q.   And from time to time that would happen
16   with respect to officers other than Spalding and
17   Echeverria, correct?
18       A.   Yes.
19       Q.   So why don't you explain the assignment
20   process once you and Coleen created the database
21   and you sort of had the new system in place?  How
22   did that work and what was your responsibility in
23   issuing the assignments?
24       A.   When the database was first started,

---

**26**

1    there were four administrative assistants in the
2    office and one handled north, one handled south,
3    one handled central, and the other administrative
4    assistant handled all the other administrative
5    work.
6        Q.   Can you tell me who was responsible for
7    each of those areas?
8        A.   They switched periodically.
9        Q.   Okay.
10       A.   At one point I was in charge of north.
11   At one point I was in charge of south.  And at
12   another point I was in charge of central.  I could
13   not give you dates on that.
14       Q.   Okay.  And then would you send out
15   emails of the assignments?  Or just explain to
16   me sort of how the process worked.
17       A.   Yes.  We would send out emails to the
18   officers and to the team and list the jobs and
19   who -- what officer was assigned to what case.
20       Q.   And how did you make those
21   determinations or make those lists?  What was the
22   process to figure out who would be assigned which
23   case?
24       A.   Well, after June of 2012 when we were

---

**27**

1    informed to assign the top five cases to TFOs, we
2    attempted to do that and the remainder would go
3    to officers who were not TFOs.
4        Q.   So your process would be you first
5    looked for the top five cases and make sure those
6    are assigned to TFOs and then the remaining cases
7    you just do it by area where the offender was
8    located, is that fair?
9        MR. TAREN:  Objection just as to time frame.
10   You're focusing only on after June of 2012,
11   correct?
12       MR. KING:  Right now I am, yes.
13   BY MR. KING:
14       Q.   And I don't want to put words in your
15   mouth.  I just want to really understand the
16   process.  For example, do you get an email with a
17   list of cases?  How do you learn about cases to
18   then distribute?  What's the process --
19       MR. TAREN:  I'm just going to --
20   BY MR. KING:
21       Q.   -- on or after June of 2012?
22       MR. TAREN:  Okay.
23   BY THE WITNESS:
24       A.   Every morning when we came in we would

---

**28**

1    have to pull the list of warrants, new warrants
2    that had been issued for offenders they were
3    wanted.  And based on that we would determine the
4    location of where the offender lived.  And from
5    there we would make the proper assignments.
6            Now, if we had, let's say, ten high
7    top five cases, obviously we couldn't give top five
8    cases to all TFOs.  So we would have to give some
9    of the top five cases to officers other than
10   TFOs.
11   BY MR. KING:
12       Q.   Okay.  Would you say that that was common or
13   an infrequent situation where you'd have to give a
14   top five case to a non-TFO?
15       A.   Frequent.
16       Q.   Okay.  And prior to June of 2012 when
17   you were instructed to give top five cases to task
18   force officers, was the process of assigning cases
19   the same as it was beginning in June, 2012?  In
20   other words, was the only difference in June, 2012,
21   the fact that you were now assigning top five cases
22   to task force officers?
23       A.   Yes.  To the best of my recollection,
24   there was no understanding that TFOs -- from the

---

JANET HANNA                                        August 12, 2015
SPALDING, et al. vs. CITY OF CHICAGO

29

1   time I arrived at the unit and started the database
2   until June of 2012, there was no direction as to
3   what officers got what cases.
4       Q.   Let me ask it another way.  With respect
5   to the assignment process and what officers got
6   what cases, was the only thing that changed in
7   June, 2012, as compared to before that was that you
8   were now trying to assign top five cases to task
9   force officers, is that fair to say?
10      A.   Yes, trying.
11      Q.   And when we talk about top five cases,
12  do you recall what kinds of cases those were in
13  particular?
14      A.   Homicides, armed robberies.
15      Q.   Sexual assault?
16      A.   Yes.
17      Q.   Do you remember any others?
18      A.   I don't.
19      Q.   Burglaries, do you recall?
20      A.   I don't recall burglaries being a top
21  five.
22      Q.   Aggravated battery?
23      A.   Absolutely.
24      Q.   Parole violations, do you recall that

30

1   being one of them?
2       A.   No.
3       Q.   Violations of probation, was that one of
4   them?
5       A.   No.
6       Q.   I think you've given me four.  I'm not
7   sure if there were only five or they just called it
8   top five.  But can you recall any other types of
9   cases that were in the top five cases?
10      A.   I believe the other one was criminal
11  sexual -- sex cases.
12      Q.   You had mentioned sexual assault.  Are
13  you saying something different than that in terms
14  of sex cases?
15      A.   No, I'm meaning the same thing.
16      Q.   Okay.  That's fine.
17           During your time in the Fugitive
18  Apprehension Unit, were you familiar with the
19  VRI overtime program?
20      A.   Yes.
21      Q.   And did you have any responsibilities
22  relating to the VRI?
23      A.   Yes.
24      Q.   What were your responsibilities?

31

1       A.   My responsibilities was to receive the
2   overtime slips from all of the officers who were
3   eligible to participate in this new program and to
4   create a database based on seniority for which
5   days the officer put in to work certain weekends,
6   Saturdays or Sundays, and it was based on
7   seniority.
8       Q.   Okay.  And who instructed you in how to
9   do that?
10      A.   Lieutenant Cesario.
11      Q.   So if multiple officers put in a request
12  to work overtime on a particular weekend, that
13  decision of who gets approved is supposed to be by
14  seniority?
15      A.   Yes.
16      Q.   And was there ever a change in that
17  system on how officers were to make their requests
18  for VRI?
19      A.   Yes.
20      Q.   And when did that change, if you can
21  recall?
22      A.   November, 2012.
23      Q.   And what was the change that happened in
24  November, 2012?

32

1       A.   I informed Lieutenant Cesario that I did
2   not feel comfortable with the process that we had
3   currently had in place, which was the officers
4   would just hand me their overtime slips.  So there
5   would be no record of dates and times and there
6   was an end period when you had to have forms
7   submitted by a certain deadline.
8       Q.   Sure.
9       A.   So I informed him I was not comfortable
10  with that practice.  And I developed a new form and
11  sent out an email to all participants that the
12  process had changed and from now on you will have
13  to email me your request by the deadline so that
14  way I would have an electronic.
15      Q.   Sure.  And when you told
16  Lieutenant Cesario you weren't comfortable with the
17  existing process, was that a face-to-face verbal
18  conversation?
19      A.   I believe so.
20      Q.   Do you recall if Coleen Dugan was also
21  present during that conversation?
22      A.   No.
23      Q.   You're not sure or you don't think she
24  was?

JANET HANNA
SPALDING, et al. vs. CITY OF CHICAGO

August 12, 2015

---

**33**

1     A.   I'm not sure.

2     Q.   Okay.  And other than what you've

3  already testified to in terms of what you said to

4  Lieutenant Cesario in that conversation about

5  changing the practice around VRI, do you recall

6  anything else you said to Lieutenant Cesario or

7  that he said to you in that conversation?

8     MR. TAREN:  Objection; assumes it's just one

9  conversation.

10  BY THE WITNESS:

11     A.   Are you referring to the conversation

12  when I told him I didn't feel comfortable with the

13  current practice?

14  BY MR. KING:

15     Q.   Yes, that you just testified to.  And my

16  question is other than what you've already

17  testified to in that conversation, was there

18  anything else said by you or by Lieutenant Cesario?

19     A.   I don't believe so.

20     Q.   Do you recall any prior conversations

21  between yourself and Lieutenant Cesario about the

22  way VRI was handled?

23     A.   Yes.

24     Q.   Okay.  And how many prior conversations

---

**34**

1  did you have?

2     A.   Many.

3     Q.   And can you remember a particular

4  conversation, how many you had or --

5     A.   Approximately five.

6     Q.   Okay.  And was the subject matter of

7  this approximately five conversations the same?  In

8  other words, it sounds like you're saying you had

9  conversations with him about the way VRI was

10  handled.  In all of those conversations were they

11  essentially the same or different topics?

12     A.   They were different topics.

13     Q.   Any recollection of when the first

14  conversation you had with Lieutenant Cesario

15  around VRI was?

16     A.   June or July of 2012.

17     Q.   And do you recall was that an in-person

18  face-to-face conversation?

19     A.   Yes.

20     Q.   And was anyone else present?

21     A.   Not to my knowledge.

22     Q.   What do you recall being said either by

23  you or Lieutenant Cesario in that June or July,

24  2012 conversation?

---

**35**

1     A.   Initially the conversation between him

2  and I was how we were going to proceed with the

3  new -- it was a new overtime procedure.  We had

4  never had that in the unit.  So the City allowed

5  us to participate in this violence reduction

6  initiation.  So initially it was conversation about

7  how we were going to go about doing things.  And it

8  was going to be based on seniority and this is the

9  form they're going to fill out.  There's going to

10  be a deadline so that you can create your database.

11  And I was the only one in charge of VRI.  So that

12  was one of the conversations.

13     Q.   Okay.

14     A.   Another conversation would be about

15  all of the cancellations.  Officers would call the

16  day they were scheduled and they would cancel.  And

17  the sergeants that were working that day did not

18  have access to my database so they didn't know

19  what officer was next in seniority to get the

20  replacement.  So they would just call anyone.

21  That's was another issue, at which time the

22  lieutenant put out an order about cancellations

23  and, you know, you get a strike against you.

24     Q.   Sure.  Not to interrupt you, but do you

---

**36**

1  ever recall Spalding or Echeverria being scheduled

2  to work overtime and then either of them canceling?

3     A.   No.

4     Q.   What other conversations did you have

5  with Lieutenant Cesario around VRI?

6     A.   I was instructed by Lieutenant Cesario

7  to act as if I didn't receive Officers Spalding and

8  Echeverria's requests and to toss them in the

9  garbage.

10     Q.   Were those his exact words?

11     A.   Not verbatim.

12     Q.   Okay.  Did he say toss them in the

13  garbage?

14     A.   Throw them out, toss them in the

15  garbage.

16     Q.   Is it fair to say you don't remember the

17  exact words that Lieutenant Cesario allegedly used

18  in this conversation?

19     MR. TAREN:  Objection.

20  BY THE WITNESS:

21     A.   Yes.

22  BY MR. KING:

23     Q.   Okay.  Was anyone else present during

24  this conversation that you just testified to with

---

JANET HANNA
SPALDING, et al. vs. CITY OF CHICAGO

August 12, 2015

---

**37**

1  Lieutenant Cesario?
2  A.  No.
3  Q.  Where did that conversation take place?
4  A.  Harrison and Kedzie in his office.
5  Q.  And since you told me that the first
6  conversation about VRI was in June or July of 2012
7  and you told me about some other conversations
8  about cancellations and the like, I'm assuming that
9  this conversation where Lieutenant Cesario
10 allegedly told you act like you didn't receive
11 their overtime requests, something along the lines
12 of throw them in the garbage, I'm assuming that
13 that happened after July of 2012, would that be
14 correct?
15 A.  No.  I believe that happened at the very
16 beginning of the program.
17 Q.  The very beginning of the program.  What
18 do you mean by that?  What time period would that
19 have been?
20 A.  June or July of 2012.
21 Q.  And was that conversation before or
22 after the system changed, if you will, where people
23 had to email their overtime requests?
24 A.  That was before.

---

**38**

1  Q.  And when Lieutenant Cesario told you
2  in effect to disregard Spalding and Echeverria's
3  overtime request, did you say anything to him?
4  A.  I asked him why.
5  Q.  And did he respond to you?
6  A.  He gave me a direct order.
7  Q.  Did he respond to you when you asked him
8  why?  What did he say?
9  A.  Yes.  He said I'm giving you a direct
10 order to throw their sheets out, their slips out,
11 and do not put them on the schedule.
12 Q.  Okay.  And was there anything else said
13 in that conversation by you or Lieutenant Cesario?
14 A.  Not to my knowledge.
15 Q.  And where did this conversation take
16 place?
17 A.  In Lieutenant Cesario's office.
18 Q.  Do you know if the door was open or
19 closed?
20 A.  Closed.
21 Q.  Other than that conversation, did you
22 have any subsequent conversations with Lieutenant
23 Cesario about the subject of disregarding overtime
24 requests from Spalding or Echeverria?

---

**39**

1  A.  No.
2  Q.  You would agree that Spalding and
3  Echeverria did work some overtime pursuant to the
4  VRI program, correct?
5  A.  Yes.
6  Q.  Is it your testimony there were
7  occasions where they put in for overtime and they
8  were not allowed to work overtime for some reason
9  other than their seniority?
10 A.  Yes.
11 Q.  Any idea how many times that occurred?
12 A.  I'm going to say at least two months,
13 but I believe it was more than two months the
14 practice continued where I had to -- I was
15 instructed by Lieutenant Cesario to throw their
16 sheets away.
17 Q.  So you think that practice continued
18 where you were essentially throwing their sheets
19 away for two or three months after June or July
20 of 2012?
21 A.  Yes.
22 Q.  And when we talk about months, were
23 there VRI overtime opportunities every single
24 weekend or once a month or how did that work?

---

**40**

1  A.  Every single weekend.
2  Q.  And do you have any recollection of
3  how many times Spalding or Echeverria requested
4  overtime and you disregarded them and threw them in
5  the trash or otherwise disregarded them?
6  A.  I do not recall exactly how many times,
7  but to the best of my knowledge it was two to five
8  times.
9  Q.  And is it your testimony that in those
10 two to five times they did not work the overtime?
11 A.  Correct.
12 Q.  At any point before that practice
13 stopped, I guess, did you speak with Shannon
14 Spalding or Dan Echeverria and tell them that
15 you had been instructed to reject their overtime
16 requests?
17 A.  No.
18 Q.  Did they ever come to you, Spalding or
19 Echeverria, during this period and ask you, hey, I
20 put in for VRI overtime, how come I didn't get it?
21 Were there any conversations like that with you?
22 A.  I believe so.
23 Q.  You believe so.  Do you recall a
24 specific conversation with Spalding or Echeverria

---

JANET HANNA
SPALDING, et al. vs. CITY OF CHICAGO

August 12, 2015

## 41

1  where they questioned you about why their request
2  for VRI overtime was not received or approved?
3      A.   Yes, I'm sure there was a conversation.
4      Q.   Do you recall -- you seem a little
5  uncertain about that.  Are you thinking that there
6  probably was a conversation or do you recall an
7  actual conversation?
8      A.   I'm thinking there probably was a
9  conversation.
10     Q.   But you don't recall any actual
11 conversations as you sit here today, correct?
12     A.   No.
13     Q.   Do you have any knowledge of how many
14 days of overtime Spalding or Echeverria did work
15 in the Fugitive Apprehension Unit?
16     A.   I would have no idea.
17     MR. KING:  Mark it as 1.
18          (WHEREUPON, a certain document was
19          marked Hanna Deposition Exhibit
20          No. 1, for identification, as of
21          08-12-2015.)
22 BY MR. KING:
23     Q.   Ms. Hanna, showing you what's been
24 marked as Hanna Deposition Exhibit No. 1, which is

## 42

1  the affidavit of Janet Hanna, I assume you're
2  familiar with this document?
3      A.   Yes, I am.
4      Q.   And you signed the document on the last
5  page, correct?
6      A.   Yes, sir.
7      Q.   And you understood that you were signing
8  this document -- I'm sorry.
9          You were representing and under
10 penalties of perjury that the statements in this
11 affidavit are true and correct?  You understood
12 that, correct?
13     A.   Yes.
14     Q.   And is it your testimony that everything
15 in this affidavit is true and correct?
16     A.   Yes.
17          Excuse me.  I do have one correction.
18     Q.   Okay.  What is the correction?
19     A.   No. 13 on Page 2.
20     Q.   Okay.
21     A.   It says on or around June 25th, 2012, I
22 was working overtime in the FAU in Homan Square and
23 that is not correct.  That should be at Harrison
24 and Kedzie because we had already made the move.

## 43

1      Q.   Okay.  Did you read this affidavit
2  before you signed it?
3      A.   I did.
4      Q.   Do you recall why or how you missed that
5  the first time?
6      A.   No, I don't.
7      Q.   Who initially contacted you about
8  potentially giving an affidavit in connection
9  with this litigation?
10     MR. TAREN:  Objection; assumes matters.
11 BY THE WITNESS:
12     A.   I contacted the attorney Chris that was
13 representing Danny and Shannon.
14 BY MR. KING:
15     Q.   Christopher Smith?
16     A.   Yes.
17     Q.   And did Shannon Spalding or Dan
18 Echeverria ask you to contact Chris?
19     A.   No.
20     Q.   Did Shannon Spalding or Dan Echeverria
21 ask you if you would consider signing an affidavit
22 for them in connection with this case?
23     A.   No.
24     Q.   Where did you get Chris Smith's contact

## 44

1  information?
2      A.   It was on the website available to
3  pull up and read the entire document, the entire
4  lawsuit.
5      Q.   Okay.  I'm certain that it was.
6          Is it your testimony that that's where
7  you got Chris Smith's name, from the complaint that
8  was on the Internet?
9      A.   I got it from the complaint that was on
10 the Internet, as well as the news release.
11     Q.   Okay.  And it's your testimony that
12 without any conversation with Shannon Spalding or
13 Danny Echeverria you took it upon yourself to
14 call up Christopher Smith and offer to give an
15 affidavit?  Is that your testimony?
16     A.   Yes.
17     Q.   Since the lawsuit was filed by Spalding
18 and Echeverria, have you had any conversations with
19 Shannon Spalding or Dan Echeverria?
20     A.   Yes, I've had conversations.
21     Q.   Since you've gone out on medical leave,
22 have you had any conversations with Shannon
23 Spalding or Dan Echeverria?
24     A.   Yes.

JANET HANNA                                                    August 12, 2015
SPALDING, et al. vs. CITY OF CHICAGO

---

45

1     Q.   And have they related to this lawsuit?
2     A.   No.
3     Q.   Have they related to the subject of your
4     affidavit in the lawsuit?
5     A.   No.
6     Q.   Why did you contact Mr. Smith?
7     A.   I was put on disability 20 September,
8     2014, and at that time I knew that I was going to
9     be on long-term disability and my doctors had told
10    me that I would be permanently disabled.  So I knew
11    that I could come forward and break the code of
12    silence without being retaliated against like
13    Officer Echeverria and Spalding were.
14    Q.   I appreciate that that may be your
15    opinion.  You mentioned the code of silence.
16    What's your understanding of what the code of
17    silence is?
18    A.   When I was in the Police Academy, I was
19    instructed by several instructors.  We were told
20    over and over again we do not break the code of
21    silence.  Blue is blue.  You stick together.  If
22    something occurs on the street that you don't think
23    is proper, you go with the flow.  And after that
24    situation, if you have an issue with that officer

---

46

1     or what happened, you can confront them.  If you
2     don't feel comfortable working with them anymore,
3     you can go to the watch commander and request a new
4     partner.  But you never break the code of silence.
5     Q.   And are you saying this was part of the
6     formal instruction at the Police Academy in courses
7     that you took or was that informal conversation
8     with people while you were in the Police Academy?
9     A.   It's well known in the Police Academy.
10    Instructors do speak about it openly in classrooms.
11    Q.   Did you ever hear instructors openly
12    speaking about the code of silence in the sense of
13    not reporting the activities, for example, of other
14    officers?  Is it your testimony that instructors in
15    the classroom in the Police Academy taught that?
16    A.   They spoke of that, yes.
17    Q.   Do you remember any particular
18    instructors that you had at the Police Academy
19    that spoke of that?
20    A.   I do not.
21    Q.   Did anyone offer you anything in
22    exchange for signing your affidavit?
23    A.   No.
24    Q.   Have you ever had a conversation

---

47

1     with Shannon Spalding about the subject of her
2     recovering money from this lawsuit?
3     A.   No.
4     Q.   Let's look at Exhibit 1, which is your
5     affidavit.  Paragraph 2 says, for the record, in
6     March of 2012, Lieutenant Cesario informed you and
7     Coleen Dugan that two new officers were coming who
8     were supposedly IAD rats and to be very leery of
9     them.
10         When did that conversation take place?
11    A.   March of 2012.
12    Q.   And was this prior to Spalding and
13    Echeverria getting to the unit?
14    A.   Yes.
15    Q.   Do you recall how many days prior to
16    them coming to the unit that conversation took
17    place?
18    A.   The day prior to them arriving.
19    Q.   Okay.  And where did this conversation
20    take place?
21    A.   Lieutenant Cesario's office at
22    Homan Square.
23    Q.   And you and Lieutenant Cesario and
24    Coleen Dugan were present, correct?

---

48

1     A.   Yes.
2     Q.   And tell me, if you would, everything
3     that Lieutenant Cesario said and that you or Coleen
4     Dugan said in that conversation.
5     A.   Pretty much we were speechless and just
6     said okay.
7     Q.   Are you aware that Coleen Dugan has
8     given a deposition in this case?
9     A.   No.
10    Q.   Then I assume you're not aware that
11    Coleen Dugan has testified under oath that she
12    never heard Robert Cesario ever refer to the
13    plaintiffs as rats?  I assume you're unaware of
14    that?
15    A.   I am unaware.
16    Q.   And if that testimony is what Coleen
17    Dugan testified to, is it your testimony that
18    Coleen is lying?
19    A.   Absolutely.
20    Q.   And then I assume you're also unaware
21    that Coleen Dugan testified under oath in this case
22    that you, in fact, were the person that referred to
23    Shannon Spalding and Danny Echeverria as having
24    come from IAD?  Are you unaware of that?

---

JANET HANNA
SPALDING, et al. vs. CITY OF CHICAGO

August 12, 2015

---

49

1     A.  How did she refer to me?  How did she
2  refer to that?
3     Q.  Are you aware of whether she testified
4  that you were the first person to tell her that
5  Spalding and Echeverria had come from IAD?
6     MR. TAREN:  I'm going to object and I'll
7  object to the line of questioning.  She already
8  testified she wasn't aware that Ms. Dugan gave a
9  deposition.
10  BY THE WITNESS:
11     A.  Yes, I'm unaware.
12  BY MR. KING:
13     Q.  Okay.  Is it true that you told
14  Coleen Dugan that you believed Spalding and
15  Echeverria were coming from IAD prior to the
16  time they arrived?
17     A.  No.
18     Q.  If Coleen Dugan testified that you told
19  her that, is it your testimony that she would be
20  lying?
21     A.  Absolutely.
22     Q.  So Paragraph 4 of your affidavit
23  indicates that the day Shannon and Danny started,
24  Cesario walked them over to you.  He walked away.

---

50

1  And then you said to Shannon and Danny, so you two
2  are the IAD rats.  Is that your testimony that that
3  conversation took place?
4     A.  Yes.
5     Q.  And you say Lieutenant Cesario had
6  walked away.  Do you know whether he heard you say
7  so you two are the IAD rats?
8     MR. TAREN:  Objection.
9  BY MR. KING:
10     Q.  If you know whether Cesario was still
11  present and heard you say that.
12     MR. TAREN:  Same objection.
13  BY THE WITNESS:
14     A.  He was not present and I do not know if
15  he heard that.
16  BY MR. KING:
17     Q.  And were these the first words you
18  uttered when you met Shannon and Danny for the
19  first time, so you two are the IAD rats?
20     A.  Yes.  I was introduced to them by
21  Lieutenant Cesario.  Coleen Dugan and I sat
22  directly across from each other at the same desk.
23  We were introduced to them at the exact same time.
24  We shook hands, nice to meet you.  And as soon as

---

51

1  he walked away, Lieutenant Cesario, those were the
2  first words I uttered out of my mouth to both
3  officers.
4     Q.  And did anybody respond to what you were
5  saying then?
6     A.  Yes.
7     Q.  Who did?
8     A.  Shannon.
9     Q.  What did Shannon say?
10     A.  Yes.  I have Gary's phone number right
11  on my cellphone.  I'll give him a call right now.
12     Q.  Okay.  What did you understand that to
13  mean?
14     A.  That she was personal friends with the
15  superintendent.
16     Q.  Do you remember you or her or Danny or
17  Coleen saying anything else in that conversation?
18     A.  No.
19     Q.  Okay.  Paragraph 7 of the affidavit
20  talks about Cesario ordering you to give Danny and
21  Shannon only dead-end cases that would not lead to
22  an arrest or officer activity.
23     Is Paragraph 7 a reference to the
24  conversation you had with Cesario that you've

---

52

1  already testified to in this deposition?
2     MR. TAREN:  Objection.
3     MR. KING:  We have --
4     MR. TAREN:  She hasn't been questioned about
5  that conversation.
6  BY THE WITNESS:
7     A.  I was only questioned about VRI and
8  assigning cases to Shannon and Danny for VRI.
9  BY MR. KING:
10     Q.  Well, let's talk about Paragraph 7.  The
11  record will speak for itself.
12     When did this conversation take place,
13  this alleged conversation when Lieutenant Cesario
14  ordered you to give them only dead-end cases that
15  would not lead to arrests or officer activity?
16     A.  Very soon after they arrived to the
17  unit.
18     Q.  Was this a conversation where just you
19  and Lieutenant Cesario were present?
20     A.  I don't believe so.
21     Q.  Do you recall anyone else being present?
22     A.  Coleen Dugan and myself.
23     Q.  Do you recall where this conversation
24  took place?

---

JANET HANNA
SPALDING, et al. vs. CITY OF CHICAGO

August 12, 2015

---

**53**

1      A.   In Lieutenant Cesario's office at

2 Homan Square.

3      Q.   And what specifically do you recall

4 Lieutenant Cesario saying and what did you or

5 Coleen Dugan say in that conversation?

6      A.   Lieutenant Cesario instructed us to give

7 them all dead-end cases, garbage cases, drinking on

8 the public way, you know, ridiculous, you know,

9 cases. And obviously when he made that statement,

10 myself and Coleen Dugan knew where he was going

11 with that after he had told us that they were

12 from IAD.

13      Q.   What was your understanding of where he

14 was going with that?

15      A.   You don't want to give them any high

16 profile cases. You don't want to give them work.

17 You know, they're just here to take up space.

18      Q.   That was your interpretation of what he

19 said?

20      A.   That was my interpretation.

21      Q.   And I would like you to tell me as best

22 as you can recall his exact words. Did he say

23 garbage cases? Did he say drinking on the public

24 way? Or is this your interpretation? For now I

---

**54**

1 just want to know the words that came out of

2 Lieutenant Cesario's mouth in that conversation.

3      MR. TAREN: Objection; asked and answered.

4 BY MR. KING:

5      Q.   What did he say specifically in

6 this conversation with you and Coleen Dugan?

7      A.   To the best of my knowledge, it was give

8 them dead-end cases, such as drinking on the public

9 way, juvenile warrants. That's it.

10      Q.   Do you recall him saying anything else

11 in that conversation?

12      A.   No.

13      Q.   And did you or Coleen Dugan say anything

14 in that conversation?

15      A.   I'm sure we agreed.

16      Q.   Do you recall you or Coleen saying

17 anything in that conversation with Lieutenant

18 Cesario?

19      A.   Well, I would have to say that I

20 acknowledged the lieutenant and said yes or okay.

21      Q.   Do you recall doing that or are you

22 assuming that that's what you did?

23      A.   I'm assuming that's what I did.

24      Q.   You don't have a specific recollection

---

**55**

1 of what, if anything, you or Coleen Dugan said in

2 that conversation?

3      A.   I do not.

4      Q.   And did you or Coleen to your knowledge

5 as the assigners of work, did you do anything to

6 carry out this alleged directive from Cesario?

7      A.   Absolutely.

8      Q.   So you would screen the cases and look

9 for dead-end cases and then you'd send those

10 to Danny and Shannon, is that your testimony?

11      A.   And the lieutenant had to be copied on

12 it, as well as the commander.

13      Q.   Okay.

14      A.   And their sergeant.

15      Q.   And what were the types of cases that

16 you were looking for when you were following

17 Lieutenant Cesario's instruction in sending them

18 to Danny and Shannon?

19      A.   As I said prior, drinking on the public

20 way, juvenile warrants, jumping a turnstile, minor

21 offenses.

22      Q.   And from the date of that conversation,

23 whenever that was, until what period of time did

24 that end when you stopped screening their cases

---

**56**

1 for dead-end cases? Do you know when that practice

2 stopped?

3      A.   Never, not as long as I was there.

4      Q.   Okay. So is it your testimony that you

5 believe Spalding and Echeverria the entire time

6 that you were in the unit got only dead-end cases,

7 such as jumping turnstiles, drinking on the public

8 way? Is that your testimony?

9      MR. TAREN: Objection; assumes matters not

10 testified to.

11 BY THE WITNESS:

12      A.   That would not be my testimony because I

13 know, in fact, that I inadvertently assigned them a

14 homicide case and I was reprimanded for that. And

15 the case was taken away by their sergeant.

16 BY MR. KING:

17      Q.   We'll talk about that.

18      Other than the one homicide case you

19 assigned them, is it your testimony that the entire

20 time that Shannon Spalding, Danny Echeverria, and

21 you worked in the Fugitive Apprehension Unit other

22 than the one homicide was that they received only

23 what you considered dead-end cases? Is that your

24 testimony?

---

JANET HANNA                                                    August 12, 2015
SPALDING, et al. vs. CITY OF CHICAGO

---

57

1    MR. TAREN: Objection. It mischaracterizes
2    her testimony.
3    BY THE WITNESS:
4        A.   No, I can't make that statement because
5    when they were switched from team to team and teams
6    were sent to different officers in the office, I
7    don't know what the other officers were doing. I
8    only know that when I was assigned to a team that
9    they were assigned to is what I did because I
10   was instructed to do that.
11   BY MR. KING:
12       Q.   Okay. What team were you on -- what
13   team were they on when you were responsible for
14   their assignments? Was that Sergeant Barnes' team
15   or Sergeant Mills' team or both?
16       A.   Sergeant Barnes.
17       Q.   So you have no knowledge of what types
18   of assignments or what the assignment process was
19   for them after they had been moved to Sergeant
20   Mills' team, correct?
21       A.   No. I know that it was -- everyone in
22   the office had knowledge of that and everyone
23   participated in that.
24       Q.   All right. I asked you when it ended

---

58

1    that they were only assigned dead-end cases and
2    you testified it never ended. It continued the
3    whole time you were there. So then my question to
4    you was is it your testimony that the entire time
5    Spalding and Echeverria and you were together in
6    the Fugitive Apprehension Unit -- is it your
7    testimony that other than one homicide case all of
8    their assignments were what you've called dead-end
9    cases? Is that what you're testifying to?
10       MR. TAREN: Objection; asked and answered.
11   BY THE WITNESS:
12       A.   When I gave the assignments to
13   Officers Spalding and Echeverria, that was the
14   practice.
15   BY MR. KING:
16       Q.   Okay. But you don't know if Coleen
17   Dugan, for example, followed that practice when
18   she gave assignments to Spalding and Echeverria,
19   correct?
20       A.   Correct.
21       Q.   Paragraph 9 indicates that Salemme and
22   Barnes were aware of these assignments because
23   they were copied on the emails.
24           I assume that's the only way they were

---

59

1    aware of them? In other words, you didn't pick the
2    dead-end cases and then go to Salemme or Barnes or
3    Cesario and say I'm only going to send them these?
4    You knew which dead-end cases to select and then
5    you would send an email and then they would be
6    copied on it, correct?
7        MR. KING: Objection. First of all, there's
8    about five questions in there and it assumes
9    matters that have not been testified to.
10   BY MR. KING:
11       Q.   Did you understand my question?
12       A.   Could you rephrase it, please?
13       Q.   Yeah, yeah. After you were given this
14   directive by Cesario and you would send the
15   assignments to Spalding and Echeverria that were
16   so-called dead-end assignments, the way that
17   Commander Salemme and Sergeant Barnes and
18   Lieutenant Cesario would know about those specific
19   case assignments is because they were copied on the
20   emails, correct?
21       A.   No.
22       Q.   Did you have a practice of before you
23   sent an email with an assignment going to either
24   Commander Salemme, Lieutenant Cesario, or

---

60

1    Sergeant Barnes and getting their approval as to
2    what cases you should send to Spalding and
3    Echeverria?
4        A.   I didn't get approval from
5    Lieutenant Cesario, Sergeant Barnes, or the
6    commander initially when they came to the unit
7    because Lieutenant Cesario handpicked all of
8    Shannon and Danny's assignments.
9        Q.   And how long did he do that?
10       A.   I would say a couple of months.
11       Q.   And when you say "handpicked," what do
12   you mean? Would he give you a piece of paper with
13   certain cases? Would he send you an email saying
14   give them these? What was the process of him
15   handpicking their assignments?
16       A.   When he arrived at work in the morning,
17   he always printed out all the warrants, as well,
18   and he would highlight which cases went to Danny
19   and which cases went to Shannon.
20       Q.   And would he highlight anybody else's
21   cases?
22       A.   No.
23       Q.   And around that time, Shannon Spalding
24   and Danny Echeverria were the only two new officers

---

JANET HANNA
SPALDING, et al. vs. CITY OF CHICAGO

August 12, 2015

---

61

1  in the unit, correct?
2  A.  They were the newest officers, but we
3  had had other new officers arrive prior to them
4  coming.
5  Q.  I guess my question is other than
6  them being copied on emails and what you've
7  already testified to about Cesario picking their
8  assignments for a limited period of time, is there
9  any other way that Cesario or Salemme or Barnes
10  would learn about which cases were assigned to
11  the two plaintiffs other than the fact that they
12  were copied on the emails?
13  A.  No.
14  Q.  So Paragraph 10 is a reference to what
15  you just testified to that he stopped handpicking
16  the cases at some point, correct?
17  A.  Yes.
18  Q.  Paragraph 11 is a reference to the
19  homicide case you previously referenced, correct?
20  A.  Yes.
21  Q.  And do you remember who the subject or
22  suspect was in that case?
23  A.  No, I do not.
24  Q.  Do you know if it was a Desmond Young?

---

62

1  Does that ring a bell at all?
2  A.  No, it does not.
3  Q.  You likely wouldn't remember the
4  specific name of the offender?
5  A.  Absolutely not.
6  Q.  Do you recall when this occurred that
7  you assigned this homicide case to Spalding and
8  Echeverria?
9  A.  I don't recall.
10  Q.  Was it while they were working on
11  Sergeant Barnes' team or Sergeant Mills' team?
12  A.  They were working on Sergeant Barnes'
13  team.
14  Q.  And do you recall the circumstances of
15  how you came to assign them a homicide case?
16  A.  I inadvertently assigned them a homicide
17  case and the very next morning Lieutenant Cesario
18  came into the office and was yelling at me and
19  admonished me.  And the next thing I knew I
20  received an email from Sergeant Barnes saying that
21  the case had been reassigned to a different
22  officer.
23  Q.  And that next day when Sergeant --
24  excuse me -- Lieutenant Cesario spoke to you about

---

63

1  this, was this an in-person conversation, just you
2  and him?
3  A.  No.  It was in-person in the office,
4  administrative office.
5  Q.  Do you recall if anybody else was
6  present?
7  A.  I don't recall.
8  Q.  Okay.  What specifically do you recall
9  Cesario saying to you and you saying to him, if
10  anything, in that conversation?
11  A.  How the hell did you give them a
12  homicide case.
13  Q.  Do you remember him saying anything
14  else?
15  A.  I told you only to give them dead-end
16  cases.
17  Q.  Do you recall him saying anything else?
18  A.  I do not.
19  Q.  Do you recall saying anything in that
20  conversation?
21  A.  Yes.
22  Q.  What did you say?
23  A.  I must have inadvertently gave them the
24  case.

---

64

1  Q.  Okay.  Do you remember saying anything
2  else in that conversation?
3  A.  No.
4  Q.  Then you're saying subsequent to that
5  you got an email from Sergeant Barnes telling
6  you to reassign the case to someone else?
7  A.  Negative.  I received an email from
8  Sergeant Barnes stating that the case had been
9  reassigned to a different officer.
10  Q.  Okay.  Do you have any recollection of
11  who that different officer was?
12  A.  I have no idea.
13  Q.  Do you have any recollection of whether
14  that different officer was a task force officer or
15  a non-task force officer?
16  A.  I have no idea.
17  Q.  Do you have any recollection of whether
18  that other reassignment was to officers on
19  Spalding's and Echeverria's team or on another
20  team?
21  A.  I would assume it would have been on the
22  same team because it was a south case.
23  Q.  Okay.  Let's look at Paragraph 13 of
24  your affidavit.  It indicates that on or around

---

JANET HANNA
SPALDING, et al. vs. CITY OF CHICAGO

August 12, 2015

---

**65**

1  June 25th, 2012, you were working at Homan Square
2  and you overheard -- you know, I won't read it all,
3  but Paragraphs 13 through 16 refer to a
4  conversation that you had with Shannon Spalding
5  and Dan Echeverria, correct?
6      A.  Correct.  I did inform you that this
7  occurred at Harrison and Kedzie and not Homan
8  Square.
9      Q.  Yes.  And do you still believe it was on
10  or around June 25th, 2012?
11      A.  Yes.
12      Q.  And why don't you tell me what you
13  recall about that incident or those conversations
14  that are described in Paragraph 13 through 16?
15      A.  I was working overtime on that day.  So
16  I was in my office and I overheard Shannon outside
17  of my office at the desk talking to Danny saying,
18  you know, what do we have to do to get back on
19  days.
20          And that's when I got up from my desk
21  and went out and approached them and said I don't
22  know what you're complaining about because Danny
23  requested to go on afternoons for family reasons
24  and you were given the opportunity to stay on days

---

**66**

1  but you chose to stay with your partner.
2          And she informed me at that time that
3  that never occurred and Danny did, as well.
4          And I told them that I had received a
5  packet from Lieutenant Cesario where I was
6  instructed to write a to/from report stating that
7  and it was submitted to Lieutenant Cesario.
8      Q.  Okay.  And when did Lieutenant Cesario
9  allegedly give you this packet and ask you to do
10  a to/from report?  Do you know when?
11      A.  I would say it would have had to have
12  been at least the week -- you know, within the week
13  prior to this conversation.
14      Q.  Within a week prior to June 25th or at
15  least within a week prior to the conversation you
16  just testified to, you had a conversation with
17  Cesario in which he gave you a packet, is that
18  your testimony?
19      A.  Yes, a file folder.
20      Q.  Was anyone else present when he gave you
21  that file folder?
22      A.  No.
23      Q.  And tell me specifically what he said to
24  you and what, if anything, you said to him at that

---

**67**

1  time.
2      A.  Inside the file packet -- file folder
3  was notes written down exactly verbatim as to what
4  he wanted me to write in a to/from report stating
5  that Danny had requested to go on afternoons due
6  to family reasons and that Shannon was given the
7  opportunity to stay on days or she could go on
8  afternoons with her partner, at which time she
9  chose to stay with her partner and go on
10  afternoons, as well.
11      Q.  Just so I'm clear, are you saying what
12  the papers said that were in the file -- I just
13  want to know what Lieutenant Cesario said to you
14  out of his mouth.  Did he say what you just
15  testified to or did he say here's a file, I want
16  you to type this up?  What did he say to you when
17  he gave you that file?
18      A.  He said, here's a file.  In here is the
19  documents that I want you to type up in a to/from
20  report.  And he read, reread for me because it was
21  in his handwriting and sometimes you cannot read
22  his handwriting.  He reread that to me and said, I
23  would like you to put this in a to/from report and
24  get it back to me as soon as possible.

---

**68**

1      Q.  What was your understanding of what that
2  meant, a to/from report?
3      A.  It's very common, a to/from report.
4  We're taught that in the Police Academy.
5      Q.  Sure.  But what was your understanding
6  of who it was supposed to be to and who it was
7  supposed to be from?
8      A.  It was supposed to be from Lieutenant
9  Cesario to Commander Salemme.
10      Q.  And did you type up that to/from report?
11      A.  Yes, I did.
12      Q.  And what did you do with it when you
13  finished typing it up?
14      A.  I hand delivered it back to Lieutenant
15  Cesario in his office.
16      Q.  You didn't email it to him, correct?
17      A.  Not to my knowledge.
18      Q.  And did you have any conversation
19  with Lieutenant Cesario at the time you handed this
20  to/from report back to him?
21      A.  I handed him the file folder and said
22  the to/from report is inside.
23      Q.  Did he say anything in that
24  conversation?

---

JANET HANNA                                                   August 12, 2015
SPALDING, et al. vs. CITY OF CHICAGO

---

**69**

1    A.    Thank you.
2    Q.    And do you have any personal knowledge
3    of whether Lieutenant Cesario actually gave that
4    report to Commander Salemme?
5    A.    No.
6    Q.    You don't have any knowledge of
7    Lieutenant Cesario doing anything with that
8    report, correct?
9    A.    Correct.
10        MR. TAREN:  You know, Counsel, at this point
11   I'd like the record to be clear that we've
12   specifically requested that document and have
13   never received anything.
14        MR. KING:  And I will let the record reflect
15   that we have specifically requested it and based
16   on what we've been told we don't believe that
17   document exists.
18   BY MR. KING:
19   Q.    You were testifying about the
20   conversation with Danny and Shannon where you told
21   them about Cesario asking you to type up the
22   to/from.  I just want to make sure.
23        Other than what you have testified to,
24   do you recall anything else said by you or Shannon

---

**70**

1    or Danny in that conversation?
2    A.    No.
3    Q.    If you look at Paragraph 18, it
4    indicates that in June, 2012, you were outside of
5    Lieutenant Cesario's office when you overheard him
6    in a meeting ordering Sergeant Mills, Barnes,
7    Mason, Stack, Nallen, and Tirado to instruct their
8    teams of officers not to provide any backup for
9    Shannon or Danny and to not work with them at all.
10        Is that a true statement?
11   A.    Yes, it is.
12   Q.    Can you tell me was anybody else present
13   where you were outside of this office overhearing
14   it?
15   A.    Not to my knowledge.
16   Q.    Was the door to Cesario's office open or
17   closed?
18   A.    Open.
19   Q.    This is a very serious allegation,
20   wouldn't you agree?
21   A.    Absolutely.
22   Q.    For a police officer to instruct other
23   police officers not to back up a police officer,
24   that's a very serious allegation, correct?

---

**71**

1    A.    Absolutely.
2    Q.    Police officers can get injured, can die
3    without backup, correct?
4    A.    Correct.
5    Q.    And it's your testimony with an open
6    door that Lieutenant Cesario instructed all of
7    these sergeants not to provide backup to Danny and
8    Shannon and not to work with them at all?  That's
9    your testimony?
10   A.    My testimony is that he instructed all
11   of those sergeants to inform his team -- their team
12   members not to provide backup for Shannon and
13   Danny.
14   Q.    Do you specifically recall hearing the
15   words "backup, not providing backup"?
16   A.    Yes.
17   Q.    And do you specifically recall hearing
18   the words "not to work with them at all"?
19   A.    Yes.
20   Q.    Other than what's reflected in
21   Paragraph 18, do you recall overhearing anything
22   else from that meeting in Lieutenant Cesario's
23   office?
24   A.    No, I don't.

---

**72**

1    Q.    Had the meeting just started when you
2    overheard this conversation?  Was it near the end
3    of the meeting, if you know?
4    A.    I'm unaware.  The sergeant's door was
5    closed and the lieutenant's office was inside of
6    the sergeant's office.  But administrative staff,
7    we go in and out of the sergeant's office quite
8    frequently.  So I believe I was in there to get the
9    sheets off of the wall.  When I say get the sheets
10   off the wall, that's because I did the A&As, which
11   is to record who's working, who's not working, so
12   forth.  And I opened up the sergeant's door, closed
13   the sergeant's door, walked over to the wall to
14   remove the sheets and that's when I heard what I
15   heard.
16   Q.    So you were in the sergeant's office
17   when you heard that?
18   A.    Yes.
19   Q.    How long do you think you were in the
20   sergeant's office?
21   A.    Three to five minutes.
22   Q.    Okay.  In the three to five minutes that
23   you were in the sergeant's office adjacent to this
24   meeting with an open door, you don't recall

---

JANET HANNA                                    August 12, 2015
SPALDING, et al. vs. CITY OF CHICAGO

---

**73**

```
 1    anything else that you overheard other than what's
 2    in Paragraph 18?
 3        A.   Nothing else.
 4        Q.   For the three to five minutes that you
 5    were in the sergeant's office, was the meeting
 6    going on that entire time in Lieutenant Cesario's
 7    office?
 8        A.   I would have no knowledge to that
 9    because after I left the office, the sergeant's
10    office, I went into my office.
11        Q.   But it was your understanding when you
12    went into the sergeant's office that this meeting
13    was going on in Lieutenant Cesario's office with
14    the door open, correct?
15        A.   Yes, the door was open.  The office was
16    not big enough to fit all those people in the
17    office.
18        Q.   But my point is the meeting was going on
19    when you walked into the sergeant's office,
20    correct?
21        A.   Yes.
22        Q.   It was still going on when you left the
23    sergeant's office, correct?
24        A.   To the best of my knowledge, it was.
```

---

**74**

```
 1        Q.   And in the three to five minutes you
 2    were adjacent to this open door meeting, you don't
 3    recall hearing anything said other than what's in
 4    Paragraph 18, is that your testimony?
 5        A.   Yes, it is.
 6        Q.   Let's look at Paragraph 19 of your
 7    affidavit.  It says on all teams in the Fugitive
 8    Apprehension Unit all members of each team are
 9    usually put on each of the team members' police
10    reports in order to bolster activity even when
11    they were not present at the scene of activity.
12             What's the basis of your understanding
13    that that was the practice?
14        A.   I've seen many police reports, arrest
15    reports indicating the same thing.  And there
16    was one incident in particular that involved
17    Officer Blecharczyk where she was on the floor
18    outside of my office, my administrative office
19    yelling very loudly so everyone could hear that she
20    was very upset that she was put in Box 1, which
21    means you are the actual arresting officer, of an
22    arrest report for an offender and a CR number had
23    been obtained for that and she wasn't even in the
24    country.  Sergeant Barnes had carried her for the
```

---

**75**

```
 1    day.
 2        Q.   The Roxane Blecharczyk incident that
 3    you just described is what's referenced in
 4    Paragraphs 21 and 22 of your affidavit, correct?
 5        A.   And 23, yes.
 6        Q.   Separate and apart from the Roxane
 7    incident -- I want to go back to Paragraph 19 -- do
 8    you have any other basis aside from the Roxane
 9    incident for that allegation that all members of
10    each team are usually put on the police reports?
11        A.   Yes, it was com- --
12        Q.   What's the basis of that?
13        A.   It was common knowledge and I saw arrest
14    reports that sergeants would sign off on.
15        Q.   So it's your testimony you saw arrest
16    reports with officers' names on them that you knew
17    had not been on the scene?
18        A.   No.  It is my testimony that when a team
19    member would make an arrest all of the whole team's
20    names would go on the arrest report for the
21    majority of arrests.
22        Q.   And you base that on what?
23        A.   Documents that I have seen.
24        Q.   Do you see all arrest reports as a
```

---

**76**

```
 1    function of your job?
 2        A.   I do not.
 3        Q.   Do you have any responsibilities that
 4    involve you seeing arrest reports?
 5        A.   I do not.
 6        Q.   This alleged practice of putting
 7    everyone on the team on a police report, is it your
 8    belief that that was the practice of a particular
 9    sergeant or all sergeants in the Fugitive
10    Apprehension Unit?
11        A.   That was the practice with all sergeants
12    in the unit.
13        Q.   How often would you have an occasion
14    to review an arrest report in the Fugitive
15    Apprehension Unit?
16        A.   Not often, but I would get reports from
17    the officers.  When they would close their cases,
18    they had to provide us with documentation for me to
19    prepare CompStat because when I no longer was in
20    charge of giving out assignments I became the main
21    girl in the office and that's when CompStat came
22    about.  So I would prepare the CompStat book every
23    week for CompStat meetings.  And in order to show
24    your activity and what you're doing the commander
```

---

JANET HANNA                                                    August 12, 2015
SPALDING, et al. vs. CITY OF CHICAGO

<table>
<tr><td>

**77**

1  would have to attend these meetings at 35th and
2  Michigan and the officers would have to give us
3  weekly updates on what they were doing with their
4  cases.  So when I would receive those reports, I
5  would receive the reports and state subject was
6  located, so-and-so, so-and-so, and these are the
7  arresting officers and it would be the whole team.
8       Q.   And do you ever remember seeing any such
9  reports for the team that Spalding and Echeverria
10 were on where everybody else on the team was listed
11 except Spalding and Echeverria?
12      A.   Yes.
13      Q.   How many times do you recall that
14 happening?
15      A.   Many.
16      Q.   Can you recall when any of the many
17 times that happened?  Do you remember years or
18 months?
19      A.   I'd say June, 2012, to March of 2013.
20      Q.   Do you have any specific recollection
21 of how many police reports you saw with everyone on
22 Spalding and Echeverria's team listed on the arrest
23 report other than them?
24      A.   I didn't see the actual arrest report.

</td><td>

**79**

1  lieutenant's attention and said they're just
2  sending in the same thing with no updated
3  information.
4       So we had changed the practice where you
5  had to put updated on and you had to put the date
6  so that we knew that you were actively working
7  those cases.
8       Q.   My question is when you got those
9  reports from the individual police officers, am I
10 correct that the way that you would have determined
11 that all of the other members of the team were
12 listed on an arrest other than Danny and Shannon
13 is you would have to look at each of the officers'
14 reports that they submitted to you and then look to
15 see if Danny or Shannon were on a particular arrest
16 and if the other team members were on a particular
17 arrest, correct?
18      A.   Correct.  But it was also common
19 knowledge that the practice was going on.
20      Q.   Okay.  Is it your testimony that in
21 the course of your duties as you received these
22 reports for CompStat purposes that you would
23 consciously take a look at the arrests on Danny
24 and Shannon's team and you'd tally up whether all

</td></tr>
<tr><td>

**78**

1  I saw the updated document from the officer who had
2  to give me information to put into the CompStat
3  book.  And their file with the information that
4  they had to provide would have in there where the
5  subject was arrested and who were the arresting
6  officers.
7       Q.   And you would get that from each police
8  officer or from their sergeant?
9       A.   Each police officer.
10      Q.   Okay.  So if I'm understanding this
11 correctly, to figure out that everybody on their
12 team other than Danny and Shannon were on an
13 arrest report, you would have to look at each of
14 the individual reports that you got from officers
15 and then you could see that all of the other
16 officers on the team were recorded as being part of
17 this arrest other than Danny and Shannon?  Is that
18 fair to say that's how you would have to do it?
19      A.   Yes.  I had to review every report every
20 week because there was -- when it first started,
21 the officers were tending to send in the same exact
22 report that they had sent in the following week --
23 the prior week and that wasn't sufficient.  And I
24 was catching that and I brought that to the

</td><td>

**80**

1  the officers were on there other than them?  Is
2  that an exercise that you engaged in?
3       A.   The exercise that I engaged in is in
4  my database we had a listing of every assignment
5  that every officer was assigned.  And so we would
6  know -- in the comments we would know -- we would
7  have a CB number.  We could look up the CB number,
8  which is the arrest report, and find out exactly
9  who is on that arrest report.
10      Q.   I understand, but you said you didn't
11 look at arrest reports on a regular basis.  You had
12 no job responsibilities relating to arrest reports.
13 I want to know how you determined on any particular
14 arrest that everybody on Shannon and Danny's team
15 was credited except for them two.  How did you
16 determine that?
17      A.   When you say "everyone," I can't speak
18 for every single person.  I am stating that the
19 majority of Danny and Shannon's team, the majority
20 of the members did not include them on their arrest
21 reports.  And how I became to know that was through
22 their CompStat reports or through looking up in the
23 databases that we had access to the CB numbers,
24 verifying the CB numbers because they had to be

</td></tr>
</table>

JANET HANNA                                     August 12, 2015
SPALDING, et al. vs. CITY OF CHICAGO

81

1    printed out and put into the CompStat book showing
2    that that person was arrested. And in that arrest
3    report, it would have all of the arresting
4    officers' names. That was my duty to include that
5    and staple that with their report into the CompStat
6    book.
7        Q.   And is it your testimony that you --
8    it's just testimony that you began to notice that
9    Danny and Shannon weren't on some arrest reports
10   and the rest of their team members were?
11       A.   No. It was common knowledge and I had
12   heard about it, so then I started looking into it.
13       Q.   I want to hear how you looked into it.
14   I want to hear what pieces of paper you looked at,
15   how frequently you did that.
16       A.   Like I said, if I received a CompStat
17   report from an officer stating that that subject
18   was arrested, that subject was topic of the
19   CompStat meeting for that week. And they submitted
20   their report stating arrested on such-and-such a
21   day. I had to go into the databases and I had to
22   type in that CB number that they had in their
23   report and I had to print out the arrest report.
24   And when I did that, I was able to see all of the

82

1    names of the arresting officers. And it became a
2    pattern of every time -- the majority of times that
3    the team members that Shannon and Danny worked
4    with, they were purposely left off of the reports.
5        Q.   That's what it appeared to you?
6        A.   Absolutely.
7        Q.   And did you notice any other occasions
8    where other members of Danny and Shannon's team
9    were not on an arrest report or were they on every
10   single report, the other members of the team? In
11   other words, that happened with other members, as
12   well, correct, that not every -- not every report
13   would indicate that every member of the team was a
14   participant in the arrest, correct?
15       A.   Very infrequent.
16       Q.   You think it was more frequent with
17   Danny and Shannon and less frequent with others on
18   the team?
19       A.   Yes.
20       Q.   Okay. Did you ever have a conversation
21   with anybody about this more frequent practice that
22   you began to notice?
23       A.   No.
24       Q.   On arrest reports or CompStat reports

83

1    where Danny and Shannon were not listed, do you
2    have any personal knowledge of whether they were
3    involved in the arrest or not?
4        A.   I do not.
5        Q.   With respect to the Roxane Blecharczyk
6    and Felix Batista conversations that you describe
7    in Paragraphs 22 and 23 of your affidavit, where
8    did those conversations take place?
9        A.   They took place at Harrison and Kedzie
10   on the main floor.
11       Q.   Do you recall who besides the two of
12   them and you were present?
13       A.   Sergeant Mills.
14       Q.   Do you recall anybody else that was
15   present?
16       A.   There were many officers from many
17   teams. The afternoon teams had all come in for
18   roll call and they were all at their computers. I
19   can't recall specifically who was there, who may
20   have had the day off. You know, I don't recall
21   specifically.
22       Q.   Okay. And other than what's in the
23   affidavit, do you recall anything else that Roxane
24   Blecharczyk said or that Felix Batista said at that

84

1    time?
2        A.   No.
3        Q.   Other than what's in the affidavit, do
4    you recall anyone else other than Roxane or Felix
5    saying anything at that time?
6        A.   No.
7        Q.   So according to you, they made the
8    statements in Paragraph 22 and 23 and then nobody
9    said anything about that or in response to that,
10   correct?
11       A.   I didn't stay present for the remainder
12   of the conversation. I was walking through.
13       Q.   That's all you heard of the
14   conversation?
15       A.   I heard her speaking very loudly and
16   that's what got me out of my seat because I heard
17   her speak -- start yelling about how in the fuck
18   did I get a CR number and, you know, I'm arresting
19   officer in Box 1. And then I heard Batista come
20   over, tell her what he said, and I proceeded to go
21   up to the commander's office.
22       Q.   Did you tell the commander or have any
23   conversation with anyone about what you had just
24   observed in terms of what Roxane and Felix said?

JANET HANNA
SPALDING, et al. vs. CITY OF CHICAGO

August 12, 2015

---

85

1    A.    No.  And I could probably be certain
2    that the commander was not in his office at that
3    time.
4    Q.    In other words, you didn't take any
5    action in response to what you overheard?
6    A.    No.  Sergeant Mills was standing right
7    there.
8    MR. TAREN:  Alan, is this a good time to take
9    five minutes?
10    MR. KING:  Sure, absolutely.
11    (WHEREUPON, a recess was had from
12    11:29 to 11:45 p.m.)
13    MR. KING:  Back on the record.
14    BY MR. KING:
15    Q.    Ms. Hanna, if I can ask you to take
16    a look at Paragraph 25 of your affidavit.  It
17    refers to a conversation that you had with
18    Lieutenant Cesario.
19    Can you just tell me what you recall
20    about that conversation, what you recall Cesario
21    saying and you saying, if anything?
22    A.    I happened to be in Lieutenant Cesario's
23    office.  Him and I, we had many one-on-one
24    conversations with closed doors because I was his

---

86

1    right-hand girl.  And he received a phone call and
2    did this, like one minute, answered the phone call
3    and spoke with someone on the phone.  And I knew it
4    was Commander O'Grady because when he said hello,
5    obviously Commander O'Grady must have said it was
6    him and he said hello, Commander O'Grady.  And then
7    the conversation proceeded.  I did not hear what
8    the conversation was.
9    He hung up the phone and that's when he
10    had said to me that was Commander O'Grady and he
11    just informed me that Shannon is no longer allowed,
12    like I said, she's no longer permitted, she's
13    banned from Homan Square, and if she goes there,
14    she will be arrested.
15    Q.    You were not able to hear anything that
16    Commander O'Grady said on the phone call, correct?
17    A.    Correct.
18    Q.    And did you hear or pay any attention to
19    anything Lieutenant Cesario said other than hello,
20    Commander O'Grady?
21    A.    No.
22    Q.    So everything you know about that
23    conversation is after Lieutenant Cesario hung
24    up and then he spoke to you about it, correct?

---

87

1    A.    Correct.
2    Q.    And when he told you about Shannon
3    Spalding not being allowed to go back to Homan
4    Square, did you say anything or have any
5    reaction?
6    A.    Okay.
7    Q.    Was anything else said about that
8    subject at that time?
9    A.    No.
10    Q.    Did you ever have a conversation with
11    anyone else about Shannon Spalding being banned
12    from Homan Square?
13    A.    No.
14    Q.    Paragraph 26 of your affidavit
15    talks about a couple of databases, Accurint and
16    LEADS 2000.
17    Let me ask you this:  There's been
18    some -- well, strike that.
19    Do you know if all of the officers in
20    Fugitive Apprehension used Accurint or is it just
21    the task force officers?
22    A.    All of the officers.
23    Q.    Okay.  And there's been some testimony
24    in the case that with respect to Accurint there

---

88

1    essentially was a password that was up on the
2    bulletin board and anybody could get the password
3    and use Accurint.  Would that be correct?  Is that
4    consistent with your recollection?
5    A.    That's consistent, although there were
6    many times when officers would come into our office
7    and tell us that the password no longer worked.
8    Q.    Okay.  Do you know one way or the other
9    whether Spalding or Echeverria ever tried to use
10    the password for Accurint?
11    A.    I'm unaware if they ever did.
12    Q.    So Paragraph 26, why don't you tell me
13    about that conversation or the exchange that you
14    had with Detective Kevin Culhane?
15    A.    Yes.  He came into my office and asked
16    me for a list of officers that were still requiring
17    access to both Accurint and LEADS 2000, at which
18    time I gave him the list.  I provided him the list
19    and had informed him that both Danny and Shannon
20    had put in numerous requests to do this and
21    everyone else that had put in requests after them
22    had already been approved and they still hadn't
23    been approved.  And that is when he told me that
24    he was told directly by the lieutenant not to give

---

JANET HANNA
SPALDING, et al. vs. CITY OF CHICAGO

August 12, 2015

---

89

1    them access.
2        Q.   Was anyone else present for that
3    conversation?
4        A.   Yes.
5        Q.   Who?
6        A.   The office staff.
7        Q.   Are you aware of anyone else overhearing
8    Detective Culhane say to you that he had been
9    specifically instructed by the lieutenant not to
10   give them access?
11       MR. TAREN:  Objection.
12   BY MR. KING:
13       Q.   Are you aware of anyone else hearing
14   that?
15       A.   The office staff.
16       Q.   You think they may or may not have heard
17   it, correct?
18       A.   They absolutely heard it.
19       Q.   Who specifically do you remember being
20   present that absolutely heard it?
21       A.   I don't remember specifically.
22       Q.   Do you remember any person that was
23   present that you believe absolutely heard it?
24       A.   I do not.

---

90

1        Q.   And do you have any idea of a date,
2    year, or month when this conversation with
3    Detective Culhane allegedly took place?
4        A.   I do not.
5        Q.   And it indicates in Paragraph 26 that
6    you provided him a list of officers that still
7    needed access to the databases, correct?
8        A.   I'm sorry.  Could you rephrase that?
9        Q.   It indicates in Paragraph 26 of your
10   affidavit that you provided him with a list of
11   officers that needed or had requested access to
12   the databases, correct?
13       A.   Correct.
14       Q.   And am I correct that Spalding and
15   Echeverria were not the only officers on that list,
16   correct?
17       A.   Correct.
18       Q.   Do you recall how many other officers
19   were on that list?
20       A.   I don't recall exactly how many.
21       Q.   Do you recall approximately how many?
22       A.   Approximately six to eight other
23   officers.
24       Q.   Do you have any recollection of who

---

91

1    any of those six to eight other officers were?
2        A.   No, I do not.
3        Q.   Do you have any recollection of whether
4    those six to eight other officers came to the unit
5    before Spalding and Echeverria or after Spalding
6    and Echeverria?
7        A.   What I recall is that the list that
8    I provided to him was a total of six to eight
9    officers, not six to eight additional officers.
10       Q.   Okay.
11       A.   And on that list, they were requests
12   from officers who had put in their first request
13   and on that request included Danny and Shannon
14   who had requested numerous times already.
15       Q.   Okay.
16       A.   But the other officers, it was their
17   first time requesting.
18       Q.   Do you have a recollection of -- strike
19   that.
20            The other officers that were on the
21   list have been in the Fugitive Apprehension Unit
22   longer than Danny and Shannon, correct?
23       A.   I can't be certain of that.
24       Q.   Who do you recall coming to the unit

---

92

1    after Danny and Shannon?
2        A.   There were many officers, Tamika Rainey,
3    Jason Landrum.
4        Q.   Do you have any specific recollection of
5    whether the other officers on that list were in the
6    unit before or after Spalding and Echeverria?
7        A.   No, I do not.
8        Q.   So was this a list that you already
9    had?  He walks in and asks you about a list and you
10   go, here it is, here's the list of the people, or
11   did you have to create this list?
12       A.   I had to create the list.
13       Q.   Okay.  Did you do that right in front
14   of Kevin Culhane while he was standing there or
15   did you do this and then get it to him later?
16       A.   No, it was already created.
17       Q.   Well, that was my question.  When he
18   asked you for it, did the list already exist?
19       A.   Yes.
20       Q.   You said, Kevin Culhane, got your list
21   right here?  You had it already ready, is that your
22   testimony?
23       A.   Yes.
24       Q.   Are you aware that to get a password and

---

JANET HANNA
SPALDING, et al. vs. CITY OF CHICAGO

August 12, 2015

---

93

1  authorization to use LEADS 2000 that officers have
2  to go through a fingerprinting process?
3      A.   I am not.
4      Q.   I assume you have no knowledge as to
5  when, if at all, Officer Spalding or Echeverria
6  went through the fingerprinting process to be
7  authorized to use LEADS 2000, correct?
8      A.   Correct.
9      Q.   When Detective Culhane allegedly told
10  you that he was specifically instructed not to give
11  them access to the databases, did you discuss that
12  with anyone?
13      A.   No.
14      Q.   Paragraph 27 says on November 1st, 2012,
15  Lieutenant Cesario walked into the office and said
16  Shannon and Danny filed a lawsuit and they'll be on
17  the news tonight.  Make sure you watch it.
18          Do you remember Cesario saying anything
19  else about that subject at that time?
20      A.   No.
21      Q.   Do you remember anybody else saying
22  anything about the lawsuit or the fact that they
23  were going to be on television at that time?
24      A.   At that time, no.

---

94

1      Q.   Do you recall who else, if anyone, was
2  present when Lieutenant Cesario made that
3  statement?
4      A.   I know myself was present, Whitney
5  Garbarz was present, and Nancy Grand was present.
6      Q.   And did you or the other two individuals
7  that you recall being present say anything about
8  the fact that the lawsuit was filed or that they
9  were going to be on television?
10      A.   No.
11      Q.   Paragraph 28 says the following day
12  everyone was talking about the lawsuit.  At one
13  point, Officer Dugan said to me, quote, "Oh, we are
14  going to get in trouble."
15          Do you remember Officer Dugan saying
16  anything else that day in reference to the lawsuit
17  other than what you have in Paragraph 28?
18      A.   Not verbatim.
19      Q.   Do you have any general recollection
20  of her saying anything else in reference to the
21  lawsuit?
22      A.   Everyone was speaking about the lawsuit.
23  It was -- and I recollect conversations being had
24  about this is a bunch of a bullshit, you know.

---

95

1      Q.   Who do you recall indicating that this
2  was a bunch of a bullshit?
3      A.   No one in particular.
4      Q.   Someone did.  Was it more than one
5  person or --
6      A.   Absolutely.
7      Q.   You don't remember anybody in particular
8  saying this is a bunch a bullshit --
9      A.   No.
10      Q.   -- or words to that effect?
11      A.   No.
12      Q.   Other than Officer Dugan saying, oh, we
13  are going to get in trouble and some unidentified
14  people saying this is a bunch of bullshit, do you
15  remember anything else that anybody said on that
16  next day after they went on television about the
17  lawsuit?
18      A.   There were various comments made by
19  various individuals throughout the entire unit, in
20  financial crimes.  I mean, it was the talk of the
21  entire floor the entire day.
22      Q.   I would imagine it would be and I'd like
23  to know every conversation that you can recall that
24  was the talk of the floor that day.

---

96

1      A.   I can't recall specifics.
2      Q.   Do you recall Lieutenant Cesario saying
3  anything that day about the lawsuit?
4      A.   No.
5      Q.   Do you recall Sergeant Barnes or
6  Sergeant Mills saying anything that day about the
7  lawsuit?
8      A.   No.
9      Q.   Paragraph 29 of your affidavit refers
10  to your responsibilities with respect to VRI.
11  That's what you've already testified to, correct?
12      A.   Yes.
13      Q.   And then Paragraph 30 indicates that
14  one day Cesario told you that if you received a
15  VRI from Shannon or Danny to toss it out, pretend
16  like you never received it.  That's what you've
17  already testified to, correct?
18      A.   Yes.
19      Q.   Paragraph 30 goes on to say that you
20  followed his orders on at least two occasions and
21  pretended to never receive Shannon or Danny's
22  request for overtime.
23          So would it be correct that that may
24  have happened only two times?

---

JANET HANNA                                          August 12, 2015
SPALDING, et al. vs. CITY OF CHICAGO

---

97

1    MR. TAREN:  Objection.
2    BY THE WITNESS:
3    A.   To the best of my recollection, it was
4    two times for certain.
5    BY MR. KING:
6    Q.   Okay.  Paragraph 31 talks about an
7    argument you had with Lieutenant Cesario over
8    this practice.
9        Where did that conversation take place?
10   A.   In Lieutenant Cesario's office.
11   Q.   Was the door closed?
12   A.   Yes.
13   Q.   Anyone else present?
14   A.   Just him and I.
15   Q.   And what do you remember saying to
16   him and what do you remember him saying to you?
17   A.   I don't feel comfortable doing this
18   practice.  It's unethical.  It's against general
19   orders.  And I don't want to be in the middle of
20   all of this that's going on.  And that was after
21   they appeared on TV with the lawsuit.  And I told
22   him that I wanted to change the way that the forms
23   were submitted and to have them sent via email to
24   me so that I would have a record of dates and

---

99

1    following a practice of disregarding and pretending
2    you did not receive Spalding's or Echeverria's
3    request for VRI?
4    A.   Yes.
5    Q.   Okay.  Paragraph 32 refers to another
6    conversation between you and Cesario.
7        Do you recall when that conversation
8    took place?
9    A.   I do not.
10   Q.   Do you know if it was after the
11   November, 2012 conversation you reference in
12   Paragraph 31?
13   A.   I do not.
14   Q.   Anyone else present for that
15   conversation?
16   A.   The office staff was present.
17   Q.   Okay.  Do you have a specific
18   recollection of anybody else being present?
19   A.   No.
20   Q.   So what did he say to you at that time?
21   A.   He was taking away all of Danny's
22   assignments and having them reassigned, to reassign
23   them to other officers.
24   Q.   Okay.  Do you know if Shannon Spalding

---

98

1    times.
2    Q.   Okay.  Did he say anything?
3    A.   I'm sure he did.
4    Q.   Do you have a recollection of what he
5    said?
6    A.   He obviously agreed to the process
7    because it went into place.
8    Q.   He agreed with your recommendation to
9    change the process, correct?
10   A.   Yes.
11   Q.   Do you remember him saying anything in
12   that meeting other than agreeing with you on the
13   change in process?
14   A.   No.
15   Q.   Do you have any -- you said this was
16   after the lawsuit was filed, that conversation?
17   A.   Yes.
18   Q.   Do you have any idea of how long after
19   or the date of that conversation that's referenced
20   in Paragraph 31?
21   A.   To the best of my recollection, it was
22   in November of 2012.
23   Q.   And is it your testimony that up until
24   that conversation in November of 2012 you were

---

100

1    was still actively at work at that time or was she
2    on leave and only Danny was working?
3    A.   I don't recall.
4    Q.   But he asked for a printout of Danny's
5    cases, not Danny's and Shannon's cases, correct?
6    A.   To the best of my knowledge, it was
7    Danny's.
8    Q.   I assume you have no personal knowledge
9    as to why Lieutenant Cesario asked for a printout
10   of those cases?
11   A.   I believe it had something to do with
12   the Third District initiative and the Seventh
13   District initiative because we had initiatives
14   going on where only -- officers were assigned to
15   the Third District initiative and so they would
16   work only on Third District cases and then officers
17   that were assigned to the Seventh District were
18   only given Seventh District cases.  And I believe
19   at that time the reason for that may have been
20   because he had switched from one initiative to
21   another or he wasn't on one of the initiatives.
22   That's to the best of my knowledge.
23   Q.   Was that based on anything Cesario said
24   or you kind of putting two and two together knowing

---

JANET HANNA                                      August 12, 2015
SPALDING, et al. vs. CITY OF CHICAGO

---

101

1    what was going on at the time?
2        A.   Yes, that's just me putting two and two
3    together.
4        Q.   Okay.  Paragraph 33 talks about another
5    conversation with Cesario.  It indicates that it
6    was a couple of months after the conversation in
7    Paragraph 32, is that correct?
8        A.   Yes.
9        Q.   Do you recall approximately when the
10   conversation took place, if you know what month and
11   year the conversation in Paragraph 33 took place?
12       A.   I do not.
13       Q.   It indicates that you and
14   Officer Sultana were present, is that correct?
15       A.   Yes.
16       Q.   Was anyone else present?
17       A.   I don't recall.
18       Q.   And what do you recall
19   Lieutenant Cesario saying at that time?
20       A.   He admonished Officer Sultana and
21   asked her who told you to reassign Danny's cases.
22       Q.   Okay.  And then did Officer Sultana or
23   you say anything in response?
24       A.   I don't believe I was in charge of

---

102

1    that database at that time.  I think I was in
2    charge of CompStat at that time.  So he was
3    directing it to Officer Sultana because she was in
4    north now.  So they were under Sergeant Mills'
5    team, which was the north team.  And he was
6    admonishing Aisha as to why his assignments had
7    been reassigned because he wasn't working his
8    assignments.
9        Q.   And when he did that, did you have
10   an understanding that he was referring to the
11   reassignment that he had inquired into you
12   about months before that or did you know what
13   reassignment he was talking about?
14       A.   Yes.  I assumed that's what he was
15   referring to.
16       Q.   You assumed that, correct?  He didn't
17   say that, correct?
18       A.   I said it to him.  I responded and told
19   him, informed him that he directed me to take his
20   assignments away and reassign them.
21       Q.   And when you said that, did Lieutenant
22   Cesario say anything?
23       A.   No.
24       Q.   Other than what you said and you

---

103

1    thought, you don't have any knowledge that what he
2    was referring to was the circumstance where he had
3    allegedly told you to take his assignments away
4    that was months prior to this, correct?
5        A.   I'm sorry.  Can you say that again?
6        Q.   You assumed that he was referring to
7    the prior situation months prior to that where he
8    had asked for the list of Danny's assignments?  You
9    assumed that?  He didn't tell you that's what
10   he was talking about?
11       A.   No.  Yes, I assumed that's what he
12   was referring to.  And then I spoke up on Aisha's
13   behalf because she's a very quiet person.  I spoke
14   on her behalf and said you were the one who
15   directed me to reassign Danny's cases.
16       Q.   Okay.  So is it your testimony that
17   when months prior to this he directed you to take
18   Danny's cases away and reassign them was Danny
19   not getting any cases?
20       A.   I wouldn't say that.
21       Q.   So did you take any action to reassign
22   his cases when Lieutenant Cesario asked you for
23   that list?
24       A.   Yes, his cases were reassigned.

---

104

1        Q.   But he continued to get a whole new
2    batch of cases, correct?
3        A.   Out of all of the officers that worked
4    in Fugitive Apprehension, Danny and Shannon got the
5    least amount of cases.
6        Q.   I guess my question is why would
7    Lieutenant Cesario wake up months later and be
8    upset about something that he asked to be done
9    months prior?  Do you have any idea why that
10   would be?
11       MR. TAREN:  Objection.
12   BY THE WITNESS:
13       A.   I can't be for certain that it was
14   months later.  I told you I wasn't aware -- I mean,
15   I'm not for certain if it was months later, but it
16   was definitely some time that had gone by.
17   BY MR. KING:
18       Q.   So Paragraph 33 says a couple months
19   later.  You're not sure if it was a couple months
20   later, is that your testimony?
21       A.   No, I'm sure it was a couple of months,
22   but a couple, two, three, four.
23       Q.   Paragraph 34 relates a conversation that
24   you had with Shannon and Danny about working VRI

---

JANET HANNA                                                    August 12, 2015
SPALDING, et al. vs. CITY OF CHICAGO

105

1    under Sergeant Mills.
2         What do you recall -- where did that
3    conversation take place?
4         A.   The conversation took place at Harrison
5    and Kedzie.
6         Q.   And was anyone else present other than
7    the three of you?
8         A.   No.
9         Q.   And what did each of the participants
10   say in that conversation as best you can recall?
11        A.   I recall Shannon telling me that they
12   were admonished for working their regular cases
13   while they were working the VRI initiative on the
14   weekend, at which time I had said to them that I
15   found that very odd because everyone else in the
16   entire unit worked their regular cases during VRI.
17        Q.   Okay.  Do you recall you or Shannon or
18   Danny saying anything else in that conversation?
19        A.   No.
20        Q.   What's the basis for your belief that
21   everyone else in the unit worked on their regular
22   cases during VRI?
23        A.   Because I would get the closeout forms
24   for CompStat.  And when I would receive the

106

1    reports, it would have dates and times and it would
2    also have -- I got an activity log from the
3    sergeants for the weekend of what arrests were made
4    and who they were.  And then when I went into the
5    database, I was able to see if, in fact, those
6    people that had been arrested or, you know, that
7    they -- well, actually arrested, if they were
8    regular cases that had been assigned or if
9    they were actually cases that were assigned
10   specifically only for VRI.
11        Q.   And was it part of your job to notice
12   that or make an assessment of whether they were
13   regular arrests or VRI arrests?
14        A.   It was my job to enter it into the
15   database.
16        Q.   I understand that.
17        A.   So I would notice immediately because
18   if I saw the name listed on the activity log for
19   VRI and I compared it to the VRI list and that
20   name was not on there, then I would have to go to
21   the database and find that name.  Then I knew that
22   that was one of their regular cases that they had
23   been assigned that they had worked on while they
24   were working VRI.

107

1         Q.   Okay.  And it's your testimony that
2    every other officer in the department other
3    than Spalding and Echeverria made regular arrests
4    outside of the VRI area while they were working on
5    VRI?
6         MR. TAREN:  Objection; mischaracterizes her
7    testimony.
8    BY MR. KING:
9         Q.   Is that your testimony?
10        A.   No, that is not my testimony.  You just
11   stated that every other officer in the department.
12        Q.   Yes.  You're not saying that?
13        A.   I'm not saying that because every other
14   officer in the department doesn't work VRI.
15        Q.   I mean, is it your testimony that
16   every other officer in the Fugitive Apprehension
17   Unit when you were there and Danny and Shannon
18   were there when they worked VRI they made arrests
19   outside of the VRI area, also known as I guess
20   regular arrests?  Is it your testimony that every
21   other officer other than the two of them did that?
22        A.   No, it is not my testimony that every
23   other officer did.
24        Q.   Sometimes that happened, correct?

108

1         A.   Frequently that happened.
2         Q.   Do you have a specific recollection
3    of -- strike that.
4         Do you have a recollection of whether
5    any officers that were on the same team as Spalding
6    and Echeverria did that, made arrests outside of
7    the VRI area?
8         A.   Yes.
9         Q.   What officers are you specifically aware
10   of from their team that did that?
11        A.   I do not recall.
12        Q.   Would it be fair to say that if officers
13   were reprimanded by their sergeant you wouldn't
14   necessarily have knowledge of that, correct?
15        A.   I wouldn't have knowledge of it, but the
16   practice wouldn't have continued.
17        Q.   Paragraph 35 of your affidavit again
18   talks about another conversation with you and
19   Lieutenant Cesario.
20        Where did this conversation take place?
21        A.   In our administrative office.
22        Q.   And was anyone else present for this
23   conversation?
24        A.   To the best of my knowledge I'm sure

JANET HANNA
SPALDING, et al. vs. CITY OF CHICAGO

August 12, 2015

---

109

1    there was, but I do not recall.
2         Q.   It indicates here that Cesario came
3    into the office screaming how the fuck did these
4    two motherfuckers get back on days?  Who the fuck
5    do they know?  They're messing with the wrong
6    people.
7              Is that what you recall Lieutenant
8    Cesario saying?
9         A.   Yes.
10        Q.   Do you recall him saying anything else
11   at that time?
12        A.   No.
13        Q.   Do you recall you or anyone else
14   saying anything or responding at that time?
15        A.   No.
16        Q.   If you look at the top of Page 6 of your
17   affidavit, it appears that there's either some text
18   missing, there's a partial sentence at the top of
19   Paragraph -- rather, the top of Page 6.  Do you
20   have any knowledge as to what that's about, why
21   this does not seem to be consistently flowing from
22   Page 5 to Page 6?
23        A.   I do not.
24        Q.   There's a Paragraph 35 of the affidavit

---

110

1    and a Paragraph 37 of the affidavit.
2              Do you recall at the time you signed it
3    there being a Paragraph 36 of the affidavit?
4         A.   Yes.
5         Q.   And did that Paragraph 36 include the
6    language at the top of Page 6, quote, "Headquarters
7    at 35th Street and Michigan Avenue to give a
8    statement about a CR file with me as a witness"?
9         A.   Yes.
10        Q.   Do you have a copy of your affidavit
11   that includes Paragraph 36?
12        A.   I do not.
13        Q.   Do you have any knowledge as to why the
14   plaintiffs' counsel produced an affidavit in this
15   case that does not have the complete Paragraph 36?
16        A.   I do not.
17        Q.   What's your recollection of what
18   Paragraph 36 stated?
19        A.   While I was on medical leave in
20   April of 2013, I was called by Sergeant Muscolino
21   from IAD informing me that I was named as a witness
22   on a CR number, that I needed to come down to 35th
23   and Michigan to give a formal statement, at which
24   time I told him I was unable to do so because I had

---

111

1    just had a surgical procedure on April 1st.
2              He said, okay, maybe we can do this over
3    the phone.  It seems to be pretty simple.  He
4    informed me of what the CR number was pertaining
5    to.
6              And I told him that never happened.  I
7    don't know what you're talking about.
8         Q.   That's fine.  My question was only what
9    was in Paragraph 36.  I don't know if all that
10   detail was in Paragraph 36.  Is that what you're
11   suggesting?
12        A.   Yes, I am.
13        Q.   And when you met with him and gave a
14   statement, you said you indicated that's
15   not what happened.
16             What did he say in terms of what the
17   allegation was or what do you recall him asking
18   you?  What was the incident he asked you about?
19        A.   I recall him asking me -- along with
20   another officer who he stated he was training,
21   placing me into a locked room and being there for
22   approximately three hours and then repeatedly
23   asking me if I had overheard a conversation on
24   Shannon's phone in the hallway with me and

---

112

1    Shannon present with a recording of
2    Sergeant Mills.
3         Q.   Okay.  And what did you say in response
4    to that?
5         A.   No, it never occurred.
6         Q.   And did they ask you anything else?
7         A.   They repeatedly asked me.  They asked
8    me different ways.  They kept on repeating and
9    repeating, would you know Sergeant Mills' voice if
10   she were to play that?
11             And I said, yes, of course, I would know
12   Sergeant Mills' voice because he worked in Area 5
13   Detective Division.  I've spoke with him on the
14   phone many times.
15        Q.   Sure.  Sure.
16        A.   Questions like that.  And they just kept
17   on questioning me and questioning me and wanting me
18   to go along with the CR number.
19        Q.   Where did the interview take place?
20        A.   At 35th and Michigan at IAD.
21        Q.   And it's your recollection that the room
22   was locked and you were in there for three hours?
23        A.   Approximately.
24        Q.   Did they ever tell you that you were not

---

ESQUIRE SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

JANET HANNA
SPALDING, et al. vs. CITY OF CHICAGO

August 12, 2015

---

113

1  free to leave?
2      A.   No.
3      Q.   You didn't think you were under
4  arrest --
5      A.   No.
6      Q.   -- correct?
7           You have an understanding that
8  Coleen Dugan reported something that led to
9  that CR then your interview, correct?
10     MR. TAREN:  Objection to the word "reported."
11 BY MR. KING:
12     Q.   Is that your understanding, that that
13 CR initiated from Coleen Dugan believing she
14 overheard some recording of Mills' voice?  You
15 understand that, correct?
16     MR. TAREN:  Objection; assumes matters not in
17 evidence.
18 BY THE WITNESS:
19     A.   I don't know who reported it.  All I
20 know is that her name was listed and my name was
21 listed.
22 BY MR. KING:
23     Q.   Okay.  If Coleen Dugan reported -- well,
24 let's not use the word "reported."

---

114

1           If Coleen Dugan said she overheard what
2  she thought was a recording of Mills' voice when
3  you and Shannon were together, do you even
4  remember that incident where Coleen asked you
5  about that?
6      MR. TAREN:  Objection.  There's been no
7  testimony about Coleen asking her anything.
8  BY THE WITNESS:
9      A.   No.
10 BY MR. KING:
11     Q.   No.  Okay.  So you're not only saying
12 there was no recording of Mills' voice; you're
13 saying the entire incident as it was explained
14 to you in the CR proceeding never occurred nor
15 anything like it?  Is that your testimony?
16     A.   Yes, it is.
17     Q.   I'm going to ask you a couple more
18 questions about that incident.
19     MR. KING:  If you'd like -- Counsel, I'm going
20 to use part of Coleen Dugan's deposition testimony
21 to ask the questions.
22     MR. TAREN:  Counsel, you can use whatever you
23 want to ask them.  But in terms of showing the
24 deposition that Ms. Hanna testified earlier she

---

115

1  didn't even know took place, that's inappropriate.
2      MR. KING:  Well, it's not inappropriate.  I'm
3  not going to ask her if she knows about this
4  testimony.
5      MR. TAREN:  Okay.  Well --
6  BY MR. KING:
7      Q.   But I'm going to tell you what Coleen
8  Dugan testified about that incident under oath.
9      MR. TAREN:  I'm going to object to that.
10 BY MR. KING:
11     Q.   At Page 94, beginning at Line 23, Coleen
12 Dugan testified:
13           "Jan was facing forward and had her
14 phone like this.  So as I was coming up the stairs,
15 Shannon had something in her hand, but I heard
16 Sergeant Mills' voice.  And I thought, why is
17 Sergeant Mills here in the morning?  It was loud
18 and it was boisterous, and I am thinking that was
19 Sergeant Mills as I am walking up the stairs here.
20 So when I got to the top of the stairs, I kind of
21 looked at Shannon and Jan, and I was like, where is
22 Sergeant Mills?  Because it was loud.  So I walked
23 over to my office, and I don't remember the details
24 of what I heard at this moment.  And I was kind of

---

116

1  confused, in my own mind, did he leave her a
2  message like that?  Did she record him?"
3           Is it your testimony that no incident in
4  connection like that happened?
5      MR. TAREN:  Objection.  Counsel, I have to
6  strenuously object.
7      MR. KING:  It's a perfectly appropriate
8  question.
9      MR. TAREN:  No, it's not because you're asking
10 her about Coleen Dugan's observations that don't
11 have anything to do with her.
12     MR. KING:  Well, they have a lot to do with
13 her.  And my question is --
14     MR. TAREN:  Excuse me, Counsel.  You want to
15 ask her what she observed at that time, whether she
16 observed Coleen Dugan, I don't have any problem
17 with that.  But the testimony that you quoted does
18 not lend itself to any answer.
19     MR. KING:  Are you done?
20     MR. TAREN:  Yeah.
21 BY MR. KING:
22     Q.   Is it your testimony that no incident
23 along the lines of what Coleen Dugan just described
24 as I read to you from her transcript -- is it your

---

JANET HANNA
SPALDING, et al. vs. CITY OF CHICAGO

August 12, 2015

---

**117**

1  testimony that no such incident occurred?
2  MR. TAREN: I'll repeat my objection.
3  BY THE WITNESS:
4  A.  That is my testimony.
5  BY MR. KING:
6  Q.  She goes on to say at Page 95, beginning
7  at Line 16:
8  "And then Jan came into my office and
9  sat there.  And I said, was Shannon recording
10  Sergeant Mills?  I go, what was that?  She goes, I
11  didn't hear it.  And then she proceeded to repeat
12  whatever it was I heard.  So I said, okay, and
13  asked me if that's basically what I heard, and I
14  said yeah.  But you didn't hear it from what's in
15  her hand?"
16  Is it your testimony that there was no
17  conversation between you and Coleen Dugan along
18  the lines of what I just read to you?
19  A.  No testimony, nothing.
20  Q.  That's false testimony?
21  A.  Absolutely.  There was no conversation.
22  Q.  Okay.  When Spalding and Echeverria
23  joined the Fugitive Apprehension Unit,
24  Sergeant Barnes' team lost two officers and then

---

**118**

1  gained Spalding and Echeverria.  Are you aware of
2  that?
3  A.  I don't recall that.
4  Q.  Do you remember two officers in the unit
5  named Kim and Kyle?
6  A.  Yes.
7  Q.  Does that refresh your recollection
8  that Kim and Kyle left the unit and Spalding and
9  Echeverria joined the unit?
10  A.  I recall Kim and Kyle leaving the unit,
11  but I don't recall what team Kim and Kyle were on.
12  Q.  And do you have a recollection that
13  Kim and Kyle left the unit because they wanted
14  to go back on third watch in 25, Area 25?
15  A.  Yes.
16  Q.  Do you have a recollection before
17  Spalding and Echeverria arrived for their first
18  day in the unit of you telling Coleen Dugan that
19  you understood they were coming from medical
20  integrity IAD?
21  A.  No.
22  Q.  Have you spoken to Coleen Dugan at all
23  since you went on television with the plaintiffs
24  in this case?

---

**119**

1  A.  No, I have not.
2  Q.  Has she made any efforts to contact you
3  or speak with you to your knowledge?
4  A.  I would be unaware of that because I
5  have her blocked on my phone.
6  Q.  Why do you have her blocked on your
7  phone?
8  A.  I don't care to speak with her.
9  Q.  Why do you not care to speak with
10  Coleen Dugan?
11  A.  Because she put me on a false CR number
12  and made allegations that were untrue, which I find
13  very unethical and immoral.
14  Q.  That's the CR number we've been talking
15  about?
16  A.  Yes.
17  Q.  Were you charged with any wrongdoing in
18  the CR to your knowledge?
19  A.  No, not to my knowledge.
20  MR. KING:  Here's 2 and 3.
21  (WHEREUPON, certain documents were
22  marked Hanna Deposition Exhibit
23  Nos. 2 and 3, for identification,
24  as of 08-12-2015.)

---

**120**

1  BY MR. KING:
2  Q.  Ms. Hanna, I'm showing you two documents
3  that have been marked Hanna Deposition Exhibits 2
4  and 3.
5  Do you recognize these documents or this
6  form?
7  A.  I do.
8  Q.  And you understand these exhibits to be
9  Shannon Spalding and Danny Echeverria requesting to
10  work VRI overtime on 29 July, 2012, correct?
11  A.  I assume, yes.
12  Q.  And July 29, 2012, would have been
13  before the practice was changed that they had
14  to request it via email, correct?
15  A.  Correct.
16  Q.  Do you have any knowledge as to whether
17  Spalding or Echeverria were approved to work
18  overtime on July 29, 2012?
19  A.  I do not.
20  MR. KING:  This is going to be 4.
21  (WHEREUPON, certain documents were
22  marked Hanna Deposition Exhibit
23  Nos. 4 through 7, for
24  identification, as of 08-12-2015.)

---

JANET HANNA
SPALDING, et al. vs. CITY OF CHICAGO

August 12, 2015

121

1    BY MR. KING:
2        Q.    Well, if I haven't totally confused
3    myself, I've shown you documents that have been
4    marked Deposition Exhibits 4, 5, 6, and 7. Let's
5    start with Exhibit 4.
6            I just want to ask you is Exhibit 4 --
7    you see the email at the bottom of the first page
8    of Exhibit 4 is from Robert Cesario and you're
9    copied on it, correct?
10       A.    Correct.
11       Q.    And this is an email with
12   Lieutenant Cesario saying -- communicating the VRI
13   schedule for July 28th and 29th, correct?
14       A.    This says the 28th.
15       Q.    Okay. If you look at the attachments,
16   it has July 28th and 29th, correct?
17       A.    Correct.
18       Q.    And this document indicates that
19   Echeverria and Spalding were on the list for
20   VRI for July 29th, correct?
21       A.    This document indicates that, yes.
22       Q.    And I believe you just told me in
23   reference to Deposition Exhibits 2 and 3 that
24   you have no knowledge as to whether, in fact, they

122

1    did work the overtime on July 29th, correct?
2        A.    Correct.
3        Q.    If you look at Exhibit 5, which is
4    another VRI email from Cesario that you're
5    copied on, this document is the VRI schedule for
6    August 4th and 5th, correct?
7        A.    Correct.
8        Q.    And the document indicates that for
9    August 5th, Echeverria and Spalding are on the list
10   to work overtime, correct?
11       A.    On this document, yes.
12       Q.    And do you have any knowledge as to
13   whether or not Spalding and Echeverria worked
14   overtime on August 5th?
15       A.    I do not.
16       Q.    And Exhibit 6 similarly is an email
17   from Cesario conveying the VRI schedule for
18   August 11th and 12th and it indicates that Spalding
19   and Echeverria were scheduled to work overtime on
20   August 12, 2012, correct?
21       A.    On this document, yes.
22       Q.    And do you have any knowledge as to
23   whether they, in fact, worked overtime on August
24   12th, 2012, meaning Spalding and Echeverria?

123

1        A.    I do not.
2        Q.    Exhibit 7 is another email from Cesario
3    on which you're copied. It's the VRI schedule for
4    August 25th and 26th and it indicates that Spalding
5    and Echeverria are scheduled to work overtime on
6    August 26th, correct?
7        A.    On this document, yes.
8        Q.    Do you have any knowledge as to whether
9    or not they, in fact, worked overtime on
10   August 26th, 2012?
11       A.    I do not.
12   MR. KING:    This is 8.
13           (WHEREUPON, a certain document was
14           marked Hanna Deposition Exhibit
15           No. 8, for identification, as of
16           08-12-2015.)
17   BY MR. KING:
18       Q.    Showing you another email, this is from
19   Shannon Spalding to you, at least the lower email
20   on the page that's been marked Deposition Exhibit
21   No. 8.
22           Do you have any recollection of this
23   email?
24       A.    I do not.

124

1        Q.    Would you agree that this is an email
2    where Shannon Spalding is letting you know that
3    she's not going to be able to work VRI on
4    November 11th, 2012, correct?
5        A.    It appears that way, but I find it very
6    suspicious that VRI and it's VRP, because she's
7    very particular about her writing.
8        Q.    Okay. Is it your suggestion that she
9    did not send this email?
10       A.    No, it is not my suggestion.
11       Q.    Shannon Spalding can make typos, too,
12   correct?
13       A.    I'm sure.
14       Q.    Does this refresh your recollection as
15   to whether there were ever any instances where
16   Shannon Spalding had asked to work overtime on a
17   particular date and then informed you that she
18   wasn't available to work overtime?
19       A.    No.
20       Q.    But you don't doubt that that may have
21   happened on November 11, 2012, correct?
22       A.    I don't doubt. I don't recall.
23
24

JANET HANNA                                              August 12, 2015
SPALDING, et al. vs. CITY OF CHICAGO

---

125

1          (WHEREUPON, a certain document was
2          marked Hanna Deposition Exhibit
3          No. 9, for identification, as of
4          08-12-2015.)
5    BY MR. KING:
6          Q.   Ms. Hanna, I'm showing you another
7    document that's been marked Deposition Exhibit
8    No. 9, which are some email exchanges between you
9    and Lieutenant Cesario.  I would just ask you to
10   take a look at that and let me know if you recall
11   this exchange.
12         A.   If you're asking me to recall something
13   from March of 2002 --
14         MR. TAREN:  '12.
15   BY THE WITNESS:
16         A.   -- or 2012 and that's over three years
17   ago, it's kind of impractical.
18   BY MR. KING:
19         Q.   You might remember.  You might not.  I'm
20   not suggesting you have to remember.  I'm just
21   asking if you do remember.
22         MR. TAREN:  Is there a question pending?
23         MR. KING:  If she recalls this email exchange.
24

---

126

1    BY THE WITNESS:
2          A.   I don't recall.
3    BY MR. KING:
4          Q.   Okay.  And in the top email, you write,
5    "Perhaps.  Talk to you when you get in."
6          I assume if you don't recall this email,
7    you don't recall any conversation with Cesario
8    about this when he got in?
9          A.   Correct.
10         Q.   And although you don't recall it, you
11   don't have any reason to believe this is not an
12   authentic email exchange between you and
13   Lieutenant Cesario in Exhibit 9, correct?
14         A.   I don't have any belief to think it's
15   not authentic.
16         MR. KING:  10 and 11.
17         (WHEREUPON, certain documents were
18         marked Hanna Deposition Exhibit
19         Nos. 10 and 11, for identification,
20         as of 08-12-2015.)
21   BY MR. KING:
22         Q.   Ms. Hanna, if you can take a look at
23   what's been marked as Deposition Exhibit No. 10,
24   which are some email exchanges between you and

---

127

1    Lieutenant Cesario.  I'm just going to ask if
2    you happen to recall these exchanges?
3          A.   I don't recall.
4          Q.   You don't have any reason to doubt that
5    this is an authentic email exchange between you
6    and Lieutenant Cesario, correct?
7          A.   No, I have no doubt.
8          Q.   Let's look at Exhibit 11, which are a
9    couple of emails that you are also a party to.
10         Do you have any recollection of
11   Deposition Exhibit No. 11?
12         A.   No, I do not.
13         Q.   Okay.  In the top email, you say,
14   "Daniel disregard this IA, please."
15         I assume if you don't recall the email,
16   you don't recall why you told him to disregard it?
17         A.   Correct.
18         MR. KING:  12.
19         (WHEREUPON, a certain document was
20         marked Hanna Deposition Exhibit
21         No. 12, for identification, as of
22         08-12-2015.)
23   BY MR. KING:
24         Q.   Ms. Hanna, I'm showing you another

---

128

1    group of emails that's marked Deposition Exhibit
2    No. 12.  And I will note that you don't seem to be
3    a participant in these emails, but there is a
4    reference to you in an email from Cesario to
5    Thomas Mills toward the middle of the page.  It
6    says, "Tom, did you assign this to Spalding?  We
7    are aware of the warrant, the circumstances of why
8    a warrant was issued, and did not assign it for
9    follow up.  Jan Hanna put a line through the name
10   on the list that she distributed."
11         Do you have any recollection of the
12   circumstances that this email might be referring to
13   of you putting a line through a name?
14         A.   No.
15         (WHEREUPON, a certain document was
16         marked Hanna Deposition Exhibit
17         No. 13, for identification, as of
18         08-12-2015.)
19   BY MR. KING:
20         Q.   Ms. Hanna, I'm showing you another group
21   of emails that's on Deposition Exhibit No. 12 that
22   you are a party to.
23         Do you have any recollection of these
24   emails?

---

JANET HANNA
SPALDING, et al. vs. CITY OF CHICAGO

August 12, 2015

129

1    A.   Are you referring to Exhibit No. 13?
2    Q.   I'm sorry.  Yes, 13.
3    A.   Do I have a recollection of this?
4    Q.   Yeah.
5    A.   No.
6    Q.   Okay.  I'll just ask.  My understanding
7  of this is that Danny Echeverria was assigned some
8  cases and then he sends an email to you saying
9  that one of them, Bradley Pruitt, had already been
10 processed by another team.
11       Does that look to be the case?
12   A.   Yes.
13   Q.   And then above that, Lieutenant Cesario
14 says, "Thanks, Dan," and he I guess offers an
15 explanation for how that may have occurred.
16       Would that be a fair description of the
17 emails?
18   A.   Yes.
19   Q.   And his explanation, Lieutenant
20 Cesario's, of how Bradley Pruitt could have been
21 assigned to Danny and he figured out he was
22 processed by another team already, would you say
23 his explanation is correct?  Would you agree with
24 that?  Do you think it's a correct explanation?

130

1    A.   It's a correct explanation, although
2  this was a problem, an ongoing problem that we had
3  in the unit where other teams were stealing other
4  people's assignments.
5    Q.   Okay.  And that was a problem not just
6  with respect to Spalding and Echeverria, correct?
7    A.   Correct.
8        (WHEREUPON, a certain document was
9        marked Hanna Deposition Exhibit
10       No. 14, for identification, as of
11       08-12-2015.)
12 BY MR. KING:
13   Q.   Ms. Hanna, I'm showing you what's been
14 marked as Deposition Exhibit No. 14, which are a
15 couple of emails you're copied on.  I'd just ask
16 you to take a look at these emails and let me know
17 if you have a recollection of these emails.
18   A.   I do not.
19   Q.   Do you have any knowledge as to
20 whether -- the conversation you said you had with
21 Kevin Culhane where he told you he was specifically
22 instructed not to give Danny and Shannon access
23 to the databases, do you know whether that
24 conversation occurred before or after

131

1  September 28th, 2012?
2    A.   I do not.
3        (WHEREUPON, a certain document was
4        marked Hanna Deposition Exhibit
5        No. 15, for identification, as of
6        08-12-2015.)
7  BY MR. KING:
8    Q.   I would like to direct your attention to
9  Deposition Exhibit No. 15.  You don't appear to be
10 copied on this exhibit.  I'd just ask if you think
11 you've ever seen this before?
12   A.   No.  Like I testified before, I didn't
13 know that there was a fingerprinting process.
14   Q.   Okay.  So as you sit here today, you
15 don't have any personal knowledge as to whether
16 Spalding and Echeverria's delay in getting access
17 to LEADS 2000 related to them not going through
18 the fingerprinting process?  You don't know,
19 correct?
20   A.   What I do know is what Detective Culhane
21 told me, which is that he was given a direct order
22 from Lieutenant Cesario to not allow them access to
23 the databases.
24   Q.   You don't know anything else about why

132

1  they wouldn't have access to the databases?
2    A.   Correct.
3    Q.   Do you have any recollection of a
4  conversation or conversations with Shannon Spalding
5  before you went out on medical leave where you had
6  talked about providing some kind of reports to her
7  that related to VRI overtime?
8    A.   Yes.
9    Q.   Do you recall what those reports were
10 that you were going to provide to her?
11   A.   Those reports that show an exhibit such
12 as No. 5.
13   Q.   Okay.  You were going to send her the
14 emails that would come from Lieutenant Cesario
15 indicating who's assigned for VRI overtime such
16 as Exhibit No. 5, correct?
17   A.   Correct.
18   Q.   And ultimately did you ever provide her
19 with those emails?
20   A.   I don't believe I ever did.
21   Q.   Okay.  You mentioned James O'Grady,
22 Commander O'Grady being on the phone with
23 Lieutenant Cesario.
24       Do you know Commander O'Grady?

JANET HANNA                                           August 12, 2015
SPALDING, et al. vs. CITY OF CHICAGO

---

133

1    A.  I do not.
2    Q.  Have you ever had a conversation with
3  him?
4    A.  Never.
5    Q.  Are you aware of Commander O'Grady
6  ever being in the Fugitive Apprehension Unit?
7    A.  I am not aware.
8    Q.  What about Nick Roti; do you know
9  Nick Roti?
10   A.  I do not.
11   Q.  Did you ever have a conversation with
12 Nick Roti as far as you know?
13   A.  Never.
14   Q.  You're not aware of Nick Roti ever being
15 in the Fugitive Apprehension Unit?
16   A.  Not while I was there.
17   Q.  And my question about O'Grady and
18 Roti being in the Fugitive Apprehension Unit, just
19 to be clear, my question is did you ever see them
20 physically inside of the Fugitive Apprehension
21 Unit, O'Grady or Roti?
22   A.  I don't know who they are.  I don't know
23 what they look like.
24   Q.  Can you tell me what happened, your

---

134

1  medical -- what happened to lead you to have to
2  go out on medical leave?  Was there an injury or
3  something?
4    A.  I had an injury on March 29th, 2013.
5    Q.  Okay.  Was that an injury while you were
6  at work?
7    A.  Yes, it was.
8    Q.  And tell me what happened.
9    A.  I was delivering papers that I was
10 ordered by Lieutenant Cesario to bring to the front
11 office that regarded wanted subjects, confidential
12 information and working in accordance with the
13 U.S. Marshal's office.  And on my return back to my
14 office, I, unbeknownst to me, did not see the hole
15 in the floor with a nail protruding from the hole.
16 And my belief is that the tip of my shoe got caught
17 on that nail and I proceeded to go flying and hit
18 both of my knees on the floor.
19   Q.  This floor, was this inside the
20 Fugitive Apprehension Unit or somewhere else?
21   A.  It's on the main floor, Fugitive
22 Apprehension Unit 606.
23   Q.  And did you apply for any kind of
24 medical leave?

---

135

1    A.  Not immediately I did not because I
2  had prescheduled surgery for that Monday,
3  April 1st.  I already had a surgery scheduled.
4    Q.  For that injury or for something else?
5    A.  For something else.
6    Q.  Did you at some point apply for medical
7  leave relating to the March 29th, 2013 injury?
8    A.  Yes, I did.
9    Q.  And you testified earlier you were
10 approved for leave, but you have not been approved
11 for duty disability, correct?
12   A.  Correct.  I was approved for IOD,
13 meaning it's an injury on duty.  I was on IOD for a
14 year, a little over a year, including my vacation
15 time.  From 3 September, 2014, to 19 September,
16 2015 -- I'm sorry.  That would be wrong.  Has to
17 be 3 September, '13, to 20 September, '14.
18   Q.  So September, 2013, to 2014 you were on
19 IOD plus your vacation time?
20   A.  Correct, about September, '13, to
21 September, '14.
22   Q.  And during that time you were getting
23 your full pay or partial pay?
24   A.  Full pay.

---

136

1    Q.  And benefits?
2    A.  Yes.
3    Q.  And then after that one year expired
4  in September of 2014, you started getting reduced
5  pay and no benefits, is that correct?
6    A.  I started getting reduced pay because
7  my IOD time was expired.  So I had to file for
8  ordinary -- or for disability.  When you file for
9  disability, you go into a 50 percent pay status
10 with benefits until your hearing at the pension
11 board.
12   Q.  And when did your IOD expire when you
13 were getting full pay and benefits?
14   A.  The last day that I worked full duty,
15 you know, as a police officer, working getting full
16 pay was 19 September, 2014.
17   Q.  But you weren't actively working during
18 that IOD period; you were on leave, correct?
19   A.  Correct.  We have 365 days.
20   Q.  Gotcha.  Do you know what your last day
21 you actively worked in the unit was?
22   A.  It was Labor Day weekend.  So
23 3 September was a Tuesday.
24   Q.  That's fine.  September of 2013?

---

JANET HANNA                                    August 12, 2015
SPALDING, et al. vs. CITY OF CHICAGO

137

1      A.  It had to be -- well, it would be
2   3, 2, 1.  So it was actually August, the end of
3   August, 2013 --
4      Q.  Thank you.
5      A.  -- the last Friday.
6      Q.  I may have asked you this.  Do you
7   recall when you got the decision that your
8   disability, duty disability was denied?
9      A.  Yes.  I had my hearing date on
10  29 May, 2015.
11     Q.  That was the hearing date?
12     A.  Yes.
13     Q.  And did they make a determination that
14  day?
15     A.  Yes.
16     Q.  Your affidavit is dated November 14,
17  2014.  Did you sign the affidavit after your one
18  year IOD had expired?
19     A.  Yes.
20     Q.  And had you at that point already put
21  in your application for disability?
22     A.  Yes.
23     Q.  Do you know who actually typed your
24  affidavit?

138

1      A.  I do not.
2      Q.  Okay.  Did you ever receive a draft or
3   a version that is different than Deposition Exhibit
4   No. 1?
5      A.  No, I didn't receive a copy of it.
6      Q.  Is today the first time you're seeing
7   the affidavit?
8      A.  No.
9      Q.  My question I guess is were you ever
10  presented with a draft of the affidavit to sign
11  and you said there was something in there you
12  wouldn't agree to or wouldn't sign off on?
13     A.  No.
14     Q.  So nobody asked you to say something
15  in the affidavit that you had a problem with and
16  said, no, I can't, I can't say that?
17     A.  No.
18     Q.  When did you see the version that had a
19  full Paragraph 36 in it?
20     A.  I would say on 19 November, 2014.
21     Q.  So it's your testimony that the version
22  you signed you think had a complete Paragraph 36?
23     A.  Yes.
24     Q.  And in this process of having the

139

1   affidavit drafted and signing it, other than
2   Christopher Smith, was there anyone else that
3   you dealt with with respect to the affidavit?
4      A.  There was a female in there.
5      Q.  Another lawyer in Chris' office?
6      A.  I don't believe she was a lawyer.  Maybe
7   an assistant.  I believe she's the one who actually
8   typed up the affidavit.
9      Q.  Did you meet with them in Chris' law
10  office?
11     A.  Yes.
12     Q.  And had there been any prior
13  conversations on the phone?
14     A.  Negative.
15     Q.  Okay.  You indicated you contacted him?
16     A.  Yes.
17     Q.  And what -- did you just say you'd like
18  to come in and meet with him?
19     A.  I would like to come forward and do the
20  right thing.  And I'm on disability.  I'm no longer
21  with the department.  So I'm not in fear of
22  breaking the code of silence and being retaliated
23  against like Danny and Shannon were.  And I have a
24  conscience.

140

1      Q.  I just asked what you said to him.  Is
2   that what you said to him?
3      A.  That's what I said to him.
4      Q.  Was the subject of signing an affidavit
5   raised by you or by Chris or someone else?
6      A.  I don't understand.
7      Q.  Okay.  You call him up.  You say I want
8   to come in and I want to meet with you.  Then you
9   meet with him and a young lady.  Who brings up the
10  topic of you signing an affidavit, you or one of
11  them?
12     A.  I tell him I want to sign -- he asks me
13  after I give him the information, are you willing
14  to give a sworn affidavit with the information you
15  are providing me?
16     Q.  I see.
17     A.  And I say, yes.
18     Q.  Okay.  And how did you get the affidavit
19  back?  Did they type it up right there while you
20  were there or was it sent to you later?
21     A.  No, right then that same day.
22     Q.  So the young lady or the lady typed
23  it up and then you read it and signed it, is that
24  correct?

JANET HANNA
SPALDING, et al. vs. CITY OF CHICAGO

August 12, 2015

141

1    A.   Yes.
2    Q.   And when you reviewed it, you were
3  comfortable that everything in it was true and
4  accurate?  You didn't ask them to make any changes
5  or take this out or add that, is that correct?
6    A.   This is not the first draft that they
7  did.
8    Q.   Okay.  I think I asked you about drafts.
9    A.   There were several of them and there
10  were mistakes.  Then she would go back and correct
11  it.  Then I would find another mistake and she'd
12  correct that.  I think that happened twice.  And
13  this is actually the official third copy that I
14  didn't find an error.
15    Q.   Okay.  What do you recall being the
16  errors or problems with the first draft?
17    A.   I don't recall.
18    Q.   Do you recall what the errors or
19  problems were with the second draft?
20    A.   No, I don't recall.
21    Q.   With respect to either of the drafts, do
22  you recall whether the errors were typo type errors
23  or they had typed something that was not correct as
24  you understood it?

142

1    A.   I don't recall.
2    Q.   Okay.  Do you have any recollection of
3  saying you can't agree to -- you're not going to
4  sign off on something that was in the first draft
5  or the second draft?
6    A.   No.
7    Q.   You don't know if the corrections were
8  just typos or something substantive?
9    A.   I never made the statement that I
10  wouldn't sign something that was in there.  So it
11  wouldn't have been of any substance.  It had to
12  have been a typo.
13    Q.   But you don't remember what they were?
14    A.   I do not.
15    Q.   Did you take a copy of the affidavit
16  after you signed it?
17    A.   No, I didn't.
18    Q.   Since you signed it that day in the
19  office, when you met with Mr. Taren, was that the
20  very next time you saw the affidavit?
21    A.   Yes.
22    MR. KING:  Give me a sec.
23        (WHEREUPON, there was a short
24        interruption.)

143

1  BY MR. KING:
2    Q.   When you met with Mr. Smith and the
3  woman in his office, was there anything that you
4  indicated you wanted them to put in the affidavit
5  but they didn't?
6    A.   No.
7    Q.   But you were comfortable that the
8  affidavit reflected all of the relevant information
9  that you had on the matter?
10    A.   Yes.
11    Q.   And it's your testimony that before
12  you reached out to Shannon Spalding and Dan
13  Echeverria's attorney in the lawsuit you had
14  no conversation with Shannon Spalding or Dan
15  Echeverria, is that correct?
16    A.   That's not correct.  I had conversations
17  with them.
18    Q.   Did you have any conversations with them
19  about contacting their attorney or giving an
20  affidavit in the case?
21    A.   No.
22    Q.   With respect to the murder case that
23  you said was assigned to Spalding and Echeverria
24  and then it was taken away from them, were they

144

1  the only two assigned to the case, if you recall?
2    A.   Yes.
3    Q.   And do you have any recollection whether
4  that case had previously been assigned to someone
5  else?
6    A.   I have no recollection.
7    MR. KING:  I don't have any further questions.
8    MR. TAREN:  I have a few matters of
9  clarification.
10        EXAMINATION
11  BY MR. TAREN:
12    Q.   Ms. Hanna, do you recall when the
13  Fugitive Apprehension Unit moved from Homan Square
14  to Harrison and Kedzie?
15    A.   In June of 2012.
16    Q.   Okay.  And was there a period of time
17  when the people in the unit were going back and
18  forth?
19    A.   Yes, for many weeks.
20    Q.   Directing your attention to your
21  affidavit, Paragraph 13, we had some questioning
22  about where the conversation that's referred to in
23  that paragraph took place.
24        Do you know for certain -- do you recall

JANET HANNA
SPALDING, et al. vs. CITY OF CHICAGO

August 12, 2015

---

145

1    for certain whether the conversation took place at
2    Homan Square or at Harrison and Kedzie?
3        A.   No, I can't be certain.
4        Q.   The conversation that you referred to in
5    there, did that take place during the period of
6    time when the unit was going back and forth?
7        A.   Yes.
8        Q.   You were questioned about Paragraph 2
9    of your affidavit, but I believe that Mr. King did
10   not ask you to recount what Lieutenant Cesario
11   stated in that conversation.
12           Would you tell us what Lieutenant
13   Cesario said to you?
14       A.   Lieutenant Cesario called Coleen and I
15   into his office at Homan Square and he closed the
16   door and sat down in the chairs and he informed us
17   of two new officers who were coming to the unit and
18   that they were IAD rats.
19       Q.   And did he instruct you in any way about
20   how you should approach them?
21       A.   To be very leery of them.
22       Q.   To your knowledge, was anyone else in
23   the unit told that Danny or Shannon were from IAD?
24       A.   Not to my knowledge.  I didn't partake

---

146

1    in actual conversations, but it was common
2    knowledge.
3        Q.   What do you base that on?
4        A.   Everyone talking about it.
5        Q.   Did you hear other individuals talking
6    about Danny and Shannon coming from IAD?
7        A.   Yes, after Lieutenant Cesario had told
8    Coleen and I.
9        Q.   Mr. King asked you about the
10   conversation that you had after Cesario introduced
11   you to Shannon and Danny where you said to them, so
12   you two are the IAD rats.
13           Do you recall that --
14       A.   Yes.
15       Q.   -- those questions?  Okay.
16           And I believe that you testified that
17   Shannon made some response about having Gary's
18   cellphone?
19       A.   Yes.
20       Q.   What was her tone of voice like when she
21   made that response to you?
22   MR. KING:  Object to the form.
23           You can answer.
24   BY THE WITNESS:

---

147

1        A.   She was very upset and her response
2    about I have Gary's -- yeah, I have Gary's
3    cellphone -- or I have Gary's phone number right
4    here was facetious.  It was -- she was just trying
5    to make light of the situation, but she was very
6    upset.
7    MR. TAREN:  That's all I have.
8    MR. KING:  A couple follow-ups.
9            FURTHER EXAMINATION
10   BY MR. KING:
11       Q.   Counsel just asked you about Paragraph 2
12   of your affidavit and what Lieutenant Cesario
13   allegedly said to you and Coleen Dugan.
14           If Coleen Dugan testified under oath in
15   this case that Lieutenant Cesario never referred
16   to the plaintiffs as IAD rats and never told her to
17   be very leery of them, is it your testimony that
18   that's a lie?
19       A.   Yes, it is.
20       Q.   I'm gathering since you've not spoken
21   to her and blocked her from your phone, you don't
22   think very highly of Coleen Dugan at this point, is
23   that fair to say?
24       A.   It's very fair to say.

---

148

1        Q.   Counsel also just asked you whether
2    you heard other individuals say that Spalding and
3    Echeverria had come from IAD.
4            Do you recall any other -- other than
5    what's in Paragraph 2 of your affidavit, do you
6    recall any specific individuals who made reference
7    to them coming from IAD or having worked at IAD?
8        A.   I don't recall specific individuals.
9        Q.   And, likewise, other than what you have
10   in Paragraph 2 of your affidavit, do you have any
11   recollection of anybody referring to Spalding or
12   Echeverria as rats or IAD rats?
13       A.   I don't recall the specifics or who
14   referred to them as IAD rats other than the
15   lieutenant having the conversation with us.
16       Q.   You're not aware of anyone other than
17   the lieutenant in the conversation referenced in
18   Paragraph 2 of your affidavit -- you're not aware
19   of anyone else calling Spalding or Echeverria rats
20   or IAD rats, correct?
21       A.   Myself and the lieutenant.
22       Q.   Okay.  Only you and the lieutenant
23   referred to them as IAD rats?
24       A.   That is what I can recall.

---

JANET HANNA
SPALDING, et al. vs. CITY OF CHICAGO

August 12, 2015

149

1    MR. KING:  That's all.
2    MR. TAREN:  Okay.  We'll reserve signature.
3        (Time Noted:  1:16 p.m.)
4        FURTHER DEPONENT SAITH NOT.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

151

1    hand of office at Chicago, Illinois, this 2nd day
2    of September, 2015.
3
4
5
6        Julie A. Conroy, CSR No. 84-2251
7        Notary Public, DuPage County, Illinois.
8        My commission expires 6/6/17.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

150

1    STATE OF ILLINOIS  )
2              ) SS:
3    COUNTY OF DUPAGE  )
4        I, JULIE A. CONROY, CSR No. 84-2251, a
5    Notary Public within and for the County of DuPage,
6    State of Illinois, and a Certified Shorthand
7    Reporter of said state, do hereby certify:
8        That previous to the commencement of the
9    examination of the witness, the witness was duly
10   sworn to testify the whole truth concerning the
11   matters herein;
12       That the foregoing deposition transcript
13   was reported stenographically by me, was thereafter
14   reduced to typewriting under my personal direction
15   and constitutes a true record of the testimony
16   given and the proceedings had;
17       That the said deposition was taken
18   before me at the time and place specified;
19       That I am not a relative or employee or
20   attorney or counsel, nor a relative or employee of
21   such attorney or counsel for any of the parties
22   hereto, nor interested directly or indirectly in
23   the outcome of this action.
24       IN WITNESS WHEREOF, I do hereunto set my

152

1                I N D E X
2    WITNESS                    EXAMINATION
3    JANET HANNA
4      BY MR. KING              3, 147
5      BY MR. TAREN             144
6
7              E X H I B I T S
8    NUMBER                     PAGE
9    Hanna Deposition
10     Exhibit No. 1            41
11     Exhibit No. 2            119
12     Exhibit No. 3            119
13     Exhibit No. 4            120
14     Exhibit No. 5            120
15     Exhibit No. 6            120
16     Exhibit No. 7            120
17     Exhibit No. 8            123
18     Exhibit No. 9            125
19     Exhibit No. 10           126
20     Exhibit No. 11           126
21     Exhibit No. 12           127
22     Exhibit No. 13           128
23     Exhibit No. 14           130
24     Exhibit No. 15           131

JANET HANNA
SPALDING, et al. vs. CITY OF CHICAGO

August 12, 2015

---

153

1            DEPOSITION ERRATA SHEET

2

3

4      Assignment No. J0178237

5      CHICAGO POLICE OFFICER SHANNON SPALDING, et al.

6      vs. CITY OF CHICAGO, et al.

7

8            DECLARATION UNDER PENALTY OF PERJURY

9            I declare under penalty of perjury

10      that I have read the entire transcript of

11      my Deposition taken in the captioned matter

12      or the same has been read to me, and

13      the same is true and accurate, save and

14      except for changes and/or corrections, if

15      any, as indicated by me on the DEPOSITION

16      ERRATA SHEET hereof, with the understanding

17      that I offer these changes as if still under

18      oath.

19

20      Signed on the _____ day of

21      _____, 20___.

22

23      _____

24                  JANET HANNA

---

154

1            DEPOSITION ERRATA SHEET

2      Page No._____Line No._____Change to:_____

3      _____

4      Reason for change:_____

5      Page No._____Line No._____Change to:_____

6      _____

7      Reason for change:_____

8      Page No._____Line No._____Change to:_____

9      _____

10      Reason for change:_____

11      Page No._____Line No._____Change to:_____

12      _____

13      Reason for change:_____

14      Page No._____Line No._____Change to:_____

15      _____

16      Reason for change:_____

17      Page No._____Line No._____Change to:_____

18      _____

19      Reason for change:_____

20      Page No._____Line No._____Change to:_____

21      _____

22      Reason for change:_____

23      SIGNATURE:_____DATE:_____

24                  JANET HANNA

---

155

1            DEPOSITION ERRATA SHEET

2      Page No._____Line No._____Change to:_____

3      _____

4      Reason for change:_____

5      Page No._____Line No._____Change to:_____

6      _____

7      Reason for change:_____

8      Page No._____Line No._____Change to:_____

9      _____

10      Reason for change:_____

11      Page No._____Line No._____Change to:_____

12      _____

13      Reason for change:_____

14      Page No._____Line No._____Change to:_____

15      _____

16      Reason for change:_____

17      Page No._____Line No._____Change to:_____

18      _____

19      Reason for change:_____

20      Page No._____Line No._____Change to:_____

21      _____

22      Reason for change:_____

23      SIGNATURE:_____DATE:_____

24                  JANET HANNA

---