**1**

```
        IN THE UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF ILLINOIS
                 EASTERN DIVISION
CHICAGO POLICE
OFFICERS SHANNON
SPALDING AND DANIEL
ECHEVERRIA,

         Plaintiffs,

    vs.                      No. 12 C 8777

CITY OF CHICAGO,
CHICAGO POLICE CHIEF
JUAN RIVERA, CHICAGO
POLICE CHIEF DEBRA
KIRBY, CHICAGO POLICE
COMMANDER JAMES
O'GRADY, CHICAGO
POLICE CHIEF NICHOLAS
ROTTI, CHICAGO POLICE
LT. DEBORAH PASCUA,
CHICAGO POLICE
SERGEANT MAURICE
BARNES, CHICAGO POLICE
LT. ROBERT CESARIO,
CHICAGO POLICE
COMMANDER JOSEPH
SALEMME, CHICAGO
POLICE SERGEANT THOMAS
MILLS, CHICAGO POLICE
SERGEANT MICHAEL BARZ
and CHICAGO POLICE
SERGEANT ROBERT
MUSCOLINO,

         Defendants.

         DEPOSITION OF ROBERT WALKER
               June 17, 2015
                 1:38 p.m.
```

**2**

1  The deposition of ROBERT WALKER,
2  called for examination pursuant to the Rules
3  of Civil Procedure for the United States
4  District Courts pertaining to the taking of
5  depositions, taken before MARIBETH REILLY,
6  C.S.R., and notary public within and for the
7  County of DuPage and State of Illinois, at
8  One North LaSalle Street, Suite 2000,
9  Chicago, Illinois, on June 17, 2015,
10  commencing at the hour of 1:38 p.m.
11
12  APPEARANCES:
13    KINOY, TAREN & GERAGHTY, P.C., by,
14    MR. JEFFREY TAREN
15    224 South Michigan Avenue
16    Suite 490
17    Chicago, Illinois  60604
18      -and-
19    CHRISTOPHER SMITH TRIAL GROUP, by,
20    MR. CHRISTOPHER SMITH
21    One North Lasalle Street
22    Suite 2000
23    Chicago, Illinois  60602
24      Representing the Plaintiffs;

**3**

1  APPEARANCES:  (Continued)
2
3    DRINKER BIDDLE & REATH, LLP, by,
4    MR. ALAN KING
5    191 North Wacker Drive
6    Suite 3700
7    Chicago, Illinois  60606
8      Representing the Defendants;
9
10    MR. DANNY ECHEVERRIA,
11      Also present.
12
13
14
15
16
17
18
19
20
21
22
23
24

**4**

1            I N D E X
2  WITNESS              EXAMINATION
3  ROBERT WALKER
4    By Mr. Smith           5
5
6
7           EXHIBITS
8
9  NUMBER              MARKED FOR ID
10  Deposition Exhibit
11    (No deposition exhibits were marked.)
12
13
14
15
16
17
18
19
20
21
22
23
24

5

1    (Whereupon, the witness was
2    duly sworn.)
3    ROBERT WALKER,
4 called as a witness herein, was examined and
5 testified as follows:
6    DIRECT EXAMINATION
7 BY MR. SMITH:
8    Q. Can you please state your name and
9 spell your name for the court reporter.
10    A. My name is Robert Walker,
11 W-a-l-k-e-r.
12    Q. Thank you. Have you ever given a
13 deposition before?
14    A. Yes.
15    Q. Just a reminder that since we have
16 a court reporter that if you could try, even
17 if you know where I am going with a
18 question, to let me finish, and then I will
19 try to do the same with you when you answer.
20 Okay?
21    A. Okay.
22    Q. And then the other thing is,
23 generally speaking, just to be mindful of
24 instead of shaking your head or nods, as we

6

1 all do, to answer questions rather than --
2 use expressions, if you can, for the same
3 reason.
4    A. Okay.
5    Q. And while this is a formal oath,
6 it's an informal proceeding in the sense of
7 if you need a break for any reason, just
8 indicate that you need a break. The only
9 thing is if there is a pending question, I'd
10 ask that you answer that question before we
11 take a break. Okay?
12    A. Okay.
13    Q. And then with respect to my
14 questions, if you don't understand the
15 question I am asking, feel free to indicate
16 that. Or if you didn't quite hear the
17 question and you need it to be repeated or
18 played back, we can do that. Okay?
19    A. Okay.
20    Q. All right. Can you just tell me
21 where you are currently working?
22    A. I am currently assigned to the 4th
23 district.
24    Q. And what with the Chicago Police

7

1 Department?
2    A. Chicago Police, correct.
3    Q. And in terms of with the 4th
4 district, what do you do in the 4th
5 district?
6    A. I am a sector sergeant.
7    Q. Sergeant, can you give me, as best
8 you can, your history in terms of when you
9 started with the Chicago Police Department,
10 and your assignments after you started up
11 until now?
12    A. My seniority date was 28 September
13 1998.
14    Q. And after the academy, where were
15 you first assigned?
16    A. The 5th district.
17    Q. How long were you with the 5th
18 district?
19    A. Ten years.
20    Q. Where were you moved after you
21 were assigned to the 5th district?
22    A. I was assigned to the Fugitive
23 Apprehension Unit.
24    Q. So do you think you were assigned

8

1 there approximately 2008, somewhere in that
2 range, the Fugitive Apprehension Unit?
3    A. Correct.
4    Q. And once you were with the
5 Fugitive Apprehension Unit, how long did you
6 stay with the Fugitive Apprehension Unit?
7    A. I want to say approximately six
8 years.
9    Q. And why did you leave the Fugitive
10 Apprehension Unit?
11    A. I was promoted to sergeant.
12    Q. Now in terms of -- you know
13 Shannon Spalding and Danny Echeverria,
14 correct?
15    A. Correct.
16    Q. When did you first meet either
17 Danny or Shannon?
18    A. Approximately?
19    Q. Yes.
20    A. Go ahead.
21    Q. Let me ask you this way: Did you
22 meet them ever before they came to the
23 Fugitive Apprehension Unit?
24    A. Not that I know of, no.

Robert Walker                     Spalding v. City of Chicago                     6/17/15

---

**9**

1    Q.  And when they came to the Fugitive
2  Apprehension Unit, who was your supervisor?
3    A.  Maurice Barnes.
4    Q.  And were you part of a team?
5    A.  Correct.
6    Q.  And what was the name of your
7  team?
8    A.  Area -- Area 2 Fugitive
9  Apprehension team.
10   Q.  And do you remember any of the
11 other members of the team that were on that
12 team when Shannon and Danny got there?
13   A.  A few names, yes.  I'm sorry, yes.
14   Q.  Can you just tell me a few of the
15 names that you remember?
16   A.  Tony Robinson, Lorne Gushiniere.
17   Q.  Anyone else?
18   A.  Harry Strong, Milton Scott.
19   Q.  Do you know Kevin Odum, or an
20 Odum?  Officer Odum?
21   A.  Do I know one?
22   Q.  Yes.
23   A.  I do know a Kevin Odum.
24   Q.  Was he part of that team?

**10**

1    A.  No.
2    Q.  So anyone else besides the four
3  you just mentioned?
4    A.  That should be it.
5    Q.  Before Danny and Shannon arrived
6  to the Fugitive Apprehension Unit, were
7  there two other officers who were part of
8  the team who left the unit, if you know?
9    A.  I don't recall.
10   Q.  Did you know a Jan Hanna?
11   A.  On the team, no.
12   Q.  Not on the team, but did you know
13 who Jan Hanna was?
14   A.  Yes.
15   Q.  Who is Jan Hanna?
16   A.  She was assigned to the unit.
17   Q.  Did you know a Kevin Williams?
18   A.  Yes.
19   Q.  How did you know Kevin Williams?
20   A.  He was also assigned to the unit.
21 He was not on our team.
22   Q.  He was a member of another team?
23   A.  Correct.
24   Q.  And do you know who his sergeant

**11**

1  was, by any chance?
2    A.  No.
3    Q.  Now you had mentioned that
4  Sergeant Barnes was your immediate
5  supervisor when Danny and Shannon first
6  arrived on the unit, correct?
7    A.  Correct.
8    Q.  And how long was Sergeant Barnes
9  your supervisor, approximately?
10   A.  2008.
11   Q.  Until when?
12   A.  I don't understand your question.
13   Q.  Sergeant Barnes was your
14 supervisor in 2008.  When did that end?  Was
15 he your supervisor all the way up until the
16 time you left to be a sergeant?
17   A.  I went to another -- from 2008 to
18 2013, approximately.
19   Q.  And were you assigned to another
20 team in 2013?
21   A.  Correct.
22   Q.  What team was that?
23   A.  Area Central team.
24   Q.  Who was the supervisor of that

**12**

1  team?
2    A.  Tommy Mason.
3    Q.  Was there any particular reason
4  you went from Area 2 team to Area Central
5  team?
6    A.  They made changes.
7    Q.  Was it the same time shift in
8  terms of day, evening, night?
9    A.  Yes.
10   Q.  And what was your regular shift?
11   A.  I work days.
12   Q.  Before Danny and Shannon became
13 part of the Fugitive Apprehension team, who
14 was your partner, if you had one?
15   A.  I am not sure.  I am not sure.
16   Q.  Were there times where you were
17 given different partners on a regular basis,
18 or would you generally have a particular
19 partner or two particular partners?
20   A.  Sometimes I was the odd man out,
21 so I would work with other people.
22   Q.  Is it fair to say that at times
23 with the Fugitive Apprehension team that
24 Sergeant Barnes would have a team meeting?

---

Robert Walker          Spalding v. City of Chicago          6/17/15

13

1      A. Correct.
2      Q. Is it fair to say that there
3  weren't regular weekly meetings? They would
4  happen just occasionally when things would
5  come up?
6      A. I wouldn't say that, no.
7      Q. Did he have a regular set meeting
8  day?
9      A. No, it wasn't a regular set
10 meeting day. If he wanted to call a team
11 meeting, he would call a team meeting.
12     Q. How often would team meetings
13 occur?
14     A. I don't know.
15     Q. Was it more than once a month?
16     A. I don't know.
17     Q. Is it fair to say that at some
18 point in time did you work in a car with
19 Danny and Shannon?
20     A. That's fair to say.
21     Q. For how long of a period did you
22 work in the same car as Danny and Shannon?
23     A. I am not sure.
24     Q. Was it more than a couple of

14

1  weeks? More than two weeks?
2      A. Oh, yeah, more than two weeks.
3      Q. Less than five months, or less
4  than six months?
5      A. I want to say it's more. I would
6  -- I don't know.
7      Q. During the time that you worked
8  with Danny and Shannon, do you recall a team
9  meeting occurring with Sergeant Barnes where
10 Danny indicated during the meeting that he
11 was essentially directing to the team if
12 anybody had had concerns with where they
13 came from, whether they came from IAD, that
14 this would be a time to discuss it?
15     A. Something to that effect. I can't
16 -- yes.
17     Q. Do you recall that, in particular,
18 the thought that if anybody wanted to know
19 where Danny or Shannon had come from,
20 whether they were IAD, that that was going
21 to be addressed in the meeting?
22     MR. KING: I'd just object to the
23 form of the question.
24     You can answer if you remember

15

1  that being said at the meeting.
2      THE WITNESS: What's the question
3  again?
4  BY MR. SMITH:
5      Q. Do you recall that IAD, in
6  particular, that was brought up during the
7  course of the meeting?
8      A. I am not sure.
9      Q. Do you recall that where Danny and
10 Shannon had come from was being brought up
11 during the meeting?
12     A. I don't recall that either in
13 terms of -- I don't know.
14     Q. Do you recall that the question of
15 whether anyone had concerns about working
16 with Danny and Shannon was brought up at the
17 meeting?
18     A. I don't know. I am not sure.
19     Q. Do you recall what Danny said
20 during the meeting?
21     A. There was one meeting in
22 particular. I don't remember by verbatim,
23 but I do remember Danny saying in this
24 particular meeting, his words were pretty

16

1  much, "hey, if you ever get a chance to know
2  me, I will get a chance to know you. I will
3  buy you all a beer." It was a meeting like
4  that. Danny made that comment.
5      In terms of the language and
6  verbatim in terms of, you know, I don't
7  know. I don't recall that.
8      Q. Do you recall saying anything
9  yourself during the course of that meeting?
10     A. I don't recall that either.
11     Q. Do you recall Sergeant Barnes
12 saying anything during the course of that
13 meeting?
14     A. No.
15     Q. Do you recall Shannon Spalding
16 saying anything during the course of that
17 meeting?
18     A. No.
19     Q. Do you have any idea why Danny
20 brought that up in terms of getting to know
21 him?
22     MR. KING: Object to the form and
23 lack of foundation.
24     You can answer.

Robert Walker               Spalding v. City of Chicago               6/17/15

---

**17**

1    THE WITNESS: You have to ask
2  Danny that.
3  BY MR. SMITH:
4    Q. In terms of what else do you
5  remember being said during the course of
6  that meeting?
7    A. It would be speculation on my
8  part. I can't remember by verbatim. I
9  cannot remember exact words.
10    During the course of my
11  career, I have had a lot of team meetings.
12  I don't know by verbatim. It would be pure
13  speculation.
14    Q. In terms of do you remember why
15  the team meeting was called?
16    A. Because Sergeant Barnes called a
17  team meeting.
18    Q. Do you know why Sergeant Barnes
19  called the team meeting?
20    A. I don't know.
21    Q. Do you remember anything that was
22  discussed other than what you said were
23  Danny's comments during the meeting?
24    A. Repeat the question.

**18**

1    Q. Do you remember anything that was
2  discussed during that meeting?
3    MR. KING: Other than what he's
4  already testified to?
5    MR. SMITH: Yes, other than what
6  you have already testified to.
7    THE WITNESS: Not by verbatim, no.
8  BY MR. SMITH:
9    Q. What was the gist of what you
10  remember about the meeting?
11    A. In particular, I don't remember
12  things -- I don't remember things by
13  verbatim.
14    Again, Danny said, hey, you
15  know, I can't remember what he said by
16  verbatim, but his answer to this was, if you
17  all want to get a chance to know me, I will
18  get a chance to know you all, you know. I
19  am showing myself as -- not by verbatim, I
20  am showing myself as a friend, hey, get a
21  chance to know me. Not by verbatim. That
22  was the gist of what I took from that
23  meeting.
24    Q. And in terms of was he responding

**19**

1  to anything; Danny?
2    A. What he was responding to? I
3  don't know. I can't remember by verbatim.
4  I don't know what was said before then by
5  verbatim. So I guess it would be in a
6  response to somebody.
7    Q. Do you remember who he was
8  responding to?
9    A. No.
10    Q. Do you remember anyone responding
11  to him?
12    A. No.
13    Q. Do you remember Danny saying
14  anything at any other meetings besides this
15  one?
16    A. No.
17    Q. Do you ever remember anything that
18  Shannon said at any meeting with Sergeant
19  Barnes?
20    A. No.
21    Q. Do you ever remember anything in
22  specifics that Sergeant Barnes has said at
23  any meeting?
24    A. Specifically, no.

**20**

1    Q. Did you ever talk with Danny or
2  Shannon about why -- did you ever talk with
3  Danny or Shannon about concerns that members
4  of the team had with working with them? If
5  anyone had had any concerns about working
6  with them?
7    A. Repeat your question.
8    Q. Have you ever talked with Danny or
9  Shannon about concerns that other people
10  were expressing about working with them?
11    A. Yes.
12    Q. What was that conversation? Or
13  was there more than one conversation about
14  that?
15    A. At what point are we talking about
16  in terms of -- are we talking about --
17    Q. When was the first time you had a
18  conversation about that?
19    A. The main conversation that I
20  remember, I remember this, in particular,
21  was when I first met Danny and Shannon.
22    Q. Okay. What was the conversation?
23    A. I understand that you all came
24  from IAD. I also told them that -- my exact

---

Robert Walker                Spalding v. City of Chicago                6/17/15

---

**21**

1   words were, you know, we are going to work
2   hard.  We are going to play hard.  We are
3   going to take a longer lunch than normal.
4   It was a conversation like that.
5        Q.  Did you tell them how it was that
6   you came to understand that they were from
7   IAD?
8        A.  I don't know if I told them I
9   heard.  I don't remember that part of the
10  conversation, but I did bring it to them
11  that I understand that you all are from IAD.
12       Q.  Who told you that they were from
13  IAD?
14       A.  Sergeant Barnes.
15       Q.  Is it possible that during the
16  meeting that you spoke of where Danny was
17  talking about getting to know people that
18  you indicated during that meeting that you
19  had told Danny and Shannon that you had
20  heard they were from IAD?
21          MR. KING:  Object to the form of
22  the question.
23          You can answer it if you
24  understand it.

---

**22**

1           THE WITNESS:  I don't understand.
2   BY MR. SMITH:
3        Q.  During the meeting where you have
4   indicated Danny said get to know me, is it
5   possible that during that meeting that you
6   admitted that you had indicated to Danny and
7   Shannon that you had heard they were from
8   IAD?
9           MR. KING:  Same objection to the
10  form, but you can answer.
11          THE WITNESS:  I still don't
12  understand the question.
13  BY MR. SMITH:
14       Q.  You recall talking about a meeting
15  with Sergeant Barnes and the team where
16  Danny said, you know, get to know me, have a
17  beer with me, correct?  You recall talking
18  about that meeting?
19       A.  Okay.
20       Q.  Is it possible that during that
21  meeting that you indicated yourself in
22  that meeting that you were -- you had told
23  them that you had heard that they were from
24  IAD?

---

**23**

1           MR. KING:  Same objection to "is
2   it possible."  I think he testified to what
3   he remembered of the conversation.  Unless
4   you can tell him if you think you said that
5   or you remember saying that.
6           THE WITNESS:  I don't recall that
7   either.
8   BY MR. SMITH:
9        Q.  In terms of when you indicated
10  that you heard Danny and Shannon were from
11  IAD, what was Shannon or Danny's response to
12  that?
13       A.  I don't recall that either.  I
14  don't remember that.
15       Q.  Did you ever talk to any other
16  members of the team in Fugitive
17  Apprehensions about Danny and Shannon being
18  from IAD?
19       A.  Yes.
20       Q.  What were the conversations about?
21       A.  The conversations were pretty much
22  about two officers are coming to the unit
23  that came from IAD.
24       Q.  Was it common knowledge that Danny

---

**24**

1   and Shannon had come from IAD?  Did the
2   other members of the team indicate that
3   that's what they were told, too?
4           MR. KING:  Object to the form of
5   the question.
6           You can answer.
7           THE WITNESS:  I don't know what
8   the other team members knew at that point.
9   BY MR. SMITH:
10       Q.  The people that you talked to
11  about them being from IAD, did they tell you
12  how they learned that Danny and Shannon were
13  part of IAD?
14       A.  I don't know that answer.  I don't
15  know.
16       Q.  Was any discussion had about what
17  Danny and Shannon were doing with IAD?
18          MR. KING:  I am just going to
19  object to the lack of foundation, and I
20  think he may be testifying to the initial
21  conversation, and I think you're suggesting
22  there are other conversations.
23          I am just not sure there is a
24  foundation that's clear that we know what

---

Robert Walker                Spalding v. City of Chicago                6/17/15

---

**25**

1  meetings or conversations we are talking
2  about.
3  BY MR. SMITH:
4      Q.  In terms of other officers within
5  the Fugitive Apprehension Unit, how many
6  officers did you have conversations with
7  about Danny and Shannon being from IAD?
8          Was it all the team members or
9  just certain ones?
10     A.  Initially?
11     Q.  Let's start with initially.
12     A.  I am guessing, and I am not sure.
13  Maybe two officers.
14     Q.  And do you know which two?
15     A.  I am guessing.  It would be Tony
16  Robinson and Lorne.
17         MR. KING:  Don't guess.  If you
18  remember, tell him.
19  BY MR. SMITH:
20     Q.  Tony Robinson and Lorne Kushner?
21     A.  Correct.
22     Q.  Do you know who brought this up?
23     A.  No, I don't.
24     Q.  Did you ever tell Danny or Shannon

---

**27**

1  BY MR. SMITH:
2      Q.  In terms of you mentioned you had
3  an initial conversation about Danny and
4  Shannon being from IAD with other officers.
5  Was that before or after you had met Danny
6  and Shannon?
7      A.  Before.
8      Q.  Do you know how long before you
9  met them?
10     A.  I don't know.
11     Q.  Was there any discussion before
12  you met Danny or Shannon about what it would
13  be -- what it would mean to work with
14  somebody from IAD?
15         MR. KING:  Object to the form of
16  the question.
17         You can answer.
18         THE WITNESS:  I don't understand
19  your question.
20  BY MR. SMITH:
21     Q.  Was there any discussion about the
22  possibility of if they are from IAD, they
23  may be doing an investigation of the
24  Fugitive Apprehension Unit?

---

**26**

1  about your conversation with Tony or Lorne?
2      A.  No.
3      Q.  When Sergeant Barnes told
4  you about Danny and Shannon coming from IAD,
5  were either Tony or Lorne present?
6      A.  I don't know.
7      Q.  In terms of after that initial
8  conversation that you spoke of concerning
9  Danny and Shannon being from IAD, what was
10  the next conversation you remember about
11  Danny and Shannon and where they had come
12  from?
13     A.  I don't recall that either.
14     Q.  In terms of did you know how long
15  it was before -- did you have a
16  conversation, initial conversation about
17  Danny and Shannon coming from IAD, before or
18  after you had met them?
19         MR. KING:  Object to the form.
20         Do you know what the initial
21  conversation is?  If you understand it, you
22  can answer.
23         THE WITNESS:  No, I don't
24  understand the question.

---

**28**

1      A.  Investigation of the Fugitive
2  Apprehension Unit?
3      Q.  Correct.
4      A.  No.
5      Q.  Was there any discussion about why
6  they might be coming to Fugitive
7  Apprehensions.
8      A.  No.
9      Q.  Did you have a discussion after
10  meeting Shannon and Danny with anybody about
11  where they had come from in terms of being
12  from IAD?
13     A.  Did I have a discussion?
14     Q.  Yes.
15     A.  No.
16     Q.  In terms of Danny and Shannon,
17  did you ever have any problems with Danny's
18  work ethic when he was in Fugitive
19  Apprehensions?
20     A.  No.
21     Q.  Did you think he was a good
22  partner to work with?
23     A.  He was all right.
24     Q.  Was there anything you have to

---

Robert Walker        Spalding v. City of Chicago        6/17/15

29

1 complain about?
2    A. No.
3    Q. Did you think he did his
4 assignments that were given to him?
5    A. Yes.
6    Q. Did you think he was an aggressive
7 officer in terms of trying to apprehend
8 people on warrants?
9    A. No.
10    Q. Why do you say that?
11    A. Was he aggressive?
12    Q. Meaning was he making efforts to
13 do his job?
14       MR. KING: I'd just object to the
15 form. Those are two different questions, so
16 I am not sure which one you want.
17 BY MR. SMITH:
18    Q. In terms of when I am using the
19 word "aggressive" in the question, I am not
20 saying physically aggressive or anything of
21 that nature. I am talking about was he
22 active in trying to do his job in Fugitive
23 Apprehensions?
24    A. Correct.

30

1    Q. And in terms of Shannon, would you
2 agree that she also was active in trying to
3 do her job?
4    A. Correct.
5    Q. Did you have any problems with
6 Shannon?
7    A. No.
8    Q. Did you think they were good
9 officers?
10    A. No.
11    Q. Why?
12    A. Going after fugitives is a skill,
13 and they were just starting off. They were
14 new. They could be good police officers,
15 but in terms -- they were getting their feet
16 wet. They were just starting off. They
17 were the police. You know, they had a
18 strong -- you know, they have a strong
19 feeling for the job. They are
20 knowledgeable, but they were learning what
21 it is to hunt fugitives, so to speak.
22    Q. Do you remember any of the
23 assignments that you, Danny and Shannon
24 worked on together?

31

1    A. No.
2    Q. Do you remember any assignments
3 where Danny or Shannon being new to the job
4 hindered apprehending a suspect or somebody
5 on a warrant?
6    A. Ask your question again.
7    Q. Do you remember any situations
8 where Danny or Shannon's being new on the
9 job somehow hindered your -- their abilities
10 or your ability to apprehend a suspect off a
11 warrant?
12    A. No.
13    Q. Do you remember any situation
14 which Danny or Shannon's being new on the
15 job was in any way detrimental or a
16 hindrance to doing an assignment?
17    A. No.
18    Q. Do you remember in any situation
19 while working with Danny or Shannon that
20 Danny or Shannon did something that you
21 wouldn't have done in connection with their
22 work in apprehending or trying to apprehend
23 a suspect?
24    A. No.

32

1    Q. Do you remember any situation in
2 which there was an assignment that Danny and
3 Shannon were working on that you would have
4 done something that they didn't do?
5    A. No.
6    Q. Did you review any documents in
7 connection with your preparation for this
8 deposition?
9    A. Did I review any?
10    Q. Documents.
11    A. No.
12    Q. Are you represented by an attorney
13 today?
14    A. Correct.
15    Q. You are.
16       In terms of the assignment of
17 Fugitive Apprehension, is it your
18 understanding that all officers in Fugitive
19 Apprehension report back to their unit that
20 they were working in for a face-to-face
21 checkoff? Or can they leave from the
22 location of their last job?
23    A. I can't speak on that.
24    Q. What was your common practice?

Robert Walker          Spalding v. City of Chicago          6/17/15

33

1    let me strike that question.
2              Were you required to check off
3    back at where you were assigned on the days
4    that you were working in Fugitive
5    Apprehension, or could you leave from where
6    your last job was?
7              MR. KING: I'd just object to lack
8    of foundation. I assume we are talking
9    about when he is on Barnes' team?
10   BY MR. SMITH:
11       Q. I am talking about when he was
12   working on Fugitive Apprehensions.
13       A. You know, on a day-to-day basis,
14   no two days were the same. So I can't
15   say that's a common practice. I can't say
16   what other officers did. I cannot attest to
17   how other sergeants ran their team.
18       Q. I am talking about you personally,
19   what did you do? Were there times when you
20   would check off without coming back to your
21   unit of assignment?
22       A. It has happened before, yes.
23       Q. And would that happen regardless
24   of whose team you are on at the time?

34

1        A. Let me explain this to you. No
2    two days were the same. It was a very fluid
3    situation. There was -- the common practice
4    was there was no common practice. It just
5    all depends on how the day was.
6        Q. So it's fair to say you weren't
7    required to always go back and do a
8    face-to-face checkoff, correct?
9        A. Correct.
10       Q. And that was true whether you were
11   working under Barnes or one of the other
12   sergeants, correct?
13       A. Correct.
14       Q. Did you know Shannon or Danny were
15   being asked to report to check-off at the
16   place of their assignment?
17       A. I don't know because -- I don't
18   know.
19       Q. In terms of did you know if Danny
20   and Shannon had had access to LEADS 2000 or
21   LexisNexis when they were working in
22   Fugitive Apprehension under Barnes?
23       A. I have no knowledge of that.
24       Q. Is that a tool that you had when

35

1    you were working there?
2        A. No, not -- of LEADS 2000?
3        Q. What databases did you have access
4    to as an officer in Fugitive Apprehension?
5    And we are talking about the timeframe of
6    when Danny and Shannon arrived.
7        A. I'd only had CLEAR, what they call
8    CLEAR.
9        Q. Why did you only have CLEAR?
10       A. I don't know.
11       Q. Did you believe that the other
12   officers in Fugitive Apprehension only had
13   CLEAR?
14       A. I never even asked. I don't know.
15       Q. In terms of were you aware of what
16   types of assignments Danny and Shannon were
17   getting while they were working in Fugitive
18   Apprehensions?
19       A. Yes.
20       Q. And how did you become aware of
21   that?
22       A. Danny, Shannon, and I worked
23   together daily.
24       Q. And what kind of assignments were

36

1    you getting?
2        A. Repeat your question.
3        Q. What kind of assignments were you
4    getting?
5        A. Was I getting?
6        Q. Were the three of you.
7        A. It varied from homicide cases to
8    prostitution warrants. It varied.
9        Q. And in terms of -- is there like a
10   system or a way you delineate types of cases
11   within Fugitive Apprehensions in terms of
12   are there different types or categories of
13   warrants that you get?
14       A. Repeat your question, please.
15       Q. Well, you mentioned homicide
16   investigation cases. And was there a
17   category? Was there any way of categorizing
18   cases in terms of like felony cases? Were
19   there levels or distinctions given to
20   warrant assignments?
21       A. Given to warrant assignments, no.
22       Q. Did you believe that you and Danny
23   and Shannon were getting a similar number of
24   homicides to the other people that were

37

1  working in Fugitive Apprehensions on Barnes'
2  team?
3      A. Homicides, yes.
4      Q. What about felony cases, did you
5  think you were getting a similar amount of
6  felony cases assigned to the three of you
7  that other cars were getting within Barnes'
8  team?
9      A. As in car, yes.
10     Q. In terms of each arrest, did you
11 believe that Shannon, Danny and you were
12 making a similar amount of arrests to the
13 other cars that were part of Barnes' team?
14     A. I don't know.
15     Q. Did anyone ever discuss within
16 Barnes' unit the numbers of arrests that
17 were being made?
18     A. Yes.
19     Q. And who would discuss that, and
20 how would that come up?
21     A. Sergeant Barnes would discuss it.
22     Q. Would he discuss them at the
23 meetings, or in what form?
24     A. If Sergeant Barnes felt our

38

1  numbers were low, he would say, hey, pick it
2  up, pick up the pace.
3      Q. How could an officer pick up the
4  pace in terms of making arrests?
5      A. By making an arrest.
6      Q. In terms of would you be able to
7  ask for more assignments?
8      A. No.
9      Q. In terms of were there instances
10 in which there was an arrest that could have
11 been made where an arrest wasn't made?
12     A. I don't understand your question.
13     Q. In other words, you get
14 assignments for warrants, and were there --
15 and you're attempting to make arrests and
16 Sergeant Barnes says pick up the pace. Were
17 there times where you had assignments that
18 you were not making arrests when you should
19 have been able to make arrests?
20     MR. KING: I'd object to the form
21 of the question.
22         If you understand it.
23     THE WITNESS: I don't understand
24 that question.

39

1  BY MR. SMITH:
2      Q. Well, how would you pick up the
3  pace if Sergeant Barnes said pick up the
4  pace?
5      A. By making arrests.
6      Q. Were there ever any times where
7  there were arrests that you could have made
8  where you decided not to make them?
9      A. No.
10     Q. Were there ever times where you
11 knew where somebody who was the subject of a
12 warrant where you weren't going and
13 executing that warrant?
14     A. I don't recall that.
15     Q. What did you think Sergeant Barnes
16 meant by picking up the pace?
17     MR. KING: I object to the form,
18 and asked and answered twice, but you can
19 answer.
20     THE WITNESS: By making arrests,
21 go out and make some arrests. That's what
22 pick up the pace meant.
23 BY MR. SMITH:
24     Q. And you would agree that you can't

40

1  make an arrest unless there is somebody to
2  arrest?
3      A. Correct.
4      Q. Did you know of anybody in the
5  unit ever being told by Sergeant Barnes to
6  pick up the pace, and then they were able to
7  make arrests they should have been able to
8  make earlier?
9      A. I cannot attest for what other --
10 what they would do. I don't know.
11     Q. How about yourself?
12     A. No.
13     Q. Is it true that sometimes you get
14 a warrant that a person could even be -- who
15 was the subject of the warrant could even be
16 dead?
17     A. Repeat the question.
18     Q. Is it true that sometimes in
19 Fugitive Apprehensions, you might be given a
20 warrant and assignment to look for somebody
21 on a warrant and you learned that they were
22 dead?
23     A. That's possible.
24     Q. And it's true that it also can be

Robert Walker                    Spalding v. City of Chicago                    6/17/15

---

**41**

1  that individuals are already in prison who
2  are the subject of a warrant, correct?
3      A. Correct.
4      Q. If an individual is in prison who
5  is the subject of a warrant, would you
6  generally still try to somehow -- what would
7  you do with that warrant if you found out
8  somebody was in prison?
9      A. What I would do?
10     Q. Yes.
11     A. There is no answer for that.
12  There is not a concrete answer for that.
13  That could be handled -- I don't know.
14  There is no concrete answer for that.
15     Q. Do you know approximately how many
16  arrests you would generally make during the
17  course of a month when you were working at
18  Fugitive Apprehensions?
19     A. I don't know.
20     Q. In terms of when you made an
21  arrest, or it was your warrant and you were,
22  say, the subject -- the person who kind of
23  found where the subject of the arrest was,
24  how would you determine what other members

---

**42**

1  of the team should be listed as part of the
2  arrest?
3      A. How I would determine?
4      Q. Yes.
5      A. Repeat your question one more time
6  for me.
7      Q. In terms of if you were involved
8  in an arrest of somebody on a warrant that
9  you were assigned to, and you were able to
10  locate the individual to make the arrest,
11  how would you determine what members of the
12  team should also be listed as a part of the
13  arrest?
14     A. I would list whoever took part of
15  me apprehending that person.
16     Q. And what would -- what would that
17  include in terms of who would be considered
18  in taking a part in apprehending that
19  person?
20     A. Who would I include?
21     Q. Yes.
22     A. I would include the janitor if he
23  gave me a tip. I mean, anybody -- I would
24  have listed another officer who worked in

---

**43**

1  another district if they gave me a tip.
2  Anybody who took part in it.
3      Q. So they wouldn't have to be people
4  who were actually at the scene of the
5  arrest?
6      A. No.
7      Q. Would you include other members of
8  the team who were working that day, just
9  generally working to try and arrest people
10  out on warrants?
11     A. I don't understand your question.
12     Q. Would you sit down and actually
13  make an assessment of this person did this
14  for me on this arrest, this person did this
15  for me on this arrest, this person did this
16  for me on this arrest? Or would you
17  essentially say that anybody who was
18  actively working warrants that day since
19  they were part of my team, they should be
20  given credit for us doing a job and trying
21  to pick people up on warrants?
22     A. No. That practice was frowned
23  upon, no.
24     Q. Where did you learn that that

---

**44**

1  practice was frowned upon?
2      A. In the academy.
3      Q. Did anyone at Fugitive
4  Apprehensions ever instruct you on how to
5  decide who should be included in an arrest,
6  warrant arrest?
7      A. I don't recall.
8      Q. Did Sergeant Barnes ever tell you
9  in any way how to fill out paperwork about
10  who should be included on an arrest and who
11  should not be included?
12     A. No, I don't recall that.
13     Q. Did any of Sergeant Barnes'
14  supervisors, either Cesario or Salemme, ever
15  tell you who should be involved or be
16  included on your arrest report and who
17  should not be?
18     A. No, I don't recall that either.
19     Q. Did you ever get any training from
20  Lieutenant Cesario in how to go about
21  conducting search warrant arrests?
22     A. No.
23     Q. Did you ever get any training from
24  Lieutenant Salemme about how to go about

---

Robert Walker                    Spalding v. City of Chicago                    6/17/15

---

45

1  conducting search warrant arrests?
2      A. No.
3      Q. Did you ever get any training from
4  Sergeant Barnes in conducting how to go
5  about search warrant arrests?
6      A. No.
7      Q. Do you know what the VRI program
8  is?
9      A. Yes.
10     Q. Are you aware of with the VRI
11 program, are you aware of where officers are
12 required to check out from and check in?
13     A. Yes.
14     Q. Where is that?
15     A. 61st and Racine and Kedzie and
16 Harrison.
17     Q. In terms of when you say 61st and
18 Racine, is that for checkout or check-in?
19     A. For both.
20     Q. And Kedzie and Harrison, is that
21 for both?
22     A. Yes.
23         MR. TAREN: Can we take a break
24 real quick.

---

46

1          MR. SMITH: Why don't we take a
2  break for a minute.
3              (Whereupon, a break was taken
4                from 2:17 p.m. to 2:23 p.m.)
5  BY MR. SMITH:
6      Q. Just to make it clear, there is
7  different types of VRI in terms of -- are
8  you aware there are different types of VRI,
9  that there is VRI that's for the Fugitive
10 Apprehension Unit?
11     A. I don't know.
12     Q. In terms of do you know where the
13 check-out and check-in for VRI in connection
14 with people who work in Fugitive
15 Apprehensions is?
16     A. I don't know that. When I was in
17 Fugitive, I didn't have a chance to work
18 VRI. I don't -- I didn't have a chance to
19 work with it.
20     Q. Did you ever tell Danny or Shannon
21 that you weren't worried about where they
22 came from?
23     A. Correct.
24     Q. Did you ever tell them that you

---

47

1  felt that you guys worked together well so
2  that wasn't going to bother you, words to
3  that effect?
4      A. About by verbatim, I don't
5  remember.
6      Q. Words to that effect?
7      A. I won't say that. But I will tell
8  you that it never bothered me. It wasn't a
9  big deal to me that they came from IAD.
10     Q. Did you ever talk to them about
11 their job before they came to Fugitive
12 Apprehensions?
13     A. At some point.
14     Q. At what point?
15     A. During the course of us working
16 together, we have had several conversations.
17     Q. Do you remember any of those
18 conversations?
19     A. One conversation that I do recall,
20 they told me they worked in Narcotics.
21     Q. How did that come up?
22     A. I don't recall.
23     Q. Do you know who said it to you?
24     A. I don't recall that either.

---

48

1      Q. Do you have any idea of what the
2  conversation was about other than that they
3  came from Narcotics?
4          MR. KING: Object to form.
5  Misstates the testimony. It wasn't that
6  they came from Narcotics.
7  BY MR. SMITH:
8      Q. They worked in Narcotics?
9      A. I don't know.
10     Q. Any other conversations you
11 remember from either Danny or Shannon about
12 what kind of work they had done as police
13 officers before they came to Fugitive
14 Apprehension?
15     A. I don't recall that.
16     Q. Do you recall any conversations
17 with Danny or Shannon about what they
18 thought of the Fugitive Apprehension Unit?
19     A. I don't recall that either.
20     Q. Do you recall any conversations
21 with Danny or Shannon about what they
22 thought of Sergeant Barnes?
23     A. No.
24     Q. Do you recall any conversation

---

Robert Walker                    Spalding v. City of Chicago                    6/17/15

---

49

1   with Danny or Shannon about what they
2   thought of Lieutenant Cesario?
3       A. No.
4       Q. Do you recall any conversations
5   with Danny or Shannon about what they
6   thought of Tom Mills, or Sergeant Mills?
7       A. No.
8       Q. Do you recall any conversations
9   with Danny or Shannon about what they
10  thought about Commander Salemme?
11      A. No.
12      Q. Did you ever learn that Danny and
13  Shannon were being moved from Sergeant
14  Barnes' team?
15      A. What's your question again?
16      Q. Did you ever learn that Danny or
17  Shannon was going to be moved from Sergeant
18  Barnes' team?
19      A. I am going to say no.
20      Q. Did you ever have any conversation
21  -- did you ever learn that Danny and Shannon
22  were assigned to Sergeant Mills' team?
23      A. What's your question again?
24      Q. Did you ever learn that Danny and

---

50

1   Shannon were assigned to Sergeant Mills'
2   team?
3       A. Yes.
4       Q. How did you learn that?
5       A. Because they were no longer on my
6   team.
7       Q. Did you ever talk with anyone
8   about that?
9       A. No.
10      Q. Did you ever ask why they were no
11  longer on Barnes' team?
12      A. No.
13      Q. Did you ever ask Danny or Shannon
14  why they were on Mills' team?
15      A. I don't recall that.
16      Q. Did you ever say good-bye to them,
17  say nice working with you, or words to that
18  effect?
19      A. I don't recall that either.
20      Q. Did you ever talk at all about --
21  with Danny or Shannon about no longer
22  working together?
23      A. I don't know.
24      Q. Did you ever talk to Danny or

---

51

1   Shannon about what assignments they would
2   have liked to have had?
3       A. I don't know.
4       Q. Did you ever talk with Danny or
5   Shannon about what shift they would have
6   liked to have had?
7       A. No.
8       Q. Did you ever talk with Danny or
9   Shannon about you wanting to be a sergeant?
10      A. Do I recall?  No.
11      Q. Did you ever talk to Danny about
12  going to a funeral for one of your
13  supervisor's wife -- or mother, rather?
14      A. Who died?
15      Q. I believe Cesario's mother.
16      A. No, I don't recall the
17  conversation.  I don't --
18      Q. Did you ever learn about any
19  incident involving allegations that Shannon
20  was recording somebody?
21      A. I have heard that.
22      Q. Who did you hear it from?
23      A. I don't recall.
24      Q. When did you hear it?

---

52

1       A. I don't know.
2       Q. Where were you when you heard it?
3   Were you on the job?  Were you on the job or
4   off?
5       A. I don't know.
6       Q. Did you ever have any
7   conversations with either Shannon or Danny
8   about those allegations?
9       A. Yes.
10      Q. Who did you have a conversation
11  with?
12      A. Both of them.
13      Q. Where was this conversation?
14      A. That I don't remember.
15      Q. Was it on the job or off the job?
16      A. On the job.
17      Q. Who were you assigned to at the
18  time?
19      A. Area 2 Apprehension team.
20      Q. Where were they assigned?
21      A. Area 2 Apprehension team.
22      Q. What was the conversation?
23      A. I don't recall that verbatim.
24      Q. Do you recall the gist of it?

---

Robert Walker        Spalding v. City of Chicago        6/17/15

---

53

1     A. No.
2     Q. Do you recall anything that was
3  said?
4     A. No.
5     Q. Do you recall who brought it up?
6     A. I don't recall that either.
7     Q. Do you recall having any sense or
8  feeling about if you thought it was fair or
9  not fair that these allegations were being
10  made?
11       MR. KING: Object to the lack of
12  foundation.
13       You can answer.
14       THE WITNESS: What's your question
15  again?
16  BY MR. SMITH:
17     Q. Did you have any feelings about
18  whether you thought the situation or the
19  allegations were fair or unfair?
20     A. I have no feelings at all.
21  Towards that, I have no feelings at all, no.
22     Q. Did you ever have any
23  conversations -- when did you learn that
24  there was a lawsuit filed by Danny or

---

54

1  Shannon?
2     A. I don't know.
3     Q. Did you ever talk with any of your
4  team members about the lawsuit?
5     A. Yes, sir.
6     Q. Who did you talk to about the
7  lawsuit?
8     A. Lorne Gushiniere.
9     Q. Did you ever talk to Sergeant
10  Barnes about the lawsuit?
11     A. No.
12     Q. Did you ever hear Sergeant Barnes
13  talk about the lawsuit?
14     A. No.
15     Q. When did you talk to Lorne
16  Gushiniere about the lawsuit?
17     A. Early part of 2015, or first
18  couple months of 2015. I don't know the
19  exact date.
20     Q. Was anyone else present?
21     A. No.
22     Q. Did you know you were going to be
23  deposed at that time?
24     A. Yes.

---

55

1     Q. Did you know that Lorne Gushiniere
2  was going to be deposed at that time?
3     A. Yes.
4     Q. Did you talk about what Lorne
5  Gushiniere was going to say during the
6  deposition?
7     A. No.
8     Q. Did you talk about the meeting in
9  which Danny had indicated that officers
10  should get to know him?
11     A. What's your question again?
12     Q. Did you talk with Lorne Gushiniere
13  about the fact about the meeting in which
14  Danny had said words to the effect of, you
15  guys should get to know me. We could have a
16  beer, that kind of thing?
17     A. No.
18     Q. Did you talk at all with Lorne
19  Gushiniere about Barnes relating to you that
20  they worked for IAD?
21     A. No.
22     Q. In terms of Barnes -- when Barnes
23  related to you that they worked for IAD, who
24  else was present for that?

---

56

1     A. I don't know.
2     Q. Were you on the job at the time?
3     A. On duty, yes.
4     Q. I might have already asked you
5  this. How long before Danny and Shannon got
6  there did that conversation occur?
7     A. I don't know.
8     Q. Was it days?
9     A. I don't know. I don't know.
10     Q. Was it hours before they arrived?
11     A. I wouldn't say hours, no.
12     Q. More than a day?
13     A. I don't know how many days.
14     Q. But definitely more -- definitely
15  more than an hour before they had arrived?
16     A. Yes, more than an hour.
17     Q. When was the last time the team,
18  if you recall, the team, Barnes and his
19  team, had a team meeting before Danny and
20  Shannon arrived?
21     A. I don't know.
22     Q. Was there a team meeting when
23  Danny and Shannon got there?
24     A. I don't recall that.

---

Robert Walker                    Spalding v. City of Chicago                    6/17/15

57

1     Q.  Was there any type of introduction
2  of the new members to the team?
3     A.  I don't recall that.
4     Q.  How did you first find out that
5  you were going to be assigned to a car with
6  Danny and Shannon?
7     A.  I wanted to work with Danny and
8  Shannon.
9     Q.  What made you want to work with
10 Danny and Shannon?
11    A.  They were new to the team.  You
12 know, I wanted to, you know, just embrace
13 them with open arms.  I wanted to work with
14 them.
15    Q.  Did anyone else indicate that they
16 wanted to work with them?
17    A.  I didn't have a conversation with
18 anybody else regarding that.
19    Q.  Do you know who you were working
20 with before they arrived on the team?
21    A.  I don't know.
22    Q.  Before they arrived on the team,
23 did you usually work in a two-man car,
24 three-man car -- three-person car, I should

58

1  say?
2     A.  Correct.
3     Q.  A three-person car?
4     A.  Correct.
5     Q.  Is that because there were odd
6  number of individuals in the unit?
7     A.  I was odd man out.  I was the odd
8  person.
9     Q.  How did you get the status as the
10 odd person?
11    A.  Who knows.  That's just the way
12 things worked out for me.
13    Q.  How long were you the odd person
14 in the unit?
15    A.  I was always -- 2009, 2010.
16    Q.  Was there an officer by the name
17 of Kyle who was part of the Fugitive
18 Apprehension Unit?
19    A.  Yes.
20    Q.  What was Kyle's last name, do you
21 know, or was that the last name?
22    A.  Give me some time to think about
23 it.
24    Q.  Was there a Kim also?

59

1     A.  Yes.
2     Q.  Do you remember Kim's last name?
3     A.  No.  But we all worked together.
4     Q.  Did you ask to work with them?
5     A.  Yes.
6     Q.  How did that happen?
7     A.  You know, it just happened.  I'm
8  sorry, I might have misspoke.  Let me not
9  say that I asked to work with them.  Let me
10 not say that.
11       Just like, Danny and Shannon,
12 you can work.  Hey, I got a car, let's go
13 out on the street.
14    Q.  Did Danny or Shannon have a car?
15    A.  No.
16    Q.  Did Lorne Gushiniere have a car?
17    A.  Yes.
18    Q.  What officers didn't have a car
19 that were part of the Fugitive Apprehension
20 team at that time, other than Danny and
21 Shannon?
22    A.  Harry Strong, Milton Scott and
23 Harry Strong.  They rode together every day.
24 I don't know if they both had cars or not.

60

1  I am not sure.  They were always together.
2  I don't know.
3     Q.  Did anyone ever besides you ever
4  volunteer to work with Danny or Shannon in a
5  car with regard to the Fugitive Apprehension
6  team under Barnes?
7     A.  Not that I know of.
8     Q.  Have you worked in a car with
9  everybody in your team over the course of
10 your time with Sergeant Barnes?
11    A.  I don't remember ever riding with
12 Harry and Milton.  I have worked -- I don't
13 recall with them, but definitely Tony and
14 Lorne.
15    Q.  Anybody else on the team?
16    A.  I don't recall.
17    Q.  Is there anybody on the team that
18 other officers wouldn't ride with and work a
19 shift with that you know of?
20    A.  Not that I know of.
21    Q.  Was there anyone on the team that
22 you knew of before Danny and Shannon got
23 there that people did not wish to ride with?
24    A.  Not that I know of.

Robert Walker          Spalding v. City of Chicago          6/17/15

---

61

1     Q. Had you ever been told any other
2 -- anyone other than Danny and Shannon had
3 come from IAD during the entire time you
4 were at Fugitive Apprehensions?
5     A. Not that I know of.
6     Q. Were you ever told where -- who on
7 your team arrived after you to Fugitive
8 Apprehensions other than Danny and Shannon?
9     A. Kyle and Kim.
10     Q. Were you told where they came from
11 before they came?
12     A. Yes.
13     Q. Where did they come from?
14     A. The 25th district.
15     Q. Who told you that?
16     A. Sergeant Barnes.
17     Q. When did he tell you that?
18     A. When they got there.
19     Q. Do you know who told Sergeant
20 Barnes that they came from the 25th
21 district?
22     A. I don't know.
23     Q. Did you talk about the 25th
24 district with Kyle or Kim?

---

62

1     A. Yes.
2     Q. Do you see Kyle or Kim at this
3 point in your career?
4     A. I might have seen them one time
5 since they left the unit. Maybe once at the
6 St. Jude party.
7     Q. In terms of after -- after Danny
8 was no longer in Barnes' unit, how often
9 would you see him at Fugitive Apprehension?
10     A. I don't know.
11     Q. Would you see him fairly regularly
12 at that point in time?
13     A. No, not regularly, no.
14     Q. More than once a week?
15     A. No. Not at all, no.
16     Q. Since working with Danny under
17 Sergeant Barnes, how often have you seen
18 him, would you say?
19     A. I don't know. I don't know. I am
20 not sure. I am not sure.
21     Q. In terms of would you say it's
22 over 50 times?
23     A. Oh, nowhere near, no.
24     Q. Over ten times?

---

63

1     A. During the course of a year, I
2 would say maybe five times. Maybe, maybe.
3     Q. Five times on average during a
4 year?
5     A. A year, maybe, maybe.
6     Q. When was the last time you had
7 seen him?
8     A. I don't know.
9     Q. Was it over a month ago or over
10 six months ago?
11     A. I don't know. I don't know. I am
12 not sure.
13     Q. Do you think you have seen him
14 this year? And by that, I mean calendar
15 year.
16     A. I am going to say no.
17     Q. How about Shannon?
18     A. No.
19     Q. Have you seen her in the last
20 year?
21     A. No.
22     Q. How many times would you say you
23 have see Shannon since you stopped working
24 with her?

---

64

1     A. I can't recall the last time I
2 have seen Shannon.
3     Q. Did you ever communicate to Danny
4 or Shannon by text messages?
5     A. Yes.
6     Q. In terms of how about after you no
7 longer worked with them?
8     A. Danny and I maintain
9 communication.
10     Q. What did you maintain
11 communication with Danny about?
12     A. We will talk about our daughters.
13 I know he goes fishing, takes his daughter
14 fishing.
15     Q. Now you mentioned talking about
16 the lawsuit with Lorne Gushiniere. What did
17 you talk to him about in relation to that?
18     A. That I was -- I had a court
19 notification, and I had to sit down and talk
20 with Corporation Counsel. That was the
21 extent of our conversation.
22     Q. Who was present for that
23 conversation?
24     A. It was over the telephone.

---

Robert Walker      Spalding v. City of Chicago      6/17/15

---

65

1     Q. Who called who?
2     A. I don't know.
3       I am sorry. I am wrong on
4 this. I am wrong on this. He called me.
5     Q. Do you know why he called you?
6     A. To tell me that I was notified, to
7 tell me that I had a court notification.
8     Q. Why would Lorne Gushiniere notify
9 you that you had a court notification?
10     A. Because he had a court
11 notification, too.
12     Q. Do you know how he came to know
13 that you had one?
14     A. I think there was an email that
15 was sent out.
16     Q. Did you ever see this email?
17     A. No.
18     Q. Were you part of the same team at
19 that point in time?
20      MR. KING: Did you finish your
21 answer?
22      THE WITNESS: I want to correct
23 something. At that time of the telephone
24 call, I had not seen the email yet. I did

---

66

1 see the email some time after that.
2 BY MR. SMITH:
3     Q. You sent an email to somebody
4 else?
5     A. No.
6      MR. KING: He saw the email.
7      THE WITNESS: I saw the email.
8 BY MR. SMITH:
9     Q. How long was that telephone
10 conversation?
11     A. I don't know.
12     Q. How often did you talk to -- what
13 timeframe are we talking about, again in
14 terms of when you found out you were going
15 to be deposed? Beginning of 2015, did you
16 say?
17     A. Correct.
18     Q. You were no longer working with
19 Lorne Gushiniere at that point in time,
20 correct?
21     A. Correct.
22     Q. How often do you talk to Lorne
23 Gushiniere?
24     A. I don't know.

---

67

1     Q. More than once a week?
2     A. Oh, nowhere near. Not even once a
3 month.
4     Q. When you say, "not even once a
5 month," do you think it's close to once a
6 month?
7     A. No.
8     Q. About how much then?
9     A. I don't know. I don't know. It's
10 not once a month.
11     Q. It's more than once a year?
12     A. Yes.
13     Q. More than twice a year?
14     A. Yes.
15     Q. How long have you known Lorne
16 Gushiniere?
17     A. 2008.
18     Q. Did you ever socialize with him
19 off the job?
20     A. No.
21     Q. Any members of the team that you
22 socialized with off the job?
23     A. Christmas parties, we have
24 socialized. Tony and Lorne have gone to my

---

68

1 mother's house before for dinner.
2     Q. Lorne Gushiniere?
3     A. Correct. He's been to my mother's
4 house for dinner once or twice over -- since
5 2008. But I don't go over to his house. I
6 don't know his address.
7     Q. Anyone other than Lorne Gushiniere
8 did you find out -- and I am not talking
9 about conversations with your attorney or
10 anything like that. Did you find out from
11 anyone else that they were being deposed in
12 connection with this lawsuit?
13     A. What's your question?
14     Q. Other than Lorne Gushiniere, did
15 you find out about anybody else being
16 deposed in this lawsuit?
17     A. Yes.
18     Q. Who?
19     A. I don't know all the names.
20     Q. In terms of conversations, did you
21 have any conversations with any other
22 people, police officers, who were being
23 deposed in this lawsuit?
24     A. No.

---

Robert Walker | Spalding v. City of Chicago | 6/17/15

---

69

1    Q.  Do you know who gives out the
2  assignments for Fugitive Apprehensions?
3    A.  I don't recall.
4      MR. KING:  Let me just object to
5  the lack of foundation.  I assume we are
6  talking about when he was there and when
7  Danny and Shannon were there?
8      MR. SMITH:  When you were there,
9  I'm sorry.
10  BY MR. SMITH:
11    Q.  When you were working for Sergeant
12  Barnes, do you know who gave out the
13  assignments?
14    A.  Assignments would come from --
15  what's her name?
16    Q.  Jan Hanna?
17    A.  Sometimes they would come from
18  her, but there was another officer.
19    Q.  Dougan?
20    A.  No.  Whitney -- I can't remember
21  her name.  Whitney -- she got married.  Her
22  maiden name was Russo, but she got married a
23  couple of years ago.
24    Q.  And do you know -- have you ever

---

70

1  heard Jan Hanna -- have you ever heard
2  anything about Jan Hanna signing an
3  affidavit or making a statement about how
4  cases were assigned to Danny and Shannon?
5    A.  An affidavit?
6    Q.  Or a statement to the press or on
7  TV.
8    A.  I saw her on T.V.
9    Q.  Are you aware that -- now, you
10  would agree that when you were working under
11  Barnes, Cesario was Barnes' immediate
12  supervisor, correct?
13    A.  Correct.
14    Q.  And the sergeants were Sergeant
15  Mills, Barnes, Stack and Melean and Tirado.
16  Is that your understanding or belief?
17    A.  I believe that.
18    Q.  Are you aware of how -- in terms
19  of -- would you have any reason to believe
20  that it wasn't true that Lieutenant Cesario
21  would instruct Jan Hanna to assign cases on
22  who to give them to?
23      MR. KING:  Object to the form of
24  the question.  Go ahead.

---

71

1      THE WITNESS:  I don't understand
2  your question.
3  BY MR. SMITH:
4    Q.  Did you know who would -- did you
5  know Lieutenant Cesario's role in handing
6  out assignments?
7      MR. KING:  And also, just object,
8  I just want to be clear, he is being asked
9  about the time when Danny and Shannon were
10  on Barnes' team?
11      MR. SMITH:  Correct.
12      MR. KING:  Thank you.
13      THE WITNESS:  His role in it?
14  BY MR. SMITH:
15    Q.  Yes.
16    A.  I guess his role was he's the
17  lieutenant of police.  He could do whatever
18  he wanted to do.
19    Q.  In terms of -- do you recall any
20  homicides being -- warrants being assigned
21  to Danny or Shannon?
22    A.  I don't recall.
23    Q.  None that you recall?
24    A.  Not that I recall, no.

---

72

1    Q.  Do you recall any assignments
2  being taken away from Danny and Shannon?
3    A.  I don't recall that offhand, no.
4    Q.  Did you ever hear about Shannon
5  Spalding being prohibited from going to
6  Homan Square?
7    A.  Is that possible?  I'm sorry.
8      MR. KING:  Just answer his
9  question.
10      THE WITNESS:  No.
11  BY MR. SMITH:
12    Q.  Have you ever heard of any officer
13  being banned from Homan Square?
14    A.  No.
15    Q.  Now, you indicated you knew an
16  officer Kevin Williams, correct?
17    A.  Correct.
18    Q.  When did you first meet Kevin
19  Williams?
20    A.  2008.
21    Q.  When Danny and Shannon came to
22  Fugitive Apprehensions, were you aware that
23  Kevin Williams was working under a Sergeant
24  Mason?

---

Robert Walker                    Spalding v. City of Chicago                    6/17/15

---

73

1    A. No.
2    Q. Were you aware which team Kevin
3  Williams was working in?
4    A. No.
5    Q. Did you ever become aware that
6  Sergeant Mason warned Kevin Williams and his
7  partner to be careful talking with Spalding
8  and Echeverria?
9    A. No.
10    Q. Have you ever had a situation
11  where Sergeant Barnes told you to write an
12  arrest report for an arrestee that you
13  weren't present for?
14    A. No.
15    Q. Have you ever had any situations
16  with Sergeant Barnes where he took you aside
17  into a room to verbally reprimand you in any
18  way?
19    A. Yes.
20    Q. How often has that happened?
21    A. Once a month.
22    Q. What was the nature of any of
23  those?
24    A. They could be anything. I don't

---

74

1  recall. I don't know.
2    Q. You don't remember any of them?
3    A. Mostly about numbers, numbers of
4  arrests, arrests.
5    Q. Would he do that with other
6  members of the team?
7    A. Yes.
8    Q. Generally once a month?
9    A. I can't speak on that, but I do
10  know with me.
11    Q. Well, did you feel like he was
12  doing it with you more than other members of
13  the team?
14    A. Yes.
15    Q. Why is that?
16    A. I don't know.
17    Q. Did you think that was fair?
18    A. Never thought about it.
19    Q. What makes you think he did it
20  with you more?
21    A. He was just always calling me
22  aside, just always reprimanding me about
23  something.
24    Q. Did he write you any kind of

---

75

1  recommendation for you to become a sergeant?
2    A. He didn't have to.
3    Q. Why is that?
4    A. I scored well enough on my own.
5    Q. Did you ever get a negative
6  performance evaluation from Sergeant Barnes?
7    A. No.
8    Q. How long have you known Sergeant
9  Barnes?
10    A. Since 2008.
11    Q. Do you still see him at all?
12    A. No.
13    Q. Were you ever personal friends
14  with Sergeant Barnes?
15    A. No.
16    Q. Did you ever find Officer Spalding
17  or Echeverria to be less than professional
18  in their work ethic?
19    A. Less than professional work ethic?
20    Q. Yes.
21    A. No.
22    Q. Did Sergeant Barnes ever in any
23  way give you any type of speech about, you
24  know, if you didn't do things right, you

---

76

1  could end up coming home in a box? I am not
2  saying threatened you like that. I am
3  saying, did he ever give you a speech like
4  that?
5       Is that something that he
6  would say is that the streets are dangerous,
7  you know, that if you don't do this, you
8  could end up in a box?
9    A. We have had conversations like
10  that.
11    Q. What were the circumstances for
12  those conversations?
13    A. Along the lines of talking about
14  tactics, along the lines of being safe.
15    Q. When did you have that
16  conversation?
17    A. We had more than one conversation
18  like that, but I can't remember the dates
19  and times.
20    Q. Did you ever hear anyone else talk
21  about a conversation with Barnes like that?
22    A. Yes.
23    Q. Who?
24    A. We have had those conversations as

---

Robert Walker          Spalding v. City of Chicago          6/17/15

---

77

1    a team.  It happens frequently.
2        Q.  Does it happen in the team
3    meetings?
4        A.  I would say -- I would say, no.
5        Q.  You remember those conversations
6    happening frequently, but you are confident
7    they didn't happen during one of the team
8    meetings?
9        A.  I am confident that it happened
10   frequently.  We didn't call team -- I mean,
11   team meetings, you know, to talk about that.
12   I am not saying that never occurred in a
13   team meeting.  But we have had
14   conversations.
15       Q.  Is it possible that it occurred in
16   a team meeting where Danny spoke up about
17   people who wanted to get to know him and who
18   he was?
19           MR. KING:  Object to the form and
20   asked and answered.
21           You can answer.
22           THE WITNESS:  I don't recall that.
23   BY MR. SMITH:
24       Q.  Are you aware of if Barnes ever

---

78

1    had a conversation like that with Shannon
2    Spalding?
3        A.  I don't know.
4        Q.  Would Shannon Spalding have been
5    present for any of those situations that you
6    are talking about where he brought up, you
7    know, that we had to be careful, or you
8    could end up in a box?
9        A.  I don't recall.
10       Q.  Did Sergeant Barnes in any way
11   instruct you not to tell Danny or Shannon
12   about what he had told you about where they
13   had come from?
14       A.  No.
15       Q.  Did Sergeant Barnes in any way
16   tell people not to spread it around that
17   they came from IAD?
18       A.  No.
19       Q.  Did you ever work in IAD?
20       A.  No.
21       Q.  Did you ever know of any other
22   Fugitive Apprehension officers who worked in
23   IAD?
24       A.  Not that I know of.

---

79

1        Q.  So as far as you were concerned,
2    is it fair to say that you thought it was
3    okay to talk about where Danny and Shannon
4    had come from, where Sergeant Barnes had
5    told you Shannon and Danny had come from?
6        A.  That it was okay?
7        Q.  Yes.
8        A.  What do you mean?  I don't --
9        Q.  I mean, you felt it was okay for
10   you to talk freely with people about where
11   Barnes had told you Danny and Shannon had
12   come from?
13       A.  I don't -- Afraid to talk about
14   it?  Afraid to?
15       Q.  You know, that you had no
16   restriction, or it was okay?  It wasn't
17   anything bad to talk about?
18       A.  No.
19       Q.  Have you ever in any way known of
20   situations where it's important that people
21   don't know who is from IAD and who is?
22           MR. KING:  Object to the lack of
23   foundation.  But if you understand, you can
24   answer.

---

80

1            THE WITNESS:  I don't understand.
2    BY MR. SMITH:
3        Q.  Well, if -- let's start with this:
4    If Sergeant Barnes -- if Danny or Shannon,
5    or any other officer, for that matter, was
6    actively working for IAD undercover, do you
7    think that it would be appropriate for
8    Sergeant Barnes to have told you that they
9    were in IAD?
10           MR. KING:  Object to the form and
11   relevance.
12   BY MR. SMITH:
13       Q.  Would you question that in any
14   way?
15       A.  No.
16       Q.  So, you know, did you know whether
17   or not Danny or Shannon were currently
18   working in IAD, or that was something that
19   had already ended?
20       A.  Currently ended?  I don't --
21       Q.  When you had a conversation with
22   Barnes, did he tell you that they were no
23   longer working with IAD, or they were still
24   with IAD?

---

Robert Walker   Spalding v. City of Chicago   6/17/15

---

81

1  A. I don't know.

2  Q. Did he tell you that they were

3 undercover, or they weren't undercover with

4 IAD?

5  A. I don't recall.

6  Q. What's your understanding of what

7 an officer in IAD would be doing?

8  A. My understanding?

9  Q. Yes.

10  A. I really don't know much about

11 IAD. I can't tell you, you know, totally

12 what their functions are. I don't know.

13  Q. You are a sergeant now, correct?

14  A. Correct.

15  Q. Do you have people working under

16 you?

17  A. Correct.

18  Q. If you learned that an individual

19 was working undercover in IAD, would you

20 feel like it was your job as sergeant to

21 tell the people who work under you that they

22 work for IAD?

23  MR. KING: Object to the form of

24 the question, calling for speculation.

---

82

1  You can answer if you can.

2  THE WITNESS: I don't know.

3 BY MR. SMITH:

4  Q. So if you found out somebody was

5 working in your unit who was working

6 undercover with IAD, what would you do with

7 that information? Would you tell anyone in

8 your -- who worked underneath you?

9  MR. KING: Same objections to

10 speculation, relevance, assuming facts not

11 in evidence, but you can answer.

12  THE WITNESS: I don't know.

13 BY MR. SMITH:

14  Q. Did anybody ever ask any

15 questions, to your knowledge, to Sergeant

16 Barnes about what their position at IAD was?

17  A. I have no knowledge of that.

18  Q. You wouldn't have been concerned

19 if they were working undercover with IAD

20 because you don't feel like you do anything

21 inappropriate on the job, correct?

22  A. Correct.

23  Q. So it's fair to say it wouldn't

24 concern you personally whether they were

---

83

1 formerly with IAD or currently with IAD,

2 correct?

3  A. Correct.

4  Q. Do you see anything wrong with

5 people who were being investigated by IAD

6 being informed that somebody was from IAD?

7  MR. KING: Object to the form,

8 lack of foundation, calling for speculation.

9  If you understand his

10 question, you can answer.

11  THE WITNESS: I don't know. I

12 never thought -- I don't know.

13 BY MR. SMITH:

14  Q. So when Barnes let you know that

15 they were from IAD, was that something where

16 it was a situation where it just slipped out

17 in conversation, or was it a conversation

18 that was actually about it, and where they

19 came from?

20  MR. KING: Object to form, asked

21 and answered. Tell him again.

22  THE WITNESS: I don't know.

23 BY MR. SMITH:

24  Q. Did you get any training as a

---

84

1 sergeant?

2  A. Training for what?

3  Q. When you get moved from, you know,

4 patrol or your position below sergeant to

5 sergeant, is there any kind of sergeant

6 training?

7  A. Yes.

8  Q. Are sergeants trained that if they

9 find out somebody works for IAD that they

10 should let everybody in their command know

11 about it?

12  A. I don't understand your question.

13 Training. I don't know.

14  Q. I am trying to figure out with

15 Sergeant Barnes and Sergeant Mason or people

16 that are in the position to pass on

17 information about where somebody -- when

18 somebody is with IAD or not, is that

19 something you are trained to do, to say --

20 if you find out that somebody works in IAD,

21 are you trained as a sergeant to pass it on

22 to the people who work underneath you?

23  A. I think it's common knowledge that

24 in the department when somebody is moved

---

Robert Walker          Spalding v. City of Chicago          6/17/15

---

85

1  from one place to another, that is something
2  that's called a transfer order.  So what was
3  said was going to be in print anyway.
4          So I am not understanding your
5  question.
6          Everybody who came to the
7  unit, you knew where they came from.
8  So-and-so came from 4th, someone transferred
9  from the 10th district, someone came from
10  IAD, and so -- and it's in print, too, as
11  well, so.
12     MR. TAREN:  Can we take a break?
13     MR. SMITH:  We are almost done.
14          (Whereupon, a break was taken
15           from 3:15 p.m. to 3:18 p.m.)
16  BY MR. SMITH:
17     Q.  Hypothetically speaking, as a
18  sergeant, if you learned that somebody was
19  in IAD, if you happened to come across
20  information on that, would you tell anyone
21  about it?
22     MR. KING:  Object to the form of
23  the question.
24

---

86

1  BY MR. SMITH:
2     Q.  Let's start with this.  Would you
3  go to your supervisor about it?
4     MR. KING:  Object to the form of
5  the question.  Counsel, are we now saying
6  your plaintiffs were in IAD when they came
7  to Fugitive Apprehension?
8     MR. SMITH:  It's your clients who
9  said that, not me.
10     MR. KING:  No.  My client and this
11  witness has testified as to what was said
12  about where they came from.
13     MR. SMITH:  Okay.
14     MR. KING:  Whether that's true or
15  not.  And now you are asking questions about
16  people being inside of IAD, which has
17  nothing to do with this lawsuit.
18     MR. SMITH:  I am asking him a
19  hypothetical question, as I phrased it that
20  way, so clearly you are making a speaking
21  objection that you want to testify -- have
22  him testify exactly the same way, which is
23  clearer than all heck on the record.
24     MR. KING:  I don't --

---

87

1          MR. SMITH:  And you are trying to
2  give him the words to use because I started
3  with the fact that I am saying
4  hypothetically speaking here, which was
5  clear as all heck.
6  BY MR. SMITH:
7     Q.  So hypothetically speaking again,
8  I am asking you as a sergeant, if you had
9  information that somebody came from IAD,
10  would you tell your supervisor about that --
11          MR. KING:  And my --
12  BY MR. SMITH:
13     Q.  -- leading up the chain towards
14  lieutenant, or whomever would be your
15  supervisor?
16          MR. KING:  The same objections.
17  And my law school training tells me that
18  when someone starts a question with a
19  hypothetical question, it's probably an
20  inappropriate question.
21          So I object to speculation
22  that it calls for, the lack of foundation in
23  the hypothetical.  But the witness can
24  certainly give his best answer to the

---

88

1  question as he understands it.
2          She can even read back the
3  question to you if you need it.
4          THE WITNESS:  I am just going to
5  refuse to answer the question.  I don't
6  know.  Hypothetically, I could give you ten
7  different answers.
8          MR. SMITH:  Okay.
9          THE WITNESS:  I don't have that
10  many answers.  I don't know.
11  BY MR. SMITH:
12     Q.  Would any of those answers be I
13  would tell the people who would work
14  underneath me?
15     A.  I don't know the answer.  I truly
16  don't know it.  I could -- I don't know.
17     Q.  You are aware that Sergeant Barnes
18  and the rest of the sergeants occasionally
19  have meetings with Lieutenant Cesario?
20     A.  I wasn't -- okay.
21     Q.  First of all, you are not in those
22  meetings, correct?
23     A.  Correct.
24     Q.  But you are aware they happen,

---

Robert Walker                Spalding v. City of Chicago                6/17/15

89

1  correct, or maybe you're not?
2      A. I was not aware.
3      Q. You have never seen, for instance,
4  a meeting between Lieutenant Cesario and the
5  sergeants?
6      A. No.
7      Q. Have you ever seen -- do you know
8  where Lieutenant Cesario's office is?
9      A. Yes.
10     Q. Have you ever seen the sergeants
11 in his office?
12     A. All the sergeants, no.
13     Q. Sergeant Barnes?
14     A. I can't recall seeing Sergeant
15 Barnes in Lieutenant Cesario's office.
16     Q. Ever during the entire time you
17 were in Fugitive Apprehensions?
18     A. I can't recall that.
19     Q. Did you have any kind of desk when
20 you were working in Fugitive Apprehensions
21 under Sergeant Barnes?
22     A. Repeat the question.
23     Q. Did you have any kind of a desk
24 when you were working in Fugitive

90

1  Apprehensions under Sergeant Barnes?
2      A. No.
3      Q. Did you have a work station?
4      A. Officers typically didn't have
5  assigned desks.
6      Q. Where would you go to work if you
7  needed a desk?
8      A. When I go to the station, if I saw
9  an open spot that was not a regular spot for
10 somebody else, I would sit there. But I did
11 not have an assigned station. I didn't have
12 an assigned table.
13     Q. How far would those desks be from
14 Lieutenant Cesario's office?
15     A. Because I sat at a different desk
16 when I was at Homan Square, I can't tell
17 you. I don't know.
18     Q. Was it more than 100 feet away?
19     A. Could be.
20     Q. Could you see Sergeant Cesario's
21 office from any of the desks that you would
22 use?
23     A. You couldn't see his office
24 from --

91

1      Q. Any of the desks?
2      A. No.
3      Q. Were they on the same floor?
4      A. Yes.
5      Q. Would you pass by the area where
6  Lieutenant Cesario's desk was to get to the
7  desk?
8      A. No.
9      Q. Did Sergeant Barnes have an
10 office?
11     A. No.
12     Q. Where would Sergeant Barnes work
13 if he had to work? Did he have a set
14 station that was his own desk or anything?
15     A. The sergeants shared an office,
16 maybe about the size of this room, that had
17 some desks in it. He had his own desk.
18     Q. Did you ever see Lieutenant
19 Cesario in the sergeant's office with
20 Sergeant Barnes?
21     A. Yes.
22     Q. Did you ever see him in the
23 sergeant's office with all the sergeants at
24 the time that Danny and Shannon were in

92

1  Fugitive Apprehensions with you?
2      A. No.
3      Q. Just in terms of -- have you ever
4  heard the term "rats" in connection with
5  police officers?
6      A. Yes.
7      Q. What's your understanding of what
8  that would mean?
9      A. My understanding is pretty much --
10     MR. KING: Just object to the form
11 and lack of foundation in your question, but
12 you can answer.
13     THE WITNESS: My definition would
14 probably be somebody that's not to be
15 trusted.
16 BY MR. SMITH:
17     Q. In terms of when you heard other
18 people use it or -- not by your definition
19 about it. What's your understanding of what
20 the term "rats" in connection with police
21 officers?
22     MR. KING: Object to the form, and
23 calling for speculation about what other
24 people mean, but you can answer.

Robert Walker          Spalding v. City of Chicago                6/17/15

---

93

BY MR. SMITH:
Q. So is that the limits of your understanding of the word "rats"?  It's just somebody not to be trusted?
A. Correct.
Q. So you never heard of it in the context of somebody who was telling on other officers?
A. That's not my understanding of it.
Q. You have never heard of a rat as being somebody who tells on somebody else?
A. My definition and my knowledge of the word is somebody that's not to be trusted.
Q. Had you ever heard of the code of silence?
A. Yes.
Q. What's your understanding of what that means?
A. Code of silence?
Q. Yes.
A. It's to be silent.
Q. So to be quiet?
A. Correct.

---

94

Q. In terms of what does the word "code" add to that phrase?
MR. KING:  Object to form of the question.
If you understand it, you can answer.
THE WITNESS:  What it means, the word "code," I mean, my definition of "code of silence" is just exactly that, just to be silent.
BY MR. SMITH:
Q. To be silent with respect to what or who or about who?
A. Exactly.
Q. Everything?
A. Correct.
Q. Just being silent?
A. Being silent.
Q. It doesn't matter who the information is about or where it came from or what it concerns?
A. That's my understanding.
Q. It doesn't matter who -- so in terms of -- have you ever heard the police

---

95

having a code of silence with respect to criminals?
A. With respect to criminals?
Q. Yes.  That they are silent with respect to criminals?
A. I never heard that.
Q. Have you ever heard the code of silence in the context of he is silent from one police officer to another, if one police officer does something wrong?
A. That's a fallacy.
Q. Have you ever heard that?
A. Yes.
Q. In what context?
A. Exactly that, the context being silent about what the police do, about anything.
Q. Isn't that your understanding of what the words "code of silence" mean?
MR. KING:  Object to the form of the question.  I think he's answered it.
BY MR. SMITH:
Q. So your meaning of code of silence is just overall silence, correct?

---

96

A. That's my understanding of it.
Q. Have you ever reported an officer for conduct that you thought was inappropriate to a supervisor?
A. No.
Q. Have you ever reported a fellow police officer in any way to anyone for something you thought was behavior that was not in accordance with their job or illegal in any way?
A. No.
Q. Have you ever had another officer say that -- report you or give a CR against you?
A. Yes.
Q. Was that anyone in Fugitive Apprehensions?
A. Yes.
Q. Was it any of your supervisors?
A. Yes.
Q. Who was the supervisor?
MR. KING:  I am going to object to the relevance to this lawsuit, but you can answer the question.

---

Robert Walker          Spalding v. City of Chicago          6/17/15

---

97

1    THE WITNESS:  Do I have to answer?
2    MR. KING:  Yes.
3    THE WITNESS:  Maurice Barnes.
4  BY MR. SMITH:
5    Q.  What did it concern?
6    A.  What did it concern?
7    Q.  Yes.
8    A.  Being intoxicated on duty.
9    Q.  Did you get any type of a
10  supervision or punishment in connection with
11  that CR?
12    A.  It was unfounded.
13    Q.  Is what Barnes said true?
14    A.  No.
15    Q.  Do you know why he said it?
16    MR. KING:  Object to the form of
17  the question.
18       If you know why he said it.
19    THE WITNESS:  Somebody made the
20  allegation to him.
21  BY MR. SMITH:
22    Q.  Do you know who made the
23  allegation to him?
24    A.  I am unclear as to who.  I am not

---

98

1  -- I don't know how it all came out.
2    Q.  Was it a police officer?
3    A.  Correct.
4    Q.  That made the allegation against
5  you?
6    A.  Correct.
7    Q.  But it was a false allegation?
8    A.  Correct.
9    Q.  When did that happen?
10    A.  Maybe 2013.
11    Q.  Did Barnes in any way say that he
12  believed you were intoxicated?
13    A.  No.  I think Maurice Barnes did
14  his job, though.
15    Q.  And he said that it was -- did he
16  indicate that he never saw you intoxicated?
17    A.  I don't know what he indicated.
18    Q.  What did he say that was false?
19    A.  Maybe I am -- I am not clear.
20  Somebody made the allegation.  He got a CR
21  number.
22       You asked me about the
23  allegation.  I said the allegation was
24  false.  Maurice Barnes did his job.  I got a

---

99

1  CR number on me.
2    Q.  In terms of Maurice Barnes, were
3  you alleged to have been intoxicated while
4  on the job?
5    A.  That's the allegation.
6    Q.  And you were working under Maurice
7  Barnes on the day that this alleged
8  intoxication occurred, correct?
9    A.  Correct.
10    Q.  And Maurice Barnes was there the
11  day that you were allegedly intoxicated,
12  correct?
13    A.  Correct.
14    Q.  To your knowledge, did Maurice
15  Barnes in any way say that you were
16  intoxicated, or that he believed or had any
17  evidence that you were intoxicated other
18  than the allegation itself?
19    A.  No.
20    Q.  So as far as you are aware,
21  Maurice Barnes would tell the people -- so
22  to this day, do you know who made the
23  allegation that you were intoxicated?
24    A.  I am not clear as to the

---

100

1  circumstances, no.
2    Q.  Did you find out in any way who
3  was involved in making the allegation?
4    A.  No.  And I don't care.
5    Q.  In any way were you ever presented
6  with any knowledge -- any information about
7  what the evidence was that you were
8  intoxicated?
9    A.  No.
10    Q.  Were you ever questioned about it?
11    A.  I had to give a statement about
12  it.
13    Q.  Were you asked who you were with
14  on that date, working with?
15    A.  Yes.
16    Q.  Who were you working with?
17    A.  One officer was Officer Rainey.
18    MR. KING:  Do you know how to
19  spell it?
20    THE WITNESS:  R-a-i-n-e-y.
21  BY MR. SMITH:
22    Q.  Do you know who the other officer
23  was?
24    A.  I can't remember his name.

---

**MARIBETH REILLY & ASSOCIATES**

Robert Walker · · · · · · · · Spalding v. City of Chicago · · · · · · · · 6/17/15

---

101

1 · · · · Q.· Do you know if any of those
2 officers indicated that you were
3 intoxicated?
4 · · · · A.· I don't know.
5 · · · · Q.· Was anything alleged to have
6 happened at the time you were allegedly
7 intoxicated?· In other words, a car accident
8 or any type of escape, or any type of issue
9 that was allegedly affected by intoxication?
10 · · · · A.· Yes.
11 · · · · Q.· What was that?
12 · · · · A.· I had a car crash.
13 · · · · Q.· Was the car crash involving
14 another vehicle?
15 · · · · A.· No.
16 · · · · Q.· Who was in the car at the time?
17 · · · · A.· Officer Rainey, myself, and
18 another officer.· I can't remember his name.
19 · · · · Q.· Did Sergeant Barnes ask you to do
20 any type of breathalyzer test?
21 · · · · A.· They took blood samples.
22 · · · · Q.· Do you know if the samples ever
23 came back?
24 · · · · A.· Yes, they came back.

---

102

1 · · · · Q.· Was anyone injured in the
2 accident?
3 · · · · A.· Yes, we were all injured.
4 Everybody in the car was injured.
5 · · · · Q.· Did you learn the results of the
6 blood test?
7 · · · · A.· I am not sure.
8 · · · · Q.· Do you know if anyone ever -- do
9 you know if the results were ever -- do you
10 know if the sample was actually tested?
11 · · · · A.· Yes.
12 · · · · Q.· Do you know what it was tested
13 for?
14 · · · · A.· Drugs and alcohol.
15 · · · · Q.· How do you know that?
16 · · · · A.· That's our police procedures.
17 · · · · Q.· But you never saw the results of
18 the test?
19 · · · · A.· No.
20 · · · · Q.· Were you ever told the results of
21 the test?
22 · · · · A.· No.
23 · · · · Q.· Was there any kind of lawsuit that
24 came out of that?

---

103

1 · · · · A.· I am not sure.
2 · · · · Q.· And you say you are not sure.· Do
3 you think there might be one?
4 · · · · A.· There could be one pending
5 possibly.
6 · · · · Q.· Do you have a lawyer for that?
7 · · · · A.· Not yet, no.
8 · · · · Q.· Do you know if it's state court at
9 the Daley Center?
10 · · · · A.· I am not sure.
11 · · · · Q.· And the victim or the party suing
12 you would be a police officer?
13 · · · · A.· Correct.
14 · · · · Q.· Is Rainey suing you, to your
15 knowledge?
16 · · · · A.· Correct.
17 · · · · Q.· Do you know Rainey's first name?
18 · · · · A.· Tamica.
19 · · · · Q.· Do you know if she is also suing
20 the City of Chicago in connection with that
21 lawsuit, to your knowledge?
22 · · · · A.· I don't know.
23 · · · · MR. SMITH:· Nothing further.
24 · · · · MR. KING:· I don't have any

---

104

1 questions.
2 · · · · We will reserve.
3 · · · · (FURTHER DEPONENT SAITH NOT.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

Robert Walker                Spalding v. City of Chicago                6/17/15

---

105

1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION
3    CHICAGO POLICE
     OFFICERS SHANNON
4    SPALDING and
     DANIEL ECHEVERRIA,
5              Plaintiffs,
         vs.
6    CITY OF CHICAGO,
     CHICAGO POLICE
7    CHIEF JUAN RIVERA,
     et al.,
8              Defendants.
9          I, ROBERT WALKER, being first duly
10   sworn, on oath say that I am the deponent in
11   the aforesaid deposition taken on June 17,
12   2015, that I have read the foregoing
13   transcript of my deposition, consisting of
14   pages 1 - 104, and affix my signature to
15   same.
16
17   _____
18             ROBERT WALKER
19       Number of errata sheets
         attached_____
20
     Subscribed and sworn to
21   before me this        day
22   of              , 2016.
23
     _____
24   Notary Public

---

106

1    STATE OF ILLINOIS  )
2                       )  SS:
3    COUNTY OF DU PAGE  )
4
5        I, MARIBETH REILLY, a notary public
6    within and for the County of DuPage County
7    and State of Illinois, do hereby certify
8    that heretofore, to-wit, on June 17, 2015,
9    personally appeared before me, at One North
10   LaSalle Street, Chicago, Illinois, ROBERT
11   WALKER, in a cause now pending and
12   undetermined in the Northern District of
13   Illinois, wherein Chicago Police Officers
14   SHANNON SPALDING and DANIEL ECHEVERRIA are
15   the Plaintiffs, and CITY OF CHICAGO, et al.,
16   are the Defendants.
17       I further certify that the said ROBERT
18   WALKER was first duly sworn to testify the
19   truth, the whole truth and nothing but the
20   truth in the cause aforesaid; that the
21   testimony then given by said witness was
22   reported stenographically by me in the
23   presence of the said witness, and afterwards
24   reduced to typewriting by Computer-Aided

---

107

1    Transcription, and the foregoing is a true
2    and correct transcript of the testimony so
3    given by said witness as aforesaid.
4        I further certify that the signature
5    to the foregoing deposition was reserved by
6    counsel for the respective parties and that
7    there were present at the deposition the
8    attorneys hereinbefore mentioned.
9        I further certify that I am not
10   counsel for nor in any way related to the
11   parties to this suit, nor am I in any way
12   interested in the outcome thereof.
13       IN TESTIMONY WHEREOF:  I have hereunto
14   set my hand and affixed my notarial seal
15   this 19th day of February, 2016.
16
17
18
19   NOTARY PUBLIC, DU PAGE COUNTY, ILLINOIS
20   C.S.R. No. 084-002306
21
22
23
24

---

108

1    (R. Walker, 6/17/15 - Spalding v. City)
2              ERRATA SHEET
3    PG/LN              CORRECTION
4    ___/___Change from:_____
5       Change to:_____
6    ___/___Change from:_____
7       Change to:_____
8    ___/___Change from:_____
9       Change to:_____
10   ___/___Change from:_____
11      Change to:_____
12   ___/___Change from:_____
13      Change to:_____
14   ___/___Change from:_____
15      Change to:_____
16   ___/___Change from:_____
17      Change to:_____
18   ___/___Change from:_____
19      Change to:_____
20   ___/___Change from:_____
21      Change to:_____
22   ___/___Change from:_____
23      Change to:_____
24   WITNESS SIGNATURE:_____

---

**MARIBETH REILLY & ASSOCIATES**
630.408.2237          Chicago & Suburbs          maribeth.reilly@gmail.com

Robert Walker                  Spalding v. City of Chicago                        6/17/15

109

```
 1    (R. Walker, 6/17/15 - Spalding v. City)
 2              ERRATA SHEET
 3    PG/LN          CORRECTION
 4    ___/___Change from:_____
 5       Change to:_____
 6    ___/___Change from:_____
 7       Change to:_____
 8    ___/___Change from:_____
 9       Change to:_____
10    ___/___Change from:_____
11       Change to:_____
12    ___/___Change from:_____
13       Change to:_____
14    ___/___Change from:_____
15       Change to:_____
16    ___/___Change from:_____
17       Change to:_____
18    ___/___Change from:_____
19       Change to:_____
20    ___/___Change from:_____
21       Change to:_____
22    ___/___Change from:_____
23       Change to:_____
24    WITNESS SIGNATURE:_____
```