Case: 1:12-cv-08777 Document #: 173-22 Filed: 03/07/16 Page 1 of 49 PageID #:2318

JON SCHORLE                                           February 12, 2016
SPALDING, et al. vs. CITY OF CHICAGO, et al.                          1

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF ILLINOIS

3                       EASTERN DIVISION

4

5   Chicago Police Officer SHANNON
    SPALDING and Chicago Police Officer
6   DANIEL ECHEVERRIA,

7            Plaintiffs,

8        vs.                      CASE NO. 12-cv-8777

9   CITY OF CHICAGO, et al.,

10           Defendants.

11  ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

12

13

14

15

16                  DEPOSITION OF EXPERT

17                       JON SCHORLE

18

19                    February 12, 2016

20                       10:54 a.m.

21

22                  2151 River Plaza Drive
                           Suite 300
23                   Sacramento, California

24

25        JENNIFER SCHUMACHER, CSR No. 9763



JON SCHORLE                                    February 12, 2016
SPALDING, et al. vs. CITY OF CHICAGO, et al.            2

1                    APPEARANCES OF COUNSEL

2

3    For the Plaintiffs SHANNON SPALDING and DANIEL
     ECHEVERRIA (Telephonically):
4
         CHRISTOPHER SMITH TRIAL GROUP
5        BY:  CHRISTOPHER SMITH, ESQ.
         1 N. LaSalle, Suite 2000,
6        Chicago, Illinois 60602
         (312) 432-0400
7        Chris@crstrialgroup.com

8
     For the Defendant CITY OF CHICAGO (Telephonically):
9
         DRINKER, BIDDLE & REATH
10       BY:  LESLIE DAVIS, ESQ.
         191 North Wacker Drive, Suite 3700
11       Chicago, Illinois 60606
         (312) 569-3000
12       leslie.davis@dbr.com

13

14                        --oOo--

15

16

17

18

19

20

21

22

23

24

25



Case: 1:12-cv-08777 Document #: 173-22 Filed: 03/07/16 Page 3 of 49 PageID #:2320

JON SCHORLE                                          February 12, 2016
SPALDING, et al. vs. CITY OF CHICAGO, et al.                        3

```
 1                    INDEX OF EXAMINATIONS

 2    WITNESS: JON SCHORLE

 3    EXAMINATION                                   PAGE

 4    By Mr. Smith                                    5

 5    By Ms. Davis                                   44

 6

 7

 8                       ---o0o---

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



1                    INDEX TO EXHIBITS

2   Exhibit                  Description                Page

3   Exhibit 1   Curriculum Vitae                          6

4   Exhibit 2   Schorle Report, 1/20/16                   6

5

6

7                       ---o0o---

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Case: 1:12-cv-08777 Document #: 173-22 Filed: 03/07/16 Page 5 of 49 PageID #:2322

JON SCHORLE                                          February 12, 2016
SPALDING, et al. vs. CITY OF CHICAGO, et al.                        5

1              DEPOSITION OF JON SCHORLE

2                    February 12, 2016

3                       --oOo--

4                    JON SCHORLE,

5      having been first duly sworn, testified as follows:

6

7                    EXAMINATION

8    BY MR. SMITH:

9      Q.  Can you please state and spell your name for

10   the record.

11     A.  Jon, J-o-n, Schorle, S-c-h-o-r-l-e.

12     Q.  Have you ever given a deposition before?

13     A.  Yes.

14     Q.  How many times do you think you've given a

15   deposition?

16     A.  I would think between five and ten times.

17     Q.  Thank you.  For this deposition, while it is a

18   formal oath, if you need a break for any reason, just

19   indicate you need a break.  Do you understand?

20     A.  Yes, sir.

21     Q.  Okay.  And in terms of -- if for any reason you

22   don't understand my question, feel free to indicate that

23   as well.  Okay?

24     A.  Yes, thank you.

25     Q.  Okay.  All right.  Now, you're aware that



1  you're here to testify in a deposition concerning a case

2  filed by an Officer Danny Echeverria and an Officer

3  Shannon Spalding; is that correct?

4      A.  Yes.

5      Q.  And I'm going to mark for purposes of this

6  deposition a CV as Deposition Schorle Exhibit No. 1.

7                  (Exhibit 1 was

8                  marked for identification.)

9          MR. SMITH:  Court reporter, could you show the

10  CV to Mr. Schorle.

11          THE REPORTER:  He's got it.

12  BY MR. SMITH:

13      Q.  Mr. Schorle, is that a copy of your CV, Exhibit

14  No. 1?

15      A.  Yes.

16      Q.  Okay.  Thank you.  And in terms of for this

17  deposition I'm going to mark as Schorle Deposition

18  Exhibit No. 2 an expert report of Jon D. Schorle dated

19  1/20/2016.

20                  (Exhibit 2 was

21                  marked for identification.)

22          THE REPORTER:  He's got it.

23  BY MR. SMITH:

24      Q.  Mr. Schorle, is that a copy of your expert

25  report in this matter?



 1      A.  Yes.

 2      Q.  And you would agree that it's a four-page

 3  report with 16 paragraphs?

 4      A.  Yes, sir.

 5      Q.  Okay.  Thank you.  Now, is it your

 6  understanding that your client is the City of Chicago in

 7  this case?

 8      A.  Yes.

 9      Q.  Now, the report that I gave you, are all your

10  opinions you are providing in this matter contained in

11  that report?

12      A.  Yes.

13      Q.  Have you written any additional paragraphs

14  since the time of that report that you're intending to

15  add?

16      A.  No.

17      Q.  Have you reviewed any documents or depositions

18  or police reports of any kind in connection with this

19  case since your report?

20      A.  No.

21      Q.  Now, I believe in paragraph 3 of your report,

22  or maybe it's paragraph 2, I apologize, at some point it

23  indicates you were a chief of police for seven police

24  departments?

25      A.  That's correct.



1    Q.  Can you just tell me what those seven police

2  departments were?

3    A.  Yes.  City of Tustin, California; California

4  State University, Dominguez Hills; San Francisco State

5  University; Reno Tahoe International Airport; the City

6  of Williams, California; the City of West Sacramento,

7  California; and Victor Valley College Police Department.

8    Q.  Just out of curiosity, the city of West

9  Sacramento, approximately how big is that?

10    A.  I think it's about 50,000 population.

11    Q.  Thank you.  All right.  Now, in terms of --

12  have you ever been hired to be an expert in any matter

13  other than this one that involved a lawsuit against city

14  of Chicago police officers?

15    A.  No.

16    Q.  Have you ever testified or given a deposition

17  in a matter that involved city of Chicago police

18  officers?

19    A.  No.

20    Q.  Are you familiar with criminal cases against

21  officers in a special operation section unit in the city

22  of Chicago dating in approximately 2005 against a Jerome

23  Finnigan and an Officer Herrera at all?

24    A.  No.

25    Q.  Are you familiar with a conviction and



1   prosecution of a Chicago police officer by the name of

2   Sergeant Miedzenowski in approximately 1998 who was

3   charged with criminal misconduct, including running a

4   drug distribution ring on Chicago's northwest side?

5        A.  No.

6        Q.  Are you familiar with a conviction and

7   prosecution of a group of officers out of Chicago

8   Wentworth neighborhood in the late '80s who were

9   convicted of taking thousands of dollars in protection

10  payoff from drug dealers?

11       A.  No, sir.

12       Q.  Are you familiar with the group called The

13  Boston Seven police officers in Chicago of Austin

14  neighborhood for using police authority to rob and

15  extort money and narcotics from drug dealers?

16       A.  No, sir.

17       Q.  Are you familiar with a police officer by the

18  name of Sergeant Patterson who headed a tactical team

19  who were caught on tape stealing videotape -- I mean

20  caught on videotape stealing cash and drugs from an area

21  drug dealer?

22       A.  No, sir.

23       Q.  Are you familiar with a group of officers out

24  of Chicago Englewood neighborhood who were indicted for

25  criminal misconduct dating back to 1999 for abuses of



1  their authority, including working with drug dealers?

2       A.  No.

3       Q.  Are you familiar with an officer by the name of

4  Glenn Lewellen who was convicted of being a part of a

5  drug dealing operation that involved a Sal Rodriguez,

6  who was an informant paid by the city of Chicago

7  approximately $800,000, who later plead guilty to murder

8  and kidnapping?

9       A.  No.

10       Q.  Are you familiar at all with the Laquan

11  McDonald case that's been on the news recently where an

12  individual was shot by a police officer, on video?

13       A.  I have seen the video, yes.  This is the one

14  where the young man was shot approximately 16 times?

15       Q.  Correct.

16       A.  Yes.

17       Q.  What criminal -- what police officer criminal

18  corruption cases in the city of Chicago are you familiar

19  with?

20       A.  I really am not familiar with any, other than

21  the information that I read in the seven or eight

22  depositions that I listed in my expert report and the

23  deposition of Shannon Spalding.

24       Q.  Did you also read the expert report provided by

25  Lou Reiter, the plaintiff's expert?



1    A.  Yes, I did.

2    Q.  Are you aware in that report that Lou Reiter

3  quotes a United States attorney by the name of Brian

4  Netols for the proposition that Brian Netols testified

5  that he believes the code of silence was involved in all

6  18 criminal trials of Chicago police officers that he

7  prosecuted?

8    A.  If it was in the report, I read it, but it

9  doesn't come to mind.

10    Q.  Do you have any reason to believe that that

11  wasn't a truthful statement?

12    A.  No.

13    Q.  By U.S. Attorney Netols?

14    A.  No.

15    Q.  Now, I believe you indicated in your report the

16  materials that you reviewed were a deposition of Susan

17  Entenberg?

18    A.  Yes.

19    Q.  And a deposition of Dr. David Kaiser?

20    A.  Yes.

21    Q.  Deposition of Nancy Landre?

22    A.  Yes.

23    Q.  Deposition of Shannon Spalding?

24    A.  Yes.

25    Q.  Deposition of Commander Robert Klimas?



Case: 1:12-cv-08777 Document #: 173-22 Filed: 03/07/16 Page 12 of 49 PageID #:2329

JON SCHORLE                                    February 12, 2016
SPALDING, et al. vs. CITY OF CHICAGO, et al.                  12

1      A.  Yes.

2      Q.  Deposition of Captain Michael Pigott?

3      A.  Yes.

4      Q.  And the deposition of Lou Reiter?

5      A.  Correct.

6      Q.  You have not reviewed the deposition of

7   plaintiff Officer Danny Echeverria?

8      A.  I have not.

9      Q.  Or the depositions of any of the defendant

10   individual police officers that are in the case,

11   correct?

12      A.  That's correct, I have not.

13      Q.  In terms of -- what were you asked to do in

14   connection with your review of this case?

15      A.  I'm sorry.  Could you repeat that?

16      Q.  Yes.  What were you asked to do in terms of

17   your review of this case?

18      A.  Simply review --

19      Q.  In other words --

20      A.  I'm sorry.  Go ahead.

21      Q.  To make the question clearer, what were the

22   particular issues that you were told to assess?

23      A.  I was asked to assess whether or not Officers

24   Echeverria and Spalding could return to work, given the

25   information contained in the depositions that I read, in



1  my opinion.

2      Q.  Were you asked to give any opinions with

3  respect to the code of silence in the Chicago Police

4  Department?

5      A.  I don't think so, no.

6      Q.  Are you giving any opinions about the existence

7  or nonexistence of a code of silence in the Chicago

8  Police Department?

9      A.  Well, I would say yes, in that I offered the

10  opinion that the code of silence in one form or another

11  exists in most organizations.

12      Q.  Are you offering opinions on whether or not

13  training should be given in relation to the code of

14  silence with respect to police officers in the Chicago

15  Police Department?

16      A.  No, I don't think so.

17      Q.  Is your opinion limited to Shannon Spalding's

18  ability to go back to work or both Danny Echeverria and

19  Officer Spalding's ability to work?

20      A.  I would say more specifically Shannon Spalding.

21      Q.  Were you making an assessment as to the truth

22  about the claims of Officer Spalding or Officer

23  Echeverria in connection with this case?

24      A.  No.

25      Q.  Are you familiar with the criminal prosecution



JON SCHORLE                                          February 12, 2016
SPALDING, et al. vs. CITY OF CHICAGO, et al.                      14

1   of a Sergeant Ronald Watts and Officer Mohammad?

2        A.  No.

3        Q.  Are you familiar at all with the allegations

4   that were -- or what Sergeant Watts was suspected of in

5   connection with his work as a Chicago police officer?

6        A.  Just in general terms.

7        Q.  Are you aware that there were at a minimum,

8   rumors, if not more, that he was involved in possibly

9   murder?

10       A.  I think that was one of the claims that was

11  made, yes.

12       Q.  All right.  Well, let's take a look at --

13  before I get to your report -- in terms of -- what

14  percentage of your income comes from consulting work as

15  an expert in connection with litigation?

16       A.  Five percent or less.

17       Q.  And do you have any breakdown as to how often

18  you're hired by plaintiffs versus defendants?

19       A.  I think that with the exception of this case I

20  think all of my work has been with plaintiffs'

21  attorneys.

22       Q.  And in terms of -- have you ever given opinion

23  testimony before on whether or not you believe an

24  officer could go back to work?

25       A.  No.



1    Q.  What types of degrees and training do you have

2  that relates to an officer's psychological condition to

3  go back to work or not?

4        MS. DAVIS:  I'm going to object.  I think we're

5  getting beyond the scope of what he's here to testify

6  about.  He's here to testify about his opinion of the

7  code of silence and the like.  He's already told you

8  what he had in regard to anything else.

9  BY MR. SMITH:

10    Q.  Okay.  Well, is there anything in your training

11  in terms of your educational training that deals with

12  training and making a psychological or psychiatric

13  assessment of whether or not people can go back to work?

14    A.  My training in that area has all been

15  on-the-job training with regard to the recruitment,

16  selection and training of police officers.  In

17  California police officers have to pass a preemployment

18  psychological screening exam, and I have reviewed

19  hundreds of those and have discussed those with the

20  psychologists and psychiatrists who give them.

21    Q.  And in terms of -- have you made

22  recommendations for officers not to go back to work in

23  your history?

24    A.  Yes.

25    Q.  How many times would you say that's happened?



1    A.  Three or four.

2    Q.  And how many times would you say that you have

3  been a part of the review process of officers?

4    A.  Probably well over a hundred.

5    Q.  In terms of what types of documents would you

6  get to make those reviews?

7    A.  I have reviewed the actual exams that are used

8  in California, and I have reviewed the written reports

9  of the psychologist or psychiatrist who offered or

10  proctored the exam and did the oral interview with the

11  officer.

12    Q.  And did you agree with the opinions of

13  Dr. Landre?

14    MS. DAVIS:  I'll object again.  He's not here

15  to opine about the psychological pieces of this case.

16  Jon, you can answer, if you can.

17    THE WITNESS:  I think the description given was

18  general in nature and acute in nature.  In other words I

19  think it was a temporary condition and described as

20  such.

21  BY MR. SMITH:

22    Q.  Okay.  Did you agree with those opinions by

23  Dr. Landre?

24    MS. DAVIS:  Same objection.

25    THE WITNESS:  I had no reason not to agree with



```
 1   them.  I just --

 2   BY MR. SMITH:

 3       Q.  What about -- sorry.

 4       A.  In my opinion, as an administrator having

 5   watched these things go over a period of time, the acute

 6   nature of the frustration that brings the officer to

 7   such an acute case or situation or feeling, tends to

 8   diminish, and once that hurdle is crossed, then the

 9   officers are more often than not, by far, ready to go

10   back to work or able to go back to work.

11       Q.  And you indicated you reviewed Dr. David

12   Kaiser's deposition.  Did you have any disagreements

13   with Dr. David Kaiser's opinion?

14       A.  No.

15       Q.  How about in review --

16           MS. DAVIS:  Ongoing running objection to any

17   questioning related to his opinions on the psychological

18   part of this case.  But subject to those, the ongoing

19   running objection, I'll let him continue.

20   BY MR. SMITH:

21       Q.  With respect to the deposition of Susan

22   Entenberg, did you disagree with any of the opinions of

23   Susan Entenberg expressed in the deposition?

24       A.  No, I viewed her report as much different than

25   the two that were offered by the medical professionals.
```



1  Q. Okay. Did you have disagreements with Susan

2 Entenberg's opinions?

3  A. No. I just didn't give it a high priority.

4  Q. Do you happen to have the preliminary report of

5 Lou Reiter on you?

6  A. Hold on one minute. Yes.

7  Q. If you want to take that out, I'm going to be

8 asking you some questions that relate to his opinion,

9 and if you want to rather than just be hearing me read

10 certain paragraphs be able to look at it, feel free to

11 take it out so you can look at it.

12  A. That's fine. I have it.

13  Q. Okay. You'll see on page 6 of his report,

14 paragraph 8, that he discusses reviewing what's called

15 CR investigations conducted by the Chicago Police

16 Department or what's called OPS.

17   Have you ever reviewed complaint registration

18 investigations conducted by either the Office of

19 Professional Standards or Independent Review Authority

20 or Internal Affairs of the Chicago Police Department?

21  A. I have not.

22  Q. In terms of -- you'll see on the 7th page,

23 paragraph 10, that Mr. Reiter indicates, "The forms of

24 retaliation alleged by Officer Spalding and Echeverria

25 and supported by affidavits of other members of the CPD



1  are those commonly found in law enforcement incidents

2  where an officer breaks the Code of Silence or is

3  presumed to have done so and who is suspected of giving

4  adverse information concerning employee misconduct about

5  another member of the police agency."

6      Have you reviewed the affidavit of Janet Hanna

7  that was produced in this case?

8      A.  No.

9      Q.  In terms of if you look on the next page, page

10 8, paragraph 11, in Mr. Reiter's report it indicates,

11 "Janet Hanna, in her affidavit on this case, stated that

12 Lieutenant Cesario, two new officers were coming who

13 were supposedly IAD rats and to be leery of them."

14     If it was, in fact, true that a lieutenant told

15 officers that there were IAD rats coming and to be leery

16 of them, would you see that as a problem?

17     A.  No.

18     Q.  Why not?

19     A.  It's just talk.  It's just locker room bravado.

20 It's not something that forthright police officers take

21 to heart in terms of how they do their job.

22     Q.  In terms of the next statement, a part of that

23 paragraph 11, Reiter puts, "She stated that this

24 lieutenant told her to give Shannon and Echeverria only

25 dead-end cases that would not lead to arrest or officer



1  activity."

2        Would you see that as a problem if a lieutenant

3  was giving -- ordering his subordinates to give officers

4  dead-end cases because they were officers who went

5  against officers in their own department?

6     A.  No.

7        MS. DAVIS:  Are you asking him to presuppose

8  that it's true?  Is it a hypothetical?

9        MR. SMITH:  Presupposing it's true.

10       THE WITNESS:  Same issue, it's just talk.  It

11 really has no bearing on how they are going to do their

12 job, in my opinion.

13 BY MR. SMITH:

14    Q.  The next sentence reads, she also stated in her

15 affidavit that lieutenant Cesario told her to destroy

16 overtime requests for Shannon and Echeverria, and in

17 quotes, pretend like I had never received it.

18       If that were true, would you perceive that as a

19 problem in terms of how officers were treated for being

20 involved in an investigation of fellow officers?

21    A.  If, in fact, that type of thing occurred, yes.

22    Q.  Have you seen any facts that or testimony that

23 indicate that Janet Hanna is --

24       MS. DAVIS:  Everybody still there?

25       THE WITNESS:  I'm here.



1  BY MR. SMITH:

2      Q.  Are you aware of any facts in this case that

3  refute Janet Hanna's affidavit?

4      A.  Well, I have not seen her affidavit, and I am

5  not aware of any facts of the matter that would refute

6  the way it was described here by Reiter.

7      Q.  In terms of the last sentence of that

8  paragraph, "In Officer Hanna's deposition in this matter

9  she testified that in 1994 when she was in the Chicago

10  Police Academy," in quotes, "I was instructed by several

11  instructors.  We were told over and over again we do not

12  break the code of silence.  Blue is blue.  You stick

13  together."

14          If that was true that she was told that in the

15  academy by instructors, would there be a problem with

16  that?

17      A.  From an administrative moral and ethical

18  perspective, I would think there was a problem with

19  that.

20      Q.  What about from a practical standpoint, would

21  there be a problem with that, in terms of how the

22  officers would potentially do their job, if they were

23  instructed in that manner?

24      A.  You know, I just don't know how to answer that

25  question.  I don't think so, but I really don't know how



Case: 1:12-cv-08777 Document #: 173-22 Filed: 03/07/16 Page 22 of 49 PageID #:2339

JON SCHORLE                                    February 12, 2016
SPALDING, et al. vs. CITY OF CHICAGO, et al.                  22

1  to answer that question.  Sorry.

2      Q.  The next paragraph reads, "Officer Michael

3  Spaargaren stated in his affidavit in this matter that

4  he worked with Sergeant Watts and Officer Mohammad at

5  the Chicago Housing Authority.  He confronted Watts

6  about large sums of money they had confiscated from

7  suspects that subsequently was not inventoried and

8  disappeared.  Officers Spaargaren went to their

9  superior, Lieutenant Spratt, and reported his

10  observations.  The lieutenant then accused him of

11  being," in quotes, "corrupt, ordered him not to go to

12  IAD, and moved him out of the unit.  He stated in his

13  affidavit that Lieutenant Spratt told him, 'You better

14  keep your mouth shut.  You don't want to lose your life

15  over this.  If you report a sergeant to IAD, how long do

16  you think you will last.'"

17          Now, if that were, in fact, true, do you think

18  that that would be an act by Lieutenant Spratt that

19  could be considered an action in conjunction with

20  observing a code of silence?

21      A.  You know, I think that is one interpretation.

22  Whether it has any bearing on the officer's conduct is a

23  whole different question, in my opinion.

24      Q.  Do you think that being told that could have

25  affected an officer's ability to work on the job, if, in



 1  fact, what they were saying was true?

 2      A.  Not in 95 percent, plus, of the cases, in my

 3  opinion.  Policemen don't react to that kind of veiled

 4  threat, I don't believe.

 5      Q.  In terms of on page 11 Lou Reiter cites a

 6  study, Christopher Commission study of the Los Angeles

 7  Police Department in 1991 found that the code of silence

 8  was perhaps the greatest single barrier to effective

 9  investigation and adjudication of complaints.  Do you

10  agree with that opinion?

11      A.  I do not.

12      Q.  Why don't you agree with that opinion?

13      A.  I don't think that's what the Christopher

14  Commission was all about in the first place.  But in the

15  second place, my experience with both the Los Angeles

16  Police Department and the Los Angeles County Sheriff's

17  Department in working with their training academies and

18  their training staff, it simply was not an issue that

19  raised to the level of concern by the training staff.

20      Q.  When did you work with the Los Angeles County

21  police and Los Angeles County Sheriff's office, what

22  period to what period?

23      A.  Well, I went through the Los Angeles Police

24  Department basic academy, sergeant school and lieutenant

25  school, and I proctored, in other words, approved a



JON SCHORLE                                    February 12, 2016
SPALDING, et al. vs. CITY OF CHICAGO, et al.                24

1  curricula, approved the instructors, and funded all of

2  the training that was put on by the Los Angeles Police

3  Department between 1973 and 1976 when I was a senior law

4  enforcement consultant with the California Commission on

5  Peace Officer Standards and Training.

6       Q.  Do you know if the Los Angeles Police

7  Department currently trains its officers about the code

8  of silence and it's part of the curriculum of training?

9       A.  No.

10      Q.  Is that, no, as you don't know one way or the

11  other, or no, they don't?

12      A.  No, I don't know.  In California I've never

13  heard it referred to as the code of silence.  There

14  certainly is training in the code of ethics as

15  prescribed by the California Peace Officers Association

16  that goes on in all police academies.

17      Q.  In terms of -- you read the deposition of

18  Michael Pigott, correct?

19      A.  Yes.

20      Q.  And you are aware that the city designated

21  Michael Pigott as the person most knowledgeable about

22  the issues concerning the code of silence in connection

23  with this case, correct?

24      A.  Yes.

25      Q.  In terms of -- would you agree with his opinion



1    that there is no code of silence --

2        A.   No.

3        Q.   -- at the CPD?

4        A.   No.

5        Q.   Would you be -- are you surprised that somebody

6    is being held out as the most knowledgeable person

7    concerning the code of silence presented by the city, a

8    captain in the police department is indicating that he's

9    never reviewed any materials regarding the code of

10   silence?

11       A.   The short answer would be, yes, I was

12   surprised.

13       Q.   Did you see that Officer Pigott indicated that

14   he didn't recall any officer who received retaliation

15   for reporting misconduct of another officer and that he

16   recalls only one case where an officer was disciplined

17   for not reporting misconduct immediately?

18       A.   I saw that.

19       Q.   In terms of -- I understand you didn't read

20   Chief Rivera's deposition, correct?

21       A.   That's correct.

22       Q.   Did you read in Lou Reiter's report that Chief

23   Rivera, who was head of Internal Affairs in 2009,

24   indicated that he's heard of it, referred to it in the

25   media, and in quotes, again, code of silence is not



Case: 1:12-cv-08777 Document #: 173-22 Filed: 03/07/16 Page 26 of 49 PageID #:2343

JON SCHORLE                                      February 12, 2016
SPALDING, et al. vs. CITY OF CHICAGO, et al.                    26

1    something I've ever heard of before other than the media

2    and that he has no knowledge of a code of silence

3    existing at any police department anywhere.  Would that

4    surprise you that a head of Internal Affairs would make

5    a statement like that?

6        A.  Yes, indeed.  What I agreed with with Chief

7    Reiter's opinion was that the Chicago Police Department

8    has apparently made a conscious choice to deny the

9    potential existence and impact of a code of silence.

10       Q.  Could that be problematic for the police

11   officers who work in the Chicago Police Department?

12       A.  Not in my opinion.

13       Q.  Why not?

14       A.  Well, because police officers are

15   self-directed, self-motivated, forthright, honest

16   people, the vast majority and for the tenure of their

17   careers.  And a lot of the hearsay and a lot of the

18   locker room malarky that goes on simply does not affect

19   how they make decisions and the job that they do.  And I

20   think that's witnessed by Spalding and Echeverria in

21   their actions.  These people are 17-year veterans of the

22   department, and they came forward.

23       Q.  Well, let's look at your report starting with

24   paragraph 7.  Paragraph 7 reads, "The essence of this

25   case revolves around two Chicago police officers,



```
 1   Plaintiffs Spalding and Echeverria, who, in the course
 2   of scope of their duties as undercover officers
 3   developed information which led them to believe officers
 4   of the Chicago Police Department were involved in
 5   illegal activities.  When reporting this belief to
 6   ranking officers the police department did not acquire
 7   the desired results.  Plaintiffs were assigned to work
 8   with the FBI in furtherance of investigation into these
 9   charges."
10        Where did you get that information that that
11   occurred.
12        A.  From -- I read all of the documents listed in
13   paragraph 5, and that was my conclusion.
14        Q.  Okay.  In terms of -- were you aware that in
15   the deposition Shannon Spalding indicates that when no
16   investigation was opened, they on their own time, her
17   and Danny Echeverria, went to the FBI?  Were you aware
18   of that?
19        A.  Doesn't ring a bell.
20        Q.  Would that affect your opinion if that were in
21   her deposition?
22        A.  No.
23        Q.  You're not trying to give testimony as to
24   whether she went to the -- her or Danny went to the FBI
25   on their own time or whether it was done during work
```



1   hours with the permission of the Chicago Police

2   Department; is that correct?

3        A.  Yes, that's correct.

4        Q.  In terms of paragraph 8 you indicated, "The

5   code of silence may be described as a particular method

6   of behavior by members of the CPD which dictates that

7   what one officer observes in the conduct of another

8   member of the department, which could be described as

9   illegal, against regulations, aberrant, outside the

10  norm, is never reported," correct?

11       A.  Yes.

12       Q.  Are you aware of or have you done any attempt

13  to research how often the Chicago Police Department

14  officers have come forward against other officers?

15       A.  No.

16       Q.  Are you aware of any attempt by the Chicago

17  Police Department in connection with the numerous

18  convictions against police officers of the Chicago

19  Police Department in which the police department has

20  attempted to determine which officers remained silent

21  and never reported those officers' illegal activities?

22       A.  No.

23       Q.  In paragraph 9 you indicated that it's been

24  your professional experience across a broad spectrum of

25  organizational settings that behavior akin to a code of



1    silence exists to some degree or another in every field

2    of endeavor, correct?

3        A.  Yes.

4        Q.  You would agree that police officers, generally

5    speaking, have a more dangerous job than the average

6    citizen?

7        A.  Yes.

8        Q.  And you would agree that police officers, and

9    especially in a narcotics unit, will deal with things

10   such as cash or large amounts of drugs in the course of

11   their job?

12       A.  Yes.

13       Q.  Would you agree that even though you have an

14   opinion that most officers are highly ethical that it

15   still is a known issue or danger that the police

16   department must be mindful of the fact that when

17   officers are put in positions to be around large amounts

18   of cash or drugs that there is a danger that some

19   individuals will be attempted to potentially take funds

20   and narcotics?

21           MS. DAVIS:  I'm going to object.  That's such a

22   compound question, I'm not sure that it's

23   understandable.

24   BY MR. SMITH:

25       Q.  Okay.  I'll ask it a slightly different way.



 1          Are there issues or dangers that police

 2     departments must train about with respect to officers

 3     who are put in a position to be around large amounts of

 4     unaccounted for cash and narcotics?

 5          A.  Yes.

 6          MS. DAVIS:  And my objection is it goes beyond

 7     the scope of testimony.  And Jon, you have to give me a

 8     chance to object so the record is clear, but go ahead.

 9          THE WITNESS:  I'm sorry.

10     BY MR. SMITH:

11          Q.  You would agree with that?

12          A.  I would agree.

13          Q.  And it's fair to say that when you give an

14     opinion about there being a code of silence in some

15     degree in every field of endeavor, it's fair to say that

16     the types of situations that a code of silence might

17     affect differ greatly between one profession and the

18     next; is that fair to say?

19          MS. DAVIS:  Objection.  Goes beyond the scope.

20     Go ahead.

21          THE WITNESS:  You know, I think the essence of

22     whether there's honesty among employees and whether

23     there's theft committed by employees, that's the essence

24     of the issue.  So I don't see it as particularly

25     different.



JON SCHORLE                                    February 12, 2016
SPALDING, et al. vs. CITY OF CHICAGO, et al.              31

 1  BY MR. SMITH:
 2      Q.  Well, in terms of the potential harm that could
 3  result by abiding by a code of silence when somebody is,
 4  you know, as I think you put it somewhere, late for work
 5  versus extorting somebody for money are highly
 6  different, the danger there, wouldn't you agree?
 7      A.  Yes.
 8      Q.  Are you aware that there have been even polls
 9  in the city of Chicago recently connected to the city's
10  perception of a problem with the code of silence in the
11  Chicago Police Department?
12      A.  No.
13      Q.  You put in your opinion No. 10, "The code of
14  silence is not high enough of any listing of needs
15  assessment that I am aware of to warrant concentrated
16  effort.  It is true that in the last several years the
17  awareness of ethics and ethical behavior has been of
18  some interest and specific training programs have been
19  developed."
20          In the city of Chicago in the current
21  environment, do you think that the code of silence does
22  warrant a concentrated effort?
23          MS. DAVIS:  Objection.  Compound question.  Go
24  ahead.
25          THE WITNESS:  You know, I think it's a matter



1  of semantics.  The code of silence is such an innocuous

2  term that I think it's hard to put measures on.  I

3  certainly think that there needs to be a concentration

4  in training on ethical behavior and obedience to

5  department policies and rules and regulations, but the

6  code of silence thing, you know, doesn't work for me.

7  BY MR. SMITH:

8      Q.  Are you aware that the mayor of the city of

9  Chicago, Emanuel, has come out indicating that the

10 Chicago Police Department has a problem with the code of

11 silence?

12         MS. DAVIS:  Objection.  I think that's -- it

13 misstates the character of Mayor Emanuel's testimony,

14 but I guess if you're asking him to suppose it's true,

15 he can answer.

16 BY MR. SMITH:

17     Q.  Are you aware of any statements from Mayor Rahm

18 Emanuel to that effect?

19     A.  No.

20     Q.  In terms of your paragraph No. 11, "Having

21 established a reputation as an expert in the field of

22 recruitment, selection and training of police personnel

23 over a lengthy period of time in a variety of

24 assignments in the field, I'm of the opinion the vast

25 majority of police officers are selected on the basis of



1   intelligence, honesty and desire to serve the public and

2   inherent need for security of an organization based on

3   shared beliefs."

4        Have you ever been involved in the hiring of

5   Chicago police officers?

6   A.  No.

7   Q.  "Therefore, to espouse any belief that a wide

8   spread contagion of dishonesty is an integral part of

9   any police organization is not acceptable to me."

10       It's fair to say that those opinions are based

11  on your hiring and experiences in other police

12  departments, not in the city of Chicago's police

13  department?

14  A.  And the field at large, both from my studies at

15  the FBI National Academy and in the development of the

16  Executive Development Course, which is a training

17  program required for newly appointed police chiefs,

18  which took me to the city of New York and the

19  Tallahassee Police Department and the Los Angeles Police

20  Department and Los Angeles Sheriff's Department.  In

21  other words, a nationwide analysis of specific training

22  needs.

23  Q.  Is it fair to say that you would expect in

24  police departments, based on your experience, that there

25  would be minor numbers of bad apples existing in an



1    organization and fewer, by far, in police organizations,

2    correct?

3        A.  Yes.

4        Q.  In terms of -- with respect to the Chicago

5    Police Department, what efforts have you made to study

6    whether its numbers have a minor number of bad apples in

7    comparison to other organizations?

8        A.  None.

9        Q.  In terms of -- I'm going to -- in terms of, or

10   hypothetically speaking for purposes of this deposition,

11   if I told you there was a section called the special

12   operation section within the Chicago Police Department

13   that approximately 400 members that was disbanded and

14   that five of those members were criminally convicted,

15   including one member who was convicted in connection

16   with audio statements of trying to hire a gang to kill a

17   fellow police officer they believed was informing

18   against them, in terms of -- at what point would you

19   start to assess there may be more than a few bad apples

20   within the Chicago Police Department?  How many numbers

21   would that take?

22       A.  And you're using a reference of five out of

23   400?

24       Q.  No, I'm using a reference of -- well, let's

25   start with the five out of 400.  And would that be



JON SCHORLE                                    February 12, 2016
SPALDING, et al. vs. CITY OF CHICAGO, et al.                35

1    consistent with the minor number of bad apples?

2        A.   No.

3        Q.   Would that be more or less?

4        A.   I think it's more.

5        Q.   In connection with that case, the whole unit

6    was eventually disbanded, and in terms of the fact that

7    these five officers were convicted, that doesn't mean

8    officers didn't sit back and watch the conduct of those

9    officers; you don't know one way or another whether

10   there were other officers who sat back and watched or

11   even participated in the conduct; is that fair to say?

12       A.   That's correct, yes.

13       Q.   If I was to tell you that in connection with

14   those special operation officers there was a videotape

15   of at least 20 officers, including supervisors, being

16   part of a raid of a bar without a warrant in which a --

17   one of the most -- one of the newest members of the unit

18   or of the police department itself was later charged and

19   convicted in relation to filing -- creating a false

20   police report and perjury in connection with that

21   incident, and if those other 20 members were involved in

22   violating people's rights, would you agree that that's,

23   again, harming the idea that there's only a few bad

24   apples in connection with that unit?

25            MS. DAVIS:   Objection to the compound nature of



 1   the question.  Answer, if you can.

 2        THE WITNESS:  It's far too hypothetical.  I

 3   mean, I just don't offer opinions based on the

 4   description that you've given.  You know, I'd want to

 5   see the reports.  I'd want to be able to ask the right

 6   questions.  So I wouldn't have an opinion in that area.

 7   BY MR. SMITH:

 8        Q.  How could you conduct an investigation to

 9   determine if the Chicago Police Department had many more

10   bad apples than the average police department?

11        A.  Well, I think there was some attempt described

12   in Chief Reiter's report where they tried to do some

13   historical perspective and found that there had been a

14   change in computers, and so they couldn't find any

15   records back beyond 2005.  I mean, clearly there has to

16   be a starting point from which to draw conclusions and

17   to do investigations.  But it certainly would not be an

18   easy case.

19        Q.  Do you think that using information from

20   criminal convictions of police officers would be a good

21   starting point to do investigations to determine who

22   else may have known, or failed to report, or were

23   inadequately supervised, or participated in those

24   crimes?

25        MS. DAVIS:  Objection.  Incomplete



 1 | hypothetical.

 2 |         THE WITNESS:  I just think that's one of the

 3 | starting points.  It wouldn't be the -- you know, when

 4 | you get into organizational decision-making, you do

 5 | things like define the tasks and examine the

 6 | alternatives and then proceed ahead to see what

 7 | alternatives work and don't work.  But you certainly

 8 | don't just use one criteria as the way to start a study.

 9 | BY MR. SMITH:

10 |    Q.  In terms of number -- if the Chicago Police

11 | Department had a code of silence and was -- and made

12 | concerted efforts even from the supervisors that the

13 | code of silence be adhered to, would there be a danger

14 | that that could lead to increased numbers of bad apples

15 | within the organization?

16 |         MS. DAVIS:  Objection.  Incomplete

17 | hypothetical.

18 |         THE WITNESS:  I mean, I see some logic in the

19 | proposition that you're making, yes.

20 | BY MR. SMITH:

21 |    Q.  Okay.  Number 12 you talk about pop culture and

22 | depictions of fiction or works of fiction concerning, I

23 | believe, the code of silence.  You would agree there are

24 | numerous examples of instances where -- I'll strike the

25 | question.



1        You've indicated a question, reporting that an

2    officer in an adjacent beat took an extra 15 minutes on

3    a coffee break is not.  What are were you trying to say

4    by indicating that?

5        A.  I was just trying to make a statement that

6    there's a -- that the media tends to broad brush, paint

7    everything with a broad brush, you know.  If one

8    policeman makes a mistake, then they have all erred.

9    And I just think that that's part of the pop culture

10   that there are -- Spalding was concerned about her life

11   safety, and I think that anything that would happen to

12   her would draw a knee jerk kind of reaction from other

13   police officers.  In other words, they would not stand

14   for things like that.  But in the pop culture, those

15   kinds of decisions are all put in one basket.  It's one

16   thing to defend another police officer's life when they

17   are under attack, and it's a totally different picture

18   to report somebody who takes 15 minutes too long on a

19   coffee break.

20       Q.  And you would agree that if officers were not

21   backed up in the streets it could be extremely dangerous

22   to their health and life, if they weren't backed up by

23   other cops?

24       A.  Could be.

25       Q.  And in terms of -- in terms of the Laquan



1  McDonald case, which you are somewhat familiar, at least

2  from viewing the video, are you aware of anything about

3  what the officers who were on the scene wrote about the

4  incident in their reports?

5      A.  I'm not familiar with the case you're making

6  reference to.

7      Q.  The shooting case.

8      A.  Oh, oh, oh, okay.  Fine.  I'm sorry.  Now --

9  okay.  Restate, please.

10     Q.  Are you aware of what the officers who were at

11  the scene of that incident wrote in their reports --

12     A.  No.

13     Q.  -- about what happened?

14     A.  No.

15     Q.  In terms of -- when you're indicating these

16  depictions are works of fiction, albeit some vein of

17  truth exist in every such story, the popular culture,

18  fueled by consternation on the part of citizens who see

19  the police above reproach, again, do not represent any

20  truth in the broader context of policing on a nationwide

21  basis, what -- have you done anything to determine

22  whether that's true with respect to the Chicago Police

23  Department?

24     A.  No.

25     Q.  Do you have an opinion as to what police



1   department in the United States is the most corrupt

2   police department?

3       A.  No.

4       Q.  Do you have any idea about which police

5   departments in the United States have had the most

6   officers convicted in Federal Court in the last 20

7   years?

8       A.  No.

9           MS. DAVIS:  Objection.  Goes to relevance.

10  BY MR. SMITH:

11      Q.  Okay.  Number 13 you start with, "In my opinion

12  bringing forth observations of illegal behavior on the

13  part of another is an obligation accepted by all police

14  officers."  What evidence do you have that the members

15  of the Chicago Police Department live up to that

16  obligation of bringing forth observations of illegal

17  behavior on the part of another?

18      A.  I can only tell you that making arrests,

19  writing citations fall into that category.  And that's

20  why the Chicago Police Department exists.

21      Q.  When you're referring to bringing forth

22  observations of illegal behavior on the part of another,

23  you're referring to other police officers, correct?

24      A.  No, I'm not, no.

25      Q.  Well, would you agree, though, bringing forth



JON SCHORLE                                      February 12, 2016
SPALDING, et al. vs. CITY OF CHICAGO, et al.                    41

1   observations of illegal actions of a police officer are

2   seen by a fellow officer is an obligation that needs to

3   be accepted by all police officers?

4       A.  Yes.

5       Q.  "Altering behavior or failing to report

6   misconduct for fear of retaliation is not a condition

7   that is acceptable to or practiced by the vast majority

8   of honorable police officers," you've indicated; is that

9   correct?

10      A.  Yes.

11      Q.  What information do you have or evidence do you

12  have that that is true of the Chicago Police Department?

13      A.  You know, I would have to take the other side

14  of it and say what proof is there that the Chicago

15  Police Department is so much different than any other

16  large city police department.

17      Q.  Well, in terms of in connection with an

18  assessment of the cases that have been presented and

19  prosecuted -- are you aware that the Department of

20  Justice is doing an investigation of the Chicago Police

21  Department currently?

22      A.  No.

23      Q.  Are you aware of any other police department in

24  the country that is currently being investigated by the

25  Department of Justice?



 1    A.  No.

 2    Q.  Are you aware of any real life examples where

 3  officers have retaliated against other officers for

 4  threatening or going to the authorities about their

 5  activity?

 6    A.  In my early experience, yes, as a field police

 7  officer.

 8    Q.  Were the types of threats involved in that

 9  instance or those instances life threatening?

10    A.  I don't believe so.

11    Q.  Are you familiar with just in terms of the

12  reading literature or news articles of instances where

13  police have been accused of murdering other police

14  officers?

15    A.  None come -- sorry.  Go ahead.

16    Q.  Go ahead.

17    A.  None come to mind.

18    Q.  Have you read any studies concerning coverups

19  within the Chicago Police Department?

20    A.  No.

21    Q.  Did you read in Lou Reiter's opinion that he

22  makes reference to the fact that Superintendent Hilyard

23  in one deposition reviewed in the past answered that he

24  believes the code of silence was simply a Chuck Norris

25  movie?



Case: 1:12-cv-08777 Document #: 173-22 Filed: 03/07/16 Page 43 of 49 PageID #:2360

JON SCHORLE                                             February 12, 2016
SPALDING, et al. vs. CITY OF CHICAGO, et al.                          43

 1     A.  I remember reading that, yes.

 2     Q.  Do you believe that complaint reviews by police

 3  departments are an important part of making sure that

 4  officers don't feel free to act however they want or to

 5  make sure that they are acting within the guidelines and

 6  rules of the police department?

 7     A.  Yes.

 8     Q.  Are you familiar at all with the Chicago Police

 9  Department's Internal Affairs Bureau or the Office of

10  Professional Standards or the Independent Review

11  Authority in the ways and manners in which they

12  investigate police officer complaints?

13     A.  No.

14     Q.  Do you have any opinion on whether Shannon

15  Spalding would be -- if she did return to the police

16  department would be emotionally able to work in a unit

17  like a narcotics unit?

18         MS. DAVIS:  I'm going to object, beyond the

19  scope of what his opinion testimony is.  Jon, you can

20  answer, if you can.

21         THE WITNESS:  Oh, I'm sorry.  What I said in my

22  report with regard to her returning to duty was that it

23  would depend on the assignment and the level of

24  supervision.  Clearly, in my opinion, someone who has

25  gone through the kind of experience that she's had would



1    have to have some retraining and a level of supervision

2    that she could trust and depend on.

3            MR. SMITH:  I have no further questions.

4                        EXAMINATION

5    BY MS. DAVIS:

6        Q.  I've got just a few.  Mr. Schorle, you

7    testified earlier that most coworkers -- basically that

8    most coworkers don't want to tell on other coworkers; is

9    that right?

10       A.  I'm sorry.  I couldn't quite understand you.

11       Q.  Okay.  Let me pick up the phone because that

12   might be easier.  Can you hear me now?

13       A.  Yes.

14       Q.  Is that better?

15       A.  Yes.

16       Q.  Okay.  I've just got a few questions.  You

17   were -- let me go back.

18           You would agree that most coworkers don't want

19   to tell on fellow coworkers regarding bad behavior or

20   improper actions; isn't that right?

21       A.  Yes.

22       Q.  Okay.  And when you say that the code of

23   silence exists in most organizations, is that what you

24   mean, that one coworker doesn't want to tell on another

25   coworker?



JON SCHORLE                                            February 12, 2016
SPALDING, et al. vs. CITY OF CHICAGO, et al.                        45

1      A.   Correct.

2      Q.   And so when you say that the quote/unquote,

3  code of silence exists in most organizations, you don't

4  mean code of silence as it relates to the way that

5  Mr. Smith uses it in terms of some kind of overt,

6  purposeful intention to commit criminal activity, do

7  you?

8      A.   No.

9      Q.   Okay.  You were asked earlier on in the

10  deposition whether or not you had any opinions about the

11  code of silence in this case.  Do you remember that?

12      A.   Yes.

13      Q.   And when you were asked that, you said, I don't

14  think so.  And so I guess I'm just trying to clear up

15  the record.  When I look at your report and I look at

16  numbers 12, 13 and 14, those are your specific opinions

17  as it relates to the code of silence allegations in this

18  case; isn't that right?

19      A.   Yes.

20      Q.   Okay.  So when you said you don't have any

21  opinions about the code of silence in this case, what

22  did you mean?

23      A.   No, I felt that he was getting a little too

24  broad, outside the scope of the materials that I had

25  reviewed, that I was asked to review.  The opinions that



Case: 1:12-cv-08777 Document #: 173-22 Filed: 03/07/16 Page 46 of 49 PageID #:2363

JON SCHORLE                                      February 12, 2016
SPALDING, et al. vs. CITY OF CHICAGO, et al.                    46

1    I gave were regarding the material that I reviewed and

2    my experience as a police officer and administrator.

3         Q.  Okay.  That's helpful.  So you do, in fact,

4    hold opinions about the alleged code of silence in this

5    case; isn't that right?

6         A.  Yes, yes.

7         Q.  Okay.  Just a few more.  You were asked about

8    Captain Pigott and him stating that he did not believe

9    there was a code of silence.  Do you remember that?

10        A.  Yes.

11        Q.  Okay.  And you said in your testimony that you

12   were surprised to hear him say that there was no code of

13   silence, right?

14        A.  Correct.

15        Q.  Okay.  What I'm asking you about is as it

16   relates to Captain Pigott's testimony.  When he said

17   that there is no code of silence, you're disagreeing

18   with the fact that he is saying that there's not an

19   effort by police officers to protect one another; is

20   that what you mean?

21        A.  Yes.  I was taken aback by the whole tenor of

22   his deposition and his reflections on not just the

23   condition of training within the Chicago Police

24   Department but the recognition of a problem that needs

25   to be addressed.



1     Q.  So it's your testimony that, in fact, there are

2   sometimes when there are issues with certain police

3   officers not following the correct procedures or

4   improperly protecting one another, and those are

5   situations that need to be addressed; is that right?

6     A.  Yes.

7     Q.  But it is not your testimony that those

8   situations where that happened is the overwhelming

9   majority or that it permeates through and through the

10   entire Chicago Police Department; is that right?

11     A.  That is correct.

12         MS. DAVIS:  I think I don't have any further

13   questions.  That's it.

14         MR. SMITH:  I've got nothing further.

15         THE WITNESS:  Thank you.

16         MS. DAVIS:  Thank you for your time, and I

17   think that's it.  We can terminate the deposition.

18         Mr. Smith has sent the check.  I have it in

19   hand, and I will forward it to you this afternoon.

20         THE WITNESS:  Okay.  Fine.  Thank you very

21   much.

22         THE REPORTER:  Do you both want copies of this

23   deposition?

24         MR. SMITH:  Sure, I'll take one.

25         MS. DAVIS:  Yeah.



1          (Discussion off the record.)

2          MS. DAVIS:  It's usually my practice to waive

3   signature, unless you think there's something that

4   you're concerned about it not having been gotten

5   straight in the deposition.  It's completely up to you.

6   If you want to review it for those minor kind of things,

7   that's fine.  Otherwise, you can just waive signature.

8          THE WITNESS:  Yes, that's fine.

9          MS. DAVIS:  Okay.  Then we'll waive signature.

10          (The deposition concluded at 12:13 p.m.)

11                          * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Case: 1:12-cv-08777 Document #: 173-22 Filed: 03/07/16 Page 49 of 49 PageID #:2366

JON SCHORLE                                              February 12, 2016
SPALDING, et al. vs. CITY OF CHICAGO, et al.                          49

1                    REPORTER'S CERTIFICATION

2

3       I, JENNIFER SCHUMACHER, a Certified Shorthand

4    Reporter in and for the State of California, do hereby

5    certify:

6

7       That the foregoing witness was by me duly sworn;

8    that the deposition was then taken before me at the time

9    and place herein set forth; that the testimony and

10   proceedings were reported stenographically by me and

11   later transcribed into typewriting under my direction;

12   that the foregoing is a true record of the testimony and

13   proceedings taken at that time.

14

15      IN WITNESS WHEREOF, I have subscribed my name this

16   February 12, 2016.

17

18

19   _____

20   JENNIFER SCHUMACHER, CSR No. 9763

21

22

23

24

25

