**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Chicago Police officer SHANNON SPALDING, | ) | |
| Chicago Police Officer DANIEL ECHEVERRIA, | ) | Case No. 12-cv-8777 |
| | ) | |
| Plaintiffs, | ) | Judge Gary Feinerman |
| | ) | Magistrate Judge Shelia Finnegan |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' REPLY TO PLAINTIFFS' LOCAL RULE 56.1(b)(3)(C) STATEMENT
OF ADDITIONAL FACTS THAT REQUIRE DENIAL OF SUMMARY JUDGMENT**

Defendants, City of Chicago (the "City"), Juan Rivera ("Rivera"), James O'Grady

("O'Grady"), Nicholas Roti ("Roti"), Maurice Barnes ("Barnes"), Robert Cesario ("Cesario"),

Joseph Salemme ("Salemme") and Thomas Mills ("Mills") (collectively, "Defendants"), by their

undersigned attorneys, Drinker Biddle & Reath LLP, submit this Reply to Plaintiffs' Local Rule

56.1(b)(3)(C) Statement of Additional Facts that Require Denial of Summary Judgment.

1.      In May 2006, Plaintiffs Shannon Spalding and Daniel Echeverria were assigned to
the "Narcotics Division," Unit 189 of the Chicago Police Department, where their work involved
pro-active police efforts to combat drug crimes. They worked to develop confidential informants,
obtain and conduct search warrants and conducted conspiracy investigations. (Spalding Dep., pp.
13-14.)

**RESPONSE**:  Admit that in May 2006 Plaintiffs were assigned to the Narcotics Division

of Unit 189, Bureau of Organized Crime.  (Plaintiffs' Response to Defendants' Statement of

Undisputed Material Fact ("Pl. Resp. to D. St.") ¶ 7.)  Deny the remaining statements as not

supported by the cited testimony.

2.      In 2004, Officer Michael Spaargaren confronted officer Ronald Watts about
missing inventory. After that conversation, Watts told Spaargaren that the Lieutenant wanted to
see him. ( Spaargaren Dep., p. 59.) Spaargaren went to his Lieutenant Jimmy Spratt with
information that suggested Sgt. Ronald Watts was corrupt. Lt. Spratt told him "You're accusing

my Sergeant and a fellow officer of stealing? Well, I don't believe you. You should have gone to a supervisor the same day it happened." Lt. Spratt also said, "You know what? I think *you're* the corrupt one, and that's why you didn't go to a supervisor." "Pack your fucking bags, you need to get out of this unit. I'm moving you to another team tomorrow. And don't even think about going to IAD now. I can call anyone and make your life miserable." (Spaargaren Dep. pp. 60-65.) "You better keep your mouth shut. You don't want to lose your life over this. If you report a Sergeant to IAD, how long do you think you will last?" (Spaargaren Affidavit ¶ 15.)

     **RESPONSE**:  Admit that Spaargaren so alleges.

     3.     As a result, Spaargaren left the force for approximately 18 months. (Spaargaren Dep., p. 20, 65.)

     **RESPONSE**:  Admit that Spaargaren alleges that he took a Leave of Absence that lasted

for approximately 18 months.  (Spaaragaren Dep., pp. 20-21.)

     4.     In 2007, while working an undercover narcotics investigation, Plaintiffs uncovered evidence of illegal activity being committed by various Chicago Police Officers. (Echeverria Dep., p. 14, Shannon Dep., p. 31)

     **RESPONSE**:  Admit that the cited testimony indicates that Plaintiff Echeverria received

information concerning alleged illegal activity of Sergeant Ronald Watts.  Deny the remaining

statements as not supported by the cited testimony.

     5.     An arrestee/informant told Echeverria that a fellow police officer, Ronald Watts, was stealing and doing his own dope line in the Ida B. Wells complex. (Echeverria Dep. p. 14, Spalding Dep., p. 34)

     **RESPONSE**:  Admit.

     6.     At Echeverria's request, the informant also told Sgt. Roderick Watson, Echeverria's supervisor, that Ronald Watts "steals, he does everything. He brings in dope for us…" (Echeverria Dep., p. 14)

     **RESPONSE**:  Admit.

     7.     After the informant provided the information to Sgt. Roderick Watson about the criminal acts, Danny Echeverria asked him how he should document the report. Sgt. Watson gave Plaintiff Echeverria a direct order to disregard all that information. (Echeverria Dep., pp. 18-19, Spalding, Dep., p. 35.)

     **RESPONSE**:  Deny as not supported by the cited testimony.  At the cited pages,

Echeverria testified that he asked Sergeant Watson if the report of the debriefing should be "a

negative or a positive" and that Watson responded, "make that shit a negative." Echeverria

further testified that at that point "my understanding was maybe, you know, he was going to do a

confidential investigation or something and he didn't want to reflect that in the report, then it

would take away from the confidential matter that I would assume it would turn into."

(Echeverria Dep., p. 19.) Spalding was not present for this exchange between Echeverria and

Watson and was not even on duty that day. (Spalding Dep., pp. 35-36.)

8. Believing that no investigation was going to be done by the Chicago Police
Department about these crimes, Plaintiffs Spalding and Echeverria, before the end of 2007, while
off-duty, reported to the Federal Bureau of Investigation, Special Agent Patrick Smith the illegal
activity by Sgt. Watts and others who worked with him. (Spalding Dep., pp. 35-37.)

**RESPONSE**: Admit, except deny that Spalding reported the matter to the FBI because

she believed "no investigation was going to be done" as it is not supported by the cited

testimony. Rather, Spalding testified that she reported the information to the FBI because she

"did not have confidence" that "a fair investigation would happen within the department."

(Spalding Dep., p. 36.)

9. Plaintiffs continued to meet with Special Agent Smith, who was assigned to the
bureau's public corruption unit, intermittently through August of 2008 to discuss the information
on Sgt. Watts that they continued to learn. Plaintiffs always did so while off-duty and in their
personal capacities. (Spalding Dep., pp. 43, 46.)

**RESPONSE**: Admit that Spalding so testified. However, certain CPD personnel,

including Debra Kirby, Tina Skahill and Defendant Roti, were aware prior to August 2008 that

Plaintiffs were working with the FBI on the Watts case, and had approved them doing so. (See

facts and record cites at D. St. ¶¶ 15-17.) Deny that during this period Plaintiffs always worked

on the Watts investigation while off-duty and in their personal capacities. (*Id.*)

10. After several meetings with the F.B.I. in their personal capacities, the F.B.I.
agents began to request that Plaintiffs spend more time assisting on the case. Because additional
involvement with the investigation would encroach on their professional time, Plaintiff
Echeverria informed Smith he was going to speak with the Chief of IAD. (Spalding Dep., pp. 47-
48, 51.)

**RESPONSE**:  Admit that Spalding so testified.  Deny that Plaintiffs always met with the

FBI in their personal capacities.  (See facts and record cited at D. St. ¶¶ 15-17.)

11.     In August of 2008, Echeverria called to set up an appointment with then-Chief of
the Internal Affairs Division ("IAD") Tina Skahill. (Spalding Dep., pp. 49, Echeverria Dep.,
p. 22)

**RESPONSE**:  Admit that Plaintiffs so testified.

12.     In August 2008, when Plaintiffs went to meet with Tina Skahill they were met by
Chief Skahill and Special Agent Patrick Smith, Tom Chester and Barb West. During the
meeting, Skahill stated that just prior to Plaintiffs' arrival, she had met with Patrick Smith, Tom
Chester and Barb West and they were filled in by Patrick Smith about the Watts investigation
and Plaintiffs' involvement. (Spalding Dep., pp. 49-51.)

**RESPONSE**:  Admit the first sentence but deny the second sentence as not supported by

the cited testimony.  Spalding did not testify that in that pre-meeting the other attendees were

"filled in by Patrick Smith about the Watts investigation and Plaintiffs' involvement."

Additionally, Chief Skahill knew prior to the August 2008 meeting about the Watts investigation

and Plaintiffs' involvement in it.  (See facts and record cites at D. St. ¶ 15.)

13.     Echeverria told Skahill and the others at this meeting how they had obtained their
information, who he had reported it to and that he and Spalding had decided to go on their own
to the FBI. (Spalding Dep., p. 53.)

**RESPONSE**:  Admit that Spalding so testified.  However, in making reference to the

original call about Sgt. Watts that she received from the FBI in approximately 1997 (Pl. Resp. to

D. St. ¶ 8), Spalding testified that "all this time has gone by from the first time I was contacted

and we decided to go on our own to FBI and, you know."  (Spalding Dep., p. 53.)

14.     Chief Skahill indicated she was detailing Danny and Shannon to Unit 543 as a
cover so they could report directly to the FBI building on a daily basis without their identities
being compromised, or the nature of the investigation being connectable to Operation Brass Tax
and investigating Chicago Police Officers. (Spalding Dep., pp. 59-65.)

**RESPONSE**:  Admit that Plaintiffs were informed in the meeting that they were being

detailed to Unit 543 ("Detached Services") and that this was being done because there are many

different divisions or details in Detached Services so "nobody would be exactly sure what we

were doing." (Spalding Dep., p. 60.) Deny the remaining statements as not supported by the cited testimony. Additionally, as of the August 2008 meeting, certain CPD personnel, including Skahill, Kirby and Roti, directly knew that Plaintiffs were working on the Watts case, and had approved them doing so. (See facts and record cites at D. St. ¶¶ 15-17; Skahill Dep., pp. 7-8.)

15.     Plaintiffs' were to report to Sgt. Tom Chester who was a CPD Sergeant working as the FBI liaison for the IAD confidential section. Plaintiffs remained assigned to the Narcotics Unit, though they were detailed to "Detached Services," Unit 543, and reported directly to F.B.I. headquarters to work on Operation Brass Tax. (Spalding Dep., pp. 63-65.)

**RESPONSE**: Admit. However, according to Plaintiffs, during this same time period when Plaintiffs were reporting to the FBI and working on Operation Brass Tax, Plaintiffs were also working on other narcotics cases for CPD. (Pl. Resp. to D. St. ¶¶ 28-29; Spalding Dep. pp. 75-76, 80-82.)

16.     Other than the Chicago Police personnel in the meeting (Skahill, West and Chester) only then Superintendent Weiss, his assistant Brust, Deputy Superintendent Kirby and Liz Glatz, the Commander of unit 543, were supposed to know of Plaintiffs' involvement in the federal investigation (known as "Operation Brass Tax"). (Spalding Dep., pp. 60-61, 63.)

**RESPONSE**: Deny. Spalding testified that in the August 2008 meeting Plaintiffs were told that the people within CPD who would know about Plaintiffs' involvement in Operation Brass Tax would be determined on a need to know basis, and that those with a need to know would not be determined by Plaintiffs. (Spalding Dep., pp. 62-63.)

17.     Prior to the August 2008 meeting, Plaintiffs were unaware of any CPD officers at any level that were aware of the Plaintiffs' involvement with the FBI investigating Watts. (Echeverria Dep., p. 23.) It was at this meeting that Plaintiffs learned for the first time that there was an open investigation of Sergeant Watts that was "inactive" even before Plaintiffs had gone to the FBI. (Echeverria Dep., pp. 27-28)

**RESPONSE**: Admit the first sentence with respect to *Plaintiffs* being unaware; however, certain CPD personnel, including Kirby, Skahill and Roti, were aware prior to the August 2008 meeting that Plaintiffs were working with the FBI on a police corruption case, and had approved them doing so. (See facts and record cites at D. St. ¶¶ 15-17.) Deny the second

sentence as it is not supported by the cited testimony. Echeverria testified that *he* learned at the August 2008 meeting that the FBI and CPD had been investigating Watts for "nearly a decade." (Echeverria Dep., pp. 27-28.) Spalding knew since approximately 1997 that the FBI had been investigating Watts. (Pl. Resp. to D. St. ¶ 8.)

18. Two days after the August 17, 2008 meeting, Plaintiffs were detailed to unit 543 and their full time work responsibility was to work on Operation Brass Tax and report in at the FBI building. (Spalding Dep., pp. 74-75.)

**RESPONSE**: Admit that Spalding so testified, except she did not say the detail was two days after the meeting. According to Plaintiffs, Plaintiffs also worked other narcotics cases for CPD during this period. (Pl. Resp. to D. St. ¶¶ 28-29; Spalding Dep., pp. 75-76, 80-82.)

19. During the time Plaintiffs worked on Operation Brass Tax, they were also encouraged by CPD command staff to develop other narcotics related cases, which overlapped with their work on Operation Brass Tax. (Spalding Dep., pp. 75-76.) Plaintiffs were to use the confidential informant pack and were instructed to have it signed by Commander O'Grady after a Narcotics Sergeant signs off on it. (Spalding Dep., pp. 80-87.)

**RESPONSE**: Deny the first sentence. (Rivera Dep., pp. 30-32.) Deny the second sentence as it is not supported by the cited testimony. Additionally, Spalding testified that at that time, "[w]e weren't, per se, in Narcotics." (Spalding Dep., p. 84.)

20. On an unknown date to the Plaintiffs, information that Plaintiffs had reported criminal misconduct by a sworn officer and were working with an outside investigation was leaked within the Department and became known to Defendant Commander O'Grady. (Spalding Dep. pp. 85-89.)

**RESPONSE**: Objection and deny. The alleged statements by O'Grady and Padar are inadmissible hearsay within hearsay. *See Duncan v. Thorek Memorial Hosp.*, 784 F. Supp. 2d 910, 921 (N.D. Ill. 2011) (holding that alleged remarks made by supervisor to employees and later relayed to plaintiff were inadmissible hearsay because both levels of hearsay did not fall within a specific hearsay exception). Additionally, both Padar and O'Grady testified that in the subject conversation, O'Grady did not refer to Plaintiffs as "rats" or make any reference to

Plaintiffs' reporting or investigating misconduct by police officers.  (See facts and record cites at D. St. ¶ 30.)  Deny the statements as not supported by the cited testimony, and the statements were not made.  (See the facts and record cites in D. St. ¶ 29.)

21.     According to Defendant Nicholas Roti, he was aware in 2008, before O'Grady became a supervisor, that Plaintiffs had been working with the FBI on a police corruption case. (Echeverria Dep., pp. 24-25.) Roti told O'Grady that Plaintiffs were on loan to IAD working on a police corruption case. (O'Grady Dep., pp. 18-19.)

**RESPONSE**:  Admit Roti was aware as of a certain time in 2008 that Plaintiffs were working with the FBI on an as-needed/part-time basis on a police corruption case, and that Roti approved Plaintiffs to do so.  (See facts and record cites at D. St. ¶¶ 16-17.)  Admit the second sentence.  In the cited testimony, O'Grady further stated that Roti told him this when O'Grady took over as Commander of Narcotics, and that Roti did not give him any specific details, just that Plaintiffs were working on a police corruption case.  (O'Grady Dep., pp. 18-19.)

22.     O'Grady refused to approve a confidential informant requested by Plaintiffs' Spalding and Echeverria. (O'Grady Dep., p. 64) The request for confidential informant had been signed by Sgt. James Padar and presented to O'Grady for his authorization by Padar. (Padar Dep. pp. 56-62)

**RESPONSE**:  Admit.  For the reasons O'Grady did not approve the confidential informant request, see the facts and record cites at D. St. ¶ 29.

23.     Padar returned the request for approval of Confidential Informant to Plaintiffs and relayed the reasons why O'Grady would not sign it. (Padar Dep., p. 66.)

**RESPONSE**:  Admit. Padar testified that the reason relayed to Spalding was that O'Grady wanted to have Plaintiffs' supervisor approve the confidential informant request and then forward it back up to O'Grady.  (Padar Dep., p. 69.)

24.     On August 17, 2010, Padar told Spalding, Echeverria and Anthony Hernandez, a member of the Narcotics squad, that O'Grady said "I will not approve this with these two IAD rats Spalding and Echeverria on here. If you want to remove their names, I will approve the informant for Hernandez only. Furthermore, you are no longer to ever work with them. I don't want them in this building, you never cross their paths. And if you are out there and they call a

10-1, which is a police emergency, you or any member of this division is not to respond."
(Spalding Dep., p. 89; Echeverria Dep., p. 41-42.)

**RESPONSE**: Objection and deny. The alleged statements by Padar about alleged

statements by O'Grady are inadmissible hearsay within hearsay. *See Duncan*, 784 F. Supp. 2d at

921. O'Grady denies making any such statements to Padar, Padar denies that O'Grady made any

such statements to him, and Padar denies that he made any such statements to Plaintiffs. (See the

facts and record cites at D. St. ¶¶ 29-31; Padar Dep., pp. 61-66; 69-70.)

25. Plaintiffs' spoke with then Chief of IAD, Juan Rivera within a day or two of the
incident in the parking lot and complained to Rivera about what Padar said. Spalding asked
Rivera "how the hell Commander O'Grady knew to the point that a sergeant would tell me that
he would go the other way if I was being shot at and that they would not respond…How the hell
did O'Grady find out to the point that you put my life and my partner's life in jeopardy."
(Spalding Dep., pp. 98-100)

**RESPONSE**: Deny. (See the facts and record cites at D. St. ¶¶ 37-39.)

26. Rivera responded stating "That might be my fault; I might have f……d up."
Rivera then told Spalding that he had informed Chief Ernie Brown (the current Chief of
Organized Crime) about their role in the investigation and he had told Deputy Chief Nick Roti
and Commander O'Grady and his command staff. (Spalding Dep p. 98-100).

**RESPONSE**: Objection and Deny. The alleged statements by Ernie Brown and Rivera

are inadmissible hearsay within hearsay. *See Duncan*, 784 F. Supp. 2d at 921. The statements

also were not made. (See the facts and record cites at D. St. ¶¶ 37-39.) Further, Spalding does

not believe that Rivera was even in the meeting that Brown allegedly had with Roti and

O'Grady. (Spalding Dep., p. 100.)

27. Spalding told Rivera that Defendant O'Grady was informing his personnel that
she and Officer Echeverria were "snitches" and "rats" (Rivera Dep., p. 50.) This took place while
Plaintiffs were still assigned to Narcotics but detailed to Detached Services. (Rivera Dep., p. 52.)
Rivera did not investigate Spalding's complaints. (Rivera Dep., p. 51)

**RESPONSE**: Deny as not supported by the cited testimony. Plaintiffs admit that

Hernandez told Rivera that these were just rumors, and that Hernandez did not witness any of it.

(See Pl. Resp. to D. St. ¶ 98.)

28.     Plaintiffs on multiple occasions asked Defendant Rivera to open a C.R. investigation into the retaliation they were experiencing. (Spalding Dep., p. 399.)

**RESPONSE**:  Deny.  (See facts and record cites at D. St. ¶¶ 96-98.)

29.     In approximately April or May, 2011, Superintendent Hilliard and Assistant Superintendent Cuello were looking into transferring Plaintiffs out of Unit 543 and back to patrol. (Rivera Dep., p. 67).

**RESPONSE**:  Admit Hillard and Cuello considered transferring Plaintiffs and other

officers back to patrol because they were looking to put officers back to patrol, and that they

considered transferring Plaintiffs because Echeverria had a telephone conversation with one of

Cuello's sergeants in which Echeverria was "borderline insubordinate." (Rivera Dep., pp. 62-63.)

Plaintiffs were never sent back to patrol.  (Echeverria Dep., p. 79.)

30.     Juan Rivera told Plaintiffs that Chief Roti had an "issue" with Plaintiffs and they would not be assigned back to narcotics. (Rivera Dep., pp. 67-68.)

**RESPONSE**:  Admit.

31.     When Defendant O'Grady returned to Narcotics unit as Commander, then Deputy Chief Roti told him that Shannon Spalding and Danny Echeverria were on loan to Internal Affairs, working on a police corruption case. (O'Grady Dep., p. 18.) O'Grady was aware of rumors at that time, that Watts and Mohammed were being looked at regarding allegations of corruption. (O'Grady Dep., p. 19.)

**RESPONSE**:  Admit, except deny that O'Grady heard rumors "at that time" as not

supported by the cited testimony.  O'Grady testified he heard such rumors "sometime in late

2008, perhaps."  (O'Grady Dep., p. 19.)

32.     O'Grady was aware that the Plaintiffs were working with the FBI on a special investigation. (O'Grady Dep., p. 20, 22, 24) At some point he learned it was a police corruption case having something to do with public housing. (O'Grady Dep., p. 35)

**RESPONSE**:  Admit.

33.     O'Grady told Deputy Chief Roti that he didn't want Spalding and Echeverria back in the Narcotics Division. (O'Grady Dep., p. 38) O'Grady had inferred from his conversation with Roti that the Plaintiffs wanted to return to their unit assignment in Narcotics after being detailed to the FBI. (O'Grady Dep., p. 43)

**RESPONSE**:  Admit.  However, Plaintiff never asked Roti or O'Grady if they could return to Narcotics.  (Pl. Resp. to D. St. ¶ 41.)

34.     Juan Rivera told Plaintiffs that he was present at the meeting where it was decided that Plaintiffs would be reassigned from Unit 543. Also present were Nick Roti, James O'Grady, Beatrice Cuello and others. (Spalding Dep., p. 109.) At that meeting O'Grady said that "I'm not taking those F-ing IAD rats back; and furthermore, God help them if they need help on the street…it's not going to come." (Spalding Dep., p. 111)

**RESPONSE**:  Objection and deny.  The alleged statements by Rivera and O'Grady are inadmissible hearsay within hearsay.  *See Duncan*, 784 F. Supp. 2d at  921.  Rivera was never at a meeting with O'Grady and Roti in which Plaintiffs came up.  (See facts and record cites at D. St. 39.)  With respect to the meeting Rivera attended with Cuello and Hillard, Roti and O'Grady were not present at that meeting, and O'Grady was not mentioned.  (Rivera Dep., pp. 58-59, 67-69.)  Deny that Rivera made any of the quoted statements to Plaintiffs.  (Rivera Dep., p. 68.)

35.     O'Grady gave this opinion to Roti despite the fact that he never met the Plaintiffs, and had never reviewed their performance evaluations and had never directly supervised them. (O'Grady Dep., pp. 43-44)

**RESPONSE**:  Admit that O'Grady gave his opinion to Roti that he did not want Plaintiffs back in Narcotics.  For the reasons O'Grady told Roti he did not want Plaintiffs back in Narcotics, see facts and record cites at D. St. ¶¶ 44-45.

36.     O'Grady always expects the officers who work for him to follow the chain of command. (O'Grady Dep., p. 61)

**RESPONSE**:  Admit.

37.     Early on during their detail to Detached Services, Roti told Defendant Rivera that he had allowed the Plaintiffs to work with the FBI. (Roti Dep., p. 31-32.) Roti told Tina Skahill that Plaintiffs should be detailed to Internal Affairs so that they can be supervised. (Rivera Dep., pp. 31-32)

**RESPONSE**:  Deny the first sentence as it is not supported by the cited testimony, which does not reference Rivera.  However, admit that Roti told Skahill that he thought Plaintiffs should be detailed to IAD, but he did not say "so that they could be supervised."  Rather, Roti

told Skahill "I think it would be best if she officially detailed Spalding and Echeverria to IAD as

opposed to this kind of ad hoc favor that we had because we thought this was going to be a

shorter term thing and just being used once in a while, coupled with the fact that I was uneasy

because it came to my attention that Spalding and Echeverria were not showing up to work at

narcotics, and I could not verify through the F.B.I. that they were with them all the time, so we

don't operate like that. We don't have officers that just go out without supervision and no one

knows where they're at. So I told Tina since I can't really properly supervise them from here,

you need to take them, which she said – and I told her at that point about – that the F.B.I. told me

that they were only going to use them part-time, which she told me in the first place, and also

that I did subsequently recontact Agent Smith and ask him if he was utilizing the CI and

Spalding and Echeverria every day, which he told me, no, he wasn't. So at that point Tina

agreed and she had them detailed out." (Roti Dep., p. 32.)

38.     After Shannon and Danny informed Peter Koconis that they had been removed
from their detail of 543, Koconis had a telephone conversation with Deputy Superintendent
Beatrice Cuello inquiring why either of these Officers would be removed from their assignments.
During this conversation, Cuello told Koconis that both officers were good officers and Cuello
never had experienced any problems with them. However, she said that during a meeting where
she was present, which included Deputy Chief James Jackson, Commander James O'Grady, and
Chief Nicholas Roti, that James O'Grady and Nicholas Roti refused to allow either officer to
return to their units of assignment within "189", due to the fact that Shannon and Danny were
"IAD rats." (Koconis Dep., pp.42, 95, 96)

**RESPONSE**:  Objection and deny.  The alleged statements by Cuello, Roti, O'Grady and

Koconis are inadmissible hearsay within hearsay.  *See Duncan*, 784 F. Supp. 2d at  921.

Additionally, Roti never attended any  meeting with Beatrice Cuello, James Jackson and

O'Grady where Plaintiffs were discussed, and Roti never stated at any point that Plaintiffs were

not allowed to return to Unit 189 because they had worked with IAD or were "rats" or "IAD

rats" or any comment along those lines.  O'Grady was never part of any meeting with Cuello or

Jackson in which Plaintiffs were discussed, and O'Grady never spoke to Cuello or Jackson about

Plaintiffs, including whether O'Grady and Roti wanted Plaintiffs to return to Narcotics or the

Bureau of Organized Crime (Unit 189). (Supplemental Declaration of James O'Grady, ¶¶ 5-6;

Supplemental Declaration of Nick Roti, ¶¶ 3-4.)[1]

39. Despite Plaintiffs having years of experience conducting undercover operations, eavesdropping operations, developing informants and other valuable police work, Defendants O'Grady and Roti would not allow Plaintiffs to return to any unit within Organized Crime, including their own unit of assignment, thus losing their specialized assignments, weekends and holidays off, take-home vehicles, and the ability to work unlimited overtime. (Echeverria Dep., p. 82-83.)

**RESPONSE**: Deny in part as all of the statements are not supported by the cited

testimony. Echeverria testified that in Narcotics people had different days off and you could not

work unlimited overtime. (Echeverria Dep., pp. 83-84.) Admit that Roti and O'Grady did not

want Plaintiffs to return to Narcotics. (See facts and record cites at D. St. ¶¶ 43-48.) However,

Plaintiffs never asked Roti or O'Grady if they could return to Narcotics. (Pl. Resp. to D. St. ¶

41.)

40. Plaintiffs were first detailed to the Police Academy, where Plaintiffs often did nothing more than sit at desks. (Echeverria Dep., p. 86.)

**RESPONSE**: Admit that Echeverria so testified. However, Echeverria further testified

that Plaintiffs were assigned to the Police Academy only temporarily while Rivera was trying to

work out their next assignment, and that while at the Academy Plaintiffs also went through

training courses and, at the request of Skahill, helped instruct an in-car camera training course.

(Echeverria Dep., pp. 86-88; Spalding pp. 150-151.

41. Around the end of July 2011, Plaintiffs were moved to the Police Academy and then the Inspections Division, Unit 126, a unit that normally deals with auditing functions; and not criminal police work. (Spalding Dep., pp. 157-158.)

---

[1]  The Supplemental Declarations of James O'Grady ("O'Grady Supp. Decl.") and Nick Roti ("Roti Supp. Decl.") are attached hereto as Exhibits A and B, respectively.

**RESPONSE**:  Deny as not supported by the cited testimony, except admit that after

being temporarily assigned to the Police Academy Plaintiffs were detailed to the Inspections

Division.  Tina Skahill made the decision to detail Plaintiffs to Inspections, and Plaintiffs are not

claiming that Skahill retaliated against them in any manner whatsoever.  (Spalding Dep., pp. 85,

151.)

42.     In October 2011, Plaintiffs were called back to assist the F.B.I. with the
completion of Operation Brass Tax. (Spalding Dep., pp. 160-161)  Plaintiffs continued to
periodically work on Operation Brass Tax with the F.B.I.

**RESPONSE**:  Admit, except the cited testimony does not state that Plaintiffs were

"called back" to assist with Operations Brass Tax.

43.     The F.B.I. publically announced the arrests of Chicago Police Officers Watts and
Mohammad on February 13, 2012. (https://www.fbi.gov/chicago/press-releases/2012/chicago-
police-sergeant-and-officer-charged-with-stealing-5-200-from-individual-they-believed-was-
transporting-drug-proceeds). Approximately three weeks later, Plaintiffs were assigned to the
Fugitive Apprehension Unit.

**RESPONSE**:  Admit the first sentence.  Deny the second sentence as it is not supported

by any record evidence.  Plaintiffs admit that they applied for positions in the Fugitive

Apprehension Unit, they were reassigned to the Fugitive Apprehension Unit on or about March

18, 2012, and they are not claiming that there was anything retaliatory about that move.  (Pl.

Resp. to D. St. ¶¶ 49-50.)

44.     Commander Salemme heard that at least one of the Plaintiffs was "IAD" before
they arrived at the Fugitive Apprehension Unit. (Salemme Dep., p. 6.) Salemme also had
knowledge that Plaintiffs were involved in the Watts' Investigation prior to the filing of the
lawsuit in November 2012. (Salemme Dep., p. 14-15)

**RESPONSE**:  Admit.  However, prior to November 2012 when Plaintiffs filed their

lawsuit, Salemme had no knowledge that either Plaintiff reported or disclosed to the FBI or to

any government or law enforcement agency, including CPD, alleged criminal misconduct,

corruption or violation of any state or federal law, rule or regulation by Watts, Mohammed or any other officer.  (See facts and record cites at D. St. ¶¶ 87-88.)

45.     The day prior to the Plaintiffs' arrival at the Fugitive Apprehension Unit, Lt. Cesario spoke with Officer Jan Hanna. He told Hanna that two new officers were coming who were supposedly IAD rats and to be very leery of them. (Hanna Dep., p. 47.)

**RESPONSE**:  Deny.  (Deposition of Coleen Dougan, pp. 35-39; Cesario Dep., p. 64.)[2]

46.     Hanna was introduced to Plaintiffs by Lt. Cesario. When Cesario left, Hanna said to the Plaintiffs, "So you two are the IAD rats?" (Hanna Dep., p. 50.)

**RESPONSE**:  Admit that Hanna so testified.

47.     Very soon after Plaintiffs arrived at Fugitive Apprehension Unit, Lt. Cesario ordered Hanna, whose job duties included distributing new cases, to only give Plaintiffs "dead end cases that would not lead to arrests or officer activity." (Hanna Dep., p. 52-53.) Hanna understood that meant not to give them any high profile cases. "You don't want to give them work. You know, they're just here to take up space." (Hanna Dep., p. 53.) Hanna acknowledged the Lieutenant and said "yes" or "okay". (Hanna Dep., p. 54.)

**RESPONSE**:  Deny.  (Cesario Dep., pp. 68-70; Dougan Dep., p. 63.)  Further, at the cited pages, Hanna testified that Cesario only allegedly said, "give them dead-end cases, such as drinking on the public way, juvenile warrants.  That's it."  (Hanna Dep., pp. 53-54.)

48.     Initially, Lt. Cesario handpicked the Plaintiffs' assignments. When he arrived at work in the morning, he always printed out all the warrants, as well, and he would highlight which cases went to Danny and which cases went to Shannon. (Hanna Dep., p. 60.)

**RESPONSE**:  Deny.  (Cesario Dep., p. 71.)

49.     Cesario required that he be copied on all of the Plaintiffs' assignments, as well as the Commander and their Sergeant. (Hanna Dep., p. 55.)

**RESPONSE**:  Deny that Hanna testified that Cesario "required this."  Cesario was copied as a matter of course on all assignment emails not just Plaintiffs' assignments.  (Cesario Dep., pp. 71-72, 111-113.)

50.     When Hanna inadvertently assigned Plaintiffs a homicide case, it was taken away from them by their sergeant. (Hanna Dep., p. 56.)

---

[2]  The Deposition of Coleen Dougan ("Dougan Dep.") is attached hereto as Exhibit C.

**RESPONSE**:  Admit that Hanna so testified.  Hanna further testified that only task force officers were supposed to be assigned "top 5" cases, including homicides, that Plaintiffs were not task force officers, and that from time to time non-task force officers other than Plaintiffs would also inadvertently be assigned top 5 cases.  (Hanna Dep., pp. 21-23, 29.)

51.     Cesario instructed Officer Jan Hanna to act as if she didn't receive Officers Spalding and Echeverria's requests for overtime and to toss them in the garbage. (Hanna Dep. p. 36.) He told her he was giving her a direct order to throw their sheets out, their slips out and do not put them on the schedule. (Hanna Dep., p. 38.) She went along with the order for two or three months. (Hanna Dep., 39.) Hanna recalls two times for certain when she pretended not to receive Plaintiffs' requests for overtime. (Hanna Dep., p. 96.)

**RESPONSE**:  Deny.  (Cesario Dep., pp. 92-93.)  Hanna further testified that Plaintiffs did work overtime while in Fugitive Apprehension, and she has no idea how much.  (Hanna Dep., pp. 39, 41.)  Additionally, Spalding testified that she is not claiming that she ever put in an overtime request while in Fugitive Apprehension and individuals will less seniority received the overtime.  (Spalding Dep., pp. 281-282.)  Echeverria is unaware of any circumstances where other non-task force officers like Plaintiffs had an opportunity to get overtime and Plaintiffs did not.  (Pl. Resp. to D. St. ¶ 104.)

52.     In June of 2012, Officer Hanna heard Lt. Cesario instruct his team of officers not to provide any backup for Plaintiffs and to not work with them at all. (Hanna Dep., p. 70.) He also informed all of the sergeants at that meeting, to inform their team members not to provide backup for Shannon and Danny. (Hanna Dep., p. 71.)

**RESPONSE**:  Deny.  (Cesario Dep., pp. 82-83; Barnes Dep., p. 38.)

53.     Lt. Cesario instructed Jan Hanna to write a To/From report stating that Danny had requested to go on afternoons due to family reasons. (Hanna Dep., p. 67.)

**RESPONSE**:  Deny.  (Cesario Dep., pp. 80-81.)

54.     While working in the Fugitive Apprehension Unit, team members did not include Plaintiffs on their arrest reports despite the fact that it was a common practice to include most all team members on a report, whether they participated in the arrest or not, so the member would get credit for the arrest statistic. (Hanna Dep., p. 81-82.)

**RESPONSE**:  Deny in part as the cited testimony does not support all of the matters alleged.  Hanna testified that she had no job responsibilities relating to arrest reports, did not often look at arrest reports, and has no personal knowledge of whether or not Plaintiffs were involved in any arrests where they were not included on arrest reports.  (Hanna Dep., pp. 75-76, 82-83.)  Hanna also testified that it "appeared to her" that the "majority of times" Plaintiffs were left off arrest reports, that other members of Plaintiffs' team were also at times left off of arrest reports, and that only the majority of Plaintiffs' team members allegedly would not include Plaintiffs on their arrest reports when Plaintiffs were not involved in the arrest.  (*Id*. at pp. 80-82.)

55.  Detective Kevin Culhane told Jan Hanna that he had been told directly by Lt. Cesario not to give Plaintiffs access to both Accurint and Leads 2000 data bases. (Hanna Dep., p. 88.)

**RESPONSE**:  Objection and deny.  The alleged statements by Ceasrio and Mr. Culhane are inadmissible hearsay within hearsay.  *See Duncan*, 784 F. Supp. 2d at  921.  They also were not made.  (Declaration of Kevin Culhane, ¶¶ 5-6; Cesario Dep., p. 134.)[3]

56.  Cesario participated in the decision to remove Plaintiffs from Sgt. Barnes' team. At that meeting, Cesario told Plaintiffs they were being removed from Barnes' day team. He said, "you want to go against officers, you want to do this type of activity, you are going to be put on the night team way up north…you will no longer work days, you will no longer have a take home car and if I can help it, you will never be deputized. (Spalding Dep., P. 248.)

**RESPONSE**:  Admit the first two sentences.  Deny as to the third sentence.  [The alleged statements by Cesario in the third sentence are inadmissible hearsay.  They also were not made.] (Barnes Dep., pp. 124-125.)

57.  During this meeting, Lt. Cesario and Commander Salemme questioned Plaintiffs about their working with IAD and what they had done for them. (Spalding Dep., p. 249.)

**RESPONSE**:  Deny, except admit that at the end of the meeting at which Plaintiffs were told they were being moved from Barnes' team to Mills' team, Cesario asked Plaintiffs if they

---

[3] The Declaration of Kevin Culhane ("Culhane Decl.") is attached hereto as Exhibit D.

worked for IAD and for the Inspection Division in order to get clarification on their background.

(Cesario Dep., p. 59.)

58.     Before Plaintiffs arrived at the Fugitive Apprehension Unit, Sgt. Maurice Barnes had already told a member of the squad, Robert Walker, that two officers "from IAD" were coming. (Walker Dep. pp. 21, 23, 27, 56)

**RESPONSE**:  Deny.  (Barnes Dep., pp. 34-35, 126.)

59.     Not long after being assigned to his team, Spalding had a conversation with Defendant Barnes. It took place in the storage room area in the Detective Division. Spalding had requested the meeting to address statements made to her that the rest of the squad had been instructed not to work with Plaintiffs or back them up, that they were IAD. (Spalding Dep., pp. 225, 233.) He also said, "The team doesn't like you. They're not going to back you up, they don't trust you." (Spalding Dep., pp. 231-233)

**RESPONSE**:  Deny.  (Barnes Dep., pp. 65-66, 69.)

60.     After Spalding told Barnes what she had heard from other officers, Barnes said "I know that, you know, you worked for IAD, you brought a sergeant down.  …you like to bring sergeants down, huh?  You like to have sergeants arrested?"  (Spalding Dep., p. 233.)

**RESPONSE**:  Deny.  (Barnes Dep., pp. 77-78.)

61.     During this conversation, Barnes said, "to be honest with you. I'd hate to one of these days have to be the one to knock on your door and tell your daughter you're coming home in a box. That's how serious it is." (Spalding Dep., p. 235.)

**RESPONSE**:  Deny.  (Barnes Dep., pp. 77-78.)

62.     Not long after that conversation, Plaintiffs were called into a meeting with Sgt. Barnes, Commander Salemme and Lt. Cesario and were removed from Sgt. Barnes' team and placed on third watch. (Spalding Dep., p. 239.)

**RESPONSE**:  Admit, except deny that Spalding testified that the meeting where

Plaintiffs were informed that they were being moved from Barnes' team to Mills' team was not

long after the alleged conversation referenced in paragraphs 59-61 above.  (Spalding Dep., pp.

237-239.)  Also deny that Barnes made any of the statements attributed to him in paragraphs 59-

61 above.  (See responses to paragraphs 59-61 above.)

63.     Sgt. Barnes was unaware of any complaints about Danny or Shannon while they were working for his team at FAU. (Barnes Dep., p. 111.)

**RESPONSE**:  Admit.

64.     Barnes believed that officers Spalding and Echeverria were good officers. He never heard from any of the other Defendants that they were not good officers. (Barnes Dep., p. 111-112.)

**RESPONSE**:  Admit, except in the cited testimony Barnes did not testify as to all of the

other Defendants.

65.     Commander Salemme removed Plaintiffs from Sgt. Barnes' team. At the meeting where this occurred, Salemme told Plaintiffs "you should have known better. If you want to go against other sworn personnel, you should have known this shit was going to happen to you. You brought this baggage here with you." (Spalding Dep., p. 247-248.)

**RESPONSE**:  Deny.  (Salemme Dep., p. 74; Barnes Dep., p. 94.)  Also, Cesario, not

Salemme, made the decision to move Plaintiffs to Mills' team.  (Pl. Resp. to D. St. ¶ 63.)

66.     In July of 2011, Defendant O'Grady told Anthony Hernandez that Shannon Spalding was banned from the Homan Square facility. He ordered Hernandez to arrest her if she entered the facility. When asked why she was banned, O'Grady said "Look at all the trouble she's caused, Tony, investigating other sworn members for corruption, even bosses, trying to put them in prison, she can't be trusted she's an IAD rat. I don't want her in this building. (Hernandez Affidavit ¶¶ 3-6)

**RESPONSE**:  Deny.  (O'Grady Dep., pp. 73-75; Supp. O'Grady Decl., ¶ 3.)

67.     Salemme testified that O'Grady told him that Spalding should not go to "Homan Square" unless she had a specific police purpose. (Salemme Dep., p. 20. ) He referred to the entire "facility." (Salemme Dep., p. 22.)

**RESPONSE**:  Admit the first sentence.  Deny the second sentence as Salemme did not

testify that O'Grady said the "entire facility."  (Salemme Dep., pp. 22-23.)  O'Grady told

Salemme that Spalding, who had been at the Homan Square location visiting her boyfriend while

he was on duty, should not be at restricted areas in Homan Square (the 2nd Floor of the building

and the east parking lot) unless she was there for a proper police purpose.  (O'Grady, pp. 68-71.)

68.     O'Grady says that he contacted Defendant Joseph Salemme and told him that Shannon Spalding should not be in a restricted area at Homan Square. He did this after someone told him they saw Plaintiff Spalding talking to her boyfriend, Officer Hernandez. O'Grady does not recall who told him. O'Grady never saw Spalding at Homan Square. O'Grady has no idea how long she was there or whether she was in a restricted area. O'Grady never spoke to Spalding before issuing this directive. (O'Grady Dep., pp. 69-75) O'Grady told Defendant Roti that he had

called Spalding's supervisors and told them that she shouldn't be at Homan Square. (Roti Dep., pp. 58-59)

**RESPONSE**: Objection. These numerous statements in one paragraph do not comply with this Court's Local Rules. *See* L.R. 56.1(b)(3)(C); *Maclin v. A.M. Bus Co.,* 2006 WL 463370, *2 (N.D. Ill. Feb. 22, 2006) (stating that "compounding of facts into an amalgamated paragraph is not permissible" and disregarding certain paragraphs); *Malec v. Sanford*, 191 F.R.D. 581, 582 (N.D. Ill. 2000) ("it is inappropriate to confuse the issues by alleging multiple facts in a single paragraph in hopes of one opponent missing one"). Notwithstanding and without waiving the objection, admit, except for the last sentence. O'Grady testified that someone had informed him that Spalding's boyfriend, Officer Hernandez, had left his assigned post and was visiting with Spalding. (O'Grady Dep., p. 72.) Additionally, Hernandez admitted to O'Grady that he had left his assigned post without supervisor approval to visit with his girlfriend, Spalding. (*Id.* at pp. 74-75.) Deny with respect to the last sentence. Roti testified at the cited pages that he thinks he learned from O'Grady that Spalding was visiting with Hernandez while he was working on duty in the guard shack at Homan Square and was impeding what Hernandez was supposed to be doing, that O'Grady communicated to Spalding "directly or through a supervisor or whoever" that Spalding should not be in that area when Hernandez was on official duty. Additionally, Roti was not told that Spalding was banned from the entire building at Homan Square. (Roti Dep., p. 59.)

69. Officer Jan Hanna was in the room when a telephone conversation came in for Lt. Cesario from Commander O'Grady. She heard Cesario say "hello Commander O'Grady." (Hanna Dep.,. p. 86.) She did not hear the conversation. As soon as Cesario hung up the telephone, Lt. Cesario told Hanna "that was Commander O'Grady and he just informed me that Shannon is no longer allowed, like I said, she's no longer permitted, she's banned from Homan Square and if she goes there, she will be arrested. (Hanna Dep., p. 86.)

**RESPONSE**: Objection and deny. The alleged statements by O'Grady and Cesario are inadmissible hearsay within hearsay. *See Duncan*, 784 F. Supp. 2d at 921. They also were not

made.  Cesario never spoke to O'Grady about Spalding and Homan Square.  (Cesario Dep., pp. 84-86.)

70.      Defendant Mills instructed the officers under his command, to watch the Plaintiffs' news conference and then they would have a team meeting about it. (Spalding Dep., p. 270.) Mills told Spalding that the people on the team don't want to work with Plaintiffs. He told Plaintiffs, "For all we know, you could still be working IAD investigating them. They don't want to work with you guys after all of this came out. (Spalding Dep., p. 279.)

**RESPONSE**:  Deny.  Mills told the team members to watch Plaintiffs on TV "because I did not want to try and ask questions from eight different people about the contents of what was going to be on TV, because I didn't know."  (Mills Dep., p. 82.)  Deny that Mills made the statements to Plaintiffs attributed to him. (Mills Dep., pp. 84-85, 87-90.)

71.      After the lawsuit was filed, Mills' treatment of Plaintiffs changed for the worse. (Spalding Dep., p. 273) He ordered Plaintiffs not to come in from the street until the end of the tour. He began to switch their hours. (Spalding Dep., p. 274.)

**RESPONSE**:  Admit that Spalding so testified, but deny that the cited testimony indicates that Mills switched Plaintiffs' hours.  Spalding testified that on a particular case "we switched our hours to go – the victim was cooperating, telling us where he was during the days. So we switched our hours."  (Spalding Dep., p. 275.)

72.      On one occasion after the lawsuit was publicized, Mills told Plaintiffs that two fellow officers, Chris Dingle and Roxanne Blarzcek, would be coming in to the office and available to back them up in connection with a specific arrest which was expected to be dangerous. When the arrest was set to take place, no officers were available to back Plaintiffs up. (Spalding Dep., p. 277-278)

**RESPONSE**:  Admit that Spalding so testified, except that Spalding did not testify that the arrest was expected to be dangerous.  Spalding also testified at the cited pages that she does not know why Dingle and Blarzcek did not show up and that Mills told her that "it's just going to be the two of you, you know, be careful with this guy."  Deny that Mills ever told anyone, including Dingle and Blarzcek, not to back Plaintiffs up.  (Mills Dep., pp. 90-91.)

73.     Post-lawsuit, Mills had told Plaintiffs they "weren't going to be backed up and the team doesn't like us and he doesn't know why we're there, he doesn't know why we [don't] leave, he doesn't know how we're going to have a career when this is over. (Spalding Dep., p. 293.)

**RESPONSE**:  Deny.  (Mills Dep., pp. 90-91.)

74.     After Spalding was ordered not to go to the Homan Square building, Mills told Spalding that Commander O'Grady hates her so much that "if he could pop you off, meaning shoot you, across the parking lot while you're waking to or from your car to work, he's going to take that shot. So I advise you, you need to wear your vest." (Spalding Dep., p. 297)

**RESPONSE**:  Deny.  (Mills Dep., pp. 95, 98-99.)

75.     In late March or early April, 2013, Defendant Mills filed a CR on Spalding accusing her criminally of secretly tape recording a conversation with him. (Spalding Dep., p. 316-317) Mills initiated this CR even though he had not seen Spalding recording him, and in fact had no direct evidence that Spalding had illegally recorded his conversation with her. (Mills Dep., pp. 54-55, 64)

**RESPONSE**:  Admit that Spalding so testified as to the first sentence, and admit the

second sentence, except Mills did not testify that he had "no direct evidence" that Spalding had

recorded the conversation.  Mills was told by Detective Steve Becker that Spalding had illegally

recorded a conversation between Mills and Spalding.  (Mills Dep., pp. 37, 63-64.)

76.     Spalding was taken into custody by Sgt. Barz and Muscolino while working at the FAU. (Spalding Dep., p. 317) Sgt. Barz told Spalding that these were serious charges and that she could lose her job because of them. (Spalding Dep., p. 317) Officer Barz told Spalding that the charges could "go away" if she dropped her federal lawsuit. (Spalding Dep., p. 329.)

**RESPONSE**:  Deny.  (Barz Dep., pp. 85-87; Muscolino Dep., pp. 91-93, 104-107, 129-

134.)

77.     Shannon Spalding became unable to continue active employment with the Chicago Police Department beginning in April or May of 2013 and continuing to the present. She has been diagnosed as having Post Traumatic Stress Disorder or Adjustment Disorder related to the retaliation she has experienced at the CPD, by her treating psychiatrist, Dr. Kaiser, her therapist Deborah Weaver and the City of Chicago Police Pension Board's evaluating psychologist, Dr. Nancy Landre. (See, Spalding Dep. p. 382; Report of Dr. David A. Kaiser M.D; Report of Nancy Landre, Ph.D.;  and Report of Susan Pearlson, M.D.) Plaintiff's financial damages expert, Dr. Thomas Donley, has reported that Officer Spalding's financial loss resulting from her inability to return to work with the Chicago Police Department, will be between $2,272,279 and $3,025,389. (Report of Thomas Donley, Ph.D.)

**RESPONSE**:  Objection.  Irrelevant; states legal conclusions and opinions rather than

facts; and these numerous statements in one paragraph do not comply with this Court's Local

Rules.  *See* L. R. 56.1(b)(3)(C); *Maclin,* 2006 WL 463370, at *2; *Malec*, 191 F.R.D. at 582.

78.     On or about May 14, 2013, as a result of the retaliation, Daniel Echeverria suffered emotional distress that required him to take a medical leave until December 10, 2013. (Echeverria Dep., p. 254-258)

**RESPONSE**:  Objection.  Irrelevant; states legal conclusions and opinions rather than

facts.  Notwithstanding and without waiving the objections, admit that Echeverria went out on

medical leave from on or about May 14, 2013 until on or about December 10, 2013.

79.     Instructors at the Police Academy told officers "over and over again we do not break the code of silence. Blue is Blue. You stick together. If something occurs on the street that you don't think is proper, you go with the flow. And after that situation, if you have an issue with that officer or what happened, you can confront them. If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner. But you never break the code of silence. (Hanna Dep., p. 45-46.)

**RESPONSE**:  Deny.  Hanna testified that she could not remember any particular

instructor at the Police Academy who allegedly spoke of this alleged code of silence.  (Hanna

Dep., p. 46.)  This alleged code of silence was not part of any instruction at the Police Academy.

Deposition of Michael Pigott ("Pigott Dep."), pp. 11-12, 18-19.)

80.     Police procedural expert Lou Reiter has concluded based upon his review of the record in this case, including the 30(b)6 witnesses designated to speak for the City of Chicago, and his vast study of CPD practices and procedures, that the City maintains *de facto* policies and practices that resulted in the injuries to the Plaintiffs. Reiter Expert Report and Deposition) These practices include:

a.     The maintenance and/or tolerance of a Police Code of Silence whereby police officers do not report the misconduct of other police officers even if that misconduct is criminal, out of fear of retaliation. (Reiter Dep., p. 35.)

b.     The conscious decision to ignore the Code of Silence and to refuse to develop any training materials that address issues relating to a Code of Silence; (Reiter Dep., 42-43; Shorle Dep pp. 25-26)

c.     The conscious decision to fail acknowledge the potential of the code of silence and take affirmative steps to minimize its influence. (Reiter Report p. 9, Reiter Dep., p. 49.)

    d.        The failure to discipline officers who engage in retaliation against others who break the Code of Silence and report the misconduct of their fellow officers;

    e.        The failure to discipline officers who engage in misconduct. (Reiter Dep., p. 51-53.)

**RESPONSE**: Objection and deny. These numerous statements in one paragraph do not comply with this Court's Local Rules. *See Maclin,* 2006 WL 463370, at *2; *Malec* 191 F.R.D. at 582. Also, no record citation is given for subparagraph d. Additionally, these paragraphs state legal conclusions and opinions rather than facts. Notwithstanding and without waiving the objections, deny, as no such code of silence policies or practices exist. (Pigott Dep., pp. 10-11, 17-20, 24-25.) See also Pl. Resp. to D. St. ¶¶ 111-112.

Dated: March 25, 2016

                             Respectfully submitted,

                             **CITY OF CHICAGO, JUAN RIVERA, JAMES O'GRADY, NICHOLAS ROTI, MAURICE BARNES, ROBERT CESARIO, JOSEPH SALEMME, and THOMAS MILLS**

                             By:   /s/ Alan S. King
                             Alan S. King, Esq. (ARDC #: 06198223)
                             Noreen H. Cull, Esq. (ARDC #: 06229417)
                             Leslie D. Davis, Esq. (ARDC #: 06229110)
                             Alejandra Lara, Esq. (ARDC # 6309517)
                             Drinker Biddle & Reath LLP
                             191 N. Wacker Drive, Suite 3700
                             Chicago, IL  60606-1698
                             Phone: (312) 569-1000/Fax: (312) 569-3334
                             E-mail:  alan.king@dbr.com
                             E-mail:  noreen.cull@dbr.com
                             E-mail:  alejandra.lara@dbr.com