**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Chicago Police Officer SHANNON SPALDING, | ) | |
| Chicago Police Officer DANIEL ECHEVERRIA, | ) | Case No. 12-cv-8777 |
| | ) | |
| Plaintiffs, | ) | Judge Gary Feinerman |
| | ) | Magistrate Judge Shelia Finnegan |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**EXHIBIT LIST FOR DEFENDANTS' REPLY TO PLAINTIFFS' LOCAL**
**RULE 56.1(B)(3)(C) STATEMENT OF ADDITIONAL FACTS THAT**
**REQUIRE DENIAL OF SUMMARY JUDGMENT**

**Exhibit A.**  The Supplemental Declaration of James O'Grady ("O'Grady Decl.")

**Exhibit B.**  The Supplemental Declaration of Nick Roti ("Roti Decl.")

**Exhibit C.**  The Deposition of Coleen Dougan ("Dougan Dep.")

**Exhibit D.**  The Declaration of Kevin Culhane ("Culhane Decl.")

# <u>EXHIBIT A</u>

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| Chicago Police Officer SHANNON SPALDING, | ) | |
| Chicago Police Officer DANIEL ECHEVERRIA, | ) | Case No. 12-cv-8777 |
| | ) | |
| Plaintiffs, | ) | Judge Gary Feinerman |
| | ) | Magistrate Judge Shelia Finnegan |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

## SUPPLEMENTAL DECLARATION OF JAMES O'GRADY

I, James O'Grady, declare under penalty of perjury that this statement is true and correct.

1. I was employed with the Chicago Police Department ("CPD") from 1986 until 2013. In or about 1997, I applied for and was assigned to the Internal Affairs Division where I worked undercover on police impersonators and police corruption cases. After several years in various CPD positions, in or about August 2008 I became the Commander of the Narcotics Division, Bureau of Organized Crime. I stayed in that role until October of 2013, when I was assigned to Commander of 11th District. I retired from CPD in December 2013.

2. At some point in time after Plaintiffs Shannon Spalding ("Spalding") and Daniel Echeverria ("Echeverria") (collectively, "Plaintiffs") had been detailed out of the Narcotics Division and were no longer working at the Homan Square location where Narcotics was housed, I had a conversation with Anthony Hernandez ("Hernandez"), a Narcotics officer who was Spalding's boyfriend, about Spalding visiting Hernandez during his work time at Homan Square. During that conversation, I told Hernandez that he was not supposed to be visiting with his girlfriend while he's working, and is not supposed to leave his assigned post without his

supervisor's approval. Hernandez said that Spalding had been dropping something off to him, and admitted that he had left his post without his supervisor's approval.

3.     I have reviewed the Affidavit of Anthony Hernandez ("Hernandez Affidavit") that was filed by Plaintiffs in this litigation, a copy of which is attached hereto as Exhibit 1. While I do not recall whether or not the conversation I had with Hernandez concerning Spalding being at the Homan Square facility was in July of 2011, everything else stated by Hernandez in paragraphs 3 through 9 of the Hernandez Affidavit is false. The alleged communications therein between Hernandez and me never occurred.

4.     I know Beatrice Cuello ("Cuello"), who at one time was Deputy Superintendent of CPD. I also know James Jackson ("Jackson"), who at one time was First Deputy Superintendent of CPD.

5.     At no time have I ever been part of any meeting with Cuello or Jackson where either Spalding or Echeverria was discussed in any manner, including whether or not Plaintiffs could return to the Narcotics Division or the Bureau of Organized Crime (Unit 189).

6.     At no time have I ever had any conversation or other communication whatsoever with Cuello or Jackson regarding either Spalding or Echeverria, including whether or not Plaintiffs could return to the Narcotics Division or the Bureau of Organized Crime (Unit 189).

James O'Grady

Executed on March 24, 2016

# **<u>EXHIBIT B</u>**

| | | |
|---|---|---|
| Chicago Police Officer SHANNON SPALDING, | ) | |
| Chicago Police Officer DANIEL ECHEVERRIA, | ) | Case No. 12-cv-8777 |
| | ) | |
| Plaintiffs, | ) | Judge Gary Feinerman |
| | ) | Magistrate Judge Shelia Finnegan |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

## SUPPLEMENTAL DECLARATION OF NICHOLAS ROTI

I, Nicholas Roti, declare under penalty of perjury that this statement is true and correct.

1.    I was employed with the Chicago Police Department ("CPD") from June 1986 until March 2015. From in or about March 2008 to in or about August 2008, I was the Commander of the Narcotics Section of the Bureau of Organized Crime. From in or about August 2008 until in or about October 2008, I was the Deputy Chief of the Detective Division. In or about October 2008, I became the Deputy Chief of Organized Crime. In or about July 2010, I became the Chief of the Bureau of Organized Crime, and I remained in that position until I retired from CPD in March 2015.

2.    I know Beatrice Cuello ("Cuello"), who at one time was Deputy Superintendent of CPD. I also know James Jackson ("Jackson"), who at one time was First Deputy Superintendent of CPD.

3.    At no time have I ever been part of any meeting in which James O'Grady, Cuello and Jackson were all present where either Spalding or Echeverria was discussed in any manner, including whether or not Plaintiffs could return to the Narcotics Division or the Bureau of Organized Crime (Unit 189).

4.    At no time have I ever had any conversation or other communication whatsoever with Cuello or Jackson in which anyone referred to either Spalding or Echeverria as "rats" or "IAD rats" or in which I indicated I was not allowing either Spalding or Echeverria to return to the Narcotics Division or the Bureau of Organized Crime (Unit 189) because Plaintiffs had worked with IAD or anything along those lines.

_____
Nicholas Roti

Executed on March _24_, 2016

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

Chicago Police
Officers SHANNON
SPALDING and DANIEL
ECHEVERRIA,

       Plaintiffs,

 vs.                 No. 12 C 8777

CITY OF CHICAGO,
Chicago Police Chief
JUAN RIVERA, Chicago
Police Chief DEBRA
KIRBY, Chicago Police
Commander JAMES
O'GRADY, Chicago
Police Chief NICHOLAS
ROTTI, Chicago Police
Lt. DEBORAH PASCUA,
Chicago Police
Sergeant MAURICE
BARNES, Chicago Police
Lt. ROBERT CESARIO,
Chicago Police
Commander JOSEPH
SALEMME, Chicago
Police Sergeant THOMAS
MILLS, Chicago Police
Sergeant MICHAEL BARZ
and Chicago Police
Sergeant ROBERT
MUSCOLINO,

       Defendants.

DEPOSITION OF COLEEN DOUGAN

June 17, 2015

9:51 a.m.

1        The deposition of COLEEN DOUGAN,

2   called for examination pursuant to the Rules

3   of Civil Procedure for the United States

4   District Courts pertaining to the taking of

5   depositions, taken before MARIBETH REILLY,

6   C.S.R, and notary public within and for the

7   County of DuPage and State of Illinois, at

8   One North LaSalle Street, Suite 3040,

9   Chicago, Illinois, on June 17, 2015,

10   commencing at the hour of 9:51 a.m.

11

12    APPEARANCES:

13        Kinoy, Taren & Geraghty, P.C., by:

14        Mr. Jeffrey Taren

15        224 South Michigan Avenue

16        Suite 490

17        Chicago, Illinois  60604

18           -and-

19        Christopher Smith Trial Group, by:

20        Mr. Christopher Smith

21        One North LaSalle Street

22        Suite 2200

23        Chicago, Illinois  60602

24           Representing the Plaintiffs;

Page 3

1  APPEARANCES: (Continued)
2
3      Dinker Biddle & Reath LLP
4      BY: Ms. Leslie Davis
5      191 North Wacker Drive
6      Suite 3700
7      Chicago, Illinois 60606
8        Representing the Defendants;
9
10     MR. DANIEL ECHEVERRIA,
11       Also present.
12
13
14
15
16
17
18
19
20
21
22
23     Maribeth Reilly, C.S.R
24     License No: 084-2306

Page 4

1              I N D E X
2  WITNESS              EXAMINATION
3  COLEEN DOUGAN
4   By Mr. Taren          5
5
6
7            EXHIBITS
8
9  NUMBER          MARKED FOR ID
10 Deposition Exhibit
11
12   (No deposition exhibits were marked.)
13
14          * * * * * *
15
16
17
18
19
20
21
22
23
24

Page 5

1      (Whereupon, the witness was
2       duly sworn.)
3      MR. TAREN: This is the case of
4  Shannon Spalding and Daniel Echeverria
5  versus City of Chicago, 12 C 8777, and the
6  deposition of Coleen Dougan.
7      COLEEN DOUGAN,
8  having been first administered an oath, was
9  examined and testified as follows:
10     EXAMINATION:
11 BY MR. TAREN:
12   Q. Ms. Dougan, my name is Jeffrey
13 Taren. I am one of the attorneys for the
14 plaintiffs in this case. Have you ever had
15 your deposition taken before?
16   A. Years ago.
17   Q. How many times?
18   A. One.
19   Q. What kind of a case was it?
20   A. It was personal.
21   Q. You are going to have to tell me.
22 Was it in any way related to your
23 employment?
24   A. No.

Page 6

1   Q. What kind of a case was it?
2   A. Kind of a domestic-related case.
3   Q. Was it a part of a divorce?
4   A. No.
5   Q. What role did you play in the
6 case?
7   A. It was my stepfather.
8   Q. But were you a party to -- did you
9 sue someone, or were you being sued?
10   A. I was being sued.
11   Q. Where was it? In Cook County?
12   A. Yes.
13   Q. I understand your reluctance to
14 talk about these things, but so that you
15 know, as part of this deposition, I am going
16 to be having to ask you some personal
17 questions. It's not meant to trick you or
18 to humiliate you in any way. It's just part
19 of my job in getting all of the background
20 information.
21      So do you have any
22 recollection of when the deposition was?
23   A. Maybe -- I don't remember. It was
24 a long time ago. Could have been in like

**Page 7**

1  '01.
2    Q. What was your stepfather's name?
3  A. Ken.
4    Q. What was his last name?
5  A. Graham.
6    Q. G-r-a-h-a-m?
7  A. Uh-huh.
8    Q. What was he suing you for?
9  A. The deposition wasn't for the
10  lawsuit. It was for the domestic. I was
11  the victim.
12    Q. Can you explain to me?
13  A. I'd rather not explain.
14    MS. DAVIS: Just tell him what the
15  case was about, and we can get past this.
16    THE WITNESS: It was in regards to
17  a domestic battery, and I was getting an
18  order of protection.
19  BY MR. TAREN:
20    Q. So when you said that you were
21  being sued, what were you being sued for?
22  A. He wanted my house.
23    Q. What was the claim, do you know?
24  A. The claim was that he had put

**Page 8**

1  money in a bank account to pay me for my
2  house, but the money was still there. He
3  said he couldn't take it out. It was very
4  convoluted. He was a drug addict.
5    Q. How did the case get resolved?
6  A. He took his money out of the bank.
7    Q. Was there a court order of some
8  sort allowing him to?
9  A. Yes, there was.
10    Q. Was there any kind of finding with
11  regard to you in that case?
12  A. That I held no liability towards
13  him, that it was -- it wasn't like a guilty
14  or a not guilty finding. It was a finding
15  that I did nothing wrong, basically.
16    Q. This was a civil case?
17  A. It was a civil matter.
18    Q. Let me explain what this
19  deposition is because it may be different
20  from the last one that you gave. I am going
21  to be questioning you about your employment
22  primarily with the Chicago Police
23  Department, and about information that you
24  may have concerning Shannon Spalding or

**Page 9**

1  Daniel Echeverria when they were employed in
2  the police department.
3    Do you want some water?
4  A. I do.
5    (Whereupon, a break was taken
6    at 9:57 a.m.)
7  BY MR. TAREN:
8    Q. I will be asking you questions.
9  They are not designed to trick you. If you
10  don't understand a question, let me know. I
11  will be happy to rephrase the question. If
12  you answer, I will assume you understood the
13  question.
14    In terms of the rules here,
15  the only real rule other than telling the
16  truth is all answers must be audible. So if
17  you shake your head like we all do or say
18  uh-huh or uh-huh, the court reporter can't
19  take that down. Okay?
20  A. Okay.
21    Q. If you need a break at some point,
22  as long as there is not a question pending,
23  let us know, and we will be happy to take a
24  break.

**Page 10**

1    As I said, I will be asking
2  you some personal information questions.
3  It's really for the purpose of this lawsuit.
4  They are asked of everyone, and I just like
5  to let people know in advance. Okay?
6  A. Okay.
7    Q. Can you tell me your current
8  address?
9  A. 3631 North Pioneer.
10    Q. That's in the City, correct?
11  A. Chicago.
12    Q. How long have you lived there?
13  A. About 12 years.
14    Q. Are you married, Ms. Dougan?
15  A. Yes.
16    Q. And what is your husband's name?
17  A. Michael.
18    Q. Is he employed by the Chicago
19  Police Department?
20  A. Yes.
21    Q. What is his position? Is he a
22  sworn officer?
23  A. Yes.
24    Q. How long has he been an officer?

Page 11

1    A. 20 years.
2    Q. How long have you been married?
3    A. 15.
4    Q. What was his rank?
5    A. Police officer.
6    Q. And what is his current
7  assignment?
8    A. Canine.
9    Q. To your knowledge, has your
10  husband ever worked with either Shannon
11  Spalding or Daniel Echeverria?
12    A. Not that I know, no.
13    Q. Do you have any children?
14    A. Yes.
15    Q. Just let me know what their ages
16  are?
17    A. 20 and 13.
18    Q. Is your 20-year-old employed by
19  the Chicago Police Department, or has he
20  ever been?
21    A. She.
22    Q. She?
23    A. No.
24    Q. Can you briefly tell me what your

Page 12

1  educational background is?
2    A. As -- what do you mean?
3    Q. Where did you go to high school?
4    A. I went to Good Counsel High
5  School.
6    Q. Where is that?
7    A. Chicago.
8    Q. What year did you graduate?
9    A. 1988.
10    Q. What is your date of birth?
11    A. 22, December, 1969.
12    Q. And after high school, did you
13  attend college?
14    A. Yes.
15    Q. Where did you go?
16    A. I went to Wright and Triton for
17  prerequisites.
18    Q. Okay.
19    A. For nursing school.
20    Q. Did you receive any kind of degree
21  or certification?
22    A. I stayed in nursing school at
23  St. Francis Hospital in Evanston for a year
24  and a half, which I left to join the police

Page 13

1  department.
2    Q. And then what year did you join
3  the police department?
4    A. 1992.
5    Q. Have you been employed by the
6  police department ever since?
7    A. Yes.
8    Q. I'd like you to, if you can, take
9  me through your career at the police
10  department in terms of positions you have
11  held and assignments with approximate dates,
12  if you can?
13    A. Dates are rough.  Obviously, when
14  I got on the police department, I was
15  assigned to the police academy.  I did my
16  field training in 23, 23rd District for six
17  months, and then I was detailed to 24th
18  District until my probation was up, and then
19  I bid into the 15th District.
20    Q. So then when did you bid into the
21  15th District, approximately?
22    A. Probably sometime in 1993 when my
23  year was up.
24    Q. How long did you remain there?

Page 14

1    A. Until, I want to say -- it's not
2  for sure, but I want to say -- I had surgery
3  in '98.  So 1998.
4    Q. Then how did your assignment
5  change at that time?
6    A. I had an accident in 1996 that I
7  had been dealing with, and then I ended up
8  finally having back surgery, spinal fusion.
9        So in 1998, I had my surgery,
10  and I was able to work out of the 12th
11  District in the commander's office as an
12  administrative assistant.
13    Q. Who was the commander at that time
14  that you worked for?
15    A. Maurice Dailey.
16    Q. How long were you in that
17  position?
18    A. I was in there -- this isn't exact
19  times just so you know -- about a year, and
20  then I went back and worked on the streets.
21    Q. Did you go back to the 15th
22  District?
23    A. No.  I stayed in 12 for a little
24  while, and worked on days, and then I bid to

**Page 15**

1  the 25th District.
2      Q.  Approximately how long were you at
3  the 25th?
4      A.  Maybe eight months.
5      Q.  And then what?
6      A.  And then I went to Area 5
7  Detective Division as an administrative
8  assistant.
9      Q.  What period of time were you in
10  Area 5 Detective Division?
11      A.  Approximately, it would have been,
12  from 2000.
13      Q.  Until when?
14      A.  Until they closed in 2012.
15      Q.  Who did you serve as
16  administrative assistant to at Area 5?
17      A.  The first commander that I worked
18  for was Gerard Minke, and then it was
19  Commander Lee Epplen.  Then it was Commander
20  Constantine Andrews.  Then it was
21  Commander Joseph Salemme, and that's it.
22      Q.  And then how did your employment
23  change in 2012?
24      A.  Well, they closed Area 5 Detective

**Page 16**

1  Division and merged different areas, so
2  there used to be five areas.  Now there is
3  three.  So now there is only north, south
4  and central.
5          Commander Salemme was going to
6  work for Fugitive Apprehension in Homan
7  Square.  I guess I had a choice of either
8  going to work north or work with Commander
9  Salemme, and I chose to go to Fugitive
10  Apprehension, Central Investigations
11  Division.
12      Q.  Do you recall when in 2012 that
13  occurred?
14      A.  I was on furlough.  I want to say
15  end of February, beginning of March.  I
16  want to -- it's not exact, but I want to say
17  maybe March, March.  Yes.
18      Q.  I am going to be focusing
19  primarily on your time in Fugitive
20  Apprehension.  Before I do that, can you
21  tell me what you did to prepare for today's
22  deposition?
23      A.  To prepare?
24      Q.  Yes.

**Page 17**

1      A.  What do you mean?
2      Q.  Did you meet with counsel?  Don't
3  tell me what you said, but just tell me if
4  you did?
5      A.  I met with Leslie.
6      Q.  And when did you do that?
7      A.  I met with her yesterday, and we
8  met a while ago.  I don't remember what
9  dates.
10      Q.  Other than speaking with counsel,
11  did you talk with anyone else to prepare for
12  today's deposition?
13      A.  No.
14      Q.  Did you review any documents?
15      A.  Yes.
16      Q.  What documents did you review?
17      A.  I reviewed Jan Hanna's affidavit.
18      Q.  Anything else?
19      A.  No.
20      Q.  Did you review anybody -- any
21  depositions that anyone else gave in this
22  case?
23      A.  No.
24      Q.  Were you given excerpts of

**Page 18**

1  anybody's depositions?
2      A.  No.
3      Q.  How long were you on furlough
4  before the assignment to Homan Square?
5      A.  I was on furlough around
6  Christmas.  I don't know the exact date.
7  Usually I come back after New Year's, and I
8  went back to Area 5 for a couple of months
9  because there was really no one there to
10  keep the organization and do the reports
11  before they were merging with Area 3.
12          So I was there for a little
13  while before I went to Fugitives, Central
14  Investigations, for maybe like, I want to
15  say, about two months.
16      Q.  Tell me what your duties and
17  responsibilities were once you were assigned
18  to Fugitive Apprehension?
19      A.  It was a lot of work.  Originally,
20  Commander Salemme, I was working just for
21  Lieutenant Cesario to develop some sort of
22  way of keeping track of who had what
23  assignments.  There was no actual physical
24  way of knowing who had what jobs, like

**Page 19**

1  assigning warrants and investigative alerts.
2         So if you wanted to know who
3  had that job, you would be like, okay, who
4  at north had that job?  There was no
5  specific person documented to be able to ask
6  questions about, I guess, as a supervisor in
7  regards to certain investigative alerts or
8  warrants.
9         So when we first got there, I
10 had to help develop a database in Access,
11 Microsoft Access.  So it wasn't --
12        MS. DAVIS:  There is no question
13 pending.
14 BY MR. TAREN:
15     Q.  Okay.  Well, yeah, there is.  The
16 question is what your duties and
17 responsibilities were?
18        What else?  So you were
19 developing this database in Microsoft
20 Access.  And do I understand that that
21 database was to help keep track of the
22 assignments?
23     A.  Yes, pretty much.
24     Q.  You were working with Lieutenant

**Page 20**

1  Cesario on that?
2     A.  Yes.
3     Q.  With anyone else?
4     A.  Jan Hanna.
5     Q.  Did you have any responsibility
6  for actually making assignments or making --
7  either determining who got what assignments
8  or communicating who got what assignments in
9  Fugitive Apprehension?
10    A.  At that point, no.
11    Q.  By "at that point," we are talking
12 about the beginning of 2012; is that
13 correct?
14    A.  Yes.
15    Q.  And did that change at some point?
16    A.  Yes.
17    Q.  When?
18    A.  I don't know the exact dates, but
19 Jan and I were each assigned areas because
20 they are divided into area north, south and
21 central.  So we were each putting in the
22 information in the database, and then
23 eventually we would assign the investigative
24 alerts, and not the warrants yet, just

**Page 21**

1  investigative alerts.
2     Q.  And can you tell me how your
3  duties changed in that regard?
4     A.  Yes.  So we could -- now going
5  back, remember, there were five areas.
6     Q.  Right.
7     A.  Now we had to combine north, south
8  and central.  There wasn't just five areas.
9  So we had to figure out which area issued an
10 investigative alert.  He made us like --
11 first, he gave us the top five jobs to
12 assign, which would be like homicides,
13 aggravated batteries, robberies, burglaries,
14 and criminal sexual assaults.  So we started
15 small before we were able to assign the rest
16 of all the investigative alerts.
17        So whatever came out from our
18 area, like I would run area north.  At that
19 point, Jan had south and central.  And then
20 we were working on -- at that time more -- I
21 was working more on NATO assignments, so I
22 had a lot of meetings and trying to figure
23 out these things they call like 204's where
24 the officers go to.  So I was working more

**Page 22**

1  with NATO, but I was assigning north.
2     Q.  Did you work on developing any
3  standards for determining who would get
4  which assignments?
5     A.  No, I wouldn't work on those
6  standards.
7     Q.  Were there standards?
8     A.  There were standards who got what
9  type of assignments?
10    Q.  Yes.  That's what I am asking.
11 Were those standards in writing?
12    A.  No.
13    Q.  Did you ever see a general order
14 or a memo that detailed the standards or
15 parameters for determining which officers
16 would be given specific assignments?
17    A.  No.
18    Q.  Well, then who did develop the
19 standards for making those determinations?
20    A.  The bosses.
21    Q.  And that would be
22 Lieutenant Cesario and Commander Salemme; is
23 that correct?
24    A.  Yes.

Page 23

1    Q. Can you tell me what you recall
2  about what those standards were? And we are
3  talking about during 2012.
4    A. 2012.
5        We had certain members that
6  were assigned to a Marshal, the U.S.
7  Marshals. They were called TFOs.
8    Q. These were officers that were
9  deputized for the marshals?
10   A. Yes.
11   Q. Okay.
12   A. And they would get most of the top
13  five jobs, especially homicides and agg
14  bats. And then we had one full marshal team
15  that did like the sex crimes.
16   Q. Were you specifically told that
17  the top five jobs went to TFOs?
18   A. Yes.
19   Q. Who told you that?
20   A. Lieutenant Cesario.
21   Q. Did he tell you why?
22   A. I didn't really understand it at
23  first, but I guess I think the marshals
24  select people to work with them, and then

Page 24

1  there is like a -- I think they reimburse
2  the City for their overtime. So I think
3  they are able to go from county to county.
4  They can even -- they are federal officers,
5  so they can work with other states and
6  counties. Whereas if we had an offender
7  here who went to Indiana, they would be able
8  to work to get that offender in Indiana,
9  from what I understand.
10   Q. Do you know how an officer became
11  deputized? How did that take place in 2012?
12   A. No.
13   Q. Of the officers you worked with
14  back in the first half of 2012, how many
15  approximately were TFOs and how many were
16  not?
17   A. I don't recall the number.
18   Q. Do you recall any officers who
19  were not TFOs?
20   A. I remember two because they were
21  on my north team.
22   Q. Who was that?
23   A. Rubin Devalia and Jeff Frelip
24  (phonetic).

Page 25

1    Q. Did either of those officers
2  become TFOs during the time that you were at
3  Fugitive Apprehension?
4    A. When I was in Fugitives?
5    Q. Yes.
6    A. No. I mean, I am still part of
7  Central Investigations. I just don't work
8  with Fugitives anymore. We have several
9  units in our unit now.
10   Q. What unit are you working with
11  now?
12   A. They are still in that unit. I am
13  just -- instead of just being an admin
14  person in Fugitive Apprehension, I am now an
15  admin person for the commanders or front
16  office.
17   Q. What commanders are you working
18  with right now?
19   A. Right now, we don't have a
20  commander. We have an acting commanding
21  officer. Lieutenant Warren Richards.
22   Q. Was Jan Hanna's duties similar to
23  yours just in 2012?
24   A. Yes, similar.

Page 26

1    Q. Was the primary difference the
2  area that you were dealing with? I think
3  you mentioned that you were handling north
4  and Jan was handling central and south?
5    A. And then there were -- well, there
6  were different reports that I would do that
7  she didn't do. There was --
8    Q. Tell me what the difference was
9  between your duties and responsibilities
10  during 2012 between you and Ms. Hanna?
11   A. Between me and Ms. Hanna?
12   Q. Yes.
13   A. I handle also -- there was a -- we
14  had like concentrated districts, so we had 7
15  and 11, which specific officers were
16  assigned those districts, so they always got
17  those jobs. We had one TFO that was in that
18  group.
19   Q. Who was that?
20   A. Charlie Garcia. So if something
21  out of the top five happened, Charlie would
22  probably be the first one to get that job.
23  And then they have to arrest -- like
24  different investigative alerts would come

Page 27

1  out.  Everybody who assigned those, Jan
2  didn't have to deal with 7, 11 reports.  She
3  would assign her seven people, but then I
4  would do the reports for CompStat.  That's
5  the meeting they have every Thursday.
6       So they were -- when it came
7  to the administrative parts of doing
8  scheduling days off, or anything like that,
9  that would fall on me.  That wouldn't be
10 Jan's.
11     Q.  I understand.
12     A.  I am more of an administrative
13 person, I guess, than a fugitive person.
14     Q.  In March of 2012 through June,
15 let's say, how often did you meet with
16 Lieutenant Cesario?
17     A.  Did I meet with him like
18 one-on-one?
19     Q.  Was it daily?
20     A.  He was there every day, yes.
21     Q.  Did you have contact with him
22 throughout the day?
23     A.  Yes.
24     Q.  And excuse my ignorance here,

Page 28

1  explain to me what the CompStat meetings
2  are?
3       A.  That's a superintendent meeting
4  where he gathers statistics about each area
5  and wants to discuss the concentration, I
6  guess, and the arrests, and what the
7  officers are doing in that area.
8       Q.  Tell me who would customarily
9  attend those meetings.
10      A.  Commander Salemme and Lieutenant
11 Cesario.  Sometimes sergeants would go, I
12 guess.
13      Q.  Sergeant Barnes, would he go?
14      A.  I don't know if he went.  But some
15 of the sergeants if they needed advice, I
16 guess, they would go with them.
17      Q.  Did you attend those meetings?
18      A.  No.
19      Q.  Do you know if Jan did?
20      A.  No.
21      Q.  Are you telling me that those
22 CompStat meetings were just Salemme and
23 Cesario?
24      A.  Pretty much.

Page 29

1       Q.  Just the two of them, or am I
2  missing something?  Were they meeting with
3  somebody else?
4       A.  The whole department heads.  It's
5  a meeting for all of the bosses, for all of
6  the department bosses.
7       Q.  Would you provide any of the data
8  to Lieutenant Cesario or Commander Salemme
9  for the purpose of those meetings?
10      A.  Yes, to Lieutenant Cesario, and
11 then it would be compiled for the commander.
12      Q.  When did you first meet either
13 Shannon Spalding or Danny Echeverria?
14      A.  I don't know the exact date when
15 they came to the unit.  There were two
16 people who were leaving the unit, and then
17 they were coming into the unit.
18      Q.  Who was it that was leaving?
19      A.  Kim and Kyle.
20      Q.  Just so I am clear, you had not
21 met either Shannon or Danny before they came
22 to the Fugitive Apprehension; is that
23 correct?
24      A.  I didn't remember until I was

Page 30

1  talking to Danny that I met him when I was a
2  teenager.
3       Q.  But you weren't in the police
4  department at that time?
5       A.  No.
6       Q.  This was a casual meeting that you
7  had?
8       A.  Mutual.  He worked with my best
9  friend.
10      Q.  Prior to either Ms. Spalding or
11 Mr. Echeverria actually reporting to
12 Fugitive Apprehension, had you heard
13 anything about them coming to the unit?
14      A.  I was just told Kim and Kyle were
15 leaving, and we are getting two more
16 officers.
17      Q.  Who told you that?
18      A.  First person who told me was Jan
19 Hanna, and then Lieutenant Cesario
20 reaffirmed that, yes, we are getting two
21 more people, and Kim and Kyle were going
22 back to the 25th District.
23      Q.  You say the first person who told
24 you that was Jan Hanna.  Did she identify

**Page 31**

1 the people who were coming by name?
2    A. No. She just said two people when
3 I first heard it.
4    Q. Did she tell you why Kim and Kyle
5 were leaving?
6    A. Because we didn't have a third
7 watch, and they wanted to go back. They
8 wanted to go back to their tact team in 25.
9    Q. Did Jan Hanna tell you anything
10 about where the two new officers were coming
11 from?
12    A. No.
13    Q. And you just said that Lieutenant
14 Cesario confirmed that. Was that in the
15 same conversation or a different one?
16    A. We had like a kitchenette so Jan
17 sat next to me and said, "oh, we are getting
18 two more people." And I said to Lieutenant
19 Cesario, I said, "Lieutenant, are we getting
20 two more people?" And he said, "yes." And
21 I said, "What team are they going on?" And
22 he said, "south." And I said, "oh, okay."
23    Q. Nothing else in that conversation?
24    A. It wouldn't be any concern of

**Page 32**

1 mine.
2      MS. DAVIS: Just answer his
3 question.
4      THE WITNESS: Oh, in that
5 conversation? No.
6 BY MR. TAREN:
7    Q. And did Lieutenant Cesario tell
8 you anything in that conversation about
9 where Officers Spalding or Echeverria had
10 previously been assigned?
11    A. No.
12    Q. Did you have any other
13 conversations with anyone about the two new
14 officers, Spalding and Echeverria, before
15 they actually started their assignment?
16    A. Just Jan.
17    Q. What other conversations did you
18 have with Jan about them?
19    A. She was trying to figure out where
20 they came from. And she said, "Oh, I think
21 they are from medical integrity, IAD."
22    Q. When did you have that
23 conversation?
24    A. Probably within the same day,

**Page 33**

1 later in the day.
2    Q. And that would have been before
3 they actually showed up for their
4 assignment, is that what you are saying?
5    A. Uh-huh.
6    Q. Yes?
7    A. Yes. I'm sorry.
8    Q. Was it part of the same
9 conversation you were just telling us about?
10    A. No. It was later.
11    Q. And it was that same day?
12    A. Uh-huh. Yes. Sorry.
13    Q. Who was present when you had that
14 conversation with Jan?
15    A. Jan.
16    Q. And tell me more specifically what
17 you recall her saying to you, and what you
18 said back to her with regard to her trying
19 to figure out where they were coming from?
20    A. She -- I wore headphones a lot
21 because I didn't really -- I wanted to get
22 my work done, so I didn't want to -- I
23 wasn't big into the chatter of everybody.
24 And I just said, I asked her eventually, do

**Page 34**

1 you know -- or she said, "Do you know where
2 they are coming from?" And I said, "no." I
3 don't the exact conversation. But she said,
4 "I believe they are coming from medical
5 integrity, IAD." And I said, "oh."
6    Q. What did you understand her to
7 mean by that?
8    A. That's where she thought that they
9 were coming from.
10    Q. Was she -- when you had that --
11      MS DAVIS: Let him finish his
12 question before you answer.
13 BY MR. TAREN:
14    Q. When you had that conversation,
15 were you looking at some documents?
16    A. No.
17    Q. Did she indicate to you where she
18 was getting her information from?
19    A. No.
20    Q. Do you know whether she had talked
21 to Lieutenant Cesario about where Shannon
22 and Danny had been coming from?
23    A. No.
24    Q. Do you think she just pulled this

Page 35

1  out of the air?
2      A.  I don't get into people's
3  business.  So if --
4          MS. DAVIS:  Answer his question.
5          THE WITNESS:  Pulling it out of
6  the air?  No.
7  BY MR. TAREN:
8      Q.  Did you ask her any questions
9  about Danny or Shannon at that time?
10     A.  No.
11     Q.  When did you first have a
12 conversation with Lieutenant Cesario about
13 either Shannon Spalding or Danny Echeverria?
14     A.  I don't recall the exact time.
15     Q.  Well, in relation to the
16 conversation you just recounted from Jan
17 Hanna, when was it?  Was it hours?  Days?
18 Weeks?
19     A.  Probably just to find out the date
20 of their arrival.  And like I said, to make
21 sure whose team they were going to be
22 working for on the jobs.
23     Q.  After your conversation with Jan
24 Hanna but before they arrived, you did have

Page 36

1  some discussion with Lieutenant Cesario
2  about Officers Spalding and Echeverria; is
3  that correct?
4      A.  Yes.  With Jan, too.
5      Q.  I understand.  But right now I am
6  asking about Lieutenant Cesario.
7      A.  Are you talking about a one-on-one
8  with him about them?
9      Q.  No.  You could have been present.
10 Why don't you tell me who was present when
11 you first spoke with Lieutenant Cesario
12 about anything to do with Shannon or Danny?
13         MS. DAVIS:  You mean other than
14 what she's already testified about?
15         MR. TAREN:  Yes.
16         THE WITNESS:  Anybody else there?
17 BY MR. TAREN:
18     Q.  Yes.
19     A.  Nobody.
20     Q.  You just told me you had some
21 conversation with Lieutenant Cesario.  You
22 had to find out, among other things, when
23 Danny and Shannon were going to start,
24 correct?

Page 37

1      A.  Yes.
2      Q.  Did he tell you when they were
3  going to start?
4      A.  Yes.
5      Q.  What did he say?
6      A.  I don't recall exactly what he
7  said.  He said the day that they were going
8  to start.  I don't remember the exact date,
9  but he told me the day that they were
10 starting.
11     Q.  Did he tell you anything else
12 about them at that time?
13     A.  No.
14     Q.  Did you ask him any questions
15 about them?
16     A.  No.
17     Q.  Did you ask where they had come
18 from?
19     A.  No.
20     Q.  When was the next time you had a
21 conversation with Lieutenant Cesario about
22 Danny or Shannon?
23     A.  Probably not until they were
24 assigned to the north team.

Page 38

1      Q.  When was that?
2      A.  I don't remember the dates, but it
3  was later than --
4      Q.  It was months later?
5      A.  Months later they were assigned.
6      Q.  Are you telling me that between
7  the conversation that you had with
8  Lieutenant Cesario where he told you when
9  Shannon and Danny were going to start, the
10 next time you had any conversations with
11 Cesario was after they had -- the
12 plaintiffs, Danny and Shannon, had been
13 assigned to the north team; is that correct?
14     A.  Yes.
15     Q.  Did you ever overhear Lieutenant
16 Cesario talking to anyone else about Danny
17 or Shannon?
18     A.  No.
19     Q.  Did Lieutenant Cesario ever tell
20 you that either Shannon or Danny had
21 previously been from IAD?
22     A.  No.
23     Q.  Did Lieutenant Cesario ever
24 caution you to be leery of Danny or Shannon?

**Page 39**

1      A.  No.
2      Q.  Did you ever hear him caution
3  anyone to be leery of Danny or Shannon?
4      A.  No.
5      Q.  Did you ever hear Lieutenant
6  Cesario refer to either Danny or Shannon as
7  a rat?
8      A.  No.
9      Q.  Did you ever hear him make that
10 statement to anyone?
11     A.  No.
12     Q.  Now, you initially told me about
13 Jan asking -- or telling you that she
14 thought that the plaintiffs had come from
15 IAD.  Did you have more than one discussion
16 with Jan about anything to do with where
17 either Danny or Shannon had previously been
18 assigned?
19     A.  Not that I recall.
20     Q.  So it was just the -- is it your
21 sworn testimony that the only conversation
22 you ever had with Jan Hanna concerning
23 Ms. Spalding or Mr. Echeverria's prior
24 assignment was that remark that she made

**Page 40**

1  before they arrived saying that she believed
2  they were coming from medical integrity,
3  IAD?
4      A.  No, that's not the only
5  conversation I had.
6      Q.  Okay.  How many conversations did
7  you have with her?
8      A.  I asked -- well --
9      Q.  You asked what?
10     MS. DAVIS:  Do you understand the
11 question?
12     THE WITNESS:  No.  Sorry.
13 Are you trying to find out --
14     MS. DAVIS:  Let him rephrase his
15 question.
16     MR. TAREN:  Would you stop
17 interrupting the witness.
18     MS. DAVIS:  I am not interrupting
19 the witness.  She said she didn't
20 understand.
21     MR. TAREN:  Yes, you are.  You
22 interrupted her about five times now.
23     MS. DAVIS:  She doesn't
24 understand.

**Page 41**

1      MR. TAREN:  I am here to ask
2  questions.
3      MS. DAVIS:  Don't get loud with
4  me.  Don't raise your voice at me.
5      MR. TAREN:  If you have an
6  objection -- I am not raising my voice.
7      MS. DAVIS:  You were.
8      MR. TAREN:  Then please make the
9  objection.
10     MS. DAVIS:  And I would.  She
11 didn't understand the question.
12     MR. TAREN:  If you continue to
13 make speaking objections, we are going to
14 terminate the deposition, we will get to
15 Judge Feinerman, and we will have to have a
16 supervisor.
17     MS. DAVIS:  I told you don't yell
18 at me, so don't yell at me.  If she said she
19 didn't understand the question, you have to
20 repeat the question.  She was getting ready
21 to ask you a question, and she is not
22 supposed to do that.
23     MR. TAREN:  You are interrupting
24 the witness in mid-answer and that is

**Page 42**

1  inappropriate.  So I am going to ask you to
2  please just if you have an objection, raise
3  your objection, do not make a speaking
4  objection.  That is not allowed under the
5  Northern District Rules.
6      MS. DAVIS:  I am fully aware of
7  the Northern District Rules.
8      MR. TAREN:  Would you read back
9  the last question, please.
10     (Whereupon, the record was
11     read as requested.)
12     MR. TAREN:  I will rephrase the
13 question.
14 BY MR. TAREN:
15     Q.  You told us about a conversation
16 you had with Jan Hanna before either
17 Ms. Spalding or Mr. Echeverria actually came
18 to Fugitive Apprehension, and my question
19 is:  How many times did you have discussions
20 with Jan Hanna that had anything to do with
21 where Ms. Spalding or Mr. Echeverria had
22 been assigned prior to Fugitive
23 Apprehension?
24     A.  I don't recall all the times, but

Page 43

1  there were a couple, a few.
2      Q.  When was the next conversation you
3  recall subsequent to the one that you
4  already testified to?
5      A.  After I met them; Shannon and Dan.
6      Q.  Tell me about that conversation?
7  Who was present?
8      A.  Jan, Dan and Shannon.
9      Q.  Do you recall when that took
10 place?
11     A.  Either the first or second day
12 they were there.
13     Q.  Where did it take place?
14     A.  In the fugitive office -- well,
15 it's like an open area, fugitives.  It's a
16 big open atrium type area where everybody is
17 at.
18     Q.  Tell me what you recall about what
19 each party to the conversation said?
20     A.  It's not word for word, but I can
21 tell you what I remember in the
22 conversation.
23     Q.  That's fine.
24     A.  They, obviously, introduced

Page 44

1  themselves.  Shannon asked me, do you know
2  where I am from, which kind of, I was like,
3  hearing from Jan, I said, oh, IAD, medical
4  integrity unit?  And she said, no, I am from
5  narcotics.  And I said, oh.
6          We were just pretty much
7  welcoming them here.  They asked me how I
8  got there.  And I said, I was Commander
9  Salemme's secretary before, and that they
10 had closed the area, and I came there, and I
11 asked if Jan could come with to help me with
12 the database.
13     Q.  Okay.
14     A.  And then there is a lot of joking
15 there.  And I said, how did you guys get
16 here?  And she said, oh, Uncle Gar.  So I
17 thought, superintendent is your uncle?  You
18 know, I was -- there was, like I said, a lot
19 of joking, and pretty much that was the
20 conversation.  No, he is not my uncle.  It's
21 just a joke, you know.  There was no --
22     Q.  It was a friendly conversation?
23     A.  Yes, it was very friendly
24 conversation.

Page 45

1      Q.  Any other joking that you recall?
2      A.  That day?
3      Q.  Correct.
4      A.  Probably laughing, showing them
5  where the lockers were, and the girls'
6  bathroom and just things like that.  It was
7  just conversation, joking, a lot of joking
8  going on.
9      Q.  Did Jan participate in the joking?
10     A.  Yes.
11     Q.  Do you recall anything she said?
12     A.  Jan is a bold person.  So I don't
13 recall specifics of what she said.  It was
14 just a lot of laughing.
15     Q.  Do you recall her saying anything
16 to the effect that so you two are the IAD
17 rats?
18     A.  You two are from IAD.  I remember
19 that.
20     Q.  Do you remember Jan saying that?
21     A.  Jan saying that.
22     Q.  I thought you just said that you
23 made a statement?
24     A.  I asked Jan -- you said during the

Page 46

1  joking part about, oh, you are not from IAD,
2  maybe Jan said something like that.  But,
3  yes, I asked -- Shannon asked me do you know
4  where I am from?  And I said previously, to
5  hearing Jan saying IAD, medical integrity
6  unit.  And I said, oh, IAD, medical
7  integrity unit?  And she said, no, we are
8  from narcotics.
9      Q.  So in this conversation, you don't
10 have any recollection of anyone saying that
11 included the words "IAD rats"?
12     A.  No, I don't remember that.
13     Q.  When was the next conversation you
14 recall that had anything to do with where
15 Ms. Spalding or Mr. Echeverria had been
16 previously assigned?
17     A.  I don't -- I don't recall any, or
18 being involved in any discussion, or
19 overhearing any conversations, discussions.
20     Q.  So that the record is clear then,
21 the only time you were present for any
22 discussion in which it was mentioned that
23 Ms. Spalding or Mr. Echeverria may have been
24 in IAD before coming to Fugitive

**Page 47**

1  Apprehension was the one conversation with
2  Jan prior to the plaintiffs' arrival, and
3  then this conversation when you first met
4  them; is that correct?
5     A.  As far as I can recall.
6     Q.  Now, did you ever have any
7  conversations with anyone else other than
8  Jan Hanna or Danny or Shannon about whether
9  or not either of them had been in IAD?
10    A.  Not that I recall.
11    Q.  Is it possible?
12    A.  I don't know.  It's a long time
13  ago.
14    Q.  But I am asking that because you
15  seemed a little unsure of yourself with
16  regard to this answer.
17    A.  I am trying to think back.  Well,
18  you are asking me -- like I said, that's not
19  a big part of my life.  I don't -- it's not
20  a concern of mine where people come from.
21    Q.  Let me ask this:  Did you think at
22  the time that it was unusual that you had
23  been told that Danny and Shannon had been in
24  medical integrity IAD, and then Shannon said

**Page 48**

1  that she had come from narcotics?
2     A.  What's the question?
3     Q.  Did you think that -- did that
4  raise some question in your mind at the time
5  where did they really come from?
6     A.  No.
7     Q.  Did you ever make any effort to
8  ask or inquire on your own of about where
9  their prior assignments had been?
10    A.  No.
11    Q.  Did anyone ever warn you to be
12  leery of Danny or Shannon?
13    A.  Warn me?
14    Q.  Correct.
15    A.  No.
16    Q.  Did you ever hear anyone warn
17  anyone else about Danny or Shannon?
18    A.  I don't recall specifics, no.
19    Q.  Well, what do you recall, even if
20  it's in general?
21    A.  Maybe Jan speaking about it.  But
22  that's about -- I sat next to her all day
23  for eight hours.
24    Q.  By the way, you two get along?

**Page 49**

1     A.  She doesn't talk to me anymore.
2     Q.  When did that start?
3     A.  When she was on TV.  She did
4  before that.
5     Q.  So before that happened -- and
6  that has to do with this case, correct?
7     A.  Yes.
8     Q.  (Continuing -- the two of you had
9  a good relationship; is that correct?
10    A.  Yes.
11    Q.  So what is it in general that she
12  said to you you just didn't recall the
13  specifics of?
14    A.  I don't know the specifics, just
15  in general of them coming from IAD or be
16  careful, but that was clarified when she
17  told me she came from narcotics.
18    Q.  So tell me, when did she tell you
19  to be careful?
20    A.  Not be careful, but I guess watch
21  what you say specifically.
22    Q.  When did she say that to you?
23    A.  Probably around the day that she
24  told me they were from IAD.

**Page 50**

1     Q.  So now you are recalling something
2  more than you initially told us?
3     A.  I would think, well, digging into
4  it, this was probably part of that
5  conversation there.
6     Q.  Did you say anything back to her
7  when she told you to be careful, they are
8  from IAD?
9     A.  Not that I recall.
10    Q.  Did you ever ask Lieutenant
11  Cesario anything about that?
12    A.  No.
13    Q.  Is there anything else that you
14  now recall about your conversations with
15  either Jan Hanna or anyone else about where
16  Danny and Shannon had come from prior to
17  Fugitive Apprehension?
18    A.  Wait, I'm sorry.  Is that the same
19  question you were just asking a few minutes?
20    Q.  I just want to make sure there is
21  nothing else that you remember that you
22  didn't initially remember?
23    A.  No.  There is nothing that I can
24  specifically recall than what I pretty much

Page 51

1  told you.
2      Q.  Did you ever try to access any
3  databases to find out what their prior
4  assignment had been?
5      A.  No.
6      Q.  When did you first have any
7  conversations with Lieutenant Cesario about
8  assignments to be given to Ms. Spalding or
9  Mr. Echeverria?
10     A.  I think one time Jan might have
11 gone, or she was off, and I had to do her
12 assignments.
13     Q.  Do you recall when that was?
14     A.  No, I don't.
15     Q.  And tell me what you had to do
16 with regard to assignments for Ms. Spalding
17 or Mr. Echeverria?
18     A.  Might have been a robbery or
19 burglary assignment or something because --
20 I don't know the exact assignments.  I don't
21 know.  I don't.
22     Q.  But did you have a conversation
23 with Lieutenant Cesario something to do
24 about the assignments for either Shannon or

Page 52

1  Danny; is that correct?
2      A.  Yes.
3      Q.  What do you recall about that
4  conversation?  Anything?
5      A.  I don't recall.  That's -- nothing
6  that would stand out in my mind.
7      Q.  Did you eventually make an
8  assignment to Spalding or Echeverria instead
9  of because --
10     A.  Back then?  Or when?
11     Q.  Back then when Ms. Hanna was gone.
12     A.  I am sure I did.
13     Q.  Do you recall what kind of
14 assignment it was?
15     A.  No, I don't recall.
16     Q.  Did you ever have any
17 conversations with Jan Hanna about what
18 kinds of assignments were to be given to
19 Shannon or Danny?
20     A.  Not that I recall what kind of
21 assignments, no, not that I remember.
22     Q.  Did you ever have any
23 conversations with Lieutenant Cesario about
24 what kind of assignments should be given to

Page 53

1  Danny or Shannon?
2      A.  You just asked me.  I don't
3  recall.
4      Q.  To your knowledge, do you know who
5  selected the assignments that were to be
6  given to Danny or Shannon?
7      A.  What do you mean by selected?
8      Q.  Who made the determinations?
9      A.  When they are on the team that you
10 are dealing with, you give out the
11 assignments.  You just keep going down the
12 line unless it's a top five assignment, you
13 are supposed to give that to a TFO.
14     Q.  I'm sorry, I may have asked you
15 this before.  Have you ever seen anything in
16 writing that instructs you or Ms. Hanna to
17 give top five assignments only to TFOs?
18         MS. DAVIS:  Objection; asked and
19 answered.
20         MR. TAREN:  You can answer.
21         THE WITNESS:  No, I didn't see
22 anything in writing.
23 BY MR. TAREN:
24     Q.  Have you ever assigned a non-TFO a

Page 54

1  top five assignment?
2      A.  Yes.
3      Q.  On how many occasions?
4      A.  I don't know.  I can't recall how
5  many occasions.
6      Q.  More than ten?
7      A.  I haven't done it in a long time.
8  I don't -- it's not something that would
9  just pop out at me.  If you gave me the
10 information of assignments, I could tell you
11 which ones I assigned.  It's been a long
12 time.
13     Q.  Do you recall the circumstances
14 behind any assignments of a top five to a
15 non-TFO?
16     A.  If there were TFOs available on
17 that area, yes.
18     Q.  So there was no restriction of
19 giving a top five assignment to an officer
20 who was not a TFO; is that correct?
21     A.  There is no restriction.  It was
22 in my bosses being directed, I guess.  It's
23 their unit.  They are the boss.
24     Q.  Did you ever observe a top five

**Page 55**

1  assignment being pulled from someone because
2  they were not a TFO?
3      A. A top five assignment?  Are you
4  talking about someone in specific?
5      Q. Anyone.
6      A. Yes, I do.
7      Q. Who?
8      A. I remember Shannon and Danny.
9      Q. Tell me what you recall about
10  that?
11     A. I believe it was a job that they
12  got assigned, and somebody else had already
13  called the sergeant and said that they were
14  working on that case with the detectives, if
15  they could get that assignment, and then the
16  sergeant called -- I don't remember if it
17  was me or Jan -- and told them to reassign
18  it to the TFO who has been working with the
19  detectives.
20     Q. Who called to request that?
21     A. I want to say -- I think it was
22  Sergeant Barnes.
23     Q. Do you recall whether Sergeant
24  Barnes called you or Jan?

**Page 56**

1      A. I don't recall.  I don't recall.
2  I thought it was -- I answered the phone,
3  and he spoke with Jan.
4      Q. And are you aware of this because
5  of something Jan told you or because of
6  something you overheard?
7      A. Because I overheard Jan saying, I
8  have to reassign this job.
9      Q. So Jan -- your understanding is
10  Jan was instructed by Sergeant Barnes to
11  reassign the job; is that correct?
12     A. Yes.
13     Q. Was this a homicide?
14     A. I think I assigned them something
15  once also.  And I -- I might have assigned
16  it, and then Jan assigned it.  And it was
17  just a -- somebody was working on it
18  already.  I know there was one that I
19  assigned, I think, on -- because I assigned
20  my stuff -- I was doing both assignments,
21  too.  I mean, Jan did that -- that happened
22  with Jan before, but it happened with me
23  before.  I don't remember if it was a
24  homicide.

**Page 57**

1      Q. But are you referring to another
2  assignment that was --
3         MS DAVIS:  You have to let him
4  finish.
5  BY MR. TAREN:
6      Q. Yes.
7      A. I'm sorry, I'm sorry.
8      Q. Are you referring to another
9  assignment that was given to Danny or
10  Shannon and was later pulled, a second one?
11     A. I don't recall if it was the same
12  one.
13     Q. All right.
14     A. It might have been the same.
15  Because if somebody is working on something,
16  and they previously worked on it, we usually
17  assign that to the same person.  Like if
18  there is a warrant or investigative alert,
19  we will assign -- if they are already
20  working on it, it might be the same person.
21  I don't know.
22     Q. I know it sounds a little
23  confusing.  It does to me.
24         So this may have been the same

**Page 58**

1  assignment you are referring to, but I
2  thought you said that it was Jan who made
3  the assignment?
4      A. I am not sure if it was Jan who
5  made it.  You have to find the paperwork.  I
6  don't know.
7      Q. That's a good point.  What
8  paperwork would there be?
9      A. The assignment.  The paperwork in
10  the database.
11     Q. Would that indicate whether it was
12  you or Jan that made the assignment?
13     A. Yes.
14     Q. Do you know the name of the
15  arrestee. Do you recall that?
16     A. No, I don't recall that.
17     Q. Are you telling me that -- I know
18  you told me it was Sergeant Barnes who made
19  the phone call saying that this case needed
20  to be reassigned because someone had
21  previously worked it, correct?
22     A. Yes.
23     Q. Did he tell you -- do you recall
24  who it was that had previously worked that

**Page 59**

1  assignment?
2      A.  I am not sure.  Maybe -- it's not
3  for sure.  But I want to say maybe Brandon,
4  Brandon Murphy maybe.  That's not for sure,
5  though.
6      Q.  When an assignment comes in, how
7  would you or Jan know that it had previously
8  been worked by another officer?  Would there
9  be something in the assignment sheet or
10  database that would tell you that?
11     A.  Yes.
12     Q.  What would that be?
13     A.  The name and IR number of the
14  Defendant.
15     Q.  What is there about the name and
16  the IR number of the defendant that would
17  tell you that another officer had worked
18  that case?
19     A.  It would tell me whose case it was
20  in there.
21     Q.  There would be a field?
22     A.  Yes.
23     Q.  That would tell you --
24     A.  Yes, a field.

**Page 60**

1      Q.  -- that would tell you whose case
2  it was, and if there was a new warrant or
3  something, that would have Officer Murphy's
4  name on it indicating that he had done
5  something already; is that correct?
6      A.  Yes.
7      Q.  When you see that, your practice
8  would then be to make the assignment back to
9  Officer Murphy?
10     A.  Yes.
11     Q.  How would it come about that
12  another officer, Spalding or Echeverria,
13  would be assigned a homicide that had been
14  worked by another officer?
15     A.  I don't know if it was a homicide.
16     Q.  Well, even if it wasn't a
17  homicide, in other words, how would a top
18  five assignment go out?
19     A.  Human error.
20     Q.  So you don't know, but you are
21  speculating that someone didn't see the name
22  of the officer that had previously worked on
23  the assignment; is that correct?
24     A.  Yes.

**Page 61**

1      Q.  Are you aware of any other top
2  five assignments that were first assigned
3  and then taken away from an officer other
4  than this one that you have been testifying
5  about?
6      A.  Well, sometimes it happened a lot
7  on even months when I was doing north, even
8  with the TFOs, yes.  Like one person would
9  be working on it but didn't call and say
10  they were working on it, and I assigned it
11  to somebody else because I didn't know that
12  they were working on it.
13     Q.  Can you identify any other
14  instance where that happened?
15     A.  I am sure that -- there is
16  probably -- I remember one time Jamie.  I
17  gave Jamie an assignment, and somebody else
18  was working on it.  I don't remember who,
19  but I had to reassign it to the person.  The
20  sergeant called me, Sergeant Stack, and said
21  such-and-such is working on it, so reassign
22  Jamie's job to somebody else.  There were
23  lots of things like that.  Because they
24  might have gotten to the area early in the

**Page 62**

1  morning and started talking to a detective
2  and started picking up the job, but just
3  didn't -- when I send out my assignments,
4  when I would do them, everybody saw
5  everybody's assignment.
6          So, let's say, I gave Jamie an
7  assignment and somebody else was working on
8  it, then they would call me and say, oh, I
9  am already working on that.  You know, this
10  way, everybody could see what everybody was
11  doing.  And if I didn't know, I didn't know.
12  I am here.  They are at the area.
13     Q.  Do you recall Sergeant Barnes ever
14  calling and instructing you or Jan to
15  reassign a top five?
16     A.  That would be for Jan, but that
17  one conversation that we previously
18  discussed already.
19     Q.  I guess my question is other than
20  that conversation, do you recall any other
21  time where Sergeant Barnes called and
22  instructed you to reassign a case?  You or
23  Jan?
24     A.  Not me.  I can't speak for Jan.

Page 63

1    Q. Did Jan ever tell you that she had
2  been instructed to give Shannon and Danny
3  dead-end assignments?
4    A. No. Sorry, no.
5    Q. What would you consider a dead-end
6  assignment in Fugitive Apprehension?
7    A. I think they are all pretty
8  important assignments.
9    Q. Is there a difference in -- I
10  don't know -- prestige between a top five
11  assignment and, say, a misdemeanor?
12    A. Are you asking that to me as a
13  person to my --
14    Q. As a police officer with knowledge
15  of the way things were handled in Fugitive
16  Apprehension.
17    A. I don't understand the question.
18      MS. DAVIS: Objection; calls for
19  speculation.
20  BY MR. TAREN:
21    Q. Let me ask you this: Do you know
22  what I mean when I say dead-end assignment?
23    A. No, I don't know what you mean by
24  dead-end.

Page 64

1    Q. Were there any assignments in
2  Fugitive Apprehension that, to your
3  knowledge, officers didn't want?
4    A. That they didn't want?
5    Q. Right.
6    A. No. They are all important. They
7  are warrants. They are investigative
8  alerts. You want to find the bad guy.
9    Q. So in your experience at Fugitive
10  Apprehension, officers were just as happy to
11  have a homicide or burglary as they would a
12  misdemeanor warrant where the individual was
13  either dead or already in jail?
14    A. I don't understand.
15    Q. Did any police officer in Fugitive
16  Apprehension ever complain to you about an
17  assignment?
18    A. No. Not -- no.
19    Q. No?
20    A. Not that I can recall that they
21  complained.
22    Q. At some point you recall that
23  Danny was assigned to third watch?
24    A. He was on Sergeant Mills' team.

Page 65

1    Q. Do you recall Jan Hanna typing a
2  to/from to have Danny assigned to third
3  watch due to family reasons?
4    A. I don't recall that.
5    Q. Did you ever have any discussions
6  with Jan about that?
7    A. Not that I can recall or remember.
8    Q. Were you present at a meeting in
9  June of 2012 with Lieutenant Cesario in
10  which Danny and Shannon were discussed?
11    A. Not that I recall.
12    Q. If it wasn't June of 2012, at any
13  other time, at a meeting with Lieutenant
14  Cesario where either Danny or Shannon were
15  discussed?
16    A. Not that I can recall.
17    Q. Did you ever hear from any source
18  that officers were instructed not to provide
19  backup for either Shannon or Danny?
20    A. No.
21    Q. Did you ever hear from any source
22  that officers were instructed by anyone not
23  to work with Danny or Shannon?
24    A. No.

Page 66

1    Q. Did you ever observe either
2  Ms. Spalding or Mr. Echeverria treated
3  differently in the Fugitive Apprehension
4  unit from any other officer?
5    A. Not that I can recall.
6    Q. I asked you about conversations
7  that you heard about either of the
8  Plaintiffs being in IAD. Other than what
9  you have already told us, did you ever hear
10  any rumors from other officers concerning
11  Danny or Shannon's past at IAD?
12    A. Not that I recall.
13    Q. Are you familiar with practices of
14  the Fugitive Apprehension unit regarding the
15  listing of officers on arrest reports?
16    A. Arrest reports?
17    Q. Right.
18    A. Well, I have seen arrest reports,
19  but I am not --
20    Q. Did you ever observe or become
21  aware of an officer being listed on a police
22  report even when they were not present at
23  the scene?
24    A. Did I?

Page 67

1    Q. Yes.
2    A. Wait, I don't understand the
3 question.
4    Q. Let me ask this: What officers
5 are, to your knowledge, supposed to be
6 listed on an arrest report? There is an
7 arresting officer, correct?
8    A. Yes.
9    Q. And other officers who are
10 participating in the arrest, are their names
11 customarily found on the arrest report?
12    A. I wouldn't look for that on an
13 arrest report. That wouldn't detail my job
14 except for the arresting officers
15 themselves.
16    Q. So do officers get some kind of a
17 statistic that is helpful for their careers
18 with regard to arrests made or participation
19 in arrests?
20    A. Statistics?
21    Q. Yes.
22    A. That wouldn't be in my -- I would
23 have no reason to know that in my position.
24    Q. So you had nothing to do with

Page 68

1 compiling or reviewing an officer's arrest
2 stats; is that correct?
3    A. Not their stats, no.
4    Q. What did you compile with regard
5 to officer's performance? Anything?
6    A. Compile their performance?
7    Q. Yes.
8    A. No, I didn't compile their
9 performance.
10    Q. So you have no knowledge one way
11 or the other whether officers in Fugitive
12 Apprehension were bolstering each other's
13 stats by putting people's names on arrest
14 reports even if they weren't involved in
15 arrests, is that your testimony?
16    A. What's the question?
17    MR. TAREN: Would you read that
18 back, please.
19        (Whereupon, the record was
20        read as requested.)
21    THE WITNESS: I have no knowledge
22 about them putting each other on arrest
23 reports.
24

Page 69

1 BY MR. TAREN:
2    Q. Did you ever hear about any
3 incidents in Fugitive Apprehension where an
4 officer was criticized or disciplined or
5 investigated for having their name on an
6 arrest report that they weren't involved in?
7    A. I am trying to understand what you
8 are trying to say. Can you simplify that?
9    Q. Well, let me make it a little more
10 specific.
11    A. It's kind of a long --
12    Q. Are you aware of any officers
13 receiving a CR number on a case where her
14 name appeared on an arrest but she had not
15 been present, actually present for the
16 arrest?
17    A. No, I am not aware of that.
18    Q. And to be a little bit more
19 specific, did you ever hear about an
20 occasion where Roxanne Bilarceck (phonetic)
21 received a CR number on a case?
22    A. Roxy got a CR number?
23    Q. I am just asking if this is
24 anything you know about?

Page 70

1    A. No, it's nothing I know about.
2    Q. Did you ever hear from any source
3 that Shannon Spalding had been banned from
4 the Homan Square building?
5    A. No.
6    Q. Did you ever hear from any source
7 that Shannon had been banned or prohibited
8 from being any place, any office of the
9 Chicago Police Department?
10    A. Not that I heard.
11    Q. What is the Accurint and Leads
12 2000 database?
13    A. A Leads 2000 database is
14 information based on the Secretary of State
15 so drivers licenses, vehicles. Accurint
16 is -- it's kind of hard to describe. It's
17 more of a background of somebody. Something
18 maybe you would pay for online, something
19 like that. But it's -- I think it's only
20 offered to police, but I am not sure about
21 that.
22    Q. To your knowledge are these
23 databases that police officers in Fugitive
24 Apprehension had access to?

**Page 71**

1    A.  Accurint everybody -- you are only
2   limited to so many accounts per each unit.
3   So if we had three accounts, which we did,
4   there was a password on a board that
5   everybody could see it go into that
6   database.  So we had a board with the
7   password to Accurint.
8           Leads 2000, which I don't even
9   have.  You have to pass a test.  If you
10  passed your test, you could be qualified for
11  Leads 2000.
12          It's a different test than our
13  regular Leads test.  But we all have Leads,
14  but for Leads 2000, you have to, from what I
15  understand, take another test, pass it, and
16  then you put in.
17   Q.  When new officers came into
18  Fugitive Apprehension, what was the practice
19  that you are aware of to get them access to
20  Leads 2000.
21   A.  There was an Officer Culhane who
22  was our officer who worked with the State
23  Police who was in charge of putting people's
24  information after they took their test into

**Page 72**

1   Leads 2000.
2    Q.  Do you know how an officer would
3   go about taking the Leads 2000 test?
4    A.  I think it's -- I am not sure.  I
5   mean, it's online.  It's on our desktop
6   somewhere to take it, I think.  I am not
7   sure, but I think it's on our desk top.  I
8   don't take it.
9    Q.  Do you know whether either a
10  sergeant or Lieutenant Cesario or the
11  commander had to authorize an officer to
12  take that test?
13   A.  Not that I know of.  You could
14  just take the test yourself.
15   Q.  I am just trying to find out the
16  procedure.
17   A.  Yes.
18   Q.  You could take the test, and then
19  go to Officer Culhane --
20   A.  Yes.
21   Q.  -- after you have passed it, and
22  then you would be given access to the Leads
23  2000?  Is that your understanding how it
24  worked?

**Page 73**

1    A.  I am sure he confirmed if you took
2   your test somewhere else and then you
3   would --
4    Q.  And then you have your own
5   password or user name?
6    A.  Yes.
7    Q.  You say you don't have access to
8   Leads 2000?
9    A.  Uh-uh.
10   Q.  Correct?
11   A.  No.
12   Q.  Do you know how many of the
13  officers in Fugitive Apprehension had access
14  to Leads 2000 and how many did not?
15   A.  No.
16   Q.  Do you know whether it was an
17  important database in order to assist them
18  to do their jobs?
19   A.  Important or --
20   Q.  Or useful?  How about useful?
21   A.  Useful.  Useful would be a word.
22   Q.  Did you ever hear from any source
23  that Danny or Shannon were not to be given
24  access to the Leads 2000 database?

**Page 74**

1    A.  No.
2    Q.  And what about to the Accurint
3   database, did you ever hear from any source
4   that they were not supposed to have access
5   to that database?
6    A.  No, I did not.
7    Q.  So is it your testimony that
8   anybody with a computer in Fugitive
9   Apprehension could just look at the
10  blackboard, get the password and utilize the
11  Accurint database?
12   A.  From my knowledge, yes.
13   MR. TAREN:  You want to take a
14  break, by the way?
15   MS. DAVIS:  Yes.  Let's take a
16  break.
17       (Whereupon, a break was taken
18        from 11:19 to 11:30 a.m.)
19   MR. TAREN:  Back on the record.
20  BY MR. TAREN:
21   Q.  And you understand that you remain
22  under oath?
23   A.  Yes.
24   Q.  One thing of clarification.  Do

**Page 75**

1 you know whether the password to the
2 Accurint database is on the blackboard
3 currently?
4     A. I think they have it out -- I am
5 not sure, but usually they have it listed
6 outside the fugitive door. I don't really
7 look at it.
8     Q. What would that be listed on?
9     A. It's like a cork board.
10     Q. So it's not a chalk?
11     A. It used to be a white board.
12     Q. All right.
13     A. And when we were at Homan. But I
14 think -- I am not sure. I don't even look
15 up there, to tell you the truth. It would
16 be there, if anywhere, I would just assume.
17 I am assuming. I don't really pay
18 attention. Sorry.
19     Q. Are you deputized?
20     A. No.
21     Q. Have you ever been?
22     A. No.
23     Q. And I had asked you about whether
24 you ever heard any conversations from

**Page 76**

1 Lieutenant Cesario about Shannon or Danny
2 having been in IAD. Did you ever hear any
3 conversations from Commander Salemme about
4 Shannon or Danny having been in IAD?
5     A. I don't recall any -- Commander
6 Salemme ever even talking about it.
7     Q. Do you recall Commander Salemme
8 talking about anything to do with Danny or
9 Shannon?
10     A. Just that we were getting two new
11 people.
12     Q. That's the only thing you do
13 recall?
14     A. Yes.
15     Q. Were you familiar with the
16 procedures regarding the check-off at the
17 end of the day when an officer was in the
18 field?
19     A. No.
20     Q. So you don't have any information
21 about whether Fugitive Apprehension members
22 were allowed to report and check off
23 directly from the field or whether they had
24 to return to the unit?

**Page 77**

1     A. No.
2     Q. How did you learn that Danny and
3 Shannon had filed a lawsuit against the
4 Chicago Police Department?
5     A. I was watching TV, and I saw them
6 on TV.
7     Q. Had you been told in advance by
8 anyone that they were going to be on TV?
9     A. I don't recall that, but I
10 remember watching it. I was -- I remember
11 seeing them on TV. And I think I said -- I
12 might have texted Jan and said, Danny and
13 Shannon are on TV.
14     Q. Do you think you did?
15     A. Jan, yeah.
16     Q. Text her?
17     A. Uh-huh.
18     Q. What phone did you text from?
19     A. My personal phone.
20     Q. What's that phone number?
21     A. (773) 315-1532.
22     Q. How often did you send a text to
23 Jan?
24     A. Did I?

**Page 78**

1     Q. Yes.
2     A. We'd text and back all the time.
3     Q. Do you recall what number you
4 would text it to?
5     A. No. I am sure it's in my phone.
6     Q. Do you have your phone with you?
7     A. Yes.
8     Q. Good. Can you tell me?
9     A. (773) 620-9337.
10     Q. Do you still have that text on the
11 phone?
12     A. No.
13     Q. What kind of phone is it?
14     A. A Samsung.
15     Q. And who is your provider service
16 provider?
17     A. AT&T.
18     Q. I am going to ask you to please
19 preserve any and all data, including texts
20 that are on that phone, pending a subpoena
21 for the data.
22         Who else have you,
23 from Fugitive Apprehension, have you ever
24 texted? And I am talking about the texts

### Page 79

1  from you to them or from them to you?
2      A. Maureen Kallus. She is the one I
3  worked with.
4      Q. Who else?
5      A. Lieutenant Cesario.
6      Q. When you texted Lieutenant
7  Cesario, what number do you text to?
8      A. Usually it's his BlackBerry.
9      Q. Do you have that number?
10     A. (312) 446-3059.
11     Q. Is that a personal number?
12     A. That's a work number.
13     Q. Is there another number that you
14 have texted to Lieutenant Cesario or
15 received a text from?
16     A. (773) 544-9710.
17     Q. Is that a personal number?
18     A. That's the personal one.
19     Q. You have sent or received texts
20 from Lieutenant Cesario from or to that
21 number, the 773 number that you just gave?
22     A. Yes.
23     Q. And have you ever sent or received
24 any texts from or to Lieutenant Cesario that

### Page 80

1  had anything to do with Danny or Shannon or
2  the lawsuit they filed?
3      A. Not that I recall.
4      Q. So it's possible that you have?
5      A. I don't know.
6      Q. You mentioned something while you
7  were looking about a group text; is that
8  correct?
9      A. Yes. I have pictures of minions
10 with me and Mo.
11     Q. I am sorry, pictures of what?
12     A. Of minions.
13     Q. I know what a minion is.
14     A. Sorry.
15     Q. Do you have any text groups that
16 include people from Fugitive Apprehension?
17     A. They are just me and Maureen and
18 Lieutenant Cesario. It's minions.
19     Q. I hate to ask this, but believe it
20 or not, one of the last cases I was involved
21 in, a minion played a role, what is the
22 minion about?
23     A. A Black Hawks minion.
24     Q. Good.

### Page 81

1      A. And there is one named Bob.
2      Q. I am really more concerned -- I
3  mean, actually my only concern has --
4      A. It's kind of personal.
5      Q. -- any texts that has to deal
6  with --
7      A. Nothing to do with this case.
8      Q. But you have already told me that
9  you sent a text to Jan Hanna after you heard
10 about or saw information about the lawsuit,
11 correct?
12     A. That I saw her on TV.
13     Q. On TV. Do you recall what your
14 text said?
15     A. No, I don't recall.
16     Q. Do you know what she said back to
17 you?
18     A. No, I don't recall that.
19     Q. Did you ever send or receive any
20 texts from Commander Salemme?
21     A. I am sure.
22         In regards to this case are
23 you asking me?
24     Q. In regards to anything to do with

### Page 82

1  Danny or Shannon?
2      A. No, not that I can recall.
3      Q. So that's possible also; is that
4  correct?
5      A. About them being on TV, you mean?
6      Q. Sure.
7      A. That could be possible.
8      Q. Tell me what numbers you would
9  have sent or received from --
10     A. I shut it off.
11     Q. -- from Commander Salemme?
12     A. I know it's his BlackBerry number.
13 I don't know his BlackBerry number.
14     Q. That's okay. While we are
15 waiting, is this the same phone that you had
16 in March of 2012?
17     A. No.
18     Q. What phone did you have in March
19 of 2012?
20     A. I don't know. It was one of those
21 flip things.
22     Q. A flip. Do you still have it?
23     A. No.
24     Q. When did you get this new phone?

Page 83

1    A. Last year.
2    Q. In 2014 at some point?
3    A. Yes. I think it was February
4 of 2014.
5    Q. Did you have all the data on your
6 prior phone transferred to this phone?
7    A. No.
8    Q. Was it the same service provider,
9 AT&T?
10    A. I don't know. I think so. I
11 think so. I am not sure.
12    Q. What did you do with your old
13 phone?
14    A. Smashed it.
15    Q. Do you still have it at home
16 smashed?
17    A. No. No, I don't.
18    Q. Did you dispose of it?
19    A. Yes.
20    Q. When?
21    A. Maybe I think I threw it in those
22 Best Buy disposable bins maybe.
23    Q. When was that?
24    A. Maybe -- I don't know. I was

Page 84

1 shopping, and we were dropping off like a
2 monitor, and I don't know what day it was.
3 I mean, it was probably soon after I got
4 another phone.
5    Q. Did anyone ever instruct you to
6 review your text messages to see if there
7 was anything that referenced Danny
8 Echeverria or Shannon Spalding?
9    A. No. Just you.
10    Q. Just today; is that correct?
11    A. Yes.
12    Q. Did anyone ever instruct you to
13 preserve any information that you had,
14 including text messages, that referenced
15 Shannon or Danny?
16    A. No.
17    Q. Is it possible that you have --
18 that there were texts on your prior
19 telephone, whether preserved or deleted,
20 between you and Jan or Cesario or Salemme
21 that referenced the lawsuit that was filed?
22    A. Not that I would recall or even
23 think about.
24    Q. But I am trying to understand how

Page 85

1 you used texts with regard to your
2 employment. Did these --
3    A. They -- my personal phone is my
4 personal phone. I mean, it wasn't in
5 regards to my employment.
6    Q. So when you were texting
7 Lieutenant Cesario, what kind of matters did
8 you text him about?
9    A. Probably jokes.
10    Q. What kind of jokes?
11    A. Maybe something we saw. We used
12 to call Mo "Face." So if I would see a face
13 in a waiting room, I would take a picture of
14 a face, I would be like Mo.
15    Q. I don't get that.
16    A. You have to be there.
17    Q. What does that mean, though?
18    A. Face, a look on her face. We
19 would call her "Face." It was a smiley
20 face.
21    Q. The two of you had a friendly
22 personal relationship, you and Lieutenant
23 Cesario; is that correct?
24    A. We were friendly being work

Page 86

1 related. We are colleagues.
2    Q. But I am asking that because --
3    A. Outside of work, no.
4    Q. What we are talking about is
5 outside of work, right?
6    A. No. We had no relationship
7 outside of work.
8    Q. Good enough to text each other
9 jokes, correct?
10    A. I guess that would be regarding
11 things that you saw.
12    Q. And what about Commander Salemme,
13 what kind of matters would you text him?
14    A. Oh, his were mostly meetings or
15 regarding going to work, or if I had a
16 situation, maybe my kid was sick. That was
17 more when I was in the area, but not when I
18 was working for Lieutenant Cesario.
19 Anything that was related, it would probably
20 be NATO stuff.
21    Q. Primarily work-related texts; is
22 that correct?
23    A. Definitely.
24    Q. Do you have the number that you

Page 87

1    texted with Commander Salemme?
2        A. Let me see, (312) 907-1723.
3        Q. Is there a personal number?
4            By the way, is that a work
5    number?
6        A. Yes, that's a work number.
7        Q. Does he have a personal number?
8        A. (312) 593-3584.
9        Q. To your knowledge, did you ever
10   send or receive a text from that number?
11       A. I could have from work. I don't
12   -- it's not something that I -- he is my
13   boss.
14       Q. Are there any other members of the
15   Fugitive Apprehension unit that you sent or
16   received texts from?
17       A. I am sure Sergeant Schlatto
18   (phonetic) or Sergeant -- if I need
19   something from them regarding paperwork.
20       Q. How about Sergeant Barnes?
21       A. Sergeant Barnes I needed paperwork
22   from.
23       Q. What number did you text to or
24   from with regard to him?

Page 88

1        A. I don't even know if I saved that
2    number. It would be on a phone list. I
3    will do it from there. They are not my
4    personal boss usually. I don't know if I
5    would have saved Barnes. No. I don't have
6    Sergeant Barnes.
7        Q. How about Sergeant Mills?
8        A. Sergeant Mills, I might have his.
9    He would have been one of the sergeants that
10   I worked with on his stuff.
11           There he is. (773) 505-1887.
12       Q. Is that to your knowledge a
13   personal cell?
14       A. That's the one he always uses. I
15   have no idea.
16       Q. Do you have any recollection of
17   having sent or received any texts with
18   regard to Sergeant Mills that had anything
19   to do with Ms. Spalding or Mr. Echeverria or
20   their lawsuit?
21       A. I don't remember. I don't recall
22   it.
23       Q. You are not sure; is that correct?
24       A. I am not sure.

Page 89

1        Q. You made mention earlier about
2    seeing Jan Hanna on television?
3        A. Yes, I did.
4        Q. After you saw Jan Hanna, did you
5    send any texts to anyone?
6        A. No, not that I remember that I
7    recall. I might -- I don't recall.
8        Q. Do you recall whether you received
9    any texts from anyone after Ms. Hanna was on
10   television?
11       A. No, I don't recall.
12       Q. Do you have a personal email?
13       A. A personal one?
14       Q. Yes.
15       A. Yes.
16       Q. What is it?
17       A. Coleencc@yahoo.com.
18       Q. Have you ever sent or received an
19   email from anyone that makes reference to
20   Shannon Spalding, Danny Echeverria or the
21   lawsuit?
22       A. I don't recall. I don't remember.
23       Q. How about with regard to either
24   Jan Hanna's appearance on television or

Page 90

1    anything that Jan Hanna said concerning
2    Ms. Spalding or Mr. Echeverria, did you ever
3    receive or send any emails?
4        A. I don't recall that.
5        Q. I would also ask you to preserve
6    any and all emails that you may have that
7    have -- well, just in general until we
8    determine whether there is anything relevant
9    to this case.
10           Were you ever instructed by
11   anyone to preserve any of your emails that
12   may have had anything to do with Shannon
13   Spalding, Danny Echeverria or this case?
14       A. No. Just by you.
15       Q. And I take it, nobody has asked
16   you to search those emails to see if there
17   was any reference to either of my clients;
18   is that right?
19       A. No, nobody asked me.
20       Q. We have been talking about text
21   messages that may have gone back and forth
22   between you and some of your bosses. Did
23   you ever email Lieutenant Cesario, Commander
24   Salemme?

**Page 91**

1    A.  Have I ever emailed them?
2    Q.  Sent emails to them or received
3  emails back to your private email.
4    A.  My private one?
5    Q.  Yes.  The yahoo.com one?
6    A.  No.
7    Q.  You have a Chicago Police
8  Department email?
9    A.  Yes.
10    Q.  What is that?
11    A.  Coleen.dougan@Chicagopolice.org.
12    Q.  To your knowledge, have you ever
13  sent or received an email to or from that
14  address that has anything to do with Shannon
15  Spalding or Danny Echeverria or any of the
16  allegations of their lawsuit?
17    A.  I don't recall.
18    Q.  So that's possible; is that
19  correct?
20    A.  I don't recall.
21    MS. DAVIS:  Objection to the form
22  of the question.
23  BY MR. TAREN:
24    Q.  Were you involved in any way in

**Page 92**

1  any of the discussions concerning the
2  reassignment of Danny or Shannon to Sergeant
3  Mills from Sergeant Barnes?
4    A.  No, I wasn't.
5    Q.  When did you find out about that?
6    A.  About?
7    Q.  About the reassignment to days --
8  strike that.
9          Their reassignment to Sergeant
10  Mills' team?
11    MS. DAVIS:  Objection to the form
12  of the question.
13    THE WITNESS:  I don't -- when was
14  it?  There is not a whole question there.
15  BY MR. TAREN:
16    Q.  At some point, Ms. Spalding and
17  Mr. Echeverria were assigned to report to
18  Sergeant Tom Mills, correct?
19    A.  Yes.
20    Q.  Do you recall when that was?
21    A.  No, I don't recall.
22    Q.  Did you ever hear any discussions
23  from anyone, from Sergeant Barnes, from
24  Lieutenant Cesario, Commander Salemme that

**Page 93**

1  had anything to do with why they were
2  assigned away from Sergeant Barnes?
3    A.  That I don't recall any discussion
4  that wouldn't involve me.
5    Q.  So you didn't -- and that would
6  include overhearing any discussions?
7    A.  Not that I recall, or that comes
8  to my memory.
9    Q.  As you sit here today, do you know
10  why that assignment, reassignment was made?
11    A.  No, I don't.
12    Q.  I'd like to switch gears here a
13  little bit.  I'd like to direct your
14  attention now to an incident which took
15  place around March 29th of 2013 when you
16  thought you heard Shannon Spalding on the
17  telephone with Sergeant Mills.  Do you
18  recall that?
19    A.  I recall it, yes.  Yes.
20    Q.  Have you reviewed the report of
21  the CR investigation with regard to that
22  incident?
23    A.  No.
24    Q.  Ever?

**Page 94**

1    A.  No.
2    Q.  Okay.  Tell me what happened.
3    MS. DAVIS:  Objection to the form
4  of the question.
5    MR. TAREN:  You can answer.
6    THE WITNESS:  I am trying to give
7  you an exact.
8  BY MR. TAREN:
9    Q.  Take your time.
10    A.  Shannon, I believe, was texting me
11  in the morning asking me what time I would
12  get to work, and I don't remember what I
13  told her.  And then I went upstairs.  I was
14  coming up the front hallway.  There is a
15  back hallway and there is a front hallway.
16  And when I was coming up the front hallway
17  in the corridor, there is three chairs that
18  are attached to each other.  And Jan was
19  sitting on this chair, and there was nobody
20  on this chair, and Shannon was sitting on
21  this chair sideways, not facing forward.
22    Q.  Okay.
23    A.  Jan was facing forward and had her
24  phone like this.  So as I was coming up the

Page 95

1   stairs, Shannon had something in her hand,
2   but I heard Sergeant Mills's voice. And I
3   thought, why is Sergeant Mills here in the
4   morning? It was loud and it was boisterous,
5   and I am thinking that was Sergeant Mills as
6   I am walking up the stairs here.
7            So when I got to the top of
8   the stairs, I kind of looked at Shannon and
9   Jan, and I was like, where is Sergeant
10  Mills? Because it was loud. So I walked
11  over to my office, and I don't remember the
12  details of what I heard at this moment. And
13  I was kind of confused, in my own mind, did
14  he leave her a message like that? Did she
15  record him?
16           And then Jan came into my
17  office and sat there. And I said, was
18  Shannon recording Sergeant Mills? I go,
19  what was that? She goes, I didn't hear it.
20  And then she proceeded to repeat whatever it
21  was I heard. So I said, okay, and asked me
22  if that's basically what I heard, and I said
23  yeah. But you didn't hear it from what's in
24  her hand?

Page 96

1            So I kind of pondered with it
2   for a little while, and I thought whatever
3   it was wasn't right.
4            And when I left, I saw Steven
5   Becker who is on Mills' team who I had known
6   previously from the area. I said maybe you
7   should -- I don't know if he left her a
8   voicemail, or she is recording him but
9   maybe, you know, tell Sergeant Mills watch
10  what he says, and then I left.
11       Q.  This took place on March 29th of
12  2013?
13       A.  I don't recall the exact date.
14       Q.  Do you recall what time of the day
15  it was?
16       A.  When I left work?
17       Q.  No. When you first --
18       A.  It was early in the morning.
19       Q.  Around 7:30 or so?
20       A.  I don't know.
21       Q.  What time do you usually get to
22  work?
23       A.  Between 6:00 and -- if I have to
24  take my daughter to school, I could get

Page 97

1   there at 8:00.
2        Q.  When you observed Jan Hanna that
3   morning, did she have headphones on?
4        A.  No. She had her telephone by her
5   ear.
6        Q.  Was she talking on the phone,
7   could you tell?
8        A.  Before that, she was asking me
9   where I was. I just kind of looked over
10  because I was looking for Sergeant Mills.
11       Q.  So during the time that you heard
12  Sergeant Mills' voice, you were walking up
13  the stairs; is that correct?
14       A.  I was walking up the front stairs.
15       Q.  Did you ever stop and linger to
16  try and eavesdrop on what was being said?
17       A.  It was loud and boisterous. I
18  remember hearing the words. I can't repeat
19  them right now, but it was a while ago.
20       Q.  I understand. My question was
21  that did you hear this in passing, or did
22  you stop and eavesdrop on what was being
23  said?
24       A.  I kind of stopped, listened and

Page 98

1   looked to see where he was.
2        Q.  For how many seconds did you hear
3   his voice?
4        A.  I don't know.
5        Q.  How many stairs were there?
6        A.  I don't know.
7        Q.  Do you think we are talking about
8   like five seconds' worth of listening?
9        A.  Maybe ten seconds I would have
10  been listening.
11       Q.  During that time, you were getting
12  further and further away from the source; is
13  that correct?
14       A.  No. She shut it off when I got
15  upstairs.
16       Q.  Did you ever make eye contact with
17  Shannon during that period of time?
18       A.  Yes, yes. I looked right at her.
19       Q.  And she looked at you?
20       A.  Yes.
21       Q.  And did she say anything to you?
22       A.  No.
23       Q.  So are you telling me -- first of
24  all, did you recognize the voice on the

**Page 99**

1  device that you heard as Thomas Mills?
2      A.  Yes.
3      Q.  Conclusively?
4      A.  Yes.
5      Q.  And did you tell that to IAD at
6  some point that you conclusively recognized
7  Thomas Mills' voice?
8      A.  Yes.
9      Q.  Did you recognize the device that
10  the voice was coming from?
11      A.  She had it in her hand.  I didn't
12  -- I might have thought it would be a phone.
13  It could be -- it was black.  That's all I
14  saw.
15      Q.  My question is did you recognize
16  the device as a telephone?
17      A.  I didn't see the top of it.
18      Q.  So is your answer no?
19      A.  No.
20      Q.  Did you think at that time that
21  there was something odd about Ms. Spalding
22  speaking with Thomas Mills that morning?
23      A.  I thought it was odd that he
24  wasn't there when I got to the top of the

**Page 100**

1  stairs.
2      Q.  Did you make any kind of
3  determination of whether Ms. Spalding had
4  this device on a speaker?
5      A.  I don't know.
6      Q.  You don't know, is that what you
7  are saying?
8      A.  It was loud.  I mean, I --
9      Q.  How is it that you knew it was
10  coming from Ms. Spalding's device and not
11  Ms. Hanna's device?
12      A.  I don't know.
13      Q.  So it could have been either one?
14      A.  It could have been either one.
15      Q.  Is it your testimony that at the
16  time you heard the exact words that you
17  believed Thomas Mills had said?
18          MS DAVIS:  Objection to the form
19  of the question.
20  BY MR. TAREN:
21      Q.  In other words, you could
22  distinguish what was being said --
23      A.  Yes.
24      Q.  -- from the device, correct?

**Page 101**

1      A.  At the time, yes.
2      Q.  How many words did you hear?
3      A.  I don't recall.
4      Q.  Is it your testimony that you
5  currently have no recollection of what you
6  heard at that time?
7      A.  At this moment.
8      Q.  Right now you don't know what was
9  said?
10      A.  I don't remember what was said,
11  no.
12      Q.  But you heard Tom Mills say
13  something, and then I believe you testified
14  Jan Hanna came to your office and repeated
15  what Tom Mills said?
16      A.  Yes.
17      Q.  And you don't recall what Jan
18  Hanna said either; is that correct?
19      A.  Not at this point, no.
20      Q.  What time did you speak with Steve
21  Becker?
22      A.  Probably 4:00 or 5:00 o'clock.
23      Q.  Am I correct that at the time that
24  you heard this incident, you had no idea

**Page 102**

1  whether there was something illegal that had
2  taken place; is that correct?
3          MS. DAVIS:  Objection to the form
4  of the question.
5          MR. TAREN:  You can answer.
6          THE WITNESS:  That something
7  illegal took place?
8  BY MR. TAREN:
9      Q.  Right.
10      A.  A little more information here.
11  Illegal regarding?
12      Q.  Anything.
13      A.  That it was illegal?
14      Q.  You didn't know what you heard,
15  isn't that true, whether it was a recording,
16  a speakerphone or something else?
17      A.  I just know he wasn't standing
18  there when I came up, and I heard him.
19      Q.  Did you believe that prior to
20  speaking to Steve Becker that something
21  inappropriate had taken place with regard to
22  what you had heard Tom Mills say?
23      A.  My personal belief?
24      Q.  Yes.  At that time?

Page 103

1      A. I don't really -- are you saying
2  was -- I don't -- sorry. Can you repeat it.
3         MS. DAVIS: I am going to object
4  to the form of the question.
5             (Whereupon, the record was
6             read as requested.)
7         THE WITNESS: Inappropriate? Most
8  likely. Illegal? I don't know. I am not a
9  lawyer.
10 BY MR. TAREN:
11     Q. Prior to speaking to Steve Becker,
12 did you inform anyone about what you
13 believed you heard?
14     A. Jan Hanna.
15     Q. Anyone else?
16     A. Not that I can recall.
17     Q. Did you talk to Lieutenant Cesario
18 about this incident?
19     A. Not that I recall.
20     Q. Did you talk to Commander Salemme
21 about this incident?
22     A. At that moment?
23     Q. At that moment.
24     A. No.

Page 104

1      Q. And how about to Tom Mills?
2      A. At that moment, no.
3      Q. I know you talked to Tom Mills
4  later, correct?
5      A. Yes.
6      Q. You never asked Steve Becker to
7  take out a CR number?
8      A. No.
9      Q. And it wasn't your intent in
10 speaking to Steve Becker to instigate any
11 kind of investigation, was it?
12     A. No.
13     Q. Did you tell that to Mr. Becker?
14     A. I didn't.
15     Q. Did you ever contact IAD or any of
16 your supervisors to complain about something
17 that you had heard with regard to this
18 incident? You personally?
19     A. Did I contact IAD?
20     Q. Yes.
21     A. No.
22     Q. Did Officer Becker thank you for
23 putting him on warning or say anything other
24 than that he would let Mills know?

Page 105

1      A. Not that I recall.
2      Q. And by the way, when you were
3  speaking with Becker, nobody else was
4  present; is that correct?
5      A. Correct.
6      Q. Did you tell Becker that he,
7  Becker, needed to be careful about what he
8  said around Officer Spalding?
9      A. Not that I recall that he be
10 careful.
11     Q. Did you tell Becker to tell Mills
12 to be careful what she said around Officer
13 Spalding?
14     A. That he should watch what he says.
15     Q. Are those your words?
16     A. Those are my words?
17     Q. When you say, "he should watch
18 what he says," who did you refer to? "He,"
19 Becker?
20     A. No. Sergeant Mills.
21     Q. Okay. So you told Becker that
22 Mills should watch what he says; is that
23 correct?
24     A. Yes.

Page 106

1      Q. And what's the next thing that
2  happened?
3      A. I left for two days. It was a
4  weekend.
5      Q. And then by the way, did you tell
6  Becker that you thought you heard a
7  recording?
8      A. I said, I heard -- I might have.
9  I don't remember. I heard Mills.
10     Q. That's what I am trying to find
11 out, though. Did you say you heard Mills,
12 or did you say you heard a recording or
13 something else?
14     A. I don't remember my exact words.
15 I said I heard Mills' voice.
16     Q. Is there anything else that you
17 said to Steve Becker or that he said to you
18 that you recall now?
19     A. Not that I recall.
20     Q. And I take it that you never told
21 Steve Becker that the conversation you
22 overheard was illegally recorded, did you?
23        MS. DAVIS: Objection; asked and
24 answered now several times.

**Page 107**

1  BY MR. TAREN:
2      Q. Did you?
3      A. That was the whole illegal thing,
4  right?
5      Q. Right.
6      A. Like I said, I don't recall saying
7  anything about an illegal recording.
8      Q. So when you came back to work
9  after the weekend, what was the next thing
10  that happened that had anything to do with
11  this incident?
12      A. I don't remember how it came up,
13  but I remember talking to Sergeant Mills and
14  him asking me what time I was working till,
15  that he wanted to speak with me.
16      Q. What did you tell him?
17      A. What time I was working till.
18      Q. Did you go speak with him?
19      A. I did.
20      Q. Where?
21      A. Right outside our office.
22      Q. Was anyone else present?
23      A. Sergeant Barnes came in for a
24  minute, but then he left, not during our

**Page 108**

1  conversation. I don't remember that. He
2  was asking me something else regarding work.
3      Q. Tell me what Sergeant Mills said
4  to you and what you said to him?
5      A. I don't know verbatim what was
6  said.
7      Q. You were discussing the incident
8  that you believe you heard on March 29th
9  with Sergeant Mills; is that correct?
10      A. Yes.
11      Q. By the way, had he sent you an
12  email first asking you come over or asking
13  you what happened?
14      A. He didn't ask me what happened.
15  He just said, what time are you working
16  till?
17      Q. Was that in an email?
18      A. I don't think so. I don't recall
19  it being in an email. I remember being on
20  the phone. I don't remember an email. I
21  don't recall one.
22      Q. So did you recall telling Mike
23  Barz from IAD that Tom Mills had sent you an
24  email asking you what happened?

**Page 109**

1      A. I don't recall that.
2      Q. Did you tell Tom Mills basically
3  what you had observed and what --
4      A. What I just told you.
5      Q. What you just told me? Yes?
6      A. Yes.
7      Q. What did he say?
8      A. He just said, I will handle it.
9      Q. Did he tell you how he would
10  handle it?
11      A. No.
12      Q. Did he ask you any questions?
13      A. I remember telling him what I
14  heard but he said that's -- that's okay.
15      Q. That's what he said, "that's
16  okay"?
17      A. He said, "I'll handle it."
18      Q. You have to answer my question.
19  So when I said that's what he said "that's
20  okay" is your answer yes?
21      A. Yes.
22      Q. Was Sergeant Barnes in there, in
23  the room for any part of the conversation
24  that you were having with Sergeant Mills?

**Page 110**

1      A. Not that part of the conversation,
2  no.
3      Q. Did Sergeant Mills tell you how he
4  would handle it?
5      MS DAVIS: Objection; asked and
6  answered.
7      THE WITNESS: No, he didn't say.
8  He just said, "I will handle it."
9  BY MR. TAREN:
10      Q. Did you tell Sergeant Mills about
11  your conversation with Jan Hanna?
12      A. No.
13      Q. Why not?
14      A. I don't know. I just didn't.
15      Q. Did you ask Sergeant Mills any
16  questions?
17      A. Not that I recall.
18      Q. What was the next thing that
19  occurred with regard to anything to do with
20  this incident?
21      MS. DAVIS: Objection to the form
22  of that question.
23      THE WITNESS: What do you mean?
24

Page 111

1    BY MR. TAREN:
2        Q. The next person you spoke to?
3        A. What's the next thing? Couple of
4    sergeants came into my office from IAD and
5    closed the door and told me to give them my
6    statement.
7        Q. Now the conversation you had with
8    Thomas Mills, was that on April 3rd?
9        A. I don't recall what date it was.
10       Q. So between the time you spoke with
11   Thomas Mills and the time you spoke with the
12   two sergeants from IAD, did you have any
13   conversations with anyone that had anything
14   to do with this March 29th incident?
15       A. With Jan.
16       Q. Do you recall talking to Jan about
17   it?
18       A. I somewhat recall. I mean,
19   little bits of it.
20       Q. Tell me the bits you recall.
21       A. I asked her how did she not hear
22   what I heard, and she said she didn't. And
23   I said, "Are you sure?" She said, "I was on
24   my phone." That's pretty much like.

Page 112

1        Q. Did you doubt that for some
2    reason?
3        A. Of course, I doubted that. She
4    was sitting there.
5        Q. Did you tell her about your
6    conversation with Tom Mills?
7        A. I don't remember. I could have
8    told her about my conversation.
9        Q. Have you ever sent any texts or
10   emails that have anything to do with this
11   incident to anyone?
12       MS. DAVIS: Objection; asked and
13   answered.
14       THE WITNESS: Which incident?
15   BY MR. TAREN:
16       Q. The March 29th.
17       A. The CR number incident?
18       Q. Correct.
19       A. Maybe Jan.
20       Q. When did you send that?
21       A. I don't know the dates.
22       Q. Was it a text or an email?
23       A. She was off work. I am assuming
24   it was a text, I'm assuming.

Page 113

1        Q. Did you ever send any texts or
2    emails to Thomas Mills about the incident?
3        A. About the incident?
4        Q. Yes. Or anything to do with the
5    CR.
6        A. Not that I recall.
7        Q. How did you find out that Officers
8    Barz and Muscolino wanted to take your
9    statement?
10       A. Came into my office and shut the
11   door.
12       Q. Is that the first information you
13   were given that someone had taken out a CR
14   number?
15       A. Yes.
16       Q. Was this on April 9th?
17       A. I don't remember the date.
18       Q. First tell me what either Officer
19   Barz or Officer Muscolino said to you when
20   they came into your office? And if you can
21   identify which ones said that, I would
22   appreciate it. If not, give me what you
23   recall.
24       A. I only talked to Sergeant Barnes,

Page 114

1    I believe, the whole time.
2        Q. Tell me what you said to him and
3    what he said to you in this conversation?
4        A. He asked me what happened, and I
5    told him, as I explained to you, the same
6    situation. Then it might have been more
7    refreshing exactly the words that were said,
8    and that was it.
9        Q. What do you mean it might have
10   been refreshing, the words that were said?
11       A. Not refreshed. I might have known
12   then more of the exact conversation of
13   Sergeant Mills, words coming from Sergeant
14   Mills.
15       Q. Did you?
16       A. No. It was pretty close to the
17   time, so I believe it's in my statement.
18       Q. If I told you that your statement
19   does not recall any of the words, would that
20   refresh your recollection?
21       A. I don't know. I remember telling
22   him I heard Sergeant Mills, and whatever my
23   statement says is what happened. Like I
24   said, it's a long time ago.

**Page 115**

1     Q. Did they show you your statement
2 after they took it?
3     A. No, no.
4     Q. Did you tell Sergeant Barz that
5 you didn't know for certain what the
6 electronic device was?
7     A. Yes.
8     Q. Did you tell the officers from IAD
9 that you didn't know if the voice was indeed
10 Sergeant Tom Mills?
11     A. I knew it was Sergeant Mills'
12 voice.
13     Q. So is your statement that you did
14 not tell them that?
15       MS. DAVIS: Objection to form of
16 the question.
17       THE WITNESS: I don't understand.
18 BY MR. TAREN:
19     Q. All I am asking you now is what
20 you recall having told the IAD officers?
21     A. That I heard Sergeant Mills'
22 voice.
23     Q. That you didn't know if the voice
24 was indeed Sergeant Mills?

**Page 116**

1       MS. DAVIS: Is that a question,
2 counsel?
3       MR. TAREN: Yes. It hasn't been
4 answered yet.
5       THE WITNESS: I don't recall. I
6 don't remember. I remember what I remember
7 now.
8 BY MR. TAREN:
9     Q. Do you recall telling Sergeant
10 Barz or Muscolino that you didn't know if
11 Spalding and Mills were having a telephone
12 conversation?
13     A. I don't remember. I don't recall.
14     Q. Did anyone ask you to provide
15 information to get a search warrant?
16     A. No.
17       MR. TAREN: I'd like to take a
18 five-minute break. We are wrapping up here.
19       (Whereupon, a break was taken
20         from 12:26 to 12:35 p.m.)
21 BY MR. TAREN:
22     Q. Just a few more. Ms. Dougan, you
23 earlier testified that you didn't recall the
24 words that you heard Thomas Mills say on

**Page 117**

1 March 29th on this device. Can you tell me
2 what the sense of what he was saying was?
3 Do you have that recollection?
4     A. It was loud.
5     Q. Rather than just the volume, do
6 you have any idea what the topic was that he
7 was speaking about?
8     A. I don't recall at this moment, no.
9     Q. When you had your conversation
10 with Thomas Mills, did he tell you that he
11 had obtained a confidential CR number on
12 Spalding?
13     A. Not that I -- that day?
14     Q. Correct.
15     A. In that room?
16     Q. Yes.
17     A. No, I don't remember.
18     Q. We also had some discussion about
19 your observation -- the television, the
20 first television report about the lawsuit
21 that was filed, which I believe would have
22 been some time in November of 2012. Do you
23 recall that?
24     A. Our conversation just now?

**Page 118**

1     Q. Yes.
2     A. Yes.
3     Q. So I think that you told me that
4 you just happened to see the news report
5 about the lawsuit on television; is that
6 correct?
7     A. Yes.
8     Q. And did you ever hear Lieutenant
9 Cesario say anything in the unit about Danny
10 and Shannon having filed a lawsuit?
11     A. Not that I recall.
12     Q. And to your recollection, nobody
13 gave you any kind of warning that they were
14 going to be on television that night; is
15 that correct.
16     A. Not that I remember. I just
17 remember seeing it.
18     Q. After you saw it, do you recall
19 having a conversation with Jan Hanna about
20 the broadcast?
21       MS. DAVIS: Objection; asked and
22 answered.
23       THE WITNESS: I probably talked to
24 her, yes.

| Page 119 | Page 121 |
|---|---|
| 1  BY MR. TAREN: | 1  Dougan was on television -- |
| 2  Q.  Do you have any recollection of | 2  A.  Not Jan Dougan. |
| 3  what you said to Jan or Jan said to you | 3  Q.  Excuse me.  After Jan Hanna -- |
| 4  about what you had seen on television? | 4  A.  Not really. |
| 5  A.  Just that they were on TV. | 5  Q.  -- was on the news about her |
| 6  Q.  That's it?  You don't recall any | 6  participation or giving an affidavit in this |
| 7  conversation about the lawsuit or the claims | 7  case, you had a conversation with her on the |
| 8  that were presented on television? | 8  telephone, correct? |
| 9  A.  I don't recall a conversation. | 9  A.  I probably emailed her.  I said, I |
| 10  Q.  Were people talking about it the | 10  hope you and your family are okay.  Hope |
| 11  next day at work? | 11  you're okay. |
| 12  A.  I don't remember, to tell you the | 12  Q.  Did you ever have a phone |
| 13  truth.  I -- work is work. | 13  conversation with her? |
| 14  Q.  So you have no recollection of | 14  A.  I called her and told her to call |
| 15  anything that anyone else from Fugitive | 15  me. |
| 16  Apprehensions said concerning the broadcast | 16  Q.  Did you have a conversation with |
| 17  of Danny and Shannon's lawsuit in November | 17  her on the telephone? |
| 18  of 2012; is that correct? | 18  A.  She didn't call me back. |
| 19  A.  I don't recall anything, or what | 19  Q.  And in your email to her, did you |
| 20  if, or what was said. | 20  make any mention of anything to do with the |
| 21  Q.  You also testified that you saw | 21  television broadcast in which her |
| 22  Jan Hanna on television after she gave her | 22  participation by way of affidavit or |
| 23  affidavit; is that correct? | 23  knowledge in this case was broadcast? |
| 24  A.  Yes. | 24  A.  No. |

| Page 120 | Page 122 |
|---|---|
| 1  Q.  Did anyone warn you that that was | 1  Q.  Did you ever refer to either |
| 2  going to be on, or did you just happen to | 2  Shannon or Danny as an IAD rat? |
| 3  watch the news and see it? | 3  A.  No. |
| 4  A.  It was on previews to the news. | 4  Q.  Is it your sworn testimony you |
| 5  Q.  Did someone tell you about it, or | 5  never heard anyone use those words or words |
| 6  did you see it yourself? | 6  to that effect to refer to Shannon or Danny? |
| 7  A.  I saw it myself. | 7  A.  Effect was that they were from |
| 8  Q.  So nobody called you up and said, | 8  IAD? |
| 9  "Guess what, Jan is going to be on | 9  Q.  Right. |
| 10  television tonight"? | 10  A.  I personally didn't hear "rat." |
| 11  A.  No. | 11  Q.  Do you know someone who did? |
| 12  Q.  And after you saw that, did you | 12  A.  I don't know, no. |
| 13  talk with Jan about it? | 13  Q.  Well.  Did anyone ever tell you |
| 14  A.  I might have talked to her and | 14  that they heard someone refer to either |
| 15  said, I hope you and your family are okay. | 15  Danny or Shannon as a rat? |
| 16  Q.  Why do you say that? | 16  A.  Not that I can recall.  That word |
| 17  A.  Because she was on a medical, and | 17  doesn't stick out in my mind. |
| 18  I know she was going for disability. | 18  Q.  Have you ever heard any police |
| 19  Q.  What did that have to do with the | 19  officer referred to as a rat? |
| 20  broadcast? | 20  A.  Not that I recall.  A rat? |
| 21  A.  That was just our normal | 21  Q.  A rat. |
| 22  conversations of friendly talk.  I didn't | 22  A.  Not that I recall. |
| 23  talk about what was on TV. | 23  Q.  What would your understanding be |
| 24  Q.  Are you saying that after Jan | 24  of the meaning of referring to a police |

**Page 123**

1  officer as a rat?
2      A.  My personal opinion?
3      Q.  Correct.
4      MS. DAVIS:  Objection to the form
5  of the question.
6      THE WITNESS:  Calling me a rat?  I
7  guess I would think that I was telling on
8  somebody.
9      MR. TAREN:  I have no further
10  questions.
11      MS. DAVIS:  Okay.  We will
12  reserve.
13
14      (FURTHER DEPONENT SAITH NOT.)
15
16
17
18
19
20
21
22
23
24

**Page 124**

1      IN THE UNITED STATES DISTRICT COURT
       NORTHERN DISTRICT OF ILLINOIS
2          EASTERN DIVISION
3
   Chicago Police
4  Officers SHANNON
   SPALDING and
5  DANIEL ECHEVERRIA,
6          Plaintiffs,
7      vs.
8  CITY OF CHICAGO,
   Chicago Police
9  Chief JUAN RIVERA, et al.,
10      I, COLEEN DOUGAN, being first duly
11  sworn, on oath say that I am the deponent in
12  the aforesaid deposition taken on
13  June 17, 2015; that I have read the
14  foregoing transcript of my deposition,
15  consisting of pages 1 - 126, and affix my
16  signature to same.
17
18          COLEEN DOUGAN

19      Number of errata sheets
        attached_____
20
   Subscribed and sworn to
21  before me this     day
   of          , 2015.
22
23
24  Notary Public

**Page 125**

1  STATE OF ILLINOIS  )
2                     )  SS:
3  COUNTY OF DU PAGE  )
4
5      I, MARIBETH REILLY, a notary public
6  within and for the County of DuPage County
7  and State of Illinois, do hereby certify
8  that heretofore, to-wit, on June 17, 2015,
9  personally appeared before me, at One North
10  LaSalle Street, Chicago, Illinois, COLEEN
11  DOUGAN, in a cause now pending and
12  undetermined in the Northern District of
13  Illinois, wherein Chicago Police Officers
14  SHANNON SPALDING and DANIEL ECHEVERRIA are
15  the Plaintiffs, and CITY OF CHICAGO, et al.,
16  are the Defendants.
17      I further certify that the said COLEEN
18  DOUGAN was first duly sworn to testify the
19  truth, the whole truth and nothing but the
20  truth in the cause aforesaid; that the
21  testimony then given by said witness was
22  reported stenographically by me in the
23  presence of the said witness, and afterwards
24  reduced to typewriting by Computer-Aided

1   Transcription, and the foregoing is a true

2   and correct transcript of the testimony so

3   given by said witness as aforesaid.

4        I further certify that the signature

5   to the foregoing deposition was reserved by

6   counsel for the respective parties and that

7   there were present at the deposition the

8   attorneys hereinbefore mentioned.

9        I further certify that I am not

10  counsel for nor in any way related to the

11  parties to this suit, nor am I in any way

12  interested in the outcome thereof.

13       IN TESTIMONY WHEREOF:  I have hereunto

14  set my hand and affixed my notarial seal

15  this 8th day of August, 2015.

16

17

18

19

20

21       NOTARY PUBLIC, DU PAGE COUNTY, ILLINOIS

22           C.S.R. No. 084-002306

23

24

# <u>EXHIBIT D</u>

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

Chicago Police Officer SHANNON SPALDING,    )
Chicago Police Officer DANIEL ECHEVERRIA,   )    Case No. 12-cv-8777
                                            )
            Plaintiffs,                     )    Judge Gary Feinerman
                                            )    Magistrate Judge Shelia Finnegan
        v.                                  )
                                            )
CITY OF CHICAGO, et al.,                    )
                                            )
            Defendants.                     )

## DECLARATION OF KEVIN CULHANE

I, Kevin Culhane, declare under penalty of perjury that this statement is true and correct.

1.      I have been employed with the Chicago Police Department ("CPD") since 2002.

Since in or about 2007 until now, I have worked in Unit 606, Central Investigations, in Auto

Theft.

2.      Leads 2000 is a database for law enforcement personnel that is run by the Illinois

State Police. Officers use Leads 2000 for tasks such as running license plates or drivers'

licenses. Since in or about 2008, I have been a Leads 2000 Delegate. As a Leads 2000 Delegate,

I have certain Leads 2000 administrative privileges that allow me to assist any officer in the City

with setting up accounts, changing passwords and trouble-shooting system issues. Issues which I

cannot resolve, I refer to CPD Leads Administration.

3.      I am familiar with Shannon Spalding ("Spalding") and Daniel Echeverria

("Echeverria"). At some point after they were assigned to Unit 606, I recall assisting them with

Leads 2000.

4.      Accurint is investigative technology that provides access to a comprehensive

database of public records. I have never been an administrator of Accurint, nor have I ever had

any administrative privileges to set up Accurint accounts for any officers. I also have never had my own Accurint account.

5.    At no point did Robert Cesario ("Cesario") or anyone else at CPD instruct me not to give either Spalding or Echeverria access to Leads 2000 or Accurint. If anyone had made such a statement to me, I would have questioned it.

6.    I am familiar with Jan Hanna ("Hanna"). At no point did I tell Hanna that Cesario or anyone else at CPD had instructed me not to give Spalding or Echeverria access to Leads 2000 or Accurint.

Kevin Culhane

Executed on March 25, 2016