UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SHANNON SPALDING and DANIEL ECHEVERRIA, | ) | |
| | ) | |
| Plaintiffs, | ) | 12 C 8777 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| CITY OF CHICAGO, JUAN RIVERA, JAMES | ) | |
| O'GRADY, NICHOLAS ROTI, JOSEPH SALEMME, | ) | |
| THOMAS MILLS, MAURICE BARNES, and ROBERT | ) | |
| CESARIO, | ) | |
| | ) | |
| Defendants. | ) | |

**M‌EMORANDUM O‌PINION AND O‌RDER**

Shannon Spalding and Daniel Echeverria, both officers with the Chicago Police

Department ("CPD"), brought this suit under 42 U.S.C. § 1983 and Illinois law against the City

of Chicago and several CPD officers, of whom Juan Rivera, James O'Grady, Nicholas Roti,

Joseph Salemme, Thomas Mills, Maurice Barnes, and Robert Cesario remain as defendants.

Rivera was Chief of the CPD Internal Affairs Division ("IAD"); O'Grady was Commander of

the CPD Narcotics Division; Roti was Commander of the Narcotics Division (prior to O'Grady)

and Deputy Chief of Organized Crime, the bureau that includes the Narcotics Division; Salemme

was Commander of the CPD Fugitive Apprehension Division ("FAU"); Mills was supervisor of

the FAU's Third Watch team; Barnes was an FAU sergeant; and Cesario was an FAU lieutenant.

The amended complaint alleges that Defendants violated the First Amendment and the

Illinois Whistleblower Act ("IWA"), 740 ILCS § 174/15, by conspiring to retaliate and actually

retaliating against Plaintiffs for reporting criminal misconduct by other CPD officers to the

Federal Bureau of Investigation ("FBI") and the IAD, and also for bringing and speaking to the

media about this lawsuit. Doc. 44. Earlier in the litigation, Defendants moved to dismiss the suit

1

under Federal Rule of Civil Procedure 12(b)(6), Docs. 57, 59-60, and the court denied the motion. Docs. 80-81 (reported at 24 F. Supp. 3d 765 (N.D. Ill. 2014)). Discovery has closed and a jury trial is set for May 31, 2016. Doc. 136.

Defendants have moved for summary judgment on all claims. Doc. 164. Briefing concluded on March 25, 2016, and argument was held on March 30, 2016. The motion is: (1) denied on the First Amendment retaliation claim; (2) denied on the *Monell* claim against the City; (3) granted on the § 1983 conspiracy claim, except for the alleged conspiracies (a) among O'Grady, Roti, and Rivera, and (b) among Barnes, Cesario, and Salemme; and (4) granted on the IWA claim as to Roti and Rivera, but not as to the other defendants.

## Background

### A. Evidentiary Issues

Before setting forth the factual background, the court resolves evidentiary issues raised by the parties.

#### 1. Defendants' Hearsay Objections

In their response to Plaintiffs' Local Rule 56.1(b)(3)(C) statement of additional facts, Defendants challenge several of Plaintiffs' factual assertions as resting on inadmissible "hearsay within hearsay." Doc. 176 at ¶¶ 20, 24, 26, 34, 38, 55, 69.

In ¶ 24 of their Local Rule 56.1(b)(3)(C) statement, Plaintiffs rely on Spalding's deposition testimony to assert that Sergeant James Padar told Plaintiffs and Officer Anthony Hernandez, Spalding's boyfriend, that O'Grady (who, as noted, was Commander of the Narcotics Division) had called Plaintiffs "IAD rats" and had prohibited Padar from working with them or from sending them backup in an emergency. *Id.* at ¶ 24 (citing Doc. 173-1 at 25).

Defendants contend that O'Grady's statements to Padar and Padar's statements to Spalding (relaying O'Grady's statements) are inadmissible hearsay.

"Under Rule 805, both levels of hearsay must come within exceptions to the hearsay rule for hearsay within hearsay to be admissible." *United States v. Severson*, 49 F.3d 268, 271 (7th Cir. 1995); *see* Fed. R. Evid. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule."). Thus, as to ¶ 24, both the "inner layer"—O'Grady's statements to Padar—and "outer layer"—Padar's statements to Spalding—must fall within a hearsay exception or exclusion for Spalding's testimony to be admissible. *Halloway v. Milwaukee Cnty.*, 180 F.3d 820, 824-25 & n.4 (7th Cir. 1999).

Because O'Grady is a defendant, his statements to Padar are admissible as opposing party statements under Rule 801(d)(2)(A), which provides that a "statement [that] is offered against an opposing party and … was made by the party in an individual or representative capacity" is not hearsay. Fed. R. Evid, 801(d)(2)(A); *see Halloway*, 180 F.3d at 825 n.4. In addition, O'Grady's statements are not hearsay because they are offered not "to prove the truth of the matter asserted," Fed. R. Evid. 801(c)(2)—that Plaintiffs are "rats"—but rather "to show what [O'Grady] himself" believed about Plaintiffs, *United States v. Smith*, 816 F.3d 479, 482 (7th Cir. 2016). "Statements that constitute verbal acts (e.g., … slander) are not hearsay because they are not offered for their truth." *Schindler v. Seiler*, 474 F.3d 1008, 1010 (7th Cir. 2007); *see also Carter v. Douma*, 796 F.3d 726, 735 (7th Cir. 2015) (holding that an officer's verbal instruction to an informant was not hearsay because "[s]uch verbal acts are not statements offered to prove the truth of their contents"). For both of these reasons, O'Grady's statements to Padar are not barred by the hearsay rule.

Padar's statements, meanwhile, came in the context of his conveying to Plaintiffs and Hernandez that O'Grady had denied their request for funds to develop a confidential informant for a narcotics investigation. Doc. 176 at ¶¶ 22-24. Because (as detailed below) Plaintiffs were required to convey such requests to O'Grady after obtaining approval from Padar, and because Padar had presented Plaintiffs' request to O'Grady, Padar's statement falls under Rule 801(d)(2)(D)'s exclusion from the hearsay rule of statements "offered against an opposing party" and "made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D); *see Bordelon v. Bd. of Educ. of Chi.*, 811 F.3d 984, 992 (7th Cir. 2016). Although "[n]ot everything that relates to one's job falls within the scope of one's agency or employment," Padar acted as O'Grady's agent, and his duties clearly "related to the decisionmaking process affecting" Plaintiffs' request for funds to develop a confidential informant. *Bordelon*, 811 F.3d at 992 (internal quotation marks omitted).

The court thus accepts as true ¶ 24 of Plaintiffs' Local Rule 56.1(b)(3)(C) statement. Although Defendants offer factual denials of ¶ 24, the parties' genuine factual dispute must be resolved in Plaintiffs' favor on summary judgment. *See Woods v. City of Berwyn*, 803 F.3d 865, 867 (7th Cir. 2015). The same holds for Defendants' factual challenges to the Local Rule 56.1(b)(3)(C) assertions discussed below, at least to the extent those assertions do not rest on inadmissible hearsay.

Plaintiffs' ¶ 20 asserts: "On an unknown date to Plaintiffs, information that Plaintiffs had reported criminal misconduct by a sworn officer and were working with an outside investigation was leaked within the department and became known to Defendant Commander O'Grady. (Spalding Dep. pp. 85-89)." Doc. 176 at ¶ 20. As with ¶ 24, Plaintiffs support this assertion by citing to Spalding's testimony that Padar had told her that O'Grady had called Plaintiffs "IAD

rats." Doc. 173-1 at 24-25.  For the reasons discussed above with regard as to ¶ 24, the hearsay rule does not bar this evidence.

Plaintiffs' ¶ 26 asserts: "Rivera responded [to Spalding] stating 'That might be my fault; I might have f……ed up.'  Rivera then told Spalding that he had informed Chief Ernie Brown (the current Chief of Organized Crime) about [Plaintiffs'] role in the investigation and [Brown] had told Deputy Chief Nick Roti and Commander O'Grady and his command staff.  (Spalding Dep. pp. 98-100)."  *Id.* at ¶ 26.  (As noted, Rivera was Chief of IAD.)  Because Rivera is a party opponent, his statement to Spalding that he told Brown about Plaintiffs' role in the investigation is not hearsay under Rule 801(d)(2)(A).  *See Halloway*, 180 F.3d at 825 n.4.  And although *Brown*'s statements to Roti and O'Grady may be inadmissible hearsay, Plaintiffs do not rely on them: they rely only on Rivera's statements about what Brown did (telling Roti and O'Grady about Plaintiffs' role in the investigation), and not on Rivera's statements about what Brown told Rivera about what Brown had told others.  Accordingly, ¶ 26 is deemed true.

Plaintiffs' ¶ 34 asserts: "Juan Rivera told Plaintiffs that he was present at the meeting where it was decided that Plaintiffs would be reassigned from Unit 543.  Also present were Nick Roti, James O'Grady, Beatrice Cuello, and others.  (Spalding Dep., p. 109.)  At that meeting, O'Grady said that 'I'm not taking those F-ing IAD rats back; and furthermore, God help them if they need help on the street … it's not going to come.'  (Spalding Dep., p. 111)."  Doc. 176 at ¶ 34.  Because Rivera and O'Grady are both party opponents, O'Grady's statement to Rivera and Rivera's statement to Spalding are non-hearsay under Rule 801(d)(2)(A).  *See Halloway*, 180 F.3d at 825 n.4.

Plaintiffs' ¶ 38 asserts: "After [Plaintiffs] informed Peter Koconis that they had been removed from their detail of 543, Koconis had a telephone conversation with Deputy

Superintendent Beatrice Cuello inquiring why [Plaintiffs] would be removed from their assignments. During this conversation, Cuello told Koconis that both [Plaintiffs] were good officers and Cuello never had experienced any problems with them. However, she said that during a meeting where she was present, which included Deputy Chief James Jackson, Commander James O'Grady, and Chief Nicholas Roti, that James O'Grady and Nicholas Roti refused to allow either officer to return to their units of assignments within [Unit] '189,' due to the fact that [Plaintiffs] were 'IAD rats.' (Koconis Dep., pp. 42, 95, 96)." Doc. 176 at ¶ 38. This paragraph is supported by Koconis's deposition; because he was on the call with Cuello but not in the meeting that she discussed, he has the knowledge to testify as to what Cuello said on the call but not as to what Roti and O'Grady said at the meeting. Doc. 173-9 at 42, 92-96.

O'Grady and Roti are party opponents, so their statements to Cuello are non-hearsay under Rule 801(d)(2)(A). *See Halloway*, 180 F.3d at 825 n.4. Cuello, however, is not a party opponent. Also, there is no indication that, during her conversation with Koconis, Cuello was acting as O'Grady's or Roti's "agent or employee," as she worked in a different CPD department and was only "present" for the meeting in which Plaintiffs' removal from their assignments was discussed. *See Bordelon*, 811 F.3d at 992. It follows, at least on the current record, that Cuello's statement to Koconis, the "outer layer" of the hearsay within hearsay, is inadmissible, and so O'Grady's and Roti's statements (which Cuello related to Koconis) are as well. *See Halloway*, 180 F.3d at 824-25 (excluding "hearsay within hearsay" where the "outer layer," but not the "inner layer," was barred by the hearsay rule); *Swearnigen-El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 864 (7th Cir. 2010). If Plaintiffs wish to introduce this evidence at trial, they will be given the chance to establish the required predicates.

Plaintiffs' ¶ 55 asserts: "Detective Kevin Culhane told Jan[et] Hanna that he had been told directly by Lt. Cesario not to give Plaintiffs access to both Accurint and Leads 2000 data bases. (Hanna Dep., p. 88)." Doc. 176 at ¶ 55. This paragraph is supported by Hanna's deposition, and she has the knowledge to testify as to what Culhane told her. *See* Doc. 173-11 at 22-23. But Culhane is not a party opponent, and there is no indication that Culhane was acting as Cesario's agent or employee when Culhane reported Cesario's statement to Hanna. *See Bordelon*, 811 F.3d at 992. (As noted, Cesario was a lieutenant in FAU.) Because Culhane's statement to Hanna is offered for the truth of the matter asserted—that Cesario told Culhane not to give Plaintiffs access to certain databases—¶ 55 rests on inadmissible hearsay and is disregarded. *See Halloway*, 180 F.3d at 825 n.4. Again, if Plaintiffs wish to introduce this evidence at trial, they will be given the chance to establish the required predicates.

Defendants challenge only one sentence of Plaintiffs' ¶ 56: "[At a meeting with Plaintiffs, Cesario] said, 'you want to go against officers, you want to do this type of activity, you are going to be put on the night team way up north … you will no longer work days, you will no longer have a take home car and if I can help it you will never be deputized.[']  (Spalding Dep., p. 248)." Doc. 176 at ¶ 56. Because Cesario is a party opponent, his statement to Spalding is non-hearsay under Rule 801(d)(2)(A). *See Halloway*, 180 F.3d at 825 n.4. In addition, Cesario's statement is not offered for the truth of the matter asserted, but rather is a verbal act offered to show his hostility towards about Plaintiffs. *See Smith*, 816 F.3d at 482; *Carter*, 796 F.3d at 735. For either of these reasons, it is not barred by the hearsay rule. *Schindler*, 474 F.3d at 1010.

Paragraph 69 asserts: "Officer Jan Hanna was in the room when a telephone conversation came in for Lt. Cesario from Commander O'Grady. She heard Cesario say 'hello Commander O'Grady.' (Hanna Dep., p. 86.) She did not hear the conversation. As soon as Cesario hung up

the telephone, Lt. Cesario told Hanna 'that was Commander O'Grady and he just informed me that [Spalding] is no longer allowed, like I said, she's no longer permitted, she's banned from Homan Square and if she goes there, she will be arrested. (Hanna Dep., p. 86.)." Doc. 176 at ¶ 69. As Cesario and O'Grady are both party opponents, O'Grady's statement to Cesario and Cesario's statement to Hanna are non-hearsay.

### 2. Other Objections

Defendants contend that ¶¶ 68, 77, and 80 of Plaintiffs' Local Rule 56.1(b)(3)(C) statement improperly combine "numerous statements in one paragraph." Doc. 176 at ¶¶ 68, 77, 80. Defendants contend that this violates Local Rule 56.1(b)(3)(C), which states in relevant part that a party opposing summary judgment may submit "a statement, consisting of *short* numbered paragraphs, of any additional facts." N.D. Ill. L.R. 56.1(b)(3)(C) (emphasis added).

The Seventh Circuit "has consistently upheld district judges' discretion to require strict compliance with Local Rule 56.1." *Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015) (citing cases); *see also Stevo v. Frasor*, 662 F.3d 880, 886-87 (7th Cir. 2011) ("Because of the high volume of summary judgment motions and the benefits of clear presentation of relevant evidence and law, we have repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings."). Although each of the challenged paragraphs contains several facts that, standing alone, could have supported a single paragraph, the paragraphs do not frustrate the "purpose of Rule 56.1," which "is to have the litigants present to the district court a clear, concise list of material facts that are central to the summary judgment determination." *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015). While perhaps not as lean as they could have been, ¶¶ 68, 77, and 80 are sufficiently "clear" and "concise" to pass muster.

Defendants also argue that ¶¶ 77 and 80 of Plaintiffs' Local Rule 56(1)(b)(3)(C) statement "state[] legal conclusions and opinions rather than facts," and that ¶ 80(d) is not supported with a record citation. Doc. 176 at ¶¶ 77, 80. But ¶¶ 77 and 80 (other than part (d)) cite to record evidence for their factual assertions and do not state legal conclusions. For ¶ 77, Defendants appear to object to the assertion that Spalding's post-traumatic stress disorder was caused by Defendants' alleged misconduct; this objection is overruled because ¶ 77 states only that this is the opinion of Spalding's treating psychiatrist, treating therapist, and the Chicago Police Pension Board's evaluating psychologist. Similarly, for ¶ 80, Defendants appear to object to Plaintiffs' expert Lou Reiter's opinion about what policies the City does or does not maintain; this objection is overruled because ¶ 80 cites Reiter's conclusions not as indisputable facts but instead, accurately, as his opinions. Defendants are, however, correct that ¶ 80(d) fails to cite to any record evidence, and so it is disregarded.

Finally, Plaintiffs object to a few paragraphs of Defendants' Local Rule 56.1(a)(3) statement on relevance grounds. Doc. 172 at ¶¶ 25, 32, 34, and 42. If the paragraphs are irrelevant, the court will not rely on them. In addition, Plaintiffs object on hearsay grounds to Defendants' ¶ 42, which quotes a personnel assessment completed by Spalding's former supervisor. Paragraph 42 is not material to the court's summary judgment analysis, and so Plaintiffs' objection is denied as moot.

## B. Factual Background

With these evidentiary matters resolved, the court sets forth the follow facts as favorably to Plaintiffs, the non-movants, as the record and Local Rule 56.1 allow. *See Woods*, 803 F.3d at 867. In considering Defendants' summary judgment motion, the court must assume the truth of those facts, but does not vouch for them. *See Arroyo v. Volvo Grp. N. Am.*, 805 F.3d 278, 281

(7th Cir. 2015). The court's recitation of these facts should not be taken as indicating the court's belief that Plaintiffs' evidence is true and, by the same token, that disclaimer should not be taken as indicating the court's belief that Plaintiffs' evidence is false. The court does not know at this point whether Plaintiffs' evidence—which purports to show extraordinarily serious retaliatory misconduct by officers at nearly all levels of the CPD hierarchy—is entirely true, partly true and partly false, or entirely false.

Spalding and Echeverria began their careers as CPD officers in 1996 and 1999, respectively. Doc. 172 at ¶¶ 1-2. In approximately 1997, while Spalding was assigned to the CPD's Public Housing South unit, FBI Special Agent Ken Samuels contacted her and asked if she knew of any illegal activity by certain CPD officers, including Sergeant Ronald Watts. *Id*. at ¶ 8. Spalding believed that the focus of Samuels's investigation was not Watts but instead Officer Joe Seinitz. *Id*. at ¶ 9. Spalding told Samuels that she was unaware of any illegal activity by Watts or the other officers. *Id*. at ¶ 8.

About a decade later, in May 2006, Spalding and Echeverria were assigned to the CPD's Narcotics Division. *Id*. at ¶ 7; Doc. 176 at ¶ 1. In 2007, a suspect informed Echeverria that Watts was stealing and both doing and dealing drugs in the Ida B. Wells housing projects. Doc. 172 at ¶ 10; Doc. 176 at ¶¶ 4-6. Echeverria passed along this information to his supervisor, CPD Sergeant Roderick Watson. Doc. 172 at ¶ 11; Doc. 176 at ¶¶ 6-7. Echeverria thought Watson might initiate a confidential investigation, but Watson instead told Echeverria that the report of the suspect's debriefing should be marked as "a negative," meaning that it had gathered no intelligence. Doc. 172 at ¶ 11; Doc. 173-1 at 11; Doc. 176 at ¶ 7.

Before the end of 2007, Spalding and Echeverria, lacking confidence that the CPD would fairly investigate Watts's alleged activity, reported that activity to FBI Special Agent Patrick

Smith.  Doc. 172 at ¶ 12; Doc. 176 at ¶ 8.  Spalding asked Smith to put her in touch with Samuels, the FBI agent who contacted her in 1997.  Doc. 172 at ¶ 13.  Smith, with whom Plaintiffs continued to meet intermittently through August 2008, told Plaintiffs that he was already aware of an FBI investigation into Watts.  *Id*. at ¶ 14.  Plaintiffs met with Smith only while they were off-duty.  Doc. 176 at ¶ 9.

After FBI agents asked Plaintiffs to spend more time assisting the Watts investigation, Echeverria told Smith that because his and Spalding's additional involvement would necessarily encroach on their CPD working hours, Echeverria planned to speak with Tina Skahill, who was at the time Chief of the CPD's IAD.  Doc. 172 at ¶ 21; Doc. 176 at ¶¶ 10-11.  Unbeknownst to Plaintiffs, upon becoming IAD Chief in March 2008, Skahill was briefed on an ongoing CPD investigation into Watts and was told that Plaintiffs were working with IAD and the FBI on the investigation.  Doc. 172 at ¶ 15.  That was partially inaccurate, as Plaintiffs at the time were working only with the FBI, not with IAD.  *Ibid*.  In June 2008, Skahill asked Roti, then Commander of Narcotics, for permission for Plaintiffs to work with the FBI on an as-needed or part-time basis on a corruption case.  *Id*. at ¶ 16.  Roti granted the authorization, but Plaintiffs were not informed that he had done so.  *Ibid*.

Echeverria set up a meeting with Skahill in August 2008.  Doc. 176 at ¶ 12.  At the meeting, also attended by Spalding, Smith, and some IAD personnel, Echeverria told Skahill how Plaintiffs had obtained their information and to whom they had reported it, and he added that Plaintiffs had decided on their own to inform the FBI.  Doc. 172 at ¶ 20; Doc. 176 at ¶ 13.  Although Samuels had mentioned Watts's name in the 1997 call, Plaintiffs learned for the first time at the Skahill meeting that the FBI and CPD had been investigating Watts, along with an Officer Mohammed, for over a decade.  Doc. 172 at ¶ 24; Doc. 176 at ¶ 17.

At the meeting, Skahill stated that she had decided to detail Plaintiffs to Unit 543 ("Detached Services") so that "nobody [in the CPD] would be exactly sure what [they] were doing" and so that they could report directly to FBI headquarters in their official capacity as police officers without compromising the federal investigation—dubbed "Operation Brass Tax"—or risking that somebody would connect them to the investigation. Doc. 172 at ¶ 22; Doc. 176 at ¶¶ 14-15, 18. Other than the CPD personnel in the meeting with Skahill, only then-CPD Superintendent Jody Weis, Deputy Superintendent Peter Brust, Deputy Superintendent Debra Kirby, and Liz Glatz, the Commander of Unit 543, were to know of Plaintiffs' involvement in the federal investigation. Doc. 176 at ¶ 16. When Rivera succeeded Skahill as IAD Chief, Skahill told Rivera that Plaintiffs were involved in an investigation of Watts and Mohammed. Doc. 172 at ¶ 35.

During Plaintiffs' work on Operation Brass Tax, CPD command staff encouraged them to develop other narcotics-related cases that overlapped with their work on the federal investigation. Doc. 176 at ¶ 19. In developing those other cases, Plaintiffs were instructed to direct requests for payment for confidential informants through a sergeant in the Narcotics Division; the sergeant would then send the request to O'Grady, who had succeeded Roti as Commander of the Narcotics Division, for his approval. Doc. 172 at ¶ 26; Doc. 176 at ¶ 19. When O'Grady replaced Roti, Roti told him that Plaintiffs were on loan to IAD for work on a police corruption case, although Roti did not reveal which officers were under investigation. Doc. 172 at ¶ 26; Doc. 176 at ¶¶ 21, 31. O'Grady also became aware that Plaintiffs were working with the FBI on a special investigation into a police corruption case involving public housing and that Plaintiffs had reported criminal misconduct by a police officer to an outside law enforcement agency. *Id*. at ¶¶ 20, 31. O'Grady earlier in his career worked in IAD, during

which time he personally arrested other CPD officers. Doc. 172 at ¶ 32. Likewise, Roti earlier in his career was involved in the arrest of CPD officers charged with a federal narcotics conspiracy. *Id*. at ¶ 34.

On August 17, 2010, Sergeant Padar presented O'Grady with a request from Plaintiffs for funds for a confidential informant on a narcotics case not involving Watts. *Id*. at ¶¶ 28-29; Doc. 176 at ¶¶ 22-23. Because Plaintiffs were not then working in the Narcotics Division, O'Grady knew little about their narcotics investigation. Doc. 172 at ¶ 29. Padar told Plaintiffs and Hernandez that O'Grady said that he would not "approve this [request from] these two IAD rats Spalding and Echeverria." Doc. 176 at ¶ 24. O'Grady also said that Padar was not to work with Plaintiffs, that O'Grady did not want Plaintiffs in the Narcotics squad's building, and that if Plaintiffs ever called for emergency backup, Padar and other members of the Narcotics Division were not to respond. *Ibid*.

When Spalding confronted Rivera about O'Grady's response, Rivera said that O'Grady's knowledge of Plaintiffs' involvement with Operation Brass Tax might be his (Rivera's) fault, as he had relayed Plaintiffs' involvement to Ernie Brown, then the Chief of Organized Crime, the bureau that includes the Narcotics Division. *Id*. at ¶ 26. Spalding told Rivera that O'Grady was informing Narcotics personnel that Plaintiffs were "snitches" and "rats," but Rivera declined to investigate because, in his view, those were merely "unsubstantiated rumors" that Hernandez, who had not personally witnessed O'Grady using this language, had conveyed to Spalding. Doc. 172 at ¶¶ 98-99; Doc. 173-7 at 14; Doc. 176 at ¶¶ 27-28.

In April or May 2011, CPD Superintendent Terry Hilliard and Deputy Superintendent of Detached Services Beatrice Cuello began considering transferring Plaintiffs from Detached Services to another unit. Doc. 176 at ¶ 29. Rivera informally asked Roti about returning

Plaintiffs to the Narcotics Division. Doc. 172 at ¶ 43; Doc. 176 at ¶ 33. After consulting with

O'Grady, Roti told Rivera that he was not interested in taking Plaintiffs back into Narcotics.

Doc. 172 at ¶ 43; Doc. 176 at ¶ 39. At a meeting attended by Roti, Cuello, Rivera, and others,

O'Grady vociferously rejected the idea of Plaintiffs' returning to Narcotics, referred to them as

"IAD rats," and indicated once more that they would not receive help on the street. *Id*. at ¶¶ 34-

35. O'Grady also noted that Spalding had a poor reputation from her previous stint in Narcotics,

including from an incident where she engaged an on-duty officer to help her intimidate an

individual into returning a dog that she had given that individual. Doc. 172 at ¶ 44. Plaintiffs

did not request a return to Narcotics, and they were instead detailed to the police academy and

then, at Skahill's direction, to the Inspections Division, which deals with auditing. Doc. 172 at ¶

41; Doc. 176 at ¶¶ 40-41.

After a brief period of inactivity, Plaintiffs in October 2011 once again began to work

periodically on Operation Brass Tax. *Id*. at ¶ 42. On February 13, 2012, the FBI publicly

announced the arrests of Watts and Mohammed. *Id*. at ¶ 43. On March 18, 2012, Plaintiffs were

reassigned to FAU, to which they had applied prior to the arrest. Doc. 172 at ¶ 49; Doc. 176 at ¶

43. Rivera and Skahill wrote recommendation letters to support their applications, and Plaintiffs

do not claim that the move to FAU was retaliatory. Doc. 172 at ¶¶ 49-50. Prior to Plaintiffs'

arrival at FAU, Salemme—the FAU commander—heard that at least one of the Plaintiffs was

"IAD." Doc. 176 at ¶ 44. Salemme also knew prior to the filing of this suit in November 2012

that Plaintiffs were involved in the Watts investigation. *Ibid*.

Cesario—an FAU lieutenant—told Officer Jan Hanna the day before Plaintiffs' arrival

that Plaintiffs were "IAD rats"; when Plaintiffs arrived the next day, Hanna asked: "So you two

are the IAD rats?" *Id*. at ¶¶ 45-46. Cesario handpicked Plaintiffs' assignments, ordered Hanna

to give Plaintiffs only "dead-end cases that would not lead to arrests or officer activity," and instructed Hanna to copy him on all emails giving Plaintiffs assignments. Doc. 173-11 at 13-14; Doc. 176 at ¶¶ 47-49. Cesario also directed Hanna to ignore Plaintiffs' requests for overtime; although Hanna testified that Plaintiffs did no overtime work at FAU, Spalding does not claim that she ever requested such overtime, and Echeverria is unaware of any circumstances where Plaintiffs' fellow non-task force officers had opportunities to do overtime work and Plaintiffs did not. *Id*. at ¶ 51. Hanna also testified that she heard Cesario instruct his officers not to work with or provide backup for Plaintiffs and to inform their team members that they should do the same. *Id*. at ¶ 52. Plaintiffs' sergeant removed them from a homicide case after Hanna inadvertently assigned them to it. *Id*. at ¶ 50.

Barnes was Plaintiffs' immediate supervisor when they began at FAU. Doc. 172 at ¶ 53. Before Plaintiffs' arrival, Barnes told a member of the squad that two officers "from IAD" were joining the team. Doc. 176 at ¶ 58. Spalding told Barnes that she had been told that the rest of the squad had been instructed not to work with Plaintiffs. *Id*. at ¶ 59. Barnes said that "[t]he team doesn't like" Plaintiffs, was "not going to back [them] up," and doesn't "trust" them. *Ibid*. Barnes added:

> I know that, you know, you worked for IAD, you brought a sergeant down. …
> You like to bring sergeants down, huh? You like to have sergeants arrested?
> … To be honest with you, I'd hate to one of these days have to be the one to
> knock on your door and tell your daughter you're coming home in a box.
> That's how serious it is.

*Id*. at ¶¶ 60-61. Barnes testified that he was unaware of any complaints about Plaintiffs while they worked for his team and that he believed they were good officers. *Id*. at ¶¶ 63-64.

In June 2012, Plaintiffs attended a meeting with Cesario, Salemme, and Barnes, at which they were removed from Barnes's team and placed on Third Watch, a later shift. Doc. 172 at ¶¶ 62-65; Doc. 176 at ¶ 62. As reasons for the move, Cesario (who made the decision) and

Salemme cited: (1) a confrontation that Barnes had with Hernandez, who was upset by rumors that Spalding might be transferred from FAU; and (2) Plaintiffs' alleged poor performance, including their low arrest activity from March 22, 2012 to June 21, 2012. Doc. 172 at ¶¶ 64-66. Salemme also told Plaintiffs that they "should have known better" and that if they went "against other sworn personnel, [they] should have known this shit was going to happen to" them. Doc. 176 at ¶ 65. Cesario and Salemme questioned Plaintiffs about their work with IAD. *Id*. at ¶ 57.

At the time of Plaintiffs' transfer from Barnes's team, the FAU's Third Watch was a new unit that required staffing. Doc. 172 at ¶ 71. The supervisor of Plaintiffs' Third Watch team was Mills, who was not working at FAU when Plaintiffs were on Barnes's team and who had worked at IAD earlier in his CPD career. *Id*. at ¶¶ 72-73. In one of his first conversations with Plaintiffs, Mills told them that they would have a fresh start with him. *Id*. at ¶ 74. Mills did not speak with Cesario about the types of cases that Plaintiffs were assigned, did not speak to O'Grady about Plaintiffs, and had no control over how assignments were dispensed to his team. *Id*. at ¶¶ 76, 78-79.

In July 2012, O'Grady told Hernandez that Spalding was banned from the CPD's facility in Homan Square due to "all the trouble she's caused" and because "she can't be trusted as she's an IAD rat." Doc. 176 at ¶ 66. (Plaintiffs' Local Rule 56.1(b)(3)(C) statement places this event in July 2011, but that appears to be a typographical error given that Plaintiffs did not begin working with Cesario and Salemme until March 2012, and also given that this episode appears chronologically in the Local Rule 56.1(b)(3)(C) statement with events from 2012.) Salemme testified that O'Grady told him that Spalding should not go to Homan Square unless she had a specific police purpose. Doc. 172 at ¶ 80; Doc. 176 at ¶ 67. O'Grady had never seen Spalding in Homan Square and had never spoken to Spalding about Homan Square before issuing this

directive, but someone (O'Grady does not recall whom) had told him that he or she had seen Spalding talking to Hernandez at Homan Square and that Hernandez had left his post to talk to Spalding. *Id*. at ¶ 68. Hanna testified that she was in the room when Cesario received a phone call, said "hello, Commander O'Grady," and then, after the call was over, told Hanna that O'Grady had just told him that Spalding was banned from Homan Square. *Id*. at ¶ 69. Mills told Spalding that O'Grady hated her so much that he (O'Grady) might shoot her, and advised Spalding to wear her bulletproof vest. *Id*. at ¶ 74.

When Plaintiffs filed this suit in November 2012, Mills instructed the officers under his command to watch Plaintiffs' news conference. *Id*. at ¶ 70. Mills then told Spalding that his team members no longer wanted to work with Plaintiffs because "[f]or all" the team knew, Plaintiffs "could still be working IAD investigating" the team. *Id*. at ¶¶ 70, 73. Mills also said that he didn't "know how [Plaintiffs were] going to have a career when this [suit] is over." *Id*. at ¶ 73. After Plaintiffs filed suit, Mills's behavior toward Plaintiffs changed. *Id*. at ¶ 71. He ordered Plaintiffs to spend their entire tours of duty on the street and began to switch their hours. *Ibid*. On one occasion, Mills told Plaintiffs that two fellow officers would be available for backup in connection with a specific arrest, but when the arrest was set to take place, the promised officers were not available. *Id*. at ¶ 72.

In late March or early April 2013, Mills, prompted by another officer's report, filed an internal CPD complaint accusing Spalding of secretly recording a conversation with him. Doc. 172 at ¶¶ 77-78; Doc. 176 at ¶ 75. When interviewed by the investigating officers, Mills said that he did not see any evidence of Spalding recording the conversation. Doc. 172 at ¶ 78. Spalding was taken into custody and told that she could lose her job as a result of the charges.

Doc. 176 at ¶ 76.  One of the CPD officers who took Spalding into custody told her that the charges against her could "go away" if she dropped this lawsuit.  *Ibid*.

Shortly after that incident, Spalding became unable to continue active employment with the CPD as a result of her emotional distress, and she has since been diagnosed with Post-Traumatic Stress Disorder or Adjustment Disorder.  *Id*. at ¶ 77.  Echeverria experienced emotional distress that required him to take a medical leave from May 14, 2013 through December 10, 2013.  *Id*. at ¶ 78.  At an unspecified date, Plaintiffs requested to be and were moved back to a daytime shift at FAU, although Spalding has not reported for duty since the transfer.  Doc. 172 at ¶¶ 81-82.

During the events detailed above, Plaintiffs' salary and employment benefits were not diminished.  *Id*. at ¶¶ 101, 103.  Spalding is not sure if she received salary increases during this time, and Echeverria's step salary increases were not impeded.  *Id*. at ¶¶ 101, 103.  Spalding believes that she lost some overtime opportunities after she was transferred from Narcotics, but she "can't guess" how much, and she does not claim to have ever submitted an overtime request while at FAU.  *Id*. at ¶ 102.  Echeverria similarly believes that some of his overtime opportunities were impeded, but he admits that he "can't put a dollar number on it because overtime is always a variable."  *Id*. at ¶ 104.

Although Rule 1 of the Chicago Police Board's Rules of Conduct prohibits "[v]iolation of any law or ordinance," *id*. at ¶ 105, Hanna testified that instructors at the CPD police academy repeatedly tell officers:

> [W]e do not break the code of silence.  Blue is Blue.  You stick together.  If something occurs on the street that you don't think is proper, you go with the flow.  And after that situation, if you have an issue with that officer or what happened, you can confront them.  If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner.  But you never break the code of silence.

Doc. 176 at ¶ 79.  Plaintiffs' police procedural expert, Lou Reiter, opined that the City maintains the following de facto policies and practices: maintaining a police code of silence, whereby police officers do not report the misconduct of other police officers; consciously failing to acknowledge or make any efforts to address the code of silence; and failing to discipline officers who engage in misconduct.  Doc. 172 at ¶ 110; Doc. 176 at ¶ 80.  Echeverria believes that Plaintiffs' breaking the code through their work at IAD and their reports to the FBI motivated the alleged retaliation against them.  Doc. 172 at ¶ 107.  Echeverria testified that other CPD officers allegedly subject to retaliation for breaking the code include Hernandez and an Officer Finnigan; Spalding offered Officer Michael Spaargaren and a few other officers whose names she did not know as other examples; and Reiter reported knowledge of another case involving Officer Michael Spaargaren.  *Id*. at ¶¶ 108-109, 111.  Reiter does not know the percentage of officers reporting misconduct by other officers who suffer some level of retaliation.  *Id*. at ¶ 112.

## Discussion

Plaintiffs allege First Amendment retaliation based on their pre-suit speech (reporting criminal misconduct by other CPD officers to the FBI and assisting the FBI investigation prior to their IAD assignment) and their suit-related speech (filing, and speaking with the media about, this suit).  The conspiracy claim appears to pertain solely to the pre-suit speech.  Doc. 171 at 18 (where Plaintiffs argue, to support that claim, that they "can present evidence of a pattern of retaliatory harassment by several officers over a period of months … all tied to Plaintiffs' protected activities that resulted in the conviction of two corrupt police officers," which occurred prior to their filing this suit).  Plaintiffs also assert that Defendants' retaliatory conduct, both before and after their assignment to IAD, violated the IWA.

## I.      First Amendment Retaliation Claim

### A.      Nature of Plaintiffs' Speech

"For a public employee's speech to be protected under the First Amendment, the employee must show that (1) he made the speech as a private citizen, (2) the speech addressed a matter of public concern, and (3) his interest in expressing that speech was not outweighed by the state's interests as an employer in promoting effective and efficient public service." *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013) (internal quotation marks omitted); *see also Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006) ("[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern."). But "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Kubiak v. City of Chicago*, 810 F.3d 476, 481 (7th Cir. 2016) (quoting *Garcetti*, 547 U.S. at 421). "Determining the official duties of a public employee requires a practical inquiry into what duties the employee is expected to perform, and is not limited to the formal job description." *Ibid.* (internal quotation marks omitted). "The determination of whether speech is constitutionally protected is a question of law." *Ibid.*

The parties agree that Plaintiffs' work for IAD is not protected by the First Amendment. Doc. 165 at 7-10; Doc. 171 at 11. They disagree, however, over whether Plaintiffs' reports to the FBI about Watts's illegal activity, and their pre-IAD work for the FBI, are constitutionally protected. Doc. 165 at 7-9; Doc. 171 at 8-11; Doc. 175 at 1-3.

The Seventh Circuit in *Kubiak* recently addressed the distinction between protected and unprotected employee speech in the police context. Kubiak worked as a beat patrol officer with

the CPD for fourteen years, and then was detailed to the Office of News Affairs ("ONA"), the CPD's public relations arm. In her new position, Kubiak served as a liaison to the news media, keeping it "apprised of police activity by providing information on topics such as crimes committed, arrests made, and providing information with regard to community safety alerts." 810 F.3d at 479. Kubiak alleged that she was verbally assaulted by another ONA officer who became enraged by a work-related report that Kubiak had drafted. Kubiak reported the incident to her supervisor, Stratton, and attempted to report it to her supervising lieutenant, Biggane, who repeatedly refused to discuss it. Kubiak then submitted a memorandum, which initiated an IAD investigation, and Kubiak provided a statement to the investigators. After the IAD complaint was "sustained," Biggane canceled Kubiak's ONA detail and reassigned her to a position as a beat officer on a midnight shift in a dangerous neighborhood. Kubiak filed suit against Stratton, Biggane, and the City of Chicago, alleging retaliation in violation of the First Amendment. *Id*. at 479-80.

The Seventh Circuit held that Kubiak's statements to Stratton and Biggane, and her cooperation with the IAD investigation, were unprotected employee speech. First, while assuming that Kubiak's official ONA duties "did not include reporting misconduct of her coworkers," the court held that the "concept of 'official duties' is overly narrow" and that "[g]enerally, an employee who is verbally assaulted by a colleague would be expected to report the inappropriate behavior to a supervisor." *Id*. at 481-82. Second, the court noted that Kubiak's speech "was intimately connected with her professional duties," as she "complained that her co-worker treated her inappropriately at work and yelled at her over a work-related report," and that she attempted to use official internal channels—her supervisor, her office's director, and IAD—

to report the misconduct. *Id*. at 482. Third, the court observed that Kubiak was primarily motivated by personal, not public, concern. *Id*. at 482-84.

*Kubiak* did not break new ground, but instead reaffirmed the settled principle that if a public employee reports official misconduct in the manner directed by official policy, to a supervisor, or to an external body with formal oversight responsibility, then the employee speaks pursuant to her official duties and her speech is unprotected by the First Amendment. *See Fairley v. Andrews*, 578 F.3d 518, 522 (7th Cir. 2009) (where Cook County Jail guards filed internal complaints in the manner required by General Orders); *Tamayo v. Blagojevich*, 526 F.3d 1074, 1091 (7th Cir. 2008) (where an Illinois Gaming Board employee reported agency misconduct to "a legislative committee responsible for overseeing the [Gaming Board's] activities"); *Vose v. Kliment*, 506 F.3d 565, 570-71 (7th Cir. 2007) (where a police sergeant reported misconduct to his supervisors); *Sigsworth v. City of Aurora*, 487 F.3d 506, 511 (7th Cir. 2007) (where a detective reported his colleagues' alleged misconduct to his supervisor, as required by established policy); *Spiegla v. Hull*, 481 F.3d 961, 965-67 (7th Cir. 2007) ("*Spiegla II*") (where a correctional officer reported other officers' violations of prison security rules to a supervisor, consistent with official policy). By contrast, if an employee testifies about misconduct to a jury or grand jury, or reports misconduct outside established channels or in violation of official policy, she speaks as a private citizen and her speech is constitutionally protected. *See Chrzanowski v. Bianchi*, 725 F.3d 734, 739-40 (7th Cir. 2013) (where a county prosecutor testified under a subpoena before a grand jury and at trial regarding alleged wrongdoing by his supervisors); *Chaklos v. Stevens*, 560 F.3d 705, 709-12 (7th Cir. 2009) (where an Illinois State Police ("ISP") employee protested an ISP contract award to an ISP procurement official, rather than to the individuals—the Attorney General of Illinois and the

chief procurement officer—required by the Illinois Procurement Code); *Houskins v. Sheahan*, 549 F.3d 480, 491 (7th Cir. 2008) (where a social worker employed at the county jail by a county sheriff reported to the city police that a county correctional officer hit her).

Under these precedents, all of which were issued before the retaliatory conduct alleged in this case, Plaintiffs' speech to the FBI—from their initial report to Smith in late 2007 until the August 17, 2008 meeting where the CPD formally assigned them to Operation Brass Tax—is protected by the First Amendment. Prompted by Watson's dismissal of Echeverria's debriefing of the suspect who reported Watts's activity, Plaintiffs reported Watts's misconduct to an outside law enforcement agency, on their own initiative, while off-duty and on their own time. These were not "the tasks [Plaintiffs were] paid to perform," *Garcetti*, 547 U.S. at 419, and police corruption is, as Defendants concede, Doc. 165 at 9, a matter of public concern. It follows that Plaintiffs' speech to the FBI before August 17, 2008—when, with their assignment to Detached Services, their reports to the FBI became part of their official CPD duties—is constitutionally protected.

Defendants' challenges to this conclusion fail to persuade. First, drawing on *Kubiak*'s statement that "Kubiak is a police officer, and as part of that job she is responsible for protecting the public from harm," 810 F.3d at 482, Defendants contend that Plaintiffs' reporting of Watts's activity "was what they were expected to do as Chicago police officers to protect the public from harm." Doc. 165 at 7; Doc. 175 at 2. But this removes the quoted statement from its context: the Seventh Circuit's point was that employees are generally expected to report other employees' inappropriate behavior to a supervisor, and that this "makes even more sense" in a police department. 810 F.3d at 482. *Kubiak* does not, however, stand for the proposition that a police officer's official duties include "protecting the public from harm" in every conceivable way,

regardless of the officer's job function.  If this were so, police whistleblowers could *never* speak as private citizens entitled to First Amendment protection, a result that *Garcetti* and its Seventh Circuit progeny clearly reject.  Further, this would run contrary to *Chaklos*, which held that the fact that state police employees have a "general duty" to report collusion among bidders for state contracts does "not by itself mean that all speech made by [the plaintiffs] regarding anticompetitive practices [were] necessarily made pursuant to their official job duties."  560 F.3d at 712.  Rather, what placed the state police employees' speech within the First Amendment's protections was that they "did not submit their concerns to the Attorney General or the chief procurement officer[,] as required by the [Illinois Procurement] [C]ode," but rather to a procurement officer with the state police.  *Id*. at 711-12; *see also Houskins*, 549 F.3d at 491 (holding that a county social worker's "statements to the police" about being hit by a county correctional officer were constitutionally protected because they "were not made pursuant to her job, as the report was not generated in the normal course of her duties and most likely was similar to reports filed by citizens every day").

Defendants also argue that because Echeverria first learned of Watts's misconduct in the course of performing his professional duties and first reported Watts's misconduct to Watson, Echeverria's supervisor, Plaintiffs were, in reporting the same misconduct to the FBI, acting pursuant to their official duties.  *Id*. at 8.  But Plaintiffs reported Watts's misconduct to the FBI only after they felt that official channels had failed them, and they do not claim that they suffered any retaliation for Echeverria's report to Watson.  Unlike the plaintiff in *Kubiak*, Plaintiffs here did not escalate their report of Watts's activity through successively higher official channels; instead, viewing what based on Watson's response they reasonably believed to be the CPD's systemic disregard for their report about Watts, brought the information to an outside law

enforcement agency. Watson's rebuffing of Echeverria forced Plaintiffs to go outside official channels; it did not transform the outside channel into an official channel.

Similarly, the fact that Echeverria learned of Watts's misconduct in the course of performing his professional duties does not place outside the First Amendment their whistleblowing to an external agency. That would frustrate "the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion." *Garcetti*, 547 U.S. at 419. For the same reason, Defendants' argument that the seriousness of Watts's criminal activity (by contrast to the verbal assault in *Kubiak*) rendered Plaintiffs' report within the bounds of their official duties, Doc. 165 at 8-9, misses the mark. The governing precedents do not establish a sliding scale based on seriousness of the reported misconduct.

Samuels's mentioning of Watts's name on a call with Spalding in 1997—a call that Spalding believed to be primarily about another officer—does not mean that Plaintiffs' unsolicited report of Watts's activity to a *different* FBI agent a *decade* later was part of their official duties. Plaintiffs did not know until their August 2008 meeting with Skahill and IAD personnel that the CPD was involved in the FBI's Watts investigation. Although Spalding asked Smith (the FBI agent she and Echeverria contacted in 2007) to put her in touch with Samuels, it is reasonable to infer that Spalding did so because she believed that Samuels was the FBI's point person on CPD corruption, not because she was aware of an open investigation or, as Defendants implausibly argue, had been "expressly asked by the FBI to" do so, Doc. 165 at 11 n.8, as "a continuation of the communication initiated by the FBI" in 1997, Doc. 175 at 3. So, contrary to Defendants' most improbable submission, Spalding did not "return[] Agent Samuels's telephone call ten years later," *ibid.*; indeed, the fact that she had to ask Smith to put her in touch with

Samuels belies any notion that reporting to Samuels was in any way connected to Spalding's official duties.

Finally, Defendants do not contest that Plaintiffs' filing this lawsuit was protected speech. Any such argument was likely to fail, as "participating in a lawsuit may amount to protected speech" if "the lawsuit involves a matter of public concern." *Salas v. Wis. Dep't of Corrs.*, 493 F.3d 913, 925 (7th Cir. 2007) (internal quotation marks omitted); *see also Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 648 (7th Cir. 2013) ("[I]t was clearly established at the time of the Gaming Board's actions that the First Amendment prohibited investigating and then suspending and terminating a public employee because he had helped another employee pursue a lawsuit aimed at uncovering and proving public corruption."); *Zorzi v. Cnty. of Putnam*, 30 F.3d 885, 896 (7th Cir. 1994) ("Retaliation for filing a lawsuit is prohibited by the First Amendment's protection of free speech."). Regardless, Defendants forfeited the argument by failing to raise it. *See Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 386 (7th Cir. 2012) ("[T]he forfeiture doctrine applies not only to a litigant's failure to raise a general argument … but also to a litigant's failure to advance a specific point in support of a general argument."); *Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011) ("As the moving party, the [defendant] had the initial burden of identifying the basis for seeking summary judgment."); *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("We have made clear in the past that it is not the obligation of this court to research and construct legal arguments open to parties, especially when they are represented by counsel, and we have warned that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (internal quotation marks and alterations omitted); *Titran v. Ackman*, 893 F.2d 145, 148 (7th Cir. 1990) ("When a party

moves for summary judgment on ground A, the opposing party need not address grounds B, C, and so on.").

### B.    Qualified Immunity

Next, Defendants contend that the defendant officers are entitled to qualified immunity. Doc. 165 at 10-13. "The doctrine of qualified immunity protects government officials from liability when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Alicea v. Thomas*, 815 F.3d 283, 291 (7th Cir. 2016); *see also Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam); *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015). "Whether a government official is entitled to qualified immunity is a legal question for resolution by the court, not a jury." *Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008).

"Two central questions must be addressed in the course of determining whether qualified immunity is available: whether the plaintiff has alleged a deprivation of a constitutional right at all, and whether the right at issue was clearly established at the time and under the circumstances presented." *Bianchi v. McQueen*, __ F.3d __, 2016 WL 1213270, at *7 (7th Cir. Mar. 29, 2016) (internal quotation marks omitted). To remove the shield of qualified immunity from the defendant officers, the constitutional right that they allegedly violated must at the time of the violation have been clearly established "in a particularized sense" and not merely "at a high level of generality." *Alicea*, 915 F.3d at 291; *see also Mullenix*, 136 S. Ct. at 308 ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.") (internal quotation marks omitted); *Zimmerman v. Doran*, 807 F.3d 178, 182 (7th Cir. 2015). For a right to be clearly established, it "must be specific to the relevant factual context of a cited case and not generalized with respect to the amendment that is the basis

of the claim." *Surita v. Hyde*, 665 F.3d 860, 868 (7th Cir. 2011). "The basic question is whether the state of the law at the time that [the defendant officers] acted gave [them] reasonable notice that [their] actions violated the Constitution." *Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011). "[I]n a § 1983 claim, the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forth with sufficient evidence to create genuine issues of material fact to avoid summary judgment." *Ault v. Speicher*, 634 F.3d 942, 945 (7th Cir. 2011) (internal quotation marks omitted).

As discussed above, the record would allow a reasonable jury to find a First Amendment violation, so Plaintiffs have met their "burden of establishing that [their] rights were violated" under the first prong of the qualified immunity inquiry. *Burritt*, 807 F.3d at 249. For the second element, Plaintiffs submit that ever since the Supreme Court issued *Garcetti* in 2006, it "has been clearly established law … that the First Amendment protects a public employee who complains about public corruption in a forum outside of his or her official job duties." Doc. 171 at 11. As noted above, the Seventh Circuit has applied the *Garcetti* standard in a variety of contexts. *See*, *e.g.*, *Chaklos,* 560 F.3d at 711-12; *Fairley*, 578 F.3d at 522; *Houskins*, 549 F.3d at 489-93; *Tamayo*, 526 F.3d at 1091; *Vose*, 506 F.3d at 570-71; *Spiegla II*, 481 F.3d at 963; *Sigsworth*, 487 F.3d at 511. All of these cases were issued before August 17, 2010, the first alleged act of retaliation in this case. And because the Seventh Circuit—in *Chaklos*, *Chrzanowski*, and *Houskins*—has consistently interpreted *Garcetti* to hold that the speech of an employee who reports misconduct *outside* official or established channels is constitutionally protected, reasonable police officers in the defendant officers' position would have known that Plaintiffs' speech to FBI was protected and that any retaliation against them for that speech would violate the First Amendment. *See also Dahlia v. Rodriguez*, 735 F.3d 1060, 1074 (9th Cir. 2013)

("[P]articularly in a highly hierarchical employment setting such as law enforcement, whether or not the employee confined his communications to his chain of command is a relevant, if not necessarily dispositive, factor in determining whether he spoke pursuant to his official duties. When a public employee communicates with individuals or entities outside his chain of command, it is unlikely that he is speaking pursuant to his official duties."); *Gibson v. Kilpatrick*, 773 F.3d 661, 670 (5th Cir. 2014) ("[I]f a public employee takes his job concerns to persons outside the work place in addition to raising them up the chain of command at his workplace, then those external communications are ordinarily not made as an employee but as a citizen.") (internal quotation marks omitted).

Defendants incorrectly contend that *Kristofek v. Village of Orland Hills*, 712 F.3d 979 (7th Cir. 2013), muddled the law in a way that compels a different result on the qualified immunity issue. Kristofek, a part-time police officer for the Village of Orland Hills, reported an alleged instance of police misconduct to fellow officers and to the FBI and, when he told other officers what he had done, the Village fired him. *Id.* at 982-83. In holding that Kristofek had stated a plausible First Amendment claim, the Seventh Circuit did not even reach the issue of qualified immunity. Defendants correctly note that the Seventh Circuit declined to address whether Kristofek's speech to the FBI was protected, but that does not mean, as Defendants assert, that "the Seventh Circuit expressly left open the question." Doc. 165 at 12-13; Doc. 175 at 3. Rather, as Defendants acknowledge, Doc. 165 at 12-13, the Seventh Circuit did not address that issue because the Village did not raise it, 72 F.3d at 984 n.1—probably because it was exceptionally clear based on *Garcetti* and its progeny that Kristofek's speech to the FBI was protected. It follows that the Seventh Circuit's declining to address that issue cannot possibly be read to have left it open. *See Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004)

("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.") (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)); *United States v. Richardson*, 558 F.3d 680, 681 (7th Cir. 2009) ("[T]he absence of any discussion [in a prior case] means that there is no holding on the point that might bind us in this case."); *Matter of Volpert*, 110 F.3d 494, 497 (7th Cir. 1997) (reasoning that because earlier opinions "did not discuss" whether a statute applies to bankruptcy courts, those opinions did not settle the question). Defendants thus had "fair warning that their treatment of [Plaintiffs] was unconstitutional." *McGreal v. Ostrov*, 368 F.3d 657, 683 (7th Cir. 2004).

Because Defendants do not assert qualified immunity based on the nature of their alleged retaliatory actions, any such argument is forfeited. *See Milligan*, 686 F.3d at 386; *Costello*, 651 F.3d at 635; *Judge*, 612 F.3d at 557; *Titran*, 893 F.2d at 148. Defendants also do not dispute that it was clearly established as of November 1, 2012 that retaliation for filing a lawsuit involving a matter of public concern violates a constitutional right, and so that argument is forfeited as well. Defendants are thus not entitled to qualified immunity.

## C.    Causation

In addition to showing that their speech was constitutionally protected, Plaintiffs must adduce evidence that would allow a reasonable jury to find that their "protected conduct was a motivating factor" in Defendants' alleged retaliation. *Peele v. Burch*, 722 F.3d 956, 959-60 (7th Cir. 2013) (internal quotation marks omitted). As the Seventh Circuit has explained:

> [T]he "motivating factor" requirement splits the burden of production between the parties on summary judgment. The plaintiff has the initial burden to produce evidence that his speech was at least a "motivating factor" in the employer's decision to take adverse action against him—or, in philosophical terms, a "sufficient condition" of the retaliation. The defendant may then rebut that evidence by demonstrating that the harm would have occurred

anyway, even without the protected conduct—or, in other words, that his conduct was not a *necessary* condition of the harm.  Put another way, [the plaintiff] must first provide evidence that the defendants were motivated, at least in part, by a desire to retaliate against him for his protected speech.  If he does, then the defendants may counter by showing that they would have reached the same result even without the protected speech.

*Id.* at 960 (citations and internal quotation marks omitted); *see also Bisluk v. Hamer*, 800 F.3d 928, 933-34 (7th Cir. 2015).

Defendants contend that Plaintiffs have not met their initial burden because all defendant officers other than Rivera lacked knowledge of Plaintiffs' pre-August 2008 speech to the FBI (and so could not have retaliated on account of it), and because Plaintiffs' work on Operation Brass Tax after August 17, 2008 was unprotected employee speech.  Doc. 165 at 13-14; Doc. 175 at 4.  Although the defendant officers could not have retaliated against Plaintiffs for doing something of which they had no knowledge, *see Everett v. Cook Cnty.*, 655 F.3d 723, 728-29 (7th Cir. 2011); *Trigillo v. Snyder*, 547 F.3d 826, 830 (7th Cir. 2008), Plaintiffs have adduced sufficient evidence to create a genuine issue as to whether the officers knew of Plaintiffs' protected work with the FBI.

The record would allow a reasonable jury to find Rivera's, Roti's, O'Grady's, and Mills's knowledge without the need for inference.  Defendants concede that Rivera knew about Plaintiffs' protected activity.  Doc. 165 at 14.  In June 2008, two months prior to Plaintiffs' reassignment to Detached Services, Roti had given Skahill permission to allow Plaintiffs to work on an as-needed basis with the FBI.  Doc. 172 at ¶ 16; Doc. 176 at ¶ 21.  To grant the authorization, Roti had to have known about Plaintiffs' prior (protected) reports to the FBI.  During Plaintiffs' work on Operation Brass Tax, O'Grady became aware of their earlier work with the FBI.  Doc. 176 at ¶ 20.  And Mills allegedly retaliated against Plaintiffs after and because of their filing this lawsuit, of which he demonstrated knowledge by instructing the

officers under his command to watch Plaintiffs' press conference and discussing the suit with Spalding. *Id*. at ¶¶ 70, 73.

Reasonable inferences establish that Barnes, Cesario, and Salemme also knew about Plaintiffs' protected activity with the FBI. Because Plaintiffs joined FAU after the FBI publicly announced the arrests of Watts and Mohammed, because Salemme knew that Plaintiffs were involved in the Watts investigation, and because Cesario and Barnes referred to Plaintiffs' work with IAD, Doc. 172 at ¶ 49; Doc. 176 at ¶¶ 43-46, 60-61, a reasonable jury could infer that Barnes, Cesario, and Salemme knew about Plaintiffs' prior work for the FBI. Defendants retort that Barnes, Cesario, and Salemme referred repeatedly to *IAD*, not the FBI, and that Plaintiffs' activity during their work for IAD, including their work on Operation Brass Tax, was unprotected employee speech. Doc. 165 at 14; Doc. 175 at 4-7. Although it is reasonable to infer that the defendant officers' references to "IAD" meant only "IAD," a reasonable jury could draw the contrary inference. Defendants' counsel noted at the motion hearing that the CPD has "hundreds of officers [in IAD] working all day every day on the same kinds of things that these plaintiffs were working on." A reasonable jury could infer that the hundreds of officers that serve in IAD are not subject to the type of retaliation Plaintiffs allegedly suffered here—and therefore that Barnes's, Cesario's, and Salemme's alleged animus toward and retaliation against them was motivated not by the mere fact that they worked in IAD, but instead by knowledge of Plaintiffs' reports to the FBI that predated their August 2008 reassignment to Detached Services.

The defendant officers' knowledge of Plaintiffs' protected activity does not alone establish causation. In addition, Plaintiffs must show that their protected speech was a motivating factor in their retaliation. *See Peele*, 722 F.3d at 959-60; *Fairley*, 578 F.3d at 525-26; *Samuelson v. LaPorte Cmty. Sch. Corp.*, 526 F.3d 1046, 1053 (7th Cir. 2008). Contrary to

Defendants' submission, Doc. 165 at 14-18, Plaintiffs have met their burden with regard to each defendant officer.

*Rivera.* Despite Spalding's complaints to Rivera that O'Grady told Narcotics Division personnel that Plaintiffs were "snitches" and "rats," Rivera declined to investigate. It is possible that Rivera chose not to investigate Spalding's complaint because he believed it was based on unsubstantiated rumors. *Id.* at 15. But a reasonable jury could find that because Rivera was aware of Plaintiffs' protected speech to the FBI, that speech motivated his decision not to investigate, which allowed O'Grady's retaliation against Plaintiffs to continue. The fact that Rivera later wrote a recommendation on Plaintiffs' behalf, Doc. 172 at ¶¶ 49-50, may inform a jury's view of his conduct, but it does not render indisputably unreasonable the inference that Plaintiffs' protected speech motivated his alleged misconduct.

*Roti.* Roti told Rivera that he did not want Plaintiffs to return to the Narcotics Division, and he allowed O'Grady's alleged slandering of Plaintiffs as "rats" to continue. *Id.* at ¶ 43; Doc. 176 at ¶¶ 34-35, 39. Although Roti provided other plausible reasons for his declining to take Plaintiffs back into Narcotics, Doc. 172 at ¶¶ 47-48, a reasonable jury could find that Plaintiffs' protected speech motivated his refusal and his condoning of O'Grady's retaliation against Plaintiffs.

*O'Grady.* Although earlier in his career O'Grady worked for IAD and arrested other CPD officers, *id.* at ¶ 32, he repeatedly referred to Plaintiffs as "rats"; refused Plaintiffs' August 17, 2010 request for funds for a confidential informant; told officers in the Narcotics Division not to provide backup to Plaintiffs in an emergency; staunchly opposed, with implicit reference to Plaintiffs' protected activity, their return to the Narcotics Division; and barred Spalding from the CPD facility at Homan Square. Doc. 176 at ¶¶ 24, 34-35, 66-69. A reasonable jury could

infer that O'Grady's hostility toward Plaintiffs resulted from the fact that Plaintiffs had worked with the FBI on the Watts investigation on their own initiative.

*Barnes*. Prior to Plaintiffs' arrival at FAU, Barnes told his team that Plaintiffs were officers from "IAD," and he later told Spalding that the team "was not going to back [Plaintiffs] up" and taunted her about her having had "sergeants arrested" and "tell[ing] her daughter that [Spalding would be] coming home in a box." *Id.* at ¶¶ 58-61. Although it is not clear whether Barnes endorsed this sentiment or was merely conveying to Spalding how his team members felt, a reasonable jury could find that his statements about Spalding's death and the team not backing up Plaintiffs were threats motivated by Plaintiffs' protected speech.

*Cesario*. Cesario referred to Plaintiffs as "rats," ordered Hanna to give Plaintiffs only "dead-end cases" and to ignore their requests for overtime, instructed his officers not to provide Plaintiffs with backup, and then decided to transfer Plaintiffs from Barnes's FAU team to the less desirable Third Watch. Doc. 172 at ¶¶ 64-66; Doc. 176 at ¶¶ 45-49, 52, 62. A reasonable jury could find that Plaintiffs' protected activity motivated these retaliatory actions. A reasonable jury also could find that even if Cesario's stated rationale for transferring Plaintiffs to the Third Watch (low arrest activity) was technically accurate, it was accurate only because of his earlier order to Hanna to assign Plaintiffs only to cases that "would not lead to arrests or officer activity," Doc. 173-11 at 13, which itself was motivated by Plaintiffs' protected speech.

*Salemme*. Salemme approved Cesario's decision to transfer Plaintiffs to the Third Watch and told Plaintiffs that "[they] should have known this shit was going to happen to" them. Doc. 172 at ¶¶ 64-66; Doc. 176 at ¶¶ 62, 65. A reasonable jury could infer that Plaintiffs' protected activity motivated Salemme's approval of their transfer to a less desirable position.

*Mills.*  After the Plaintiffs filed this suit, Mills told them that he did not "know how [they would] have a career" after the suit was over, began to change Plaintiffs' hours, and initiated an internal complaint that allegedly caused Spalding's emotional distress and her inability to continue active employment with the CPD.  Doc. 172 at ¶¶ 77-78; Doc. 176 at ¶¶ 71, 73, 76-77. Because Mills's actions occurred after this suit was filed and represented a stark change from his prior behavior, *id*. at ¶ 71, a reasonable jury could find that Plaintiffs' filing of the lawsuit motivated his conduct.  Defendants' contention that Mills could not have retaliated against Plaintiffs for this lawsuit because he was not named as a defendant until May 2013, Doc. 175 at 7, is nonsensical.  Defendants cite no authority for the proposition that filing a lawsuit is protected speech only with regard to the defendants named in the suit.

Citing *Gekas v. Vasiliades*, 814 F.3d 890 (7th Cir. 2016), Defendants contend that the Plaintiffs' protected speech could not have caused the alleged retaliation given the substantial time gap between the speech (late 2007-August 2008) and the first instance of retaliation (August 2010).  Doc. 175 at 5.  This argument fails to persuade.  The two-year gap between Plaintiffs' protected activity and the retaliation they suffered is not analogous to the circumstances in *Gekas*, where the plaintiff alleged sixteen- and nineteen-year gaps between his protected activity and the alleged retaliation.  814 F.3d at 895-96.  Further, Gekas was completely unable "to connect the [retaliatory] events that happened to him in 2004 to the [protected] conversations he had in 1988," and the 1988 and 2004 events involved entirely distinct sets of individuals.  *Id*. at 891-93, 896.  As discussed above, the record in this case allows Plaintiffs to draw the required connection.  *See Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 565 (7th Cir. 2015) ("[T]he mere passage of time does not conclusively bar an inference of retaliation.") (internal quotation marks omitted); *Malin v. Hospira, Inc.*, 762 F.3d 552, 559 (7th Cir. 2014) (reversing the grant of

summary judgment and disapproving the district court's holding "that three years was simply too long an interval [between the protected activity and the retaliatory conduct] to support an inference that retaliation had occurred"); *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 829 (7th Cir. 2014) ("[N]o bright-line timing rule can be used to decide whether a retaliation claim is plausible or whether it should go to a jury. Other factors can always be relevant. … The facts and circumstances of each case necessarily must be evaluated to determine whether an interval is too long to permit a jury to determine rationally that an adverse employment action is linked to an employee's earlier complaint.") (internal quotation marks omitted).

Finally, for at least most of the defendant officers, the August 2008 "date is irrelevant," because "the clock begins when the defendants learned of [Plaintiffs'] protected speech." *Mullin v. Gettinger*, 450 F.3d 280, 285 (7th Cir. 2006). Roti learned of Plaintiffs' protected activity in June 2008, but as noted above the record contains ample evidence to support the reasonable inference that he retaliated against Plaintiffs for their protected activity. The record also supports the inference that the other defendant officers learned of Plaintiffs' protected activity well after August 2008. Indeed, *none* of the defendant officers were present at the August 2008 meeting that transformed Plaintiffs' previously unprotected activity into protected speech, and that meeting, and Plaintiffs' activity that triggered it, were intended to remain undisclosed and seem to have done so until certain personnel transitions—O'Grady replacing Roti as Commander of Narcotics, and Rivera replacing Skahill as Chief of IAD—occurred at unspecified dates closer in time to the alleged retaliation. The record also supports the inference that Salemme, Cesario, Barnes, and Mills learned of Plaintiffs' protected activity only once Plaintiffs were set to transfer to FAU, and their retaliation in FAU began almost immediately upon that transfer (and in some instances predated it).

Because Defendants do not argue that the retaliatory acts at issue would have occurred even had Plaintiffs not engaged in protected speech, that argument is forfeited. *See Milligan*, 686 F.3d at 386; *Costello*, 651 F.3d at 635; *Judge*, 612 F.3d at 557; *Titran*, 893 F.2d at 148. Plaintiffs have thus met their burden on the causation element of the retaliation claim.

### D.    Statute of Limitations

"The statute of limitations for § 1983 claims in Illinois is two years." *Gekas*, 814 F.3d at 894. "Generally, the statute of limitations clock begins to run on First Amendment retaliation claims immediately after the retaliatory act occurred," but "[f]ederal law … governs the accrual date for § 1983 claims, which is when the plaintiff knows or should know that his or her constitutional rights have been violated." *Ibid*. (internal quotation marks omitted). Defendants contend that because Plaintiffs filed this lawsuit on November 1, 2012, all instances of retaliation prior to November 1, 2010, including O'Grady's August 17, 2010 denial of funds for Plaintiffs' confidential informant, are time-barred. Doc. 165 at 18; Doc. 175 at 7-8.

Defendants are incorrect, as the record would allow a reasonable jury to find that their understanding of O'Grady's retaliation reasonably changed as they suffered additional retaliatory actions. Single incidents may have unusual or idiosyncratic causes. At the time O'Grady denied funds for their confidential informant, Plaintiffs did not know that O'Grady knew about their protected speech, as they had been given the impression that only a few individuals, not including O'Grady, would be told about their pre-IAD work for the FBI. Thus, when Padar initially conveyed O'Grady's denial of funds, Plaintiffs may simply have assumed that O'Grady disapproved of their working with IAD. Spalding's response to the incident, questioning Rivera (Chief of IAD) about "how the hell Commander O'Grady knew" about her work on the Watts investigation, Doc. 176 at ¶ 25, is consistent with the reasonable belief that O'Grady's animosity

was limited to Plaintiffs' unprotected IAD work.  Only after they suffered other instances of

retaliation did Plaintiffs know, or should they have known, that the retaliation pertained to

something other than their work with IAD—namely, their protected, pre-IAD work for the FBI,

outside official channels—and therefore that their constitutional rights were being violated.  *See*

*Gekas*, 814 F.3d at 894.  Or so a reasonable jury could conclude.  *See Hart v. Mannina*, 798 F.3d

578, 591 (7th Cir. 2015) ("[N]o *reasonable trier of fact* could find on this record that Mannina's

probable cause affidavit was false or misleading.  There is no evidence that she knew or should

have known that the November 22 identifications were unreliable.") (emphasis added); *Reed v.*

*Gardner*, 986 F.2d 1122, 1126 (7th Cir. 1993) ("[W]e would require from a plaintiff sufficient

evidence from which a jury could reasonably draw the inference that police officers knew or

should have known that car passengers were intoxicated.").

## II.     Section 1983 Conspiracy Claim

"A civil conspiracy is a combination of two or more persons acting in concert to commit

an unlawful act or to commit a lawful act by unlawful means."  *Beaman v. Freesmeyer*, 776 F.3d

500, 510 (7th Cir. 2015) (internal quotation marks omitted).  "To establish conspiracy liability in

a § 1983 claim, the plaintiff must show that (1) the individuals reached an agreement to deprive

him of his constitutional rights, and (2) overt acts in furtherance [of the conspiracy] actually

deprived him of those rights."  *Ibid*.  "Because conspiracies are often carried out clandestinely

and direct evidence is rarely available, plaintiffs can use circumstantial evidence to establish a

conspiracy, but such evidence cannot be speculative."  *Id*. at 511; *see also Williams v. Seniff*, 342

F.3d 774, 785 (7th Cir. 2003) ("Although a conspiracy certainly may be established by

circumstantial evidence, we have stressed that such evidence cannot be speculative.").  And

although "a conspiracy claim cannot survive summary judgment if the allegations are vague,

conclusionary, and include no overt acts reasonably related to the promotion of the alleged conspiracy," *Amundsen v. Chi. Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000) (internal quotation marks omitted), "[s]ummary judgment should not be granted if there is evidence from which a reasonable jury could infer the existence of a conspiracy," *Beaman*, 776 F.3d at 510-11.

As discussed above, Plaintiffs have demonstrated (for summary judgment purposes) a deprivation of their First Amendment rights, so to preserve their conspiracy claim they must adduce evidence only of an agreement among the defendant officers. Plaintiffs may demonstrate an agreement by establishing that the defendant officers "underst[ood] the general objectives of the scheme, accept[ed] them, and agree[d], either explicitly or implicitly, to do [their] part to further them." *McCann v. Mangialardi*, 337 F.3d 782, 789-90 (7th Cir. 2003) (emphasis and internal quotation marks omitted). If the alleged agreement was not overt, Plaintiffs must point to acts that are "sufficient to raise the inference of mutual understanding (*i.e.*, the acts performed by the members of a conspiracy are unlikely to have been undertaken without an agreement)." *Amundsen*, 218 F.3d at 718 (internal quotation marks omitted).

Plaintiffs contend that the record "contains ample evidence that, tied together by the glue of the Code of Silence, the individual Defendants took actions against the Plaintiffs, both in concert and individually, which shared the common objective of punishing Plaintiffs for having worked with the FBI to pursue criminal charges against officers Watts and Mohammed." Doc. 171 at 19. In support, Plaintiffs cite six "pieces of the puzzle from which" they claim "the conspiracy can be inferred." *Beaman*, 776 F.3d at 511. The pieces are: (1) O'Grady referring to Plaintiffs as "rats" and denying funds for their confidential informant; (2) Rivera declining Plaintiffs' return to Narcotics after attending a meeting with O'Grady, Roti, and others, and then failing to investigate O'Grady's misconduct; (3) Cesario referring to Plaintiffs as "rats" and

telling Hanna to assign them "dead end cases"; (4) Cesario instructing his sergeants not to work with or provide backup to Plaintiffs, and Barnes's and Mills's subsequent actions; (5) O'Grady banning Spalding from the Homan Square facility and notifying Salemme and Cesario of the ban; and (6) Salemme, Cesario, and Barnes removing Plaintiffs from Barnes's team and Mills's retaliation against Plaintiffs. Doc. 171 at 19-20. (Plaintiffs refer to one additional incident, *id*. at 19, but they rely entirely on ¶ 38 of their Local Rule 56.1(b)(3)(C) statement, and that assertion, as discussed above, rests on inadmissible hearsay.) Plaintiffs also contend, without citing the record or a Local Rule 56.1 statement or response, that Cesario could have known about Plaintiffs' work with the FBI only if "it was communicated to him by one or more of the other conspirators." *Id*. at 19.

Plaintiffs' argument seems to be that because the defendant officers involved in the above-referenced instances of retaliation form a chain (with "Mills clos[ing] the loop," *id*. at 20), they were necessarily working in concert to retaliate against Plaintiffs. But the chain has three weak links. First, Plaintiffs' submission that Cesario could have known about Plaintiffs' protected speech only if the other defendant officers had informed him of such is speculative. *See Beaman*, 776 F.3d at 511; *Williams*, 342 F.3d at 785. Second, the fact that O'Grady told Salemme and Cesario that he had banned Spalding from Homan Square does not demonstrate an agreement among those three defendants—it merely shows that O'Grady felt the need to inform Spalding's lieutenant and commander about discipline that he had imposed on her. Such communication "is to be expected between [employees] and supervisors in the corporate or other institutional setting," and thus is not evidence of a conspiracy. *Smith v. Bray*, 681 F.3d 888, 906 (7th Cir. 2012); *see also Williams*, 342 F.3d at 785 (holding that the fact that certain defendants "remained in contact" does not, "standing alone," evidence a conspiracy). Third, the fact that

Plaintiffs worked for Mills's team after Cesario and Salemme transferred them does not demonstrate any evidence of an agreement, particularly given that Plaintiffs allege that Mills's retaliatory behavior began only after they filed this suit, by which time Cesario's and Salemme's retaliation had already occurred.

With these three links broken, the record would allow a reasonable jury to find only two more limited conspiracies rather than one large one. The first includes Rivera, Roti, and O'Grady. Roti and Rivera were aware of O'Grady's view that Plaintiffs were "rats," and Plaintiffs have adduced evidence sufficient for a reasonable jury to find that Roti and Rivera shared O'Grady's view. Rivera informally consulted with Roti, and Roti with O'Grady, before deciding whether Plaintiffs should return to the Narcotics Division. A reasonable jury could infer that this communication was innocent; after all, Rivera was the IAD Chief, Roti a former commander of the Narcotics Division under whom Plaintiffs had served, and O'Grady the current commander of Narcotics, the division to which Plaintiffs might be returning. But because, as shown above, a reasonable jury could infer that Plaintiffs' protected activity motivated their actions, it also could infer that their communications about Plaintiffs reflected a conspiracy to retaliate against them for their protected activity.

The second conspiracy includes Barnes, Cesario, and Salemme. Those three spread the word before Plaintiffs' arrival at FAU that two officers from "IAD" were coming; Cesario and Barnes made similar comments about Plaintiffs not receiving backup; and all three took part in the meeting where it was decided that Plaintiffs would be transferred to Third Watch. In effecting the transfer, Cesario and Salemme cited Hernandez's alleged confrontation with Barnes as well as Plaintiffs' low arrest activity, and they both questioned Plaintiffs about their work with the IAD. Doc. 172 at ¶¶ 64-66, Doc. 176 at ¶¶ 57, 62, 65. The three defendants' joint role in this

transfer, together with their similar behavior at the meeting, provides circumstantial evidence beyond the speculative level that would allow a reasonable jury to infer an agreement to retaliate against Plaintiffs for their protected speech.

Defendants liken this case to *Williams v. Seniff*, where the Seventh Circuit held that the fact that "various individuals expressed displeasure with" the plaintiff, a terminated police officer, "does not provide evidence of an *agreement* on the part of those who expressed the displeasure to deprive [the] plaintiff of his rights." 342 F.3d at 786. But the plaintiff in *Williams* presented no evidence about the "various individuals" other than vague indications that they "[were] involved in the events surrounding" his termination. The defendant officers' alleged coordination here is supported by sufficient evidence to forestall summary judgment on the conspiracy claim.

Summary judgment is therefore granted on Plaintiffs' conspiracy claim insofar as it pertains to an agreement among all seven officer defendants or to any agreement involving Mills, but it is denied as to the more limited agreements (1) among O'Grady, Rivera, and Roti, and (2) among Barnes, Cesario, and Salemme.

## III.    *Monell* Claim

Plaintiffs' claim against the City arises under the municipal liability doctrine of *Monell v. Department of Social Services*, 436 U.S. 658 (1978). "The Supreme Court has recognized three particular grounds on which a municipality can be held liable under § 1983. There must be: (1) an express policy that would cause a constitutional deprivation if enforced; (2) a common practice that is so widespread and well-settled that it constitutes a custom or usage with the force of law even though it is not authorized by written law or express policy; or (3) an allegation that a person with final policy-making authority caused a constitutional injury." *Rossi v. City of*

*Chicago*, 790 F.3d 729, 737 (7th Cir. 2015). In addition to showing that the municipality acted culpably in one of those three ways, the plaintiff must prove causation, demonstrating that the municipality "is the 'moving force' behind the deprivation of constitutional rights." *Glisson v. Ind. Dep't of Corrs.*, 813 F.3d 662, 667 (7th Cir. 2016) (internal quotation marks omitted). Although "[a]n unconstitutional municipal policy can take the form of an implicit policy or a gap in expressed policies," *Dixon v. Cook Cnty.*, __ F.3d __, 2016 WL 1393527, at *3 (7th Cir. Apr. 8, 2016) (internal quotation marks omitted), or of "a series of violations to lay the premise of deliberate indifference," *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009) (internal quotation marks omitted), "a municipality cannot be held liable solely on the grounds of *respondeat superior*." *Rossi*, 790 F.3d at 737 (citing *Monell*, 436 U.S. at 691). Put another way, "local governments are responsible only for their *own* illegal acts" and may not be held "vicariously liable under § 1983 for their employees' actions." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (internal quotation marks omitted).

The record contains no evidence that the City had an express policy that violates the Constitution. Rather, Plaintiffs' *Monell* claim rests on the CPD's alleged widespread and unwritten "code of silence." According to Plaintiffs, CPD officers are trained under the code to ignore their fellow officers' misconduct and to retaliate against any officer who does not. Doc. 171 at 21. Plaintiffs submit that the retaliation they suffered as a result of their protected speech resulted from their breaking the code, the existence of which Reiter's expert report and testimony support. *Id*. at 21-23.

The Seventh Circuit recently addressed a similar *Monell* claim in *Rossi v. City of Chicago*. Doubek, an off-duty Chicago police officer, participated in an assault on Rossi. Mathews, a CPD detective assigned to investigate the assault, "exerted no discernible effort" on

43

and then closed the investigation. Doubek faced no discipline for her role in the assault. Rossi brought a *Monell* claim against the City "for perpetuating a 'code of silence' that shields police officers from investigation and promotes misconduct by police." 790 F.3d at 732. In affirming summary judgment for the City, the Seventh Circuit held:

> [T]he facts of this case … raise serious questions about accountability among police officers. But a *Monell* claim requires more than this; the gravamen is not individual misconduct by police officers (that is covered elsewhere under § 1983), but a *widespread practice* that permeates a critical mass of an institutional body. In other words, *Monell* claims focus on institutional behavior; for this reason, misbehavior by one or a group of officials is only relevant where it can be tied to the policy, customs, or practices of the institution as a whole.

*Id*. at 737. The Seventh Circuit added that Rossi did not adduce sufficient evidence of a widespread practice, noting that he "did not retain a defense expert for his case and his pre-trial disclosures failed to identify any expert reports addressing" the code of silence. *Id*. at 737-38.

Unlike Rossi, Plaintiffs here have retained an expert, Lou Reiter. Reiter is a former Deputy Chief of Police of the Los Angeles Police Department who since 1983 has provided law enforcement consultation in police training and management, including with the Civil Rights Division of the U.S. Department of Justice. Doc. 173-20 at 1-3. By his own estimate, Reiter has been involved in fifteen civil litigation matters involving the CPD since the late 1980s, including four in which the City retained him as an expert. *Id*. at 6. Reiter has testified regarding the CPD's code of silence in five other cases. *Id*. at 6-7; *see Obrycka v. City of Chicago*, 2012 WL 601810, at *7 (N.D. Ill. Feb. 23, 2012). Based on his expertise and his review of the record, including depositions of the City's Rule 30(b)(6) witnesses, Reiter opines that the City maintains a code of silence whereby police officers do not report the misconduct of other police officers out of fear of retaliation. According to Reiter, the code is advanced by the City's conscious decision to fail to acknowledge it, to take affirmative steps to minimize its influence, and to fail

to discipline officers who engage in misconduct.  Doc. 176 at ¶ 80.  Defendants have not

challenged Reiter's opinions under Federal Rule of Evidence 702.

Reiter's opinions find support in the record.  The fact that the defendant officers are not

clustered in a single unit or precinct, range widely in seniority and supervisory authority, and

engaged in retaliatory acts against Plaintiffs over a lengthy period suggests that retaliation

against those who report misconduct "permeates a critical mass of" the CPD.  *Rossi*, 790 F.3d at

737.  Further, Hanna testified that instructors at the CPD police academy stress the importance of

not breaking the code of silence.  Doc. 176 at ¶ 79.  Considered together with Reiter's report, that

evidence "lays the premise of the system of inference" sufficient for Plaintiffs to forestall

summary judgment on their *Monell* claim.  *Davis v. Carter*, 452 F.3d 686, 695 (7th Cir. 2006).

Defendants also argue that Plaintiffs have not adduced evidence that the retaliatory aspect

of the code of silence was sufficiently widespread to support *Monell* liability; in support,

Defendants maintain that Plaintiffs identified only three other cases of alleged retaliation against

officers who reported misconduct by other officers, while Reiter identified only one.  Doc. 165 at

25; Doc. 175 at 10.  Defendants further contend that because Reiter provides no statistical

evidence on the rate of retaliation within the CPD, his report "offers no evidence of a widespread

municipal policy or custom to *retaliate* against officers" who break the code.  Doc. 165 at 26.

This argument fails to persuade.  The Seventh Circuit has declined to "adopt any bright-line rules

defining a 'widespread custom or practice' … [b]ut the plaintiff must demonstrate that there is a

policy at issue rather than a random event."  *Thomas*, 604 F.3d at 303.  With the support of

Reiter's report, Hanna's deposition testimony that *all* new CPD officers are trained in the code,

and the facts of the case, Plaintiffs have done just that.  Defendants cite to no precedent requiring

empirical evidence to illustrate the existence of a widespread custom, and the weight of Reiter's

report and Hanna's testimony creates a genuine issue of fact regarding pervasiveness of the code. This is all that is required on summary judgment.

## IV. IWA Claim

The IWA provides in pertinent part: "An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation." 740 ILCS 174/15(b). Defendants advance four grounds for partial or complete summary judgment on Plaintiffs' IWA claim.

First, Defendants contend that Plaintiffs have adduced insufficient evidence of causation under the IWA because no defendant officer other than Rivera knew prior to the media reports about this lawsuit that Plaintiffs had disclosed information to the IAD or FBI about Watts and Mohammed. Doc. 165 at 26-27; Doc. 175 at 11-12. As with Defendants' causation argument on the First Amendment retaliation claim, this argument fails on summary judgment. The IWA, like other "[w]histle-blower protection statutes," does not have a First Amendment component and thus is not subject to *Garcetti*, and so it may "provide a remedy (particularly if an employee is punished for reporting illegal acts), [even when] the Constitution does not." *Fairley*, 578 F.3d at 523; *see also Sigsworth*, 487 F.3d at 511 ("[E]ven employees who face retaliation for speech connected to a job duty may be entitled to protected under their state whistleblower statutes."). This means that the IWA protects not only Plaintiffs' First Amendment-protected speech to the FBI, but also their constitutionally unprotected work for the IAD on Operation Brass Tax. A reasonable jury certainly could find that all of the defendant officers knew about the constitutionally unprotected work; indeed, Defendants effectively concede that they did. Doc. 165 at 14 ("[E]ven based on Plaintiffs' evidence, the other individual Defendants only knew, at

most, that Plaintiffs were working with IAD on a police corruption case.").  In addition, as discussed above, a reasonable jury could find that the defendant officers knew about the constitutionally protected work.

Relatedly, Defendants argue that even if they knew that Plaintiffs were working on a police corruption case, they did not know that the Plaintiffs themselves were whistleblowers. Doc. 175 at 12.  But a reasonable jury could infer that the defendant officers retaliated against Plaintiffs for this very reason.  And while Defendants contend that the defendant officers had legitimate reasons for taking each of the alleged retaliatory actions, a reasonable jury could find on this record that they acted with retaliatory animus.

Second, Defendants argue that the retaliatory actions underling the IWA claim do not qualify as "materially adverse" actions, Doc. 165 at 27-28; Doc. 175 at 12, as the IWA requires. *See* 740 ILCS 174/20.1 (an act or omission "constitutes retaliation by an employer under this Act if the act or omission would be materially adverse to a reasonable employee and is because of the employee disclosing or attempting to disclose public corruption or wrongdoing").  The record includes evidence of repeated threats that Plaintiffs would not be supported in emergency situations, deliberate assignments to "dead end" cases, a transfer to a less desirable shift, being barred from a CPD facility, and a trumped-up investigation that resulted in Spalding's PTSD and continuing inability to work and Echeverria's emotional distress and seven-month medical leave. Even though Plaintiffs suffered no salary reductions, their IWA claims allege retaliation consisting of "change[s] … that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity."  *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 889 (7th Cir. 2016) (internal quotation marks

omitted); *cf. Owens v. Dep't of Human Rights*, 936 N.E.2d 623, 640 (Ill. App. 2010) (applying the federal materially adverse standard to an Illinois law case).

Third, Defendants contend that the Illinois Local Governmental and Governmental Employees Tort Immunity Act ("TIA"), 745 ILCS 10/1-101 *et seq.*, bars the IWA claim. Doc. 165 at 28-29; Doc. 175 at 13-14. The TIA provides in relevant part: "A public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2-201. The Seventh Circuit and the Supreme Court of Illinois have both cautioned that "because the Tort Immunity Act is in derogation of the common law, it must be strictly construed against the public entities involved." *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 679 (7th Cir. 2009) (quoting *Van Meter v. Darien Park Dist.*, 799 N.E.2d 273, 286 (Ill. 2003)) (internal quotation marks omitted).

Consistent with that limiting principle, "[s]ection 2-201 immunizes an individual defendant only to the extent that the action he is being sued for involves both the making of a policy choice and the exercise of discretion." *Ibid.* Here, the record would allow a reasonable jury to find that the defendant officers retaliated against Plaintiffs for statutorily protected activity, and such retaliation cannot be characterized as a policy decision or a discretionary "judgment call between interests." *Ibid.* ("Owen's one-time decision to fire one employee, Valentino, does not amount to a 'judgment call between competing interests.' In fact, we are at a loss to identify any competing interests at all. Rather, Owen either made a one-time decision to fire Valentino because she copied the sign-in sheets or because she spoke out against the Village's practice of ghost payrolling, or some combination thereof. The Village offers no evidence that it had a policy against copying the sign-in sheets either before or after Valentino's

48

termination. Even if such a policy did exist, we cannot see how the decision to create it might involve competing interests and judgment calls that would meet the Illinois courts' definition of a 'policy decision.'"); *see also Bello v. Vill. of Skokie*, __ F. Supp. 3d __, 2015 WL 9582986, at *12-13 (N.D. Ill. Dec. 31, 2015). It follows that the TIA does not immunize the defendant officers on summary judgment. And because the defendant officers may be found liable for some or all of the federal and state law claims, § 2-109 of the TIA, which provides that a local public entity cannot be liable if its employees are not liable, 745 ILCS 10/2–109, does not immunize the City.

Finally, Defendants contend that part of the IWA claim is time-barred. Doc. 165 at 29-30; Doc. 175 at 14-15. The TIA's statute of limitations is one year from the time "the interest at issue is invaded." *Taylor v. Bd. of Educ. of Chi.*, 10 N.E.3d 383, 395 (Ill. App. 2014). Because Plaintiffs filed this suit on November 1, 2012, Defendants argue that they are entitled to summary judgment on the IWA claim insofar as it alleges conduct before November 1, 2011, including O'Grady's August 2010 denial of funds for the confidential informant and Rivera, Roti, and O'Grady's May 2011 decision not to accept Plaintiffs back into the Narcotics Division. Doc. 165 at 29-30. However, the IWA claim is subject to the continuing violation doctrine, which under Illinois law applies "where the tort involves continuous or repeated injurious behavior, by the same actor and of a similar nature," and under which "the plaintiff's cause of action does not accrue until the date the final injury occurs or the tortuous acts cease." *Taylor*, 10 N.E.3d at 395. Here, O'Grady's retaliation against Plaintiffs occurred both within (*e.g.*, his barring Spalding from Homan Square in July 2012) and outside the limitations period, and so Plaintiffs' IWA claim includes all of his retaliatory conduct. But because Plaintiffs suffered no retaliation by Rivera and Roti within the limitations period, the IWA claim may not rest on

Rivera's and Roti's conduct, as they were not "the same actor[s]" that caused Plaintiffs' injuries within the limitations period. *Ibid.*; *see also Mnyofu v. Bd. of Educ. of Rich Twp. High Sch. Dist. 227*, 2007 WL 1308523, at *15 (N.D. Ill. Apr. 27, 2007) (rejecting the plaintiff's "attempt[] to invoke the continuing violation rule by improperly lumping different acts by *different* actors at varying time periods").

## Conclusion

For the foregoing reasons, Defendants' summary judgment motion is denied on the First Amendment retaliation claim and the *Monell* claim. The motion is granted on the § 1983 conspiracy claim, except for the alleged conspiracies (1) among O'Grady, Roti, and Rivera, and (2) among Barnes, Cesario, and Salemme. The motion is granted on the IWA claim as to Roti and Rivera, but not as to the other defendants. The surviving claims will proceed to trial.

May 11, 2016

_____
United States District Judge